**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | |
| Plaintiffs, | Civil Action |
| v. | Lead Case No.: |
| GREG ABBOTT, et al., | 3:21-CV-00259-DCG-JES-JVB |
| Defendants. | |
| CECILIA GONZALES, AGUSTIN LOREDO, JANA LYNNE SANCHEZ, JERRY SHAFER, DEBBIE LYNN SOLIS, CHARLES JOHNSON JR., VINCENT SANDERS, ROGELIO NUÑEZ, MARCI MADLA, MERCEDES SALINAS, HEIDI CRUZ, SYLVIA BRUNI, AND GWENDOLYN COLLINS, | |
| Plaintiffs, | Consolidated Case No.: 1:21-CV-00965-DCG-JES-JVB |
| v. | |
| JANE NELSON, in her official capacity as Texas Secretary of State, and GREGORY WAYNE ABBOTT, in his official capacity as Governor of Texas, | |
| Defendants. | |

**SECOND SUPPLEMENTAL COMPLAINT**
**FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Cecilia Gonzales, Agustin Loredo, Jana Lynne Sanchez, Jerry Shafer, Debbie

Lynn Solis, Charles Johnson Jr., Vincent Sanders, Rogelio Nuñez, Marci Madla, Mercedes Salinas,

Heidi Cruz, Sylvia Bruni, and Gwendolyn Collins (collectively, the "Gonzales Plaintiffs") file this

Complaint for Declaratory and Injunctive Relief against Defendants Jane Nelson in her capacity

as Texas Secretary of State and Gregory Wayne Abbott in his capacity as Governor of the State of Texas, and allege as follows:

1.    In the early morning hours of August 23, 2025, the Texas Legislature passed House Bill 4 (HB 4), an unnecessary mid-decade revision of Texas' congressional districts that intentionally dismantles majority-minority districts from the prior plan, explicitly because of the racial composition of those districts. The predictable result is a map that eviscerates minority representation and hands Anglo voters control of an even larger share of Texas's congressional seats.

2.    The legislature took up redistricting only because Governor Abbott added it to a special session call based expressly on "constitutional concerns raised by the U.S. Department of Justice." Those "constitutional concerns" were laid out in a July 7 letter arguing that four congressional districts—CD 9, CD 18, CD 29, and CD 33—"constitute unconstitutional 'coalition districts'" because they contain too many voters from different minority groups. But although the Department of Justice's letter alleged that the four challenged districts were "racial gerrymanders," the Governor was quick to tell this Court that they were not: that "the Texas Legislature did not racially discriminate in drawing the [prior] congressional electoral districts—full stop." ECF No. 1116 at 1. Nonetheless, in a July 22 interview, Governor Abbott explained that he added redistricting to the special session because he "want[ed] to make sure that we have maps that don't impose coalition districts" now that the Fifth Circuit has held that such districts are not legally required by the Voting Rights Act.

3.    HB 4 does what Governor Abbott convened the legislature to do, and more. It eviscerates minorities' opportunity to elect their candidates of choice in four key areas of the state: Harris County, the Dallas–Fort Worth metropolitan area, Central Texas, and South Texas. The

result is that non-Anglo Texans now have an opportunity to elect their preferred candidates in far fewer districts than under the map previously enacted in 2021.

4.    HB 4's intentional targeting of majority-minority congressional districts based on the race of the voters who live within them is blatantly unlawful. The Fifth Circuit's decision in *Petteway v. Galveston County*, 111 F.4th 596, 604 (2024) (en banc), held only that Section 2 of the Voting Rights Act does not allow "two minority groups [to] combine forces *to pursue a vote dilution claim*." (Emphasis added.)

5.    Nowhere did the Fifth Circuit suggest, much less hold, that districts that happen to include a majority of voters from multiple racial or ethnic minority groups are unconstitutional and must be redrawn. The fundamental rule that a state may not "invidiously . . . minimiz[e] or cancel[] out the voting potential of racial or ethnic minorities" remains. *Abbott v. Perez*, 585 U.S. 579, 586 (2018) (first alteration in original). Texas's new map blatantly violates that rule.

6.    Moreover, in intentionally destroying majority-minority districts and replacing them with majority-Anglo districts, the legislature also engaged in unconstitutional racial gerrymandering, placing voters within and without particular districts on the predominant basis of their race in violation of the Fourteenth Amendment.

7.    Even a cursory look at the new districts in HB 4 confirms the obvious—that the legislature engaged in race-based districting by targeting both individual voters based on their race and particular districts based on their racial composition to dilute the vote of Black and Latino Texans.

8.    In Dallas County, for example, the legislature took CD 30, an already performing, 46 percent Black-eligible-voter district in the prior enacted plan, and added just enough additional Black voters to make the district 50.2 percent Black, as part of a set of changes that *reduced* by

one the number of districts in Dallas–Fort Worth in which Black voters have an opportunity to elect their candidates of choice.

9. In Harris County, the legislature packed Black voters who previously formed a plurality of—and were able to elect their candidates of choice in—*two* districts, CD 9 and CD 18, into a single district, new CD 18, that was also carefully drawn so that 50.5 percent of its eligible voters are Black.

10. In neither Dallas County nor Harris County is this careful sorting of voters explainable by partisan factors. Voters of all races in both counties vote overwhelmingly Democratic, so partisanship provides no explanation for the legislature's clear choice to pack Black voters into a bare-majority district in each county. Nor is the legislature's race-based districting justified by the Voting Rights Act, because Black voters were already electing their candidates of choice in existing districts that—Defendants have asserted *ad nauseam* in these proceedings—were drawn blind to race.

11. Similarly, in both Harris County and in Central Texas, HB 4 draws CD 9 and CD 35 as Potemkin majority-Latino districts that are carefully engineered to have a bare majority of Latino voting-eligible Texans while ensuring that those voters will never actually have the opportunity to elect their candidates of choice. New CD 9, in Harris County, is 50.3 percent Latino, while new CD 35, in and around Bexar County, is 51.6 percent Latino. In each case, the candidates consistently preferred by Latino voters would not have won *any* of the last 31 elections for statewide office in the district.

12. HB 4 also violates Section 2 of the Voting Rights Act by failing to draw at least six additional districts in which Latino voters have the ability to elect their candidates of choice: one in the Dallas–Fort Worth metro area, one in Harris County, two in and around Bexar County, and

two in the Rio Grande Valley. In each of these regions, politically cohesive communities of Latino voters could easily make up a majority of the voting-eligible population of additional reasonably compact districts in which they would have the opportunity to elect their candidates of choice. But instead, the legislature either scattered those voters across multiple districts or carefully crafted districts to ensure that, even where Latino voters might comprise a majority on paper, in practice their preferred candidates will be consistently defeated by Anglo Texans voting as a bloc for other candidates—a result that neither satisfies nor is required by Section 2 of the VRA.

13. Finally, and zooming out, HB 4 is a per se violation of the Equal Protection Clause. Even aside from the particular districts drawn, the entire enterprise of a mid-decade revision to Texas's existing, legislatively-enacted congressional districts is inherently unlawful, because it involves drawing districts that are malapportioned based on their current populations, and it unnecessarily takes account of racial information and partisan politics without any legitimate justification. While Supreme Court precedent tolerates aspects of those infirmities when they are essential to mandatory decennial redistricting or necessary to remedy violations of law found by courts, it has never upheld their weaponization as part of a voluntary mid-decade revision to legislatively enacted districts of the sort that Texas engaged in here.

14. Plaintiffs therefore seek an order (i) declaring that Texas's unnecessary mid-cycle revision to legislatively-enacted districts violates the Equal Protection Clause; (ii) declaring that HB 4 violates the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act because it, and multiple districts within it, were intentionally enacted to discriminate against non-Anglo Texans by destroying districts in which they make up a majority of voters; (iii) declaring that HB 4 violates the Fourteenth Amendment to the United States Constitution because racial considerations predominated without justification in drawing

the district lines of multiple districts in the map; (iv) declaring that HB 4 violates Section 2 of the Voting Rights Act because it fails to create additional compact districts in which members of a single minority group make up a majority of eligible voters; (v) enjoining Defendants from conducting future elections under HB 4; (vi) ordering the use of a congressional redistricting plan that remedies these violations of federal law; and (vii) providing such additional relief as is appropriate.

### JURISDICTION AND VENUE

15.    Plaintiffs bring this action under 42 U.S.C. § 1983, the Fourteenth and Fifteenth Amendments to the United States Constitution, and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

16.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States and involve the assertion of deprivation, under color of state law, of rights under federal law.

17.    This three-judge district court has jurisdiction over this action under 28 U.S.C. § 2284(a) because the action challenges the constitutionality of the apportionment of congressional districts.

18.    This Court has personal jurisdiction over Defendants, who reside in Texas and are sued in their official capacities, pursuant to Fed. R. Civ. P. 4(k)(1)(A).

19.    Venue is proper in this Court and this Division under 28 U.S.C. §§ 124(d)(1) and 1391(b) because a substantial part of the events that give rise to Plaintiffs' claims occurred in this judicial district.

20.    This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

21.    Plaintiff Cecilia Gonzales is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Arlington, in Tarrant County. Under House Bill 4, she resides in Texas's 25th congressional district ("CD 25"). Ms. Gonzales intends to vote in future congressional elections in CD 25, or in any other districts in which she is eligible to vote.

22.    Plaintiff Agustin Loredo is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under House Bill 4, he resides in Texas's 9th congressional district ("CD 9"). Mr. Loredo intends to vote in future congressional elections in CD 9 or in any other district in which he is eligible to vote.

23.    Plaintiff Jana Lynne Sanchez is a Latina citizen of the United States and of the State of Texas, and a registered voter eligible to vote in Fort Worth, in Tarrant County. Under House Bill 4, she is eligible to vote in Texas's 12th congressional district ("CD 12"). Ms. Sanchez intends to vote in future congressional elections in CD 12, or in any other district in which she is eligible to vote.

24.    Plaintiff Jerry Shafer is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under House Bill 4, he resides in CD 9. Mr. Shafer intends to vote in future congressional elections in CD 9 or in any other district in which he is eligible to vote.

25.    Plaintiff Debbie Lynn Solis is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Dallas, in Dallas County. Under House Bill 4, she resides in Texas's 33rd congressional district ("CD 33"). Ms. Solis intends to vote in future congressional elections in CD 33, or in any other district in which she is eligible to vote.

26.    Plaintiff Charles Johnson Jr. is a Black citizen of the United States and of the State of Texas, a registered voter, and a resident of Cedar Hill, in Dallas County. Under House Bill 4,

he resides in Texas's 30th congressional district ("CD 30"). Mr. Johnson intends to vote in future congressional elections in CD 30, or in any other district in which he is eligible to vote.

27.    Plaintiff Vincent Sanders is a Black citizen of the United States and of the State of Texas, a registered voter, and a resident of Houston, in Harris County. Under House Bill 4, he resides in Texas's 18th congressional district ("CD 18"). Mr. Sanders intends to vote in future congressional elections in CD 18, or in any other district in which he is eligible to vote.

28.    Plaintiff Rogelio Nuñez is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of San Benito, in Cameron County. Under House Bill 4, he resides in Texas's 34th congressional district ("CD 34"). Mr. Nuñez intends to vote in future congressional elections in CD 34, or in any other district in which he is eligible to vote.

29.    Plaintiff Marci Madla is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of San Antonio, in Bexar County. Under House Bill 4, she resides in Texas's 35th congressional district ("CD 35"). Ms. Madla intends to vote in future congressional elections in CD 35, or in any other district in which she is eligible to vote.

30.    Plaintiff Mercedes Salinas is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Corpus Christi, in Nueces County. Under House Bill 4, she resides in CD 34. Ms. Salinas intends to vote in future congressional elections in CD 34, or in any other district in which she is eligible to vote.

31.    Plaintiff Heidi Cruz is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Austin, in Travis County. Under House Bill 4, she resides in Texas's 27th Congressional District ("CD 27"). Ms. Cruz intends to vote in future congressional elections in CD 27, or in any other district in which she is eligible to vote.

