# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., <br><br>                      Plaintiffs, <br><br>     v. <br><br> GREG ABBOTT, et al., <br><br>                   Defendants. | Civil Action <br><br><br> Lead Case No.: <br> 3:21-CV-00259-DCG-JES-JVB |
| CECILIA GONZALES, et al., <br><br>                   Plaintiffs, <br><br>     v. <br><br> JANE NELSON, in her official capacity as Texas Secretary of State, and GREGORY WAYNE ABBOTT, in his official capacity as the Governor of Texas, <br><br>                   Defendants. | <br><br><br><br> Consolidated Case No.: <br> 1:21-CV-00965-DCG-JES-JVB |

## GONZALES PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

Just weeks after the conclusion of a trial challenging the legality of Texas's 2021 congressional map, Governor Greg Abbott called a special session of the legislature to engage in an extraordinary and unusual mid-decade redistricting. The explicit purpose of the special session was to dismantle existing majority-minority congressional districts—and only those districts—because of their racial composition. The legislature dutifully completed its assignment.

In accordance with the Governor's instruction, the newly enacted House Bill 4 ("HB 4") eviscerates minorities' opportunity to elect their candidates of choice in four key areas of the state: Harris County, the Dallas–Fort Worth metropolitan area, Central Texas, and South Texas. The result is that non-Anglo Texans now have an opportunity to elect their preferred candidates in far fewer districts than under the map previously enacted in 2021, while Anglo Texans enjoy more majority-Anglo districts than ever.

HB 4's intentional targeting of majority-minority congressional districts based expressly on the race of the voters within them is blatantly unlawful. A state may not "invidiously . . . minimize[e] or cancel[] out the voting potential of racial or ethnic minorities." *Abbott v. Perez*, 585 U.S. 579, 586 (2018) (first alteration in original). No Fifth Circuit case—or any case for that matter—says otherwise. While the legislature claimed to be relying on *Petteway v. Galveston County*, 111 F.4th 596, 604 (5th Cir. 2024) (en banc), that opinion held only that multi-racial coalitions may not bring affirmative Section 2 claims for *new* districts—it did not license the intentional, race-motivated destruction of existing districts. And in intentionally destroying majority-minority districts and replacing them with majority-Anglo districts, the legislature also engaged in unconstitutional racial gerrymandering, placing voters within and without particular districts on the predominant basis of their race without adequate reason, in violation of the Fourteenth Amendment.

Texas's explicit, intentional manipulation of district lines to suppress minority voting strength provides an open-and-shut case to strike down the congressional map. But HB 4 also inflicts a threshold, per se violation of the Equal Protection Clause. HB 4's districts are unconstitutionally malapportioned, because they do not reflect Texas's uneven population growth since the 2020 census, and because the legal fiction of continued equal population between censuses exists to *avoid* constant redistricting, not to permit the unnecessary and premature replacement of legislatively-enacted districts. *See LULAC v. Perry*, 548 U.S. 399, 421 (2006) (plurality op.). And the legislature's use of racial information and any pursuit of partisan advantage in an unnecessary mid-decade revision of legislatively-enacted districts is unconstitutional and cannot benefit from the permissive approaches—and presumption of good faith—that the Supreme Court has adopted to allow for the necessity of decennial redistricting.

Plaintiffs are therefore likely to prevail in showing that HB 4 is unlawful. But without immediate intervention by the Court, such a victory will come too late. Texas is set to hold primary elections for seats in the new congressional map in less than six months, on March 3, 2026. The filing period to participate in those primaries runs from November 8 through December 8. If those elections go forward under the districts created by HB 4, Latino and Black Texans will be irreparably harmed, deprived of their right to exercise their voting rights on equal terms with Anglo Texans. Because all the relevant factors strongly favor a preliminary injunction, the Court should issue a preliminary order enjoining the use of Texas's latest congressional map and reinstating the 2021 congressional districts for the 2026 election.

## II.    BACKGROUND

Texas fulfilled its decennial obligation to redraw its congressional districts in October 2021, when the Texas Legislature passed, and Governor Abbott signed, Senate Bill 6 ("SB 6"), to reapportion Texas's congressional districts after the 2020 census. In the years of litigation that

followed, Governor Abbott and the legislators who enacted SB 6 consistently defended its districts as having been drawn "blind to race" and in pursuit of raw partisan advantage. ECF No. 986 at 8.

On July 7, 2025, just weeks after the close of evidence in a three-week bench trial of challenges to SB 6, Harmeet Dhillon—the Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice—wrote to Governor Abbott and Attorney General Ken Paxton to insist that Texas draw a new map for race-based reasons. ECF No. 1114-2. Citing no evidence, Dhillon argued that four majority-minority Texas congressional districts—CD 9, CD 18, CD 29, and CD 33—were "unconstitutional racial gerrymanders" and needed to be redrawn. *Id.* at 2.

In response to that letter, Governor Abbott filed supplemental briefing assuring this Court that, consistent with the State's representations during the trial, "the Texas Legislature did not racially discriminate in drawing the current congressional electoral districts—full stop." ECF No. 1116 at 2. Attorney General Paxton likewise responded to Dhillon on July 11 to explain that "[t]he evidence at [trial] was clear and unequivocal: **the Texas legislature did not pass race-based electoral districts for any of [its] three political maps**." ECF No. 1116-1 at 2. Attorney General Paxton further noted that Senator Joan Huffman, the former Chair of the Senate Special Committee on Redistricting, "testified under oath that she drew Texas districts blind to race, and sought to maximize Republican political advantage[.]" *Id.*

Notwithstanding his repeated, forceful denials of the Dhillon Letter's charge of racial gerrymandering in drawing SB 6, Governor Abbott *also* seized on the racial justification to call for a new round of redistricting, as the Dhillon Letter demanded. On July 9, the Governor called a special session of the legislature to consider, among several other items, "Legislation that provides a revised congressional redistricting plan *in light of constitutional concerns raised by the U.S. Department of Justice*." ECF No. 1114-1 at 3 (emphasis added). These "constitutional concerns"—

the validity of which Governor Abbott and Attorney General Paxton flatly denied, including in filings with this Court—were the *only* justification cited by the Governor for this extraordinarily unusual mid-decade redistricting.

