# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

|  |  |  |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES, SERGIO MORA, BOBBIE GARZA-HERNANDEZ | § § § § |  |
| Plaintiffs | § § | Civil Action No. |
|  | § | 3:21-cv-00259-DCG-JES-JVB |
| v. | § | [Lead Case] |
|  | § |  |
| STATE OF TEXAS, GREG ABBOTT, GOVERNOR OF THE | § § | 3:21-cv-00988-DCG-JES-JVB |
| STATE OF TEXAS, in his official capacity, and JANE NELSON, | § § | [Consolidated Case] |
| SECRETARY OF STATE OF TEXAS, in her official capacity | § § |  |
| Defendants | § |  |

## PLAINTIFF MALC'S FIRST SUPPLEMENTAL COMPLAINT

Plaintiff Mexican American Legislative Caucus ("MALC") submits this First Supplemental Complaint pursuant to Federal Rule of Civil Procedure 15(d). The pleading is for the purpose setting forth events that occurred after the filing and four-week trial of this action in May and June of 2025 and pleading additional claims based on those events. Plaintiff would show the Court as follows:

On August 23, 2025, the Texas Legislature passed a mid-decade redistricting map for the United States House of Representatives to dilute dramatically minority voting power across the State of Texas. The process the Texas Legislature conducted to pass its discriminatory map was egregiously unfair and contrary to the ideals of democratic governance – minimizing, ignoring or even excluding full and vital public participation. The result of such a flawed process was predictable. Discriminatory maps passed without proper input and deliberation. Racial

considerations infected, tainted, and drove the redrawn Congressional map and have resulted in a grossly unconstitutional map that must be enjoined and struck down.

Plaintiff requests declaratory and injunctive relief against Defendants regarding the redistricting plan adopted by the State of Texas for the United States House of Representatives (Plan C2333) in the Second Special Session of the 89th Texas Legislature.

Specifically, Plaintiff seeks declaratory relief declaring that the Plans were drawn and adopted with the purpose of discriminating on the basis of race in violation of the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment; that certain districts within the plan, detailed in the ensuing paragraphs, violate Section 2 of the Voting Rights Act on the grounds that they impermissibly dilute the voting power of Latinos and Spanish speakers; that certain districts, detailed in the ensuing paragraphs, manipulate population deviations for impermissible ends, in violation of the Fourteenth Amendment; and that certain districts, detailed in the ensuing paragraphs, constitute an impermissible racial gerrymander on the grounds that race was a predominant factor in their drawing without a sufficiently compelling governmental interest to justify making it such. Plaintiff further seeks injunctive relief to prevent the use of the Plan in upcoming elections.

## PARTIES

1.      Plaintiff, Mexican American Legislative Caucus, Texas House of Representatives (hereinafter MALC), is the nation's oldest and largest Latino legislative caucus.  MALC is a non-profit organization established to serve the members of the Texas House of Representatives and their staff in matters of interest to the Mexican American community of Texas, to form a strong and cohesive voice on those matters in the legislative process, including redistricting. MALC's mission includes maintaining and expanding Latino representation across elected offices in Texas.

MALC strives to raise the level of Latino engagement in Texas government and politics through policy, education, outreach, organizing, and advocacy.

2.      MALC membership is composed predominantly of sitting Texas State Representatives who are either (a) of Mexican-American descent or (b) whose legislative district includes not less than 50 percent Hispanic/Latino total population, as reflected in the demographic research and redistricting records of the Texas Legislative Council, and who are confirmed by a vote of two-thirds of the Caucus. Every Texas State Representative who has identified themselves as being of Latino descent is a member of MALC, and historically almost every State Representative of Latino descent has joined MALC. A major purpose of MALC is to help promote Latino representation and advocacy in the State of Texas, including ensuring appropriate citizen participation and access to all levels of government, including both state and federal government.

3.      MALC has one or more members who reside in the challenged districts and who have had their own ability to elect representatives of their choice injured on account of being Latino and/or being part of the Spanish-speaking community in the affected areas. As a whole, MALC represents the interests of both the organization and its purpose of supporting Latino representation and advocacy in Texas, but also each of its individual members that are adversely effected by and discriminated against as a result of Plan C2333.

4.      MALC members in challenged districts include:

a.      Rep. Eddie Morales, who resides in Maverick County in CD 23. Rep. Morales is a registered voter in Maverick County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

b.      Rep. Mary González, who resides in El Paso County in CD 23. Rep. González is a registered voter in El Paso County. She usually votes for the Latino preferred candidate in primary

and general elections and intends to continue doing so in upcoming elections.

   c.  Rep. Claudia Ordaz, who resides in El Paso County in CD 16. Rep. Ordaz-Perez is a registered voter in El Paso County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

   d.  Rep. Joe Moody, who resides in El Paso County in CD 16. Rep. Moody is a registered voter in El Paso County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

   e.  Rep. Vince Perez, who resides in El Paso County in CD 16. Rep. Perez is a registered voter in El Paso County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

   f.  Rep. Ramon Romero, who resides in Tarrant County was in CD 25 and now resides in CD 33. Rep. Romero is a registered voter in Tarrant County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections. Rep. Romero is the current Chairman of the Mexican American Legislative Caucus.

   g.  Rep. Rafael Anchía, who resides in Dallas County in CD 33. Rep. Anchía is a registered voter in Dallas County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

   h.  Rep. Armando Walle, who resides in Harris County in CD 29. Rep. Walle is a registered voter in Harris County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

   i.  Rep. Christina Morales, who resides in Harris County in CD 18. Rep. Morales is a registered voter in Harris County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

j.      Rep. Mary Ann Perez, who resides in Harris County was in CD 7 and now resides in CD 29. Rep. Perez is a registered voter in Harris County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

k.      Rep. Penny Morales Shaw, who resides in Harris County in CD 29. Rep. Morales Shaw is a registered voter in Harris County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

l.      Rep. Armando Martinez, who resides in Hildago County in CD 34. Rep. Martinez is a registered voter in Hidalgo County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

m.      Rep. Erin Gamez, who resides in Cameron County in CD 34. Rep. Gamez is a registered voter in Cameron County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

n.      Rep. Lulu Flores, who resides in Travis County in newly created CD 27. Rep. Flores is a registered voter in Travis County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

o.      Rep. Elizabeth Campos, who resides in Bexar County in newly created CD 20. Rep. Campos is a registered voter in Bexar County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

5.      Defendant State of Texas is a political subdivision covered under the provisions of the Voting Rights Act and responsible for the actions of its officials with regard to state-wide redistricting.

6.      Defendant Greg Abbott is the Governor of the State of Texas. Pursuant to Article

Four, Section 1 of the Texas Constitution, he is the chief executive officer of the Defendant State of Texas.  His duties include ordering the elections for state offices and the United States House of Representatives. He is sued in his official capacity. He may be served at the Office of the Governor, State Insurance Building, 1100 San Jacinto, Austin, Texas 78701.

7.      Defendant Jane Nelson is sued in her official capacity as the Secretary of State of Texas. Ms. Nelson is the current Texas Secretary of State, successor to John Scott, the previous Secretary of State and chief election officer appointed by Governor Greg Abbott on October 21, 2021. The Secretary of State is the chief election officer of this state. She supervises elections and has constitutional and statutory duties associated with redistricting and apportionment, including advising election authorities on boundaries of districts, setting election deadlines for new districts, and enforcement of certain election rules and laws. She is sued in his official capacity.

8.      Plaintiff challenges Congressional Plan C2333 as representing the interests of citizens and registered voters residing in CDs 2, 5, 9, 12, 18, 27, 29, 30, 32, 33, and 35.

9.      Plaintiff has standing to bring this action under 42 U.S.C. § 1983 to redress injuries suffered through the deprivation, under color of state law, of rights secured by the Constitution and the Voting Rights Act of 1965, 52 U.S.C. § 10301 et seq., as well as standing to bring this action directly under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

## SUPPLEMENTAL FACTUAL ALLEGATIONS

### *DOJ demands Texas dismantle multiracial congressional districts on account of race*

10.      On July 7, 2025, DOJ sent a letter to Governor Abbott and Attorney General Ken Paxton contending that "Congressional Districts TX-09, TX-18, TX-29 and TX-33 currently constitute unconstitutional 'coalition districts' and we urge the State of Texas to rectify these race-based considerations from these specific districts."

11.      The letter continued, stating that "[i]t is the position of this Department that several Texas Congressional Districts constitute unconstitutional racial gerrymanders, under the logic and reasoning of

*Petteway*. Specifically, the record indicates that TX-09 and TX-18 sort Houston voters along strict racial lines to create two coalition seats, while creating TX 29, a majority Hispanic district."

12.     "Additionally," the letter continued, "TX-33 is another racially-based coalition district that resulted from a federal court order years ago, yet the Texas Legislature drew TX-33 on the same lines in the 2021 redistricting. Therefore, TX-33 remains as a coalition district."

13.     The letter states that "the State's interest when configuring these districts was to comply with Fifth Circuit precedent prior to the 2024 *Petteway* decision, that interest no longer exists. Post-*Petteway*, the Congressional Districts at issue are nothing more than vestiges of an unconstitutional racially based gerrymandering past, which must be abandoned, and must be corrected by Texas."

