UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LULAC, et. al., <br><br>   *Plaintiffs* <br><br> Eddie Bernice Johnson, Sheila Jackson-Lee Alexander Green, and Jasmine Crockett <br><br>   *Plaintiff-Intervenors* <br><br>   v. <br><br> GREG ABBOTT, in his official capacity As Governor of Texas, et. al. <br><br>   *Defendants* | Case No.: 3-21-CV-00259-DCG-JES-JVB [Lead Case] |

## SUPPLEMENTAL COMPLAINT OF PLAINTIFF-INTERVENORS JASMINE CROCKETT AND ALEXANDER GREEN

**TO THE HONORABLE COURT:**

Plaintiff-Intervenors Congresswoman Jasmine Crockett and Congressman Alexander Green respectfully submit this Supplemental Complaint challenging Texas Congressional Plan C2333, enacted in 2025. This mid-decade redistricting constitutes a continuation and escalation of the racially discriminatory practices previously adjudicated by this Court and represents intentional racial discrimination against African American and Latino voters in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act.

## I. INTRODUCTION AND SUMMARY

**1.** This Supplemental Complaint arises from Texas's 2025 mid-decade redistricting that dramatically restructures Congressional Districts 9, 18, and 30, along with other districts throughout the state to the detriment of Black and Hispanic voters in Texas. The enactment of Plan C2333 represents the second mid-decade redistricting attempt in Texas since Tom DeLay's

notorious 2003 redistricting, demonstrating a continuing pattern of using redistricting as a tool for racial discrimination and vote dilution, *see ECF Document 619*.

**2.** The impetus for this mid-decade redistricting was a July 7, 2025 letter from the Trump Administration's Department of Justice demanding that Texas eliminate what it characterized as "unconstitutional coalition districts" in Congressional Districts TX-09, TX-18, TX-29, and TX-33. Rather than pursue a measured response that preserved minority voting opportunities while addressing constitutional concerns, the Texas Legislature used this directive as a pretext to systematically dismantle minority electoral power throughout the state, *see Exhibit A*. The Trump DOJ letter expressly requested that the State engage in racial gerrymandering by requesting that these 4 districts be changed from what it wrongfully concluded were coalition districts. The complete focus of the Trump letter was on race and not on party. The letter wrongfully requires 50.1 percent, a Gingles pre-condition, as a requirement for the continued existence of African American and Latino ability to elect or opportunity seats. In the current litigation the State has admitted that the 9th, 18th and 30th are African American opportunity seats. The courts have held the 9th, 18th, 29th and 30th as opportunity seats and not coalition seats. The court which drew the 33rd Congressional District held that it was not a coalition district but a naturally occurring district. Nonetheless the DOJ letter describes the 33rd as a coalition district whose character was maintained by the Legislature in 2021.

**3.** As demonstrated by the expert analysis of Dr. Richard Murray, Plan C2333 reduces the number of Hispanic opportunity districts from multiple performing districts to potentially zero in Harris County for the first time in three decades, while simultaneously reducing Black opportunity districts statewide from three to two and the number of districts that perform for African American voters from 4 to 2. These reductions occur despite continued growth in minority populations that should support additional, not fewer, minority opportunity districts, *see Exhibit B*. Some of the important changes found in the new plan C2333 are as follows:

Houston Area Changes

| Data from C2333 the New Map | C2193 Data from the Existing Map |
|---|---|
| Voting Age Population<br>District 9 - White 28.3% Black 10.2% Hispanic 58.6%<br>District 18 - White 14.7% Black 45% Hispanic 32.2% | Voting Age Population<br>District 9 - White 19.3% Black 34.1% Hispanic 31.4%<br>District 18 - White 22% Black 38.2% Hispanic 34.5% |

| | |
|---|---|
| District 29 - White 12.8% Black 27.3% Hispanic 55.7% | District 29 - White 10% Black 14.6% Hispanic 72.4% |
| Citizen Voting Age Population<br>District 9 - White 35.1% Black 11.5% Hispanic 50.3%<br>District 18 - White 17.8% Black 50.5% Hispanic 23.7%<br>District 29 - White 17.8% Black 32.7% Hispanic 43.3% | Citizen Voting Age Population<br>District 9 - White 18.7% Black 46% Hispanic 24.9%<br>District 18 - White 24.2% Black 39.7% Hispanic 29.5%<br>District 29 - White 13.7% Black 18.4% Hispanic 63.5 |

