# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br>　　　　*Plaintiffs,*<br><br>ALEXANDER GREEN, *et al.*,<br>　　　　*Plaintiff-Intervenors,*<br><br>v.<br><br>GREG ABBOTT, *et al.*,<br>　　　　*Defendants.* | 3:21-cv-00259-DCG-JES-JVB<br>[Lead Case]<br><br>&<br><br>All Consolidated Cases |

### STATE DEFENDANTS' MOTION TO DISMISS THE GONZALES PLAINTIFFS' COUNT IV FOURTEENTH AMENDMENT CLAIM

　　In their August 23, 2025 Second Supplemental Complaint for Declaratory and Injunctive Relief, Gonzales Plaintiffs raise a "malapportionment" Equal Protection Clause claim, alleging that Texas's 2025 mid-decade redraw of its congressional map runs afoul of the "one person, one vote" principle because it relied on the decennial census. ECF 1131-1, ¶¶ 49–54, 251–61 ("Count IV"). This claim fails as a matter of law. The U.S. Constitution "leaves with the States the primary responsibility for apportionment of the federal congressional . . . districts." *Growe v. Emison*, 507 U.S. 25, 34 (1993). Neither the Constitution nor federal statute prohibits the States from exercising that power mid-decade, even if for partisan ends. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 415 (2006); *see also* Sarah J. Eckman & L. Paige Whitaker, *Mid-Decade Congressional Redistricting: Key Issues,* CONG. RSCH. SERV., IF13082, at 1 (Aug. 11, 2025).

　　The U.S. Supreme Court previously examined and rejected the legal foundation of Gonzales Plaintiffs' arguments in *LULAC v. Perry* when it upheld Texas's decision to redistrict in 2003 for purposes of obtaining a Republican congressional majority. 548 U.S. at 420–23. In that case, the Supreme Court noted that plaintiffs' objection turned "not on whether [the State's] redistricting furthers equal-population principles but rather on the justification for redrawing a plan

1

in the first place." *Id.* at 422. It then concluded that partisan motives were not sufficient grounds for the Court to upend Texas's constitutional prerogative to revise its district lines. *Id.* at 423; *see also Rucho v. Common Cause*, 588 U.S. 684, 710 (2019) (determining partisan gerrymandering claims to be non-justiciable). The plaintiffs had "state[d] no claim on which relief may be granted for their statewide challenge." *Id.* at 423.

Gonzales Plaintiffs have simply repackaged the same arguments asserted in *Perry*: their objection lies not with the mid-decade use of the decennial census *per se*, *see* ECF 1133-2 at 23 (Gonzales Plaintiffs' Aug. 24, 2025, Motion for Preliminary Injunction) (citing permissible examples), but with the partisan goals Texas cites as a reason for enacting a new map. Accordingly, this Court should adopt the Supreme Court's holding in *Perry* and later *Rucho v. Common Cause* and dismiss Count IV under FRCP 12(b)(6) for failure to state a claim.

I. **FACTUAL BACKGROUND**

To better understand the dispute that the Parties place before the Court today, it is useful to take a few steps back to revisit the recent historical context that underlies it.

When the Texas Legislature, led by a Republican majority, redrew maps for the Texas House and Senate and the U.S. Congressional delegation in 2011 following the 2010 census, it took an aggressive approach aimed at maximizing the number of Republican-leaning districts. While this initially yielded the desired partisan results, Republicans would go on to lose a dozen seats in the Texas House, two in the Texas Senate, and two in Congress to Democrats in the 2018 mid-term elections. As Dr. Sean Trende would testify at trial, as the 2010s advanced, the "map that Republicans had drawn at the beginning of the 2010s started to look like what is genuinely referred to in peer-reviewed literature as a dummymander." Trial Tr. Jun. 9, 2025 AM, at 82:23–25; *see also id.* at 83:8–23 (explaining the meaning of the term "dummymander" and why it applied).

In 2021, the Legislature took a different, more cautious approach when crafting Texas's four statewide maps. Instead of maximizing the number of Republican districts, the Legislature favored safe seats that reinforced Texas's existing Republican majority and protected incumbents. The result was a set of maps that expanded Republicans' advantage, but to quote Plaintiffs' expert

2

Dr. Moon Duchin, who cited the Legislature's restraint as evidence of invidious racial intent, the final plans "left a lot on the table"—the Congressional map in particular Trial Tr. May 31, 2025 AM at 57:23–2.

