IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br> *Plaintiffs,* <br><br> ALEXANDER GREEN, *et al.*, <br> *Plaintiff-Intervenors,* <br><br> V. <br><br> GREG ABBOTT, *et al.*, <br> *Defendants.* | 3:21-cv-00259-DCG-JES-JVB <br> [Lead Case] <br><br> & <br><br> All Consolidated Cases |

**STATE DEFENDANTS' MOTION TO STRIKE EXPERT REPORTS OF DR. BARRETO**

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................................. iii

    I.     State Defendants' Efforts to Obtain Missing Key Data Without Compulsion ................ 3

    II.    The Insufficiency of the Reports ..................................................................................... 7

    III.   The Reports are unreliable because they are non-replicable, and they are thus not admissible under Federal Rule of Evidence 702. ......................................................... 12

    IV.   State Defendants are entitled to know the data relied upon by Barreto in forming his expert conclusions. Since Plaintiffs have refused to provide the data, Barreto's reports should be stricken. ...................................................................... 13

Conclusion ............................................................................................................................... 15

Certificate of Conference ........................................................................................................ 16

Certificate of Service .............................................................................................................. 16

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Pierce v. N.C. State Bd. of Elections*,
  97 F.4th 194 (4th Cir. 2024) ................................................................................................12

*Pierce v. N.C. State Bd. of Elections*,
  713 F. Supp. 3d 195 (E.D.N.C. 2024) ................................................................................. 11

*Pipitone v. Biomatrix, Inc.*,
  288 F.3d 239 (5th Cir. 2002) ................................................................................................12

*Smith v. Goodyear Tire & Rubber Co.*,
  495 F.3d 224 (5th Cir. 2007) ................................................................................................12

*Torres v. City of San Antonio*,
  No. SA:14-CV-555-DAE, 2014 WL 7339122 (W.D. Tex. Dec. 23, 2014) ..............................14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................................................

**Rules & Regulations**

Fed. R. Civ. P.  37(b)(2)(A)(ii) ................................................................................................... 8

Fed. R. Civ. P. 26(a)(2)(A) .........................................................................................................12

Fed. R. Civ. P. 26(a)(2)(B) ................................................................................................... 4, 13

Fed. R. Civ. P. 26(a)(2)(B)(ii) ................................................................................................ 4, 9

Fed. R. Civ. P. 37(c)(1) ........................................................................................................8, 12

Fed. R. Civ. P. 65(a)(1) ..............................................................................................................12

Fed. R. Civ. P. 65(b)(3) ..............................................................................................................12

Fed. R. Evid. 702 .......................................................................................................................12

Defendants the State of Texas; Greg Abbott, in his official capacity as Governor of Texas; Jane Nelson, in her official capacity as Secretary of State; and Dave Nelson, in his official capacity as Deputy Secretary of State (collectively, "State Defendants") move the Court under Federal Rule of Civil Procedure 37(c)(1) to strike the "August 2025 Declaration of Dr. Matt A. Barreto and Michael B. Rios, MPP" (Aug. 24, 2025, Brooks Ex. 269) and the "September 2025 Supplemental Declaration of Matt Barreto and Michael Rios" (Sep. 5, 2025) (the "Reports") due to the experts' continuing failure to provide the disclosure and other information required of them under Federal Rule of Civil Procedure 26(a)(2)(B)(ii) (and under FRCP 26(a)(2)(B) more generally) and because the Reports are unreliable under Federal Rule of Evidence 702.

Barreto's August and September 2025 reports include a new analysis based on computer-simulated redistricting plans (one that, to State Defendants' knowledge, he has never before performed), but Barreto has failed and refused to provide critical pieces of data necessary to replicate and test his methodology. In the August report, Barreto simulates 1,000 congressional plans; examines how many "majority-White CVAP" and "Trump-performing" districts are drawn in his simulated plans; and by comparing the range of such districts in the simulated plans to the number of such districts in Plan C2333, concludes that the enacted C2333 Plan is an "extreme outlier" with respect to both partisanship and race. ECF No. 1150-17 at ¶¶ 50, 51. This new methodology is similar to Dr. Duchin's analysis in that it involves creating simulation maps using a robot. The September 5 Supplemental Report includes additional simulations and map visualizations in the Dallas and Harris County regions using the same "data" as the August report.

