## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>*Plaintiffs,*<br><br>**v.**<br><br>STATE OF TEXAS, *et al.*,<br><br>*Defendants.* | Civil Action No.<br>3:21-cv-00259-DCG-JES-JVB<br>[Lead Case]<br><br>&<br><br>All Consolidated Cases |

**BRIEF OF NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC., DELTA SIGMA THETA, INCORPORATED, BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE, BARBARA JORDAN LEADERSHIP INSTITUTE, FRIENDSHIP-WEST BAPTIST CHURCH, AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF TEXAS, LEAGUE OF WOMEN VOTERS, LEAGUE OF WOMEN VOTERS OF TEXAS, AND THE HOUSTON AREA URBAN LEAGUE AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

Leah C. Aden*
John S. Cusick*
NAACP Legal Defense
   & Education Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
laden@naacpldf.org
jcusick@naacpldf.org

*Counsel for Amici Curiae*

***Admitted Pro Hac Vice***

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae* the NAACP Legal Defense & Educational Fund, Inc., Delta Sigma Theta Sorority, Incorporated, Black Voters Matter Capacity Building Institute, Barbara Jordan Leadership Institute, Friendship-West Baptist Church, American Civil Liberties Union ("ACLU"), ACLU of Texas, League of Women Voters, League of Women Voters of Texas, and the Houston Area Urban League state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICI CURIAE*..................................................................... 1

INTRODUCTION ............................................................................................ 2

ARGUMENT .................................................................................................... 4

I.    Texas' Justification for Mid-Decade Congressional Redistricting is Pretextual, Contrary to Their Defense of the 2021 Congressional Map, and Confirms Race Predominated in the Design of Districts in the 2025 Congressional Map. ........................................ 5

II.    The 2025 Special Legislative Sessions Were a Sham...................................... 12

III.    The Texas Legislature Cannot Harm Black Voters and Other Voters of Color as a Means to Augment Political Power.................................. 15

CONCLUSION.................................................................................................. 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. S.C. State Conf. of the NAACP,*
   602 U.S. 1 (2024) ................................................... 4, 19

*Allen v. Milligan,*
   599 U.S. 1 (2023) ................................................. 15-16, 19

*Bartlett v. Strickland,*
   556 U.S. 1 (2009) ................................................ 8, 18, 20

*Bethune-Hill v. Va. State Bd. of Elections,*
   580 U.S. 178 (2017) ................................................. 7-8, 17

*Bush v. Vera,*
   517 U.S. 952 (1996) ................................................ 15-16

*Campos v. City of Baytown, Tex.,*
   840 F.2d 1240 (5th Cir. 1988) .................................... 8

*Cooper v. Harris,*
   581 U.S. 285 (2017) ........................................ 11, 16, 18, 20

*Miller v. Johnson,*
   515 U.S. 900 (1995) ............................................ 4, 15-16

*Milligan v. Allen,*
   Case No. 2:21-cv-01530-AMM, 2025 WL 2451593 (N.D. Ala. Aug. 7,
   2025) ............................................................ 19

*New Hampshire v. Maine,*
   532 U.S. 742 (2001) ................................................ 10

*Perez v. Abbott,*
   274 F. Supp. 3d 624 (W.D. Tex. 2017), *rev'd and remanded on other*
   *grounds, Abbott v. Perez,* 585 U.S. 579 (2018) .................... 8

*Perez v. Perry,*
   SA-11-CV-360, 2012 WL 13124278 (W.D. Tex. Mar. 19, 2012) ........... 20

*Petteway v. Galveston County,*
   111 F.4th 596 (5th Cir. 2024) (en banc) ........................*passim*

*Reed v. City of Arlington*,
  650 F.3d 571 (5th Cir. 2011) ..................................................... 10

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000) ................................................................. 11

*Rogers v. Lodge*,
  458 U.S. 613 (1982) ................................................................... 5

*Shaw v. Hunt*,
  517 U.S. 899 (1996) ................................................................. 18

*Shaw v. Reno*,
  509 U.S. 630 (1993) ......................................................... 4, 15-16

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ..................................................................... 7

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) (en banc) ................................... 5, 12

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ............................................................. 5, 16

*Voinovich v. Quilter*,
  507 U.S. 146 (1993) ................................................................. 18

## Statutes

Voting Rights Act Section 2....................................................*passim*

## Other Authorities

Ailsa Chang, et al., *A Texas Republican State Lawmaker on the Fight
  for Redistricting*, NPR (Aug. 6, 2025),
  https://www.npr.org/2025/08/06/nx-s1-5493480/texas-democrats-
  quorum-oliverson............................................................... 10

Eleanor Klibanoff, *Texas' Proposed Congressional Map Dismantles
  Districts Flagged by DOJ*, Tex. Tribune (Aug. 1, 2025),
  https://www.texastribune.org/2025/08/01/texas-congressional-
  redistricting-doj-coalition-districts/ ........................................ 8

