IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, ET AL., <br><br> *Plaintiffs*, <br><br> ALEXANDER GREEN, ET AL., <br><br> *Plaintiff-Intervenors*, <br><br> v. <br><br> GREG ABBOTT, ET AL., <br><br> *Defendants*. | 3:21-cv-00259-DCG-JES-JVB [Lead Case] <br><br> & <br><br> All Consolidated Cases |

BRIEF OF UNITED STATES SENATORS JOHN CORNYN AND TED CRUZ AS *AMICI CURIAE*
IN SUPPORT OF THE STATE DEFENDANTS

TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................................... ii

Interest of *Amici Curiae* ............................................................................................................. 1

Introduction and Summary of Argument .................................................................................... 2

Argument ..................................................................................................................................... 3

    1.    State legislatures, not federal courts, bear the responsibility to enact congressional districting plans with oversight from Congress. ............................................................ 3

    2.    Districting plans drawn by state legislatures are thus preferred over court-imposed plans. ................................................................................................... 5

    3.    State legislatures are presumed to have acted in good faith when enacting a districting plan. .......................................................................................................................... 6

    4.    Partisanship is inherent and permissible in the legislative districting process, and partisanship presents no ground for a court to overturn a districting plan. .......................... 6

    5.    Legislative districting plans drawn "mid-decade" or in a special session are entitled to the same presumptions as other plans; the timing of the enactment is not evidence of a lack of good faith. ......................................................................................... 8

Conclusion ................................................................................................................................... 9

Certificate of Service ................................................................................................................ 11

Certificate of Compliance ......................................................................................................... 11

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Perez*,
   585 U.S. 579 (2018) ............................................................................................................. 8

*Alexander v. S. C. State Conf. of the NAACP*,
   602 U.S. 1 (2024) ............................................................................................................ 3, 6

*Branch v. Smith*,
   538 U.S. 254 (2003) ......................................................................................................... 3, 5

*Chapman v. Meier*,
   420 U.S. 1 (1975) ................................................................................................................ 3

*Gaffney v. Cummings*,
   412 U.S. 735 (1973) ............................................................................................................ 7

*Gill v. Whitford*,
   585 U.S. 48 (2018) .............................................................................................................. 7

*Growe v. Emison*,
   507 U.S. 25 (1993) .............................................................................................................. 3

*LULAC v. Perry*,
   548 U.S. 399 (2006) ............................................................................................... 2, 4, 5, 8

*Miller v. Johnson*,
   515 U.S. 900 (1995) ............................................................................................................ 6

*Moore v. Harper*,
   600 U.S. 1 (2023) ................................................................................................................ 3

*Perry v. Perez*,
   565 U.S. 388 (2012) ............................................................................................................ 5

*Rucho v. Common Cause*,
   588 U.S. 684 (2019) ............................................................................................................ 7

*Smiley v. Holm*,
   285 U.S. 355 (1932) ............................................................................................................ 4

*Vieth v. Jubelirer*,
   541 U.S. 267 (2004) ............................................................................................................ 7

*White v. Weiser*,
    412 U.S. 783 (1973)..................................................................................................4, 7

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................................9

**Constitutional Provisions and Statutes**

2 U.S.C. § 2c ........................................................................................................................4

2 U.S.C. § 7 .........................................................................................................................4

2 U.S.C. § 9 .........................................................................................................................4

Tex. Const. art. III, §§ 1, 28................................................................................................4

U.S. CONST. art. I, § 4 .....................................................................................................2, 4

**Other Authorities**

Caroline Vakil, *Here is Where Key States Stand on Redistricting*, The Hill, Sept.
    2, 2025, available at *https://thehill.com/homenews/campaign/5478198-texas-
    mid-decade-redistricting-battle/* ....................................................................................8

Elmer Cummings Griffith, The Rise and Development of the Gerrymander (1907) .......8

Erik J. Engstrom, *Stacking the States, Stacking the House,* The Am. Pol. Sci.
    Rev., vol. 100, no. 3, (Aug. 2006) ..................................................................................8

11A Fed. Prac. & Proc. (Wright & Miller) § 2948 (3d ed. 1973)......................................9

H.R. 4358 ..............................................................................................................................5

H.R. 4798 ..............................................................................................................................5

#### INTEREST OF AMICI CURIAE[1]

*Amici Curiae* are the United States Senators from Texas, John Cornyn and Ted Cruz.

