**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

LEAGUE OF UNITED LATIN AMERICAN
CITIZENS, *et al.*,

       *Plaintiffs*,

ALEXANDER GREEN, *et al.*,

       *Plaintiff-Intervenors,*

v.

GREG ABBOTT, in his official capacity as
Governor of the State of Texas, *et al.*,

       *Defendants.*

**EP-21-CV-00259-DCG-JES-JVB
[Lead Case]**

**& All Consolidated Cases**

## BRIEF AMICUS CURIAE OF THE NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTEREST OF THE AMICUS CURIAE ........................................................................1

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND.........................................................................................2

I.      Plaintiffs Cannot Show a Substantial Likelihood of Success on the Merits........................3

      A.      Plaintiffs Seek an Unconstitutional Remedy. ...........................................3

      B.      Plaintiffs' Claims Fail on the Merits..........................................................6

            1.      Racial Gerrymandering. ...............................................................6

            2.      Intentional Vote Dilution & Intentional Discrimination............................12

CONCLUSION.............................................................................................................17

## INTEREST OF THE AMICUS CURIAE[1]

Amicus Curiae the National Republican Congressional Committee ("NRCC") is the national political party committee devoted to electing Republicans to the U.S. House of Representatives. The NRCC represents all Republican members of the House, including the Texas delegation. As such, NRCC respectfully submits this brief to expound upon the law underlying Plaintiffs' claims and to provide further constitutional context to assist the Court in adjudicating Plaintiffs' claims.

## INTRODUCTION

Plaintiffs' motions for preliminary injunction rely on dizzying circular logic and tabloid headlines to erroneously claim that House Bill 4 ("HB4") was drawn with impermissible racial intent under various legal theories, including racial gerrymandering, intentional discrimination, and intentional vote dilution. Plaintiffs are wrong on all fronts.

First, Plaintiffs' claim that HB4 was drawn with racial data is based on unsubstantiated speculation. Mr. Adam Kincaid, the primary mapdrawer of HB4, did not use race when drawing the map (either C2308 or C2333). Second, Plaintiffs' theories on the use of race are starkly unconstitutional. Plaintiffs claim that race predominated in the drawing of HB4 (which query how this is even possible without the use of racial data), but then simultaneously use race to create a scenario in which all Democrat-performing districts that have a nebulous critical mass (but not a majority) of racial and ethnic minorities are protected under the law. Plaintiffs cannot succeed because the coalition districts they seek are unconstitutional. Even if coalition districts were somehow constitutional, race did not predominate in the drawing of HB4.

---

[1] Counsel for Amicus authored this brief in whole, and no counsel for a party authored this brief in whole or in part. No counsel or party made a monetary contribution intended to fund the preparation or submission of this brief.

## FACTUAL BACKGROUND

HB4 became law on August 23, 2025. [ECF No. 1149 – Ex. R]. Shortly thereafter, Plaintiffs in the above-captioned matter sought to amend their Complaints to challenge HB4 under various theories, including racial gerrymandering, intentional vote dilution, and intentional discrimination on the basis of race. [ECF Nos. 1131-32, 1135, 1139, 1140-41]. Shortly thereafter, Plaintiffs filed motions for preliminary injunction, seeking to enjoin the use of HB4. [*See, e.g.* ECF Nos. 1142-43, 1149-50]. After a status conference on August 27, 2025, the Court entered a scheduling order, which scheduled a preliminary injunction hearing to begin on October 1, 2025. [ECF No. 1146]. The scheduling order also set the deadline for filing any motions for leave to file an amicus brief as September 17, 2025. [*Id.* at 4]. Amicus Curiae timely file this brief according to the August 28, 2025 scheduling order.

## ARGUMENT

A preliminary injunction may issue when the movant shows: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006) (quotation omitted); Fed. R. Civ. P. 65. Importantly, preliminary injunctions are extraordinary remedies that "should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (quotation omitted). When the government is a party, the government's interests and the public's merge. *Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

I.    **Plaintiffs Cannot Show a Substantial Likelihood of Success on the Merits.**

Plaintiffs cannot show a substantial likelihood of success on the merits because they seek an unconstitutional remedy of coalition districts. But, even if the Court were to find coalition districts a constitutional remedy, Plaintiffs cannot prove their racial gerrymandering claims because they do not submit alternative maps as required post-*Alexander*, and because maps were drawn without racial data. *See* Hr'g on H.B. 4 Before the Senate Special Committee on Congressional Redistricting at 2:35:30, 89th Leg. (Tex. Aug. 17, 2025), https://senate.texas.gov/videoplayer.php?vid=22485&lang=en (Senator King confirming race was not a factor in the drawing of the map). Plaintiffs also cannot prove their intentional vote dilution and intentional discrimination claims, which require a prima facie showing of both purpose and effect.

