## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

|  |  |
|---|---|
| LULAC, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*, <br><br> *Defendants*. | Case No. 3:21-CV-00259-DCG-JES-JVB <br> [Lead Case] |

## BROOKS PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO STRIKE EXPERT REPORTS OF DR. BARRETO

Lengthy detours into cooking imagery are unnecessary to respond to Defendants' motion to strike Dr. Barreto's reports. Defendants were provided with all the data required by the Rules and their specific questions about Dr. Barreto's analysis were answered in detail. Their motion to strike has no merit and should be denied.

### DR. BARRETO'S REPORTS

Remarkably, Defendants ask the Court to strike Dr. Barreto's reports without even attaching the reports to their motion.[1] It is easy to see why they seek to obscure them.

Dr. Barreto's two reports show that a race-blind mapdrawing process designed to achieve the same Republican performance of the 2025 map would *never* result in the same outlier racial skew and race-based targets of the enacted map. During his cross examination in this summer's trial, Defendants' expert Dr. Trende testified that one way to disentangle race from politics would be to use a redistricting algorithm (called "redist") to simulate a large set of maps that achieve the

---

[1] Dr. Barreto's reports are attached hereto as Exhibits 1 and 2.

same number of Republican districts, with around 55% Republican performance within those districts. *See, e.g.*, 6/9/25 PM Rough Tr. at 7-8.

That is what Dr. Barreto did in his reports. He created code to achieve this level of Republican performance (without any racial input in the mapdrawing) in the same number of Republican districts as Plan C2333 and found that it is statistically *impossible* that the racially skewed outcomes of Plan C2333 could arise absent an overriding focus on race.[2] His August report analyzed simulated maps in two regions: (1) the Bexar County area and (2) the Harris County area. Ex. 1 at 18. Dr. Barreto found that out of 332,000 simulations that created one Trump 55% or higher district among the counties that make up CD 35 in Plan C2333, "exactly zero were majority Hispanic CVAP." Ex. 1 at 18. That compares to Plan C2333's version of CD 35, which is bare-majority Hispanic CVAP—something the map's supporters loudly trumpeted. Likewise, Dr. Barreto found that zero majority Hispanic CVAP Trump districts were simulated in Harris, Liberty, and Fort Bend Counties, unlike the bare-majority Hispanic CVAP version of CD 9 included in Plan C2333. Ex. 1 at 18.

Dr. Barreto expanded on this analysis in his September 2025 report. He conducted four regional analysis to assess the likelihood—absent a focus on race—of creating (1) a Black CVAP majority district in Harris County, (2) a Black CVAP majority district centered in Dallas County, (3) a Hispanic CVAP majority district among all the territory of Republican Harris County area districts and (4) two Hispanic CVAP majority districts among the territory that comprise CDs 21,

---

[2] Dr. Barreto's report includes a number of other analyses about which Defendants do not object in their motion despite requesting that his reports be stricken in their entirety. Defendants offer no explanation for how aspects of Dr. Barreto's reports unrelated to the simulated maps could plausibly be stricken. For example, Dr. Barreto's September report includes a series of maps illustrating the race-based changes that were made to CD 9 during the process—including an alternative map that shows improved Republican performance for CD 9 but without the district hitting the State's 50%+1 Hispanic CVAP racial target. Ex. 2 at 19.

23, and 35. The answer for each regional analysis was that the challenged districts—CDs 9, 18, 30, and 35—would not be single-race majority CVAP absent an overriding focus on achieving that racial target. Ex. 2 at 1-4. Dr. Barreto's September report also assesses the likelihood of the racial skew of Plan C2333 at the statewide level. When instructed to create 29 Trump 55%+ districts and 1 below 55% (similar to Plan C2333, where 3 districts are below 55% Trump), the simulations reveal four Hispanic CVAP majority districts won by Trump—unlike the six in Plan C2333. Ex. 2 at 5. This confirms the regional analysis of CDs 9 and 35 as extreme, improbable outliers that would not arise absent a focus on race. The analysis also shows that even while matching the Republican performance of Plan C2333, between 12 and 15 districts are still expected to be multiracial majority with no single race constituting the majority of voters. Ex. 2 at 5. This stands is shocking contrast to Plan C2333, which has just 4 such districts (down from 9 in the 2021 map). Ex. 2 at 5. This result is not surprising, given that it was the openly and loudly stated goal of this redistricting process—including by Governor Abbott and at DOJ's instruction—to eliminate districts that lacked a single racial group as a majority of voters.

