# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREG ABBOTT, et al., <br><br> Defendants. | Civil Action <br><br><br> Lead Case No.: <br> 3:21-CV-00259-DCG-JES-JVB |
| CECILIA GONZALES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JANE NELSON, in her official capacity as Texas Secretary of State, and GREGORY WAYNE ABBOTT, in his official capacity as the Governor of Texas, <br><br> Defendants. | Consolidated Case No.: <br> 1:21-CV-00965-DCG-JES-JVB |

**RESPONSE IN OPPOSITION TO MOTION TO DISMISS COUNT IV OF GONZALES PLAINTIFFS' SECOND SUPPLEMENTAL COMPLAINT**

Plaintiffs in Case No. 1:21-cv-00965 (the "Gonzales Plaintiffs") file this response in opposition to Defendants' Motion to Dismiss Count IV of the Gonzales Plaintiffs' Second Supplemental Complaint, ECF No. 1162 ("Mot.").

## INTRODUCTION

Defendants' Motion addresses only one count of the Gonzales Plaintiffs' Second Supplemental Complaint ("SSC")—their malapportionment claim in Count IV. The problem raised by that count is simple. The new congressional districts enacted by House Bill 4 ("HB 4") have equal populations based on the 2020 census, but it is now 2025, and Texas's population has shifted considerably. Texas's population has grown by nearly five percent since the 2020 census, and the growth was very uneven: by 2023, eight Texas counties saw their populations increase by between 15.1 percent and 23.6 percent since the 2020 census, while more than one-third of Texas counties experienced a decline in population. But the Texas Legislature made no effort to ensure that the congressional districts in HB 4 reflect that uneven post-census growth. As a result, HB 4 places millions of Texans—including Plaintiffs Gonzales and Collins—in overpopulated districts where their vote is diluted relative to other Texans' without sufficient justification.

"The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Perez v. Abbott*, 250 F. Supp. 3d 123, 185 (W.D. Tex. 2017) (quoting *Gray v. Sanders*, 372 U.S. 368, 381 (1963)). Accordingly, the Supreme Court has interpreted Article I, § 2 of the U.S. Constitution to require that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964). States must "draw congressional districts with populations as close to perfect equality as possible." *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016). And while the Court has held that this standard does not necessarily require "precise mathematical equality," the State must

"justify population differences between districts that could have been avoided by a 'good-faith effort to achieve absolute equality.'" *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 759 (2012) (quoting *Karcher v. Daggett*, 462 U.S. 725, 730 (2012)).

Here, Texas made no effort, good-faith or otherwise, to achieve numerical equality among congressional districts in HB 4. And Texas does not argue that it had some "legitimate state objective" that justifies the population deviation, let alone one that is "consistent with constitutional norms." *Id.* at 760 (quoting *Karcher*, 462 U.S. at 740). Instead, Texas relies entirely on the "legal fiction" that treats a plan with equal population based on the decennial census as properly apportioned until the next census is released. Mot. 4. But that legal fiction exists to *avoid* "constant redistricting," not to sanction it. *LULAC v. Perry*, 548 U.S. 399, 421 (2006) (plurality op.). And the Supreme Court has never applied it to a legislature's voluntary decision to replace its *own* previously enacted districts. To do so would turn the purpose of the legal fiction on its head—authorizing, rather than preventing, constant redistricting. By rejecting the legal fiction's application to these very different circumstances, the Court can bring the storm of unnecessary redistricting currently sweeping the nation to an appropriate—and uniform—end.

## BACKGROUND

The factual basis for the Gonzales Plaintiffs' Count IV is straightforward and undisputed. Texas fulfilled its decennial obligation to redraw its congressional districts in October 2021 when it reapportioned Texas's congressional districts after the 2020 census. SSC ¶¶ 78–83. There has been no new census since that time. But Texas has continued to experience fast but uneven population growth in the years since, so that some counties have grown substantially while others have declined in population. SSC ¶¶ 75–76. As of 2023, eight counties saw their populations increase between 15.1 percent and 23.6 percent since the 2020 census, while more than one-third of Texas counties experienced a decline in population in that same time. SSC ¶ 76.

