# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

LEAGUE OF UNITED LATIN AMERICAN
CITIZENS, *et al.*,

        *Plaintiffs,*

v.

GREG ABBOTT, *et al.*,

        *Defendants.*

Case No. 3:21-cv-00259
[Lead Case]

---

## STATE DEFENDANTS' RESPONSE TO
## PLAINTIFF-INTERVENORS AND TEXAS NAACP'S PRELIMINARY INJUNCTION

---

## TABLE OF CONTENTS

Table of Authorities ......................................................................................................... iii

I.   Introduction .............................................................................................................. 1

II.  Standards ................................................................................................................... 5

    A.  Preliminary Injunction......................................................................................... 5

    B.  Presumption of Good Faith ................................................................................. 6

    C.  Racial Gerrymandering/*Arlington Heights* ........................................................ 6

III. Argument and Authorities........................................................................................ 7

    A.  C2333 Does Not Violate Section 2 of the VRA (Intervenor Claim) ................... 7

        1.  Intervenors Lack Article III and Statutory Standing ..................................... 7

        2.  Intervenors' Section 2 Claim Fails on the Merits ......................................... 9

        a.  Intervenors are Unlikely to Satisfy the First *Gingles* Precondition ............ 10

        b.  Intervenors are also Unlikely to Satisfy the Second and Third *Gingles* Preconditions .............................................................................................11

        c.  Intervenors have Failed to Carry their Burden under the Totality of the Circumstance .............................................................................................11

    B.  Plaintiffs' Claimed Evidence is Insufficient ...................................................... 12

        1.  Plaintiffs Misunderstand *Petteway*........................................................... 12

        2.  Plaintiffs Cannot Meet Their Burden ......................................................... 15

        3.  Plaintiffs' Expert Analysis Is Insufficient .................................................. 16

    C.  The *Arlington Heights* Factors Favor Texas........................................................ 17

        1.  Alleged Discriminatory Effect .................................................................... 17

        2.  Historical Context ...................................................................................... 17

        3.  Sequence of Events Leading Up to 2025 Map ........................................... 18

        4.  Substantive and Procedural Departures....................................................... 19

        5.  Contemporaneous Statements from the Decisionmakers ........................... 20

Conclusion .................................................................................................................... 20

Certificate of Service ..................................................................................................... 21

## TABLE OF AUTHORITIES

Page

**Cases**

*Arlington Heights v. Metropolitan Housing Dev. Corp.,*
    429 U.S. 252 (1977) ................................................................. 17

*Abbott v. Perez,*
    585 U.S. 579 (2018) ..................................................... 6, 10, 11

*Alexander v. S.C. State Conf. of the NAACP,*
    602 U.S. 1 (2024) ................................................... 6, 15, 16, 19

*Allen v. Milligan,*
    599 U.S. 1 (2023) .............................................................. passim

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment,*
    86 F.4th 1204 (8th Cir. 2023) ..................................................... 8

*Benisek v. Lamone,*
    585 U.S. 155 (2018) ...................................................................... 5

*Bethune-Hill v. Virginia State Bd. of Elections,*
    580 U.S. 178 (2017) ....................................................... 6, 15, 16

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.,*
    588 F.3d 250 (5th Cir. 2009) ..................................................... 5

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) ...................................................................... 6

*Carney v. Adams,*
    592 U.S. 53 (2020) ........................................................................ 8

*City of Baker Sch. Bd. v. City of Baker,*
    2007 WL 9702694 (M.D. La. Jan. 12, 2007) ............................ 9

*Coleman v. Bank of New York Mellon,*
    No. 3:12-CV-04783-M-BH, 2013 WL 1187158 (N.D. Tex. Mar. 4, 2013) ............................ 12

*Conway Sch. Dist. v. Wilhoit,*
    854 F. Supp. 1430 (E.D. Ark. 1994) ........................................ 8

*Cooper v. Harris,*
    581 U.S. 285 (2017) ............................................................ 11, 15

*Fusilier v. Landry,*
    963 F.3d 447 (5th Cir. 2020) ..................................................... 7

*Gill v. Whitford,*
    585 U.S. 48 (2018) ................................................................................................. 8, 9

*Growe v. Emison,*
    507 U.S. 25 (1993) ............................................................................................... 10, 11

*Harding v. Cty. of Dallas,*
    948 F.3d 302 (5th Cir. 2020) ......................................................................... 6, 8, 17

*Johnson v. De Grandy,*
    512 U.S. 997 (1994) .................................................................................................. 10

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.,*
    328 F.3d 192 (5th Cir. 2003) ................................................................................... 5

*League of United Latin Am. Citizens v. Perry,*
    548 U.S. 399 (2006) ................................................................................... 10, 19, 20

*Magnolia Bar Ass'n, Inc. v. Lee,*
    994 F.2d 1143 (5th Cir. 1993) ............................................................................... 10

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .................................................................................................. 12

*McCleskey v. Kemp,*
    481 U.S. 279 n.20 (1987) ......................................................................................... 18

*Miller v. Johnson,*
    515 U.S. 900 (1995) ............................................................................................ 6, 15

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ................................................................................................ 7, 8

*Oh v. Philadelphia Cnty. Bd. of Elections,*
    2008 WL 4787583 (E.D. Pa. Oct. 31, 2008) ......................................................... 8

*Perez v. Abbott,*
    253 F. Supp. 3d 864 (W.D. Tex. 2017) ............................................................... 12

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ................................................................................................... 6

*Petteway v. Galveston County,*
    111 F.4th 596 (5th Cir. 2024) ..................................................................... 9, 10, 14

*Roberts v. Wamser,*
    883 F.2d 617 (8th Cir. 1989) .................................................................................... 8

