IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br>*Plaintiffs,*<br><br>EDDIE BERNICE JOHNSON, *et al.*,<br>*Plaintiff-Intervenors,*<br><br>V.<br><br>GREG ABBOTT, *et al.*,<br>*Defendants.* | 3:21-cv-00259-DCG-JES-JVB<br>[Lead Case]<br><br>&<br><br>All Consolidated Cases |

STATE DEFENDANTS' RESPONSE TO
GONZALES PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

Table of Authorities ....................................................................................................... iii

I.    Introduction ....................................................................................................... 1

II.   Background ......................................................................................................... 3

III.  Legal Standard ................................................................................................... 7

IV.   Argument ........................................................................................................... 8

    A. The Texas Legislature Did Not Intentionally Discriminate Against Racial
       Minorities When It Drew the 2025 Congressional Map. ................................. 9

       1. Gonzales Plaintiffs present no direct evidence of racial discrimination ........ 10

       2. Circumstantial evidence does not support a finding of racially
          discriminatory intent. ............................................................................ 16

          a.  No Alternative Plan ......................................................................... 17

          b.  *Arlington Heights* Factors ................................................................ 18

    B. There is No Evidence the 2025 Map was Drawn with the Predominant
       Purpose of Discriminating Against Racial Minorities. ................................. 25

    C. Gonzales Plaintiffs' Claim that H.B. 4 is a Per Se Violation of the Equal
       Protection Clause Fails as a Matter of Law and Evidence. .......................... 26

    D. The Motion Fails Independently on Governing Equitable Factors ................ 27

Conclusion .................................................................................................................. 31

Certificate of Service .................................................................................................. 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 49 (2017) .......................................................................................................... 29

*Abbott v. Perez,*
    585 U.S. 579 (2018) ................................................................................................9, 18, 28

*Agee v. Benson,*
    No. 1:22-cv-272, 2023 WL 8826692 (W.D. Mich. Dec. 21, 2023) ..................................... 20

*Alexander v. S.C. State Conf. of the NAACP,*
    602 U.S. 1 (2024) .................................................................................................... passim

*Allen v. Milligan,*
    599 U.S. 1 (2023) ......................................................................................................25, 28

*Ardoin v. Robinson,*
    142 S. Ct. 2892 (2022) ..................................................................................................... 29

*Alabama Legislative Black Caucus v. Alabama,*
    575 U.S. 254 (2015) ..................................................................................................... 8, 11

*Bartlett v. Strickland,*
    556 U.S. 1 (2009) ............................................................................................................ 20

*Benavidez v. Irving Indep. Sch. Dist., Tex.,*
    690 F. Supp 2d 451 (N.D. Tex. 2010) ...............................................................................27

*Benisek v. Lamone,*
    585 U.S. 155 (2018) .......................................................................................................7, 27

*Bethune-Hill v. Virginia State Bd. of Elections,*
    368 F. Supp. 3d 872 (E.D. Va. 2019) ...............................................................................12

*Bethune-Hill v. Virginia State Bd. of Elections,*
    580 U.S. 178 (2017) .................................................................................................... passim

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.,*
    577 F.3d 250 (5th Cir. 2009) ..............................................................................................7

*Brown v. East Miss. Elec. Power Ass'n,*
    989 F.2d 858 (5th Cir. 1993) ............................................................................................ 15

*Bush v. Vera,*
    517 U.S. 952 (1996) ................................................................................................. 10, 15

*Callais v. Landry*,
   732 F. Supp. 3d 574 (W.D. La. 2024) .................................................................................... 29

*Caster v. Merrill*,
   No. 2:21-cv-1536, 2022 WL 264819 (N.D. Ala. Jan. 24, 2022) ............................................ 31

*Chabot v. Ohio A. Philip Randolph Inst.*,
   139 U.S. 2635 (2019) .............................................................................................................. 29

*Chisom v. Roemer*,
   853 F.2d 1186 (5th Cir. 1988) ................................................................................................ 28

*City of Mobile v. Bolden*,
   446 U.S. 55 (1980) ..................................................................................................................... 8

*Cooper v. Harris*,
   581 U.S. 285 (2017) ................................................................................................. 10, 11, 19

*Davis v. Bandemer*,
   478 U.S. 109 (1986) ................................................................................................................... 2

*Def. Distributed v. U.S. Dep't of State*,
   838 F.3d 451 (5th Cir. 2016) .................................................................................................. 28

*Easley v. Cromartie*,
   532 U.S. 234 (2001) ................................................................................................................ 16

*Gill v. Whitford*,
   137 S. Ct. 2289 (2017) ............................................................................................................ 28

*Gill v. Whitford*,
   585 U.S. 48 (2018) ..................................................................................................................... 8

*Harding v. Cnty. of Dallas*,
   948 F.3d 302 (5th Cir. 2020) .................................................................................................... 9

*Hunt v. Cromartie*,
   526 U.S. 541 (1999) ............................................................................................................. 8, 9

*Hunter v. Underwood*,
   471 U.S. 222 (1985) .................................................................................................................. 9

*In re Davis*,
   170 F.3d 475 (5th Cir. 1999) .................................................................................................. 15

*In re Landry*,
   83 F.4th 300 (5th Cir. 2023) ................................................................................................... 31

*Johnson v. DeSoto Cnty. Bd. Comm'rs*,
204 F.3d 1335 (11th Cir. 2000) ........................................ 26

*Karcher v. Daggett*,
455 U.S. 1303 (1982) .................................................... 28

*La Union Del Pueblo Entero v. Abbott*,
119 F.4th 404 (5th Cir. 2024) ........................................ 30

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.*,
328 F.3d 192 (5th Cir. 2003) ...........................................7

*Lawyer. v. Dep't of Justice*,
521 U.S. 567 (1997) .................................................... 11

*LULAC v. Abbott*,
601 F. Supp. 3d 147 (W.D. Tex. 2022) ...................... 20, 28, 29

*LULAC v. Abbott*,
604 F. Supp. 3d 463 (W.D. Tex. 2022) ...........................25, 9

*LULAC v. Perry*,
548 U.S. 399, 418 (2006) ............................................ 11

*McNeil v. Springfield Park Dist.*,
851 F.2d 937 (7th Cir. 1988) ........................................ 26

*Merrill v. Milligan*,
142 U.S. 879 (2022) ................................................ 28, 30

*Miller v. Johnson*,
512 U.S. 1283 (1994) .................................................. 29

*Miller v. Johnson*,
515 U.S. 900 (1995) ............................................... passim

*Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
894 F.3d 924 (8th Cir. 2018) ..........................................27

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................27

*North Carolina v. Covington*,
137 U.S. 808 (2017) ................................................... 29

*North Carolina v. Covington*,
138 U.S. 974 (2018) ................................................... 29

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) ..................................................................................................12

*Paulino v. Harrison,*
    542 F.2d 692 (9th Cir. 2008) ....................................................................................15

*Perez v. Pasadena Indep. Sch. Dist.,*
    958 F. Supp. 1196 (S.D. Tex. 1997) ........................................................................ 26

*Perez v. Perry,*
    No. 11-CV-360, 2017 WL 962686 (W.D. Tex. Mar. 10, 2017).................................27

*Perez v. Texas,*
    No. SA-11-CV-360-OLG-JES-XR, 2014 WL 12853571 (W.D. Tex. June 23, 2014) .............25

*Perry v. Perez,*
    565 U.S. 1090 (2011).................................................................................................. 29

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ..............................................................................................6, 14

*Petteway v. Galveston Cnty.,*
    111 F.4th 596 (5th Cir. 2024) ...................................................................................13

*Pierce v. N. Carolina State Bd. of Elections,*
    97 F.4th 194 (4th Cir. 2024) .........................................................................21, 28, 30

*Poe by & through Poe v. Drummond,*
    No. 23-5110, 2025 WL 2238038 (10th Cir. Aug. 6, 2025) ......................................15

*Prejean v. Foster,*
    227 F.3d 504 (5th Cir. 2000) ....................................................................................25

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006)................................................................................................. 28, 30

*Radomsky v. United States,*
    180 F.2d 781 (9th Cir. 1950) ....................................................................................15

*Robinson v. Callais,*
    144 U.S. 1171 (2024) ................................................................................................. 29

*Reno v. Bossier Par. Sch. Bd.,*
    528 U.S. 320 (2000) ...........................................................................................19, 25

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ..................................................................................................28

*Robinson v. Ardoin*,
    37 F.4th 208 (5th Cir. 2022) ................................................................. 29

*Rogers v. Lodge*,
    458 U.S. 613 (1982) .......................................................................... 8

*Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*,
    6 F.4th 633 (5th Cir. 2021) ................................................................. 18

*Rucho v. Common Cause*,
    138 U.S. 923 (2018) ..................................................................... 26, 29

*Salas v. Sw. Texas Jr. Coll. Dist.*,
    964 F.2d 1542 (5th Cir. 1992) .............................................................. 21

*Salazar v. Buono*,
    559 U.S. 700 (2010) ......................................................................... 28

*Shaw v. Reno*,
    509 U.S. 630 (1993) ........................................................................ 8, 9

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ..........................................................................7

*Sw. Voter Registration Educ. Project v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) ............................................................... 28

*Tex. All. for Retired Am. v. Hughs*,
    976 F.3d 564 (5th Cir. 2020) ............................................................... 30

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) .........................................................................18

*United States v. O'Brien*,
    391 U.S. 367 (1968) .........................................................................14

