# State Defendants' Response to Gonzales Plaintiffs' Motion for Preliminary Injunction

# Exhibit DD

Christina Adkins Declaration

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> GREG ABBOTT, *et al.*, <br> *Defendants*. | § § § § § § § § § | Case No. 3:21-cv-259-DCG-JES-JVB <br> [Lead Case] |

## **DECLARATION OF CHRISTINA WORRELL ADKINS**

I, Christina Worrell Adkins, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following testimony is true and correct to the best of my knowledge and belief:

1. I am the Director of Elections for the Office of the Texas Secretary of State. I have served in this position since March 10, 2023, initially as the Acting Director until April 26, 2023. Prior to becoming Elections Director, I served as Legal Director of the Elections Division. I have worked at the Secretary of State's Office since June 2012.

2. The Texas Secretary of State is the chief election officer for Texas. In this capacity, the Secretary, through the Elections Division, prepares and distributes guidance to appropriate state and local authorities in the administration of elections in Texas, and provides certain administrative support.

3. In my time at the Secretary of State's Office, I have become familiar with the administration and operations of Texas elections, including the tasks, practices, and responsibilities that election authorities must fulfill; the deadlines associated with these tasks, as well as the time and funding needed to perform the duties; and the laws and regulations with which local election authorities must comply to plan, coordinate, manage, and execute a successful election. I am also familiar with Texas's redistricting process, including the duties and responsibilities that state law imposes on counties to implement a new redistricting plan adopted by the Texas Legislature.

4. Every election conducted in Texas takes months of preparation. The March 2026 Primary Election is no exception. Primary elections, in fact, can often involve a greater amount of effort to organize and conduct than other elections because they are run by county chairs of a political party and entail additional deadlines to account for the unique characteristics of a primary, such as the candidate-filing period and the need to conduct a drawing to determine the order of candidate names on the ballot.

5. Although Election Day (March 3, 2026) is over five months away, work has already begun for the primary and election authorities face multiple impending deadlines.

6. For example, pursuant to state law, the candidate filing period for the office of precinct chair for the March 2026 Primary Election began on September 9, 2025, and is scheduled to continue until December 8, 2025. Precinct chair candidates—who submit their applications to the county chair of the political party, or the secretary of the county executive committee, for a place on the primary election ballot—have already begun filing applications for the March 2026 Primary Election.

7. The candidate filing period for all other offices for the March 2026 Primary Election will run from November 8, 2025 to December 8, 2025.

8. Under the current schedule, within ten days after the candidate filing period closes on December 8, 2025—*i.e.*, December 18, 2025 for the March 2026 Primary Election—the county chair or the county chair's designee must conduct a drawing to determine the order that the candidates' names will appear on the general primary election ballot for each county. *See* Tex. Elec. Code § 172.082. Notice of the drawing must be posted for at least 24 consecutive hours beforehand. *See id.*

9. Once the county chair has certified the drawing, the relevant local election authority will design and proof the ballots, program the ballots into the voting machines, and conduct logic and accuracy testing to ensure that there are no errors. Logic and accuracy testing is a collection of pre-election procedures that help ensure that the voting equipment and ballots to be used in an upcoming election can properly display the ballot, collect votes, and accurately tabulate results. It also helps ensure that the candidates only appear in the districts for which they are running. As part of conducting logic and accuracy testing, the local election authority will test by hand every possible ballot combination.

10. Each local election authority must complete its initial public testing of electronic voting equipment no later than the 48th day before election day. Tex. Elec. Code § 129.023. This testing process consists of three tests that are conducted simultaneously: a public logic and accuracy test, a first tabulation test of central counting station equipment, and a tabulation test of polling place equipment. For larger counties, whose election may involve hundreds, if not thousands, of ballot combinations, logic and accuracy testing can take a week or more to complete.

11. The Military and Overseas Voter Empowerment ("MOVE") Act requires Texas election authorities to transmit validly-requested absentee ballots to military and overseas voters no later than 45 days before a federal election. For the March 2026 Primary Election, the 45th-day deadline is January 17, 2026. To my knowledge, some counties aim to send out ballots sixty days before the election day; however, most counties lack the resources to mail ballots in advance of the 45th-day deadline. In each election, there are multiple local election authorities that struggle to meet this deadline and finish their ballot preparation at the deadline.

12. Local election authorities thus have a mere 30 days to prepare, test, and ready the ballots between the deadline for the ballot order drawing (December 18, 2025) and the federal deadline for the mailing of ballots to voters (January 17, 2026).

13. Even a minor delay or alteration of the election deadlines would cause serious disruptions for local election authorities and voters. For example, changes to any of the initial deadlines, like the candidate filing period, would reduce the timeframe by which local election authorities have to prepare ballots before the 45th-day deadline. This means that counties may run afoul of the MOVE Act and face an enforcement action by the U.S. Department of Justice, while voters would experience a delay in receiving their mail-in ballots. An accelerated timetable also would increase the likelihood of errors by local election authorities when creating the ballot unless they devote additional, unforeseen time and resources for ballot preparation (which is simply not feasible for some counties).

14. Moving the candidate filing period for one set of offices (U.S. Congress) but not for other offices would bring about additional complications. For one thing, having different candidate filing periods for different offices will add to the confusion for candidates, who already pose many questions to our office in a normal election cycle. Moreover, the lack of uniform candidate filing deadlines applicable to all offices up for election in 2026—as it is under current law—could lead to gamesmanship by candidates who, along with other candidates, may be interested in applying for one office subject to a particular filing deadline or another office subject to a different deadline.

