**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | 3:21-cv-00259-DCG-JES-JVB [Lead Case] |
| *Plaintiffs,* | |
| EDDIE BERNICE JOHNSON, *et al.*, | & |
| *Plaintiff-Intervenors,* | |
| V. | All Consolidated Cases |
| GREG ABBOTT, *et al.*, | |
| *Defendants.* | |

**STATE DEFENDANTS' RESPONSE TO BROOKS, LULAC, AND MALC PLAINTIFFS' JOINT MOTION FOR PRELIMINARY INJUNCTION**

T<span>ABLE OF</span> C<span>ONTENTS</span>

Page

Table of Authorities ............................................................................................................. iii

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 3

   I.   Democrats have waged a nationwide "redistricting war" against Republicans over the past several decades............................................................................................. 3

   II.  Texas drew its 2021 Congressional Map blind to race. ....................................... 5

   III. President Trump demanded that states, including Texas, redraw their maps to help maintain a Republican advantage in the Congress...................................... 6

   IV. Legislative Action and Hearings Prior to the Introduction of the Maps............. 8

   V.  The Texas Legislature redrew the Congressional maps to improve Republican partisan performance.......................................................................................... 12

       A.  Plan C2308 ................................................................................................. 12

   VI. Texas Democrats Break Quorum to Prevent Passage of the Partisan Maps.................... 14

       A.  Legislative Proceedings while House is Disabled due to Democrat Quorum Break ............................................................................................. 15

   VII.  Democrats Return to Texas and Now Allege a Racial Gerrymander .............. 17

       A.  Plan C2331 ................................................................................................. 17

       B.  Plan C2333 ................................................................................................. 18

       C.  Floor Debate.............................................................................................. 18

Argument ............................................................................................................................ 20

   I.   Consolidated Plaintiffs are unlikely to succeed on the merits of their racial vote dilution claims. ......................................................................................... 21

       A.  The direct evidence shows partisan motivations for the enacted map. ...... 22

       B.  Assertion of Circumstantial Evidence. ..................................................... 27

   II.  Consolidated Plaintiffs are unlikely to succeed on their claims of racial gerrymandering. .................................................................................................. 34

   III. Consolidated Plaintiffs will not endure irreparable harm as a result of the 2025 Congressional map. .......................................................................................... 39

   IV. The balance of the equities weighs against a preliminary injunction................ 39

Conclusion .......................................................................................................................... 40

Certificate of Service.......................................................................................................... 41

ii

## TABLE OF AUTHORITIES

Page

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ............................................................................21, 22, 27

*Ala. Legislative Black Caucus,*
    575 U.S. 254(2015) .................................................................................. 22, 29

*Alexander v. S.C. State Conference of the NAACP,*
    602 U.S. 1 (2024) ......................................................................................passim

*Allen v. Milligan,*
    599 U.S. 1 (2023) (plurality opinion)........................................................passim

*Bartlett v. Strickland,*
    556 U.S. 1 (2009) (plurality opinion)............................................................. 29

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) (per curiam)............................................................... 39

*Benisek v. Lamone,*
    585 U.S. 155 (2018) ........................................................................................ 19

*Bethune-Hill v. Va. State Bd. of Elections,*
    368 F. Supp. 3d 872 (E.D. Va. 2019) ............................................................. 24

*Bethune-Hill v. Va. State Bd. of Elections,*
    580 U.S. 178 (2017) ...................................................................................passim

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021)......................................................................................... 25

*City of Mobile, Ala. v. Bolden,*
    446 U.S. 55 (1980)........................................................................................... 21

*Cooper v. Harris,*
    581 U.S. 285 (2017) ................................................................................... 22, 29

*Defense Distributed v. U.S.Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) ..................................................................... 20, 39

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ........................................................................................ 39

*Gill v. Whitford,*
    585 U.S. 48 (2018) .......................................................................................... 23

*Hartman v. Moore,*
  547 U.S. 250 (2006) .................... ........................................ 26

*House the Homeless, Inc. v. Widnall,*
  94 F.3d 176 (5th Cir. 1996) .................... .................................... 20

*Hunt v. Cromartie,*
  526 U.S. 541 (1999) .................... ..................................... 21, 23

*Hunter v. Underwood,*
  471 U.S. 222 (1985) .................... ............................................ 21

*Lawyer v. Dep't of Justice,*
  521 U.S. 567 (1997) .................... .......................................... 35

*League of United Latin Am. Citizens v. Abbott,*
  604 F. Supp. 3d 463 (W.D. Tex. 2022) .... ................................. 29

*LULAC v. Abbott,*
  601 F. Supp. 3d 147 (W.D. Tex. 2022) .... ................................. 30

*LULAC v. Perry,*
  548 U.S. 399 (2006) (plurality opinion).... ............................... 33

*McCleskey v. Kemp,*
  481 U.S. 279 (1987) .................... ............................................ 31

*Miller v. Johnson,*
  515 U.S. 900 (1995) .................... ................................ passim

*Miss. Power & Light Co. v. United Gas Pipe Line Co.,*
  760 F.2d 618 (5th Cir. 1985) .................... ............................... 20

*Missouri State Conf. of NAACP v. Ferguson-Florissant School Dist.,*
  201 F. Supp. 3d 1006 (E.D. Mo. 2016) .... ................................. 30

*Nken v. Holder,*
  556 U.S. 418 (2009) .................... ......................................... 39

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist.*
  *No. 1*, 551 U.S. 701 (2007) (plurality opinion) ...................... 24

*PCI Transp., Inc. v. Fort Worth & W. R. Co.,*
  418 F.3d 535 (5th Cir. 2005) .................... ............................... 20

*Perez v. Abbott,*
  253 F. Supp. 3d 864 (W.D. Tex. 2017) .... ................................. 31

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) .................... ......................................... 27

*Petteway v. Galveston Cnty.*,
111 F.4th 596 (5th Cir. 2024)................................................................ 7, 24, 29

*Pierce v. N.C. State Bd. of Elections*,
713 F. Supp. 3d 195 (E.D.N.C.)............................................................... 30

*Planned Parenthood of Greater Tex. Family Planning & Preventative Health Services, Inc. v.*
*Kauffman*,
981 F.3d 347 (5th Cir. 2020) (en banc)..................................................... 20

*Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*,
6 F.4th 633 (5th Cir. 2021).................................................................... 28

*Rucho v. Common Cause*,
588 U.S. 684 (2019)............................................................................. 25

*Salazar v. Buono*,
559 U.S. 700 (2010)............................................................................. 39

*Shaw v. Reno*,
509 U.S. 630 (1993)......................................................................... 20, 21

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)............................................................................. 28

*United States v. Willis*,
639 F.2d 1335 (5th Cir. 1981)................................................................. 23

*Univ. of Texas v. Camenisch*,
451 U.S. 390 (1981)............................................................................. 19

*Veasey v. Abbott*,
830 F.3d 216 (5th Cir. 2016)................................................................... 31

*Veasey v. Abbott*,
870 F.3d 387 (5th Cir. 2017) (per curiam) ................................................. 39

*Vieth v. Jubelirer*,
541 U.S. 267 (2004) (plurality opinion)..................................................... 24

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977)....................................................................... passim

*Voinovich v. Quilter*,
507 U.S. 146 (1993)............................................................................. 24

*Weinberger v. Romero-Barcelo*,
456 U.S. 305 (1982)............................................................................. 20

*Whitaker v. Livingston*,
    732 F.3d 465 (5th Cir. 2013) .................... ............... ..................................................... 39

*Whitcomb v. Chavis*,
    403 U.S. 124 (1971) .......................... ............... ..................................................... 29

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................... ................ ............................................... 20, 39

*Yakus v. United States*,
    321 U.S. 414 (1944) .......................... ............... ................................................ 20

*"If we don't say this is racial . . . we can't win."*

Congressman Alexander Green

## INTRODUCTION

To say that Texas started this political arms race requires that the Court assume that history began yesterday. For decades, Democrat-run states have engaged in extreme partisan gerrymandering—some under the thinly veiled facades of "non-partisan" redistricting commissions—to maximize their political advantage. Their Republican-led corollaries are fed up with these games and now plan to fight fire with fire. As the largest Republican-led state, Texas is spearheading this effort by redrawing its Congressional maps to help maintain a Republican majority in the United States Congress. Plaintiffs, LULAC, MALC, and the Brooks Plaintiffs (Consolidated Plaintiffs), who consist largely of Democrat legislators and operators, do not like that Texas is meeting the partisan redistricting efforts of states like California and Massachusetts with a reinvigorated and proportional response, and now seek to use race as a foil to kneecap Texas's efforts to even the playing field.

In preceding decennial redistricting cycles, states such as Illinois, California, Massachusetts, and New York have employed partisan gerrymanders to systematically deny Republican seats in the U.S. Congress, despite each state having a statistically significant proportion of Republican voters. For example, notwithstanding the fact that one-third of its overall population votes Republican in the last seven presidential elections, Massachusetts has not sent a Republican to Congress in ***thirty years***. Out of its 17 Congressional seats, Illinois sends only 3 Republican representatives to Washington, D.C., even though its population votes Republican 40 percent of the time. In New York, Democrats control 19 of 26 seats in Congress, despite more than 40 percent of the electorate backing Trump in the 2024 presidential race. Even though roughly one-third of California's voters supported Donald Trump in the last two presidential elections, Republicans hold only 9 of the state's 52 Congressional seats.

Amid this ongoing partisan political battle, President Donald Trump called on Governor Greg Abbott to level the playing field by redrawing Texas' Congressional districts to help

Republicans win five additional seats in Congress. To that end, Governor Abbott arranged a special session to give Texas a chance to do precisely what Democratic states have been doing for the last thirty years and send more Republican representatives to Congress on Texas's behalf.

Consolidated Plaintiffs and their Democrat allies are desperate to prevent Republicans from fighting on equal footing. To wit, more than 50 Democrat Texas legislators fled the state to deprive the Texas House of Representatives of a quorum. Ironically, they absconded to Illinois, New York, Massachusetts, and California—some of the most politically gerrymandered states in the nation.

After meeting and conferring with the Democratic leaders in these states, the Texas Democrats changed their arguments: rather than objecting to the new map for nonjusticiable, partisan reasons, they now argue that a partisan gerrymander favoring Republicans is discriminatory. Theirs is nothing but a lackluster repackaging of arguments that Plaintiffs and their compatriots made about the 2021 maps.

After years of litigation over the 2021 Congressional map, wherein Consolidated Plaintiffs alleged, *inter alia*, that Plan C2193 constituted an unconstitutional racial gerrymander, Consolidated Plaintiffs now request that the court welcome that map back with open arms as a preservation of "the status quo." ECF No. 1150 at 46. Were Consolidated Plaintiffs to get their way, they would rather have the old "discriminatory" map, and not the new "discriminatory" one, and such a request therefore demonstrates the intrinsic partisan nature of this dispute. Importantly, this underscores Consolidated Plaintiffs'—and to a greater extent, Democrats'—strategy: whenever they do not get what they want, they cry racism. But their claims are not genuinely about not about race; instead, they are about partisan politics and demanding that Texas fight with one hand tied behind its back while California Democrats desecrate their own constitution to get additional representation. Texas Democrats and Consolidated Plaintiffs allege that every action taken by Republicans is racist and that every identical action taken by Democrats is necessary to "save our democracy."

The Court should not entertain these thinly-veiled accusations of racial discriminations and

should instead look beyond the claims to see them for what they truly are—an attempt to regain power in one of the most impactful Congressional elections in recent memory. California, Massachusetts, and other Democrat-majority states have been maximizing the Democratic seats in their congressional delegations for decades. Texas is entitled to exercise the same freedom to choose the partisan makeup of its congressional representation. With its new congressional map, Texas has done just that.

