UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **LEAGUE OF UNITED LATIN** | § | |
| **AMERICAN CITIZENS**, *et al.*, | § | |
| | § | |
| ***Plaintiffs***, | § | |
| | § | |
| **ALEXANDER GREEN**, *et al.*, | § | **EP-21-CV-00259-DCG-JES-JVB** |
| | § | **[Lead Case]** |
| ***Plaintiff-Intervenors***, | § | |
| **v.** | § | **&** |
| | § | |
| **GREG ABBOTT**, *in his official capacity as* | § | **All Consolidated Cases** |
| *Governor of the State of Texas*, ***et al.***, | § | |
| | § | |
| ***Defendants***. | § | |

<u>**ORDER DENYING MOTION TO STRIKE**</u>

For the following reasons, the Court **DENIES** Defendants' Motion to Strike the Expert

Reports of Dr. Matt A. Barreto and Michael B. Rios (collectively, "Dr. Barreto").

## I.    DISCUSSION

### A.    The Court Denies Defendants' Request to Strike the Reports Pursuant to Federal Rule of Civil Procedure 37(c)(1)

Defendants partly base their Motion on Federal Rule of Civil Procedure 37(c)(1),[1] which

states that "[i]f a party fails to provide information or identify a witness as required by [Federal

Rule of Civil Procedure] 26(a) or (e), the party is not allowed to use that information or witness

to supply evidence . . . at a hearing . . . unless the failure was substantially justified or is

---

[1] *See, e.g.*, Mot. Strike, ECF No. 1169, at 4, 10–11.

All page citations in this Order refer to the page numbers assigned by the Court's CM/ECF
system, rather than the cited document's internal pagination.

harmless."[2]  "In addition to or instead of" that exclusionary sanction, the Court "may impose

other appropriate sanctions,"[3] such as "prohibiting the disobedient party from supporting or

opposing designated claims . . . or from introducing designated matters in evidence."[4]

The primary provision of "Rule 26(a) or (e)"[5] that Defendants accuse the Brooks

Plaintiffs of violating is Rule 26(a)(2)(B)(ii),[6] which requires an expert witness's report to

disclose "the facts or data" that the witness "considered . . . in forming" his or her opinions.[7]

Defendants specifically claim that Dr. Barreto should have produced:

(1)    "a data file, referred to as a 'foundational shapefile,' . . . that provides
       'CVAP, 2024 Presidential Election results, and C2193 boundaries merged
       at the VTD level'"; and

(2)    either:

       (a)    "the simulated congressional plans [that] Barreto's
              simulations [program] created and that he analyzed in his
              Reports"; or

       (b)    "the seed value that would enable State Defendants to
              recreate those simulated plans."[8]

---

[2] FED. R. CIV. P. 37(c)(1).

[3] *Id.*

[4] FED. R. CIV. P. 37(b)(2)(A)(ii).

[5] *See* FED. R. CIV. P. 37(c)(1).

[6] *See, e.g.*, Mot. Strike at 4, 7, 12.

[7] FED. R. CIV. P. 26(a)(2)(B)(ii).

[8] *See, e.g.*, Mot. Strike at 7.

1.      **The Brooks Plaintiffs Need Not Produce a Foundational Shapefile Because Dr. Barreto Did Not Consider One**

Beginning with Item (1), the Brooks Plaintiffs have represented to the Court that Dr. Barreto did not use or consider a "foundational shapefile" when performing his analysis.[9]  If it's true that a "foundational shapefile" was not among the "facts or data" that Dr. Barreto "considered . . . in forming" his opinions, then Rule 26(a)(2)(B)(ii) does not require the Brooks Plaintiffs to produce one.[10]

2.      **The Brooks Plaintiffs Need Not Produce Merged Data to Facilitate Dr. Trende's Analysis**

The Court understands Defendants' demand for a "foundational shapefile" to be part and parcel of a more general complaint that the Brooks Plaintiffs identified only the *raw data* that Dr. Barreto considered in performing his analysis, without giving Defendants a *merged version* of that data that Defendants' expert (Dr. Trende) could readily input into Dr. Barreto's simulation program.[11]

By way of background, Dr. Barreto's code directs the user to input "CVAP, 2024 Presidential Election results, and C2193 boundaries merged at the VTD level" into the program.[12]  As the Court understands the issue, the Brooks Plaintiffs have pointed Dr. Trende to *publicly available sources* from which Dr. Trende may *download* those three types of data

