UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LULAC, et. al., §§§§ *Plaintiffs* §§§ Alexander Green, and Jasmine Crockett §§§ Plaintiff-Intervenors § §§§ v. §§§ GREG ABBOTT, in his official capacity As Governor of Texas, et. al. §§§§ *Defendants* § | Case No.: 3-21-CV-00259-DCG-JES-JVB [Lead Case] |

**INTERVENORS' REPLY TO STATE DEFENDANTS' RESPONSE TO REQUEST FOR PRELIMINARY INJUNCTION**

**I. Preliminary Disclaimer**

While Plaintiff-Intervenors maintain their substantive Section 2 claims for resolution on the merits, they do not seek preliminary injunctive relief based on Section 2 vote dilution claims at this procedural juncture. Section 2 vote dilution claims typically require extensive factual development through expert testimony and detailed demographic analysis that may be more appropriately resolved at trial rather than at the preliminary injunction stage. *Thornburg v. Gingles* established the complex three-part test requiring proof of geographic compactness, political cohesiveness, and racially polarized voting. *Thornburg v. Gingles*, 478 U.S. 30, 78-79 (1986).

**II. The Voting Rights Act Demands Consideration of Race**

As the Supreme Court emphatically declared in *Allen v. Milligan*, "Section 2 demands consideration of race" to remedy historical discrimination, directly contradicting the State's fundamental premise that racial consideration in redistricting is constitutionally prohibited. *Allen v. Milligan*, 599 U.S. 1, 32 (2023). *Cooper v. Harris* established that redistricting may permissibly consider race when necessary to comply with federal voting rights law. *Cooper v. Harris*, 581 U.S. 285, 307 (2017). *Shaw v. Reno* recognized the fundamental distinction between permissible racial

1

consideration under the VRA and impermissible racial predominance that subordinates traditional districting principles. *Shaw v. Reno*, 509 U.S. 630, 656 (1993). The State's argument that Plan C2333 was compelled by the DOJ letter ignores this fundamental distinction between permissible racial consideration under the VRA and impermissible racial predominance under Shaw. The Trump administration's July 7, 2025 letter explicitly commanded elimination of minority opportunity districts based solely on racial composition without regard to electoral performance or traditional redistricting principles. The State's contradicted/incredible "blind to race" assertions conflict with controlling Supreme Court precedent that requires consideration of minority voting rights in redistricting decisions. The assertion that the Fourteenth and Fifteenth Amendments do not permit inquiry into race when drawing districts turns these vital pillars of American Constitutional jurisprudence on their ears.

**III. The Dhillon Invitation Letter Refutes the State's Partisan Defense**

The State argues that the Legislature was motivated by partisan concerns rather than the DOJ letter contained in the Governor's proclamation, contending that the Governor's proclamation was immaterial to the Legislature's redistricting decisions. Chairman Vasut's July 27, 2025 invitation to Assistant Attorney General Dhillon definitively refutes this argument by demonstrating that the Legislature specifically focused on the DOJ letter w**hich is about race**, not just possible partisan considerations.[1] Arlington Heights established that the sequence of events leading to discriminatory action provides crucial evidence of discriminatory purpose. *Village of Arlington Heights v. MHDC*, 429 U.S. 252, 267 (1977). *McCleskey v. Kemp* recognized that evidence of government officials' actual motivations through their own statements and actions establishes discriminatory intent. *McCleskey v. Kemp*, 481 U.S. 279, 292-93 (1987). *Hunter v. Underwood* held that contemporaneous evidence of discriminatory motivation satisfies constitutional analysis of intentional discrimination. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). The Chair of the House Select Committee on Congressional Redistricting formally invited the federal official who authored the racially-motivated DOJ letter to testify "concerning a letter you sent to Governor Greg Abbott and Attorney General Ken Paxton on July 7, 2025". This invitation demonstrates that the Legislature specifically recognized the federal DOJ letter's and its racial directives rather than only possible partisan redistricting objectives. The State cannot credibly argue that legislators ignored the DOJ letter when

---

[1] Not to mention the undeniable timing of the DOJ letter being received by Texas prior to Texas initiating any plans to engage in mid-decade redistricting in the middle of litigating the 2021 maps and the new 2025 maps complying with the DOJ letter dictates.

the legislative leadership specifically sought testimony from the federal official whose racial directive prompted the entire redistricting process.

