# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREG ABBOTT, et al., <br><br> Defendants. | Civil Action <br><br> Lead Case No.: <br> 3:21-CV-00259-DCG-JES-JVB |
| CECILIA GONZALES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JANE NELSON, in her official capacity as Texas Secretary of State, and GREGORY WAYNE ABBOTT, in his official capacity as the Governor of Texas, <br><br> Defendants. | Consolidated Case No.: <br> 1:21-CV-00965-DCG-JES-JVB |

**GONZALES PLAINTIFFS' REPLY
IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I.  **INTRODUCTION**

On July 22, Governor Abbott went on FOX 4 in Dallas to explain "why [he] added redistricting to the special session call."[1] His response was unequivocal: "[C]oalition districts are no longer required and so we want to make sure that we have maps that don't impose coalition districts." He proceeded to reference "coalition districts" and the *Petteway* decision at least five more times, while batting away suggestions of a partisan power grab, stating that he was not focused on "what may happen in the midterms." *Id.* He thereby sold an unpopular, unnecessary redistricting to the people of Texas by portraying it as an attack on diverse, majority-minority districts because of their racial makeup. Legislative leaders echoed that message, with the bill's sponsor trumpeting the replacement of multi-racial majority-minority districts with single-race majority districts. And the legislature enacted a new congressional plan in which eight districts lost more than half of their prior population—and *all eight were majority-minority districts*.[2]

Defendants have no answer to this direct evidence of racial discrimination and race-based districting. They argue that the real objective was partisanship, but "[i]ntentions to achieve partisan gain and to racially discriminate are not mutually exclusive." *Veasey v. Abbott*, 830 F.3d 216, 241 n.30 (5th Cir. 2016) (en banc). Perhaps some in Texas were happy to deliver to President Trump the five additional Republican seats he demanded for purely partisan reasons. But others were hesitant, exemplified by Chair Huffman's unequivocal testimony that Texas legislators "[were] not" "considering redrawing the Congressional Districts" as of June 9—less than a month before Governor Abbott added redistricting to the special session. Rough Trial Tr. Day 15 AM 53:25–54.

---

[1] FOX 4 Dallas-Fort Worth, *Abbott on THC, redistricting & the special session*, YouTube, at 3:33–39 (July 22, 2025), https://www.youtube.com/watch?v=PHsYs0NTPTY.

[2] *See* Fox Decl. Exs. B, C.

1

It was only after Governor Abbott—and the U.S. Department of Justice—framed the redistricting in expressly racial terms that the legislature was galvanized to pass a new map. And the map did exactly what Governor Abbott promised—it targeted and destroyed multi-racial majority-minority districts, whatever their partisanship. The direct and circumstantial evidence together bookend an open-and-shut case of racial discrimination in redistricting.

Defendants barely spill any ink at all in response to Plaintiffs' racial gerrymandering claim, including evidence that the Texas Legislature purposefully used race to replace existing coalition districts with unnecessary fifty-percent-plus-one single-race majority districts. They offer no alternative explanation for how this came to pass, and they offer no response to statements from legislators and the Governor touting the creation of these districts as a feature of HB 4. Nor do they make any attempt to argue that the creation of these districts was required by federal law. Quite the opposite: they specifically disown Assistant Attorney General Dhillon's argument that the redistricting was constitutionally required, calling it a "poor attempt" and "baseless." Opp. 12.

Defendants also fail to meaningfully address the Gonzales Plaintiffs' plan-wide claims. Their new argument on malapportionment (Count IV) that the census is presumed accurate does nothing in the face of clear evidence from Texas itself that the 2020 census does not accurately reflect Texas's 2025 population. And Defendants entirely ignore the Gonzales Plaintiffs' Count V, which asserts that Texas violated the Equal Protection Clause by considering race and pursuing partisan advantage as part of an unnecessary mid-decade redistricting. Mot. 24.

Finally, Defendants' argument that it is already too late for the Court to grant relief must fail. The 2026 general election is more than a year away, and Texas's unusually early primary is still more than five months away. There is no need for a time-consuming remedial process because

2

Plaintiffs seek only to restore the 2021 Map. The Court will need to act quickly, as it has, but there is plenty of time for effective relief without disrupting any election.

