UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LULAC, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*,<br><br>    *Defendants.* | Case No. 3:21-CV-00259-DCG-JES-JVB<br>[Lead Case] |

**BROOKS, LULAC, AND MALC PLAINTIFFS' REPLY IN SUPPORT OF *JOINT*
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1
ARGUMENT ................................................................................................................... 3
   I.   Plaintiffs are likely to succeed on their intentional racial vote dilution claims. .................. 3
   II.   Plaintiffs are likely to succeed on their racial gerrymandering claims. ............................ 11
   III.   The remaining injunction factors favor Plaintiffs. ............................................................ 15
CONCLUSION ................................................................................................................ 15
CERTIFICATE OF SERVICE ......................................................................................... 18

> *"We wanted to remove those coalition districts."*
>
> Governor Greg Abbott
>
> *"[T]hat would raise serious questions under both the Fourteenth and Fifteenth Amendments"*
>
> United States Supreme Court

## INTRODUCTION

Defendants now disavow President Trump's Department of Justice ("DOJ"), contending that DOJ's demand that Texas dismantle its multiracial majority coalition districts was merely "political cover for Texas to engage in partisan redistricting," that DOJ's legal analysis was "erroneous" and "ham-fisted," and that "the DOJ Voting Rights Section lacks an understanding of voting rights law." ECF No. 1197-1 at 7, 23. But Governor Abbott, Chair Hunter, Speaker Burrows, and other legislators ran with DOJ's demand. Defendants' new litigation position apparently is that it was more politically palatable to attack the racial composition of districts than their partisan composition, so the districts' racial status was the public wrapping paper for the State's partisan gerrymander.

Well here's Governor Abbott saying exactly the opposite on television on August 4:

**Jake Tapper:** Would you have gone forward with redistricting if President Trump had not personally gotten involved and asked you to do this?

**Governor Abbott:** To be clear Jake, this is something I've been interested in for a long time. First of all, I've been involved in redistricting litigation for more than twenty years now. Second, one thing that spurred all of this is a federal court decision that came out last year . . . [that] said that Texas is no longer required to have coalition districts. As a result, we had drawn maps with coalition districts in it. ***Now we wanted to remove those coalition districts*** and draw them in ways that in fact turned out to provide more seats for Hispanics. ***For example, four of the districts are predominantly Hispanic***. It's just coincides it's going to be Hispanic Republicans elected to those seats. One thing that's happened in the state of Texas is the Hispanic community, a lot of it, have decided they're no longer with the Democrats who believe in open border policies, who believe in going against our law

| | |
|---|---|
| | enforcement, who believe that men should play in women's sports and they instead align with Republicans. ***What we want to do is draw districts that give those Hispanics and African Americans in the state of Texas the ability to elect their candidate of choice.*** |
| **Jake Tapper:** | Well that's not really, I mean, *you're doing this to give Trump and Republicans in the House of Representatives five additional seats, right* – I mean that's the motivation is to stave off any midterm election losses? |
| **Governor Abbott:** | *Again to be clear, Jake, the reason why we're doing this is because of that court decision* Texas is now authorized under law that changed that was different than in 2021 when we last did redistricting. |

Brooks Ex. 335.[1]

Asked point blank to confirm that his motivation for calling a special session on redistricting was actually partisan and not racial, Governor Abbott responded in the negative. He cannot now come to Court and say otherwise. Nor would Defendants' contradictory, *post hoc* litigation explanation be legally relevant even if true. The overwhelming racial justification proffered by Governor Abbott and legislators renders the map unconstitutional, including if the State used race as a proxy for partisanship.

Defendants' *post hoc* litigation arguments evaporate in front of a wall of direct evidence—including from Governor Abbott himself (a defendant in this case)—of an avowed and direct purpose to dismantle districts on account of their racial composition.

Defendants' problem ultimately is not with the "ham-fisted" nature of this all, but rather with the Fourteenth and Fifteenth Amendments to the United States Constitution. The Constitution's prohibition on undue reliance on race in redistricting should be apparent to anyone with even a passing familiarity with redistricting jurisprudence much less a third-term Governor and former Attorney General of Texas boasting of "twenty years" of redistricting experience.

---

[1] The video will be provided as a Brooks Exhibit. The video of this interview can also be watched on CNN's official YouTube Channel at https://www.youtube.com/watch?v=Ip4ZILggIuM.

