UNITED STATES DISTRICT COURT

For the

WESTERN DISTRICT OF TEXAS

at El Paso

L.U.L.A.C., et.al.,

    Plaintiffs,

v.

Gregg Abbott, in his official capacity as Governor of the State of Texas, et al.,

    Defendants.

Robert A. Heghgmann,

    Intervening Plaintiff,

v.

State of Texas, et al,.

    Defendants,

Alexander Green,

    Plaintiff Intervenor

Case No. 3:21-CV-00259

DCG-JES-JVB (lead Case)

FILED OCT 02 2025 CLERK, U.S. DISTRICT COURT WESTERN DISTRICT OF TEXAS BY ___ DEPUTY CLERK

## PLAINTIFF INTERVENOR'S COMLAINT

1. The Intervening Plaintiff (hereinafter "Plaintiff") in this case will challenge the apportionment of Congressional Districts in Texas, Virginia, New York and other states based solely on population without regard to citizen population characteristics. Under the Supreme Court ruling in *Baker v. Carr*, 369 U.S. 186 (1962), the Plaintiff has standing under Art. III, Sec. 2.

1

2. This action is brought by the Plaintiff pursuant to the United States Constitution including, but not limited to Article I, Sec. 8, cl. 1 and cl. 2, Amendments 14 and 15 of the Constitution, and the Declaratory Judgment Act, 28 U.S.C. Secs. 2201 and 2202. This Court has Subject Matter Jurisdiction under 28 U.S.C. Secs. 1331 and 1343 (3).

3. Robert A. Heghmann resides and votes in the 31st Congressional District in the State of Texas. As will be discussed below, previously the Plaintiff resided in Virginia Beach, VA. The Plaintiff alleges that because of apportionment of Congressional Districts in Texas, Virginia, New York and other states based solely upon total population, without regard to the citizen characteristics of the population, his vote and the votes of other suburban and rural voters in the 2022 and 2024 Congressional Elections were debased and diluted. This result was caused by the plan devised and implemented by President Obama and the Democratic Party to use unchecked immigration, largely illegal across the Southern U.S. Border, to create Congressional Districts that are in clear violation of the One Person, One Vote Mandate. This allowed the "Blue" States to accumulate Congressional Districts in excess of the number to which they were entitled.

### THE FEDERAL BUDGET FOR FISCAL YEAR 2010

4. Long before his inauguration as President, Barack Obama had a plan to turn America Blue by corrupting the U.S. House of Representatives. In

simple terms, he would use immigration, primarily illegal immigration across the Nation's Southern Border, to turn Purple and Red States Blue and to put a Democratic Party lock on the U. S. House of Representatives and the Electoral College. By flooding the Nation with illegal immigrants from Latin America, he would assure the Democratic Party of victory in a majority of Congressional Election Districts. Further, using these illegal immigrants to create more and more Congressional Districts in Blue States, he would assure Democratic Party control of the Electoral College.

5. To execute this plan, president Obama needed a huge increase in the Government Bureaucracy which meant a huge increase in the federal budget. He knew Congress would never increase taxes to fund this growth in the Bureaucracy and, if it did increase taxes, would never authorize the expenditures be used to support the increase in illegal immigration.

6. Barack Obama was, however, a constitutional scholar. A former Editor in Chief of the Harvard Law Review, he taught Constitutional Law in Chicago for nine years before beginning his political career, The Constitutional Convention of 1787 was caused in part by the Financial Crisis of 1787. The Convention was called to end that crisis and assure the voters who would be called upon to ratify the Constitution that government policies which lead to the crisis would not be repeated. To accomplish this the Framers put a firewall in the Constitution between Clause 1 and

Clause 2 of Article I, Section 8 to assure the reckless spending that had caused the Financial Crisis of 1787 would not be repeated,

7. That firewall protected the United States for 220 years, 110 Congresses and 43 Presidents. But Barack Obama, the Constitutional Scholar, knew the firewall and knew that if he blew up the firewall, he would have access to the unlimited funds he wanted, funds which would be totally at his disposal. Therefore, blowing up the firewall would be the first order of business and he did this in the proposed Federal Budget for F.Y. 2010. He borrowed $1.75 Trillion under Article I, Sec. 8, Clause 2 for spending under Article I, Sec. 8, Clause 1. This immediately increased the size of the Federal Bureaucracy by 88%. He borrowed another $ 1.0 Trillion in F.Y. 2011. His Administration used these funds to expand those Departments and Agencies which would provide illegal aliens with access to the Southern Border and, more importantly, would provide those illegal aliens with transportation throughout the United States in a pattern designed to turn Red States "Blue" and corrupt the House of Representatives and the Electoral College. By June 2014, the increased Federal Bureaucracy was ready to absorb and distribute millions of illegal aliens crossing the Southern Border for distribution into Red States and Red Districts in Blue States. This massive increase in illegal aliens has now been renewed and continues under the Biden Administration.

