United States District Court

for the

Western District of Texas

at El Paso



———————————————————————

L.U.L.A.C., et al.,

        Plaintiffs,

v.

Gregg Abbott, in his official capacity as

Governor of the State of Texas, et al.,

        Defendants

Case No. 3:21-CV-00259

DCG, JES, JVB (Lead Case)

———————————————————————

Robert A. Heghmann,

        Intervening Plaintiff,

v.

Alexander Green,

        Plaintiff Intervenor

And

State of Texas, et al.,

        Defendants.

———————————————————————

## MEMORANDUM OF LAW IN SUPPORT OF THE INTERVENING PLAINTIFF'S MOTION TO INTERVENE AND FOR LEAVE TO FILE COMPLAINT

# TABLE OF CONTENTS

Pages

Table of Authorities:                                                     i

Statement of the Case                                                     1

Constitutional Issue Presented                                           4

Standard of Review                                                       4

The Impact of Open Borders on the Right to Vote in Texas                7

The Plaintiff has Suffered and Will Suffer an Injury in Fact             6

This Court has Jurisdiction Over Plaintiff's Claims                      5

This is the Court of Last Resort                                        6

Argument:

Apportionment using both Number of Inhabitants and

Foreign Born Non-Citizen Percentages                                   16

The One-Person, One Vote Mandate Should be Interstate                  14

Plaintiffs use of Alternative Census Data to Support his case          22

The Founding Fathers and Rotten Boroughs                               11

The Horsey Litigation                                                  18

Conclusion                                                             25

## TABLE OF AUTHORITIES

**Cases:**                                                      Page

*African American Voting Rights Legal Defense Fund v.*
*Villa*, 54 F.3d 1345, 1352 – 53 (8th Cir. 1995)                 19


*Anderson v. Celebrezze*, 460 U.S. 780 (1983)                   15

-i-

*Baker v. Carr,* 369 U.S. 186 (1962)                             5


*Burns v. Richardson*, 384 U.S. 73 (1966)                       17


*Chen v. City of Houston*, 206 F.3d 502 (5th Cir. 2000)         21


*Bush v. Gore*, 531 U.S. 98, 103 (2000)                          7


*Department of Commerce v. Montana*, 503 U.S. 442 (1992)        15


*Dunn v. Blumstein*, 405 U.S. 330 (1972)                        16


*Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990)  21


*Hernndez v. Mesa*, 137 S. CT. 2003, 2005 (2017)                 5

*Wade H. Horsey v. Secretary of State*, #3:99-cv-2250 (D. Conn. 1999)    *in passim*

*Johnson v. DeGrandy*, 512 U.S. 997 (1994)                      19

*Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992)              5

*Reynolds v. Sims,* 377 U.S. 533 (1964)                         *in passim*

*Wade H. Horsey v. Secretary of State*, #3:99-cv-2250 (1999)    *in passim*

*Wesberry v. Sanders*, 376 U.S. 1 (1964)                        *in passim*

*Wisconsin v. City of New York,* 517 U.S. 1 (1996)                                    15

*Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)                                       15

**Statutes:**

52 U.S.C. § 20501(b)(1)-(2) (2018)                                                   7

52 U.S.C, § 20501(b)(3)-(4) (2028)                                                   7

S. Ct. Rule 17.2                                                                     5

U. S. Constitution Article I, Sec. 8, cl. 1                                          1

U. S. Constitution Article I, Sec. 8, cl. 2                                          1

**Authorities:**

John Binder, Soros-Funded Group Seeks to "Turn Texas Blue' With

Mass Immigration, Breitbart News, June 30, 2024                                      1

Breitbart.com, Feds to Bus, Fly Surge of

Biden's Migrants to U.S. Homes, February 25, 2021                                    3

Federalist No. 57 (Cooke ed. 1961)                                                  18

Jens Manuel Krogstad and Ana Gonzalez-Barrera,

 Number of Latino children caught trying to enter

U.S. nearly doubles in less than a year, June 24, 2014                              1,2

Jens Manuel Krogstadt and Ana Gonzalez-Barrera,

Texas tops list of states where this year's unaccompanied

child migrants ended up, December 11, 2014                                           2

Migration Policy Institute                                                           7

Michael D. Shear, Obama Approves Plan to Let

Children in Central America Apply for

Refugee Status, September 30, 2014                                                   2

The Records of the Federalist Convention of 1787,

Rev. 1966 (Farrand, Ed.)                                    11,12

## Statement of the Case

Barack Obama knew before he was elected President that he was going to use immigration, both legal and illegal, to corrupt the House of Representatives and eventually the Electoral College. See John Binder, <u>Soros-Funded Group Seeks to</u> <u>"Turn Texas Blue' With Mass Immigration,</u> Breitbart News, June 30, 2024 explaining the Democrat's plan to use Mass Immigration to turn Congressional Districts from Republican to Democrat. In his Budgets for F.Y 2010 and 2011, he borrowed $ 2.75 Trillion unconstitutionally under Article I, Sec. 8, cl. 2. He and later President Biden used these unconstitutional borrowing to fund a huge bureaucracy under Article I, Sec. 8, cl. 1 which would allow illegal immigrants to cross the Southern Border and then to be re-settled strategically to make the Democratic Party totally dominant in the United States by turning Red States or Red Districts into Blue States or Districts. By June 2014, the Bureaucracies were ready for business.

