**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | Civil Action |
| Plaintiffs, | |
| v. | Lead Case No.: |
| GREG ABBOTT, et al., | 3:21-CV-00259-DCG-JES-JVB |
| Defendants. | |
| CECILIA GONZALES, et al., | |
| Plaintiffs, | Consolidated Case No.: |
| v. | 1:21-CV-00965-DCG-JES-JVB |
| JANE NELSON, et al., | |
| Defendants. | |

**GONZALES PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF THEIR**
**PRELIMINARY INJUNCTION MOTION[1]**

---

[1] Because the parties received certified transcripts of the October preliminary injunction hearing just hours before filing this Post-Hearing Brief, all transcript citations refer to the rough transcripts produced during the hearing. If helpful to the Court, the Gonzales Plaintiffs would be happy to provide a revised Post-Hearing Brief with updated citations to the certified transcripts.

Plaintiffs in No. 1:21-CV-00965 (the "Gonzales Plaintiffs"), provide this post-hearing brief in support of their preliminary injunction motion, ECF No. 1149. The evidence offered at the hearing confirms that the Gonzales Plaintiffs are entitled to the relief they seek: an order preliminarily enjoining the use of the congressional districts enacted by HB 4 for the 2026 elections, and requiring those elections to be conducted under the districts enacted in 2021 instead.

The evidence at the hearing showed clearly that racial considerations infected Texas's adoption of new congressional districts from inception through enactment. While President Trump may have pushed for new districts for partisan reasons, the Governor sold them to the public for racial reasons: "[C]oalition districts are no longer required," he insisted. "And so we want to make sure that we have maps that don't impose coalition districts." Brooks Ex. 325. Supportive legislators repeatedly emphasized and praised the 2025 Map's creation of single-race majority districts to replace the prior map's multi-racial coalition districts. And whatever data Adam Kincaid considered in drawing the districts, many of his choices of which districts to target and how to draw them cannot be explained by his partisan goals but were tailored to achieve the desired racial results. The Gonzales Plaintiffs are therefore likely to succeed in showing that the 2025 Map is unconstitutional, and the Court should preliminarily enjoin its use for the 2026 elections.

## I.    The Gonzales Plaintiffs are likely to succeed on the merits of their claims.

The Gonzales Plaintiffs are likely to succeed because they showed that HB 4 was enacted to intentionally dilute the votes of minority voters by destroying multi-racial majority-minority districts, that its districts are racially gerrymandered to produce single-race majority districts, and that the enactment of HB 4 impermissibly considered race and advanced partisan interests as part of a voluntary mid-decade redistricting. Second Suppl. Compl. ("SSC") Counts I, II, V (Aug. 28, 2025), ECF No. 1147. The Gonzales Plaintiffs have standing to bring these claims as registered

voters in the districts they challenge. *See* Gonzales Exs. 48–60; Mem. Op. & Order Granting in Part & Denying in Part Defs.' Mots. to Dismiss at 23 (May 23, 2022), ECF No. 307.[2]

### A.    HB 4 intentionally dilutes minority votes.

#### 1.    Discriminatory Intent

HB 4 intentionally dilutes minority votes by expressly targeting districts in the prior map for destruction because of their racial composition. As Governor Abbott explained from the beginning, this was the whole purpose of the exercise: to "make sure that we have maps that don't impose coalition districts" in light of the Fifth Circuit's decision in *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024). Brooks Ex. 325. This overt expression of racial motivation was no slip of the tongue. Governor Abbott eschewed any suggestion that he is "letting President Trump call the shots," touting instead the need for districts that "fit the structure of this recent court decision." *Id.* When asked about the prospect of picking up five Republican seats in the midterms, he insisted "what we're focused on is not what may happen in the midterms." *Id.* And three weeks later, when CNN's Jake Tapper pressed Governor Abbott to admit that he was really doing this to get five more Republican seats, Governor Abbott pointed to *Petteway* instead. Brooks Ex. 335.

That is race discrimination, plain and simple. "[I]ntentionally d[rawing] district lines in order to destroy otherwise effective [coalition] districts" raises "serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality op.). The defining feature of a coalition district is its racial makeup, *Petteway*, 111 F.4th at 611,

---

[2] HB 4 is also unconstitutional because its districts are grossly and unjustifiably malapportioned. *See* SSC Count IV; *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 759 (2012). On September 30, 2025, the Court granted Defendants' partial motion to dismiss Count IV for failure to state a claim. ECF No. 1226. The Gonzales Plaintiffs continue to seek preliminary relief as to this claim. ECF No. 1149 at 20–22. If that relief is denied based on the dismissal order, the Gonzales Plaintiffs respectfully request that the Court enter judgment under Rule 54(b) as to Count IV when it issues its preliminary injunction order to ensure that each of the Gonzales Plaintiffs' claims may be reviewed at once in any appeal from the Court's order. *See* ECF No. 1265.

so destroying a coalition district because it is a coalition district *means* destroying a district because racial and ethnic minorities are able to use that district to elect their candidates of choice. Defendants have not even attempted to defend the intentional destruction of a coalition district as constitutional. *See generally* ECF No. 1199.

