# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | Civil Action |
| Plaintiffs, | |
| v. | Lead Case No.: |
| GREG ABBOTT, et al., | 3:21-CV-00259-DCG-JES-JVB |
| Defendants. | |
| | |
| CECILIA GONZALES, et al., | |
| Plaintiffs, | Consolidated Case No.: |
| v. | 1:21-CV-00965-DCG-JES-JVB |
| JANE NELSON, et al., | |
| Defendants. | |

## GONZALES PLAINTIFFS' PROPOSED FINDINGS OF FACT

Plaintiffs Cecilia Gonzales, Agustin Loredo, Jana Lynne Sanchez, Jerry Shafer, Debbie Lynn Solis, Charles Johnson Jr., Vincent Sanders, Rogelio Nuñez, Marci Madla, Mercedes Salinas, Heidi Cruz, Sylvia Bruni, and Gwendolyn Collins (the "Gonzales Plaintiffs"), by and through their undersigned counsel, submit the following proposed findings of fact in support of their motion for an order preliminarily enjoining the use of the congressional districts enacted by House Bill 4 ("HB 4" or the "2025 Map") for the 2026 elections, and requiring those elections to be conducted under the districts enacted by Senate Bill 6 2021 ("SB 6" or the "2021 Map").[1]

## FINDINGS OF FACT

### I.    Introduction

1.    Texas fulfilled its decennial obligation to redraw its congressional districts in October 2021, when the Texas Legislature passed, and Governor Abbott signed, Senate Bill 6 to reapportion Texas's congressional districts after the 2020 census.

2.    In the years of litigation that followed, Governor Abbott and the legislators who enacted SB 6 consistently defended its districts as having been drawn "blind to race" and in pursuit of raw partisan advantage. *E.g.*, ECF No. 986 at 8.

3.    But on July 7, 2025, just weeks after the close of evidence in a three-week bench trial on challenges to SB 6, Harmeet Dhillon—the Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice—wrote to Governor Abbott and Attorney General Ken Paxton to insist that Texas draw a new map. Gonzales Ex. 41. Dhillon argued that four majority-minority Texas congressional districts—CD 9, CD 18, CD 29, and CD 33—were "unconstitutional

---

[1] Because the parties received certified transcripts of the October preliminary injunction hearing just hours before filing these Proposed Findings of Fact, all transcript citations refer to the rough transcripts produced during the hearing. If helpful to the Court, the Gonzales Plaintiffs would be happy to provide revised Proposed Findings of Fact with updated citations to the certified transcripts.

racial gerrymanders" and "urge[d] the State of Texas to rectify these race-based considerations from these specific districts." *Id.*

4.      On July 9, the Governor called a special session of the legislature to consider, among several other items, "Legislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice." Gonzales Ex. 43.

5.      Chairman Todd Hunter introduced the map that became House Bill 4 soon thereafter. After failing to pass HB 4 in the first special session, Governor Abbott called, and the legislature gaveled in, a second special session. Gonzales Ex. 21. On August 20, the House voted to pass HB 4, and the Senate passed HB 4 in the early hours of August 23. Gonzales Ex. 24. Governor Abbott signed HB 4 on August 29.

6.      Immediately following the passage of HB 4, the Gonzales Plaintiffs filed a supplemental complaint and preliminary injunction motion challenging the map. ECF Nos. 1147, 1149. As relevant to the instant preliminary injunction motions, the Gonzales Plaintiffs allege that the 2025 Map enacted by HB 4 intentionally dilutes the voting power of Black and Latino Texans in several parts of the state in violation of the Fourteenth and Fifteenth Amendments, and that race predominated in the drawing of several districts in violation of the Fourteenth Amendment. *See* ECF No. 1149.

7.      The Court took evidence on the Plaintiffs' challenges in these consolidated cases over the course of a nine-day hearing held from October 1 through October 10, and now makes the following Findings of Fact.

## II.    The Parties

### A.      Plaintiffs

8.      Plaintiff Cecilia Gonzales is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Arlington, in Tarrant County. Under House Bill 4,

she resides in Texas's 25th congressional district ("CD 25"). Ms. Gonzales intends to vote in future congressional elections in CD 25, or in any other district in which she is eligible to vote. *See* Gonzales Ex. 48.

9.      Plaintiff Agustin Loredo is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under House Bill 4, he resides in Texas's 9th congressional district ("CD 9"). Mr. Loredo intends to vote in future congressional elections in CD 9 or in any other district in which he is eligible to vote. *See* Gonzales Ex. 49.

10.      Plaintiff Jana Lynne Sanchez is a Latina citizen of the United States and of the State of Texas, and a registered voter eligible to vote in Fort Worth, in Tarrant County. Under House Bill 4, she is eligible to vote in Texas's 12th congressional district ("CD 12"). Ms. Sanchez intends to vote in future congressional elections in CD 12, or in any other district in which she is eligible to vote. *See* Gonzales Ex. 50.

11.      Plaintiff Jerry Shafer is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under House Bill 4, he resides in CD 9. Mr. Shafer intends to vote in future congressional elections in CD 9 or in any other district in which he is eligible to vote. *See* Gonzales Ex. 51.

12.      Plaintiff Debbie Lynn Solis is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Dallas, in Dallas County. Under House Bill 4, she resides in Texas's 33rd congressional district ("CD 33"). Ms. Solis intends to vote in future congressional elections in CD 33, or in any other district in which she is eligible to vote. *See* Gonzales Ex. 52.

13.    Plaintiff Charles Johnson, Jr. is a Black citizen of the United States and of the State of Texas, a registered voter, and a resident of Cedar Hill, in Dallas County. Under House Bill 4, he resides in Texas's 30th congressional district ("CD 30"). Mr. Johnson intends to vote in future congressional elections in CD 30, or in any other district in which he is eligible to vote. *See* Gonzales Ex. 53.

14.    Plaintiff Vincent Sanders is a Black citizen of the United States and of the State of Texas, a registered voter, and a resident of Houston, in Harris County. Under House Bill 4, he resides in Texas's 18th congressional district ("CD 18"). Mr. Sanders intends to vote in future congressional elections in CD 18, or in any other district in which he is eligible to vote. *See* Gonzales Ex. 54.

15.    Plaintiff Rogelio Nuñez is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of San Benito, in Cameron County. Under House Bill 4, he resides in Texas's 34th congressional district ("CD 34"). Mr. Nuñez intends to vote in future congressional elections in CD 34, or in any other district in which he is eligible to vote. *See* Gonzales Ex. 55.

16.    Plaintiff Marci Madla is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of San Antonio, in Bexar County. Under House Bill 4, she resides in Texas's 35th congressional district ("CD 35"). Ms. Madla intends to vote in future congressional elections in CD 35, or in any other district in which she is eligible to vote. *See* Gonzales Ex. 56.

17.    Plaintiff Mercedes Salinas is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Corpus Christi, in Nueces County. Under House Bill

4, she resides in CD 34. Ms. Salinas intends to vote in future congressional elections in CD 34, or in any other district in which she is eligible to vote. *See* Gonzales Ex. 57.

18.    Plaintiff Heidi Cruz is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Austin, in Travis County. Under House Bill 4, she resides in Texas's 27th Congressional District ("CD 27"). Ms. Cruz intends to vote in future congressional elections in CD 27, or in any other district in which she is eligible to vote. *See* Gonzales Ex. 58.

19.    Plaintiff Sylvia Bruni is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Laredo, in Webb County. Under House Bill 4, she resides in Texas's 28th Congressional District ("CD 28"). Ms. Bruni intends to vote in future congressional elections in CD 28, or in any other district in which she is eligible to vote. *See* Gonzales Ex. 59.

20.    Plaintiff Gwendolyn Collins is a Black citizen of the United States and of the State of Texas, a registered voter, and a resident of Richmond, in Fort Bend County. Under House Bill 4, she resides in Texas's 22nd Congressional District ("CD 22"). Ms. Collins intends to vote in future congressional elections in CD 22, or in any other district in which she is eligible to vote. *See* Gonzales Ex. 60.

## B.    Defendants

21.    Defendant Jane Nelson is sued in her official capacity as the Secretary of State of Texas. As Secretary of State, Ms. Nelson serves as Texas's Chief Election Officer. Tex. Elec. Code § 31.001(a). As "the chief election officer of the state," *id.*, Ms. Nelson is required to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's election laws, including by issuing directives and instructions to all state and local authorities having duties in the administration of these laws, *id.* § 31.003. Ms. Nelson is further empowered to remedy voting rights violations by ordering any official to correct conduct that "impedes the free exercise of a

citizen's voting rights." *Id.* § 31.005(b). Ms. Nelson prescribes the form that individuals must complete for a place on a political party's general primary ballot, *see id.* §§ 141.031, 172.021–.024. Political parties that wish to hold a primary must deliver written notice to the Secretary of State noting their intent to hold a primary election, *id.* § 172.002, and the party chairs must certify to the Secretary of State the name of each candidate who has qualified for placement on the general primary election ballot, *id.* § 172.028. The Secretary of State also serves as the filing authority for independent candidates for federal office, including members of Congress. *See id.* § 142.005. Finally, the adopted redistricting plans are filed with the Secretary of State to ensure that elections are conducted in accordance with those plans. *See* Joint Stipulations of Fact ("Jt. Stips.") ¶ 21, ECF No. 978.

22.     Defendant Gregory Wayne Abbott is sued in his official capacity as the Governor of the State of Texas. Governor Abbott has exclusive authority to call special sessions of the Texas Legislature and set the agenda for those special sessions. *See* Tex. Const. art. III, § 40; *id.* art. IV, § 8(a). Under Texas's election laws, Governor Abbott "shall order . . . each general election for . . . members of the United States Congress" by proclamation. Tex. Elec. Code § 3.003; *see also* Jt. Stips. ¶ 22.

### III. The 2021 Map

23.     In 2021, following the release of data from the 2020 U.S. Census, Texas began the process of redrawing its congressional district lines. The initial proposal—congressional Plan C2101—was introduced by Senator Joan Huffman, the Chairwoman of the Senate Redistricting Committee, as Senate Bill 6 (SB 6).

24.     During legislative debate on SB 6, Senator Huffman admitted that Plan C2101, the base map for SB 6, was drawn not by any Texas legislator or their staff but by the Texas Republican congressional delegation's lawyer. Tr. June 7 PM 26:1–27:2. Senator Huffman said

on the floor that after she received the plan, she made "changes," and those changes were incorporated into Plan C2101 before she introduced it as SB 6. *Id.* Senator Huffman repeatedly insisted in remarks to the Senate that Plan C2101 was drawn "blind to race." *Id.* at 27:3–5; *see also* Tr. Oct. 1 AM 12:9–15:17. It was later revealed that Plan C2101 was drawn by Adam Kincaid, the President of the National Republican Redistricting Trust, in consultation with Chris Gober, an attorney for Texas's Republican congressional delegation. Tr. Oct. 7 PM at 56:10–15. Like Senator Huffman, Kincaid later testified that the map was drawn without the use of any racial data, and that it was drawn to maximize partisan advantage for Republicans. Tr. May 29 PM 38:9.

## IV.    Litigating the 2021 Map

25.    Immediately after SB 6 was signed into law in October 2021, the Gonzales Plaintiffs sued to enjoin it, alleging that it violated Section 2 of the Voting Rights Act. ECF No. 7-5.