32.     Plaintiff Sylvia Bruni is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Laredo, in Webb County. Under House Bill 4, she resides in Texas's 28th Congressional District ("CD 28"). Ms. Bruni intends to vote in future congressional elections in CD 28, or in any other district in which she is eligible to vote.

33.     Plaintiff Gwendolyn Collins is a Black citizen of the United States and of the State of Texas, a registered voter, and a resident of Richmond, in Fort Bend County. Under House Bill 4, she resides in Texas's 22nd Congressional District ("CD 22"). Ms. Collins intends to vote in future congressional elections in CD 22, or in any other district in which she is eligible to vote.

34.     Defendant Jane Nelson is sued in her official capacity as the Secretary of State of Texas. As Secretary of State, Ms. Nelson serves as Texas's Chief Election Officer. Tex. Elec. Code § 31.001(a). As "the chief election officer of the state," *id.*, Ms. Nelson is required to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's election laws, including by issuing directives and instructions to all state and local authorities having duties in the administration of these laws, *id.* § 31.003. Ms. Nelson is further empowered to remedy voting rights violations by ordering any official to correct conduct that "impedes the free exercise of a citizen's voting rights." *Id.* § 31.005(b). Ms. Nelson prescribes the form that individuals must complete for a place on a political party's general primary ballot, *see id.* §§ 141.031, 172.021–.024. And political parties who wish to hold a primary must deliver written notice to the Secretary of State noting their intent to hold a primary election, *id.* § 172.002, and the party chairs must certify to the Secretary of State the name of each candidate who has qualified for placement on the general primary election ballot, *id.* § 172.028. The Secretary of State also serves as the filing authority for independent candidates for federal office, including members of Congress. *See id.*

§ 142.005. Finally, the adopted redistricting plans are filed with the Secretary of State to ensure that elections are conducted in accordance with those plans.

35.    Defendant Gregory Wayne Abbott is sued in his official capacity as the Governor of the State of Texas. Governor Abbott has exclusive authority to call special sessions of the Texas Legislature and set the agenda for those special sessions. *See* Tex. Const. art. III, § 40; *id.* art. IV, § 8(a). Under Texas's election laws, Governor Abbott "shall order . . . each general election for . . . members of the United States Congress" by proclamation. Tex. Elec. Code § 3.003.

## LEGAL BACKGROUND

### A.  The Fourteenth & Fifteenth Amendments – Intentional Vote Dilution

36.    The Civil War Amendments to the U.S. Constitution "were designed to protect the civil rights" of racial minorities, and as such, "courts have been vigilant in scrutinizing schemes allegedly conceived or operated as purposeful devices to further racial discrimination." *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971).

37.    The Fourteenth Amendment "prohibits intentional vote dilution." *Abbott*, 585 U.S. at 586 (cleaned up). This occurs when a state "invidiously minimize[s] or cancel[s] out the voting potential of racial or ethnic minorities." *Id.* A racial minority's voting power is "particularly diluted when bloc voting occurs and ballots are cast along strict majority-minority lines." *Rogers v. Lodge*, 458 U.S. 613, 616 (1982).

38.    Allegations that electoral districts "unconstitutionally dilute the voting strength of racial minorities" are "subject to the standard of proof generally applicable to Equal Protection Clause cases." *Id.* at 617. This requires direct or circumstantial evidence "that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'" *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 38 (2024) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). In addition to direct evidence of legislative

purpose, courts consider five non-exhaustive factors in determining whether a particular decision was made with a discriminatory intent: (1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged action; (4) substantive and procedural departures from the normal-decision making process; and (5) contemporaneous viewpoints expressed by the decisionmakers. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

39.     To establish intentional discrimination, a plaintiff need only show that discriminatory purpose was "a" motivating factor in the legislation—not the only, or even the predominant factor. "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Id.* at 265.

**B.  The Fourteenth Amendment – Racial Gerrymandering**

40.     Just as a State may not "segregate citizens on the basis of race in its public parks, buses, golf courses, beaches, and schools," the Fourteenth Amendment prohibits it from "separat[ing] its citizens into different voting districts on the basis of race." *Miller*, 515 U.S. at 911 (cleaned up). This "idea is a simple one: 'At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not 'as simply components of a racial, religious, sexual or national class.'" *Id.* at 911. (citation omitted). Racial gerrymandering is "analytically distinct" from intentional vote dilution, but every bit as unlawful. *Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 312 (5th Cir. 2020) (quoting *Shaw v. Reno*, 509 U.S. 360, 652 (1993)).

41.     To succeed on a racial gerrymandering claim, a plaintiff must show "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to

legislative purpose" that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. "[A] plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.* If "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," then "the design of the district must withstand strict scrutiny." *Cooper v. Harris*, 581 U.S. 285, 291–92 (2017).

### C.  Section 2 of the Voting Rights Act

42.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 prohibits vote dilution.

43.     A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

44.     The dilution of voting strength "may be caused by the dispersal of [members of a racial or ethnic group] into districts in which they constitute an ineffective minority of voters or from the concentration of [members of that group] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

45. The United States Supreme Court, in *Thornburg v. Gingles*, identified three necessary preconditions ("the *Gingles* preconditions") for a vote dilution claim under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50–51.

46. Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors that courts should consider when determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

47. These Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; (7) the extent to which members of the minority group have been elected

to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the minority group; and (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

48.     The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* at 1566 ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim."); *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (similar).

### D.  Equal Protection and One Person, One Vote

49.     "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Perez v. Abbott*, 250 F. Supp. 3d 123, 185 (W.D. Tex. 2017) ("*Perez I*") (quoting *Gray v. Sanders*, 372 U.S. 368, 381 (1963)); *see also* 1 Records of the Federal Convention of 1787, p. 473 (M. Farrand ed. 1911) ("There can be no truer principle than this—that every individual of the community at large has an equal right to the protection of government.").

50.     As applied to congressional districts, the one-person-one-vote principle requires States to "draw congressional districts with populations as close to perfect equality as possible." *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016). This demands *"*a good-faith effort to achieve precise

mathematical equality." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969) (citing *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).

51.     To state a one-person-one-vote violation, a plaintiff must "prov[e] the existence of population differences that 'could practically be avoided.'" *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 760 (2012) (per curiam) (quoting *Karcher v. Daggett*, 462 U.S. 725, 734 (1983)). Once such a showing is made, the State has the burden to "'show with some specificity' that the population differences 'were necessary to achieve some legitimate state objective.'" *Id.* (quoting *Karcher*, 462 U.S. at 740–41).

52.     To "avoid constant redistricting," *LULAC v. Perry*, 548 U.S. 399, 421 (2006) (Kennedy, J.), the Supreme Court has held that when states redistrict immediately after a census, they then "operate under the legal fiction that even 10 years later, the plans are constitutionally apportioned" despite shifts in population, *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003). But a majority of the Supreme Court has never extended that legal fiction to authorize unnecessary mid-decade changes to legislatively enacted districts that fail to reflect intervening changes in population. *See LULAC*, 548 U.S. at 421 (upholding mid-decade revision of court-drawn plans over a malapportionment challenge in an opinion joined only by three justices).

53.     Extending the legal fiction of continuing equal population despite post-census changes to the very different circumstance of a new, voluntary mid-decade redistricting of an existing, legislatively enacted plan would turn the legal fiction's purpose on its head, such that it would enable, rather than avoid, constant redistricting. And it would invite legislatures to engage in entirely unnecessary racial and partisan discrimination by drawing new districts for partisan or race-based reasons when valid, legislatively enacted districts already exist.

54.    The legislature's voluntary decision to revise previously enacted districts also affects the legal analysis of the legislature's consideration of race and pursuit of partisan interests. In ordinary decennial redistricting, the Supreme Court has held that because legislators will "almost always be aware of racial demographics" in drawing districts, a heightened racial predominance standard applies before the use of race leads to strict scrutiny. *Miller*, 515 U.S. at 916. And the Supreme Court has held that complaints about partisan gerrymandering are nonjusticiable in that context, because prohibiting pursuit of "partisan interests" in redistricting might make it impossible for partisan legislatures to draw districts at all. *Rucho v. Common Cause*, 588 U.S. 684, 700–01 (2019). Absent a court order (and there is no such order here), mid-decade revision of previously enacted districts is entirely optional, so there can be no necessity justification for the legislature's use of race or for its pursuit of partisan advantage.

## FACTUAL ALLEGATIONS

### A.  Texas's History of Discrimination

55.    HB 4 is the latest iteration of centuries-long efforts by Texas officials to suppress non-Anglo political participation through race-discriminatory districts and other means.

56.    "Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682–83 (S.D. Tex. 2017) (quoting *LULAC*, 548 U.S. at 439–40); *see also Perez v. Abbott* ("*Perez II*"), 253 F. Supp. 3d 864, 888, 906 (W.D. Tex. 2017) (three-judge panel noting that "Texas's history of official discrimination touching on the right of Hispanics to register, vote, and otherwise to participate in the democratic process is well documented").

16

57.     Texas's history of voting discrimination is hardly a thing of the past.

58.     A 2018 study by the U.S. Commission on Civil Rights found that Texas had "the highest number of recent [Voting Rights Act] violations in the nation." U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States* 74 (2018).

59.     In 2016, the U.S. Court of Appeals for the Fifth Circuit, sitting en banc, concluded that there was evidence that Texas's 2011 law requiring photo identification for voters was motivated by a discriminatory purpose. *See Veasey v. Abbott*, 830 F.3d 216, 225, 234–43 (5th Cir. 2016) (en banc). The Fifth Circuit further "conclude[d] that the district court did not clearly err in determining that [the photo identification law] ha[d] a discriminatory effect on minorities' voting rights in violation of Section 2 of the Voting Rights Act." *Id.* at 265.

60.     Texas also uses the enormous power of its criminal justice system to suppress minority political participation. Since Attorney General Ken Paxton took office in 2015, at least 72 percent of the prosecutions brought by his Election Integrity Unit have been against Black and Latino individuals—who make up just over 50 percent of the State's population.

61.     Because the rules governing voter registration and ballot casting can be confusing, the threat of criminal prosecution for violating such rules significantly deters eligible voters from participating in the political process. The severe racial and ethnic disparities in Texas's election-related prosecutions thus intimidate minority voters against participating in the State's elections.

62.     In 2019, former Acting Secretary of State David Whitley issued an advisory decision to county registrars claiming to have a list of 95,000 noncitizens who were unlawfully registered to vote. The list was rife with errors, particularly because it failed to account for noncitizens who had since become naturalized. A federal judge called Secretary Whitley's actions in this incident "ham-handed and threatening" and lamented that these actions stoked "fear and

anxiety" among the State's minority population and "intimidate[d] the least powerful among us." *Tex. League of United Latin Am. Citizens v. Whitley*, No. CV SA-19-CA-74-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019).

63.     In 2021, the Texas Legislature re-doubled its efforts to make it more difficult for Black and Latino Texans to vote, enacting an omnibus voter suppression bill that burdens voters, restricts access to the franchise, and targets the very measures that communities of color disproportionately relied on to increase voter turnout in 2020 and other recent elections. *See generally* SB 1, 87th Leg., 2d Called Sess. (Tex. 2021). Disturbingly, SB 1 even empowered partisan poll watchers to employ voter intimidation tactics by granting them increased freedom in the polling place while limiting the oversight powers of election workers.

64.     Texas's ongoing pattern of discrimination is readily apparent in the redistricting process. In every redistricting cycle between 1970 and 2020, a federal court has ruled at least once that the State violated the Voting Rights Act or the U.S. Constitution during the redistricting process. *See, e.g.*, *Texas v. United States*, 887 F. Supp. 2d 133, 159–62, 163–66, 177–78 (D.D.C. 2012), *vacated and remanded on other grounds*, 570 U.S. 928 (2013); *Perez II*, 253 F. Supp. 3d at 945–62; *see also LULAC v. Abbott*, 601 F. Supp. 3d 147, 170 (W.D. Tex. 2022) ("In every decade since the statute was passed in 1965, federal courts have held that Texas violated the VRA."). In fact, in the redistricting cycle that followed the 2010 census, Texas was the only State whose maps failed to achieve preclearance under the Voting Rights Act. [1]

---

[1] Although the D.C. District Court's 2012 decision was vacated in light of *Shelby County v. Holder*, 570 U.S. 529 (2013), "that does not undo the historical significance of that three-judge decision" and "the en banc Fifth Circuit has pointed to the case as demonstrating a 'contemporary example of State-sponsored discrimination.'" *LULAC*, 601 F. Supp. 3d at 170 (quoting *Veasey*, 830 F.3d at 239).