In a July 22 interview at the start of the special session, Governor Abbott explained that he had added redistricting to the special session because of the Fifth Circuit's decision in *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024). He characterized *Petteway* as holding that "coalition districts"—districts in which multiple minority groups together form a majority of voters to elect their candidates of choice—"are no longer required *and so we want to make sure that we have maps that don't impose coalition districts*."[1] He thus made clear that his purpose in asking the legislature to enact a new map was to eliminate majority-minority districts. He did not mention partisan considerations, and he did not say he thought the existing districts were unconstitutional racial gerrymanders or otherwise unlawful.

On July 30, 2025, Chairman Todd Hunter introduced HB 4, which did exactly what the Governor asked. HB 4 dramatically alters or destroys longstanding majority-minority districts across Texas, with a particular focus on coalition districts. Declaration of David R. Fox ("Fox Decl.") Ex. A. HB 4 moves more than half the population out of eight districts—each of which was a majority-minority district under the prior map, including each of the four districts that the Dhillon Letter targeted. *Id.* Ex. B, Ex. C. The changes cannot be explained by partisanship. HB 4 turns two Republican-voting majority-minority districts (CD 22 and CD 27) into Republican-voting majority-Anglo districts. *Id.* Ex. P (Joint Trial Exhibit ("JX") 942), Ex. C (JX 903), Ex. O, Ex. A. And HB 4 leaves CD 37—the only majority-Anglo Democratic district in the state—largely

---

[1] FOX 4 Dallas-Fort Worth, "Abbott on THC, redistricting & the special session," at 3:33–39 (YouTube, July 22, 2025), https://www.youtube.com/watch?v=PHsYs0NTPTY.

intact. *See Id.* Ex. B; Ex. P ; Ex. O. Moreover, in sharp contrast to the 2021 debates over the prior map, at no point during the 2025 special session did Chairman Hunter state that the map was drawn blind to race. *See* Hr'g on H.B. 4 Before the H. Select Comm. on Cong. Redistricting ("August 1 Hearing") at 13:25:43, 89th Leg. (Tex. Aug. 1, 2025), https://house.texas.gov/videos/22418 (Statement of Chairman Todd Hunter) (stating he "did not" know if mapmakers used racial demographic data).

On August 12, the Senate passed the initial Senate version of HB 4 on a party-line vote, with nine Democrats leaving the chamber in protest. Fox Decl. Ex. D. The first special session adjourned sine die on August 15, 2025, with no new map enacted. *Id.* Ex. E. That same day Governor Abbott called, and the legislature gaveled in, a second special session. *Id.* Ex. F.

On August 17, the Senate Special Committee on Redistricting favorably reported a version of HB 4 with slight changes in El Paso. *Id.* Ex. G. The House reestablished quorum on August 18, 2025, at which point HB 4 was referred to the House Select Committee on Redistricting. *Id.* Ex. H. At a committee meeting later that day, Chairman Hunter substituted HB 4 with yet another plan, which made changes in the Harris County area. Fox Decl. Ex. U. That plan was reported favorably out of committee as the new House Bill 4 the same day. *Id.* On August 20, after nine hours of debate, the House voted 88-52 to pass HB 4. *Id.* In a press release hailing the bill's passage, Speaker of the House Dustin Burrows announced: "The Texas House today delivered legislation to redistrict certain congressional districts to address concerns raised by the Department of Justice . . . ." *Id.* Ex. Q.

The Senate Redistricting Committee took up HB 4 the following morning, August 21, and immediately voted it to the Senate Floor. *Id.* Ex. H The full Senate passed HB 4 in the early hours of August 23. *Id.* Governor Abbott has promised to sign it when it gets to his desk. *Id.* Ex. R.

## III.    LEGAL STANDARD

A preliminary injunction "should issue" when a plaintiff shows: (1) "a substantial likelihood of success on the merits," (2) "a substantial threat of irreparable injury if the injunction is not issued," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Speaks v. Kruse*, 445 F.3d 396, 399 (5th Cir. 2006) (quoting *Concerned Women for Am., Inc. v. Lafayette County*, 883 F.2d 32, 34 (5th Cir. 1989)). "To show a likelihood of success" when seeking a preliminary injunction, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

## IV.    ARGUMENT

### A.    HB 4 intentionally discriminates against Black and Latino voters by targeting majority-minority districts.

HB 4 intentionally discriminates against Black and Latino Texans by targeting majority-minority districts for substantial alteration or destruction because of their racial makeup. The Fourteenth Amendment prohibits redistricting plans that "invidiously minimize or cancel out the voting potential of racial or ethnic minorities." *Abbott*, 585 U.S. at 586 (cleaned up). To prove intentional vote dilution, plaintiffs "need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will towards minorities because of their race." *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017). They need only establish, with direct or circumstantial evidence, that "race was *part* of Defendants' redistricting calculus," *LULAC v. Abbott*, 601 F. Supp. 3d 147, 161 (W.D. Tex. 2022) (emphasis in original), and "that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities,'" *Alexander v. S.C. State Conf. of NAACP*, 602 U.S.