14.     Although the letter was dated July 7, 2025, it demanded a response by July 7, 2025, and threatened that "[i]f the State of Texas fails to rectify the racial gerrymandering of TX-09, TX-18, TX-29 and TX-33, the Attorney General reserves the right to seek legal action against the State, including without limitation under the 14th Amendment." Notably, DOJ has no statutory authority to sue a State for an alleged equal protection violation.

15.     According to the most recent 2019-2023 American Community Survey Citizen Voting Age Population ("CVAP") estimates reported by the Texas Legislative Council for Plan C2193 (the 2021 congressional map), CD 9 is 45.0% Black CVAP, 25.6% Hispanic CVAP, and 18.1% Anglo CVAP.

16.     CD 18 in Plan C2193 is 38.8% Black CVAP, 30.4% Hispanic CVAP, and 23.4% Anglo CVAP.

17.     CD 29 is 63.5% Hispanic CVAP, 18.4% Black CVAP, and 13.7% Anglo CVAP.

18.     CD 33 is 43.6% Hispanic CVAP, 25.2% Black CVAP, and 23.4% Anglo CVAP.

### *Governor Abbott calls for special session to redistrict congressional map to eliminate multiracial congressional districts on account of race*

19.     On July 9, 2025, Governor Abbott signed a Proclamation calling for a special session of the Legislature. Among the topics on the Call was "[l]egislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice."

20.     But the sworn testimony regarding the 2021 congressional map from those responsible for its configuration, including Senator Joan Huffman, the Republican congressional delegation's attorney Chris Gober, and mapdrawer Adam Kincaid, was that race was not considered at all in the creation of the congressional districts.

21.     Thus, on July 11, 2025, Attorney General Paxton sent a letter to DOJ stating, *inter alia*, that "[h]ad the Texas legislature felt compelled under pre-*Petteway* strictures to create coalition districts, the basis for such decisions—as you say—"no longer exists." However, my office has just completed a four-week trial against various plaintiff groups concerning the constitutionality of Texas's congressional districts . . . . The evidence at that trial was clear and unequivocal: **the Texas legislature did not pass race-based electoral districts for any of those three political maps.**"

22.     Contrary to the assertions in DOJ's letter—which were cited by Governor Abbott's Proclamation as the basis for the legislature undergoing mid-decade redistricting—the State contends that race played no role in the creation of CDs 9, 18, 29, and 33 and thus they cannot be racial gerrymanders.

23.     Accordingly, CDs 9, 18, 29, and 33—and any other Texas congressional district—cannot have been created for the purpose of being a minority coalition district to comply with a pre-*Petteway* understanding of Section 2's requirements.

24.     Notwithstanding Attorney General Paxton's letter stating unequivocally that race was not considered at all in the configuration of the 2021 congressional map, the DOJ's Assistant Attorney General for Civil Rights, Harmeet. Dhillon has continued to call for the dismantling of multiracial majority Texas congressional districts on account of their racial composition.

25.     For example, on August 6, 2025, Ms. Dhillon posted on her official DOJ X.com account a TV interview she did with "Real America's Voice" about her letter to Governor Abbott and Attorney General Paxton. She said "we took a look at Texas and we found that four of their districts in Texas are comprised of these so-called coalition districts. In other words, to get to a special minority district you have to add together multiple minorities or count on a certain percentage of a crossover white vote . . . . And so

we wrote to Texas telling them that . . . their districts are not in compliance with the federal voting rights laws and so they needed to take action to fix them. That is what triggered the Texas . . . Governor to call the legislature into session to put new maps together."[1]

26.     On August 8, 2025, Ms. Dhillon posted a "highlights of the week" video on her official X.com account, noting the 60th anniversary of the Voting Rights Act. She said: "That kind of takes us into the first big project that we did this week that was in the news, which is our involvement in the Texas redistricting that is happening now. We sent a letter last month in July to Texas, noting that under a Fifth Circuit precedent that was passed in 2024, several of Texas's districts are no longer legal under Voting Rights Act analysis because they constitute illegal coalition districts. And so, that caused the Texas legislature to be called into session by the Governor . . . ."[2]

27.     On August 9, 2025, Ms. Dhillon posted video of a television interview she did on her official X.com account, saying that DOJ took issue with four of Texas's congressional districts with "multiple minority groups" constituting a majority of their voters, contending that this state of events was illegal. "So we told Texas it's in violation of federal law, and Texas needs to fix that. To its credit, Texas has responded to that call by calling a special session of the legislature that's required for redistricting . . . ."[3]

28.     Governor Abbott has repeated Ms. Dhillon's view that multiracial majority, or "coalition" districts must be dismantled. He has publicly stated that his purpose in placing mid-decade redistricting on the legislature's special session agenda was to eliminate minority coalition districts. As a Defendant in this lawsuit, however, he has consistently claimed these districts were created without consideration of race and thus their racial composition occurred by happenstance.

29.     For example, in a July 22, 2025, television interview with Fox 4 Dallas-Fort Worth, Governor Abbott stated his purpose for including congressional redistricting on his Special Session Call:

---

[1] X.com, @AAGHarmeetDhillon, Aug. 6, 2025 6:00 PM, https://x.com/AAGDhillon/status/1953214706199458078.
[2] X.com, @AAGHarmeetDhillon, Aug. 8, 2025, 6:39 PM, https://x.com/AAGDhillon/status/1953949095238009285.
[3] X.com, @AAGHarmeetDhillon, Aug. 9, 2025 3:26 PM, https://x.com/AAGDhillon/status/1954263141019529527.

"Since the last time we did redistricting, the law has changed. In a lawsuit that was filed by Democrats, and the decision came out last year, it says that coalition districts are no longer required. ***And so we want to make sure that we have maps that don't impose coalition districts . . . .***"[4]

30.     In response to a question regarding the fact that the State—including himself as a Defendant in this case—defended the 2021 map in court, Governor Abbott said: "The map that was drawn was drawn before this recent court decision that said coalition districts were not required and the map I believe as drawn could be upheld. That said, we are no longer compelled to have coalition districts and as a result we can draw maps, not have coalition districts, and through that process maximizing [*sic*] the ability of Texans to elect their candidates of choice."[5]

31.     In an August 7, 2025 interview with Joe Pags, posted on Governor Abbott's Youtube channel, Governor Abbott said: "Texas is no longer required to have what are called coalition districts. ***And as a result, we're able to take the people who were in those coalition districts, and make sure they're gonna be in districts that really represent the voting preference of those people who live here in Texas.***" He continued, saying "We saw the aftermath of the Trump election, that an overwhelming number of Hispanics, and Blacks, as well as others, chose to vote for Trump. Four of the five districts we're going to create are predominantly Hispanic districts that they're going to be voting for Republicans as opposed to Democrats."[6]

32.     He continued, "We're creating four new Hispanic oriented districts that are gonna vote Republican. And Joe – something else that is going to happen in this process and that is the consolidation of what is known as the Barbara Jordan district over in the Houston area. A Black woman who served there for a long time – they've been begging to protect her district and that's exactly what we're doing."[7]

---

[4] *Abbott on THC, redistricting & the special session* at 3:16, Fox 4 Dallas-Fort Worth, https://www.youtube.com/watch?v=PHsYs0NTPTY (emphasis added).
[5] *Id.*
[6] *Governor Abbott Talks Democrat Desperation on the Joe Pags Show*, Aug. 7, 2025, https://www.youtube.com/watch?app=desktop&v=kubKVtdGgBA (emphasis added).
[7] *Id.*

MALC'S SUPPLEMENTAL COMPLAINT - 10

33.     In other words, Governor Abbott's, the legislature's, and the State's position is that the 2021 congressional districts were drawn without regard to race. That race-neutral process in turn yielded a number of districts that unintentionally turned out to be multiracial—*i.e.*, no single racial group comprised a majority of their eligible voters. Four years and two election cycles later, DOJ researched the racial composition of Texas's congressional districts and objected to the existence of four districts *on account of* their racial composition. Governor Abbott, learning of those districts' racial makeup, called a special session of the legislature to dismantle those districts *on account of* their racial composition, telling a reporter he wanted multiracial, minority coalition districts eliminated from the state's congressional map to block them from electing their preferred candidates.

### *Legislature undertakes redistricting on account of race*

34.     Before issuance of the DOJ letter, Senator Huffman testified the legislature had no plans to redraw the Texas Congressional map. Trial Tr. June 10, 2025 at 54:4-7. But just days after the trial in this Court concluded, the legislature moved quickly in response to the Governor's command to redistrict the congressional map on account of race. The special session began on July 21, 2025. The House held its first committee hearing on July 24, 2025 to take public testimony, with additional hearings on July 26, July 28, and August 1. The Senate held its first committee hearing on July 25, with additional hearings on July 26, July 28, July 29, and July 30.