Dallas/Fort Worth Area Changes

| Data from 2333 the New Map | C2193 Data from the Existing Map |
|---|---|
| Voting Age Population Data<br>District 30 - White 15.4% Black 46.6% Hispanic 32.4%<br>District 32 - White 52.4% Black 13.6% Hispanic 21.7%<br>District 33 - White 26.8% Black 15.7% Hispanic 50.3% | Voting Age Population Data<br>District 30 - White 22.5% Black 42.4% Hispanic 31.1%<br>District 32 - White 36.2% Black 20.3% Hispanic 32.6%<br>District 33 - White 15.8% Black 20.4% Hispanic 54.5% |
| Citizen Voting Age Population Data<br>District 30 - White 18.6% Black 50.2% Hispanic 25%<br>District 32 - White 58.7% Black 14.9% Hispanic 16%<br>District 33 - White 35.5% Black 19.6% Hispanic 38.2% | District 30 - White 25.1% Black 47.1% Hispanic 22.5%<br>District 32 - White 43.9% Black 23.4% Hispanic 22.9%<br>District 33 - White 23.4% Black 25.2% Hispanic 43.6% |

**4.** The procedural irregularities surrounding Plan C2333's enactment mirror and exceed those found discriminatory in prior Texas redistricting cases. Plan C2333 was never presented for a public hearing. The bill was unveiled on the 18th of August after 5 p.m., and was heard by the House at 10 a.m. on the 20th of August. A committee hearing had been set to consider the existing House Bill at 1 p.m. on the 18th and that meeting was cancelled and some time that afternoon a "meeting" of the Redistricting Committee was called for 5 p.m. During that meeting the Committee Substitute C2333 was unveiled, laid out and adopted by the Committee with no opportunity for public input.

When C2333 went to the floor there were a number of important questions to the speaker who simply said, in a manner inconsistent with the history of the House, that certain general questions

would not be considered. The bill was required to be adopted after a second and a third reading, which on such bills do not normally occur on the same day. However, on this day, the readings were heard on the same day so that the bill could move through with rapid fire. Shortly after the bills steamrolled through the House, President Trump endorsed the Speaker. The bill was heard by the Senate the very next day. It was again discussed in the Senate Redistricting Committee where the public was permitted to have no input. The bill was presented and adopted on the 21st of August, less than 24 hours after the bill passed the House of Representatives. Less than 24 hours after the bill passed out of the Senate Committee, it went to the floor of the Senate where it was adopted on the 22nd of August. This means the map was received and considered by the Legislature for only 5 days before final adoption. Attempts to include provisions in the bill to ensure compliance with the law were defeated when requested by Legislators. The racially discriminatory impact and vote dilution contained in the bill were made clear to the Legislative Leaders in both the House and the Senate before they adopted the bill—HB4. Even before the week of August 18th, during the Special Session the Legislature eliminated normal notice requirements, conducted hearings with minimal advance notice, held most hearings with no map, disregarded citizen input generally when they did hold hearings, and in the House Redistricting Committee adopted a redistricting plan on the same day it was publicly unveiled, denying lawmakers and the public meaningful opportunity to analyze or comment on the proposal.

## II. JURISDICTION AND VENUE

**5.** This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 42 U.S.C. § 1988. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Plaintiff-Intervenors seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## III. PARTIES

**6.** Plaintiff-Intervenor Congresswoman Jasmine Crockett currently represents Congressional District 30. She is a member of the United States House of Representatives, serving on the House Committee on Oversight and Accountability and the House Committee on Agriculture. Congresswoman Crockett was first elected in 2022 and re-elected in 2024. She is an African American voter who resides in Dallas, Texas, and has been an active advocate for protecting minority voting rights throughout her service in both the Texas Legislature and Congress. Under Plan C2333, her residence is moved outside of Congressional District 30, forcing her to choose

4

between districts and demonstrating the racially discriminatory targeting of minority elected officials.[4]