This decision to favor security over ambition ended up having national implications. While the Texas adopted a fairly moderate form of partisanship in drawing the 2021 maps, other states adopted a more aggressive gerrymander that systematically diluted Republican votes and gave Democrats a leg up in regaining control of the U.S. House of Representatives. In Illinois, for example, the House Delegation consisted of five Republican- and thirteen Democrat-held seats before the 2020 Census data was released. Then, when Illinois lost a seat following reapportionment, the Democrat-controlled legislature drew the seventeen remaining seats to create a delegation consisting of three Republicans and fourteen Democrats. In Oregon, right-leaning voters were packed into a single district, allowing for the creation of five Democratic-leaning districts, even though the Democratic presidential candidate received only 56% of the votes in the 2020 presidential election and a 55% vote share in 2024. New Mexico, Connecticut, and Massachusetts, meanwhile, all have *100%* Democratic Congressional delegations, even though the Republican presidential candidate received a considerable percentage of the vote in each state in Presidential elections in both 2020 (44%, 39%, and 32%, respectively) and 2024 (46%, 42%, and 36%).

Given these facts, and mindful of history showing that a president's political party tends to lose House seats in mid-term election years, President Trump publicly sought strategies for his party to respond in kind for the November 2026 elections. It was with the goal of evening the playing field that President Trump called on Governor Abbott to redraw Texas's congressional districts in a manner that could allow Republicans to win up to five additional seats.[1] Governor Abbott thus called a first and then a second special legislative session to address this question (as well as a number of other pending legislative matters).

---

[1] J. David Goodman & Shane Goldmacher, *White House Pushes Texas to Redistrict, Hoping to Blunt Democratic Gains*, N.Y. Times (June 9, 2025), https://www.nytimes.com/2025/06/09/us/politics/trump-texas-redistricting.html.

It is unnecessary for present purposes to go into the details of precisely how those sessions transpired (or to describe the difficulties that arose when Democratic members of the Texas House broke quorum and fled to consult with various barons of the Democratic party in some of the country's most gerrymandered states). Ultimately, the Republican-controlled Texas Legislature passed HB4 in late August, and Governor Abbott signed it shortly thereafter. The bill redrew Texas's Congressional map to give an increased partisan advantage to Republicans.

## II.   LEGAL STANDARD

A plaintiff must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

## III.   ARGUMENT

Gonzales Plaintiffs have failed to state a claim for relief that is plausible on its face. The U.S. Constitution permits mid-decade redistricting. Moreover, both the U.S. Supreme Court and a previous three-judge panel in Texas have extended the legal fiction of ongoing decennial census accuracy even when a state enacts a voluntary map for partisan purposes. In arguing otherwise, Gonzales Plaintiffs grasp at the fact that the controversy in *Perry* concerned a replacement to a court-drawn map, whereas Texas's recent redistricting efforts replaced a map created by an earlier legislature. However, this is a distinction without a difference. And it has no basis in the Constitution's text, which entrusts principal responsibility for apportionment with the States. At bottom, what Gonzales Plaintiffs protest is Texas's partisan objective in enacting a new map, and it is that exact premise that the Supreme Court rejected in *Perry* and again in *Rucho*.

A. **Mid-decade redistricting is permissible under the U.S. Constitution, federal law, and the Texas Constitution.**

The Gonzales Plaintiffs' Fourteenth Amendment claim should be dismissed because it is based on a theory that has been considered and rejected by the U.S. Supreme Court. In *LULAC v. Perry*, the U.S. Supreme Court addressed Constitutional and Voting Rights Act claims that were initiated after the Texas Legislature in 2003 replaced a 2000 court-ordered redistricting plan. 548 U.S. 399 (2006). The 2003 maps were drawn using the 2000 Census data after Republicans gained control of the Texas Legislature in 2003.