A computer redistricting simulation analysis requires several kinds of information necessary to reproduce and test its results. First, there is the input code, which serves to instruct the robot how to process data—the recipe or instructions, if you will. Second, there are the data that are fed into the code for processing—these are the ingredients the robot chef uses in preparing the dish described by the recipe. Third, there are the outputs produced by running data through the input code—the piping-hot dish itself. Finally, there are reports the robot can run to ensure it followed the recipe—whether the robot processed all the data as the input code anticipated, or

1

whether the robot properly measured the ingredients, added them at the correct time, and cooked them at the correct temperature for the appropriate time.

As described below, Barreto has only produced his input code, and claims his data sources are publicly available such that he need not identify them with specificity or disclose whether or how he might have manipulated those data prior to running them through his input code. He refuses to produce reports demonstrating the robot successfully ran data through his input code. Crucially, Barreto fails to produce the 1,000 simulated plans his computer code outputted or a "seed" value to allow State Defendants' experts to recreate those districts, leaving the State Defendants and the Court without a reliable means to assess whether Barreto's 1,000 plans are reasonable comparators to Plan C2333. Continuing the analogy, Barreto has refused to produce the dish he says he cooked and insists that State Defendants and the Court rely on his description of the dish in judging whether it sufficiently resembles the dish prepared by the Texas Legislature.

Barreto has made himself a sort of bizarre food critic. He has tasted the dish offered by the Texas Legislature, and formulated what he insists is a recipe that will reproduce the dish. But he will not disclose the ingredients he used or how his sous chef prepared them. He will not produce information showing he followed his recipe, and he refuses even to allow State Defendants—or the Court—to sample the dish he prepared. Instead, everyone except Barreto and his lawyers must simply take him at his word—his dish is everything the Texas Legislature's dish hopes to be, but better.

The disclosure gamesmanship of their chief expert belies Plaintiffs' putative confidence that their newest intentional discrimination claims are so well supported that they may justify delaying the 2026 elections.[1] They refuse to provide basic data necessary to reproduce and test the brand-new analysis performed by an expert buoying the claims of three Plaintiffs' groups. By contrast, Dr. Duchin provided over 100 gigabytes of data supporting her simulations. Barreto

---

[1] Hr'g Tr. Aug. 27, 2025 at 27:1–29:16.

provided bare input code—a mere recipe compared with the recipe, ingredients, progress pictures, and finished dish provided by Dr. Duchin.

With the Preliminary Injunction hearing set to begin on October 1, 2025 (ECF No. 1146), there is simply not enough time remaining for State Defendants to evaluate and respond to Barreto's reports fully, even if Plaintiffs were now to decide, or were now ordered, to produce the critical withheld data.

**I.    State Defendants' Efforts to Obtain Missing Key Data Without Compulsion**

The Reports are offered by the Brooks, LULAC and, MALC Plaintiffs in support of their August 28, 2025 Joint Motion for Preliminary Injunction. ECF No. 1150. Upon review of the August Report and then the September Report, it was apparent to the State Defendants that Plaintiffs had failed to provide key data that support Barreto's conclusions and/or that would allow State Defendants to reproduce and verify the Reports' calculations. In a word, and as described below and in **Section II**, Barreto provided an incomplete set of input data and, perhaps even more critically, did not provide either the relevant outputs resulting from application of his algorithmic operations or the "seed" value, which would allow State Defendants (and their experts) to reproduce the simulations created by the robot.