Jens Manuel Krogstad & Mohamad Moslimani, *Key Facts about Black
  Eligible Voters in 2024*, Pew Rsch. Ctr. (Jan. 10, 2024),
  https://www.pewresearch.org/short-reads/2024/01/10/key-facts-
  aboutblack-eligible-voters-in-2024/........................................ 4

Tex. House Redistricting Comm., Aug. 1, 2025,
    https://house.texas.gov/videos/22418 ........................................................... 9, 11, 19

Tex. House Redistricting Comm., Aug. 18, 2025,
    https://house.texas.gov/videos/22492 .................................................................... 9

Tex. Senate Redistricting Comm., Jul. 9, 2025,
    https://senate.texas.gov/videoplayer.php?vid=22414&lang=en ............................ 9

*Texas Senate and Texas House Working in Lockstep on Congressional
    Redistricting Legislation to Address Concerns*, Off. of Lieutenant
    Governor Dan Patrick (July 11, 2025),
    https://www.ltgov.texas.gov/2025/07/11/texas-senate-and-texas-
    house-working-in-lockstep-on-congressional-redistricting-
    legislation-to-address-concerns/ ............................................................................. 6

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* the NAACP Legal Defense & Educational Fund, Inc., Delta Sigma Theta Sorority, Incorporated, Black Voters Matter Capacity Building Institute, Barbara Jordan Leadership Institute, Friendship-West Baptist Church, American Civil Liberties Union ("ACLU"), ACLU of Texas, League of Women Voters, League of Women Voters of Texas, and the Houston Area Urban League submit this amicus brief in support of the motions for preliminary injunction, filed by the Plaintiffs in the above-captioned case, to enjoin Texas' recently adopted congressional map.[2] *Amici* are nonprofit, nonpartisan civil rights and racial justice organizations that work in service of Black Texans and other Texans to enjoy their full and equal rights. Achieving equal representation and ensuring that voters are able to cast equal and effective votes depends, in part, on redistricting maps that are fairly drawn to reflect and respect the communities *Amici* serve. For these reasons, *Amici* have worked to achieve fair representation in electoral maps in Texas and protect against unfair and racially discriminatory redistricting plans. Several *Amici* submitted oral and written testimony in the 2025 special legislative sessions that the Texas Legislature held regarding this mid-decade congressional redistricting, some of which

---

[1] No person or entity other than *Amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief. *Amici* submit this brief per this Court's August 28, 2025 Order, ECF 1146, permitting the timely filing of amicus briefs by September 17, 2025 regarding the pending preliminary injunctions. Out of an abundance of caution, *Amici* also contacted counsel of record in the above-captioned case to obtain their position on *Amici's* filing of their brief. The parties provided their consent.

[2] For this brief, "Plaintiffs" refer to those who have filed motions for preliminary injunction. *See* ECF 1142-1143, 1149, 1150.

is included in the Appendix to this brief. *Amici* submit this brief to illuminate for this Court their concerns and the harms arising from this mid-decade congressional redistricting, many of which they raised with Texas officials during these recent legislative sessions.

## INTRODUCTION

Texas officials and legislators continue to evade their constitutional and statutory obligations. Rather than address the constitutional and statutory infirmities made plain after trial on the 2021 congressional map, the Texas Legislature doubled down on racial discrimination by again using an impermissibly race-driven process to enact a new congressional map that discriminates against Black and Hispanic voters. Texas' Governor and the Texas Legislature relied on a patently erroneous legal theory advanced by the U.S. Department of Justice (the "Department") that targeted the redrawing of congressional districts where sizeable populations of Black and Hispanic people live based on the racial makeup of those districts. During two special legislative sessions, the Legislature proposed maps that dismantled those same districts, despite Texas having defended them in this litigation as allegedly being drawn "race blind" and otherwise legally compliant. ECF 1116-1 at 2. For the 2025 congressional map, the Legislature packed Black voters at unnecessarily high numbers in certain congressional districts in the Harris County and Dallas-Fort Worth areas without a legitimate — let alone compelling — reason. Texas' decisions in these and other areas of the 2025 map to racially gerrymander and intentionally dilute the votes of people of color harms the people that *Amici* serve.

The legislative records from these 2025 special sessions provide additional evidence that the 2025 map is racially discriminatory. Legislators have offered shifting and pretextual rationales to defend this map. They ignored the warnings by several *Amici* that the 2025 map would further harm Black and other voters, particularly in the Houston and Dallas-Fort Worth areas. They also disregarded warnings that the U.S. Constitution prohibits targeting Black and Hispanic voters as a means to increase partisan advantage, as the 2025 map does.