Senator John Cornyn is the senior Senator from the State of Texas and has represented Texas in the U.S. Senate since 2002. He is a longtime member of Senate Committee on the Judiciary and was the Republican Party Whip from 2013–2019. He is Chairman of the Subcommittee on Border Security and Immigration. Prior to his election to the Senate, he served as the Attorney General of Texas, a Justice on the Texas Supreme Court, and a district court judge in Bexar County.

Senator Ted Cruz has represented the State of Texas in the Senate and served on the Senate Committee on the Judiciary since 2013. He currently serves as Chairman of the Subcommittee on Federal Courts, Oversight, Agency Action and Federal Rights. Prior to his election to the Senate, he served at the Department of Justice, the Federal Trade Commission, and as the Solicitor General of Texas.

*Amici* have a strong interest in ensuring that the views of Texas voters, as expressed through the statutes enacted by their elected representatives, are implemented and preserved in Texas law. In their current roles as Texas's elected Senators, as well as their prior roles as Attorney General and Solicitor General, *Amici* have advised state officials on redistricting matters and have defended prior districting decisions enacted by the Texas Legislature. And *Amici* have a strong interest in preserving the role that the Constitution has granted Congress to oversee and regulate the States' congressional elections.

---

[1] *Amici* file this proposed amicus brief with a motion for leave to file, as required by the Order of the Court entered on August 28, 2025. Dkt. 1146.

INTRODUCTION AND SUMMARY OF ARGUMENT

"[D]rawing lines for congressional districts is one of the most significant acts a State can perform to ensure citizen participation in republican self-governance." *LULAC v. Perry*, 548 U.S. 399, 416 (2006). Debating and enacting a congressional districting plan in any State, much less a State as big and as diverse as Texas, involves countless individual decisions, many (or even most) of which are political or partisan. It should come as no surprise, then, that the Founders left that often-divisive responsibility to the political branches of government, rather than to either the federal judiciary or state courts. The Elections Clause of the Constitution vests primary responsibility over apportionment to the state legislatures, and it provides Congress the oversight authority to amend or preclude the States' role in establishing the "Times, Places and Manner" of elections for the U.S. House of Representatives. U.S. CONST. art. I, § 4.

Supreme Court redistricting jurisprudence has developed several principles that are consistent with the understanding that the political branches generally provide the proper forum for addressing concerns regarding districting decisions, including:

1. State legislatures are responsible for enacting congressional districting plans with oversight from Congress.

2. A legislature's plan is preferable to a court-drawn plan.

3. State legislatures are presumed to have acted in good faith when redistricting.

4. Partisanship is inherent and permissible in the districting process.

5. The timing of the enactment of a districting plan is no evidence of bad faith.

These principles, in addition to the high standard that plaintiffs generally must meet in order to enjoin the implementation of a state statute, should govern the Court's analysis in these consolidated cases.

# ARGUMENT

Plaintiffs' challenges to the Texas Legislature's recent reapportionment of the Texas congressional districts argue, *inter alia*, that the mid-decade, special-session decision to redistrict was "unnecessary," procedurally rushed and irregular, and produced an unconstitutional map. *See, e.g.*, Dkt. 1147 at 2, 5, 15–16; Dkt. 1152 at 1, 34; Dkt. 1154 at 1–3 (Plaintiffs' newly supplemented and amended complaints challenging Texas Congressional Plan C2333). As a remedy for these and other perceived violations, many of the Plaintiffs have asked the Court to enjoin the implementation and use of Plan C2333 and instead impose a Court-ordered plan for the upcoming 2026 congressional elections. *See, e.g.*, Dkt. 1147 at 66; Dkt. 1148 at 50; Dkt. 1151 at 38; Dkt. 1152 at 40; Dkt. 1153 at 137–38 (Plaintiffs' complaints request relief that includes the Court ordering a congressional districting plan for Texas). The Supreme Court's redistricting cases have established several key principles applicable to a court's review of a legislatively drawn districting plan that should govern the Court's review of Plan C2333.