A.    **Plaintiffs Seek an Unconstitutional Remedy.**

Plaintiffs argue that race cannot be used in districting to increase the minority voting age population of a district, but that race can be used to reach a certain unspecified threshold to draw a coalition district. This makes no sense.

When the government engages in race-based classifications, it "demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities*." Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,* 600 U.S. 181, 220 (2023) ("*SFFA*") (quoting *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). Race-based districting schemes require the government to engage in stereotyping based on "the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller v. Johnson*, 515 U.S. 900, 911-12 (1995) (quotation omitted). Coalition districts are similarly based on racial stereotypes and, like crossover districts, are unworkable because they "would place courts in the

untenable position of predicting many political variables and tying them to race-based assumptions." *Petteway v. Galveston County*, 111 F.4th 596, 610 (5th Cir. 2024) (en banc) (quoting *Bartlett v. Strickland*, 566 U.S. 1, 17 (2009)).

Seeking to compel some sort of race-based coalition district impermissibly brings race into the districting calculus such that state legislatures attempting to act in good faith "will be uncertain how to consider more than one racial minority or language group." *Petteway*, 111 F.4th at 611 (citing *Nixon v. Kent County*, 76 F.3d 1381, 1391 (6th Cir. 1996)). That is why coalition districts are neither required nor permissible and cannot serve as a constitutional remedy. *Id.* at 609-10 ("Indeed, unless the minority group can show that it has the potential to elect a representative of its *own choice* in a single-member district, 'there has neither been a wrong nor can be a remedy.'" (quoting *Bartlett,* 556 U.S. at 15 (emphasis in original))); *Perry v. Perez*, 565 U.S. 388, 398-99 (2012) (per curiam); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (describing how influence-dilution claims would require *Gingles* I "to be modified or eliminated").

Plaintiffs' argument that *Petteway* is inapplicable because it "held only that multi-ethnic coalitions can no longer form the basis of an affirmative vote dilution claim" is shortsighted and misses the greater constitutional point. [*See, e.g.,* ECF No. 1149 at 8]. Everything any legislature does related to race and redistricting must be understood against the "competing hazards of liability" arising from the Equal Protection Clause and the Voting Rights Act (VRA). *Abbott v. Perez*, 585 U.S. 579, 587 (2018) (quotation omitted). Race-based districting requires the State to have "'a strong basis in evidence' for concluding that the [VRA] required its action." *Cooper v. Harris*, 581 U.S. 285, 292-93 (2017) (quoting *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). If a legislature creates a majority-minority district in an attempt to comply

with the VRA, its intent will likely be deemed predominantly racial, and it will have to justify its choice under strict scrutiny.[2] *See Cooper*, 581 U.S. at 300-301.

Post-*Petteway*, coalition districts cannot serve as a strong basis in evidence that §2 requires the drawing of districts using race. Without the cover of compliance with §2 as a compelling government interest, "the sorting of voters on the grounds of their race remains suspect[.]" *Cooper*, 581 U.S. at 308 n.7; *Miller*, 515 U.S. at 915 (describing race-based decision making in districting as "inherently suspect"). Intentionally drawing a district that favors Black and Hispanic voters, and that assigns those voters to districts based on race to meet certain thresholds, likely violates the Equal Protection Clause. This is exactly what happened in *Cooper*, where the Court held North Carolina's belief that it was required to draw a §2 district under the VRA was not based on a compelling state interest because the State's understanding was pure error of law. 581 U.S. at 306.