Dr. Barreto's analysis is damning evidence underscoring the expressly verbalized race-based goal of the mid-decade redraw. For that reason, Defendants seek to exclude it.

## DEFENDANTS' REQUEST FOR INFORMATION

On September 6, Defendants' counsel emailed Brooks Plaintiffs' counsel with two questions/requests. First, they asked whether Dr. Barreto had created a "foundational shapefile" that merged CVAP data, the 2024 presidential election results, and the redistricting map's boundaries and if so, if that shapefile could be produced. Defs' Ex. C, ECF No. 1169-3. Defendants explained that "[t]his will enable us to ensure that we are using things like the same CVAP year Dr. Barreto is using" and the same precinct boundaries. *Id.* Second, Defendants said "*it would be*

*ideal* if Dr. Barreto would produce the saved simulations upon which he relied. Because he did not appear to set a seed, any replication that we manage will likely produce *slightly different* maps than those with Dr. Barreto produces." *Id.* (emphasis added).

## PLAINTIFFS' RESPONSE TO DEFENDANTS' REQUESTS

After several attempts to address Defendants' requests, Plaintiffs ultimately sent the following response, which we reproduce in full here (over next few pages):

Ryan-

Here, again, are the answers to your requests.

**Question 1: Foundational Shapefile**

In your September 6 email, you asked if there was (1) a "foundational shapefile that Dr. Barreto relies upon to run his simulation" or (2) "the code that created the foundational shapefile, as well as the shapefiles upon which *that* code relies. This will enable us to ensure that we are using things like the same CVAP year Dr. Barreto is using or that is apportioned in the same way, or (for that matter) that the precinct boundaries employed are the same ones Dr. Barreto uses."

**Answer Regarding Foundational Shapefile/Code**: There is no foundational shapefile aside from redistricting plan (e.g., Plan C2333). Dr. Barreto produced the shapefiles for Plans C2193, C2308, C2331, and C2333 (which of course the state generated and possesses). And the code Dr. Barreto produced is the code you're looking for. Specifically, Dr. Barreto's code provides the instructions to filter to the geographic subset of counties or districts he analyzes. Once the whole plan is added to the R environment, R is able to filter to particular geographies. Below are several examples:

```
27 #Subset data to Harris, Liberty, and Fort Bend Counties
28 hlfb <- texas_24 %>%
29   filter(County %in% c("HARRIS","LIBERTY","FORT BEND"))
30
31 #Create redistricting map object
32 hlfb_map <- redist_map(
33   hlfb,
34   ndists    = 7,          #Create 7 districts
35   total_pop = Total_Pop,  #Using 'Total_Pop' column for deviation
36   pop_tol   = 0.01)       #Population deviation tolerance set to 1%
37
38 #Create dat holder with geometry removed from redist object
39 dat <- sf::st_drop_geometry(hlfb_map)
```

```
362 #### RUNNING REDIST SIMULATIONS ####
363 #*This template code focuses on drawing 3 districts in South Central Texas using VTDs
364 #Subset data
365 south.central <- texas_24 %>%
366   filter(as.character(District) %in% c('21', '23', '35')) %>%
367   st_make_valid()
368
369 #Create redistricting map object
370 south.central_map <- redist_map(
371   south.central,
372   ndists    = 3,          #Create 3 districts
373   total_pop = Total_Pop,  #Using 'Total_Pop' column for deviation
374   pop_tol   = 0.01)       #Population deviation tolerance set to 1%
375
376 #Create dat holder with geometry removed from redist object
377 dat <- sf::st_drop_geometry(south.central_map)
```

5

```
492 #### RUNNING REDIST SIMULATIONS ####
493 #*This template code focuses on drawing 7 districts in Harris County area using VTDs
494 #Subset data
495 harris.area <- texas_24 %>%
496   filter(as.character(District) %in% c("2", "8", "9", "14", "22", "36", "38")) %>%
497   st_make_valid()
498
499 #Create redistricting map object
500 harris.area_map <- redist_map(
501   harris.area,
502   ndists    = 7,              #Create 7 districts
503   total_pop = Total_Pop,      #Using 'Total_Pop' column for deviation
504   pop_tol   = 0.01)           #Population deviation tolerance set to 1%
505
506 #Create dat holder with geometry removed from redist object
507 dat <- sf::st_drop_geometry(harris.area_map)
508
```