In 2025, soon after completing a weeks-long trial on the validity of its 2021 congressional map, Texas voluntarily chose to enact new congressional districts by passing HB 4. SSC ¶ 1. The legislature drew the new districts based on 2020 census data, making no effort to equalize their populations in light of uneven post-census population growth. SSC ¶ 254. Because it is based on five-year-old census data, HB 4 places many Texans in overpopulated congressional districts where their votes are diluted relative to Texans in other, underpopulated congressional districts. The injured voters include Plaintiff Cecilia Gonzales, who lives in new CD 25, which is overpopulated by more than 12,000 residents, SSC ¶ 259, and Plaintiff Gwendolyn Collins, who lives in new CD 22, which is overpopulated by more than 25,000 residents, SSC ¶ 260.[1]

## ARGUMENT

**I.     Congressional districts must be equally apportioned, and HB 4's districts are not.**

States are required to "draw congressional districts with populations as close to perfect equality as possible," *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016), an obligation demanding "a good-faith effort to achieve precise mathematical equality." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969) (citing *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)). The Supreme Court has set forth a two-prong test to determine whether a State's congressional redistricting plan meets this standard. "First, the parties challenging the plan bear the burden of proving the existence of population difference that 'could practically be avoided.' If they do so, the burden shifts to the State to 'show with some specificity' that the population differences 'were necessary to achieve some legitimate state objective.'" *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 760 (2012) (quoting *Karcher v. Daggett*, 462 U.S. 725, 734 (1983)).

---

[1] The 125,000 figure alleged in the SSC is the result of a typographical error. *See* ECF No. 1149 at 21 (Gonzales Plaintiffs' preliminary injunction motion noting the correct overpopulation number as 25,000).

The application of this test here is straightforward—and HB 4 fails it at every level. First, the "existence of population difference[s]" in HB 4 is beyond dispute. *Id.* The legislature was well-aware that Texas's population had grown substantially and unevenly since the 2020 census. Chairman Todd Hunter acknowledged in hearings that legislators had access to and considered "population changes" and "voter trends." SSC ¶ 114. And the Texas Demographic Center made available data showing how uneven Texas's growth since 2020 had been.[2] But the legislature nevertheless reshuffled voters based on five-year-old census data, ensuring that the districts had vastly unequal populations at the time of enactment. SSC ¶ 254.

There also is no dispute that these population differences "could practicably be avoided." *Karcher*, 462 U.S. at 734. For one, Texas could have "avoided" drawing a new map altogether. It was certainly under no obligation to do so, as Texas seems to concede, Mot. 4. Alternatively, perhaps Texas could have sought to equalize district populations based on more recent population data that reflected post-census growth. But Texas indisputably made no effort to do so. By choosing to enact districts with unequal populations five years after the last decennial census, the legislature diluted the votes of Plaintiffs Cecilia Gonzales and Gwendolyn Collins, and millions of other Texas voters, "merely because of where they reside[]." *Reynolds*, 377 U.S. at 557. "Their right to vote is simply not the same right to vote as that of those living in a favored part of the State." *Id.* at 563.

Texas does not argue that these avoidable population differences "were necessary to achieve some legitimate state objective." *Tennant*, 567 U.S. at 760 (quoting *Karcher*, 462 U.S. at 741). Indeed, Texas points to no state objective at all that is satisfied by the population differences

---

[2] *See* Texas Demographic Center, *Percent Population Change for Texas Counties, 2020-2023*, https://www.demographics.texas.gov/Visualizations/2024/Estimates2024/ (last visited Sept. 22, 2025).

between districts in HB 4. All Texas contends is that it is constitutionally "entitled" to redraw districts in the middle of the decade. Mot. 5–7. But that is beside the point. The question is not whether Texas has constitutional authority to draw new districts mid-decade but whether it can do so without complying with the ordinary requirements applicable whenever congressional districts are drawn, including the need to draw districts with populations that are "as close to perfect equality as possible." *Evenwel*, 578 U.S. at 59. Where the legal standard requires Texas to offer "with some specificity," *Karcher*, 462 U.S. 741, a sufficient justification for its decision to deviate from population equality, it is flatly insufficient for Texas to point to its purported authority to draw maps in general.[3]

Defendants' contention that the 2021 districts were, by 2025, similarly malapportioned, also cannot satisfy their burden to justify the new malapportioned districts. *See* Mot. 8. When the 2021 districts were drawn shortly after a decennial census, the "perfect equality" requirement was met by using decennial census data—the "best population data available" at that time. *Karcher*, 462 U.S. at 738 (quoting *Kirkpatrick*, 394 U.S. at 528). But the decennial census data "only provides a snapshot of a dynamic demographic process." *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, No. 1:10CV564 LG-RHW, 2013 WL 4483376, at *4 (S.D. Miss. Aug. 20, 2013). It "rapidly becomes outdated as people are born, die, and move." *Id.*; *see also Raiford v. Dillon*, 297 F. Supp. 1307, 1310 (S.D. Miss. 1969) ("[C]ensus records, while comprehensive, quickly become outdated."), *vacated*, 430 F.2d 949 (5th Cir. 1970). Accordingly, the circumstances that justified

---

[3] Any such justification would need to specifically justify population deviation, not just a new map. A purported desire for partisan advantage, for instance, does not justify population deviation. *See Larios v. Cox*, 300 F. Supp. 2d 1320, 1353 (N.D. Ga.), *aff'd*, 542 U.S. 947 (2004). And, as the Gonzales Plaintiffs' Count V—not at issue in this motion—separately alleges, the use of racial data and any pursuit of partisan advantage as part of a mid-decade redistricting is constitutionally impermissible in any event.

population deviation for districts drawn in 2021, immediately after census results were certified, cannot justify the population deviation for new districts drawn in 2025.