*Robinson v. Ardoin,*
    86 F.4th 574 (5th Cir. 2023) .................................................................................... 8

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) ................................................................................................. 17

*Salas v. Sw. Texas Jr. Coll. Dist.,*
    964 F.2d 1542 (5th Cir. 1992) ...................................................................................... 11

*Shaw v. Reno,*
    515 U.S. 630 (1993) ....................................................................................................... 6

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) ....................................................................................................... 5

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ................................................................................................ 10, 11

*Town of Chester, N.Y. v. Laroe Ests., Inc.,*
    581 U.S. 433 (2017) ....................................................................................................... 7

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ....................................................................................................... 7

*Turtle Mountain Band of Chippewa Indians v. Howe,*
    137 F.4th 710 (8th Cir. 2025) ........................................................................................ 8

*Vaughan v. Lewisville Indep. Sch. Dist.,*
    475 F. Supp. 3d 589 (E.D. Tex. 2020) ........................................................................... 9

*White-Battle v. Democratic Party of Va.,*
    323 F. Supp. 2d 696 (E.D. Va. 2004) ............................................................................. 8

# I.    INTRODUCTION

The Plaintiffs in the present case—as Democrats—have expressly admitted their strategy to allege racism, regardless of the underlying facts:

> The VRA is being chipped away, and the only thing left for us now is Section 2. And we're not going to win under Section2 unless we show that this act by the State of Texas if it does it . . . **but if we don't say that this is racial, if we don't indicate that, we're not going to get to Section 2 and we can't win.**

Rep. Al Green, Ex. B at 36–37.

Just weeks ago at trial, Dr. Sean Trende capably explained the virtues of Texas's 2021 congressional map, which maximized Republican strongholds rather than Republican opportunity. But with a slim Republican House majority at risk in the 2026 midterms, President Trump publicly called on Texas to draw a map that maximized Republican opportunity. The Texas Legislature passed a 2025 congressional map on precisely partisan lines.

Plaintiffs' expert, Dr. Moon Duchin, argued Texas's failure to maximize partisan opportunity in 2021 was evidence of racial discrimination—after all, she argued, why would a map that was partisan rather than racial leave partisan opportunity on the table? The Court will perhaps be unsurprised to learn that although the 2025 Map addresses Dr. Duchin's concern, she nevertheless concludes the new map must be racist, too.

Plaintiffs' facility with racial accusations, regardless of the merits, is perhaps best demonstrated by the diametrically opposed attacks on the 2025 Map (and its Republican supporters) lodged by Senate Democrats. Senator Miles, of the 2025 redistricting committee, stated on the Senate floor that Senator King *must have looked at racial data* when drawing map (it was "impossible" to have drawn maps race blind), which made the Texas Republicans clearly discriminatory. Senator Miles, Ex. A at 31. Senator Eckhardt, on the other hand, stated just as clearly that the Texas Republicans *failed to look at racial data*, which made the Texas Republicans clearly discriminatory. Ex. AL at 66–67.

Plaintiffs and Texas Democrats utilized the same tactic throughout the 2021 process, as well. For example, in the previous decade's redistricting, Democrats seized on a statement made

by a representative (the Opiela "nudge factor" e-mail) to taint every vote of every Republican as evidence of a racial intent. In 2021, there simply was no such statement, yet Plaintiffs' expert Dr. Kousser opined the lack of overt racial statements in the record was even *stronger* evidence of racism in 2021. Tr. 5/27/2025 PM 132:15–134:19.[1]

Plaintiffs and their Democratic allies came into the 2021 redistricting process ready to allege discrimination from the starting gun. Senator Powell hired a redistricting attorney to represent her in January of 2021, before census data was even expected, and then attempted to introduce race into the 2021 map-drawing process by presenting racially-shaded maps to Senator Huffman when she knew litigation was possible. Powell Depo., pp. 94:13–95:5, 95:23–96:6. Rep. Anchía took it one step further: he retained a redistricting attorney before any maps were drawn, as well, but then had that attorney assist in drawing up MALC's demonstrative maps. Tr. 6/05/2025 AM 28:7–16, 66:11–67:19. MALC drew these maps primarily using race, which precluded their lawful adoption. *Id*. Knowing Texas could not lawfully adopt MALC's racial maps, Anchía then forced a vote on them as amendments to the 2021 map. *Id*. Once his amendments failed—as he knew they had to— Anchía then presented the failure of his amendments as evidence of discrimination. *Id*.

The complete reversals of the Plaintiffs' positions between this year's trial and the upcoming hearing demonstrates Plaintiffs' rigged game. At trial, Dr. Matt Barreto testified that it was completely impossible to separate racial data from partisan data, so closely are they intertwined. Tr. 5/30/25 AM 163:13-23. Two months later in his new reports, however—and now realizing that the failure to disaggregate race from partisanship fails to meet Plaintiffs' burden— Barreto claims to have discovered the key to disaggregation: a method he has never used before and about which he refused to supply meaningful information. He once again manages to find racial discrimination.

---

[1] All Plaintiffs take this approach: heads, we win; tails, you lose. Intervenors, for example, had also previously argued that there was a "mountain" of evidence that maps were not drawn blind to race (ECF 1111 at 3), but that if they had indeed been drawn blind to race, that itself was an admission of guilt by the state (*Id*.).

Tellingly, Texas Democrats initially criticized the 2025 redistricting effort as a partisan power grab.[2] After breaking quorum and meeting with prominent party leaders, Democrats abruptly shifted to allegations of racial discrimination. *See* Ex. P; *see generally* Ex. Q.; Ex. AJ (as of August 3, Eric Holder—chair of the National Democratic Redistricting Committee—made no racial allegations but argued political power). Of course, some legislators were ahead of the curve, with Rep. Joe Rosenthal, for example, decrying the new 2025 Map as racially motivated before there was even a map to criticize. *See* Rep. Joe Rosenthal, Ex. C at 14.