*United States v. Vill. of Port Chester*,
    704 F. Supp. 2d 411 (S.D.N.Y. 2010) ..................................................... 26

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ............................................................... 21

*Veasey v. Abbott*,
    870 F.3d 387 (5th Cir. 2017) ...............................................................27

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) .................................................................... 13, 26

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..............................................................8, 18, 19, 21

*Voinovich v. Quilter*,
    507 U.S. 146 (1993).............................................................. 13, 14, 26

*Whitaker v. Livingston*,
    732 F.3d 465 (5th Cir. 2013) .........................................................27

*Whitcomb v. Chavis*,
    403 U.S. 124 (1971)......................................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).........................................................................27

*Wise v. Circosta*,
    978 F.3d 93 (4th Cir. 2020) ..................................................... 30, 31

**Constitutional Provisions & Statutes**

52 U.S.C. § 20302(a)(8) ............................................................... 30

## I. Introduction

"The VRA is being chipped away, and the only thing left for us now is Section 2. And we're not going to win under Section 2 unless we show that this act by the State of Texas if it does it – And I pray that it won't, I take no delight in saying what I say – *But if we don't say that this is racial, if we don't indicate that, we're not going to get to Section 2 and we can't win.*"[1]

Congressman Al Green did a rare thing when testifying before the Senate Redistricting Committee against the challenged map: He said the quiet part out loud. Namely, it does not matter what actions the Texas Legislature takes. The Supreme Court described this case in warning courts to be "wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare' that will deliver victories that eluded them 'in the political arena'" in an effort to "sidestep [the] holding in *Rucho* that partisan-gerrymandering claims are not justiciable in federal court." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11, 21 (2024) (citation omitted); *c.f. Rucho v. Common Cause*, 588 U.S. 684, 718 (2019). Gonzales Plaintiffs have built their legal strategy around the Congressman's advice. They take what Texas Democrats themselves called "a naked, partisan, political power grab"[2] and characterize it instead as an "intentional manipulation of district lines to suppress minority voting strength." ECF 1149 at 3. The allegation, however, falls apart on close scrutiny.

As anyone with a television or social media account knows, the decision to redraw Texas's congressional lines occurred in the midst of a bitter, nationwide fight over partisan gerrymandering—a story that spans decades.

When the Texas Legislature redrew maps for the U.S. Congressional delegation in 2011 following the 2010 census, it took an aggressive approach aimed at maximizing the number of Republican-leaning districts. While this initially yielded the desired partisan results, Republican losses in a 2018 wave election revealed that the "map that Republicans had drawn at the beginning of the 2010s started to look like what is genuinely referred to in peer-reviewed literature as a

---

[1] Ex. A, Testimony on Congressional Redistricting before the Senate Special Comm. on Congressional Redistricting, 89th Leg., 1st C.S. 36 (July 28, 2025) (Representative Al Green speaking) (emphasis added).

[2] Ex. B, S. J. of Tex. 89th Leg., 1st C.S. 64 (Aug. 22, 2025) (Sen. Royce West).

dummymander."[3] *See Davis v. Bandemer*, 478 U.S. 109, 152 (1986) (O'Connor, J., concurring in the judgment) (describing how "political gerrymandering is a self-limiting enterprise" because, "to gerrymander, the legislative majority must weaken some of its safe seats, thus exposing its own incumbents to greater risks of defeat"); *cf. Rucho*, 588 U.S. at 703 (recognizing the credibility of Justice O'Connor's *Bandemer* opinion given her "extensive experience in state and local politics"). Once bitten, twice shy, the Legislature took a more cautious approach when crafting Texas's statewide maps in 2021, favoring safe seats. As a consequence, the 2021 congressional map increased Republicans' electoral advantage, but to quote Plaintiffs' expert Dr. Moon Duchin, the final configuration "left a lot on the table."[4]

This decision to favor security over ambition ended up having national implications. In contrast to Texas's cautious approach, Democrat-controlled states adopted far more aggressive gerrymanders that systematically diluted Republican votes and gave Democrats a leg up in the contest for control of the U.S. House of Representatives. To offer an example, only three, or 17.6 percent, of Illinois's 17 Congressional Representatives are Republican[5] despite its overall population voting Republican more than 40 percent of the time.[6] In New York, Democrats control 19 out of 26 seats in Congress even though more than 40 percent of the electorate backed Trump in the 2024 presidential race. New Mexico, Connecticut, and Massachusetts, meanwhile, all have *100%* Democratic Congressional delegations, even though the Republican presidential candidate received a considerable percentage of the vote in each state in Presidential elections in both 2020 (44%, 39%, and 32%, respectively) and 2024 (46%, 42%, and 36%).

Enter, President Donald Trump. Mindful of history showing that a president's political

---

[3] Trial Tr. Jun. 9, 2025 AM at 82:23–25

[4] Trial Tr. May 31, 2025 AM at 57:24–25.

[5] Ex. C, *United States House of Representatives Directory of Representatives*, https://www.house.gov/representatives.

[6] Ex. D, *Illinois President Results: Harris Wins*, https://www.nbcnews.com/politics/2024-elections/illinois-president-results (43.5 percent voting for Trump in the 2024 presidential election).

party tends to lose House seats in mid-term election years and concerned that a Democrat majority would disrupt his national agenda, President Trump demanded that Republican legislatures fight fire with fire. He called on Texas lawmakers to find five additional congressional seats; he then sought to impose whatever political pressure he could to secure the Legislature's agreement. As is often the case, "[w]hen Donald Trump says jump, the Republicans simply ask how high[.]"[7] Governor Abbott thus called a first and then a second special legislative session to consider a more aggressive partisan map, which the Legislature eventually adopted. It is this political arms-race that motivated Texas legislators to redistrict mid-decade, not race. And it is the countervailing desire to see Republicans fail that drives Gonzales Plaintiffs' motion.

## II. Background

In 2021, as the COVID pandemic raged, the Texas legislature passed a Congressional Map ("the 2021 Map") which increased minority representation in Congress.[8] To ensure the map was compliant with the Voting Rights Act ("VRA"), the legislature drew the map race blind and subsequently passed the map to outside counsel to review for VRA compliance.[9] Representatives repeatedly stated that the map was drawn blind to race and emphasized that they did not consider race when drawing the districts.[10] In drawing the 2021 Map, Texas aimed to maintain and increase its Republican districts and also prioritized incumbent desires.[11] The result was a map that "left a lot" of Republican districts "on the table."[12] But before Governor Abbott even signed the 2021 Map into law, Plaintiff groups sued to preliminarily enjoin it, alleging that it violated Section 2 of the Voting Rights Act and the United States Constitution. ECF 1 (LULAC, et al.'s Compl. (Oct.

---

[7] Ex. E, *Leader Jeffries: "Republicans are Desperately Trying to Cling on to Power*," https://jeffries.house.gov/2025/08/07/leader-jeffries-republicans-are-desperately-trying-to-cling-on-to-power/.

[8] *See e.g.,* Trial Tr. 6/6/25 PM at 83:25–84:10 (creating CD 35 as a new majority Hispanic District).

[9] *See e.g.*, Trial Tr. 6/7/25 PM at 95:12– 99:20; Trial Tr. 6/10/25 PM at 81:15–84:7.

[10] *See, e.g.*, Trial Tr. 6/10/25 AM at 96:9–97:11.

[11] *See* Trial Tr. 6/7/25 PM at 33:10-24.

[12] Trial Tr. 05/31/25 AM at 57:24-25.

18, 2021)). Plaintiffs claimed the 2021 Map should have been more compact and that the districts were oddly shaped. *See e.g.*, ECF 1108 p. 4, ECF 977 p. 4. Plaintiffs argued that the 2021 Map did not have enough Hispanic majority districts. ECF 977 p. 1 (Gonzales Pls' Pretrial Br.). Plaintiffs complained that the 2021 Map decreased the Black voting age population in CD 18. ECF 989 p. 4 (Intervenors' Pretrial Memo). Plaintiffs argued that the Legislature's insistence that it did not consider race when drawing the maps was "suspicious."[13] Plaintiffs' witnesses forcibly introduced racial data to the 2021 Legislature because it was of the utmost importance that the Legislature know the racial impact of the map they were voting for.[14] This is the map Plaintiffs now request as their remedy.

On June 9th, 2025, President Trump's redistricting pressure campaign began when the New York Times reported that the Trump administration was looking to strong-arm state legislatures into redistricting to "pick up as many as four or five House seats in 2026 . . . ."[15] The rationale behind the President's request is simple. Republicans currently have a razor-thin majority in the United States House of Representatives; if Democrats flip four seats in the upcoming midterm elections, they would take control of the House.[16] The Texas Tribune reported on June 11, 2025, that President Trump's political advisors were urging Governor Abbott to call a special session to redraw the Congressional map, with the aim of giving Republicans a better chance to flip Democrat-held seats in the 2026 midterm.[17] In a poor and legally-unsound attempt to provide political cover for Texas to redistrict mid-decade, the Department of Justice issued a letter ("the Dhillon Letter") threatening to sue Texas if it did not redistrict. ECF 1114-2. Although Governor

---

[13] Trial Tr. 5/27/25 PM at 135:6–21.

[14] *See e.g.,* Trial Tr. 5/23/25 AM at 63:1–4.

[15] Ex. F, David Goodman & Shane Goldmacher, *White House Pushes Texas to Redistrict, Hoping to Blunt Democratic Gains*, (June 9, 2025), https://www.nytimes.com/2025/06/09/us/politics/trump-texas-redistricting.html.