15. Given these considerations, it is my opinion that postponing the candidate filing period by anything longer than one week—if at all—would cause significant administrative upheaval, impose burdens on local election authorities, and potentially compromise the integrity of Texas elections.

16. In addition, congressional candidates who want to be placed on the primary ballot for the Republican Party or Democratic Party, or seek the nomination of the Green Party or Libertarian Party through the convention process, must file a candidate application and submit a filing fee ($3,125 for U.S. House) or secure a requisite number of signatures from registered voters who live in the particular district. Those candidates who choose to submit a petition in lieu of a filing fee have already begun to collect signatures for their petition. Candidates can only obtain signatures from registered voters of the congressional district for which they are applying. So, the validity of a signature on a petition is directly tied to the lines of each congressional district. Changing these lines—after the signature-collection process has begun—will create confusion among candidates, voters, and election authorities. It could force candidates to restart their signature-gathering efforts to align with new district lines. And further changes to congressional district lines could even lead to legal challenges regarding the validity of signatures on a candidate's petition.

17. I also have significant concerns about moving the date of the 2026 Primary Election. These concerns are based on my experience with the Secretary of State's Office for over thirteen years, including multiple redistricting cycles. When the 2012 primary date was rescheduled by court order, counties and local entities experienced increased costs to run their elections;

voters and election officials were confused and frustrated by the shifting dates; and candidates and other members of the public complained to our office about the challenges caused by changing deadlines. The Secretary of State's Office saw firsthand how these changes disrupted the effective administration of elections. We also witnessed the efforts by the State and local election authorities to implement the court's orders and remain in compliance with state and federal laws.

18. Were the court to postpone the primary election, the court would need to set a new candidate filing period or create a second filing period if the initial filing period had opened before the postponement. In the case of the latter, candidates whose applications were accepted during the initial filing period may no longer be eligible for the office if the district lines were changed by the court. In such an instance, the filing authority would subsequently reject the application based on the candidate's ineligibility, and the candidate could submit an application for a different office, if eligible, during the second filing period. Other candidates whose applications were accepted in the initial filing period and remain eligible for the office sought may attempt to refile due to confusion over the new deadline or revised districts. In addition, candidates who failed to timely submit an application in the first filing period, or whose initial applications were rejected due to a defect, may take advantage of the second filing period. In 2012, when the court postponed the primary, the court scheduled a second candidate filing period, which caused a great amount of confusion and discontent from candidates due to changes in district lines. I expect that the same would happen if the 2026 Primary Election were delayed.

19. Relatedly, counties must review and implement changes to county election precincts in light of the new congressional maps adopted by the Texas Legislature. Election Code § 42.005 provides that a county election precinct cannot contain territory from more than one congressional district (among other limitations). Therefore, if a county needs to alter its election precincts in light of the new redistricting plan, its commissioners court must order those changes.

20. The process of drawing precinct lines can be time-consuming depending on the number of changes to district lines made in a given area by the Legislature. According to Election Code § 42.006, an election precinct must contain a set population of at least 100 but not more than 5,000 registered voters. The number may vary slightly if the county has a population under 100,000 or 50,000. In addition, the county commissioners court must determine whether the county election precincts comply with the officer line rule, *see* § 42.005, the population rule, *see* § 42.006, and the ban on combining incorporated and unincorporated territory in a single precinct, *see* § 42.007.

21. Counties impacted by the new congressional redistricting maps are working to draw their election precinct lines to comply with state law. Later this year, beginning in mid-November, counties will send out voter registration certificates to voters, specifying their information, including their election precinct. Drawing new lines and issuing voter registration certificates require a considerable amount of time and expense, and the counties would be unable to recover these expenditures—or absorb another round of expenses, for many counties—if they had to review and redraw the election precincts again

4

in light of a court order. On top of that, the counties would need to act quickly as the primary cannot be held until the election precincts are finalized.

22. Moving the March 2026 Primary Election could also impact the effective administration of the November 2026 General Election.

23. Under the Election Code, "[i]f no candidate for nomination to a particular office receives the vote required for nomination in the general primary election, a runoff primary election shall be held to determine the nomination." § 172.004. In a normal election year, the runoff primary election date is the fourth Tuesday in May. *See* § 41.007. The state chair of each political party then certifies by posting on the Secretary of State's website the name and address of each primary candidate who is nominated for a statewide or district office. *See* § 172.122. And the Secretary of State, not later than the 68th day before general election day, delivers the certification to the authority responsible for having the official general election ballot prepared in each county. *See* § 161.008.

24. For the November 3, 2026 general election, the deadline for the Secretary of State's ballot certification is August 27, 2026. This gives local election authorities about three weeks to design the ballots, program their polling machines, conduct logic and accuracy testing, and prepare ballots for delivery before the 45th-day deadline for mailing ballots to military and overseas voters. Texas local election authorities sometimes have difficulty meeting the federal deadline as is. The probability of a Texas county or other election authorities missing this deadline would increase if ballot certification was delayed for any reason.

25. The State has an acute interest in ensuring that any delay in the primary or primary runoff dates would not impede the state chair from certifying the candidates or the Secretary of State from delivering the certification of the general election ballot to the local election authorities. Based on the Secretary of State's experiences with prior elections, mid-July is likely the latest time that the runoff could occur without disturbing the efficient administration of the November election.

Executed on this 22nd day of September, 2025.

*Christina W. Adkins*

Christina Worrell Adkins
Director of Elections

5