## BACKGROUND

### I.   Democrats have waged a nationwide "redistricting war" against Republicans over the past several decades.

In 1980, the United States House of Representatives elections in California yielded an almost even split: 22 Democrats and 21 Republicans.[1] A year later, Democrat Congressman Phillip Burton worked with the California Legislature to introduce a new Congressional map to upset this balance and swing the seats heavily in favor of the Democrats.[2] Despite Republican vote share falling by only 3 percentage points in 1982, the Democrats under the Burton Plan secured an eleven-seat lead to shift to a 28-17 majority.[3] Even in 1984, despite 57.51% of choosing to vote for Ronald Reagan, California Democrats captured a nine-seat advantage, 27-18.[4]

Seeing the political benefit of partisan gerrymandering, Democrats began to implement California's model in other states. As a result, roughly 25 years ago, significant Democrat partisan gerrymanders resulted in substantial Congressional swings. In 2002, Maryland Democrats were direct with their intention to unseat Republicans;[5] turning an evenly split delegation into a 3-1

---

[1] Ex. A, Thomas E. Ladd, *Statistics of the Presidential and Congressional Election of November 4, 1980,* at 6–9 (Apr. 15, 1981), https://clerk.house.gov/member_info/electionInfo/1980election.pdf.

[2] Ex. B, Wallace Turner, *California G.O.P. Seeks to Void Redistricting*, NYTIMES (Sep. 22, 1981), https://www.nytimes.com/1981/09/22/us/california-gop-seeks-to-void-redistricting.html.

[3] *Compare* Ex. C, Thomas E. Ladd, *Statistics of the Congressional Election of November 2, 1982*, at 6–9 (May 5, 1983), https://clerk.house.gov/member_info/electionInfo/1982election.pdf *with* Ex. D, Thomas E. Ladd, *Statistics of the Presidential and Congressional Election of November 6, 1984,* at 3–6 (May 1, 1985), https://clerk.house.gov/member_info/electionInfo/1984election.pdf.

[4] Ex. D at 5–8.

[5] Ex. E, Daniel LeDuc & Jo Becker, *Md. Democrats Redraw Morella's District*, WAPO (Jan. 24, 2002), https://www.washingtonpost.com/archive/local/2002/01/25/md-democrats-redraw-morellas-district/276e7cee-6962-4e96-9140-4b83084fea20/.

Democrat advantage, proportionally speaking, despite Republicans increasing their share of the vote from the previous election in 2000.[6] Democrat control of the 146th Georgia General Assembly resulted in a map designed to swing seats in Congress in favor of the Democratic party;[7] these effects were realized in the 2004 Congressional elections when Democrats received an additional House seat to split the House delegation 7-6 despite votes for Republicans nearly doubling those of votes for Democrats.[8]

This partisan gerrymandering fight is not simply a relic of the past; it is happening in real time. In other words, "a nationwide gerrymandering war, is now in effect."[9] In Massachusetts, voters cast one-third of their ballots for Republicans in the last seven presidential elections,[10] yet "Massachusetts has not elected a Republican to the U.S. House since 1994."[11] In 2018, New Jersey voters cast 38 percent of their ballots for Republicans only to yield a single House Seat resulting in an 11-1 Democrat majority.[12] Despite the fact that Republicans are within just four percentage points of capturing a majority of the statewide popular vote, Democrats currently control three times as many seats in New Jersey.[13] In 2024, New York Republicans won about 42.5% of the vote

---

[6] Ex. F, Jeff Trandahl, Statistics of the Congressional Election of November 5, 2002, at 19 (May 1, 2003), https://clerk.house.gov/member_info/electionInfo/2002election.pdf; Ex. G, Jeff Trandahl, Statistics of the Presidential and Congressional Election of November 7, 2000, at 26–27 (Jun. 21, 2001), https://clerk.house.gov/member_info/electionInfo/2000election.pdf.

[7] Ex. H, Thomas B. Edsall, *Georgia Democrats May Gain Up to 4 Seats in House*, WAPO (Sep. 28, 2001), https://www.washingtonpost.com/archive/politics/2001/09/29/georgia-democrats-may-gain-up-to-4-seats-in-house/e489f9c3-4fe6-406b-804e-c985a671362c/.

[8] *See* Ex. I, Jeff Trandahl, *Statistics of the Presidential and Congressional Election of November 2, 2004,* at 16 (Jun. 27, 2004) (Republican candidates received 1,819,817 votes in congressional elections compared to Democratic candidates receiving 1,140,869), https://clerk.house.gov/member_info/electionInfo/2004election.pdf.

[9] *See* Ex. J, Texas Senate Chambers Aug. 22, 2025 (Part III) Tr. at 41:9-10.

[10] Ex. K, Massachusetts, 270TOWIN, (2025) (compiling the popular vote percentages for the seven most recent Presidential elections), https://www.270towin.com/states/massachusetts.

[11] Ex. L, Chris Lisinski, *The Trump administrated suggested Mass. Is gerrymandered. Is that true?*, WBUR, (Sep. 2, 2025), https://www.wbur.org/news/2025/09/02/massachusetts-trump-gerrymander-texas-california-democrats.

[12] Ex. M, Cheryl L. Johnson, *Statistics of the Congressional Election, November 6, 2018,* at 29–31 (Feb. 28, 2019), https://clerk.house.gov/member_info/electionInfo/2018/statistics2018.pdf.

[13] Ex. N, Kevin F. McCumber, *Statistics of the Presidential and Congressional Election, November 5, 2024,* at 43–44 (Mar. 10, 2025) (Democrats lead Republicans 52.97%-45.79% in the popular vote, but hold 75% of New Jersey's U.S. House seats), https://clerk.house.gov/member_info/electionInfo/2024/statistics2024.pdf.

but secured only 7 of 26 seats (~26.9%), while Democrats won about 57.2% of the vote and captured 19 seats (~73.1%).[14] In California, nearly 40% of voters cast their ballots for Republican candidates in 2024, but Democrats still seized 43 of the state's 52 seats, taking 82.69% of its Congressional representation.[15]

In the 2020 election cycle, Illinois's Congressional map has been regarded as the "Worst Democratic Gerrymander in the Country."[16] In 2024, despite almost 47% of votes going to Republicans, Democrats took 82% of the seats, resulting in a staggering 14-3 split.[17] In short, the modern battlefield of partisan gerrymandering did not start three months ago, it is built upon a decades-long record of aggressive Democratic partisan gerrymanders to which Republican state legislatures are only now finally responding.[18]

## II. Texas drew its 2021 Congressional Map blind to race.

On April 26, 2021, the U.S. Census Bureau announced that, based on the 2020 decennial census, Texas would gain two additional seats in the United States House of Representatives.[19] On August 12, the Census Bureau then released the detailed population and demographic data needed to draw new Congressional districts.[20] On September 7, 2021, Governor Abbott announced a third

---

[14] *Id.* at 46–51.

[15] *Id.* at 6–10.

[16] Ex. O, Nathaniel Rakich and Tony Chow, *Illinois May Be The Worst Democratic Gerrymander In The Country*, FIVETHIRTYEIGHT (May 6, 2022), https://fivethirtyeight.com/videos/illinois-may-be-the-worst-democratic-gerrymander-in-the-country/.

[17] Ex. P, *Compare* Cheryl L. Johnson, *Statistics of the Congressional Election, November 8, 2022*, at 15–16 (Feb. 28, 2023), https://clerk.house.gov/member_info/electionInfo/2022/statistics2022.pdf *with* Kevin F. McCumber, *Statistics of the Presidential and Congressional Election, November 5, 2024,* at 21–23 (Mar. 10, 2025), https://clerk.house.gov/member_info/electionInfo/2024/statistics2024.pdf.

[18] Ex. Q, Benjamin Siegel, *Redistricting arms race: These are the states in addition to Texas and California where parties could redraw maps,* ABCNEWS.COM, (Aug. 21, 2025 5:28 P.M.) (listing California, Ohio, Indiana, Missouri, Florida, Illinois, New York, and Maryland as the likely next states to engage in partisan redistricting before the 2026 election), https://abcnews.go.com/Politics/redistricting-arms-race-states-addition-texas-california-parties/story?id=124855541

[19] Ex. R, U.S. CENSUS BUREAU, *2020 Census: Apportionment of the U.S. House of Representatives*, (Apr. 26, 2021) (announcing that Texas will gain two seats in the U.S. House of Representatives per the 2020 Census), https://www.census.gov/library/visualizations/2021/dec/2020-apportionment-map.html

[20] Ex. S, U.S. Census Bureau, Decennial Census P.L. 94-171 Redistricting Data (Aug. 12, 2021), https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html.

special session of the Texas Legislature, commencing on September 20, 2021, for the purpose of redrawing legislative and Congressional districts in accordance with the results of the 2020 census.[21] This plan was drawn to maximize partisan advantage for Republicans, and it was drafted without looking at any racial data by the map drawers, but it was reviewed for VRA compliance by outside counsel. Tr. 6/7/2025 PM 02:51:16–02:51:44. Governor Abbott signed Senate Bill 6 on October 25, 2021.[22]

Before Governor Abbott even signed Senate Bill 6 into law, Plaintiff groups sued to preliminarily enjoin SB 6, alleging that it violated Section 2 of the Voting Rights Act and the United States Constitution. ECF No. 1 (LULAC et al.'s Compl. (Oct. 18, 2021)). Texas' position has been the same throughout this litigation: these maps were drawn for partisan effect and were drawn without consideration of racial data. ECF No. 1116-1 at 2 ("The evidence at that trial was clear and unequivocal: the Texas legislature did not pass race-based electoral districts for any of those three maps.").

## III.    President Trump demanded that states, including Texas, redraw their maps to help maintain a Republican advantage in the Congress.

On June 9th, 2025, Trump's redistricting pressure campaign began when the New York Times reported that the Trump administration was pressuring state legislatures into redistricting to "pick up as many as four or five House seats in 2026 . . . ."[23] The Texas Tribune reported on June 11, 2025 that President Trump's political advisors were urging Governor Abbott to call a special session to redraw the Congressional map, with the aim of giving Republicans a better chance to flip Democrat-held seats in the 2026 midterm.[24] The rationale behind the President's request is

---

[21] Ex. T, Governor Abbott Announces Third Special Session Date and Agenda, (Sep. 7, 2021), https://gov.texas.gov/news/post/governor-abbott-announces-third-special-session-date-and-agenda.

[22] Ex. U, S. J. of Tex. 87th Lege., 3d C.S. 359 (Oct. 18, 2021).

[23] Ex. V, J. David Goodman & Shane Goldmacher, *White House Pushes Texas to Redistrict, Hoping to Blunt Democratic Gains,* NYTIMES, (June 9, 2025), https://www.nytimes.com/2025/06/09/us/politics/trump-texas-redistricting.html.

[24] Ex. W, Owen Dahlkamp & Natalia Contreras, Trump Aides Want Texas to Redraw Its Congressional Maps *to Boost the GOP. What Would that Mean?,* TEX. TRIB. (Jun. 11, 2025) https://www.texastribune.org/2025/06/11/texas-congress-midcycle-redistricting-trump-republicans/.

simple. Republicans currently have a razor-thin majority in the United States House of Representatives; if Democrats flip four seats in the upcoming midterm elections, they would take control of the House.[25]

President Trump is a singularly important figure in the Republican Party. His endorsement and approval swings primaries instantaneously. It is no surprise, then, that his publicly-stated desire for Texas to draw a new Congressional map put tremendous political pressure on Texas Republicans. Just two weeks after Trump's redistricting pressure campaign went public, Governor Abbott announced that he planned to call a special session the following month.[26]

The Department of Justice issued a letter threatening to sue Texas if it failed to revise its districts. ECF No. 1141-2 (the DOJ Letter). The DOJ Letter came to the erroneous conclusion that because the Fifth Circuit held in *Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024), that a legislative body was not required to create coalition districts under Section 2 of the Voting Rights Act (Section 2), that the existence of any district so composed was illegal. ECF No. 1141-2 at 2. Its ham-fisted legal conclusions notwithstanding, the DOJ Letter apparently sought to provide political cover for Texas to engage in partisan redistricting. This is best illustrated by the fact that the DOJ voluntarily dismissed all its claims in this litigation only four months prior—and even those claims had been limited to Section 2 allegations. ECF No. 872 (Order Dismissing the United States' Claims).