---

[9] *See, e.g.*, Resp., ECF No. 1193, at 5 ("There is no foundational shapefile . . . ."); *id.* at 10 ("Defendants continue to insist there is some 'foundational shapefile' . . . that Dr. Barreto is hiding. There is not.  Just as Dr. Trende did with his own simulation analysis, Dr. Barreto instructed 'R' to gather the relevant files from their saved location on the computer—which files have all produced and identified for Defendants—and run the analysis from there. . . . There is no 'un-produced shapefile.'" (emphasis omitted) (citation modified)).

[10] *See* FED. R. CIV. P. 26(a)(2)(B)(ii).

[11] *See, e.g.*, Mot. Strike at 7, 9–10, 12–14.

[12] *See, e.g.*, *id.* at 7.

*separately*,[13] but haven't *packaged* those distinct categories of data into a combined format that Dr. Trende may readily feed into Dr. Barreto's program.[14]  According to Dr. Trende, without knowing exactly how Dr. Barreto *assembled* the data that he analyzed, Dr. Trende will have no assurance that the input he plugs into the program will be identical to Dr. Barreto's input[15]—and, thus, no reliable way to test the accuracy of Dr. Barreto's outputs and conclusions.[16]

The difficulty with Defendants' argument is that the plain text of Rule 26(a)(2)(B)(ii) merely requires an expert report to contain "the *facts or data considered* by the witness"—it does not explicitly require the expert to *compile* those facts or data into any specific format.[17] Defendants haven't directed the Court to any caselaw interpreting Rule 26(a)(2)(B)(ii) to require an expert witness to not just identify "the facts and data" upon which he relied, but also package

---

[13] *See* Resp. at 6 ("Dr. Barreto linked to the CVAP data in his August 2025 report . . . [H]e used the 5-year ACS CVAP data ending in 2023, the most recent.  [The link to that data] is here again for your reference . . . . Here is the direct link to download the nationwide block group CVAP dataset . . . ."); *id.* at 7 ("With respect to VTD boundaries, as you know Dr. Barreto's report uses the 2024 election results for his analysis.  The 2024 VTD boundaries are available [at the following link] . . . .").

[14] *See* Mot. Strike at 13 ("[A user] must merge these data to a specific metric before the [program] can process them.  [The publicly available website to which the Brooks Plaintiffs have directed Defendants] does not perform this merging function, and Barreto discloses neither the data nor his process for merging it.").

[15] *See id.* at 10 (accusing the Brooks Plaintiffs of "requiring [Defendants] to guess whether the various merges and transformations of data [they] pull are the same as the ones employed by Dr. Barreto").

[16] *See id.* at 4 (insisting that Dr. Barreto "has failed and refused to provide critical pieces of data necessary to replicate and test his methodology").

[17] *See* FED. R. CIV. P. 26(a)(2)(B)(ii) (emphasis added).

those facts and data into a format that will readily permit the other side's experts to replicate (and, if possible, undermine) the expert's findings.[18]

Although the Court lacks the time to exhaustively canvas the relevant caselaw in advance of the October 1, 2025 Preliminary Injunction Hearing, the cases that the Court *has* had time to review undermine Defendants' argument that Dr. Barreto's failure to provide a merged data file requires the Court to exclude his Reports. In *Alter Domus, LLC v. Winget*, for example, the plaintiff sought to bar the defendant's expert appraiser from testifying about a business's value.[19] The plaintiff argued that the defendant violated Rule 26(a)(2)(B)(ii) by failing to produce the "master spreadsheet" that its expert used to "compile the financial data" he considered when performing his appraisal.[20] The Eastern District of Michigan concluded, however, that "[t]he non-disclosure of the spreadsheet" was "not a good basis" to exclude the expert's testimony