**IV. Race Predominated Over Partisanship in Drawing Plan C2333**

The evidence overwhelmingly demonstrates that race, not partisanship, was the predominant factor in drawing Plan C2333's boundaries, as required under *Shaw v. Reno* and *Alexander v. S.C. State Conference of the NAACP*. *Alexander v. S.C. State Conf. of the NAACP* established that plaintiffs must "disentangle race and partisanship" to prove racial gerrymandering claims, but this burden is satisfied when explicit racial directives, rather than partisan objectives, drove redistricting decisions. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024). *Miller v. Johnson* held that "race was the predominant factor motivating the legislature's decision" when racial considerations subordinate traditional districting principles rather than advancing legitimate political goals. *Miller v. Johnson*, 515 U.S. 900, 916 (1995). *Shaw v. Reno* established that racial gerrymandering occurs when "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district" based on racial rather than political characteristics. *Shaw v. Reno*, 509 U.S. 630, 642 (1993).

Turner's eloquent comments show contemporary evidence "the intent to do something that is inconsistent with minority voting rights," was understood in the chamber and demonstrates discriminatory purpose under Arlington Heights analysis. The Trump administration's DOJ letter explicitly commanded Texas to eliminate minority opportunity districts based purely on racial composition, making no reference to partisan performance or traditional redistricting criteria. The letter states that Congressional Districts TX-09, TX-18, TX-29, and TX-33 "currently constitute unconstitutional 'coalition districts'" based solely on racial demographics, demanding their elimination without any analysis of partisan effects. When legislative leaders make statements evidencing intent to harm minority voting rights based on race, federal officials direct redistricting based exclusively on racial considerations, and the legislature complies with those racial directives, race becomes the predominant factor by definition under Shaw analysis.

As this District previously recognized in *Perez v. Abbott*, "race was the predominant factor motivating the legislature's decision" when explicit racial directives subordinate neutral redistricting principles. *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017). Congressional Districts 9, 18, and 30 are documented naturally occurring African American opportunity districts that have elected African American representatives for decades. Texas v. United States found that "the way in which the State had carved apart the Congressional districts being represented by

African American members of Congress could be explained only by an intent to discriminate against minority voters" in prior redistricting cycles. *Texas v. United States*, 887 F. Supp. 2d 133, 160-61 (D.D.C. 2012). *Perez v. Abbott* established that Texas has "found itself in court every redistricting cycle, and each time it has lost" due to discriminatory redistricting practices that prioritize racial considerations over legitimate governmental interests. *Perez v. Abbott*, 253 F. Supp. 3d 864, 957 (W.D. Tex. 2017). *Rogers v. Lodge* held that systematic targeting of minority electoral opportunity demonstrates discriminatory intent based on race rather than legitimate political objectives. *Rogers v. Lodge*, 458 U.S. 613, 627 (1982). The federal court that drew CD-33 specifically found it was "not a minority coalition district" but rather "a naturally occurring district," contradicting the DOJ letter's racial characterization in its call for CD-33's elimination. *Perez v. Texas*, 891 F. Supp. 2d 808, 830 (W.D. Tex. 2012). The systematic targeting of these performing districts for elimination demonstrates intentional racial discrimination against naturally occurring minority communities based on race rather than partisan considerations. The deliberate dismantling of naturally occurring minority opportunity districts while preserving Anglo districts demonstrates that racial considerations, not partisan objectives, drove the specific boundary decisions in Plan C2333.

**V. Targeting of Minority Representatives Demonstrates Racial Discrimination**

Congressman Green's residence is currently in Congressional District 18, while Congresswoman Crockett's residence is now in Congressional District 33,[2] demonstrating systematic targeting of black elected officials. *Abbott v. Perez* recognized that systematic targeting of minority legislators constitutes evidence of discriminatory intent based on racial animus rather than legitimate political competition. *Abbott v. Perez*, 585 U.S. 579, 616 (2018). *Bush v. Vera* established that targeting minority incumbents demonstrates racial motivation in redistricting rather than traditional political gerrymandering. *Bush v. Vera*, 517 U.S. 952, 968 (1996). *Village of Arlington Heights* held that discriminatory impact on specific racial groups provides evidence of discriminatory purpose. *Village of Arlington Heights v. MHDC*, 429 U.S. 252, 266 (1977). Plan C2333 systematically targets both minority representatives by restructuring their districts and potentially forcing them to compete against each other, repeating the discriminatory pattern found unlawful in prior Texas redistricting cases. The systematic targeting of minority legislators' residences while preserving Anglo representatives' district configurations demonstrates conscious racial discrimination that subordinates neutral principles to racially discriminatory objectives.