II. **ARGUMENT**

    A. **HB 4 intentionally discriminates against Black and Latino voters by targeting majority-minority districts.**

In their Motion, the Gonzales Plaintiffs identified both direct and circumstantial evidence demonstrating that the Texas Legislature intentionally targeted majority-minority coalition districts for elimination at least in part because of, rather than in spite of, their racial composition. Defendants fail to engage with much of this evidence, and the arguments they do make misunderstand both the nature of the evidence and the governing legal test.[3]

    1. **Direct Evidence**

Defendants fail to rebut the Gonzales Plaintiffs' direct evidence of discriminatory intent. As an initial matter, Defendants misunderstand what "direct" evidence is. "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). Governor Abbott's public statements that his intent in calling a special session for redistricting was to eliminate coalition districts are direct evidence of discriminatory intent. *See* Mot. 8 & n.2. "Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district

---

[3] Defendants' initial contention that the Gonzales Plaintiffs failed to specifically identify the districts that they challenge for intentional race discrimination (Opp. 8) is wrong. The SSC alleges that specific districts were drawn with discriminatory intent, ECF No. 1147 ¶ 213, and the Gonzales Plaintiffs' preliminary injunction motion provides a detailed recitation of the ways in which HB 4 intentionally discriminates against minority voters in those districts, *see* Mot. 10–13. The Gonzales Plaintiffs have also since provided that same information in user-friendly chart form. *See* ECF No. 1201.

3

lines." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 8 (2024).[4] And Defendants apparently do not dispute that "intentionally d[rawing] district lines in order to destroy otherwise effective [coalition] districts" raises "serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality op.); *see also* Mot. 9. They make no attempt to distinguish *Strickland* or argue that its reasoning does not apply with equal or greater force to coalition districts.

Defendants instead point to *other* evidence that they say "shows the purpose of the 2025 Map was to increase Republican performance across the state." Opp. 10. That is irrelevant. Direct evidence of racial intent is still *direct* evidence of racial intent even if it exists alongside evidence of other motivations. "Evidence need not show that race was the sole basis in order to constitute direct evidence." *Jones*, 427 F.3d at 993; *see also Veasey*, 830 F.3d at 236 n.20 (recognizing that the evidentiary issues in employment discrimination cases are "analogous" to those arising under *Arlington Heights*). And "[i]ntentions to achieve partisan gain and to racially discriminate are not mutually exclusive." *Veasey*, 830 F.3d at 241 n.30. To prove intentional vote dilution, plaintiffs need only establish, with direct or circumstantial evidence, that "race was *part* of Defendants' redistricting calculus," *LULAC v. Abbott*, 601 F. Supp. 3d 147, 161 (W.D. Tex. 2022). They need not show that race was the *only* motivation involved. *Id.*

And contrary to Defendants' suggestion, Opp. 13–14, it is no defense if lawmakers racially discriminated in pursuit of partisan ends. Plaintiffs "need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will towards minorities

---

[4] Governor Abbott was indisputably "a relevant state actor" because the legislature could not have taken up redistricting at all if he had not added it to the special session call. *See* Tex. Const. art. III, § 40. But, as explained in the Gonzales Plaintiffs' Motion, legislators made similar statements, and the analysis in this section applies to those statements, too. Mot. 10.

4

because of their race." *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017). Lawmakers' "personal feelings toward minorities don't matter; what matters is [if they] intentionally took actions calculated" to discriminate against them because of their race. *Garza v. County of Los Angeles*, 918 F.2d 763, 778 & n.1 (9th Cir. 1990) (Kozinski, J., concurring). Put differently, the challenged action must have been taken "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). And "the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper v. Harris*, 581 U.S. 285, 308 n.7 (2017).

Defendants tie themselves in knots trying to explain away the Dhillon Letter and its explicit call for eliminating majority-minority districts. Recognizing how damaging it is to their defense, Defendants, including Governor Abbott, variously call Assistant Attorney General Dhillon's work "poor and legally-unsound," Opp. 4, "baseless," *id.* at 12, a "mistake," *id.*, "erroneous," ECF No. 1200 at 7, and "ham-fisted," *id.* They insist that she sent it only "to provide political cover for Texas to redistrict mid-decade." Opp. 4. This is a serious accusation to level against a high-ranking DOJ official. *Cf.* 5 U.S.C. § 7323(a)(1). But the fact that Defendants feel that they must do it only underscores how significant the evidence is. In the end, none of Defendants' attempts to minimize or distance themselves from the Attorney General's express command that Texas engage in racially-motivated redistricting can erase this direct evidence or its direct effect on the resulting legislation.