2

Whatever path of experience has brought Governor Abbott to this moment, the map must yield, for government of the people cannot long endure where citizens are denied their equal voice at the ballot because of their race.

## ARGUMENT

### I. Plaintiffs are likely to succeed on their intentional racial vote dilution claims.

Plaintiffs are likely to succeed on their intentional racial vote dilution claims. As Plaintiffs' opening brief illustrates, the direct and circumstantial evidence is overwhelming: Texas "intentionally drew district lines to destroy otherwise effective [coalition] districts." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality) (explaining that this "raise[s] serious questions under the Fourteenth and Fifteenth Amendments"). Defendants' arguments to the contrary are meritless.

*First*, Defendants repeatedly conflate the legal standards for intentional racial vote dilution claims and racial gerrymandering claims. Defendants introduce their discussion of Plaintiffs' intentional racial vote dilution claims (at 21-22) by quoting from the Supreme Court's racial gerrymandering decisions, including *Alexander v. South Carolina Conference of the NAACP*, 602 U.S. 1 (2024), which require plaintiffs to disentangle race and partisanship in situations in which those characteristics are correlated and the State claims partisanship as a defense. A racial gerrymandering claim alleges that "race was the 'predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* at 7 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). A racial gerrymandering claim is "'analytically distinct' from a vote dilution claim," *Miller*, 515 U.S. at 911 (quoting *Shaw v. Reno*, 509 U.S. 630, 652 (1993)), because the latter focuses not on racial *predominance*, but rather on the allegation that "the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities,'" *id.* (quoting *Mobile v. Bolden*, 446 U.S. 55, 66 (1980)).

3

While a plaintiff asserting a racial gerrymandering claim must prove racial predominance, that is not the standard for intentional *racial vote dilution* claims. Rather, for an intentional racial discrimination claim, "'racial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)); *see League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 161-62 (W.D. Tex. 2022) ("*LULAC*") ("Plaintiffs may show intentional vote dilution merely by establishing that race was *part* of Defendants' redistricting calculus, but to show racial gerrymandering they must go further and prove that race *predominated* over other considerations such as partisanship." (emphasis in original)).

A map becomes a racial gerrymander—regardless of *why* race was used—once a threshold amount of racial consideration is reached (*i.e.*, predominance). *See Alexander*, 602 U.S. at 38 ("A racial gerrymandering claim asks whether race predominated in the drawing of a district 'regardless of the motivations' for the use of race."). On the other hand, a map intentionally dilutes minority voting strength once *any* amount of racial purpose occurs if the goal is to reduce voting strength on account of race. Thus, while the *amount* of racial consideration defines a racial gerrymandering claim, even a portion of a decision that is based on race is enough to prove an intentional racial vote dilution claim.

Contrary to this clear precedent, Defendants invite the Court to conflate claims the Supreme Court has instructed are "analytically distinct." *Miller*, 515 U.S. at 911. A plaintiff raising a racial gerrymandering claim must "disentangle race from politics" when the two are closely aligned because of the predominance requirement—"[i]f either politics or race could explain a district's contours, the plaintiff has not cleared its bar" to show racial predominance. *Alexander*,

4

602 U.S. at 9. But even if partisanship is the predominant purpose behind a map's design, the map will still be unconstitutional if "racial discrimination [was] one purpose, *and not even a primary purpose*," for how its districts are configured. *Veasey*, 830 F.3d at 230 (emphasis added). For that reason, Defendants' contention (at 27-28) that the Supreme Court's racial gerrymandering precedent has made the *Arlington Heights* factors inapplicable to intentional racial vote dilution claims is misplaced. Likewise misplaced is their suggestion (at 28) that *Alexander*'s alternative maps framework applies to intentional vote dilution claims.[2] The disentangling the *Alexander* framework accomplishes is simply not a necessary task where predominance is not the question to be answered.[3]

*Second*, even if *Alexander*'s race/politics disentanglement framework governed Plaintiffs' intentional vote dilution claim, Governor Abbott has done the disentangling for us. In an August 4, 2025, television interview with Jake Tapper on CNN, Governor Abbott stated that the reason he called a special session for redistricting was to dismantle coalition districts (the defining feature of which is their racial composition) and *not* to increase Republican partisan performance. Asked point blank by Tapper to agree with him that partisanship motivated the redistricting, Abbott disagreed, doubling down on his race-based motivation. *See* Brooks Ex. 335.