8. This borrowing under Clause 2 for spending under Clause 1 was unconstitutional. Barack Obama knew this as did the Plaintiff who tried to challenge the borrowing in federal court. His challenge was dismissed due to lack of standing. See *Heghmann v. Geithner, 10-cv-2523 (S.D.N.Y. 2010)*, affirmed *Heghmann v. Geithner*, 10-cv-1689 (2d Cir. 2010) certiorari denied *Heghmann v. Geithner*, Supreme Court Docket 10 1155. As a result, every Federal Budget since 2010 was and is unconstitutional. If the United States is to be saved, this Court must restore the Firewall.

## STATEMENT OF FACTS

9. The result of this use of Immigration as a political tool was clearly visible in Virginia in 2018. As the New York Times, which along with the Washington Post is the newspaper of record for the Democratic Party, reported new immigrants handed Virginia to the Democrats in the Congressional Elections in 2018.

> Around the advent of the modern immigration system, in 1965, foreign-born people made up only about five percent of the American population. Now they are nearly 14 percent, almost as high as the last peak in the early 20th century. The concentrations used to be in larger gateway cities, but immigrants have spread out considerably since then.
>
> Some went South. In 1980, 56 percent of adults eligible to vote in Virginia were born in the state. Today, that's down to 45 percent. Sabrina Tavernise and Robert Gebeloff, *How Voters Turned Virginia From Deep Red to Solid Blue*, N.Y. Times, 11/09/2019.

10. Whether the mass immigration of the past 10 years has been good or bad for the United States can be hotly debated but what is beyond debate is that it has been good for the Democratic Party.

> Mass legal immigration is driving Democrats towards full electoral dominance, with left-wing politicians winning nearly 90 percent of congressional districts with larger than average foreign-born populations, analysis finds.
>
> *The Atlantic* senior editor Ronald Brownstein analyzed Census Bureau statistics for the 2018 midterm elections, finding that the country's admission of more than a million legal immigrants every year is set to hand over electoral dominance to House and Senate Democrats.
>
> Among Brownstein's findings is that nearly 90 percent of House congressional districts with a foreign-born population above the national average were won by Democrats. This concludes that every congressional district with a foreign-born population exceeding 14 percent had a 90 percent chance of being controlled by Democrats and only a ten percent chance of electing a Republican. Joe Klamar, *Democrats Winning 90% Congressional Districts with Large Foreign-Born Populations*, Breitbart, 02/07/2019

11. American Immigration Policy is being driven by the Democrat Party's thirst for power, not necessarily what is best for the United States. Why that is this Court's constitutional concern is that the Democrats are pursuing this policy in violation of the "One Person, One Vote" Constitutional Mandate.

### *The Horsey Rule*

12. Wade H. Horsey II was a citizen of the United States and resided in Avon, CT. In 1996 and 1998, Wade Horsey was a candidate in the Connecticut House of Representatives from the Town of Avon, a suburb of Hartford. In

both elections Wade Horsey, an African American running as a Republican candidate, received in excess of 8,000 votes and lost.

13. After the 1998 loss, Wade Horsey reviewed the election results and realized that the Speaker of the Connecticut House of Representatives running as a Democrat in an urban voting district in Hartford won with 1200 votes.

14. Further analysis revealed similar results. Republican candidates running in suburban and rural districts received thousands of votes and lost. Democrats running in urban voting district received hundreds of votes and won. Plaintiff Robert A. Heghmann, an attorney who served as Wade Horsey's Federal Election Commission Compliance Officer for the campaign, was asked if there might be a violation of the "One Man, One Vote" Mandate. I advised Wade Horsey that I believed it was fair grounds for litigation.

15. On November 18, 1999 a complaint was filed in the United States District Court in Connecticut, *Wade H. Horsey v. Secretary of State*, #3:99-cv-2250 and assigned to District Court Judge Underhill. As required, the Plaintiff requested a Three-Judge Panel and a Three Judge Panel was convened. Second Circuit Court of Appeals Judge Ralph K. Winter and District Court Judge Hall joined District Court Judge Underhill on the Panel.