In June, 2014 seemingly out of nowhere, 20,000 refugee children appeared at the Southern Border after crossing from Latin America through Mexico. The number of Latino children caught trying to enter the U.S. nearly doubled in 2014 compared to the year earlier. See Jens Manuel Krogstad and Ana Gonzalez-Barrera, <u>Number of Latino children caught trying to enter U.S. nearly doubles in less than a year,</u> June 16, 2014. As the article notes:

> Between Oct. 1, 2013, and May 31 of this year, 47,017 unaccompanied children under 18 traveling without a parent or guardian were taken into custody, according to <u>U.S. Customs and Border Protection</u>. That total is nearly twice as high as all of the last fiscal year (24,493 apprehensions), with four

1

months yet to go in the current fiscal year. One <u>unofficial government estimate</u> projects apprehensions rising to 90,000 in 2014—nearly four times as many as the year before.

...

Obama administration officials have said the increase in unaccompanied youth at the border could be due to violence and poor economies in children's home countries, such as in Honduras and El Salvador, and the <u>spread of rumors</u> that children who arrive at the border without parents won't be deported. Meanwhile, <u>Republicans blame a 2012 policy</u> that has resulted in two-year work permits and deportation relief being given to more than 600,000 unauthorized immigrants who came to the U.S. as children. With the first round of permit renewals coming up, Republicans blame that policy for stoking rumors that the U.S. won't deport children.

Claiming he was concerned about the children crossing Mexico, Obama issued an executive Order granting children from El Salvador, Guatemala and Nicaragua Refugee Status. This was the birth of illegal caravans. See Michael D. Shear, <u>Obama Approves Plan to Let Children in Central America Apply for Refugee Status</u>, September 30, 2014.

The Obama administration and later the Biden Administration has refused to disclose where the children are being re-settled claiming they are protecting the children's privacy. Fortunately, Pew Research produced a Report, Jens Manuel Krogstadt and Ana Gonzalez-Barrera, <u>Texas tops list of states where this year's unaccompanied child migrants ended up, December 11, 2014</u> which details where the 53,518 children who arrived between June, 2014 and January, 2015 were resettled. This report shows how efficient the Obama bureaucracies became in re-settling these

illegal immigrants in Red States in an effort to turn them Blue. The number one state receiving immigrant children was Texas which received 7,409. Texas was followed by Florida which received 5,445, Virginia which received 3,887, North Carolina which received 2,064, Georgia which received 2,047, Louisiana which receiver 1,755 and Tennessee which received 1,294. And this was just in 2014. Texas has now seen ten (10) years of incredibly increased illegal immigration.

Nor has this invasion diminished. President Biden continued to flood the Nation with illegal immigrants crossing the Southern Border. Money is no object as the article Feds to Bus, Fly Surge of Biden's Migrants to U.S. Homes, February 25, 2021, Breitbart.com demonstrates.

"This isn't about a backlog," said Rosemary Jenks, policy director at Number USA. She continued:

This is about Biden's policies creating a border surge ... They're getting exactly what we all knew they were going to get which is more people coming across, including more unaccompanied children. So now they're trying to figure out what to do with them because you know AOC [Rep. Alexandria Ocasio-Cortez, (D-NY)] and others are so unhappy with their "kids in containers" policy that they've got to fly them away from the border so nobody notices them.

"The administration wants open borders — they want anyone from around the world to come here as fast as they possibly can," she said. But the resulting rush of migrants is forcing officials to hide the unpopular migration as it arrives at the border.

...

On February 23, the *Washington Times reported*

U.S. Immigration and Customs Enforcement is scrambling to find bigger airplanes and figure out more ground transport capacity for soaring numbers of illegal immigrants, and is even talking with a company that runs

"Man Camps" for oil workers in Texas to see whether it will rent bed space for the incoming wave of illegal immigrants.

New Homeland Security Secretary Alexandro Mayorkas told ICE that cost is no issue, and to cancel contracts and sign new ones without worry about the price tag, according to the email from ICE Chief of Staff Timothy Perry. Mr. Mayorkas said he is also pondering diverting money from the border wall "to backfill budgets later," the email said.

…

"ICE should increase the cadence of its transport and arrange for individuals to complete their processing and ATD'ing at processing centers north of the border," he wrote. ATD, or Alternatives to Detention, means those migrants will be released into communities with conditions like regular check-ins with officers.

First President Obama and later President Biden used illegal immigration to create the modern equivalent of "rotten boroughs" or more properly Rotten Congressional Districts. And just as Rotten Boroughs corrupted the British Parliament and caused the American Revolution, the Rotten Congressional Districts are corrupting the U.S. House of Representatives.