The Governor's statements therefore constitute direct evidence of race discrimination: "a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 8 (2024). And because the Governor's proclamation of a special session was an essential step in the enactment of H.B. 4, *see* Tex. Const. art. III, § 40, his decision to proclaim one for the express purpose of "mak[ing] sure that we have maps that don't impose coalition districts," Brooks Ex. 325, is a but-for cause of H.B. 4's enactment. *Hunter v. Underwood*, 471 U.S. 222, 232 (1985). No more is required for the Gonzales Plaintiffs to prevail on this claim.

Defendants argue that what the Governor and the legislature *really* cared about was partisan performance and President Trump's demand for more Republican seats, not the destruction of coalition districts. ECF No. 1199 at 1. But the Governor chose not to testify, and his lawyers invoked legislative privilege to prevent Plaintiffs from probing his true motivations. *See* ECF No. 1260. And in public, televised interviews, the Governor repeatedly said otherwise—that "what we're focused on is not what may happen in the midterms," Brooks Ex. 325, and that he had called the special session because of *Petteway*, not because President Trump demanded five more Republican seats, Brooks Ex. 335. Legislators said similar things. In an interview with National Public Radio, Representative Tom Oliverson, the Chairman of the Republican caucus, denied that Texas was redistricting "because of the president's request," stating: "No, we are not." Tr. Oct. 1 PM 68:19–23; *see also* Brooks Ex. 327 at 0:53–0:1:25. In a television interview on October 2,

Representative Steve Toth responded to a question regarding the purpose of this redistricting by stating that it was "required" in "response to *Petteway*, to get compliant." Tr. Oct. 7 PM 10:20–11:3; *see also* Brooks Ex. 339 at 1:49–2:14. And in a press release hailing HB 4's passage, Speaker of the House Dustin Burrows said: "The Texas House today delivered legislation to redistrict certain congressional districts to address concerns raised by the Department of Justice . . . ." Gonzales Ex. 33.

Moreover, the "sequence of events" that gave rise to HB 4 confirms that partisan justifications alone were insufficient to persuade Texas lawmakers to take up redistricting again. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). As Adam Kincaid explained on a podcast recorded the same day HB 4's map was unveiled, convincing Republican officials to do partisan redistricting is no easy task. *See* Brooks Ex. 340 at 8:10 ("If I go into a state and say, I need you to pass this map, or Republicans need you to pass this map, we would get laughed out of the state. It's something the states controlled by Republicans want to handle themselves."). Kincaid testified that he and White House officials spoke with Governor Abbott about congressional redistricting at least three times in June. Tr. Oct. 7 PM 26:20–27:11, 29:7–9, 30:12–17, 30:18–31:2. The New York Times reported on June 9 that the President's push for Texas to redraw its congressional districts was met with reluctance on the part of Texas Republicans, who worried that the plan could "backfire." Defs.' Ex. 1415. For weeks afterwards, the effort gained no momentum. When Senator Huffman was asked about the New York Times article the next day, she testified unequivocally that the Texas Legislature was "not" considering redrawing Texas's congressional districts. Rough Trial Tr. Day 15 AM 53:25–54:7. Governor Abbott put out no public statement in support of the effort after the June 9 article, and when he put out an initial special session agenda on June 23, he left redistricting off it. Gonzales Ex. 35.

It quickly became clear that for mid-decade redistricting to happen in Texas, Governor Abbott and the legislature needed some form of what Defendants themselves call "political cover." ECF No. 1199 at 4, 13, 14. So Kincaid strategized with White House officials and the Department of Justice. At some point between June 9—the date of the New York Times report—and June 23—the date of Governor Abbott's initial special session agenda—Kincaid was shown a draft of what would become known as the "Dhillon Letter" or "DOJ Letter" during a meeting in the West Wing of the White House. Tr. Oct. 8 AM 116:20–117:5. He discussed the draft letter with at least two DOJ officials, Tr. Oct 7 PM 52:12–24, and then directly with Governor Abbott and White House officials sometime in "late June." *Id.* at 31:7–32:10. He suggested CDs 9, 18, 29, and 33—the districts that were ultimately listed in the letter—as ones that he had not personally drawn in the 2021 Map. *Id.* at 56:10–19.

Harmeet Dhillon, the Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice, sent that letter on July 7. Gonzales Ex. 41. The letter, addressed to Governor Abbott and Attorney General Paxton, asserted based on *Petteway* that "Congressional Districts TX-09, TX-18, TX-29, and TX-33 [] constitute[d] unconstitutional 'coalition districts'" and "urge[d] the State of Texas to rectify these race-based considerations from these specific districts." *Id.* All agree that the Dhillon Letter's analysis is legally and factually wrong. *E.g.*, ECF No. 1199 at 4, 12; ECF No. 1200 at 7. But the letter had its intended effect. After weeks without action, Governor Abbott issued a special session proclamation just two days after he received the letter, specifically calling on the Texas Legislature to "provide[] a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice." Gonzales Ex. 43.