26.    The Gonzales Plaintiffs alleged—among other claims—that SB 6 improperly cracked and packed Latino voters in the Dallas–Fort Worth and Houston metropolitan areas, to avoid creating an additional district in each metropolitan area in which a majority of eligible voters are Latino and have the opportunity to elect their representatives of choice. *Id.*

27.    Several other groups of private plaintiffs as well as the United States also sued, alleging violations of Section 2 as well as the Fourteenth and Fifteenth Amendments. ECF Nos. 16, 83, 92 (consolidation orders). In March 2025, following the change in presidential administration, the United States dismissed its claims and withdrew from the case. ECF No. 872.

28.    In May and June 2025—nearly four years after SB 6 was enacted—this Court held a consolidated 16-day bench trial on all outstanding claims.

29.    Texas's principal defense to the intentional discrimination claims brought by various plaintiff groups was that the congressional districts were drawn "blind to race." *E.g.* ECF

No. 986 at 8. The parties presented video of Senator Huffman's repeated statements on the Senate floor that the maps were drawn race blind. And Senator Huffman repeatedly reiterated that assertion in sworn testimony during trial. *See*, *e.g.* Tr. June 7 PM at 33; Tr. June 9 AM at 54.

## V.    The 2025 Redistricting Process

### A.    *Petteway* prompts Texas to revisit its districts.

30.    Meanwhile, in early 2025, RNC Committeeman Robin Armstrong—who is also an appointed member of the Galveston County Commissioners' Court—began "going around DC and asking about [redistricting]." Tr. Oct. 7 PM 6:24–7:2. Armstrong was eventually introduced to Adam Kincaid, who runs the National Republican Redistricting Trust (NRRT). *Id.* at 7:3–7; Tr. Oct. 7 AM 31:6–7. During a brief phone call in or around March 2025, Armstrong told Kincaid that he "believed it was possible to redraw the Texas Congressional map to pick up more seats." Tr. Oct. 7 PM 7:17–20. And in a subsequent conversation, Armstrong told Kincaid that the Fifth Circuit's decision in *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024) (en banc), "gave . . . Republicans the opportunity to redraw [Texas's Congressional Maps]" *Id.* at 8:8–17.

31.    In *Petteway*, the en banc Fifth Circuit held that Section 2 of the Voting Rights Act does not allow so-called "coalition claims" in which "two minority groups [to] combine forces to pursue a vote dilution claim." 111 F.4th at 604. *Petteway* did not, however, hold that multi-racial majority-minority districts may not lawfully be drawn by the state for race neutral reasons. *See id.*

32.    In April or May of 2025, Kincaid began having conversations "in earnest" with White House staff about mid-decade redistricting. Tr. Oct. 7 PM 16:7–10. And in May, Kincaid was retained by the Republican National Committee (RNC) to draw a new map for Texas's congressional districts. *Id.* at 29:23–30:11.

33.    On June 9, 2025, in the midst of the trial challenging the 2021 Map, the New York Times reported that President Trump was pressuring Texas Republicans to re-draw Texas's

congressional map to more heavily favor Republicans. Defs.' Ex. 1415. But the New York Times also reported reluctance on the part of Texas Republicans, who worried that the plan could "backfire." *Id.*

34.     When Senator Joan Huffman, the Chairwoman of the Senate Redistricting Committee in 2021, was asked about this reporting during cross examination, she testified unequivocally that the Texas Legislature was "not" considering redrawing Texas's congressional districts. Tr. June 10 AM 53:25–54:7.

35.     As exemplified by Senator Huffman's testimony, and the New York Times' reporting, it quickly became clear that there was little political appetite for mid-decade redistricting in Texas. Governor Abbott put out no public statement in support of the effort after the June 9 article. On June 23—two weeks after the New York Times' initial reporting and Senator Huffman's firm denial—Governor Abbott issued an initial agenda for a special session of the legislature that listed nine items, none of which was redistricting. Gonzales Ex. 35. Indeed, as Adam Kincaid publicly acknowledged on the day the 2025 Map was unveiled, even convincing Republican officers to do partisan redistricting is no easy task. *See* Brooks Ex. 340 at 8:10 ("If I go into a state and say, I need you to pass this map, or, you know, Republicans need you to pass this map, we would get laughed out of the state. It's something that the states controlled by Republicans, they typically want to handle themselves."). And Kincaid testified that he was aware of the Governor's June 23 announcement showing a lack of movement on redistricting. Tr. Oct. 8 AM 116:3–24.

36.     Kincaid and the White House continued to push Texas for mid-decade redistricting throughout the month of June. Kincaid testified that he had three conversations with the White House and Governor Abbott concerning mid-decade redistricting that month. Tr. Oct. 7 PM 26:20–

27:11. The first call, in "early June," *id.* at 29:7–9, included counsel for the Governor's office, counsel for the RNC, counsel for the White House, Kincaid, the Governor, and James Blair, the White House Deputy Chief of Staff. "[A] couple weeks later," also in June, there was a "quicker call" involving Kincaid, Governor Abbott, and White House officials. *Id.* at 30:12–31:2.

37.    The "final call" with Kincaid, the White House, and Governor Abbott occurred some time in "late June" a "week or so after" the previous one. *Id.* at 31:7–14. During that conversation, Kincaid was in the West Wing with Blair and Matt Brasseaux, the Director of the White House Office of Political Affairs. *Id.* at 31:15–32:10. Blair got Governor Abbott on the phone, and they discussed a draft of what has become known as the "Dhillon Letter." *Id.*; *see also id.* at 53:5–13 (Kincaid testifying that he spoke with Governor Abbott and James Blair about the Dhillon Letter before it was released).

38.    The "Dhillon Letter" was sent on July 7 to Governor Abbott and Attorney General Ken Paxton by Harmeet Dhillon, the Assistant Attorney General for the Civil Rights Division of the U.S. Department of Justice. Gonzales Ex. 41. The Letter purported to raise "serious concerns regarding the legality of four of Texas's congressional districts." *Id.* Dhillon asserted that "Congressional Districts TX-09, TX-18, TX-29, and TX-33 currently constitute unconstitutional 'coalition districts'" and "urge[d] the State of Texas to rectify these race-based considerations from these specific districts." *Id.* In support of this argument, Dhillon cited the Fifth Circuit's decision in *Petteway*. *Id.*

39.    Each of the districts targeted by the Dhillon Letter was a majority-minority district under the 2021 Map. CD 9 was a diverse, majority Black and Latino district. According to the most recent available ACS data, its Citizen Voting Age Population (CVAP) was 25.6 percent Latino, 45 percent Black, 9.3 percent Asian, and only 18.1 percent Anglo. Gonzales Ex. 19. It is

currently represented by Black Congressman Al Green. Tr. Oct. 3 PM 18:10–13. CD 18 under SB

6 was also a majority Black and Latino district, whose CVAP was 30.4 percent Latino, 38.8 percent

Black, 23.4 percent Anglo, and 5.3 percent Asian. Gonzales Ex. 19. It was formerly represented

by longtime Black Congresswoman Sheila Jackson Lee and, following the passing of both

Congresswoman Lee and her successor, is currently vacant. Tr. Oct. 1 AM 74:1–8. CD 29 was a

majority-Latino district with 63.5 percent Latino CVAP, 18.4 percent Black CVAP, and 13.7

percent Anglo CVAP. Gonzales Ex. 19. It is currently represented by Latina Congresswoman

Sylvia Garcia. Tr. Oct. 1 PM 88:20–23. CD 33, represented by Black Congressman Marc Veasey,

was a diverse district whose voting-eligible population was majority Black and Latino. Tr. Oct. 2

AM 8:7–19. Its CVAP was 43.6 percent Latino, 25.2 percent Black, and 23.4 percent Anglo.

Gonzales Ex. 19.

40.    Adam Kincaid later testified that, in addition to Governor Abbott and White House

officials, he discussed the Dhillon Letter with at least two officials at the Department of Justice

before it was sent: Michael Gates (whose name also appeared on the Dhillon Letter) and Maureen

Riordan. Tr. Oct. 7 PM 52:12–24. He suggested CDs 9, 18, 29, and 33—the districts that were

ultimately listed in the letter—as ones that he had not personally drawn in the 2021 Map. *Id.* at

56:10–19. Kincaid could not identify who, precisely, drew those four districts—he knew only that

they were adopted in their current form as amendments on the floor of the Texas House. *Id*

41.    The core allegation of the Dhillon letter is that race "predominated" in the drawing

of those specific four districts. The Letter explains:

> It is the position of this Department that several Texas Congressional Districts
> constitute unconstitutional racial gerrymanders, under the logic and reasoning of
> *Petteway*. Specifically, the record indicates that TX-09 and TX-18 sort Houston
> voters along strict racial lines to create two coalition seats, while creating TX 29, a
> majority Hispanic district. Additionally, TX-33 is another racially-based coalition
> district that resulted from a federal court order years ago, yet the Texas Legislature

> drew TX-33 on the same lines in the 2021 redistricting. Therefore, TX-33 remains
> as a coalition district.

Gonzales Ex. 41, at 2. Racial gerrymandering, as the Dhillon Letter uses the term, occurs only

where "race was the predominant factor motivating the legislature's decision to place a

significant number of voters within or without" certain congressional districts. *Miller v. Johnson*,

515 U.S. 900, 916 (1995).

42.    As Defendants would later concede, the Dhillon Letter was "a poor and legally-

unsound attempt to provide political cover" for an unpopular mid-decade redistricting effort. *See*

ECF No. 1199 at 4. Governor Abbott, facing opposition to mid-decade redistricting even within

his own party, hoped to build public support by "cit[ing] a legal necessity (rather than political

desire) as the goal." *Id.* at 14.

43.    The Department of Justice's assertion that race predominated in the drawing of the

four targeted districts flatly contradicts the "blind to race" defense put forward by Governor Abbott

in defending SB 6 at trial. Both Senator Huffman and Adam Kincaid testified unequivocally and

repeatedly that the 2021 Map was drawn "race blind" and without using any racial data. Defendants

relied on that testimony in disputing other plaintiffs' intentional discrimination claims. *See, e.g.*,

ECF No. 1123 at 9–10. This defense is irreconcilable with the Dhillon Letter's factually

unsupported assertion that race predominated in the drawing of SB 6.

44.    Attorney General Paxton agreed that DOJ was wrong to argue that any district in

the 2021 Map, including those discussed in the Dhillon Letter, was a racial gerrymander. In a July

11 letter responding to Assistant Attorney General Dhillon's letter, Attorney General Paxton

explained that "[t]he evidence at that trial was clear and unequivocal: **the Texas legislature did**

**not pass race-based electoral districts for any of those three political maps**." Gonzales Ex. 42,

at 2 (emphasis in original). In a subsequent filing in this Court, the Governor reiterated that the

2021 Plan was drawn "blind to race." ECF No. 1116 at 3. He argued that DOJ "has no basis" for its contrary contention, "nor does it cite one." *Id.* at 7.

### B.    The Special Legislative Sessions

45.    Nonetheless, the plan worked. On July 9, 2025, after weeks without action and just two days after the Dhillon Letter was sent, Governor Abbott issued a special session proclamation calling on the Texas Legislature to "provide[] a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice." Gonzales Ex. 43.