65.     This is also not the first time that Texas has diluted minority votes through unnecessary mid-decade redistricting—although it is the first time the legislature has undertaken a mid-decade revision of a legislatively enacted plan.

66.     In 2003, after taking control of the Texas House of Representatives, Texas Republicans initiated a similar round of mid-decade redistricting to revise the existing, court-drawn plan. *See LULAC*, 548 U.S. at 412–13. When that map was challenged, the Supreme Court found that Texas violated Section 2 by redrawing District 23 to dilute Latino voting power. *Id.* at 442. In so doing, the Court observed that "the State took away the Latinos' opportunity because Latinos were about to exercise it." *Id.* at 440. This, the Court said, "bears the mark of intentional discrimination that could give rise to an equal protection violation." *Id.*

67.     During the 2010 redistricting cycle, federal courts found that Texas had intentionally diluted Black and Latino voting strength in crafting new congressional and state legislative maps. *See Perez II*, 253 F. Supp. 3d at 949–62; *Perez I*, 250 F. Supp. 3d at 145–80; *Texas*, 887 F. Supp. 2d at 159–66, 177–78. A three-judge court "found that the Texas Legislature intentionally discriminated in 2011 in numerous and significant ways," and the Supreme Court "never addressed or in any way called into question [that court's] findings as to the Legislature's discriminatory purpose in enacting the 2011 plans." *Perez v. Abbott*, 390 F. Supp. 3d 803, 811–12 (W.D. Tex. 2019).

68.     These findings include some of the same districts challenged here. A three-judge court in the District of Columbia denied preclearance of changes made to CD 9 and CD 18 following the 2010 census because it found "based on the totality of the evidence that the plan was enacted with discriminatory intent." *Texas*, 887 F. Supp. 2d at 161. And CD 33 was itself created

to remedy a finding of discriminatory intent by a different three-judge district court. *See Perez v. Abbott*, 274 F. Supp. 3d 624, 653–54 (W.D. Tex. 2017).

### B. The 2020 Census

69.     On April 26, 2021, the U.S. Census Bureau announced that, based on the 2020 decennial census, Texas would gain two additional seats in the United States House of Representatives. On August 12, the Census Bureau then released the detailed population and demographic data needed to draw new congressional districts. The Census Bureau's data revealed that Texas's population grew by nearly four million people between 2010 and 2020.

70.     Texas's growth came overwhelmingly from communities of color. Texas's Anglo population grew by just 187,252 between 2010 and 2020. In contrast, Texas's Latino population grew by 1,980,796; Texas's Asian population grew by 613,092; and Texas's Black population grew by 557,887. The number of Texans identifying as members of multiple races also grew significantly.

71.     In all, non-Anglo Texans accounted for 95 percent of Texas' population growth from 2010 to 2020, and Latinos accounted for more than half of that growth. Latino Texans made up just under 40 percent of Texas's population according to the 2020 census—only half a percentage point less than Anglo Texans. Had it not been for the growth in its communities of color, Texas likely would have lost congressional seats instead of gaining them.

72.     Communities of color also grew significantly in their share of Texas's voting-age population. More than 36 percent of voting-age Texans are now Latino—an increase of almost three percentage points since 2010. More than 12 percent of voting-age Texans are now Black and more than 5 percent are Asian. Only 43 percent of Texas's voting age population is now Anglo— a decrease of more than 6 percentage points since 2010.

73.     The 2020 census did not collect citizenship information. Based on the Census Bureau's 2015–2019 American Community Survey ("ACS"), Texas's citizen voting age population was 29.9 percent Latino, 13.1 percent Black, 3.7 percent Asian, and 51.6 percent Anglo. Based on the 2016–2020 ACS, Texas's citizen voting age population was 30.5 percent Latino, 13 percent Black, 3.8 percent Asian, and 50.8 percent Anglo.

### C. Population growth after the 2020 census

74.     The 2020 Census placed Texas's population at 29.1 million. By 2023, Texas's population grew about 4.7 percent, to 30.5 million. As of December 2024, Texas's population increased to over 31 million, marking the second consecutive year in which Texas's population grew more than any other state in the country.

75.     Texas's growth in population has, however, been far from uniform. Most of Texas's population growth has occurred in the areas surrounding the central counties—most concentrated in the triangle formed by the four largest Metropolitan Statistical Areas: Dallas–Fort Worth, Austin, San Antonio, and Houston.

76.     As of 2023, eight counties had their populations increase between 15.1 percent and 23.6 percent since the 2020 census, while more than one-third of Texas counties experienced a *decline* in population in that time.

77.     Texas's population growth since 2020 also has not been uniform across racial groups. Texas's Anglo population has continued to shrink as a portion of Texas's overall population. Based on the 2019–2023 ACS—the most recent available data—Texas's citizen voting age population was 49.1 percent Anglo, 31.3 percent Latino, 13.7 percent Black, and 4.2 percent Asian.

**D.  The 2021 Redistricting Process**

78.      Senate Bill 6—the congressional plan enacted by the Texas Legislature in 2021—resulted from a truncated legislative process during which the Texas Legislature failed to meaningfully engage with voters and abdicated its map-drawing responsibility to outside interests. But even this cursory process offered more meaningful opportunities for public input and debate than did the rushed process that resulted in House Bill 4.

79.      On September 7, 2021, Governor Abbott announced a third special session of the Texas Legislature, commencing on September 20, for the purpose of redrawing legislative and congressional districts in accordance with the results of the 2020 census. One week later, on September 27, Senator Joan Huffman released congressional Plan C2101—the first proposed congressional district map, which later became Senate Bill 6, and scheduled a public hearing on it three days later.

80.      During a September 30 hearing of the Special Committee on Redistricting on SB 6, Senator Huffman admitted that Plan C2101, the base map for SB 6, was drawn not by any Texas legislator or their staff but by the Texas Republican congressional delegation's lawyer. Senator Huffman said on the floor that after she received the plan, she made "some changes," and those changes were incorporated into Plan C2101 before she introduced it as SB 6. Senator Huffman repeatedly insisted in remarks to the Senate that Plan C2101 was drawn "blind to race."

81.      It was later revealed that Plan C2101 was drawn by Adam Kincaid, the President of the National Republican Redistricting Trust, in consultation with Chris Gober, an attorney for Texas's Republican congressional delegation. Like Senator Huffman, Kincaid later testified that the map was drawn without the use of any racial data, and that it was drawn to maximize partisan advantage for Republicans.

82.     After a conference committee was appointed to reconcile amendments made by the House, the final version of SB 6—known as Plan C2193—passed both houses of the legislature with minor amendments on October 18, 2021.

83.     Governor Abbott signed Senate Bill 6 on October 25, 2021.

**E. Litigating the 2021 Map**

84.     Immediately after SB 6 was signed into law, the Gonzales Plaintiffs sued to enjoin SB 6, alleging that it violated Section 2 of the Voting Rights Act.

85.     The Gonzales Plaintiffs alleged—among other claims—that SB 6 improperly cracked and packed Latino voters in the Dallas–Fort Worth and Houston metropolitan areas, to avoid creating an additional district in each metropolitan area in which a majority of eligible voters are Latino and have the opportunity to elect their representatives of choice.

86.     Several other groups of private plaintiffs as well as the United States also sued, alleging violations of Section 2 as well as the Fourteenth and Fifteenth Amendments. In March 2025, following the change in presidential administration, the United States dismissed its claims and withdrew from the case.

87.     In May and June 2025—nearly four years after SB 6 was enacted—this Court held a consolidated 16-day bench trial on all outstanding claims.

88.     Texas's principal defense to the intentional discrimination claims brought by various plaintiff groups was that the congressional districts were drawn "blind to race." The parties presented video of Senator Huffman's repeated statements on the Senate floor that the maps were drawn race blind. And Senator Huffman repeatedly reiterated that assertion in sworn testimony during trial.

89.     Adam Kincaid, the primary map-drawer for the congressional plan, similarly testified repeatedly that in preparing what became SB 6, "we were not drawing based off of race." Tr. Day 7 PM at 38:9 (Kincaid); *see also, e.g.*, *id.* at 39:19–20 ("Operating under [the direction of the attorney for the Texas Republican Congressional delegation], I did not use race data when drawing the maps."); 27:13–25 (Kincaid testifying he "would not have used race data when making . . . changes" to the map); *id.* at 28:6–10 (Kincaid testifying he "did not" use mapping software to "shade census geography by race."); *id.* at 75:3–4 ("If you're asking if I ever looked at a racial map on my computer shaded by race, I did not."). And he testified unequivocally that his objectives were political, not racial. In Dallas–Fort Worth, he sought "to create three heavily Democratic districts and then try to shore up the other Republicans around it," and to "[p]rotect[] the many incumbent Republicans that lived in and around DFW." *Id.* at 118:14–20, 119:3–6. Similarly, in Harris County, he sought to "create four heavily Democratic districts . . . and then create a new Republican-leaning district" that served "Republican voters in western Harris County." *Id.* at 126:23–127:7, 127:17–23. Texas's own expert, Dr. Sean Trende, characterized the congressional plan as a "political gerrymander plain as punch," Tr. Day 14 AM at 94:8–10, "drawn to substantially improve the political advantage of the Republican Party," Def. Ex. 8 at 9.

90.     Dr. Trende also explained that drawing some heavily Democratic districts is a feature of such a gerrymander, not a bug, because it "free[s] up Republicans to put into these districts they're trying to save." Tr. Day 14 AM at 100:2–7. For example, Dr. Trende testified that CD 32, which had been trending Democratic, was specifically drawn as a "heavily Democratic district" to absorb Democratic voters from neighboring districts, thus "freeing up Republicans to put into these districts they're trying to save." *Id.* Similarly, Dr. Trende testified that CD 33 was altered by SB 6 from its previous form to "pick up . . . heavily blue precincts" to act as a vote sink

for Democratic votes. *Id.* at 103:1–20. He explained that, in Dallas–Fort Worth, "30, 32, and 33 are kind of solidly Democratic districts, or the districts that the Republicans wanted to make solidly Democratic" and as a result, "there are not very many red precincts left in Districts 30, 32, or 33." *Id.* at 109:1–3, 19–20. In support of his conclusion that these configurations were motivated by partisanship, rather than race, Dr. Trende observed that many plurality-Anglo, Democratic-leaning precincts were included in CD 30 and 32. *Id.* at 114:3–12.

### F.  2025 Redistricting

91.    On June 9, 2025, in the midst of the trial challenging the 2021 map, the *New York Times* reported that President Trump was pressuring Texas Republicans to re-draw Texas's congressional map to more heavily favor Republicans.[2] Senator Huffman was asked about this reporting during cross examination, and she testified that the Texas Legislature was not considering redrawing the congressional districts.

92.    Other Republicans, both in Congress and in the Texas legislature, expressed reservations about further partisan gerrymandering, believing that it would endanger incumbent Republican members of Congress. The June 9 *Times* article reported that the "push from Washington has unnerved some Texas Republicans, who worry that reworking the boundaries of Texas House seats to turn Democratic districts red by adding reliably Republican voters from neighboring Republican districts could backfire in an election that is already expected to favor Democrats." Indeed, public reports indicate that a majority of Texas's Republican congressional delegation opposed mid-decade redistricting for this reason.

---

[2] J. David Goodman & Shane Goldmacher, *White House Pushes Texas to Redistrict, Hoping to Blunt Democratic Gains*, N.Y. Times (June 9, 2025), https://www.nytimes.com/2025/06/09/us/politics/trump-texas-redistricting.html

93.     About a month later, on July 7, 2025, Harmeet Dhillon, the Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice, wrote to Governor Abbott and Attorney General Paxton purporting to raise "serious concerns regarding the legality of four of Texas's congressional districts." Dhillon asserted that "Congressional Districts TX-09, TX-18, TX-29, and TX-33 currently constitute unconstitutional 'coalition districts'" and "urge[d] the State of Texas to rectify these race-based considerations from these specific districts." ECF No. 1114-2.