1, 38 (2024) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (holding that discriminatory purpose means action taken "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group").

### 1. Direct Evidence

Here, there is clear direct evidence that HB 4 was enacted specifically to destroy majority-minority districts. "Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8. Governor Abbott provided that acknowledgment when he added redistricting to the first special session expressly in response to the "constitutional concerns raised by the U.S. Department of Justice"—the Dhillon Letter's demand that Texas eliminate majority-minority coalition districts. And he confirmed that acknowledgment when he explained that his purpose in asking the legislature to take up redistricting again was to "make sure that we have maps that don't impose coalition districts" after the Fifth Circuit's decision in *Petteway*.[2]

In reality, the Fifth Circuit's holding in *Petteway* provides no justification for the intentional destruction of coalition districts. *Petteway* held only that multi-ethnic coalitions can no longer form the basis of an affirmative vote dilution claim. *Petteway*, 111 F.4th at 608. It did not hold—as the Dhillon Letter suggests—that existing coalition districts are unlawful. ECF No. 1114-2 (asserting without citation that coalition districts "run afoul [of] the Voting Rights Act and the Fourteenth Amendment"). And it certainly did not license the intentional destruction of such districts.

---

[2] FOX 4 Dallas-Fort Worth, "Abbott on THC, redistricting & the special session," at 3:33–39 (YouTube, July 22, 2025), https://www.youtube.com/watch?v=PHsYs0NTPTY.

As the Supreme Court has explained in discussing crossover districts—districts in which white and minority voters come together to elect minority candidates of choice—the fact that such districts are an insufficient basis for *plaintiffs* to bring Voting Rights Act claims does not mean the districts are unconstitutional and cannot be drawn by *legislatures*, much less that they can be intentionally targeted and destroyed. *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality op.). Rather, "[s]tates that wish to draw crossover districts are free to do so where no other prohibition exists." *Id.* And "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Id.* This analysis applies equally to coalition districts after *Petteway*. Yet "intentionally dr[awing] district lines in order to destroy otherwise effective [coalition] districts" is exactly what the legislature did—at the Governor's express direction.

The Dhillon Letter's baseless assertion that the prior districts were racial gerrymanders provides no cover for the Governor's and the legislature's targeting of those districts. Governor Abbott represented to this Court in no uncertain terms that "the Texas Legislature did not racially discriminate in drawing the current congressional electoral districts—full stop." ECF No. 1116 at 2. Absent some showing that, notwithstanding Defendants' years-long position in this Court and volume-after-volume of sworn testimony to the contrary, the prior districts were in fact drawn for predominantly racial reasons, the bare assertion that redrawing the map was necessary to correct a pre-existing racial gerrymander cannot justify the legislature's decision to now target the prior map's majority-minority districts.

Under the Texas Constitution, the Texas Legislature was able to take up redistricting in the special session only because of the Governor's choice to add it to the special session's call. Tex. Const. art. III, § 40. By his own admission, the Governor's choice to add redistricting to the special

session was to "make sure that we have maps that don't impose coalition districts"—an admission that provides strong, direct evidence of racial intent. And in enacting HB 4, legislators repeatedly echoed the Governor's race-based motives.

At HB 4's sole public hearing during the first special session on August 1, 2025, HB 4's sponsor Chairman Hunter emphasized that federal law did not "require[] the drawing of coalition districts," which he defined as "when two different minority or language groups are combined." August 1 Hearing at 00:48:12–48:52. When asked to explain the methodology for how the map was constructed, Chairman Hunter explained that mapdrawers were expressly instructed to "use" "the *Petteway* case" in deciding where and how to redraw districts. *Id.* at 14:21:24–56; *see also id.* at 00:49:34–00:50:00 (Chair Hunter citing political performance in addition to "clarification from the Fifth Circuit on coalition districts" as the bases for having "redrawn the congressional map"). And in a press release hailing the bill's passage, Speaker of the House Dustin Burrows said: "The Texas House today delivered legislation to redistrict certain congressional districts to address concerns raised by the Department of Justice . . . ." Fox Decl. Ex. Q. These statements embraced and perpetuated the Governor's concerted intent to eliminate majority-minority districts. It makes no difference if the Governor and the legislature may *also* have had partisan goals—"racial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) (plurality op.) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)).

### 2.  Circumstantial Evidence

The *Arlington Heights* factors provide additional, circumstantial evidence of the Governor's and the legislature's discriminatory intent in enacting HB 4.

**Discriminatory Effect.** HB 4 dismantles longstanding majority-minority districts while doing far less damage to majority-Anglo districts. "[T]he destruction of a majority-minority

district, particularly one controlled by one racial group, [is] a relatively clear discriminatory impact." *LULAC*, 601 F. Supp. 3d at 167. Each of the eight most-altered districts in HB 4 was a majority-minority district in the 2021 map, Fox Decl. Ex. B, Ex. C, with the result that HB 4 obliterates longstanding minority-majority districts in key areas of the state. By contrast, HB 4 keeps intact more than half of the district populations for each of the majority-Anglo districts from the 2021 map, while simultaneously drawing two additional majority-Anglo districts. *Id.* Ex. B, Ex. C, Ex. A.