35.     Both the House and Senate Redistricting Committee Chairs invited Ms. Dhillon, who signed the DOJ letter, to testify regarding the assertions in her letter. According to Chair Vasut, she did not respond, other than via an "out of office" auto-response received by House Committee Chair Cody Vasut. A motion to issue a subpoena to her failed in the Senate Redistricting Committee, with members voting no citing an opinion by the Texas Legislative Council that there was no legislative subpoena power outside the state and despite the fact that a Senate committee had recently issued out-of-state subpoenas to BlackRock and other technology companies.[8] The Senator who issued the out-of-state tech company subpoenas, Bryan

---

[8] https://www.foxbusiness.com/politics/texas-subpoenas-blackrock-documents-related-esg-push

Hughes, turned around and voted against out-of-state subpoenas as a member of the Redistricting Committee.

36.     Ms. Dhillon did not respond to the invitation and instead subsequently conducted television interviews claiming credit for Governor Abbott's and the Texas Legislature's dismantling of multiracial majority districts based on her racial research into Texas's congressional districts.

37.     Most of the committee hearings, at which thousands of Texans testified in opposition of mid-decade redistricting, were held prior to the release of H.B. 4's map on July 3, 2025 (Plan C2308). Senate Redistricting Committee Chair Phil King and House Redistricting Committee Chair Cody Vasut denied knowing anything about the drawing or creation of the map prior to its release, although Senator King acknowledged during the Senate Redistricting Committee's July 30, 2025 meeting that Adam Kincaid—the same person who drew the 2021 map—was the mapdrawer again this time. Although the Senate Committee voted against Senator Alvarado's motion to subpoena Mr. Kincaid to come testify, Chair King sent a letter to Mr. Kincaid inviting him to come testify. He never came and testified. During the floor debate, Senator King acknowledged he had been in contact with Mr. Kincaid for months, and claimed he specifically requested to not be told about the draft map or process.

38.     H.B. 4 was sponsored in the House by Rep. Todd Hunter, who had served as the House Redistricting Committee Chair for the 2021 redistricting process.

39.     The new map did exactly as DOJ (Ms. Dhillon) and Governor Abbott demanded—it dismantled the four targeted congressional districts—CDs 9, 18, 29, and 33—and made additional predominantly race-based changes to other districts, including CD 35, with a purpose of diluting the voting strength of Latino and Black voters. Overall, while the 2021 map—drawn blind to race—contained nine congressional districts in which no racial single racial group constituted a majority of eligible voters, Plan C2308 dropped that number by more than half to just four such districts.

40.     Creating just four districts out of thirty-eight in which no single race constitutes a majority of voters is a remarkable feat in Texas, which is one of the most diverse states in the country. According to

the 2020 Census, Texas's total population is 39.7% Anglo, 39.3% Hispanic, 13.6% Black, and 6.3% Asian. According to the 2023 American Community Survey, its citizen voting age population is 49.1% Anglo, 31.3% Hispanic, and 13.8% Black, and 4.6% Asian.

41.     Yet somehow, the State has produced a congressional map in which 89% (34 of 38) of the districts are single-race majority. Sixty-three percent (24 of 38) of the districts are Anglo CVAP majority, despite Anglos accounting for less than half of the State's CVAP.

42.     Creating single-race majority districts—with a 50%+1 mechanical racial target—was a concerted and purposeful goal of the 2025 mid-decade redistricting. This startling racial segregation did not occur by chance. And the responsible state officials did not even hide their racial motivations. But Texas has no legitimate or compelling justification for this race-based redesign of congressional districts that Texas has contended were configured blind to race.

43.     The Houston area was the center of the radical, racially-motivated redraw. The 2021 map's CDs 9 and 18, which had maintained their basic configuration for decades and had long elected Black members of Congress, were dismantled and "consolidated," as Governor Abbott said, to create just one Black opportunity district in the region. In the 2021 map, CD 9 had a Black CVAP of 45%. Just 2.9% of the district's population was retained in the new CD 9, which is shifted east and is now a bare-majority Hispanic CVAP district at 50.5% (with a Black CVAP of 12.1% and an Anglo CVAP of 34.0%).

44.     Under the 2021 map, CD 18 had a Black CVAP of 38.8%, a Hispanic CVAP of 30.4%, and an Anglo CVAP of 23.4%. The district was substantially reconfigured and its Black population purposefully increased so that it would become majority Black. This was accomplished by fusing together 70.7% of the 2021 map's CD 9 with 25.6% of the 2021 map's CD 18. Under Plan C2308, CD 18 is now 50.8% Black CVAP, 22.2% Hispanic CVAP, and 17.9% Anglo CVAP.

45.     The DOJ letter also targeted CD 29, confusingly labeling it a coalition district on the first page of its letter while acknowledging its majority Hispanic status on the second page. Under the 2021 map, CD 29 was the sole Hispanic majority district in the Houston area, with a Hispanic CVAP of 63.5%. Under

Plan C2308, its Hispanic CVAP drops by over 20 points to 43.5%, with its remaining population 32.7%

Black CVAP and 18.2% Anglo CVAP.

46.    The only Hispanic-majority district in the Houston area is now the reconstituted CD 9, with

a Hispanic CVAP of just 50.5% and electoral performance data showing that the district will not likely

perform to elect Hispanic voters' candidates of choice. Indeed, Defendants have contended in this case that

districts with bare-majority Hispanic CVAPs like this will not perform to elect Latino preferred candidates.

CD 9 is a "façade" or "sham" district purposefully created to be just above a mechanical racial target of

50%+1 Hispanic CVAP, with the knowledge and intent that it will not likely perform to elect candidates

preferred by the district's Hispanic voters.

47.    The proposed map also accomplishes the express goal of dismantling CD 33. CD 33 was

originally created to remedy intentional racial discrimination that the *Perez v. Abbott* three-judge court

found in how the 2011 congressional map (Plan C185) fragmented minority communities in Tarrant

County. As Judge Smith commented regarding the 2011 map's treatment of Tarrant County voters,

"[r]elatively little about the 2011 Congressional redistricting passes the smell test as to DFW," observing

that the map had "unusual appendages added [into Tarrant County] from an adjoining, but demographically

dissimilar, neighboring county." *Perez v. Abbott*, 253 F. Supp. 3d 864, 986 (W.D. Tex. 2017) (Smith, J.,

dissenting).

48.    CD 33 was jointly proposed by various plaintiffs in the *Perez* litigation and the State. The

parties filed a Joint Advisory with the three-judge *Perez* court (including with then-Attorney General

Abbott on the signature bloc) asserting that "CD33 [i]s [n]ot a [c]oalition [d]istrict" and that "[r]ace is not

the predominant districting criterion in CD33" but rather "the district does not have a majority racial group,

and neither does the Metroplex within which it is situated. The district simply reflects the population and

its growth in Dallas and Tarrant Counties."[9] The *Perez* court agreed, explaining that "CD33 was not

intentionally drawn as a minority coalition district under § 2. Rather, it was created to remedy the alleged

---

[9] Joint Advisory, *Perez v. Perry*, No. 5:11-cv-00360-OLG (Feb. 16, 2012), ECF No. 660.

intentional discrimination (cracking) claims by removing the fingers from the Anglo-majority districts that reached into Dallas and Fort Worth."[10]

49.     The 2013 legislature then adopted the same configuration of CD 33 the court ordered. Although the district was reconfigured in 2021, it remained anchored in Tarrant County and was drawn race-blind according to the State.

50.     Despite this history—including its race-blind reconfiguration in 2021—DOJ expressly demanded in its letter that CD 33 be dismantled because it was a "racially-based coalition district" at its inception and "the Texas Legislature drew TX-33 on the same lines in the 2021 redistricting" so "[t]herefore, TX-33 remains as a coalition district."

51.     The new map complies with DOJ's demand, eliminating CD 33 from its Tarrant County base and combining the Dallas County pieces of the district with portions of CD 32 to reduce from three to two the number of majority-minority districts in the Dallas Fort Worth metroplex.  The map accomplishes this through employing the same type of "unusual appendages added [into Tarrant County] from [] adjoining, but demographically dissimilar, neighboring count[ies]" as the 2011 map.

52.     Chair Hunter and other supporters of 2025 map in the House extensively described the racial reasons for the configuration of various districts and cited racial reasons to justify their support of the map at the August 1, 2025 House redistricting committee meeting.

53.     Laying out the bill, Chair Hunter cited *Petteway*'s coalition district holding as a basis for undertaking redistricting and said "[i]t is important to note that four of the five new districts are majority minority Hispanic CVAP districts." Describing the districts' racial composition in detail, Chair Hunter explained that "congressional district 9, the new district, has a 50.5% Hispanic CVAP. CD 28, that's the valley south, has an 86.7% Hispanic CVAP. CD 32 is a and remains a nonminority district. CD 34, 71.9%, is now Hispanic CVAP. And CD 35, which is San Antonio, is now at 51.6% Hispanic CVAP."

---

[10] *Perez v. Abbott*, 274 F. Supp. 3d 624, 653 (W.D. Tex. 2017), *rev'd and remanded on other grounds*, *Abbott v. Perez*, 585 U.S. 579 (2018).

54.    He continued: "In 2021 plan, there were nine Hispanic majority voting age districts. In this plan, there are 10 Hispanic majority voting age districts. In the 2021 plan, there were 7 Hispanic citizen voting age districts, and under this plan there are eight. There were no majority Black CVAP . . . districts under the 2021 plan. In the proposed plan today, CD 18 is now 50.8% Black CVAP. In 2021, it was 38.8. CD 30 is now 50.2% Black CVAP. In 2021, it was 46%."