**7.** Plaintiff-Intervenor Congressman Alexander Green represents Congressional District 9 but his residence and a large portion of the current 9th Congressional district have been moved to the 18th Congressional District. He has served in Congress since 2005 and is a member of the House Committee on Financial Services and the House Committee on Homeland Security. Congressman Green is African American and resides in Houston, Texas. Under Plan C2333, his residence is moved from Congressional District 9 to Congressional District 18, and the district he has represented for nearly two decades is fundamentally restructured to eliminate African American electoral opportunity. This targeting of Congressman Green's residence repeats the racially discriminatory pattern identified in prior Texas redistricting cases. *See Texas v. United States*, 887 F. Supp. 2d 133, 160-61 (D.D.C. 2012). Some of Green's voters were left behind in the old 9th Congressional District where they will have no opportunity to elect their candidate of choice, and others were unnecessarily moved into the 18th Congressional District along with him so they could destroy the traditional 18th Congressional District and also the 29th Congressional District where core parts of the 18th were moved to the 29th.

## IV. FACTUAL ALLEGATIONS

### A. Historical Context of Texas Redistricting Racial Discrimination

**8.** Texas has a well-documented history of redistricting racial discrimination spanning multiple decades. As this Court has previously noted, "Texas has found itself in court every redistricting cycle, and each time it has lost." *Perez v. Abbott*, 253 F. Supp. 3d 864, 957 (W.D. Tex. 2017). The pattern of racial discrimination includes systematic efforts to minimize minority electoral opportunity through cracking and concentrating, removal of economic engines from minority districts, and exclusion of minority legislators from the redistricting process.

**9.** In the 2017 *Perez v. Abbott* litigation, this Court found extensive evidence of intentional racial discrimination in Texas redistricting, including findings that "race was used as a proxy for political affiliation, and that this was done intentionally to dilute minority voting strength." The Court specifically found that Congressional District 30 demonstrated "a classic racial gerrymandering technique of concentrating minority voters into CD30 to waste their votes, while moving Anglos into neighboring districts to increase their Republican performance."

**10.** The D.C. Circuit's decision in *Texas v. United States* found that Texas's 2011 Congressional plan was enacted with racially discriminatory intent, noting that "the way in which the State had carved apart the Congressional districts being represented by African-American members of Congress could be explained only by an intent to racially discriminate against minority voters in the districts."

**B. The 2025 Mid-Decade Redistricting Process**

**11.** In June 2025, rumors began circulating regarding potential mid-decade redistricting in Texas. These rumors were confirmed when the Trump Administration's Department of Justice sent a letter dated July 7, 2025, to Governor Abbott and Attorney General Paxton declaring that Congressional Districts TX-09, TX-18, TX-29, and TX-33 constitute "unconstitutional coalition districts" that must be rectified immediately *see Exhibit A*.

**12.** The DOJ letter relied primarily on the Fifth Circuit's *Petteway v. Galveston County* decision to argue that coalition districts violate the Voting Rights Act and Fourteenth Amendment. The letter demanded that Texas respond by July 7, 2025, with a plan to bring its redistricting into constitutional compliance *see Exhibit A*.

**13.** Rather than engaging in a deliberative process to address the constitutional concerns while preserving minority electoral opportunity to the extent possible, the Texas Legislature embarked on a rushed redistricting process characterized by the same procedural irregularities that have marked prior racially discriminatory redistricting efforts in Texas.

**C. Procedural Irregularities in the 2025 Process**

**14.** The 2025 redistricting process was marked by systematic exclusion of minority legislators and denial of meaningful public participation. The Legislature eliminated normal notice requirements for Senate hearings, forcing the public to rely on rumors and last-minute announcements to track the redistricting process.

**15.** When Democratic legislators, including members of the Texas Legislative Black Caucus, left the state to deny a quorum for the initial redistricting proposal (Plan C2308), Republican leadership had them taken into custody and effectively incarcerated until they agreed to return and provide a quorum.

**16.** The House canceled a scheduled hearing on redistricting and instead provided same-day notification for a committee meeting, denying lawmakers and the public meaningful opportunity

to analyze the proposal. The bill was adopted on the same day it was unveiled, preventing any substantive review or public input.

**17.** No information was provided about any assessment conducted to ensure compliance with the Voting Rights Act or other applicable law. Democratic legislators were denied access to the rooms where the maps were being drawn and were prohibited from providing meaningful input into the redistricting process.