Justice Kennedy's opinion concluded that "[w]ith respect to a mid-decade redistricting to change districts drawn earlier in conformance with a decennial census, *the Constitution and Congress state no explicit prohibition*." *LULAC*, 548 U.S. at 415 (emphasis added); *see also id.* at 456 (Stevens, J., joined by Breyer, J., dissenting) (noting that the three-judge District Court panel "correctly found that the Constitution does not prohibit a state legislature from redrawing congressional districts in the middle of a census cycle").

In reaching this conclusion, Justice Kennedy's opinion quotes U.S. Constitution Article I, Section 2 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States . . . .") and Section 4 ("The Times, Places and Manner of holding Elections for . . . Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations . . . ."), and finds that "the Constitution vests redistricting responsibilities foremost in the legislatures of the States . . . " *Id.* at 416.

Plaintiffs in *LULAC* also criticized the "voluntary, mid-decade nature of the redistricting and its partisan motivation." *Id.* at 421. But the Justice Kennedy opinion (joined by Justices Souter and Ginsburg) notes that States may "operate under the legal fiction that their plans are constitutionally apportioned throughout the decade." *Id.*; *see also Georgia v. Ashcroft,* 539 U.S. 461, 489 n.2 (2003) ("[B]efore the new census, States operate under the legal fiction that even 10 years later the plans [*i.e.*, plans relying on the last census data] are constitutionally apportioned. After the

new enumeration, no districting plan is likely to be legally enforceable if challenged, given the shifts and changes in population over 10 years.").

In not finding any constitutional violation flowing from the Texas Legislature's redrawing of districts mid-decade in *LULAC*, the U.S. Supreme Court did not depart from the ruling on this point made by the three-judge panel in the first instance, in *Henderson v. Perry*, 399 F. Supp. 2d 756 (E.D. Tex. 2005). The lower court had refused to declare a mid-cycle redistricting plan invalid on the basis that it was "unconstitutionally tainted by excessive partisan purpose." *Henderson*, 399 F. Supp. 2d at 758. The District Court panel found, more specifically, that "there is no constitutional or statutory prohibition on mid-decade redistricting." *Id.* at 766.

But as the U.S. Constitution provides that authority over defining the "Times, Places and Manner of holding Elections for . . . Representatives" for any given state rests with that state's Legislature, it must also be determined whether the law of Texas also countenances mid-decade redistricting.

The Supreme Court of Texas has held that mid-decade revision relying on the latest census data is permissible. In *Mauzy v. Legislative Redistricting Board*, the Supreme Court of Texas held that Section 28, Article III of the Constitution of Texas need not be given a slavishly literal reading. That provision reads in relevant part: "The Legislature shall, at its first regular session after the publication of each United States decennial census, apportion the state into senatorial and representative districts." In *Mauzy*, the Texas Legislature undertook reapportionment in the regular session *during which* the census data were released, rather than at the next regular legislative session *following* the release. The Texas Supreme Court held, "We are convinced that the overriding intent of the people in adopting Sec. 28 was to permit apportionment of the state into legislative districts at the regular session of the Legislature which is convened in January following the taking of the census, if publication is either before convening or during the session." *Mauzy v. Legislative Redistricting Bd.*, 471 S.W.2d 570, 573 (Tex. 1971). The Court indicated that while the language of the constitutional provision was subject to the contrary interpretation proposed, it did not consider that contrary interpretation to be "a reasonable one." *Id.*

6

Even more to the point, in 2022 the Texas Supreme Court held that the authority of the Texas Legislature to redistrict using the latest decennial census is *not* limited by the Texas Constitution to redistricting that occurs in the first regular session following publication of the census:

> [T]he Legislature is vested with "all legislative power—the power to make, alter and repeal laws—not expressly or impliedly forbidden by other provisions of the State and Federal Constitutions." . . .
> In apportioning legislative districts, the Legislature is exercising its legislative power to make laws, not "a power ordinarily and intrinsically belonging to another department of the government." Section 28 provides a mechanism to ensure that the Legislature exercises this power in a timely fashion following each decennial census, but it neither expressly nor impliedly forecloses this power from being exercised at another time.

*Abbott v. Mexican Am. Legislative Caucus, Texas House of Representatives*, 647 S.W.3d 681, 702 (Tex. 2022).