On Wednesday, September 3, 2025, State Defendants sent an email to Plaintiffs' counsel requesting that they produce all of Barreto's code (which he had not yet produced) and the missing data, noting:

> State Defendants have yet to receive all data supporting the latest round of Plaintiffs' expert reports; specifically, we lack complete code and chain data necessary to reproduce the work described in the reports we have. We hereby request Plaintiffs produce all such data before the weekend.

Ex. A.

On the night of Friday, September 5, Plaintiffs' counsel forwarded "an additional report from Barreto as well as a detailed file that includes the code he has utilized." Ex. B.

State Defendants urgently reviewed the provided materials, but it rapidly became evident that while at least some of Barreto's code was produced, the data he provided were not of a sort

3

that would allow State Defendants to analyze and answer the Reports. The present motion focuses on two distinct pieces of data that Barreto "considered" to form the opinions in his report, Fed. R. Civ. P. 26(a)(2)(B)(ii), but which Plaintiffs omitted from his disclosure: (1) a data file, referred to as a "foundational shapefile" in the parties' meet-and-confer correspondence that provides "CVAP, 2024 Presidential Election results, and C2193 boundaries merged at the VTD level," and (2) either the simulated congressional plans Barreto's simulations robot created and that he analyzed in his Reports or the seed value that would enable State Defendants to recreate those simulated plans.

As State Defendants' counsel explained to Plaintiffs' counsel by email the next afternoon, Saturday, September 6:

> We're in receipt of your supplementation. . . . We believe that this is still insufficient . . . .
>
> In particular, the code includes the following lines:
>
> #Dataset needs CVAP, 2024 Presidential Election results, and C2193
>
> boundaries merged at the VTD level
>
> #For other regional replications, change the counties to subset on lines 27–28
>
> ##Also, change the number of ndists on line 34; the K_min on line 52
>
> texas_24 <- fread("filepath")
>
> This suggests that there is a foundational shapefile that Dr. Barreto relies upon to run his simulation. Please provide that shapefile so that we can actually replicate his results (or, identify the shapefile elsewhere in the production). Failing that, please provide the code that created the foundational shapefile, as well as the shapefiles upon which *that* code relies. This will enable us to ensure that we are using things like the same CVAP year Dr. Barreto is using or that is apportioned in the same way, or (for that matter) that the precinct boundaries employed are the same ones Dr. Barreto uses.
>
> Finally, it would be ideal if Dr. Barreto would produce the saved simulations upon which he relied. Because he did not appear to set a seed, any replication that we manage will likely produce slightly different maps than those which Dr. Barreto produces.

Ex. C.

4

The Plaintiffs' response to these highly specific requests was received on the afternoon of September 8, 2025 and can fairly be described as dilatory and diversionary. It reads in relevant part:

> Just to be certain, I confirmed with Dr. Barreto that the last supplementation of code has everything Dr. Trende needs to fully understand Dr. Barreto's work given his detailed instructions and 813 lines of code produced. In addition, Dr. Barreto has provided direct links to three online resources hosted by the authors of the redist package, which Dr. Trende can use to inform his work. Dr. Barreto has gone beyond the Rule 26(a)(2)(B) standard, if it even applies in a preliminary injunction posture. . . .
>
> We have provided everything Dr. Trende needs to understand the analysis. Dr. Trende is certainly capable of restricting his analysis to the Plan C2333 district geographies identified in Dr. Barreto's report. The shapefile is here, in the state's possession: https://data.capitol.texas.gov/dataset/ planc2333. Dr Barreto did not create any new foundational shapefiles, rather he relied on boundaries in the Plan C2333. With respect to the set.seed issue, using that, as Dr. Trende seems to, is just a fundamental disagreement between to the two experts as to how this should be done. Nevertheless, Dr. Trende can run it his way and he has what he needs to run it Dr. Barreto's way including outputting extra files like the simulations you mention.
>
> Operators of R [the programming language] can approach coding in an infinite number of styles and iterations. Longer code, that includes more lines as you suggest, does not mean that shorter code cannot accomplish the same task. We both may write instructions on assembling something from Ikea and undoubtedly our instructions would vary in length, order and detail. "More code" does not equal better or good code.