To conceal its discrimination, the Legislature enacted the 2025 map in a rushed, non-transparent, and non-democratic process. It conducted few public hearings, and most of those were held without a map for the public to assess. When a map was introduced that altered 37 of Texas' 38 congressional districts, the House and Senate each held only *one* hearing that allowed public testimony on that map, with minimal notice to the public. They refused to provide basic information, including: who had their hand on the mouse when district lines were being changed and voters were sorted among them; who else was involved in the mapdrawing in and outside of Texas' Legislature; what criteria explained specific changes to each district; and what data and analyses were conducted to justify the specific configurations of districts. And when the Legislature published an amended map, it continued its sham process by not inviting public testimony or providing basic information about that map. Instead, the House and Senate redistricting committees suspended procedural rules and adopted the 2025 map with minimal notice of hearings. The process is unjustifiable.

Texas' 2025 map is unconstitutional. While this litigation proceeds, a preliminary injunction is necessary to mitigate the harms to *Amici*, their members, and other Black voters, who comprise the largest raw number of Black registered voters among all 50 states,[3] as well as Hispanic voters for the upcoming elections. Absent preliminary relief, those harms cannot be undone.

## ARGUMENT

The U.S. Constitution prohibits intentional racial vote dilution and racial gerrymandering. Those racial discrimination theories are analytically distinct and have different standards, burdens of proof, and remedies. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38 (2024). Racial gerrymandering claims require a plaintiff to show — by using direct or circumstantial evidence — that a significant number of voters were predominantly sorted based on their race without a compelling justification. *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995). A racial gerrymandering claim is agnostic as to the group voting strength of the sorted voters or the electoral results of the impermissible sorting. *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 645 (1993).

To prove intentional racial vote dilution, plaintiffs must show that officials purposefully "enacted a particular voting scheme . . . 'to minimize or cancel out the *voting potential* of racial or ethnic minorities.'" *Miller*, 515 at 911 (citation omitted) (emphasis added). Challengers may use direct or circumstantial evidence to

---

[3] Jens Manuel Krogstad & Mohamad Moslimani, *Key Facts about Black Eligible Voters in 2024*, Pew Rsch. Ctr. (Jan. 10, 2024), https://www.pewresearch.org/short-reads/2024/01/10/key-facts-aboutblack-eligible-voters-in-2024/.

demonstrate intentional discrimination. *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Intentional racial discrimination need only be "*a* motivating factor," not, as in the racial gerrymandering context, the "sole[]" or even "primary" reason for the government's decision. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) (emphasis added). The *Arlington Heights* framework offers several factors that courts use to assess if there is a racially discriminatory purpose, including: the sequence of events leading to a challenged decision; procedural or substantive deviations from the normal legislative decision-making processes; and the contemporaneous viewpoints expressed by legislative decisionmakers to assess whether the justifications for the challenged decision are pretextual or tenuous. *Id.*; *see also Veasey v. Abbott*, 830 F.3d 216, 236 (5th Cir. 2016) (en banc).

*Amici* assert that the direct and circumstantial evidence leading up to Texas' enactment of the 2025 map illuminates the racially discriminatory intent of the key decisionmakers and the predominant role that race played in its design.

I.     **Texas' Justification for Mid-Decade Congressional Redistricting Is Pretextual, Contrary to Their Defense of the 2021 Map, and Confirms Race Predominated in the Design of Districts in the 2025 Map.**

Texas has spent more than four years in federal court defending its 2021 map as being legally compliant. *See*, *e.g.*, ECF 1116 at 1. While Plaintiffs dispute Texas' defense, Texas Attorney General Paxton characterized the evidence presented at a recent trial before this Court, which ended in June 2025, as "clear and unequivocal" that the 2021-adopted congressional districts were drawn "blind to race." ECF 1116-1 at 2. Texas also defended the 2021 map as being legally compliant because,

according to Texas, legislators drew districts to "maximize Republican political advantage balanced against traditional redistricting criteria." *Id.*

Yet less than four weeks after trial concluded, Governor Abbott cited "constitutional concerns raised by the U.S. Department of Justice" in a July 7, 2025 letter from the Department's Civil Rights Division about congressional districts ("CDs") 9, 18, and 29 (in the Harris County area), and 33 (in the Dallas-Fort Worth area) as the basis to conduct mid-decade congressional redistricting. ECF 1114-1 at 3. Key Texas legislative leaders similarly cited "concerns raised by the U.S. Department of Justice" as the reason to conduct mid-decade redistricting.[4] And the 2025 map overhauls these four districts even though Texas defended these districts just months ago at trial as complying with the Voting Rights Act ("VRA"). ECF 986 at 17. The Department's letter, in turn, asserted that these districts "constitute unconstitutional coalition districts . . . [which] run afoul the [sic] Voting Rights Act and the Fourteenth Amendment." ECF 1114-2.