> **1. State legislatures, not federal courts, bear the responsibility to enact congressional districting plans with oversight from Congress.**

The Supreme Court has repeatedly recognized that the Elections Clause of the United States Constitution vests the States, not the federal judiciary, with the responsibility for apportionment of federal and state legislative districts. "Redistricting constitutes a traditional domain of state legislative authority." *Alexander v. S. C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024) (citing *Moore v. Harper*, 600 U.S. 1 (2023); U.S. CONST. art. I, § 4); *see also, e.g., Growe v. Emison*, 507 U.S. 25, 34 (1993) ("'We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.'") (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)); *Branch v. Smith*, 538 U.S. 254, 261 (2003) (Redistricting "is primarily the duty and responsibility of the

State through its legislature."); *White v. Weiser*, 412 U.S. 783, 795 (1973) ("[S]tate legislatures have primary jurisdiction over legislative reapportionment.").

The Elections Clause provides that power to the political branches of government, with the state legislatures granted the authority, subject to federal regulation by Congress:

> "The Times, Places and Manner of holding Elections for Senators and Representatives, *shall be prescribed in each State by the Legislature thereof*, but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

U.S. CONST. art. I, § 4, cl. 1. The Supreme Court has explained that the text of the Elections Clause—"Times, Places and Manner of holding elections"—offers "comprehensive words embrac[ing] authority to provide a complete code for congressional elections," subject to Congress's power also to enact legislation on the matter. *Smiley v. Holm*, 285 U.S. 355, 366–67 (1932).

In Texas, the authority and responsibility for apportionment reside in the Texas Legislature. Tex. Const. art. III, §§ 1, 28.

The U.S. Constitution does not leave the States unchecked in their power over congressional elections, but Congress (rather than the federal judiciary) was tasked with that primary responsibility under Article I, section 4. "That Congress is the federal body explicitly given constitutional power over elections is also a noteworthy statement of preference for the democratic process." *LULAC*, 548 U.S. at 416. And Congress has exercised its oversight authority on numerous occasions. For example, Congress has enacted laws requiring single-member districts, established a uniform date for congressional elections, and established the method for casting votes by paper ballot or voting machine. 2 U.S.C. §§ 2c, 7, 9.

Congress could—but has not—regulate when a state legislature may redistrict its congressional map. So an injunction precluding the use of Texas's newly enacted congressional

4

map and replacing it with a court-drawn map would not only infringe the authority of the Texas Legislature to exercise its constitutional authority to redistrict, but it would defy Congress as well. In the current Congress, bills have been introduced both to *prohibit* States from engaging in mid-decade redistricting, *e.g.*, H.R. 4358, and to *require* States to do so, H.R. 4798. Congress is the constitutionally designated branch of the federal government to consider and act on the issue, and it remains available to do so if it determines that is the will of the American people.

### 2.  *Districting plans drawn by state legislatures are thus preferred over court-imposed plans.*

Given that the state legislatures have the primary authority to consider and to implement a congressional districting plan, holding elections under state-drawn plans is preferable to using court-imposed plans. *LULAC*, 548 U.S. at 416 (explaining that "a lawful, legislatively enacted plan should be preferable to one drawn by the courts"). Indeed, to prefer otherwise, *i.e.*, "to prefer a court-drawn plan to a legislature's [plan] would be contrary to the ordinary and proper operation of the political process." *Id.*; *see also Branch v. Smith*, 538 U.S. 254, 278 (2003) (noting that it is "preferable" for a state legislature to redistrict rather than leave that responsibility to federal courts); *Perry v. Perez*, 565 U.S. 388, 393 (2012) (explaining that even when a federal court is required to impose a plan, it must be guided by the state legislature's policy choices even if those choices were embodied in an unenforceable plan). Enjoining the State's plan in favor of a court-imposed plan that would be proposed by one or more of the Plaintiffs would replace the policy judgments of the Texas Legislature with those preferred by Plaintiffs (most of whom are not members of the Texas Legislature) and be "contrary to the ordinary and proper operation of the political process." *LULAC*, 548 U.S. at 416.