However, the Supreme Court has also recognized that there may be regions or areas where a minority group may naturally be a majority in a reasonably configured district, and when that is the case, "the Constitution does not place an *affirmative* obligation upon the legislature to avoid creating districts that turn out to be heavily, even majority, minority." *Easley v. Cromartie*, 532 U.S. 234, 249 (2001) ("*Cromartie II*") (emphasis in original). Instead, as explained in *Cromartie II*, the federal Constitution imposes an obligation that districts cannot be created for predominately racial motivations. *Id.* Moreover, since coalition districts cannot help the State overcome strict scrutiny, then the intentional creation of them is "interest-group politics rather than a rule hedging against racial discrimination." *Thornburg v. Gingles*, 478 U.S. 30, 83 (1986) (White, J.,

---

[2] Whether an intentional creation of a majority-minority congressional district violates the Fourteenth or Fifteenth Amendments to the United States Constitution is an open question before the Supreme Court. *See Louisiana v. Callais*, No. 24-109 (U.S. Aug. 1, 2025) (text order directing supplemental briefing).

concurring). Plaintiffs seek an unconstitutional remedy, and for that reason alone their claims fail on the merits.

**B.      Plaintiffs' Claims Fail on the Merits.**

Plaintiffs' claims, all involving race-based intent, also fail because Plaintiffs cannot show a substantial likelihood of success on the merits. Tabloid headlines aside, the relevant factual record reveals that race was not part of the mapdrawer's districting calculus.

"Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Abbott*, 585 U.S. at 603. The presumption of legislative good faith warns that courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 915-16. Thus, courts are directed to "draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions."[3] *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024).

**1.      Racial Gerrymandering.**

Racial gerrymandering occurs when a state "separate[s] its citizens into different voting districts on the basis of race" without adequate justification. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quotation omitted). If "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a

---

[3] The presumption of legislative good faith does not magically disappear in mid-decade districting, as Gonzalez Plaintiffs claim. [ECF No. 1149 at 22-24]. Indeed, the evidentiary presumption of legislative good faith is derived from separation of powers principles that recognize redistricting "is primarily the duty and responsibility of the State," and "[f]ederal court review of districting legislation represents a serious intrusion on the most vital of local functions." *Miller*, 515 U.S. at 915. Good faith intent of state legislatures must be presumed on the front end, and Plaintiffs still must overcome that presumption to prove their case. *See id.* at 915-17.

particular district," then "the design of the district must withstand strict scrutiny." *Cooper*, 581 U.S. at 291-92. This is the case even if a state is attempting to comply with §2. *Id.* at 292-93.

To succeed on a claim of racial gerrymandering, a plaintiff must show that a state "'subordinated' race-neutral districting criteria" in favor of "racial considerations." *Alexander*, 602 U.S. at 7. In other words, proof of racial predominance is required. *Id.* at 10. "Racial considerations predominate when '[r]ace was the criterion that, in the State's view, could not be compromised' in the drawing of district lines." *Id.* at 7 (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) ("*Shaw II*")). It is the "racial classification itself" that serves as the harm, *id.* at 38, and such claims do not depend on an assertion that votes were diluted, purposefully or otherwise. *See Shaw v. Reno,* 509 U.S. 630, 652 (1993) ("*Shaw I*").

Plaintiffs may prove racial predominance "through some combination of direct and circumstantial evidence." *Alexander*, 602 U.S. at 8 (citing *Cooper*, 581 U.S. at 291). The Supreme Court has repeatedly emphasized that the standard for circumstantial evidence is demanding; especially when, as here, politics is at play. *Id.* at 9 (holding race-intent claims based on circumstantial evidence cannot succeed unless the challenger is able to "disentangle race from politics"). But racial predominance can be proven circumstantially through a "substitute map that shows how the State 'could have achieved its legitimate political objectives' . . . while producing 'significantly greater racial balance.'" *Id.* at 34 (quotation omitted). If political or racial choices could explain the lines, the alternative map fails. *See id.; Cromartie II*, 532 U.S. at 258 (holding contemporaneous legislative statements that referenced both race and politics were insufficient to prove racial gerrymandering). Without an alternative plan, *Alexander* compels an "adverse inference" against plaintiffs. 602 U.S. at 34.