Notably, this is exactly what Dr. Trende did to analyze geographical subsets for his
simulation analysis. This is from Dr. Trende's code:

```
140 1-nbv(dist)
141 ########################################### Table 7
142 a <- as_tibble(old_vtds %>% st_drop_geometry() %>%
143   filter(FENAME %in% c("TRAVIS", "BASTROP", "WILLIAMSON", "BELL", "COMAL",
144                        "BEXAR", "HAYS")) %>%
145   mutate(d_win = ifelse(biden > trump, 1, 0)) %>%
146   group_by(Old_District) %>%
147   summarise(d = sum(d_win))%>%
148   mutate(perc =d/sum(d))
149   )
150
151 a <- a %>%
152   add_row(Old_District = 11, d = NA, perc= NA) %>%
153   add_row(Old_District = 37, d = NA, perc = NA) %>%
154   arrange(Old_District)
```

Dr. Barreto did not program R to output an interim "foundational" shapefile. We did not
receive a foundational shapefile aside from map files from Dr. Trende. Is there such a file
that was part of his analysis that he did not produce?

**Answer Regarding CVAP/VTD**: You noted that you needed further information to ensure (1)
that you are using the same CVAP year and (2) the same VTD boundaries.

Dr. Barreto linked to the CVAP data in his August 2025 report, page 9 paragraph 30, footnote
#9; he used the 5-year ACS CVAP data ending in 2023, the most recent. That link is here
again for your reference: https://www.census.gov/programs-surveys/decennial-
census/about/voting-rights/cvap.html. Here is the direct link to download the nationwide
block group CVAP dataset: https://www2.census.gov/programs-
surveys/decennial/rdo/datasets/2023/2023-cvap/CVAP_2019-2023_ACS_csv_files.zip.

6

With respect to VTD boundaries, as you know Dr. Barreto's report uses the 2024 election results for his analysis. The 2024 VTD boundaries are available here: https://data.capitol.texas.gov/dataset/vtds#.

Dr. Trende merged CVAP data with VTD boundaries in the code he produced in this case (lines 83-116 of "1 Make the Maps").

**Summary Answer to Question 1**: Just as Dr. Trende's code indicates for his analysis, Dr. Barreto relied upon (1) the enacted and proposed map shapefiles, (2) the 2023 5-Year CVAP data, and (3) the 2024 presidential election results using 2024 VTDs. R filtered the regional subset geographies using the code provided above.

**Question 2:** In your September 6 email, you said "it would be ideal if Dr. Barreto would produce the saved simulations upon which he relied. Because he did not appear to set a seed, any replication that we manage will likely produce slightly different maps than those which Dr. Barreto produces."

**Answer**: Dr. Barreto has produced the exact same thing that Dr. Trende did – the output data analysis tables/charts/graphs from the simulations. Dr. Trende did not save and produce any of the 100,000 simulated maps, just the tables/charts/graphs. *See, e.g.*, June 9, 2025 PM Trial Transcript (Rough) at 14-15 (Trende Cross).

What's more, in social science peer-reviewed articles, the authors of the redist software package also rely on the presentation of plots and histograms as their evidence while describing their general practice, they do not save and upload the simulation results output as part of the normal social science publication process.

**Examples from McCartan and Imai 2023[1]**

[CONTINUED ON NEXT PAGE]



In your September 8 email, you question how you will know if the simulated maps have contiguous districts. Here is how Dr. Trende answered that same question: "Well, the program should create contiguous maps because that's how spanning trees work." *Id.* at 15.

You note that because Dr. Barreto did not "set a seed," Dr. Trende will get "slightly different maps" than Dr. Barreto did when he ran his code. That is correct. And that is a fundamental point of disagreement in proper methodology between the two. Dr. Barreto's opinion is that purpose of this type of analysis is to produce a statistically random and large sample of simulated maps and then chart the characterstics of that set of maps. If the analysis is programmed with a seed, the process after that is no longer random because the analyst has constricted the outcomes from random to what is required by the seed. That

undermines the entire purpose of the analysis, which is to get a "slightly different" (as you say) set of maps from a large set of random draws. The randomness is the feature, not the flaw. Dr. Trende can run the analysis using Dr. Barreto's code, and we trust he will report what he finds.