In sum, where a legislature chooses to voluntarily replace the districts it previously enacted, it must do so within the well-established constitutional constraints for ensuring that district populations are "as close to perfect equality as possible." *Evenwel*, 578 U.S. at 59. Texas failed this standard by continuing to use the 2020 decennial census data five years after that census was taken without any justification for doing so.

**II.     No "legal fiction" is available to validate HB 4's malapportioned districts.**

Rather than attempt to argue that HB 4's districts are in *fact* properly apportioned, or that some legitimate state objective required malapportionment, Texas relies entirely on a legal *fiction*: the general rule that a legislative plan drawn based on the decennial census remains "constitutionally apportioned throughout the decade." *LULAC v. Perry*, 548 U.S. 399, 421 (2006) (plurality op.); Mot. 5. The purpose of this legal fiction is "to *avoid* [the] constant redistricting" that would be necessary if districts had to be redrawn to equalize population before every election. *LULAC*, 548 U.S. at 421 (emphasis added). Thus, once a properly apportioned plan has been adopted, "States operate under the legal fiction that even 10 years later, the plans are constitutionally apportioned." *Georgia v. Ashcroft*, 539 U.S. 461, 488 n.2 (2003). It is only when a new census is released that "States must [again] redistrict to account for any changes or shifts in population." *Id.*

The plurality opinion in *LULAC* extended this legal fiction to also allow a state legislature that was unable draw a lawful plan after the decennial census to later adopt such a plan using census population data to replace a court-drawn remedial plan. 548 U.S. at 421–22. This situation arose in *LULAC* because after the 2000 census, Texas's Legislature had deadlocked and failed to pass any congressional plan at all, creating the "necessity of a court-ordered plan to comply with

7

the Constitution's one-person one-vote requirement." *Id.* at 411. The use of such a plan, the Court explained, was disfavored: "the legislative branch plays the primary role in congressional redistricting," and "'[l]egislative bodies should not leave their reapportionment tasks to the federal courts.'" *Id.* at 415 (quoting *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978)). The Court therefore upheld the legislature's 2003 decision to replace that "court-drawn plan with one of its own design," even though doing so meant upholding a plan drawn based on census data that was, by then, several years old. *Id.* at 416, 420–23. After all, "a lawful, legislatively enacted plan should be preferable to one drawn by the courts." *Id.* at 416. The interest in adopting a legislatively enacted plan, the Court thought, justified the resulting population deviations. *See id.* at 421–22.

This case presents a fundamentally different situation, because here Texas already had a legislatively enacted plan—the plan it enacted in 2021. This is not a "hair-splitting distinction." Mot. 8. It is instead a vindication of the principle—frequently repeated in Defendants' Motion, and central to *LULAC*, 548 U.S. at 415–16, 421–22—that state legislatures, rather than courts, bear primary responsibility for redistricting. Contrary to Texas's argument, *LULAC*—a plurality opinion to begin with—simply does not address whether a legislature that voluntarily chooses to redraw its own previously enacted congressional plan mid-decade can justify the resulting population deviations in the same way that a legislature replacing a court-drawn plan can.

To further extend the legal fiction of continuing population equality to also cover voluntary revisions to legislatively enacted plans would turn its purpose on its head. The legal fiction exists only "to *avoid* constant redistricting, with accompanying costs and instability." *Id.* at 42l (emphasis added). Like any legal fiction, it exists to further "the administration of the law" where "required by the demands of convenience and justice." *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 92 (1934). It should not be "woodenly appl[ied]" where doing so would "serve none of the

purposes and goals" that justify it. *Cruz v. Chesapeake Shipping, Inc.*, 932 F.2d 218, 227–28 (3d Cir. 1991). Yet that is just what Texas seeks here—to convert a legal fiction crafted to avoid constant redistricting into a permission slip to do just that, without requiring any effort to equalize district population based on post-census population changes.