The political pressure placed on the Texas Republicans was universally understood. Prior to the Department of Justice (DOJ) letter relied on by the Plaintiffs, President Trump had already publicly demanded in June that the Texas Legislature draw a new Congressional map that would produce 4-5 more Republicans in Congress. *See*, e.g., Ex. AC. Moreover, everyone recognized why the President had made the demand: maintaining Republican control of the House for the second half of his presidential term. Ex. S; Ex. T; Ex. AC. With 2026 elections coming, President Trump's legislative agenda relied on a slim and endangered majority; any loss of Republican Representatives in the House could prevent any movement forward on his policies—and almost certainly result in a slew of resource-draining impeachment attempts. Ex. AB – ABC News Report. And Democratic states had already been gerrymandered for years to provide a partisan advantage to the Democrats in Congress.

---

[2] *E.g.*, H.J. of Tex. 89th Lege., 2nd C.S. at 66 (Aug. 20, 2025) (Rep. C. Morales citing political gain as motive); H.J. of Tex. 89th Lege., 2nd C.S. at 78 (Aug. 20, 2025), (Rep. Ramos Rodriguez stating Rep. Hunter "admitted openly" that the new map was about a "Republican performance increase"); S. J. of Tex. 89th Lege., 2nd C.S. at 64 (Aug. 22, 2025) ( Sen. Royce West: "Let's call this redistricting what it is: a naked, partisan, political power grab."); Ex. AG at 72–73 (Rep. Sylvia Garcia: "Remember that you are here because Donald Trump wants to remain in power. . . .That Big Ugly bill passed by just one vote and that was his signature agenda. So he knows he has got to find seats somewhere to offset their losses.").

Coming out of the 2024 election, for example, California Democrats held 83% of their delegation's seats despite receiving only 61% of the statewide vote. Ex. D, Eric McGhee.[3] Illinois Democrats have similarly gerrymandered for years, holding 82% of the congressional seats (14 of 17), but with only 56% of the statewide vote. Ex. F, Govtrack.us.; Ex. G Politico Election Results. Similar gerrymandered districts also existed in New York and Maryland. Ex. H (Independent Voter News, "The 10 Worst Gerrymandered States in the Country").

In response to President Trump's demand to Texas in June, Democratic states, including California, planned to retaliate by redistricting their maps to further increase their already outsized partisan advantage. Ex. I (Explainer (Harvard Univ.), "Understanding the mid-decade redistricting push in Texas")); Ex. J (Jessie Bedayn, pbs.org newshour); *see* Ex. N.

> In June, President Trump floated the idea of a mid-decade redistricting in Texas. The governor of Texas, Greg Abbott, has called a special session in Texas where they are redrawing the congressional district maps. The very plainly stated goal is to try to add five Republican congressional seats that will be won in the 2026 congressional election. The thinking is that the midterm election nationwide is going to be very competitive. For Republicans to hold onto a majority in the House of Representatives, every seat they can win will be valuable. And, so, adding five seats in Texas may prove to be the margin of victory to maintain a majority in the House.

Ex. I.[4] Dr. Schneer, the article's author, concludes that the true motivation for the Trump administration and the state of Texas to move forward with redistricting is "blatantly and unambiguously political." *Id.*

---

[3] Note that this Democrat-favored outcome was done with a supposedly independent commission. In reality, Democrats sent undisclosed party operatives to testify before the commission, calling themselves "community" representatives. Ex. E (ProPublica, "How Democrats Fooled California's Redistricting Commission").

[4] Dr. Benjamin Schneer, Assoc. Professor of Public Policy, at the Harvard Kennedy School. His research is in American politics and focuses primarily on political representation: how citizens express their preferences, how government responds to them, and what may shape and distort these processes. His background and experience are set out on Ex. K. (https://www.hks.harvard.edu/faculty/benjamin-schneer).

The initial political pressure to redistrict for increased partisan opportunity was intense, coming from a very public, presidential ask. When Democrat states began announcing efforts to cancel out Texas's attempt to gain five seats, regardless of whether Texas passed a new map, Texas Republican lawmakers were left with little political choice. *See* Ex. J;[5] *see also* Ex. V, Ex. Y, Ex. Z.

Recognizing this pressure, over 50 Democratic legislators fled the state to break quorum. Ex. U. Ironically, they fled to the Democratic states with some of the most gerrymandered districts in the country. *See* Ex. T, Ex. W. While breaking quorum, they met with Democrat party potentates to discuss how to delay, if not defeat, the new 2025 effort for redistricting. Ex. L; *see also* Ex. M; Ex. X.

Despite the delay caused by the Democratic quorum-breakers, Texas Governor Greg Abbott called a second special session wherein the Texas Legislature, on party lines, passed a new congressional map that raised the number of predicted Republican congressional districts from 25 to 30. Ex. R; Ex. AA.

## II. STANDARDS

### A. Preliminary Injunction

Preliminary injunctions are extraordinary equitable relief that are not awarded as of right. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024); *see also Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (applying this standard in a redistricting case). A court will grant a preliminary injunction if a plaintiff shows: (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest. *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 588 F.3d 250, 252–53 (5th Cir. 2009) (citing *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003)).

---

[5] This was especially true of Governor Newsom's announcement that California would move forward with its own redistricting to add five more Democratic seats. *See id.*

### B. Presumption of Good Faith

When bringing intentional discrimination claims against a legislature, it is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the Legislature acted with invidious intent." *Abbott v. Perez*, 585 U.S. 579, 605 (2018). Such intent is not mere being awareness of consequences; instead, it requires a legislature to have passed a law "because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Racial gerrymandering claims further require Plaintiffs to show race was "'the predominant factor motivating' the redistricting process and 'subordinat[ing] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests[.]'" *Harding v. Cty. of Dallas*, 948 F.3d 302, 313 (5th Cir. 2020) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). It is not sufficient to show a correlative relationship between party affiliation and race. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021). Rather, it is a plaintiff's burden to disentangle race and partisanship. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024). Plaintiffs have not done so here.