[16] Ex. G, *Member Data, Party Breakdown*, https://pressgallery.house.gov/member-data/party-breakdown.

[17] Ex. H, Owen Dahlkamp & Natalia Contreras, T*rump Aides Want Texas to Redraw Its Congressional Maps to Boost the GOP. What Would that Mean?,* (Jun. 11, 2025) https://www.texastribune.org/2025/06/11/texas-congress-midcycle-redistricting-trump-republicans/.

Abbott, represented by Attorney General Paxton, rejected the legal reasoning of the DOJ Letter and affirmed that "[T]he Texas legislature did not pass race-based electoral districts for any of those three political maps," ECF 1116-1 at 2, Governor Abbott nevertheless ordered a special session and placed redistricting on the call.[18]

On July 24th, the House Select Committee on Congressional Redistricting held the first of a series of public hearings regarding the topic of Congressional Redistricting.[19] At this hearing, Democratic members of the committee and Democratic politicians offered testimony corroborating the partisan nature of the redistricting effort. Congresswoman Sylvia Garcia testified that the Dhillon letter "is just a pretext to go in there and just change everything to get those five districts that the felon in the White House needs to maintain his power."[20] Democratic House Representative Senfronia Thompson stated that the DOJ Letter was an absurdity because the Texas House would never pass a race-based map.[21] But Texas Democrats were desperate to prevent Republicans from giving Trump the five Congressional seats that he desired. So more than 50 Democratic Texas legislators fled the state to deprive the Texas House of Representatives of the quorum needed to take legislative action.[22] While the Texas House could not act without a quorum, the Texas Senate was under no such constraint.[23] The Senate voted to pass S.B. 4 on August 12, in a straight party line 19-2 vote with 9 of the Senate's 11 Democrats walking out in

---

[18] Ex. I. *Governor Abbott Announces Special Session Agenda*, Office of the Texas Governor, (July 9th, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-special-session-agenda-.

[19] Ex. J, Hearing on Redistricting Before the House Select Comm. on Redistricting, 89th Leg., 1st C.S. (July 24, 2025).

[20] Ex. J at 67.

[21] Ex. J at 27.

[22] Ex. K, Kayla Guo & Eleanor Klibanoff, *Texas House Democrats flee the state in bid to block GOP's proposed congressional map*, (Aug. 3, 2025) https://www.texastribune.org/2025/08/03/texas-democrats-quorum-break-redistricting-map/.

[23] Ex. L, S. J. of Tex. 89th Leg., 1st C.S. (Aug. 4, 2025) (introducing SB4).

protest.[24] The House reestablished quorum in the Second Special Session on August 18, 2025.[25] On August 20, after eight hours of debate, the House voted 88-52 to pass Plan C2333 as H.B. 4.[26] The full Senate passed H.B. 4 after midnight on August 23.[27]

The 2025 Map not only increases Republican partisan advantage, but it should also resolve Plaintiffs' grievances with the 2021 Map—the 2025 Map is a more compact map with additional majority-minority districts. As a side effect of its partisan goals, the 2025 Map adds three majority-minority districts, one Hispanic and two Black. ECF 1133-26 pp. 2, 3. ("Ansolabehere's August 2025 Report"). The 2025 Map is more compact than the 2021 Map by every judicially recognized measure.[28] The Legislature followed the same procedure as in 2021 and provided the map to outside counsel for a VRA compliance check.[29] But this time, the Legislature was more prepared to answer questions about the racial makeup of the map, as Plaintiffs previously requested—that is, after drawing the map blind to race and checking for VRA compliance, some legislators availed themselves of publicly available VAP data to answer criticisms of the map during debate. *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (stating that awareness of race is distinct from being motivated by race); *Alexander*, 602 U.S. at 22 (same). Discriminatory purpose implies more than awareness of consequences. *Miller*, 515 U.S. at 916 (citing, inter alia, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). It implies that the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects" upon an identifiable group. *Id.* (citation omitted)

Plaintiffs now cite those legislators' knowledge of that publicly-available VAP data as

---

[24] Ex. M, Testimony on S.B. 4 on the Floor of the Senate, 89th Leg., 1st C.S. 16 (Aug. 12, 2025).

[25] Ex. N, Testimony on H.B. 4 Before the House Select Comm. on Congressional Redistricting, 89th Leg. 2nd C.S. 3 (Aug. 18, 2025).

[26] Ex. O, H.J. of Tex. 89th Leg., 2nd C.S. 65 (Aug. 20, 2025).

[27] Ex. B, S. J. of Tex., 89th Leg., 2nd C.S. 61 (Aug. 22, 2025).

[28] Ex. M at 11.

[29] Ex. M at 11.

evidence of intentional discrimination. Mere months ago, Plaintiffs argued that the legislator's consistent statements that they did not consider race supported a finding that they in fact *did* consider race.[30] Now, Gonzales Plaintiffs argue that Representative Hunter's *failure* to disavow knowledge of publicly-available VAP data supports a finding of intentional discrimination. ECF 1149 p. 6. Plaintiffs trip over themselves in contradictions because Plaintiffs' real complaint is that Texas's 2025 Congressional Map is set to elect five more Republicans to the U.S. House of Representatives. However, the fairness of partisan redistricting schemes is a question "beyond the reach of federal courts[,]" *Rucho*, 588 U.S. at 716, so Plaintiffs bring claims of racial discrimination instead, just as the Supreme Court warned would occur, *Alexander*, 602 U.S. at 11. As Congressman Al Green said, "if we don't say that this is racial . . . we can't win."[31]

### III. Legal Standard

To be entitled to a preliminary injunction, the applicant bears the burden of proving (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm if the injunction is granted, and (4) that granting the injunction will not disserve the public interest. *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252-53 (5th Cir. 2009) (citing *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195-96 (5th Cir. 2003)). A "preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' and all four requirements." *Id.* at 253 (citing *Lake Charles Diesel, Inc.*, 328 F.3d 192, 196 (5th Cir. 2003)). Preliminary injunctions are extraordinary equitable relief that are not awarded as of right. *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024); *see also Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam) (applying this standard in a redistricting case).

---

[30] *See* Trial Tr. 5/27/25 PM at 135:6–21.
[31] Ex. A at 36:14-24.

## IV.  Argument

Gonzales Plaintiffs focus their preliminary injunction motion on racial vote dilution and racial gerrymandering claims. *See* ECF 1149 pp. 7–20. As an initial matter, these claims are district-specific, *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 191 (2017) (racial gerrymandering); *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (intentional vote dilution), but Gonzalez Plaintiffs attempt to challenge "HB 4," a complete redistricting plan. ECF 1149 pp. 7, 15. Precedent forecloses redistricting claims "with respect to the State as an undifferentiated whole." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 264 (2015). Insofar as they intend to unveil district-specific claims in the future, Gonzales Plaintiffs have frustrated the State Defendants' ability to respond to their motion. It should be denied on that basis alone.

In all events, Gonzales Plaintiffs' intent-based claims are unlikely to succeed. Racial-gerrymandering and intentional vote-dilution claims are distinct causes of action, *Alexander*, 602 U.S. at 38, but are founded on common principles under the Fourteenth and Fifteenth Amendments, *see Miller*, 515 U.S. at 911. Those provisions not offended by state action that merely has "a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (Fourteenth Amendment); *City of Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (same for Fifteenth Amendment). Instead, these provisions protect individuals from "racial classifications," *Shaw v. Reno*, 509 U.S. 630, 651 (1993) (*Shaw I*), which can arise in two ways: A state actor may employ a racial classification that is "explicit" in a statute, regulation, or policy, or else a "facially neutral law" may be proven to be "motivated by a racial purpose or object," *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (*Cromartie I*), and to have achieved a discriminatory "effect," *Shaw I*, 509 U.S. at 641. There is no express classification here because H.B. 4 "classifies tracts of land, precincts, or census blocks, and is race neutral on its face." *Cromartie I*, 526 U.S. at 547. "The Fifteenth Amendment does not entail the right" of any racial group to have its preferred "candidates elected." *City of Mobile*, 466 U.S. at 64; *see Rogers v. Lodge*, 458 U.S. 613, 624 (1982).

This is a case where "'assessing . . . motivation" presents "an inherently complex endeavor," *Cromartie I*, 526 U.S. at 547, which begins "with a presumption that the legislature acted in good faith." *Alexander*, 602 U.S. at 6. "[A] court must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (citation omitted). Gonzalez Plaintiffs' vote-dilution claim entails the standard elements of "discriminatory purpose and discriminatory effect." *Harding v. Cnty. of Dallas*, 948 F.3d 302, 312 (5th Cir. 2020); *see Alexander*, 602 U.S. at 38. As for intent, it must be proven that race was "a 'but for' motivation for the enactment." *Hunter v. Underwood*, 471 U.S. 222, 232 (1985); *see Shaw I*, 509 U.S. at 641. By comparison, the analytically distinct racial-gerrymandering claim requires proof that race was the "predominant motive for the design of the district as a whole." *Bethune-Hill*, 580 U.S. at 188. A plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. However, a racial-gerrymandering plaintiff need not show that the legislature had the purpose, or achieved the effect, of minimizing or cancelling voting potential of racial minorities.[32] *Alexander*, 602 U.S. at 38. Neither standard is met here.

## A. The Texas Legislature Did Not Intentionally Discriminate Against Racial Minorities When It Drew the 2025 Congressional Map.