Governor Abbott, represented by Attorney General Paxton, rejected the legal reasoning of the DOJ Letter and affirmed: "[T]he Texas legislature did not pass race-based electoral districts for any of those three political maps." ECF No. 1116-1 at 2. Indeed, some Plaintiffs agree that the letter was "factually unsupported." *See* ECF No. 1131-1 at 28.

On July 9th, 2025, exactly one month after Trump's redistricting pressure plan went

---

[25] Ex. X, *Member Data, Party Breakdown*, U.S. HOUSE OF REPRESENTATIVES PRESS GALLERY, https://pressgallery.house.gov/member-data/party-breakdown.

[26] Ex. Y, Press Release, Governor Greg Abott, "Governor Abbott Announces Special Session Date, Initial Agenda" (Jun. 23, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-special-session-date-initial-agenda.

public, Texas Governor Greg Abbott called a special session of the 89th Texas Legislature to revise Texas' Congressional districts.[27] Just six days later, President Trump stated that he wanted Texas to flip "five [seats]" to the Republican Party.[28] Texas Republicans now had an identified goal established by the most powerful political leader in a quarter-century: get five seats.

## IV.    Legislative Action and Hearings Prior to the Introduction of the Maps

On Monday, July 21st, 2025, the Texas House and Texas Senate were called to order in accordance with Governor Abbott's proclamation.[29] Later that day, Senator King moved for suspension of Senate Rule 8.02 to permit immediate consideration of SR5, establishing rules of procedure to be observed by the Senate for the consideration of redistricting during the 89th legislature.[30] This Senate Resolution put in place "the very same process that we used, without objection, in 2021, 31-0 vote. No objections during the process. The same process that we used in 2023, 31-0 vote. And again, as the process went forward, no complaints about that, no efforts to amend the rules."[31] Despite the uncontroversial nature of the rules resolution, the Senate Floor debated the resolution for three hours before a vote. This time, however, the Senate Democrats opposed this resolution, which passed on partisan lines.[32]

On July 24th, the House Select Committee on Congressional Redistricting held the first of a series of public hearings regarding the topic of Congressional Redistricting, the first hearing was held in Austin.[33] Cody Vasut, chair of the Congressional Redistricting Committee, sought input

---

[27] Ex. Z, Governor Abbott Announces Special Session Agenda, (July 9th, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-special-session-agenda-.

[28] Ex. AA, *Press Gaggle: Donald Trump Speaks to Reporters Before Marine One Departure - July 15, 2025*, ROLLCALL.COM, (Jul. 15, 2025) (providing a transcript of President Trump's conversation with reporter Ed O'Keefe detailing his desire to flip five Texas House Seats), https://rollcall.com/factbase/trump/transcript/donald-trump-press-gaggle-before-marine-one-departure-july-15-2025/.

[29] Ex. AB, H. J. of Tex. 89th Lege., 1st C.S. First Day at 1 (Jul. 21, 2025); [Ex. AC] S. J. of Tex., 89th Lege., 1st C.S. First Day at 1 (Jul. 21, 2025).

[30] Ex. AC, S. J. of Tex. 89th Lege., 1st C.S. at 4 (Jul. 21, 2025).

[31] Ex. AD, Texas Senate Chambers (Part II) July 21, 2025, Tr. at 158:21–159:1.

[32] Ex. AC at 7.

[33] Ex. AE, House Committee on Congressional Redistricting Minutes (July 24, 2025); Ex. AF, House Special Committee on Congressional Redistricting, July 24, 2025, Tr. at 5:19-6:5.

from the public.[34] At this hearing, the committee heard five hours of public testimony to take into consideration. Chair Vasut stated, "All information that flows through the committee is available to committee members to guide them in making any decision . . . . And so the first stage is to hear from the public."[35] Chair Vasut then articulated that these hearings are the standard procedure for the legislature: "[I]t is customary for the legislature, when the Governor places an item on the call . . . to take up that item. . . . I then set up these pre-hearings . . . based on prior precedent, which has always been followed by the Redistricting Committee."[36] Chair Vasut further confirmed that the hearings were set based upon following "the practice of every redistricting I'm aware of" and that he "did not set these hearings based off of that July 7th letter."[37]

At this hearing, Democrat members of the committee and politicians offering testimony identified the partisan nature of the redistricting effort: Vice Chair Rosenthal referred to the effort as a "power grab" during his remarks.[38] Congresswoman Sylvia Garcia similarly testified that the DOJ letter "is just a pretext to go in there and just change everything to get those five districts that the felon in the White House needs to maintain his power."[39] Congressman Castro agreed with that sentiment.[40] Democratic House Representative Senfronia Thompson—Mrs. T, Dean of the House—stated that the DOJ Letter was an absurdity because the Texas House would never pass a race-based map.[41] Chair Vasut further stated that every map he has ever voted on has been compliant with the Voting Rights Act.[42] In contrast, Gary Bledsoe repudiated race-blind map-drawing.[43]

On July 25th, the Senate Committee on Congressional Redistricting held the first of a series

---

[34] Ex. AF, House Special Committee on Congressional Redistricting, July 24, 2025, Tr.at 5:19–7:12.
[35] *Id.* at 32:17-22.
[36] *Id.* at 90:17-25.
[37] *Id.* at 93:7-17.
[38] *Id.* at 14:19.
[39] *Id.* at 67:9-11.
[40] *Id.* at 69:1-70:7.
[41] *Id.* at 27:9-22.
[42] *Id.* at 94:4-6.
[43] *Id.* at 135:3-23.

of public hearings.[44] At this hearing, the committee heard three hours of public testimony.[45] Senator King made clear at the hearing that the purpose the hearing was ***not*** to litigate the DOJ Letter.[46]

On July 26th, the House Select Committee on Congressional Redistricting held its second hearing, this time in Houston.[47] At this hearing, the committee heard five hours of public testimony.[48] Chair Vasut guaranteed that the House would hold additional public hearings once the maps were published, and that it would provide more than the minimum required 24 hours' notice.[49] Despite the Committee and Chair Vasut's efforts to maintain the normal House procedures, a Democrat member of the Committee objected nonetheless.[50] Again, at this hearing, Democrat members of the Committee and politicians offering testimony identified the partisan nature of the redistricting effort. For example, Democrat Congresswoman Lizzie Fletcher implied that any partisan gerrymander in favor of Republicans will be a racial gerrymander.[51]

That same day, the Senate held another public hearing.[52] The Chair affirmed that anyone who wanted to testify was welcome to do so and that the next session would continue as long as necessary so that every voice could be heard.[53]

During the third House Committee field hearing on July 28, 2025, the House Redistricting Committee heard five more hours of public testimony.[54] Chair Vasut confirmed that all public testimony was being taken into account, that maps were not being hidden, but rather the chair was reviewing the comments and guaranteed that hearings on proposed maps would occur as soon as

---

[44] Ex. AG, Senate Redistricting Committee Minutes (Jul. 25, 2025).
[45] *Id.* at 1–2.
[46] Ex. AH, Senate Special Committee on Congressional Redistricting, July 25, 2025, Tr.at 33:20–34:2.
[47] Ex. AI, House Redistricting Committee Minutes (Jul. 26, 2025).
[48] *Id.* at 1–3.
[49] Ex. AJ, House Special Committee on Congressional Redistricting, July 26, 2025, Tr. at 48:14–49:12.
[50] *Id.* at 214:2-8.
[51] Ex. AJ at 70:19–71:6.
[52] Ex. AK, Senate Committee on Congressional Redistricting Minutes (Jul. 26, 2025).
[53] *Id.* at 4.
[54] Ex. AL, House Redistricting Committee Minutes (Jul. 28, 2025).

they were filed.[55]

Similarly, on July 28th, the Senate Redistricting Committee held another public hearing, at which it considered over three hours of testimony.[56] Importantly, during this hearing, Congressman Al Green made a statement regarding litigation surrounding redistricting:

> And we are not going to win under Section 2 unless we show that this act by the state of Texas. If it doesn't, and I pray that it won't, I take no delight in saying what I say, ***but if we don't say that this is racial, if we don't indicate that, we're not going to get to Section 2 and we can't win.*** And people are very smart. They understand that if they say that this is just politics, this is partisan politics, or this is a power grab, they understand now that the law has devolved to the point where you can say that, and then I've got to prove, no, that's not what your intent was. ***And that is almost impossible.***[57]

In a July 29th, 2025, Committee hearing, the Senate heard testimony from Nina Perales, among others.[58] Ms. Perales explicitly requested that the Legislature view racial data in its consideration and drawing of the map.[59] She continued by expressing concerns about the DOJ Letter and questioning the DOJ's motives.[60] In the same hearing, Senator Miles levied racial accusations toward Senator King, questioning his impartiality based upon Senator King's race.[61]

The Senate held its final public hearing prior to the introduction of legislation on July 30, 2025. Senator King reiterated that the DOJ Letter was irrelevant to the considerations of Legislature and the Senate Redistricting Committee.[62] Democrats agreed with this statement. Senator Carol Alvarado stated that the first step in redistricting process was not the letter, but rather partisan efforts.[63] Senator King further articulated that the intentions of the map drawer are immaterial to the intent or the Redistricting Committee when he said:

> I would never see any benefit to bringing in whoever was the actual map drawer and

---

[55] Ex. AM, House Special Committee on Congressional Redistricting July 28, 2025, Tr.at 266:9-267:17.
[56] Ex. AN, Senate Redistricting Committee Minutes at 1–2 (Jul. 28, 2025).
[57] *Id.* at 36:19–37:5 (emphasis added).
[58] Ex. AP, Senate Special Committee on Congressional Redistricting, July 29, 2025, Tr. at 26:7–27:21.
[59] *Id.* at 27:18-21.
[60] *Id.* at 34:4-12.
[61] *Id.* at 216:4-20.
[62] Ex. AQ, Senate Special Committee on Congressional Redistricting, July 30, 2025, Tr.at 5:1–7:6.
[63] *Id.* at 11:22–12:3.

saying, "Why did you do this and how did you do that?" I would want to look at the map, determine if it -- have someone take a -- give it a good legal scrub and determine if it is legal in all respects, and then we would want to look at it as policy makers and determine and determine if it's the best policy for the state of Texas. It doesn't matter to me who drew it.[64]

Throughout the legislative hearings, Chair King and Chair Vasut implemented measures beyond what was called for by regular procedure to ensure greater accessibility to the public to allow hours upon hours of testimony to inform the decision of how to draw and for what reasons to draw the map.

## V.    The Texas Legislature redrew the Congressional maps to improve Republican partisan performance.

As President Trump directed, the Legislature redrew the Congressional map to maximize partisan performance and to reach the stated goal to get five seats. The author of HB 4, Representative Todd Hunter, stated explicitly that "the primary changes, though, are focused on five districts for partisan purposes . . .. Each of these newly drawn districts now trend Republican in political performance."[65] Representative Hunter went on to say that the DOJ Letter had no effect on his decision to introduce the bill:

[A]ll I know is that we are here by proclamation of the Governor, as to what the letter has to do with it, I got no personal knowledge, I have no knowledge. And I will tell you, I don't know what that has to do with this. That wasn't part of me. All I know is that we had a special session call and this was a topic, and I agreed by the request of the chairman to file this bill.[66]

President Trump said that he wanted to get five seats, so the Texas House and Senate Republicans introduced a Congressional district maps to get five seats.