---

[18] The few cases interpreting Rule 26(a)(2)(B)(ii) and 37(c)(1) that Defendants cited in their briefing don't support that reading. *See* Mot. Strike at 16–17. For instance, Defendants cited *Torres v. City of San Antonio* for the proposition that Rule 26(a)(2)(B)'s purpose "is to provide an opposing party with fair notice of the content of the experts' testimony." *See id.* (quoting No. 5:14-CV-00555, 2014 WL 7339122, at *2 (W.D. Tex. Dec. 23, 2014)). "[W]ithout the requisite information," *Torres* explains, the opposing party "is greatly prejudiced because it is left unaware of the testimony each expert plans to offer"—and, by extension, unable to "prepare to rebut the testimony." 2014 WL 7339122, at *2. Unlike the Brooks Plaintiffs, however, the plaintiff in *Torres* didn't produce written reports for her experts *at all*. *See id.* ("Plaintiff's [expert] designations are not accompanied by written reports as required by Rule 26(a)(2)(B) . . . ."). Thus, whereas the defendant in *Torres* had *no idea* what the plaintiff's experts would say, Defendants here are in a much better position to rebut Dr. Barreto's testimony, even without a merged data file.

Defendants also cited *In re C.F. Bean L.L.C.* for the proposition that "[f]ailure to provide proper notice of expert testimony should give rise to a commensurate and predictable consequence—the offending party is not allowed to use that information to supply evidence on a motion or at a trial, unless the failure was substantially justified or is harmless." *See* Mot. Strike at 17 (quoting *In re C.F. Bean L.L.C.*, 841 F.3d 365, 372 (5th Cir. 2016)). However, the *C.F. Bean* court Fifth Circuit concluded that excluding expert testimony would have been a "disproportionately harsh" sanction for the Rule 26(a) violation in that particular case. *See* 841 F.3d at 372–74. *C.F. Bean* thus provides little support for Defendants' argument that the Court should exclude the Reports at issue here.

[19] No. 23-10458, 2024 WL 4904658, at *1 (E.D. Mich. Nov. 26, 2024).

[20] *Id.* at *6.

because the defendant had given the plaintiff "all of the underlying data [the appraiser] placed

into the document."[21]  Because the defendant had already given the plaintiff all of "the

information [that the spreadsheet] summarized," Rule 26(a)(2)(B)(ii) did not obligate the

defendant to also give the plaintiff a single file presenting that very same data in a compiled

format.[22]

While there are of course factual distinctions between *Alter Domus* and this case, we still

think *Alter Domus* is sufficiently analogous to lend support.  Like the defendant in *Alter Domus*,

the Brooks Plaintiffs have directed Defendant to "all the data that [Dr. Barreto] imported" into

his program; Rule 26(a)(2)(B)(ii) does not require the Brooks Plaintiffs to also give Defendants a

merged data file that "compile[s] th[at] . . . data" into a more readily usable format.[23]

We've also reviewed the *Pierce* case that Defendants discussed in their briefing.[24]  Just

like the instant case, *Pierce* was a redistricting case in which Dr. Barreto served as an expert

witness for a group of plaintiffs seeking a preliminary injunction.[25]  And, just as he did here, Dr.

Barreto directed the defendants in *Pierce* to collect the facts and data on which he relied from

publicly available sources, rather than giving the defendants the underlying data in a more

---

[21] *Id.*

[22] *Id.*

[23] *Cf. id.*

[24] *See* Mot. Strike at 14–15 (citing *Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195, 229, 237 & n.12 (E.D.N.C.), *aff'd*, 97 F.4th 194 (4th Cir. 2024)).

[25] *See, e.g.*, 713 F. Supp. 3d at 207–08, 227.

readily usable format.[26]  The *Pierce* court concluded that the defendants would be "entitled to have Dr. Barreto produce his input data" once the case proceeded past the preliminary injunction phase and into discovery.[27]

While *Pierce* may evince a troubling pattern on Dr. Barreto's part,[28] it doesn't support preemptively excluding Dr. Barreto's Reports from the preliminary injunction record under Rule 37(c)(1) and 26(a)(2)(B)(ii).  For one thing, the case doesn't cite or apply those Rules at all, and thus provides no support for Defendants' relatively expansive interpretation of Rule 26(a)(2)(B)(ii).[29]  For another, the *Pierce* court *didn't exclude* Dr. Barreto's opinions based on his failure to give the defendants spreadsheets of his input data before the preliminary injunction hearing (or for any other reason); the court instead *considered* Dr. Barreto's opinions in its preliminary injunction opinion (and ultimately rejected them as unpersuasive).[30]  That further suggests that pointing Defendants to uncompiled raw data from publicly available sources isn't a basis to exclude his Reports from the preliminary injunction record entirely.