---

[2] Instead of their prior districts: CD-9 and CD-30, respectively.

**VI. Harris County and Dallas-Fort Worth Demonstrate Systematic Racial Vote Dilution**

The demographic manipulation in Harris County and Dallas-Fort Worth demonstrates systematic preservation of white electoral dominance despite minority population majorities, revealing racial rather than partisan motivations. Harris County has ten congressional districts where Anglo voters dominate eight (80%) despite the county's 40% white and 60% minority demographic composition mirroring the statewide pattern. *White v. Regester* established that vote dilution occurs when electoral systems systematically prevent minority voters from electing candidates of their choice based on racial demographics rather than political preferences. *White v. Regester*, 412 U.S. 755, 766-67 (1973). *Rogers v. Lodge* held that the systematic exclusion of minority voters from effective participation constitutes intentional discrimination that targets racial groups rather than political opponents. *Rogers v. Lodge*, 458 U.S. at 627. *Johnson v. De Grandy* recognized that lack of proportional representation provides probative evidence of vote dilution when minority populations are sufficiently large to support additional districts. *Johnson v. De Grandy*, 512 U.S. 997, 1025 (1994). Dr. Murray's analysis demonstrates that Plan C2333 eliminates Hispanic opportunity districts "for the first time in three decades" while concentrating minority voters in fewer districts (commonly referred to as packing). The systematic preservation of Anglo electoral control in eight of ten districts despite minority population majorities constitutes classic vote dilution through cracking and packing techniques designed to reduce racial electoral power.

The Dallas-Fort Worth area has eleven congressional districts where Anglo voters now dominate nine of eleven (82%), representing a more than double increase from the previous four of eleven (36%) Anglo-controlled districts. *League of United Latin American Citizens v. Perry* found that systematic reduction in minority electoral opportunity constitutes intentional discrimination targeting racial communities rather than political parties. *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440 (2006*). Bush v. Vera* held that discriminatory effects on minority communities establish evidence of impermissible racial motivation in redistricting. *Bush v. Vera*, 517 U.S. at 977. *Thornburg v. Gingles* established that vote dilution occurs when minority communities are systematically prevented from electing candidates of their choice due to racial gerrymandering. *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986). This dramatic shift occurs in a region with demographic composition similar to the state's 60% minority, 40% white population distribution. The systematic increase in Anglo electoral control from four to nine of eleven districts in a minority-majority region demonstrates intentional manipulation to preserve white political dominance over non-whites through redistricting.

**VII. District Renumbering and Compressed Timeline Demonstrate Discriminatory Process**

The systematic renumbering of districts represents a classic element of intentional discrimination designed to confuse voters and weaken minority political organization. *Terry v. Adams* established that systematic efforts to undermine minority political participation violate constitutional principles by targeting racial communities for exclusion. *Terry v. Adams*, 345 U.S. 461, 469 (1953). *Smith v. Allwright* held that practices designed to exclude minority voters from effective participation are constitutionally impermissible when they systematically disadvantage racial groups. *Smith v. Allwright*, 321 U.S. 649, 664 (1944). *Lane v. Wilson* recognized that procedural manipulations designed to disadvantage minority voters constitute discriminatory action targeting racial participation. *Lane v. Wilson*, 307 U.S. 268, 275 (1939). The complete restructuring and renumbering of minority opportunity districts while maintaining consistency for Anglo districts demonstrates discriminatory intent. Dr. Murray's report makes clear that the unnecessary removal of traditional Black neighborhoods out of the 18th was evidence of intentional discrimination. Congressional District 9, historically an African American opportunity district, is transformed into "an entirely new territory in eastern Harris County and Liberty County" where minority voters "have no influence". The selective renumbering and restructuring of minority districts while preserving continuity for Anglo districts constitutes intentional discrimination designed to disrupt minority political organization and electoral capacity.

The extraordinarily compressed five-day adoption timeline and elimination of meaningful public input on Plans C2308 and C2333 mirror and negatively exceed prior discriminatory redistricting patterns found unconstitutional by federal courts. *Crawford v. Marion County Election Bd*. Established that procedural departures from normal legislative processes can demonstrate discriminatory intent when they systematically disadvantage minority participation. *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 204 (2008). *Bush v. Gore* recognized that denial of meaningful participation opportunities violates due process principles when applied in discriminatory fashion. *Bush v. Gore*, 531 U.S. 98, 109 (2000). *Village of Arlington Heights* held that the sequence of events and procedural departures provide evidence of discriminatory purpose in government decision-making. *Village of Arlington Heights v. MHDC*, 429 U.S. 252, 267 (1977). Plan C2333 was "unveiled, laid out and adopted by the Committee with no opportunity for public input" and moved through both chambers in less than five days. The bill was "received and considered by the Legislature for only 5 days before final adoption" with "almost none" public input on the final plan C2333 compared to the initial C2308 proposal. The systematic elimination of public