Defendants first offer a weak defense of the Dhillon Letter, arguing that it "did not urge race-based districts," Opp. 12, but that argument contradicts the Letter on its face. The Letter expressly and specifically urged the elimination of four districts based expressly on their racial

5

composition. *See* ECF No. 1114-2. References to the Letter cannot be "race-neutral references to constitutional law," Opp. 16, because the constitutional "analysis" in the letter was explicitly based on the racial composition of districts it targeted.

Defendants next try to shrug off the erroneous legal premise of the new map, arguing that it simply "does not matter whether Governor Abbott (or Harmeet Dhillon) misread *Petteway*" because "[a] legislative act based on mistake . . . remains a valid legislative act." Opp. 13, 15. But the Supreme Court has held the opposite, repeatedly refusing to approve racially-driven maps "whose necessity is supported by no evidence and whose *raison d'être* is a legal mistake." *Cooper*, 581 U.S. at 306. And Defendants' supposed "good reasons . . . for redrawing districts merely to avoid a suit by DOJ, even it appears not to be well-founded" do not help them either. Opp. 13 n.35. Legal compliance can justify race-based districting only if the State has a "strong basis in evidence for believing that" it is necessary. *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996). An "interest in avoiding meritless lawsuits" from DOJ does not suffice. *Id.*

Most remarkably, Defendants' principal defense is that Governor Abbott was lying to the public when he invoked the Dhillon Letter's race-based rationale in order to achieve "political cover" for a partisan gerrymander. Opp. 23. But this is a confession, not a defense. The Dhillon Letter targeted districts based on race, and Governor Abbott and the legislature did what the Dhillon Letter asked. Where lawmakers "use race" to "advance[]their partisan interests—perhaps thinking that a proposed district is more 'sellable' as a race-based VRA compliance measure than as a political gerrymander and will accomplish much the same thing—their action still triggers strict scrutiny." *Cooper*, 581 U.S. at 308 n.7. Governor Abbott's desire—*according to Defendants themselves*—"to cite a legal necessity (rather than political desire) as the goal," Opp. at 14, thus explains "why a mapmaker who wanted to produce five new Republican districts would use data

6

about voters' race rather than their political preferences." Opp. 18 (internal quotation marks omitted) (quoting *Alexander*, 602 U.S. at 22). The Dhillon Letter provided "political cover" only because Texas did what Dhillon asked—it eliminated diverse coalition districts.[5]

Try as they might, Defendants cannot dispute or ignore the abundance of direct evidence of racially discriminatory intent. Instead, they criticize the Gonzales Plaintiffs for having "trouble reconciling" Governor Abbott's explicit race-based rationale with his lawyers' insistence otherwise. Opp. 16. But it is Defendants who owe an explanation for the State's confused defense. Indeed, the Governor's out-of-court statements are admissions when offered against him, Fed. R. Evid. 801(d)(2), but his attorneys' statements to the Court "are not evidence" at all. *Skyline Corp. v. NLRB*, 613 F.2d 1328, 1337 (5th Cir. 1980) ("Statements by counsel in briefs are not evidence."). The *evidence* before the Court is strikingly consistent—the Dhillon Letter expressly called for the elimination of coalition districts, ECF No. 1114-2; Governor Abbott cited the "constitutional concerns raised by the U.S. Department of Justice" as the basis for adding redistricting to the special session, ECF No. 1114-1 at 3; he reiterated in a public, videotaped explanation that the intent behind the map was "to make sure that we have maps that don't impose coalition districts," *supra* n.1; and the resulting map effectuates that expressed intent.[6]

---

[5] Texas also contends that Governor Abbott "rejected the legal reasoning of the DOJ letter." Opp. 5. But their only citation for that proposition is a letter from Attorney General Paxton that never purports to be written on behalf of Governor Abbott. *See* ECF No. 1116-1.

[6] Texas cannot seriously complain that Plaintiffs have failed to produce testimony from "the map-maker," Opp. at 11 when the legislature purposely chose to hide the map-drawing process behind the attorney-client privilege by outsourcing the physical drawing of the map to an outside law firm. *See, e.g.*, *Hearing on H.B. 4 Before the H. Select Comm. On Cong. Redistricting* ("*August 1 Hearing*"), 89th Leg., at 2:07:32–2:07:44 (Tex. 2025), https://house.texas.gov/videos/22418. In any event, the map that was drawn—with its targeted destruction of majority-minority districts and preservation of majority Anglo districts regardless of the partisan bent of those districts, Mot. 5–6—speaks for itself.