---

[2] As the Court explained in ruling on the Brooks Plaintiffs' preliminary injunction motion with respect to SD 10, alternative maps *can* be evidence proffered by plaintiffs in an intentional discrimination case, but they are not required evidence.

[3] Defendants likewise apply the wrong legal test in questioning (at 29) whether *Petteway* means that the intentional destruction of coalition districts causes a discriminatory effect. As this Court already concluded in its decision on the Brooks Plaintiffs' motion for a preliminary injunction regarding SD 10, ECF No. 258 at 32, the *Gingles* test for statutory Section 2 claims does not govern the determination of discriminatory effect for *constitutional* claims. For the same reason, Defendants' criticism (at 29-30) of Dr. Barreto for not including an analysis of primary election voter behavior in his report is misplaced.

Governor Abbott conducted a jam-packed media tour loudly proclaiming that he called the special session to dismantle multiracial coalition districts on account of their racial composition. The Court could end its inquiry here, without examining the circumstantial evidence of the map itself. But that evidence likewise overwhelmingly shows that what Governor Abbott *said* was the motivation indeed *was* the actual motivation. As Dr. Barreto (among other experts) shows, the 2025 map systematically eliminated districts in which a single racial group did not comprise the majority of voters—reducing that number from nine to just four, while race-blind computer simulations show that the number should be between twelve and fifteenth, even with the purported partisan goals achieved. *See* Brooks Ex. 283 (Sept. Barreto Report). And Dr. Barreto's analysis likewise shows on a district-specific level that none of the racial targets Texas achieved would ever occur absent a principal focus on achieving them. *Id.*[4] The map did exactly what the DOJ Letter demanded and more, systematically rooting out multiracial majority districts.

Furthermore, Texas replaced Hispanic opportunity districts CDs 29 and 35 with sham versions (new CDs 9 and 35) that Governor Abbott and legislators then trumpeted, over and over and over, based on their race: "*Four of the districts are predominantly Hispanic!*" *See, e.g.*, Brooks Ex. 335 (Abbott). DOJ's letter specifically mentioned CD 29 as a coalition district (it is not), while Texas added CD 35 to the DOJ target list. Indeed, although Texas created CD 35 in 2011 as a majority Hispanic CVAP district to comply with Section 2 of the VRA (and affirmed by the Supreme Court on that basis), Texas placed it on the multiracial coalition district chopping block. *See, e.g.*, Brooks Ex. 309 at 1:36:15 (Rep. Pierson identifying CD 35 as a coalition district and Chair Hunter responding by identifying it as converted to bare Hispanic CVAP majority). And

---

[4] Without explanation, Defendants' contend (at 23) that Plaintiffs fail to "tie their deficient direct-evidence narrative to district boundaries." Plaintiffs have done that at length.

6

after dismantling neighboring multiracial coalition CDs 9 and 33 that had long sent Black representatives to Congress, Texas single-mindedly plussed up the Black CVAP of CDs 18 and 30 seemingly for the sole purpose of creating a media talking point to obscure the purposeful *reduction* in Black electoral strength. *See, e.g.* Brooks Ex. 316 at 4:22:48 (Chair Hunter highlighting during House Floor Debate the increase of the Black CVAP of CDs 18 and 30); Brooks Ex. 331 (Abbott on Joe Pags Show emphasizing the consolidation of CDs 9 and 18 unironically in tribute to Barbara Jordan).

Governor Abbott's CNN interview dooms Defendants' counsels' *post hoc* explanations advanced in their opposition brief. They contend (at 1-7) that the redistricting was a result of gerrymandering in other states (including from the 1980s) culminating in Trump's push for partisan redistricting this summer. Not according to Governor Abbott, who says it was based on his own involvement in redistricting litigation in Texas for twenty years and a desire to dismantle coalition districts post-*Petteway*. Defendants' counsel say (at 7) that "[i]t's ham-fisted legal conclusions notwithstanding, the DOJ Letter apparently sought to provide political cover for Texas to engage in partisan redistricting." Not according to Governor Abbott—or for that matter Chair Hunter or Speaker Burrows, whose press release upon passage was about complying with DOJ's race-based command. Brooks Ex. 344 (Burrows Press Release). Defendants' counsel assert (at 22) that "[n]owhere did anyone—state actor or otherwise—announce an intent 'to dismantle districts on account of their racial composition" and (at 25) that "the Governor did not call for . . . the dismantling of districts due to their racial composition." Yet Governor Abbott announced: "***[W]e wanted to remove those coalition districts.***" Brooks Ex. 335 (Governor Abbott on CNN).