16. The issue placed before the Court was as follows:

> Does apportionment of both state and congressional election districts based solely upon total population without regard for the percentage

of citizens result in the effective impairment of suburban and rural votes cast in both statewide and congressional elections as those votes are debased and diluted thereby rendering the system of apportionment based solely upon total population without regard to citizen characteristics unconstitutional under the One Person, One Vote Mandate?

17. The Secretary of State moved to Dismiss for failure to state a cause of action. On June 1, 2001 the Three Judge panel denied the State's Motion to Dismiss and later noted, "Because Horsey offers information regarding the percentages of citizens and non-citizens in different states and certain congressional districts, there may be some evidentiary support for his claim that including non-citizens for apportionment purposes substantially dilutes his vote." (Citation to Record deleted) Horsey Slip Opinion at 11.

18. In the wake of the 2000 Census, the Census Bureau published detailed reports district by congressional district stating with 90% accuracy the number of non-citizens in each district thereby permitting the Plaintiff to factually demonstrate the potential constitutional violation. At the time of the 2000 Census, the Census Bureau announced that after the 2010 Census it would report state legislative district by state legislative district the number of non-citizens in each district but that information was not currently available. Therefore, the Plaintiff abandoned the claim with regard to state apportionment.

19. The Court then considered the Plaintiff's Offer of Proof and found, "The data reveal that the percentage of non-citizens in Connecticut's

8

congressional districts varies from between 2.2 percent and 9.7 percent. However, this is within a generally accepted range of deviation from equality. See *Chen v. City of Houston*, 206 F.3d 502, 522 (5th Cir. 2000) (less than 10% deviation is constitutionally tolerated for state elections); *Garza v. County of Los Angeles*, 918 F.2d 763, 785 – 86 (9th Cir. 1990) (Kozinski, J., concurring in part, dissenting in part).

20. Thus, the rule in the District of Connecticut is that (1) if a plaintiff offers information regarding the percentages of citizens and non-citizens in different congressional districts, there is evidentiary support for his claim that including non-citizens for apportionment purposes substantially dilutes his vote and (2) that a 10% deviation is the red line in determining the generally accepted range of deviation from equality. In this case, the Plaintiff is asking the Court to adopt this rule and apply it to congressional voting districts in Texas, Virginia, New York and other states.

### The Democratic Party's Reaction to Horsey

21. The Democratic Party in Washington was well aware of the *Horsey* litigation. Gregory D'Oria, the Assistant Attorney General defending the case, advised me that when the Panel denied the State's Motion to Dismiss, his telephone (remember this was 2002) exploded. Every Democratic leader in Washington wanted updates on the litigation. As a result of the legal success of the *Horsey* litigation even though there was no remedy, when Barack Obama became President, he ordered the Census Bureau to

9

discontinue documenting the number of foreign-born non-citizens in congressional election districts and to abandon plans to document the number of foreign born, non-citizens in state legislative election districts. The Census Bureau continues to adhere to that order. In addition, the *Horsey* decision was not printed in either the Federal Reporter or the Federal Supp Reporter. The Three-Judge Panel did not order the Decision not to be printed.

22. The order of President Obama to the Census Bureau effectively made it almost impossible for a voter to impose the One Person, One Vote Mandate on the creation of Congressional Districts in urban areas thereby permitting the Democrats to debase and dilute the votes of suburban and rural voters throughout the United States. Nevertheless, the Plaintiff has continued to appeal to Federal Courts to enforce the Rule in order to protect suburban and rural voters.

*Constitutional Violations in Texas*

23. The impact of the Obama-Biden Open Borders Policy upon Texas and the right to vote of its citizens is undeniable. According to the Migration Policy Institute, in 2019 there were 4,951,156 foreign born inhabitants in the State of Texas. These foreign-born inhabitants comprised 17.1 of the total Texas population. Of the foreign-born inhabitants, 1,959,253 or 39.6% were naturalized citizens. The remaining 2,991, 903 or 60.4% were non-citizens.

24. Of the Texas Congressional Districts which had 14% or more foreign-born inhabitants, 63% elected Democrats while 37% voted for Republicans. More significantly, in Congressional Districts which had less than 14.9% foreign born inhabitants, not a single Congressional District elected a Democrat.