### *Constitutional Issue Presented*

Does apportionment of both state and congressional election districts based solely upon total population without regard for the percentage of citizens result in the effective impairment of suburban and rural votes cast in both statewide and congressional elections as those votes are debased and diluted thereby rendering the system of apportionment based solely upon total population without regard to citizen characteristics unconstitutional under the one person, one vote mandate?

### *Standard of Review*

This Court considers two primary factors when it decides to grant a Plaintiff leave to file a bill of complaint against a State: (1) the nature of the interest of the complaining Plaintiff, and (2) the availability of an alternative forum in which the

4

issue tendered can be resolved. *Mississippi v. Louisiana*, 506 U.S. 73, 77 (1992) (internal quotations omitted) As is evidenced by the prior failed efforts of the Plaintiff to restore the voting rights of suburban and rural voters in federal courts in Virginia and Texas, there may be no alternative forum in which the issues raised by the Plaintiff may be resolved.

### This Court has Jurisdiction Over Plaintiff's Claims

The case directly on point is *Baker v. Carr*, 366 U.S. 186 (1962). In *Baker* the Plaintiffs, voters in an urban election district, alleged that, by means of a 1901 statute of Tennessee, the state arbitrarily and capriciously apportioned the seats in the General Assembly among the State's 95 counties, *and a failure to reapportion them subsequently notwithstanding substantial growth and redistribution of the State's population,* they suffer a "debasement of their votes," and were thereby denied the equal protection of the laws guaranteed them by the Fourteenth Amendment". (Emphasis added) *Ibid*. In this case the Plaintiff takes no position as to whether or not the Congressional Voting Districts were constitutional when originally established. What the Plaintiff does claim is that by a failure to reapportion them subsequently notwithstanding substantial growth and distribution of the State's foreign-born, non-citizen population, he will suffer a "debasement of his vote" in the 2024 Congressional Elections and will thereby be denied the equal protection of the laws guaranteed them by the Fourteenth Amendment".

In *Baker* the Court concluded, [t]hat the complaint's allegations of a denial of equal protection presented a justiciable constitutional cause of action upon which

appellants are entitled to a trial and a decision. The right asserted is within the reach of judicial protection under the Fourteenth Amendment." *Ibid*. There is no question that the Plaintiff has standing and this Court has jurisdiction over this claim.

*This is the Court of Last Resort*

As is set forth in the Complaint, since 2020, the Plaintiff has filed three Federal Court actions seeking to restore his right to vote. In each action he cited *Baker v. Carr*, supra., and demanded a Three-Judge Panel. In each case the District Court Judge to whom the case was assigned refused repeated requests to advise the Chief Judge of the Circuit that a Three-Judge Panel was required. As a result, the judgements in the three actions were void and unappealable. If this Court does not move expeditiously, the right to vote of the plaintiff and millions of other suburban and rural voters will be essentially denied.

*The Plaintiff has Suffered and Will Suffer an Injury in Fact*

The Plaintiff, Robert A. Heghmann, is qualified and registered to vote in the 31st Congressional District in the State of Texas. Prior to January, 2021, the Plaintiff resided the State of Virginia and did in fact vote in elections held in 2018 and 2020 in Virginia for President and the Congress of the United States. The Plaintiff alleges that due to apportionment of Congressional Districts based solely upon total population without regard to the citizen characteristics of the population, his vote was debased and diluted in 2018 and 2020 in Virginia, in Texas in 2022 and 2024 and will be debased and diluted in Texas in 2026.

6

Lawful elections are at the heart of our freedoms. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 10 (1964) Trust in the integrity of that process is the glue that binds our citizenry and the States in this Union.

Elections face the competing goals of maximizing and counting *lawful* votes but minimizing and excluding *unlawful* ones. *Reynolds v. Sims*, 377 U.S. 533, 554-55 (1964); *Bush v. Gore*, 531 U.S. 98, 103 (2000) ("the votes eligible for inclusion in the certification are the votes meeting the properly established legal requirements"); *compare* 52 U.S.C. § 20501(b)(1)-(2) (2018) *with id.* § 20501(b)(3)-(4) (2018). Moreover, "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. *supra.*, at 555. Reviewing election results requires not only counting lawful votes but also eliminating unlawful ones.

### The Impact of Open Borders on the Right to Vote in Texas

The impact of the Obama-Biden Open Borders Policy upon Texas and the right to vote of its citizens is undeniable. According to the Migration Policy Institute, in 2019 there were 4,951,156 foreign born inhabitants in the State of Texas. These foreign-born inhabitants comprised 17.1 of the total Texas population. Of the foreign-born inhabitants, 1,959,253 or 39.6% were naturalized citizens. The remaining 2,991, 903 or 60.4% were non-citizens.