Once the special session started, legislators were quick to repeat the Governor's race-based justifications. At a public hearing in the Senate on July 21, Senator Alvarado asked Senator King whether he "knew what sparked the governor" to put redistricting in the call for a special session, in response to which Senator King pointed to the "constitutional concerns raised by the U.S. Department of Justice," which he "kn[ew]" the legislature would "be discussing" in the coming days. Tr. Day 1 AM at 24:13–25; *see also* Brooks Ex. 300 at 24:2–19.

At a public hearing on July 26, Representative Cody Vasut, the Chairman of the House Select Committee on Redistricting, repeatedly pointed to the Governor's proclamation as the reason why the Committee had been convened. Never, in those early public hearings, did he even mention partisanship, let alone invoke partisanship motivations for redistricting. *See generally* Tr. Day 8 PM at 88:21–95:5; *see also* Defs.' Ex. 1281 at 23:3–30:15.

At HB 4's sole public hearing during the first special session on August 1, 2025, HB 4's sponsor Chairman Hunter emphasized that federal law did not "require[] the drawing of coalition districts," which he defined as "when two different minority or language groups are combined." Gonzales Ex. 45 at 00:48:12–48:52. When asked to explain the methodology for how the map was constructed, Chairman Hunter explained that mapdrawers were instructed to "use" "the *Petteway* case" in deciding where and how to redraw districts. *Id.* at 14:21:24–56; *see also id.* at 00:49:34– 00:50:00 (Chairman Hunter citing political performance in addition to "clarification from the Fifth Circuit on coalition districts" as the bases for having "redrawn the congressional map"). When asked whether "one of the reasons that we're doing this" was "because of the *Petteway* case and the ruling in the *Petteway* case as it related—as it relates to these coalition districts," Hunter responded that "the combination" of both *Petteway* and *Rucho v. Common Cause*, 588 U.S. 684 (2019), were "involved in this matter." Tr. Oct. 1 PM at 86:21–23; *see also* Brooks Ex. 316T at

76:18–77:13. When Chairman Hunter was asked whether CD 9 was "purposefully changed to be slightly above 50 percent Hispanic CVAP instead of being a coalition district now," Hunter responded: "Again, because of *Petteway*, I'm hesitant to just use the words coalition district, since we just talked about how we used *Petteway* . . . ." Tr. Oct. 1 PM 52:25–53:5.

It makes no difference if—as the reference to *Rucho* perhaps suggests—the *ultimate* objectives of the Governor and the legislature were partisan in nature. "[R]acial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (en banc) (plurality op.) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)); *see also LULAC v. Abbott*, 601 F. Supp. 3d 147, 161 (W.D. Tex. 2022) (intentional vote dilution under the Fourteenth Amendment requires evidence that "race was *part* of Defendants' redistricting calculus" (emphasis in original)). And "[i]ntentions to achieve partisan gain and to racially discriminate are not mutually exclusive." *Veasey*, 830 F.3d at 241 n.30; *see also LULAC v. Perry*, 548 U.S. at 440 (concluding Texas's map "bears the mark of intentional discrimination . . . [e]ven if we accept the District Court's finding that the State's action was taken primarily for political, not racial, reasons"). Where lawmakers "use race" to "advance[] their partisan interests—perhaps thinking that a proposed district is more 'sellable' as a race-based VRA compliance measure than as a political gerrymander and will accomplish much the same thing—their action still triggers strict scrutiny." *Cooper v. Harris*, 581 U.S. 285, 308 n.7 (2017); *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 222–23 (4th Cir. 2016) ("[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose. This is so even absent any evidence of race-based hatred and despite the obvious political dynamics."). Here, the centrality of the targeting of coalition districts in the public justification for

the map shows that HB 4 was enacted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), and thus functioned as "a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 38 (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

Finally, for purposes of Plaintiffs' intentional vote dilution claim, it is the Governor's and the legislature's intent that matters—not the intent of Adam Kincaid. The question is whether the enacting "Legislature's intent was legitimate." *Abbott v. Perez*, 585 U.S. 579, 608 (2018). In addressing that question in *Perez*, the Supreme Court focused on the executive branch's advice to the legislature on what to do, the legislative sponsor's statements of his own objectives, and the legislature's own decision to adopt the plans in question. *Id.* All of those factors here point to the centrality of eliminating coalition districts to the legislative purpose. The Governor convened the legislature to eliminate coalition districts, Kincaid produced a map that systematically eliminated coalition districts, the legislature approved the elimination of coalition districts, and together the legislature and the Governor enacted the plan. No more is required. As Senator King explained on the Senate floor, Kincaid's testimony would not "provide any relevant information to the committee's decision of do we like that map" because "all that matters is what is in the four corners of that document." Tr. Oct. 9 AM 121:9–16; *see also* Brooks. Ex. 308T 25:25–26:6. It therefore does not matter for purposes of this claim exactly what racial data Kincaid considered when—only why the Governor and the legislature did what they did.