46.    Soon thereafter, Governor Abbott went on a media blitz to sell the unpopular mid-decade redistricting plan. On July 22, just after the special session began, Governor Abbott went on TV to discuss the special session. Brooks Ex. 325. He discussed *Petteway* at length and explained that "coalition districts are no longer required. And so we want to make sure that we have maps that don't impose coalition districts." *Id.* When asked if the redistricting effort evidenced a lack of confidence in Republican performance in the upcoming midterm elections, Governor Abbott told FOX 4 "what we're focused on is not what may happen in the midterms." *Id.*

47.    The Special Session called by the Governor began on July 21. The House and Senate each appointed redistricting committees, to be chaired by Representative Cody Vasut and Senator Phil King, respectively. Tr. Oct. 1 AM at 122:21–122:4; Brooks Ex. 319 at 55:10–11. Before any map was introduced, the legislature held a series of "field hearings" to take testimony from Texans regarding redrawn congressional maps. Brook Ex. 307 at 3:10–12. Public testimony was "overwhelmingly against" the mid-decade redistricting effort. Tr. Oct. 1 PM 33:10–12.

48.    As legislative proceedings got underway, key legislators echoed Governor Abbott's citation of the Dhillon Letter's race-based redistricting demands as the reason for undergoing mid-decade redistricting. At the Senate redistricting committee's first public hearing on July 21,

Senator Carol Alvarado asked Senator King whether he "knew what sparked the governor" to put redistricting in the call for a special session, in response to which Senator King pointed to the "call itself," which "does say legislation that provides a . . . revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice," and said that he "kn[ew]" the legislature would "be discussing such things." Tr. Oct. 1 AM at 24:13–25; *see also* Brooks Ex. 300 at 24:2–19; Tr. Oct. 6 PM 138:15–21 (video of July 29 Hearing, Brooks Ex. 307) ("Senator King: So the reason the committee was created and convened initially was because the— Governor Abbott added to the Special Session the following charge. It says: . . . Legislation that provides a revised Congressional Redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice.").

49.     At a public hearing of the House redistricting committee on July 26 its Chairman, Cody Vasut, refused to invoke partisan motivations for redistricting. He repeatedly pointed to the Governor's proclamation as the reason why the Committee had been convened. When asked by Representative Gene Wu whether Vasut could confirm that Governor Abbott called for a special session for the purpose of dismantling coalition districts, Chairman Vasut refused to say one way or another, remarking only that he could not "speculate" about the Governor's intent. Tr. Oct. 9 PM 89:20–24. He said his "position is that the Governor has put an item on the proclamation, and as is customary, when the governor puts items on the proclamation, the Legislature responds with these hearings." *Id.* at 89:24–90:2. Representative Vasut never mentioned partisanship in those early hearings. *See generally id.* at 88:21–95:5; *see also* Defs.' Ex. 1281 at 23:3–30:15.

50.     On July 30, 2025, after field hearings had been completed, Representative Todd Hunter introduced Plan C2308 as House Bill 4. *See* Gonzales Ex. 24. This was the first time that any proposed map was presented to the public.

51.    On August 1, 2025, the House redistricting committee held its sole public hearing on HB 4. Its sponsor Chairman Hunter emphasized that federal law did not "require[] the drawing of coalition districts," which he defined as "when two different minority or language groups are combined." Brooks Ex. 309T at 52:2–3, 53:9–10. When asked to explain the methodology for how the map was constructed, Chairman Hunter explained that the "scope of work" for the people "hired to do the maps" included "us[ing]" "the *Petteway* case" in deciding where and how to redraw districts. Brooks Ex. 309 at 14:21:24–56. Chairman Hunter cited political performance in addition to "clarification from the Fifth Circuit on coalition districts" as the bases for having "redrawn the congressional map." Brooks Ex. 309T at 53:18–25. In stark contrast to Senator Huffman's layout of SB 6 in 2021, neither Chairman Hunter nor any other legislator at the August 1 hearing suggested that the new map was drawn blind to race.

52.    Instead, throughout the August 1 hearing, Chairman Hunter and other legislators repeatedly invoked the racial composition of HB 4 in support of its passage. Chairman Hunter emphasized that it was "important to note that four of the five new districts" were "majority-minority Hispanic CVAP districts, citizen voting-age population." Tr. Oct. 1 PM 44:12–14; *see also* Brooks Ex. 309T at 54:19–22. Chairman Hunter also remarked that "[i]n the 2021 plan, there were nine—that's nine—Hispanic majority voting age districts," but in the 2025 plan, "there are ten Hispanic majority voting age districts." Tr. Oct. 1 PM 48:8–10; *see also* Brooks Ex. 309T at 58:8–11. Later, switching from VAP to CVAP, he remarked that "[i]n the 2021 plan there were seven Hispanic citizen voting age districts," but under the 2025 plan, "there are eight," Tr. Oct. 1 PM at 48:11–12; *see also* Brooks Ex. 309T at 58:11–13.

53.    Much of this information was elicited through colloquies with supporters of HB 4. In an exchange with Republican Representative Katrina Pierson, who asked whether it was true

that the 2025 map had "not just one, but two majority Black CVAP districts," Chairman Hunter

responded that was "correct," and proceeded to "give everybody details": "CD18 was now 50.8

Percent Black CVAP. In 2021 it was only 38.8 Percent. CD30 is now 50.2 percent Black CVAP.

In 2021 it was 46 percent." Tr. Oct. 7 PM 92:5–13; *see also* Brooks Ex. 309T at 100:8–16. In that

same exchange, Representative Pierson made sure to point out that while the number of "Black

districts" in the 2021 map was "zero," in the 2025 map, "Black voters in the state of Texas go from

zero to two majority Black CVAP districts out of the 28 seats in Texas." Tr. Oct. 7 PM 92:14–22;

*see also* Brooks. Ex. 309T at 100:17–25.

54.     Republican Representative Colonel Terry Wilson similarly elicited information

from Hunter about the increase in the number of Hispanic CVAP districts from 2021. *See* Tr. Oct.

1 PM 50:10–51:1–6.

55.     The repeated emphasis on race by HB 4's supporters was no accident. As Speaker

Pro Tempore of the House Joe Moody explained, many of these questions from other Republican

representatives to Hunter were "all very well scripted" because they were "trying to reiterate th[e]

point" that they were purportedly increasing the number of majority-minority districts. Tr. Oct. 1

PM at 51:10–17.

56.     Indeed, Chairman Hunter made clear that the racial targets achieved by Plan C2308

were a feature of the map, not a bug. When asked whether CD 9 was "purposefully changed to be

slightly above 50 percent Hispanic CVAP instead of being a coalition district now," Hunter

responded: "Again, because of *Petteway*, I'm hesitant to just use the words coalition district, since

we just talked about how we used *Petteway* . . . ." Tr. Oct. 1 PM 52:25–53:5. Asked again whether

CD 9 "was also purposely changed so that the Hispanic CVAP would be over 50 percent?"

Chairman Hunter responded: "50.41 percent. Correct." Tr. Oct 1 PM at 58:21–59:10; *see also* Brooks Ex. 309.

57.    Similarly, when asked: "CD 18 was purposely altered to a Black CVAP majority district rather than a 38.8 Percent Black CVAP district, right?" Chairman Hunter responded: "CD-18 was drawn to be a 50.81 percent CVAP, which is 11.82 change, plus." Tr. Oct 1 PM 51:24–52:3. On August 1, 2025, when Representative Turner asked whether the proposed CD-35 was *purposely changed* to increase its Hispanic CVAP to be about 50 percent," Chairman Hunter corrected him only on the precise Hispanic CVAP number. Tr. Oct 1 PM 52:8–13; *see also* Brooks Ex. 309.

58.    When Chairman Hunter was expressly asked whether it was a "coincidence" that these districts hit bare majority-minority thresholds, he candidly responded that "Nothing's a coincidence." Tr. Oct. 1 PM 46:19; *see also* Brooks Ex. 309T 106:15–107:4.

59.    When Chairman Hunter was asked whether "drawing this particular map" was "racial neutral," Chairman Hunter responded "I don't know what you mean by 'racial neutral.' We're all talking race, and we talk neutral. These are all words. Give me a legal definition." Brooks Ex. 309T 89:25–90:8; Tr. Oct. 2 PM 89:1–8.

60.    On Sunday, August 3, Texas legislators left the state to deprive the Texas House of Representatives of the quorum needed to bring HB 4 to a vote in the House. *See* Gonzales Ex. 21.

61.    The first special session was adjourned sine die on August 15, 2025, with no new map enacted. *Id*. That same day Governor Abbott called, and the legislature gaveled in, a second special session. *Id*. Notably, the proclamation calling for the second special session omitted the first proclamation's reference to the "constitutional concerns" expressed in the Dhillon Letter—suggesting an awareness of the Letter's implications for Texas's eventual defense of the map.

*Compare* Gonzales Ex. 43, *with* Ex. 22. With only 97 of the required 100 members present, the House still lacked a quorum and was immediately adjourned. Gonzales Ex. 21.

62.    During the second special session, Plan C2308 was re-introduced in the Senate redistricting committee as Senate Bill 4. Representative Hunter then introduced a slightly modified version of that Plan—Plan C2331—as House Bill 4. *See* Brooks Ex. 315T 31:13–16. Plan C2331 made only modest changes to Plan C2308 to reunite Fort Bliss with the city of El Paso in CD 16. Defs.' Ex. 939.

63.    The House reestablished quorum on August 18, 2025, at which point HB 4 was referred to the House Select Committee on Redistricting. Brooks Ex. 315. At that time, Plan C2331 was substituted with a new plan, Plan C2333. Brooks Ex. 316T 39:13–40:12. Plan C2333 is identical to Plan 2331 except in Harris County, where it made changes to several majority-minority districts, and in the rural counties south of Dallas–Fort Worth, where it made a minor change to the boundary between CD 6 and CD 17. Gonzales Ex. 37.

64.    The principal changes between Plan C2331 and Plan C2333 were made to CD 9, which under both plans is a bare majority-Latino district that, notwithstanding that slight numerical advantage, nonetheless does not allow Latino voters to elect their candidates of choice. Plan C2333, however, added the entirety of Liberty County—a majority-Anglo, rural county—to CD 9, improving its Republican performance. Tr. Oct. 7 AM 168:21–169:5; Gonzales Exs. 31, 38. Tellingly, however, Plan C2333 maintains CD 9 as a bare majority-Latino district. Gonzales Ex. 17. These changes to CD 9 also necessitated changes to CD 18, but CD 18 is drawn as a bare majority-Black district in both plans. Gonzales Exs. 17, 36.

65.    Plan C2333's revisions to Plan C2331 thus maintained the racial composition of both CD 9 and CD 18 with laser-like precision. The Latino CVAP of CD 9 changed by only two-

tenths of a percentage point, while the Black CVAP of CD 18 changed by only three-tenths of a percentage point—keeping both districts barely above the majority-minority threshold achieved in Plan C2331. Gonzales Exs. 17, 36.

66.    On August 18, when Chairman Hunter laid out Plan C2333 in the House redistricting committee, he continued to invoke *Petteway*, saying: "based on *Rucho*, based on *Petteway*, this, Mr. Chairman, is what the committee substitute addresses." Tr. Oct. 1 PM 73:9–10; *see also* Brooks Ex. 315T 6:12–17.