94.     In support of this argument, Dhillon cited the Fifth Circuit's 2024 en banc decision in *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024), holding that Section 2 of the Voting Rights Act does not allow "two minority groups [to] combine forces to pursue a vote dilution claim." *Id.* at 604. *Petteway* therefore held that so-called "coalition claims"—claims under Section 2 of the Voting Rights Act seeking the creation of a majority-minority district in which multiple minority groups combine to make up a majority of voters—are not legally cognizable. *Id.* *Petteway* did not, however, hold that such districts may not lawfully be drawn by the state. *See id.*

95.     Each of the districts targeted by the Dhillon Letter was a majority-minority district under SB 6. CD 9 was a diverse, majority Black and Latino district. According to the most recent available ACS data, its Citizen Voting Age Population (CVAP) was 25.6 percent Latino, 45 percent Black, 9.3 percent Asian, and only 18.1 percent Anglo. It is currently represented by Black Congressman Al Green. CD 18 under SB 6 was also a majority Black and Latino district, whose CVAP was 30.4 percent Latino, 38.8 percent Black, 23.4 percent Anglo, and 5.3 percent Asian. It was formerly represented by longtime Black Congresswoman Sheila Jackson Lee and, following the passing of both Congresswoman Lee and her successor, is currently vacant. CD 29 was a majority-Latino district with 63.5 percent Latino CVAP, 18.4 percent Black CVAP, and 13.7 percent Anglo CVAP. It is currently represented by Latina Congresswoman Sylvia Garcia. CD 33,

represented by Black Congressman Marc Veasey, was a diverse district whose voting-eligible population was majority Black and Latino. Its CVAP was 43.6 percent Latino, 25.2 percent Black, and 23.4 percent Anglo.

96.    The core allegation of the Dhillon letter is that race "predominated" in the drawing of these four districts. The Letter explains:

> It is the position of this Department that several Texas Congressional Districts constitute unconstitutional racial gerrymanders, under the logic and reasoning of *Petteway*. Specifically, the record indicates that TX-09 and TX-18 sort Houston voters along strict racial lines to create two coalition seats, while creating TX-29, a majority Hispanic district. Additionally, TX-33 is another racially-based coalition district that resulted from a federal court order years ago, yet the Texas Legislature drew TX-33 on the same lines in the 2021 redistricting. Therefore, TX-33 remains as a coalition district.

ECF No. 1114-2, at 2. Racial gerrymandering, as the Dhillon Letter uses the term, occurs only where "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without" certain congressional districts. *Miller*, 515 U.S. at 916.

97.    The Department of Justice's assertion that race predominated in the drawing of the four targeted districts flatly contradicts the "blind to race" defense put forward by Governor Abbott in defending SB 6 at trial. Both Senator Huffman and Adam Kincaid testified unequivocally and repeatedly that Plan C2193 was drawn "race blind" and without using any racial data. Defendants relied on that testimony in disputing other plaintiffs' intentional discrimination claims. *See, e.g.*, ECF No. 1123 at 9–10. This defense is irreconcilable with the Dhillon Letter's factually unsupported assertion that race predominated in the drawing of SB 6.

98.    Attorney General Paxton and Governor Abbott agree that DOJ was wrong to argue that any district in SB 6, including those discussed in the Dhillon Letter, were racial gerrymanders. In a July 11 letter responding to Assistant Attorney General Dhillon's letter, Attorney General Paxton explained that "[t]he evidence at [this] trial was clear and unequivocal: **the Texas**

27

**legislature did not pass race-based electoral districts for any of those three political maps**." ECF No. 1116-1, at 2 (emphasis in original). In a subsequent filing in this Court, the Governor reiterated that the 2021 Plan was drawn "blind to race." ECF No. 1116 at 3. He argued that DOJ "has no basis" for its contrary contention, "nor does it cite one." *Id.* at 7.

99.     On July 9, 2025, Governor Abbott nevertheless called a special session of the Texas Legislature to consider, among several other items, "Legislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice." ECF No. 1114-1 at 3.

100.     In explaining why he added redistricting to the special session, however, Governor Abbott did not join Assistant Attorney General Dhillon in attacking the prior districts—which he had defended for years in this Court—as unconstitutional. Instead, Governor Abbott said simply that he *wanted* to eliminate majority-minority coalition districts, and now he could: after *Petteway*, "coalition districts are no longer required and *so we want to make sure that we have maps that don't impose coalition districts*." (Emphasis added.)[3]

101.     By doing so, Governor Abbott made clear that he was adding redistricting to the special session specifically for the purpose of asking the legislature to eliminate existing majority-minority districts that he now believed were no longer legally required.

102.     Governor Abbott said nothing in the July 22 interview to suggest that partisan motivations were his reason for adding redistricting to the special session.

---

[3] FOX 4 Dallas–Fort Worth, *Abbott on THC, redistricting, and the special session*, at 3:32–3:40 (July 22, 2025), https://www.youtube.com/watch?v=PHsYs0NTPTY.

103.    Before the Dhillon Letter raised a race-based justification for redistricting, on information and belief, Governor Abbott made no public statements in support of mid-decade changes to Texas's congressional districts.

104.    Governor Abbott's reasons for adding congressional redistricting to the call of the special session are integral to the legislative process that produced HB 4. Under the Texas Constitution, Governor Abbott has exclusive authority to call a special session of the legislature and to designate the topics that may be addressed at a special session. Tex. Const. art. IV, § 8. Thus, if Governor Abbott had not added congressional redistricting to the special session for the express purpose of eliminating majority-minority districts, then the legislature could never have enacted HB 4 to effectuate that purpose.

105.    The special session convened by Governor Abbott commenced on July 21, 2025.

106.    During the special session, and before any map was even introduced, the legislature held a series of four "field hearings" to take testimony from Texans regarding redrawn congressional maps. Thousands of Texans registered to testify. Of the 419 who were permitted to speak, 401 testified against mid-decade redistricting and only 14 testified in favor of the effort.

107.    At the second hearing on July 26, 2025, Chair Cody Vasut acknowledged that he voted for the 2021 map targeted by DOJ's letter, and that he still believed it was compliant with federal law. When asked by Representative Gene Wu whether Vasut could confirm that Governor Abbott called for a special session for the purpose of dismantling coalition districts, Chair Vasut refused to say one way or another, remarking only that he could not "speculate" about the Governor's intent.

108.    At the third House hearing on July 28, 2025, Jeff Archer of the Texas Legislative Council acknowledged that he receives updated data from the American Community Survey

annually, and that American Community Survey data includes population estimates of geographic areas in Texas. Nevertheless, Archer confirmed that any new map would apportion districts based only on five-year-old data from the 2020 Census.

109.    The fourth and final pre-map hearing took place in the Senate on July 29, 2025. Chair Phil King admitted that an outside contractor—not the legislature—was drawing the new map and that Senator King had not seen the map and was not attempting to draw one himself. When asked by Senator Carol Alvarado how Senator King would decide whether to file a new map in the Senate, Senator King replied that he would file it as long as he was told it was given a "solid legal scrub," and that he would not study the map in detail.

110.    On July 30, 2025, after field hearings had been completed, Representative Todd Hunter introduced Plan C2308 as House Bill 4. This was the first time that any proposed map was presented to the public.

111.    The House held a single public hearing on Plan C2308—on August 1, 2025, just three days after it was unveiled to the public. At that hearing, Representative Hunter confirmed his understanding that the Voting Rights Act "no longer requires the drawing of coalition districts."

112.    Representative Hunter also explained that the private law firm Butler Snow, not any legislator or legislative staff, created the map, and that it was Butler Snow that advised Hunter about the map's compliance with federal law. According to Hunter, Butler Snow was told to use "partisan performance" as well as "the *Petteway* case," and then "see what map can be developed."

113.    Representative Hunter thus confirmed, as Governor Abbott said, that the intent of this map was to eliminate majority-minority districts based on a purported application of the *Petteway* decision.

114.    Representative Hunter could not confirm what population data was used to create the map when asked, but he did say that population changes and voter trends were considered.

115.    When Representative Senfronia Thompson inquired whether there was any legal basis for the decrease in Black CVAP in CD 9 as compared to the 2021 enacted maps, Representative Hunter had none to offer, saying only that "counsel provided it."

116.    Also discussed at the August 1 hearing were the significant effects the new map would have on districts like CD 30 and CD 18, such as the removal of significant "economic engines." As Congresswoman Jasmine Crockett explained at the hearing, those economic engines were critical because they enabled Black communities to have "buy in" and receive legislative attention.

117.    Congresswoman Crockett testified that Plan C2308 removed significant economic engines from her district like, for example, the Dallas Love Field Airport and Downtown Dallas businesses such as AT&T and Goldman Sachs. As for CD 18—the district formerly represented by Shelia Jackson Lee—Plan C2308 removed George Bush Intercontinental Airport from its boundaries.

118.    Neither Hunter nor any other legislator at the August 1 hearing suggested that the new map was drawn blind to race.

119.    Alarmed by Plan C2308's attack on minority representation in Texas, on Sunday August 3, more than 50 Texas legislators left the state to deprive the Texas House of Representatives of the quorum needed to bring HB 4 to a vote in the House.

120.    Quorum breaking as a legislative tactic is nothing new in Texas. Democrats in the legislature have done it twice in recent decades: once in 2021 to delay passage of Senate Bill 1, a

draconian statute that added significant barriers to voting, and once in 2003—the last time Texas engaged in mid-decade redistricting.

121.    What *was* unprecedented, however, was the Governor's and Attorney General's response. Warrants were issued for the arrest of the lawmakers and the Texas Department of Public Safety was ordered to track them down. U.S. Senator John Cornyn also requested the assistance of the Federal Bureau of Investigation to locate the quorum breakers. And Governor Abbott and Attorney General Paxton filed competing lawsuits to have the lawmakers removed from their elected offices.

122.    On August 6, Assistant Attorney General Dhillon gave an interview explaining that her letter, which demanded Texas "fix" its coalition districts, "was what triggered the Texas Legislature and the Texas Governor to call the legislature to session to put new maps together." The mid-decade redistricting, Dhillon asserted, was an "existential threat to the seats that have been gerrymandered for minority congressional candidates who get in there and keep them for years."

123.    Meanwhile, the Senate introduced Plan C2308 as Senate Bill 4. The Senate Special Committee on Redistricting held a single public hearing on the bill on August 7. The committee heard testimony from 42 Texans, 39 of whom testified in opposition to Senate Bill 4.

124.    Senator Phil King, the Chair of the committee, claimed during the hearing that Plan C2308 was drawn "race blind," while at the same time denying having any input in the map drawing. He instead indicated that the map was drawn by the National Republican Redistricting Trust.

125.    That same day, the Senate Special Committee on Redistricting voted 6–1 to pass SB 4, sending it to the full Senate floor.

126.    The Senate voted to pass SB 4 on August 12, in a party line 19–2 vote, with 9 of the Senate's 11 Democrats walking out in protest.

127.    The first special session was adjourned sine die on August 15, 2025, with no new map enacted. That same day Governor Abbott called, and the legislature gaveled in, a second special session. With only 97 of the required 100 members present, the House still lacked a quorum and was immediately adjourned.

128.    During the second special session, Plan C2308 was re-introduced in the Senate redistricting committee as Senate Bill 4. Representative Hunter then introduced a slightly modified version of that Plan—Plan C2331—as House Bill 4. Plan C2331 was identical to Plan C2308, except that slight changes were made to the border between CD 23 and CD 16 to unite Fort Bliss with the rest of El Paso in CD 16.

129.    The Senate Special Committee on Redistricting held a hearing on SB 4 on Sunday, August 17. Forty-two Texans testified in opposition to SB 4 at this hearing, and only one testified in support.

130.    The same day, the Senate committee voted 6–3 along party lines to advance SB 4.

131.    The House reestablished quorum on August 18, 2025, at which point HB 4 was referred to the House Select Committee on Redistricting. At a committee meeting later that day, Plan C2331 was substituted with a new plan, Plan C2333. Plan C2333 was reported favorably out of committee as the new House Bill 4.