Start with Harris County. Under the prior map, there were two plurality Black, majority-minority districts in which Black and Latino voters were consistently able to elect their candidates of choice (CD 9 and CD 18); one majority Latino district in which Latino and Black voters were able to elect their candidates of choice (CD 29); and one more majority-minority district in which Black, Latino, and Asian voters were all able to elect their candidates of choice (CD 7). Fox Decl. Ex. J at 18, 21, 22 (Gonzales Trial Ex. 6), Ex. K at 2–4, 6–7 (Gonzales Trial Ex. 9). HB 4 substantially demolishes three of those four districts, moving 97 percent of CD 9's population into different districts, along with 74 percent of CD 18's population and more than 60 percent of CD 29's population. *Id.* Ex. B. In doing so, HB 4 eliminates CD 9 as a longstanding Black opportunity district, packing most of its Black voters into new CD 18 and CD 29, which now become even more overwhelmingly majority-minority than before. *Id.* Ex. B, Ex A. And while new CD 9 has a Latino CVAP of 50.3 percent, Latino voters have no reasonable opportunity to elect their candidates of choice. Fox Decl. Ex. A; Decl. of Stephen Ansolabehere Ex. 1, at 4 ("Ansolabehere Rep."). *Cf. Perez*, 253 F. Supp. 3d at 885 (finding that "the increases in SSVR and HCVAP were not intended to and did not maintain or improve Latino voting strength"); *Perez v. Abbott*, 390 F. Supp. 3d 803, 811–12 (W.D. Tex. 2019) (noting that the Supreme Court "never addressed or in

11

any way called into question [that court's] findings as to the Legislature's discriminatory purpose in enacting the 2011 plans."). The net effect is to reduce by one the number of districts in which minority voters in Harris County like Plaintiff Vincent Sanders have a reasonable opportunity to elect their candidates of choice. And tellingly, in doing so HB 4 also revises CD 22—a firmly Republican district under both the prior map and HB 4 that had become majority-minority due to post-census growth in minority populations—to again make it a majority-Anglo eligible-voter district. Fox Decl. Ex. P, Ex. O, Ex. L (JX 899), Ex. C, Ex. A.

HB 4 makes similar changes in the Dallas–Fort Worth metropolitan area. It dismantles two existing majority-minority districts in Dallas–Fort Worth in which Black and Latino voters were able to elect their candidates of choice—CD 32 and CD 33—moving more than 67 percent of CD 33's population and more than 58 percent of CD 32's population out of the districts. Ansolabehere Rep. at 3; Fox Decl. Ex B. In doing so, HB 4 packs minority voters in Dallas County into a new CD 33, while cracking the minority voters in Tarrant County who used to be in CD 33 across multiple majority-Anglo districts. Fox Decl. Ex. M at 34, Ex. B, Ex. C, Ex. A. As a result, Black Congressman Marc Veasey, who has represented CD 33 since 2013, is drawn out of his district and paired against incumbent Anglo Republican Congressman Roger Williams in majority-Anglo CD 25. *Id*. Ex. N, Ex. A. Meanwhile, HB 4 also unnecessarily packs additional Black voters into CD 30 to change it from a plurality-Black to a majority-Black eligible voter district, even though it was already a district in which Black voters were electing their candidates of choice. Ansolabehere Rep. at 3; Fox Decl. Ex. C, Ex. A. The net result, as in Harris County, is one fewer district in which Black and Latino voters have an opportunity to elect their candidates of choice— and one more majority-Anglo district in which Anglo voters will be able to elect theirs. Ansolabehere Rep. at 4–5.

HB 4 also harms minority representation elsewhere in the state, while leaving Anglo representation notably intact. In Central Texas, HB 4 moves more than 90 percent of the population out of CD 35, a plurality-Latino district that is currently represented by Latino Democrat Greg Casar, but makes far fewer changes to CD 37, the only majority-Anglo Democratic district in the existing plan. Fox Decl. Ex. B, Ex. A, Ex. P. HB 4 then creates a new, predominantly rural CD 35 with a 51.6 percent Latino CVAP, in which Latino voters are unlikely to elect their candidates of choice. *Id.* Ex. A; Ansolabehere Rep. at 4. Along the Gulf Coast, HB 4 moves more than 60 percent of the population out of CD 27, which was previously a majority-minority Republican district, so that it is now a majority-Anglo Republican district. Fox Decl. Ex. B, Ex. C, Ex. P, Ex. A, Ex. O. And in the Rio Grande Valley, HB 4 substantially reduces the opportunity for Latino voters in CD 34 to elect their candidates of choice. Ansolabehere Rep. at 4.

**Sequence of Events**. In assessing discriminatory intent, "[c]ontext matters." *Veasey*, 830 F.3d at 236. As explained above, the events leading up to the special session and the enactment of HB 4 provide direct evidence of discriminatory intent. *Supra* Parts II, IV.A.1.

The events also strongly suggest that Governor Abbott and the Texas Legislature would not have redrawn the congressional plan were it not for this racial motivation. President Trump's initial, partisan push for new maps got little traction among Texas lawmakers. Senator Huffman testified on June 10 that despite the partisan pressure, the Texas Legislature was "not" considering redrawing the congressional districts. Rough Trial Tr. Day 15 AM 53:25-54:7. On June 23, when Governor Abbott first announced that he planned to call a special session of the legislature, he did not include redistricting on the list of matters he would ask the legislature to take up. Fox Decl. Ex. S. And Defendants acknowledged *in filings they submitted in this case* that "the [Trump] Administration faced resistance to a mid-decade draw, particularly from the Texas GOP

congressional delegation, who worried that a new map would overextend the party's advantage." ECF No. 1116 at 4.