55.    In a colloquy with Republican Rep. David Spiller, Chair Hunter agreed that the 2021 plan contained coalition districts and *Petteway* no longer required those districts.

56.    Rep. Spiller said: "Let's talk about district 18 in Harris County, what is referred to as the Barbara Jordan district. Is it your understanding that district 18 was, or currently is, a coalition district?" Chair Hunter responded: "I can tell you that under this plan that it becomes a real performing Black CVAP district."

57.    Rep. Spiller continued, regarding CD 18, "I would submit to you that it is currently a coalition district, under HB 4 it would not be . . . it goes from a coalition district to a majority Black CVAP district, being 50.81% Black." Chair Hunter responded, "That is correct."

58.    Rep. Spiller then asked about CD 9, saying "Let's talk about district 9. My understanding is district 9 was also a coalition district and under HB 4 changes from a coalition district to a majority Hispanic CVAP district, do you know whether that's correct or not?" Chair Hunter responded, "Well, what we're doing, it moves – district 9 is basically in 2021, the Hispanic CVAP was 25.73. The Black CVAP was 45.06. In this proposal, the Hispanic CVAP is 50.41."

59.    Rep. Spiller responded, "So previously Hispanics did not hold a majority in that district and under this scenario, HB 4, they now do, correct?" Chair Hunter responded, "Well, according to CVAP."

60.    Speaking about CD 29 in discussion with Rep. Spiller, Chair Hunter said "It moves from a Hispanic majority CVAP district to what they call a non-Hispanic majority CVAP district. For example, in 29, the Black CVAP goes from 18.31% in 2021 to 32.79% under this proposal."

61.     In a later exchange with Democratic Rep. Chris Turner, Rep. Turner asked: "On CD 29, in that district Hispanic CVAP was actually reduced by 20 percent to be less than 50%, why is that?" Chair Hunter responded, "Okay, on 29, Congressman [*sic*] Garcia's district, the Black CVAP went from 18.31 to 32.79, a plus 14.48; the Hispanic CVAP went from 63.53 to 43.12, . . . it moves from a Hispanic majority CVAP to a non-Hispanic majority CVAP, increasing Black percentage."

62.     Republican Rep. Katrina Pierson also had a colloquy with Chair Hunter about the racial composition of the districts. Asking about CD 35, Rep. Pierson asked "This is one of the coalition districts that is now one of the majority Hispanic CVAP districts, is that correct?" And Chair Hunter responds that CD 35 is now majority Hispanic CVAP, with an "increase of 5.71 change" in its Hispanic CVAP.

63.     Rep. Pierson and Chair Hunter discussed how the map created 50%+1 targets for Black CVAP as well. Rep. Pierson started by saying "There was a fear that if the lines were redrawn, that the new map would put in jeopardy the historic Barbara Jordan majority minority district in the Houston area, they felt like that might go away, do you recall that?" Chair Hunter responded, "That is correct, yes."

64.     Rep. Pierson continued, "Well there were also stakeholders who testified during those field hearings that felt like the population of Black voters in the state did not have appropriate representation, do you recall that testimony?" Chair Hunter responded in the affirmative.

65.     Next, Rep. Pierson asked, "This current map that you have submitted actually shows there's not just one but two majority Black CVAP districts drawn on this map, is that true?" Chair Hunter responded, "That is correct, let me give everyone the details. CD 18 is now 50.8% Black CVAP, in 2021 it was only 38.8%. CD 30 is now 50.2% Black, in 2021 it was 46%." Rep. Pierson summarized, "So overall Black voters go from zero to two majority Black CVAP seats out of the 38 seats in Texas."

66.     Republican Rep. Terry Wilson also engaged in a colloquy with Chair Hunter, saying: "And, what I also understood, and to just be brass tacks, is that we went from seven to eight Hispanic and from zero to two Black, is that accurate?" Chair Hunter agreed.

67.     Democratic Rep. Christian Manuel asked Chair Hunter noted that CDs 9 and 35 were changed to be just above 50% Hispanic CVAP and CDs 18 and 30 were changed to be just above 50% Black CVAP and asked Chair Hunter "Is that a coincidence?" Chair Hunter responded: "Nothing's a coincidence."

68.     Asked by Democratic Rep. Senfronia Thompson whether there was any particular legal basis for reducing CD 9's Black population and making it Hispanic CVAP majority, Chair Hunter responded "I'm not able to tell you that."

69.     Rep. Turner asked a series of questions regarding the justification for the purposeful use of race in redrawing these districts.

70.     Rep. Turner said, "Is there any evidence or data you have that would suggest that Black voters in CD 18 or CD 30 are unable to elect the candidates of their choice in the current configuration?" Chair Hunter responded "I don't have any evidence. You said do I have evidence? I don't, I don't have any evidence."

71.     Rep. Turner continued, "Similarly, is there any evidence or data that shows that Latino voters in the existing CD 35 are unable to elect the candidates of their choice?" Chair Hunter responded, "As I told you, I don't have any data or any evidence."

72.     Rep. Turner also asked, "Has Butler Snow conducted a racially polarized voting analysis within the new CD 9 to ascertain who the candidates of choice are with Hispanic voters and also Anglo voters?" Chair Hunter responded, "I don't know."

73.     Asked by Rep. Thompson whether the map was drawn "race neutral," Chair Hunter responded: "I don't know what you mean by race neutral. We're all taking race. We're all taking neutral."

74.     Chair Hunter denied having any knowledge about the mapdrawer. Asked by Rep. Turner: "Senator King has clearly identified Adam Kincaid as the mapdrawer. Do you have any reason to doubt Senator King on that?" Chair Hunter responded: "Let me tell you something, I have no idea. I heard that he

mentioned it so I'm not here to say that he's right or wrong, I heard that he made that mention, Representative, I don't have any details on his communication with Adam Kincaid."

75.     Asked by Democratic Rep. Barbara Gervin-Hawkins what the scope of work given to the mapdrawer was, and whether he or Chair Vasut knew the answer, Chair Hunter responded: "I don't know what the chair knows, but I don't think the chair knows much more than me on all of this. So all I can tell you is, when . . . a member is asked to file a Bill presented, and I agree with it, I did it, but the origin, the specifics, the development involves a lot of privilege a lot of specific information, I'm not part of that discussion, and I can't tell you who is."

76.     On August 2, 2025 the House Redistricting Committee voted out HB 4 favorably without amendment. But before a vote could occur on the House floor, a large number of representatives left Texas, protesting the intentionally racially discriminatory map, and thereby denied the House a quorum to conduct business.

77.     The identical senate version, SB 4, was passed by the Senate on August 12, 2025.

78.     With no quorum in the House, the legislature adjourned the First Called Session of the 89th Legislature sine die on August 15, 2025.

79.     That same day, the Governor called a second special session of the 89th Legislature, to convene at noon on August 15, 2025. The list of topics against included congressional redistricting.

80.     Also on August 15, 2025, Chair Hunter introduced HB 4 again, with just a minor adjustment reflected in Plan C2331. The only difference between Plan C2308 and Plan C2331 is that several precincts were swapped between CD16 and CD23 to place Fort Bliss back into CD16, the same district to which it is assigned in the 2021 map. All of the above allegations regarding Plan C2308 apply equally to Plan C2331.

81.     On August 18, 2025, the House redistricting committee met and Chair Hunter introduced a committee substitute to HB 4, Plan C2333, which made changes to twelve districts compared to Plan C2331 (CDs 2, 6, 7, 8, 9, 14, 17, 18, 22, 29, 36, and 38). The most substantial changes were to CD 9, which

had Liberty County appended to it. Corresponding changes were made to the Harris County portion of the district that overall dropped its Hispanic CVAP from 50.5% to 50.3%, while improving Trump's 2024 margin in the district.

82.     It is apparent, however, that whatever partisan goals explained this change to CD 9, the overriding goal that could not be compromised was staying above the 50%+1 Hispanic CVAP racial target. That is evident because more changes were made than needed to balance population in Harris County after adding Liberty County, and those changes are explicable only as a means to maintain the racial target, because they degraded Republican performance in the district. Indeed, population was merely swapped between CD 9 and CD 36 that helped maintain CD 9's bare Latino majority CVAP status while at the same time frustrating a partisan goal to improve CD 9's performance. A mapdrawer looking only at partisan shading and data could not and would not have made these changes. Any partisan goal for CD 9 was subordinated to the inflexible goal to maintain the district over 50% Hispanic CVAP.

83.     The House held its floor debate on August 20, 2025. Though Chair Hunter at times suggested that political performance was a factor motivating the map, he never provided any political data for the members to consider. Instead, he spoke at length for hours about the racial composition of the districts, trumpeting that the map met various racial targets.

84.     For example, he said early in his presentation, "It is important to note – Please note members. Four of the five new districts are majority minority Hispanic, what we call CVAP districts. That's the citizen voting age population. Each of these newly drawn districts now trend Republican in political performance."

85.     He continued, "The five new districts we have. CD 9, 50.15% what we call Hispanic citizen voting age population. That's HCVAP. CD 28, which is approximately 86.72% HCVAP. CD 32 remains a nonminority district. CD 34 71.93% HCVAP. CD 35, 51.57% HCVAP."