**D. Racially Discriminatory Impact of Plan C2333 on Hispanic Voters**

**18.** Dr. Richard Murray's expert analysis demonstrates that Plan C2333 "greatly reduces the opportunity for Hispanic voters in Texas to elect candidates of their choice." The plan systematically dismantles existing Hispanic opportunity districts while creating no new districts to account for continued Hispanic population growth, *see Exhibit B*.

**19.** In Harris County, Plan C2333 dismantles Congressional District 29, a performing Latino opportunity district since 1992. The district is split, with one portion dominated by Black voters moved out of existing CD18, and the other portion moved into a new CD9 dominated by conservative Anglo voters who uniformly oppose candidates preferred by Hispanic voters, *see Exhibit B*.

**20.** The destruction of CD29 means that the Hispanic population in Harris County, totaling 2,034,700 in 2020, will have "for the first time in three decades, no good opportunity to elect a candidate of their choice to Congress, *see Exhibit B*."

**21.** In the Bexar-Travis area, Plan C2333 significantly weakens the existing coalition opportunity district (CD35) by replacing Travis, Hays, and Comal areas with counties that have "a recent history of polarized voting against the preferred candidates of Latino voters, *see Exhibit B*."

**22.** In the Lower Rio Grande Valley, Plan C2333 weakens CD34 by removing heavily Latino portions of Hidalgo County and replacing them with parts of Nueces County that are less Hispanic and more polarized against Latino-preferred candidates. Significantly, the plan deliberately removes heavily Latino portions of Nueces County while including less Latino areas, demonstrating intentional racial discrimination, *see Exhibit B*.

**E. Racially Discriminatory Impact on African American Voters**

**23.** Plan C2333 reduces Black opportunity districts in Texas from three (CD 9, CD 18, and CD 30) to two (CD 18 and CD 30). This reduction occurs despite continued growth in the African

American population that should support maintaining, not reducing, Black electoral opportunity, *see Exhibit B*.[3] Defendants judicially admit that benchmark CD's 9, 18, and 30 are all "minority opportunity districts." *See* ECF 225 at 3. In the alternative if the Court does not hold that 9 is an ability to elect district then the destruction of coalition and naturally occurring districts --9 (coalition district) and 33 (coalition or naturally occurring).

24. The Ninth District, which "gave African American voters the opportunity to elect their candidate of choice in eleven consecutive elections," is completely eliminated. The new district retaining the number 9 is "an entirely new territory in eastern Harris County and Liberty County" where "Black voters have no influence, *see Exhibit B*.

25. The high-turnout Black precincts from the existing Ninth District are moved into CD18, forcing removal of over half of the existing Eighteenth District, including high-performance Black areas like Independence Heights and Acres Homes. This constitutes a classic example of concentrating Black voters to waste their electoral strength, *see Exhibit B*.

26. The manipulation of Congressional District 30 demonstrates continued concentration and cracking tactics. The district gains 200,000 new voters after having gained 200,000 new voters in the 2021 redistricting, with Congresswoman Crockett's residence moved away from her district, repeating the racially discriminatory targeting of minority elected officials found unlawful in prior cases.

**F. Evidence of Intentional Racial Discrimination**

27. The timing and circumstances of Plan C2333's enactment provide clear evidence of racially discriminatory intent. The redistricting was prompted not by census data or population changes, but by a partisan DOJ directive specifically targeting minority opportunity districts, *see Exhibit A*.

28. The systematic targeting of minority elected officials' residences repeats racially discriminatory patterns from prior redistricting cycles. Both Congressman Green and Congresswoman Crockett find their residences moved to different districts, forcing them to choose between districts and potentially pitting them against each other, *see Exhibit B*.

29. The procedural irregularities surrounding Plan C2333's enactment - including elimination of notice requirements, same-day adoption, and exclusion of minority legislators - parallel those found racially discriminatory in prior Texas redistricting cases and demonstrate conscious efforts to prevent minority communities from effectively opposing the racially discriminatory plan.