Gonzales Plaintiffs offer no case to support their theory that reapportionment lapses into unconstitutionality between censuses, because no such case exists. Instead, Gonzales Plaintiffs offer a policy argument for why this Court should put aside the U.S. and Texas Constitutions and all case law. ECF 1131-1, ¶ 53. The Court should bat down this Hail Mary and affirm the universal understanding that decennial census data remains valid until the next census.

**B. The State of Texas is Entitled to Rely upon Census Data when Revising Congressional Districts.**

Despite the above precedent, Plaintiffs ask that the Court decline to extend the presumption of census data validity to these maps, holding by implication that mid-decade revisions are unconstitutional. Plaintiffs' sole argument in support of such contentions is that the Court in *LULAC* "has never extended" the presumption of census data validity to mid-decade changes to legislatively enacted districts. ECF 1131-1, ¶ 52.

And Plaintiffs appear to argue implicitly that using census data compiled in year *N* to draw districts in year *N+1* and then maintaining those districts unchanged for ten years (*i.e.*, over the next five U.S. Congressional cycles in *N+2*, *N+4*, *N+6*, *N+8*, and *N+10*) somehow better ensures

7

respect of the one person, one vote principle than using that same year $N$ data to redraw the districts at some point in that same ten-year period for use in any of the remaining Congressional elections. ECF 1131-1, ¶¶ 253–57.

A state's population will obviously evolve over the ten years between census reports, and that evolution is entirely unrelated to and unaffected by whether the Congressional districts are drawn just once or more than once over that ten-year period. As a general matter, there is simply no reason in logic to conclude, without more, that a district redrawn in, say, $N+7$, will necessarily have a greater (or lesser) deviation from its then-"ideal" population than the originally corresponding district would have in the same year $N+7$.

Further, the average population deviation of a state's districts from the "ideal" district population in $N+7$ will, as a mathematical matter, be strictly identical in both the scenario where the districts are redrawn and that in which they remain untouched for ten years.

Plaintiffs support their claim that census data is valid for fewer than ten years by citing two cases that actually *support* Texas′ reliance on census data. ECF 1131-1, ¶ 52 (quoting *Georgia v. Ashcroft,* 539 U.S. 461, 488 n.2 (2003) (observing that state legislatures "operate under the legal fiction that even 10 years later, the plans are constitutionally apportioned"), and *LULAC v. Perry,* 548 U.S. at 421 (upholding mid-decade revision by applying the legal fiction of presumed continued census validity)).

The hair-splitting distinction Plaintiffs attempt to draw to substantially impair a core state legislative power, fundamental to the structure of our Constitution, is predicated solely on the happenstance that this *exact fact pattern* has not yet been addressed by the Supreme Court. That is not how freedom works. Plaintiffs cannot strip Texas of its constitutionally-enumerated powers simply because a federal court has not previously assented to those powers under identical, historical circumstances.

Notably, Plaintiffs appear to want to limit any restriction upon legislative redistricting to "*unnecessary*, mid-decade redistricting." *See, e.g.*, ECF 1131-1, ¶¶ 1, 14, 52, 65, 257. "Unnecessary" is not a word included in the U.S. Constitution's reservation of redistricting authority to state

legislatures, and the Court should decline Gonzales Plaintiffs' invitation to shackle what the Constitution leaves unfettered.

Plaintiffs' individual political judgment of the value of redistricting cannot serve to strip the Texas Legislature of its constitutional authority to revise its districts, nor does it grant Plaintiffs a cause of action to challenge the exercise of that power, simply because Plaintiffs are not aligned with the partisan motivations of the Legislature in this instance. And this cause of action is, to be sure, a rank political judgment. Plaintiffs' counsel, led by the eponymous former lawyer for the Democratic Party, Marc Elias,[2] have not filed suit in California to prevent a Democrat-dominated state from mid-cycle redistricting—and no reasonable observer believes they will.

Plaintiffs also seem to imply that the Supreme Court views legislative revisions to maps "drawn by the courts" to be preferable to revisions to earlier legislatively drawn maps. If this is indeed Plaintiffs' suggestion, this is not an accurate summary of *LULAC*. The Court expressed a preference for *legislatively-drawn* maps generally because "drawing lines for congressional districts is one of the most significant acts a State can perform to ensure citizen participation in republican self-governance." *LULAC*, 548 U.S. at 416. It is for this reason that map drawing exercises placed upon the Federal Judiciary is "unwelcome" ("[q]uite apart from the risk of acting without a legislature's expertise, and quite apart from the difficulties that a court faces in drawing a map that is fair and rational"). *Id.* at 415–16.