Ex. D.

State Defendants considered the response and, in light of the tight deadlines, wrote back later that same afternoon to explain once again, with even greater specificity, why the materials provided neither satisfied or relieved Plaintiffs of their Rule 26 obligations nor permitted State Defendants to craft a rebuttal to the proposed expert testimony. It is useful to quote the State Defendants' September 8 email to opposing counsel at some length:

> The code related to simulations in [Dr. Barreto's] latest reports is, of course, the code we seek. To the extent that there is any confusion, I am talking only about his simulations. For further clarity, to the extent the data relied upon by Dr. Barreto are different from data relied upon by his assistant, Mr. Rios, we are requesting Rios' data, as well. Finally, we seek not some set number of code lines, but the data

5

necessary to run the code. I can't tell if Barreto's Ikea chair will hold my weight simply by reading the instructions he followed—I need the pieces he used, as well.

As we both know, Dr. Trende is familiar with the R package Dr. Barreto references, given that he used it in his opening report. But it's simply incorrect to frame this as a disagreement over how this "should be done." You cite the relevant portion of Rule 26, which requires the expert to produce "the facts or data considered by the witness in forming [his opinions]."

If Dr. Barreto is taking the position that he never considered the output of his simulations, either directly or via computerized interpretation, then it will make for a short cross. But whatever Dr. Barreto considered, he hasn't produced it, nor can we reproduce it ourselves, for reasons explored below. We have his code, but he doesn't appear to "consider" his code in forming his opinions, which is at best referenced tangentially in his report.

The data on which he relies—what he actually tests—is simulation *output*, which is referenced repeatedly in his reports. These are the pieces he used to build the Ikea chair in your analogy.

Instead, he refuses to produce the actual finished product he tested, and for no apparent reason. We can't see the maps that he relied upon in his report (either directly or via computerized interpretation) and we can't check to make sure that they are contiguous or otherwise in compliance with the law. We can't check to see if they have the properties Dr. Barreto references in his report. Nor—and this is key—can we replicate them ourselves, since Dr. Barreto failed to set a seed in his code, *or employ any other technique* that would have made the random choices made by Dr. Trende's computer the same as the random choices made by Dr. Barreto's. As it stands, whatever Dr. Trende's simulations produce will be different than Dr. Barreto's, possibly in material ways. To wrap up the analogy, we're entitled to test the same piece of furniture Dr. Barreto tested—what he actually considered—but he continues to hide it.

Moreover, we have not been provided everything we would need to replicate the things on which Dr. Barreto relies. It's insufficient to point to a web page with almost 200 files on it and tell State Defendants, "Go fish." You've told us the Ikea chair Dr. Barreto tested is somewhere in the store, but refuse to identify which one. We are again entitled to test [and] examine the same data Dr. Barreto used, not hope that we get the right product while browsing the store. This is particularly problematic given the extremely tight deadline under which we are operating.

In Dr. Barreto's code he notes that the dataset that forms the foundation for his simulations "needs CVAP, 2024 Presidential Election results, and [C2333][2] boundaries merged at the VTD level." If there is a single shapefile on the page that you reference that contains this information *without requiring additional manipulation*, please identify the shapefile. In the alternative, please follow the

---

[2] The text of the email contains a typographical error and refers erroneously here to Plan "C2193."

> process followed by almost every expert in this case and simply produce all of the files necessary to run Dr. Barreto's code, without requiring us to guess whether the various merges and transformations of data we pull are the same as the ones employed by Dr. Barreto. [ . . . ]
>
> I cannot understand what purpose withholding these shapefiles serves, other than to hope we can't actually replicate his output and will therefore miss some very real concern plaintiffs have about them.

Ex. E.