As several *Amici* repeatedly warned in testimony submitted to the Legislature, App. 1-4, 9-12, the Department's assertion of unconstitutionality rested on both a fundamental misreading and misapplication of *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024) (en banc). In asserting illegality, the Department claimed that in the 2021 map, Texas mapmakers intentionally drew "TX-09 and TX-18 [to]

---

[4] *Texas Senate and Texas House Working in Lockstep on Congressional Redistricting Legislation to Address Concerns*, Off. of Tex. Lieutenant Goveror Dan Patrick (July 11, 2025), https://www.ltgov.texas.gov/2025/07/11/texas-senate-and-texas-house-working-in-lockstep-on-congressional-redistricting-legislation-to-address-concerns/.

sort Houston voters along strict racial lines to create two coalition seats, while creating TX 29, a majority Hispanic district" and drew "TX-33" to be "another racially-based coalition district." ECF 1114-2 at 2. These assertions are inconsistent with Texas' repeated insistence that these districts, like the entire 2021 map, were drawn in a race-blind manner without any consideration of race. *See, e.g.*, ECF 1116.

The root problem with the Department's claim of illegality — and Texas' reliance on that contention as the original reason to engage in mid-decade redistricting — is that it fundamentally misreads the Fifth Circuit's *en banc* decision in *Petteway*. *Petteway* concerns whether litigants challenging district lines in the jurisdictions within the Fifth Circuit can establish the *Thornburg v. Gingles*, 478 U.S. 30 (1986), first precondition of a VRA Section 2 violation by aggregating "separately protected minority groups . . . for purposes of a vote dilution claim." *Petteway*, 111 F.4th at 603. *Petteway* does not, however, address whether such districts are inherently unconstitutional as an impermissible racial gerrymander, an analytically distinct claim. And the record here reflects that Texas did not propose CDs 9, 18, and 33 as districts to satisfy the first *Gingles* precondition; these districts were each proposed by Texas' own mapmakers in 2021 of their own volition and defended as complying, in large part, with race-neutral traditional redistricting principles. *See, e.g.*, ECF 1116-1 at 2.[5]

---

[5] Even if Texas had previously intended to comply with Section 2 of the VRA by intentionally drawing coalition districts, that would have been proper because legislatures should "apply the body of law in effect at th[e] time." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 197 (2017) (Alito, J., concurring). In 2021, the governing law in the Fifth Circuit was *Campos v. City of Baytown, Tex.*, which held

*Petteway* did not address, suggest, or hold that so-called "coalition" majority-minority districts are inherently unconstitutional. Nor does it hold that mapmakers are prohibited from fashioning such districts out of their own volition when such districts otherwise comport with traditional redistricting principles, including preservation of local jurisdictions or communities of interest, or satisfy political considerations. Nor could it, because no law prohibits states from choosing to establish such a district so long as it complies with other legal requirements. *Cf. Bartlett v. Strickland*, 556 U.S. 1, 23-24 (2009) (plurality) ("Our holding that § 2 does not require crossover districts does not consider the permissibility of such districts as a matter of legislative choice or discretion.").

Throughout this litigation, Texas has defended the 2021 map, including CDs 9, 18, 29, and 33, as drawn to comply with "traditional redistricting criteria." *See, e.g.*, ECF 986 at 17. Any deviations, Texas claims, can be explained by "partisanship." *Id.* at 15. Further, more than a decade ago, Texas argued that CD 33 was not a coalition district, and this Court agreed.[6] *Perez v. Abbott*, 274 F. Supp. 3d 624, 653 (W.D. Tex. 2017), *rev'd and remanded on other grounds*, *Abbott v. Perez*, 585 U.S. 579 (2018). Indeed, CD 33 was created and sanctioned by this Court as a remedy to address an

---

that "distinct minority groups may aggregate their populations for purposes of vote dilution claims under Section 2." *Petteway*, 111 F.4th at 599 (citing *Campos*, 840 F.2d 1240, 1244 (5th Cir. 1988)). Thus, in 2021, Texas had a "a compelling interest at the relevant time" to draw coalition districts. *Bethune-Hill*, 580 U.S. at 193.

[6] Eleanor Klibanoff, *Texas' Proposed Congressional Map Dismantles Districts Flagged by DOJ*, Tex. Tribune (Aug. 1, 2025), https://www.texastribune.org/2025/08/01/texas-congressional-redistricting-doj-coalition-districts/.

intentionally racially discriminatory map. *Id.* And Texas has defended the 2021 map as complying with the VRA even after the *Petteway* decision. ECF 986 at 17.