Justices across the political spectrum have agreed that "federalism and the slim judicial competence to draw district lines weigh heavily against judicial intervention in apportionment

5

decisions; as a rule, the task should remain within the domain of state legislatures." *Miller v. Johnson*, 515 U.S. 900, 934–35 (1995) (Ginsburg, J., dissenting).

### 3. *State legislatures are presumed to have acted in good faith when enacting a districting plan.*

No different than legislation in other areas of the law, a legislatively-enacted districting plan is presumed to have been enacted in good faith, and it is thus presumed valid.

The Supreme Court has repeatedly confirmed that courts must "start [with the] presumption that the legislature acted in good faith," and that the "presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10 (citing *Abbott*, 585 U.S. at 610–12); *see also, e.g.*, *Miller*, 515 U.S. at 915 ("[T]he good faith of a state legislature must be presumed."). "Electoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to balance competing interests." *Miller*, 515 U.S. at 915.

The presumption of good faith embodies several key principles, including "the Federal Judiciary's due respect for the judgment of state legislators" and the need to be "wary of plaintiffs" who turn to the federal courts to "deliver victories that eluded them in the political arena." *Alexander*, 602 U.S. at 11 (internal quotation omitted). This presumption of good faith "explains why [the Supreme Court has] held that the plaintiff's evidentiary burden in these cases is especially stringent." *Id.* As explained below, Plan C2333 does not lose the presumption of good faith merely because it was considered during a special session of the Texas Legislature mid-decade.

### 4. *Partisanship is inherent and permissible in the legislative districting process, and partisanship presents no ground for a court to overturn a districting plan.*

"Legislative districting is highly political business." *Miller*, 515 U.S. at 934 (Ginsburg, J.,

6

dissenting); *see also, e.g.*, *White v. Weiser*, 412 U.S. 783, 795–96 (1973) ("Districting inevitably has sharp political impact and inevitably political decisions must be made by those charged with the task."). Indeed, "[t]o hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities." *Rucho v. Common Cause*, 588 U.S. 684, 701 (2019). Yet for decades, the Supreme Court faced partisan gerrymandering claims in which it was asked to determine "'when political gerrymandering has gone too far.'" *Id.* (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 296 (2004) (plurality opinion)); *see also, e.g.*, *Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) (rejecting a partisan gerrymandering claim because redistricting "inevitably has and is intended to have substantial political consequences").

Despite the Supreme Court's "'considerable efforts'" since *Gaffney*, it could never reach consensus on a substantive standard for evaluating partisan gerrymandering claims. *Rucho*, 588 U.S. at 702–03 (quoting *Gill v. Whitford*, 585 U.S. 48, 65 (2018)). And the Supreme Court's recognition that substantial partisan and political interests are inherent in the redistricting process, combined with the inability to determine an appropriate test for "how much is too much?," ultimately led the Supreme Court to hold that partisan gerrymandering claims are non-justiciable:

> "We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts. Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions."

*Rucho*, 588 U.S. at 718. Accordingly, to the extent the Legislature's decisions and policy judgments that went into enacting Plan C2333 were political and partisan choices, they offer no basis for the Court to enjoin the use of Plan C2333.

7

> **5.** *Legislative districting plans drawn "mid-decade" or in a special session are entitled to the same presumptions as other plans; the timing of the enactment is not evidence of a lack of good faith.*

The Supreme Court has explained that a legislature's decision to redistrict mid-decade or in a special session is no evidence of impropriety. For example, in *Abbott v. Perez*, the Supreme Court rejected a district court's finding that adopting a districting plan in a special legislative session permitted an inference of bad faith. The Supreme Court explained that "we do not see how the brevity of the legislative process can give rise to an inference of bad faith—and certainly not an inference that is strong enough to overcome the presumption of legislative good faith." *Abbott v. Perez*, 585 U.S. 579, 610 (2018). Similarly, in *LULAC v. Perry*, the Supreme Court explained that "the fact of mid-decade redistricting alone is no sure indication of unlawful political gerrymanders." 548 U.S. at 419; *cf. also id.* at 418–19 ("The text and structure of the Constitution and our case law indicate there is nothing inherently suspect about a legislature's decision to replace mid-decade a court-ordered plan with one of its own).