Here, there is no direct evidence of racial predominance. Nor can there be as the mapdrawer, Mr. Kincaid, unequivocally did not use any racial data in the drawing of C2333. *See* Hr'g on H.B. 4 Before the Senate Special Committee on Congressional Redistricting at 2:35:30, 89th Leg. (Tex. Aug. 17, 2025), https://senate.texas.gov/videoplayer.php?vid=22485&lang=en (Senator King confirming race was not a factor in the drawing of the map). No districting map has ever been struck down as an unconstitutional racial gerrymander when no racial data was used in the drawing process. *Alexander*, 602 U.S. at 8.

Additionally, even if race were considered, which it was not, a few comments by Governor Abbott (who no one has alleged was the primary mapdrawer) does not automatically mean that C2333 is a racial gerrymander. First and foremost, because Governor Abbott is not a member of the Legislature, his statements cannot be used to prove intent of the Legislature itself. *Id.* at 8 ("Direct evidence often comes in the form of *a relevant state actor's* express acknowledgement that race played a role in the drawing of district lines." (emphasis added)). Even if Governor Abbott was a member of the Legislature, the Supreme Court has found that similar statements do not arise to the level of race predominating.

In *Cromartie II*, the Supreme Court held that contemporaneous legislative testimony by Roy Cooper (one of the North Carolina General Assembly's redistricting leaders) that the challenged plan satisfied "a need for racial and partisan balance" was insufficient evidence of racial predominance because while the statement showed that the legislature considered race, it did so on par with other considerations. 532 U.S. at 253-54 (quotation omitted). In fact, an email sent from the mapdrawer to redistricting leaders about moving 60,000 Black voters into challenged CD12 also did not show predominance because it did not say that those voters were being moved solely because of their race. *Id.* at 254. In so holding, the Supreme Court gave weight to the fact

that the email was only addressed to two legislators, not the entire legislative body. *Id.* The same principles apply here. Governor Abbott's calling of a special session to "make sure that we have maps that don't impose coalition districts" is insufficient evidence of racial predominance because it does not say that a certain class of voters must be moved out of certain districts because of their race. Nor does it mean that the Legislature as a whole shared that specific belief. Plaintiffs cannot prove direct evidence through Governor Abbott.

Plaintiffs also cannot meet their burden of proof based on circumstantial evidence for several reasons. First, Plaintiffs have wholesale failed to produce an alternative map.[4] "Without an alternative map," Plaintiffs here cannot "defeat [the] starting presumption that the legislature acted in good faith," which "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10 (citing *Abbott*, 585 U.S. at 610-12). To the extent that Plaintiffs might argue that Dr. Barretto's simulated maps are viable alternatives, that is a farce. Dr. Barretto's simulations were run race and partisanship blind, ECF No. 1150-17 at 15-17, and therefore cannot serve as alternative maps that "would have better satisfied the legislature's other nonracial political goals as well as traditional nonracial districting principles[.]" *Cromartie II*, 532 U.S. at 249.

Second, Plaintiffs cannot disentangle race from politics. Indeed, "[a] circumstantial-evidence-only case is especially difficult when the State raises a partisan-gerrymandering defense." *Alexander*, 602 U.S. at 9. This is because a high correlation between race and politics will naturally result in a map which has been politically gerrymandered "look[ing] very similar to

---

[4] The stated political goals of C2193 and C2333 could not be more different. C2193 was drawn to shore up all incumbents on both sides of the aisle and give Republicans the opportunity to pick up Texas' two new seats from the 2020 apportionment. C2333 was drawn to give Republicans the opportunity to gain five new seats in the 2026 midterm elections. C2193 is not an adequate alternative map to C2333 and Plaintiffs have not produced one.

a racially gerrymandered map." *Id.* "[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were conscious of that fact." *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999).

As to Dr. Barreto's simulations in the San Antonio and Houston metro regions, his comparisons to the enacted Plan C2333 are inapposite. [ECF No. 1150-17 at 17-18]. In these simulations, Dr. Barreto assumed that the mapdrawer treated the Trump vote share in these districts as a non-negotiable, setting his simulations to that target when there is simply no evidence that is the case. Nor would it logically make sense that a mapdrawer would treat an exact percentage as non-negotiable, as 59% is essentially the same as 58.9%, 59.5%, and so on. [ECF No. 1150-17 at ¶54]. It is therefore clear that Dr. Barreto based his simulations on nothing but flawed assumptions, making them unreliable gobbledygook.