In reviewing Dr. Trende's code, it appears that he set the seed "8675309" for every one of the regional simulation analyses for his 2022 report. While Dr. Trende's selection of a seed based upon Tommy Tutone's Song "867-5309/Jenny" is humorous, it is methodologically flawed. Dr. Trende constrained his simulations to start from the same mapping standpoint in each analysis, which defeats the point of the random simulations.

Hopefully we have cleared up any confusion.

Defendants offered no response or further request, and instead filed their motion to strike, which merely repeats the same inaccurate assertions without any adjustment for the clear and direct answers and information Brooks Plaintiffs provided.

## ARGUMENT

### I.    Dr. Barreto has produced all the facts and data he considered.

Dr. Barreto has produced all the facts and data he considered in his analysis. Rule 26(a)(2)(B)(ii) requires that expert reports contain "the facts or data considered by the witness" in forming his or her opinion. As the above-quoted response demonstrates, Dr. Barreto produced every factual or data input that he used to conduct his analysis and provided detailed and specific answers to Defendants' questions. The coding program, called "R," (which is open source and publicly available) was instructed to pull data from the 2023 5-Year CVAP file, the 2024 Texas presidential result file, and the relevant redistricting map file saved on Dr. Barreto's computer. Per the instructions in Dr. Barreto's code, "R" merges these files together and filters to the relevant geographical area of analysis. The "redist" package then creates simulated maps based upon the parameters Dr. Barreto set (as shown in his code)—*e.g.*, matching Republican vote share performance in the relevant number of districts, creating compact districts, matching Plan C2333's respect for county boundaries, etc.

Despite the explanation reproduced above, Defendants continue to insist there is some "foundational shapefile" or "merged . . . data set" that Dr. Barreto is hiding. *See, e.g.*, Mot. at 9. There is not. *Just as Dr. Trende did* with his own simulation analysis, Dr. Barreto instructed "R" to gather the relevant files from their saved location on the computer—which files have all been produced and identified for Defendants—and run the analysis from there. Defendants also cite, for the first time, another line in Dr. Barreto's code they insist reveals some subterfuge: "texas_24 <- fread("filepath")." Mot. at 10. Defendants assert that "[i]n this code, 'filepath' is a placeholder for the data to be run through the code—an un-produced shapefile." *Id.* This is incorrect. "[F]ilepath" is merely a note to insert the location on the computer where the relevant file is stored—in this case, the CVAP data, election results, and relevant redistricting map. All of those files were produced to Defendants. There is no "un-produced shapefile."

Frankly, we do not find the assertion that Dr. Trende is actually having difficulty with this credible. This is exactly how his own code is structured, with the same inputs, for his own simulation analysis using "redist." Brooks Plaintiffs have repeatedly and clearly explained the inputs, referred Defendants to them specifically, and answered their questions. If Dr. Trende truly believes he is missing something here, then the Court should require him to submit a declaration under oath saying as much, because it is implausible that he cannot run this code.[3]

To assure himself of this, Dr. Barreto contacted Drs. Kosuke Imai and Cory McCarten, the professors who developed the "redist" software that both Drs. Barreto and Trende have used in this case. Below is how Dr. Imai responded:

---

[3] It is unclear whether these questions/requests are even coming from Dr. Trende, as opposed to Defendants' counsels' attempts to interpret, and draw conclusions and assertions regarding, the code on their own accord.

**From:** Kosuke Imai <imai@harvard.edu>
**Sent:** Wednesday, September 17, 2025 11:04 PM
**To:** Matt Barreto <matt@bspresearch.com>
**Subject:** Re: Question on your Redist package

Dr. Barreto,

The standard requirement for academic journals is that authors provide the code and data necessary to reproduce the results reported in the article. In the context of redistricting simulation analysis, this means that you are only expected to deposit your code and the original input data (shapefiles, VTD election data, census data, etc.). Since running the code with the data will reproduce the simulated plans, there is no need to deposit the simulated plans themselves. For example, in my 2023 *PNAS* article, we deposited the code and input data but not the simulated plans. See:

Kenny, Christopher; McCartan, Cory; Simko, Tyler; Kuriwaki, Shiro; Imai, Kosuke, 2023, "Replication Data for: Widespread Partisan Gerrymandering Mostly Cancels Nationally, but Reduces Electoral Competition", https://doi.org/10.7910/DVN/JI1U8X, Harvard Dataverse, V1, UNF:6:nYlhzGaxtdVnHl7IeCQbCA== [fileUNF]

I hope this answers your question.