**III.    Texas's remaining arguments are irrelevant.**

Texas's remaining arguments can be easily rejected. First, Texas accuses the Gonzales Plaintiffs of seeking to "strip the Texas Legislature of its constitutional authority to revise its districts." Mot. 9. That argument is merely a rejection of the one-person one-vote principle: Justice Harlan's dissent in *Wesberry v. Sanders* similarly characterized application of the one-person one-vote principle to congressional maps as "derogatory" to "the power of the state legislatures." 376 U.S. 1, 30 (1964) (Harlan, J., dissenting). It is now settled law that, while state legislatures bear primary responsibility for redistricting, they must do so within constitutional constraints, including one-person one-vote. Texas's repeated appeals to the legislature's "constitutional authority" over redistricting do nothing to explain why the legislature should be entitled to draw districts that it knows are not in fact equally apportioned.[4]

Texas's appeal to history is also unpersuasive. The smattering of mid-decade redistricting examples from the 1800s that it cites, Mot. 9–10, predate by decades the Supreme Court's recognition of the one-person one-vote principle on which Count IV is based. Instead, they date from an era when federal courts "resisted any role in overseeing the process by which States draw legislative districts," leading to "pervasive malapportionment" and "many rural districts" being

---

[4] In any event, the Gonzales Plaintiffs do not ask the Court to draw a new map to remedy the violation alleged in Count IV. The Texas Legislature already passed a presumptively apportioned map in 2021. Should the Gonzales Plaintiffs prevail only on Count IV, the proper remedy would be to order Texas to continue to use the 2021 legislatively enacted map. *See* ECF No. 1149 at 26.

left "significantly underpopulated in comparison with urban and suburban districts." *Evenwel*, 578 U.S. at 58. These nineteenth century examples, then, *reflect* unconstitutional malapportionment—they do not excuse it. That mid-decade redistricting was more common in that era only confirms that it raises serious malapportionment problems under current doctrine.

As for Texas's examples of mid-decade redistricting from the 2000s, Mot. 10, Texas—as already discussed—involved replacing a court-drawn plan. *LULAC*, 548 U.S. at 421–22. Colorado's mid-decade redistricting was held unconstitutional by the Colorado Supreme Court under the Colorado Constitution, mooting any federal one-person one-vote question. *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1235–43 (Colo. 2003) (en banc). And while the Georgia Supreme Court upheld Georgia's 2005 redraw, the challengers to that plan do not appear to have raised this issue. *See generally Blum v. Schrader*, 637 S.E.2d 396 (Ga. 2006).

Finally, Texas points to the cascade of other states, red and blue alike, that have begun to consider mid-decade redistrictings of their own now that Texas has redrawn its plan. Mot. 9. If anything, the redistricting arms race sweeping the nation only confirms that applying the legal fiction of continuing equal population to voluntary mid-decade redistricting perversely encourages the very "costs and instability" of continuous redistricting that the legal fiction was supposed to avoid. *LULAC*, 548 U.S. at 421. But regardless, the Gonzales Plaintiffs agree—what's sauce for the goose is sauce for the gander. If the Gonzales Plaintiffs are correct that voluntary mid-decade revisions to legislatively enacted congressional districts based on outdated census data are unconstitutional, and if the Supreme Court concludes as much, that conclusion should—and presumably will—apply nationwide. Such a conclusion would hopefully put a stop—everywhere—to the wildfire of unnecessary redistricting that was sparked in Texas and is now spreading nationwide.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss Count IV of the Gonzales Plaintiffs' Second Supplemental Complaint.

Dated: September 22, 2025

                                                                   Respectfully submitted,

Renea Hicks  
Attorney at Law  
Texas Bar No. 09580400  
Law Office of Max Renea Hicks  
P.O. Box 303187  
Austin, Texas 78703-0504  
(512) 480-8231  
rhicks@renea-hicks.com  

                                                                   */s/ David R. Fox*  
                                                                   David R. Fox  
                                                                   Richard A. Medina  
                                                                   James J. Pinchak  
                                                                   **ELIAS LAW GROUP LLP**  
                                                                   250 Massachusetts Avenue NW, Suite 400  
                                                                   Washington, D.C. 20001  
                                                                   Telephone: (202) 968-4490  
                                                                   dfox@elias.law  
                                                                   rmedina@elias.law  
                                                                   jpinchak@elias.law  

                                                                   Abha Khanna  
                                                                   **ELIAS LAW GROUP LLP**  
                                                                   1700 Seventh Ave, Suite 2100  
                                                                   Seattle, WA 98101  
                                                                   Telephone: (206) 656-0177  
                                                                   akhanna@elias.law  

                                                                   *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on September 22, 2025, and that all counsel of record were served by CM/ECF.

<em>/s/ David R. Fox</em>