Plaintiffs cite circumstantial evidence that does not meet the heavy burden of proving intentional discrimination.

### C. Racial Gerrymandering/*Arlington Heights*

A claim of racial gerrymandering requires Plaintiffs to show "that race was the predominant factor motivating the legislature's [redistricting] decision[s]." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). "To satisfy this burden, the plaintiff must prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quotation omitted). Conversely, "[w]here . . . race-neutral considerations are the basis for redistricting legislation . . . a State can 'defeat a claim that a district has been gerrymandered on racial lines.'" *Miller*, 515 U.S. at 916 (quoting *Shaw*, 515 U.S., at 647).

6

NAACP uses the *Arlington Heights* framework for its claims. Under that precedent, five "non-exhaustive factors" guide courts in determining whether a particular decision was made with a discriminatory intent: (1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged action; (4) substantive and procedural departures from the normal-decision making process; and (5) contemporaneous viewpoints expressed by the decisionmakers. *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020). These are examined below.

## III. ARGUMENT AND AUTHORITIES

### A. C2333 Does Not Violate Section 2 of the VRA (Intervenor Claim)

Plaintiff-Intervenors ("Intervenors") stand alone among Plaintiffs in seeking provisional relief on a results claim under VRA Section 2. Dkt 1154, Supp. Compl. at 11. But at the August 27th status conference, counsel for Intervenors announced that they would not seek provisional relief on their Section 2 claim. *See* Ex. AK. Their inexplicable assertion of a Section 2 claim in contradiction to that representation is hard to understand, and the position should be deemed waived. In all events, Intervenors' perfunctory argument shows no prospect of success on the merits.

### 1. Intervenors Lack Article III and Statutory Standing

As a threshold matter, Intervenors have not established standing to bring a Section 2 claim. Because they present a Section 2 claim not raised by other parties and seek relief other parties have not sought, they cannot rely on other Plaintiffs' standing for their Section 2 contentions. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek"); *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("an intervenor . . . must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests"). "At the preliminary injunction stage, . . . the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation omitted). To meet that burden, Intervenors must show a likelihood of proving that they "suffered a concrete and

particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (citation omitted). Where challengers' allegation of harm "is the dilution of their votes, that inquiry is district specific." *Gill v. Whitford*, 585 U.S. 48, 66 (2018). Accordingly, Section 2 plaintiffs must show residency "in a district where their vote has been cracked or packed." *Harding v. Cnty. of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020); *see* ECF 592 pp. 9–11, 26–27.

Intervenors, however, have not met this standard. While the two remaining congressional Intervenors (Crockett and Green) have alleged they reside, respectively, in CD30 and CD9, ECF 1154 ¶¶ 6–7, 32, they presented no evidence on this point and thus cannot satisfy the preliminary injunction standard. *See Murthy*, 603 U.S. at 58. Even if they had presented such evidence, their claims and potential relief would be confined to just *two* districts (CD30 and CD9). *See Gill*, 585 U.S. at 66 ("the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district"). Yet their preliminary injunction brief appears to challenge the entire 2025 congressional plan. *See* ECF 1143 p. 10 ("Plan C2333 employs the paradigmatic vote dilution techniques of cracking and packing"). The two Intervenors have no prospect of establishing standing to challenge 38 districts.

Relatedly, Intervenors have not shown that they have statutory standing to bring Section 2 claims on behalf of "minority" voters. *See, e.g.*, ECF 1143 p. 2. While the Fifth Circuit recognizes a statutory right of action for voters to bring dilution claims under Section 2, *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023), courts have consistently deemed that right of action (assuming any exists) available only to voters who belong to the group allegedly suffering vote dilution.[6] *Roberts v. Wamser*, 883 F.2d 617, 622–23 (8th Cir. 1989); *Oh v. Philadelphia Cnty. Bd. of Elections*, 2008 WL 4787583, at *7 (E.D. Pa. Oct. 31, 2008); *White-Battle v. Democratic Party of Va.*, 323 F. Supp. 2d 696, 703 (E.D. Va. 2004), *aff'd*, 134 F. App'x 641 (4th Cir. 2005); *Conway Sch. Dist. v. Wilhoit*, 854 F. Supp.

---

[6] The circuits are split on whether any right of action exists for anyone. *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023); *Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710 (8th Cir. 2025).

1430, 1433 (E.D. Ark. 1994); *City of Baker Sch. Bd. v. City of Baker*, 2007 WL 9702694, at *2 (M.D. La. Jan. 12, 2007); *Vaughan v. Lewisville Indep. Sch. Dist.*, 475 F. Supp. 3d 589, 595 (E.D. Tex. 2020). Intervenors appear to identify as Black or African-American.[7] ECF 1154 ¶¶ 6–7. At best, they will have standing to bring a single-race Section 2 claim alleging burdens on the rights of Black voters. *See Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024). They have no prospect of establishing standing to assert the rights of "Hispanic voters" or "minority voters." ECF 1143 at 10.

When their claims are properly framed against their districts of residence—and setting aside that they provided no evidence of their districts of residence—Intervenors are unlikely to establish injury in fact (and thus cannot show Article III standing). CD33 is a Hispanic-plurality district that is likely to elect the "Minority Preferred Candidate" by wide margins. ECF 1149.1 ¶ 24, and incorporated Exhibit V (showing 100% success rate and average vote share of 70%). CD18 is a majority-Black district that is also likely to elect the "Minority Preferred Candidate" by wide margins. *See id.* (also a 100% success rate). Intervenors cannot show "an individual and personal injury of the kind required for Article III standing," *Gill*, 585 U.S. at 68, when their own Black communities will likely have a certainty of electoral success in their own districts. The Section 2 claim fails on this basis alone.