Gonzales Plaintiffs' claim that the 2025 Map is the result of intentional vote dilution against Hispanics defies both logic and fact. The evidence does not establish any "purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities[.]'" *Miller*, 515 U.S. at 911 (citation omitted). Nor would it make sense to claim that a Republican-controlled legislature enacted the 2025 Map to cancel out the voting potential of *the demographic group trending most toward Republicans*. President Trump requested Texas re-draw its map to include five more

---

[32] *Alexander* overrides a prior, imprecise assertion of this Court that "the only practical difference between intentional-vote-dilution and racial-gerrymandering claims is that racial gerrymandering is harder to show," *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 509 (W.D. Tex. 2022). *See Alexander*, 602 U.S. at 38–39 (indicating respects in which the vote-dilution burden is more demanding).

Republican districts, and Texas did so. Gonzales Plaintiffs' objection to that is non-justiciable. *Rucho*, 588 U.S. at 718. Their effort to dress a partisan claim in racial garb falls short.

### 1. Gonzales Plaintiffs present no direct evidence of racial discrimination.

Direct evidence shows the purpose of the 2025 Map was to increase Republican performance across the state, not to intentionally racially discriminate.[33] Gonzales Plaintiffs cherry-pick statements and allege they serve as "direct" evidence that the legislature acted with discriminatory intent. These statements do not suffice to carry Gonzales Plaintiffs' burden because they are not direct evidence. Direct evidence of intentional racial discrimination exists when there is evidence of a "consensus within the legislature" that new districts should be drawn specifically to allow members of a racial group to elect Congressional representatives, when the State concedes in litigation that the districts were created for the purpose of enhancing a racial group's districts, and when testimony of individual state officials confirmed that the decision to intentionally create race based districts was made "at the outset of the process and never seriously questioned." *Bush v. Vera*, 517 U.S. 952, 960-61 (1996). In other words, direct evidence of discriminatory intent exists when legislators repeatedly tell their colleagues "in no uncertain terms" that a district was drawn with a race-based goal and that goal was communicated to the legislature's consultant and the consultant corroborates that instruction. *Cooper v. Harris*, 581 U.S. 285, 299-300 (2017). There is no such evidence here. Gonzales Plaintiffs acknowledge much of what they call "direct" evidence is contradictory. ECF 1149 p. 4 (noting that Governor Abbott's forceful denials of the Dhillon Letter's charge of racial gerrymandering conflicts with Governor Abbott's "seizing" of the alleged racial justification for redistricting). The statements Gonzales Plaintiffs rely on are at best ambiguous and their meaning is genuinely disputed.

**No Direct Evidence of Race-Based Line Drawing.** Gonzales Plaintiffs' motion is more

---

[33] *See e.g.,* Ex. P, Testimony on Tex. H.B. 4 on the Floor of the Senate Part I, 89th Leg., 2nd C.S., 4 (Aug. 22, 2025); Ex. Q, Testimony on H.B. 4 Before the Senate Committee on Cong. Redistricting, 89th Leg., 2nd C.S. 5 (Aug. 21, 2025); Ex. N at 4.

probative in what it does not say than in what it says. Nowhere do Gonzales Plaintiffs even pretend to have direct evidence that a racial target was used in crafting any districts (let alone H.B. 4 as an undifferentiated whole).[34] Direct evidence of racial intent in redistricting cases typically comes in the form of testimony by the map-maker (legislator or consultant, or both) that the legislature "purposefully established a racial target." *Cooper*, 581 U.S. at 299; *see id.* at 300 (consultant testified that legislators "instructed him" to hit majority-minority target); *Bethune-Hill*, 580 U.S. at 184 (state acknowledged that a 55% minority voting-age population target "was used in drawing the Challenged Districts" (citation omitted)); *Alabama*, 575 U.S. at 259–60 ("Alabama believed that, to avoid retrogression under § 5, it was required to maintain roughly the same black population percentage in existing majority-minority districts."); *see also Alexander*, 602 U.S. at 8 ("States often admit to considering race for the purpose of satisfying our precedent interpreting the Voting Rights Act"). Here, however, Gonzales Plaintiffs effectively admit they can identify no such admission; the best they muster is uncertainty among legislators as to how lines were drawn. *See* ECF 1149 pp. 5–6.

Gonzales Plaintiffs propose that sweeping discussions of the redistricting legislation qualify as direct evidence, but they cite no case where a court has deemed direct evidence of racial intent present merely because of sweeping discussions of what a redistricting plan accomplishes. *Cf. LULAC v. Perry*, 548 U.S. 399, 418 (2006) (plurality opinion) ("We should be skeptical … of a claim that seeks to invalidate a statute based on a legislature's unlawful motive but does so without reference to the content of the legislation enacted."). Nor do their efforts to link supposed "direct" evidence to districts within H.B. 4 make sense. In Gonzales Plaintiffs' view, all roads of legislative motive lead to the letter of Harmeet Dhillon, Assistant Attorney General for Civil Rights at the U.S. Department of Justice. But that letter urged revision of just four districts (CD9, CD18,

---

[34] While Gonzales Plaintiffs allege "50 percent–plus racial targets in drawing multiple districts," ECF 149 at 17, they cite *no* evidence for that assertion, much less *direct* evidence. *See Lawyer. v. Dep't of Justice*, 521 U.S. 567, 582, (1997) ("we have never suggested that the percentage of black residents in a district may not exceed the percentage of black residents in any of the counties from which the district is created").

CD29, CD33). ECF 1114-2. Texas, however, revised all but one of its 38 congressional districts. *See* ECF 1149-3 at 2-7. On its face, the Gonzales Plaintiffs' narrative accounts for very little of what occurred in the 2025 redistricting. It would appear unprecedented for the Court to issue a preliminary injunction applying theories of racial intent with no direct evidence of racial motivation in line drawing.

**The Dhillon Letter**. The dominant player in Gonzales Plaintiffs' racial-intent narrative is not a "relevant state actor[]," *Alexander*, 602 U.S. at 8, but Harmeet Dhillon. *See* ECF 1149 pp. 4, 5, 8, 9. State Defendants agree with Gonzales Plaintiffs that the claim that any of Texas's districts were racially gerrymandered is a "baseless assertion" that serves as a poor attempt at "cover" for Texas's decision to redistrict mid-decade. ECF 1149 p. 9. (By comparison, it is odd that Gonzales Plaintiffs call an allegation of racial intent in the 2021 Map "baseless" where they made that very assertion and have never retracted it.) State Defendants' "years long position in this Court and volume-after-volume of sworn testimony" that the 2021 Map was not discriminatory remains the truth. ECF 1149 p. 9. The 2021 Map was not drawn with racially discriminatory intent. But that point is irrelevant here. A mistake of fact by a Washington official about the record in a case from which DOJ withdrew does not translate into racial motive on the part of the Texas legislature.

Gonzales Plaintiffs consider the "Dhillon Letter" relevant because (they say) Governor Abbott called the special session "in response" to that letter. ECF 1149 p. 8. But a response to the letter does not suggest anything racial because the letter did not urge race-based districts. The letter (incorrectly) accused Texas of employing race-based districts and demanded that they "be rectified." ECF 1114-2. The letter did not urge the legislature to use race in that process, and that would have been an odd request, given the *accusation* of racial gerrymandering. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race."). Even in cases where race-based redistricting is found to occur, remedying it does *not* require—or even likely entail—the use of race. *See Bethune-Hill v. Virginia State Bd. of Elections*, 368 F. Supp. 3d

872, 879–80 (E.D. Va. 2019) (three-judge court) (rejecting assertion that special master's redrawing of districts found to be racially gerrymandered involved the use of race, even though the special master intervened for no other reason). This case therefore presents the opposite fact pattern from those where Washington officials insisted that state actors create districts hitting a racial target under the VRA. *See, e.g.*, *Miller*, 515 U.S. at 918.

Undeterred by what the Dhillon Letter says, Gonzalez Plaintiffs persist in emphasizing it because (they say) it provided "the *only* justification cited by the Governor for this extraordinarily unusual mid-decade redistricting." ECF 1149 p. 5. Setting aside the widely broadcast justification of yielding to the President's political demands, *see supra* pp. 3–7, Texas needs no justification to pass its own legislation. While "federal courts may not order the creation of" any specific types of "districts unless necessary to remedy a violation of federal law," "that does not mean that the State's powers are similarly limited." *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). "[B]ecause it is the domain of the States . . . to conduct apportionment in the first place," *id.*, Texas could exercise its legislative power even if it did not need to remedy a violation of federal law, *see Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion) ("Laws promulgated by the Legislative Branch can be inconsistent, illogical, and ad hoc; law pronounced by the courts must be principled, rational, and based upon reasoned distinctions."). It therefore does not matter whether Governor Abbott (or Harmeet Dhillon) misread *Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024), or whether any districts in the 2021 Map actually needed to be redrawn. A legislative act based on mistake—or that cite a Washington official's mistake as political cover for lawful political redistricting—remains a valid legislative act.[35] "[T]he federal courts may not order" new districts merely because they find the legislature's choice (or explanation for the choice) odd or distasteful. *Voinovich*, 507 U.S. at 156.