### A.    Plan C2308

On July 30, 2025, Representative Hunter, the Chair of the 2021 House redistricting committee, introduced Plan C2308 as HB 4. H.B. 4, 89th Leg., 1st Spec. Sess. (Tex. 2025). The bill was first presented in the House Redistricting Committee meeting on August 1, 2025.[67] Members of the

---

[64] *Id.* at 27:21–28:4.
[65] Ex. AR, (Texas House Redistricting Committee Hr'g at 51:10–52:00 (Aug. 1, 2025), https://house.texas.gov/videos/22418.
[66] *Id.* at 58:38–59:10.
[67] Ex. AS, House Committee on Congressional Redistricting Minutes at 2 (Aug. 1, 2025).

public were also permitted to submit testimony in writing at the hearing to the clerk to be shared with all members of the Committee.[68] During the August 1, 2025, meeting, over 110 members of the public, interested persons, and representatives registered with intent to testify before the Committee.[69] During this meeting, Democrat members took issue that the map was "rigged" based upon on the partisan effects of the map.[70] Representative Joe Rosenthal objected to partisan redistricting as "a power grab by the Trump Administration."[71]

Representative David Spiller asked, "is it fair to say that the map in HB 4 is based on political performance or partisan performance?"[72] Representative Todd Hunter replied, "The answer is yes, and I want everybody to know that, being transparent, that is correct: it is based on *Rucho,* the United States Supreme Court case."[73] Hunter continued, "we have five new districts, these five new districts based on political performance."[74]

In an exchange between Representative Christian Manuel and Representative Todd Hunter, Representative Manuel stated: "I know some people say there are no coincidences," and subsequently asked whether changes to "Congressional districts 9, 18, 30, and 35" that resulted in "each [having] between 50 and 52 percent for Hispanic and black voting age [population]" was "a coincidence?"[75] Representative Hunter explained that these changes were the correlative effect of the map's considerations:

> Nothing is a *coincidence* . . . . part of the reason it was increased was to follow the compactness-contiguous [goal] and some of the districts were historic and so there has been a growth and you bring them back to the configuration: they are going to [] increase. Most of the ones that you have referenced were . . . on compact[ness] and the configuration.[76]

Representative Manuel followed this exchange by affirming that he did not think any

---

[68] Id.
[69] Ex. AT, House Committee on Congressional Redistricting Witness List (Aug. 1, 2025).
[70] Ex. AR, at 8:10–8:20, 9:05–9:12.
[71] *Id.* at 10:05.
[72] *Id.* at 1:07:50.
[73] *Id.* at 1:08:00.
[74] *Id.* at 1:11:40.
[75] *Id.* at 1:45:30–1:46:55.
[76] *Id.* at 1:47:00–1:47:28.

member of the House had racial intent when enacting the map.[77] He then, in opposition to the bill, stated that the entire situation seemed political. He likened the map to pure political retaliation and surmised that "Congressman Al Green and, we know, President Trump have not been on any terms near where they are best friends . . . is this political retribution against Congressional members, particularly those who have been outspoken, whether intentional or not, who *happen to be African American* . . . because they won't follow along with what the current administration is currently doing."[78]

In response to a question by Representative Gervin-Hawkins regarding the amount of seats that the Republicans sought to flip, Representative Hunter said: "It sure did help get to five; you are going to keep talking about it, if we keep talking about it maybe we will go to six."[79] Representative Gervin Hawkins then replied: "Maybe we will go to seven or eight, or go to nine or ten."[80] Representative Hickland emphasized during this hearing that reliance on racial data would have been useless in crafting a partisan performance map,[81] and Representative Hunter agreed.[82]

On August 2nd, the House Committee on Congressional redistricting met to discuss the recommendation of the committee regarding HB 4. Democratic Representative Christian Manuel stated that he understood why HB4 was promulgated, "I understand, again, that politics wins the day; and I understand that everybody wants to do what they can for their political survival."[83] HB 4 was reported favorably out of committee, 12-6 with all Republicans in attendance voting in favor and all Democrats in attendance voting against.[84]

## VI.    Texas Democrats Break Quorum to Prevent Passage of the Partisan Maps

Desperate to prevent Republicans from giving Trump the five Congressional seats that he desired, more than 50 Democratic Texas legislators, fled the state to deprive the Texas House of

---

[77] *Id.* at 1:49:40.
[78] *Id.* at 2:03:50 (emphasis added).
[79] *Id.* at 1:59:27.
[80] *Id.* at 1:59:35.
[81] *Id.* at 13:41:30.
[82] *Id.* at 13:41:51.
[83] Ex. AU, House Special Committee on Congressional Redistricting, Aug. 2, 2025, Tr. at 9:3-5.
[84] Ex. AV, House Committee on Congressional Redistricting Minutes at 2 (Aug. 2, 2025).

Representatives of the quorum needed to take legislative action.[85] Rather than merely expressing their views and votes, these members decided to obstruct Texas' political process and disable the Texas House of Representatives. In response, the House issued of civil warrants to arrest the members who had deliberately and without excuse broken quorum.[86] The civil arrest warrant was duly and lawfully issued pursuant to the Quorum Resolution.

During their Quorum Break, the Texas Democrats met with Federal Democrat Leadership to coordinate their response to the bill. While the Democrats met with friendly states, out-of-state Democrats, such as Nancy Pelosi and Barrack Obama, attacked HB4 not as a racial gerrymander, but as a partisan gerrymander.[87]

### A. Legislative Proceedings while House is Disabled due to Democrat Quorum Break

While the House was unable to reach quorum due to Democrat efforts, the Senate introduced Plan C2308 as Senate Bill 4 on August 4th.[88] On August 4th, SB4 was referred to the Senate Committee on Congressional Redistricting.[89] The Senate Committee on Congressional Redistricting held two hearings after the bill was filed, in addition to the five hearings the committee held prior to the filing of the bill.[90]

The first of these hearings was on August 6th, 2025.[91] At this hearing, Senator King "requested, the Democrat caucus to submit the names of any -- anyone that they wanted to bring

---

[85] Ex. AW, Kayla Guo & Eleanor Klibanoff, *Texas House Democrats flee the state in bid to block GOP's proposed congressional map*, (Aug. 3, 2025) https://www.texastribune.org/2025/08/03/texas-democrats-quorum-break-redistricting-map/

[86] Ex. AX, H. J. of Tex. 89th Lege., 1st C.S. at 23–50 (Aug. 4, 2025).

[87] Ex. AY, *Governor Newsom and California leaders host Texas officials amid their fight to protect democracy* (Aug 8, 2025), https://www.gov.ca.gov/2025/08/08/governor-newsom-and-california-leaders-host-texas-officials-amid-their- fight-to-protect-democracy/; Ex. AZ, Arlette Saenz, *Obama praises Texas Democrats and calls state redistricting effort 'a systematic assault on democracy*, CNN (Aug. 14, 2025, 12:56 AM), https://www.cnn.com/2025/08/15/politics/obama-texas-democrats- redistricting-systematic-assault.

[88] Ex. BA, S. J. of Tex. 89th Lege., 1st C.S. at 35 (Aug. 4, 2025).

[89] Id.

[90] Ex. BB, Senate Committee on Congressional Redistricting Minutes (Aug. 6, 2025); Ex. BC, Senate Committee on Congressional Redistricting Minutes (Aug. 7, 2025).

[91] Ex. BB.

in as invited testimony" and invited all of those submitted.[92] Senator King emphasized that the purpose of having an additional hearing for those invited members to discuss the filed maps.[93] Senator King explained that bifurcating the invited testimony and public testimony was done as a courtesy to the public as the House had intermixed both and it had meant the hearing went on for a far longer time than expected.[94]

The Senate Redistricting Committee received no response back from either the NAACP and La Unión Del Pueblo Entero.[95] They were told by Asian Americans Advancing Justice, Every Texan, LULAC, Texas NAACP, Brennan Center for Justice, University of Michigan Law School, and MALDEF that they were "unable or did not wish to attend" to provide testimony.[96] Each of these groups had been invited witnesses, had testified before the quorum break, but now decided that they would withhold their testimony now that there was a map on which to provide testimony. All twelve Democratic Congressional members were also invited to personally testify, only Veasey filed written testimony in response, all other members decided to withhold their testimony now that the bill was filed.[97]

On August 7th, the Senate Committee on Congressional Redistricting met for the final time of the first called session to discuss SB 4.[98] Senator King laid out SB 4 and affirmed that Plan C2308 was not drawn using any racial data.[99] Senator Adam Hinojosa stated that he believed racial data was not considered.[100] Importantly, Senator Miles made it clear that the Democrats understood that the DOJ letter was mere political cover to gain five seats.[101] SB4 was reported favorably out of committee without amendments on a 6-1 vote.[102]

---

[92] Ex. BD, Texas Senate Special Committee on Congressional Redistricting Aug. 6, 2025, Tr. at 5:8-10.
[93] *Id.* at 5:1–6:9.
[94] *Id.* at 6:10-7:14
[95] *Id.* at 7:15-19.
[96] *Id.* at 7:20-8:3.
[97] *Id.* at 8:15-9:23.
[98] Ex. BC; Ex. BE, Senate Redistricting Committee, Notice of Public Hearing (Aug. 7, 2025).
[99] Ex. BF, Texas Senate Special Committee on Congressional Redistricting Aug. 7, 2025, Tr. at 17:17–23.
[100] *Id.* at 43:1–5.
[101] *Id.* at 25:11–26:4.
[102] Ex. BC.

On the Senate Floor on August 12, Senator King moved to suspend the regular order of business to take up consideration of SB 4 at this time on its second reading.[103] He recounted that the redistricting committee heard the testimony of 205 witnesses, testimony included sitting members of Congress.[104] For the members that the redistricting committee invited at the behest of the Democratic caucus, with the exception of Gary Bledsoe who testified the following day, none of the invitees attended the August 6th hearing.[105] Over the course of the Senate Committee's hearings, the committee heard testimony from 242 witnesses directly.[106]

The Senate voted to pass SB4 on August 12, on a straight party line 19-2 vote with 9 of the Senate's 11 Democrats walking out in protest.[107]

The first special session was adjourned *sine die* on August 15, 2025, with no new map enacted.[108] Later that day Governor Abbott called, and the legislature gaveled in, a second special session and requested the legislature to consider "Legislation that provides a Congressional redistricting plan."[109] At this time, the Democrats still had not returned, as such, the House still lacked a quorum and was immediately adjourned.[110]

## VII.   Democrats Return to Texas and Now Allege a Racial Gerrymander

### A.  Plan C2331

During the second special session, Plan C2308 was re-introduced in the Senate redistricting committee hearing on August 17th, 2025, as Senate Bill 4.[111] Representative Hunter then introduced a slightly modified version of that Plan—Plan C2331—as House Bill 4.[112] Plan C2331 was identical to Plan C2308, except that slight changes were made to the border between CD 23

---

[103] Ex. BG, S. J. of Tex. 89th Lege., 1st C.S. at 52 (Aug. 12, 2025).
[104] Ex. BH, Texas Senate Chambers Aug. 12, 2025, Tr. at 5:16-25.
[105] *Id.* at 5:16–6:16.
[106] *Id.* at 6:23.
[107] Ex. BG at 53.
[108] Ex. BI, H. J. of Tex. 89th Lege., 1st C.S. at 75 (Aug. 15, 2025).
[109] Ex. BJ, H. J. of Tex. 89th Lege., 2nd C.S. at 1–2 (Aug. 15, 2025).
[110] *Id.* 1–2, 4.
[111] Ex. BK, Senate Committee on Congressional Redistricting Minutes (Aug. 17th, 2025).
[112] Ex. BL, H. J. of Tex. 89th Lege., 2nd C.S. at 39 (Aug. 18, 2025).

and CD 16 to unite Fort Bliss with the rest of El Paso in CD 16.[113] Representative Hunter explained that all changes to the Congressional districts are "To make it more Republican. . . . partisanship, political performance. That's what I said at the very top. Absolutely they've been enhanced, and it makes it stronger, and it allows a Republican performance, partisan under the U.S. Supreme Court."[114]

### B. Plan C2333

The House reestablished quorum on August 18, 2025, at which point HB 4 was referred to the House Select Committee on Redistricting.[115] At a committee meeting later that day, Plan C2331 was substituted with a new plan, Plan C2333.[116] Plan C2333 was reported favorably out of committee as the new House Bill 4.[117]