---

[26] *See id.* at 237 ("Dr. Barreto failed to provide Dr. Alford with the data files . . . that Dr. Barreto used to prepare his report."); *id.* at 237 n.12 ("At the hearing on plaintiffs' motion for a preliminary injunction, plaintiffs explained that the legislative defendants asked plaintiffs for Dr. Barreto's underlying Excel spreadsheet files.  Plaintiffs reported that the software package that Dr. Barreto uses does not produce those.  Plaintiffs directed the legislative defendants to Dr. Barreto's footnotes to find Dr. Barreto's input data from publicly available sources and replicate Dr. Barreto's statistical methods.").

[27] *See id.* at 237 n.12 (E.D.N.C.); *id.* at 229 (remarking that the case "would greatly benefit from discovery, including, for example, Dr. Barreto's deposition and Dr. Barreto producing his complete data files to the legislative defendants").

[28] *See* Mot. Strike at 14 (remarking that "State Defendants' experience here does not represent the first instance in which Barreto has withheld relevant information from an opposing party").

[29] *See generally* 713 F. Supp. 3d at 207–47.

[30] *See id.* at 227–32.

In summary, Defendants have failed to carry their burden to show that Dr. Barreto's failure to provide a merged data file amounts to a Rule 26(a)(2)(B)(ii) violation that mandates the exclusion of his Reports.

### 3.     The Brooks Plaintiffs Need Not Produce the Individual Simulated Maps That Dr. Barreto's Program Generated

The Court next considers Defendants' argument that Rule 26(a)(2)(B)(ii) required Dr. Barreto to produce the individual congressional maps that his simulation program randomly generated.[31]  According to Defendants, without "the exact maps upon which Barreto relied"—or, barring that, the ability to generate identical simulated maps themselves[32]—"Defendants' experts [cannot] be sure, when they perform their own analyses, that they are examining the same data as Barreto."[33]

Although the Court is operating at a disadvantage due to its lack of familiarity with the exact way the experts' simulation programs work, the Court's understanding is that those programs operate by:

(1)     randomly generating a large number of hypothetical redistricting maps;

(2)     analyzing the attributes of those numerous maps by measuring them against demographic data inputted into the program; and then

(3)     aggregating the results of that analysis into a format that doesn't require a human user to manually review the maps that the program generated.

As the Court understands it, the human user need not (and generally *does* not) personally review any of the simulated maps that the program generates; what the user bases his or her conclusions

---

[31] *See, e.g.*, Mot. Strike at 7.

[32] *See infra* Section I.A.4.

[33] *See, e.g.*, Mot. Strike at 11.

upon is *aggregated* data that the program produces as its end product.[34]  In other words, the

Court understands the individual simulation maps to be an *intermediate by-product* of the

process that redistricting experts don't personally review when forming their opinions; all the

experts look at is the final, aggregated results.

If that's correct, then the individual maps Defendants seek aren't among "the facts or

data" that Dr. Barreto "considered . . . in forming" his opinions, and thus aren't covered by Rule

26(a)(2)(B)(ii)'s disclosure requirements.[35]  What Dr. Barreto considered was the aggregated

data—which he has produced.[36]

Here too, the compressed timeframe before the October 1, 2025 hearing has prevented

the Court from researching this issue more thoroughly.  But the caselaw the Court *has* located

supports the conclusion above.  In *In re Google Adwords Litigation*, for instance, the defendant's

expert witness similarly based his opinions upon an aggregation of data without personally

examining the underlying data himself.[37]  Invoking Rule 26(a)(2)(B)(ii), the plaintiffs sought to

compel the expert to disclose "the underlying . . . data . . . upon which the aggregate . . . data

. . . was based."[38]  Because the expert "did not consider, or even view, the underlying . . . data

---

[34] *See, e.g.*, *Harkenrider v. Hochul*, 204 A.D.3d 1366, 1373 (N.Y. App. Div. 2022) (noting that, in another redistricting case, Defendants' expert Dr. Trende "*did not review*, and did not submit for review, *the simulated maps*" he generated, "and instead based his analysis on the *aggregate* data generated *from* those maps" (emphases added)).

[35] *See* FED. R. CIV. P. 26(a)(2)(B)(ii).

[36] *See* Barreto Report, ECF No. 1193-1, at 16–17.