participation and compressed adoption schedule demonstrates procedural departures designed to prevent minority community opposition to discriminatory redistricting decisions. The abdication of legislative duties and the refusal to properly engage in the legislative process forced minority legislators to break quorum in the face of potential fines, fees and other penalties such as loss of chairmanships. In fact one legislator who reported was held in custody in the House Chamber from the 18th until the 20th of August because she refused to sign a release that was beyond the authority of the House to require.

**VIII. The Clockwise Discrimination Pattern and Preservation of White Power**

The systematic manipulation of Congressional Districts 9, 18, and 29 follows a discriminatory "clockwise motion" pattern that demonstrates coordinated racially gerrymandered targeting of minority electoral power. *Shaw v. Hunt* established that coordinated manipulation of district boundaries demonstrates racial predominance in redistricting decisions when patterns correlate with race rather than legitimate political factors. *Shaw v. Hunt*, 517 U.S. 899, 907 (1996). *Bush v. Vera* held that systematic boundary manipulations correlating with race satisfy Shaw's predominance test for identifying racial gerrymandering. *Bush v. Vera*, 517 U.S. at 979. *Miller v. Johnson* recognized that coordinated efforts to reduce minority electoral opportunity establish racial gerrymandering when race drives boundary decisions. *Miller v. Johnson*, 515 U.S. at 916. Dr. Murray's analysis reveals that the discrimination regarding districts 9, 18, and 29 (we are challenging the 18th Congressional District in this hearing) followed "a clockwise motion" where minority voters were systematically moved between districts to eliminate their electoral influence. This contrasts sharply with Congressional District 7, which "was treated much better" and maintained its Anglo electoral control. The coordinated manipulation of adjacent minority opportunity districts through systematic voter transfers demonstrates that race was the predominant factor in drawing boundaries, satisfying Shaw's racial gerrymandering analysis.

The fundamental purpose and effect of Plan C2333 is to "preserve the power of white voters" despite Texas's transformation into a majority-minority state. *Johnson v. De Grandy* recognized that systematic preservation of racial electoral dominance violates equal protection principles when government action perpetuates racial hierarchy. *Johnson v. De Grandy*, 512 U.S. at 1025 (O'Connor, J., concurring). *League of United Latin American Citizens v. Perry* established that intentional efforts to maintain racial electoral control constitute discrimination under constitutional analysis. *League of United Latin American Citizens v. Perry*, 548 U.S. at 440-41. *White v. Regester* held that electoral systems designed to preserve racial dominance violate constitutional principles of equal

7

participation. *White v. Regester*, 412 U.S. at 765-66. Despite Anglo voters comprising less than 40% of Texas's population, Plan C2333 enables Anglo voters to "elect candidates they support in 25 of the state's 38 congressional districts," (66%) with that total potentially increasing "to as many as 30 seats if C2333 is used for the 2026 elections" (79%). This occurs despite minorities accounting for "over 90 percent" of the state's population growth since 2000. The systematic preservation of white electoral dominance despite minority population growth demonstrates that Plan C2333's fundamental purpose is racial discrimination in violation of the Equal Protection Clause and Voting Rights Act.

**IX. Arlington Heights Factors Establish Discriminatory Intent**

The *Arlington Heights* factors comprehensively demonstrate that Plan C2333 was enacted with discriminatory intent to preserve white political power through systematic racial gerrymandering. Chairman Turner's documented statements evidencing intent "inconsistent with minority voting rights" provide direct contemporary evidence of discriminatory purpose. *Hunter v. Underwood* established that contemporaneous statements revealing discriminatory purpose satisfy Arlington Heights analysis for proving intentional racial discrimination. *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). *Rogers v. Lodge* held that direct evidence of discriminatory motivation establishes intentional discrimination under constitutional equal protection analysis. *Rogers v. Lodge*, 458 U.S. at 627. Arlington Heights recognized that contemporaneous statements provide the strongest evidence of discriminatory intent in government decision-making. *Arlington Heights*, 429 U.S. at 268. Representative Vasut's invitation to DOJ official Dhillon demonstrates legislative recognition that racial directives, not neutral redistricting principles, drove the redistricting process. Contemporary statements by legislative leaders establishing discriminatory intent satisfy the *Arlington Heights* requirement for direct evidence of discriminatory purpose in redistricting decisions.