## 2. Circumstantial Evidence

### i. Plaintiffs are not required to produce an alternative map.

Defendants fault the Gonzales Plaintiffs for failing to produce a map showing that the legislature's partisan goals could be met without diluting the votes of minority voters, but no such map is required. This is not "a case such as" *Easley v. Cromartie*, 532 U.S. 234, 258 (2001), or *Alexander*, 601 U.S. at 34, which relies primarily on evidence of discriminatory impact that could have resulted from either racial or partisan discrimination. This is instead a case like *Cooper*, based on direct evidence of lawmakers' racial intent. Governor Abbott and key lawmakers *said* they were intentionally destroying coalition districts, and then they did it. Mot. 8–10. As in *Cooper*, that evidence "itself satisfie[s] the plaintiffs' burden of debunking [Texas's] 'it was really politics' defense; there [is] no need for an alternative map to do the same job." 581 U.S. at 322.

### ii. The *Arlington Heights* factors support an inference of discriminatory intent.

Perhaps recognizing that each of the *Arlington Heights* factors weighs strongly in favor of a finding of intentional discrimination here, Defendants resist the application of this longstanding test of legislative intent to the redistricting context at all. Opp. at 18. Defendants offer no alternative test in its place. They cite two Supreme Court decisions, but the first cited *Arlington Heights* in describing the legal standard, *Abbott v. Perez*, 585 U.S. 579, 581 (2018), and the second turned on a specific failure of proof—disaggregating racial from partisan effects—that falls outside the *Arlington Heights* framework, *Alexander*, 602 U.S. at 7–39. That is not a problem for Plaintiffs here given both the direct evidence of racial intent and the clearly disparate treatment of majority-minority districts as compared with majority-Anglo districts regardless of partisan makeup—evidence that directly shows racial rather than purely partisan map-drawing. This Court has already held that the *Arlington Heights* framework guides the intent analysis in redistricting cases because

8

"intentional-vote-dilution theories call for the application of general constitutional principles." *LULAC*, 601 F. Supp. 3d at 160.

**Discriminatory Effect.** Defendants do not dispute that HB 4 eliminated several majority-minority districts, nor that HB 4 reduced *both* the overall number of majority-minority districts *and* the number of districts in which Black and Latino voters have an opportunity to elect their candidates of choice. *See* Mot. 11–13. That should be the end of the matter as to discriminatory effect. *See LULAC*, 601 F. Supp. 3d at 167 ("[T]he destruction of a majority-minority district, particularly one controlled by one racial group, [is] a relatively clear discriminatory impact."). Defendants' contrary arguments change nothing.

First, Defendants fault the Gonzales Plaintiffs for failing to offer an alternative demonstrative map with more electoral opportunity. But this Court has already held that "Plaintiffs may show discriminatory effect *without* making a full *Gingles* showing." *LULAC*, 601 F. Supp. 3d at 162. All that is required is a showing that the redrawing of a district "bears more heavily on one race than another." *Id.* at 164 (quoting *Arlington Heights*, 429 U.S. at 266). For purposes of this Preliminary Injunction Motion, a comparison to the 2021 Map serves that need. And even if more were needed, the Gonzales Plaintiffs presented evidence at trial showing that two *additional* majority-Latino districts could be drawn that would give Latino voters an opportunity to elect their candidates of choice. *See* ECF No. 1108 at 3–5 (summarizing evidence). The 2021 Map was bad; the 2025 Map is worse.

Defendants next argue that the Gonzales Plaintiffs failed to disentangle partisan effects from racial effects. Again, this Court has already held that an intentional vote dilution plaintiff need not satisfy the *Gingles* test (which requires a showing of racially polarized voting) and may instead "rely on the more generic Equal Protection framework in *Arlington Heights*, which finds

9

discriminatory effects more readily." *LULAC*, 601 F. Supp. 3d at 168. But in any event, Dr. Ansolabehere's analysis plainly demonstrates that voting in each of the relevant districts is highly polarized along *racial* lines, with Latino and Black voters cohesively preferring Democrats and Anglo voters cohesively preferring Republicans. Defendants' only criticism of this analysis is that it examines only general elections, and not primary elections. But this Court's previous discussion of primary elections focused on "analyzing *divisions within political coalitions*." *Id.* at 166 (emphasis added). Dr. Ansolabehere's report does not analyze the cohesion of political coalitions—it analyzes voting behaviors and cohesion within individual racial groups.