*Third*, recognizing that Governor Abbott, Chair Hunter, and other bill supporters infused the record with their race-based motivations, Defendants retreat (at 25) to the Senate's purported

7

race neutrality in the process. They cite (at 25) the *Brnovich* Court's rejection of the "cat's paw" theory as applied to legislative bodies. But as Defendants agree (at 21), unconstitutional intentional racial discrimination occurs when discrimination was a "but for" cause of the challenged action. *See Hunter v. Underwood*, 471 U.S. 222, 232 (1985). *But for* Governor Abbott's expressly stated purpose to "remove" districts on account of their multiracial majority status, the special session would not have occurred and none of us would be here. *But for* Chair Hunter and his colleagues' obsession with racial data during the House proceedings, the map would not have its challenged configuration. The Senate's attempted willful blindness[5] to the racial discrimination afoot all around them is beside the point. Plaintiffs' burden is not to establish that every legislator harbored improper intent.[6] It is to show that but for the proven invidious intent, the challenged map would not have become law. Governor Abbott said so on TV.

*Fourth*, it's not as though Defendants' *post hoc* version of events is any better for them. Defendants' counsel now contend (at 7 & 24) that all this talk of race and eliminating multiracial coalition districts by DOJ, Governor Abbott, and legislators was simply "political cover for Texas to engage in partisan redistricting." To start, Defendants are in essence asking the Court to apply a presumption of legislative *bad faith* because the stated objective (eliminating multiracial majority districts and Hispanic opportunity districts on account of race) is legally problematic while the *post hoc* litigation explanation (partisanship) is not. But if the "presumption of good faith" has any stable meaning beyond "heads we win, tails you lose," surely the Court must take Governor Abbott's words at their face value. And what he *said* was "**we wanted to remove those coalition**

---

[5] The hearing will illustrate the implausibility of this attempted willful blindness.

[6] In *Brnovich*, the Court was unwilling to attribute a single legislator's statements to others. Here, Governor Abbott was singularly responsible for calling the special session. It is nothing like *Brnovich*, where the Court disapproved attributing one legislator's comments to the whole body. But for causation is plainly established here.

8

*districts*" and that the redistricting was *not* done to comply with President Trump's request for more Republican districts. Brooks Ex. 335 (emphasis added). The presumption of good faith requires us to start with the assumption that he wasn't lying in saying so.

In any event, "the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper v. Harris*, 581 U.S. 285, 308 n.7 (2017). This is so even if the DOJ Letter (which was officially credited in the special session proclamation and again in the Speaker's press release upon passage of the map) was, in Defendants' counsels' words (at 7 & 23), an "erroneous" and "ham-fisted legal conclusion[]" by a newly constituted "DOJ Voting Rights Section [who] lack[] an understanding of voting rights law." *Cf. Cooper*, 581 U.S. at 306 (disapproving race-based decision "whose necessity is supported by no evidence and whose *raison d'être* is a legal mistake").

Defendants, apparently to suggest the DOJ Letter means something other than what it says, ponder (at 24): "Why would the United States government accuse a state of racial discrimination and *sub silentio* insist on *more* race-based action?" But there is nothing *sub silentio* about DOJ's demand that Texas dismantle congressional districts on account of their racial composition. There is nothing *sub silentio* about the new map doing exactly that. And there is nothing *sub silentio* about Governor Abbott's statements when he seized on the DOJ demand.

*Fifth*, Defendants contend (at 23) that the 2025 redistricting could not actually have been motivated by an intent to dismantle multiracial coalition districts on account of race because the resulting map still includes four (down from nine) districts in which no single race constitutes a majority of voters. Defendants say (at 23), "[i]f the goal was to dismantle coalition districts, the Legislature must have failed in carrying it out." But the evidence shows that it was statistically impossible to get as low as they did (four districts) absent an intent to do so, *see* Brooks Ex. 283

9

(Barreto Sept. Report), and the fact that the map does not reduce the number to zero given Texas's diverse population does not detract from Texas's expressly stated mission to root out diversity in district population wherever possible. Also telling is that Chair Hunter shifted the metric in how he described newly configured CD 29 from citing CVAP to citing VAP, so as to maintain the ability to characterize it as single-race majority. *See, e.g.*, Ex. 316 at 30:12-31:18 (Chair Hunter, during House Floor Debate, characterizing CD 29: "CD 29 becomes a majority Hispanic VAP district – that's voting age population"). The fact that the mapdrawers cannot eliminate every multi-racial majority district does not detract from their stated goal of eliminating as many single-race majority districts as was physically possible.