25. The Plaintiff, now a Texas resident and registered voter in the 31ST Congressional District (11.6% foreign born), will have his vote in Congressional Elections in Texas debased and diluted because of Open Borders and the fact that Texas does not apportion inhabitants in accordance with the One Person, One Vote Mandate. Compare the 31stCongressional District with the following Congressional Districts: 33rd (31.8%), 7th (30.6%), 29th (30.4%), 9th (29.4%), 24th (27.9%), 30th (21.6%), 22nd (25.0%), 18th (23.4) and 3rd (22.9%).

26. Since re-districting for the 2022 Congressional Elections, the Plaintiff continues to reside in the 31st Congressional District. This means that in a number of other Districts with a large majority of Hispanic inhabitants, fewer voters in those districts will elect more Congresspersons than voters in districts such as District 31. This continues to be a clear violation of the One Person, One Vote Mandate.

*Constitutional Violations in Virginia*

27. The first District within which the Plaintiff sought to enforce the Horsey Rule was in the Eastern District of Virginia. In that case he challenged

apportionment in the states of Virginia and New York. He did that because the Supreme Court has not decided if the One Person, One Vote Mandate is intra state or inter state therefore he sought to include data on the Elections in Congressional Districts in New York. For the same reason, the Plaintiff is including census data in this case. The Plaintiff believes the Horsey Rule should be inter state.

28. Although the Census Bureau no longer publishes the citizen percentage of congressional districts, parts of the Community Survey continue to document the percentages of foreign-born citizens *and non-citizens* in each state and in counties and cities in each state. In Virginia, 12.1% of the population is foreign-born. Of these foreign-born persons, 51.1% are naturalized citizens while 48.9% of the foreign-born are non-citizens.

29. While the Census Bureau per President Obama's Order has not documented the percentage of foreign born who are naturalized citizens versus non-citizens in each congressional district as it did in 2004, we do know what counties comprise the 8th and 9th congressional districts in Virginia. Plaintiff used county citizen/non-citizen statistics to calculate congressional district foreign-born citizen versus foreign-born non-citizen statistics.

30. According to the 2017-18 Census Department's Community Survey, the population in the 9th congressional district where the Plaintiff resided and voted, was 704,831. Of this the foreign-born population in the district was

15, 260 or 2.2% of the total population. By contrast the 8th congressional district had a population of 795, 467 of which 224,571 were foreign-born or 28.2% of the total population.

31. The 8th Congressional District comprises all of Arlington County, approximately half of Fairfax County and the City of Fairfax. Of Arlington County's 234,965 total population, 11.9% (27, 904) are foreign born non-citizens. Of Fairfax County's 1,148,433 total population, 14.4% (165, 387) are foreign born non-citizens. Of the City of Fairfax's 23,589 total population, 15.3% (3615) are non-citizens.

32. Combining Arlington County, half of Fairfax County and City of Fairfax, 14.4% of the population of the 8th Congressional District are foreign born non-citizens. Even assuming all of the foreign-born population in the 9th Congressional District, 2.2%, is non-citizen (which is not likely) the difference of 12.2% is outside the acceptable range to avoid violation of the One Person, One Vote Mandate.

*Constitutional Violations in New York*

33. In New York City Immigrants make up 38% of the population. New York City contains 11 Congressional Voting Districts. Once again, the Census Bureau has not broken out the statistics on citizen versus non-citizen population in each congressional district but it has broken out the non-citizen statistics in each county. Three of the eleven congressional districts are contained in one county.

34. The sixth congressional district is contained entirely within the County of Queens. Out of a population of 2,278,722, the foreign-born population of Queens is 1,111,780. If these foreign-born, 482,104, or 21.2% of the total population, are non-citizens.

35. The ninth congressional district is entirely contained in Brooklyn. Of the 2,504,700 residents, 971,504 are foreign-born. Of these, 399,573, or 16% of the total population, are non-citizens.

36. The 15th congressional district is contained entirely in the Bronx. Of the 1,432,132 residents, 513,499 are foreign-born. Of the foreign-born, 264,531, or 18.5% of the total population, are non-citizens

37.. Compare these urban congressional districts with three suburban and rural New York congressional districts. The 21st congressional district has 701,112 residents of whom 26,295, or .03% of the total population, are foreign born. The 22nd congressional district has 697,372 residents of whom 42,674, or .06% are foreign-born. The 23rd Congressional District has 693,764 residents of whom 27,591, or .04% of the total population, are foreign-born.