7

According to the U.S. Census Community Survey and County Business Patterns, the population of Texas' 36 Congressional Districts in November 2020 was as follows

| C.D. | TOTAL POPULATION | FOREIGN-BORN | % |
| --- | --- | --- | --- |
| 1 | 726,094 | 52,573 | 7.2 |
| 2 | 787,271 | 169,338 | 21.5 |
| 3 | 913,161 | 208,789 | 22.9 |
| 4 | 782,743 | 56,434 | 7.2 |
| 5 | 759,749 | 117,902 | 15.5 |
| 6 | 818,442 | 109,381 | 13.4 |
| 7 | 762,826 | 233,754 | 30.6 |
| 8 | 895,861 | 117,971 | 13.1 |
| 9 | 769,335 | 266,437 | 29.4 |
| 10 | 925,348 | 164,740 | 17.9 |
| 11 | 790,264 | 78,985 | 10.0 |
| 12 | 844,563 | 95,415 | 11.3 |
| 13 | 714,733 | 66,240 | 9.2 |
| 14 | 760,430 | 84,095 | 11.1 |
| 15 | 804,562 | 172,894 | 21.5 |
| 16 | 747,648 | 159,732 | 21.4 |
| 17 | 786,023 | 89,869 | 11.4 |
| 18 | 827,015 | 193,429 | 23.4 |
| 19 | 729,664 | 60,896 | 8.3 |
| 20 | 832518 | 123,973 | 14.9 |
| 21 | 829,628 | 86,984 | 10.8 |
| 22 | 960,957 | 238,556 | 25.0 |

| 23 | 786,712 | 118,421 | 15.0 |
| 24 | 832,445 | 222,115 | 27.9 |
| 25 | 818,807 | 67,397 | 8.2 |
| 26 | 920,865 | 128,038 | 14.0 |
| 27 | 745,526 | 66,702 | 8.9 |
| 28 | 772,410 | 151,994 | 20.0 |
| 29 | 783,915 | 238,076 | 30.4 |
| 30 | 792,445 | 149,566 | 26.1 |
| 31 | 916,064 | 106,560 | 11.6 |
| 32 | 778,087 | 169,271 | 21.8 |
| 33 | 751,182 | 238,837 | 31.8 |
| 34 | 712,596 | 132,812 | 18.6 |
| 35 | 857,654 | 130,039 | 15.2 |
| 36 | 758,238 | 82,991 | 10.9 |

So, what happened in Texas in the 2020 Congressional elections?

| FOREIGN BORN % | C.D. | WINNING PARTY |
| --- | --- | --- |
| 31.8 | 33 | **DEMOCRAT** |
| 30.6 | 7 | **DEMOCRAT** |
| 30.4 | 29 | **DEMOCRAT** |
| 29.4 | 9 | **DEMOCRAT** |
| 27.9 | 24 | REPUBLICAN |
| 26.1 | 30 | **DEMOCRAT** |
| 25.0 | 22 | REPUBLICAN |
| 23.4 | 18 | **DEMOCRAT** |
| 22.9 | 3 | REPUBLICAN |
| 21.8 | 32 | **DEMOCRAT** |
| 21.5 | 2 | REPUBLICAN |

9

| | | |
|---|---|---|
| 21.5 | 15 | **DEMOCRAT** |
| 21.4 | 16 | **DEMOCRAT** |
| 20.0 | 28 | **DEMOCRAT** |
| 18.6 | 34 | **DEMOCRAT** |
| 17.9 | 10 | REPUBLICAN |
| 15.5 | 5 | REPUBLICAN |
| 15.2 | 35 | **DEMOCRAT** |
| 15.0 | 23 | REPUBLICAN |
| 14.9 | 20 | **DEMOCRAT** |
| 14.0 | 26 | REPUBLICAN |
| 13.4 | 6 | REPUBLICAN |
| 13.1 | 8 | REPUBLICAN |
| 11.6 | 31 | REPUBLICAN |
| 11.4 | 17 | REPUBLICAN |
| 11.3 | 12 | REPUBLICAN |
| 11.1 | 14 | REPUBLICAN |
| 10.9 | 36 | REPUBLICAN |
| 10.8 | 21 | REPUBLICAN |
| 10.0 | 11 | REPUBLICAN |
| 9.2 | 13 | REPUBLICAN |
| 8.9 | 27 | REPUBLICAN |
| 8.3 | 19 | REPUBLICAN |
| 8.2 | 25 | REPUBLICAN |
| 7.2 | …4 | REPUBLICAN |
| 7.2 | 1 | REPUBLICAN |

Of the Texas Congressional Districts which had 14% or more foreign-born inhabitants, 63% elected Democrats while 37% voted for Republicans. More

10

significantly, in Congressional Districts which had less than 14.9% foreign born inhabitants, not a single Congressional District elected a Democrat.

The Plaintiff, now a Texas resident and registered voter in the 31ST Congressional District (11.6% foreign born), will have his vote in Congressional Elections in Texas debased and diluted because of Open Borders and the fact that Texas does not apportion inhabitants in accordance with the One Person, One Vote Mandate. Compare the 31stCongressional District with the following Congressional Districts: 33rd (31.8%), 7th (30.6%), 29th (30.4%), 9th (29.4%), 24th (27.9%), 30th (21.6%), 22nd (25.0%), 18th (23.4) and 3rd (22.9%).