## 2. Discriminatory Effect

Of course, for the Dhillon Letter to provide the "political cover" that Governor Abbott sought, the resulting map had to do what the Letter demanded: destroy majority-minority coalition districts. The evidence demonstrates that HB 4 accomplished just that. It systematically eliminated

most of the prior map's multi-racial-majority districts and replaced them with ones in which members of a single race—whether Anglo, Black, or Latino—comprise a bare majority of eligible voters. Each of the eight most-altered districts in HB 4 was a majority-minority district in the 2021 Map—including one, CD 27, that reliably voted for Republicans. Gonzales Exs. 18, 19, 32. In contrast, HB 4 kept intact more than half of the district populations for each of the majority-Anglo districts from the 2021 Map, while simultaneously drawing two additional majority-Anglo districts. Gonzales Exs. 17–19. HB 4 therefore did almost exactly what the Dhillon Letter demanded.

HB 4 demolished all three Harris County districts listed in the Dhillon Letter, moving 97 percent of CD 9's population into different districts, along with 74 percent of CD 18's population and more than 60 percent of CD 29's population. Tr. Oct. 3 AM 30:18–25; Gonzales Ex. 18. In doing so, HB 4 consolidated the cores of two plurality Black coalition districts from the prior map that were listed in the Dhillon Letter, CD 9 and CD 18, into a single majority-Black CVAP district, CD 18. Tr. Oct. 8 AM 93:24–25 (Kincaid) ("[T]he core of Texas 9 is now in Texas 18."). It turned CD 9 into a bare majority-Latino CVAP district (50.3 percent) in which Latino voters will be unable to elect their candidates of choice. Tr. Oct. 3 AM 30:18–25; Gonzales Exs. 17, 39. And, tellingly, it revised CD 22—a firmly Republican district under the prior map that had become majority-minority due to post-census growth in minority populations—to restore it as a majority-Anglo eligible-voter district. Tr. Oct. 3 AM 36:6–25; 37:1–17; *see also* Gonzales Exs. 17, 19, 28, 31, 32.

This was unnecessary to achieve what Defendants say were the legislature's partisan goals. Out of all of the Houston-area Democratic districts, Kincaid prioritized consolidating the cores of CDs 9 and 18 into new, majority-Black CD 18; only *after* he did that did he consider whether he

could *also* eliminate other Democratic districts too. Tr. Oct. 8 AM at 136:17–137:6; *see also id.* at 136:5–10 ("It wasn't an either/or. It was a both sort of thing."). The net effect was to reduce by one the number of districts in which minority voters in Harris County have a reasonable opportunity to elect their candidates of choice. Tr. Oct. 3 AM 38:19–20.

In Dallas-Fort Worth, HB 4 dismantled CD 33—one of the districts listed in the Dhillon Letter—along with another coalition district, CD 32, moving more than 67 percent of CD 33's population and more than 58 percent of CD 32's population out of the prior districts. Gonzales Ex. 39 at 3; Gonzales Ex. 18; *see also* Tr. Oct. 3 AM 38:21–22 (regarding CD 32); *id.* at 38:21–22. In doing so, HB 4 consolidated minority voters in Dallas County into a new CD 33, while cracking the minority voters in Tarrant County who used to be in CD 33 across multiple majority-Anglo districts. Gonzales Ex. 29 at 34; Gonzales Exs. 17, 18, 19. Meanwhile, HB 4 also packed additional Black voters into CD 30 to change it from a plurality-Black to a majority-Black eligible voter district, Tr. Oct. 3 AM 20:13–14, even though CD 30 was already a district in which Black voters were electing their candidates of choice. Gonzales Ex. 39 at 3; Gonzales Exs. 17, 19. The net result, as in Harris County, is one fewer district in which Black and Latino voters have an opportunity to elect their candidates of choice—and one more majority-Anglo district in which Anglo voters will be able to elect theirs. Gonzales Ex. 39 at 4–5.

HB 4 also harms minority representation elsewhere in the state, while leaving Anglo representation notably intact. In Central Texas, HB 4 moves more than 90 percent of the population out of CD 35, a plurality-Latino district that is currently represented by Latino Democrat Greg Casar, but makes far fewer changes to CD 37, the only majority-Anglo Democratic district in the existing plan. Gonzales Exs. 17–18, 32. HB 4 then creates a new, predominantly rural CD 35 with a 51.6 percent Latino CVAP, in which Latino voters are unlikely to elect their candidates of choice.

Gonzales Ex. 17; Gonzales Ex. 39 at 4. Along the Gulf Coast, HB 4 moves more than 60 percent of the population out of CD 27, which was previously a majority-minority Republican district, so that it is now a majority-Anglo Republican district. Gonzales Exs. 17, 18, 19, 31, 32. And in the Rio Grande Valley, HB 4 substantially reduces the opportunity for Latino voters in CD 34 to elect their candidates of choice. Tr. Oct. 3 AM 38:22; Gonzales Ex. 39 at 3–4.