67.    The substituted version of HB 4—Plan C2333—was considered on the floor of the House on August 20, 2025. Proceedings on the House floor largely followed the same script as those in committee. Chairman Hunter again repeated that it was "important to note" that "four of the five new districts are majority-minority Hispanic, what we call CVAP districts," Tr. Oct. 1 PM 78:21–23, and that "Republicans will now have an opportunity to potentially win these districts," *id.* at 79:2–3. He similarly remarked: "In 2021 there were nine Hispanic majority age districts. In this plan there are ten Hispanic majority age districts. In the 2021 plan there were seven Hispanic citizen voting age districts and under this plan there are eight. There are no Black CVAP districts under the 2021 plan. In the proposed plan there are two majority Black CVAP districts. CD-18, 50.71 percent Black CVAP, compared to 38.99 percent in 2021. CD-30, 50.41 percent Black CVAP, 46 percent in 2021," Tr. Oct. 1 PM 79:13–23; *see also* Brooks Ex. 316T 30:12–24. Hunter similarly touted other racial makeups in the "Harris County/Houston area" as well. Tr. Oct. 1 PM at 79:24–80:1–7; *see also* Brooks Ex. 316T at 30:25–31:1–11.

68.    When asked whether "one of the reasons that we're doing this" was "because of the *Petteway* case and the ruling in the *Petteway* case as it related – as it relates to these coalition

districts," Hunter responded that "the combination" of both *Petteway* and *Rucho* were "involved in this matter." Tr. Oct. 1 PM 85:15–23; *see also* Brooks Ex. 316T 76:18–77:13.

69.     When Republican Representative David Spiller asked Hunter whether HB 4 in fact took "the current map from zero majority Black CVAP districts in the State of Texas," to "two majority Black CVAP districts," Hunter replied "Correct. 18, and – is one of the ones that we talked about – and 30." Tr. Oct. 1 PM 89:18–25; *see also* Brooks Ex. 316T 82:7–16.

70.     Chairman Hunter acknowledged that there was no partisan purpose or effect to the map's 50%+1 racial target for Black CVAP in CD 30, saying "Congressional 30 to respond to you, the political performance is unchanged. There was no Black CVAP in 2021. Now there is a Black CVAP in 2025. So everybody has the information, the Black CVAP in 30 is 50.41%. The political performance is still Democrat." Tr. Oct. 1 PM 92:6–10; *see also* Brooks Ex. 316T 336:18–24.

71.     The House passed Plan C2333 as HB 4 later that same day, August 20. Gonzales Ex. 24. In a press release hailing the bill's passage, Speaker of the House Dustin Burrows said: "The Texas House today delivered legislation to redistrict certain congressional districts to address concerns raised by the Department of Justice . . . ." Gonzales Ex. 33.

72.     The Senate Redistricting Committee took up HB 4 the following morning, August 21, and immediately voted it to the Senate Floor. Gonzales Ex. 24. The full Senate passed HB 4 in the early hours of August 23. *Id.*

### C.     Legislators' Public Statements.

73.     In public, as on the floor of the Legislature, legislative leaders and the Governor defended the 2025 Map by invoking its racial composition. In an August 4, 2025, interview with CBS news, Representative Katrina Pierson, who served on both the standing Committee and Select Committee that considered the bill and who "consistently weighed in during the hearings," Tr.

Oct. 1 PM 68:1–7, defended HB 4 by saying that "Texas has maps that has increased minority representation," *id.* at 67:4–5; *see also* Brooks Ex. 330T 35:10–12.

74.     On August 5, 2025, Governor Abbott appeared on Fox News and touted the creation of a majority-Black "Barbara Jordan district"—CD 18. Brooks Ex. 331; *see also* Tr. Oct 1 AM 72:20–23. Abbott said that "four of the five districts we are drawing, they would be Hispanic districts." Brooks Ex. 331; *see also* Tr. Oct 1 AM 72:20–23.

75.     In an August 6, 2025 interview with National Public Radio, Representative Tom Oliverson, the Chairman of the Republican caucus, denied that Texas was redistricting "because of the president's request," stating: "No, we are not." Tr. Oct. 1 PM at 68:19–24; *see also* Brooks Ex. 327T 1:20–22.

76.     In an August 7 interview with the radio host Joe Pags, Governor Abbott said: "Texas is no longer required to have what are called coalition districts, and as a result, we're able to take the people who were in those coalition districts, and make sure they are going to be in districts that really represent the voting preference of those people who live here in Texas." Tr. Oct. 1 AM 79:22–80:2. He continued: "we saw in the aftermath of the Trump election that an overwhelming number of Hispanics and Blacks, as well as others, chose to vote for Trump. Four of the five districts that we are going to create are predominantly Hispanic districts that happen to be voting for Republican as opposed to Democrats." Brooks Ex. 326T 2:5–9; Tr. Oct. 1 AM 80:3–9. He continued: "We're creating four new his Hispanic-oriented districts that are going to vote Republican" and touted "the consolidation of what is known as the Barbara Jordan district over in the Houston area. A Black woman who served there for a long time—they've been begging to protect her district and that's exactly what we're doing." Brooks Ex. 326 at 3:40–4:02.

21

77.     On August 11, the Governor went on CNN to defend the plan. Brooks Ex. 335. In an interview with Jake Tapper, the Governor resisted the suggestion that he went forward with mid-decade redistricting only because President Trump "personally got involved and asked [him] to do this," explaining "this is something that I have been interested in for a long time." Tr. Oct. 1 AM 8:15–19. He then pointed to *Petteway* as the impetus for the mid-decade redistricting, saying that "Texas is no longer required to have coalition districts," and as a result "we wanted to remove those coalition districts" and draw new maps that "provide more seats for Hispanics." *Id.* at 8:25–9:5. He emphasized that "four of the districts" in Plan C2308 "are predominantly Hispanic." *Id.* at 9:5–6. Tapper pushed back, asking: "you are doing this to give Trump and Republicans in the House of Representatives five additional seats, right? I mean, that's the motivation, is to stave off any midterm election losses." *Id.* at 9:17–21. Faced with this clear invitation to cite partisanship as the motive for mid-decade redistricting, Governor Abbott declined. He responded: "Again, to be clear, Jake, the reason why we are doing this is because of that court decision." *Id.* at 9:22–24.

78.     In a television interview on October 2, 2025, Representative Steve Toth responded to a question regarding the purpose of redistricting by stating that it was "required" in "response to *Petteway*, to get compliant." Tr. Oct. 9 PM 10:20–11:3; *see also* Brooks Ex. 339T at 2:11–15.

79.     Having considered the sequence of events leading up to the passage of the 2025 Map, and the contemporaneous statements of legislators and the Governor, the evidence points unmistakably toward two conclusions. First, in drawing the 2025 Map, Texas set out to intentionally destroy majority-minority coalition districts—selecting which districts to target for elimination based principally on their racial composition. Indeed, that was the stated purpose of the entire enterprise from the outset. And second, race predominated in the drawing of several districts—including CDs 9, 18, 30, and 35—where legislators repeatedly touted the achievement

of a bare 50 percent single-race majority. In light of these statements and the precision with which the 2025 Map achieved these 50 percent thresholds, doing so cannot have been merely a coincidence.

### D.     The 2025 Map

80.     HB 4 has the effect of diluting minority voting strength in Texas by systematically dismantling majority-minority districts in which Black and Latino voters had the opportunity to elect their candidates of choice.

81.     Perhaps the most notable feature of the 2025 Map is the degree to which it substantially altered majority-minority districts while keeping intact Anglo districts. Eight districts in the 2025 Map retained less than 50 percent of their 2021 population. All were majority-minority districts in the 2021 Map:

- CD 9 retained only 2.9 percent of its population. Under the 2021 Map, it was 81.9 percent non-Anglo;

- CD 35 retained only 9.5 percent of its population. Under the 2021 Map, it was 64.3 percent non-Anglo;

- CD 18 retained only 25.8 percent of its population. Under the 2021 Map, it was 76.6 percent non-Anglo;

- CD 33 retained only 32.7 percent of its population. Under the 2021 Map, it was 76.6 percent non-Anglo;

- CD 29 retained only 37.2 percent of its population. Under the 2021 Map, it was 84.3 percent non-Anglo;

- CD 27 retained only 39.8 percent of its population. Under the 2021 Map, it was 55.9 percent non-Anglo;

- CD 15 retained only 40.6 percent of its population. Under the 2021 Map, it was 78.2 percent non-Anglo.

- CD 32 retained only 41.2 percent of its population. Under the 2021 Map, it was 56.1 percent non-Anglo.

*See* Gonzales Exs. 18, 19.

82.    Notably, among these districts are CDs 9, 18, 29, and 33—the four districts specifically targeted by the Dhillon Letter. Gonzales Ex. 41.

83.    By contrast, the 2025 Map kept intact more than half of the district populations for each of the majority-Anglo districts from the 2021 Map—CDs 17, 10, 36, 25, 6, 8, 37, 4, 21, 31, 11, 14, 3, 5, 2, 12, 38, 1, 24, 26, 13, and 19. *See* Gonzales Exs. 18, 19. It also created two additional majority-Anglo districts. *Compare* Gonzales Ex. 17, *with* Gonzales Ex. 19.

84.    The most substantial changes made by the 2025 Map came in four key areas of the state: Harris County, Dallas-Fort Worth, and Central Texas, including Bexar and Travis Counties and their surrounds, and the Rio Grande Valley.

### 1.    Harris County.

85.    In Harris County, the 2025 Map reduces the number of districts in which Black and Latino voters may elect their candidates of choice from four to three.

86.    Under the prior map, there were two plurality Black, majority-minority districts in which Black and Latino voters were consistently able to elect their candidates of choice (CD 9 and CD 18); one majority Latino district in which Latino and Black voters were able to elect their candidates of choice (CD 29); and one more majority-minority district in which Black, Latino, and Asian voters were all able to elect their candidates of choice (CD 7). Gonzales Trial Ex. 6 at 18, 21–22; Gonzales Trial Ex. 9 at 2–4, 6–7.

87.    The 2025 Map makes substantial changes to CDs 9, 18, and 29. It combines the Black "cores" of CD 9 and CD 18 to create a single majority-Black CVAP district, CD 18. Gonzales Ex. 17; Tr. Oct. 8 AM 93:24–25 (Kincaid) ("[T]he core of Texas 9 is now in Texas 18."). This adjustment reduced Black voters' electoral power substantially. As established by the testimony of Dr. Ansolabehere, which is described in further detail below, Black voters in Harris

County were previously able to comfortably elect their candidates of choice in two plurality-Black districts, while they now are able to do so in only *one* majority-Black district.

88.    The 2025 Map replaces CD 9 with a bare majority-Latino CVAP district (50.3 percent) on the opposite side of Harris County. Gonzales Ex. 17. Latino voters in this new district, however, are unable to elect their candidates of choice, as Dr. Ansolabehere's analysis showed. Tr. Oct. 3 AM 30:18–25.

89.    The 2025 Map also revises CD 22—a firmly Republican district under the prior map that had become majority-minority due to post-census growth in minority populations—to again make it a majority-Anglo eligible-voter district. Tr. Oct. 3 AM 36:6–37:17; *see also* Gonzales Exs. 17, 19, 28, 31, 32

90.    In sum, the 2025 Map reduces by one the number of districts in which Black and Latino voters in Harris County have a reasonable opportunity to elect their candidates of choice— a straightforward example of discriminatory effect.

91.    Race predominated in the drawing of CD 9, CD 18, and CD 22. Each of these districts—consistent with the contemporaneous statements of the governor and the legislature— was drawn to achieve a single-race majority just over 50 percent, in a manner that simply cannot be explained as a coincidence.

## 2.    Dallas-Fort Worth

92.    The 2025 Map produced a discriminatory effect by reducing the number of districts in which Black and Latino voters in Dallas-Fort Worth have a reasonable opportunity to elect their candidates of choice.