132.    Plan C2333—now identified as HB 4—is identical to Plan 2331 except in Harris County, where it made changes to several majority-minority districts, along with a minor change to the boundary between CD 6 and CD 17 in the rural counties south of Dallas–Fort Worth. The principal changes were made to CD 9, which under both plans is a bare majority-Latino district

that, notwithstanding that slight numerical advantage, nonetheless does not allow Latino voters to elect their candidates of choice. Plan C2333, however, added the entirety of Liberty County—a majority-Anglo, rural county—to CD 9, further shoring up the voting strength of Anglo voters in the district at the expense of Latino voters. Tellingly, however, Plan C2333 maintains CD 9 as a bare majority-Latino district. These changes to CD 9 also necessitated changes to CD 18, but CD 18 is drawn as a bare majority-Black district in both plans.

133.    Plan C2333's revisions to Plan C2331 thus maintained the racial composition of both CD 9 and CD 18 with laser-like precision. The Latino CVAP of CD 9 changed by only two-tenths of a percentage point, while the Black CVAP of CD 18 changed by only three-tenths of a percentage point—keeping both districts barely above the majority-minority threshold achieved in Plan C2331.

134.    On August 20, after nine hours of debate, the House voted 88–52 to pass Plan C2333 as HB 4. In a press release hailing the bill's passage, Speaker of the House Dustin Burrows said: "The Texas House today delivered legislation to redistrict certain congressional districts to address concerns raised by the Department of Justice . . . ."

135.    The Senate Redistricting Committee took up HB 4 the following morning, August 21, and immediately voted it to the Senate Floor. The full Senate passed HB 4 just after midnight on August 23. Governor Abbott promised to sign the bill quickly.

## G. The 2025 Map – House Bill 4

### 1. Overview

136.    The new congressional map enacted by HB 4 intentionally obliterates existing majority-minority districts in which Black and Latino Texans were able to elect their candidates of choice, while leaving existing majority-Anglo districts largely intact. In other words, it accomplishes exactly what the Dhillon Letter and Governor Abbott asked for.

137.    Overall, despite measurable increases in Texas's non-Anglo population since the 2020 census—and a corresponding decline in the share of the population that is Anglo—HB 4 *increases* the share of Anglo representation in Texas's congressional districts.

138.    Whereas under SB 6, 22 of Texas's 38 congressional districts had a majority Anglo voting-eligible population, under HB 4, 24 districts have a majority Anglo voting-eligible population.

139.    That means Anglo voters now form a majority of eligible voters in 63 percent of Texas's congressional districts, despite comprising only 49.1 percent of the state's citizen voting age population. And that number understates matters significantly, because the legislature carefully crafted several additional districts to have a bare majority of non-Anglo voters who will not, in practice, have any reasonable opportunity to elect their candidates of choice.

140.    Consistent with the Dhillon Letter's explicit targeting of majority-minority districts, HB 4 made the most substantial alterations, by far, to districts in which a majority of voters were not Anglo under the prior map.

141.    The table below indicates, for each existing district under SB 6, what percentage of the population of that district was retained under HB 4. It is sorted from lowest percentage retained to highest. The shaded rows were majority-minority CVAP districts under SB 6 according to 2019-2023 ACS data.

| District | Percent of Population Retained | Percent Non-Anglo under 2021 Map |
|---|---|---|
| 9 | 2.9 | 81.9 |
| 35 | 9.5 | 64.3 |
| 18 | 25.8 | 76.6 |
| 33 | 32.7 | 76.6 |
| 29 | 37.2 | 86.3 |
| 27 | 39.8 | 55.9 |
| 15 | 40.6 | 78.2 |
| 32 | 41.2 | 56.1 |
| 17 | 53.1 | 38.1 |
| 28 | 53.6 | 76.2 |
| 10 | 55.8 | 35.3 |
| 36 | 59.3 | 40.9 |
| 20 | 60.5 | 78.5 |
| 25 | 61.1 | 33.3 |
| 34 | 61.6 | 88.3 |
| 6 | 63.1 | 43.2 |
| 8 | 65.8 | 44.1 |
| 22 | 65.9 | 50.8 |
| 37 | 67.8 | 39.3 |
| 30 | 68.7 | 76 |
| 4 | 69.3 | 29.9 |
| 21 | 69.9 | 34.5 |
| 31 | 72.8 | 33.5 |
| 11 | 73.8 | 48.7 |
| 7 | 74.6 | 63.4 |
| 14 | 75.4 | 40.1 |
| 3 | 75.9 | 35.2 |
| 5 | 76.1 | 41.5 |
| 2 | 79.8 | 41.2 |
| 23 | 81.2 | 65.9 |
| 12 | 81.8 | 35.7 |
| 38 | 82.1 | 41.8 |
| 1 | 84.8 | 31.8 |
| 24 | 86.5 | 29.7 |
| 26 | 93.1 | 33.7 |
| 16 | 96.1 | 85.3 |
| 13 | 98.4 | 32.7 |
| 19 | 100 | 42.4 |

142. As the table above demonstrates, each of the eight districts where less than half the population was retained by HB 4—meaning more than half the population was moved—was a majority-minority district under SB 6. That includes the four districts specifically targeted by the Dhillon Letter: CD 9, CD 18, CD 29, and CD 33.

143. The eight most-altered districts also include CD 15 and CD 27—two majority-minority districts that are represented by Republican incumbents. Meanwhile, CD 37—the only majority-Anglo district that has historically elected a Democrat—remains far more intact, with less than a third of its population shifted.

144. Consistent with the Dhillon Letter and Governor Abbott's statements, this shows that race—not partisanship—was the reason that districts were targeted for substantial revision in HB 4.

145. As shown, existing CD 9, CD 18, CD 33, and CD 35—all districts in which Black and Latino voters together form a majority of eligible voters—were effectively obliterated. CD 29—once a majority Latino CVAP district—is also virtually unrecognizable.

146. HB 4 also affects far more minority incumbents than Anglo incumbents—from both political parties.

147. For example, in Harris County, according to Texas Legislative Council data, HB 4 pairs Wesley Hunt, the only Black Republican member of the Texas congressional delegation, with Congressman Al Green, a Black Democrat, in new CD 18, a majority-Black district. Congressman Hunt currently represents CD 38, which under the prior map was a 58 percent Anglo district, making the legislature's choice to place him in a majority-Black district particularly striking.

148.    In contrast, while the original Plan C2308 drew Congresswoman Lizzie Fletcher, an Anglo Democrat, out of her district, she was drawn back in when the plan was revised to C2333. No such fix was made for Congressman Hunt, or any other minority member of Congress.

149.    In the Rio Grande Valley, HB 4 pairs Latino Democratic Congressman Vicente Gonzalez—who currently represents CD 34—in CD 15 with Latina Republican Congresswoman Monica De La Cruz.

150.    In San Antonio, HB 4 draws Latino Democratic Congressman Joaquin Castro out of CD 20—a majority-Latino district he has represented since 2013—and places him in majority-Anglo CD 21 with Anglo incumbent Republican Congressman Chip Roy.

151.    In Dallas-Fort Worth, HB 4 draws Black Democratic Congressman Marc Veasey, who has represented CD 33 since 2013, out of his district and pairs him with incumbent Republican Congressman Roger Williams in majority-Anglo CD 25. Meanwhile, Black Democratic Congresswoman Jasmine Crockett is drawn out of her current district—CD 30—and placed in the new CD 33.

152.    And in Central Texas, Latino Democratic Congressman Greg Casar's Black and Latino-majority district, CD 35, is eliminated, and he is paired with Anglo incumbent Democratic Congressman Lloyd Doggett in CD 37—the only majority-Anglo district currently held by a Democrat.

### 2. Harris County

153.    In Harris County, HB 4 reduces the number of districts in which Black and Latino voters may elect their candidates of choice from four to three. It does this by intentionally eliminating CD 9 and CD 18—both districts in which Black and Latino voters together formed a majority of eligible voters and had an opportunity to elect their candidates of choice. It then

strategically packs the Black populations previously in CD 9 and CD 18 into a newly drawn CD

18 that is a bare majority—50.5 percent—Black CVAP.

154.    The boundaries of new CD 18 are drawn to precisely circumscribe the boundaries

of Houston's predominantly Black precincts, while crisscrossing heavily Democratic areas:



155.    There was no reason to believe that the Voting Rights Act required CD 18 to be

redrawn as a majority-Black district, as Black voters—including Plaintiff Vincent Sanders—

already had a reasonable opportunity to elect their candidates of choice in the prior CD 18, a district that Texas has insisted for years was drawn without consideration of race.

156. HB 4 disperses the remaining population of former CD 9 and former CD 18 between CD 29—a formerly Latino-majority district that is now 43.3 percent Latino and 32.7 percent Black voting-eligible population—and various rural districts in which Anglo voters vote as a bloc to prevent Black and Latino voters from electing their candidates of choice. These districts include CD 2, CD 14, CD 36, and CD 38.

157. To allow it to absorb population from the dismantled remnants of former CD 18, the southeastern section of former CD 29 is severed from the rest of the district and combined with rural areas to the north and east to create a newly formed CD 9. The legislature drew CD 9 to include just enough Latino voters to make them a bare majority of the voting eligible population—50.3 percent—but ensured that the district was crafted so that Latino voters have no opportunity to elect their candidates of choice. Ecological inference analysis shows that Latino voters in new CD 9 cohesively support Democratic candidates, but that Democratic candidates won in zero out of 31 elections analyzed in new CD 9.[4] That is in part due to low voter turnout among Latino voters in the area covered by new CD 9. Although CD 9 is now 50.3 percent Latino CVAP, its Spanish

---

[4] Election results do not report the race or ethnicity of the voters who supported each candidate, but social scientists have developed statistical techniques to enable them to infer the political preferences of racial and ethnic groups from the precinct-level results of past elections. Two such techniques are "ecological regression" and "ecological inference." Using ecological regression and ecological inference analysis, it is possible to reliably estimate the vote shares that candidates received from particular racial and ethnic groups in past elections. Moreover, because ecological regression and ecological inference analysis rely upon precinct-level results, it is possible to estimate such vote shares in hypothetical districts, in addition to actual historical districts. Ecological regression and ecological inference analysis are accepted, reliable means by which plaintiffs in Section 2 cases may meet their burden of showing that minority groups are politically cohesive and that majority groups vote as a bloc to prevent the minority groups from electing their candidates of choice. *See, e.g.*, *Gingles*, 478 U.S. at 52–53; *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013).

Surname Voter Registration (SSVR) is only 44.5 percent, and its Spanish Surname Turnout (SSTO) is only 37.1 percent. SSVR and SSTO are measures of Latino voter registration and participation made available by the Texas Legislative Council.

158.    Notably, the version of CD 9 proposed in the prior versions of HB 4—Plans C2308 and C2331—had an almost identical racial composition, and was slightly less favorable to Republicans. In redrawing CD 9 in Plan C2333, map drawers managed to improve the Republican performance of CD 9 while maintaining the precise, bare-majority Latino composition of the district under the prior proposals. Both plans, therefore, demonstrate a clear intent to draw majority-Latino districts that do not in fact allow Latino voters to enact their candidates of choice.

159.    Plan C2333 achieves this precise racial quota, in part, by adding Latino voters in Baytown—where Plaintiffs Jerry Shafer and Agustin Loredo live—to counterbalance the addition of predominantly Anglo Liberty County to the district.

160.    The changes to CD 9 made by Plan C2333 also required changes to CD 18. Although CD 18 is extended eastward to pick up some of the population of Plan C2331's version of CD 9, Plan C2333 makes changes elsewhere in the district to maintain its precise composition as a bare majority-Black district.

161.    HB 4 also removes important economic engines from CD 18. For instance, Houston International Airport, which was historically in CD 18, is now in CD 29.