It was only after the July 7 Dhillon Letter framed the push for new congressional districts in racial rather than partisan terms that momentum for redistricting began to build. Just two days later, citing these purported "constitutional concerns"—and with no mention of partisanship— Governor Abbott called a special session of the legislature to address them. ECF No. 1114-1 at 3. Governor Abbott then defended redistricting in entirely racial terms in a July 22 interview.[3] This sequence of events makes clear that the racial motivations raised by the Dhillon Letter and confirmed by Governor Abbott were a central part of the reason that the legislature took up redistricting at all. Partisanship, by contrast, proved insufficient on its own to motivate this extraordinary mid-cycle redistricting. Thus, even if partisanship were part of the equation, it was by no means the *only* reason for drawing new congressional districts. *See Veasey*, 830 F.3d at 241 n.30 ("Intentions to achieve partisan gain and to racially discriminate are not mutually exclusive.").

Events once the legislature did take up redistricting reinforce the conclusion that the redistricting was racially motivated. "Departures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role." *LULAC*, 601 F. Supp. 3d at 172 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). HB 4 was extraordinary from the start. It was entirely unnecessary, as Texas already had drawn new districts after the 2020 census. It was also entirely unprecedented—Plaintiffs are unaware of any recent instance where a state legislature has seen fit to voluntarily redraw its own congressional map mid-decade. And the legislature chose to adopt HB 4 in a special session, not during its

---

[3] FOX 4 Dallas-Fort Worth, "Abbott on THC, redistricting & the special session," at 3:33–39 (YouTube, July 22, 2025), https://www.youtube.com/watch?v=PHsYs0NTPTY.

ordinary session, even though nothing would have prevented it from addressing the issue a few months earlier. Texas's decision to redraw districts only *after* a weeks-long trial on its previous map—and not at any point during the preceding three-and-a-half years—smacks of bad faith. And the chairs of both the House and Senate committees admitted that an outside contractor retained by a private law firm—not the legislature or legislative staff—had drawn the map, that they had not even seen it before the pre-map hearings that took place in the legislature, and that they could offer little explanation of the map's specifics. *See, e.g.*, August 1 Hearing at 02:07:32–12:32:56 (Rep. Hunter saying he had "no idea" who gave Butler Snow the map); Hr'g on S.B. 4 Before the S. Spec. Comm. on Congressional Redistricting at 1:43:02, 89th Leg. (Tex. Aug. 7, 2025), https://senate.texas.gov/videoplayer.php?vid=22443&lang=en (Statement of Senator King) (denying "any input" in mapdrawing). Legislators' effort to clothe the map drawing process in attorney-client privilege strongly suggests that they had something to hide.

**Historical Background.** The Court is familiar, from the recent trial, with Texas's long record of racial discrimination in the drawing of congressional districts and in other aspects of voting and politics. This Court held four years ago that "Texas's recent history . . . favors an inference of discriminatory intent," *LULAC*, 601 F. Supp. 3d at 170, and the same is true here.

Direct and circumstantial evidence therefore confirm that Texas adopted HB 4 intentionally to discriminate against voters based on their race, in violation of the Fourteenth Amendment, the Fifteenth Amendment, and the Voting Rights Act.

**B. HB 4 is an unconstitutional racial gerrymander.**

HB 4 also violates the Fourteenth Amendment because its reconfiguration of districts creates unconstitutional racial gerrymanders. *See Shaw v. Reno*, 509 U.S. 630 (1993). Racial gerrymandering occurs when, in the absence of "sufficient justification," a state "separates its citizens into different voting districts on the basis of race." *Bethune-Hill v. Va. State Bd. of*

*Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller*, 515 U.S. at 911). If "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," then "the design of the district must withstand strict scrutiny." *Cooper v. Harris*, 581 U.S. 285, 291–92 (2017).

A plaintiff may prove "that the legislature 'subordinated' other factors—compactness, respect for political subdivisions, partisan advantage, what have you—to 'racial considerations' . . . through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both." *Id.* at 291 (quoting *Miller*, 515 U.S. at 916). It does not matter *why* "racial considerations" were predominant—it is no defense if "a legislature elevated race to the predominant criterion in order to advance other goals, *including political ones." Id.* at 291 n.1 (emphasis added); *see also Bush v. Vera*, 517 U.S. 952, 968–70 (1996); *Miller*, 515 U.S. at 914 (stating that the "use of race as a proxy" for "political interest[s]" is "prohibit[ed]"). Once a plaintiff shows that race predominated, the defendant must "prove that its race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper*, 581 U.S. at 292 (internal quotation marks omitted).

The Texas Legislature undeniably subordinated other redistricting criteria to race in drawing CD 9, CD 18, CD 30, and CD 35—all districts in the prior map in which Black and Latino voters together formed a majority of eligible voters—and in drawing CD 22 and CD 27, which were previously majority-minority districts but have been redrawn as majority-Anglo districts, even though both districts were already electing Republican candidates by substantial margins under the prior districts.

To start, the evidence that Texas intentionally destroyed majority-minority districts due to the race of the voters in them, *supra* Part IV.A.1, is itself evidence of racial predominance. "While

an intentional vote dilution and a *Shaw* claim are analytically distinct, meaning the Court must analyze them under different rubrics, they are not mutually exclusive, and the allegations are sufficient to support both types of claims." *Perez*, 253 F. Supp. 3d at 892 n.29. The direct evidence discussed above is exactly the kind of direct evidence the Supreme Court has found significant in sniffing out racial predominance. *See Vera*, 517 U.S. at 962 (finding direct evidence of "racial motivations" where state conceded that "it was committed" to creating districts with certain racial makeups "from the outset"); *Miller*, 515 U.S. at 907 (same where state conceded it "set out to create" districts based on race); *Shaw v. Hunt*, 517 U.S. 899, 906 (1996) (same where plan's "principal draftsman" said that race was the reason for creation of districts). And that strong direct evidence that racial considerations drove the adoption of HB 4 eliminates any need to provide an illustrative plan showing that partisan goals could have been achieved in a less racially unbalanced way. *Cooper*, 581 U.S. at 321–22.