86.     He then spoke for over two minutes rattling off racial data about specific districts before claiming that political performance was a motivator. Here's what he said: "Some data points. In

comparison to 2021. In 2021 there were nine Hispanic majority age districts. In this plan there are 10 Hispanic majority age districts. In the 2021 plan, there were seven Hispanic citizen voting age districts and under this plan there are eight. There are no Black CVAP districts under the 2021 plan. In the proposed plan there are two majority Black CVAP districts. CD 18, 50.71% Black CVAP compared to 38.99% in 2021. CD 30 50.41% Black CVAP. 46% in 2021. In the Harris County Houston area, there are currently what they call two coalition districts and one Hispanic CVAP district. In the proposed plan CD 18 becomes a new Black CVAP district. CD 9 becomes a new HCVAP district. And CD 29 becomes a majority Hispanic VAP district – that's voting age population – which should continue their political performance. CD 9 – 50.15% HCVAP, CD 18 – 50.71% Black CVAP, CD 29 - 43.45 HCVAP and 32.69% Black CVAP. All surrounding Republican districts to continue to perform for the Republicans. This is a good plan, I urge its adoption. But Mr. Speaker, Members, you can use political performance, and that is what we've done."

87.    That is not what they did, as his own description illustrates, consistent with the DOJ letter and the Governor's Proclamation and public statements.

88.    Speaking about CD 9, Chair Hunter said, "CD9, the Hispanic CVAP is 50.15%. It's a new Hispanic CVAP. Liberty County is now in CD 9. There does show in this CD, Republican partisan performance. Previously though, CD 9 was not a majority of a single group. So now, they are."

89.    In a colloquy with Rep. Spiller, Rep. Spiller asked: "We talked about district 18, what we call the Barbara Jordan historic district, when we went to Houston we heard a lot of testimony about that. But it was – it's currently one of these coalition districts and under HB 4 changes to a majority Black CVAP district, is that correct?" Chair Hunter responded, "That's correct, it is now 50.71% Black CVAP. In 2021, it was 38.99% Black CVAP." Then Rep. Spiller continued, "And

so previously, Black voters in that district did not hold a majority, but under your bill, under HB 4, they actually do, is that correct?" And Chair Hunter responded, "That is correct."

90.    Rep. Spiller continued: "And also, relative to Harris County, we talked about District 9 - which was also second one in Harris County, a coalition district – the district that was addressed in the Petteway case – and now under your HB 4, changes from a coalition district to a majority Hispanic CVAP district, is that correct?" Chair Hunter answered: "Yes for the record the Hispanic CVAP for congressional district 9 under this plan, the Hispanic CVAP is 50.15%. In 2021, it was 25.73%."

91.    Spiller summarized, unironically: "This claim, that a lot of this stuff is racially motivated and race negative. Let me ask you, and you've touched on it before, we went under the current map from zero majority Black CVAP districts in the state of Texas and now under your map we added two to that list – there are now two majority Black CVAP districts, is that correct?" Chair Hunter responded: "Correct. 18 – is one of the ones we talked about, and 30."

92.    Later, Chair Hunter acknowledged that there was no partisan purpose or effect to the map's 50%+1 racial target for Black CVAP in CD 30, saying "Congressional 30 to respond to you, the political performance is unchanged. There was no Black CVAP in 2021. Now there is a Black CVAP in 2025. So everybody has the information, the Black CVAP in 30 is 50.41%. The political performance is still Democrat."

93.    Subsequently, the House voted to pass HB 4.

94.    After the map was passed by the House, Speaker Dustin Burrows issued a press release, which he posted on his X.com account, in which the first sentence said: "The Texas House today delivered legislation to redistrict certain congressional districts *to address concerns raised by the Department of*

*Justice* and to ensure fairness and accuracy in Texans' representation in Congress."[11] In other words, the Speaker acknowledged that the map purposefully removed multiracial majority congressional districts— whose racial composition DOJ researched and reported to Texas—on account of their racial composition.

95.     The Senate debated HB 4 on August 22, 2025 and passed it in the early morning hours of August 23, 2025.

### *Houston Area Districts*

96.     Plan C2333 reduces from one to zero the number of districts in which Latino voters in Harris County have an equal opportunity to elect their candidates of choice. As Brooks Plaintiffs pled in their Fourth Amended Complaint, the 2021 map violated Section 2 of the Voting Rights Act by failing to create two Latino opportunity congressional districts in Harris County. That violation was not remedied by Plan C2333, indeed the violation both persists and worsens by the failure to create *any* such districts. Plaintiffs incorporate by reference all allegations in their Fourth Amended Complaint regarding the failure of the 2021 map to comply with Section 2 of the Voting Rights Act in Harris County, in particular paragraphs 178-199 and 297-302, and reassert those allegations here as against Plan C2333. Plaintiffs further rely on the evidence offered at the May/June 2025 trial.

97.     Plan C2333 intentionally dismantles CD 9 and CD 18 on account of their multiracial majority racial composition. The stated purpose of the DOJ letter, the supporting legislators, and Governor Abbott was to dismantle these districts because Black and Latino voters together happened to constitute a majority of their voters, rather than a single race of voters being the majority.

98.     This intentional racial discrimination was accompanied by a discriminatory effect. Under the 2021 map—and for decades prior—minority voters in both districts voted cohesively to elect Black members of Congress from both districts.

---

[11]     X.com, @Burrows4TX, Aug. 20, 2025, https://x.com/Burrows4TX/status/1958318084021801464?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Etweet (emphasis added).

99.     For example, a racially polarized voting analysis by Dr. Ansolabehere admitted in evidence in this case shows that in the 2021 map's CD 9, 96% of Black voters and 81% of Hispanic voters share the same candidate preference for Democratic candidates. Black Democrat Al Green is the longtime incumbent for that district and the preferred candidate of CD 9's Black and Latino voters. Likewise, in the 2021 map's CD 18, 96% of Black voters and 77% of Latino voters share the same candidate preference for Democratic candidates. CD 18 is currently vacant, but Black and Latino voters previously cohesively supported Black Democrats Sylvester Turner and Shiela Jackson Lee as their member of Congress.

100.    Under Plan C2333, most of the Black voters from CD 9 and CD 18 are purposefully consolidated into a single newly configured CD 18, reducing from two to one the number of Houston area districts likely to elect a Black member of Congress. The new CD 18 is now just over 50% Black CVAP.

101.    Compliance with Section 2 of the VRA does not justify this purposeful use of race to reach a mechanical 50%+1 Black CVAP majority target for the new CD 18. Black voters comfortably elected their preferred candidates under the 2021 plan's versions of CD 9 and CD 18. When asked, Chair Hunter could cite no evidence or basis to purposefully consolidate these districts into one Black majority CVAP districts. Yet he and Governor Abbott both confirmed that this target of Black majority CVAP status for the CD 18 was intentional.

102.    Race predominated in consolidation of CD 9 and CD 18 into a new Black majority CVAP CD 18 with no compelling justification advanced by narrowly tailored means.

103.    The dismantling of two districts that elected Black preferred candidates into a single Black majority CVAP district was also purposefully done to minimize the voting strength of minority voters, reducing from two to one the number of Harris County districts in which a Black member of congress is likely to be elected.

104.    While Plan C2333 consolidates the 2021 map's CDs 9 and 18 into a single Black majority CVAP CD 18, it creates a new CD 9 in eastern Harris County that was purposefully configured with a 50%+1 Hispanic CVAP target.

105.    This new version of CD 9 is a façade or sham Hispanic district. It has a bare Latino majority, with a Hispanic CVAP of 50.5%. But its non-suspense Spanish Surname Voter Registration is just 43.6% and its Spanish Surname Turnout is just 36.3% for the 2024 general election. The 2021 map also had just one Latino majority district, CD 29, but its Hispanic CVAP was 63.5%, its non-suspense Spanish Surname Voter Registration was 58.0%, and its Spanish Surname Turnout was 53.2% for the 2024 general election.

106.    As DOJ instructed, Plan C2333 breaks CD 29 into pieces, assigning 48.6% of it to the new sham Hispanic majority CD 9, 38.7% of it to a reconfigured CD 29 for which the Hispanic CVAP is 20 points lower than the 2021 map's version, and the remainder to other nearby districts.

107.    Plan C2333's CD 9 was intentionally designed to be a bare Hispanic CVAP majority district and also intentionally designed *not* to elect Latino preferred candidates.

108.    A racially polarized voting analysis of the district shows that Latino voters cohesively support Democratic candidates with margins ranging from 61% to 71% in the 2024 President, 2024 Senate, 2022 Governor, and 2022 Attorney General elections.

109.    Plan C2333's CD 29, in which Congresswoman Sylvia Garcia resides, sees its Hispanic CVAP reduced by 20 points, from 63.5% to just 43.0%. Its non-suspense Spanish Surname Voter Registration is just 37.2% and its Spanish Surname Turnout just 32.1%.

110.    Race was intentionally used to eliminate the sole performing Latino majority congressional district in the Houston area and replace it with a sham district in which Latino preferred candidates are unlikely to prevail. This use of race was for the purpose of diluting the voting strength of Latino voters and will have that effect.