**30.** The disproportionate impact of Plan C2333 on minority voters cannot be explained by neutral redistricting principles. While Texas's Anglo population is less than 40 percent of the state total, Plan C2333 would result in Anglo voters electing candidates they support in as many as 30 of the state's 38 congressional districts, *see Exhibit B*. In the last round of redistricting, the Court found this lack of proportionality troubling insofar as minority voters were treated differently. *Perez v. Abbott*, 253 F. Supp. 3d 864, 958–59 (W.D. Tex. 2017)(quoting *Johnson v. De Grandy*, 512 U.S. 997, 1025, (1994) (O'Connor, J., concurring) (lack of proportionality is probative evidence of vote dilution and is always relevant)).

Moreover, all 3 African American Congresspersons were drawn out of their existing districts. 5 districts change in C2333, and 4 of them have Latino CVAP majorities and will not function as districts that elect the Latino candidate of choice. This demonstrates an intention to avoid a determination that the map is a racial gerrymander, but to the contrary this demonstrates that race was a dominant consideration in the drafting of C2333.

A fair map would contain at least 12 districts where Latino voters could elect their candidate of choice and 5 districts where African Americans could elect their candidate of choice. Currently we have 10 districts with Latino majorities, and this number is carried over to the new map. There are 25 districts now with a majority of white voters and that number is increased to 26 in the new map. White voters are likely to control at least 3 of the Latino majority seats and there is a better than even chance they will control at least 5 of those 10 districts.

**G. Violation of Traditional Redistricting Principles**

**30.1** Plan C2333 represents a systematic abandonment of traditional redistricting principles that the Supreme Court has recognized as legitimate and nondiscriminatory objectives. The Supreme Court has acknowledged that preserving the cores of prior districts constitutes a legitimate redistricting principle that can justify minor population deviations, provided the criteria are applied in a nondiscriminatory manner. *Karcher v. Daggett*, 462 U.S. 725 (1983); *Bush v. Vera*, 517 U.S. 952 (1996). Similarly, the Court has recognized that keeping communities of interest together—including consideration of a district's urban character, common media sources, and major transportation lines—represents a traditional districting principle. *Bush v. Vera*, 517 U.S. at 977. The Court has further acknowledged that avoiding contests between incumbent representatives constitutes a legitimate redistricting objective. *Abbott v. Perez*, 585 U.S. 579, 616

(2018). However, Plan C2333 systematically violates each of these traditional principles in ways that disproportionately burden minority communities.

Rather than preserving district cores, Plan C2333 completely dismantles the performing Congressional District 29, a Latino opportunity district since 1992, and transforms Congressional District 9 into "an entirely new territory in eastern Harris County and Liberty County" where the existing African American community loses all electoral influence. Instead of maintaining communities of interest, the plan fractures longstanding Hispanic communities in Harris County, splitting CD29 and dispersing Latino voters between a district dominated by Black voters and another dominated by conservative Anglo voters who uniformly oppose Hispanic-preferred candidates. Rather than protecting incumbents equally, Plan C2333 specifically targets minority elected officials by moving Congressman Green's residence from Congressional District 9 to Congressional District 18 and moving Congresswoman Crockett's residence away from Congressional District 30, forcing both to choose between districts and potentially creating contests between minority incumbents. These departures from traditional redistricting principles follow racial rather than neutral lines, demonstrating that race, not legitimate redistricting objectives, was the predominant factor driving Plan C2333's boundaries. *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

## V. CLAIMS FOR RELIEF

**COUNT I: INTENTIONAL VOTE DILUTION IN VIOLATION OF THE FOURTEENTH AND FIFTEENTH AMENDMENTS**

**31.** Plaintiff-Intervenors incorporate by reference all preceding allegations.

**32.** Plan C2333 was enacted with the intent to disadvantage African American and Latino voters, including those in Congressional Districts 9 where Green formerly resided, 18 where Green now resides, 30 where Crockett formerly resided and 33 where Crockett now resides. This intentional racial discrimination violates the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the United States Constitution.

**33.** The *Arlington Heights* factors demonstrate racially discriminatory intent: (1) the disparate impact on minority voters is clear and foreseeable; (2) Texas has a documented history of redistricting racial discrimination; (3) the sequence of events, including the rushed process and exclusion of minority legislators, supports an inference of racial discrimination; (4) the plan

represents significant departures from neutral redistricting principles that correlate with race; and (5) contemporary statements and the legislative record reveal racially discriminatory purpose.