Even the implication that mid-decade revisions are anything outside the ordinary is patently incorrect. "In both 1804 and 1808, New York drew new congressional district boundaries unrelated to any population shifts." Sarah J. Eckman & L. Paige Whitaker, *Mid-Decade Congressional Redistricting: Key Issues,* CONG. RSCH. SERV., IF13082, at 2 (Aug. 11, 2025). "One analysis found that at least one state redrew its congressional boundaries in every year between 1872 and 1896."

---

[2] "Elias has arguably done more than any single person outside government to shape the Democratic Party and the rules under which all campaigns and elections in the United States are conducted." Vogel, Ken, *Democratic Lawyer Stymied Trump in 2020. Other Efforts Played into G.O.P. Hands*, N.Y. Times (October 30, 2024), https://www.nytimes.com/2024/10/30/us/politics/democratic-lawyer-stymied-trump-in-2020-other-efforts-played-into-gop-hands.html.

*Id*. "Ohio drew congressional district boundaries seven times between 1878 and 1892, conducting five consecutive House elections under different maps." *Id*.

Since the 2000 census, Texas, Colorado, and Georgia have all revised their districts via mid-decade redistricting. *Id*. Indeed, even now, "California, Florida, New York, and Missouri, are reportedly considering the possibility of redrawing their congressional district boundaries before the 2030 census." *Id*. at 1. Plaintiffs' assertion that Texas' mid-decade revision, or its reliance upon the most recent census data, is anything other than a fairly routine exercise of partisanship goes against the great weight of court precedent and historical evidence.

## Conclusion

Because Plaintiffs fail to state a claim to relief that is plausible on its face, Defendants respectfully request that the Court dismiss the Gonzales Plaintiffs' Count IV "Fourteenth Amendment" Claim.

| | |
|---|---|
| Date: September 8, 2025 | Respectfully submitted, |

| | |
|---|---|
| KEN PAXTON<br>Attorney General of Texas | /s/ Ryan G. Kercher<br>RYAN G. KERCHER<br>Chief, Special Litigation Division<br>Texas Bar No. 24060998 |
| BRENT WEBSTER<br>First Assistant Attorney General | KATHLEEN T. HUNKER<br>Deputy Chief, Special Litigation Division<br>Texas Bar No. 24118415 |
| RALPH MOLINA<br>Deputy First Assistant Attorney General | |
| RYAN D. WALTERS<br>Deputy Attorney General for Legal Strategy | DAVID BRYANT<br>Senior Special Counsel<br>Texas Bar No. 03281500 |
| WILLIAM D. WASSDORF<br>Associate Deputy Attorney General for Civil Litigation<br>Texas Bar No. 24103022 | ZACHARY L. RHINES<br>Special Counsel<br>Texas Bar No. 24116957 |
| OFFICE OF THE ATTORNEY GENERAL OF TEXAS<br>Special Litigation Division<br>P.O. Box 12548 (MC-009)<br>Austin, Texas 78711-2548<br>Phone: (512) 936-1700<br>Fax: (512) 457-4410<br>ryan.kercher@oag.texas.gov<br>kathleen.hunker@oag.texas.gov<br>william.wassdorf@oag.texas.gov<br>david.bryant@oag.texas.gov<br>zachary.rhines@oag.texas.gov<br>munera.al-fuhaid@oag.texas.gov<br>zachary.berg@oag.texas.gov<br>ali.thorburn@oag.texas.gov | MUNERA AL-FUHAID<br>Special Counsel<br>Texas Bar No. 24094501 |
| | ZACHARY W. BERG<br>Special Counsel<br>Texas Bar No. 24107706 |
| | ALI M. THORBURN<br>Assistant Attorney General<br>Texas Bar No. 24125064 |
| | COUNSEL FOR STATE DEFENDANTS |

**CERTIFICATE OF SERVICE**

I certify that on September 8, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

/s/ Ryan G. Kercher
RYAN G. KERCHER