State Defendants concluded their September 8 email unambiguously, announcing that if the missing data were not produced by Wednesday, September 10, they would move to strike the Reports. *Id.*

Plaintiffs' counsel responded further on September 9, 2025. The full response is attached hereto as Exhibit F. Its main points are reflected in the following short extracts:

- "**Answer Regarding Foundational Shapefile/Code:** There is no foundational shapefile, aside from redistricting plan (e.g., Plan C2333). [ . . . ] Dr. Barreto's code provides the instructions to filter to the geographic subset of counties or districts he analyzes."

- "Dr. Barreto has produced the exact same thing that Dr. Trende did—the output data analysis tables/charts/graphs from the simulations. Dr. Trende did not save and produce any of the 100,000 simulated maps, just the tables/charts/graphs. [ . . . ] What's more, in social science peer-reviewed articles, the authors of the redist software package also rely on the presentation of plots and histograms as their evidence while describing their general practice, they do not save and upload the simulation results output as part of the normal social science publication process."

- *"You note that because Dr. Barreto did not 'set a seed,' Dr. Trende will get 'slightly different maps' than Dr. Barreto did when he ran his code. That is correct.* [ . . . ] Dr. Barreto's opinion is that purpose of this type of analysis is to produce a statistically random and large sample of simulated maps and then chart the characteristics of that set of maps." (emphasis added).

Ex. F.

## II.   The Insufficiency of the Reports

The Reports themselves, and the disclosures of underlying information that accompany them, are marked by a number of flaws that, whether viewed individually or collectively, create a situation of noncompliance with the requirements of FRCP 26(a)(2)(B) and justify this Court in striking those Reports under the dictate of FRCP 37(c)(1) that "[i]f a party fails to provide

7

information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Court may impose additional appropriate sanctions under FRCP 37(c)(1)(C), and these include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." Fed. R. Civ. P. 37(b)(2)(A)(ii).

The shortcomings in the Reports can be summarized as follows:

First, the State Defendants have been placed in a position where they are unable to examine the exact maps upon which Barreto relied or to recreate new simulated maps. In matters involving the drawing of legislative districts, it is commonplace for experts to provide the outputs produced by their simulation models or in the alternative, provide the seed value. (Dr. Duchin, for example, typically provides her chains upon request, and has agreed to do so in this matter, even though they are massive files taking up 100 gigabytes of space.) Barreto's should have saved the outputs of his simulations; assuming he did, he should produce them so that State Defendants' experts can be sure, when they perform their own analyses, that they are examining the same data as Barreto. As the ability to review the same data set constitutes a fundamental aspect of any scrutiny of Barreto's work, there is simply no credible explanation for Barreto to hide it.

This refusal places State Defendants in an especially critical situation because, second, it is impossible for them to replicate Barreto's simulated maps. In Plaintiffs' September 9, 2025 email response (Ex. F), they attempted to defend their approach by observing that Dr. Trende did not produce his simulations with his 2022 report. Yet, unlike Barreto, Dr. Trende employed a technique known as "setting a seed," which allows opposing parties (and their experts) to track the random choices made by the robot. This is a critical distinction. Dr. Trende provided Plaintiffs what they needed to reproduce his work. Barreto has not.

Running redistricting simulations involves a large number of computer-generated random choices. Each time the simulation software is run, the computer produces a different set of maps. Those maps will have roughly the same overall properties, but the individual maps will be different.

8

In other words, it is impossible for State Defendants to examine the properties of the individual maps Barreto analyzed because (a) Plaintiffs refuse to produce them, and Barreto may have destroyed them by terminating his program without saving them; and (b) Barreto chose not to employ a standard technique that would allow a defense expert to replicate his exact maps.

The upshot of the foregoing—and on this the Parties seem to agree—is that the Plaintiffs either will not or cannot provide the data Barreto used to form his conclusions, and that it is impossible for anyone to recreate that data. As such, Plaintiffs have *not* produced "the facts or data considered by the [expert] witness in forming [his opinions]," as mandated by Rule 26(a)(2)(B)(ii).