Texas has also consistently defended CDs 9, 18, 29, and 33, as well as the entire 2021 map, as drawn on a race-blind basis. Indeed, the record is riddled with Texas' claims that its 2021 redistricting efforts were driven by racially neutral motives. *See, e.g.,* ECF 1125 at 4 ("The record also shows that the chief concerns in each instance were partisanship, incumbency, or some other neutral principle."); ECF 1124 at 4 ("race played no role in the process"); ECF 1123 at 10 ("[T]he legislative record attests to the race-blind motives behind the Enacted Maps."); ECF 1116 at 1, 3 ("[T]he Texas Legislature did not racially discriminate in drawing the [prior] congressional electoral districts — full stop." Texas Attorney General Paxton, in response to the Department, reiterated:

> The evidence at trial was clear and unequivocal: **the Texas legislature did not pass race-based electoral districts** for [the Congressional, state Senate, or State House] **maps**. Texas State Senator Joan Huffman, who chaired the Senate Redistricting Committee, testified under oath that she drew Texas districts blind to race . . . . The Texas legislature has led the Nation in rejecting race-based decision-making in its redistricting process — it has drawn its current maps in conformance with traditional, non-racial redistricting criteria. . . .

ECF 1116-1 at 2 (emphasis in original). Consistent with these assertions, during the recent legislative sessions, legislators defended their 2021 process as race-blind and otherwise legal.[7]

---

[7] Tex. Senate Redistricting Comm. at 33:40, July 29, 2025, https://senate.texas.gov/videoplayer.php?vid=22414&lang=en; *see also* Tex. House Redistricting Committee at 1:44:30, Aug. 1, 2025,

Given these repeated claims of race-blindness in developing the 2021 map, Texas' assertion that it can now engage in a mid-decade redistricting based on the Department's claim that these districts were unconstitutional is "plainly inconsistent with [its] prior position." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011) (explaining judicial estoppel); *see generally New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (a party may not "gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory") (citation omitted).

Tellingly, Texas never raised concerns about the existence of such purported coalition districts in its 2021 map when it had to brief this Court *about* the effects of *Petteway*. Roughly two months after that decision, Texas filed a letter motion before this Court arguing that *Petteway's* "holding that coalition claims are impermissible under Section 2 of the Voting Rights Act . . . flatly preclude[es] claims of the type that Plaintiffs raise here." ECF 815. But Texas never claimed that *Petteway* posed a problem for CDs 9, 18, 29, or 33. The Legislature chose not to conduct any new congressional redistricting during its 2025 regular legislative session, even though legislators discussed it after *Petteway* was decided in 2024 and before that legislative

---

https://house.texas.gov/videos/22418 (Representative Hunter stating that he was told by the law firm Butler Snow, with which he worked to develop the 2021 congressional map, that it is legally compliant); Tex. House Redistricting Committee at 33:05, Aug. 18, 2025, https://house.texas.gov/videos/22492.

session started in January 2025.[8] Nor did Governor Abbott ask the Legislature to redistrict because of *Petteway* during the 2025 regular legislative session.

Setting aside the validity of Texas' argument, Texas was no doubt right that *Petteway* dealt with the availability of coalition claims. But Texas now reverses course. While Texas once relied on *Petteway* before this Court to defend the constitutionality of the very districts at issue in the Department's letter, it now uses the Department's misreading of *Petteway* — that is, that *Petteway* renders Texas' districts unconstitutional — to justify its discriminatory redistricting efforts.[9] The Department's patent misreading and misapplication of *Petteway* do not absolve the State from its obligations to comply with the VRA and Constitution. *See, e.g.*, *Cooper v. Harris*, 581 U.S. 285, 306 (2017) (explaining courts should not "approve a racial gerrymander . . . whose *raison d'etre* is a legal mistake"). That means Texas cannot have its cake and eat it too by relying on a misinterpretation of *Petteway* to justify this mid-decade redistricting. Having defended the 2021 map for years, contending that it was developed using a race-blind process, Texas' reliance on the Department's contentions of racially gerrymandering to justify its mid-cycle redistricting efforts is a classic example of pretext. And one can "reasonably infer from the falsity of the explanation that the [defendant] is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *see*

---

[8] Ailsa Chang, et al., *A Texas Republican State Lawmaker on the Fight for Redistricting*, NPR (Aug. 6, 2025), https://www.npr.org/2025/08/06/nx-s1-5493480/texas-democrats-quorum-oliverson.
[9] *See, e.g.*, Tex. House Redistricting Committee at 51:08, Aug. 1, 2025, https://house.texas.gov/videos/22418.

*also Veasey*, 830 F.3d at 236 (recognizing pretext relevant to constitutional intentional discrimination claims).