The practice of so-called mid-decade redistricting did not begin in Texas. *E.g.*, Elmer Cummings Griffith, The Rise and Development of the Gerrymander (1907) 56–57 (describing the New York Legislature's districting laws enacted in 1797, 1801, 1802, 1804, and 1808); Erik J. Engstrom, *Stacking the States, Stacking the House*, The Am. Pol. Sci. Rev., vol. 100, no. 3, pgs. 419–20 (Aug. 2006) (noting that at least one state redrew the congressional districts before each election from 1872 through 1896, and that "strategic mid-decade gerrymanders altered partisan control of the House [of Representatives]" in the elections of 1878 and 1888). Nor would the practice likely end even if Plaintiffs obtain the injunction sought here. *E.g.*, Caroline Vakil, *Here is Where Key States Stand on Redistricting*, The Hill, Sept. 2, 2025, available at https://thehill.com/homenews/campaign/5478198-texas-mid-decade-redistricting-battle/ (last visited Sept. 15, 2025) (describing efforts in eleven additional States to consider whether to redraw

8

congressional districts before the 2026 elections). A State's decisions whether to redraw congressional district boundaries at this time, and if so, how, are inherently political decisions—like any other decision made in the apportionment process—so they are appropriately left to the political branches within the States and Congress, as contemplated by the Elections Clause of the Constitution.

<p style="text-align:center">* * *</p>

Plaintiffs' challenges to Texas Congressional Plan C2333 must confront each of these established principles before they can obtain the "extraordinary remedy" of an injunction. *E.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); 11A Fed. Prac. & Proc. (Wright & Miller) § 2948 (3d ed. 1973) (describing a preliminary injunction as an "extraordinary and drastic remedy" that "never may be obtained as a matter of right"). And they must meet the high bar of establishing a likelihood of success on the merits, a likelihood of irreparable harm if they don't obtain injunctive relief, that the balance of equities supports the injunction, and that the injunction would serve the public interest, *Winter*, 555 U.S. at 20, which Plaintiffs cannot do in this case.

## CONCLUSION AND PRAYER

The Court should deny Plaintiffs' requests to enjoin the use of the Texas Legislature's duly enacted congressional districting plan.


| | |
|---|---|
| Dated: September 17, 2025 | Respectfully submitted, |

By: */s/ Adam W. Aston*
Adam W. Aston
Texas Bar No. 24045423
aaston@jw.com
JACKSON WALKER L.L.P.
100 Congress Avenue, Suite 1100
Austin, Texas 78701
Telephone: (512) 236-2000
Facsimile: (512) 236-2002

Allison B. Allman
Texas Bar No. 24094023
aallman@jw.com
JACKSON WALKER L.L.P.
777 Main Street, Suite 2100
Fort Worth, Texas 76102
Telephone: (817) 334-7200
Facsimile: (817) 870-5126

***Counsel for Amici Curiae***
***United States Senators John Cornyn and Ted Cruz***

**CERTIFICATE OF SERVICE**

I hereby certify that on Sept. 17, 2025, a true and correct copy of the foregoing was filed and served electronically (via CM/ECF) on the parties through their counsel of record.

/s/ Adam W. Aston
Adam W. Aston

**CERTIFICATE OF COMPLIANCE**

This amicus brief complies with the Order of the Court entered on August 28, 2025, Dkt. 1146, requiring amici curiae to file a motion for leave to file an amicus brief in this case along with a proposed amicus brief not to exceed twenty pages. This amicus brief also complies with the formatting requirements of Local Rule CV-10.

/s/ Adam W. Aston
Adam W. Aston