Nor do any of Plaintiffs' other experts make a serious attempt at disentangling race and politics. For example, in section 5.1 of her report [ECF No. 1142-6 at 10], Dr. Moon Duchin produces dot density plots that show the court the geographic distribution of four racial groups (Asian, White, Black, and Latino) within certain challenged congressional districts. Tellingly Dr. Duchin does not produce these same maps with respect to partisanship to allow the Court to disentangle race from politics. Mr. Blakeman Esselstyn's expert report [ECF No. 1149-25] reveals why.

On pages 17-18 of Mr. Esselstyn's report, he produces political and racial heatmaps of certain districts. For example, Mr. Esselstyn provides the following for CD18:



[ECF No. 1149-25 at 17]. These heatmaps clearly show that nearly all of CD18 has a Democratic

vote share of between 55-69.99% or higher (blue shading on the right). By comparison, large

portions of the district have either 0-14.99% BCVAP, or 15-29.99% BCVAP (light green shading

on the left). Only some portions of CD18 have a higher BCVAP. This pattern is starkly revealed

in the northeastern portion of CD18, where even though there are some portions of darker green,

they largely correspond with darker blue and higher Democratic vote share than BCVAP. For

example, the top left northeastern corner of CD18 has BCVAP ranges of 0-29.99%, and the same

area's partisan vote share is 55-69.99% Democratic according to Mr. Esselstyn. Other portions of

CD18, near the center, show precincts mostly in the 55-84.99% BCVAP range, with a few

precincts in the 85-100% BCVAP range, where almost all of the same precincts have 85-100%

Democratic vote share or 70-84.99% Democratic vote share. Thus, throughout CD18, voters are

more Democratic than Black—a clear sign that partisanship played a larger factor than race.

Plaintiffs have failed to disentangle race from politics and cannot otherwise show that race predominated without an alternative map. As such, Plaintiffs' racial gerrymandering claims must fail.[5]

### 2. Intentional Vote Dilution & Intentional Discrimination.[6]

Plaintiffs' intentional vote-dilution and intentional discrimination claims require proof of the standard elements of discriminatory purpose and effect, *Alexander*, 602 U.S. at 39. Generally speaking, the intent standard of the Fourteenth and Fifteenth Amendments requires proof that race was "a 'but-for' motivation for the enactment." *Hunter v. Underwood*, 471 U.S. 222, 232 (1985); *see N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 235 (4th Cir. 2016) (applying but-for causation standard). It must be shown that the state action was taken "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Plaintiffs must also prove a discriminatory "effect" of diluting minority voting strength. *Alexander*, 602 U.S. at 39.

No evidence submitted proves that race was considered at all, let alone that it was a but-for cause of any district configurations. *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020); *Abbott*, 585 U.S. at 603 (citation omitted). Nor did Plaintiffs prove the requisite effect. Accordingly, Plaintiffs' intentional vote-dilution and intentional discrimination claims fail.

---

[5] If Plaintiffs were able to state a prima facie case for racial predominance, the burden would then shift to the State to prove strict scrutiny—that the "race-based sorting of voters serves a compelling interest and is narrowly tailored to that end." *Cooper*, 581 U.S. at 292 (quotations omitted). Amicus Curiae submit that Plaintiffs cannot show racial predominance in the first instance, and the Court need not wade into the strict scrutiny analysis.

[6] Amicus Curiae analyze Plaintiffs' intentional vote dilution and intentional discrimination claims in the same section because the discrimination claims require effect, i.e., vote dilution, and the vote-dilution claims require invidious intent, i.e., purpose of diluting votes.

### a.    Plaintiffs Cannot Prove Discriminatory Intent.

As discussed *supra* pages 8-9, there is simply no direct evidence of discriminatory intent because Mr. Kincaid did not use race to draw C2333. Governor Abbott's statements cannot be imputed onto the Legislature, and Plaintiffs attempts to do so are nothing more than a sideshow that should be given little weight. Indeed, "when a State chooses to allocate authority among different officials who do not answer to one another, different interests and perspectives…may emerge." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 191 (2022); *see also United States v. Barcenas-Rumualdo*, 53 F.4th 859, 867 (5th Cir. 2022) (considering the President's veto of legislation not probative of what Congress believed).