Best,

Kosuke

Kosuke Imai
Professor of Government and of Statistics, Harvard University

1737 Cambridge Street, Institute for Quantitative Social Science

Cambridge MA 02138. Phone: 617-384-6778, URL: https://imai.fas.harvard.edu

Ex. 3. And below is how Dr. McCarten responded:

**From:** Cory McCartan <cory.mccartan@gmail.com>
**Sent:** Wednesday, September 17, 2025 5:34 PM
**To:** Matt Barreto <matt@bspresearch.com>
**Subject:** Re: Question on Redist standards

Dr. Barreto,

I have briefly reviewed the code and report you sent, and your process seems consistent with what I have seen from other expert reports using simulation methods, and their code, as well as my own reports and academic work.

Simulation algorithms are inherently random, and they leverage this randomness to provide insights into what kind of districting plans are typical under certain constraints. When simulation methods are applied properly, this randomness will not affect the substantive conclusions one draws from the simulation analysis. That is, while running the same code twice might produce different simulated output, the conclusions one makes about, for example, whether an enacted plan is an outlier or not, should not change. This is exactly what we showed mathematically in the article you reference.

To your point, for that article, we included the code and the underlying shapefiles for our Pennsylvania and Florida analyses in the replication package that is published alongside the article, but we did not include the actual simulated plans for either analysis. That is because our code and the shapefile data suffice to recreate the analysis and the conclusions we drew.

To sum up: when simulation methods are applied properly, accessing the raw simulation output is not required in order to evaluate the methodology or conclusions of a simulation analysis, or to re-create the analysis and examine other aspects of the simulated plans.

Sincerely,
Cory


**Cory McCartan**
Hoben and Patricia Thomas and Thomas and Ann Hettmansperger Early Career Professor in Statistics
Assistant Professor, Department of Statistics
Faculty affiliate, Department of Political Science
Pennsylvania State University
corymccartan.com

Ex. 4.

Dr. Barreto produced all of his input data. That is what Rule 26 requires.

## II.    Dr. Trende can reproduce Dr. Barreto's analysis with or without a seed.

Dr. Trende can reproduce Dr. Barreto's analysis with or without a "seed." To place this issue—the second of two that Defendants raise—into perspective, it is important to go back to Mr.

Kercher's September 6 email where it was initially raised: "Finally, it would be ideal if Dr. Barreto would produce the saved simulations upon which he relied. Because he did not appear to set a seed, any replication that we manage will likely produce slightly different maps that those with Dr. Barreto produces." Def. Ex. C, ECF No. 1169-3. This is not a basis to strike Dr. Barreto's reports.

First, Mr. Kercher's own email acknowledges that this is not a Rule 26 disclosure issue. A request that begins with "it would be ideal" is not one that asserts that a disclosure rule has been broken. Instead, it reflects an attempt to shortcut Dr. Trende's task of reproducing Dr. Barreto's analysis. Rule 26 does not impose that burden on a party proffering expert analysis. An expert report cannot be stricken for not satisfying an opposing litigant's "ideal" scenario request. It would be *ideal* if Texas had not dismantled congressional districts on account of their racial composition. Yet here we are.

Second, Defendants did not produce any of the individual maps upon which Dr. Trende's simulations in this case were based. In fact, Dr. Trende testified at trial that he did not recall viewing or producing the maps. *See* 6/9/25 PM Rough Tr. at 14-15. Dr. Trende's approach in this regard is not limited to this case. In New York's redistricting litigation, in which Dr. Trende testified on behalf of plaintiffs challenging the map, the court observed that "it was undisputed that Trende did not review, and did not submit for review, the simulated maps, and instead based his analysis on the aggregate data generated from those maps." *Harkenrider v. Hochul*, 204 A.D.3d 1366, 1373 (N.Y. App. Div. 2022). The court found no flaw, concluding that "none of respondents' evidence contradicted the overwhelmingly consistent pattern Trende's model produced." *Id.* Undoubtedly Dr. Trende has followed the same approach Defendants now criticize Dr. Barreto of because taking the additional step of isolating each of hundreds of thousands of map files involves

running a different set of code in addition to the "redist" package and involves using literal terrabytes of storage space to house the electronic map files for over 300,000 distinct maps. Defendants cannot seek to strike an opposing expert's report for following the same approach and production their own expert did and has successfully done in prior cases.