2.  Intervenors' Section 2 Claim Fails on the Merits

Intervenors' showing fails equally on the merits. Intervenors do not specify which districts they allege violate the VRA. *Id.*; see also Dkt. 1143 at 9–11. Nor do they offer much else in support of their VRA claim.

For a Section 2 results claim to succeed, (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) "the minority group must be able to show that it is politically

---

[7] To be precise, Congressmember Crockett clearly alleges she is African-American; Congressmember Green's allegations are ambiguous but suggest he identifies as African-American as well.

cohesive," and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it … usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott v. Perez*, 585 U.S. 579, 614 (2018). Intervenors do nothing to meet these burdens. Section 2 "does not assume" the predicates of a claim; "plaintiffs must prove" them. *Growe v. Emison*, 507 U.S. 25, 42 (1993).

    a.   <u>Intervenors are Unlikely to Satisfy the First *Gingles* Precondition</u>

    The first precondition is unlikely to be satisfied. The precondition "requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994). This "specifically contemplates the creation of hypothetical districts." *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 (5th Cir. 1993). Intervenors are not up to that task. They summarily announce that "African American and Latino populations in the relevant areas are sufficiently large and geographically compact to constitute majorities in reasonably configured districts." ECF 1143 p. 10. But they are not entitled to combine "African American and Latino populations" to make this showing, *Petteway*, 111 F.4th at 603, and simply announcing what Intervenors imagine to be true does not establish that more than the existing number of reasonably configured majority-Black districts can be created, *see Growe*, 507 U.S. at 42. Without an illustrative plan, the Court cannot evaluate whether new districts would be reasonably configured, *see League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006); *Allen v. Milligan*, 599 U.S. 1, 20–21 (2023), or an improvement on minority opportunity, *Johnson*, 512 U.S. at 1015 (finding it insufficient for challenger to show "that lines could have been drawn elsewhere, nothing more"). Notably, the 2025 plan increases majority-minority districts by comparison to the 2021 plan, so it is far from obvious that even *more* could be reasonably created. And Intervenors have not shown that this could occur without crossing the "line … Between [racial] consciousness and predominance." *Milligan*, 599 U.S. at 33.

Similarly, Intervenors assert "these minority communities" vote cohesively and that bloc-voting prevents them from electing "the minority's preferred candidate" with neither a scintilla of evidence that these conditions are met nor a shred of clarity as to which minority populations Intervenors seek to protect.

    b.   Intervenors are also Unlikely to Satisfy the Second and Third *Gingles* Preconditions

The second and third conditions are also not established. It is far from clear that the Latino vote is "politically cohesive." *Milligan*, 599 U.S. at 18; *see* ECF 1149-24 pp. 8–9 (Hispanic support for Democratic candidates as low as 50%). More fundamentally, Intervenors are unlikely to establish that the white vote can operate "as a bloc to enable" that group "to defeat the minority's preferred candidate." *Milligan*, 599 U.S. at 18. As noted, CD18 is a majority-Black district, so Intervenors "face[] an obvious, difficult burden in proving" that a district in which the Black group can prevail simply by turning out is dilutive. *Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). Moreover, the evidence available for both CD18 and CD33 indicates that Black and Hispanic groups *will* elect their candidates of choice—without much trouble. ECF 1149.1 ¶24, and incorporated exhibit V. Although CD33 is not a majority-Black district, it need not be to satisfy Section 2. *See Cooper v. Harris*, 581 U.S. 285, 305 (2017) (explaining that Section 2 can be "*satisfied by*" districts that are not majority-minority districts). Because the *Gingles* preconditions are not satisfied, "there neither has been a wrong nor can be a remedy," *Growe*, 507 U.S. at 41, let alone the exceptional remedy of a preliminary injunction.

    c.   Intervenors have Failed to Carry their Burden under the Totality of the Circumstance

All of that is amply sufficient to doom the Section 2 basis of Intervenors' motion. But it bears noting, in addition, that dilution under the totality of circumstances remains their burden to prove. *Abbott*, 585 U.S. at 614. Intervenors' treatment of the totality of circumstances, on its face, disappoints the "intensely local appraisal" and "searching practical evaluation of the 'past and present reality'" that review of a Section 2 claim demands. *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quoting *Gingles*, 478 U.S. at 79). Rather than making their own case, Plaintiffs merely cite to a finding that another court reached amid litigation over Texas's 2010 electoral maps. Dkt. 1143 at 10

(quoting *Perez v. Abbott*, 253 F. Supp. 3d 864, 958–59 (W.D. Tex. 2017)). Moreover, that citation discusses the racial demographics of the State's contemporary electoral districts and accordingly has no relevance to the current map. *Id.*

Such conclusory statements do not meet Plaintiffs' burden to establish their likelihood of success on the merits. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (stating that a preliminary injunction requires "a clear showing" of every element) (emphasis in original) (citation omitted). Proving a Section 2 claim is ordinarily a fact-intensive and data-driven ordeal that involves extensive expert testimony. But here, Plaintiffs' "conclusory allegations fail to meet the *Iqbal* pleading standards, let alone show that Plaintiff[s] [are] likely to succeed on the merits." *Coleman v. Bank of New York Mellon*, No. 3:12-CV-04783-M-BH, 2013 WL 1187158, at *7 (N.D. Tex. Mar. 4, 2013).