**Gubernatorial Statements**. Plaintiffs' efforts to read racial intent into Governor Abbott's

---

[35] Gonzales Plaintiffs also miss the good reasons a State has for redrawing districts merely to avoid a suit by DOJ, even it appears not to be well-founded.

statements fare no better. They mostly describe the Governor's discussion of the Dhillon Letter's "constitutional concerns" and the *Petteway* ruling, and these points fail for reasons explained: a legal theory does not create a constitutional violation, even if it is incorrect. Moreover, Gonzales Plaintiffs' interpretation of Governor Abbott's statements is more easily understood when one considers the statement *outside* the fraught political context where it was made. When viewed in the proper context—i.e., a national whirlwind of calls for aggressive partisan redistricting— Governor Abbott's statements plainly reflect no desire to redraw districts because of their racial makeup, but instead an effort to transform the State's most heavily Democratic districts regardless of their racial makeup and to cite a legal necessity (rather than political desire) as the goal.

      **Legislative Statements**.   Neither Chairman Hunter's nor House Speaker Burrows's statements constitute direct evidence of intentional racial discrimination. First, discussing the requirements of federal law is not discriminatory. *See Feeney*, 442 U.S. at 279; *Voinovich*, 507 U.S. at 159 (explaining that state actor's "preference for federal over state law when he believed the two in conflict does not raise an inference of intentional discrimination; it demonstrates obedience to the Supremacy Clause of the United States Constitution."). Nor is discussing what legislative actions might be available to advance partisan goals due to a change in law. Courts must not place "too much weight on the fact that several legislative staffers" "viewed racial data at some point during the redistricting process." *Alexander*, 602 U.S. at 22. "This acknowledgment means little on its own because we expect that "[r]edistricting legislatures will . . . almost always be aware of racial demographics." *Id.* (quoting *Miller*, 515 U.S. at 916). This is particularly true where the legislators "testified without contradiction that they considered the relevant racial data only *after* [they] had drawn the Enacted Map and that [they] generated that data solely for a lawful purpose, namely, to check that the maps they produced complied with our Voting Rights Act precedent. *Id.*

      Second, the intentions of a single legislator do not impugn the intent of the Legislature as a whole. *United States v. O'Brien*, 391 U.S. 367, 383-84 (1968) ("What motivates one legislator to

make a speech about a statute is not necessarily what motivates scores of others to enact it"); *see also In re Davis*, 170 F.3d 475, 480 (5th Cir. 1999) ("Isolated statements of individual legislators represent neither the intent of the legislature as a whole nor definitive interpretations of the language enacted by Congress."); *see also Poe by & through Poe v. Drummond*, No. 23-5110, 2025 WL 2238038, at *6 (10th Cir. Aug. 6, 2025) ("contemporary statements from a few legislators do not persuade us of discriminatory intent."). Even assuming *arguendo* that Gonzales Plaintiffs' characterizations of Chairman Hunter and Speaker Burrows's statements are correct, Gonzales Plaintiffs have hardly shown direct evidence of a "consensus within the legislature" to purposely discriminate against Hispanics. *Vera*, 517 U.S. at 960.

Third, the meaning Gonzales Plaintiffs derive from the statements is disputed, contradicted, and unclear. Evidence is not direct if the meaning of the statement relies on an inference. *See Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) ("Direct evidence is evidence which, if believed, proves the fact without inference or presumption."); *see also Paulino v. Harrison*, 542 F.3d 692, 700 n.6 (9th Cir. 2008) ("circumstantial evidence is a set of facts from which another fact may be inferred, as opposed to direct evidence, which goes directly to the fact to be established."); *Radomsky v. United States*, 180 F.2d 781, 783 (9th Cir. 1950) ("Circumstantial evidence is that which establishes the fact to be proved only through inference based on human experience that a certain circumstance is usually present when another certain circumstance or set of circumstances is present. Direct evidence establishes the fact to be proved without the necessity for such inference."). Along the same lines addressed above, Gonzales Plaintiffs read into Chairman Hunter's and Speaker Burrows's references to *Petteway* or the Dhillon letter and implicit racial premise, but that is a *non-sequitur*. To redraw districts believed to be unconstitutional does not prove, or even suggest, racial motive, even if the premise of an underlying violation is faulty.

Limited Probative Value of Any Direct Evidence. As shown, Gonzales Plaintiffs have presented no direct evidence of intent to racially discriminate. But even assuming *arguendo* that

15

the statements cited by Gonzales Plaintiffs constitute some direct evidence of intentional discrimination, the statements are unpersuasive and fail to satisfy Gonzales Plaintiffs' burden to show likelihood of success on the merits. *See Easley v. Cromartie*, 532 U.S. 234, 253-54 (2001) (finding that the "direct" evidence the district court relied on—an email and a statement that could be interpreted in different ways—were "less persuasive than the links of direct evidence we have found significant in other redistricting cases") (quotations in original). Gonzales Plaintiffs struggle to reconcile Governor Abbott's "forceful denials of the Dhillon Letter's charge of racial gerrymandering in drawing SB 6" and his reference to the Dhillon Letter in the first special session call. ECF 1149 p. 4. Similarly, Gonzales Plaintiffs are unable to reconcile Chairman Hunter and Speaker Burrows's statements about *Petteway* with the claim that the 2025 Map was drawn for partisan reasons without the consideration of race. Gonzales Plaintiffs have trouble reconciling these statements because Gonzales Plaintiffs start by assuming that references to the Dhillon Letter and *Petteway* are evidence of discriminatory intent. If instead, one treats references to the Dhillon Letter and *Petteway* as race-neutral references to constitutional law, the statements are quite consistent. Instead, Gonzales Plaintiffs painted themselves into a corner. Either Gonzales Plaintiffs are correct, and their "direct" evidence is weak and contradicted by the legislators themselves or Gonzales Plaintiffs' interpretation of the "direct" evidence is wrong. Either way, the cited statements do not satisfy Gonzales Plaintiffs' burden of proving a likelihood of success on the merits.

### 2. Circumstantial evidence does not support a finding of racially discriminatory intent.

When, as here, plaintiffs lack direct evidence of discriminatory intent, they are left to rely on circumstantial evidence. Proving racial intent "with circumstantial evidence alone is much more difficult" than it is with direct evidence, and the Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Alexander*, 602 U.S. at 8. The possibility is open only "in theory." *Id.* Theory does not make out a clear showing

necessary for extraordinary provisional relief.

### a. No Alternative Plan

"A circumstantial-evidence-only case is especially difficult when the State raises a partisan-gerrymandering defense." *Id.* at 9. "When partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map." *Id.* Legislatures "may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (citation omitted). Courts must "be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare'" by restyling partisan-gerrymandering claims as race-based claims and "sidestep[ping]" the Supreme Court's holding "that partisan gerrymandering claims are not justiciable in federal court." *Id.* at 11, 21 (citation omitted). A plaintiff therefore "must 'disentangle race from politics.'" *Id.* (citation omitted). Precedent directs "an adverse inference" against plaintiffs who do not provide a "substitute map that shows how the State 'could have achieved its legitimate political objectives' in [a challenged district] while producing 'significantly greater racial balance.'" *Id.* at 34 (citation omitted). "If either politics or race could explain a district's contours, the plaintiff has not cleared its bar."[36] *Id.* at 10.

No Plaintiffs in this case even pretend to satisfy the standard of *Alexander*. The 2021 Map obviously does not show how Texas could achieve its legitimate political objectives; it contains approximately five fewer Republican-leaning districts than the 2025 Map (as the nation knows). Plaintiffs' collective army of experts has failed to muster a plan showing how the Texas legislature could achieve its goal with a different racial outcome.[37] A negative inference is mandated by

---

[36] These principles apply fully to allegations of intentional vote dilution, given that the same correlation of race and politics arises in such cases, as does the keen incentive to restyle partisan gerrymandering claims in racial terms.

[37] *See generally* Ex. CC, Dr. Sean Trende Expert Report.

precedent, and Gonzales Plaintiffs cannot overcome it *at the preliminary injunction stage*.[38]

### b. *Arlington Heights* Factors

Gonzales Plaintiffs turn to "[t]he *Arlington Heights* factors" for "circumstantial evidence." ECF 1149 p.10. The *Arlington Heights* factors include (1) discriminatory effect; (2) historical background; (3) the sequence of events leading up to a challenged decision; (4) departures from normal procedure; and (5) legislative history. *Vill. of Arlington Heights*, 429 U.S. at 266-68; *see Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*, 6 F.4th 633, 640 (5th Cir. 2021) ("These factors are not exhaustive"). Gonzales Plaintiffs' overriding dependence on these factors is a sign of weakness; it is far from clear that they provide much guidance in redistricting cases. *See Abbott*, 585 U.S. at 609–10 (addressing "circumstantial evidence" in redistricting case with minimal—arguably no—reliance on *Arlington Heights* factors); *Alexander*, 602 U.S. at 7–39 (32-page discussion of circumstantial evidence in redistricting case without one cite to *Arlington Heights*). The *Arlington Heights* factors were not fashioned to "disentangle race and politics," which is *the* task at hand. *Alexander*, 602 U.S. at 6. Nor do these factors get at redistricting-specific questions, such as "why a mapmaker who wanted to produce" five new Republican districts "would use data about voters' race rather than their political preferences"—a question Gonzales Plaintiffs cannot answer. *Id.* at 22. In all events, the *Arlington Heights* factors are probative only insofar as they can fairly point to "a discriminatory goal." *Rollerson*, 6 F.4th at 640; *cf. Twitter, Inc. v. Taamneh*, 598 U.S. 471, 504 (2023) (explaining that a multi-factor test cannot be construed "as a sequence of disparate, unrelated considerations without a common conceptual core"). That is not the case here.