Plan C2333—now identified as HB 4—is identical to Plan C2331 except in Harris County. Minor changes were made to CD 6, CD 9, CD 17, and CD 18 to shore up Republican gains in the region.[118] On August 20, after eight hours of debate, the House voted along party lines to pass Plan C2333 as HB 4.[119]

### C. Floor Debate

The Senate Redistricting Committee took up HB 4 the following morning, August 21, and voted to send it to the Senate Floor.[120] On August 22nd, the full Senate debated HB 4 for hours into the night.[121] Senator King stated repeatedly that no racial data was used in the creation of the map and that the map was created purely for partisan advantage.[122]

The Democrats adopted a new strategy of attacking the maps on racial grounds rather than partisan grounds: Democratic Senators alleged that the map was illegal as a racial gerrymander

---

[113] *Compare* Ex. BM, PlanC2331 Map *with* Ex. BN, PlanC2308 Map.
[114] Ex. BO, Texas House Special Committee on Congressional Redistricting Aug. 18, 2025, Tr. at 14:5-13.
[115] Ex. BL 34, 39.
[116] Ex. BP, House Committee on Congressional Redistricting Minutes (Aug. 18th, 2025).
[117] *Id.*
[118] *Compare* Ex. BQ, PlanC2333 Map *with* Ex.BM. *See also* Ex. BO at 3:22–6:17.
[119] Ex. BR, H. J. of Tex. 89th Lege., 2nd C.S. at 65 (Aug. 20, 2025).
[120] Ex. BS, Senate Committee on Congressional Redistricting Minutes (Aug. 21, 2025).
[121] Ex. BT, S. J. of Tex. 89th Lege., 2nd C.S. at 59–60 (Aug. 22, 2025).
[122] Ex. BU, Texas Senate Chambers (Part I) Aug. 22, 2025, Tr.at 7:24–8:6.

based upon two conflicting theories. Senator Alvarado contended the map was discriminatory because she believed that the map drawers *did* look at racial data.[123] Senator Johnson contended that the map may be discriminatory because the map drawers *did not* look at racial data.[124] The full Senate passed HB 4 after midnight on August 23.[125] Governor Abbott signed the bill into law and Democrats across the nation responded.[126]

After the passage of the map, the response of Democrats has been not to swear off mid-decade partisan redistricting, but to condemn Texas for it while resolving to engage in further partisan gerrymandering in their own states. Politicians and commentators from inside and outside of Texas identified the issue as "Republican gerrymandering" and indicated their intent to redraw their own maps for retaliatory political gains. Ryan Chandler, Correspondent for NBC News stated clearly, "This is not about 'constitutional concerns' like Gov. Abbott cited in the special session call. This is, nakedly and unapologetically, about power."[127] Texas House Representative John Bucy III said the passage of HB 4 was all about "power."[128] Eric Holder, the Chairman of the National Democratic Redistricting Committee, said that Democrats need to "protect our democracy" by engaging in partisan gerrymandering themselves.[129]

### Legal Standard

Preliminary injunctions issue to "preserve the relative positions of the parties until a trial on the merits[.]" *Benisek v. Lamone*, 585 U.S. 155, 161 (2018) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)). Before the Court may issue a preliminary injunction, the plaintiff must establish four factors: "(1) a substantial likelihood of success on the merits, (2) a substantial threat

---

[123] *Id.* at 12:3–13:13.
[124] *Id.* at 66:5–68:11.
[125] Ex. BT at 59–61.
[126] Ex. BV, H. J. of Tex. 89th Lege., 2nd C.S. at 316 (Sep. 2, 2025).
[127] Ex. BW, Ryan Chandler, @RyanChandlerTV, X (Aug. 2, 2025, 10:01 AM), https://x.com/RyanChandlerTV/status/1951659747368718621.
[128] Ex. BX, John Bucy III, @BucyForTexas, X, (Aug 21, 2025, 9:58 AM), https://x.com/BucyForTexas/status/1958544198669578367/.
[129] Ex. BY, Western Lensman, @WesternLensman, X, (Aug. 10, 2025, 8:53 AM) https://x.com/WesternLensman/status/1954541716087656907.

of irreparable harm if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Planned Parenthood of Greater Tex. Family Planning & Preventative Health Services, Inc. v. Kauffman*, 981 F.3d 347, 353 (5th Cir. 2020) (en banc). Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). "[W]here an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff. *" Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982) (quoting *Yakus v. United States*, 321 U.S. 414, 440 (1944)).

The Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Defense Distributed v. U.S.Dep't of State*, 838 F.3d 451, 457 (5th Cir. 2016) (quoting *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005)) *see also Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right."). As a result, "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *House the Homeless, Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

## ARGUMENT

Consolidated Plaintiffs' motion for preliminary injunction centers on claims of intentional vote dilution and racial gerrymandering. ECF No. 1150 at 24–44. These claims are not viable. The Fourteenth and Fifteenth Amendments protect individuals from "racial classifications," *Shaw v. Reno*, 509 U.S. 630, 651 (1993) (*Shaw I*), which can arise in two ways: A state actor may employ a racial classification that is "explicit" in a statute, regulation, or policy, or else a "facially neutral

law" may be proven to be "motivated by a racial purpose or object," *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (*Cromartie I*), and to have achieved a discriminatory "effect," *Shaw I*, 509 U.S. at 641.

Because there is no racial classification on the face of the statute, "'assessing . . . motivation" behind HB 4 becomes a significantly more complex issue. *Cromartie I*, 526 U.S. at 547. The Court's analysis should begin with "with a presumption that the legislature acted in good faith", *Alexander v. S.C. State Conference of the NAACP*, 602 U.S. 1, 6 (2024), and the Court "must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus." *Abbott v. Perez*, 585 U.S. 579, 603 (2018) (citation omitted). To prove their vote dilution claims, Consolidated Plaintiffs must show racial intent behind the map, *i.e.*, that race was "a 'but for' motivation for the enactment." *Hunter v. Underwood*, 471 U.S. 222, 232 (1985); *see Shaw I*, 509 U.S. at 641. In contrast, Consolidated Plaintiffs must demonstrate that race was the "predominant motive for the design of the district as a whole" to prevail on their racial gerrymandering claim. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 188 (2017).

## I.   Consolidated Plaintiffs are unlikely to succeed on the merits of their racial vote dilution claims.

Consolidated Plaintiffs' vote dilution claim requires proof that H.B. 4, a "facially neutral law," was motivated by a racial purpose or object," *Cromartie I*, 526 U.S. at 546, and achieved a discriminatory "effect," *Shaw I*, 509 U.S. at 638. It is not enough for Consolidated Plaintiffs to assert "a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 65 (1980).

Consolidated Plaintiffs are wrong to suggest that a supposed a disparate racial or ethnic impact does most of their work. *See* ECF 1150 at 23. This assertion ignores "the complex interplay of forces that enter a legislature's redistricting calculus." *Abbott*, 585 U.S. at 603 (citation omitted); *see also Miller v. Johnson*, 515 U.S. 900, 915 (1995); *Cromartie I*, 526 U.S. at 547. The Supreme Court recently explained that, "[w]hen partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to

a racially gerrymandered map." *Alexander*, 602 U.S. at 9. Legislatures "may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact."[130] *Id.* (citation omitted). By insisting that disparate *partisan* impact creates a presumption of *racial* discrimination, ECF No. 1150 at 23, Consolidated Plaintiffs create exactly the scenario of which the Supreme Court recently warned: courts must "be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare'" by restyling partisan-gerrymandering claims as race-based claims and "sidestep[ping]" the Supreme Court's holding "that partisan gerrymandering claims are not justiciable in federal court." *Alexander*, 602 U.S. at 11, 21 (citation omitted). Consolidated Plaintiffs cite cases pre-dating *Alexander*, many of which do not concern the sensitive factors at play in redistricting. ECF No. 1150 at 23. They begin their analysis well off the mark, *Abbott*, 585 U.S. at 603; *Alexander*, 602 U.S. at 11, 21, and only stray further in carrying it along.

### A. The direct evidence shows partisan motivations for the enacted map.

Consolidated Plaintiffs hyperbolically claim to find direct evidence of intent "to dilute [minority] voting strength on account of race." ECF No. 1150 at 30. Nothing could be further from the truth. Nowhere did anyone—state actor or otherwise—announce an intent "to dismantle districts on account of their racial composition." *Id.* at 27.

### i.    There is no evidence of race-based line drawing.

To begin, Consolidated Plaintiffs, like Gonzales Plaintiffs, fail to identify the type of direct evidence that precedent has recognized as such: admissions by map-makers that they sought to hit a racial target. *Cooper v. Harris*, 581 U.S. 285. 299–300 (2017); *Bethune-Hill*, 580 U.S. at 184; *Ala. Legislative Black Caucus*, 575 U.S. 254, 259–63(2015). Consolidated Plaintiffs resist any need to present evidence of this kind as too high a bar, theorizing that legislatures will not announce intent to use race. ECF No. 1150 at 23. They again miss the factors unique to redistricting cases. *Abbott*,

---

[130] Insofar as Consolidated Plaintiffs believe they can gerrymander around this rule by styling their claim a racial "vote dilution" claim rather than a racial "gerrymandering" claim, they cannot be correct. All factors *Alexander* identified in fashioning standards apply to the claim Plaintiffs styled a vote dilution claim.

585 U.S. at 603; *Miller*, 515 U.S. at 915; *Cromartie I*, 526 U.S. at 547. "States often admit to considering race for the purpose of satisfying … precedent interpreting the Voting Rights Act." *Alexander*, 602 U.S. at 8. No such admission was made here.

Nor do Consolidated Plaintiffs tie their deficient direct-evidence narrative to district boundaries. They admit the "DOJ letter" referenced just four "specified" districts and that the Legislature reconfigured far "more"—37, to be precise. ECF No. 1150 at 29. Consolidated Plaintiffs do not explain how a supposed announced intent about four districts can translate into a statewide claim. *See Bethune-Hill*, 580 U.S. at 191 (claims must proceed district by district); *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (same). Nor can the supposed direct evidence of intent be probative when, plainly, the Legislature was drawing lines well beyond what the DOJ letter contemplated. In fact, Consolidated Plaintiffs' own assertion cuts against them: they allege intent to dismantle minority coalition districts but admit the 2025 plan contains "*four*" coalition districts. ECF No. 1150 at 29. If the goal was to dismantle coalition districts, the Legislature must have failed in carrying it out. If the goal was—as is obvious—to create five more Republican-leaning districts, the Legislature appears to have succeeded.

From there, Consolidated Plaintiffs provide color commentary about what "the map purposefully" does. ECF No. 1150 at 30. Because "the map" cannot testify about its purpose at the upcoming hearing, Consolidated Plaintiffs cannot plausibly call their guesswork direct evidence. Nor is it evidence at all. *United States v. Willis*, 639 F.2d 1335, 1338 (5th Cir. 1981) ("[a]ll we will say about the lawyer's argument is that it was not evidence"). Nor do Consolidated Plaintiffs even attempt to show that the supposed outcome was the product of a racial goal rather than a partisan one. *See Alexander*, 602 U.S. at 9.

### ii. The DOJ Letter

Like Gonzales Plaintiffs, Consolidated Plaintiffs focus on proving the "DOJ letter" was "***nonsense***." ECF No. 1150 at 25 (emphasis in original). But their task was to show invidious "purpose *and* effect," *Alexander*, 602 U.S. at 38–39, not to prove that the DOJ Voting Rights Section lacks an understanding of voting rights law. The Assistant Attorney General for Civil

Rights is not a "relevant state actor[]," *Id*.. at 8, and Texas (unlike a federal court) enjoys the prerogative to redistrict whether or not it does so "to remedy a violation of federal law." *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). Assuming Texas had no federal violation to remedy—despite Consolidated Plaintiffs' continued insistence that the prior map *did* violate federal law—and assuming the contrary assertion of the DOJ Voting Rights Section was incorrect, that would supply no basis for federal intervention. *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion) ("Laws promulgated by the Legislative Branch can be inconsistent, illogical, and ad hoc; law pronounced by the courts must be principled, rational, and based upon reasoned distinctions."). Consolidated Plaintiffs' discussion of *Petteway v. Galveston County*, 111 F.4th 596, 603 (5th Cir. 2024) (en banc), is therefore entirely academic.