[37] *See* No. C08-03369, 2010 WL 5185738, at *1 (N.D. Cal. Dec. 8, 2010) ("[The expert] purportedly based his conclusion on, in part, his review of the aggregate click data for four of [his] clients."); *id.* at *4 ("[The expert] did not consider, or even view, the *underlying* click data . . . in forming his expert opinions.  Rather, he only considered and viewed the *aggregate* click data . . . .").

[38] *Id.* at *1.

. . . in forming his expert opinions," the Northern District of California concluded that the defendant didn't need to produce the underlying data.[39]

While the Court again recognizes that there are factual distinctions between *Google Adwords* and this case, the Court understands the case to stand for the following principle: if an expert based his opinions on a review of aggregated data without viewing the underlying data itself, then Rule 26(a)(2)(B)(ii) only requires the expert to disclose what he or she actually looked at.  Since it appears Dr. Barreto has done that here, the Court won't exclude the Reports based on Dr. Barreto's failure to disclose individual maps that he didn't personally review.

### 4.    The Brooks Plaintiffs Need Not Provide Defendants a Seed Value

Finally, Defendants object to Dr. Barreto's failure to provide them a "seed" value that would permit them to reproduce the exact same maps that Dr. Barreto's program generated in the process of performing his analysis.[40]

With the caveat that no one on this panel is a computer science expert, our understanding is that a "seed" is a value that a user may input into a computer program to produce an output that is random to the human using the program, but not to the computer generating the output.  To illustrate, imagine there's a program designed to produce a set of three random numbers between 1 and 10.  Suppose that a user arbitrarily inputs a seed value of "123" into the program and gets an output of 2, 7, and 8.  Those values are random to the user because she had no way to predict beforehand what the three numbers would be; if she had arbitrarily selected a different seed value, she would have received a different set of three numbers that she likewise wouldn't have been able to predict beforehand.  But the values are *non*-random to the extent that if the

---

[39] *Id.* at *4–5.

[40] *See* Mot. Strike at 5–11, 15–16.

user plugs "123" into the program again, she will once again get the same output of 2, 7, and 8. If, however, the user does not input a seed value at all, then the output will be truly random, and the user will never be able to reproduce the exact same set of three numbers again except by pure chance.[41]

The parties' experts disagree regarding the methodological validity of using seed values in the redistricting simulation context.[42] Dr. Trende always uses a seed value—in fact, he always uses the *same* seed value, which he derived from the lyrics of a popular song.[43] That approach has the virtue of reproducibility, as anyone who plugs Dr. Trende's preferred seed value into the program will produce the exact same maps and get the exact same results.[44]

Dr. Barreto, by contrast, did *not* use a seed value when performing his simulations.[45] The upside of that approach is that his results were truly and completely random.[46] The downside is

---

[41] Again, this is just our layperson's understanding of a concept about which we lack the relevant subject-matter expertise. If the Court is mistaken about any of the foregoing, the parties may correct the Court's misconceptions at the Preliminary Injunction Hearing.

[42] *See, e.g.*, Resp. at 15 ("Defendants' objection that Dr. Barreto did not set a 'seed' as part of the analysis goes to a fundamental disagreement between he and Dr. Trende on the methodology of the analysis.").

[43] *See, e.g.*, *id.*

[44] *See, e.g.*, *id.* ("[S]etting a 'seed' from which the program will start drawing the simulated maps eliminates the random aspect of the analysis—in essence forcing the program to make the same mapping choices over and over and over, each time the analysis is run.").

[45] *See, e.g.*, *id.*

[46] *See, e.g.*, *id.* at 14 ("[U]sing the random approach of Dr. Barreto will likely produce slightly different maps. As Plaintiffs explained in response to [Defendants'] email, then [sic] entire point of this analysis is for it to be a random simulation of a large number of possibilities—here hundreds of thousands. The randomness is a feature of the analysis, not a flaw.").

that the exact maps that Dr. Barreto's program generated can never realistically be reproduced again—which is an obstacle to Dr. Trende double-checking Dr. Barreto's work.[47]

If Dr. Barreto did not use a seed value to generate his maps, then a seed value is not among "the facts or data" that Dr. Barreto "considered . . . in forming" his opinions.[48]  Rule 26(a)(2)(B)(ii) thus does not require Dr. Barreto to provide Defendants a seed value.