The "idea to redistrict was not the Governor's idea" but originated from the Trump administration's racially-focused and -motivated DOJ letter targeting specific performing minority districts. *McCleskey v. Kemp* established that the sequence of events leading to discriminatory action provides evidence of discriminatory purpose in government decision-making. *McCleskey v. Kemp*, 481 U.S. 279, 292-93 (1987). Arlington Heights recognized that the sequence of events leading to challenged action provides evidence of discriminatory intent when racial motivations drive the process. Arlington Heights, 429 U.S. at 267. *Washington v. Davis* held that discriminatory purpose may be inferred from the sequence of events leading to challenged government action when racial

8

considerations predominate. *Washington v. Davis*, 426 U.S. 229, 242 (1976). Nothing regarding redistricting occurred "in regular session" by Texas officials until the federal directive letter demanded elimination of minority opportunity districts based solely on racial considerations. The sequence of events from federal racial directive to immediate legislative compliance demonstrates that discriminatory purpose originated from and willingly and quickly complied with external racial animus rather than legitimate state redistricting principals and objectives.

### X. Balance of Harms Mandates Relief

The systematic destruction of minority electoral opportunity represents irreparable constitutional harm that cannot be remedied through monetary damages and far outweighs any administrative burden on the State. *Obama for America v. Husted* established that denial of voting rights constitutes irreparable harm requiring immediate judicial intervention. *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). *League of Women Voters v. Newby* held that systematic vote dilution causes irreparable constitutional injury that cannot be compensated through damages. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). *Allen v. Milligan* recognized that voting rights violations constitute irreparable harm requiring immediate relief to preserve constitutional rights. *Allen v. Milligan*, 599 U.S. at 32. The elimination of performing minority opportunity districts destroys decades of political organization and electoral success that cannot be restored through monetary compensation. This problem is not alleviated merely by packing the Black voters from two Congressional districts into one. In fact, it propounds the problem and is evidence of intentional discrimination. Congressional District 9 has "given African American voters the opportunity to elect their candidate of choice in eleven consecutive elections," representing irreplaceable community electoral capacity. The constitutional harm from systematic racial gerrymandering designed to increase and preserve white political power despite simultaneous population declines constitutes irreparable injury that mandates preliminary injunctive relief to protect minority voting rights pending trial.

### XI. Conclusion

Plan C2333 constitutes systematic racial gerrymandering where race was the predominant factor motivating redistricting decisions, designed to increase and preserve white electoral dominance despite decreasing population numbers in violation of *Shaw v. Reno* and the Equal Protection Clause. *Shaw v. Reno* established that racial gerrymandering occurs when race predominates over traditional districting principles in government redistricting decisions. *Shaw v. Reno*, 509 U.S. 630, 642 (1993). *Miller v. Johnson* held that racial predominance in redistricting

violates constitutional principles of equal protection. *Miller v. Johnson*, 515 U.S. at 916. Cooper v. Harris recognized that systematic racial manipulation violates equal protection guarantees when race drives redistricting boundaries. *Cooper v. Harris*, 581 U.S. at 300-01. The evidence demonstrates that explicit federal racial directives drove redistricting decisions, contemporaneous statements established discriminatory intent, traditional districting principles were abandoned for minority districts while preserved for Anglo districts, and the systematic effect is to increase and preserve white electoral control despite increasing minority population majorities. The Court should grant the preliminary injunction to prevent implementation of this racially gerrymandered plan, as the systematic preservation of white political power through explicit racial manipulation violates constitutional principles and threatens the fundamental voting rights guaranteed by the Fourteenth Amendment.

        Respectfully submitted,
        /s/ Gary Bledsoe
        The Bledsoe Law Firm PLLC
        State Bar No. 02476500
        6633 Highway 290 East #208
        Austin, Texas 78723-1157
        Telephone: 512-322-9992
        Fax: 512-322-0840
        gbledsoe@thebledsoelawfirm.com

        */s/ Robert S. Notzon*
        Law Office of Robert S. Notzon
        1502 West Avenue
        Austin, Texas 78701
        RobertNotzonLaw.com
        Telephone: 512-474-7563
        Fax: 512852-4788

        **Attorneys for Plaintiff-Intervenors**
        **Alexander Green and Jasmine Crockett**

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 29th day of September 2025.

        */s/Robert S. Notzon*