Finally, Defendants contend that HB 4 could not possibly have a discriminatory effect because "[t]he overall number of majority-minority districts across the state has increased." Opp. 20. It is unclear what Defendants mean by this, as HB 4 has two more majority-Anglo eligible-voter districts than the prior plan. Ansolabehere Rep. at 4. It creates more majority Latino districts, but none of the "additional" barely majority-Latino districts will allow Latino voters to elect their candidates of choice. *See id.* at 4–5. Texas, remarkably, makes no effort to argue otherwise. Majority-Latino districts in which Latino preferred candidates will always lose are worth nothing to Latino voters. But they seem to be politically valuable to Governor Abbott, who was quick to trumpet them as giving "Hispanic Republicans" more electoral opportunities.[7] "This use of race to create the façade of a Latino district also weighs in favor of [the Gonzales Plaintiffs'] claim." *LULAC v. Perry*, 548 U.S. 399, 441 (2006). Similarly, while HB 4 creates two majority-Black districts, it does so by eliminating a plurality Black district in which Black voters were able to elect

---

[7] *See* CNN, *'What gives you the right?': Tapper pushes back on Abbott over calls to remove Dem lawmaker*, YouTube, at 4:00–4:17 (Aug. 11, 2025), https://tinyurl.com/yvf9ht6e ("[W]e wanted to remove those coalition districts and draw them in ways that, in fact, turned out to provide more seats for Hispanics. For example, four of the districts are predominantly Hispanic. It just coincides [that] there's going to be Hispanic Republicans elected to those seats.")

their candidates of choice, reducing Black electoral opportunity overall. Ansolabehere Rep. at 4–5.

**Historical Background.** Defendants have no answer to the extensive record evidence of recent discrimination in voting and redistricting—including in some of the very same districts challenged here. *See LULAC*, 601 F. Supp. 3d at 170. They observe that redistricting in Texas is "politically hard-nosed," Opp. 21, but this gets them nowhere because, again, partisanship and racial discrimination are not mutually exclusive. They claim that "evidence in the recent trial showed Texas has worked hard to remedy the effects of its history of discrimination." Opp. 21. But they cite no such evidence. They merely fault one of the several historical experts who testified at trial for focusing his analysis on 20th century history, and then change the subject to complain about political gerrymandering in other states. *Id.* at 21–22.

**Sequence of Events.** Defendants also have no answer to evidence demonstrating that, notwithstanding President Trump's demands for partisan redistricting, it was *only* after the Dhillon Letter and Governor Abbott framed the push for new congressional districts in racial rather than partisan terms that momentum for redistricting began to build. Mot. 13–14. Confusingly, Defendants' response to this evidence focuses exclusively on the actions of lawmakers who *opposed* HB 4. But this says nothing about the intent of the legislators who voted for the bill. *Cf. Veasey*, 830 F.3d at 234 ("The Supreme Court has repeatedly cautioned—in the analogous context of statutory construction—against placing too much emphasis on the contemporaneous views of a bill's opponents." (quoting *Butts v. City of New York*, 779 F.2d 141, 147 (2d Cir. 1985)).

**Legislative History.** Defendants' account of the legislative history of HB 4 is tellingly selective. They rely almost exclusively on the statements of Senator King, but those statements are of limited probative value because Senator King disclaimed any knowledge of the process that led

11

to the creation of HB 4. *Hearing on S.B. 4 Before the S. Spec. Comm. on Congressional Redistricting*, 89th Leg. 1:43:02 (Tex. 2025), https://senate.texas.gov/videoplayer.php?vid=22443&lang=en (statement of Sen. King) (denying "any input" in mapdrawing). The more probative evidence came from the House, where the map originated. Chairman Hunter *repeatedly* cast HB 4 in racial terms, touting its elimination of coalition districts and consolidation of minority voters into single-race majority districts. *See, e.g.*, Mot. 10. And as the proponent of HB 4, Chairman Hunter's statements are particularly probative of legislative intent. *Cf. Kenna v. U.S. Dist. Ct. for C.D.Cal.*, 435 F.3d 1011, 1015 (9th Cir. 2006) ("[F]loor statements by the sponsors of the legislation are given considerably more weight than floor statements by other members"); *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 526–27 (1982) (holding that the remarks "of the sponsor of the language ultimately enacted[] are an authoritative guide to the statute's construction").