*Sixth*, Defendants posit that the racially-infused House proceedings—where Chair Hunter and others took every opportunity (unprompted) to repeatedly and emphatically describe the racial features of the proposed districts—were unproblematic because "a map drawer is perfectly within his rights to review racial data *after* the drawing of the map for a lawful purpose, 'namely, to check that the maps he produced complied with [] Voting Rights Act precedent." ECF No. 1197-1 at 27 (quoting *Alexander*, 602 U.S. at 22). Notably absent from Defendants' brief is a citation to a single instance of Chair Hunter or his supporting colleagues ever contending that they were dwelling on the racial makeup of the districts for any VRA compliance reason. Indeed, Chair Hunter expressly *denied* engaging in any VRA analysis to support his focus on racial data. *E.g.*, Brooks Ex. 309-T at 778 (Chair Hunter, in response to question by Rep. Thompson as to whether there was any legal basis for making CD 9 Hispanic CVAP majority, "I'm not able to tell you that"); *id.* at 868-69 (Chair Hunter, in response to Rep. Turner's question about whether there was any evidence or data to support increasing CDs 18 and 30 above majority Black CVAP, "I don't have any evidence. You said do I have evidence? I don't, I don't have any evidence."); *id.* (Chair Hunter denying

10

having any evidence to support increasing CD 35's Hispanic CVAP above majority status); *id.* at 870 (Chair Hunter, in response to Rep. Turner asking whether Butler Snow had done a racially polarized voting analysis to determine Hispanic voters' candidates of choice, "I don't know").

* * *

Contrary to Defendants' characterization (at 21), this is not a "significantly [ ] complex issue." Governor Abbott called a special legislative session and said he wanted to remove districts because of their racial composition. And then the Legislature dismantled districts on the basis of race. The Constitution forbids that.

## II. Plaintiffs are likely to succeed on their racial gerrymandering claims.

Plaintiffs are likely to succeed on their racial gerrymandering claims. As the evidence will show, race was the predominant consideration in several aspects of the 2025 congressional map: (1) the 50%+1 Black CVAP racial target for CDs 18 and 30, which shuffled Democrats among neighboring districts on the basis of race without accomplishing any VRA-compliance or partisan objective (causing CD 33 to be racially gerrymandered in the process), (2) the 50%+1 Hispanic CVAP racial target for CDs 9 and 35, which worked against the purported Republican performance goals but allowed the map's proponents to claim they were not dismantling Hispanic VRA Section 2 districts, and (3) the single-race Anglo-majority target for CD 27 that reduced the district's Republican performance. Defendants' contrary arguments are without merit.

*First*, Defendants contend (at 35) that Plaintiffs have "no evidence" of racial gerrymandering and that "[a] district's racial [*sic*] does not speak for itself, let alone to invidious motive." But Plaintiffs do not cite merely the demographics of the districts, but rather the loud, persistent, and repeated cheerleading of those racial demographics before, during, and after the redistricting process by the map's proponents—notably Governor Abbott, Chair Hunter, and other

11

House members. If achieving Hispanic- and Black-majority racial targets was not the central design feature, then why did they talk about it so much? Why did Governor Abbott do a media circuit while the map was under consideration in the Legislature emphasizing at every turn that four of the five new districts were being drawn to achieve Hispanic majorities? *See Alexander*, 602 U.S. at 8 ("Direct evidence often comes in the form of a relevant state actor's express acknowledgement that race played a role in the drawing of district lines.").[7]

Beyond this race-based media campaign by the Governor and race-focused discussion by proponents during the legislative process, expert analysis of the map shows that it could not have arisen from a partisan-motivated process. Rather, it only could have been the product of intentional racial targets. *See, e.g.*, Ex. 283 (Barreto Sept. Report). This is evidenced not only by the simulation analysis but also by Dr. Barreto's careful step-by-step analysis of changes made to CD 9 during the legislative process.[8] *Id.* Defendants are thus wrong to invoke *Alexander*'s "adverse inference" discussion. For starters, for Plaintiffs' CDs 18, 29, 30, and 33 claims, *Alexander*'s alternative map requirement is inapplicable because race and party are not correlated in the relevant geographic