38. Even if all the foreign-born population in the 21st, 22nd and 23rd Congressional districts foreign born are non-citizens (which is not likely), the sixth, ninth and 15th districts do not fall within the permissible 10% difference required by *Horsey*.

39. If our Representative Democracy is to retain the confidence of The People and survive, this Court must take a stand and defend the principle of One Person, One Vote in congressional districting. If *Horsey* is good law (and President Obama, a constitutional scholar, apparently though so since he ordered the Census Bureau to stop reporting the percentage of foreign-born, non-citizens in congressional and state representative districts) then the 2022, 2024 congressional elections were in violation of the One Man, One Vote Mandate and, as a result, the Congressional election in 2026 will be unconstitutional.

### Count I

1. The Plaintiff incorporates and re-states the allegations contained in paragraphs 1 through 39 as if fully set forth herein.
2. It is clear that President Obama intended to use illegal immigration to change the face of American society both demographically and politically. Getting illegal immigrants to come to the United States was easy, just open the Southern Border. The difficult part was transporting the illegal immigrants to Red States and Red Districts in Blue States. That would take an enlarged Washington Bureaucracy and millions of dollars, resources Congress was unlikely to provide, especially to increase illegal immigration.
3. To provide the funds necessary rather than raise tax revenues and appropriate funds, President Obama using his constitutional expertise,

violated the limitations on borrowing under Article I, Sec, 8, cl. 2 and borrowed $1.75 Trillion in F.Y. 2010 and another $1.0 Trillion in F.Y. 2011 and added the funds to spending under Article I, Sec. 6, Cl. 1. This was, as President Obama well knew, unconstitutional.

4. Since the borrowed funds had not gone through the appropriation process, President Obama was free to use the funds as he saw fit. He channeled the funds to many agencies but especially to the Departments of Health and Human Services and Homeland Security. These Departments have lead the way in allowing unchecked illegal immigration and, more importantly, to diverting the illegal immigrants to geographic areas which would enhance Democratic Party political power.

5. This constitutional violation must never be repeated. Therefore, the Plaintiff will make a Motion for a Declaratory Judgment that Borrowing under Cl. 2 for Spending under Cl. 1 is unconstitutional.

## Count II

6. The Plaintiff incorporates and re-states the allegations contained in paragraphs 1 through 39 as if fully set forth herein.

7. The Obama team and the Democratic Party used the illegal immigrants, all non-citizens, to create Congressional Districts in violation of the One Man, One Vote Mandate thereby enhancing the political power of Democrats by diminishing the votes of suburban and rural voters thereby corrupting the House of Representatives and now the Electoral College.

8. This corruption of the House of Representatives and the Electoral College must not be allowed to continue therefore the Plaintiff will file a Motion for Declaratory Judgment that if any Congressional District is comprised of 10% illegal- alien, non-citizens then the Congressional District must be re-apportioned.

Wherefore, the Plaintiff demands:

1. A Declaratory Judgment that borrowing under Article I, Sec. 8 cl.2 for Spending under Article II, Sec. 8, cl. 1 in times of Peace is unconstitutional and that all budgets from F.Y. 2010 to the present were and are unconstitutional, and

2. A Declaratory Judgment that the current apportionment of Congressional Districts based upon population without regard for citizen characteristics is a violation of the One Person, One Vote Mandate and therefore Congressional Districts in Texas, New York, Virginia and other States are unconstitutional.

Dated: September 26, 2025

Robert A. Heghmann
P.O. B. 2108
Leander, TX 78646
Bob_Heghmann@Reagan.com

## CERTIFICATION

The Plaintiff hereby certifies that a copy of this pleading was sent by e-mail to the first Lead Counsel to be Notified for each remaining Party on Sept. 26, 2025.

17



**US POSTAGE PAID**
$11.00
Origin: 76513
09/29/25
4806750513-13

**PRIORITY MAIL®**

0 Lb 9.80 Oz

RDC 03

EXPECTED DELIVERY DAY: 10/02/25

C015

FILED
OCT 02
U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEPUTY CLERK

SHIP TO:
RM 105
525 MAGOFFIN AVE
EL PASO TX 79901-2578

USPS TRACKING® #

9505 5163 1683 5272 3364 20

FROM:
R. A. Heighmann
6736 Athens St.
Belton, TX
76513

TO:
U.S. District Clerk's Ofc
525 Mogoffin Ave.
Suite 105
El Paso, TX
79901