Since redistricting for the 2022 Congressional Elections, the Plaintiff continues to reside in the 31st Congressional District. This means that in a number of other Districts with a large majority of Hispanic inhabitants, fewer voters in those districts will elect more Congresspersons than voters in districts such as District 31. This continues to be a clear violation of the One Person, One Vote Mandate.

### THE FOUNDING FATHERS AND ROTTON BOROUGHS

When the Founding Fathers gathered in Convention in 1787, they clearly expressed their admiration for the English *system* of government but also their perception that this system had been corrupted by the control of Parliament exerted through control of Rotten Boroughs. As James Madison wrote in his Notes, "Much has been said of the Constitution of G. Britain. I will confess that I believe it to be the best constitution in existence." The Records of the Federalist Convention of 1787, Rev.

1966 (Farrand, Ed.) Vol. 1 at 398. (hereinafter "Farrand") Hamilton spoke glowingly of how much the British owed to "the excellence of their Constitution". In fact, he was so enamored with that Constitution that in the plan that he put forward at the Convention he provided that the Executive and the second house of the legislature (the Senate) would have a term of office for life. This mirrored the life tenure of the King and members of the House of Lords. 1 Farrand at 288 – 289; 299-300. But as much as they admired the British Constitution, the delegates to the Convention knew that the British government was fatally flawed. As Mr. Gorham stated, "The corruption of the English government cannot be applied to America. *This evil exists there in the venality of their boroughs*." (Emphasis added) 1 Farrand at 381. "The delegates were quite aware of what Madison called the "vicious representation" in Great Britain whereby "Rotten Boroughs" with few inhabitants were represented in Parliament on or almost on a par with cities of greater population." *Wesberry v. Sanders, supra*, 376 U.S. at 14. Men like Madison, Wilson and Randolph wanted a National Legislature but without the abuses of the Rotten Boroughs.

To avoid the evils of the Rotten Boroughs, the Founding Fathers framed a republican system on such a scale as to insurer that such Rotten Boroughs or Districts could not be created. What was that scale? At the time of the Convention, the population of the United States was estimated at approximately 3,000,000 inhabitants. 1 Farrand at 572-573, 3 Farrand at CLXXI. Originally, Madison suggested one representative for at least every 30,000 people or approximately one for every 1% of the population. Since virtually every freeman in that 30,000 would

have the right to vote in elections, the Founding Fathers felt assured that they had

protected the new Nation from the *venalities* of the English system. They did not

provide in the Constitution for actual districts but believed that the states would

arrange the districts themselves. Madison in The Federalist Papers described the

system of division of States into Congressional Districts, the method which he and

others assumed States would adopt: "The city of Philadelphia is supposed to contain

between fifty and sixty thousand souls. It will therefore form nearly two districts for

the choice of Federal Representatives." "[N]umbers," he said, not only are a suitable

way to represent wealth but in any event "are the only proper *scale* of representation."

(Emphasis added) *Wesberry v. Sanders*, *supra*, 376 U.S. at 15. (Citing Federalist No.

57 (Cooke ed. 1961) at 389 and Federalist No. 54 at 368)

In *Wesberry*, Mr. Justice Brennan emphasized that the sad experience of the

English electoral system was well known to the Framers of the Constitution. He noted

that in the Convention, they repeatedly referred to the English system and the

"Rotten Boroughs".

> It would defeat the principle solemnly embodied in the Great
> Compromise - equal representation in the House for equal numbers of people -
> for us to hold that, *within the States*, legislatures may draw the lines of
> congressional districts in such a way as to give some voters a greater voice in
> choosing a Congressmen than others. The House of Representatives, the
> Convention agreed, was to represent the people as individuals, and on a basis
> of complete equality for each voter. The delegates were quite aware of what
> Madison called the "vicious representation" in Great Britain whereby "rotten
> boroughs" with few inhabitants were represented in Parliament on or almost
> on a par with cities of greater population. Wilson urged that people must be
> represented as individuals, so that America would escape the evils of the
> English system under which one man could send two members to Parliament

13

to represent the borough of Old Sarum while London's million people sent but four. The delegates referred to rotten borough apportionments in some of the state legislatures as the kind of objectionable governmental action that the Constitution should not tolerate in the election of congressional representatives. (Emphasis added) *Wesberry v. Sanders*, *supra*, 376 U.S. at 14 – 15.

The equivalence of population and citizen voters in the minds of the Framers can be seen from later comments by James Wilson. Soon after the Constitution was adopted, Wilson, by then an Associate Justice of the Supreme Court, gave a series of lectures at Philadelphia in which, drawing on his experience as one of the most active members of the Constitutional Convention, said:

> "[A]ll elections ought to be equal. Elections are equal, when a given number of *citizens*, in one part of the state, choose as many representatives, as are chosen by the *same number of citizens*, in any other part of the state. In this manner, the proportion of the representatives and of the constituents will remain invariably the same." (Emphasis added) *Wesberry v. Sanders*, *supra*, 376 U.S. at 17

## ONE -PERSON, ONE VOTE SHOULD BE INTERSTATE

Is One Man, One Vote intrastate or interstate? If One Man, One Vote is intrastate then under the *Horsey* decision discussed below, since the Texas Congressional District with the lowest percentage of foreign-born was the 4th C.D. with 7.2%, then any Congressional District with a foreign-born percentage over 17.1% would have to be Reapportioned. If One Man, One Vote is interstate then since the 24th C.D. in New York has only .04% foreign born inhabitants then every Congressional District in Texas over 10.3% would have to be Reapportioned.