HB 4 therefore does almost exactly what Governor Abbott expressly convened a special session of the legislature to do—it systematically eliminates multi-racial coalition districts across the state and replaces them with single-race majority districts, even where doing so was unnecessary to or at cross-purposes with the legislature's avowed partisan objectives.

### B. HB 4 includes unconstitutionally racially gerrymandered districts.

HB 4 also contains at least six districts that were racially gerrymandered to "separate[] [Texas] citizens into different voting districts on the basis of race," *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller*, 515 U.S. at 911), and thereby maximize the number of districts in which a single racial group—rather than a multi-racial coalition—forms a majority of eligible voters. By doing so, HB 4 allowed Governor Abbott and Texas legislators to say they were eliminating coalition districts and preserving minority voting opportunity, even while HB 4 in fact did the opposite. This unnecessary pursuit of single-race majority districts is a classic form of racial gerrymandering. *See Cooper*, 581 U.S. at 313 (finding racial gerrymandering based in part on "the redistricters' on-the-nose attainment of a 50% BVAP"); *Perez*, 585 U.S. at 620–21 (finding racial gerrymandering where the Texas legislature "moved Latinos into [a] district to bring the Latino population back above 50%" without a basis in the VRA).

The racially gerrymandered districts fall into three categories. First are the majority-Black districts, CD 18 and CD 30. There were no majority-Black CVAP districts in the 2021 Map. But there were three districts in which Black eligible voters made up a plurality of CVAP: CD 9 (45.9

11

percent) and CD 18 (39.3 percent) in Houston, and CD 30 (47.0 percent) in Dallas–Fort Worth. Gonzales Ex. 39, tbl. 5. Each of those districts consistently performed for Black voters. *Id.*, tbl. 10. In both congressional elections conducted under the 2021 Map, the Black-preferred candidates won CD 9, CD 18 and CD 30 handily. Tr. Oct. 3 AM 23: 3–24; Gonzales Ex. 39, tbl. 9. Yet HB 4 consolidated the cores of CD 9 and CD 18 into a single, majority-Black CVAP CD 18 (51.6 percent), and added just enough Black voters to CD 30 to make it majority-Black CVAP as well (51.3 percent). Gonzales Ex. 39, tbl. 6. The Voting Rights Act did not require this, and Defendants do not argue otherwise. After all, the prior districts were already Black opportunity districts, so "experience gave the State no reason to think that the VRA required it to ramp up [the districts'] BVAP." *Cooper*, 581 U.S. at 302–03.

Defendants argue instead that the increase in Black CVAP is a coincidence. But it would be quite a coincidence. There were only three Black-plurality districts in the state, and HB 4 eliminated one of them and substantially revised the other two—in two completely different metropolitan areas—so that each was just over 50 percent Black CVAP. And while Adam Kincaid testified that he did not have race data turned on while drawing the new districts, he nevertheless described map-drawing choices in creating CD 18 and CD 30 that were practically guaranteed to produce Black-majority districts *without* serving any partisan purpose. In Harris County, Kincaid testified that he intentionally combined the cores of old CD 9 and old CD 18—which he knew were Black opportunity districts—in new CD 18, knowing full well that new CD 18 would encompass "a heavily African American area." Tr. Oct. 8 AM 96:6–14. He did so even though there are three adjacent districts in Harris County—CD 18, CD 29, and CD 7—that are all strong Democratic districts, and that could have been combined in other ways. Gonzales Ex. 32 (2024 election results under the 2021 Map).

In Dallas–Fort Worth, Kincaid testified that he sought to draw the strongest Democratic district possible in roughly the footprint of the prior CD 30—even though there are stronger Democratic (but less Black) precincts to the northeast, and even though he was simply dividing precincts between heavily Democratic CDs 30 and 33. Kincaid testified that when drawing CD 30 and CD 33, he first created a "super district" by "just lumping a bunch of Democrat areas together." Tr. Oct. 7 AM 103:20–24. He then divided that "super district" into two, choosing to put "the most heavily Democrat contiguous precincts" in CD 30, *id.* at 109:2–5, and "using the footprint of 30 as it currently existed." Tr. Oct. 7 PM 69:5–6. This formula was guaranteed to make that district majority-Black since, as Mr. Kincaid is well aware, Black voters are the most reliably Democratic voters in Dallas County. Tr. Oct. 8 AM 89: 17–20 ("I will concede that there is a high correlation between African Americans and Democrat votes, yes."); *id.* at 58:20–22 (acknowledging that a heavily Black area "also overlaps a heavily Democrat area"). But there was no partisan reason for this approach because, as Kincaid admitted, he was simply sorting voters within his Democratic "super district" to create two strong Democratic districts—CD30 and CD33. *Id.* at 109:15–21. These choices mirror the choices made by the map-drawer in *Cooper*, who was explicitly seeking to draw majority-Black districts. *Cooper*, 581 U.S. at 300 (explaining that the map-drawer had "moved the district's borders to encompass the heavily black parts of Durham (and only those parts)").