93.    In Dallas-Fort Worth, the 2025 Map similarly dismantles two existing majority-minority coalition districts in which Black and Latino voters were able to elect their candidates of choice—CD 32 and CD 33—moving more than 67 percent of CD 33's population and more than

58 percent of CD 32's population out of the districts. Gonzales Ex. 39 at 3; Gonzales Ex. 18. In doing so, the 2025 Map consolidates minority voters in Dallas County into a new CD 33, while cracking the minority voters in Tarrant County who used to be in CD 33 across multiple majority-Anglo districts. Gonzales Ex. 29 at 34; Gonzales Exs. 17, 18, 19.

94.     Further, race predominated in the drawing of CD 30 as a bare majority Black CVAP district. The 2025 Map also converts CD 30 from a plurality-Black district in which Black voters were easily able to elect their preferred candidates to a bare majority Black CVAP (50.2 percent) district. *See* Gonzales Exs. 17, 19. Consistent with the contemporaneous statements of legislators touting the creation of two majority-Black districts, CD 30 was drawn to hit a precise racial target between 50 and 51 percent. As explained further below, there was no reason—partisan or otherwise—to draw CD 30 in this way.

### 3.    Central Texas

95.     In Central Texas, HB 4 moves more than 90 percent of the population out of CD 35, a plurality-Latino district that is currently represented by Latino Democrat Greg Casar, but makes far fewer changes to CD 37, the only majority-Anglo Democratic district in the existing plan. Gonzales Exs. 17, 18, 32; Tr. Oct. 3 PM 22:17–25. HB 4 then creates a new, predominantly rural CD 35 with a 51.6 percent Latino CVAP, in which Latino voters are unlikely to elect their candidates of choice. Gonzales Ex. 17; Gonzales Ex. 39 at 4. This is yet another example of the destruction of a performing, majority-minority district in which no single racial group comprised a majority—and its replacement with a single-race majority district in which Latino voters are unable to elect their candidates of choice.

96.     Race predominated in the drawing of CD 35. As in CD 9, CD 35 was drawn to hit a bare Latino-majority threshold while ensuring that only Republican candidates can be elected

there. As Dr. Ansolabehere's analysis—addressed below—shows, those two goals are at cross-purposes with each other because Latino voters in CD 35 cohesively prefer Democratic candidates.

97.     The configuration of two majority Latino districts (CD 9 and CD 35) that consistently reject the candidates preferred by most Latino voters in those districts was no accident—it is directly consistent with Governor Abbott's public statement that the purpose of the map was to "provide more seats for Hispanics" that would also elect Republicans. Tr. Oct. 1 AM 8:25–9:5.

98.     Moreover, much of the population of former CD 35 is shifted to CD 27, which stretches to the Gulf Coast. Gonzales Ex. 18. HB 4 then moves more than 60 percent of the population out of existing CD 27, which was previously a majority-minority Republican district, so that it is now a majority-Anglo Republican district. Gonzales Exs. 17, 18, 19, 31, 32. There was no partisan reason for this change to CD 27's racial composition, which did not meaningfully affect CD 27's partisan performance—it can only be explained by race.

### 4.     Rio Grande Valley

99.     In the Rio Grande Valley, the 2025 Map substantially reduces the opportunity for Latino voters in CD 34 to elect their candidates of choice. Tr. Oct. 3 AM 38:22–22. Though Latino voters continue to form a majority in the newly drawn CD 34, Dr. Ansolabehere's analysis shows that they are now less likely to elect their preferred candidates than they were under the prior version of that district. Gonzales Ex. 39, Tbls. 10 & 12.

### E.     Adam Kincaid

100.     At the hearing, Defendants relied on the testimony of Adam Kincaid, who drew "most" of the 2025 Map. Tr. Oct. 7 AM 29:22–24. Kincaid also runs the National Republican Redistricting Trust. *Id.* at 31:6–7. As discussed above, Kincaid was retained by the RNC in May 2025 to draw a proposed map for Texas's congressional districts. Tr. Oct. 7 PM at 29:23–30:11.

101.    Throughout the special session, the legislative leaders of the redistricting effort were notably coy about Kincaid's role in the map drawing process—and at times inconsistent. When Senator Carol Alvarado asked Chairman King at a July 21 hearing whether Adam Kincaid would be drawing the new 2025 maps, King responded: "Probably want to ask him that." Tr. Oct. 1 AM at 23:9–10; Brooks Ex. 300T at 20:12–14.

102.    In fact, Senator King was aware as early as June that Kincaid was drawing the 2025 Map: he called Adam Kincaid and specifically asked him whether he was going to be involved. Tr. Oct. 7 PM 17:9–16. But it was not until the fourth and final pre-map hearing in the Senate on July 29, 2025, that Senator King admitted that Adam Kincaid was drawing the map, though Senator King had not seen it. Tr. Oct. 6 PM 135:9–15.

103.    In light of this revelation, Democratic members of the Senate redistricting committee sought to subpoena Adam Kincaid to testify about the 2025 Map. *Id.* at 140:14–16. Senator King resisted this effort as unnecessary, explaining that he could not see "how his testimony would provide any relevant information to the committee's decision of, do we like that map?" *Id.* at 140:7–10. As Senator King put it: "All that matters is what is in the four corners of that document. What are . . . the parameters of each district on that map?" *Id.* at 140:5–7. The committee ultimately voted down the subpoena. *Id.* at 140:17–19.

104.    Nonetheless, Senator King, at Senator Alvarado's request, sent a letter to Kincaid to invite him to testify. *Id.* at 140:20–22. Kincaid also testified—in contradiction to Senator King's testimony, *id.* at 140:23–141:22—that Senator King called him after sending this letter to ask if he had received the invitation. Tr. Oct. 7 PM at 21:21–22:10. Senator King "made a point to say he had made a promise to the Democrat he was working with" to seek Kincaid's testimony. *Id.* at

22:14–18. Kincaid declined the invitation, however, citing his busy schedule and the burdens of traveling to Austin. *Id.* at 22:19–23:5.

105.    On August 22, Senator King said on the Senate floor that he spoke with Kincaid "three times in the last probably couple of months," Brooks Ex. 319T at 38:2–3, including Monday, August 18, Tr. Oct. 1 AM at 112:24–113:5; *see also* Brooks Ex. 319T at 41:2–8. But at the preliminary injunction hearing, Senator King remembered a fourth conversation "sometime late in the first called Special Session" when he called Kincaid to ask if he "use[d] racial data in drawing the map." Tr. Oct. 6 PM 81:24–82:7.

106.    Senator King testified that the second of these three (or four) conversations occurred at the annual conference of the American Legislative Exchange Council (ALEC) in mid-July, just before the start of the special session. *Id.* at 116:6–117:10. Senator King testified that they "ran into" each other at the conference and that Senator King told Kincaid he "preferred that we not discuss the redistricting maps," *id.* at 81:16–23, and that Kincaid "honored [that] request." *Id.* at 118:12–17.

107.    Kincaid's account of that meeting differed in material ways. He testified that the two men first spoke on the phone and planned the encounter. Tr. Oct. 7 PM 20:6–15. He further testified that the two had a substantive conversation about the 2025 Map, which Kincaid was working on at the time. *Id.* at 18:16–19:24. He testified that Senator King asked "How many seats are we talking" and that Kincaid answered "[i]t's going to be a five-seat pickup." *Id.* at 18:20-25. According to Kincaid, Senator King was "curious" about "whether or not we would actually be able to pick [up] that five seats." *Id.* at 19:5-15. Kincaid also testified that Senator King also said "something about getting the map done or working together to get the map done, something along those lines." *Id.* at 21:3-7.

108.    Kincaid also testified that there was another Senator present at that meeting—Senator Adam Hinojosa. *Id.* at 45:1–6. And Senator Hinojosa confirmed in his own testimony that he was indeed present. Tr. Oct. 8 PM 77:7–17. Counsel for Defendants asserted Senator Hinojosa's legislative privilege over the substance of this conversation, and instructed Kincaid not to answer because "the substance of the conversation would have been Senator Hinojosa pulling Kincaid into the legislative process to discuss redistricting." Tr. Oct. 7 PM 47:24–48:4.

109.    Senator King—who had waived his legislative privilege—omitted Senator Hinojosa's presence from his telling. When prompted, he recalled that "it seems like there may have been someone else randomly sitting at the table; but I don't remember for sure." Tr. Oct. 9 AM 126:2–6. He could not recall who that person was or anything about them, and he testified was "not even sure there was someone else there." *Id.* at 126:15–23. But when he was then asked directly whether the third person might have been his colleague Senator Hinojosa, Senator King suddenly remembered "[t]hat may have been who it was." *Id.* at 126:20–23.

110.    Leaders in the House were even less forthcoming—or were purposely kept out of the loop. At a hearing on July 24, 2025, Representative Cody Vasut, the Chairman of the House Select Committee on Redistricting, said he had "no idea who" Kincaid was. Brooks Ex. 301T 21:17–20; *see also* Tr. Oct. 1 AM 123:15–18. Chairman Hunter was asked point blank on August 1 whether Kincaid "helped [him] draw this map," to which he bluntly responded: "No." Tr. Oct. 1 AM 121:14–18; *see also* Brooks Ex. 309T 89:1–5. Speaking in the third person, Chairman Hunter also said that "Todd Hunter has no knowledge of Adam Kincaid involved in this." Brooks Ex. 309T 127:13–14.

111.    Despite the Legislature's apparent effort to shield Kincaid's involvement from public view, defendants called him to testify at the October preliminary injunction hearing. Much

of his testimony, however, was shrouded behind various forms of privilege. Kincaid was unable to answer substantial questions about the inputs that he considered as he drew the 2025 Map. For instance, Kincaid was unable to testify as to the substance of his communications with Governor Abbott and the White House. Tr. Oct. 7 PM 25:7–26:16; *id.* 27:12–28:13. And while Senator King waived his legislative privilege to discuss his communications with Kincaid, Senator Hinojosa— who was present for at least one of those conversations—did not. *Id.* at 47:24–48:4. Overall, Kincaid provided a notably selective account of his communications with key figures during this time, which, combined with the Legislature's apparent unwillingness to acknowledge his role, created an unmistakable impression that much was left unsaid about what happened behind the scenes.

112.    Senator King was correct to observe that Kincaid's testimony sheds little light on the intent of the Legislature and the Governor. Tr. Oct. 6 PM 140:5–11. It therefore deserves little weight. But it did provide the following details.

113.    Kincaid is deeply familiar with Texas's congressional districts. It was he who drew the 2021 Map—with the exception of the four congressional districts targeted in the Dhillon Letter. Tr. Oct. 7 PM at 56:10–15. Although he did not draw those particular districts, Kincaid was nonetheless aware that CDs 9, 18, 29, and 33 under the 2021 Map were considered minority opportunity districts, in that they provided minorities an opportunity to elect their candidates of choice. Tr. Oct. 8 AM 129:3–11.

114.    Kincaid testified that he drew the map that was introduced in the Texas Legislature as Plan C2308. Tr. Oct. 7 AM 59:10–14. He also made the changes to that map that eventually became Plan C2333, except for the change made to the boundary between CD 16 and CD 23 to reunite Fort Bliss with El Paso. *Id.* at 167:13–168:8, 154:12–19.