162.    HB 4 also makes changes to CD 22, where Plaintiff Gwendolyn Collins lives. CD 22 covers a rapidly growing and diversifying area southwest of Harris County, including Fort Bend County, to restore it as a majority-Anglo district. When CD 22 was drawn in 2021, the most recent available ACS data (2015–2019) showed that its citizen voting age population was 54.4 percent Anglo, 23.2 percent Latino, and 11.1 percent Black. Five years later, however, the most recent

ACS data (2019–2023) showed that CD 22's citizen voting age population under SB 6 was 49.2 percent Anglo, 24.6 percent Latino, and 12.7 percent Black. HB 4 carves off many of the most diverse parts of the old CD 22 and packs them into CD 18, the majority-Black district, while adding additional, majority-Anglo precincts in Brazoria County to the new CD 22. The result is that HB 4 restores CD 22 as a majority-Anglo district, with a citizen voting age population that is 50.8 percent Anglo, 24.9 percent Latino, and 11.6 percent Black.

163.    There was no partisan reason for these changes to CD 22. The incumbent in CD 22, Anglo Republican Tory Nehls, easily won reelection in 2024 in the prior district with 62 percent of the vote, and Republican candidates are predicted to continue to win re-election by similar margins in the new district.

164.    Rather, the only explanation for the changes to CD 22 is Governor Abbott's stated desire to eliminate majority-minority coalition districts in response to the Dhillon Letter.

165.    Equally problematic are the changes that HB 4 does *not* make. As the Gonzales Plaintiffs previously demonstrated at trial, it is possible to draw *two* compact, majority-Latino districts in Harris County in which politically cohesive populations of Latino voters—including Plaintiffs Agustin Loredo and Jerry Shafer—would have an opportunity to elect their candidates of choice.

166.    HB 4 does not include such districts. And in particular, although CD 9 is a new district with a bare Latino majority of eligible voters, the legislature carefully crafted CD 9 to ensure that it has too few Latino voters to actually allow them an opportunity to elect their candidates of choice. Because CD 9 is not a performing opportunity district, it is neither justified by nor compliant with the Voting Rights Act.

### 3. Dallas–Fort Worth

167.    Similar to its approach in Harris County, HB 4 dismantles two existing districts in Dallas–Fort Worth in which Black and Latino voters were able to elect their candidates of choice—CD 32 and CD 33—and scraps them for parts.

168.    CD 33—one of the districts targeted by the Dhillon Letter—is split in half. Its eastern portion, in Dallas County, is combined with the southeastern portion of existing CD 32 (and smaller portions of existing CD 30) to form a single district that is 38.2 percent Latino CVAP and 19.6 percent Black CVAP. The predominantly Latino community in Tarrant County that comprised the western half of existing CD 33 is then cracked between two majority-Anglo, mostly rural districts: CD 12 (61.9 percent Anglo CVAP) and CD 25 (55.6 percent Anglo CVAP). In each of these districts, ecological inference analysis shows that Anglo voters vote as a bloc to prevent Black and Latino voters from electing their candidates of choice.

169.    HB 4 then creates a new, 58.7 percent Anglo CVAP CD 32 that begins in rural Upshur County and extends west to gobble up the diverse communities in northeast Dallas County that comprise the remainder of existing CD 32. Ecological inference analysis shows that minority voters in new CD 32 cohesively favor Democratic candidates, but that they will find themselves consistently outvoted by Anglo voters who vote as a bloc to defeat those candidates.

170.    Meanwhile, Black voters in Dallas County and southeastern Tarrant County are packed along strict racial lines into CD 30, transforming that district from a performing, plurality Black district in which Black voters consistently elected their candidates of choice—and which Texas has insisted for years was drawn without consideration of race—into a majority-Black (50.2 percent) CVAP district. As in CD 18, new CD 30 carefully circumscribes predominantly Black precincts, while crisscrossing heavily Democratic areas:



C2333 Boundaries obtained from Texas Legislative Council's Capitol Data Portal. Shaded areas in both maps are the Texas 2024 VTDs (same source). BCVAP (Black Citizen Voting Age Population) estimates from the Census Bureau's 2019-2023 ACS Special Tabulation. Block-level CVAP disaggregation and VTD-level election results obtained from the Redistricting Data Hub. BCVAP based on the "Black alone" CVAP category. Vote percentages are the Harris two-party vote share.

171.    Further, HB 4 removes economic engines from CD 30 that have long been integral

to the district's core. Dallas Love Field Airport, which has historically been in CD 30 and provides

employment to many of its voters, is now in CD 33. All of downtown Dallas, which houses major

employers such as AT&T and Goldman Sachs, as well as the Medical Center, was also removed

from the district and placed in CD 33. These changes "substantially decreased the political power of the citizens in [the] district." *Texas*, 887 F. Supp. 2d at 216.

172.    The remaining predominantly Black precincts in parts of Tarrant County that are not contiguous with CD 30 are captured, with great precision, by an unsightly appendage of CD 25, a mostly rural, majority-Anglo district extending as far west as Callahan County, along with CD 6, which reaches a narrow finger into Dallas and Tarrant Counties from rural districts to the south, and CD 12, which captures western Tarrant County along with rural districts to the West.

173.    The end result is that Black and Latino voters in the Dallas-Fort Worth metroplex—including Plaintiffs Cecilia Gonzales, Jana Sanchez, Debbie Solis, and Charles Johnson Jr.—are left with only two districts in which they have an opportunity to elect their candidates of choice: CD 33 and CD 30.

174.    As the Gonzales Plaintiffs previously demonstrated at trial, however, it is possible to draw an additional compact, majority-Latino district uniting politically cohesive Latino communities in Dallas County and Tarrant County in which Latino voters would have an opportunity to elect their candidates of choice. HB 4's districts in Dallas and Tarrant Counties could readily be reconfigured to accommodate an additional performing majority-Latino voting-eligible population district made up of a politically cohesive community of Latino voters—including Plaintiff Debbie Solis—along the lines of the one from the Gonzales Plaintiffs' Demonstration Map 2 offered at trial, without reducing the number of other districts in which Latino voters have an opportunity to elect their candidates of choice.

### 4.  Central Texas

175.    In Central Texas, HB 4 eliminates CD 35—a majority-minority, plurality Latino district that stretched from Austin to San Antonio and is currently represented by Latino Democrat

Greg Casar. But, notably, HB 4 leaves relatively intact CD 37—a majority Anglo district that has consistently elected an Anglo Democrat, Lloyd Doggett.

176.    HB 4 then creates a new, predominantly rural CD 35 that extends south and east after consuming Harlandale and other predominantly Latino communities in the southern portion of San Antonio, including that of Plaintiff Marci Madla. Although new CD 35 is 51.6 percent Latino CVAP, it does not allow Latino voters to elect their candidates of choice. Ecological inference analysis shows that Latino voters in new CD 35 cohesively support Democratic candidates, while Anglo voters consistently vote as a bloc against those candidates. But Democratic candidates won zero of 31 elections analyzed in new CD 35. As in CD 9, that is in part due to voter turnout. Though CD 35 is 51.6 percent Latino CVAP, its SSVR is only 43 percent and its SSTO is only 37.3 percent.

177.    It is possible, however, to draw a performing version of CD 35 while also creating an *additional* compact, majority-Latino district in which a politically cohesive community of Latino voters have an opportunity to elect their candidates of choice, and thereby draw *three* districts in which Latino voters in Bexar County and its surrounds comprise a majority of the voting-eligible population *and* are able to elect their candidates of choice. Meanwhile, HB 4, by packing Latino voters into CD 20, allows those voters only *one* such district.

### 5.  Rio Grande Valley

178.    HB 4 carefully alters each of the three congressional districts in the Rio Grande Valley to make it meaningfully harder for Latino voters in those districts to elect their candidates of choice in any elections in which their preferred candidates diverge from the preferences of Anglo voters in the districts.

179.    In each of CD 15, CD 28, and CD 34, ecological inference analysis shows that a clear, cohesive majority of Latino voters consistently prefer candidates affiliated with the

Democratic Party, particularly in congressional and other down-ballot races. But HB 4 altered CD 15 and CD 34 to make them several percentage points less likely to elect the Democratic Party candidates that Latino voters in the district, on average, favor.

180.    On average across elections between 2020 and 2024, 67 percent of Latino voters in new CD 15, 65 percent of Latino voters in new CD 28, and 65 percent of Latino voters in new CD 34 supported Democratic Party candidates, with cohesion being even stronger in down-ballot races. Yet analysis of past elections shows that Latino-preferred candidates would have won only 16 percent of contests in new CD 15 and 45 percent of contests in new CD 34, while they would have won 77 percent of contests in new CD 28.

181.    The reason that Latino voters in these districts lack an opportunity to elect their candidates of choice is simple—extraordinarily high levels of Anglo bloc voting that suffice to defeat Latino-preferred candidates in those elections where Latino preferences diverge from Anglo preferences—92 percent in new CD 15, 85 percent in new CD 28, and 76 percent in new CD 34.

182.    An alternative, substantially more compact configuration of these districts is possible in which Latino voters still form a majority of eligible voters, but they would have a reasonable opportunity to elect the candidates of choice that they cohesively favor in all three districts.

### 6.  The Gulf Coast

183.    Finally, along the Gulf Coast, HB 4 substantially reconfigures CD 27, which was previously a majority Black and Latino district and makes it into a new majority-Anglo district. While CD 27 was only 44.1 percent Anglo citizen voting age population under SB 6, it is now 52.8 percent Anglo CVAP. And while CD 27 previously included all of majority-Latino Nueces County, it now includes only a small portion—reaching a narrow tendril into the dense, heavily

Latino core of Corpus Christi and submerging that population in a vast, rural, and now majority-Anglo district to the north.

184.    Again, there is no partisan justification for this change. The prior version of CD 27 already elected a Republican representative, so the only reason to reconfigure CD 27 as a majority-Anglo district is racial, not partisan.

## H. Totality of the Circumstances

185.    Together with Texas's history of discrimination, discussed above, the following factors demonstrate that, under the totality of the circumstances, Black and Latino Texans are less able to participate in the political process than their Anglo counterparts.

### 1. Racial Polarization

186.    As courts have long recognized, voting in nearly every region of Texas is severely racially polarized. *See Veasey*, 830 F.3d at 258 (noting State's failure to contest evidence that "racially polarized voting exists throughout Texas"); *Perez I*, 250 F. Supp. 3d at 180 (noting "the existence of racially polarized voting throughout Texas").

187.    In the sections above, Plaintiffs have made specific allegations about racially polarized voting in the specific enacted and proposed districts at issue in their claims.

188.    The racially polarized voting patterns in Texas are driven in significant part by attitudes about race and ethnicity. Members of Texas's two major political parties exhibit sharp disagreements over issues relating to race and ethnicity. Members of the Democratic Party—which Latino voters in the state overwhelmingly prefer—are significantly more likely to view Texas's voting laws as racially discriminatory, support removing Confederate monuments from public spaces, oppose immediate deportation of undocumented immigrants, and support comprehensive immigration reform with a pathway to citizenship than members of the Republican Party, which Anglo voters overwhelmingly prefer.

48

## 2. Use of Racial Appeals in Political Campaigns

189.    Political campaigns in Texas commonly resort to racial appeals that rely on stereotypes. During the 2018 campaign for the U.S. Senate, Senator Ted Cruz ran ads capitalizing on fears founded on the stereotype that Latino immigrants are violent criminals and mocked his opponent's call for an investigation into the police shooting of an unarmed Black man in the man's own apartment.

190.    In support of former congressman Pete Olson, who was facing a challenge by Sri Preston Kulkarni in 2018, the Fort Bend County Republican Party circulated an advertisement depicting Ganesha, a Hindu deity, asking, "Would you worship a donkey or an elephant? The choice is yours."

191.    That same year, former congressman Pete Sessions claimed that his Black opponent, Colin Allred, wanted to legalize crack cocaine, and ran a digital ad placing Congressman Allred's name over a picture of a dark-skinned hand clasping a white woman's mouth.

192.    Local campaigns have also included racial appeals. For example, Vic Cunningham, an Anglo candidate for Dallas County Commissioner in 2018, explained to the *Dallas Morning News* that he believed it would be "Christian" only if his children married a person "that's Caucasian."