The evidence also strongly suggests that Texas adopted unnecessary, 50 percent–plus racial targets in drawing multiple districts in HB 4. Adopting such targets is a "textbook example" of racial predominance. *Id.* at 301 (quoting *Harris v. McCrory*, 159 F. Supp. 3d 600, 611 (M.D.N.C. 2016)); *see also Bethune-Hill*, 580 U.S. at 191. And it is not justified by Section 2 of the Voting Rights Act if minority voters in the relevant district were previously able to elect their candidates of choice even in a district in which they did not form a majority of eligible voters. *Cooper*, 581 U.S. at 303.

In Dallas–Fort Worth, HB 4 packs additional Black voters into CD 30 to raise the Black citizen voting-age population from 46 percent under the prior map to 50.2 percent under HB 4, even though Black voters in CD 30 were already electing their candidates of choice. Fox Decl. Ex. C; Ex. A; Ansolabehere Rep. at 3. It does the same thing with CD 18 in Harris County, raising the

Black citizen voting age population from 38.8 percent to 50.5 percent, even though Black voters in CD 18 were also already electing their candidates of choice. Fox Decl. Ex. C, Ex. A; Ansolabehere Rep. at 3. And in each case, the result of this unnecessary racial quota is to diminish Black political representation, by reducing the number of districts in each region where Black voters have the opportunity to elect their candidates of choice. Ansolabehere Rep. at 4–5.

This consolidation of Black communities in Dallas–Fort Worth and Harris County can only be explained by race. The adjoining communities in both areas—including predominantly Anglo communities—overwhelmingly vote for Democrats. Decl. of Blakeman B. Esselstyn, Ex. 2.

There is no partisan reason for the boundaries of new CD 18 and CD 30 to hew so closely to the boundaries of the predominantly Black precincts in these areas. And because Black voters in prior CD 18 and CD 30 were already able to elect their candidates of choice, there is no legal basis—in the Voting Rights Act or otherwise—for the legislature's decision to ratchet up the Black voting-eligible population above 50 percent in drawing the new districts. *Cooper*, 581 U.S. at 302–06.

HB 4 similarly uses racial quotas for Latino voters in Harris County and in Central Texas, creating new bare-majority Latino CVAP districts without actually providing new opportunities for Latino voters. CD 9, in Harris County, is redrawn from a 25.6 percent Latino CVAP district to a 50.5 percent HCVAP district, while CD 35, in Central Texas, is redrawn from a 46 percent Latino CVAP district to a 51.6 percent Latino CVAP district. Fox Decl. Ex. C, Ex. A. In each case, the prior districts were already electing Latino voters' candidates of choice. Ansolabehere Rep. at 2–3. But—even worse—the new districts will not. Statistical analysis shows that Latino voters in HB 4's versions of CD 9 and CD 35 will cohesively prefer candidates affiliated with the Democratic Party but that such candidates would have lost every recent election in those districts. *Id*. at 4.

These drawing of these districts, too, can only be explained by race. If the legislature's goal were simply to draw additional Republican districts, it could easily have done so without such careful attention to creating majority-Latino districts. And when the legislature altered new CD 9 midway through the legislative process to improve its partisan performance for Republicans, it was careful to keep the proposed district a bare majority-Latino CVAP district in both proposals. *See* Fox Decl. Ex. O, Ex. V, Ex. A, Ex. T.

Finally, race also predominated in the redrawing of CD 22 and CD 27. When the prior version of CD 22 was drawn in 2021, it was a majority-Anglo CVAP district according to then-available data from the Census Bureau's American Community Survey ("ACS"). Fox Decl. Ex. L. Since then, however, growth in the minority population of the district left its voting-eligible population just 49.2 percent Anglo. *Id.* Ex. C. HB 4 reverses that, restoring CD 22 as a bare majority-Anglo (50.8 percent) CVAP district. *Id.* Ex. A. There is no partisan reason for this change; both the prior version of CD 22 and HB 4's version strongly favor Republican candidates. *Id.* Ex P, Ex. O.

CD 27 is a similar story. Under SB 6, CD 27 was a majority Black and Latino district, according to the most recent ACS, that consistently elected Republican candidates by wide margins. *Id.* Ex. C, Ex. P. Despite that partisan performance, HB 4 substantially reconfigures CD 27 so that it is now an Anglo-majority district, at 52.8 percent Anglo. *Id.* Ex. A. To make this possible, while CD 27 previously included all of majority-Latino Nueces County, CD 27 now includes only a small portion—reaching a narrow tendril into the dense, heavily Latino core of Corpus Christi and submerging that population in a vast, rural, and now majority-Anglo district to the north. *Id.* Ex. M at 28. Once again there was no partisan reason for the change, as both districts consistently elect Republicans. *Id.* Ex. O.

By intentionally manipulating the racial composition of these districts without any compelling interest to justify it, the Texas Legislature engaged in racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments. Even assuming that Texas's "end goal" was to "advanc[e] . . . partisan interests," the Governor's attempt to "sell[]" the mid-decade redraw as a "race-based [constitutional] compliance measure" rather than "as a political gerrymander" that "will accomplish much the same thing . . . [and] triggers strict scrutiny," which HB 4 does not survive because no compelling state interest—such as VRA compliance—justifies it. *Cooper*, 581 U.S. at 308 n.7.