111.    Race was the predominant factor in the redesign of CD 9 and CD 29. Race was not used to comply with Section 2 of the VRA, and no compelling purpose advanced by narrowly tailored means justifies the use of race in the redesign of these districts.

*Dallas Fort Worth Area Districts*

112.    Just as the 2021 plan did, Plan C2333 fails to create a Latino opportunity congressional district in the Dallas Fort Worth area. As Brooks Plaintiffs pled in their Fourth Amended Complaint, the 2021 map violated Section 2 of the Voting Rights Act by failing to create a Latino opportunity congressional district in DFW. That violation was not remedied in Plan C2333 and instead persists. Plaintiffs incorporate by reference all allegations in their Fourth Amended Complaint regarding the failure of the 2021 map to comply with Section 2 of the Voting Rights Act in DFW, in particular paragraphs 137-177 and 285-290, and reassert those allegations here as against Plan C2331. Plaintiffs further rely on the evidence offered at the May/June 2025 trial.

113.    Under the 2021 map, there were three majority-minority Dallas Fort Worth area congressional districts. None was a single race majority, but rather each was comprised of a multiracial coalition of voters. For example, CD 30 was 46% Black CVAP and 24.5% Latino CVAP, CD 32 was 23.4% Black CVAP, 22.9% Hispanic CVAP, and overall 56.1% non-Anglo CVAP, and CD 33 was 43.6% Hispanic CVAP and 25.2% Black CVAP. The State contends these districts were configured blind to racial data.

114.    Black and Latino voters cohesively supported the same candidates in all three districts. For example, according to expert analysis by Dr. Ansolabehere admitted into evidence in this case, under the 2021 map's CD 30, 95% of Black voters and 80% of Latino voters supported the same Democratic candidates. Rep. Jasmine Crockett was elected as the candidate of choice CD 30's minority voters. Under the 2021 map's CD 32, 81% of Black voters and 85% of Latino voters supported the same Democratic candidates. Rep. Julie Johnson was elected as the candidate of choice of CD 32's minority voters, and before her Rep. Colin Allred. Under the 2021 map's CD 33, 93% of Black voters and 88% of Latino voters supported the same Democratic candidates. Rep. Marc Veasey was elected as the candidate of choice of CD 33's minority voters.

115.    Plan C2333 purposefully—and on account of race—reduces from three to two the number of majority-minority congressional districts in DFW. The DOJ letter specifically targeted CD 33 for elimination because of its racial composition, and the map does just that. It consolidates CD 33 and CD 32 into a single majority-minority district contained wholly in Dallas County. This new district is composed of 32.7% of the 2021 map's CD 33, 32.4% of the 2021 map's CD 32, and 30.9% of the 2021 map's CD 30. Meanwhile, CD 32 is drastically changed to stretch across all or part of eight counties, horizontally from Dallas County all the way Upshur and Camp Counties in east Texas. CD 32 is now 58.7% Anglo.

116.    Plan C2333 accomplishes the charge of the DOJ letter to dismantle DFW minority coalition districts. While it retains the *number* CD 33 for a majority minority district, the district as it existed is entirely different and the map eliminates one of the three majority-minority districts in the DFW metroplex, replacing it with an Anglo-majority district and leaving Tarrant County's minority voters (who make up a majority of the county) fragmented across multiple Anglo-majority districts (CDs 6, 12, and 25).

117.    Together, Dallas and Tarrant Counties have a population of 4.7 million, which would be enough to support six congressional districts wholly contained within the two counties. Together, the two counties have an Anglo CVAP of 45.2%, a Hispanic CVAP of 24.4%, a Black CVAP of 23.6%, and an Asian CVAP of 5.6%. Despite 54.8% of the CVAP of the two counties being majority minority, just two of the 2025 map's congressional districts are majority minority. The remaining six congressional districts that include parts of the two counties—several into far flung rural areas—are majority Anglo.

118.    Plan C2333 also makes adjustments to CD 30 predominantly on the basis of race. As Chair Hunter openly admitted, CD 30 was purposefully altered so that it would hit a mechanical 50%+1 Black majority CVAP racial target. Most of the district remained unchanged, with 68.7% of the voters remaining. That portion is 54.8% Black voting age population. To achieve the majority Black target, Plan C2333 removes the portion of the 2021 map's population that was least Black—30.9% of its people of whom just 16.4% were Black voting age population—and replaces them with pieces of former CDs 6, 25, 32, and 33 that had larger Black population shares. The end result is a newly formed CD 30 that has a Black CVAP

just above 50%, at 50.2% Black CVAP. The supporting legislators and Governor Abbott have openly cheered this race-based target and result.

119.    There were no good reasons or substantial basis in evidence to believe that CD 30 needed to have its Black population increased in order to comply with Section 2 of the Voting Rights Act. Black voters in the district had long succeeded in electing their preferred candidate to Congress—Rep. Jasmine Crockett and before her Rep. Eddie Bernice Johnson.

120.    Chair Hunter said he had no evidence to support purposefully converting CD 30 into a Black CVAP majority district.

121.    There is no compelling state interest in predominantly using race to alter the configuration of CD 30, and certainly no narrow tailoring.

122.    The racial gerrymandering of CD 30 extends to the 2025 map's CD 33 as well. To effectuate the racial target to increase CD 30's Black CVAP above 50%, nearly one-third of the 2021 map's version of CD 30—its least Black areas—were shifted to CD 33. Thus nearly a third of CD 33's population was shifted into the district predominantly on the basis of their racial composition in order to effectual a racial target in neighboring CD 30. This renders CD 33 likewise an unconstitutional racial gerrymander.

### CD 35

123.    The 2021 map's CD 35—as in both the 2011 and 2013 maps—was a Latino opportunity district that followed I-35 to connect parts of San Antonio and Austin. When the district was challenged as a racial gerrymander under both the 2011 and 2013 maps, Texas successfully defended it—all the way to the United States Supreme Court.

124.    In *Abbott v. Perez*, the Supreme Court held that Texas had good reasons to think that Section 2 of the VRA *required* the creation of a Latino opportunity district in this region. 585 U.S. 579 (2018). The Court held that "the 2013 Legislature had 'good reasons' to believe that the district at issue (here CD35) was a viable Latino opportunity district that satisfied the *Gingles* factors," that only the second factor was in dispute in the case and "there is ample evidence that this factor is met." *Id.* at 616. Moreover,

the Court observed that the three-judge district court had previously concluded that CD 35 in the 2011 map "was likely not a racial gerrymander and that even it was, it likely satisfied strict scrutiny. In other words, the 2013 Legislature justifiably thought that it had placed a viable opportunity district along the I-35 corridor." *Id.*

125.    In 2021, Texas retained CD 35 in much the same configuration and contended that it was drawn blind to any racial data. The resulting district was 46.0% Hispanic CVAP, with a Black CVAP of 13.0%. The district's Hispanic and Black voters cohesively supported the same candidates, with 83% of Hispanic voters and 78% of Black voters supporting the same Democratic candidates. Most recently, that candidate of choice was Congressman Greg Casar, and before that Congressman Lloyd Doggett.

126.    During the trial on the 2021 map, the State defended the map *because* it resulted in Congressman Doggett—a white Democrat—moving to the new CD 37, providing an opening for a new Hispanic member of the delegation, Congressman Casar.

127.    Plan C2333 dismantles CD 35, much the same as the other districts from the 2021 map that lacked a single race majority. Rather than connecting Latino voters in San Antonio and Austin along I-35, the new CD 35 more or less takes State House District 118, which the state well knows does not perform for Latino preferred candidates and appends it to Guadalupe, Wilson and Karnes Counties.

128.    Plan C2333's CD 35 was purposefully drawn to increase its Hispanic CVAP share just above a majority, with a Hispanic CVAP of 51.6%. Yet it was also purposefully drawn so that the candidates preferred by Latino voters in the district would not prevail, by appending to the district rural counties with high turnout Anglo voters. A racially polarized voting analysis of the district conducted shows that Latino voters in the district cohesively supported Democratic candidates with margins ranging from 64% to 71% in the 2024 President, 2024 Senate, 2022 Governor, and 2022 Attorney General contests.

129.    The result is, like the new CD 9 in Harris County and State House District 118, a façade or sham Latino majority district designed to appear to provide an electoral opportunity for Latino voters but indeed providing a false opportunity.

130.    Race was intentionally used to create a sham Latino majority CD 35 that is unlikely to perform for Latino voters. voters in the district cohesively support Democratic candidates. For that reason, Section 2 of the VRA provided no justification for this race-based reconfiguration of CD 35 because the resulting district will not perform to elect Latino preferred candidates.

131.    The 2021 map's version of CD 35—which is a district created to protect the Section 2 rights of the region's Latino voters—was purposefully dismantled because of its racial composition and replaced with a race-based redraw designed to dilute the voting strength of Latino voters.

132.    Race was the predominant factor in redesigning CD 35 with no compelling interest advanced through narrowly tailored means.