**34.** Under *Abbott v. Perez*, 585 U.S. 579 (2018), while legislatures are entitled to a presumption of good faith, that presumption is overcome by the substantial evidence of racially discriminatory intent in this case, including the systematic targeting of minority opportunity districts, exclusion of minority voices from the process, and adoption of a plan that dramatically reduces minority electoral opportunity without justification.

### COUNT II: VIOLATION OF SECTION 2 OF THE VOTING RIGHTS ACT

**35.** Plaintiff-Intervenors incorporate by reference all preceding allegations.

**36.** Plan C2333 results in a denial or abridgement of the right to vote on account of race and color in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

**37.** The three *Gingles* preconditions are satisfied: (1) African American and Latino populations in the relevant areas are sufficiently large and geographically compact to constitute majorities in reasonably configured districts; (2) these minority communities are politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

**38.** Under the totality of circumstances, including the Senate factors, the political processes in Texas are not equally open to African American and Latino voters. The systematic reduction in minority opportunity districts, combined with Texas's history of racial discrimination and racially polarized voting, demonstrates that minority voters do not have an equal opportunity to participate in the political process and elect representatives of their choice.

**39.** Plan C2333 employs classic vote dilution techniques of cracking and concentrating. Hispanic voters are concentrated by dismantling performing opportunity districts and dispersing Hispanic communities among districts where they cannot elect candidates of their choice. African American voters are concentrated in fewer districts to waste their electoral strength.

### COUNT III: RACIAL GERRYMANDERING IN VIOLATION OF THE FOURTEENTH AMENDMENT (SHAW CLAIM)

**40.** Plaintiff-Intervenors incorporate by reference all preceding allegations.

**41.** Race was the predominant factor in drawing the boundaries of Congressional Districts 9, 18, and 30, as well as surrounding districts that were reconfigured to accommodate the racial manipulation of these districts.

**42.** Traditional redistricting principles were subordinated to racial considerations. The districts exhibit irregular shapes that can be explained only by efforts to sort voters by race. The systematic movement of minority voters between districts, as documented by Dr. Murray's analysis, demonstrates that racial considerations predominated over neutral factors, *see Exhibit B*.

**43.** To the extent Defendants claim compliance with the Voting Rights Act as justification for race-conscious redistricting, they cannot satisfy strict scrutiny. The DOJ letter that prompted this redistricting specifically argued that coalition districts are unconstitutional, meaning Defendants had no strong basis in evidence for believing that race-conscious districting was required by federal law, *see Exhibit A*.

## VI. RELIEF SOUGHT

**WHEREFORE**, Plaintiff-Intervenors respectfully request that this Court:

**A.** Issue a declaratory judgment that Plan C2333 violates the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act and 3 C relief;

**B.** Issue preliminary and permanent injunctive relief prohibiting the use of Plan C2333 for any elections;

**C.** Order the State of Texas to adopt a remedial redistricting plan that eliminates the constitutional and statutory violations identified herein and restores meaningful electoral opportunity for African American and Latino voters;

**D.** If necessary, adopt an interim redistricting plan for the 2026 elections that remedies the racial discrimination found in Plan C2333;

**E.** Retain jurisdiction over this matter to ensure compliance with all orders and to prevent future racial discrimination;

**F.** Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1973l(e) and 1988; and

**G.** Grant such other relief as the Court deems just and proper.

**Respectfully submitted,**

**/s/ Gary Bledsoe**

Gary Bledsoe

State Bar No. 02476500

The Bledsoe Law Firm PLLC

6633 Highway 290 East, Suite 208

Austin, Texas 78723-1157

Telephone: (512) 322-9992

Fax: (512) 322-0840

gbledsoe@thebledsoelawfirm.com

**/s/ Robert S. Notzon**

Robert S. Notzon

State Bar No. 00797934

1502 West Avenue, 78701

robert@notzonlaw.com

**Attorneys for Plaintiff-Intervenors Jasmine Crockett and Alexander Green**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon all counsel of record in accordance with the Federal Rules of Civil Procedure.

**/s/ Gary Bledsoe**

Gary Bledsoe

**Dated:** August 26, 2025