Third, it is impossible for the defense even to *approximate* the maps upon which Barreto relied, because Plaintiffs have refused to produce the "merged" data that Barreto relied upon to examine the partisan and racial effects of his 1,000 simulated plans. As explained below, by adopting the stances described above in **Section I**, Plaintiffs are preventing State Defendants from producing and examining *a* set of maps that track the constraints that Barreto applied in his modeling. Should State Defendants' attempts to replicate Barreto's work return results different from Barreto, that leaves Barreto free to dismiss the inconsistency by saying State Defendants must have inaccurately replicated his work. This is simply not the standard of fairness set by Rule 26.

Barreto's simulations include a portion of code entitled "#### UPLOAD MERGED DATA ####." It continues: "#Dataset needs CVAP, 2024 Presidential Election results, & C2333 boundaries merged at the VTD level." for State Defendants and their experts to reproduce—any claimed political or racial properties of those 1,000 simulated plans, by giving the computer the data at the VTD level to tally up within the simulated districts.

Presumably, Barreto possesses this dataset of CVAP, 2024 presidential election results, and C2333 boundaries merged at the VTD level. For reasons that are *altogether* unclear, he refuses to produce that particular data set. Instead, he points to the Texas Legislative Council's website, which contains over 200 data files for the new map. These files include various sources of CVAP data—e.g., ACS 1 year, and ACS 5 year data. Moreover, the data required to run Barreto's code—CVAP, 2024 presidential elections, and C2333 boundaries—are not "merged at the VTD level"

9

out of the box. Instead, a sous chef must merge these data to a specific metric before the robot can process them. TLC's website does not perform this merging function, and Barreto discloses neither the data nor his process for merging it.

After these descriptions, the code includes a command that apparently reads in this file: "texas_24 <- fread("filepath")". In this code, "filepath" is a placeholder for the data to be run through the code—an un-produced shapefile—and then saves it in the computer's memory under the name "texas_24." This "texas_24" object is then subsetted, manipulated, and reconfigured throughout the code to produce Barreto's desired simulations. Without this command and shapefile, the code will not run.

Again, there is simply no good reason for refusing to provide this information, as almost every Plaintiffs' expert does in this case.

Finally, what alternative do Plaintiffs propose to address the fact that, unlike Dr. Trende in 2022, Barreto refuses to produce the code he used to create the foundational dataset (*i.e.*, to merge the CVAP, 2024 presidential election results and C2333 boundaries at the VTD level)? Plaintiffs respond that Dr. Trende is capable of re-creating this shapefile himself, presumably by writing his own code. This may or may not be a valid assumption. Can it be done in the period that the State Defendants' expert has to respond to the Reports, while also attending to his other professional obligations? He cannot, and he should not have to. Even were it otherwise, Dr. Trende performing this calculation in no way allows State Defendants to determine whether *Barreto* performed the calculation correctly.

Plaintiffs cannot, through voluntary conduct and maneuvers, render State Defendants unable to respond timely or completely. This is exactly what the Rules are provided to guard against.

And if the Reports were allowed into evidence under these facts, perhaps the most regrettable outcome will be that it will be impossible to tell whether *Barreto* (or his assistant) made a mistake while creating the shapefile. After all, (a) Barreto has never before, to State Defendants' knowledge, testified with respect to redistricting simulations; (b) some portion of his work appears

10

to have been drafted by someone who does not hold a Ph.D., and (c) just on the face of what has been produced, Barreto appears to make one major, fatal mistake in his code that renders many of his simulations useless. There is simply no reason, under the rules, applicable timelines, or basic notions of fairness to leave State Defendants or the Court bereft of this basic ability to check Barreto's work.

It is not State Defendants' job to play "go fish" and attempt to hunt down the data on which an opposing expert relies, or to write new computer code to merge data under strict time constraints. Under circumstances where Barreto has refused to produce the actual results on which he relied, failed to include code that would make his results replicable, and refused to produce the actual files necessary to run his code (without some undetermined additional manipulation to merge the files), the only equitable outcome would be to strike the Reports.