Texas' proffering of what would otherwise be "seemingly neutral reason[s]" cannot mask a racially discriminatory purpose. *Veasey*, 830 F.3d at 236. That is because Texas' shifting rationales "fail to correspond in any meaningful way" to the facts and full record here. *Id.* at 263. The "many rationales" that "shifted as they were challenged or disproven" through public scrutiny and also, in this case, through relevant briefings, are probative of a racially discriminatory purpose. *Id.* at 240-41. Once these shifting justifications are properly disregarded as pretextual and tenuous, only one rationale remains: the Legislature dismantled districts serving racial minority voters *because of* those districts' racial compositions. That is unlawful and tainted the 2025 special legislative sessions.

### II.    The 2025 Special Legislative Sessions Were a Sham.

Texas attempted to conceal its illegitimate use of race in developing the 2025 map through an undemocratic rushed and non-transparent legislative process.

Extensive public testimony submitted to the House Select Committee on Congressional Redistricting ("House Redistricting Committee") and Senate Special Committee on Congressional Redistricting ("Senate Redistricting Committee"), including by *Amici*, opposed mid-decade congressional redistricting for several reasons, including that neither Committee presented any clear justification to conduct mid-decade congressional redistricting. *See, e.g.*, App. 18-20. *Amici* were concerned about a pretextual justification motivating the entire process because the Committee Chairs claimed to disagree with the Department's theory that CDs 9, 18,

29, and 33 were unconstitutional, while justifying the need to conduct mid-decade congressional redistricting based on Governor Abbott's call to conduct it to resolve constitutional concerns raised by the Department. *Id.* at 1-2, 9-10.

Equally concerning, *Amici* and the public were deprived of — and thus still lack — basic information about the redistricting criteria that the legislative Committees used to guide any mapdrawing generally or the reconfiguration of specific districts. *See, e.g.*, App. 33-34. If the Committees, for example, were going to redraw certain districts because of their racial composition, *Amici*, consistent with other public testimony, inquired whether analyses would be done to allow and ensure that any changes complied with federal law and the U.S. Constitution. *Id.* at 35. Likewise, several *Amici* inquired what data would be on the screen as voters were sorted into and out of districts, information that would aid their assessments and discussions on how to raise any concerns. *Id.*

The Legislature deprived *Amici* and members of the public of knowledge about how the 2025 map was developed, who took part in developing it, what demographic or electoral information, if any, was used in their development, and other basic guideposts for how new congressional maps and specific district configurations were shaped. *Id.* In response to testimony *Amici* and members of the public submitted, as well as questions directed at legislators, the key sponsor of the 2025 map, Representative Hunter, stated that everything was done through a law firm and that "he doesn't know who drew" the map. *Id.* at 34; *see also id.* at 21. Nor did he or any

other members of the House or Senate Redistricting Committees know what data or other factors went into the 2025 map's design. *Id.* at 33-34.

The lack of transparency was compounded by an extraordinarily truncated timeline for considering maps that altered most congressional districts and fundamentally targeted districts serving Black and Hispanic voters.[10] No legislatively proposed map was available to the public during most of the public hearings the House and Senate Redistricting Committee held. *Id.* at 5, 29-30. When a map (C2308) was publicly released during the first special legislative session, the House Redistricting Committee gave the public less than 48 hours before holding its only public hearing on the map. *Id.* at 33. Because of the short timeline, limited information, and the hearing being held during working hours on a weekday, *Amici* and their members, and other members of the public, could not conduct or provide meaningful assessments of the proposed plan. *See, e.g.*, *id.* at 20, 33-34. The Senate Redistricting Committee likewise held only one hearing on that proposed map. *Id.* at 18.

Despite the concerns raised about the lack of transparency with the first special legislative session, neither the House nor the Senate Redistricting Committees changed course during the second special legislative session. *Id.* at 33-34. Neither Committee invited public testimony on the 2025 map when it was

---

[10] Several *Amici* participated in the redistricting process that led to the enactment of the 2021 map. While that process was also rushed and non-transparent, the 2025 special legislative sessions were even more unusual and unnecessarily truncated compared to the 2021 legislative session.

14

proposed. *Id.* at 30-31. The House Redistricting Committee publicly released the new congressional map less than six hours before the only hearing on it. *Id.* at 34. Similarly, the Senate provided less than 24-hours notice before its only hearing on the map. *Id.*

As a practical matter, this meant that *no* members of the public could provide comment on the 2025 map because the Legislature invites public testimony only during committee hearings. *Id.* In sum, the House and Senate Redistricting Committees permitted public testimony at *only one* public hearing each and on an early version of what would be the new 2025 map. *Id.* at 29-31.

All told, the process was a sham.

### III.    The Texas Legislature Cannot Harm Black Voters and Other Voters of Color as a Means to Augment Political Power.