Plaintiffs' effort to overcome a lack of direct evidence with circumstantial evidence presents a "difficult" task. *Alexander*, 602 U.S. at 8. Simply put, none of Plaintiffs' expert opinions establish that a racial motive was the but-for cause of any district lines. That is, they failed to establish that any district is "a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Id.* at 38-39 (citation omitted). Plaintiffs have pointed to *Arlington Heights*, a decision identifying circumstantial evidence that may help show racial intent, such as "a clear pattern, unexplainable on grounds other than race," "[t]he historical background…particularly if it reveals a series of official actions taken for invidious purposes," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977). These factors are not exhaustive and, in any event, Plaintiffs fail under these factors. *Id.* at 268.

Plaintiffs can point to no series of recent actions by the current Legislature taken for racial purposes that might suggest racial intent in the 2025 redistricting process. Instead, Plaintiffs rely solely on historical evidence—namely the acts of prior Legislatures. But "[a] legislature's past acts

do not condemn the acts of a later legislature, which [courts] must presume acts in good faith." *Raymond*, 981 F.3d at 298. The Supreme Court has made clear that "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination" and "'past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.'" *Abbott*, 585 U.S. at 603 (citation omitted). Plaintiffs' citations to court opinions and findings regarding former legislatures are insufficient to overcome the presumption of legislative good faith. *See Raymond*, 981 F.3d at 298; *Abbott*, 585 U.S. at 603. Furthermore, even if a legislator said something potentially discriminatory in relation to the ideas generally espoused in a bill, this would not constitute evidence of discriminatory purpose where other legislators actively involved in the bill expressed other, genuine reasons for its passage. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687-90 (2021); *Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 408 (5th Cir. 1991) (finding "isolated and ambiguous statements made by . . . legislators" were not compelling evidence of that law's discriminatory purpose); *Jones v. City of Lubbock*, 727 F.2d 364, 371 n.3 (5th Cir. 1984) (refusing to "judge intent from the statements [made by] ... a single member" of the legislative body); *United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.").

Similarly, the event sequence leading to the 2025 redistricting further defeats the allegations of racial intent and confirms the Legislature's political intent. Politics was the but-for cause of the 2025 redistricting itself. *See, e.g.,* Joey Cappelletti & Nicholas Riccardi, *Trump tells Texas Republicans to redraw the state congressional map to help keep House majority*, Associated Press (July 15, 2025), https://apnews.com/article/trump-congress-house-republicans-texas-

redistricting-d18e8280a32872d9eefcbb26f66a0331; Giselle Ewig, *Trump on Texas redistricting:*
*'We are entitled to 5 more seats'*, Politico (Aug. 5, 2025), at
https://www.politico.com/news/2025/08/05/trump-texas-redistricting-
00493624?mkt_tok=NTU2LVlFRS05NjkAAAGcNVKHqocDid9pnMn4IjBggxlb_CEnGr2Zv8
QI74lW3FNct56Pf7aja2XTbnhZfyuZmcWTfhhRi0CSPjvKfCg. And just because a bill passes in
a special session does not make it inherently suspect.

Furthermore, mid-decade districting in Texas is nothing new. In *League of United Latin*
*American Citizens v. Perry*, 548 U.S. 399, 420 (2006) ("*LULAC*"), the Supreme Court dealt with
mid-decade districting for partisan purposes and did not find that the act of mid-decade districting
was unconstitutional. The Congressional Research Service's Mid-Decade Congressional
Redistricting Report further shows that Texas is not alone in mid-decade districting. Sarah J.
Eckman & L. Paige Whitaker, Cong. Rsch. Serv., IF13082, *Mid-Decade Congressional*
*Districting: Key Issues* (Aug. 11, 2025), https://www.congress.gov/crs-product/IF13082. Just
because C2333 was drawn mid-decade does not mean that it is inherently suspect. *See LULAC*,
548 U.S. at 423 ("In sum, we disagree with appellants' view that a legislature's decision to override
a valid, court-drawn plan mid-decade is sufficiently suspect to give shape to a reliable standard for
identifying unconstitutional political gerrymanders.").  Plaintiffs' claims of discriminatory intent
fail.