Third, Mr. Kercher's email confirms that Dr. Trende *can* reproduce the analysis and that doing so using the random approach of Dr. Barreto will "likely produce *slightly different maps*." *Id.* (emphasis added). As Plaintiffs explained in response to Mr. Kercher's email, then entire point of this analysis is for it to be a random simulation of a large number of possibilities—here hundreds of thousands. The randomness is a feature of the analysis, not a flaw. As Dr. McCartan, co-author of the seminal article on the topic and co-developer of the "redist" program explained, "[s]imulation algorithms are inherently random, and they leverage this randomness to provide insights into what kind of districting plans are typical under certain constraints." Ex. 4.

All Dr. Trende needs to do is run Dr. Barreto's code and see if he obtains a meaningful difference in the result. Defendants acknowledge that is unlikely, stating that if he does so, Dr. Trende's "maps will have roughly the same properties overall, but the individual maps will be different." Mot. at 8. In fact, Dr. Trende has undoubtedly already done this in advance of Defendants filing their motion to strike. And undoubtedly the result of that analysis is why Defendants chose to seek to strike Dr. Barreto's report, because the result confirms what Dr. Barreto reported and is incredibly harmful to their case.

In an analysis where randomness is one of the key properties that builds confidence in the results, the fact that two experts reach "slightly different" individual maps with "the same properties overall" is not a basis for exclusion on *Daubert* grounds.

Fourth, Defendants' objection that Dr. Barreto did not set a "seed" as part of the analysis goes to a fundamental disagreement between he and Dr. Trende on the methodology of the analysis. As Plaintiffs explained in their response email highlighted above, setting a "seed" from which the program will start drawing the simulated maps eliminates the random aspect of the analysis—in essence forcing the program to make the same mapping choices over and over and over, each time the analysis is run. While this would allow Dr. Trende to replicate the exact same maps down to the census block level, it would entirely eliminate the randomness of the analysis— the very *purpose* of conducting the analysis. A review of the code Dr. Trende produced for each of his simulated map runs in his earlier report in this case reveals that he reuses the same "seed" code each time: 8675309. While deploying an 80s song to launch each simulated set of maps is humorous, it is methodologically flawed where the goal is to find out what happens in a large set of random draws.

## III.    Alternatively, Dr. Barreto can rerun his analysis using "8675309."

If the Court concludes that Dr. Barreto and Dr. Trende should draw conclusions from precisely the same 300,000+ maps—despite randomness being the fundamental purpose of the analysis—then the proper course is not to strike Dr. Barreto's report, but rather simply to have Dr. Barreto re-run his analysis using the same "seed" with which Dr. Trende is familiar—"8675309." If Defendants are concerned about time, nothing is stopping Dr. Trende from running Dr. Barreto's code using "8675309" now. All it requires is adding that "seed" as a line of code and running the program in the background as he goes about his day's work.

## CONCLUSION

For the foregoing reasons, the motion should be denied. At most, the Court could order the parties' experts to both run the simulations again using Dr. Trende's preferred "seed" of "8675309."

September 19, 2025                                    Respectfully submitted,

<div style="margin-left: 50%;">

*/s/ Chad W. Dunn*
Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
1900 Pearl Street
Austin, TX 78705
(512) 717-9822
chad@brazilanddunn.com

*/s/ Mark P. Gaber*
Mark P. Gaber*
Mark P. Gaber PLLC
P.O. Box 34481
Washington, DC 20043
(715) 482-4066
mark@markgaber.com

Jesse Gaines* (Tex. Bar. No. 07570800)
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com

Molly E. Danahy*
P.O. Box 51
Helena, MT 59624
(406) 616-3058
danahy.molly@gmail.com

Sonni Waknin*
10300 Venice Blvd. # 204
Culver City, CA 90232
732-610-1283
sonniwaknin@gmail.com

*Admitted *pro hac vice*

*Counsel for Brooks Plaintiffs*

</div>

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record on September 19, 2025 via the Court's CM/ECF system.

*/s/ Chad W. Dunn*