Satisfying Gingles' three factors is a threshold requirement to proving a section 2 violation. *Milligan*, 599 U.S. at 18. Since Plaintiffs cannot even satisfy the *Gingles* preconditions, they are not entitled to preliminary relief on the basis of their Section 2 claim. The Court need not consider the Intervenors' limited offerings on the totality of the circumstances.

### B. Plaintiffs' Claimed Evidence is Insufficient

#### 1. Plaintiffs Misunderstand *Petteway*

No letter from the U.S. Department of Justice constitutes the position of the State of Texas, as evidenced by Texas's letter in response. Ex. AF. More importantly, the DOJ letter was in direct contradiction of the testimony from every trial witness from the Texas Legislature regarding the 2021 redistricting process, as well as numerous legal experts testifying to the Legislature in 2025. See Ex. C at 17 ("[V]oting rights experts who testified at our first hearing in Austin last week thoroughly debunked the DOJ's position."). Democratic Rep. Senfronia Thompson, on July 26, 2025, was even more straightforward: "There's no way in hell that a racist map is going to come out of the Texas Senate. And I resent that the United States Justice Department would send a bogus letter down here to the state of Texas accusing the people in this state of doing such." Ex. AG at 16.

Senator Alvarado has admitted that the Dhillon DOJ letter calling for redistricting is, as the State of Texas contends, simply wrong on the law and incorrect when claiming the map enacted in 2021 was unconstitutional. Ex. AH at 22; *see also* Ex. AH at 56, testimony of Michigan law professor Ellen Katz (stating the claims made in the DOJ letter were "simply wrong."). Not only does the DOJ not speak for Texas, it was a party opponent in the 2021 redistricting case. Once the Governor places an item before the Legislature for a special session, the Legislature must then take up the issue. But then it "determines the how and the why of all items on the call." Ex. AI at 5. Senator King opined that "I believe really the letter has no impact and is really superfluous to the Committee's actions." *Id.* at 5-6.

As shown above, Texas legislators did not find the Dhillon DOJ letter legally correct, much less compelling. Even Plaintiffs admit the DOJ could cite no evidence that Texas' 2021 congressional map was racially gerrymandered. However, the letter acted as an allegation that Texas had acted under jurisprudence that had since changed; that, at least, was true. The President's demand for more districts to help with his agenda, combined with the public letter to Governor Abbott, placed a great deal of political pressure on the Governor to call for redistricting in a special session, which he did.

By doing so, he did not endorse the faulty legal reasoning of the DOJ. Plaintiffs cite to a statement from Governor Abbott to Fox 4 Dallas-Fort Worth,[8] but this statement does not parrot the DOJ's claim. While the DOJ claimed that coalition districts were "unconstitutional," the State of Texas never accepted that premise (just as the NAACP labelled it as "spurious"). The governor stated that coalition districts were no longer "compelled." This is entirely correct:

> The text of Section 2 [of the VRA] does not authorize coalition claims, either expressly or by implication.
>
> * * *
>
> Nowhere does Section 2 indicate that two minority groups may combine forces to pursue a vote dilution claim. On the contrary, the statute identifies the subject of a vote dilution claim as "a class," in the singular, not the plural.

---

[8] NAACP Mot. for Prelim. Inj. (ECF 1142) at 5.

*Petteway v. Galveston County*, 111 F.4th 596, 604 (5th Cir. 2024) (material in brackets added). While not necessarily making a finding regarding any specific districts, the Fifth Circuit clearly stated that the VRA required neither creating nor maintaining coalition districts for their own sake.

Because the initial legal vetting of the 2021 maps was done under the law pre-*Petteway*, there was indeed a new consideration in redistricting: absent a VRA coalition district parameter, just how partisan could one draw the Texas map? This question demonstrates no racial motive in drawing an avowedly partisan map post-*Petteway*. This is true where, entirely consistent with its practices in 2021, the Legislature had outside counsel review the maps for compliance under the VRA as part of its process. Finally, regardless of what the Governor has said in any format, he neither drew the map at issue nor voted on it.

Plaintiffs either misconstrue or misuse statements from the legislators themselves. They quote Rep. Vasut's statement that redistricting was "solely to respond to the Governor's call."[9] But Rep. Vasut does not endorse any statement from the Governor or the DOJ in making his factually (and legally) correct statement. Likewise, the mere mention of *Petteway* is no endorsement of the DOJ's reasoning. The Texas Attorney General's office, and the legislators themselves, flatly rejected the DOJ's interpretation on a bipartisan basis. See Ex. O.

Senator King set forth the Senate's objectives on the floor of the Senate on August 12, 2025. First, the new map had to be legal. Second, the new map had to elect more Republicans based on political performance. Third, he wanted the new districts to be compact. Ex. AD at 10–11, (Senator King). He made clear that race was not used to draw the map, and that he did not consider race when he filed the bill. *Id*. at 9; *see also* Ex. A at 14–15. Rep. Hunter, for the Texas House, also testified that the new map was drawn to increase Republican performance. Ex. AE at 4, 14 (Rep. Todd Hunter).

Plaintiffs' repeated emphasis and insistence upon negative inferences from legislator statements threatens to repeat the error addressed in *Alexander*:

---

[9] Pls' Mot. (ECF 1142) at 7.

> [T]he District Court placed too much weight on the fact that several legislative staffers, including Roberts, viewed racial data at some point during the redistricting process. This acknowledgment means little on its own because we expect that "[r]edistricting legislatures will ... almost always be aware of racial demographics." *Miller*, 515 U.S. at 916, 115 S.Ct. 2475. Here, Roberts testified without contradiction that he considered the relevant racial data only *after* he had drawn the Enacted Map and that he generated that data solely for a lawful purpose, namely, to check that the maps he produced complied with our Voting Rights Act precedent.