**Discriminatory Effect**. A showing that legislation "bears more heavily on one race than

---

[38] It is further telling that Gonzales Plaintiffs present no meaningful analysis comparing racial and political geography against district lines. They sponsor the terse report of Mr. Blake Esselstyn that merely plots choropleth maps of Black CVAP and percentage vote for the Democratic candidate for President in 2024 side-by-side. ECF 1149-25 at Ex. 2. His report offers no conclusions, analysis, or opinions about the political significance of these two side-by-side choropleth maps, *see generally id.* at 1–3.

another" is necessary but not sufficient to prevail on a discriminatory intent claim. *Arlington Heights*, 429 U.S. 266–68. As explained, a discriminatory "effect" is an independent element of such a claim. *Alexander*, 602 U.S. at 39. Disparate impact may also provide a "starting point" as circumstantial evidence of motive, but absent a "stark" pattern "unexplainable on grounds other than race," "impact alone is not determinative." *Vill. of Arlington*, 429 U.S. at 264-65. Gonzales Plaintiffs have not established this factor, so their claim fails on this basis alone. In all events, the factor provides no circumstantial evidence of invidious motive.

Gonzales Plaintiffs must prove that H.B. 4 operates "to minimize or cancel out the voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 38 (citation omitted). In "Fifteenth Amendment proceedings" alleging vote dilution, a "comparison must be made with a hypothetical alternative," demonstrating "what the right to vote ought to be." *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000). It is unclear what comparator Gonzales Plaintiffs propose. While their expert, Dr. Ansolabehere, compares the 2025 Map to the 2021 Map, ECF 1149-24 pp. 3–5, that argument is hard to follow when Gonzales Plaintiffs sued to have the 2021 Map enjoined. It is not credible for them to cite that plan to show what their right to vote ought to be.

Regardless, the comparison must establish a *racially* invidious effect; the Constitution does not condemn a plan merely because, under it, Republican candidates win and Democratic candidates lose. *See Whitcomb v. Chavis*, 403 U.S. 124, 150 (1971). Gonzales Plaintiffs claim, without citing evidence or authority, that "the changes cannot be explained by partisanship." ECF 1149 at 5. But Gonzales Plaintiffs have no basis to make that argument because they have failed to disentangle race from politics. Notably, Gonzales Plaintiffs' expert, Dr. Ansolabehere, performed an analysis attempting to distinguish race from politics, which the Supreme Court cited as some circumstantial evidence of intent in *Cooper*, 581 U.S. at 315; *see Alexander*, 602 U.S. at 31. Dr. Ansolabehere did not present such an analysis here.

Plaintiffs cite the work of Dr. Ansolabehere for two propositions: (1) that in CD 9 and CD

35, which they concede are majority-Latino CVAP districts, Latino voters would be unlikely to be able to "elect their candidates of choice" and (2) that CD 18 and CD 30 were "packed" based on modest increases in Black CVAP from prior iterations of those districts in Plan C2193. ECF 1149 at 11, 13, 17-18 (describing increase from 46 to 50.2% in CD 30 and 38.8% to 50.5% in CD 18). But Dr. Ansolabehere only analyzed general elections, generating estimates for Anglo, Hispanic, and Black voters support for "Democratic" candidates in various contests in 2020, 2022, and 2024. *See* ECF 1149-24 ("Ansolabehere Rep.") at 8, tbl. 7. This omission is startling given the Court's prior criticism of an expert who failed to consider primary elections. *See LULAC v. Abbott*, 601 F. Supp. 3d 147, 165 (W.D. Tex. 2022) ("giv[ing] little weight to Dr. Barreto's ultimate conclusions" because he maintained "that the only relevant factor in determining Black and Hispanic citizens vote as a cohesive group is how they vote in general elections"). And this omission is particularly important with respect to the districts alleged to be "packed" (i.e., CD18 and CD23), since in districts Democratic candidates will likely win, so the relevant question is who will win the Democratic primary. *See Agee v. Benson,* No. 1:22-cv-272, 2023 WL 8826692, *54 (W.D. Mich. Dec. 21, 2023) (three-judge court) (criticizing RPV expert for failing to consider primaries where "[e]veryone agrees that the elections in these districts are decided in the Democratic primaries, not the general election").

A separate problem for Gonzales Plaintiffs is that the overall number of majority-minority districts across the state increased, whereas the number of Democratic districts decreased. That describes a partisan impact, not a racially discriminatory impact. Indeed, Gonzales Plaintiffs challenge *majority-minority* districts as discriminatory. In a majority-minority district, the relevant minority group can "elect [its preferred] candidate based on their own votes and without assistance from others." *Bartlett v. Strickland*, 556 U.S. 1, 14 (2009) (plurality op.). A state does not establish "a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities," *Alexander*, 602 U.S. at 38 (citation omitted), by creating districts in which the minority can elect

20

its candidates of choice—assuming it has any—at will. While Plaintiffs predict that the Hispanic group will not exercise this opportunity, their expert shows that this is due to low Hispanic turnout and low cohesion.[39] *See* Collingwood Rep. 9–25. That does not mean the voting potential has been cancelled or minimized. *Cf. Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) ("Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote."). Nor does it plausibly suggest motive to cancel out minority votes; it points to political motive.

**Recent History**. A review of "historical background," *Arlington Heights*, 429 U.S. at 267, further undermines Gonzales Plaintiffs' effort to restyle partisan motive as racial motive. Even a cursory look at Texas redistricting history shows that it can be as politically hard-nosed as anywhere. *LULAC*, 548 U.S. at 412–13 (describing "a protracted partisan struggle, during which Democratic legislators left the State for a time to frustrate quorum requirements, [and] the Republican-controlled legislature enacted a new congressional districting map" mid-decade). Politics then, politics now.

Moreover, Texas's recent history belies the conclusion that minorities are still subject to the consequences of the invidious racial discrimination of Texas's past. *Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016) ("[T]he most relevant 'historical' evidence is relatively recent history, not long-past history."); *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 221 (4th Cir. 2024) ("recent history is more persuasive of whether 'the political process is . . . equally open to minority voters' than history far more removed"). Gonzales Plaintiffs point to the trial record to support their argument here, but evidence in the recent trial showed Texas has worked hard to remedy the effects of its history of discrimination. Plaintiff expert Dr. Tijerina could not point to any empirical evidence that the history of discrimination he painstakingly outlined hinders the

---

[39] It is difficult to understand why the Texas legislature would use information about Hispanic residential patterns when the group's low cohesion would be a poor predictor of election outcomes. *Cf. Alexander*, 602 U.S. at 22 (faulting challengers for "provid[ing] no explanation why a mapmaker who wanted to produce a version of" the challenged district "that would be safely Republican would use data about voters' race").

ability of Latinos to participate in the political process in 2020.[40] To the contrary, there is strong evidence of Texas's improvements. For example, members of minority groups are consistently elected and re-elected in Texas.[41] In fact, none of the discriminatory practices outlined in Plaintiff expert Dr. Tijerina's report have been in effect for at least 60 years.[42] Within the last 60 years, however, Democratic states have politically gerrymandered their states and stifled their Republican voters' abilities to elect Republicans to Congress. The trial record shows that the effects of Texas's history of discrimination do not prevent minorities from participating in the political process any longer. Now, the battle is a political one.

**Sequence of Events**. Every procedural step of the 2025 redistricting shows political motive, not racial motive. "[S]tep one was Trump, saying he wanted five more congressional districts out of Texas-Republican congressional districts."[43] When the Legislature attempted to deliver on that request, House Democrats fled to some of the most heavily gerrymandered Democratic states in the union to prevent a quorum, while describing the 2025 Map as a blatant partisan power grab.[44] After meeting with high-level Democratic officials, House Democrats returned to Texas singing a different tune. Instead of partisan complaints, Democrats now alleged

---

[40] Trial Tr. 5/27/25 AM at 13:24–14:4.

[41] *See e.g.,* Trial Tr. 5/21/25 AM at 12:13–18; Trial Tr. 5/21/25 AM at 13:8–22; 15:8–20.

[42] Trial Tr. 5/27/25 AM at 13:6–9.

[43] Ex. S, Testimony on Redistricting Before the Senate Special Comm. on Congressional Redistricting, 89th Leg., 1st C.S. 11-12 (Jul. 30th, 2025) (Senator Alvarado speaking).

[44] *See e.g.,* Ex. J, at 56-57(Congressional Representative Garcia: "[W]e are here today playing political games. . . . I urge you to reject this partisan gerrymandering of Texas"); Ex. J at 76 ("[T]he short-term gain is getting the five seats to retain the gavel of the House and get the agenda done. I mean, that's the power grab."); Ex. T, Testimony on Redistricting on the Floor of the Senate Part I, 89th Leg., 1st C.S. 21 (July 21, 2025) (Senator Alvarado regarding the DOJ Letter: "So the letter, neither finds a violation of law, nor engages in Bonafide settlement efforts. It raises concerns and asks for a same-day response. It's kind of a fig leaf or a power grab."); Ex. T at 155 (Senator Miles: "This isn't redistricting. It's rig districting . . . The Trump administration has put a target on the backs of those who have dared to speak up the truth . . . . This is a political attack on democracy, a strategic assault to steal the 2026 election, to flip congressional districts"); Ex. U, Testimony on Redistricting Before the Senate Special Comm. on Redistricting, 89th Leg., 1st C.S. 17 (July 26, 2025) (Senator Alvarado: "Because now that Trump has asked Texas to do this, now there are other states trying to do the same thing. . . . [I]f we do this, then any state at any time can follow this path and just start redistricting because of a power grab or afraid of midterm elections.").

racial discrimination.[45] This sequence of events illustrates that the original intent for the 2025 Map was to redistrict for partisan effect. Everyone knew it. Only after meeting with the likes of Eric Holder—who chairs the National Democratic Redistricting Committee—did Democratic lawmakers coalesce around a narrative more likely to succeed in litigation—as Congressman Al Green testified: if the map wasn't *racially* discriminatory, Democrats could not prevent its use in 2026.[46]

Gonzales Plaintiffs attempt to reorient this decidedly political course of events around "the July 7 Dhillon Letter," which they say "framed the push for new congressional districts in racial rather than partisan terms." ECF 1149 p. 14. As explained, the letter did not frame the line drawing in racial terms but demanded that (incorrectly diagnosed) race-based line drawing be redone. This was a legal theory served to provide political cover for Texas to redistrict. However misconceived Gonzales Plaintiffs might think it to be, it does not change the fact that the process was, from beginning to end, a partisan process.