Yet Consolidated Plaintiffs run wild, piling inference on inference with no basis in evidence. They say DOJ was mistaken in believing "a State can purposefully seek out and destroy multiracial majority districts that just *happen to exist*—and do so expressly *on account* of their racial makeup." ECF No. 1150 p. 25–26. Nothing in the record says this occurred, and DOJ did not request it. The letter erroneously accused Texas of racial gerrymandering in four districts in the prior map and demanded that those districts "be rectified." ECF No. 1141-2.That's it. Everything Consolidated Plaintiffs say about "the intentional dismantling of districts on account of their multiracial majority" is invention. ECF No. 1150 at 26. The only logical reading of the letter is as a demand for new districts drawn *without* regard to race. Why would the United States government accuse a state of racial discrimination and *sub silentio* insist on *more* race-based action? *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion) ("The way to stop discrimination on the basis of race is to stop discriminating on the basis of race."). If Consolidated Plaintiffs mean to say that remedying a (supposed) race-based district necessarily requires more race-based redistricting, they are wrong. *Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 879–80 (E.D. Va. 2019) (three-judge court) (finding remedy to racially gerrymandering district to be race-neutral). They also err in reading the record insofar as the DOJ was simply a political cover the Trump Administration to persuade Texas—along with other

states—to redistrict for a distinct partisan advantage. Consolidated Plaintiffs' objection to that is non-justiciable. *Rucho v. Common Cause*, 588 U.S. 684 (2019).

### iii.    Governor Abbott's Proclamation and Subsequent Statements

Nor do the Governor's statements about redistricting serve as direct evidence of race-based line drawing. Consolidated Plaintiffs cite the Governor's Proclamation that called for "[l]egislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice" as direct evidence of racial motive on behalf of the Legislature. ECF No. 1150 at 29. But the Governor did not call for, as Consolidated Plaintiffs suggest, the dismantling of districts due to their racial composition. *Id*. Instead, the Governor asked the Legislature to review the congressional map and draw a new one. His public statements reinforce this sentiment. For example, in his August 7, 2025 interview with Joe Pags, Governor Abbott reinforced his partisan motive by stating that his goal is to "take the people who were in [] coalition districts, and make sure they're gonna be in districts that really represent the voting preference of those people who live here in Texas."[131]

Inattentive to what the record truly shows, Consolidated Plaintiffs double down on the Governor's statements and proclaim "[t]he Court can stop its analysis there," given his supposed centrality in the redistricting process. ECF No. 1150 at 27. Of course, if the Court were to stop there, Consolidated Plaintiffs would lose, since the Governor provided no direct evidence of racial intent. Moreover, precedent does not treat the intent of one actor as *dispositive* on the question of legislative intent. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021) (The 'cat's paw' theory has no application to legislative bodies."). And Consolidated Plaintiffs' own arguments cut against them. The Texas Senate is also "of singular importance to the enactment of legislation," ECF No. 1150 at 27, since no plan could pass without its affirmative vote. But Consolidated Plaintiffs do not even allege that the Senate acted with a racial motive. *See* ECF No. 1150 at 21. Because an independent organ of State government plainly—and undisputedly—

---

[131] Ex. CA, *Governor Abbott Talks Democrat Desperation On The Joe Pags Show*, YouTube (Aug. 7, 2025), https://www.youtube.com/watch?app=desktop&v=kubKVtdGgBA.

acted without racial motive, there can be no claim of racial discriminatory state action. *See Hartman v. Moore*, 547 U.S. 250, 260 (2006).

     iv.    **Statements by Legislators**

Consolidated Plaintiffs cite several statements made by members of the Texas Legislature that they contend serve as direct evidence of racial motive. Not so. Consolidated Plaintiffs have divorced portions of statements from their relevant context. For example, Consolidated Plaintiffs contend that:

> Democratic Rep. Christian Manuel noted to Chair Hunter that CDs 9 and 35 were changed to be just above 50% Hispanic CVAP and CDs 18 and 30 were changed to be just above 50% Black CVAP and asked Chair Hunter: "Is that a coincidence?" Id. at 1:45:32. Chair Hunter responded: "Nothing's a coincidence."

ECF No. 1150 at 18 (citations omitted). This is misleading, and egregiously so considering Consolidated Plaintiffs' own vehement objections concerning the rule of optional completeness. Chair Hunter's full response was:

> Nothing is a *coincidence* . . . . part of the reason it was increased was to follow the compactness-contiguous [goal] and some of the districts were historic and so there has been a growth and you bring them back to the configuration: they are going to [] increase. Most of the ones that you have referenced were . . . on compact[ness] and the configuration.[132]

Representative Hunter's full quote shows that the changes about which Representative Manuel inquired were not "coincidence," but rather the byproduct of neutral goals like improved compactness and population equality. That does not reflect racial intent but a goal of configuring districts according to neutral criteria. To his credit, Representative Manuel took Representative Hunter at his word and disavowed any accusation that members acted with a racial motive, saying: "I do not want anyone to think that I am trying to say that anyone has any racial bias[.]"[133] Taken in proper context, this evidence refutes Consolidated Plaintiffs' allegations of racial motive.[134]

Consolidated Plaintiffs also criticize what amount to simple factual statements about the racial makeup of certain districts. ECF No. 1150 at 16–20, 30–31. It is gross mischaracterization to

---

[132] Ex. AR at 1:47:00–1:47:28.
[133] *Id.* at 1:49:40.
[134] Trial Tr. 6/7/2025 4:29:09–4:32:20, 4:32:33–4:32:56, 4:48:05–4:49:49, 4:49:49–4:50:22, 4:50:22–4:50:31, 4:50:55–4:51:36.

cite references to racial outcomes *after* the map was drawn as direct evidence of racial motive. For Legislators to know what the racial makeup of a given district is, especially if they did not draw the map, is not direct evidence of discriminatory intent. *See* ECF No. 258 at 18 (citing *Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979) ("And in that context, discriminatory purpose means more than awareness of a discriminatory effect"). Legislatures will "almost always be aware of racial demographics," and that does not amount to racial intent. *Miller*, 515 U.S. at 916. In *Alexander,* the Supreme Court found that the "District Court placed too much weight on the fact that several legislative staffers . . . viewed racial data at some point during the redistricting process." *Alexander* 602 U.S. at 22. And a map drawer is perfectly within his rights to review racial data *after* the drawing of the map for a lawful purpose, "namely, to check that the maps he produced complied with our Voting Rights Act precedent." *Id*. And the Legislators to whom Consolidated Plaintiffs would impute a discriminatory motive have done the same here. Consolidated Plaintiffs therefore lack any coherent or persuasive direct evidence of racial intent by the Legislature.

### B. Assertion of Circumstantial Evidence.

Failing to provide direct evidence that any district in the 2025 plan was drawn with racial intent, Consolidated Plaintiffs turn to "the *Arlington Heights* factors" to shoulder their burden. ECF No. 1150 at 32. They ignore, however, that the Supreme Court has fashioned standards for addressing circumstantial evidence in redistricting cases that place no meaningful reliance on the factors mentioned in *Arlington Heights. Abbott*, 585 U.S. at 609–10; *Alexander*, 602 U.S. at 7–39.

The Supreme Court has explained that proving racial intent "with circumstantial evidence alone is much more difficult" than it is with direct evidence, and the Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Alexander*, 602 U.S. at 8. The possibility is open only "in theory." *Id*. "A circumstantial-evidence-only case is especially difficult when the State raises a partisan-gerrymandering defense." *Id.* at 9. "When partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map." *Id.* As noted

already, courts must be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare'" by restyling partisan-gerrymandering claims as race-based claims and "sidestep[ping]" the Supreme Court's holding "that partisan gerrymandering claims are not justiciable in federal court." *Id.* at 11, 21 (citation omitted). A plaintiff therefore "must 'disentangle race from politics.'" *Id.* (citation omitted). Precedent directs "an adverse inference" against plaintiffs who do not provide a "substitute map that shows how the State 'could have achieved its legitimate political objectives' in [a challenged district] while producing 'significantly greater racial balance.'" *Id.* at 34 (citation omitted). "If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Id.* at 10. Like Gonzales Plaintiffs, Consolidated Plaintiffs do not attempt to shoulder this burden and have no likelihood of success.

All that aside, Consolidated Plaintiffs fail to make out a persuasive case under the *Arlington Heights* factors. The *Arlington Heights* factors include (1) discriminatory effect; (2) historical background; (3) the sequence of events leading up to a challenged decision; (4) departures from normal procedure; and (5) legislative history. *Arlington Heights*, 429 U.S. at 266-68; *see Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*, 6 F.4th 633, 640 (5th Cir. 2021) ("These factors are not exhaustive"). the *Arlington Heights* factors are probative only insofar as they can fairly point to "a discriminatory goal." *Rollerson*, 6 F.4th at 640; *cf. Twitter, Inc. v. Taamneh*, 598 U.S. 471, 504 (2023) (explaining that a multi-factor test cannot be construed "as a sequence of disparate, unrelated considerations without a common conceptual core"). They must not be applied "mechanically." ECF No. 258 at 43. Consolidated Plaintiffs' analysis under this rubric is, at most, mechanical.

### i.   Discriminatory Effect

As State Defendants explained in the opposition to the Gonzales Plaintiffs' motion, a showing of discriminatory effect is a necessary element of an intentional discrimination claim and may double as *partial*—but incomplete—evidence of invidious intent. *Arlington Heights*, 429 U.S. 266-68; *Alexander*, 602 U.S. at 39. Consolidated Plaintiffs' showing serves *neither* purpose because it is insubstantial. In a single sentence they declare that "three performing majority minority

districts are eliminated." ECF No. 1150 at 34. One initial problem with this assertion is that, as Consolidated Plaintiffs elsewhere acknowledge, their case concerns "coalition seats," ECF 1150 p. 4, not majority-minority districts, *see Petteway*, 111 F.4th at 603. The enacted plan *increased* the number of majority-minority districts as the law defines that term. *Bartlett v. Strickland*, 556 U.S. 1, 14 (2009) (plurality opinion). Consolidated Plaintiffs do not explain how a minority group can suffer vote dilution through districts in which its members can "elect [their preferred] candidate based on their own votes and without assistance from others."[135] *Id.*

Regardless, Consolidated Plaintiffs make "no effort to disentangle race from politics." *Alexander*, 602 U.S. at 24. The Constitution does not condemn a plan merely because, under it, Republican candidates win and Democratic candidates lose. *See Whitcomb v. Chavis*, 403 U.S. 124, 150 (1971). Consolidated Plaintiffs' contention that minority coalition districts "are replaced by districts in which Anglo-preferred candidates prevail," ECF No. 1150 at 32, is code for the contention that districts in which Democratic candidates once prevailed are now districts in which Republican candidates are projected (but not certain) to prevail. This is a transparent attempt "to sidestep [the Supreme Court's] holding in *Rucho* that partisan-gerrymandering claims are not justiciable in federal court." *Alexander*, 602 U.S. at 21. Consolidated Plaintiffs equate minority success with Democratic success—even though substantial numbers of Hispanic voters do *not* prefer Democratic candidates—and call their burden met.