**5.    Conclusion**

We are thus persuaded that Dr. Barreto disclosed all of "the facts or data" that he actually "considered . . . in forming" his opinions.[49]  Dr. Barreto has therefore complied with Rule 26(a)(2)(B)(ii), and there's consequently no basis to exclude his Reports under Rule 37(c)(1).

**B.    The Court Denies Defendants' Request to Strike the Reports Pursuant to Federal Rule of Evidence 702**

We next consider Defendants' argument that the Reports are inadmissible under Federal Rule of Evidence 702.[50]  As the Court explains below, expert testimony must be "reliable" to be admissible under Rule 702.[51]  According to Defendants, Dr. Barreto's opinions are unreliable because, for the reasons set forth above, Defendants can't replicate Dr. Barreto's exact findings.[52]

---

[47] *See, e.g.*, Mot. Strike at 7 ("Because he did not appear to set a seed, any replication that we manage will likely produce slightly different maps than those which Dr. Barreto produces."); *id.* at 9 ("Dr. Barreto failed to set a seed in his code, or employ any other technique that would have made the random choices made by Dr. Trende's computer the same as the random choices made by Dr. Barreto's.  As it stands, whatever Dr. Trende's simulations produce will be different than Dr. Barreto's, possibly in material ways." (emphasis omitted)).

[48] *See* FED. R. CIV. P. 26(a)(2)(B)(ii).

[49] *See id.*

[50] *See* Mot. Strike at 15–16.

[51] *See infra* note 53 and accompanying text.

[52] *See* Mot. Strike at 15–16; *see also supra* Sections I.A.3–4.

Rule 702 specifies that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent" of the expert's testimony "demonstrates to the court that it is more likely than not that:"

(a)    "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;"

(b)    "the testimony is based on sufficient facts or data;"

(c)    "the testimony is the product of *reliable* principles and methods;" and

(d)    "the expert's opinion reflects a *reliable* application of the principles and methods to the facts of the case."[53]

As the italicized language underscores, the issue here is whether Dr. Barreto's testimony is reliable.[54]  To evaluate the reliability of an expert's testimony under Rule 702, courts apply the *Daubert* standard,[55] which encourages courts to consider:

(1)    "whether the expert's theory or technique can be or has been tested;"

(2)    "whether the theory or technique has been subjected to peer review and publication;"

(3)    "the known or potential rate of error of the challenged method;" and

(4)    "whether the theory or technique is generally accepted in the relevant scientific community."[56]

---

[53] FED. R. EVID. 702 (emphases added).

[54] *See supra* note 52 and accompanying text.

[55] *See, e.g.*, *Williams v. BP Expl. & Prod., Inc.*, 143 F.4th 593, 597 (5th Cir. 2025) (explaining that the *Daubert* standard enumerates a "non-exclusive list of factors to evaluate the reliability of expert testimony").

[56] *E.g.*, *id.* at 597–98.

"The *Daubert* factors . . . are not a definitive checklist or test, and th[e] analysis is flexible."[57] "Whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."[58]

Critically, "[t]he object of Rule 702 is to protect *juries* from unreliable and irrelevant expert testimony."[59]  The Preliminary Injunction Hearing won't be proceeding before a jury— Plaintiffs will instead be trying their Preliminary Injunction Motions to the bench.  As the Fifth Circuit has recognized, "[m]ost of the safeguards provided for in *Daubert* are not as essential . . . where a district judge"—or, as here, two District Judges and one Circuit Judge—"sit[] as the trier of fact in place of a jury."[60]  That's because when there's "no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence."[61]

For that reason, we decline to preemptively exclude the Reports from the record under Rule 702.  Rather than deciding *ex ante* whether Dr. Barreto's conclusions are reliable, we will permit the parties to introduce the Reports into the record.[62]  We'll then assess Dr. Barreto's reliability *ex post* when we consider what weight to give Dr. Barreto's conclusions in our

---

[57] *E.g.*, *id.* at 598 (citation modified).

[58] *E.g.*, *id.* (citation modified).

[59] *E.g.*, *Earnest v. Sanofi U.S. Servs., Inc. (In re Taxotere (Docetaxel) Prods. Liab. Litig.)*, 26 F.4th 256, 268 (5th Cir. 2022) (emphasis added).

[60] *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).