Texas skips over that part of the legislative history and instead misleadingly quotes from Chairman Hunter's statements regarding changes made by House Committee Substitute to HB 4. When Chairman Hunter said that the "intent of the changes was to increase Republican political performance," he was referring specifically to changes made to CD 9 *by the Committee Substitute* (Plan C2333) to an earlier version of HB 4 (Plan C2331). ECF No. 1199-14 at 4:5–17. And indeed, the Committee Substitute did significantly improve the Republican performance of CD 9 (by about 2.4 percentage points) while reducing the Latino composition of the district by only .3 percentage points, keeping it at a bare 50.5 percent majority. *See* Fox Decl. Exs. O, V, A, T. Taking at face value Chairman Hunter's assertion that the purpose of the Committee Substitute was to improve the Republican performance of the map (and more specifically, CD 9), the fact that it did so without making *any* significant changes to the district's racial composition strongly supports an inference

12

that this was done on purpose, meaning that race was still the predominant factor—or at least *a* factor—guiding the drawing of the district. As Chairman Hunter put it: "Nothing's a coincidence." *August 1 Hearing* at 1:46:54; *cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 222 (2023) ("The results of the Harvard admissions process reflect this numerical commitment. For the admitted classes of 2009 to 2018, black students represented a tight band of 10.0%–11.7% of the admitted pool.").

### B. HB 4 is an unconstitutional racial gerrymander.[8]

Texas fails entirely to respond to the Gonzales Plaintiffs' claims that CD 9, CD 18, CD 30, CD 35, CD 22, and CD 27 were drawn with specific racial quotas in mind, dismissing *all* such evidence as "cursory quibbles with certain districts." Opp. 26. Texas offers *no explanation* for why CDs 9, 18, 30, and 35 were each drawn with single-race minority populations *just* over 50 percent. Mot. 17–18. It offers *no explanation* for why the boundaries of CD 18 and CD 30 crisscross Democratic precincts and hew precisely to the boundaries of majority Black precincts. *Id.* at 18. It offers *no explanation* for why, when the Committee Substitute for HB 4 added an *entire county* to make CD 9 more Republican-leaning, changes were made elsewhere to the district lines to maintain CD 9's razor-thin Latino majority. *Id.* at 19. It offers *no explanation* for why each of the eight most-altered districts in HB 4 was a majority-minority district in the 2021 map. *Id.* at 11. And it offers *no explanation* for why CDs 22 and 27—both majority-minority *Republican* districts—were tweaked to make them majority-Anglo. *Id.* at 19.

---

[8] Texas mistakenly contends that "Gonzales Plaintiffs bring a racial gerrymandering claim under the 14th and 15th Amendments." Opp. 25 n.56. That is incorrect: the Gonzales Plaintiffs' racial gerrymandering claim is pleaded only under the Fourteenth Amendment. *See* ECF No. 1147 ¶¶ 219–240 (Count II of the Second Supplemental Complaint). Only the Gonzales Plaintiffs' intentional vote dilution claim is pleaded under the Fourteenth and Fifteenth Amendments. *See id.* ¶¶ 202–218 (Count I); *LULAC*, 601 F. Supp. 3d at 160.

13

*None* of this was a coincidence—and Texas does not even attempt to argue otherwise. The direct evidence, as discussed above, demonstrates that both Governor Abbott and the Texas Legislature were hyper aware of the racial composition of Texas's districts when calling the special session and enacting HB 4.[9] The Governor and key legislators made clear their belief that 50 percent single-race quotas were a feature, not a bug, of HB 4. *See, e.g.*, ECF No. 1150 at 14–16 (summarizing legislative debates). Governor Abbott even made an appearance on CNN to brag about eliminating coalition districts and creating majority-Latino districts that elect Republicans.[10] And Texas does not dispute that racial data was central to the legislative debates on HB 4. Instead, the state attempts to minimize this evidence by claiming *entirely without citation* that "after drawing the map blind to race and checking for VRA compliance, some legislators availed themselves of publicly available VAP data to answer criticisms of the map during debate." Opp 6; *see also* Opp. 14. In sharp contrast to the 2021 Map, Defendants offer no evidence that is true.