---

[7] Defendants object (at 26) that Plaintiffs quoted Chair Hunter, who answered Rep. Manuel's question about how CDs 9, 18, 30, and 35 landed at just north of 50% Black or Hispanic CVAP, by saying "nothing is a coincidence." Defendants provide an expanded "no coincidence" statement by Hunter in which he uses phrases like "follow the compactness-contiguous [goal]" and "some of the districts were historic and so there has been a growth and you bring them back to the configuration: they are going to [] increase." In C2333, neither CD9 nor CD35 are 'brought back' to an historic configuration. CD35 has only ever encompassed communities along the I-35 corridor between San Antonio and Austin (since its creation in 2011). CD9 in C2333 is moved to a different part of Harris County and only minimally overlaps with CD9 in C2193. Hunter's claim that "[m]ost of the ones that you have referenced were . . . on compact[ness] and the configuration" does not explain why CD9 and CD35 have razor thin Hispanic CVAP majorities. Rather his initial response to a question about these districts' demographics, that "[n]othing's a coincidence" is Chair Hunter's admission that these congressional districts were purposefully crafted to be just above 50% Hispanic or Black CVAP.

[8] By the time these changes to Plan C2331 were made to create Plan C2333, the media campaign championing CD 9's Hispanic CVAP majority status was already well underway, and mapdrawers maintained that status as a key goal.

area of the districts—the district boundaries carve through Democratic areas. *See Alexander*, 602 U.S. at 6 (analysis applicable "when race and partisan preference are highly correlated"). Furthermore, with respect to the dismantling of CD 29 (to create new CD 9) and CD 35, *Alexander*'s race/partisanship disentanglement is irrelevant because the benchmark districts were protected by Section 2 of the VRA. Partisan goals are not an excuse to dismantle VRA-required districts.

Moreover, with respect to CD 9, Dr. Barreto proffered an alternative map in his report that better achieves the partisan goal without satisfying the racial target as part of his step-by-step analysis of the changes to CD 9 from Plan C2331 to Plan C2333. Brooks Ex. 283 at 19. And for all the districts, Dr. Barreto's simulation analysis[9] shows that a mapdrawing process focused on partisanship and not race never would have achieved the racial targets evident in the map. Brooks Ex. 283. While Defendants now complain (at 37-38) that Dr. Barreto's simulations did not precisely match Trump's support in each relevant district, it was Dr. Trende who testified in June that a reasonable approach to this type of analysis would be to clear a 55% Trump-support level as relevant (note that three of the Trump districts in Plan C2333 do not achieve even that level). *See, e.g.*, 6/9/25 PM Rough Tr. at 7-8. Defendants also contend (at 37) that Dr. Barreto's algorithm did not focus on "incumbency protection," but Chair Hunter emphasized that incumbents need not reside in the districts in which they run. Ex. Brooks Ex. 309-T at 850-51 (Chair Hunter: "That's

---

[9] Defendants observe that the "the Supreme Court has expressed heavy skepticism of this type of analysis." But the *Alexander* Court discounted the plaintiffs' simulation evidence in that case because the model did not seek to achieve the state's purported partisan goals. 602 U.S. at 24-25. Dr. Barreto's simulations do. Defendants also cite the Supreme Court's discussion of simulation analysis in *Allen v. Milligan*, but in that case the Court was discounting the usefulness of simulation analysis in assessing *Gingles* I demonstrative districts. 599 U.S. 1, 36 (2023). As Justice Kavanaugh noted in his concurring opinion, this type of analysis is useful in intent-based analyses. *Id.* at 44 (Kavanaugh, J., concurring) ("It is true that computer simulations might help detect the presence or absence of *intentional* discrimination." (emphasis in original)).

the first I've heard a congressman worry about where they lived"). Apparently, incumbency protection was not actually a redistricting criteria in the map's creation.