14

The fact that the Plaintiff, a resident and qualified voter in Texas, is claiming that his vote for a representative in Congress was debased and diluted in comparison to votes cast in Texas congressional districts and *in congressional districts in other states* is not a bar to this Court's exercise of jurisdiction. In two separate cases, lower courts have held that the rationale of *Wesberry* is applicable to interstate as well as intrastate congressional apportionment. Upon review the Supreme Court did not rule that the rationale of *Wesberry* is not applicable to interstate congressional apportionment claims. *Wisconsin v. City of New York,* 517 U.S. 1 (1996*); Department of Commerce v. Montana*, 503 U.S. 442 (1992).

With voting, "'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Bush v. Gore*, *supra.*, 531 U.S. at 105 (quoting *Reynolds*, 377 U.S. at 555). In presidential elections, "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Anderson v. Celebrezze*, 460 U.S. 780, 795 (1983). Thus, votes in other States affect the votes by Plaintiff in Virginia or Texas.

The citizens of Texas and Virginia have the right to demand that all other States abide by the constitutionally set rules in apportionment. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry*, *v. Sims, supra.*, 376 U.S. at 10; *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) ("the political franchise

15

of voting" is "a fundamental political right, because preservative of all rights"). "Every voter in a federal ... election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted." *Anderson v. United States*, *supra*., 417 U.S. at 227; *Baker v Carr, supra.,* 369 U.S. at 208. Put differently, "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction," *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972), and—unlike the residency durations required in *Dunn*—the "jurisdiction" here is the entire United States.

## APPORTIONMENT USING BOTH NUMBER OF INHABITANTS AND FOREIGN BORN, NON-CITIZEN PERCENTAGES

*Horsey* was not be the first time the argument over the use of citizen characteristics as opposed to total population *alone* had been presented to a federal court. In *Burns v. Richardson*, 384 U.S. 73, 94 - 95 (1966), a case involving apportionment of voting districts in Hawaii, the Court found that Hawaii's special population problems, including large concentrations of military and other transients centered on Oahu, distorted the democratic process. As a result of these special population problems, 73% of the registered persons on Oahu could elect 79% of the representatives. The Court then suggests that in some cases, state citizen population rather than total population is the appropriate comparative guide for apportionment

In the debate at the Convention of 1787, many of the smaller states feared that if they submitted their fate to a national legislature that would have more delegates from the larger states, they would lose their liberty. Under the Articles of Confederation, each state was equal and had a veto power over all the other states.

16

On that basis, the smaller states could defend themselves against the more populous larger states. On June 29, 1787, Alexander Hamilton, a Delegate from New York, rose to allay these fears by pointing out that the first branch of the legislature represented people, not states, and that *each voter in each state would have an equal vote:*

> (Mr. Madison wrote) Mr. Hamilton observed that individuals forming political Societies modify their rights differently, with regard to suffrage. Examples of it are found in all the States. In all of them some individuals are deprived of the right altogether, not having the requisite qualification of property. In some of the states the right of suffrage is allowed in some cases and refused in others. To vote for a member in one branch, a certain quantum of property, to vote for a member in another branch of the Legislature, a higher quantum of property is required. In like manner States may modify their right of suffrage differently, the larger exercising a larger, the smaller a smaller share of it. But as States are a collection of individual men which ought we to respect most, the rights of the people composing them, or of the artificial beings resulting from the composition. Nothing could be more preposterous or absurd than to sacrifice the former to the latter. It has been sd. that if the smaller States renounce their *equality*, they renounce at the same time their *liberty*. The truth is it is a contest for power, not for liberty. Will men composing the small States be less free than those composing the larger? The state of Delaware having 40,000 souls will *lose power*, if she has 1/10 only the votes allowed to Pa. having 400,000: but will the people of Del: *be less free*, if each citizen has an equal vote with each citizen of Pa. (emphasis in original) 1 Farrand at 465-466.

It was understood by the Founding Fathers that in the House of Representatives because seats would be allocated based upon population, the *States* would lose power. But the people would not lose their *liberty* because each voter *would have an equal vote with every other voter* regardless of state of residence. This argument was carried forward in the Federalist Papers. In arguing to the people for adoption of the Constitution, the Framers anticipated the creation of congressional

districts in which between 5000 and 6,000 would elect each Member of Congress. See, *Federalist Papers No. 57.* Knowing the different suffrage requirements of each state mitigated against exact equality, nevertheless the Framers, and the people, had every reason to expect that the votes would fall within a given range. In the Federalist Papers that range was plus or minus 10% of a mean of 5500 votes. This was the argument presented at the Convention and later to the people themselves that caused the smaller states to adopt the Constitution.