The second set of racially gerrymandered districts are majority Latino CD 9 and CD 35. CD 9, in Harris County, is drawn as an entirely new 50.5 percent Latino CVAP district, while CD 35, in Central Texas, is redrawn from a 46 percent Latino CVAP district to a 51.6 percent Latino CVAP district. Gonzales Exs. 17, 19. In each case, the prior districts were already electing Latino voters' candidates of choice, and the new districts will not. Gonzales Ex. 39 at 2–3. This result

cannot be explained by the correlation between race and partisanship because Latino voters in CD 9 and CD 35 favor Democrats, *id.*, tbl. 8, so creating a majority-Latino district is at cross purposes with creating a Republican district—as Mr. Kincaid also admitted. Tr. Oct. 8 AM 129:12–19. And when the legislature altered new CD 9 midway through the legislative process to improve its partisan performance for Republicans, it was careful to keep the proposed district a bare majority-Latino CVAP district in both proposals. *See* Gonzales Exs. 17, 31, 36, 38. Neither Kincaid nor Defendants had any adequate explanation for how this happened.

The last set of racially gerrymandered districts are CD 22 and CD 27. HB 4 converted these districts from majority-minority Republican districts to majority-Anglo Republican districts. Tr. Oct. 3 AM 37:10–17. In the 2021 Map CD 22, though plurality Anglo, was majority non-Anglo. *Id.* at 36:6–15; Gonzales Ex. 39, tbl. 5. CD 27 was a Latino plurality majority-minority district, with 48.8 percent Latino CVAP and only 43.9 percent Anglo CVAP. Tr. Oct. 3 AM 36:16–20; Gonzales Ex. 39, tbl. 5. In both districts, Republican candidates consistently won both congressional and statewide elections. Tr. Oct. 3 AM 36:19–22. And both existing districts hit Kincaid's asserted 60 percent target for support for President Trump in the 2024 general election. Gonzales Ex. 31; Tr. Oct. 7 AM 60:19–24. Under the 2025 Map, however, both CD 22 and CD 27 are nevertheless redrawn to be majority-Anglo, with 50.8 percent and 52.8 percent Anglo CVAP, respectively. Gonzales Ex. 17.

The record also confirms these racial features of HB 4 were a central part of the reasons that Governor Abbott supported the new districts and that the legislature enacted them. In defending HB 4, Governor Abbott and the Texas Legislature repeatedly touted HB 4's creation of single-race majority districts. Governor Abbott boasted on CNN of HB 4's creation of four "more seats for Hispanics" that would elect "Hispanic Republicans." Brooks Ex. 335. He similarly touted

the creation of a majority-Black "Barbara Jordan district"—CD 18. Tr. Oct 1 AM 72:20–23; Brooks Ex. 332. In an August 4 interview with CBS news, Representative Katrina Pierson, who served on both the standing Committee and Select Committee that considered the bill and who "consistently weighed in during the hearings," Tr. Oct. 1 PM 68:1–7, defended HB 4 by saying that: "Texas has maps that has increased minority representation," *id.* at 67:4–5; *see also* Brooks Ex. 330 at 40:45–53:47.

The racial features of HB 4 were also repeatedly touted by the bill's supporters during the legislative process. When Chairman Hunter was expressly asked whether it was a "coincidence" that these districts hit bare majority-minority thresholds, he candidly responded that "Nothing's a coincidence." Tr. Oct. 1 PM 46:19; *see also* Brooks Ex. 309 at 106:15–107:4. In introducing the bill, Chairman Hunter emphasized that it was "important to note that four of the five new districts" were "majority-minority Hispanic CVAP districts, citizen age population." Tr. Oct. 1 PM 44:12–14; *see also* Brooks Ex. 309 at 54:19–22. When asked point blank: "[W]ith CD-9, just to close the loop on that, it was also purposely changed so that the Hispanic CVAP would be over 50 percent?" Chairman Hunter responded: "50.41 percent. Correct." Tr. Oct 1 PM at 58:21–59:10; *see also* Brooks. Ex. 309. When asked to confirm that "CD 18 was purposely altered to a Black CVAP majority district rather than a 38.8 Percent Black CVAP district, right?" Chairman Hunter responded: "CD-18 was drawn to be a 50.81 percent CVAP, which is 11.82 change, plus." Tr. Oct 1 PM 51:24–52:3; *see also* Brooks Ex. 309. When asked whether CD-35 was "purposely changed to increase its Hispanic CVAP to be about 50 percent," Chairman Hunter responded**,** "51.57 percent. And it also has political performance on all of this." Tr. Oct. 1 PM 52:8–13.

The legislative record is rife with similar statements from Republican legislators:

- **Chairman Hunter:** "In the 2021 plan, there were nine – that's nine -- Hispanic majority voting age districts. In this plan there are ten Hispanic majority voting age

districts. In the 2021 plan there were seven Hispanic citizen voting age districts. And under this plan there are eight," Tr. Oct.1 PM 48:8–12.