115.    Kincaid used a web-based platform called ESRI to draw the 2025 Map. *Id.* at 37:4–24. This software comes "preloaded" with boundary line information and demographic data from the Census Bureau. *Id.* at 38:7–18. It is possible, when using this software, to display this demographic data—including racial data—when drawing a map. *Id.* at 41:9–20. Kincaid testified, however, that when he draws a map using ESRI, he does not "have racial data visible." *Id.* at 41:21–42:1.

116.    Kincaid testified that he received input from several sources in drawing the map. For instance, Kincaid testified that he received, via counsel for the RNC, requests from various members of Congress that influenced his drawing of the map—but he was unable to testify as to the substance of those requests due to his invocation of attorney-client privilege. Tr. Oct. 8 AM 124:19–25. He testified, however, that these were "significant requests" and he honored them to the extent possible. *Id.* at 125:1–10.

117.    Kincaid did testify that he was instructed "[b]y the delegation" not to "make certain changes based on how districts had previously performed." Tr. Oct. 7 AM at 61:25–62:5. He testified on October 7 that the "Republican congressional delegation" "instruct[ed]" him that two counties, Kaufman and Van Zandt—had to be included in CD 5. *Id.* at 85:9–19. But when his testimony continued the following day, he recalled that the request was made by James Blair, the White House political director, on behalf of Congressman Gooden. Tr. Oct. 8 AM 134:13–18; *id.* at 134:5–10.

118.    Kincaid's testimony about his process for drawing, though of limited probative value, did offer some insights into how the 2025 Map came to be.

119.    Starting with Dallas–Fort Worth, Kincaid admitted that he "completely transformed Texas 32," Tr. Oct. 7 AM 81:25, a majority-minority coalition district in which Black and Latino voters were able to elect their candidates of choice. *See* Gonzales Ex 19.

120.    Kincaid testified that when drawing CD 30 and CD 33 in Dallas–Fort Worth, he first "took what became 30 and 33 and drew one megadistrict . . . of the most Democrat VTDs [he] could find in Dallas and Tarrant County and put them all in one district." Tr. Oct. 7 AM 97:20–23. He then divided that "megadistrict" in two by focusing on what became CD 30. *Id.* at 105:5. He identified an area "south of downtown" Dallas that contained heavily Democratic precincts, and assigned those to CD 30. *Id.* at 105:6–21. He next added "heavily Democrat precincts in southeastern Tarrant County." *Id.* at 106:11–18. His aim, he testified, was to put "the most heavily Democrat contiguous precincts" in CD 30, *id.* at 109:2–5, and "us[e] the footprint of 30 as it currently existed." Tr. Oct. 7 PM 69:5–6. After that was completed, CD 33 was "the district that was left over from the creation of 30 within the super district." Tr. Oct. 7 AM 109:20–21.

121.    Although Kincaid described his process for drawing CDs 30 and 33 in purely partisan terms, it is not credible that Kincaid was unaware of the racial contours of the districts he was creating. Indeed, Kincaid "concede[d] that there is a high correlation between African Americans and Democrat votes." Tr. Oct. 8 AM 89:17–20; *see also id.* at 58:20–22 (acknowledging that a high Black CVAP section of DFW "also overlaps a heavily Democrat area"). There was no partisan reason for this apparent racial sorting because, as Kincaid admitted, he was simply sorting voters within his Democratic "super district" to create two strong Democratic districts—CD30 and CD33. Tr. Oct. 7 AM 109:15–21.

122.    Harris County was the last portion of the map that Kincaid drew. *Id.* at 117:10–13. As in Dallas–Fort Worth, Kincaid testified that he "looked for the most partisanly Democrat

precincts in Harris County and then into Fort Bend and Brazoria County and put all of those together in the 18th District." *Id.* at 119:12–16. CD 18, Kincaid later testified, combined the "core" of CD 9 with parts of CD 18. Tr. Oct. 8 AM 93:24–25. This configuration effectively obliterated what was once CD 9, *see* Gonzales Ex. 18, and, as Kincaid testified he was aware, dramatically altered the shape of CD 18. Tr. Oct. 7 AM 123:22–124: 2.

123.    Only after he completed drawing CDs 18, 9, 29, and 22 did Kincaid consider whether he could *also* eliminate other Democratic districts too. Tr. Oct. 8 AM at 136:17–137:6. Kincaid testified that he "was also looking to do a sixth" Republican district. *Id.* at 126:10–11. But he was unable to because of geographical and political constraints that arose *after* he had consolidated the Black cores of CDs 9 and 18. He never considered an alternative to the consolidation of CDs 9 and 18. In Kincaid's words: "It wasn't an either/or. It was a both sort of thing." *Id.* at 136:5–10.

124.    Much of Kincaid's testimony relied on assertions about the partisanship of individual precincts or groupings of precincts that were inadequately proven. Kincaid was not qualified as an expert witness, nor was he proffered as one. He did not provide an expert report in advance of testifying as required by Rule 26(a)(2). And he offered no testimony to suggest that his assertions about the partisan composition of various geographical areas in Texas were based on his personal observations as a layperson, rather than on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702(a). For this additional reason, Kincaid's testimony concerning the partisan features of the precincts he chose to include or not include in individual districts is entitled to little, if any, weight.

## VI.    Expert Witnesses

### A.    Dr. Stephen Ansolabehere

125.    Dr. Stephen Ansolabehere is the Frank G. Thompson professor of Government at Harvard University. Tr. May 27 PM 140:6–10. His research focuses on elections, representation, and public opinion, including statistical methods and redistricting. *Id.* at 140:18–141:1. He has published several peer-reviewed articles about statistical methodology in political science, racially polarized voting, ecological analysis, and redistricting. *Id.* at 141:2–13.

126.    Dr. Ansolabehere has produced demonstration maps in redistricting litigation in Florida, Texas, Virginia, Wisconsin, North Carolina, and Arizona, and consulted with the Arizona Redistricting Commission as a map drawer. *Id.* at 141:18–23. In addition to his academic work, he works on the election night desk for CBS news and is responsible for calling the results of elections. *Id.* at 142:3–10. In all of these applications, Dr. Ansolabehere works with census data to interpret polling and election results. *Id.* at 142:11–17. He has testified as expert witness in approximately fifteen cases, on topics including the geographic and demographic features of legislative districts, racially polarized voting, and the proper interpretation of election results. *Id.* at 142:18–143:6.

127.    Dr. Ansolabehere submitted a total of five expert reports in the earlier stage of this case addressing the 2021 Map, including a principal report, a rebuttal report, two supplemental reports, and an addendum to his second supplemental report. *See* Gonzales Exs. 6 (May 20, 2022 expert report), 7 (June 13, 2022 supplemental report), 8 (July 27, 2022 rebuttal report), 9 (March 31, 2025 second supplemental report), & 10 (April 28, 2025 addendum to second supplemental report); Tr. May 27 PM 145:1–148:9.

128.    During the May-June trial, the Court received Dr. Ansolabehere, without objection, as an expert in demographics, election analysis, and racially polarized voting. Tr. May 27 PM 143:22–144:4.

129.    In advance of the October 2025 preliminary injunction hearing, Dr. Ansolabehere produced two additional reports: an Expert Report dated August 23, 2025, Gonzales Ex. 39, and a Rebuttal Report dated September 29, 2025, Gonzales Ex. 61.

130.    After receiving Dr. Ansolabehere's testimony and reviewing his reports, the Court finds his analyses, opinions, and testimony credible.

### 1.    Methodology

131.    In his September 29 report, Dr. Ansolabehere analyzed the citizen voting age population (CVAP) of Texas's congressional districts under the 2021 Map and the 2025 Map using data from the Census Bureau's American Community Survey (ACS). Gonzales Ex. 39, Tbls. 5 & 6. The ACS is a nationwide survey of 3 million people conducted each year by the census bureau, and is "the standard source for measuring the citizen voting-age population overall, but also for specific groups." Tr. May 27 PM 151:5–9. Dr. Ansolabehere testified that because the ACS samples only 3 million people, the "standard dataset that everyone uses for this is the five-year average, which is the average of five years of the ACS for any interval." *Id.* at 151:13–15.[2]

132.    To analyze whether Black and Latino voters are able to elect their candidates of choice in each of the districts under both plans, Dr. Ansolabehere conducted an Ecological

---

[2] Because the American Community Survey provides estimated CVAP data at the block group level, the Texas Legislative Council includes all block groups with more than 50% of the population in a district in its analysis of that district's CVAP. *See, e.g.* Gonzales Ex. 17. Dr. Ansolabehere, however, allocates CVAP counts in split block groups according to the share of the VAP that is in each precinct. Gonzales Ex. 6 ¶ 15. As a result, Dr. Ansolabehere's CVAP estimates may differ slightly, though not materially, from those reported by the Texas Legislative Council.

Inference (EI) analysis. Tr. Oct. 3 AM 21:2–18. EI is a methodology that uses "the relationship between electoral outcomes at the precinct level and the racial composition of precincts in a particular district, county, or other area of interest to infer the vote preferences of different racial groups." Gonzales Ex. 6 ¶ 14. Using this method, it is possible to reliably estimate the vote shares that candidates received from particular racial and ethnic groups in past elections. Tr. May 28 AM 25:18–26:4. And because ecological inference analysis relies upon precinct-level results, it is possible to estimate such vote shares in hypothetical districts, in addition to actual historical districts. *Id.* at 29:13–30:6. EI is an accepted, reliable means in political science for estimating the voting preferences of different racial groups. *Id.* at 31:24–32:5; *see also, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 52–53 (1986); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013).

### 2.   CD 18 & CD 30

133.   Dr. Ansolabehere's analysis shows that the 2025 Map contains two Black majority CVAP districts, but that it was unnecessary to make these districts majority-Black because Black voters were already able to elect their candidates of choice in plurality-Black districts in those same geographies.

134.   In the 2025 Map, CD 18 is 51.6 percent Black CVAP, and CD 30 is 51.3 percent Black CVAP. Tr. Oct. 3 AM 20:9–14; Gonzales Ex. 39, Tbl. 6. Under the 2021 Map, the Black CVAP of CD 18 was 39.3 percent, and the Black CVAP of CD 30 was 47 percent, making Black voters the largest racial group by CVAP in each of those districts despite not comprising a majority. Tr. Oct. 3 AM 20:15–21:1; Gonzales Ex. 39, Tbl. 5.

135.   Dr. Ansolabehere's EI analysis showed that across 31 elections under the 2021 Map, 94 percent of Black voters voted for Democratic candidates in both CD 18 and CD 30. Tr. Oct. 3 AM 21:19–24; *id.* at 22:3–7. Those same preferences were shared by 63 percent of Latinos

and 58 percent of Anglos in CD 18, and by 74 percent of Latinos and 58 percent of Anglos in CD 30. *Id.* at 21:25–22:2, 22:8–22:13; Gonzales Ex. 39, Tbl. 7. As a result, it was not necessary to add additional Black voters to those districts for Black voters in those districts to be able to elect their candidates of choice. Tr. Oct. 3 AM 22:14–18.

136. In fact, Black voters in CD 18 and CD 30 were able to elect their candidates of choice under the 2021 Map despite making up only a plurality of the CVAP. In both congressional elections conducted under the 2021 Map, the Black-preferred candidates won handily. *Id.* at 23:3–24; Gonzales Ex. 39, Tbl. 9. And, according to Dr. Ansolabehere's analysis of statewide election results in each of those districts, the candidates preferred by Black voters won in 31 of 31 elections examined, with an average of 72 percent of the vote in CD 18 and 77 percent of the vote in CD 30. Tr. Oct. 3 AM 24:6–23; Gonzales Ex. 39, Tbl. 11.