193.    Race played an enormous role in the 2020 election, fueled in significant part by police killings of Black Americans like George Floyd and Breonna Taylor. In Texas, Republican officials publicly mocked the worldwide outrage and protests that these killings provoked. One county Republican chair posted a Martin Luther King Jr. quote on a background with a banana. Other county Republican chairs spread false conspiracy theories on social media suggesting that George Floyd's murder was staged in an effort to limit Black support for former president Trump and that the protesters demanding racial justice nationwide were being paid by George Soros.

Taking these blatantly false assertions a step further, Republican Agriculture Commissioner Sid Miller publicly stated that Soros was starting a "race war."

194.    During the 2020 U.S. Senate race, Republican incumbent John Cornyn engaged in several racial appeals. He nicknamed potential opponent Royce West, who is Black, "Restful Royce"—a clear reference to a longstanding racist stereotype.

195.    Senator Cornyn also publicly blamed China's "culture" for the coronavirus outbreak, playing into the same racial appeals used by former president Trump and other Republicans, who, for example, referred to the pandemic as the "Kung-Flu." An Asian American studies expert called this language "textbook racist discourse."

196.    And, in 2021, a Republican candidate in the State's special congressional election for CD 6 outright declared that she did not want Chinese immigrants in the United States.

197.    At trial in this case, multiple witnesses identified additional examples depicting Black and Latino Texans as dangerous and threatening. Gonzales Ex. 11 at 37–52; Tr. Day 6 PM at 96:13–103:12 (Lichtman). These include a former candidate for statewide office who used a racial slur to refer to Latino immigrants. Gonzales Ex. 11 at 39. Echoing these themes, Representative Ramon Romero testified about campaign literature circulated in his district during his campaign for the state house, associating him with gang violence, and a local newspaper referring to him and others as the "Mexican Mafia." Tr. Day 11 PM at 31:9–37:8 (Romero); LULAC Ex. 141. Michael Evans testified about the extent racial issues permeated his election as the first Black mayor of Mansfield, in Tarrant County, including advertisements containing darkened images of Evans similar to those identified by Dr. Allan Lichtman involving other candidates. Tr. Day 7 AM 38:15–39:15, 49:16–55:11, 58:8–61:13 (Evans); Gonzales Ex. 11 at 47–49 (discussing history of darkened images in political advertisements).

### 3. Ongoing Effects of Texas's History of Discrimination

198.    The long history of discrimination against Black and Latino Texans has produced stark disparities between the everyday lives of minority and Anglo Texans. Black and Latino Texans make up a disproportionate number of individuals living in poverty. According to the U.S. Census Bureau's 2019 American Community Survey ("ACS") 5-Year Estimate, 8.4 percent of Anglo Texans lived below the poverty line, compared to 19.3 percent of Black Texans and 20.7 percent of Latino Texans.

199.    Disparities also exist in the areas of employment and income. According to the 2019 5-year ACS Estimate, the median income among non-Latino Anglo Texan households ($75,879) was significantly higher than that among Black Texan households ($46,572) and Latino Texan households ($49,260). And according to a 2018 study by the Economic Policy Institute, non-Anglo Texans had a significantly lower unemployment rate (3.9 percent) than Black Texans (5.7 percent) and Latino Texans (4.5 percent).

200.    Low-income voters face a number of hurdles to voter participation including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

### 4. Extent to Which Latino Texans Have Been Elected to Public Office

201.    The ongoing disparities in minority political participation are also reflected by the fact that Latino and Black lawmakers are underrepresented in the State's elected offices. Latino Texans constitute more than 30 percent of Texas's citizen voting-age population. But just 21 percent of the seats in Texas's delegation to the U.S. House of Representatives, and less than 25 percent of the seats in the Texas Senate and Texas House are held by Latino lawmakers. At the

local level, many communities with large Latino populations lack any minority representation at all.

## CLAIMS FOR RELIEF

### COUNT I
### Intentional Vote Dilution – Fourteenth and Fifteenth Amendments & Section 2 of the Voting Rights Act

202.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

203.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution forbids states from enacting laws for which a racially discriminatory intent or purpose is a motivating factor and which produce discriminatory results. This includes laws that use race as a means to gain political or partisan advantage.

204.    Section 2 of the Voting Rights Act and the Fifteenth Amendment similarly prohibit the use of any voting practice or procedure enacted with discriminatory intent. *United States v. Brown*, 561 F.3d 420, 432–33 (5th Cir. 2009) (citing *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (5th Cir. 1984)).

205.    To establish intentional discrimination, a plaintiff need only show that discriminatory purpose was "a" motivating factor in the legislation—not the only, or even the predominant factor. "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265.

206.    In addition to direct evidence of legislative purpose, courts consider five non-exhaustive factors in determining whether a particular decision was made with a discriminatory intent: (1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged action; (4) substantive

and procedural departures from the normal-decision making process; and (5) contemporaneous viewpoints expressed by the decisionmakers. *Id.* at 266–68.

207.    Both direct and circumstantial evidence point toward intentional discrimination in the drawing of Plan C2333, enacted by House Bill 4.

208.    Governor Abbott said it himself. The Governor called for unusual mid-decade redistricting in a special session "in light of constitutional concerns raised by the U.S. Department of Justice" in the July 7 Dhillon Letter, which explicitly sought the dismantling of four majority Black and Latino districts—*because* they are majority-minority.

209.    Were there any doubt that the purpose of the special session was to intentionally eliminate coalition districts, Governor Abbott dispelled it after the session began, saying in an interview, that "coalition districts are no longer required and so *we want to make sure that we have maps that don't impose coalition districts.*"

210.    These statements are direct evidence of discriminatory intent. When "a State intentionally dr[aws] district lines in order to destroy otherwise effective crossover districts, that . . . raise[s] serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality). That principle applies with even greater force to majority-minority *coalition* districts—those that allow minority voters to elect their candidates of choice not because Anglo voters "cross over," but because multiple minority groups together themselves form a politically cohesive majority.

211.    Moreover, each of the five *Arlington Heights* factors provides circumstantial evidence of discriminatory intent.

212.    *First*, House Bill 4 clearly has a discriminatory effect. As this Court has previously observed, "the destruction of a majority-minority district, particularly one controlled by one racial

group, would be a relatively clear discriminatory impact." *LULAC*, 601 F. Supp. 3d at 167. That is exactly what has happened here. House Bill 4 obliterates longstanding majority-minority districts in key areas of the state, while creating other "sham" majority-minority districts. The end result is that House Bill 4 increases the number of districts in which Anglo voters are a majority of eligible voters, and reduces the number of districts in which Black and Latino voters are able to elect their candidates of choice.

213.    As a result, House Bill 4 dilutes the votes of Plaintiffs Cecilia Gonzales in CD 25, Jana Lynne Sanchez in CD 12, Agustin Loredo and Jerry Shafer in CD 9, Debbie Lynn Solis in CD 33, Charles Johnson Jr. in CD 30, Vincent Sanders in CD 18, Rogelio Nuñez and Mercedes Salinas in CD 34, Marci Madla in CD 35, Heidi Cruz in CD 27, Sylvia Bruni in CD 28, and Gwendolyn Collins in CD 22.

214.    *Second*, as described above, Texas has both a long and recent history of intentionally discriminating against Black and Latino voters in redistricting. Courts have invalidated portions of Texas's legislative and congressional districts in every recent decade, in many of the same parts of the state implicated by House Bill 4.

215.    *Third*, the sequence of events leading up to the special session and the enactment of HB 4 makes clear that it was enacted with the express goal of diminishing minority voting power by systematically dismantling existing majority-minority districts. After initially resisting calls for further partisan gerrymandering, Texas Republicans leapt at the DOJ's request for the targeted destruction of majority-minority districts based principally on race, and Governor Abbott added congressional redistricting to the special session call for that express purpose.

216.    *Fourth*, the passage of HB 4 was marred by procedural and substantive departures from the norm. Mid-decade redistricting itself is extraordinary. And to do it in a hastily convened

special session just weeks after a trial on SB 6, all for the avowed purpose of eliminating majority-minority districts from a map that was enacted by the legislature, is unprecedented. Moreover, the procedures followed during the special session were unusually rushed and opaque.

217.    *Fifth*, the legislative history of the special session indicates that majority-minority districts were intentionally targeted based on race. During the special session, advocates and legal experts repeatedly warned the Texas Legislature that to heed the DOJ's call to systematically dismantle coalition districts would be to engage in intentional race discrimination. But the legislature was undeterred.

218.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act, enforceable under the Voting Rights Act and 42 U.S.C. § 1983. Defendants will continue to violate those rights absent relief from this Court.

## COUNT II
## Racial Gerrymandering – Fourteenth Amendment

219.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

220.    House Bill 4 separately violates the Fourteenth Amendment because it contains multiple districts that are racial gerrymanders in violation of the Fourteenth Amendment. *See Shaw v. Reno*, 509 U.S. 630 (1993). Racial gerrymandering occurs when, in the absence of "sufficient justification," a state "separates its citizens into different voting districts on the basis of race." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017). If "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or

without a particular district," then "the design of the district must withstand strict scrutiny." *Cooper*, 581 U.S. at 291–92.

221.    A plaintiff may prove "that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations' . . . through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* at 291 (quoting *Miller*, 515 U.S. at 916). Upon such a showing, the State must "prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Id.* at 292 (internal quotation marks omitted). "[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Id.* at 308 n.7.

222.    The Texas Legislature subordinated other redistricting criteria—including partisan advantage—to race in drawing CD 9, CD 18, CD 30, and CD 35—all districts in the prior map in which Black and Latino voters together formed a majority of eligible voters—and in drawing CD 22 and CD 27, which were previously majority-minority districts but have been redrawn as majority-Anglo districts, even though both districts were already electing Republican candidates by substantial margins under the prior districts.

223.    In CD 30, Black voters in Dallas County and eastern Tarrant County are packed along strict racial lines into that new district, taking what was once a performing plurality Black CVAP district and turning it into a bare majority-Black CVAP district. And the remaining predominantly Black precincts in parts of Tarrant County that are not contiguous with CD 30 are captured, with great precision, by an unsightly appendage of CD 25, a mostly rural, majority-Anglo district extending as far west as Callahan County. The result is that Black voters, who previously were able to elect their candidates of choice in *three* Dallas–Fort Worth majority-minority

districts—CD 30, CD 32, and CD 33, are now able to do so only in *two* districts: CD 30 and what remains of CD 33.

224.    The combination of CD 9 and CD 18 in Harris County similarly elevated race over other considerations. HB 4 packs the Black populations from those former majority-minority districts into a newly drawn CD 18 that is a bare majority—50.5 percent—Black CVAP, the boundaries of which are drawn to precisely circumscribe the boundaries of Houston's predominantly Black precincts. Black voters already formed a plurality, and were able to elect their candidates of choice, in *both* CD 9 and CD 18 under Senate Bill 6. By packing Black voters into a bare majority-Black CD 18, Texas has reduced Black voters' ability to elect their candidates of choice.

225.    This consolidation of Black communities in Dallas–Fort Worth and Harris County can only be explained by race. The adjoining communities in both areas—including predominantly Anglo communities—overwhelmingly vote for Democrats. There is therefore no partisan reason for the boundaries of new CD 18 and CD 30 to hew so closely to the boundaries of the predominantly Black precincts in these areas.

226.    Moreover, because Black voters in prior CD 9, CD 18, and CD 30 were already able to elect their candidates of choice, there is no legal basis—in the Voting Rights Act or otherwise—for the legislature's decision to ratchet up the Black voting-eligible population above 50 percent in drawing the new districts. *Cooper*, 581 U.S. at 302–06.

227.    Ecological inference analysis confirms that in every election under the prior set of districts, Black voters in CD 9, CD 18, and CD 30 were able to elect their candidates of choice, with 95 percent of Black voters in each of those districts supporting Democratic candidates.

228.    There was therefore no basis under the Voting Rights Act for making CD 18 and CD 30 into majority-Black districts.

229.    The drawing of CD 9 also demonstrates the clear predominance of a racial target. By splitting off half of the densely-Latino portion of former CD 29 and combining it with predominantly Anglo areas to the east and north, HB 4 creates yet another district that is a bare majority of a single-race: in this case, 50.3 percent Latino CVAP. But unlike Black voters in new CD 30 and new CD 18, Latino voters are *not* able to elect their candidates of choice in new CD 9. The precision with which HB 4 achieves a bare majority Latino CVAP district that does not in fact perform for Latino voters strongly suggests that the legislature intended this exact result.