### C. HB 4 is a per se violation of the Equal Protection Clause.

Irrespective of the individual district configurations, HB 4 as a whole violates the Equal Protection Clause for two reasons: its districts are malapportioned due to uneven post-census population growth, and the legislature unnecessarily relied on racial data and claimed to pursue partisan ends. And while those issues might not doom a mandatory decennial redistricting, Texas has no necessity justification for this utterly unnecessary mid-decade change.

#### 1. HB 4 is unconstitutionally malapportioned.

HB 4 is unconstitutional at the outset because its districts are grossly and unjustifiably malapportioned. States must "justify population differences between districts that could have been avoided by 'a good-faith effort to achieve absolute equality.'" *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 759 (2012) (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (1983)). The Supreme Court has adopted a "two-prong test to determine whether a State's congressional redistricting plan meets this standard." *Id.* at 760. First, "the parties challenging the plan bear the burden of proving the existence of population differences that could practically be avoided." *Id.* (internal quotation marks omitted). Then, "the burden shifts to the State to show with some specificity that the

20

population differences were necessary to achieve some legitimate state objective." *Id.* (internal quotation marks omitted).

HB 4's districts undeniably do not have equal populations as of the enactment date. According to the 2019–2023 ACS, for example, CD 25—where Plaintiff Cecilia Gonzales lives— is overpopulated by over 12,000 individuals, and CD 22—where Plaintiff Gwendolyn Collins lives—is overpopulated by over 25,000. Fox Decl. Ex. I. The districts were equally populated five years ago, according to the 2020 census. But years of subsequent, uneven population growth in Texas have produced substantial deviations, so that the actual number of people in the districts as of the date of enactment varies widely. Moreover, because the 2019–2023 ACS is a five-year average, and Texas's population has continued to grow, these numbers likely understate the deviation significantly. Ansolabehere Rep. tbl. 1.

There is no question that these population disparities "could have been avoided" by simply maintaining Texas's existing districts. *Tennant*, 567 U.S. at 759. States generally "operate under the legal fiction" that plans remain constitutionally apportioned for ten years after they are adjusted for a given census. *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003). But the purpose of that legal fiction is to "*avoid* constant redistricting, with accompanying costs and instability," as population patterns shift. *LULAC*, 548 U.S. at 421 (emphasis added). The Supreme Court has never applied that legal fiction to uphold an unnecessary, mid-decade change to districts that had already been enacted by the state legislature. *Cf. id.* at 416 (explaining that where the prior plan was court-drawn, "a lawful, legislatively enacted plan should be preferable to one drawn by the courts"). To do so would perversely convert a protection against "constant redistricting" into a license for it. *See id.* at 422 (noting that the test "turns not on whether a redistricting furthers equal-population principles but rather on the justification for redrawing a plan in the first place").

Texas cannot meet its burden to establish that "these population differences were necessary to achieve some legitimate state objective." *Tennant*, 567 U.S. at 760 (quoting *Karcher*, 462 U.S. at 741). The mid-decade redistricting was not "necessary" at all. Courts "are willing to defer to state legislative policies" that "require small differences in the population of congressional districts" only "*so long as* they are consistent with constitutional norms." *Id.* (emphasis added) (quoting *Karcher*, 462 U.S. at 740). Texas's unprompted, unprecedented decision to engage in mid-decade redistricting when it already had a legislatively enacted plan falls far short of this standard. Because Texas can offer no justification for these extreme deviations, HB 4 is unconstitutionally malapportioned.

### 2. Texas's use of racial data and any pursuit of partisan advantage in a mid-decade redistricting are unconstitutional.

Texas's choice to change its existing, legislatively enacted districts in the middle of the decade also has another consequence. Courts have been willing to tolerate the consideration of race and the pursuit of partisan advantage in redistricting because they are seen as essential to the necessary task of adjusting districts to reflect population changes after each decennial census. But here, nothing about Texas's mid-decade redistricting is necessary.

In recognition of the "complex interplay of forces that enter a legislature's redistricting calculus," the Supreme Court has granted legislatures significant leeway to consider a variety of factors, including "racial demographics," in discharging their constitutional obligation to redistrict every decade. *Miller*, 515 U.S. at 915–16. The Court has therefore imposed a high, predominance standard before subjecting districts drawn with an awareness of race to strict scrutiny—reasoning that otherwise, redistricting might be impossible. *Id.* at 916; *see also Shaw*, 509 U.S. at 646 ("[R]ace consciousness does not lead inevitably to impermissible race discrimination."); *id.* at 661

(White, J., dissenting) (noting that "extirpating" racial considerations from the redistricting process is "unrealistic").

The Court has similarly held that prohibiting pursuit of "partisan interests" might make it impossible for partisan legislatures to draw districts, and it has held claims of partisan gerrymandering non-justiciable for that reason. *Rucho v. Common Cause*, 588 U.S. 684, 700–01 (2019) ("Politics and political considerations are inseparable from districting and apportionment." (quoting *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973))).

The rationale for this treatment, however, is grounded in legal *necessities*—including the constitutional mandate that states redistrict after a decennial census, the need to remedy a legal violation when a court invalidates a legislatively-drawn map, or the need to allow a legislature to exercise its right to replace a prior court-drawn plan. *See LULAC*, 548 U.S. at 416 (emphasizing that "if a legislature acts to replace a court-drawn plan with one of its own design, no presumption of impropriety should attach to the legislative decision to act"). In each case, a legislature has to act, and the Court has given some latitude in recognition of that necessity.