133.    Moreover, Section 2 of the Voting Rights Act requires CD 35 to be configured in a manner that protects the voting rights of the area's Latino voters. Each of the *Gingles* preconditions is satisfied, as the Supreme Court's decision in *Abbott v. Perez* makes clear:

a.    A version similar to the 2011 map's configuration of CD 35 satisfies the first *Gingles* precondition because it connects a geographically compact Latino population in a reasonably configured form. Indeed, the State itself drew the district, demonstrating that its configuration complies with the State's policies and conception of traditional districting principles.

b.    Alternatively, two highly compact districts in which Latino voters comprise a majority of eligible voters can be drawn wholly within Bexar County. Indeed, the City of San Antonio has a total population of just over 1.4 million—about the size of two congressional districts—and its Hispanic CVAP is 59.8%. Two highly compact majority Hispanic CVAP districts can be configured to comprise the bulk of the City of San Antonio, easily meeting the first *Gingles* precondition and constituting among the most compact districts in the State.

c.    The second *Gingles* precondition is satisfied because Latino voters Bexar County are highly cohesive. For example, there are at least 60 voting tabulation districts with Hispanic CVAPs over 90% throughout the City of San Antonio in which over 148,000 people reside. Across these VTDs, Biden

prevailed over Trump 74.9% to 23.8% in 2020, MJ Hegar prevailed over Senator Cornyn 71.9% to 24.9% in 2020, O'Rourke prevailed over Abbott 75.4% to 23.0% in 2022, Harris prevailed over Trump 65.8% to 33.0% in 2024, and Allred prevailed of Cruz 69.9% to 27.0% in 2024.

      d.      The third *Gingles* precondition is satisfied because Anglo voters in Plan C2331's version of CD 35 bloc vote to usually defeat the candidates of choice of Latino voters in the district. For example, Republican candidates carried the district in all recent statewide elections, while Latino voters in the district preferred Democratic voters.

      e.      Moreover, the totality-of-circumstances Senate Factors are satisfied as well. Latino voters in San Antonio suffer the effects of discrimination that reduces their ability to participate in the political process and, together with other considerations under the totality of circumstances, dilutes their voting strength. For example, the City of San Antonio's 2019 Racial Equity Indicator Report showed that 21.9% of the city's Latino population lived in poverty compares to 11.2% of its Anglo population. Among the city's Anglo population, 43.4% had received a bachelor's degree or higher, compared to 16.2% of the city's Latino population. 19.7% of the city's Latino population lacked health insurance, versus 9.4% of the city's Anglo population. These factors combine to reduce Latino voter participation compared to Anglo voter participation, and together with other totality of circumstances considerations demonstrate vote dilution among Latino voters in demonstrative CD 20 and 35.

      f.      Further, the changes to CD 35 in the 2025 map were the product of intentional racial discrimination and racial gerrymandering.

      g.      Texas has a long history of racial discrimination in voting, as set forth in Brooks Plaintiffs' Fourth Amended Complaint and proven at the trial on the 2021 map. Moreover, the process by which the 2025 plan has been adopted reflects procedural and substantive departures from the norm and racially-based decisionmaking.

### *CD 27*

134.    CD 27 is another of the 2021 map's multiracial majority districts in which no single race constituted a majority of its CVAP. Under the 2021 map's CD 27, its Hispanic CVAP was 48.6%, its Black CVAP was 4.5%, and its Anglo CVAP was 44.1%. President Trump carried the district in 2024 with 64.3%of the vote.

135.    Under Plan C2333, the district is converted from a multiracial majority district into a single race majority district, with its Anglo CVAP now increased to 52.8%, its Hispanic CVAP dropped to 36.8%, and its Black CVAP at 7.3%.

136.    Consistent with DOJ's letter, another racial target was set to increase CD 27 above 50% Anglo CVAP. And doing so is not consistent with a Republican partisan goal, as Republican performance in the district decreased, with President Trump carrying the new configuration of CD 27 with 60.0% of the vote.

137.    The district was also converted from a compact design to an oddly shaped district that now spans from Travis County to part of Corpus Christi—though not in any direct way. Indeed, a long stretch of the district is mostly ocean and islands between Corpus Christi Bay and San Antonio Bay.

138.    As with districts throughout the map, converting multiracial majority districts to single-race majority districts was an overriding predominant purpose. Because this was a criterion that could not be compromised, race predominated in the configuration of CD 27 with no basis in evidence or justification for such a racial target, rendering it unconstitutional.

### *Arlington Heights Factors*

139.    In addition to the overwhelming direct evidence of an intent to dilute minority voting strength on account of race in the adoption of the 2025 map, the circumstantial evidence under the *Arlington Heights* framework strongly evidences an intent to discriminate.

140.    First, the 2025 map bears more heavily on Black and Latino Texans than on Anglo Texans. It reduces from three to two the number of majority minority districts in the Dallas Fort Worth area in which Black and Latino voters are likely to elect their preferred candidates. It eliminates CD 35 as a performing Hispanic opportunity district (one Texas defended in the Supreme Court as reasonably thought to be required by Section 2) and replaces it with a sham bare Hispanic CVAP majority district in which analysis shows that Hispanic voters in the district will be unlikely to be able to elect their preferred candidates. It eliminates the sole Hispanic opportunity district in Houston, which had a Hispanic CVAP of 64%, and replaces it with a sham bare Hispanic CVAP majority district in which analysis shows that Hispanic voters in the district will be unlikely to be able to elect their preferred candidates. And it eliminates one of two districts in Houston in which a Black member of congress has been elected.

141.    The historical background points towards a finding of discriminatory intent. Texas has been found to violate voting rights laws—including with intentional discrimination—in every decade since the Voting Rights Act was adopted. Most recently, Texas was found to have intentionally discriminated in the configuration of its 2011 congressional map in the DFW area. In fact, Texas was found to have intentionally discriminated by doing the exact thing it does in the 2025 map—fragment Tarrant County minority voters across multiple Anglo-dominated districts. Remarkably, it does that by dismantling the very remedial district—CD 33—that Texas was ordered to implement as a remedy for that intentional discrimination. Texas was likewise found to have intentionally discriminated in the configuration of SD 10 in its 2011 map, and to have racially gerrymandered HD 90 in its 2013 map—all affecting the same Tarrant County minority voters affected by the 2025 map. Texas also enacted a voter ID law found by the en banc Fifth Circuit to have resulted in discrimination against minority Texans in 2016.

142.    The sequence of events leading to the decision and the legislative history reveal discriminatory intent. The DOJ letter, the Governor's Proclamation, the Governor's public statements, and statements by legislators all reveal an open and transparent purpose to eliminate multiracial majority congressional districts expressly *because of* their racial composition and so that the districts would no longer

elect the candidates preferred by those multiracial electorates. This was not a hidden racial motive, but rather was publicly championed.

143.    The process departed from the norm in both process and substance. It is not normal for Texas to redistrict mid-decade because DOJ researched the racial composition of districts and demands that they be eliminated on that basis. It is not normal to redistrict a statewide map in just 30 days' time. It is not normal to only hold public hearings before any map is made available. It is not normal to refuse to extend time for members to ask questions of the bill sponsor on the House floor. These and other procedural and substantive deviations indicate a racially discriminatory intent.

## SUPPLEMENTAL CAUSES OF ACTION

### SUPPLEMENTAL ALLEGATIONS AS TO MALC'S CAUSES OF ACTION

### *Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq., 42 U.S.C. § 1983* (Congress, Dallas/Fort Worth Latino Opportunity District Claim)

144.    Plaintiffs incorporate by reference all preceding paragraphs and all paragraphs of MALC's Plaintiffs' Third Amended complaint as if fully set forth herein.

145.    Plan C2333 repeats the same failure of the 2021 map to create a Latino-opportunity district in the Dallas Fort Worth area and indeed worsens the injury creating zero districts in which Tarrant County Latino voters are able to elect their candidate of choice, instead fracturing them among CDs 6, 12, and 25.

146.    For that reason, the violation of Section 2 of the VRA persists in Plan C2333's configuration of DFW area congressional districts.

### *Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq., 42 U.S.C. § 1983* (Congress, Houston Latino Opportunity District Claim)

147.    Plaintiffs incorporate by reference all preceding paragraphs and all paragraphs of the MALC's Third Amended complaint as if fully set forth herein.

148.    Plan C2333 repeats the same failure of the 2021 map to create two Latino opportunity districts in Harris County/Houston area. In fact, Plan C2333 deepens that violation of Section 2 by dismantling existing CD 29, a Latino majority district, and replacing it with a sham/façade bare Latino

majority version of CD 9 that is not likely to perform to elect Latino preferred candidates. As a result, Plan C2333 not only persists in the violation of Section 2, but worsens it by reducing from one to zero the number of performing Latino majority districts, when the number should have been increased from one to two such districts in order to comply with Section 2.

## COUNT 5

### *Intentional Racial Discrimination in Violation of the Fourteenth & Fifteenth Amendments*
### *(CDs 2, 5, 6, 9, 12, 18, 25, 29, 32, 33, and 35)*

149.    Plaintiffs incorporate by reference all preceding paragraphs and all paragraphs of the MALC's Third Amended complaint as if fully set forth herein.