Regrettably, State Defendants' experience here does not represent the first instance in which Barreto has withheld relevant information from an opposing party. In 2024, an Eastern District of North Carolina judge found that Barreto's conclusions were "undercut" and unreliable after it was revealed at a preliminary injunction hearing that he intentionally omitted relevant elections from his ecological inference (EI) models. The Court also noted that there were "profound discrepancies between the methods of analysis he performed in his initial report and in his supplemental declaration," and it found his "belated explanation" therefore to be "unpersuasive." *Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195, 229 (E.D.N.C.), *aff'd but criticized*, 97 F.4th 194 (4th Cir. 2024). Prior to that case's preliminary injunction hearing, Barreto had failed to provide the legislative defendants "with the data files and EI procedures" he had used to prepare his report. *Id.* at 237. Instead, as in the present case, "Plaintiffs directed the legislative defendants to Barreto's footnotes to find Barreto's input data from publicly available sources and replicate Barreto's statistical methods." *Id.* at 237 n.12.

The Fourth Circuit took note of the range of flaws in Barreto's reports, including the retention of his input data files and details of the ecological inference analytical options used for the report—noting at one point that "[a]t bottom, Barreto's response to the district court's

11

question created enough uncertainty that the court was quite reasonably unwilling to rely exclusively on Barreto's analysis," *Pierce*, 97 F.4th at 215—and affirmed the district court's denial of a preliminary injunction and remanded for further proceedings.

**III.     The Reports are unreliable because they are non-replicable, and they are thus not admissible under Federal Rule of Evidence 702.**

The proponent of expert testimony must establish that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "[E]xpert testimony is admissible only if it is both relevant and reliable." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002). That is the "overarching concern" when assessing the admissibility of expert testimony. *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)).[3]

An "expert's testimony must be reliable at each and every step or else it is inadmissible. 'The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir.1999)). Here, Barreto refuses to provide the output of his simulations, the seed, or the code used, to allow State Defendants' experts to recreate the output of his simulations.

---

[3] Plaintiffs' counsel has suggested in correspondence that expert disclosure requirements do not govern their preliminary injunction motion. This is incorrect. Rule 37(c) forbids "a party [who] fails to provide information . . . as required by Rule 26(a)" from using "that information . . . to supply evidence on a *motion*" or "at a *hearing*." Fed. R. Civ. P. 37(c)(1) (emphasis added). This text necessarily embraces requests for preliminary injunctions. *See* Fed. R. Civ. P. 65(a)(1) and (b)(3) (preliminary injunction request is made by motion subject to a hearing requirement). Likewise, Rule 26 applies its disclosure requirements to an expert witness a party "*may* use at trial." Fed. R. Civ. P. 26(a)(2)(A) (emphasis added). A disclosure failing would therefore signal that the party may *not* use that expert's opinions at trial. A party cannot make the requisite "clear showing" for a preliminary injunction, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008), with information it cannot possibly use at trial.

State Defendants are therefore unable to assess the facts underlying Barreto's opinions and whether those facts and opinions are consistent. Additionally, the lack of output data (or seed) prevents State Defendants from assessing whether Barreto applied his methodology correctly in this, his first foray into robot simulations.

Plaintiffs admit that State Defendants will not be able to replicate Barreto's results (their email of Sep. 9, 2025 discussed *supra* in **Section I**). In effect, Barreto intends to present an analysis to the Court that compares Plan C2333 to 1,000 computer-simulated plans he created, but has not produced the 1,000 plans or any way for State Defendants to replicate them. Plaintiffs ask the Court to take their expert at his word, just looking at a "table/chart/graph," *see* Ex. F at 3, reporting calculations by district of percentage-CVAP and percentage Trump-vote, without any indication whether the districts in the 1,000 plans are legal or reasonably configured (i.e., a reasonable comparator to use to evaluate Plan C2333). That should be dispositive. Yet Plaintiffs seem to expect that the State Defendants—and the Court—should just uncritically take Barreto's word for what his simulations showed. The Reports are unreliable because the supposed expert conclusions are unsupported by data; as such, the Reports are inadmissible under FRE 702.