In the redistricting context, federal courts review race-conscious decisionmaking differently than such decisions in other state action contexts under its equal protection jurisprudence. *Shaw I*, 509 U.S. at 646. Race-conscious decisionmaking in redistricting is not inherently suspect and thus does not trigger strict scrutiny. *Miller*, 515 U.S. at 915-16; *see also Allen v. Milligan*, 599 U.S. 1, 30-31 (2023) ("[R]edistricting legislatures will almost always be aware of racial demographics, but such race consciousness does not lead inevitably to impermissible race discrimination[.]") (cleaned up).

This doctrinal distinction reflects the Supreme Court's recognition that mapdrawers will almost always be aware of racial demographics during the mapdrawing process. *Miller*, 515 U.S. at 915-16. Mapdrawers are frequently familiar

with the racial composition of the communities they district, and they use tools and data that include racial data and considerations. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 961 (1996) (plurality); *Miller*, 515 U.S. at 915-16; *Shaw I*, 509 U.S. at 646. One reason mapdrawers need to be race conscious is to comply with federal law and the protection of equal rights. Section 2 of the VRA, for example, "demands considerations of race." *Milligan*, 599 U.S. at 30 (plurality). "[A] legislature undertaking a redistricting must assess whether the new districts it contemplates (not the old ones it sheds) conform to the VRA's requirements." *Cooper*, 581 U.S. at 303-04. In short, "race consciousness does not lead inevitably to impermissible race discrimination." *Shaw I*, 509 U.S. at 646.

While race consciousness is permissible in the redistricting context, the Constitution imposes important constraints and the Supreme Court has developed a framework for assessing racial considerations in developing electoral maps. *See, e.g.*, *Miller*, 515 U.S. at 915-16. The Equal Protection Clause of the Fourteenth Amendment prohibits racial gerrymandering — that is, the unjustified, predominant use of race in drawing electoral districts. *See, e.g.*, *id*. And the Constitution also prohibits intentional racial vote dilution. In this context, a discriminatory purpose need not be "*the* sole[]" or even "primary" motivation for the legislature, but rather "*a* motivating factor." *Arlington Heights*, 429 U.S. at 265-66 (emphasis added).

Here, as certain *Amici* warned, Texas' Legislature impermissibly used race as *the* predominant factor in targeting and reconfiguring CDs 9, 18, and 30.[11] In Harris County, the Legislature's actions reflect its obsession with race. The Department and Legislature targeted CDs 9 and 18 based on their racial composition. The 2025 map, for example, eliminates a district for Black voters to elect their preferred candidates in CD 9 by packing Black voters in CD 18 at levels that are unnecessary to provide them with electoral opportunity: before these changes, Black voters were able to elect candidates of their choice even though they were not the majority of voters in that district in the 2021 map.[12] In the 2021 map, CDs 9 and 18 had been well-known as historic districts for Black electoral opportunity.[13] Similarly, while the Department did not mention CD 30 in the Dallas-Fort Worth area in its letter, the district performed for Black voters when they did not comprise the majority under the 2021 map.[14] Yet the 2025 map unnecessarily increases the Black-citizen-voting-age population to just above 50% in CD 30, in part, by pulling Black voters from CD 33, which the Department did target in its letter. *See* ECF 1150-15 at 5.

---

[11] *Amici* understand that the 2025 map also harms electoral opportunities for Hispanic voters in the Harris County and Dallas-Fort Worth areas of the state, among others. *Amici* are adamant that opportunities for Black and Hispanic voters are not zero sum, but, as several of our testimonies reflect, it is possible in a fairly drawn map for each racial and ethnic group of Black and Hispanic voters to have electoral opportunities in these areas. *See, e.g.*, App. 35.

[12] *Compare* ECF 1150-6 at 1 (reflecting that the Black-citizen-voting-age population ("BCVAP") in CD 9 under the 2021 map is 45.0%), *with* ECF 1150-13 at 1 (reflecting that the BCVAP in CD 9 under the 2025 map is 11.5%) and ECF 1150-6 at 1 (reflecting that the BCVAP in CD 18 under the 2021 map is 38.8%), *with* ECF 1150-13 at 1 (reflecting that the BCVAP in CD 18 under the 2025 map is 50.5%).

[13] ECF 989 at 2, 4-6.

[14] *Id.*

Because race predominates in these districts' construction, Texas must show that its use of race was "narrowly tailored to achieve a compelling interest." *Bethune-Hill*, 580 U.S. at 182. The key architects of the 2025 map never publicly advanced any argument, evidence, or defense that CDs 9, 18, or 30 were narrowly tailored to serve a compelling interest, such as compliance with Section 2 of the VRA. Any attempt for the Legislature to now offer a VRA defense would be a *post hoc* justification that is entitled no evidentiary weight. *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) ("To be a compelling interest, the State must show that the alleged objective was the legislature's 'actual purpose' for the discriminatory classification.").