        **b.**      **Plaintiffs Cannot Prove Discriminatory Effect.**

Plaintiffs' failure to prove intent is dispositive. In any event, they also failed to establish
the requisite effect. As explained, their claims require proof of effect "to minimize or cancel out
the voting potential of" Black or Latino voters. *Miller*, 515 U.S. at 911 (quotation omitted). The
evidence falls short of that. It establishes, unsurprisingly, that a plan configured by a Republican-
controlled legislature benefited Republican electoral interests more than a plan configured under

a mistaken belief that coalition districts were afforded special protection under the VRA. *See Cooper*, 581 U.S. at 306 (North Carolina's belief that it was required to draw majority-Black district could not be based on a strong basis in evidence because it was a pure error of law).

Plaintiffs show no discriminatory effect other than the one on Democratic districts. Indeed, no pre-existing majority-BVAP or majority-HVAP districts using Decennial Census[7] data were destroyed. The standard for discriminatory effect cannot be that all Democratic districts must be protected.

## II. Plaintiffs Have Not Established that the Equitable Factors Favor a Preliminary Injunction.

Plaintiffs are not entitled to a preliminary injunction for the independent reason that the equities do not support one. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 25-26 (2008). The alleged harm—congressional districts that purportedly dilute the voting rights of Latino and Black Texans—is the same regardless of whether or not an injunction issues because Plaintiffs also claim the prior Congressional Plan (C2193) intentionally dilutes the voting rights of Latino and Black Texans. Remarkably, Plaintiffs claim that if the Court preliminary enjoins HB4, the

---

[7] To the extent that Gonzalez Plaintiffs raise malapportionment claims based on updated ACS estimates, those arguments are not logical. If Plaintiffs claim that C2333 is malapportioned, then so too is C2193 because both are based off of Decennial Census data. Furthermore, it is a slippery slope to claim that mid-decade districting should be done on updated population numbers. Do we need to have a Census every five years instead of ten? Do all plans not yet finalized have to be re-apportioned pursuant to ACS estimates? Does Texas gain a congressional seat mid-decade due to population growth (people moving to the state), while California loses a seat because of people moving away? *See* Alexa Mae Asperin, *People are leaving California and moving to these cities instead, data shows*, Fox 11 Los Angeles (Aug. 25, 2025), at https://www.foxla.com/news/people-leaving-california-moving-cities. Surely Plaintiffs are not arguing that Texas cannot use Decennial Census numbers, but somehow California can. Additionally, reliance on ACS estimates is problematic in and of itself given the Census Bureau's warning that "ACS data is 'not intended to be used in redistricting.'" *Pierce v. N. Carolina State Bd. of Elections*, 713 F. Supp. 3d 195, 225 (E.D.N.C. 2024) (quotation omitted), *aff'd by* 97 F.4th 194 (4th Cir.).

2021 plan "remain[s] available for use, subject to Plaintiffs' pending challenge to some of those

districts." [ECF No. 1149 at 26]. Plaintiffs cannot have their cake and eat it too.

## CONCLUSION

For these reasons, Plaintiffs' motions for preliminary injunction should be denied.

Respectfully submitted, this the 17th day of September, 2025.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

By: _/s/ David M. Medina_____
    David M. Medina
    Texas Bar No. 0000088
    Federal Bar No. 2609723
    1111 Bagby St., Suite 2100
    Houston, Texas 77002
    Ph: (346) 646-5441
    david.medina@nelsonmullins.com

    Phillip J. Strach*
    North Carolina State Bar No. 29456
    Alyssa M. Riggins*
    North Carolina State Bar No. 52366
    301 Hillsborough Street, Suite 1400
    Raleigh, North Carolina 27603
    Ph: (919) 329-3800
    phil.strach@nelsonmullins.com
    alyssa.riggins@nelsonmullins.com

    *Motion for Pro Hac Vice Forthcoming*

    *Counsel for the National Republican
    Congressional Committee*

## CERTIFICATE OF SERVICE

I, David M. Medina, hereby certify that I have this day electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will provide electronic notification to counsel of record.

This the 17th day of September, 2025.

**NELSON MULLINS RILEY &
SCARBOROUGH LLP**

By: _/s/ David M. Medina_____
    David M. Medina
    Texas Bar No. 0000088
    Federal Bar No. 2609723
    1111 Bagby St., Suite 2100
    Houston, Texas 77002
    Ph: (346) 646-5441
    david.medina@nelsonmullins.com