*Alexander*, 602 U.S. at 22.

Just as in 2021, the maps were drawn blind to race and then sent to attorneys to ensure that the map complied with all applicable law—including the VRA. Ex. A at 15.

2. Plaintiffs Cannot Meet Their Burden

A challenger to a congressional map has a duty to show that the State's chosen map conflicts with traditional redistricting criteria. *See Alexander*, 602 U.S. at 8 (citing *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U. S. 178, 190, (2017)). This is because it is difficult for challengers to find other evidence sufficient to show that race was **the** overriding factor causing neutral considerations to be cast aside. *Id*. This showing can be made through some combination of direct and circumstantial evidence. *See Cooper v. Harris*, 581 U. S. 285, 291 (2017).

The statements cited by Plaintiffs in support of their Motion do not qualify as direct evidence, which most usually comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines. *Alexander*, 602 U.S. at 8. None of the statements show that the map at issue was drawn on the basis of race. Likewise, after the map had been passed—and after it had passed Section 2 compliance checks supplied by outside counsel—the fact that Senators and Representatives then knew about racial data related to the districts says nothing about them either knowing that data when the map was enacted or that such knowledge was used. In the face of the very strong presumption of good faith on the part of the lawmakers, Plaintiffs instead demand that every negative inference be drawn related to statements by Republican legislators. That is not the law and stands in contrast to every reasonable interpretation of what the lawmakers actually said. As shown above, the legislators were adamant that the maps

15

were drawn to follow the law, maximize Republican chances, and otherwise emphasize compactness. They did not consider anything from the DOJ or Governor's office as binding on them in any way. After the initial map was drawn—blind to race—it was then vetted by legal counsel to ensure that the map complied with the Constitution and Section 2 of the VRA. Plaintiffs have wholly failed to meet their burden to prove this process was somehow racially motivated. This map simply does not conflict with traditional redistricting criteria; Plaintiff cannot prevail. *See Bethune-Hill*, 580 U. S. at 190.

    3.  <u>Plaintiffs' Expert Analysis Is Insufficient</u>

As noted above, a party challenging a map's constitutionality must disentangle race and politics to prove legislative racial motive. *Alexander*, 602 U.S. at 6. Plaintiffs rely on Dr. Duchin's newest report for this proposition. This analysis, however, is flawed. First, Dr. Duchin provides the *ipse dixit* that race data could have been used "as a proxy for partisanship," but fails to show that her analysis matches the aims of the Texas Legislature in redistricting. Texas wanted four or five new Republican seats. While that change entails some risk—just one reason that the 2021 redistricting was not as aggressive—Republicans wanted districts that, on the whole, managed that risk. Dr. Duchin's conclusory insistence on the possibility of creating a more partisan map completely underestimates the complexity of drawing a partisan map. Her analysis fails to show that any of her hypothetical maps would meet the partisan goal of—as safely as possible—electing Republicans without spreading the voters so thin that the districts would veer Democratic over the next 5 years. In other words, Dr. Duchin's conclusion fails to consider durability and how well the districts are expected to perform not just regarding the Census of 2020, but through the years leading up to 2030.

Further, her conclusions are flatly contradicted by neutral analyses:

A.  Ex. DD, The Texan (Brad Johnson, editor)
    "[T]hose drawing the map clearly used the Trump 2024 results as the benchmark
    for where to set the lines." (with included map)

B.  Ex. EE, The Texan (Brad Johnson, editor)

"Texas Republicans drew the new map based on 2024 Trump results, that's how they get the 5-seat pickup."

C. Ex. N. Dr. Benjamin Schneer, Assoc. Prof. of Public Policy, Harvard Kennedy School
"The way the concept of the durable majority gerrymander applies to Texas is that the map is drawn to continue to perform well for Republicans even if there are future vote swings that favor Democrats. So, for example, if in 2026 there's a swing from the 2024 election totals in Texas to, say, a 5 percentage point greater statewide vote for Democrats, Republicans will continue to hold on to maybe four or five of those new seats. The idea of durability is that it is impervious to swings against the party that drew the map."

C. **The *Arlington Heights* Factors Favor Texas**

1. Alleged Discriminatory Effect

To show a discriminatory effect in the context of an intentional violation of the Constitution or federal law, Plaintiffs must demonstrate that the enacted 2025 map "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. Plaintiffs cannot let go of the age-old understanding in American politics that the Black and Hispanic electorate tends to vote Democrat, while Anglos tend to vote Republican. Recent evidence suggests this trope is deteriorating, but Plaintiffs cling to the past because it supports the conceit that any gerrymander favoring Republicans tends to lessen the voting strength of minorities relative to Anglos. The logical extension of that conceit, however, is that any gerrymander favoring Democrats lessens the relative voting strength of Anglos, whose voting rights are also protected by the Constitution—perhaps especially notable now that Anglos are no longer a majority of Texas's population. *See*, *e.g.*, *Harding v. City of Dallas*, 948 F.3d 302, 306 (5th Cir. 2020). The Supreme Court has rejected treating race and partisanship as one, and specifically held federal courts cannot police partisanship out of deference to the legislative function. *See Rucho v. Common Cause*, 588 U.S. 684, 718 (2019).

Because race and partisanship correlate, it is the duty of any claimant to disaggregate partisanship in order to show a true discriminatory effect. Plaintiffs have failed to do so.

2. Historical Context

Plaintiffs essentially repeat the claims made in the recent trial over the 2021 maps. But Plaintiffs have admitted that the Texas of the 2020s is not the Texas of the 1960s, much less the

1860s. Racial discrimination, sadly, is part of the state's history. But as even Co-Plaintiffs' expert Dr. Andrés Tijerina admitted, the discriminatory practices that once characterized Texas's treatment of its minority citizens—dispossession of lands, white primaries, restrictive racial covenants, the poll tax—"have not existed in Texas for the last 60 years." Tr. 5/27/25 AM 10:12–13:9.