**Alleged Procedural and Substantive Departures**. Redistricting in a special session is not evidence of racial intent; redistricting in a special session is at least as consistent with partisanship as it might be—if at all—with racial motives. *Rucho*, 588 U.S. at 710. Indeed, the State of Texas has repeatedly used special sessions to enact redistricting legislation.[47] Other than the timing of redistricting, there were few procedural or substantive departures from the normal redistricting process. Members of the public and lawmakers received adequate notice of hearings and amendments in English and Spanish.[48] Advocates for prominent civil rights organizations

---

[45] *See e.g.,* Ex. P at 12 Senator Alvarado: "I have a hard time believing that you or anybody that had anything to do with the drawing of the map did not look at racial numbers, demographics."); Ex. V, Testimony on Tex. H.B. 4 on the Floor of the Senate Part III, 89th Leg., 2nd C.S. 50 (Aug. 22, 2025) ("And this might seem like an attack on Senator King, and I don't mean it to be, but the fact is, we've got to find out who the racists are. I know it's not Senator King. It's the map makers.").

[46] Ex. A at 36:21-24.

[47] Ex. M at 7.

[48] *See e.g.,* Ex. W, Tex. House Comm. on Congressional Redistricting Notice of Hearing, 89th Leg., 1st C.S. (Jul. 24, 2025).

including NAACP and LULAC testified at hearings.[49] The Legislature held region specific hearings.[50] Legislators answered extensive questions regarding the impact of the maps. The Legislature held hours of debate, spending more time debating and evaluating the 2025 Map than the 2021 Map. The 2025 procedure was consistent with redistricting in a special session. The Legislature likewise did not substantively depart from traditional redistricting principles. Senator King stated his goals for the map were legal compliance, partisanship, and compactness, in that order.[51] The 2025 Map fulfills those redistricting goals.

**Legislative History**. The legislative history strongly weighs against a finding of discriminatory intent. For example, in the Senate, Chairman King expressly stated that his goals for the 2025 Map were legal compliance, partisan performance, and compactness, in that order.[52] Chairman King stated on the floor that the Dhillon Letter is of no relevance to the legislature or the Senate Redistricting Committee because once redistricting in on the call, the Legislature must address the issue regardless of why the Governor placed it on the call.[53] Likewise in the House, Chairman Hunter stated that the House Committee Substitute to H.B. 4 (which ultimately passed as the 2025 Map) were "based on partisanship, political performance."[54] "The intent of the changes was to increase Republican political performance in existing Republican districts[.]"[55] These represent just a small sampling of the plethora of contemporaneous statements supporting the partisan purpose of the map.

---

[49] *See e.g.,* Ex. X, Tex. House Comm. on Congressional Redistricting Witness List, 89th Leg., 1st C.S. (Jul. 24, 2025) (including Gary Bledsoe and Nina Perales as testifying witnesses).

[50] *See e.g.,* Ex. Y, Tex. House Comm. on Redistricting Handout Compilation, 89th Leg., 1st C.S. (Jul. 26, 2025) (Houston); Ex. Z Tex. House Comm. on Redistricting Handout Compilation, 89th Leg., 1st C.S. (Jul. 28, 2025) (Arlington).

[51] Ex. Q at 6.

[52] Ex. Q at 6.

[53] Ex. S at 14.

[54] Ex. N at 4:11-14.

[55] Ex. N at 4:15-17.

**B. There is No Evidence the 2025 Map was Drawn with the Predominant Purpose of Discriminating Against Racial Minorities.**

Gonzales Plaintiffs' racial gerrymandering claims are equally unlikely to succeed. "To prove racial gerrymandering, a plaintiff must establish not just that race was a factor in redistricting, but that it was 'the predominant factor.'" *LULAC v. Abbott*, 604 F. Supp. 3d 463, 509 (W.D. Tex. 2022) (quoting *Miller*, 515 U.S. at 916). "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller*, 515 U.S. at 916.[56] The inquiry turns on "the design of the district as a whole," so "[a] court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue." *Bethune-Hill*, 580 U.S. at 192. Importantly, the predominance test is not satisfied merely because of a racial goal, even a racial target. *Allen v. Milligan*, 599 U.S. 1, 32–33 (2023) (plurality opinion) (explaining "that 'the use of an express racial target' [is] just one factor among others that the court would have to consider as part of '[a] holistic analysis.'"). "As a practical matter, in many cases, perhaps most cases, challengers will be unable to prove an unconstitutional racial gerrymander without evidence that the enacted plan conflicts with traditional redistricting criteria." *Bethune-Hill*, 580 U.S. at 190.

Gonzales Plaintiffs fail to show any serious prospect of success under this standard. To begin, they have failed to provide the kind of alternative plan required by precedent, so they must overcome an adverse inference. Moreover, Gonzales Plaintiffs' reliance on an abstract narrative of letters exchanged between Washington and Austin is particularly inapt under the racial gerrymandering test, which (as noted) concerns the "decision to place a significant number of voters within or without a particular district." *Id.* at 187. Even if there was some abstract racial

---

[56] Gonzales Plaintiffs bring a racial gerrymandering claim under the 14th and 15th Amendments. Racial gerrymandering claims are not cognizable under the 15th Amendment. *Perez v. Texas*, No. SA-11-CV-360-OLG-JES-XR 2014 WL 12853571 *2-3 (W.D.T.X June 23, 2014); *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000); *see also Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 n. 3 (2000) ("we have never held that vote dilution violates the Fifteenth Amendment.").

concept—and there was not—Gonzales Plaintiffs cannot prevail under this theory without the type of "holistic analysis" demanded in precedent concerning how that goal impacted district lines. *Id.* at 192. Gonzales Plaintiffs' cursory quibbles with certain districts, ECF 1149 pp. 18–20, fail to differentiate race and politics, are provided with minimal evidentiary backing, and ignore the many ways in which the 2025 plan is *more* consistent with traditional districting principles (e.g., under compactness measures). Gonzales Plaintiffs are not entitled to a preliminary injunction.

### C. Gonzales Plaintiffs' Claim that H.B. 4 is a Per Se Violation of the Equal Protection Clause Fails as a Matter of Law and Evidence.

Gonzales Plaintiffs assume H.B. 4 was "utterly unnecessary[.]" ECF 1149 at 20. However, Texas needs no legal justification to exercise its legislative power. *See Rucho*, 588 U.S. at 716; *Voinovich*, 507 U.S. at 156; *Vieth*, 541 U.S. at 278 (plurality opinion). State Defendants moved to dismiss Gonzales Plaintiffs' malapportionment and equal protection claims in their September 8, 2025, Motion to Dismiss. ECF 1162. State Defendants hereby incorporate the arguments made therein.

Gonzales Plaintiffs' claim also contravenes the settled rule that "[t]he census is presumed accurate until proven otherwise." *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir. 1988); *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 204 F.3d 1335, 1341 (11th Cir. 2000) ("The presumption is that census figures are continually accurate."); *United States v. Vill. of Port Chester*, 704 F. Supp. 2d 411, 439 (S.D.N.Y. 2010) ("this Court recognizes that Census data is presumptively accurate"). They insist that "HB 4's districts undeniably do not have equal populations as of the enactment date." ECF 1149 p.21. This is so easy to deny that the law *presumes* it to be wrong: to "override the presumption of correctness of the prior decennial census," a party must present "clear, cogent and convincing" evidence that disproves the census figures with "a high degree of accuracy." *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1210 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999) (collecting cases). Gonzales Plaintiffs rely on the American Community Survey (ACS), but "[t]he ACS is a sample survey" that does not overcome

the presumptive accuracy of the decennial census "with any reliable degree of certainty." *Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 932 (8th Cir. 2018). Parties routinely fail to overcome the presumption of accuracy in the decennial census with ACS data. *See, e.g.*, *Benavidez v. Irving Indep. Sch. Dist., Tex.*, 690 F. Supp. 2d 451, 460 (N.D. Tex. 2010) ("Here, the use of the ACS data does not similarly meet the high standards and thorough coverage of the decennial census."); *cf. Perez v. Perry*, No. 11-cv-360, 2017 WL 962686, at *3 (W.D. Tex. Mar. 10, 2017) ("Even with aggregated data, block group estimates may contain large margins of error."). Plaintiffs do not even attempt to rebut the legal presumption standing in their way, and they have no serious prospect of success on the malapportionment claim.