Consolidated Plaintiffs do not measure minority opportunity apart from politics (such as an analysis of primary data) or otherwise show *racial* as opposed to *partisan* dilution. Consolidated

---

[135] It bears noting that minority groups believing race to have been used in the drawing of their districts, but who may elect their candidates of choice nonetheless, have generally brought racial gerrymandering claims, which do not entail an element of dilution, rather than vote dilution claims. *See, e.g.*, *Cooper*, 581 U.S. at 303–04; *Bethune-Hill*, 580 U.S. at 184; *Alabama*, 575 U.S. at 259–60. It is a mystery why Plaintiffs here have emphasized their vote dilution claims. They may have been mislead by dicta in a decision of this Court suggesting vote-dilution claims are easier than racial gerrymandering to prove. *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 509 (W.D. Tex. 2022). With respect, this is manifestly mistaken. *Alexander*, 602 U.S. at 38–39 (indicating respects in which the vote-dilution burden is more demanding). Plaintiffs would not have, for decades, brough racial gerrymandering claims rather than vote dilution claims if the latter were easier to prove.

Plaintiffs' expert, Dr. Barreto, again omitted primary data from his racial bloc voting analysis. ECF No. 1150-17 ("Barreto Rep.") at ¶¶ 25, 27 & App'x B. When this Court previously evaluated Dr. Barreto in 2022, the Court found that he "showed signs of partiality to his side's position" and largely discredited his racially polarized voting analysis because Dr. Barreto refused to consider primary elections. *LULAC v. Abbott*, 601 F. Supp. 3d 147, 165 (W.D. Tex. 2022). Despite that finding, in his new August 24, 2025, report, Dr. Barreto persists in relying solely on general elections. This is a troubling omission given that Dr. Barreto was discredited as an expert in *Pierce* for having "profound discrepancies" between his two reports in that case, and that his belated explanation for those discrepancies "undercuts all of [his] conclusions by demonstrating that fuller data sets could change his estimated outcomes." *Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195, 229 (E.D.N.C.), aff'd but criticized, 97 F.4th 194 (4th Cir. 2024). Likewise, Dr. Collingwood provides an RPV analysis of Anglo and Hispanic voters in CD 9 and CD 35 in the 2025 enacted plan. Collingwood Sept. 5, 2025, Rep. at 1. But he conducted this analysis not only just using general elections, despite this Court's prior finding that general elections are not sufficient, *see LULAC*, 601 F. Supp. 3d at 165, but also only using "six statewide contests featuring Spanish surname or Hispanic candidates over the last three general election cycles (2024, 2022, and 2020)." Collingwood Rep. at 1. But this cherrypicked selection of districts is not sufficient to carry the day; while "interracial elections" between Anglo and Hispanic candidates are undoubtedly relevant, *see Missouri State Conf. of NAACP v. Ferguson-Florissant School Dist.*, 201 F. Supp. 3d 1006, 1040 (E.D. Mo. 2016), they are not the *only* probative elections, especially given that all the elections Dr. Collingwood studied are exogenous elections (meaning, not for the offices challenged) and none were endogenous. *See id*.[136]

---

[136] Notably, Dr. Collingwood's report also finds there is significant turnout variation between Anglo and Hispanic voters, with Anglo voters turning out at higher rates than Hispanic voters. Collingwood Rep. at 18–20. While turnout can matter in a district-specific functional analysis in a Section 2 claim, this preliminary-injunction motion is proceeding on intent-based claims. If Hispanic voters make up a majority of the CVAP in a district, they should be able to influence if not control the outcome of the election—provided they turn out and vote cohesively.

### ii.    Historical Context

Consolidated Plaintiffs' argument that historical context supports an inference of discriminatory intent cherry-picks one historical event while entirely glossing Texas's recent efforts to expand access to the political system to all Texans' regardless of their race. The Supreme Court has held that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value[.]" *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). Courts should not unduly rely on "noncontemporary evidence of discrimination in the voting rights context." *Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016).

Consolidated Plaintiffs chiefly identify as evidence of historical discrimination the 2012 three-judge panel's finding in *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017), where the three-judge panel found that the Legislature had discriminated against minority citizens in enacting Senate District 10. And while this Court has agreed that such a finding is relevant to the historical context factor, ECF No. 258 at 34, Consolidated Plaintiffs' assertions take a myopic view of Texas's approach towards access to the political process.

Contrary to Consolidated Plaintiffs' assertions, Texas has made significant strides in expanding access to the franchise to all Texans. The State Defendants' trial testimony is replete with this evidence. To begin, Texas was a pioneer in no-excuse early voting. All registered voters have the ability to vote prior to election day, expanding access to the ballot box to those who, among other things, may have an immovable conflict on election day. [Ex. 48] Tr. 6/6/25 PM 136:16–137:10. To that end, "[e]arly voting helps all Texas voters." [Ex. 48] Tr. 6/6/25 PM 138:24. The available evidence supports the contention that early voting helps all voters—most Texas voters utilize early voting as opposed to voting on election day. [Ex. 48] Tr. 6/6/25 PM 138:6–8.

Moreover, because Texas is a heavily bilingual state, Tr. 6/6/25 PM 144:20–23, it has made taken a number of steps to ensure that its Spanish-speaking citizens, among others, can participate in the political process. To that end, Texas law requires that all ballots be printed in both English and Spanish. *Id.* Voters can also use translators of their choice[137] to help them vote if they do not

---

[137] Translators cannot be the induvial voter's employer or labor union representative.

readily speak a language in which the ballot is printed, or even if they prefer to sue a translator. Tr. 6/6/25 PM 144:24–145:7.

These are but two examples of the efforts Texas has made to improve the political process for all citizens, including minorities. To ignore these and focus on one negative instance of state action over a decade ago, as Consolidated Plaintiffs have done, continues their insistent blindness to the very progress for which the purport to advocate.

### iii.    The Remaining Arlington Heights Factors

The final three *Arlington Heights* factors—the sequence of events leading up to the challenged decision, departure from normal procedure, and legislative history, can be "difficult to disentangle." ECF No. 258 at 35. And while the sequence of events leading up to the passage of the current Congressional map could theoretically include both departures from normal procedure and legislative history, this Court chose to focus on the more informal sequence of events leading up to the map. ECF No. 258 at 35. State Defendants do the same here. The events leading up to the new Congressional map are not complex. President Trump wanted five more Republican representatives out of Texas.[138] Texas responded in the form of Governor Abbott's proclamation, and the Legislature followed through.[139] Further, House Democrats' behavior during this period signals their belief about the Legislature's true intent. Prior to their widely publicized quorum break, where they fled Texas to speak at press conferences in Democratic-led states that have been politically gerrymandering their districts for decades, House Democrats accused House Republicans of a partisan political power grab.[140]  This is, of course, undeniably accurate. But after

---

[138] Ex. AA.

[139] Ex. Z; *See also* Ex. AB at 1; Ex. AC at 1.

[140] Ex. AF at 56:21–57:23 (Congressional Representative Garcia: "[W]e are here today playing political games. . . . I urge you to reject this partisan gerrymandering of Texas"); *id.* at 76:16-19 ("[T]he short-tern gain is getting the five seats to retain the gavel of the House and get the agenda done. I mean, that's the power grab."); Ex. AD at 21:22-25 (Senator Alvarado regarding the DOJ Letter: "So the letter, neither finds a violation of law, nor engages in bonafide settlement efforts. It raises concerns and asks for a same-day response. It's kind of a fig leaf or a power grab."); *id.* at 155:3-16 (Senator Miles: "This isn't redistricting. It's rig districting. The Trump administration has put a target on the backs of those who have dared to speak up the truth . . . . This is a political attack on democracy, a strategic assault to steal the 2026

meeting with Democrat lawmakers and operatives, Texas House Democrats changed their tune. They began framing the redistricting effort as an attempt to discriminate against minority voters.[141] The Court should not ignore this, as it supports the idea that *everybody*, Democrats included, knew the partisan goal of the redistricting legislation and that Democrats only changed their minds when it became politically expedient to do so.

These events notwithstanding, Consolidated Plaintiffs nonetheless conflate the third and fourth *Arlington Heights* factors, presumably in an attempt to tip the scales in their favor. State Defendants will now address Consolidated Plaintiffs' arguments related to those factors.

Consolidated Plaintiffs first complain (at 35) that Texas engaged in perfectly permissible mid-decade redistricting and urge the Court to take an inference of racial intent from this action. This is nonsense. While not common, redistricting in between the decennial census is entirely permissible. "With respect to a mid-decade redistricting to change districts drawn earlier in conformance with a decennial census, the Constitution and Congress state no explicit prohibition." *LULAC v. Perry*, 548 U.S. 399, 415 (2006) (plurality opinion). And the Supreme Court has previously "assumed that state legislatures are free to replace court-mandated remedial plans by enacting redistricting plays of their own." *Id.* at 416. There is in fact no difference between Texas replacing a court-mandated map with its own maps. That the Consolidated Plaintiffs infer some racial motive from this is beyond the pale, especially considering the partisan motivations, discussed *supra*, behind the Legislature's decision to redistrict.

Consolidated Plaintiffs also ask the Court to infer racial intent from the somewhat truncated process that the Legislature undertook to pass the new map. This too is curious. At the

---

election, to flip congressional districts."). Ex. CB, Texas Senate Committee on Congressional Redistricting, Saturday, July 26, 2025 at 17:12-23 (Senator Alvarado: "Because now that Trump has asked Texas to do this, now there are other states trying to do the same thing. . . . [I]f we do this, then any state at any time can follow this path and just start redistricting because of a power grab or afraid of midterm elections.").

[141] Ex. BU at 12:22-24 (Senator Alvarado: "I have a hard time believing that you or anybody that had anything to do with the drawing of the map did not look at racial numbers, demographics."); Ex. J at 50:18-23 ("And this might seem like an attack on Senator King, and I don't mean it to be, but the fact is, we've got to find out who the racists are. I know it's not Senator King. It's the map makers.").

outset, Plaintiffs' accusation that the reason the Legislature "rushed the process was to squeeze it in after this Court held the trial" is baseless conjecture. In fact, there was little deviation from the normal process at all. *Contra* Consolidated Plaintiffs assertion that it was a departure from the normal legislative process to not "release a map until the public hearings were over", ECF No. 1150 at 36, Chair Vasut specifically noted on the floor that "it has always been the practice of the redistricting committee, to my knowledge, to first have hearings before even considering a map[.]"[142] And based on the testimony already given in this matter, the Legislature allotted ***more*** time for consideration of the maps than did the 87th Legislature when it enacted the 2021 maps during special session. Moreover, after HB 4 was announced, the Legislature hosted over ten hours of public testimony on August 1—a point Consolidated Plaintiffs conveniently ignore.[143]

Last, the legislative history, which is intertwined with the other remaining *Arlington Heights* factors, is inundated with statements from lawmakers regarding the partisan intent behind the maps. And the story remains clear and consistent. The Legislature drew the maps to maximize Republican advantages in Texas.[144]

## II. Consolidated Plaintiffs are unlikely to succeed on their claims of racial gerrymandering.

Consolidated Plaintiffs have also failed to show they are likely to prove a claim of racial gerrymandering. While that cause of action carries no required proof of vote dilution (or intent to

---

[142] Ex. AJ at 214:10-13.

[143] While that testimony pertained to Plan C2308, as opposed to the enacted plan (C2333), which Plaintiffs admit (at 20) made only minor changes to twelve different districts. And Plaintiffs only gripe with the changes made in Plan C2333 relate to a small change in CD 9 that was explicitly meant to improve Republican performance in the district.