[61] *Whitehouse Hotel Ltd. P'ship v. C.I.R.*, 615 F.3d 321, 330 (5th Cir. 2010).

[62] *See, e.g.*, *Travelers Prop. Cas. Co. of Am. v. Barkley*, No. 16-61768, 2017 WL 4867012, at *1 (S.D. Fla. June 2, 2017) ("Where a trial judge conducts a bench trial, the judge need not conduct a *Daubert* (or Rule 702) analysis before presentation of the evidence . . . . It is unnecessary for the Court to make an advance ruling excluding [the defendant's expert] before hearing his testimony at trial." (citation modified)).

opinion.  Once we've heard Dr. Barreto and Dr. Trende testify at the upcoming hearing, we'll be

in a much better position to assess the reliability of Dr. Barreto's methodology and opinions.[63]

## C.    Final Points

We wish to emphasize two points before we conclude.  First, although we've ruled that

Dr. Barreto disclosed everything that the Federal Rules required him to, we do not now express

any view regarding the methodological soundness of Dr. Barreto's methods and processes.

Defendants' overarching contention—that it's difficult or impossible to reverse-engineer from

the information that Dr. Barreto has disclosed whether the outputs he produced at Point B follow

from the data he input at Point A—is one we'll seriously consider once we hear Dr. Barreto's

and Dr. Trende's testimony at the Preliminary Injunction Hearing.  If Defendants elicit credible

testimony on direct- or cross-examination that any of the following cast doubt on the reliability

of Dr. Barreto's analysis:

> (1)    his failure to use a foundational shapefile;
>
> (2)    his refusal to provide either a merged data set or a more fulsome explanation of how he merged his data;
>
> (3)    his failure to retain and provide the exact simulated maps he generated; and/or
>
> (4)    his decision not to use a seed value,

the Court will take that into account when it decides what weight to give Dr. Barreto's opinions.

---

[63] *Cf., e.g.*, *Littleton v. Transocean Offshore Deepwater Drilling, Inc.*, No. 5:07cv143, 2009 WL 10676858, at *3 (S.D. Miss. May 26, 2009) (choosing to "withhold deciding" whether an expert witness's opinions "f[e]ll short of Rule 702's requirements . . . until the evidence [was] more fully presented").

Second, as the Court's equivocating language throughout this Order suggests, the Court was laboring under two major hindrances while it was drafting this Order:

(1)     the proximity of the October 1, 2025 Preliminary Injunction Hearing deprived the Court of the time it would have needed to exhaustively scrutinize Dr. Barreto's report and review the caselaw interpreting the applicable Federal Rules; and

(2)     the Court lacks the technical expertise it needs to make fully informed judgments about the computerized processes and concepts at issue here.

It is therefore entirely possible that the Court has misunderstood some aspect of the simulation process that will only become clear once the Court hears the experts' testimony. It is likewise possible that the Court missed some authority that supports a broader reading of the Federal Rules' disclosure provisions. The Court thus emphasizes that it has the right to reconsider this interlocutory ruling after the hearing.[64]

## II.    CONCLUSION

The Court **DENIES** "State Defendants' Motion to Strike Expert Reports of Dr. Barreto" (ECF No. 1169) **WITHOUT PREJUDICE** to Defendants' renewing the Motion upon the close of evidence at the upcoming Preliminary Injunction Hearing.

---

[64] *See* FED. R. CIV. P. 54(b) (providing that an "order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment").

*See also, e.g.*, *Six Dimensions, Inc. v. Perficient, Inc.*, 969 F.3d 219, 227 (5th Cir. 2020) ("Rule 54(b) . . . permits reconsideration of interlocutory orders and authorizes the district court to revise at any time any order or other decision that does not end the action. . . . Under Rule 54(b), the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law." (citation modified)).

**So ORDERED and SIGNED this 29th day of September 2025.**

_[signature]_

**DAVID C. GUADERRAMA**
**SENIOR U.S. DISTRICT JUDGE**

_And on behalf of:_

|                                             |          |                                           |
|---------------------------------------------|----------|-------------------------------------------|
| **Jerry E. Smith**                          |          | **Jeffrey V. Brown**                      |
| **United States Circuit Judge**             | _-and-_  | **United States District Judge**          |
| **U.S. Court of Appeals, Fifth Circuit**    |          | **Southern District of Texas**            |