### C. Plaintiffs are entitled to relief under Count IV because HB 4 is unconstitutionally malapportioned.

To defend their use of 2020 census data to draw districts enacted in 2025, Defendants appeal to the "settled rule that '[t]he census is presumed accurate until proven otherwise.'" Opp. 26 (alteration in original) (quoting *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir. 1988)). But the presumption of accuracy does nothing for them, because there is ample evidence—

---

[9] Texas repeatedly accuses "Plaintiffs" of "contradictions" because they previously "argued that the legislator's consistent statements that they did not consider race supported a finding that they in fact *did* consider race." Opp. 7; *see also id.* at 12 (incorrectly claiming that the Gonzales Plaintiffs made an "allegation of racial intent in the 2021 Map" and "have never retracted it"). That is false. The Gonzales Plaintiffs have never made such an argument—or any other argument as to the intent behind the 2021 Map—because their challenge to the 2021 Map is based solely on the *Gingles* discriminatory-effect test under Section 2 of the Voting Rights Act. *See* ECF No. 863 (Gonzales Fourth Amended Complaint); *Allen v. Milligan*, 599 U.S. 1, 25 (2023).

[10] *See* '*What gives you the right?*,' *supra* note 7, at 4:00-4:17.

and no possible dispute—that the 2020 census does not accurately reflect population in 2025. Defendants cannot seriously argue otherwise—the state's own documents show that the districts have disparate total populations today. *See* ECF No. 1149-13.

The cases Defendants cite do not help them. In *United States v. Village of Port Chester*, 704 F. Supp. 2d 411, 439 (S.D.N.Y. 2010), the question was whether the census was inaccurate *when taken*—that is not the question here. In *McNeil*, 851 F.2d at 946, a VRA plaintiff tried to meet *Gingles* by arguing that a minority group had grown since the census, without providing "any concrete evidence" to show that. And in *Johnson v. DeSoto County Board of Commissioners*, 204 F.3d 1335, 1338 (11th Cir. 2000), the Court emphasized that the census's continued accuracy "is presumed only until the party challenging the census data [offers] competent evidence to the contrary." The Gonzales Plaintiffs have offered such evidence, and Defendants offer nothing contesting it. Nor could they—Texas's own state data confirms the substantial, uneven growth.[11]

> **D. Defendants have waived any argument as to Count V: that Texas's use of racial data and any pursuit of partisan advantage are unconstitutional in a mid-decade redistricting.**

Plaintiffs also moved for preliminary relief on Count V, which asserts that Texas cannot consider race or pursue partisan advantage when it undergoes unnecessary mid-decade redistricting. Mot. 24. Defendants have not moved to dismiss this claim, *see* ECF No. 1162 at 2 (asking the Court only to "dismiss Count IV"), nor do Defendants address it in their Opposition, *see* Opp. 27. Count V is distinct from Plaintiffs' malapportionment claim. *See* Mot. 23.

"[W]here a party does not brief an issue" in opposition to a preliminary injunction motion, "it is waived." *Bosarge v. Edney*, 669 F. Supp. 3d 598, 615 (S.D. Miss. 2023) (citing *Block v.*

---

[11] *See* Texas Demographic Center, *Percent Population Change for Texas Counties, 2020-2023*, https://www.demographics.texas.gov/Visualizations/2024/Estimates2024/ (last visited Sept. 29, 2025).

15

*Tanenhaus*, 815 F.3d 218, 221 n.3 (5th Cir. 2016)). And Plaintiffs have shown they are likely to prevail. State legislatures have leeway to consider "racial demographics" in discharging their constitutional obligation to redistrict every decade, *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995), and federal courts cannot review their pursuit of "partisan interests" lest redistricting become impossible, *Rucho v. Common Cause*, 588 U.S. 684, 700–01 (2019). But both rationales are grounded in legal necessity. There is no necessity here because Texas's prior map was enacted by the legislature, and its decision to re-draw those districts in the middle of the decade serves no legitimate interest at all. *See* Mot. 23–24. Defendants offer no response to this argument, and Plaintiffs are entitled to preliminary relief on this claim.