*Second*, Defendants contend (at 35) that Governor Abbott's intended to protect an incumbent's seat in CD 18, that doing so was a "race-neutral goal, even if the incumbent is a minority." This defense warrants some unpacking. Here is what Governor Abbott said in the interview with Joe Pags: "Joe, something else that is going to happen in this process and that is the consolidation of what is known as the Barbara Jordan district over in the Houston area. A Black woman who served there for a long time – they've been begging to protect her district and that's exactly what we're doing." Brooks Ex. 326.[10]

Barbara Jordan left office in January 1979 and passed away in 1996. The most recent CD 18 incumbent, Rep. Sylvester Turner, passed away in March 2025. Since then, Governor Abbott has purposefully and egregiously blocked CD 18's voters—primarily minorities—from congressional representation by slow walking the special election to fill the seat. Defendants' contention that the "consolidation of what is known as the Barbara Jordan district" was *actually* about Governor Abbott's goal to protect Barbara Jordan's incumbency—"*even if the incumbent is a minority*"(!)—evinces most charitably a serious misunderstanding of the facts at hand. What Governor Abbott's repeated invocation of Barbara Jordan—likewise repeated by Chair Hunter and other supporting legislators throughout the process—in fact reveals is a disingenuous and transparent ploy to collapse two Black opportunity districts into one while claiming to uphold the universally respected legacy of Barbara Jordan. But it certainly does not reveal an attempt at incumbency protection, as Defendants' brief puzzlingly asserts.

---

[10] This can also be viewed at https://www.youtube.com/watch?app=desktop&v=kubKVtdGgBA.

14

\* \* \*

Plaintiffs' claims—both their intentional vote dilution claims and their racial gerrymandering claims—are satisfied by overwhelming direct evidence. The Governor and legislators openly stated their racial intent during the process. The circumstantial evidence of map analysis merely affirms the plain conclusion that race both motivated and predominated in drawing and enacting C2333.

### III. The remaining injunction factors favor Plaintiffs.

The remaining injunction factors favor Plaintiffs. Defendants offer no dispute (at 39) that Plaintiffs will suffer irreparable harm absent an injunction beyond disputing that they are likely to succeed on the merits of their claims. And in discussing the balance of the equities, they merely request that any relief issue before preparations for the 2026 election begin (they have not yet) and that the length of time it took for the 2021 map trial to occur somehow suggests relief related to the 2025 map should be delayed. This latter point makes no sense. Plaintiffs have moved with lightning speed to seek injunctive relief against the 2025 map.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted.

September 29, 2025

*/s/ Nina Perales*
Nina Perales
Julia Longoria
Sabrina Rodriguez
Mexican American Legal Defense and Educational Fund (MALDEF)
110 Broadway Street, Suite 300
San Antonio, TX 78205
 (210) 224-5476
Fax: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
srodriguez@maldef.org

Ernest I. Herrera
Mexican American Legal Defense and Educational Fund (MALDEF)
634 S. Spring Street, 9th Floor
Los Angeles, CA 90014
 (210) 629-2512
eherrera@maldef.org

Khrystan N. Policarpio*
Mexican American Legal Defense and Educational Fund (MALDEF)
1512 14th Street
Sacramento, CA 95814
 (916) 444-3031
kpolicarpio@maldef.org

*Admitted *pro hac vice*

*Counsel for LULAC Plaintiffs*

SOMMERMAN, MCCAFFITY, QUESADA & GEISLER, L.L.P.

*/s/ Sean J. McCaffity*
Sean J. McCaffity
State Bar No. 24013122
George (Tex) Quesada
State Bar No. 16427750
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219-4461

Respectfully submitted,

*/s/ Chad W. Dunn*
Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
4407 Bee Caves Road
Building 1, Ste. 111
Austin, TX 78746
(512) 717-9822
chad@brazilanddunn.com

*/s/ Mark P. Gaber*
Mark P. Gaber*
Mark P. Gaber PLLC
P.O. Box 34481
Washington, DC 20043
(715) 482-4066
mark@markgaber.com

Jesse Gaines* (Tex. Bar. No. 07570800)
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com

Molly E. Danahy*
P.O. Box 51
Helena, MT 59624
(406) 616-3058
danahy.molly@gmail.com

Sonni Waknin*
10300 Venice Blvd. # 204
Culver City, CA 90232
732-610-1283
sonniwaknin@gmail.com

*Admitted *pro hac vice*

*Counsel for Brooks Plaintiffs*

16

214-720-0720 (Telephone)
214-720-0184 (Facsimile)
SMcCaffity@textrial.com
Quesada@textrial.com

*Attorneys for MALC Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record on September 29, 2025 via the Court's CM/ECF system.

*/s/ Mark P. Gaber*