To argue now that *Wesberry* is not interstate would deprive this Court of fulfilling the promise of the Founding Fathers to the People who ratified the Constitution. That cannot be permitted. Even if the Plaintiff herein cleans up the Rotten Boroughs in Virginia or Texas, the Democrats can use Rotten Boroughs it has created in other states to impose laws and regulations through the Congress opposed by a majority of the People, including the Plaintiff, but which the Democrats by virtue of their control of the Rotten Boroughs can, despite their minority status, impose their will on the majority. This is why the Plaintiff must be granted standing to challenge apportionment in other states like New York and now Virginia.

## THE *HORSEY* LITIGATION

Wade Horsey alleged that the creation of election districts at both the state and congressional level based solely upon total population without regard for citizenship has muted the voice of suburban and rural citizen voters. Representatives in both Congress and many state houses *do not* bear *a proportion of the votes their*

*constituents would have if convened* because of the disparity in the percentage of citizens in urban as opposed to suburban and rural voting districts.

Mr. Justice Soutar in *Johnson v. DeGrandy*, 512 U.S. 997 (1994) alluded to this situation. In *DeGrandy*, California had created majority Hispanic voting districts in the hope of electing Hispanic legislators. Despite this, the Hispanic candidates still lost. A legal challenge was filed claiming voter dilution under Sec. 2 of the Voting Rights Act. As Mr. Justice Souter writing for the Court noted, "The State protests that fully half of the Hispanic voting age residents of the region are not citizens." *Id.* at 1008 The Court in considering demographic evidence in determining dilution of Hispanic votes sanctioned the use of voting age population as opposed to total population for apportionment purposes when dealing with Hispanic districts. *Id.*, 512 U.S. at 1000; *African American Voting Rights Legal Defense Fund v. Villa*, 54 F.3d 1345, 1352 – 53 (8th Cir. 1995)

Mr. Justice Souter did not stop there, "The parties' ostensibly factual disagreement (over the effects of demographics on voter dilution) raises an issue of law about which characteristics of minority population (e.g. age, citizenship) ought to be the touchstone for proving a dilution claim and devising a remedy. These cases may be resolved, however, without reaching this issue." Id., 512 U.S. at 1008.

The *Horsey* case was the case to which Mr. Justice Souter referred. The Plaintiff claimed that the use of total population diluted his vote primarily due to the citizen characteristics of the foreign-born population.  Citizenship is the touchstone of the case. The Plaintiff herein saw this political gambit developing in 1999 and to

prevent it represented Wade Horsey in a suit challenging apportionment without regard for citizenship characteristics. On November 18, 1999 a complaint was filed in the United States District Court in Connecticut, *Wade H. Horsey v. Secretary of State*, #3:99-cv-2250 (D. Conn. 1999) and assigned to District Court Judge Underhill. As required a Three Judge Panel was convened and Second Circuit Court of Appeals Judge Ralph K. Winter and District Court Judge Hall joined the Panel.

The issue placed before the Court was as follows:

> Does apportionment of both state and congressional election districts based solely upon total population without regard for the percentage of citizens result in the effective impairment of suburban and rural votes cast in both statewide and congressional elections as those votes are debased and diluted thereby rendering the system of apportionment based solely upon total population without regard to citizen characteristics unconstitutional under the One Person, One Vote Mandate?

The Secretary of State moved to Dismiss for failure to state a cause of action. On June 1, 2001, the Three Judge panel denied the State's Motion to Dismiss and later noted, "Because Horsey offers information regarding the percentages of citizens and non-citizens in different states and certain congressional districts, there may be some evidentiary support for his claim that including non-citizens for apportionment purposes substantially dilutes his vote." (Citation to Record deleted) Horsey Slip Opinion at 11. A copy of that opinion is attached as Exhibit 1.

In the wake of the 2000 Census, the Census Bureau published detailed reports district by congressional district stating with 90% accuracy the number of non-

citizens in each district thereby permitting the Plaintiff to factually demonstrate the potential constitutional violation. At the time of the 2000 Census, the Census Bureau announced that after the 2010 Census it would report state legislative district by state legislative district the number of non-citizens in each district but that information was not currently available. Therefore, the Plaintiff abandoned the claim with regard to state apportionment.

The Court then considered the Plaintiff's Offer of Proof and found, "The data reveal that the percentage of non-citizens in Connecticut's congressional districts varies from between 2.2 percent and 9.7 percent. However, this is within a generally accepted range of deviation from equality. See *Chen v. City of Houston*, 206 F.3d 502, 522 (5th Cir. 2000) (less than 10% deviation is constitutionally tolerated for state elections); *Garza v. County of Los Angeles*, 918 F.2d 763, 785 – 86 (9th Cir. 1990) (Kozinski, J., concurring in part, dissenting in part).

Thus, the rule in the District of Connecticut is that (1) if a plaintiff offers information regarding the percentages of citizens and non-citizens in different congressional districts, there is evidentiary support for his claim that including non-citizens for apportionment purposes substantially dilutes his vote and (2) that a 10% deviation is the red line in determining the generally accepted range of deviation from equality.