- **Chairman Hunter**: "It is important to note, please note, members, four of the five new districts are majority-minority Hispanic, what we call CVAP districts," Tr. Oct. 1 PM 78:21–23, "Republicans will now have an opportunity to potentially win these districts," *id.* at 79:2–3.

- **Chairman Hunter:** "In 2021 there were nine Hispanic majority age districts. In this plan there are ten Hispanic majority age districts. In the 2021 plan there were seven Hispanic citizen voting age districts and under this plan there are eight. There are no Black CVAP districts under the 2021 plan. In the proposed plan there are two majority Black CVAP districts. CD-18, 50.71 percent Black CVAP, compared to 38.99 percent in 2021. CD-30, 50.41 percent Black CVAP, 46 percent in 2021." Tr. Oct. 1 PM at 79:16–23.

- **Representative Pierson:** "[T]his current map that you have submitted actually show where there's not just one, but two majority Black CVAP districts drawn on this map. Is that true**?"** **Chairman Hunter:** "That is correct. And let me give everybody details. CD18 was now 50.8 Percent Black CVAP. In 2021 it was only 38.8 Percent. CD30 is now 50.2 percent Black CVAP. In 2021 it was 46 percent." Tr. Oct. 7 PM 92:5–13.

- **Representative Spiller:** "[W]e went under the current map from zero majority Black CVAP districts in the State of Texas and now under your map we added two to that list. There are two majority Black CVAP districts, correct? **Chairman Hunter:** "Correct. 18 and – is one of the ones we talked about, and 30." Tr. Oct 1 PM at 89:18-25.

- **Representative Wilson:** "[T]o just be brass tacks, . . . we went from seven to eight Hispanic and from zero to two Black. Is that accurate?" **Chairman Hunter:** "[Y]es. So 2021 plan majority Hispanic, nine[.] [U]nder this plan, ten." Tr. Oct 1 PM at 50:10-25.

Democratic Speaker Pro Tempore Joe Moody put his finger on this choregraphed display when he explained that these colloquies between Republican representatives and Chairman Hunter were "all very well scripted" because they were "trying to reiterate the point" that they were purportedly increasing the number of majority-minority districts. Tr. Oct 1 PM 51:10–17.

The Court need not determine *why* Texas lawmakers saw fit to emphasize both the number of newly-created majority-minority districts and the minority percentages of those districts. Whether for "political cover," in an effort to dispel allegations of racial discrimination, or in a

16

genuine attempt to create "more seats for Hispanics" that would elect "Hispanic Republicans," Brooks Ex. 335, this sorting of voters along racial lines is unconstitutional.

This record leaves no doubt that, however HB 4's proliferation of bare-majority single-race districts came to be drawn, the Texas Legislature purposefully enacted such districts predominantly because of their racial characteristics. Just like the legislators in *Cooper*, Texas legislators "were not coy in expressing" their support for HB 4's racial characteristics. 581 U.S. at 299. It makes no difference whether there was "an 'actual conflict' between" the lines drawn to achieve those racial characteristics and "'traditional districting principles.'" *Id.* at 301 n.3. All that matters is that "race furnished 'the overriding reason for choosing one map over others,'" and the Governor's and supportive legislators' repeated invocations of race make clear that it did. *Id.* (quoting *Bethune-Hill*, 580 U.S. at 190). And while Defendants *now* emphasize partisanship to the exclusion of race, "[t]he racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 580 U.S. at 190.

Finally, the Gonzales Plaintiffs were not required, under the circumstances of this case, to provide an "*Alexander* map" showing that the legislature's partisan goals could have been accomplished in a less race-discriminatory manner. 602 U.S. at 10. That requirement applies only to a "circumstantial-evidence-only case"—a case without "a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Id.* at 8. This is not such a case because of the Governor's repeated statements that the purpose of redistricting was to eliminate coalition districts—a task that required the map to be drawn with single-race majority districts instead—and legislators' repeated touting of the racial features of the 2025 districts as a reason for their enactment. In *Alexander*, in contrast, there was no direct evidence of racial intent

with respect to the challenged district. *See id.* at 19–24. This case is instead like *Cooper*, where the direct evidence of racial intent meant that no alternative map was needed. 581 U.S. at 318–22.

Here, moreover—unlike in *Alexander*—race and partisanship were *not* "very closely correlated" with respect to the map-drawing choices that produced the challenged districts. 602 U.S. at 21. The claim in *Alexander* was that the legislature, in seeking to draw a more-Republican district, had engaged in racial gerrymandering to remove Black voters from the district. 602 U.S. at 14–15. But as the Supreme Court explained, that was entirely explainable by partisanship— Black voters in the area were overwhelmingly Democrats, while White voters were overwhelmingly Republicans. *Id.* at 20. But here, with respect to CD 9 and CD 35, the legislature's racial and partisan goals are *negatively* correlated—they drew a *Republican* district that included a majority of Latino voters, even though most Latino voters in the area are *Democrats*. Gonzales Ex. 39, tbls. 8, 12. The desire to produce a Republican district cannot explain that racial result. As for CD 18 and CD 30, the relevant choices were in allocating voters *between* Democratic districts in an area where all racial groups vote Democratic. Tr. Oct. 7 AM 103:20–24 (describing Democratic "super district"). Neither set of districts, therefore, is like *Alexander*, where making a partisan district would be expected to have "a side effect" of producing the racial features present in the enacted plan. 602 U.S. at 20.