137. Dr. Ansolabehere's analysis produced similar results for the 2025 Map. In CD 18 under the 2025 Map, 96 percent of Black voters, 73 percent of Latino voters, and 62 percent of Anglo voters voted for Democratic candidates, on average. Tr. Oct. 3 AM 25:6–12. In CD 30, 94 percent of Black voters, 81 percent of Latino voters, and 48 percent of Anglo voters voted for Democratic candidates. *Id.* at 25:13–17; *see also* Gonzales Ex. 39, Tbl. 8.

138. As under the 2021 Map, the candidates preferred by Black voters handily won all 31 elections analyzed in CD 18 and CD 30, with vote shares of 80 percent and 77 percent, respectively. Tr. Oct. 3 AM 25:18–26:10; Gonzales Ex. 39, Tbl. 13.

### 3. CD 9

139. Dr. Ansolabehere's analysis shows that CD 9 under the 2021 Map was a plurality-Black district in which Black and Latino voters were able to elect their candidates of choice. The new version of CD 9 under the 2025 Map—which bears very little resemblance to prior CD 9—is

now a bare majority Latino CVAP district in which Black and Latino voters are unable to elect their candidates of choice.

140.    CD 9 under the 2021 Map was a district in which Black voters had the ability to elect their preferred candidates. Tr. Oct. 3 AM 27:25–28:8. The 2021 Map's version of CD 9 was plurality Black CVAP, at 45.9 percent. Gonzales Ex. 39, Tbl. 5. In each of the 31 elections Dr. Ansolabehere examined, a majority of Black voters preferred Democrats, with an average of 94 percent voting for Democrats. *Id.* Tbl. 7; Tr. Oct. 3 AM 26:20–27:7. Anglo and Latino voters in CD 9 also preferred Democrats, at an average level of 56 percent and 71 percent, respectively. Gonzales Ex. 39, Tbl. 7.

141.    Unsurprisingly, in the only contested congressional election that took place in CD 9 under the 2021 Map, the candidate preferred by Black and Latino voters won with 77 percent of the vote. Tr. Oct. 3 AM 27:13–18. Similarly, in statewide elections, the candidates preferred by Black voters won 31 out of the 31 elections examined, with an average vote share of 75 percent. *Id.* at 27:19–24. Thus, although Black voters in CD 9 formed only a plurality of CVAP, they were able to elect their candidates of choice. *Id.* at 28:2–8.

142.    In the 2025 Map, CD 9 is a majority Latino CVAP district, with 50.2 percent Latino CVAP. Gonzales Ex. 39, Tbl. 6. The Black eligible voter population is reduced to 11.9 percent, while the Anglo CVAP is 35.3 percent. *Id.*

143.    Voting in the new CD 9 is racially polarized. Latinos in the new CD 9 on average voted 77 percent of the time for Democrats, and in all 31 of 31 elections examined, a majority of Latinos voted for Democratic candidates. Similarly, in all 31 elections a majority of the Black voters in that district voted for Democratic candidates, with Black support for those candidates averaging 80 percent. Anglos in the new CD 9, however, preferred Republican candidates in all

31 elections analyzed. On average they voted 11 percent for Democrats and 89 percent for Republicans. Tr. Oct. 3 AM 28:22–29:8; Gonzales Ex. 39, Tbl. 8.

144.    Dr. Ansolabehere's analysis showed that in each of the 31 past statewide elections examined, the Republican candidate would have won the majority of votes in the precincts included in CD 9 under the 2025 Map, with an average vote share of 57 percent. Tr. Oct. 3 AM 29:9–19; Gonzales Ex. 39, Tbl. 13.

145.    As a result, although CD 9 is a bare majority Latino district under the 2025 Map, it does not allow Latino voters a reasonable opportunity to elect their candidates of choice. Tr. Oct. 3 AM 30:4–7. This is because "the White cohesion rate is very high and even higher than the Hispanic cohesion level" and because White voters "have much higher turnout than Hispanics in that district." *Id.* at 30:8–17.

### 4.    CD 35

146.    Dr. Ansolabehere's analysis demonstrates that in the 2025 Map, CD 35 is transformed from a plurality-Latino district in which Latino voters were able to elect their candidates of choice into a bare majority-Latino district in which Latino voters are *not* able to elect their candidates of choice.

147.    Under the 2021 Map, CD 35 was a district in which no single racial group comprised a majority of the CVAP, but Latinos were a plurality with 45.9 percent of the CVAP. *Id.* at 31:11–16; Gonzales Ex. 39, Tbl. 5.

148.    In the 2021 Map, a majority of Latino voters in CD 35 voted for Democratic candidates in all 31 of the elections Dr. Ansolabehere examined, and on average those candidates won 73 percent of the Latino vote. Tr. Oct. 3 AM 31:17–22; Gonzales Ex. 39, Tbl. 7. Black and Anglo voters also preferred Democratic candidates in all 31 elections; on average, Anglos voted

72 percent for Democratic candidates, and Blacks voted 68 percent for Democratic candidates. Tr. Oct. 3 AM 32:23–33:4; Gonzales Ex. 39, Tbl. 7.

149.    In each of the two congressional elections conducted under the 2021 Map, the Latino candidate of choice won handily in CD 35, with 70 percent of the vote on average. Tr. Oct. 3 AM 32:9–15; Gonzales Ex. 39, Tbl. 9. Similarly, in statewide elections, the Latino candidates of choice won 31 of 31 contests analyzed in old CD 35, receiving on average 71 percent of the vote. Tr. Oct. 3 AM 32:18–25; Gonzales Ex. 39, Tbl. 11.

150.    In sum, although Latino voters comprised only a plurality of the CVAP of old CD 35, they were nonetheless able to consistently elect their candidates of choice. There was thus no need for Latino voters in this geography to be in a majority-Latino district in order to elect their candidates of choice. Tr. Oct. 3 AM 33:1–4.

151.    Under the 2025 Map, the Latino CVAP of CD 35 is increased to 51.6 percent. *Id.* 33:7–9.

152.    Voting in the new CD 35 is racially polarized. As in the prior version of CD 35, Latino voters cohesively prefer Democratic candidates in new CD 35. In each of the 31 elections examined, Latino voters preferred Democratic candidates; on average they voted 79 percent for Democrats. *Id.* at 33:10–15; Gonzales Ex. 39, Tbl. 8. Anglo voters in the new CD 35, however, cohesively prefer Republican candidates; they voted on average 20 percent for Democratic candidates and 80 percent for Republican candidates, and in every election Dr. Ansolabehere analyzed a majority of Anglos voted for Republican candidates. Tr. Oct. 3 AM 33:16–20; Gonzales Ex. 39, Tbl. 8.

153.    As a result of this racial polarization, in all 31 elections examined by Dr. Ansolabehere in new CD 35, Republican candidates won the majority of votes—meaning that

Latinos are no longer able to elect their candidates of choice in CD 35 under the 2025 Map. Tr. Oct. 3 AM 33:21–34:17.

### 5.    CD 37

154.    Dr. Ansolabehere's analysis shows that CD 37, which under the 2021 Map was a majority-Anglo district that consistently elected Democratic candidates, maintained this character in the 2025 Map. Under the 2021 Map, CD 37 was a majority Anglo CVAP (60.4%) district where Anglo voters consistently and cohesively preferred Democratic candidates. Tr. Oct. 3 AM 34:23–35:9. Under the 2025 Map, CD 37 remains a majority Anglo CVAP (53.8%) district where Anglo voters consistently and cohesively prefer Democratic candidates. *Id.* at 35:12–20. In both versions of CD 37, the Anglo-preferred Democratic candidates consistently won in both congressional and statewide elections. *Id.* at 35:21–36:5.

### 6.    CD 22 & CD 27

155.    Dr. Ansolabehere's analysis shows that CD 22 and CD 27 under the 2021 Map were both majority-minority districts that consistently elected Republican candidates. But in the 2025 Map, they were converted to majority-Anglo districts that will continue to elect Republican candidates.

156.    Under the 2021 Map, both CD 22 and CD 27 were majority-minority districts that consistently elected Republican candidates. CD 22, though plurality Anglo, was majority non-Anglo. *Id.* at 36:6–15; Gonzales Ex. 39, Tbl. 5. CD 27 was a Latino plurality majority-minority district, with 48.8 percent Latino CVAP and only 43.9 percent Anglo CVAP. Tr. Oct. 3 AM 36:16–18; Gonzales Ex. 39. Tbl. 5. In both districts, Republican candidates consistently won both congressional and statewide elections. Tr. Oct. 3 AM 36:19–22.

157.    Under the 2025 Map, both CD 22 and CD 27 are majority Anglo, with 50.5 percent and 52.9 percent Anglo CVAP, respectively. *Id.* at 36:25–37:6. As in the 2021 Map, Republican

candidates will consistently win in both districts. *Id.* at 37:7–9. CD 22 and CD 27 were thus converted from majority-minority Republican districts to majority-Anglo Republican districts. *Id.* at 37:10–17.

### 7.    CD 34

158.    Finally, in the Rio Grande Valley, Dr. Ansolabehere's analysis shows the 2025 Map substantially reduces the opportunity for Latino voters in CD 34 to elect their candidates of choice. Tr. Oct. 3 AM 38:22–22. Though Latino voters continue to form a majority in the newly drawn CD 34, their preferred candidates lost in 17 of the 31 elections that Dr. Ansolabehere analyzed in the new district. Gonzales Ex. 39 at 4. In the 2021 Map's version of CD 34, however, Latino-preferred candidates won 29 out of 31 elections. *Id.* Tbl. 10.

### 8.    Conclusions

159.    Based on the foregoing detailed analysis of the racial demographics and political performance of congressional districts under both the 2021 Map and the 2025 Map, Dr. Ansolabehere reached three principal conclusions. First, he concluded that "there was a reduction of four districts . . . from the old map to the new map in which Hispanics or Blacks had the opportunity to elect their preferred candidates." *Id.* at 38:13–18; Gonzales Ex. 39 at 5.

160.    Second, Dr. Ansolabehere concluded that the 2025 Map's creation of two majority-Black CVAP districts, CDs 18 and 30, does not improve Black voters' opportunities because both districts replace plurality-Black districts in which Black voters were already consistently able to elect their candidates of choice. Gonzales Ex. 39 at 5. "Rather, by reducing the number of other majority-minority districts in which Black voters would consistently have been able to elect their candidates of choice, the [2025 Map's] overall effect is to reduce Black voters' electoral opportunities." *Id.*

43

161.    Third, Dr. Ansolabehere concluded that the 2025 Map's configuration of CD 9 and CD 35 as new majority-Latino CVAP districts does not improve Latino voters' opportunities to elect their candidates of choice, because in both districts, the candidates favored by a substantial majority of Latino voters would have lost 31 out of 31 elections analyzed. *Id.*

### 9.    Response to Defendants' Expert

162.    None of Defendants' experts questioned the results of Dr. Ansolabehere's EI analysis, and none conducted a competing EI analysis.

163.    Defendants produced an expert report by Dr. Jeffrey Lewis which responded to Dr. Ansolabehere's August 23 Report. Defs. Ex. 570. Dr. Lewis did not conduct his own EI analysis or produce his own estimates of racially polarized voting. Tr. Oct. 8 PM 137:12–14, 138:4–5. He nonetheless leveled two criticisms at Dr. Ansolabehere's EI analysis.