230.    Black voters do not have an opportunity to elect their candidates of choice in new CD 9, either. Black voters make up just 11.5 percent of the new district, and ecological inference analysis shows that they consistently favor Democratic candidates, but that Republican candidates will consistently win.

231.    The legislature's intent to create CD 9 as a bare-majority Latino district that does not afford Latinos an opportunity to elect their candidates of choice is made evident by the changes made in Plan C2333. Although Plan C2333 made changes to the partisan composition of CD 9, it nonetheless maintained the precise racial composition that it had in Plan C2331.

232.    Similarly, HB 4 effectively eliminates CD 35—a Latino and Black majority district that united diverse communities in Austin and San Antonio and is currently represented by Latino Democrat Greg Casar. HB 4 creates a new CD 35 that extends south and east to absorb rural, more Anglo precincts after consuming Harlandale and other predominantly Latino communities in the southern portion of San Antonio. The new CD 35 is a bare majority—51.6 percent—Latino CVAP, but it does not allow Latino voters to elect their candidates of choice. As in CD 9, the precision

with which HB 4 achieves a bare majority Latino CVAP district that does not in fact perform for Latino voters strongly suggests that the legislature intended this exact result and elevated that racial goal over other considerations. *See Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 192 (2017) (use of express racial target can be indicative of racial gerrymandering).

233.    Race also predominated in the drawing of CD 22, just southwest of Harris County. When it was drawn in 2021, CD 22 under SB 6 was a majority-Anglo (54.4 percent) district by CVAP. ACS data shows, however, that growth in the non-Anglo population over the intervening five years reduced the Anglo share of existing CD 22's CVAP to just 49.2 percent. House Bill 4 restores CD 22 as a bare majority-Anglo (50.8 percent) CVAP district. Again, this rebalancing can only be explained by race, as under both SB 6 and HB 4, CD 22 strongly favors Republican candidates.

234.    Race also predominated in the revisions to CD 27. Under SB 6, CD 27 was a majority Black and Latino district that consistently elected Republican candidates. HB 4 substantially reconfigures CD 27 to make it into a new Anglo majority district that will still consistently elect Republican candidates. There is no partisan explanation for this change. Although CD 27 was only 44.1 percent Anglo citizen voting age population under SB 6, it is now 52.8 percent Anglo CVAP. And while CD 27 previously included all of Nueces County, it now includes only a small portion—reaching a narrow tendril into the dense, heavily Latino core of Corpus Christi and submerging that population in a vast, rural, and now majority-Anglo district to the north.

235.    None of this is surprising. Governor Abbott's call for a special session expressly asked for race-based changes to districts. The impetus for that decision was the Department of

Justice's July 7, 2025, letter, which mentions race no fewer than eleven times in accusing Texas of drawing its "race-based" districts by sorting voters "along strict racial lines."

236.    Yet in purporting to rectify a problem that didn't exist, Texas did exactly what the Department of Justice's letter accused it of doing with its old maps: using race as the predominant factor in drawing its districts.

237.    Because the Department of Justice's erroneous "constitutional concerns" were explicitly race-based, race-based districting was the only way the legislature could have achieved its stated goal of eliminating majority-minority districts in Texas's diverse urban areas. This is true regardless of whether the State targeted individual voters based on their race or, rather, targeted particular districts based on the race of the voters *within* those districts.

238.    In doing so, Texas also subordinated traditional race-neutral districting principles—including compactness, respect for political subdivisions, and communities defined by actual shared interests—to race.

239.    The predominant use of race to dismantle existing majority-minority districts is not narrowly tailored to serve any compelling state interest. As noted above, the dismantling of majority-minority districts was based on a bad misreading of a legal decision. But it is well established that courts will not "approve a racial gerrymander . . . whose *raison d'etre* is a legal mistake." *Cooper*, 581 U.S. at 306.

240.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983. Defendants will continue to violate those rights absent relief from this Court.

## COUNT III
## Discriminatory Effects – Section 2 of the Voting Rights Act

241.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

242.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

243.    The district boundaries created by HB 4 combine to "crack" and "pack" Latino Texans, resulting in the dilution of the electoral strength of the state's Latino and residents, in violation of Section 2 of the Voting Rights Act.

244.    Latino voters in Dallas–Fort Worth, Harris County, Central Texas, and the Rio Grande Valley are politically cohesive, and elections in the state reveal a clear pattern of racially polarized voting that allows the bloc of Anglo voters usually to defeat Latino-preferred candidates.

245.    Latino voters in the Dallas–Fort Worth metroplex are sufficiently numerous and geographically compact to allow for the creation of an additional district in which a majority of eligible voters are Latino and are able to elect their candidates of choice.

246.    House Bill 4 includes only one majority-Latino district in Harris County, and that district does not allow Latino voters to elect their candidates of choice. But Latino voters in Harris County are sufficiently numerous and geographically compact to allow for *two* performing majority-Latino districts in which Latino voters have an opportunity to elect their candidates of choice.

247.    House Bill 4 includes two majority-Latino districts in Central Texas, and only one such district allows Latino voters an opportunity to elect their candidates of choice. But Latino

voters in Central Texas are sufficiently numerous and geographically compact to allow for *three* performing majority-Latino districts in this region in which Latino voters have an opportunity to elect their candidates of choice.

248.    House Bill 4 includes three majority-Latino districts in the Rio Grande Valley. But at least two of those districts do not allow Latino voters a reasonable opportunity to elect their candidates of choice. Latino voters are sufficiently numerous and geographically compact, and sufficiently cohesive, to draw each of these districts to be performing, majority-Latino districts in which Latino voters can elect their candidates of choice.

249.    The totality of the circumstances establishes that the congressional map established by Senate Bill 6 has the effect of denying Latino voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

250.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act and enforceable under the Voting Rights Act and 42 U.S.C. § 1983. Defendants will continue to violate those rights absent relief granted by this Court.

### COUNT IV
### Malapportionment – Fourteenth Amendment

251.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

252.    When drawing congressional districts for the U.S. House of Representatives, states must "draw congressional districts with populations as close to perfect equality as possible," *Evenwel*, 578 U.S. at 59, or in other words, "as nearly as is practicable." *Wesberry v. Sanders*, 376

U.S. at 1, 7–8 (1964). This requires states to make a "good-faith effort to achieve precise mathematical equality." *Kirkpatrick*, 394 U.S. at 530–31 (citing *Reynolds*, 377 U.S. at 577).

253.    Texas did not make a good-faith effort to achieve mathematical equality across districts. Quite the opposite—Texas acted in bad faith by redrawing its districts without care for any of the population shifts that have occurred since the 2020 census—all in a race-based gambit to increase the number of Republican representatives from the state's congressional delegation at the expense of its own citizens.

254.    House Bill 4 fails to achieve anything close to precise mathematical equality in populations across Texas's districts. Because it is based on a census taken five years ago, House Bill 4 fails to take account of shifts in Texas's population.

255.    Texas's population has grown by nearly five percent since the 2020 census—more than any other state in the country. Most of that growth has occurred in the areas surrounding the central counties—most concentrated in the triangle formed by the four largest Metropolitan Statistical Areas: Dallas–Fort Worth, Austin, San Antonio, and Houston. As of 2023, eight counties had their populations increase between 15.1 percent and 23.6 percent since the 2020 census, while more than one-third of Texas counties have experienced a *decline* in population in that time.

256.    Representative Hunter tacitly acknowledged these population deviations during a public hearing on House Bill 4, stating that "population changes" and "voter trends" were considered in drawing the map.

257.    Although states generally "operate under the legal fiction" that plans remain constitutionally apportioned for ten years after they are adjusted for a given census, *Georgia*, 539 U.S. at 488 n.2, states should not get the benefit of that legal fiction when they choose to engage

in unnecessary, mid-decade redistricting. The purpose of this legal fiction is to "avoid constant redistricting," *LULAC*, 548 U.S. at 421. Extending the legal fiction to unnecessary, mid-decade redistricting would turn its purpose on its head, such that it would enable, rather than avoid, constant redistricting.

258.    Here, unlike in *LULAC v. Perry*, the prior map being replaced by mid-decade redistricting was itself a legislatively-enacted map. As a result, a preference for legislatively-enacted rather than court-drawn districts provides no justification for extending the legal fiction of equal population to cover the Texas Legislature's voluntary choice in HB 4 to redraw their existing Congressional districts now.

259.    Plaintiff Cecilia Gonzales is among the voters injured by Texas's decision to enact mid-decade malapportioned maps. Gonzales lives in CD 25, which under HB 4 is overpopulated by over 12,000 residents according to 2019–2023 ACS data. And because the 2019–2023 ACS is a five-year average, and Texas's population has continued to grow, that number likely understates the deviation significantly. Gonzales's vote is therefore diluted relative to the vote of other Texans in other, underpopulated districts.

260.    Plaintiff Gwendolyn Collins is also among the voters injured by HB 4's malapportionment. Collins lives in CD 22, which under HB 4 is overpopulated by over 125,000 residents according to 2019–2023 ACS data. Collins's vote is therefore diluted relative to the vote of other Texans in other, underpopulated districts.

261.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the Fourteenth Amendment to the United States Constitution, enforceable under 42 U.S.C. § 1983. Defendants will continue to violate those rights absent relief from this Court.

## COUNT V
## Equal Protection Clause – Racial Data and Partisan Advantage

262.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

263.    The Supreme Court has emphasized that legislators will "almost always be aware of racial demographics" when they draw districts, and it has therefore imposed a higher standard before subjecting districts drawn with an awareness of race to strict scrutiny—otherwise, redistricting might be impossible. *Miller*, 515 U.S. at 916.

264.    The Supreme Court similarly held in *Rucho*, 588 U.S. at 700–01, that prohibiting pursuit of "partisan interests" in redistricting might make it impossible for partisan legislatures to draw districts.

265.    Those rationales take as a given that the act of redistricting is necessary, or at least desirable. Even in *LULAC*, a plurality of the Supreme Court emphasized the desirability of allowing a legislature to draw its own map to replace a court-ordered plan. 548 U.S. at 416.

266.    The Texas Legislature's voluntary choice to make unnecessary mid-decade changes to the state's congressional districts eliminates any inevitability justification for the use of racial data or the pursuit of partisan advantage in the redistricting process. Even if racial and partisan considerations are an unavoidable part of redistricting, there is no need for legislatures to take those considerations into account a second time in a single decade, unprompted by a court order or desire to replace a court-ordered map.

267.    As a result, the Texas Legislature's consideration of racial information and pursuit of partisan advantage as part of a voluntary, unnecessary mid-decade revision of legislatively enacted congressional plans violates the Equal Protection Clause.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Declare that House Bill 4 violates the Fourteenth Amendment to the United States Constitution because it, and the lines of multiple districts described above, was enacted with discriminatory intent as a motivating factor;

b. Declare that House Bill 4 violates the Fourteenth Amendment to the United States Constitution because racial considerations predominated without justification in drawing the district lines of multiple districts described above;

c. Declare that House Bill 4 violates Section 2 of the Voting Rights Act;

d. Declare that House Bill 4 violates the Fourteenth Amendment because it is malapportioned in violation of one person, one vote;

e. Declare that House Bill 4 violates the Fourteenth Amendment because it unnecessarily and unjustifiably considers racial and partisan demographics as part of a voluntary, mid-cycle redistricting;

f. Order the adoption of a valid congressional redistricting plan that remedies these violations;

g. Preliminary and permanently enjoin Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional districts as drawn in House Bill 4, including an injunction barring Defendants from conducting any further congressional elections under the current map;

h. Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid plan for new congressional districts in the State of Texas; and

i. Grant such other or further relief the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated: August 23, 2025

Respectfully submitted,

Renea Hicks
Attorney at Law
Texas Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

*David R. Fox*
David R. Fox
Richard A. Medina
James J. Pinchak
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law
jpinchak@elias.law

Abha Khanna
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

*Counsel for Plaintiffs*