There is no necessity here—Texas already had legislatively enacted congressional districts, and its decision to re-draw those districts in the middle of the decade, absent any court order, serves no legitimate interest at all. As explained above, HB 4 is a targeted, race-based strike on minority representation. *See supra* Parts IV.A, B. Texas cannot claim that its expressed awareness of race in redrawing districts was somehow inevitable or justifiable, where it was under no obligation to redraw districts at all. Nor can Texas seek refuge by asserting purely partisan motivation. While determining whether a particular set of districts goes "too far" in promoting partisan aims may present a difficult—and therefore nonjusticiable—question when a legislature is tasked with the mandatory duty of redrawing districts, *Rucho*, 588 U.S. at 701 (quoting *Vieth v. Jubelirer*, 541

U.S. 267, 296 (2004) (plurality op.)) a state's voluntary decision to draw new districts on a whim poses no such difficulty. "[I]n *this* context," it is entirely "clear what fairness"—and unfairness— "looks like." *Id.* at 706 (emphasis added).

In sum, Texas's decision to make voluntary, mid-decade changes to its legislatively enacted districts leaves it unable to justify its consideration of race or any pursuit of partisan advantage in adopting those districts.

### D. Black and Latino Texans, including Plaintiffs, will suffer irreparable harm absent an injunction.

A preliminary injunction is needed because without one, Plaintiffs are "likely to suffer irreparable harm." *Daniels Health Scis*, 710 F.3d at 585 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The candidate filing period for the 2026 congressional election is set to open on November 8, 2025, and close a month later. Tex. Elec. Code § 172.023. Voting in the primary election will then begin on February 17, 2026, and end on election day, March 3. *Id.* §§ 85.001, 41.007. If these events are allowed to occur under HB 4's congressional districts, Latino and Black Texans will have their voting rights diluted in breach of federal law—a violation of their fundamental rights for which there can be no adequate remedy after the election has already occurred. "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (similar); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon."). That is because "once the election occurs, there can be no do-over and no redress" for voters whose rights were violated. *League of Women Voters of N.C.*, 769 F.3d at 247. That analysis is fully applicable here. If elections are

allowed to occur under HB 4, millions of Black and Latino Texans would see their right to vote—and have their vote counted equally—irreversibly and irreparably abridged.

### E.  The balance of equities and the public interest favor relief.

The public interest and the balancing of the equities also strongly favor injunctive relief. These two "factors merge when the Government is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And both the balance of the equities and the public interest are served by protecting the right of every Texan to vote on equal footing.

Neither the balance of the equities nor the public interest support conducting elections under electoral districts that violate federal law. "[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (quoting *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011)). When a statute "is unconstitutional," "the public interest [i]s not disserved by an injunction preventing its implementation." *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *see also Bank One, Utah v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999) ("[T]he public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law."); *Chamber of Com. of the U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) ("Oklahoma does not have an interest in enforcing a law that is likely constitutionally infirm."); *cf. Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 298 (5th Cir. 2012) ("Injunctions protecting First Amendment freedoms are always in the public interest." (cleaned up)).

To be sure, the Court must weigh the benefits and import of any injunctive relief against the confusion it might cause, particularly in the middle of an election cycle. *See Purcell v. Gonzalez* 549 U.S. 1, 4 (2006). But we are not in the middle of an election cycle—and there is no ongoing congressional election in Texas. No candidates have officially filed to run in any newly-created

district—and the primary election as it stands is a full six months away. This motion thus comes at a fundamentally different juncture than when this Court last considered a preliminary injunction motion in this case. *See LULAC*, 601 F. Supp. 3d at 184. That motion was filed on November 24, 2021, and the hearing was held in January 2022. *Id.* at 157. The instant motion comes in August, three months earlier in the election calendar. That leaves the Court more than three months to resolve this motion without adjusting any deadlines in the current election calendar. Moreover, in 2021, the Texas Legislature passed—and Governor Abbott signed—a law providing for alternative, later filing periods and election dates for the 2022 primary elections in the event that the legislature was delayed in enacting maps. *See* Tex. Elec. Code § 41.0075(c) (2022). While that law has now expired, Texas nonetheless made clear that those extended timelines—providing for candidate filing deadlines as late as March 7, and primary dates as late as May 24—are readily feasible and consistent with the public interest. *See id.*

The consequences of granting preliminary relief in this case are also far less than they often would be in a redistricting dispute. If the Court preliminarily enjoins HB 4, the prior set of congressional districts that the legislature itself enacted just four years ago remain available for use, subject to Plaintiffs' pending challenge to some of those districts. That available remedy makes relief far less of an intrusion on state sovereignty than would be involved with a court-drawn plan. To the contrary, it would simply reinstate the status quo—a map designed by the Texas legislature and in effect the last two Texas congressional elections. *See Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) ("Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned."). And any administrative burden that might be occasioned by granting a preliminary injunction at this stage lies squarely at the feet of the Governor and the

Texas Legislature, who chose to take the extraordinary step of engaging in mid-decade redistricting during a special session just months before an upcoming primary.

## V.    CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin the use of HB 4's districts and order Texas to continue to use the prior congressional districts for the 2026 election.

Dated: August 24, 2025

Respectfully submitted,

Renea Hicks
Attorney at Law
Texas Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

*David R. Fox*
David R. Fox
Richard A. Medina
James J. Pinchak
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400f
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law
jpinchak@elias.law

Abha Khanna
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on August 24, 2025, and that all counsel of record were served by CM/ECF.

_/s/ David R. Fox_____