150.    Plan C2333, as reflected in HB 4, was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of the 2021 map's CDs 9 and 18 on account of race and consolidation of those two majority-minority districts into a single district in which a Black member of Congress is likely to be elected rather than two such districts. Minority voters who are not consolidated into that new Black CVAP majority district are fragmented across nearby Anglo-majority districts in which they will be unable to elect their preferred candidates to Congress.

151.    Plan C2333 likewise was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of the 2021 map's CD 29 on account of race and the replacement of that effective Latino majority district with a sham/façade Latino majority district that is not likely to preform for Latino voters.

152.    Plan C2333 likewise was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of the 2021 map's CD 33 on account of race, fragmenting its minority voters across seven districts, including new CDs 6, 25, 32, and 33, and reducing from three to two the number of majority-minority districts in the DFW Metroplex.

153.    Plan C2333 likewise was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of the 2021 map's CD 35 on account of race, fragmenting its Hispanic voters across multiple districts and creating instead a new version of CD 35 that is a sham/façade Latino majority district. That district was purposefully configured to be just above 50% Hispanic CVAP but not perform to election the preferred candidates of Latino voters. This was done despite the State having argued to the Supreme Court that it had good reasons to believe that the prior configuration of CD 35 was required by Section 2 of the VRA.

### COUNT 6

***Racial Gerrymandering in Violation of the Fourteenth Amendment (CDs 9, 18, 30, 33, 35)***

154.    Plaintiffs incorporate by reference all preceding paragraphs and all paragraphs of the MALC's Third Amended complaint as if fully set forth herein.

155.    Race was the predominant consideration in the reconfiguration of CDs 18 and 30, in that the predominant consideration was achieving a mechanical 50%+1 racial target for the districts' Black CVAP with no compelling justification to do so that is narrowly tailored. Black voters were already successfully electing their preferred candidates in these districts without them being changed to meet a racial majority status target. Neither Section 2 of the VRA nor any other interest justifies the predominant use of race in reconfiguring these districts.

156.    Race was likewise the predominant consideration in the configuration of CD 33, in that 30.9% of its population was shifted from CD 30 to CD 33 because this segment of the 2021 map's version of CD 30 was its least Black population segment. This large portion—nearly a third—of CD 30's population was thus shifted into CD 33 predominantly on the basis of race in order to achieve the racial target of reconfiguring CD 30 to hit a 50%+1 Black CVAP racial target. A substantial portion of CD 33's population was thus shifted into the new district on account of race with compelling interest furthered by a narrowly tailored means, in that compliance Section 2 was not the purpose of the race-based population shift. Nor is

any partisan Republican goal furthered by trading population on account of race between two Democratic congressional districts.

157.    Race was the predominant consideration in the reconfiguration of CDs 9 and 35, in that the predominant consideration was achieving a mechanical 50%+1 racial target for the districts' Hispanic CVAP with no compelling justification to do so that is narrowly tailored. Hispanic voters were already succeeding in electing their preferred candidates in the 2021 map's versions of CDs 9 and 35, but Hispanic voters will no longer likely be able to elect their preferred candidates in Plan C2333's versions of CDs 9 and 35. Neither Section 2 of the VRA nor any other interest justifies the predominant use of race in reconfiguring these districts.

## COUNT 7

### *Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq., 42 U.S.C. § 1983 (Bexar County Latino Opportunity District)*

158.    Plaintiffs incorporate by reference all preceding paragraphs and all paragraphs of the MALC's Third Amended complaint as if fully set forth herein.

159.    Hispanic voters in Bexar County are sufficiently numerous and geographically compact to constitute a majority in an additional congressional district wholly contained within Bexar County such that two such districts comprise the bulk of the City of San Antonio.

160.    Hispanic voters in Bexar County are politically cohesive.

161.    Anglo voters in Plan C2333's version of CD35 and surrounding CDs 21 and 23 vote sufficiently as a bloc to usually defeat the candidates of choice of Hispanic voters.

162.    The totality of circumstances reveals that Hispanic voters in Bexar County have less opportunity that other groups of the electorate to elect their candidates of choice and to participate in the political process.

163.    Hispanic voters are thus entitled, under Section 2 of the Voting Rights Act, to an additional congressional district in Bexar County that provides an opportunity to elect their candidate of choice.

**COUNT 8**

*Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq., 42 U.S.C. § 1983 (Statewide Racial Discrimination in Voting)*

164.    Plaintiffs incorporate by reference all preceding paragraphs and all paragraphs in MALC's Third Amended Complaint as if fully set forth herein.

165.    The 2025 map was passed with the express purpose of eliminating multiracial majority congressional districts and replacing them with single-race majority districts.

166.    Under the 2025 map, the number of Anglo-majority CVAP districts is increased to 63% of the Texas's congressional districts, despite Anglo CVAP statewide being less than 50%.

167.    Minority voters, who constitute a majority of Texas's CVAP, are the majority in just 37% of Texas's districts.

168.    Meanwhile, in racially diverse areas of the State in which one would naturally expect multiracial majority districts to arise—and where they previously arose—the 2025 map eliminates them. For example, Tarrant County has a population of 2.1 million, with an Anglo CVAP of 53%, Hispanic CVAP of 21.6%, and Black CVAP of 18.8%. But of the five congressional districts that contain part of Tarrant County, only CD 30—which covers just a small part of the county—is majority minority. The remaining four districts are all majority Anglo CVAP.

169.    Statewide, the 2025 map reduced from nine to just four the number of multiracial majority districts.

170.    This race-based redraw is so egregious as to constitute a statewide violation of Section 2 of the Voting Rights Act in that the entire map abridges the right to vote of non-Anglo Texans on account of race and provides less opportunity to participate in the political process on an equal basis.

**SUPPLEMENTAL REQUESTED RELIEF**

Plaintiffs request that the Court:

a)    Issue a declaratory judgment that Plan C2333, enacted in HB 4, unlawfully dilutes minorities' voting rights through intentional racial discrimination violation of the Fourteenth and

Fifteenth Amendments by intentionally dismantling CDs 9, 18, 29, 32, 33, and 35 on account of their racial composition and replacing those six districts in which minority voters are able to elect their candidates of choice with just three such districts (reconfigured CDs 18, 29, and 33);

b)    Issue a declaratory judgment that Plan C2333, enacted in HB 4, was drawn predominantly on the basis of race in the configuration of CDs 9, 18, 27, 30, 32, and 35 via the setting of mechanical racial targets of 50%+1 Black or Hispanic CVAP with no justification to satisfy Section 2 of the VRA or other compelling purpose, in violation of the Fourteenth Amendment;

c)    Issue a declaratory judgment that Plan C2333, enacted in HB 4, violates the discriminatory results prong of Section 2 of the Voting Rights Act by failing to draw two Latino opportunity districts in Harris County, a Latino opportunity district in the Dallas Fort Worth area, and two Latino opportunity districts in the Bexar County area in which Latino voters would have an equal opportunity to elect their candidates of choice;

d)    Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under Texas Congressional Plan C2333, with respect to districts in which legal violations are found. Plaintiffs have no adequate remedy at law other than judicial relief sought herein, and unless Defendants are enjoined from using Texas Congressional Plan C2193 with respect to the challenged districts, Plaintiffs will be irreparably injured by the continued violation of their constitutional and statutory rights;

e)    Set a reasonable deadline for state authorities to enact or adopt redistricting plans that do no dilute, cancel out, or minimize the voting strength of minority voters and are not drawn predominantly on the basis of race;

f)      If state authorities fail to enact or adopt a valid redistricting plan by the Court's deadline, order a new redistricting plan that does not dilute, cancel out, or minimize the voting strength of minority voters are configure districts on a predominantly racial basis. Alternatively, if the state's intentional machinations leave the Court without time to fashion a remedy for the upcoming elections, order that with the 2025 map enjoined and its repeal of the 2021 map no longer effective, declare  the 2021 map the governing map for 2026, but require the adoption or imposition of a new redistricting plan that does not dilute, cancel out, or minimize the voting strength of minority voters are configure districts on a predominantly racial basis for use in the 2028 elections;

g)      Award Plaintiffs their costs and reasonable attorneys' fees and expenses pursuant to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e);

h)      Retain jurisdiction and render any and further orders that the Court may deem necessary and just,  and require Texas to obtain preclearance pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c) with respect to its voting practices and procedures; and

i)      Grant any and all further relief to which Plaintiffs may show themselves to be entitled.

Dated: AUGUST 25, 2025.

Respectfully submitted,

SOMMERMAN, MCCAFFITY,
QUESADA &GEISLER, L.L.P.

*/s/ George (Tex) Quesada*

_____
George (Tex) Quesada
State Bar No. 16427750
Email:  quesada@textrial.com

Sean J. McCaffity

State Bar No. 24013122
Email:  smccaffity@textrial.com

3811 Turtle Creek Boulevard, Suite 1400
Dallas, Texas  75219-4461
214/720-0720 (Telephone)
214/720-0184 (Facsimile)

-and-

Joaquin Gonzalez
Texas Bar No. 24109935
1055 Sutton Dr.
San Antonio, TX  78228
jgonzalez@malc.org

***ATTORNEYS FOR PLAINTIFFS***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned that the foregoing Supplemental Complaint was filed and served via ECF notice and e-mail on AUGUST 26, 2025

  */s/ Sean J. McCaffity*_____
Sean J. McCaffity