**IV.   State Defendants are entitled to know the data relied upon by Barreto in forming his expert conclusions. Since Plaintiffs have refused to provide the data, Barreto's reports should be stricken.**

The Court should strike Barreto's Reports, because failure to do so prejudices State Defendants. Rule 26 provides that witnesses "retained or specially employed to provide expert testimony" must include in their expert reports, *inter alia*, a "complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; [and] any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(B). The Advisory Committee Notes to the 1993 Amendments state that "[t]he report is to disclose the data and other information considered by the expert."

The purpose of this rule "is to provide an opposing party with fair notice of the content of the experts' testimony; without the requisite information, [it] is greatly prejudiced because it is left

13

unaware of the testimony each expert plans to offer." *Torres v. City of San Antonio*, No. SA:14-CV-555-DAE, 2014 WL 7339122, at *2 (W.D. Tex. Dec. 23, 2014). Insufficient notice leaves a party unable to "prepare to rebut the testimony" and therefore at a comparative disadvantage. *Id.* Failure to provide proper notice of expert testimony should give rise to a commensurate and predictable consequence—the offending party "is not allowed to use that information . . . to supply evidence on a motion . . . or at a trial, unless the failure was substantially justified or is harmless." *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 372 (5th Cir. 2016) (quoting Fed. R. Civ. P. 37(c)(1)).

Plaintiffs have not met their Rule 26 obligation to provide the facts or data on which their expert relied. As described above, among the missing data are the outputs from Barreto's simulations. This leaves two possible outcomes: either the expert provides the simulations' outputs, or he provides code and data sufficient to allow State Defendants to replicate those outputs. For reasons that defy explanation, Barreto refuses to do this.

Even setting aside the lingering questions of why Plaintiffs proceed this way, the outcome of retaining this information should be fatal for the Reports. Simulations are vulnerable to a large number of problems and are sensitive to various instructions. The only rational purpose for engaging in the behavior in which Plaintiffs are engaged is that there is something they are very concerned about in the simulations that they are hoping to conceal. What is it that Plaintiffs do not want the Court to see?

This failure to provide data is not "substantially justified"; Plaintiffs are just hiding the ball. Without action by the Court, State Defendants will only be able to question Barreto at the preliminary injunction hearing about the logic of his conclusions, not the actual, quantitative results. Because Plaintiffs have deprived State Defendants of the opportunity to challenge the accuracy of the work on which Barreto's conclusions rest, the Court should strike the Reports.

## CONCLUSION

State Defendants respectfully ask that this Court exclude from evidence at the preliminary injunction hearing the "August 2025 Declaration of Dr. Matt A. Barreto and Michael B. Rios, MPP" (Aug. 24, 2025, Brooks Ex. 269) and the "September 2025 Supplemental Declaration of Matt Barreto and Michael Rios" (Sept. 5, 2025). In addition, State Defendants request that the Court adopt adverse inferences regarding any work Barreto performed for this case.

Date: September 15, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

WILLIAM D. WASSDORF
Associate Deputy AG for Civil Litigation
Texas Bar No. 24103022
william.wassdorf@oag.texas.gov

OFFICE OF THE
ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Special Counsel
Texas Bar No. 24125064

COUNSEL FOR STATE DEFENDANTS

## CERTIFICATE OF CONFERENCE

I certify that on Monday, September 8, 2025, I conferred with Plaintiffs' counsel and informed them that if the missing data were not produced by Wednesday, September 10, 2025, State Defendants would move to strike the Reports. Plaintiffs have produced no additional data since then.

/s/ Ryan G. Kercher
RYAN G. KERCHER
Chief, Special Litigation Division

## CERTIFICATE OF SERVICE

I certify that on September 15, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

/s/ Ryan G. Kercher
RYAN G. KERCHER
Chief, Special Litigation Division