But even if contemporaneously made, a VRA defense would not satisfy scrutiny. Because CDs 9, 18, and 30 all historically provided electoral opportunities for Black voters, drawing CDs 18 and 30 as majority-Black under the guise of VRA compliance would not be narrowly tailored to address any identified VRA violation. *Cooper*, 581 U.S. at 302-04; *Bartlett,* 556 U.S. at 23-24. That is because the VRA does not require majority-Black districts. *See Voinovich v. Quilter*, 507 U.S. 146, 155 (1993). Instead, the VRA requires that, under certain circumstances, minority groups have "opportunity districts in which minority groups form effective majorities." *Abbott*, 585 U.S. at 875 (cleaned up). For Black voters, an opportunity district could be a district in which Black voters on their own comprise 50%+1 of the voting-age population (i.e., a majority-Black district), *or* a district in which Black voters on their own are not above 50% (i.e., a non-majority-Black district), *or* some other electoral structure — so long as in that district there is a reasonable basis to believe that Black

18

voters have an opportunity to elect their preferred candidate. *See Milligan*, 599 U.S. at 18; s*ee Milligan v. Allen*, Case No. 2:21-cv-01530-AMM, 2025 WL 2451593 (N.D. Ala. Aug. 7, 2025) (finding an opportunity district in which Black voters comprise 48.7% of the population to remedy a VRA violation and compliant with the Constitution). And *Amici* warned (so the Legislature knew) that CDs 9, 18, and 30 had been functioning for Black voters to elect their candidates of choice, who were Black representatives, without those districts being majority-Black districts. App. 35.

Further, as *Amici* warned the Legislature in their testimonies, *id.* at 38, using race as the predominant means to sort voters into districts is also unconstitutional even if done as a means for partisan goals. *See, e.g.*, *Alexander*, 602 U.S. at 7 n.1. Here, the majority party used race in an impermissible way by harming Black voters (and other voters of color) as a means to solidify their political power. To be clear, even if the Legislature had what they consider a legitimate end (i.e., political dominance), it cannot achieve that end through an impermissible means (i.e., racially gerrymandering and intentional racial vote dilution). Yet during the two special legislative sessions, the Legislature never explained what, if any, political data it used to sort voters in the 2025 map. The key architects, for example, claimed to not have the "specifics" relating to what data was used to design the 2025 map.[15] Nor did they know who was actually involved or what criteria went into the 2025 map's design.[16] Yet, as discussed above, the Department identified only the racial

---

[15] Tex. House Redistricting Committee at 1:32:30, Aug. 1, 2025, https://house. texas.gov/ videos/22418.
[16] *Id.* at 1:48:00 and 1:51:45.

composition of certain districts and the Legislature altered those districts. Representative Hunter also trumpeted the racial composition of districts when presenting and discussing the 2025 map. *See, e.g.*, ECF 1150 at 16-23.

Finally, the Legislature's decision to destroy what were otherwise effective crossover districts that provided electoral opportunities to Black voters also raises independent constitutional concerns. The term "crossover district" refers to a legislative district "in which minority voters make up less than a majority of the voting-age population," but "is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13. Drawing such districts is not prohibited by Section 2. *Id.* at 24. But, as some *Amici* warned, App. 38, the Supreme Court has warned that "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments" of the Constitution. *Id.* at 24; *Cooper*, 581 U.S. at 302-04; *see also Perez v. Perry*, SA-11-CV-360, 2012 WL 13124278, at *20 (W.D. Tex. March 19, 2012). As discussed above, CDs 9, 18, and 30 have historically served as effective opportunity districts for Black voters and the Legislature intentionally eliminated these districts based on their racial makeup.

## CONCLUSION

For the foregoing reasons, *Amici* urge this Court to grant Plaintiffs' motions for preliminary injunction.

Dated:  September 15, 2025                     Respectfully submitted,


                                              /s/ *Leah C. Aden*
                                              Leah C. Aden*
                                              John S. Cusick*
                                              NAACP Legal Defense
                                                  & Education Fund, Inc.
                                              40 Rector Street, 5th Floor
                                              New York, NY 10006
                                              laden@naacpldf.org
                                              jcusick@naacpldf.org

                                              *Counsel for Amici Curiae*

                                              *Admitted Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with this Court's August 8 Order, ECF 1146 at 3, because it does not exceed 20 pages.

I further certify that the attached amicus brief complies with the typeface and type style requirements of Local Rule CV-10 because it has been prepared in a proportionally spaced typeface using Microsoft Word and 12-point font.

Executed this 15 day of September 2025.

/s/ *Leah C. Aden*
Leah C. Aden

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2025, I electronically filed the original of this brief with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operation of the Court's electronic filing system.

Executed this 15 day of September 2025.

/s/ *Leah C. Aden*
Leah C. Aden

*Counsel for Amici Curiae*

23