Any historical evidence under this factor must be "reasonably contemporaneous" with the challenged decision in order to have any weight at all. *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). And the truth is that historical discrimination does not mean that minority Texans cannot now fully participate in the political process. Today, more than a quarter of the Texas Legislature is Hispanic. Tr. 5/27/25 AM 15:15–16:2. Linda Lewis—one of the first African American election administrators appointed in Texas—testified that Dyana Limon-Mercado, a Hispanic woman, oversees elections in Travis County. Tr. 5/29/25 AM 151:7–152:7. Texas takes pains to ensure election access—pioneering policies like no-excuse early voting that "helps all Texas voters," Tr. 6/6/25 PM 136:12–137:10, 138:22–24, translating all election materials into Spanish, id. at 145:8–10, and working directly with local election officials and members of the public with the aim that every eligible "voter is able to vote without being turned away." Tr. 6/11/25 PM 70:9–72:5. The Texas that once restricted access to the franchise on racial lines bears no resemblance to the Texas of 2025, and does not weigh against the lawfulness of Texas's 2025 electoral map

3. Sequence of Events Leading Up to 2025 Map

The sequence of events leading up to the 2025 special session and vote on the new map is discussed extensively above. Given the danger to President Trump's legislative agenda posed by 2026 elections and the historical trend of the presidential party doing poorly in non-presidential election years, there was a great deal of political pressure placed on the State of Texas to match the political gerrymandering of Democrat states. This pressure only intensified when other states, especially California, pledged to perform mid-decade redistricting to make their already one-sided congressional maps even more favorable to Democrats. At that point, there was effectively no way

for Texas Republicans to back down without an almost guaranteed cessation of the Republican majority in the House of Representatives.

None of those factors indicate race was involved, but merely reinforce the weighty partisan concerns and large stakes of the redistricting process.

4. Substantive and Procedural Departures

This factor is almost identical to the analysis of the 2021 redistricting process. The legislature was forced to call a special session by outside forces; the Democrats fled the state to prevent quorum; because the map had to be handled by special session (and because election deadlines were fast approaching), the vote had to be taken within 30 days; and Democratic lawmakers announced that they would vote against the map before they ever laid eyes on it.

First, it must be noted that there is nothing suspect about a decision to redistrict mid-decade. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 408 (2006). As admitted by Plaintiffs within their Motion, Texas had done it previously. The timing, as well as the number of hearings and witnesses closely matches that previous effort. Moreover, Plaintiffs are incorrect when they dismiss all of the work that went into the 2021 congressional map.

The 2025 redistricting is based on the 2020 Census. Since 2020, the Texas Senate has held 21 regional and other public hearings, with the Texas House holding just as many. Ex. AD at 5–7 (Senator King). The information and testimony from these hearings were still available to the Legislature, and dealt with the same Census used in 2025. During the special session for redistricting in 2025, the Senate Committee held four regional public hearings via virtual testimony, a fifth hearing specifically for invited testimony at the Capitol, and then a sixth hearing at the Capitol for general public testimony. *Id*. at 5–7. These hearings included 242 witnesses in total. *Id*. Further, the Senate invited other witnesses to testify at an August 6th hearing, but only one—Gary Bledsoe, attorney for the NAACP—submitted testimony. *Id*. at 6. This is significant, as the Plaintiffs in the present lawsuit who are purportedly demanding more time: (1) prevented quorum for over 2 weeks and (2) announced they were not going to agree to any map; and (3) did not (apart from Mr. Bledsoe) offer or submit testimony on the map when given the chance.

Finally, redistricting has been addressed in special sessions of the Texas Legislature dating back to at least 1871 when the Legislature took up school districts in special session redistricting and then again in 1882, when it took up congressional redistricting in a special session. *Id.* The process in 2025 was Constitutional, was not unusual, and offered every opportunity for citizens to testify and provide concerns and information to the legislature prior to passing.

5. <u>Contemporaneous Statements from the Decisionmakers</u>

This factor was dealt with exhaustively above. The legislators in this case were blind to race when the map was drawn, then vetted it through legal counsel to ensure that it would comply with the law. They said repeatedly and openly that they—in response to a demand from the president—set out to draw a map that would allow 4–5 more Republican seats to assist the party in the mid-term. This is Constitutionally allowed.

What the evidence shows is that the Texas Legislature utilized a process to comply with the mandates of both the Constitution and the VRA whereby maps were drawn race blind, followed by an independent legal review of the map to determine compliance with the law prior to any vote on it. This process was developed to protect the statutory and constitutional rights of Texas voters.

Plaintiffs have failed to show that legislator statements contemporaneous with the passage of the maps are indicative of intent to racially discriminate. Instead, they rely largely upon statements after the map was passed, a letter written by a non-party, and references to *Petteway,* which Plaintiffs take to be a racist dog whistle. But they are forced to take this position, as noted by Rep. Al Green *supra* at 1, because if Texas' map is just Donald Trump getting what Donald Trump wants, then Plaintiffs lose.

## Conclusion

For the foregoing reasons, Plaintiff-Intervenors' and Texas NAACP's motions to preliminarily enjoin implementation of Plan C2333 should be DENIED.

Date: September 22, 2025

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

WILLIAM D. WASSDORF
Associate Deputy Attorney General for Civil
Litigation
Texas Bar No. 24103022
william.wassdorf@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov

/s/ Ryan G. Kercher
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Special Counsel
Texas Bar No. 24125064

COUNSEL FOR STATE DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on September 22, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

*Ryan G. Kercher*
RYAN G. KERCHER
Special Counsel