### D.  The Motion Fails Independently on Governing Equitable Factors

Even if a plaintiff can show a likelihood of success, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 585 U.S. at 158. Plaintiffs must also show "a substantial threat of irreparable injury if the injunction is not issued." *Whitaker v. Livingston*, 732 F.3d 465, 466 (5th Cir. 2013). It is not enough to show that irreparable injury is possible, a plaintiff must demonstrate that "he is *likely* to suffer irreparable harm." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because Plaintiffs here are not likely to prevail on their claims that the Legislature unconstitutionally discriminated on the basis of race, they cannot show that they are likely to suffer irreparable harm. By comparison, an injunction would irreparably harm the State. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). Accordingly, the balance of the equities and public interest "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and courts "should be particularly cautious when contemplating relief that implicates public interests." *Salazar v. Buono*, 559 U.S. 700, 714 (2010). "[T]he balance of harm requirement . . . looks to the relative harm to both parties if the injunction is granted or denied." *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016). Here, that balance militates against an injunction.

"Then there's *Purcell*." *Pierce*, 97 F.4th at 226. "That name stands for the principle that 'federal courts ordinarily should not enjoin a state's election laws in the period close to an election,' and that when 'lower federal courts contravene that principle,' the Supreme Court will stop them." *Id.* (quoting *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring)); *see Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). The *Purcell* principle has its genesis in *Reynolds v. Sims*, 377 U.S. 533 (1964), which ruled that the lower court "acted wisely in declining to stay the impending primary election in Alabama," *id.* at 586, even though the challenged redistricting plan was plainly unconstitutional, *id.* at 545. "*Sims* has been the guidon to a number of courts that have refrained from enjoining impending elections," *Chisom v. Roemer*, 853 F.2d 1186, 1190 (5th Cir. 1988), "even in the face of an undisputed constitutional violation," *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003).

As this Court has recognized, *LULAC*, 601 F. Supp. 3d at 186, the Supreme Court has not hesitated to stay injunctions against elections under the *Purcell* principle. In *Milligan*, the Supreme Court intervened to stay a three-judge panel's redistricting injunction, which was issued on January 24, 2022, "seven weeks" before the beginning of early voting on March 30, 2022, for the state's primary. *Merrill v. Milligan,* 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring). According to the two Justices whose votes were decisive, the strength of the *Purcell* principle, standing alone, compelled that result. *Id.* at 879–82. That much was confirmed when the Supreme Court ultimately affirmed on the merits, concluding that the lower court "faithfully applied our precedents." *Milligan*, 599 U.S. at 23. The Supreme Court has similarly stayed other district court decisions that attempted to issue election-related injunctions in the period close to an election. *See, e.g., Karcher v. Daggett*, 455 U.S. 1303 (1982) (Brennan, J., in chambers); *Gill v. Whitford*, 137 S. Ct. 2289 (2017); *Rucho v. Common Cause*, 583 U.S. 1099 (2018); *North Carolina v. Covington*, 580 U.S. 1088 (2018); *Abbott v. Perez*, 138 S. Ct. 49 (2017); *North Carolina v. Covington*, 583 U.S. 1109 (2017); *Perry v. Perez*, 565 U.S. 1090 (2011); *Miller v. Johnson*, 512 U.S. 1283 (1994); *Chabot v. Ohio A. Philip Randolph Inst.*, 587 U.S. 1024 (2019).

The *Robinson* litigation is instructive. In that case, the Fifth Circuit declined to stay a June district-court injunction under Section 2 against Louisiana's congressional plan, despite the fact that the "primary elections [were] five months away," the candidate filing deadline was June 22, UOCAVA ballots would be mailed in "late September, and early voting [began] in October." *Robinson v. Ardoin*, 37 F.4th 208, 228-29 (5th Cir. 2022). The Fifth Circuit called *Milligan* "an outlier" and reasoned the injunction was proper because it had issued before ballots had been mailed, thereby attempting to distinguish this Court's May 2022 decision's *Purcell* analysis, which was grounded in part on the fact ballots had been mailed by the time of the hearing. *Id.* at 229 (citing *LULAC*, 601 F. Supp. 3d at 186–187). That was erroneous. The Supreme Court promptly entered the stay the Fifth Circuit refused to enter. *Ardoin v. Robinson*, 142 S. Ct. 2892 (2022).

Two years later, a new congressional plan adopted by Louisiana in response to the *Robinson* case was itself enjoined by an April 30, 2024, order of a three-judge district court, as an alleged racial gerrymander. *Callais v. Landry,* 732 F. Supp. 3d 574 (W.D. La. 2024). Even though the district court had scheduled a status conference for May 6 to discuss a remedial phase, *id.* at 613, and the election was in November,[57] the Supreme Court promptly stayed the district court's injunction under *Purcell*. *Robinson v. Callais*, 144 S. Ct. 1171 (2024). "Insanity is doing the same thing over and over and expecting different results."[58]

This case is like *Robinson* and *Callais* in all material respects. The injunction hearing is scheduled to run from October 1 to 10, 2025. ECF 1146 at 1–2. To repeat, stays were issued in those cases five and six months before elections. Here, Texas's candidate qualification period runs from November 8 to December 8, 2025, early voting begins February 17, 2026, and the primary election is March 3, 2026—five months away from the hearing.[59] Early voting for overseas and

---

[57] Louisiana does not have a traditional primary election in the spring.

[58] Ex. AA, *E.g.*, Frank Wilczek, *Einstein's Parable of Quantum Insanity*, Scientific American (Sep. 23, 2015), https://www.scientificamerican.com/article/einstein-s-parable-of-quantum-insanity/.

[59] *See* Ex. BB. Tex. Sec'y of State, *Important 2026 Election Dates*, at https://www.sos.state.tx.us/elections/voter/important-election-dates.shtml#2026 (visited Sept. 20, 2025).

military voters begins even earlier, on January 17, 2026, as federal law requires the issuance of absentee ballots to such voters 45 days before the primary. 52 U.S.C. § 20302(a)(8).

The issuance of an injunction against H.B. 4 would "confuse voters, unduly burden election administrators, [and] otherwise sow chaos or distrust in the electoral process." *La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 408 (5th Cir. 2024) (citation omitted). Voter confusion by election-related litigation can lead to "incentive to remain away from the polls," *Purcell,* 549 U.S. at 4–5, and a precipitous injunction would impose a burden on election officials that would impair the State's "significant interest in ensuring the proper and consistent running of its election machinery," *Tex. All. for Retired Am. v. Hughs,* 976 F.3d 564, 569 (5th Cir. 2020) (citation omitted), by requiring election officials throughout the State to attempt to accurately re-implement some different congressional plan in time for the March 3 primary. Moreover, "late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Such negative effects will occur should the Court grant Plaintiffs' request.[60]

There is no room for Plaintiffs to complain that H.B. 4 was enacted too late for judicial review. *Cf. Pierce*, 97 F.4th at 226 (applying *Purcell* even though timing of enactment "set a tight timeline for any pre-election challenge"). The Legislature *tried* to enact H.B. 4 earlier and was frustrated by Democratic members' political stunt of fleeing the state. In all events, *Purcell* protects the "status quo" a State establishes, *regardless of when it does so. Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) (per curiam). *Wise* found that "it is not federal court decisions, but state decisions, that establish the status quo." *Id.* In that case, North Carolina's executive and judicial branches altered state election law in late September 2020 to address COVID-related concerns known long before, and the Fourth Circuit held that *Purcell* protected that choice, *id.* at 96-99, over the dissent's objection that the state action came too late, *id.* at 116-17 (Wilkinson, J., dissenting).

---

[60] *See* Ex. DD, Sworn Declaration of Christina Adkins, Director of Elections for the Office of the Texas Secretary of State, attached as Exhibit DD and incorporated herein.

Likewise, in the *Milligan* litigation, the Alabama legislature enacted the challenged congressional plan on November 3, 2021, suit was filed the same day, *Caster v. Merrill*, No. 2:21-cv-1536, 2022 WL 264819, at *6, 15 (N.D. Ala. Jan. 24, 2022), and *Purcell* barred the preliminary injunction. Here, H.B. 4 is the "status quo" and *Purcell* protects that status quo. A ruling otherwise would allow plaintiffs to make redistricting "a game of ambush." *In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023). It is not supposed to be that.

## Conclusion

For the foregoing reasons, Plaintiffs' motion to preliminarily enjoin implementation of Plan C2333 should be DENIED.

Date: September 20, 2025

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Ralph Molina
Deputy First Assistant Attorney General

Ryan D. Walters
Deputy Attorney General for Legal Strategy

William D. Wassdorf
Associate Deputy Attorney General for Civil Litigation
Texas Bar No. 24103022
william.wassdorf@oag.texas.gov

Office of the
Attorney General of Texas
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410

Respectfully submitted,

*/s/ Ryan G. Kercher*
Ryan G. Kercher
Chief, Special Litigation Division
Texas Bar No. 24060998

Kathleen T. Hunker
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

David Bryant
Senior Special Counsel
Texas Bar No. 03281500

Zachary L. Rhines
Special Counsel
Texas Bar No. 24116957

Munera Al-Fuhaid
Special Counsel
Texas Bar No. 24094501

Zachary W. Berg
Special Counsel
Texas Bar No. 24107706

Ali M. Thorburn
Special Counsel
Texas Bar No. 24125064

31

ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov

zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov

COUNSEL FOR STATE DEFENDANTS

### CERTIFICATE OF SERVICE

I certify that on September 22, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

/s/ Ryan G. Kercher
RYAN G. KERCHER
Chief, Special Litigation Division