[144] Ex. AR at 47:30–49:10 (Representative Hunter: "[T]hese districts were drawn primarily using political performance that criteria from the U.S. Supreme Court, that's why I'm explaining this to be open to everybody. Also the law in the Fifth Circuit, on coalition districts. . . . Under the Fifth Circuit, and this is a recent decision, they changed the law. . . . Coalition districts, were held by the Court, that Section 2 no longer requires the drawing of Coalition districts."); *id.* 49:25–49:55 (Representative Hunter: "Now, and I want to be open to everybody, given that political performance is an acceptable reason for drawing districts, and clarification from the Fifth Circuit on coalition districts, we have redrawn the Congressional map with those points."); *see also* Ex. BO at 14:1-13 (Representative Manuel: "May I ask what was the reason for the changes in the congressional districts from what we had previous?" Representative Hunter responded: "To make it more Republican . . . . That's right, partisanship, political performance. That's what I said at the very top. Absolutely they've been enhanced, and it makes it stronger, and it allows a Republican performance, partisan under the U.S. Supreme Court.").

dilute votes), it does require proof that race was "the 'predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Alexander*, 602 U.S. at 7 (quoting *Miller* 515 U.S. at 916). The standard is "demanding." *Id.* at 17 (citation omitted). "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller*, 515 U.S. at 916. The inquiry turns on "the design of the district as a whole," so "[a] court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue." *Bethune-Hill*, 580 U.S. at 192. Importantly, the predominance test is not satisfied merely because of a racial goal, even a racial target. *Allen v. Milligan*, 599 U.S. 1, 32–33 (2023) (plurality opinion) (explaining "that 'the use of an express racial target' [is] just one factor among others that the court would have to consider as part of '[a] holistic analysis.'"). "As a practical matter, in many cases, perhaps most cases, challengers will be unable to prove an unconstitutional racial gerrymander without evidence that the enacted plan conflicts with traditional redistricting criteria." *Bethune-Hill*, 580 U.S. at 190.

Consolidated Plaintiffs appear to challenge CD9, CD18, CD30, CD33, CD35, and CD27. *See* ECF No. 1150 at 38–41. They contend that CD9, CD18, CD35, and CD35 "were the product of racial targets." ECF No. 1150 at 40; *see also id.* at 38–39. But they have no evidence of that. For CD9, CD33, and CD35, they rely on *ipse dixit*. ECF No. 1150 at 39–40. A district's racial does not speak for itself, let alone to invidious motive. *See Lawyer v. Dep't of Justice*, 521 U.S. 567, 582 (1997) ("we have never suggested that the percentage of black residents in a district may not exceed the percentage of black residents in any of the counties from which the district is created"). For CD18, Consolidated Plaintiffs cite the statement of Governor Abbot of intent to protect an incumbent's seat. ECF No. 1150 at 38. But "incumbent protection" is a race-neutral goal, even if the incumbent is a minority, *Alexander*, 602 U.S. at 13; *Miller*, 515 U.S. at 907, and Consolidated Plaintiffs err in conflating that with a racial target (which the Governor's statement does not reference in any way). For CD18 and CD30, Consolidated Plaintiffs merely reference floor

statements describing them as new majority-Black districts. ECF No. 1150 at 39. That after-the-fact description of outcomes does not prove predominant intent to draw lines on the basis of race. *Alexander*, 602 U.S. at 22 ("Roberts testified without contradiction that he considered the relevant racial data only *after* he had drawn the Enacted Map"); *Miller*, 515 U.S. at 916. Simply put, there is no evidence of a racial target and no direct evidence of racial motive at all. *See supra* § A.ii–iv. (explaining Consolidated Plaintiffs' errors concerning the DOJ letter and gubernatorial and legislative statements).

That failing lands Consolidated Plaintiffs with "an adverse inference." *Alexander*, 602 U.S. at 34. They have not provided direct evidence that any line was drawn on the basis of race, or that a racial target was used, or presented an alternative plan showing that Texas could have created five new Republican-leaning districts with a different racial outcome. *Id.* at 34–35. This failing "should be interpreted … as an implicit concession that the plaintiff cannot draw a map that undermines the legislature's defense that the districting lines were 'based on a permissible, rather than a prohibited, ground.'" *Id.* at 35 (citation omitted).

Consolidated Plaintiffs cannot overcome the adverse inference compelled by precedent with circumstantial evidence. To begin, the possibility of prevailing on circumstantial evidence alone exists only "in theory," *Id.* at 8, which is no basis for the extraordinary remedy of a preliminary injunction. And the circumstantial evidence here is basically non-existent. Consolidated Plaintiffs point to the work of Dr. Barreto, who provided two simulation analyses. *See* Barreto Supp. Rep. at Figs. S1-S3. But the Supreme Court has expressed heavy skepticism about this type of analysis, *Alexander*, 602 U.S. at 24–34 (finding clear error in trial court's reliance on such an analysis); *Allen*, 599 U.S. at 36–37 (stating that even a "trillion trillions" of simulations would not fairly show what redistricting plans could provide a "reliable way to determine who wins" the "contest of computers"). Any type of simulation analysis must, at minimum, "replicate the 'myriad considerations' that a legislature must balance as part of its redistricting efforts," and a report that fails to do so "cannot sustain a finding that race played a predominant role in the drawing of" district lines. *Alexander,* 602 U.S. at 24 (quoting *Allen*, 599 U.S. at 35). Here,

Dr. Barreto admits his model could not match the partisan performance of the districts he analyzed. For one thing, he only looked at one election—the 2024 presidential election—to model partisan performance. But the record does not reflect that the Legislature considered *just* the 2024 election. For another, he does not claim that he modeled all the non-racial redistricting criteria used by the Texas Legislature—like incumbency protection—which dooms simulations analysis. *See Allen*, 599 U.S. at 34 (holding reliance on simulated maps to be "misplaced" where the maps "ignored certain traditional redistricting criteria, such as keeping together communities of interest, political subdivisions, or municipalities" and/or the state's "own districting guidelines").

Moreover, Dr. Barreto's Supplemental Report reveals significant methodological problems that doom even his modeling based on the 2024 presidential elections alone. In Harris County, he admitted that the 2025 Plan created seven districts in the Houston area that were "59% or higher for Trump," and his simulations robot could only draw *six* such districts because the robot was attempting to draw districts more compact than some of the districts in the enacted plan. *Id.* at ¶ 9 n. 2. Accordingly, he had to reprogram his robot to try to draw districts that were *56%* or higher for Trump, to overcome the compactness limitation. *Id.* at ¶ 9. The fact that Dr. Barreto's robot could not draw the enacted plan *once* was an obvious sign that his model was flawed. But Dr. Barreto chose to ignore that glaring red flag and simply lowered the Trump vote-share to a low enough number to get his robot to work. Likewise, Dr. Barreto purports to analyze the 2025 Plan's "districts 21, 23, 35" by modeling three districts "won by Trump with at least 55% of the vote" in the same territory as those districts. *Id.* at ¶ 12. But President Trump carried CD 21 with 60.2% of the vote, CD 23 with 56.8% of the vote, and CD 35 with 54.6% of the vote; he did *not* carry all three districts by merely "55%" of the vote. *See* Election Analysis – Congressional Districts – Plan C2333 2024 General Election, Texas Legislative Council, at https://data.capitol.texas.gov/dataset/planc2333. This failure to match the enacted plan's political performance—even accepting Dr. Barreto's assumption that the Legislature considered *only* the 2024 presidential election—again renders his simulated maps an apples-to-oranges

comparison that does not carry Consolidated Plaintiffs' burden to show race, rather than politics, explains the lines.

In a qualitative analysis, Dr. Barreto also presents 15 choropleth maps shaded with percentage of BCVAP and HCVAP for different regions of Texas. He asserts that "these visualizations help illustrate what the intent behind the map drawers might have been as they moved lines from the 2021 to 2025 maps." Barreto Rep. ¶ 41. In particular he claims that "Maps 1–15" provide "evidence that mapdrawers relied on the racial composition of neighborhoods, and not primarily partisan performance data in crafting the new maps" because "map drawers decided to split VTDs more than 440 times and instead draw boundaries on census blocks, for which only racial data exists." *Id.* at ¶ 43. But Dr. Barreto's report and appendix maps do not show *which* split VTDs they allege were divided along racial lines, and because Dr. Barreto's appendix maps were color-coded at the "block or block-group level from U.S. Census data," *id.* at ¶ 41, and not at the VTD level, the maps do not appear to show which VTDs were split.

In his September 5, 2025, supplemental report (ECF No. 1193-2), Dr. Barreto for the first time presents choropleth maps shaded by partisanship of select districts in the 2025 Plan (using only the 2024 presidential election results, rather than an index), and then presents choropleth maps shaded by HCVAP (and BCVAP for CD 9) in the same geography. *Id.* at App'x B, Figures S22 to S30. He declares that "the partisan shading maps herein make clear that across the greater Houston region, the greater Dallas region, and the Austin-San Antonio to South Texas region, partisanship does not explain map boundaries." *Id.* at ¶ 20. But nowhere does Dr. Barreto explain *how* or *why* that is so, and a visual inspection of the choropleth maps he produces does not in any way disentangle race from politics. The border of CD 9 and CD 18 in Houston, for example, appears to follow *partisan* boundaries, with some light-blue shaded area (understood to mean areas the Democratic presidential candidate narrowly carried)[145] included in CD 9 but all dark blue

---

[145] Dr. Barreto's August 24, 2025, Report and September 5, 2025, Supplemental Report do not provide a key that identifies what the different color shades mean in his maps (e.g., what Republican vote-share corresponds to dark red).

territory kept on the CD 18 side of the line. *See* Barreto Supp. Rep. App'x B at Fig. S22. The same is true for the districts depicted in the "Dallas/Tarrant County region" and "Austin/San Antonio" regions.[146] *Id.* at Figs. S26 and S27.

## III.  Consolidated Plaintiffs will not endure irreparable harm as a result of the 2025 Congressional map.

Even if Consolidated Plaintiffs could show a likelihood of success, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam). Consolidated Plaintiffs must also show "a substantial threat of irreparable injury if the injunction is not issued." *Whitaker v. Livingston*, 732 F.3d 465, 466 (5th Cir. 2013). It is not enough to show that irreparable injury is possible, a plaintiff must demonstrate that "he is *likely* to suffer irreparable harm." *Winter*, 555 U.S. at 20. Because Consolidated Plaintiffs are not likely to prevail on their claims that the Legislature unconstitutionally discriminated on the basis of race, they cannot show that they are likely to suffer irreparable harm.

## IV.  The balance of the equities weighs against a preliminary injunction.

When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). This merges the balance of equities and public interest. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Indeed, courts should be loathe issue injunctions that disrupt the public interest. *See Salazar v. Buono*, 559 U.S. 700, 714 (2010). "[T]he balance of harm requirement . . . looks to the relative harm to both parties if the injunction is granted or denied." *Def. Distributed*, 838 F.3d at 459.

---

[146] Consolidated Plaintiffs tender an expert report from David Ely dated September 5, 2025 (the "Ely Report"). In that report, like Dr. Barreto, Mr. Ely presents choropleth maps shaded for BCVAP, HCVAP, and partisan performance (measured using the same six elections Dr. Collingwood considered), and contends—without meaningful analysis—that these maps somehow demonstrate that racial rather than partisan explanations drive mapmaking.  This exercise suffers from the same flaws as Dr. Barreto's work. Worse, it contains overt *ipse dixit* conclusory opinions—such as that "Congressional Districts 9 and 35" were created to "reach a target of 50% [HCVAP]"—that are bereft of any meaningful analysis explaining the *basis* of such broad opinions. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (court not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert").

Here the Court must weigh the disruption that a preliminary injunction will inflict on the 2026 elections, as well as the harm to Texas's sovereign interest in its laws, against any injury it will likely inflict on Consolidated Plaintiffs' voting rights. The *Purcell* doctrine weighs against preliminary relief once preparations for the 2026 elections have begun. If the Court does not issue its judgment by that date, then the equities favor denial of Consolidated Plaintiffs' motions. Further, Consolidated Plaintiffs' long record of inaction in prosecuting their challenges to Texas's 2021 maps strongly implies that they do not need preliminary relief. These topics are discussed at length in State Defendants' Response to the Gonzalez Plaintiffs' Motion for Preliminary Injunction, and State Defendants hereby incorporate by reference each of the arguments and authorities discussed therein.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to preliminarily enjoin implementation of Plan C2333 should be DENIED.

Date: September 23, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

WILLIAM D. WASSDORF
Associate Deputy Attorney General for Civil
Litigation
Texas Bar No. 24103022
william.wassdorf@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Special Counsel
Texas Bar No. 24125064

Counsel for State Defendants

## CERTIFICATE OF SERVICE

I certify that on September 23, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division