### E. Gonzales Plaintiffs are entitled to injunctive relief.

Finally, Defendants take the untenable position that this Court cannot replace an illegal map with its direct predecessor even after being immediately challenged in a non-election year. Opp. 28–31. That cannot be right. The 2026 general election is more than a year away, and Texas's primary is more than five months away. And Plaintiffs seek only the status quo—the continued use of the 2021 Map while the Court adjudicates their claims. There is no need for a remedial process or any implementation.

Not a single case Defendants cite applied *Purcell*-like considerations six months out from elections, in a non-election year, much less to relief as modest as that. *See Rucho v. Common Cause*, 583 U.S. 1099 (2018) (staying order in election year); *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (staying order seven weeks before early voting in election year); *Miller v. Johnson*, 512 U.S. 1283 (1994) (staying order in September of election year). *Purcell* was not even raised

by applicants in many of the stay orders Defendants cite.[12] Others involved injunctions that would have required enacting brand-new remedial maps,[13] which is not an issue here. Mot. 26.

Defendants are similarly incorrect that "this case is like" the Supreme Court's stay orders in *Ardoin* and *Callais*. *See* Opp. 29 (citing 142 S. Ct. 2892 (2022); 144 S. Ct. 1171 (2024)). The Supreme Court's stay in *Ardoin* was issued in June of an election year after the district court invalidated a redistricting plan, leaving Louisiana without any congressional map at all. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 856 (M.D. La. 2022). Two years later in *Callais*, the Supreme Court stayed a similar order that again left Louisiana without any map in the middle of an election year. *See Callais v. Landry*, 732 F. Supp. 3d 574 (W.D. La. 2024). Here, in contrast, the Court could simply reinstate Texas's previous map.

As a last-ditch effort, Defendants resort to an academic argument that HB 4—not Texas's prior map—constitutes the status quo because the status quo is what "a State establishes," rather than the state of affairs created by "federal court decisions." Opp. 30 (quoting *Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) (per curiam)). But the 2021 Map was drawn by the state legislature, not a court. In any event, what matters for purposes of this inquiry is that the "currently existing" map under HB 4 is "causing [Plaintiffs] irreparable injury," requiring the Court to "alter the situation so as to prevent the injury." *Canal Auth. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

---

[12] *See generally* Application for Stay, *Gill v. Whitford*, No. 16-1161, 2017 WL 4311108 (U.S. 2017); Application for Stay, *Perry v. Perez*, 565 U.S. 1090 (2011) (No. 11-713).

[13] *See Karcher v. Daggett*, 455 U.S. 1303 (1982) (Brennan, J., in chambers) (staying injunction on March 15 to avoid March 22 trigger date for court-drawn map); *North Carolina v. Covington*, 580 U.S. 1088 (2017) (staying district court remedy that would require new map); *Abbott v. Perez*, 138 S. Ct. 49 (2017) (same); *Chabot v. Ohio A. Philip Randolph Inst.*, 587 U.S. 1024 (2019) (same); *North Carolina v. Covington*, 583 U.S. 1109 (2018) (granting stay only "insofar as it direct[ed] the revision of House districts").

And reinstating the map in effect in the last two Texas congressional elections would prevent these injuries.

### III. CONCLUSION

For the foregoing reasons, the Court should preliminarily enjoin the use of HB 4's districts and order Texas to continue to use the 2021 Map for the 2026 election.

Dated: September 29, 2025

Respectfully submitted,

| | |
|---|---|
| Renea Hicks<br>Attorney at Law<br>Texas Bar No. 09580400<br>Law Office of Max Renea Hicks<br>P.O. Box 303187<br>Austin, Texas 78703-0504<br>(512) 480-8231<br>rhicks@renea-hicks.com | */s/ David R. Fox*<br>David R. Fox<br>Richard A. Medina<br>James J. Pinchak<br>**ELIAS LAW GROUP LLP**<br>250 Massachusetts Avenue NW, Suite 400<br>Washington, D.C. 20001<br>Telephone: (202) 968-4490<br>dfox@elias.law<br>rmedina@elias.law<br>jpinchak@elias.law<br><br>Abha Khanna<br>**ELIAS LAW GROUP LLP**<br>1700 Seventh Ave, Suite 2100<br>Seattle, WA 98101<br>Telephone: (206) 656-0177<br>akhanna@elias.law<br><br>*Counsel for Plaintiffs* |

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on September 29, 2025, and that all counsel of record were served by CM/ECF.

/s/ David R. Fox