The Democratic Party in Washington was well aware of the *Horsey* litigation. Gregory D'Oria, the Assistant Attorney General defending the case, advised this Plaintiff that when the Panel denied the State's Motion to Dismiss, his telephone

(remember this was 2002) exploded. Every Democratic leader in Washington wanted updates on the litigation. As a result of the legal success of the *Horsey* litigation even though there was no remedy, when Barack Obama became President, he ordered the Census Bureau to discontinue documenting the number of foreign-born non-citizens in congressional election districts and to abandon plans to document the number of foreign born, non-citizens in state legislative election districts. The Census Bureau continues to adhere to that order.

The Order of President Obama to the Census Bureau effectively made it almost impossible for a voter to impose the One Person, One Vote Mandate on the creation of Congressional Districts in urban areas thereby permitting the Democrats to debase and dilute the votes of suburban and rural voters throughout the United States. While the media describes the "crisis" on the Southern Border, this is business as usual for the Democratic Party.

**PLAINTIFF'S USE OF ALTERNATIVE CENSUS DATA TO SUPPORT HIS CASE**

While the Obama Order to the Census makes it very difficult to support a claim of debasement and dilution of suburban and rural voter's votes, it did not render it impossible. The Census bureau continues to compile community data on citizen versus foreign-born populations in the various states. This is what that data shows in Virginia and New York.

In New York City Immigrants make up 38% of the population. New York City contains 11 Congressional Voting Districts. Once again, the Census Bureau has not

broken out the statistics on citizen versus non-citizen population in each congressional district but it has broken out the non-citizen statistics in each county. Three of the eleven congressional districts are contained in one county.

The sixth congressional district is contained entirely within the County of Queens. Out of a population of 2,278,722, the foreign-born population of Queens is 1,111,780. If these foreign-born, 482,104, or 21.2% of the total population, are non-citizens.

The ninth congressional district is entirely contained in Brooklyn. Of the 2,504,700 residents, 971,504 are foreign-born. Of these, 399,573, or 16% of the total population, are non-citizens.

The 15th congressional district is contained entirely in the Bronx. Of the 1,432,132 residents, 513,499 are foreign-born. Of the foreign-born, 264,531, or 18.5% of the total population, are non-citizens.

Compare these urban congressional districts with three suburban and rural New York congressional districts. The 21st congressional district has 701,112 residents of whom 26,295, or .03% of the total population, are foreign born. The 22nd congressional district has 697,372 residents of whom 42,674, or .06% are foreign-born. The 23rd Congressional District has 693,764 residents of whom 27,591, or .04% of the total population, are foreign-born.

Even if all the foreign-born population in the 21st, 22nd and 23rd Congressional districts foreign born are non-citizens (which is not likely), the districts do not fall within the permissible 10% difference required by *Horsey*.

If One Person, One Vote is interstate, then the votes cast by the Plaintiff in Virginia and Texas in 2020 and 2022 were debased and diluted in comparison to urban Congressional District votes in Virginia and New York. Further, Plaintiff's vote in Texas will be debased and diluted.

## CONCLUSION

In order to restore One Man, One Vote Mandate, this Court must find that the Mandate is interstate and that the failure to apply the *Horsey* Rule of 10% deviation between the Congressional Districts with the largest percentage of foreign-born, non-citizens and the Congressional Districts with the smallest percentage requires re-apportionment of inhabitants in the Congressional Districts with 10% or more foreign-born, non-citizens regardless of state.

Dated: September 26, 2025

Robert A. Heghmann
P.O. Box 2108
Leander, Texas 78646-2108
Bob_Heghmann@Reagan.com

## CERTIFICATION

The Plaintiff hereby certifies that a copy of this pleading was sent by e-mail
to the first Lead Counsel to be Notified for each remaining Party on Sept. 26, 2025.



UNITED STATES
POSTAL SERVICE

pected delivery date specif
ost domestic shipments incl
PS Tracking® included for c
nited international insuranc
hen used internationally, a c

ance does not cover certain items
stic Mail Manual at http://pe.usps.
International Mail Manual at http:

LAT RATE EN
E RATE ■ ANY WEIGHT

RACKED ■ INS



PS00001000014

**P**  US POSTAGE PAID
**$11.00**  Origin: 76513
09/29/25
4806750513-13

PRIORITY MAIL®

0 Lb 9.80 Oz

RDC 03

EXPECTED DELIVERY DAY: 10/02/25

C015

SHIP
TO:
RM 105
525 MAGOFFIN AVE
EL PASO TX 79901-2578

USPS TRACKING® #

9505 5163 1683 5272 3364 20

FROM:

R. A. Heghmann
6736 Athens St.
Belton, TX
76513



FILED
OCT 02
U.S. DISTRICT COURT
DISTRICT OF TEXAS
DEPUTY CLERK

TO:

U.S. District Clerk's Ofc
525 Magoffin Ave.
Suite 105
El Paso, TX
79901