## C.    Texas's use of racial data and pursuit of partisan advantage in a mid-decade redistricting was unconstitutional.

The Gonzales Plaintiffs also demonstrated that the Texas Legislature's use of racial data and claimed pursuit of partisan advantage is unconstitutional because HB 4 was not grounded in legal necessity. *See* SSC Count V; ECF Nos. 1149 at 22–24; 1222 at 15–16. Defendants still have not addressed this claim either in a motion to dismiss or in their opposition to the Gonzales Plaintiffs' preliminary injunction motion. *See* ECF No. 1222 at 15 ("[W]here a party does not brief

an issue" in opposition to a preliminary injunction motion, "it is waived." (quoting *Bosarge v. Edney*, 669 F. Supp. 3d 598, 615 (S.D. Miss. 2023)).

As demonstrated at the preliminary injunction hearing (and further explained above), HB 4 is a targeted, race-based strike on minority representation, *see supra* I.A, and Texas cannot claim that its expressed awareness of race in redrawing districts was inevitable or justifiable because it was under no obligation to redraw districts at all. Nor can Texas seek refuge by asserting purely partisan motivation; while it might prove difficult to determine whether a particular set of districts goes "too far" in promoting partisan aims, *Rucho*, 588 U.S. at 701 (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 296 (2004) (plurality op.)), Texas's voluntary decision to draw new districts poses no such difficulty. "[I]n *this* context," it is entirely "clear what fairness"—and unfairness—"looks like." *Id.* at 706 (emphasis added).

## II.    The Court should enjoin HB 4 and order Texas to proceed under SB 6 for the 2026 elections.

All plaintiff groups agree that reverting to the 2021 Map for the 2026 midterm elections would be an appropriate interim remedy for the constitutional violations proven at the hearing. This is the unusual case where a state legislature acted mid-decade to replace a map that the legislature itself enacted just four years prior, and that has not been invalidated by a court. The 2021 Map thus remains available for use. To be sure, the Gonzales Plaintiffs maintain their challenges to the 2021 Map under Section 2 of the Voting Rights Act. But the 2025 Map takes the legal infirmities in the 2021 Map and compounds them, resulting in a plan that is even worse for Black and Latino voters. Thus, while not a complete remedy, reverting to the 2021 Map would at least partially remedy the injuries inflicted on the Gonzales Plaintiffs by the 2025 Map.

Reverting to the 2021 Map also obviates many of the timing concerns expressed by Defendants. Christina Adkins, the Director of Elections for the Texas Secretary of State's office,

testified that counties are "in the process of redrawing their county election voter registration precincts, which is the change that counties would have to make to comply with the new maps." Tr. Oct. 8 AM 149:21–150:5. But she also acknowledged that Texans across the state will be voting in statewide and local elections on November 4, 2025. Tr. Oct. 8 PM 32:14–33:3. And those elections will be conducted using precinct boundaries that are already drawn to conform to the 2021 Map. *Id.* at 33:4–34:9. There can be no prejudice to election officials or voters in using the same voting precincts in the March 2026 primary that they will already be using in the November 4, 2025 statewide election.

Finally, reverting to the 2021 Map for the 2026 elections is appropriate because unconstitutional racial considerations infected the enactment of HB 4 from top to bottom, making it impossible to remedy the resulting constitutional violations via minor adjustments to the new districts. The record makes clear that Governor Abbott convened the legislature to enact HB 4 only after racial justifications—the desire to eliminate coalition districts—were offered, and that legislators themselves emphasized the racial features of the new districts as an important reason for supporting them. Unlike in *Perez*, there is no "court-approved interim plan" that attempts to address that discrimination and stands ready to be adopted. 585 U.S. at 610. But the 2021 Map was adopted by the legislature, has been used for two election cycles, and provides a ready remedy for the additional harm inflicted by the 2025 Map.

## CONCLUSION

For the foregoing reasons and the reasons given in the Gonzales Plaintiffs' preliminary injunction motion and supporting reply brief, ECF Nos. 1149, 1222, the Court should preliminarily enjoin the use of HB 4's districts and order Texas to continue to use the 2021 Map for the 2026 election.

Dated: October 17, 2025

Renea Hicks
Attorney at Law
Texas Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

Respectfully submitted,

*/s/ David R. Fox*

David R. Fox
Richard A. Medina
James J. Pinchak
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law
jpinchak@elias.law

Abha Khanna
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

Counsel for Gonzales Plaintiffs

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically and served on all counsel of record (via CM/ECF) on October 17, 2025.

*/s/ David R. Fox*