164.    First, Dr. Lewis compared Dr. Ansolabehere's EI results to those of another Plaintiff expert, Dr. Loren Collingwood. *Id.* at 139:24–140:3. Because Dr. Collingwood used a different measure of race than did Dr. Ansolabehere, his estimates of Latino voter cohesion differ slightly from those reported by Dr. Ansolabehere in certain districts. Tr. Oct. 3 AM 39:9–21. Nonetheless, both Dr. Ansolabehere and Dr. Lewis agreed that these different results from different methodologies do not suggest a problem with Dr. Ansolabehere's analysis. *Id.* at 39:16–21; Tr. Oct. 8 PM 140:4-19. Dr. Lewis pointed to these differences merely "to point out that these are estimates." Tr. Oct. 8 PM 140:15.

165.    Second, Dr. Lewis opined that a "homogeneous precinct analysis" might suggest that the estimates offered by Dr. Ansolabehere may overstate the true level of Hispanic cohesion in Texas elections. Defs. Ex. 570 ¶ 12. As Dr. Ansolabehere explained, homogeneous precinct analysis "examines the subset of precincts in a map that . . . have very high concentrations of one racial group, like 95 percent White or 95 percent Black." Tr. Oct. 3 AM 40:7–11. That analysis is

performed to "confirm some other analysis." *Id.* at 40:14–15. Dr. Ansolabehere testified that when he did his original EI analysis, he checked it against homogeneous precincts "as a matter of course." *Id.* at 40:18–19. And in his rebuttal report, he reported the results of this analysis using two different methods. Gonzales Ex. 61 at 1; Tr. Oct. 3 AM 40:20–41:22. This analysis, Dr. Ansolabehere testified, "confirmed that the EIs were getting the numbers right" and did not suggest any problems with his original EI analysis. Tr. Oct. 3 AM 31:21–25.

### B.   Dr. Jeffrey Lewis

166.   In addition to his critique of Dr. Ansolabehere's EI estimates, Dr. Lewis performed his own analysis comparing the precinct-level results for President Trump's 2024 election to those of Governor Abbott in 2022. Defs. Ex. 570 at 4–5. He also compared the Trump 2024 results to the racial composition of those precincts. *Id.*

167.   Dr. Ansolabehere, however, explained that this is "not a statistically appropriate comparison." Gonzales Ex. 61 at 2. That is because "the vote share for Abbott in the 2022 gubernatorial election is itself related to [the] racial and ethnic makeup of the precinct," and regressing these results against the 2024 presidential election results therefore does not "isolate partisanship from race." *Id.* In other words, "because the Abbott vote also includes the preferences of Blacks and Hispanics and Whites in that election," Dr. Lewis's analysis is "factoring in race twice." Tr. Oct. 3 AM 42:14–16.

168.   Next, Dr. Lewis purported to examine the overall effect of the 2025 Map statewide on minority voters. Defs. Ex. 570 at 6–8. By comparing the percentages of Democrats and Republicans of different racial groups that were expected to prefer the winning candidates under both the 2021 Map and 2025 Map, Dr. Lewis concluded that the 2025 Plan disadvantages Black, Latino, and Anglo Democrats, and advantages Black, Latino, and Anglo Republicans. *Id.*

169.    But, as Dr. Ansolabehere pointed out, Dr. Lewis's analysis suffers from two issues. First, his report presents only percentages, without any information on the size of those groups he was analyzing. Tr. Oct. 3 AM 42:22–43:5. And, of course, "40 percent of a very big group is a different number than 60 percent of a really small group." *Id.* at 43:2–5. Second, Dr. Lewis's analysis infers from a *statewide* ecological inference analysis what is happening in an individual precinct in a particular part of the state. *Id.* at 43:6–10. But as Dr. Lewis himself acknowledged, Defs. Ex. 570 at 6; Tr. Oct. 8 PM 141:18–21, there is significant variation across Texas in how Latinos and Anglos vote. Tr. Oct. 3 AM 43:11–19; *see also* Gonzales Ex. 61 at 2–3.

170.    In his rebuttal report, Dr. Ansolabehere conducted his own analysis that both reports the size of the relevant groups and conducts the EI analysis at the district level. Gonzales Ex. 61 at 3–4; Tr. Oct. 3 AM 43:20–44:1. That analysis shows that the 2025 Map "*increased* the number of White adult citizens who live in CDs in which candidates supported by White voters won a majority of the vote, while *decreasing* the number of Black and Hispanic adult citizens who live in CDs in which the candidates supported by those voters won the majority of the vote." Gonzales Ex. 61 at 3–4.

171.    Moreover, Dr. Lewis admitted that "Table 1" in his report, which shows the results of his statewide analysis, omitted key information that supports Dr. Ansolabehere's critique. Tr. Oct. 9 AM 18:1–25. The R code that Dr. Lewis produced alongside his report generated, in addition to the percentages of Democrats and Republicans of different racial groups that were expected to prefer the winning candidates in their respective districts under each map, those same percentages for Anglo, Black, and Latino voters overall—regardless of party. Gonzales Exs. 68, 73. This metric shows that overall, only 45 percent of Latino and 45 percent of Black voters are able to elect their candidates of choice statewide under the 2025 Map—a 6 percentage point drop for each group as

compared to the 2021 Map. Gonzales Ex. 73. Meanwhile, the ability of Anglo voters to elect their candidates of choice is unchanged between the two maps, holding steady at 78 percent. *Id.*

172.    Dr. Lewis could not explain this omission. He testified that he "meant" to include this information in his report, because this is a "very, very obvious point." Tr. Oct. 9 AM 19:6–8, 19:21–20:1. But "somewhere in the back-and-forth" over the report between Dr. Lewis and his lawyers, this information was removed without Dr. Lewis's knowledge. *Id.* at 20:15–21:8.

173.    Indeed, Dr. Lewis's report is rife with significant errors that cast considerable doubt on the reliability and credibility of his conclusions. For instance, Dr. Lewis reported that, "Professor Ansolabehere's estimates of Hispanic support for President Trump in 2024 have a median value of 63 percent and are greater than 76 percent in one-quarter of his estimates." Defs. Ex. 570 at 6 n.2. But as Dr. Lewis later testified, that is not true: in fact, those numbers represent the Latino support for President Trump's *opponent*, Vice President Kamala Harris. Tr. Oct. 8 PM 142:1–17. Even Dr. Lewis acknowledged that this is "a pretty big difference." *Id.* at 142:18–24.

174.    Dr. Lewis also acknowledged under cross examination that in part of the code he produced with his expert report, he assumed that Asian voters vote like Anglo voters—multiplying the EI estimate for Anglo support for Democratic candidates by the sum of the number of Anglo eligible voters and Asian eligible voters. Tr. Oct. 9 AM 8:1–7. And he acknowledged that such an assumption is inappropriate when conducting an analysis "for the purposes of determining whether two groups voted differently." *Id.* at 3:23–4:2.

175.    This carelessness unfortunately appears to be part of a pattern in cases involving Dr. Lewis. In *Common Cause v. Lewis*, a case in North Carolina state court, Dr. Lewis rested his analysis on an assumption that "zero percent" of unaffiliated white voters would support Democrats, which he admitted during his deposition was "obviously . . . not a reasonable

assumption." *Id.* at 150:1–9. Dr. Lewis recalculated his results to adjust for this error. *Id.* at 150:25–151:4. But, rather than produce his recalculated results, the Defendants in that case withdrew Dr. Lewis's report and withdrew him from their witness list before trial. Tr. Oct. 9 AM 116:11–25.

176.    In *Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2022), Dr. Lewis analyzed racially polarized voting and opined that majority minority districts were unnecessary in Louisiana because Black voters have a meaningful opportunity to elect candidates of their choice owing to White crossover voting. *Id.* at 843. The district court flatly rejected Dr. Lewis's analysis, explaining: "His opinion is simply unsupported by sufficient data and is accordingly unreliable." *Id.* The court further discredited Dr. Lewis's assertion—similar to one made here, Defs. Ex. 570 ¶ 5—that "time limitations" made further analysis impossible. 605 F. Supp. 3d at 843. That excuse was "less than persuasive, especially since Dr. Lewis performed his analysis using the data gathered by [Plaintiffs' expert]," just as he did here. *Id.*

177.    Based on the foregoing findings, Dr. Lewis's testimony lacks credibility and reliability, and is entitled to little weight.

## VII.    Conclusions

178.    Based on the detailed findings recounted above, the Texas Legislature intentionally diluted the votes of Black and Latino voters when it enacted the 2025 Map. The 2025 Map undisputedly reduces the number of districts in which Black and Latino voters have the opportunity to elect their candidates of choice. And the evidence shows that the legislature chose which districts to target for elimination at least in part based on their racial composition. Specifically, the legislature targeted majority-minority "coalition districts" in order to sell the 2025 Map as a race-based compliance measure in light of the Department of Justice's demands.

179.    Race predominated in the drawing of CD 18, CD 30, CD 9, and CD 35. All four districts were drawn with precise racial quotas in mind. In the case of CDs 18 and 30, the

Legislature intentionally created majority-Black districts at the expense of plurality-Black districts where Black voters were comfortably able to elect their candidates of choice. Indeed, members of the Texas Legislature proudly trumpeted the creation of these districts, perhaps in a misguided attempt to dispel allegations of intentional discrimination. And in CDs 9 and 35, the Legislature intentionally created bare majority-Latino CVAP districts that do *not* allow Latino voters to elect their candidates of choice—all in service of a false political narrative that Latino voters now prefer Republican candidates.

180.    Race also predominated in the drawing of CDs 22 and 27. Both were majority-minority districts that consistently elected Republican candidates under the 2021 Map. And both were transformed into majority-Anglo districts, for no discernable partisan purpose.

## VIII.    Equitable Considerations

181.    Requiring Texas to use the 2021 Map for the upcoming 2026 elections will not work substantial hardship to voters or election officials. The filing period for candidates for Congress, which runs from November 8 through December 8, has not yet begun. Tex. Elec. Code § 172.023. No ballots have been printed or mailed, and certainly no ballots have been cast.

182.    The main challenge for election officials in implementing new maps at this juncture in the election cycle is to undertake the process of re-drawing voting precinct lines to ensure (with some exceptions) that each precinct contains territory from only one congressional district. *See* Tex. Elec. Code § 42.005. Christina Adkins, the Director of Elections for the Texas Secretary of State's office, testified that counties are "in the process of redrawing their county election voter registration precincts, which is the change that counties would have to make to comply with the new maps." Tr. Oct. 8 AM 149:21–150:5.

183.    But Ms. Adkins also acknowledged that Texans across the state will be voting in statewide and local elections on November 4, 2025. Tr. Oct. 8 PM 32:14–33:3. And those elections

will be conducted using precinct boundaries that are already drawn to conform to the 2021 Map. *Id.* at 33:4–34:9.

184.    Reverting to the 2021 Map therefore will not require any additional effort from Texas's county election officials because the voting precincts they will need to use should the 2026 primary go forward under the 2021 Map are already in place. There will be no prejudice to election officials or voters in using the same voting precincts in the March 2026 primary that they will already be using in the November 4, 2025 statewide election.

Dated: October 17, 2025

Renea Hicks
Attorney at Law
Texas Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

Respectfully submitted,

*/s/ David R. Fox*

David R. Fox
Richard A. Medina
James J. Pinchak
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law
jpinchak@elias.law

Abha Khanna
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

Counsel for Gonzales Plaintiffs

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically and served on all counsel of record (via CM/ECF) on October 17, 2025.

*/s/ David R. Fox*