## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| LULAC, *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*,<br><br>    *Defendants.* | Case No.: 3:21-CV-00259-DCG-JES-JVB [Lead                                    Case] |
| ROY CHARLES BROOKS, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*,<br><br>    *Defendants.* | Case No.1-21-CV-00991-DCG-JES-JVB [Consolidated Case] |

## BROOKS, MALC'S, and LULAC PLAINTIFFS' PROPOSED FINDINGS OF FACT

Plaintiffs sued and moved for a preliminary injunction on their claims under the Fourteenth and Fifteenth Amendments, and 42 U.S.C. § 1983. Starting on October 1, 2025, and ending on October 10, 2025, the Court held a preliminary injunction hearing on these claims. The Brooks Plaintiffs, MALC Plaintiffs, and LULAC Plaintiffs submit proposed findings of fact and respectfully request the Court enjoin Plan C2333.

## FINDINGS OF FACT

**I.    Parties**

a.  **Plaintiffs**

**Brooks Plaintiffs**

1. Plaintiff Roy Charles Brooks is a Black citizen. He is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code and is currently registered to vote. Plaintiff Brooks lived in CD 12 in Plan C2193, Brooks Ex. 46; 239, and now lives in CD 12. *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333. Plaintiff Brooks has voted in past elections including in 2022 and 2024, and plans to vote in future elections. Joint Stipulations of Fact, ECF No. 978 at ¶ 10.

2. Plaintiff Felipe Gutierrez is a Hispanic citizen, is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code and is currently registered to vote. Brooks Ex. 332. Plaintiff Guiterrez lived in CD 12 in Plan C219, Brooks Ex. 47, and now lives in CD 12 under Plan C2333. *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333; Brooks Ex. 232. Plaintiff Guiterrez has voted in elections in 2022 and 2024 and plans to vote in future elections. Brooks Ex. 232.

3. Plaintiff Phyllis Goines is a Black citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 48; 235. She resided in CD33 under Plan C2193 and now resides in CD 12 under Plan C2333. *Id.*; *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333.

4. Plaintiff Eva Bonilla is a Latina citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 49; 231 She resided in CD 12 under Plan C2193. *Id.* Under Plan C2333 she lives in CD 12. *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333.

5. Plaintiff Clara Faulkner is a Black citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 50; 230. She resided in CD 33 under Plan C2193, *id.*, and now resides in CD 25 under Plan C2333. *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333.

6. Plaintiff Deborah Spell is a Black citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 51; 236. She resided in CD 25 in Plan C2193, *id.,* and now resides in CD 30 under Plan C2333. *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333.

7. Plaintiff Sandra M. Puente is a Latina citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 237. She resided in CD 29 under the 2021 mapping configuration and now resides in CD 29 under Plan C2333. *Id.*; *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333. Ms. Puente intends to vote in future elections in CD 29, and in other elections in which she is eligible to vote. Brooks Ex. 237.

8. Plaintiff Jose R. Reyes is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 229. He resided in CD 29 under Plan    C2193 and resides in CD 18 under Plan C2333. *Id.; See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333.    Mr. Reyes intends to vote in future elections in and in other elections in which he is eligible to vote. Brooks Ex. 229.

9. Plaintiff Norma Cavazos is a Latina citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 234. Under Plan C2193 she lived in CD 28 and under Plan C2333 she lives in CD 35. *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333.

10. Plaintiff Lydia Alcalan is a Latina citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 238. She resided in CD 30 in Plan C2193, *id.*, and now resides in CD 33 under Plan C2333. *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333. Ms. Alcalan intends to vote in future elections and in other elections in which she is eligible to vote. Brooks Ex. 238.

11. Plaintiff Martin Saenz is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 233. He resided in CD 5 in Plan C2193. *Id.* Under Plan C2333, Mr. Saenz resides in CD 5. *See* https://dvr.capitol.texas.gov/Congress/94/PLANC2333. Mr. Saenz intends to vote in future elections and in other elections in which he is eligible to vote. Brooks Ex. 233.

12. Plaintiff Justin Boyd is a Black citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 271. He now resides in CD 2 in the 2025 Texas Congressional map. *Id.* Under the 2021 Congressional plan, Plaintiff Boyd resided in CD 18. *Id.* Plaintiff Boyd intends to vote in future elections in CD 2 and in other elections in which they are eligible to vote. *Id.*

13. Plaintiff Charles Cave is a Black citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 272. Under the 2025 Texas Congressional map, he resides in CD 18. *Id.* In the 2021 Congressional plan, he lived in CD 9. *Id.* Plaintiff Cave intends to vote in future elections in CD 18 and in other elections in which they are eligible to vote. *Id.*

14. Plaintiff Emmanuel Guerrero is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 273. He resides in CD 9 in the 2025 Texas Congressional map. *Id.* He resided in CD 29 under the 2021

Congressional plan. Plaintiff Guerrero intends to vote in future elections in CD 9 and in other elections in which they are eligible to vote. *Id.*

15. Plaintiff Betty Keller is a Black citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  Brooks Ex. 274. Under the 2025 Texas Congressional map she resides in CD 18. *Id.* Under the 2021 Texas Congressional plan she resided in CD 9. *Id.* Plaintiff Keller intends to vote in future elections in CD 18 and in other elections in which they are eligible to vote. *Id.*

16. Plaintiff Lorraine Montemayor is a Latina citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 275. Under the 2025 Texas Congressional map she resides in CD 27. *Id.* Under the 2021 Texas Congressional map, she resided in CD 35. *Id.* Plaintiff Montemayor intends to vote in future elections in CD 27 and in other elections in which they are eligible to vote. *Id.*

17. Plaintiff Joetta Stevenson is a Black citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 276. Under the 2025 Texas Congressional map, she resides in CD 18. *Id.* Under the 2021 Texas Congressional map, they resided in CD 18. *Id.* Plaintiff Stevenson intends to vote in future elections in CD 18 and in other elections in which she is eligible to vote. *Id.*

18. Plaintiff Dennis Williams is a Black citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. Brooks Ex. 277. Under the 2025 Texas Congressional map, he resides in CD 32. *Id.* Under the 2021 Texas Congressional map, he resided in CD 32. Plaintiff Williams intends to vote in future elections in CD 32 and in other elections in which he is eligible to vote. *Id.*

**MALC Plaintiffs**

19. Plaintiff Mexican American Legislative Caucus, Texas House of Representatives ("MALC") is a nonprofit caucus of sitting Texas State Representatives of Mexican American descent or representing majority-Latino districts. Tr. June 4 AM133:6-134:19; Tr. Oct. 2 PM 29:20-30:6.

20. MALC's mission is to advance Latino representation in Texas government through legislative participation, outreach, and litigation. Trial Tr. PM (October 1, 2025) 94:16-95:25.

21. MALC historically participates in each decennial and mid-decade redistricting process by offering proposals and testimony before the Legislature. Trial Tr. PM (October 1, 2025) 96:1-5.

22. MALC's participation in redistricting litigation is part of the organization's core mission. Trial Tr. PM (October 1, 2025) 96 1-14.

23. Individual MALC members are affected by the changes to the Congressional maps, Trial Tr. PM (October 2, 2025) 29: 5-11, including MALC members who reside in Congressional Districts 9, 18, 29, 33. *Id*. at 30:20-25.

24. MALC Chairman Romero testified that the organization's "members all around the state" have been affected by the new maps. Trial Tr. PM (October 2, 2025) 29:20- 30:6.

25. MALC members reside in what was CD9. Trial Tr. PM (October 2, 2025) 30:20-22.

26. MALC members Armando Walle, Ana Hernandez, Mary Ann Perez, and Christina Morales reside in former CD 29. Trial Tr. PM (October 2, 2025) 32:6-25. MALC Member Joe Moody resides in former CD 16.  Trial Tr. PM (October 1, 2025) 96:15-20.

27. MALC Chairman Romero's residence used to be in CD33, but under the new plan his residence would be moved into CD 25. Trial Tr. PM (October 2, 2025) 31:1-6; *Id.* at 48:25-49:21.

28. Portions of Chairman Romero's state house district will be moved from CD 33 in the current map into CD 12 and CD 25 in the new plan. Trial Tr. PM (October 2, 2025) 49:13-19.

29. MALC members Vinton Jones, Rafael Anchia, Ana-Maria Ramos, Jessica Gonzalez, and Terry Meza reside immediately adjacent to what had been CD 33. Trial Tr. PM (October 2, 2025) 47:25-48:18.

30. MALC member Armando Walle, living in CD 29 will have difficulty electing his candidate of choice under the new Congressional plan. Trial Tr. PM (October 2, 2025) 35:24-36:4; *Id.* at 38:18-39:3.

31. Ana Hernandez's state house district used to include portions of former CD 18 and CD 19 but is now almost exclusively in CD 9. Trial Tr. PM (October 2, 2025) 39:14-40:3.

32. Each of the foregoing MALC members are also registered voters that intend to vote in future elections to elect members of the U.S. House of Representatives and other elections in which they are entitled to vote. *See* MALC Exhibits MALC.3-MALC.12 (admitted in May/June Trial).

**LULAC Plaintiffs**

33. LULAC members include Latino registered voters who are injured by Defendants' dilution of Latino voting strength and intentional discrimination, because those members reside in areas where Defendants either could have created additional Latino citizen

voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.

34. Plaintiff LULAC Member A is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. ECF No. 1246, Ex. A; LULAC Ex. 1345. He resides in CD27 under Plan C2333. *Id.* He intends to vote in future elections in CD 27 and in any other district in which he is eligible to vote. *Id.*

35. Plaintiff LULAC Member B is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. ECF No. 1246, Ex. B; LULAC Ex. 1347. She resides in CD 34 under plan C2333, and resided in CD 27 under plan C2193. *Id.* She intends to vote in future elections in CD 34 and in other district in which she is eligible to vote. *Id.*

36. Plaintiff LULAC Member C is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. ECF No. 1246, Ex. C; LULAC Ex. 1349. He resides in CD 34 under Plan C2333, and resided in CD 27 under Plan C2193. *Id.* He intends to vote in future elections in CD 34 and in any other district in which he is eligible to vote. *Id.*

37. Plaintiff LULAC Member D is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. ECF No. 1246, Ex. D; LULAC Ex. 1351. He resides in CD 36 under plan C2333. *Id.* He intends to vote in future elections in CD 36, and in any other district in which he is eligible to vote. *Id.*

38. Plaintiff LULAC Member E is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. ECF No. 1246, Ex. E; LULAC Ex. 1353. She resides in CD 9 under plan C2333 and resided in CD 29 under plan

C2193. *Id.* She intends to vote in future elections in CD 9 and in any other district in which she is eligible to vote. *Id.*

39. Plaintiff LULAC Member I is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. ECF No. 1246, Ex. I; LULAC Ex. 1358. He resides in CD 35 under plan C2333 and resided in CD 15 under plan C2193. *Id.* He intends to vote in future elections in CD 35, and in any other district in which he is eligible to vote. *Id.*

40. Plaintiff LULAC Member J is a Hispanic citizen, is a registered voter, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. ECF No. 1246, Ex. J; LULAC Ex. 1359. He resides in CD 25 under plan C2333 and resided in CD 28 under plan C2193. *Id.* He intends to vote in future elections in CD 35, and in any other district in which he is eligible to vote. *Id.*

41. Plaintiff LULAC Member L is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. ECF No. 1246, Ex. L; LULAC Ex. 1361. She resides in CD 36 under plan C2333 and resided in CD 29 under plan C2193. *Id.* She intends to vote in future elections in CD 36, and in any other district in which she is eligible to vote. *Id.*

42. Plaintiff LULAC Member M is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code. ECF No. 1246, Ex. M; LULAC Ex. 1362. He resides in CD 9 under plan C2333 and resided in CD 29 under plan C2193. *Id.* He intends to vote in future elections in CD 9 and in any other district in which he is eligible to vote. *Id.*

43. Plaintiff LULAC Member O is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1246, Ex. O; LULAC Ex. 1364.  She resides in CD 29 under plan C2193. *Id.*  She plans to vote in future elections in CD 29 and in any other district in which she is eligible to vote.  *Id.*

44. Plaintiff LULAC Member P is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1246, Ex. P; LULAC Ex. 1365.  She resides in CD 27 under plan C2333 and resided in CD 27 under plan C2193.  *Id.*  She intends to vote in future elections in CD 27 and in any other district in which she is eligible to vote.  *Id.*

45. TEXAS HOPE's members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice. Thus, TEXAS HOPE has associational standing to challenge those districts.

46. Plaintiff TX HOPE Member C is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1246, Ex. DD; LULAC Ex. 1350.  She resides in CD 37 under plan C2333 and resided in CD 35 under plan C2193.  *Id.*  She intends to vote in future elections in CD 37 and in any other district in which she is eligible to vote.  *Id.*

47. Plaintiff TX HOPE Member D is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1246, Ex. EE; LULAC Ex. 1352.  He resides in CD 27 under plan C2333 and resided in CD 22

under plan C2193.  *Id.*  He intends to vote in future elections in CD 27 and in any other district in which he is eligible to vote.  *Id.*

48. Plaintiff TX HOPE Member E is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1246, Ex. FF; LULAC Ex. 1354.  She resides in CD 9 under plan C2333 and resided in CD 29 under plan C2193.  *Id.*  She intends to vote in future elections in CD 9 and in any other district in which she is eligible to vote.  *Id.*

49. Plaintiff Jose Olivares is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1255, Ex. A; LULAC Ex. 1375.  He resides in CD 34 under plan C2333 and resided in CD 27 [under plan C2193.  *Id.*  He intends to vote in future elections in CD 34 and in any other district in which he is eligible to vote.  *Id.*

50. Plaintiff Paulita Sanchez is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1255, Ex. B; LULAC Ex. 1376.  She resides in CD 21 under plan C2333.  *Id.*   She intends to vote in the upcoming November 2026 election, including for Congress.  *Id.*

51. Plaintiff JoAnn James is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1255, Ex. C; LULAC Ex. 1377.  She resides in CD 35 under plan C2333, and resided in CD 28 under plan C2193  *Id.*  She intends to vote in future elections in CD 35 and in any other district in which she is eligible to vote.  *Id.*

52. Plaintiff David Lopez is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1255, Ex. D; LULAC Ex.

1378.  He resides in CD 38 under plan C2333 and resided in CD 38 under plan C2193. *Id.*  He intends to vote in future elections in CD 38 and in any other district in which he is eligible to vote.  *Id.*

53. Plaintiff Diana Martinez Alexander is a Hispanic citizen, is registered to vote, and is a qualified voter pursuant to Sec. 11.002 of the Texas Election Code.  ECF No. 1255, Ex. E; LULAC Ex. 1379.  She resided in CD 38 under plan C2193.  *Id.*  She intends to vote in future elections in CD 38 and in any other district in which she is eligible to vote.  *Id.*

### b.  Defendants

54. Jane Nelson is the Secretary of State of Texas. As Secretary of State, Ms. Nelson serves as Texas's Chief Election Officer. Tex. Elec. Code § 31.001(a). This role requires Ms. Nelson to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's election laws, including issuing directives and instructions to all state and local authorities in the administration of these laws, *id.* § 31.003. Ms. Nelson is empowered to order any official to correct conduct that "impedes the free exercise of a citizen's voting rights." *Id.* § 31.005(b). Ms. Nelson prescribes the form that individuals must complete for a place on a political party's general primary ballot, *see id.* §§ 141.031, 172.021-.024. Political parties who wish to hold a primary must deliver written notice to Ms. Nelson's office in her role as the Secretary of State noting their intent to hold a primary election, *id.* § 172.002, and the party chairs must certify to the Secretary of State the name of each candidate who has qualified for placement on the general primary election ballot, *id.* § 172.028. Ms. Nelson, in her role as Secretary of State also serves as the filing authority for independent candidates for federal office, including members of Congress. *See id.* § 142.005. The adopted redistricting plans are filed with the Secretary of State to ensure that

elections are conducted in accordance with those plans. Stipulations of Fact, ECF No. 978 at ¶ 21.

55. Gregory Wayne Abbott is the Governor of the State of Texas. Under Texas's election laws, Governor Abbott "shall order . . . each general election for . . . members of the United States Congress" by proclamation. Tex. Elec. Code § 3.003. Stipulations of Fact, ECF No. 978 at ¶ 22.

## II.    Expert Witness

### Plaintiffs Experts

56. Plaintiffs' experts Matt Barreto, Ph.D., Loren Collingwood, Ph.D, Stephen Ansolabehere, Ph.D., testified on the ability for Black and Hispanic voters in Harris County, Dallas Fort-Worth Counties, Travis and Bexar Counties, and the coastal area and central Texas to be able to elect candidates of choice, the existence of racially polarized voting within CDs that cover those regions, and the reduction of Black and Hispanic electoral opportunity under the 2025 congressional map, Plan C2333. *See e.g.,* Brooks Ex. 269, 283, 284; Gonzales Ex. 39, 61; LULAC Ex. 829; 832.

57. Dr. Barreto's, Dr. Ansolabehere's, and Dr. Collingwood's opinions are based on quantitative analysis of demographic data and election results. Brooks Ex. 269 at 2; Gonzalez Ex. 39 at 1.

58. Dr. Matt Barreto is a Professor of Political Science and Chicano Studies at the University of California at Los Angles. Brooks Ex. 225; 269. He is also the Co-Founder and Faculty Director of the Latino Policy and Politics Initiative at UCLA, and the Co-Founder and Faculty Director of the UCLA Voting Rights Project. *Id.* Dr. Barreto has testified dozens

of times in federal court on the topics of racially polarized voting, demographic change, mapmaking, and public polling. *Id*.

59. Dr. Barreto has 20 years of experience in analyzing mapping and redistricting plans. He has been hired to assist state, county, and city governments with their redistricting process during the 2011 and 2021 redistricting cycles. Trial Tr. AM (October 4, 2025) 48:8-24 (Dr. Barreto).

60. Dr. Barreto and Mr. Rios further use the voter file to conduct BISG to input the race and ethnicity of actual voters into their EI models and conclude that Texas elections exhibit racially polarized voting. BISG provides a more precise and accurate analysis of voting patterns because it correlates precinct VTD candidate choice with the race and ethnicity of actual names on the voter file.  Brooks Ex. 269 (Barreto Report) at 10. While CVAP estimates are also reliable, they include people who are not registered or did not vote, as such BISG voter file data is more precise. *See Petteway v. Galveston Cnty.,* 698 F. Supp. 3d 952, 975 (S.D. Tex.); *Nat'l Ass'n for Advancement of Colored People, Spring Valley Branch v. E. Ramapo Cent. Sch. Dist.,* 462 F. Supp. 3d 368, 392 (S.D.N.Y. 2020), aff'd sub nom. *Clerveaux v. E. Ramapo Cent. Sch. Dist.,* 984 F.3d 213 (2d Cir. 2021). Dr. Barreto ran 600 total EI regression models across 2022 and 2024 elections that documented a clear pattern of racially polarized voting. Brooks Ex. 269 (Barreto Report) 7-9.

61. The Court recognized Plaintiffs' expert Dr. Barreto as an expert in political science, voting analysis, demographic analysis, the application of the *Gingles* factors and Voting Rights Act claims and now recognized him as an expert in mapping analysis. Trial Tr. AM (October 4, 2025) 48:19-49:9 (Dr. Barreto). Having observed Dr. Barreto and reviewed his

reports and declaration, the Court finds Dr. Barreto credits his analyses, opinion, and testimony, and grants them substantial weight.

62. Dr. Loren Collingwood is a tenured Associate Professor of Political Science at the University of New Mexico who specializes in quantitative research on racially polarized voting. Trial Tr. AM (October 3, 2025) 66:10-67:2. Dr. Collingwood has published numerous social science articles on research methodology, statistics, and analysis related to racially polarized voting, and the lead author of the software package eiCompare. Trial Tr. AM (October 3, 2025) 67:8-21. Numerous federal courts have credited his testimony and expert reports as credible and reliable on the topic of polarized voting and minority compactness. *See Soto Palmer v. Hobbs*, 686 F. Supp. 3d 1213, 1225 (W.D. Wash. 2023), cert. denied before judgment sub nom. *Trevino v. Palmer*, 144 S. Ct. 873, 218 L. Ed. 2d 58 (2024); *Turtle Mt. Band of Chippewa Indians v. Howe*, No. 3:22-cv-22, 2023 LX 92006 (D.N.D. Nov. 17, 2023); *Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136 (N.D. Ga. 2023; *Brule v. Lyman Cty., Lyman Cty. Bd. of Comm'rs*, 625 F. Supp. 3d 891 (D.S.D. 2022); *Rivera v. Schwab*, 315 Kan. 877, 512 P.3d 168 (2022).

63. In advance of the October 2025 preliminary injunction hearing, Dr. Collingwood produced two reports and his CV: (i) Expert Report of Dr. Loren Collingwood dated September 5, 2025, LULAC Ex. 829; (ii) CV of Loren Collingwood, LULAC Ex. 830; and (iii) Rebuttal Expert Report of Dr. Loren Collingwood dated September 29, 2025, LULAC Ex. 832.

64. Dr. Collingwood examined the extent to which racially polarized voting exists in the newly enacted Congressional Districts 9 and 35 (in Plan C2333). Dr. Collingwood also examined whether Hispanic-preferred candidates or White-preferred candidates win or lose in those districts. Trial Trial Tr. AM (October 3, 2025) 69:19-25. Dr. Collingwood concluded that

voting is polarized by race between Hispanic and White non-Hispanic voters in both CD9 and CD35 in Plan C2333. Trial Tr. AM (October 3, 2025) 93:2-17.

65. Dr. Collingwood concluded that voting is polarized by race between Hispanic and White non-Hispanic voters in both CD9 and CD35 in Plan C2333 and that based on his performance analysis, that Latino preferred candidates would be elected zero times for a win rate of 0% in the new CDs 9 and 35. Trial Tr. AM (October 3, 2025) 93:2-17; 93:18-94:3. Dr. Collingwood concluded that it's quite unlikely that the Hispanic-preferred candidate will win in either CD9 or CD35 in Plan C2333. Trial Tr. AM (October 3, 2025) 94:8-13. Dr. Collingwood also concluded that relatively lower Hispanic voter turnout rates, in combination with very high White voter cohesion, are the basic factors that contribute to the loss of Hispanic preferred candidates in CD9 and CD35 in Plan C2333. Trial Tr. AM (October 3, 2025) 92:4-93:1; 94:4-7; LULAC Ex. LULAC 829, page 21, Figure 5.2.

66. Throughout Dr. Collingwood's live testimony, his opinions were clear, consistent, and forthright. He had no difficulty articulating the basis for his opinions and answered questions presented to him clearly. As such, the Court finds Dr. Collingwood credible and grants his testimony on racially polarized voting substantial weight. Defendants questioned Dr. Collingwood about a substantially different type of analysis he conducted in North Carolina in which that court did not credit his testimony. That analysis is not at issue in this case and there is no doubt about the quality of his analysis in this case. In that case, however, the expert for North Carolina, who is an expert for Texas in this case, relied on Dr. Collingwood's EI estimates and agreed with Dr. Collingwood regarding the level of Black voter cohesion. Trial Trial Tr. AM (October 3, 2025) AM (October 3, 2025) 130:21-

131:14.  The district court also credited Dr. Collingwood's analysis and concluded that the plaintiffs had satisfied the second *Gingles* prong of minority cohesion.  Trial Tr. AM (October 3, 2025) 131:15-18.  The district court also accepted and relied on Dr. Collingwood's findings of the estimates for White voter cohesion in the analysis of Gingles prong 3.  Trial Tr. AM (October 3, 2025) 131:19-22.

67. This Court finds that in this particular case in Texas, Dr. Collingwood was careful in selecting data and elections to analyze and provided the court with reliable evidence pointing to the existence of racially polarized voting in recent elections in Texas. Defendants' own expert, Dr. Jeffrey Lewis, cited Dr. Collingwood's methodology as reliable and accurate in his own report. Def. Ex. 570 at 2 ("I agree with *LULAC* Plaintiffs' expert Professor Loren Collingwood's conclusions, in his September 5, 2025, Report…"). As such, the Court finds Dr. Collingwood credible and grants his opinions significant weight.

68. Moreover, Defendants questioned Dr. Collingwood's credibility because at some point Dr. Collingwood updated his curriculum vitae to remove the entry identifying his dissertation advisor, Dr. Barreto. Dr. Collingwood explained that he did so while considering going on the job market for a promotion as a professor after reviewing other professors' CVs to assess whether it was custom to continue listing one's dissertation advisor after reaching a more senior level of their career and concluded it was not. The Court finds Dr. Collingwood's explanation to be reasonable and credible and rejects the suggestion that there was some intent to hide his professional connection to Dr. Barreto. Indeed, a quick glance at the balance of Dr. Collingwood's CV shows otherwise, as that connection is obvious from their jointly published works.

69. Dr. Stephen Ansolabehere is the Frank G. Thompson professor of Government at Harvard University. Trial Tr. PM (May 27, 2025) 140:6–10. His research focuses on elections, representation, and public opinion, including statistical methods and redistricting. *Id.* at 140:18–141:1. He has published several peer-reviewed articles about statistical methodology in political science, racially polarized voting, ecological analysis, and redistricting. *Id.* at 141:2–13.

70. Dr. Ansolabehere has produced demonstration maps in redistricting litigation in Florida, Texas, Virginia, Wisconsin, North Carolina, and Arizona, and consulted with the Arizona Redistricting Commission as a map drawer. *Id.* at 141:18–23. In addition to his academic work, he works on the election night desk for CBS news and is responsible for calling the results of elections. *Id.* at 142:3–10. In all of these applications, Dr. Ansolabehere works with census data to interpret polling and election results. *Id.* at 142:11–17. He has testified as expert witness in approximately fifteen cases, on topics including the geographic and demographic features of legislative districts, racially polarized voting, and the proper interpretation of election results. *Id.* at 142:17–143:6.

71. Dr. Ansolabehere submitted a total of five expert reports in the earlier stage of this case addressing the 2021 Map, including a principal report, a rebuttal report, two supplemental reports, and an addendum to his second supplemental report. *See* Gonzales Exs. 6 (May 20, 2022, expert report), 7 (June 13, 2022, supplemental report), 8 (July 27, 2022, rebuttal report), 9 (March 31, 2025, second supplemental report), & 10 (April 28, 2025, addendum to second supplemental report); Trial Tr. PM (May 27, 2025) 145:1–148:9.

72. During the May-June trial, the Court received Dr. Ansolabehere, without objection, as an expert in demographics, election analysis, and racially polarized voting. Trial Tr. PM (May 27, 2025) 143:22–144:4.

73. In advance of the October 2025 preliminary injunction hearing, Dr. Ansolabehere produced two additional reports: an Expert Report dated August 23, 2025, Gonzales Ex. 39, and a Rebuttal Report dated September 29, 2025, Gonzales Ex. 61.

74. In his September 29 report, Dr. Ansolabehere analyzed the citizen voting age population (CVAP) of Texas's congressional districts under the 2021 Map and the 2025 Map using data from the Census Bureau's American Community Survey (ACS). Gonzales Ex. 39, Tbls. 5 & 6. The ACS is a nationwide survey of 3 million people conducted each year by the census bureau and is "the standard source for measuring the citizen voting-age population overall, but also for specific groups." Trial Tr. PM (May 27, 2025) 151:3–9. Dr. Ansolabehere testified that because the ACS samples only 3 million people, the "standard dataset that everyone uses for this is the five-year average, which is the average of five years of the ACS for any interval." *Id.* at 151:13–15.

75. To analyze whether Black and Latino voters are able to elect their candidates of choice in each of the districts under both plans, Dr. Ansolabehere conducted an Ecological Inference (EI) analysis. Trial Tr. AM (October 3, 2025) 21:2–18. EI is a methodology that uses "the relationship between electoral outcomes at the precinct level and the racial composition of precincts in a particular district, county, or other area of interest to infer the vote preferences of different racial groups." Gonzales Ex. 6 ¶ 14. Using this method, it is possible to reliably estimate the vote shares that candidates received from particular racial and ethnic groups in past elections. Trial Tr. AM (May 28, 2025) 25:18–26:4. And because

ecological inference analysis relies upon precinct-level results, it is possible to estimate such vote shares in hypothetical districts, in addition to actual historical districts. *Id.* at 29:13–30:6. EI is an accepted, reliable means in political science for estimating the voting preferences of different racial groups. *Id.* at 31:24–32:5; *see also, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 52–53 (1986); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013).

76. After receiving Dr. Ansolabehere's testimony and reviewing his reports, the Court finds his analyses, opinions, and testimony credible.

77. Plaintiffs presented Mr. David Ely to testify regarding the whether CDs 9 and 35 in C2333 were both created by combining Hispanic CVAP concentrations sufficient to reach a target of 50% with maximum white block voting against Hispanic preferred candidates, resulting in districts in which none of the Hispanic preferred candidates in the index have prevailed in re-aggregated elections.

78. Mr. David Ely is the owner and founder of Compass Demographics. Trial Tr. PM (October 2, 2025) 94:13–15.   Mr. Ely is a demographer, and database and election analysis consultant, whose work primarily focuses on redistricting and election issues. Trial Tr. PM (October 2, 2025) at 94:9–11. His firm, Compass Demographics, consults with jurisdictions on issues related to election districts, policy matters relating to census data, and consults with litigants in voting rights cases.  Trial Tr. PM (October 2, 2025) at 94:17-20.

79. Mr. Ely has worked on over one hundred matters in which he has drawn maps, either as part of redistricting, redistricting litigation, or investigations regarding redistricting. Trial Tr. PM (October 2, 2025) at 99:12–17.   In his consulting practice, Mr. Ely has been hired

as a consultant by over forty local jurisdictions, and his work has ranged from technical data work to drawing and implementing maps. Trial Tr. PM (October 2, 2025) at 98:13–18.  In addition to consulting, Mr. Ely has also testified as an expert witness regarding redistricting maps in over forty cases. Trial Tr. PM (October 2, 2025) at 98:19-22.

80. Mr. Ely has also served as a consultant on mapping for both Plaintiff and Defendant jurisdictions in litigation. Trial Tr. PM (October 2, 2025) at 98:23–99:8. Mr. Ely was also retained by the United States District Court for the Northern District of Alabama in *Milligan v. Allen* (2023), Case No. 2:21-cv-1530, as the cartographer for Special Master Richard Allen's team.  Trial Tr. PM (October 2, 2025) 96:1-12.  There, Mr. Ely's objective was to draw remedial plans to remedy unlawful dilution that carefully comply with constitutional requirements while respecting the wishes of the State Legislature.  Trial Tr. PM (October 2, 2025) at 96:15-25.

81. Mr. Ely also served as a Special Master in the remedial phase of *Terrebonne Parish NAACP et al. v. Governor of Louisiana et al.*, where Mr. Ely created a remedial district for the court.  Trial Tr. PM (October 2, 2025) at 98:1–9; LULAC Ex. 831 at 3.

82. In advance of the October 2025 preliminary injunction hearing, Mr. Ely produced two reports: (i) the Declaration and Expert Report of David Ely dated August 23, 2025, LULAC Ex. 831; and (ii) the Rebuttal Report of Expert David Ely dated September 29, 2025, LULAC Ex. 833.

83. In his September 29 report, Mr. Ely utilized data downloaded from the Texas Legislative Council ("TLC") database, including: (i) the census block definitions of the pre-existing districts for PlanC2193 and for the newly adopted districts for PlanC2333; (ii) Voter Tabulation District ("VTD") geography; (iii) and election results data from the 2020, 2022,

and 2024 general elections by VTD and by districts for the two aforementioned plans. LULAC Ex. 831 at 5-6.  Mr. Ely examined and relied on the election analysis contained in the March and August 2025 declarations of Dr. Matt Barreto and Michael B. Rios and the August 23, 2025 Declaration of Stephen Ansolebehere.  LULAC Ex. 831 at 6.

84. Mr. Ely also testified that he "identified from the other expert reports, the Hispanic-preferred candidate for each of these contests, since the polarization analysis was done within each district," as well as the White-preferred candidate, and then identified "whether or not the Hispanic-preferred candidate would have prevailed within that district."  Trial Tr. PM (October 2, 2025) at 111:23–112:22.

85. To analyze whether Hispanic voters are able to elect their candidates of choice under the new Plan C2333, Mr. Ely reviewed "six statewide contests from the last three election cycles in which there was at least one major party candidate who was either Spanish surnamed or identified as Hispanic." Trial Tr. PM (October 2, 2025*)* at 113:6-12.  Mr. Ely evaluated the way the districts were drawn in Plan C2333 and evaluated election and Census data related to those districts, with a particular focus on CD 9 and CD 35.  Trial Tr. PM (October 2, 2025) at 100:9-14; LULAC Ex. 831 at 7.

86. None of Defendants' experts questioned Mr. Ely's conclusions. Defendants produced an expert report by Dr. Sean P. Trende which contained a brief response to Mr. Ely's Declaration and Expert Report, dated August 25, 2025.  Dr. Trende did not offer up any contrary conclusions to Mr. Ely with respect to his projected election results.  Instead, he only criticized (i) the labels of the demonstrative maps in Mr. Ely's report; (ii) the potential error margins in disaggregated CVAP data at the Census block level.

87. First, Mr. Ely addressed Dr. Trende's mislabeling allegations in his Rebuttal Report, dated September 29, 2025.  LULAC Ex. 833.  As Mr. Ely explained, the legends for each map correctly "indicate that they are shaded by Block." Mr. Ely explained that due to an editing error, the paragraphs preceding each demographic map sometime refer to "precincts," when they should have said the maps indicate Census blocks.  Trial Tr. PM (October 2, 2025) at 107:7–18.

88. Second, in response to Dr. Trende's allegations of possible "huge error margins" in the disaggregation of CVAP data from the Census block group to the Census block, Mr. Ely explained that the method he used to disaggregate Block level data is the same method that the Texas Legislative Council uses.  Mr. Ely also demonstrated that Census blocks are nested within block groups and that it is most common for a Census block group to contain between 20 to 100 blocks. *Trial Tr. PM (October 2, 2025)* at 102:6-21.  The disaggregated CVAP data adds back up from the blocks to the block group and so the block level estimates are constrained by the Census block group estimate.  Trial Tr. PM (October 2, 2025) at. 104:12-23.

89. After receiving Mr. Ely's testimony and reviewing his reports, the Court finds his analyses, opinions, and testimony credible.

90. Plaintiffs presented Dr. Richard Murray. Dr. Murray has a PHD from the University of Minesota that he received in 1966. He is currently a Senior Research Fellow at the Hobby School of Public Affairs, University of Houston. He has been accepted as an expert in every redistricting case he has testified in. 2333 is the "most extreme case" he has seen in his 50 years of experience. In his expert report, Plaintiff Intervenors Exhibit 2 of the PI Hearing, he opined that Intentional Discrimination occurred in C2333 on pages 3 and 4.

He further opined that C2333 reduces black Opportunity Districts in Texas from 3 to 2. *Id.* at 2. And that C2333, "greatly reduces the opportunity for Hispanic voters in Texas to elect candidates of their choice." *Id.* at 1. Lastly, he opined that "two White Democratic districts are passed over, not substantially changed, but you have huge changes in District 9, District 18, district 29, District 33 in Dallas, District 32, where there's significant minority impact." Trial Tr. (October 6, 2025) 32:11-14. No expert challenged Dr. Murray's methodology or conclusions. In the May-June Trial, the State's expert Dr. Alford opined that Dr. Murray knew more about knew more about Texas politics than any person living. Trial Tr. AM (June 10, 2025) 143: 13-16. The Court finds him credible and accepts his testimony.

91. Plaintiffs presented Dr. Moon Duchin to testify regarding the changes made from Plan C2193 to C2333. Dr. Duchin is a professor at the University of Chicago where she is tenured in computer science. Trial Tr. AM (October 6, 2025) at 24:6-13. She is on leave from her position as a professor at Cornell University, where she teaches mathematics and is tenured in public policy. Trial Tr. AM (October 6, 2025) at 24:14-18. Dr. Duchin's research focuses on mathematics and computing as it relates to elections, democratic mechanisms, and redistricting. Trial Tr. AM (October 6, 2025) at 24:23-25:2. Additionally, Dr. Duchin directs the Data and Democracy Research Initiative within the Data Science Institute at the University of Chicago. Trial Tr. AM (October 6, 2025) at 24:19-22.

92. Defense Experts Dr. Trende and Dr. Lewis submitted rebuttal reports on September 22, 2025. Neither of these reports call into question or in any way address the analysis and conclusions in Dr. Duchin's September 2 report. *See* State Ex. 570, 571.Dr. Duchin was

accepted as an expert in the fields of data science and applied mathematics in this proceeding without objection. Trial Tr. AM (October 6, 2025) at 70:20-71:2.

93. Based on her analysis, Dr. Duchin concluded that the changes made in Plan C2333 were not consistent with the race neutral pursuit of partisan gain. Rather, she concluded that there was strong evidence that race was used in the creation of Plan C2333 in a manner that diluted the votes of people of color. Trial Tr. AM (October 6, 2025) at 26:10-27:1.

94. Like the Court in *Singleton v. Allen,* 782 F. Supp. 3d 1092, 1259 (N.D. Ala. 2025), we find Dr. Duchin's analysis and testimony to be "highly credible." Notably, her analysis stands entirely unrebutted by both Dr. Trende and Dr. Lewis, who had ample time to assess her work as demonstrated by their thorough responses to Dr. Barretto and Dr. Collingwood. Further, Dr. Duchin was candid with the Court about the limits of her analysis explaining that she was not attempting to "simulate" the decision making of the legislature and freely conceding areas where her analysis was not as strong. *See e.g.* Trial Tr. AM (October 6, 2025) 52:2-53:13 ("…so again I would really avoid thinking of it as a simulation of what people do."); Trial Tr. AM (October 6, 2025) 69:14-22 ("...But the evidence here isn't as strong as in the previous two clusters"). Finally, the State's sole critique of Dr. Duchin's analysis, her use of outdated incumbent information for the limited purpose of avoiding double-bunking, does little to undercut her robust findings. The State concedes it had all the data and code it needed to test whether the updated incumbent addresses altered Dr. Duchin's findings, but it did not do so. And there is no apparent reason to believe changes in incumbent addresses would meaningfully alter the demographic makeup of the ensembles analyzed by Dr. Duchin. Accordingly, we give great weight to her testimony and analysis.

*Defendants' Experts*

95. Defendants presented Dr. Sean Trende and Dr. Jeffrey Lewis to rebut the analysis of Drs. Collingwood, Ansolabehere, and Barreto. Trial Tr. PM (October 8, 2025) 89:20-90:8 (Dr. Lewis). Dr. Trende's report addresses Dr. Barreto's mapping simulation analysis and Dr. Daivd Ely. *See e.g.,* Def. PI Ex. 571. Dr. Lewis only addresses Drs. Collingwood and Ansolabehere's reports. *See e.g.*, Def. PI Ex. 570. Indeed, Dr. Lewis explicitly declined to address Dr. Barreto's racially polarized voting analysis and in-out mapping analysis*. Id.* The Court finds that Dr. Barreto's racially polarized voting analysis is uncontested.

96. After receiving both expert's testimony, the Court does not give full weight to either expert's opinions.

97. Defense expert Dr. Lewis testified on the use of electoral data versus racial data on forecasting voting in Texas precincts in future election; level of Hispanic voter cohesion in various parts of Texas; and the degree to which white, Hispanic, and Black Democrats and white, Hispanic, and Black Republicans would have the opportunity to vote for winning candidates under C2333. Trial Tr. PM (October 8, 2025) 96:21-97:15. The Court places little weight on the analysis conducted by Dr. Lewis.

98. First, Dr. Lewis' "vote forecasting" and Hispanic voter cohesion analysis do not rebut either Dr. Ansolabehere or Dr. Collingwood's racially polarized voting analysis. This is because Dr. Lewis' analysis tells the Court nothing about actual levels of voter cohesion. Dr. Lewis did not use ecological inference, did not conduct a racially polarized voting analysis, and did not actually determine how individual groups of voters voted but instead compared support for one Republican candidate to another Republican candidate. Trial Tr. PM (October 8, 2025) 113:18-114:4 (Dr. Lewis). Dr. Lewis agreed that his analysis was

similar to measuring one person's height in inches compared to a person's height in centimeters. *Id.* Despite testifying that he had run ecological inference "many times" and having the materials from both Dr. Ansolabehere and Dr. Collingwood, Dr. Lewis stated that he did not have enough time to run the analysis and could not produce his own estimates. Trial Tr. PM (October 8, 2025) 135:15-21; 136:3-138:5 (Dr. Lewis); Trial Tr. AM (October 9, 2025) 31:25-32:5 (Dr. Lewis). As such, the Court has serious doubts that Dr. Lewis has the expertise in ecological inference analysis he has claimed and that Dr. Lewis has ever analyzed Plan C2333. Trial Tr. AM (October 9, 2025) 23:8-10 (Dr. Lewis) ("Q: You didn't see fit to mention that you had done other work related to this Texas map? A: I don't know that I have.").

99. Further, Dr. Lewis made substantial errors in his report. Dr. Lewis made unfounded assumptions such as estimating that white and Asian voters vote similarly in Texas, meaning that the Court is unable to know if his analysis demonstrates accurate levels of white support for democratic candidates. Trial Tr. AM (October 9, 2025) 8:1-11 (Dr. Lewis). Dr. Lewis's analysis on voting preferences for Democratic and Republican candidates does not account for ticket splitting and instead counts voters who split tickets on both sides of his analysis. Trial Tr. AM (October 9, 2025) 13:1-11 (Dr. Lewis). While Dr. Lewis stated he was following the analysis of another expert in conducting this analysis, on cross-examination, Dr. Lewis revealed that he was not sure if he was following that expert's practices nor social science literature. Trial Tr. AM (October 9, 2025) 13:12-23 (Dr. Lewis). Regardless, Dr. Lewis admitted that his analysis does not bear any direct relationship to whether voters have the ability to elect candidates of their choice. Trial Tr. AM (October 9, 2025) 16:14-16 (Dr. Lewis). Dr. Lewis also agreed that his analysis does

not disentangle race from partisanship. Trial Tr. AM (October 9, 2025) 9:4-11:24 (Dr. Lewis).

100. Additionally, Dr. Lewis's methodology is not reliable because he uses different types of data inputs in his two models. In paragraph five of his report, Dr. Lewis stated that voter file data is preferred to CVAP data which includes many people not registered and registered non-voters. Def. Ex. 571. Yet in his analysis, he only used voter file data to correlate Abbott 22 and Trump 24 vote and instead relies on his admittedly less accurate data for Black and Hispanic CVAP data in his racial analysis. *Id.* Even though BISG voter file data was readily available from Dr. Barreto's report, for some unexplained reason he did not read or access that report.

101. Dr. Lewis's homogenous precinct analysis is also unpersuasive for rebutting Drs. Collingwood and Ansolabehere. Dr. Lewis did not make any effort to isolate homogenous precincts in any particular congressional district at issue, failed to isolate homogenous precincts in any particular region, and inaccurately stated that Hispanic support for President Trump had a median value of 63% and 76% when in actuality those estimates were for Vice President Harris. Trial Tr. PM (October 8, 2025) 141:9-143:14 (Dr. Lewis). Critically, on cross-examination revealed that when reviewing homogenous Hispanic precincts used by Dr. Lewis to conduct his analysis that the election results support Dr. Collingwood and Dr. Ansolabehere's Latino cohesion estimates.

102. Dr. Lewis also admitted on cross-examination that he had originally run a net-effects analysis which revealed that Black and Hispanic voters were more disadvantaged than Whites and that someone later removed that analysis from his final report. Trial Tr. AM (October 9, 2025) 19:1-5 (Dr. Lewis) ("Q: And if you look at the total, you can see that it

keeps things for White voters about the same, but it hurts Black voters overall and it hurts Hispanics overall by your metrics, right? A: Yes."); Gonzales Exs. 68, 73. Dr. Lewis's analysis shows that overall, only 45 percent of Latino and 45 percent of Black voters are able to elect their candidates of choice statewide under the 2025 Map—a 6 percentage point drop for each group as compared to the 2021 Map. Gonzales Ex. 73. Meanwhile, the ability of Anglo voters to elect their candidates of choice is unchanged between the two maps, holds steady at 78%. *Id.* Dr. Lewis also testified that he failed to turn over analysis and produce results from his report. Trial Tr. PM (October 8, 2025) 143:5-14 (Dr. Lewis); Trial Tr. AM (October 9, 2025) 18:4-21:23 (Dr. Lewis). While it is unclear if Dr. Lewis chose to remove analysis that showed Latino and Black voters are harmed under C2333 or counsel for Defendant's deleted the analysis, such removal leads the Court to find Dr. Lewis's testimony unreliable.

103. Finally, Dr. Lewis had no credible explanation for whether or not his report was independent and neutral from his advocacy as a State Senate consultant in support of the map just months earlier in August 2025. Based on the foregoing findings, we find that Dr. Lewis's testimony lacks credibility and reliability, and we accordingly afford it only little weight for the proposition that Black and Hispanic voters regardless of partisan preferences are disadvantaged under Plan C2333.

104. Dr. Trende testimony focused on Dr. Barreto's precinct split analysis and mapping simulations. *See e.g.,* Def. PI Ex. 571. Although Dr. Trende responded to Dr. Ely in one paragraph in his report, he did not testify regarding any criticism he had of Dr. Ely's findings and opinions. *See e.g.,* Trial Tr. PM (October 9, 2025) 145:19- Trial Tr. PM (October 10, 2025) 50:20 (Dr. Trende). Dr. Trende did not address Dr. Moon Duchin's

analysis and report, *see* Trial Tr. PM (October 10, 2025) 44:9-20 (Dr. Trende), and therefore finds that Dr. Duchin's opinions are uncontested.

105. The Court credits Dr. Trende's opinions but finds them of limited probative value. First, as he did in the May trial (by presenting "white plurality" precincts—which often are actually majority-minority—as indicative of white voter behavior), Dr. Trende utilized misleading precinct coloring that identified only Anglo voting age population concentrations, which as he acknowledged provides no information of the sorting of Black and Latino voters. Trial Tr. AM (October 10, 2025) 144:12-145:23 (Dr. Trende). His reporting of the voting age population of components of split precincts along the border of CD 18, the district he analyzed to illustrate his view that race was uninvolved in determining where to split precincts, also misses the point because the question is whether the State intentionally boosted the citizen voting age population ("CVAP") racial percentages. Trial Tr. PM (October 10, 2025) 23:17-27:20 (Dr. Trende). On cross examination, Dr. Trende acknowledged the differences. Indeed, Dr. Trende's first example of a split precinct in his report—which he testified revealed no sorting by racial VAP—in fact revealed substantial differences when assessed by CVAP, with the Black CVAP of the portion included in CD 18 much higher than the portion excluded from CD 18. Trial Tr. (October 10, 2025) 30:1-16, 31:7-32:2. This evidence supports Plaintiffs' claim that CD 18 was racially gerrymandered to increase its Black CVAP to majority status. Dr. Trende conceded that the number of Black citizens in CD 18 to reach a racial target and move the percentages of Black CVAP could be as little as 2500 people for a 1% move in Black CVAP. Trial Tr. PM (October 10, 2025) 25:12-26:11, 26:18-27:21. Second, Dr. Trende did not address Dr. Barreto improved simulations and map diversity demonstrations, which

remedied issues related to production of unique maps and district compactness. Trial Tr. PM (October 10, 2025) 7:10-8:21 (Dr. Trende). Third, Dr. Trende's results from some of his simulations also achieved similar results as Dr. Barreto, demonstrating that Plan C2333's racial composition of Texas's congressional districts with the same political constraints is a statistical outlier (if not impossible to occur). Trial Tr. PM (October 10, 2025) 14:1-16:2; 17:21-19:13 (Dr. Trende).

106. While the Court credits Dr. Trende as a qualified witness, Dr. Trende showed signs of partiality to his side's position and appeared inconsistent in his criticism of Dr. Barreto for not providing clear instructions to download or merge underlying files. While on direct examination, Dr. Trende stated that he had not seen Dr. Barreto's inputs or outputs in this case and made allegations that Dr. Barreto did not provide all of the materials needed to conduct his simulations, Dr. Trende later testified that he did not even look at the production of Dr. Barreto and did not know what Dr. Barreto produced. Trial Tr. AM (October 10, 2025) 3:11-5:19; 21:10-13 (Dr. Trende), *cf* Trial Tr. PM (October 10, 2025) 8:22-9:3; 9:4-11:24 (Dr. Trende). On direct examination, Dr. Trende's insisted that he provided Plaintiffs' counsel his entire file, Trial Tr. AM (October 10, 2025) 5:10-19 ("A: I always provide it."), only to later admit on cross examination that he did not know if he produced corrected code to Plaintiffs, he did not provide his own merge code, and in another instance stated that he "had a script that I forgot to turn over." Trial Tr. PM (October 10, 2025) 8:22- 12:14;17:1- 20:20 (Dr. Trende). Dr. Trende also stated that he did not need Dr. Barreto's data to replicate his analysis. Trial Tr. PM (October 10, 2025) 10:14-19 (Dr. Trende). Dr. Trende also spoke of Dr. Barreto in strongly negative terms, stating that Dr. Barreto's production was not sufficient to recreate his analysis, Trial Tr.

AM (October 10, 2025) 18:23-19:2 (Dr. Trende), but then later admitting multiple times that he was able to replicate Dr. Barreto's analysis and achieve the same results, and that he had not himself produced the very file he accused Dr. Barreto of withholding. Trial Tr. PM (October 10, 2025)17:21-25 ("Q: So it's your testimony that you did fix it and you were able to replicate Dr. Barreto's analysis and got the same plots that he did of where the block—the Black percentages of the relevant districts in the simulation said? A: That's right."). Dr. Trende's criticism of Dr. Barretto regarding lack of production of materials for something that, in the end, both experts agreed was a basic process calls into question Dr. Trende's objectivity.

107. Dr. Trende's demeanor during cross examination showed elements of bias. Dr. Trende accused Plaintiffs' counsel of being untruthful and having racial targets simply because counsel asked him cross examination questions—which Dr. Trende acknowledged were correct—showing that a partisan-motivated map drawing process would not have resulted in majority Hispanic CVAP configurations of CDs 9 and 35. Trial Tr. AM (October 10, 2025) 109:18-110:2 (Dr. Trende) ("Q: I don't have a racial target. A: I don't believe you."). In stark contrast, he openly admitted he did not remain professionally skeptical of the State's claims regarding race neutrality and partisan motives. Trial Tr. (October 10, 2025) 28:2-18. Moreover, Dr. Trende tended to go beyond just presenting statistical conclusions, providing legal and political opinions. *See* Trial Tr. PM (October 10, 2025) 28:6-18; 48:6-9; 50:6-8 (Dr. Trende). While Dr. Trende is qualified, his conduct was not conducive to finding that he acted as a neutral authority.

108. Lastly, the Court finds that the experts disclosed the materials necessary to evaluate their analyses. Both of the Defendants' experts demonstrated that they did not produce materials

with their reports, yet Plaintiffs' experts were able to review their production and conduct the analysis. It is clear from the testimony of all experts that the parties had the materials needed to have their experts conduct their own analysis in this case and followed the disclosure requirements of Rule 26.

### III.    2020 Decennial Census

109. On April 26, 2021, the U.S. Census Bureau announced that based on the results of the 2020 Decennial Census, Texas would gain two additional seats in the United States House of Representatives. Joint Stipulations of Fact, ECF No. 978 at ¶ 23.

110. On August 12, 2021, the Census Bureau released the detailed population and demographic data needed to draw new congressional districts under Public Law 94-171. Joint Stipulations of Fact, ECF No. 978 at ¶ 24.

111. According to the 2020 U.S. Census, Texas's population was 29,145,505 in 2020. Joint Stipulations of Fact, ECF No. 978 at ¶ 26. Texas's overall population increased by 3,999,944 people between 2010 and 2020. Hispanics and/or Hispanics accounted for 49.5% of that growth. The non-Hispanic White population accounted for 4.7% of that growth. Joint Stipulations of Fact, ECF No. 978 at ¶ 28.

112. 39.8% of Texans were non-Hispanic White, 39.3% of Texans were Hispanic, 5.99% of Texans were Asian (or AAPI), and 13.6% of Texans were Black (including multi-racial Texans who identified as partially Black). Joint Stipulations of Fact, ECF No. 978 at ¶ 27.

113. According to American Community Survey data, Texas's CVAP grew by 3,301,865 between 2010 and 2020. The citizen voting age population (CVAP) of Texas was 18,578,830 in 2020. Of that population, 50.8% was non-Hispanic White, 30.5% was

Hispanic, 4.22% was Asian (or AAPI), and 13.5% was Black (including multi-racial Texans who identified as partially Black). Joint Stipulations of Fact, ECF No. 978 at ¶ 29.

## IV.    Texas's Recent History of Discrimination in Voting from 2011 to Present

114. Texas's recent history demonstrates that the targeting of coalition districts was racially discriminatory. As this Court has already noted, in every decade since the VRA was passed in 1965, federal courts have held that Texas violated the VRA.

115. In 2006 the Supreme Court held that Texas violated Section 2 of the Voting Rights Act by weakening Hispanic voting strength in West Texas, specifically Congressional District 23. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439 (2006).

116. After the 2011 congressional redistricting in Texas, Texas sued the United States and Attorney General Holder to have the Texas 2011 districting plan for the United State House of Representatives precleared under Section 5 of the Voting Rights Act. *Texas v. United States*, 887 F. Supp. 2d 133, 204 (D.D.C. 2012), vacated and remanded, 570 U.S. 928, 133 S. Ct. 2885, 186 L. Ed. 2d 930 (2013). In the *Texas v. U.S.* case, the three-judge panel found that the 2011 Congressional plan (of which Chairman Todd Hunter was a participant) was racially discriminatory. The court likewise found that the configuration of SD 10 in Tarrant County was the result of intentional discrimination.

117. The San Antonio three-judge federal court that ultimately adjudicated the VRA and constitutional challenges to the 2011 congressional map ultimately found, in a decision that was never appealed,[1] that the State had intentionally discriminated against Black and

---

[1] Although the State appealed the San Antonio court's ruling regarding the 2013 maps, it never appealed from the final judgment regarding the 2011 maps. *See* Final Judgment, *Perez v. Abbott*, No. SA-11-CA-360-OLG-JES-XR (Aug. 2, 2019) (ECF No. 1637).

Latino voters in the Dallas Fort Worth area by purposefully packing and cracking them to dilute their voting strength. *Perez v. Abbott*, 253 F. Supp. 3d 864, 961 (W.D. Tex. 2017); *id.* a 986 (Smith, J., dissenting) (observing that "[r]elatively little about the 2011 Congressional redistricting passes the smell test as to DFW").

118. The same three-judge court found that Rep. Todd Hunter—who was the sponsor of the 2025 congressional map in the House—had engaged in racial gerrymandering in the configuration of Nueces County state house districts in 2011 specifically to dilute the voting strength of Latino voters. *See Perez v. Abbott*, 250 F. Supp. 3d 123, ## (W.D. Tex. 2017) ("Further, there is evidence that the mapdrawers (including specifically Rep. Hunter) racially gerrymandered the districts that remained in Nueces County to further undermine Latino voting strength. . . . [M]apdrawers intentionally packed Hispanic voters into HD35 to minimize their number and influence in HD34 and protect Hunter. . . . [T]here is also evidence that they targeted low turnout minority areas for inclusion in HD35 and intentionally drew out potential Hispanic rivals (both Republican and Democrat), again to protect the Anglo incumbent. And, as discussed below, there is evidence that Hunter intentionally overpopulated HD33 (and underpopulated his own HD34), without a legitimate justification for doing so."). This decision was likewise never appealed.

119. In 2018, the Supreme Court held that Texas intentionally discriminated against Hispanic voters via racial gerrymander in Tarrant County. *Abbott v. Perez*, 585 U.S. 579, 622 (2018). Prior to the *Abbott v. Perez* holding, in 2006 the Supreme Court held that Texas violated Section 2 of the Voting Rights Act by weakening Hispanic voting strength in West Texas. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439 (2006). This persistence and dedication to discrimination is merely a continuation of Texas's pattern of official

discrimination dating back to the state's early history. *See generally* Gonzales Ex. 11 at 6-7; LULAC Ex. 4 (report of Dr. Tijerina); TXNAACP Ex. 139 (report of Dr. Martinez).

120. Chairman King agreed that he had read at least parts of the Supreme Court decision in *Abbott v. Perez*, and that it was important because it happened three years before he undertook the 2021 redistricting. Trial Tr. PM (October 9, 2025) 26:2-8. He agreed that in that case, the Supreme Court said that the Texas Legislature had good reasons to believe that the district at issue, CD35, was a viable Latino Opportunity District that satisfied the Gingles factors. Trial Tr. PM (October 9, 2025) 24:7-14.

## IV. 2021 Redistricting Cycle

121. Texas began their new decade redistricting in 2019. The Texas House and Senate Committees on Redistricting held their first public hearings on the issue of redistricting in Dallas, Texas on October 22, 2019, and October 29, 2019. At these meetings, presentations were given by Dr. Lila Valencia and Dr. Lloyd Potter from the State Demographer's office. Dr. Potter presented population and demographic data. Joint Stipulations of Fact, ECF No. 978 at ¶ 40. Dr. Valencia's presentation included population projections and growth figures broken down by race and ethnicity. Joint Stipulations of Fact, ECF No. 978 at ¶ 41. Dr. Potter's presentation included racial and ethnic breakdowns of Texas's population growth, and racially shaded maps showing the location and density of Black Texans in the Dallas–Fort Worth and Houston areas. Joint Stipulations of Fact, ECF No. 978 at ¶ 43.

122. After the release of the decennial census information in 2021, Texas appointed a new Committee on Redistricting in the Texas House of Representatives, which included the following members: Todd Hunter (Chair), Toni Rose (Vice Chair), Rafael Anchia, Craig

Goldman, Ryan Guillen, Jacey Jetton, Brooks Landgraf, Ina Minjarez, Joe Moody, Geanie Morrison, Andrew Murr, Mike Schofield, Senfronia Thompson, and Chris Turner. Joint Stipulations of Fact, ECF No. 978 at ¶ 34.

123. In 2021, Texas Lieutenant Governor Dan Patrick appointed the following members to the Texas Senate Committee on Redistricting: Senators Joan Huffman, Juan Hinojosa, Carol Alvarado, Paul Bettencourt, Brian Birdwell, Donna Campbell, Kelly Hancock, Bryan Hughes, Eddie Lucio, Jr., Robert Nichols, Angela Paxton, Charles Perry, Royce West, John Whitmire, and Judith Zaffirini. Joint Stipulations of Fact, ECF No. 978 at ¶ 38.

124. From January to March 2021, the Senate Special Committee on Redistricting, led by Republican Senator Joan Huffman, and the Texas House Committee on Redistricting heard public testimony during a series of hearings with a regional focus. Each hearing was held over the Zoom two-way video conferencing platform. Joint Stipulations of Fact, ECF No. 978 at ¶¶ 44-45.

125. The Senate Redistricting Committee hearings were on the floor during the 2021 session and most Senators participated in the hearings. Trial Tr. AM (October 1, 2025) 11:15-23 (Senator Alvarado).

126. After a series of hearings and public testimony since 2019, on September 27, 2021, Senator Joan Huffman released Plan C2101, which was filed as Senate Bill 6. Senate Bill 6 was for a public hearing on September 30, 2021. Joint Stipulations of Fact, ECF No. 978 at ¶ 52.

127. Senator Alvarado, as a member of the 2021 Redistricting Committee, stated that Senator Huffman, as the sponsor of the bill, gave a number of presentations and answered questions generally. Trial Tr. AM (October 1, 2025) 11:24-12:8 Senator Alvarado). During these

hearings, Senator Huffman would continuously emphasize that her Congressional map was drawn "neutral to trace" or "racially blind." Trial Tr. AM (October 1, 2025) 12:6-12:13 (Senator Alvarado); *see also* JX. 4259 at 37:40-38:00; *id.* at 1:02:05-30; *Id.* at 1:03:07-1:03:22; *id.* at 1:20:45-1:21:10; Def. Ex. 568 at 13; Def. Ex. 569 at 28; JJX 4259 at 1:21:51-1:22:13; JX 4236 at 8:5-12; JX 4263 at 22:25-38; 25:55-26:13; Def Ex. 549 at 8, 10; JX 4263 at 28:32-45; JX 4263 at 1:46:35-54; JX 4232 at 42:11-15; JX 4232 at 52:5-9, 54:7-12, 57:22-58:17; JX 4232 at 65:22-66:1; JX 4232 at 92:2-4; JX 4232 at 95:6-10; JX 4256 at 21:12-29; JX 4259 at 1:07:22-42; JX 4236 at 34:21-35:5; JX 4236 at 19:2-10.

128. While answering questions and speaking about the Congressional map, Senator Joan Huffman would reiterate as a talking point that maps were drawn without the consideration of race. Trial Tr. AM (October 1, 2025) 12:6-8 (Senator Alvarado).

129. These statements were consistent with statements in prior redistricting cycles that race was not used to intentionally drawing coalition districts. During the January 2012 trial on preclearance, Mr. Downton, the map drawer of the 2011 Texas congressional map testified during trial that he and other legislative staff involved in redistricting did not believe that a coalition district comprising over 50% population of multiple racial or ethnic minority groups are protected or covered under Section 5 or Section 2 of the Voting Rights Act. Brooks Ex. 279 at 123:10-124:19.

130. In addition to the *Texas v. United States* lawsuit, individual voters filed suit in *Perez v. Abbott*, which went to trial in February 2012. During the February 2012 trial, the state of Texas argued that coalition districts are not required by Section 2 of the Voting Rights Act and further argued that the new remedy district in CD35 was not a coalition district. Brooks

Ex. 280 (Trial Tr. Vol 1 (Feb. 14, 2012)) 16:1-17:23; Brooks Ex. 281 (Trial Tr. Vol 2 (Feb 15, 2012) 320:6-327:1).

131. After the 2021 Congressional map was signed into law, multiple Plaintiffs filed lawsuits over the legality of SB 6 and the Texas Congressional plan. *See LULAC v. Abbott*, 3:21-CV-00259-DCG-JES-JVB. *LULAC v. Abbott* went to trial on Plaintiffs' Section 2 Voting Rights Act and Fourteenth and Fifteenth Amendment racial gerrymandering claims against the 2021 Congressional map from May 21, 2025, to June 11, 2025. The State of Texas continued to defend the maps as "race blind" and state legislators testified that the Congressional map was drawn blind to race.

## V.     2025 Redistricting Process and Legislative History

132. In early 2025, Republican National Committeeman for Texas and Galveston County Commissioner Robin Armstrong contacted Adam Kincaid regarding the redrawing of Texas's Congressional map. Trial Tr. AM (October 7, 2025) 54:22-55:4 (Adam Kincaid). Adam Kincaid is a map drawer and runs the National Republican Redistricting Trust (NNRT). Trial Tr. AM (October 7, 2025) 31:6-13 (Adam Kincaid). Kincaid was responsible for drawing most of the 2021 Texas congressional map and testified that he drew all or most of the 2025 congressional plan, Trial Tr. PM (October 7, 2025) 56:13-15 (Adam Kincaid), though the chairs of both legislative committees—Senator King and Representative Vasut—testified that they were unsure of the extent of Mr. Kincaid's involvement in the map drawing. Trial Tr. AM (October 9, 2025) 149:12-150:1 (Senator King); Trial Tr. PM (October 6, 2025) 119:14-120:9 (Senator King);  Trial Tr. PM (October 9, 2025) 125:7-10 (Rep. Vasut).

133. During February or March, Adam Kincaid, White House officials, and Texas officials, including Robin Armstrong, met to discuss Texas mid-decade redistricting. Trial Tr. PM (October 7, 2025) 6:14-8:13 (Adam Kincaid). At some point during these conversations, Armstrong told Kincaid that the *Pettaway* case provided Texas an opportunity to redraw the Texas congressional map. Trial Tr. PM (October 7, 2025) 8:9-17 (Adam Kincaid).

134. In June 2025, Governor Abbott and Texas officials started having conversations with the White House and Adam Kincaid about redistricting. Trial Tr. PM (October 15, 2025) 30:21-32:20 (Adam Kincaid).

135. Kincaid knew the racial composition of the 2021 congressional plan and understood that 2021 congressional plan contained Black and Hispanic opportunity districts such as CDS 30, 9, 18. Trial Tr. PM (October 7, 2025) 105:21-107:22 (Adam Kincaid); Brooks Ex. 341 ("So those three [African American] seats were preserved…Those three seats will still likely elect African American members of Congress."). When discussing three Black opportunity districts in the 2021 plan, Kincaid stated "I think that's as far as the Texas map, I think it complies with the law." Brooks Ex. 341. Moreover, Kincaid also acknowledged that he does not advocate turning off racial data while mapping yet claimed to have done so in redrawing the congressional map in 2025. Trial Tr. PM (October 7, 2025) 108:22-109:11 (Adam Kincaid).

**July 7, 2025, DOJ Letter**

136. On July 7, 2025, the United States Department of Justice issued a letter to Governor Greg Abbott and Texas Attorney General Ken Paxton (herein the DOJ Letter). *See, e.g.*, Brooks Ex. 253. This letter, signed by the Chief of the DOJ Civil Rights Division, Harmeet Dhillon

and another DOJ attorney Michael Gates, stated that "Congressional Districts TX-09, TX-18, TX-29, and TX-33 currently constitute unconstitutional 'coalition districts'" and urged the state to change the racial composition of those districts. Brooks Ex. 253. Of the districts targeted by the DOJ letter, three (TX-9, TX-18, and TX-29) are in Houston.  One of the districts, TX-29 was not a "coalition district" but rather majority Hispanic CVAP. Trial Tr. AM (October 1, 2025) 17:8-18:5 (Senator Alvarado).

137. The DOJ Letter further stated that "It is the position of this department that several Texas congressional districts constitute unconstitutional racial gerrymanders under the logic and reasoning of *Petteway*. Specifically, the record indicates that TX-9 and TX-18 sort Houston voters along strict racial lines to create two coalition seats, while creating TX-29, a majority Hispanic district. Additionally, TX-33 is another racially based coalition district that resulted from a federal court order years ago, yet the Texas Legislature drew TX-33 on the same lines in the 2021 redistricting. Therefore, TX-33 remains as a coalition district." Brooks Ex. 253; Trial Tr. AM (October 1, 2025) 19:9-13-20:1 (Senator Alvarado).

138. The DOJ Letter, among other mistakes, also required response by July 7, 2025, which is the date the letter was issued. Brooks Ex. 253.

139. In either late June or early July, Adam Kincaid was provided a draft of the DOJ letter while he was in the West Wing. Trial Tr. PM (October 7, 2025) 49:7-51:14 (Adam Kincaid). Kincaid discussed the letter with signatory DOJ Attorneys Michael Gates (a signatory of the ultimate letter) and Maureen Reardon, Governor Abbott, and White House Deputy Chief of Staff James Blair prior to the letter being released. Trial Tr. PM (October 7, 2025) 52:16-53:13 (Adam Kincaid). Kincaid believed that the DOJ letter was unnecessary and shared those views "openly and widely" with people at the Department of

Justice. Trial Tr. PM (October 7, 2025) 57:20-58:2; 82:13-20 (Adam Kincaid). Kincaid told DOJ attorneys that the letter was "dumb and unnecessary and I didn't think we needed to send the letter." Trial Tr. PM (October 7, 2025) 87:6-23 (Adam Kincaid). Kincaid later testified that when discussing the DOJ's letter, his response was that sending a letter to Texas regarding the race of districts is completely unnecessary because the map would be a political draw. Trial Tr. PM (October 7, 2025) 88:21-89:8 (Adam Kincaid). Regardless the letter was sent and cited in the proclamation as the reason for the Special Session and as the trigger event by Governor Abbott. *Id.*

140. Texas legislators interpreted this letter to mean that the DOJ was threatening the State of Texas to redistrict their maps and specifically dismantle the aforementioned coalition districts. Trial Tr. AM (October 1, 2025) 20:2-20:3 (Senator Alvarado); Trial Tr. AM (October 2, 2025) 86:23-25 (Rep. Thompson) ("Q: So was the first time that the gears got in motion on redistricting was after the Department of Justice Letter? A: Yes.").

141. Prior to July 7, 2025, legislators, including Chair Todd Hunter, stated that they did not know if Texas was going to be redistricting and that they "kind of brushed it off as though it might have been just a rumor." Trial Tr. AM (October 1, 2025) 86:6-22 (Representative Thompson). Moreover, Senator Huffman testified during the *LULAC v. Abbott* trial in June 2025 that Texas was not considering redistricting. Trial Tr. AM (June 10, 2025) 54:4-7 (Senator Huffman). At some point, Senator King called Adam Kincaid regarding President Trump's statements on Texas redistricting. Trial Tr. PM (October 6, 2025) 80:15-8 (Senator King).

142. Despite numerous statements throughout the following hearings referencing the role the DOJ letter played in the redistricting, Chairman King contended that he never took the

letter into account and did not think it mattered.  Tr. Day 8 AM at 134:24-135:5. Chairman King also conceded that he had read the DOJ letter and was aware that it identifies four different districts and that that it says that those districts have to be drawn because of their racial makeup.  Trial Tr. PM (October 9, 2025) 7:9-16; 9:7.  Despite this admission, in response to questioning about whether he knew that the four districts identified in the DOJ letter were majority-minority, Chairman King contended that he "didn't take the facts in the letter one way or the other" and that, to this day, he has never looked at the numbers. Trial Tr. PM (October 9, 2025) 9:3-14.

**July 9, 2025- Governor's Proclamation for First Special Session**

143. On July 9, 2025, in response to the DOJ Letter, Governor Abbott issued a proclamation calling a special session of the 89th Legislature. Brooks Ex. 254. The proclamation listed for consideration "Legislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice." Brooks Ex. 254 at 3; Trial Tr. AM (October 1, 2025) 16:9-20:12 (Senator Alvarado).

144. Legislators understood that Governor Abbott's call for a special session on mid-decade redistricting was to directly respond to the race-based concerns of the DOJ. Trial Tr. AM (October 1, 2025) 20:13-21:2 (Senator Alvarado).

145. On July 11, 2025, Texas Attorney General Ken Paxton responded to the DOJ July 7, 2025, letter stating: "The evidence at that trial was clear and unequivocal: the Texas legislature did not pass race-based electoral districts for any of those three political maps." Brooks Ex. 255.  And ahead of the First Special Session, State of Texas filed supplemental briefing assuring this Court that, consistent with the State's representation during trial, "the Texas

Legislature did not racially discriminate in drawing the current congressional electoral districts- full stop." ECF No. 1116 at 2.

146. At some point after Governor Abbott issued the call, Kincaid was put in contact with Butler Snow attorneys representing members of the Texas House of Representatives around July 13 or 14 to draw a redistricting plan. Trial Tr. AM (October 7, 2025) 58:1-58:17 (Adam Kincaid). A week and a half later, Kincaid provided a mapping proposal to the Texas Legislature. Trial Tr. AM (October 7, 2025) 58:16-18 (Adam Kincaid). No credible explanation was ever made for how and why Kincaid's map was moved through Butler Snow counsel and its origin and purposes were obscured not just from the public but from the House and Senate sponsors to the Legislation.  None of the trial explanations given by Kincaid for his mapping choices were made known to legislative actors and the only legislation sponsor who did have detailed information on the map, Rep. Hunter, talked explicitly and directly about the racial composition of districts.

147. On July 17, 2025, Adam Kincaid testified that he and Senator King planned to meet at the ALEC conference and discuss Texas's redistricting effort. Trial Tr. PM (October 6, 2025) 81:16-23; 117:2-24 (Senator King). Kincaid's versions of events are that Chairman King was curious about how many seats Republicans would try to draw, and Kincaid told him that there would be a "five-seat pickup." Trial Tr. PM (October 7, 2025) 18:21-19:15 (Adam Kincaid). Kincaid also said that Chairman King mentioned "getting the map done or working together to get the map done." Trial Tr. PM (October 7, 2025) 21:5-7 (Adam Kincaid). By contrast, Chairman King testified that he merely ran into Mr. Kincaid (not that the meeting was planned) and multiple times stated (including in testimony in court) that he told Kincaid that he did not want to know anything about the congressional map.

Trial Tr. PM (October 5, 2025) 118:8-17 (Senator King); Trial Tr. AM (October 9, 2025) 127:12-22 (Senator King). Moreover, despite Senator Hinojosa also attending at the meeting, Trial Tr. PM. (October 7, 2025) 20:6-14 (Adam Kincaid), Senator King stated originally that no one was at the meeting and then days later when he was testifying again on cross examination stated that Senator Hinojosa was with him.  Trial Tr. AM (October 8, 2025) 126:4-23 (Senator King).  Whichever version is believed, if any, it is clear that Kincaid's motivations for his mapping choices as explained in his court testimony were never shared with Senator King or any other legislative actor.

**July 21, 2025- First Special Session- Senate**

148. The 89th Legislature's special session on redistricting began on July 21, 2025, with Senator Phil King, Chairman of the Senate Special Committee on Congressional Redistricting (herein "Senate Committee on Redistricting" or "Senate Special Committee on Redistricting"), introducing the resolution to redistrict and beginning debate on the issue. Trial Tr. AM (October 1, 2025) 21:3-21:8 (Senator Alvarado).

149. The Senate Special Committee on Congressional Redistricting was chaired by Phil King, and the vice chair was Brandon Creighton. The members were Carol Alvarado, Juan Hinojosa, Bryan Hughes, Borris L. Miles, Tan Parker, Angela Paxton, and Kevin Sparks. *See* Brooks Ex. 304 (July 25, 2025, Senate Special Committee on Congressional Redistricting) 2:7- 2:24 (calling role).

150. Although there were several issues that warranted a special session, including the deadly floods that occurred in and around Kerr County, after receipt of the DOJ letter, the issue of redistricting took precedence over all other issues. Trial Tr. PM (October 2, 2025) 56:10- 21 (Rep. Romero).

151. The DOJ Letter was the central issue in these debates. Trial Tr. AM (October 1, 2025) 25:15-19) (Senator Alvarado). Chairman King stated legislators needed to craft a "revised congressional redistricting plan in light of constitutional concerns raised by U.S. Department of Justice." Trial Tr. AM (October 1, 2025) 24:19-24 (Senator Alvarado). During the debate, however, Chairman King stated that he believed the 2021 redistricting map was legal, contrary to the assertions made by the DOJ. Brooks Ex. 300 (July 21, 2025, Senate Special Committee on Redistricting) 108:23-109:8.

152. During the debate, Chairman King repeated multiple times that he did not have a new districting map and that he was not drawing a map. Trial Tr. AM (October 1, 2025) 22:13-19 (Senator Alvarado).

153. Chairman King also confirmed that although Adam Kincaid drew the map adopted after the 2020 Decennial Census, Brooks Ex. 300 (July 21, 2025, Senate Special Committee on Redistricting) 20:3–20:11, King was not aware of whether Adam Kincaid was involved in the mid-decade redistricting effort. Brooks Ex. 300 (July 21, 2025, Senate Special Committee on Redistricting) 20:12–20:24.

154. Chairman King testified that, when Lieutenant Governor Dan Patrick called him to ask whether he would be willing to chair the committee, the Lieutenant Governor explained that, of the major issues on the governor's call, the House would take the lead on the congressional redistricting bill and that the Senate would be working from the House map. Trial Tr. PM (October 9, 2025) 120:20-121:2; 122:1-5; 136:9-11. Chairman King testified that he never had the need to interact with the House sponsor of the map, Representative Todd Hunter, in part because the original intent was for it to be a House bill. Tr. Day 8 AM at 138:16-19.

155. On July 22, 2025, in the midst of the special redistricting session, Governor Abbott gave an interview stating that the mid-decade redistricting effort was motivated by a desire to avoid "coalition districts" after the Fifth Circuit's decision in *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024). He characterized *Petteway* as holding that "coalition districts"—districts in which multiple minority groups together form a majority of voters to elect their candidates of choice—"are no longer required *and so we want to make sure that we have maps that don't impose coalition districts*." Brooks Ex. 325. The Governor made this statement even though he was the Attorney General in the 2011 redistricting cycles and his assigned counsel argued to those courts that the state did not believe the VRA required coalition districts and the state denied having drawn any VRA coalition districts.

**July 24, 2025- First Special Session- House**

156. The House Special Committee on Congressional Redistricting (herein "House Committee on Redistricting") met on July 24, 2025. Brooks Ex. 301. At the time of the mid-decade redistricting hearings, the House Select Committee on Congressional Redistricting was chaired by Cody Vasut, and the vice chair was Jon E. Rosenthal. The other members were Josey Garcia, Charlie Geren, Barbara Gervin-Hawkins, R.D. Guerra, Ryan Guillen, Cole Hefner, Hillary Gail Hickland, Todd Hunter, Christian Manuel, John W. McQueeney, Will Metcalf, Joe Moody, Katrina Pierson, David Spiller, Carl Tepper, Senfronia Thompson, Chris Turner, Terry M. Wilson, and Gene Wu. *See* Brooks Ex. 303 (July 28, 2025, House Committee on Congressional Redistricting) 2:5- 3:19 (calling role).

157.  Chairman Hunter's appointment to the Committee raised concerns from legislators of color, as Chairman Hunter had, in the past been found by a federal court to have engaged in intentional discrimination. Trial Tr. AM (October 3, 2025) 141:21-142:14 (Rep. Hawkins).

158. The DOJ's letter was a central focus of the July 24, 2025, hearing.  During this meeting, Chairman Vasut laid out his expectations of the procedure the committee would follow regarding providing 24 hours' notice of public hearings (which did not occur) and stated that he believed the sole reason for the mid-decade redistricting process was a desire to answer the call contained in Governor Abbot's proclamation. Brooks Ex. 301  (July 24, 2025, House Committee Hearing) 18:23-19:3; Brooks Ex. 301 (July 24, 2025, House Select Committee on Congressional Redistricting) 6:11–6:18. Representative Rosenthal and the Clerk started the hearing by distributing copies of the DOJ Letter, Governor Abbot's proclamation calling for the Special Session, and the Committee's hearing notice, noting that while the DOJ letter referenced CDs 9, 18, 29, and 33, the Committee's hearing notice did not have reference to those districts. Brooks Ex. 301 (July 24, 2025, House Committee Hearing) 13:6–13:21.

159.  In response to questioning, Representative Vasut denied communicating with Attorney General Paxton, the Department of Justice, the White House, Adam Kincaid, and anyone associated with the National Republican Redistricting Trust regarding the mid-decade redistricting but noted that the House retained Butler Snow law firm as counsel. He could not state whether the firm's representation extended to all individual members of the Committee. Brooks Ex. 301 (July 24, 2025, House Committee Hearing) 20:8–20:13. Brooks Ex. 301 (July 24, 2025, House Committee Hearing) 20:25-22:1. One day prior, on

July 23, 2025, Adam Kincaid provided to Butler Snow an initial map. Trial Tr. PM (October 7, 2025) 48:6-49:4 (Adam Kincaid).

160. During public testimony, law Professor Ellen Katz from the University of Michigan provided in-depth testimony regarding Voting Rights Act case law and coalition districts. Professor Katz testified that *Petteway* only held that such districts were not obligatory under the Voting Rights Act, rather than mandating the complete elimination of all racial coalition districts (on account of their racial composition) as DOJ asserted. Brooks Ex. 301 (July 24, 2025, House Committee Hearing) 38:19–19:18. Professor Katz testified that implementing the DOJ Letter's demand that certain House Districts be redrawn to eliminate coalition districts would, in fact, violate the Voting Rights Act and the Fourteenth Amendment. Brooks Ex. 301 (July 24, 2025, House Committee Hearing) 42:25–45:19. After Professor Katz's testimony, Representative Spiller reiterated his belief that racial coalition districts were not authorized by the Voting Rights Act. Brooks Ex. 301 (July 24, 2025, House Committee Hearing) 197:14-197:23. In response to Professor Katz's testimony, Chairman King asked Professor Katz questions only about whether she provided testimony in the El Paso case. Trial Tr. PM (October 9, 2025) 13:5-16.

161. Despite testimony like Professor Katz's, Chairman King testified that, during the entire process, no one presented any evidence in any hearing to suggest that the map was not legal. Trial Tr. PM (October 9, 2025) 39:7-11. Sen. King also testified that he did not look at any map until he had his legal counsel do an extensive review of it and let him know if it was legal, and that he had his mind made up at an early point that it was a legal map. Trial Tr. PM (October 9, 2025) 38:11-14; 40:14-15.

**July 25, 2025- First Special Session-Senate**

162. The Senate Redistricting Committee held their first regional hearing, focusing on South Texas and Central Texas areas. Brooks Ex. 304-T (July 25, 2025, Senate Redistricting Committee Hearing) 3:15-20. It was the first of four scheduled hearings that took place online. Brooks Ex. 304-T (July 25, 2025, Senate Redistricting Committee Hearing) 3:21-25.

163. Prior to public testimony, Chairman King stated that he had not invited Assistant Attorney General Harmeet Dhillon to testify and had not had any contact with her or with anyone else from the Department of Justice. Brooks Ex. 304 (July 25, 2025, Senate Redistricting Committee Hearing) 25:2-25:20. The Chairman also stated regarding the DOJ letter that he had not seen the facts or background information supporting it. *Id.* Senator Miles and Senator Alvarado both moved for the Redistricting Committee to subpoena Ms. Dhillon to testify before them, which was denied by the Chair due to procedural rules. Chair King said that he would consider the request in future hearings that were not field hearings. Brooks Ex. 304 (July 25, 2025, Senate Redistricting Committee Hearing) 30:8-39:1. In response to a statement from Senator Miles, that the DOJ's letter "is what got us right here today," Sen. King responded "I understand." Trial Tr. PM (October 6, 2025) 134:15-20.

164. Professor Ellen Katz testified before the Senate Redistricting Committee after being invited by Senator King on behalf of Senate Alvarado. Brooks Ex. 304 at 51:10-64:13. Professor Katz told the Senate that coalition districts do not violate the Voting Rights Act, that the existence of coalition districts in and of themselves does not mean that these districts were drawn or otherwise reflect impermissible race-based considerations. Rather, reliance on the DOJ letter and dismantling effective coalition districts would be

constitutionally problematic. Trial Tr. AM (October 1, 2025) 45:17-46:19 (Senator Alvarado).

165. During the hearing, Chairman King told Senator Alvarado and the public that "if there's a map before the committee, to go into great detail over that map with all the experts that anyone wishes to bring." Brooks Ex. 304 (July 25, 2025, Senate Redistricting Committee Hearing) 83:5-83:25.

**July 26, 2025- First Special Session- House and Senate**

166. The House Redistricting Committee met again on July 26, 2025. During this hearing no redistricting plan was presented.

167. Chairman Vasut clarified that counsel retained by the Chair, Butler Snow, only represented the Speaker of the House, the Chair of the Committee, Chairman Hunter and all their respective staff. Butler Snow would not provide legal counsel to the entire Committee on Redistricting. Brooks Ex. 302 (July 26, 2025, House Select Committee) 20:1–20:17. At some point, Butler Snow retained Trey Hood to provide expert analysis but this was not revealed until trial and the legislature had no benefit of any analysis he allegedly performed. Trial Tr. PM (October 7, 2025) 118:9-11 (Adam Kincaid).

168. When questioned by Representative Moody as to whether Chair Vasut had received any proposed maps from Washington D.C. or had begun to prepare a mapping proposal, Chairman Vasut denied receiving anything and asserted that the only map he had reviewed at that time was one proposal uploaded to the public portal. Brooks Ex. 302 (July 26, 2025, House Select Committee) 30:24–32:3.

169. The Senate Redistricting Committee also met on July 26, 2025. *See e.g.,* Brooks Ex. 305 (July 26, 2025, Senate Redistricting Committee Hearing). There was no map presented to

the members of the public for consideration during this hearing. Brooks Ex. 305 (July 26, 2025, Senate Redistricting Committee Hearing) 12:12-13. Chairman King presented to the committee a copy of the informal invitation to Ms. Dhillon and told the committee that they had received an automatic response. Brooks Ex. 305 (July 26, 2025, Senate Redistricting Committee Hearing) 10:23-13:10.

**July 28, 2025- First Special Session-House**

170. The House Redistricting Committee met on July 28, 2025, for a field hearing at the University of Texas-Arlington to gather public testimony on redistricting, despite no mapping proposal or information regarding what a map would look like being available to the public or members of the redistricting committee. *See e.g.* Brooks Ex. 303.

171. Members of the public packed the hearing waiting to testify. These persons overwhelmingly testified in opposition to *an*y congressional redistricting. Despite expectations of a large crowd, UT Arlington did not provide additional spaces for members of the public to wait to present their testimony. Brooks Ex. 303 (July 28, 2025, House Select Committee) 40:10-41:2. The hearing was so filled with people waiting to testify that many left because they were being turned away or had no waiting room. Trial Tr. AM (October 2, 2025) 15:3-14 (Senator West). University administration was told not to open overflow rooms. Trial Tr. AM (October 2, 2025) 21:4-11 (Senator West).

172. In a break from the normal tradition in which Senators do not testify before House Committees, Senator West attended this hearing and testified before the House Redistricting Committee in order to express his concern with North Central Texas. Trial Tr. AM (October 2, 2025) 13:3-15:14 (Senator West). Senator West's testimony focused

on why the Attorney General's office has not taken the position of defending the 2021 map against the DOJ. Trial Tr. AM (October 2, 2025) 14:1-16 (Senator West).

173. Jeff Archer with the Texas Legislative Council (herein "TLC") was questioned by Representative Manuel as to why RedAppl (the mapping tool used by Texas) was temporarily unavailable on the morning of June 28, 2025, and removed from members' computers. Brooks Ex. 303 (July 28, 2025, House Select Committee) 84:8–90:18.

174. The DOJ letter was again a topic of discussion, Chairman Vasut stated that he had not received a response to an email he sent the Department of Justice to come testify, aside from an automated out-of-office notification. Brooks Ex. 303 (July 28, 2025, House Select Committee) 17:16–17:22. He stated that he would look into the possibility of issuing a subpoena to get a response from the Department of Justice to inquiries the Committee had previously posed to the Department. Brooks Ex. 303 (July 28, 2025, House Select Committee) 17:23–18:13. No subpoenas were ever issued to officials at the DOJ and no one responsible for the DOJ letter testified before the House.

175. Representative Moody questioned the lack of a mapping proposal presented to the Committee during the hearings despite the fact that multiple hearings had been held. Brooks Ex. 303 (July 28, 2025, House Select Committee) 37:9-37:19. Indeed, during the multiple hearings already held, members of the public, members of Congress, and a member of the Senate came to the House to inquire about mapping proposals. Brooks Ex. 303 (July 28, 2025, House Select Committee) 37:20-38:8.

**July 28, 2025, First Special Session- Senate**

176. By July 28, 2025, there was still no map or plan that had been submitted for consideration. Trial Tr. AM (October 1, 2025) 50:11-14 (Senator Alvarado).

177. The author of the DOJ Letter, Assistant Attorney General Dhillon failed to respond to an invitation to testify sent by Chairman King. Brooks Ex. 306 (July 28, 2025, Senate Redistricting Committee) 21:15–22:12. Senator Alvarado again proposed issuing a subpoena to compel Assistant Attorney General Dhillon's testimony. Chairman King denied this request as not feasible. Brooks Ex. 306 (July 28, 2025, Senate Redistricting Committee) 22:13–24:2.

178. Chairman King granted Senator Alvarado's requests to provide the trial transcripts of the *LULAC v. Abbott* May-June 2025 to the 2025 Senate Redistricting Committee. Brooks Ex. 306 (July 28, 2025, Senate Redistricting Committee) 24:24-26:16. Chairman King also told members that mid-decade redistricting had been done before, in 2003. Brooks Ex. 306 (July 28, 2025, Senate Redistricting Committee) 198:23-199:6.

**July 29, 2025, First Special Session- Senate**

179. On July 29, 2025, the Senate Redistricting Committee held another public hearing. No map was provided for public consideration. *See e.g.,* Brooks Ex. 307.

180. The 2021 maps were discussed at length during this hearing. Chairman King explained that he did not believe the maps passed in 2021 violated the VRA in any way. Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 206:14-20. Congressman Marc Veasey testified before the Senate Redistricting Committee regarding the shape of his congressional district and the court orders that required the redrawing of that congressional district. Brooks 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 156:6-156:14.

181. Frustrated by the lack of transparency regarding the maps, Senator Alvarado questioned why the Committee was even redistricting, to which Chairman King stated it was due to

the Governor's proclamation to consider "[l]egislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice." Brooks Ex. 307 (July 29, 2025, Senate Redistricting Committee Hearing) 204:18-205:13. Chairman King stated that the Committee would decide about whether to recommend a map to the full Senate, and that prior to doing so it would go through the normal process of amendments in the Committee. Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 207:19- 207:20. Chairman King denied that there was a map before the Committee but that when one came to them, the Committee would immediately make it available to the public and begin public testimony on it. Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 207:21- 207:23. He could not provide a timeline for redistricting.

182. Chairman King was evasive in answering questions regarding mapping proposals, replying "Like I said, I haven't had one presented to me," "You know, I can't state" what districts will be redrawn, "I don't think anything is predetermined" regarding the map and "I haven't seen any maps yet. No one has presented a map to me." Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 207:7-210:6. According to Adam Kincaid's telling of events, however, Chairman King did know that the new map would in fact feature five new Republican leaning districts based on his conversation with Adam Kincaid about redistricting only two weeks earlier. *See, e.g.*, Trial Tr. PM (October 7, 2025). Senator King directly disputed this telling of events as "incorrect." Trial Tr. AM (October 9, 2025) 127:23-128:3 (Senator King)

183. While Chairman King had been evasive as to whether he knew Adam Kincaid, he stated during this hearing that Adam Kincaid may be the map drawer but reiterated that he was

unsure and had not seen a map. Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 208:3-208:9. While Chairman King stated this to the Committee, Chairman King had spoken to Adam Kincaid at least 3 to 5 times and had his personal cellphone number.

184. Chairman King also noted he was seeking legal representation, to be paid for by the State, to represent himself as Chairman of the Committee. Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 222:19- 223:17.

**July 30, 2025, First Special Session Senate Committee**

185. During the July 30, 2025, Senate Redistricting Committee, Chairman King announced that the Texas House Redistricting Committee had filed a map for consideration, but that the Senate did not have a mapping proposal and that he had not filed a map. Brooks Ex. 308 (July 30, 2025, Senate Redistricting Committee) 28:10-12.

186. Senators on the Redistricting Committee discussed subpoenaing Adam Kincaid to come testify regarding his process. Chairman King fought against this request stating, "I don't really see any purpose of his testimony—I don't see any—how his testimony would provide any relevant information." Brooks Ex. 308-T (July 30, 2025, Senate Committee on Congressional Redistricting) 25-26. Chairman King repeatedly shot down any request for the testimony of Adam Kincaid stating he did not think that hearing a map drawer's methodology or mental state was relevant to their redistricting. Brooks Ex. 308 (July 30, 2025, Senate Committee on Congressional Redistricting) 31:5- 31:15; Brooks Ex. 308-T at 31 (Sen. Alvarado: "I just don't see the harm in inviting somebody who drew a map and asking how and why they drew the map." Sen. King: "Well, if the point is to determine their methodology and their thoughts behind it and all that, I just – I just think those are

irrelevant in the unique situation of a redistricting map . . . . I don't think it really matters because I think the methodology gets wiped out by our legal scrub and the mental state gets knocked out by our policy decisions.").

187. Chairman King then told the Committee he would send Mr. Kincaid an invitation to testify before the committee, all while not telling members that he could call Mr. Kincaid and ask him to testify. Brooks Ex. 308 (July 30, 2025, Senate Committee on Congressional Redistricting) 26:8-26:14. Senator King did send Mr. Kincaid an invitation and spoke with him twice during the redistricting process, which was not disclosed to other members of the Redistricting Committee. Trial Tr. PM (October 7, 2025) 21:10-22:18 (Adam Kincaid). Mr. Kincaid testified that Senator King called him to ensure that he received the invitation and to ask if he would testify—a conversation that Senator King adamantly denied occurred. *Id*. ("He made a point to say he had made a promise to the Democrat he was working with to, you know, he would do that, so he did."). Trial Tr. AM (October 9, 2025) 144:2-9 (Senator King).

188. Chairman King similarly stated that Assistant Attorney General Harmeet Dhillon did not need to testify before the Committee, claiming her testimony would have no impact on whether Texas decided to redistrict. Brooks Ex. 308 (July 30, 2025, Senate Committee on Congressional Redistricting) 14:2-14:18.

189. Despite a mapping proposal being introduced in the House, Chairman King claimed to have not made any decision about the proposed map. Brooks Ex. 308 (July 30, 2025, Senate Committee on Congressional Redistricting) 31:18-33:7.

190. Chairman King also announced that he had retained Baker Hostetler to represent him and review the Texas House's congressional mapping proposal. Brooks Ex. 308 (July 30, 2025,

Senate Committee on Congressional Redistricting) 34:25-35:8. Although not revealed until trial, Baker Hostetler retained Jeff Lewis to assist their analysis. Trial Tr. PM (October 7, 2025) 118:9-11 (Adam Kincaid). This analysis was not provided to members of the redistricting committee and there is no evidence, if the analysis was performed, about its scope or accuracy and, in any event, there is no evidence that any relevant state actor was aware of same.

191. Right after Chairman King stated that he did not have a timeline and did not know when a map would be produced, a congressional mapping proposal was filed in the House of Representatives by Chairman Hunter on July 29, 2025, at 8:23:40 p.m. Trial Tr. AM (October 1, 2025) 59:9-15 (Senator Alvarado); Brooks Ex. 259. This mapping proposal would be introduced as HB 4 and Plan C2308.

192. Kincaid disavowed the DOJ letter and, as noted, opposed its issuance. Nevertheless, Kincaid drew a map that dismantled multiracial coalition districts in exactly the way the DOJ letter demanded, on the districts listed in the DOJ letter. *See* Trial Tr. PM (October 7, 2025) 9:10-10:7 (Adam Kincaid).


**August 1, 2025, Texas House of Representative Committee on Redistricting**

193. On August 1, 2025, the House Special Committee on Congressional Redistricting (herein "House Committee" or "House Committee on Redistricting") heard its first and *only* public testimony on HB4, which was the bill that contained Plan C2308. The public was given less than 48 hours prior to the public hearing to review the map.

194. Plan C2308 does precisely what the DOJ and Governor Abbott demanded in the call for the Special Session; the bill eliminated existing multiracial majority "coalition" districts

across the State, eliminated at least two Hispanic opportunity districts, including one that Texas successfully argued to the Supreme Court it had good reasons to think was required by Section 2 of the Voting Rights Act. *See also* Trial Tr. PM (October 7, 2025) 58:21-23 (Adam Kincaid) (The 2025 map drawer testifying that he agrees that the districts targeted by the DOJ letter, CDs 9,18, 29, and 33 were the most affected by the map he drew). Specifically, Plan C2308 dismantled CDs 9, 18, and 29, radically changing their racial composition. The 2025 congressional plan had just four districts (out of thirty-eight) in which a single race constituted a majority of the district's eligible voters, unlike the 2021 Congressional plan, which had nine. Brooks Ex. 258 (Plan C2193 CVAP Report); Brooks Ex. 259 (Plan C2308 CVAP Report). This is a remarkable feat, given that the entire state has no majority racial group among eligible voters.

195. Plan C2308 had a dramatic effect on Hispanic and Black voters in the Houston Metroplex area. Plan C2308 consolidated Black voters who formed a plurality of citizen voting age population ("CVAP") in both CDs 9 and 18 into a single, newly configured CD 18, which was drawn to just surpass a majority Black CVAP, at 50.8%. Brooks Ex. 259 (Plan C2308 CVAP Report). The proposed CD 18 contained 70.7% of the 2021 map's CD 9 and 25.6% of that map's CD 18. Brooks Ex. 260 (Plan C2308 v. C2193 Overlap Report). Notably, Plan C2308 spliced apart the 2021 map's version of CD 9 into seven new districts along racial lines, splitting its non-Black areas among six new districts and joining its Black areas with CD 18's Black areas. *Id*. The same is true of CD 18, which Plan C2308 split into six districts, consolidating its most heavily Black territory with CD 9, and splitting its less concentrated Black populations among the other five. *Id.*

196. Plan C2308's version of CD 9 contained just 2.9% of the 2021 map's CD 9. Id. Instead, the new CD 9 fused 48.6% of the 2021 map's CD 29, 27.7% of the 2021 map's CD 36, and 20.8% of the 2021 map's CD 2. *Id*. The resulting district had a bare-majority Hispanic CVAP of 50.5%, Brooks Ex. 259 (Plan C2308 CVAP Report), but was carried by Republican candidates in recent statewide elections, Brooks Ex. 261 (Plan C2308 2024 Election Report). Plan C2308 also drastically reduced the Hispanic CVAP of its version of CD 29 compared to the 2021 map, dropping it from 63.5% to 43.0%. *Compare* Brooks Ex. 258 (Plan C2193 CVAP Report) *with* Brooks Ex. 259 (Plan C2308 CVAP Report). Overall, Plan C2308 created *façade* Hispanic opportunity districts by creating congressional districts with bare Hispanic CVAP majorities, but would not allow a majority of Hispanic voters the opportunity to elect their candidates of choice, and collapsed two Black plurality districts into a single Black Majority district. *Id.*

197. Plan C2308 also dismantled CD 33, which was drawn to remedy an intentionally discriminatory map that splintered Tarrant County minority voters. *Perez v. Abbott*, 274 F. Supp. 3d 624, 653 (W.D. Tex. 2017), *rev'd and remanded on other grounds*, *Abbott v. Perez*, 585 U.S. 579 (2018). In redrawing this district, Plan C2308 fragmented Tarrant County's minority voting population among several Anglo-dominated districts. Brooks Ex. 269 (August 2025 Barreto Report). Plan C2308 placed a newly reconfigured CD 33 in Dallas County, consisting of nearly equal parts of the 2021 map's CDs 30, 32, and 33. Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report). And it radically reconfigured CD 32, which in the 2021 map was another of the multiracial majority-minority "coalition" districts lacking a single race majority, Brooks Ex. 258 (Plan C2193 CVAP Report). In Plan C2308, CD 32 stretched from Dallas County to Upshur and Camp Counties in east

Texas, contained all or part of eight counties, and went from a majority-minority district to one with an Anglo CVAP of 58.7%, Brooks Ex. 259 (Plan C2308 CVAP Report).

198. Keeping with DOJ and Governor Abbott's demand to eliminate multiracial majority districts, Plan C2308 converted CD 30 from a Black plurality CVAP district to a Black majority CVAP district, with a Black CVAP of 50.2%. *Id*. It accomplished this by retaining the most heavily Black parts of CD 30's core (68.7% of its existing population) and trading its least Black sections (30.9% of the 2021 maps' CD 30) to the newly configured CD 33 in exchange for portions of CDs 6, 25, 32, and 33 that had somewhat higher Black population shares—enough to boost the district to just above majority Black CVAP status. Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report). Doing so had no partisan benefits because the areas traded in population were all Democratic districts, but it had a racial effect on the composition of the district. Trial Tr. AM (October 4, 2025) 97:8-18 (Dr. Barreto). Plan C2308 intentionally drew the congressional map in the DFW area to go from three multiracial majority districts to just one.

199. Plan C2308 had a discriminatory impact on Hispanic voters in Bexar and Travis Counties. Plan C2308 redrew CD 35, which is an existing Hispanic opportunity congressional represented by Hispanic Congressman Greg Casar, and cracked the district among seven new districts. Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report). The new version of CD 35 contains just 9.5% of the 2021 map's CD 35. *Id*. Together with that small piece of the former CD 35, Plan C2308 stitched together 39.8% of the former CD 28, 17.4% of the former CD 15, 14.8% of the former CD 20, and 4.5% of the former CD 23. *Id*. Because the portion of CD 20 that Plan C2308 moved into the district is over 80% Hispanic, the new version of CD 35 went from being plurality Hispanic CVAP to 51.6% Hispanic

CVAP, but non-preforming for Latino candidates of choice in statewide elections. Brooks Ex. 261 (Plan C2308 2024 Election Report). Plan C2308 reconfigured CD 20, the other Hispanic majority district in San Antonio, to contain 60.5% of its 2021 population and take on 30.0% of the 2021 version of CD 35. Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report). The portion of CD 35 appended to CD 20 was the most highly concentrated Hispanic portion of CD 35, Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report), and thus the new map packs the Hispanic population from two preexisting performing Hispanic opportunity districts into just one remaining such district.

200. CD 27 was redrawn to pack Anglo voters into the district and disperse the district's Hispanic and Black populations in order to ensure the district did not have a multiracial majority. Under the 2021 map CD 27's Hispanic CVAP was 48.6%, its Black CVAP was 4.5%, and its Anglo CVAP was 44.1%. Brooks Ex. 258 (Plan C2193 CVAP Report). President Trump carried the district in 2024 with 64.3% of the vote. Brooks Ex. 262 (Plan C2193 2024 Election Report). Plan C2308 dismantled CD 27 as a multiracial majority district, leaving only 39.8% of its core population intact, Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report) and reconfiguring it to be Anglo CVAP majority at 52.8%. Brooks Ex. 259 (Plan C2308 CVAP Report). As a result, CD 27's Republican performance actually decreased, belying any partisan explanation for the change. Compare Brooks Ex. 262 (Plan C2193 2024 General Election Report) with Brooks Ex. 261 (Plan C2308 2024 General Election Report).

201. Laying out Plan C2308, Chairman Hunter cited the *Petteway* coalition district holding as the basis for undertaking redistricting and said that it was "important to note that four of

the five new districts are majority minority Hispanic CVAP districts." Brooks Ex. 309-T (Aug. 1, 2025, House Committee on Congressional Redistricting) 52:10- 54:22.

202. He and other Representatives presented racial data about the maps. Representative Hunter noted that the new plan included more Hispanic CVAP districts, and higher Black CVAP majority districts, focusing primarily on CDs 18, 9, and 29.  Brooks Ex. 309 (Aug. 1, 2025, House Committee on Congressional Redistricting) 58:22-59:6; 74:11-78:21.  For example, in committee, Representative Pierson highlighted in an exchange with Representative Hunter that CD35 "is one of the coalition districts that is one of the new majority Hispanic CVAP districts."  Brooks Ex. 309-T at 97:8-10.  In response to Rep. Pierson's question, Rep. Hunter gave a figure of 51.57%, describing it as "an increase of 5.71 change."  *Id.* at 97:8-15 ("REP. PIERSON:  And this is one of the coalition districts that is one of the new majority Hispanic CVAP districts; is that correct?  REP. HUNTER:  Well, again [CD 35] is 51.57 percent. It's an increase of 5.71 change.").

203. When asked whether it was a coincidence that numerous districts' CVAP increased, Representative Hunter responded that nothing is a coincidence "[a]nd some of the districts are historic. And so there's been a growth and you bring them back to the configuration. They're gonna go back to the increase." Trial Tr. PM (October 1, 2025) 46:17-23 (Rep. Moody); Brooks Ex. 309 (Aug. 1, 2025, House Committee on Congressional Redistricting) 105:13-107:13. The latter comments appear to be a reference to the late Congresswoman Barbara Jordan, whose district was repeatedly used by proponents as a justification to collapse back to just one Black opportunity district in the Houston area.

204. Chairman Hunter also stated that he could not tell Representative Thompson or others why CD 9 was changed. Trial Tr. AM (October 2, 2025) 97:4-114 (Rep. Thompson).

Chairman Hunter agreed that CD 9 was purposefully changed to be over 50% Hispanic CVAP. Def. Ex. 1289 at 868:1-6. When asked about the specific changes CD 35, including CD 35 was purposefully changed to increase the Hispanic CVAP to be above 50%, Hunter responded "51.57%." Brooks Ex. 309 at 861:8- 865:24. When asked explicitly about the racial changes to district boundaries for CD 18, Chairman Hunter stated that "CD 18 was drawn to be a 50.81 percent CVAP, which is a 11.82 change plus." Def Ex. PI 1289 at 862:11-17.

205. The drawing of districts to hit above 50% CVAP demonstrated an intentional racial target by the map drawer and legislative leadership responsible for the map. Trial Tr. PM (October 1, 2025) 108:5-13 (Rep. Moody).

206. Chairman Hunter knew little about the map besides it's racial demographics.  Chairman Hunter stated that he was unsure what data was used to draw the maps, did not know if Adam Kincaid was the map drawer for the 2025 plan, and did not know who the experts were that Butler Snow hired to review the map. Brooks Ex. 309 (Aug. 1, 2025, House Committee on Congressional Redistricting) 88:7- 89:17. He also did not know whether Butler Snow conducted a racially polarized voting analysis on CD 9 and did not ask the Attorney General's office to review the map regarding polarized voting despite the Attorney General having the capabilities to run it. Trial Tr. PM (October 1, 2025) 55:18-56:13 (Rep. Moody).

207. No fewer than five times during the August 1, 2025, House Redistricting Committee did Chairman Hunter state that he did not have any involvement with Adam Kincaid, that he did not know if Adam Kincaid was involved in drawing the map and could not say who was involved with drawing the map. *See* Brooks Ex. 309-T (Transcript of August 1, 2025,

House Special Redistricting Committee) 88:7-17; 88:24-89:5; 127:7-128:8 ("Rep. Hunter: Todd Hunter has no knowledge of Adam Kincaid involved in this."); Trial Tr. PM (October 1, 2025) 58:5-16 (Rep. Moody). He also stated he did not know if Butler Snow was working with Adam Kincaid. Brooks Ex. 309-T (Aug. 1, 2025, House Committee on Congressional Redistricting) 128:2-19.

208. At no point during the August 1, 2025, hearing did Chairman Hunter state that the map was drawn blind to race. *See e.g.* Brooks Ex. 309-T. Instead, Chairman Hunter would constantly speak to representatives regarding the racial composition of districts. Trial Tr. PM (October 1, 2025) 58:20-24 (Rep. Moody); Trial Tr. PM (October 1, 2025) 59:16-60:4 (Rep. Moody); Trial Tr. AM (October 2, 2025) 94:14-96:3 (Rep. Thompson); Brooks Ex. 309-T (August 1, 2025 House Redistricting Committee) 90:2-7 ("Rep Hunter: I don't know what you mean by 'racial neutral.' Rep. Thompson: Well— Rep. Hunter: We're all talking race, and we talk neutral.").

**August 2, 2025-August 7, 2025**

209. After only one day of debate and public comments, Plan C2308 passed out of committee on a party line vote on August 2, 2025. Brooks Ex. 310 (Aug. 1, 2025, House Committee on Congressional Redistricting) 20:19- 20:21. Adam Kincaid, the map drawer, was publicly touting that the new Texas congressional plan has four new majority Hispanic CVAP districts—including on a podcast before the map was even made public. Trial Tr. PM (October 6, 2025) 101:11- 18 (Adam Kincaid); Brooks Ex. 340-T at 10.

210. In response Democratic lawmakers in Texas left the State, denying the Texas House a quorum. Trial Tr. AM (October 1, 2025) 70:1-5 (Senator Alvarado).

**August 6, 2025 - August 15, 2025** **Senate Redistricting Committee Hearings and First Special Session Ends**

211. On August 6, 2025, the Senate Redistricting Committee held a hearing in which none of the witnesses who were invited to testify attended. Trial Tr. AM (October 1, 2025) 72:3-11 (Senator Alvarado). Unlike previous hearings, which were held remotely, these hearings were going to be held in person. Tr. Day 8 AM a 129:11-15. Chairman King acknowledged that he had sent the invitations just the day before, on August 5, 2025. Tr. Day 8 AM at 129:5-10.

212. Adam Kincaid was brought up again by committee members to Chairman King. Brooks Ex. 312 (Aug. 7, 2025, Senate Committee on Congressional Redistricting) 98:5- 98:12. Chairman King noted that of those who had provided input on the map or were signed up to do so, the vast majority opposed the map and very few were in support of redistricting. Brooks Ex. 312 (Aug. 7, 2025, Senate Committee on Congressional Redistricting) 98:13-98:17.

213. At this point still no one at the DOJ had reached out to the legislature regarding the letter, Legislators, including Chairman King, acknowledged that the DOJ letter unnecessarily confused the redistricting process. Brooks Ex. 312 (Aug. 7, 2025, Senate Committee on Congressional Redistricting) 204:22- 205:1; 208:8-208:24; Tr. Day 8 AM at 132:8-22.

214. The First Special Session ended on August 15, 2025.

**August 15, 2025, to August 17, 2025- Second Special Session**

215. Governor Abbott called a second special session of the 89th Legislature to begin at 12p.m. on August 15, 2025. Brooks Ex. 263. The list of topics included congressional redistricting,

this time without mention of the DOJ letter. *Id.* This omission is itself evidence that the Governor was now trying to obscure the racial purpose unpinning the redistricting effort.

216. On August 15, Chairman Hunter introduced HB 4 again with minor adjustments, reflected in Plan C2331. The only difference between Plan C208 and Plan C2331 was minor changes to CDs 16 and 23 in order to place Fort Bliss back into CD 16. Brooks Ex. 264 (Plan C2331 v. Plan C2308 Overlap Report); Trial Tr. PM (October 1, 2025) 73:12-20 (Rep. Moody).

217. During the August 17, 2025, meeting of the Senate Special Committee on Redistricting, Chairman King stated that Adam Kincaid drew the new congressional map and that Chairman King did not speak to anyone in the White House or DOJ regarding the new congressional plan. Brooks Ex. 314 (Aug. 17, 2025, Senate Committee on Congressional Redistricting) 105:2- 105:12. Chairman King also stated that his understanding is that the redistricting proposal from the Texas House was drawn by the National Republican Redistricting Trust. Brooks Ex. 314 (Aug. 17, 2025, Senate Committee on Congressional Redistricting) 103:3- 103:7.

**August 17, 2025, to August 18, 2025- Second Special Session**

218. The House Redistricting Committee held a hearing on August 18, 2025, in which Chairman Hunter introduced a committee substitute to replaced C2331 with Plan C2333. Chairman Hunter reiterated this new bill was based on the *Pettaway* case. Trial Tr. PM (October 1, 2025) 73:5-10.

219. Plan C2333 made minor changes to twelve districts (CD 2, 6, 7, 8, 17, 18, 22, 29, 36, and 38) with the most material changes made to CD 9. The changes to CD 9 from Plan C2331 to C2333 dropped the District's Hispanic CVAP from 50.5% to just 50.3% and included

all of Liberty County. Brooks Ex. 265 265 (Plan C2333 CVAP Report[2]). Chairman Hunter claimed that the change was intended to boost Republican performance in CD 9. Brooks Ex. 315 (Aug. 18, 2025, House Committee on Congressional Redistricting) 7:20- 8:12.

220. Chairman Hunter outlined the changes made to Districts 9 and 18 in the proposed map, including increasing CD-9 to almost 60 percent Republican. Brooks Ex. 315 (Aug. 18, 2025, House Committee on Congressional Redistricting) 6:25- 7:7. District 8 remained a majority-minority Black CVAP district and that its compactness stayed the same – the Black CVAP decreased slightly, but Hispanic CVAP increased slightly. Brooks Ex. 315 (Aug. 18, 2025, House Committee on Congressional Redistricting) 7:20- 8:12. The changes to CD-9 included all of Liberty County and "made sure that particular Congressional District has an increase to almost 60 percent Republican." Trial Tr. PM (October 1, 2025) 75:15-25 (Rep. Moody); Brooks Ex. 315 (Aug. 18, 2025, House Committee on Congressional Redistricting) 8:10- 10:24.

221. Representative Turner asked Chairman Hunter if he knew who had drawn the proposed map. Brooks Ex. 315 (Aug. 18, 2025, House Committee on Congressional Redistricting) 31:24- 32:5. Chairman Hunter denied knowing who drew it and said "everything I've gotten is from the law firm," presumably referring to Butler Snow. Brooks Ex. 315 (Aug. 18, 2025, House Committee on Congressional Redistricting) 32:6- 32:8.

222. Chairman Hunter continued to deny knowing who drew plan C2333. Trial Tr. PM (October 1, 2025) 77:9-18 (Rep. Moody).

---

[2] The Hispanic CVAP numbers reported by TLC are in some instances, such as with CD9, slightly higher than the numbers that Chair Hunter repeatedly read aloud in the Committee and on the Floor. In those instances, he referred to CD 9 as being 50.15% Hispanic CVAP. *E.g.*, Brooks Ex. 316-T at 80:13-24.

**August 20, 2025- Second Special Session**

223. The August 20, 2025, House held its floor debate on HB 4. The floor debate was completely dominated by discussions of the racial composition of the congressional plan. Chairman Hunter spoke in granular detail at length about the racial composition of the districts and trumpeted the various "new" majority-minority districts within Plan C2333. *See Brooks* Ex. 316-T (Aug. 20, 2025, House Special Session) 29:24- 30:3; Brooks Ex. 316-T (Aug. 20, 2025, House Special Session) 79:5-18 (Rep. Spiller stating that CD 18 "is currently one of these coalition districts, and under HB 4, changes to a majority Black CVAP district. Is that correct? Rep. Hunter: That is correct); 80:13-24 ("Rep Hunter: Yes. For the record, the Hispanic CVAP of Congressional District 9 under this plan, the Hispanic CVAP is 50.15 percent."); 80:25-17 ("Rep Hunter: Let me give you the information on 29, because I just heard some of that, so everybody knows. 29 has gone from a Black CVAP in 18.31 percent in 2021 to now 32.79 percent. As they said, Hispanic CVAP decreased, but to 43.12 percent."); 81:18-82:23.

224. For example, Chairman Hunter said early in this presentation to members that "*It is important to note—Please note members. Four of the five new districts are majority minority Hispanic, what we call CVAP districts.*" Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 29:19-30: 24. Chairman Hunter then compared plan C2333 to the 2021 enacted congressional map, describing with precise detail the racial demographics of the "new" majority minority districts. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 30:12- 30:24. Chairman Hunter highlighted specific districts which would either remain or become majority-minority CVAP districts. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 30:21- 31:11.

225. In response to Plan C2333, Representative Chris Turner told the Committee that *Petteway* did not require the Legislature to find naturally occurring racial coalition districts and destroy them, which HB 4 does, but was ignored. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 74:3- 74:7.

226. Chairman Hunter and Representative Spiller had dialogue on the floor discussing the legal requirements for racial coalition districts and the *Petteway* case. Trial Tr. PM (October 1, 2025) 84:23-85:23 (Rep. Moody). Representative Spiller asked Chairman Hunter, "So now, in Texas, one of the reasons that were doing this now is that we are, feel compelled to because of the *Petteway* case and the ruling in the *Petteway* case as it relates to these coalition districts, correct" to which Chairman Hunter agrees. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 77:5- 77:23; Trial Tr. PM (October 1, 2025) 85:15-6.

227. Chairman Hunter and Representative Spiller also discussed the changes to CD 18, with both discussing that CD 18 was not a majority Black CVAP district compared to the district being comprised of a racial coalition in the 2021 map. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 79:19- 79:23. They also discussed on the floor the changes to CDs 9 and 29, detailing the change in Hispanic CVAP and Black CVAP in the districts in detail. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 81:16- 81:17; Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 220:5- 220:10. Both discussed on the floor how the 2025 congressional plan increased the under of Hispanic-majority and Black-majority districts. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 82:17- 82: 22.

228. House members raised the issue of Black voters in Houston and Dallas being packed into concentrated areas to reduce their electoral ability during the floor debate stating that their impression of the map was that it was a "fairly straightforward packing of Black voters into

concentrated area to reduce their electoral ability." Trial Tr. PM (October 1, 2025) 86:25-86:7 (Rep. Moody).

229. During the debate, several issues were raised such as the unusual procedural process related to the 2025 redistricting cycle, the lack of knowledge of authors of the map, lack of knowledge regarding where the map came from, what the rationale for the bill was and the rationale for the policy changes. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 85:24- 86:5. Representative Hawkins also questioned Chairman Hunter on the changes to the Black voter population in CD 9 and 33 and the fact that the Texas Legislative Black Caucus was not consulted or engaged in the map drawing process. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 112:12- 113:6; 126:6- 126:22.

230. With respect to the DOJ letter's impact on redistricting, according to Chairman Hunter the DOJ letter impacted the 2025 redistricting process because the DOJ letter was discussed in Committee, then the lawyers looked at the letter, and then the Committee came up with this plan. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 111:6- 111:16.

231. After nine hours of debate, the House voted 88-52 to pass HB 4.

232. In a press release, Speaker of the Texas House Burrows announced, "[t]he Texas House today delivered legislation to redistrict certain congressional districts to address concerns raised by the Department of Justice and to ensure fairness and accuracy in Texans' representation in Congress." Brooks Ex. 282.

233. Sen. King agreed that he was aware of Chairman Hunter's layout on the floor of HB 4 on August 20, 2025, where Chairman Hunter described the effect of redistricting on the racial makeup of several congressional districts.  Tr. Day 8 AM at 169:2-170:16.

**August 21, 2025- August 22, 2025- Second Special Session**

234. On August 21, 2025, the Senate Redistricting Committee took up HB 4 and Plan C2333. Trial Tr. AM (October 1, 2025) 88:4-9 (Senator Alvarado).

235. Senator Alvarado challenged the lack of public input and transparency of the process and plans. Brooks Ex. 317 (Aug. 21, 2025, Senate Special Committee on Redistricting) 6:25-7:20. She also noted the new map split Hispanic neighbors, specifically in Houston's East end. Brooks Ex. 317 (Aug. 21, 2025, Senate Special Committee on Redistricting) 6:25-7:20; Trial Tr. AM (October 1, 2025) 89:12-25 (Senator Alvarado). No explanation for these changes or lack of transparency was ever given. Trial Tr. AM (October 1, 2025) 90:7-8 (Senator Alvarado).

236. Chairman King ignored these concerns and denied knowing anything about Plan C2333 prior to the plan's unveiling to the public. Brooks Ex. 317 (Aug. 21, 2025, Senate Special Committee on Redistricting) 9:20- 10:7; 15:11-15:16. This was because at no point was Chairman King involved in the creation of C2333. Trial Tr. AM (October 1, 2025) 97:8-13.

237. Chairman King justified not holding additional hearings with public testimony because HB 4 was a companion bill catching up with the Senate bill.  Tr. Day 8 AM at 146:12-15.

238. On August 22, 2025, the full Texas Senate began debate on HB 4.

239. Senator Menendez questioned Chairman King about why Senator King had not looked at race data, given that Chairman Hunter looked at and listed race data for each district to which Chairman King responded that the law is complex with respect to race. Brooks Ex. 318 (Aug. 22, 2025 Senate Session) 25:5- 25:19. Senator Menendez also asked Senator King if he believed there is racially polarized voting in Texas, to which Senator King responded that he was not sure whether he was qualified to comment on that but that he

knew the proposed map was legal with regard to the VRA and other applicable law. Brooks Ex. 318 (Aug. 22, 2025, Senate Session) 29:9- 29:16.

240. Chairman King also stated during the debate that HB 4 came out of the House and that he does not know who "physically drew the map" and did not know if the map was a product of the House author or counsel. Trial Tr. AM (October 1, 2025) 98:2-19. Chairman King then remarked that the "map that's before us today is not based on coalition districts." Trial Tr. AM (October 1, 2025) 99:4-11 (Senator Alvarado).

241. During the debate, Senator West questioned Senator King about District 33, whose U.S. Congressperson is Marc Veasey. Brooks Ex. 318 (Aug. 22, 2025, Senate Session) 97:24-98:9. Senator King stated to members that while he had not taken racial data into consideration with drawing the map, he knew where the African American and Hispanic communities in the Dallas Fort-Worth area were located and knew that District 33 was comprised of a significant African American Community and Hispanic Community. Brooks Ex. 318 (Aug. 22, 2025, Senate Session) 98:24- 99:8.

242. Chairman King was unable to provide any information as to the changes of the racial composition of numerous districts, such as CD 18. Brooks Ex. 318 (Aug. 22, 2025, Senate Session) 127:7- 127:11; 128:1- 128:7. In response to questions regarding the racial gerrymandering and cracking of existing opportunity districts, Chairman King responded that he was assured that the proposed map does not pack or crack any existing districts. Brooks Ex. 318 (Aug. 22, 2025, Senate Session) 128:8- 128:14.

243. Senator Alvarado alerted her colleagues that she would be filibustering the bill. Trial Tr. AM (October 1, 2025) 131:3-7 (Senator Alvarado). After she had done so, the proceedings in the Senate changed. Trial Tr. AM (October 1, 2025) 131:7-16 (Senator Alvarado). The

Senate took a three-hour dinner break to drag out the proceeding. Trial Tr. AM (October 1, 2025) 131:12-16 (Senator Alvarado). When the Senate came back from the dinner break, it was announced that Senator Alvarado would not be allowed to filibuster due to a fundraising email announcing her plans. Trial Tr. AM (October 1, 2025)19-8 (Senator Alvarado). This explanation was pre-textual, however, because another Democratic Senator who did not send a fundraising email was also not permitted to filibuster, violating Senate tradition in order to force a vote on the bill as fast as possible. Trial Tr. AM (October 1, 2025) 131:12-136:14 (Senator Alvarado).  The Senator that made the move to block Senator Alvarado's filibuster (Senator Perry) argued that her fundraising solicitation was a violation of decorum.  Senator Perry in earlier legislative proceedings concerning the immigration issue quipped, "shoot, shovel and shut up" presumably about covering up the murder of unauthorized immigrants. Brooks Ex. 338

244. The Texas Senate then passed HB 4 in the early hours of August 23, 2025. Trial Tr. AM (October 1, 2025) 136:7-16 (Senator Alvarado).

245. Governor Abbott signed HB4 into law on August 29, 2025.


## VI. Discriminatory Impact of the Enacted Plan C2333

246. The plaintiffs' quantitative experts have demonstrated that Plan C2333 will fail to allow Black and Hispanic voters in the Houston, Dallas-Fort Worth, Travis and Bexar, and Coastal Texas areas to elect candidates of their choice and influence elections generally. Brooks Ex. 269 (Barreto Report); Brooks Ex. 283 (Barreto-Rios Supplemental); Brooks Ex. 284 (Barreto and Rios Rebuttal); Gonzalez Ex. 39 (Ansolabehere Report); Gonzalez Ex. 61 (Ansolabehere Rebuttal).

247. In part, this is because Plan C2333 disperses Hispanic voters in the DFW, Houston, and Travis/Bexar County areas, while it packs Black voters in the Houston and DFW areas. See Brooks Ex. 269; Gonzalez Ex. 39 at 3-5.

248. "Rather, by reducing the number of other majority-minority districts in which Black voters would consistently have been able to elect their candidates of choice, the [2025 Map's] overall effect is to reduce Black voters' electoral opportunities." Gonzales Ex. 39 at 5.

249. The 2025 Map's configuration of CD 9 and CD 35 as new majority-Latino CVAP district does not improve Latino voters' opportunities to elect their candidates of choice, because in both districts, the candidates favored by a substantial majority of Latino voters would have lost all elections analyzed. Gonzales Ex. 39 at 5; Brooks Ex. 269 (Barreto Report) at 5 ("[T]he map eliminates Hispanic opportunity districts by dismantling CD 35 and CD 29 and replacing them with bare majority Hispanic districts that are unlikely to perform to elect Hispanic-preferred candidates.").

250. In the 2021 map, nine districts were multiracial majority, with no single race constituting a majority of eligible voters. Brooks Ex. 258 (Plan C2193 CVAP Report). Under C2333, just four districts are multiracial majority. Brooks Ex. 265 (Plan C2333 CVAP Report) (CDs 7, 8, 29, 33). Statewide, the average core retention, i.e., percentage of people who remain together in a district from the 2021 map to the 2025 map, is 67.6%. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). That number is 20 points lower among the nine multiracial majority districts in the 2021 map, at just 52.3%. Brooks Ex. 267 (Plan C2333 v. C2193 Overlap Report).Of the six districts with the lowest core retention, five were multiracial majority under the 2021 map: CD 33 (32.7% core retention); CD 35

(39.8% core retention); CD 27 (39.8% core retention); CD 32 (41.2% core retention); and CD 9 (43.7% core retention). Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). In four districts, the largest grouping of people in the 2021 version of the district are no longer even in the same numbered district—including three of the four identified in the DOJ letter, with CD 33 missing that metric by just 0.3%. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report) (CDs 9, 18, 29, and 35).

251. Ultimately, Plan C2333 bears more heavily on Black and Latino voters than on Anglo voters by (1) reducing from three (2021 CDs 30, 32, and 33) to two (2025 CDs 30 and 33) the number of effective minority opportunity districts in Dallas Fort Worth, from four (2021 CDs 7, 9, 18, and 29) to three (2025 CDs 7, 18, and 29) the number of effective minority opportunity districts in the Harris County area, and by eliminating CD 35 as an effective minority opportunity district.

252. Indeed, Mr. Kincaid acknowledged knowing that his changes would eliminate minority opportunity districts that existed in the 2021 map but that he dismantled in the 2025 map. Trial Tr. AM (October 8, 2025) 129:3-11 ("When you drew the 2025 map, did you know that CDs 9, 18, 29, and 33 under the 2021 map were considered minority opportunity districts, in that they provided minorities an opportunity to elect candidate of their choice?" Kincaid: "I did."). Trial Tr. PM (October 7, 2025) 105:21-17 (Adam Kincaid); Brooks Ex. 341.

**Harris County Area**

253. In Harris County, two majority-minority districts that were multiracial majority districts, CD 9 and CD 18, were dismantled and instead collapsed into a newly configured, Black CVAP majority CD 18. *See* Brooks Ex. 269 (Barreto Report) at 3.

254. **CD 9:** CD 9 is not an effective opportunity district for Hispanic voters in Plan C2333. Under enacted Plan C2333, CDs 9 and 18 are consolidated into a single district, and District 9 became a sham bare-majority Hispanic CVAP district with a Hispanic CVAP of 50.3%. Brooks Ex. 269 (Barreto Report) 3, 14-15; Brooks Ex. 265 (Plan C2333 CVAP Report) at 1. Additionally, in the 2025 Map, the Black eligible voter population is reduced to 11.9 percent, while the Anglo CVAP is 35.3 percent. Gonzales Ex. 39, Tbl. 6.

255. The 2021 Map's version of CD 9 was plurality Black CVAP, at 45.9 percent. Gonzales Ex. 39, Tbl. 5. In each of the 31 elections Dr. Ansolabehere examined, a majority of Black voters preferred Democrats, with an average of 94 percent voting for Democrats. *Id.* Tbl. 7; Trial Tr. AM (October 3, 2025) 26:20–27:7. Anglo and Latino voters in CD 9 also preferred Democrats, at an average level of 56 percent and 71 percent, respectively. Gonzales Ex. 39, Tbl. 7.

256. In the only contested congressional election that took place in CD 9 under the 2021 Map, the candidate preferred by Black and Latino voters won with 77 percent of the vote. Trial Tr. AM (October 3, 2025) 27:13–18. Similarly, in statewide elections, the candidates preferred by Black voters won 31 out of the 31 elections examined, with an average vote share of 75 percent. *Id.* at 27:19–24. Thus, although Black voters in CD 9 formed only a plurality of CVAP, they were able to elect their candidates of choice. *Id.* at 28:2–8.

257. Voting in the new CD 9 is racially polarized. Latinos in the new CD 9 on average voted 77 percent of the time for Democrats, and in all elections examined, a majority of Latinos

voted for Democratic candidates. *See* Brooks Ex. 269 (Barreto Report) at 45; Brooks Ex. 268 (Plan C2333 2024 General Election); Gonzales Ex. 39, Tbl. 8. Similarly, in all elections a majority of the Black voters in that district voted for Democratic candidates, with Black support for those candidates averaging 80 percent. Anglos in the new CD 9, however, preferred Republican candidates in the elections analyzed. According to Dr. Ansolabehere's analysis Anglos on average voted 11 percent for Democrats and 89 percent for Republicans. Trial Tr. AM (October 3, 2025) 28:22–29:8; Gonzales Ex. 39, Tbl. 8.

258. Although CD 9 has a bare Hispanic CVAP majority, it does not allow Latino voters a reasonable opportunity to elect their candidates of choice. Dr. Ansolabehere's analysis showed that in each of the past statewide elections examined, the Republican candidate would have won the majority of votes in the precincts included in CD 9 under the 2025 Map, with an average vote share of 57 percent. Trial Tr. AM (October 3, 2025) 29:9–19; Gonzales Ex. 39, Tbl. 13. Additionally, Dr. Collingwood concluded that Hispanic-preferred candidates would not win in CD 9 in Plan C2333. Trial Tr. AM (October 3, 2025) 87:23-88:1; LULAC Exhibit 829 at Table 5.2. Additionally, Dr. Collingwood found that there are two factors behind the losses of Hispanic-preferred candidates in CD9 in Plan C2333: very high cohesion among Anglo voters and a very high voter turnout differential between Hispanic and white voters. Trial Tr. AM (October 3, 2025) 88:2-7. Dr. Collingwood visually displayed the gap in voter turnout between Latino and White voters in CD9 using scatterplots. LULAC 829, page 20, Figure 5.1. The scatterplot correlation coefficients showed a negative relationship between being Hispanic and voting, and a positive relationship between being Whie and voting. Trial Tr. AM (October 3, 2025) 88:12-90:16. Dr. Collingwood testified that taken together, the scatterplots mean that a

turnout differential is a very plausible explanation as to why Hispanic-preferred candidates failing to win in CD9 in Plan C2333. Trial Tr. AM (October 3, 2025) 90:13-16. Dr. Collingwood further testified that over time, the turnout gap between Hispanic and White voters is widening in CD9 in Plan C2333. Trial Tr. AM (October 3, 2025) 90:17-91:8. Because "the white cohesion rate is very high and even higher than the Hispanic cohesion level" and because white voters "have much higher turnout than Hispanics in that district." Trial Tr. AM (October 3, 2025) at 30:8–17.

259. Moreover, the new CD 9 splits Hispanic communities of interest and groups them with counties that have nothing in common with and vote opposite to Hispanic interests. Trial Tr. AM (October 1, 2025) 129:6-13 (Senator Alvarado). It purposefully buries Hispanic voters from Houston's East End Neighborhood with those in Anglo-majority Liberty County. Trial Tr. AM (October 1, 2025) 138:7-10 (Senator Alvarado). Under the 2021 Plan Hispanic and Black voters had the ability to elect candidates of choice to Congress in CD 9 but now will not be able to elect their candidates of choice under the 2025 congressional plan. Trial Tr. AM (October 2, 2025) 140:4-19 (Rep. Thompson).

260. It is highly unlikely that a majority CVAP district would arise within the district boundaries here. Brooks Ex. 269 (Barreto Report) at 4-5; Brooks Ex. 283 (Barreto Supplemental) at 12, Figure S8.

261. Moreover, Adam Kincaid testified that while the prior CD 9 elected African American candidates of choice, the new configuration of CD 9 that he drew would not likely elect African American candidates of choice. Trial Tr. AM (October 8, 2025) 94:4-15 (Adam Kincaid).

262. Adam Kincaid testified that he sought first to redraw the minority opportunity districts CD9 and CD 18 in Harris County, and not CD7, which is a Democratic district represented by a White member of Congress and not mentioned in the DOJ letter. Trial Tr. AM (October 8, 2025) 135:14-136:19.

263. Chairman King acknowledged that Sen. Miles was concerned about the changes to the bill, including those changes affecting the Harris County area, specifically because there were changes made to CD9 between the two versions of the bill. . Trial Tr. AM (October 8, 2025) 147:10-17. Sen. King agreed that those changes affected very significantly the political performance of CD9, primarily by adding in Liberty County. Tr. Day 8 AM at 147:18-22. Nevertheless, Sen. King testified these changes were "minor" and "not sufficiently substantive to require public testimony." . Trial Tr. AM (October 8, 2025) 146:16-21.

264. **CD 18:** Under Plan C2333, Black voters from CD 9 are combined with CD 18's Black voters to create just one majority Black CVAP district. Brooks Ex. 269 (Barreto Report) 3, 5. In the 2021 map, CD 18 was a multiracial majority district, with no single race constituting a majority of eligible voters. Brooks Ex. 258 (Plan C2193 CVAP Report) 1; Brooks Ex. 269 (Barreto Report) 3. In the 2025 Map, CD 18 is 51.6 percent Black CVAP. Trial Tr. AM (October 3, 2025) 20:9–14; Gonzales Ex. 39, Tbl. 6. Under the 2021 Map, the Black CVAP of CD 18 was 39.3 percent making Black voters the largest racial group by CVAP in CD 18 despite not comprising a majority. Tr. Oct. 3 AM 20:15–21:1; Gonzales Ex. 39, Tbl. 5. Dr. Ansolabehere's EI analysis showed that across 31 elections under the 2021 Map, 94 percent of Black voters voted for Democratic candidates in CD 18. Trial Tr. AM (October 3, 2025) 21:19–24; *id.* at 22:3–7. Those

same preferences were shared by 63 percent of Latinos and 58 percent of Anglos in CD 18. *Id.* at 21:25–22:2, 22:8–22:13; Gonzales Ex. 39, Tbl. 7. As a result, it was not necessary to add additional Black voters to CD 18 to be able to elect their candidates of choice. Trial Tr. AM (October 3, 2025) 22:14–18; *see also* Gonzales Ex. 39, Tbl. 11.

265. Now, CD 18 is bare majority Black CVAP with the Black CVAP being 50.5%. Brooks Ex. 265 (Plan C2333 CVAP Report). CD 18's packing of Black voters creates a "vote sink" such that Black voters do not have the same weight or ability to influence elections in Houston. Brooks Ex. 268 (Plan 2333 General Election Results) at 3-8. The map drawer intentionally drew CD 18 as such. *See* Trial Tr. PM (October 7, 2025) at 59:4-11 (Adam Kincaid); Trial Tr. AM (October 8, 2025) 96:6-14.

266. **CD 29:** In Plan 2333, CD 29 is eliminated as a Hispanic CVAP majority district, the District's CVAP changed by 20 points. Brooks Ex. 269 (Barreto Report) at 3. The former CD 29's Hispanic population under the new plan is now dispersed between multiple districts, with a majority of the former CD 29's Hispanic population put into CD 9. See Brooks Ex. 267 (Plan C2333 v. Plan 2193) at 2.

267. Voting CD 29 is racially polarized. Trial Tr. AM (October 4, 2025) 62:16-63:13 (Dr. Barreto). Racially polarized voting analysis demonstrates that the Latino community in District 29 votes cohesively, and that the Black community votes cohesively with the Latino community. Trial Tr. AM (October 4, 2025) 63:17-63:22 (Dr. Barreto). This electoral information about racial and partisan voting patterns would have allowed map drawers to make selections based on race. Trial Tr. AM (October 4, 2025) 63:23-64:1 (Dr. Barreto).  Defense experts did not contest the uniform racially polarized voting patterns reported by Drs. Barreto, Collingwood and Ansolabehere.

268. Adam Kincaid acknowledged that CD 29 was, in addition to being a majority Hispanic CVAP district, a Hispanic opportunity district under the 2021 congressional plan. Trial Tr. AM (October 8, 2025) 93:12-19 (Adam Kincaid).

269. Chairman King was present at the July 25th hearing at which Sen. Alvarado stated that Congressional District 29 has always been a Latino Opportunity District or Latino majority district since it was created in 1991. Trial Tr. PM (October 9, 2025) 14:20-15:8; 15:16-22. Chairman King is aware that Congresswoman Garcia is Hispanic and has represented CD29 since 2019. Trial Tr. PM (October 9, 2025) 14:3-12. Chairman King agreed that at the July 25, 2025, hearing on redistricting, Congresswoman Sylvia Garcia testified that Congressional District 29 is a majority Hispanic district in the 2021 map. Trial Tr. PM (October 9, 2025) 15:23-16:1; 16:16-20. Chairman King also agreed that Congresswoman Garcia testified that "the Voting Rights Act protects districts like the 29th." Trial Tr. PM (October 9, 2025) 16:21-25.

270. Chairman King also agreed that the DOJ letter, which he had read, expressed "serious concerns" about District 29. Trial Tr. PM (October 9, 2025) 17:6-14. He also conceded that the DOJ Letter characterizes CD 29 as an unconstitutional coalition district and that it recognizes CD 29 as a majority-Hispanic district. Trial Tr. PM (October 9, 2025) 17:18-25. Chairman King also conceded that the DOJ Letter states that the Attorney General reserves the right to seek legal action if the State of Texas fails to rectify the racial gerrymandering of District 29. Trial Tr. PM (October 9, 2025) 9:3-14; 17:6-18:7.

271. Chairman King agreed that, compared to its configuration in C2193, CD29 in C2308 is in two different places, with a part that's in Northside and Northwestern Harris County and another part in CD9. Trial Tr. PM (October 9, 2025) 19:1-20:7. Chairman King also

agreed that in the final 2025 congressional map, C2333, CD29 is separated into two parts -- one in the north side, north/northwest Houston, and the other part in CD9.  Trial Tr. PM (October 9, 2025) 20:8-19.  Chairman King testified that he understood that CD9 in the 2025 map would perform better for Republicans, and that the part of CD29 that went into CD9 is going into a district that will now elect a Republican.  Trial Tr. PM (October 9, 2025) 20:20-21:11.

272. Chairman Vasut agreed that he read the DOJ Letter.  Trial Tr. PM (October 9, 2025) 133:21-22.  Chairman Vasut also agreed that CD 29 was referenced in the letter and did not dispute that it referred to CD 29 as a majority-Hispanic district.  Trial Tr. PM (October 9, 2025) 133:12-18.

273. Chairman Vasut agreed that Congresswoman Sylvia Garcia represents Congressional District 29 and is Hispanic Democrat.  Trial Tr. PM (October 9, 2025) 132:20-133:2; 136:12-15.  Chairman Vasut testified that Congresswoman Garcia testified at the Texas House Redistricting Hearing on July 24, 2025, and that he heard her testimony.  Trial Tr. PM (October 9, 2025) 133:23-134:3.  Chairman Vasut agreed that he heard Congresswoman Garcia testify that the VRA protects districts like CD 29.  Trial Tr. PM (October 9, 2025) 134:23-135:6.

274. Chairman Vasut agreed that, compared to its configuration in C2193, CD29 in the final 2025 congressional map, C2333, has been separated into two parts, with the eastern and southern portions of placed in CD9, and the remainder of CD29 reshaped.  Trial Tr. PM (October 9, 2025) 136:3-8.  Chairman Vasut acknowledged that, in attempting to redraw CD9 to likely elect a Republican, the final 2025 congressional map transferred a portion of

CD29, which he recognized was previously majority-Hispanic and had elected a Democrat congresswoman.  Trial Tr. PM (October 9, 2025) 136:16-137:6.

275. Speaker Moody testified that, under Plan C2193, CD 29 had a Hispanic CVAP of 63.5%. Trial Tr. PM (October 1, 2025) 114:7-12.  Speaker Moody testified that, under Plan C2333, CD 29 shifted significantly to the west, and that the eastern half of the district went into CD 9.  Trial Tr. PM (October 1, 2025) 114:18-23.  Speaker Moody also testified that, under Plan C2333, the Hispanic CVAP decreased from 63.5% to 42.1%, meaning that CD 29 is no longer a Hispanic CVAP majority district.  Trial Tr. PM (October 1, 2025) 115:8-18. Speaker Moody agreed that CD 29's Black CVAP under Plan C2333 sits at 33.6%, which he described as "relatively equal" in proportion to CD 29's Hispanic CVAP.  Trial Tr. PM (October 1, 2025) 115:19-116:3.

**Dallas Fort-Worth Area**

276. In the Dallas Fort-Worth area, Plan C2333 eliminates one of the two majority-minority districts and instead collapses CD 33 and CD 32 into a single district, "leaving minority voters fragmented across several Anglo-majority districts." Brooks Ex. 269 at 3. The impact is stark, Hispanic voters in DFW are put into an Anglo-majority district in which they will not be able to elect candidates of choice, Black voters are packed into CD 30, and Black and Hispanic voters are cracked into CD 32 which will not elect their candidates of choice. *See* Brooks Ex. 269 (Barreto Report) at 47.

277. **CD 30:** Under Plan C2333, CD 30 is a majority Black CVAP district. Brooks Ex. 269 (Barreto Report) 3. In the 2021 map, CD 30 was a multiracial majority district, with no single race constituting a majority of eligible voters. Brooks Ex. 258 (Plan C2193 CVAP

Report) at 1. In Plan C2333, 30.9% of CD 33's population were shifted into CD 33 from CD 30 in Plan C2333. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report) at 5-6. The segment of the population shifted out of CD 30 had its lowest Black CVAP share, and they were replaced by populations from nearby districts with larger Black CVAP shares. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report) at 5-6; Brooks Ex. 269 (Barreto Report) at 25. This had the effect of achieving a bare-Black CVAP majority in CD 30. Brooks Ex. 269 (Barreto Report) at 3, 4-5.

278. **CD 32:** Under Plan C2333, the original CD 33 has been dismantled and fused with pieces of CD 32 to create a new CD 33 that consolidates two majority-minority districts into one. Brooks Ex. 269 (Barreto Report) at 3, 6. Hispanic voters put into the new CD 32 are now unable to elect their candidates of choice. Voting is racially polarized in CD 32: Hispanic voters favor their candidates on average over 80% while Anglo voters are cohesive for different sets of candidates at around the 75% in the elections analyzed. Brooks Ex. 269 at 47.

279. **CD 33**: The dismantling of CD 33 has a discriminatory and disparate impact on Hispanic and Black voters in Tarrant County. Under the 2025 map, nearly a third of its residents were assigned to it to effectuate the race-based reconfiguration of CD 30. Fully 30.9% of CD 33's population, 236,797 people, were shifted out of CD 30 and into CD 33 in the 2025 map predominantly on account of their racial composition. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). This segment of CD 30's population had its lowest Black CVAP share. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). Removing this population from CD 30 and replacing it with population from other nearby districts with larger Black population shares was the only way to achieve a bare-Black

CVAP majority in CD 30. Under the 2021 Congressional plan, voters in CD 33 elected Congressman Mark Veasy. Trial Tr. AM (October 2, 2025) 8:7-12 (Senator West).

280. CD 33 in the 2021 plan covered parts of Fort Worth and Dallas. It was originally drawn as a remedial district after a federal court found the district was previously drawn with discriminatory intent. Trial Tr. AM (October 2, 2025) 8:20-9:5 (Senator West). CD 33 allowed Black and Hispanic persons in Tarrant and Dallas Counties to elect representative of their choice who would represent their interests. Under the new plan, these voters no longer have such an opportunity. Trial Tr. AM (October 2, 2025) Trial Tr. AM (October 2, 2025) 9:15-21 (Senator West).

281. The discrimination in redistricting has a lasting impact on voters in the Dallas Fort-Worth area. A resident of Fort Worth, Texas, testified about other instances of discrimination in redistricting, with Christina Elene Elbitar, for example, noting a feeling of "disrespect" in the way the elected officials treat those within their community. Trial Tr. PM (October 2, 2025) 89:12-20 (Christina Elbitar).

**Travis and Bexar County Area**

282. **CD 35:** Under Plan C2333, the configuration of CD 35 has a discriminatory impact on Hispanic voters. While Hispanic voters in the 2021 congressional plan had the ability to elect candidates of choice and did elect those candidates, the new CD 35 splits Hispanic communities of interest, submerging these voters with cohesive Anglo voters such that Hispanic voters will be effectively blocked from electing their candidates of choice. Brooks Ex. 269 (Barreto Report) at 4; LULAC Ex. 829 at 6-29. The new configuration completely abandons Hispanic population in Comal, Hays and Travis County that the prior configuration provided them an opportunity to elect a candidate of their choice.

283. Under the 2021 Map, CD 35 was a district in which no single racial group comprised a majority of the CVAP, but Latinos were a plurality with 45.9 percent of the CVAP. Trial Tr. AM (October 3, 2025) 31:11–16; Gonzales Ex. 39, Tbl. 5. Latino voters in the 2021 configuration of CD 35 also voted for Democratic candidates in all the elections Dr. Ansolabehere examined, and on average those candidates' won 73 percent of the Latino vote. Trial Tr. AM (October 3, 2025) 31:17–22; Gonzales Ex. 39, Tbl. 7. Black and Anglo voters also preferred Democratic candidates in all 31 elections; on average, Anglos voted 72 percent for Democratic candidates, and Blacks voted 68 percent for Democratic candidates. Trial Tr. AM (October 3, 2025); Gonzales Ex. 39, Tbl. 7.

284. In each of the two congressional elections conducted under the 2021 Map, the Latino candidate of choice won handily in CD 35, with 70 percent of the vote on average. Trial Tr. AM (October 3, 2025) 32:9–15; Gonzales Ex. 39, Tbl. 9. Similarly, in statewide elections, the Latino candidates of choice won 31 of 31 contests analyzed in old CD 35, receiving on average 71 percent of the vote. Trial Tr. AM (October 3, 2025) 32:18–25; Gonzales Ex. 39, Tbl. 11.

285. Now, CD 35 is a bare majority at 51.6% yet will not elect Hispanic candidates of choice. *See* Trial Tr. AM (October 3, 2025) 91:9-92:3; LULAC Ex. 829, page 18, Table 5.3; Brooks Ex. 265 (C2333 CVAP Report) at 2; Brooks Ex. 269 (Barreto Report) at 48; Brooks Ex. 268 (Plan C2333 2024 General Election) at 3 to 8. This is because voting in the new CD 35 is racially polarized such that Hispanic voters voting cohesively together and Anglo voters vote cohesive for their own different preferred candidates and vote as a bloc against the Hispanic preferred candidates and according to Dr. Collingwood there is relatively

lower Hispanic turnout in the new CD 35. Trial Tr. AM (October 3, 2025) 92:4-93:1; LULAC Ex. LULAC 829, page 21, Figure 5.2; Brooks Ex. 269 at 48 (RPV Tables).

286. As in the prior version of CD 35, Latino voters cohesively prefer Democratic candidates in new CD 35. *Id.* In each of the elections examined, Latino voters preferred Democratic candidates; on average they voted 79 percent for Democrats. Brooks Ex. 269 at 48 (RPV Tables); Gonzales Ex. 39, Tbl. 8. Anglo voters in the new CD 35, however, cohesively prefer Republican candidates; they voted on average 20 percent for Democratic candidates and 80 percent for Republican candidates, and in every election analyzed a majority of Anglos voted for Republican candidates. Brooks Ex. 269 at 48 (RPV Tables); Gonzales Ex. 39, Tbl. 8.

287. Dr. Collingwood concluded that if Plan C2333 was implemented in the 2026 election, it is unlikely that the Hispanic-preferred candidate will win in either CD9 or CD35. Trial Tr. AM (October 3, 2025) 94:8-13.Dr. Collingwood testified that in order to understand whether Latino-preferred candidates are likely to be elected in a particular district, such as the newly enacted CD 9 and CD 35, the best analytical approach is to look at voting behavior in that specific district. Trial Tr. AM (October 3, 2025) 95:16-21. Dr. Collingwood testified that Latino voters and White voters vary depending on what part of the state they live in, for example whether they are in South Texas or North Texas or West Texas. Dr. Collingwood further testified that it is not appropriate to generalize from just two congressional districts to other areas where demographic patterns and political considerations may be different. Dr. Collingwood testified that one cannot assume that an estimate of the average Latino candidate preference statewide is the same as Latino candidate preference in a more localized geography. Dr. Collingwood specifically

testified that one cannot assume that a Latino voter who lives in the East End or Second Ward of Houston has the same candidate preferences as a Latino voter in McAllen, Texas in the Rio Grande Valley. He further testified that one cannot assume that a Latino voter in San Antonio's South Side has the same candidate preferences as a Latino voter in Midland, Texas. Trial Tr. AM (October 3, 2025) 94:14 -95:15.

288. Chairman King voted, in 2011, for the configuration of CD35 in Plan C2100. Trial Tr. PM (October 9, 2025) 22:1-21. Chairman King also chaired the Texas House redistricting committee in 2019, during a time that the committee heard from experts in redistricting law and state demographics. Trial Tr. PM (October 9, 2025) 21:12-25. Chairman King voted, in 2021, for the configuration of CD35 in Plan C2193 and believes that map to be a legal map. Trial Tr. PM (October 9, 2025) 25:7-19.

289. Chairman King is aware that the first person elected to CD35 under Plan C2193, in the 2022 election, is Congressman Greg Casar, a Hispanic Democrat. Trial Tr. PM (October 9, 2025) 27:3-8; 29:1-2. Chairman King agreed that in C2193 CD35 tracks the I-35 highway from San Antonio to Austin, but that under the new 2025 plan, C2333, it no longer does so. Trial Tr. PM (October 9, 2025) 27:17-28:2. Chairman King further testified that "I believe that the new configuration for CD35 has a good possibility of electing a Republican." Trial Tr. PM (October 9, 2025) 29:3-11.

290. Chairman Vasut voted for the 2021 map in October of 2021. Trial Tr. PM (October 9, 2025) 140:5-14.

291. Chairman Vasut agreed that Congressman Greg Casar testified before the House committee on July 24, 2025. Trial Tr. PM (October 9, 2025) 137:20-22. Chairman Vasut testified that he presumed Congressman Casar is Hispanic, and agreed that he is a

Democrat.  Trial Tr. PM (October 9, 2025) 137:23-138:3.  Chairman Vasut agreed that Congressman Casar represents CD 35, which in the 2021 map runs along the I-35 corridor from San Antonio to Austin.  Trial Tr. PM (October 9, 2025) 138:4-8.  Chairman Vasut acknowledged that Congressman Casar testified that CD35 was created after the 2010 census and that it was upheld by the U.S. Supreme Court as a promise to Latino communities in Central Texas to make sure they had meaningful participation and the ability to elect the representative of their choice under the VRA.  Trial Tr. PM (October 9, 2025) 139:13-140:4.

292. Chairman Vasut agreed that under C2333, CD35 now connects San Antonio's south side with nonurban counties like Karnes and Wilson Counties.  Trial Tr. PM (October 9, 2025) 141:14-18.  Chairman Vasut agreed that he voted for this map because it would flip CD35 from a district that had elected a Hispanic Democrat to one that would vote Republican.  Trial Tr. PM (October 9, 2025) 142:14-21.

**Coast and Central Texas**

293. **CD 27:** Under Plan C2333, CD 27 is a single-race, Anglo-majority district with an Anglo CVAP of 52.8%, Hispanic CVAP of 36.8%, and Black CVAP of 7.3%. Brooks Ex. 269 (Barreto Report) 3; Brooks Ex. 265 (Plan C2333 CVAP Report) at 1.

294. In the 2021 map, CD 27 was a Hispanic CVAP plurality district, with a Hispanic CVAP of 48.6%, while its Black CVAP was 4.5%, and its Anglo CVAP was 44.1%. Brooks Ex. 258 (Plan C2193 CVAP Report) 1; Brooks Ex. 269 (Barreto Report) 3. In 2021, the district was strongly Republican performing, however, under Plan C2333 the Republican performance of the district declines. *See* Brooks Ex. 262 (Plan C2193 2024 Election

Report) 3-5; Brooks Ex. 268 (Plan C2333 Election Report) 3-5; Brooks Ex. 269 (Barreto Report) 3.

295. While overall CD27 sheds Latino population and gains Anglo population, the district carefully excises Latino neighborhoods in the City of Corpus Christi from CD 34. Brooks Ex. 269 (Barreto Report) 23; Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report) 4-5. The removal of Latino voters from CD34, on the basis of their race, further emphasizes the racial gerrymander at work in CD27 and serves to reduce the ability of Latinos in CD34 to elect their preferred candidate.  The decline in Republican performance does not match the stated objectives of the map drawer to maximize Republican performance.

**Racially Polarized Voting Generally**

296. Dr. Barreto, a leading expert on Hispanic voting patterns, provided clear and uncontested data to show that in 2024 a majority of Hispanics voted for Democrat Kamala Harris, in every region of Texas. Trial Tr. AM (October 4, 2025) 127:15-128:4; 136:13-19 (Dr. Barreto). Dr. Barreto testified that while President Trump did increase his standing with Hispanic voters, the gain was unique to Trump while other Republicans such as Senator Ted Cruz trailing Trump among Hispanics by six to eight points, and that in 2022 Republicans trailed by an additional six to eight points.  Trial Tr. AM (October 4, 2025) 56:5-57:9 (Dr. Barreto). Dr. Barreto concluded that the general pattern of Hispanic voting in Texas was still very cohesive in support of Democrats by about a 2-to-1 margin. Brooks Ex. 269 (Barreto Report) at 11. For example, Dr. Barreto's BISG model for District 35 showed cohesive Hispanic support for Democrats. Brooks Ex. 269 (Barreto) 57. Dr. Barreto's BISG RxC analysis reported 64.9% Hispanic vote for Harris in 2024, 70.9%

Hispanic vote for Allred in 2024, and 75.9% Hispanic vote for O'Rourke in 2022. In contrast, Anglo voters in District 35 supported Trump (82.1%), Cruz (80.5%) and Abbott (84.1%). See Brooks Ex. 269 (Barreto Rios August 2025 Declaration) Appendix B at 54. As such, this Court finds that for Hispanic voters in Houston, Dallas-Fort Worth, Travis and Bexar regions and generally within the state are cohesive. Defendants did not contest these findings and limited their cross examination to the simulation part of Dr. Barreto's analysis. The main criticism of the simulation analysis, which says nothing about the RPV analysis, was an alleged lack of disclosure by Dr. Barreto. But then, under cross-examination, Defendant's expert Dr. Trende admitted that he was able to replicate Dr. Barreto's simulations when he tried to and further admitted that he himself had not disclosed the very routine items that he had complained Dr. Barreto had not disclosed.

## VII. Procedural Departures from Prior Redistricting Cycles

### a. Rapid and Unclear Legislative Process

297. The 2025 redistricting process was shrouded in confusion and forced rapid timelines. Plan C2333 was introduced in the Texas House on August 18, 2025, and less than five days later the plan passed both chambers of the Texas House of Representatives.

298. Most public hearings occurred prior to a map being presented. Indeed, there was only one public hearing after Chairman Hunter introduced HB 4 in which the public was permitted to give testimony. Trial Tr. PM (October 1, 2025) 43:15-4 (Rep. Moody).

299. In contract to past redistricting cycles, there is no evidence that any redistricting timeline was established by the legislature during the 2025 Special session.

300. Unlike other redistricting cycles in Texas, the Texas Legislature was not prepared to conduct mid-decade redistricting. The Texas Senate had to establish a redistricting committee during the First Special Session because there was no standing committee due to the fact that prior to July 9, 2025, the Texas Senate wasn't "going to do any redistricting. It was mid-decade." Trial Tr. AM (October 1, 2025) 21:16-21 (Senator Alvarado).

301. Despite the redistricting processing being underway, Chairman King of the Senate Redistricting Committee stated in the middle of the First Special Session on July 29, 2025, that he had no timeline and was "trying to work through a timeline mentally… You know, the Senate may desire to wait and see what the House passes out." Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 212:7- 212:10.

302. The House process also lacked a clear timeline.  Prior to July 30, 2025, when Chairman Hunter introduced Plan C2308, Chairman Hunter would not tell members of the House when a mapping proposal would be filed or what the process to consider the map would look like. Trial Tr. PM (October 1, 2025) 37:6-12 (Rep. Moody).

**b. Disregard for Public Input**

303. There was a complete disregard for public input on the 2025 congressional mapping plan. Public hearings were held without mapping proposal presented to the public. Trial Tr. AM (October 1, 2025) 53:19-55:4 (Senator Alvarado); Trial Tr. AM (October 2, 205) 22:17- 23:8 (Senator West); Trial Tr. AM (October 2, 2025) 88:14-17) ("And what – was there a map for you to consider at this point, a new map? A: We never saw a map, period, at none of the hearings. None. Nothing. Nada.").

304. The 2025 Redistricting process also differed from the 2021 Redistricting process in the way that field hearings were conducted. Trial Tr. AM (October 1, 2025) 29:19-8. During

the 2021 Redistricting process the Texas Senate conducted their field hearings in-person and legislators controlling the process did not permit virtual hearings. Trial Tr. AM (October 1, 2025) 29:19-8. During the 2025 Redistricting process, however, Senate field hearings were conducted virtually. *Id.* During the 2025 redistricting cycle there were only four virtual regional hearings. Trial Tr. AM (October 1, 2025) 150:25-151:4 (Senator Alvarado).

305. The 2025 House Redistricting Committee held public hearings in various places, but these hearings were notable for the lack of accessibility. Even though redistricting usually elicited immense public comment and participation, the Houston regional hearing was "standing room only, long line, and over a thousand people." Trial Tr. AM (October 1, 2025) 31:17:19 (Senator Alvarado). The hearing location was "jam packed," there was a line to get into the room to give testimony. The temperature of the hearing room, "was very hot." Trial Tr. PM (October 1, 2025) 30:19-31:24 (Rep. Moody). The House Redistricting Committee gave only a limited amount of time for each person's testimony, monitoring each statement with a timer. Trial Tr. PM (October 1, 2025) 33:18-25 (Rep. Moody). University of Arlington officials were instructed not to open additional spaces to the public to wait in. Trial Tr. AM (October 2, 2025) 21:4-11 (Senator West). Representative Hawkins raised concerns that those testifying at the first hearing in Austin were told you could not have testimony registered as "yea" or "nay," rather, they were required to sign into the hearing as having a neutral position. Trial Tr. AM (October 3, 2025) 143:12-144:21 (Rep. Hawkins).

306. As Senator West testified, "There was no transparency in this process in terms of making certain people who wanted to have input into the process was able to see exactly what maps

were being considered so they could give an honest assessment of how they felt about the maps and what they thought could be done in order to improve upon them." Trial Tr. AM (October 2, 2025) 18:4-10 (Senator West).

307. Members of the public were also not given adequate notice of the public hearings held to discuss the redistricting issue. When discussing the only one to two days' notice of the hearing given to the public, and no special notice provided to the public of the hearing, Representative Hawkins emphasized that the public deserved an opportunity to weigh in on the redistricting process, and that did not happen. Trial Tr. PM (October 3, 2025) 10:16-11:3 (Rep. Hawkins).

308. Lack of opportunity for the public to comment on an actual map also occurred during the Second Special Session. During the Second Special Session the House Redistricting Committee held *only one* public hearing on Plan C2333, the plan that was actually signed into law. Regardless, public testimony had no bearing on any part of Plan C2333, as the map "does not reflect the views of the public and the testimony from the public" that was heard by legislators. Trial Tr. AM (October 2, 2025) 138:8-10 (Rep. Thompson). The map drawer testified that he did not take into consideration public input and testimony when drawing his plan. Trial Tr. PM (October 7, 2025) 90:13-18 (Adam Kincaid).

### c.  Lack of Transparency Regarding the Congressional Map

309. The Defendants have failed to provide any credible explanation for the lack of transparency about which person or entity drew the congressional plan that was adopted by Texas.

310. Texas Legislators could not say with any certainty or confidence who drew the congressional mapping plan. *See* Trial Tr. AM (October 1, 2025) 124:2-11 (Senator

Alvarado); Trial Tr. PM (October 9, 2025) 125:7-10 (Rep. Vasut). This was not from a lack of trying; democratic legislators continuously asked during the 2025 redistricting cycle who drew the map and did not get any answers from Chairman Hunter, Vasut, or King. Trial Tr. AM (October 1, 2025) 124:5-11 (Senator Alvarado); Trial Tr. PM (October 1, 2025) 77:20-11 (Rep. Moody).

311. Chairman King, who was principally responsible for redistricting in the Senate, refused to say where the congressional mapping plan was derived. Trial Tr. AM (October 1, 2025) 22:13-19 (Senator Alvarado). During multiple hearings Chairman King stated he had not had a map presented to him even though the redistricting process was ongoing. Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 210:3- 210:6.

312. Chairman King stated on the issue of debating an actual mapping proposal, "I'm not drawing a map. I don't know of anyone here today. They may be, others may be trying to draw a map. I'm not aware of that. But, traditionally, the way it's happened in the past is the congressional Republican caucus has presented a map. But I haven't seen anything to date. But I'm very confident at some point I will." Trial Tr. AM (October 1, 2025) 22:13-19 (Senator Alvarado). Chairman King could not state when a map would be provided to the Committee for review. Trial Tr. AM (October 1, 2025) 22:20-22 (Senator Alvarado). Chairman King also said during the July 29, 2025 Senate Redistricting Committee that maybe Adam Kincaid was drawing a map on behalf of the Redistricting Trust, but that he was not sure and that "[n]o one has presented a map to me, and I haven't been trying to draw one myself." Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 208:9-208:11.

313. Moreover, Chairman King was not forthcoming about his conversations with Adam Kincaid. Adam Kincaid testified that he had spoken to Chairman King five times, while Chairman King initially testified that he only had four conversations with Kincaid. Trial Tr. AM (October 7, 2025) 58:19-23 (Kincaid); Trial Tr. PM (October 6, 2025) 80:15-19 (Senator King). Moreover, Chairman King and Kincaid have conflicting testimony regarding their conversations. While Chairman King testified that Kincaid simply asked whether redistricting was actually going to happen in Texas, Kincaid testified that Senator King mentioned that "he was glad I was involved" because Kincaid knew what he was doing. Trial Tr. PM (October 7, 2025) 18:8-14 (Kincaid). *Cf.* Trial Tr. PM (October 6, 2025) 81:1-13 (Senator King). Chairman King also testified that he and Kincaid "ran into each other at the ALEC, American Legislative Exchange Council, annual conference in mid-July," Trial Tr. PM (October 6, 2025) 81:14-18 (Senator King), whereas Kincaid testified that Chairman King reached out to him to meet when they were both at ALEC and that Senator Hinojosa was also present at this meeting. Trial Tr. PM. (October 7, 2025) 20:6-14 (Adam Kincaid). While Chairman King testified that he told Kincaid that he preferred "that we not discuss the redistricting maps," Trial Tr. PM (October 6, 2025) 81:19-23 (Senator King), Kincaid's versions of events is that Chairman King asked about how many seats would be redistricting and Kincaid told him that there would be a "five-seat pickup." Trial Tr. PM (October 7, 2025) 18:21-19:15 (Adam Kincaid). Chairman King stated that he then spoke to Kincaid and asked him whether he used racial data to draw the map, Trial Tr. PM October 6, 2025) 82:2-7 (Senator King). Chairman King admitted that he did not raise this conversation with Sen. Gutierrez on the floor during a conversation about the number of times Sen. King had communicated with Kincaid. Trial Tr. PM

(October 6, 2025) 129:12-16. Kincaid did not mention this conversation in his testimony but instead said that Chairman King called him about whether he had received an invitation to testify before the Senate. Trial Tr. PM (October 7, 2025) 22:2-18 (Adam Kincaid). Adam Kincaid testified that he did not speak to Chairman Hunter nor any members of the Texas House with respect to mid-decade redistricting, Trial Tr. PM (October 7, 2025) 35:19-36:9 (Kincaid). Chairman King testified, however, that Kincaid called him for Representative Toth's contact information. Trial Tr. PM (October 9, 2025) 165:25-166:24 (Senator King). Sen. King testified that he believed Kincaid was a relevant person in the mapping discussion because he had announced that he was going to run for Congress, and the he believed Representative Toth represented part of Harris County and that the changes to Harris Count likely would impact Representative Toth. Tr. Day 8 AM at 167:2-16. Sen. King testified that, during that call, he asked Kincaid what the House was amending, and that Kincaid said they were moving Fort Bliss back into metropolitan CD 16, which had been requested by Senator Blanco in the Senate, and that they were taking the split out of Navarro County and making some adjustments in the Houston area. Tr. Day 8 AM at 165:1-10. Sen. King testified that at that point, he told Kincaid that he didn't want to know anything else about it. Tr. Day 8 AM at 165:11-12. Additionally, Adam Kincaid admitted on cross examination to serving on ALEC conference panels in the past with Senator King on the importance of secrecy in the legislative redistricting process. Trial Tr. AM (October 8, 2025) 108:21-109:24 (Adam Kincaid).

314. The extraordinary conflicts between Chairman King and Adam Kincaid's testimony during their contact and involvement during the 2025 redistricting cycle, coupled with Chairman King's misleading of Texas Legislators during the entirety of the 2025

redistricting process leads this Court to question the credibility of both Mr. Kincaid and Chairman King regarding their testimony about the map drawing process and legislative process.

315. The Court observed Mr. Kincaid's demeanor on the witness stand and testimony and has substantial doubts about major aspects of this testimony. In particular, Mr. Kincaid throughout the lengthy examination answered questions that were not asked (suggesting he had come into the testimony with his own agenda as opposed to simply answering questions posed), instructed his counsel of which questions to ask him, objected to cross examination questions that were not objected to by his lawyer, asked whether he had to answer certain questions, and became argumentative on cross examination when questioned about certain map drawing choices. Moreover, Mr. Kincaid purposefully crafted exhibits explicitly for trial that did not show the actual election data Mr. Kincaid was viewing when he drew the 2025 map, but what he wanted to the Court. Trial Tr. AM (October 8, 2025) 72:18-74:19 ("You wanted this image to look as contrasting as possible when you are putting it up in front of the Court; is that correct? A: Yeah. I wanted to make it as clear as I could, yes. Q: But it's not actually – sitting here today, you can't tell me that this is the break you used to draw these districts; is that correct? A: Yeah. I don't recall that.").

316. Chairman King also provided conflicting accounts to the Senate committee and in court about his knowledge of Kincaid's involvement in drawing the map.  Chairman King testified that he told Kincaid in their second conversation that he did not want to know any information about the map because he had no idea whether Kincaid's map would be the map presented to the committee or one of many.  Trial Tr. PM (October 6, 2025) 119:4-8.

Chairman King nevertheless acknowledged that he knew that Kincaid had been heavily involved in the drafting of the House Map, HB4.  Trial Tr. PM (October 6, 2025) 120:8-11.  He testified that Kincaid's involvement was common knowledge, in part because of Kincaid's role in drawing the 2021 maps, as well as his role as a witness in the trial in June.  Trial Tr. PM (October 6, 2025) 122:6-19.  Less than a week after Chairman King's second conversation with Kincaid, on July 21, 2025, the first day of the special session, Chairman King responded to a question from Senator Alvarado question about whether Kincaid was drawing the maps, that she "[p]robably want[ed] to ask him that."  Trial Tr. PM (October 6, 2025) 129:17-21; 131:6-12; 132:3-5.  Chairman King acknowledged that Kincaid was drawing the map on behalf of the Redistricting Trust at a Senate hearing on July 29, 2025, before he had seen any map.  Trial Tr. PM (October 6, 2025) 135:5-12.  Chairman King again acknowledged that the map was drawn by the National Republican Redistricting Trust during an August 17, 2025 hearing.  Tr. Day 8 AM at 136:2-13.  At this same hearing, Chairman King agreed that it was widely known that Kincaid drew the 2021 maps and that, months before the redistricting hearings, was in court defending those maps.  Tr. Day 8 AM at 141:16-19.  Five days later, Chairman King asserted during a floor debate that he did not have any personal knowledge as to who physically drew the map, and that he was assuming it was a product of the House author and their counsel.  Tr. Day 8 AM at 148:10-16; 149:7-19.  Despite this acknowledgement and Chairman King's previous conversations with Kincaid, Chairman King testified that he assumed it was a collaborative process and, although a number of people were involved in drawing the map, he really did not know.  Tr. Day 8 AM at 136:13-16.

317. Despite Chairman King stating that Adam Kincaid was the map drawer to members of the Senate Redistricting Committee, members of the Texas House of Representatives who were primarily responsible for moving HB 4 denied knowing about Adam Kincaid or his involvement. Chairman Hunter who introduced the new congressional plan that the Texas Senate ultimately took up stated that he had no communication with Adam Kincaid. Indeed, no less than five times during the August 1, 2025, House Redistricting Committee did Representative Hunter state that he did not have any involvement with Adam Kincaid or that he did not know if Adam Kincaid was involved in drawing the map. *See* Brooks Ex. 309-T (Transcript of August 1, 2025, House Special Redistricting Committee) 88:7-17; 88:24-89:5; 127:7-128:8. Representative Vasut stated that he did not know Adam Kincaid. Books Ex. 301 (July 24, 2025, House Committee on Redistricting (21:10-22:1). The conflicting testimony between the House and Senate Committee Redistricting Chairs and members regarding who drew the map are suspicious omissions.

318. Additionally, the lack of transparency regarding who drew the congressional plan differs from the 2021 process in which Senator Joan Huffman clearly stated during Senate Redistricting hearings the process of receiving and reviewing the congressional plan. *See* Trial Tr. PM (June 7, 2025) 26:1-27:2. Unusually, at no point did Chairman Hunter or Chairman King have persons who were responsible for drawing the map, reviewing the maps for compliance, or an attorney who represented them regarding redistricting come before the committees. Trial Tr. PM (October 1, 2025) 77:24-78:11 (Rep. Moody).

319. To date, legislators still have never been directly told who drew Plan C2333, including the Chair of the House Redistricting Committee. Trial Tr. AM (October 2, 2025) 33:25-34:4 (Senator West); Trial Tr. PM (October 9, 2025) 125:7-10 (Rep. Vasut).

### d. Limited Ability for Legislators to Engage in the Deliberative Process

320. Conduct by Chairman Vasut, Chairman Hunter, and Chairman King indicated a disregard for legislators to engage in the deliberative process.

321. The 2025 redistricting process was marked by refusal to provide information to members of the legislature that would aid in the deliberative process. Trial Tr. AM (October 1, 2025) 24:3-8. For example, at no point did the Senate Redistricting Committee hear from Ms. Dhillon or Mr. Kincaid.

322. While the Texas Attorney General's office aided the redistricting committees in prior cycles, none of the lawyers or resources from the Attorney General's office were employed during the 2025 process. Trial Tr. AM (October 1, 2025) 168:8-14. Chairman King explained to the Senate that the Attorney General's office turned down representing him because the Attorney General's office lacked expertise in redistricting. Trial Tr. AM (October 2, 2025) 19-25 (Senator West).

323. Despite it being common practice to have the persons who drafted the content of a bill, or in this case a map, testify before a committee considering the bill, Chairman King refused to have Adam Kincaid, the presumed map drawer of the Congressional plan come testify. Brooks Ex. 308 (July 30, 2025, Senate Committee on Congressional Redistricting) 31:5- 31:15.

324. Moreover, Chairman Hunter and Chairman Vasut in the House and Chairman King in the Senate both chose to use outside counsel to provide an overview of the 2025 congressional redistricting plan. Trial Tr. PM (October 1, 2025) 26:8-21 (Rep. Moody). This is in direct contrast to the 2021 process in which Senator Huffman and others submitted their maps to the Texas Attorney General's office. Trial Tr. AM (October 1, 2025) 4-12. Involvement by

the Texas Attorney General's office in redistricting has occurred as a matter of standard practice in multiple redistricting cycles. Trial Tr. AM (October 1, 2025) 168:8-14 (Senator Alvarado.

325. Conduct from Chairman King and Chairman Hunter indicates a complete disregarding for legislators of color to have any meaningful impact on the map or information. Representative Thompson was told during the process by legislative leaders that they were redrawing the historically Black opportunity districts in Houston "[b]ecause we can." Trial Tr. AM (October 2, 2025) 100:24- 101:8 (Rep. Thompson). Senator Alvarado was not permitted to filibuster the redistricting plan during the last date of debate, in violation of Senate norms and rules. Trial Tr. AM (October 1, 2025) 133:19-135:24 (Senator Alvarado)

326. In justifying not permitting Senator Alvarado to filibuster, Senator Perry stated that her campaign email violated ethics and decorum of the Texas Senate even though Senator Alvarado was never charged as such. Trial Tr. AM (October 1, 2025) 133:19-135:6 (Senator Alvarado).  Afterwards, Senator Alvarado indicated that Senator Cook would like to filibuster and Senator Perry shut down any filibuster stating "no, we're not going to do that. We're moving on. We're calling the question." Trial Tr. AM (October 1, 2025) 135:15-24 (Senator Alvarado). During prior redistricting cycles, the Black caucus would have their input sought out during the legislative process. This was not done during the 2025 redistricting cycle. Trial Tr. AM (October 2, 2025) 39:21-40:23 (Senator West) ("There was no—how do I put this? Deliberate steps taken by the authors of the bill to reach out to us. Wherein some of the prior session there had been instances where we would be asked our input into this. But not this time around. Not at all.").

327. Moreover, there was limited House debate on redistricting during the First Special Session, in which House members were told that questions would be asked at "closing" but in reality, had very little ability to make changes or have a debate on the contours of the bill. Trial Tr. PM (October 1, 2025) 63:11-22 (Rep. Moody).

328. While it is usually custom to have leniency on motions to extend time, during the August 20, 2025, House Redistricting Committee hearing members objected to motions to extend time, resulting in a record vote. Trial Tr. PM (October 1, 2025) 83:4-15 (Rep. Moody).

329. Compared to the 2021 process, in which legislators offered amendments and worked collaboratively with respect to CD 9 and 18, it was clear to legislators that in 2025 "it was an effort in futility to offer any amendments." Trial Tr. AM (October 2, 2025) 93:16-24 (Rep. Thompson). Representative Moody testified that while legislators "can have the goal of changing political performance, [] the pathway to get there is depressing the ability of Black and Hispanic voters in Texas to elect candidate of choice." Trial Tr. PM (October 1, 2025) 134:3-9 (Rep. Moody).

330. Chairman King agreed that there were no amendments passed out of the Senate Redistricting Committee to the map, Trial Tr. PM (October 9, 2025) 44:2-3, and acknowledged that in the 2003 and 2011 redistricting processes, there were amendments considered from committee members that changed the maps that came from the congressional delegation, Trial Tr. PM (October 9, 2025) 46:8-16.

**VIII. Public Statements from Governor Abbott, United States Department of Justice, and Legislators Regarding Redistricting Centered on Race.**

331. Throughout the entire 2025 redistricting process, legislators, public officials, and Governor Abbott continuously made statements that the focus of mid-decade redistricting was to address removing racial coalition congressional districts.

332. The Department of Justice letter imbued race in the legislative process and was the publicly stated catalyst for redistricting. Trial Tr. AM (October 2, 2025) 6:22-4 (Senator West).

333. The Texas House of Representatives discussed the reasoning of the changes to the congressional map based on changing the racial composition of congressional districts. Chairman Hunter explicitly talked about the motivations of changing some of the congressional districts to align them with their historic racial compositions. Chairman Hunter stated about the increase in Black and Hispanic majority districts that "nothing's a coincidence . . . And some of the districts are historic. And so there's been a growth and you bring them back to the configuration. They're gonna go back to the increase." Trial Tr. PM (October 1, 2025) 46:17-23 (Rep. Moody).

334. Chairman Hunter would continually tout the racial demographics of the 2025 redistricting process, mentioning racial statistics in his layout of the bill. Trial Tr. PM (October 1, 2025) 47:19-50:8. Questions from Republican legislators to Chairman Hunter regarding the map reiterated which districts would become majority-Hispanic and/or majority-Black. Trial Tr. PM (October 1, 2025) 51:10-19 (Rep. Moody). When questioned about their motivations for redistricting, Republican legislators in Texas denied that redistricting efforts were due only to partisan motivations. Trial Tr. PM (October 1, 2025) 69:5-12; 89:18-90:6 (Rep. Moody). Chairman Hunter explicitly talked about the motivations of changing some of the congressional districts to align them with their historic racial compositions. Chairman

Hunter states about the increase in Black and Hispanic majority districts that "nothing's a coincidence . . . And some of the districts are historic. And so there's been a growth and you bring them back to the configuration. They're gonna go back to the increase." Trial Tr. PM (October 1, 2025) 46:17-23 (Rep. Moody).

335. Representative Moody testified that the use of racial data was part of a demonstration of intentional racial targeting and that "the racial numbers that were broken down in committee and on the floor were very precise." Trial Tr. PM (October 1, 2025) 108:9-13 (Rep. Moody). Senator Hinojosa also touted the racial demographics of the new redistricting plan. Trial Tr. PM (October 8, 2025) (Senator Adam Hinojosa).

336. Governor Abbott's purpose for redistricting was clear throughout the process: remove racial coalition districts. Trial Tr. AM (October 1, 2025) 170:4-10 (Senator Alvarado). On August 11, 2025, Governor Greg Abbott gave an interview to Jake Tapper on CNN regarding Texas mid-decade redistricting. Brooks Ex. 335. Trial Tr. AM (October 1, 2025) 8:8-10:10 (Senator Alvarado). During the interview, Governor Abbott stated explicitly that Texas "wanted to remove those coalition districts and draw them in ways that in fact turned out to provide more seats for Hispanics." Brooks Ex. 335; Trial Tr. AM (October 1, 2025) 9:2-5 (Senator Alvarado).

337. When asked by Mr. Tapper after Governor Abbott made that statement whether "you are [redistricting] to give Trump and Republicans in the House of Representatives five additional seats," Governor Abbott deflected and said it was being done because of his long experience as a redistricting lawyers and to get rid of coalition districts. Brooks Ex. 335; Trial Tr. AM (October 1, 2025) 9:17-24 (Senator Alvarado).

338. Instead, Governor Abbott in response to the question of whether Texas was redistricting on the behest of President Trump stated, "Again, to be clear, Jake, the reason why we are doing this is because of that court decision, Texas is now authorized under law that changed that was different than in 2021 when we last did redistricting." Brooks Ex. 335; Trial Tr. AM (October 1, 2025) 9:22-10:1 (Senator Alvarado).

339. Additionally, Governor Abbott, in another interview stated that the reason that redistricting was being conducted was because a legal "decision came out last year, it says that coalition districts are no longer required. And so we want to make sure that we have maps that don't impose coalition districts." Trial Tr. AM (October 1, 2025) 28:5-9 (Senator Alvarado); Brooks Ex. 325.

340. Governor Abbott was explicit in the intent for redistricting to target and remove racial minority coalition districts for political gain, elaborating that "[w]e are no longer compelled to have coalition districts. And as a result, we can draw maps to not have coalition districts." Trial Tr. AM (October 1, 2025) 28:16-18 (Senator Alvarado).; Brooks Ex. 325.

341. Days after HB 4 and the Texas House's congressional plan was introduced, Governor Abbott and other elected officials in Texas continued to reiterate that the mid-decade redistricting was to address the existence of racial coalition districts and remove those districts. On August 5, 2025, Governor Abbott gave an interview in which he stated that the new congressional map would be comprised of four Hispanic majority districts. Brooks Ex. 331.

342. Assistant Attorney General Harmeet Dhillon gave a news interview on August 5, 2025, stating that the careers of Texas politicians of color are due to a "system of racial spoils." Brooks Ex. 335. In another interview on August 6, 2025, Assistant Attorney General

Dhillon discussed how the DOJ explicitly looked at the racial composition of congressional districts in Texas and wrote to Texas telling the State that "they need to take action to fix" having racial coalition districts. Brooks Ex. 322. She then stated that the DOJ's demand to "fix" having any racial coalition congressional districts "is what triggered the Texas Legislature and the Texas governor to call the legislature in session to put new maps together." Brooks Ex. 322. Assistant Attorney General Dhillon reiterated her belief that it was the DOJ's demand that Texas remove coalition districts that triggered redistricting. Brooks Ex. 324; Trial Tr. AM (October 1, 2025) 83:19-85:22 (Senator Alvarado).

343. On August 6, 2025, Governor Abbott was a guest on the Joe Pags Show. Brooks Exs. 326, 332 (Aug. 6, 2025, Joe Pags Show Interview with Governor Abbott). Governor Abbott explained that the redistricting was taking place mid-decade because Texas was no longer required to have coalition districts, so people in those districts were going to be moved into districts "that really represent the voting preference" of Texans. Brooks Exs. 326, 332-T (Aug. 6, 2025, Joe Pags Show Interview with Governor Abbott).

344. Additionally, on August 6, 2025, the Justice Department released a video commemorating the 60th anniversary of the Voting Rights Act. Brooks Ex. 322 (Aug. 6, 2025, DOJ Video). In it, Assistant Attorney General Harmeet Dhillon noted that the Justice Department had notified Texas of "grave concerns about congressional districts drawn with racial motivations." Brooks Ex. 322 (Aug. 6, 2025, DOJ Video).

345. During other interviews discussing the congressional map that Governor Abbott hoped to pass, Governor Abbott focused explicitly on the racial composition of the maps he wanted the legislature to approve. Trial Tr. AM (October 1, 2025) 79:14-80:17 (Senator Alvarado); Brooks Ex. 332.

### IX. Plan C2333 Does Not Meet the Stated Goals of Legislators and the Map Drawer

346. Plan C2333 does not meet the stated goals of the map drawer of maximizing the partisan outcome for Republican and Democratic districts.

347. Adam Kincaid testified that his goal was to maximize Republican political performance and Democratic political performance in their respective districts. Trial Tr. AM (October 7, 2025) 163:8-16 (Adam Kincaid); Trial Tr. PM (October 7, 2025) 71:22-72:4; 71:22-72:4 (Adam Kincaid); Trial Tr. AM (October 8, 2025) 99:21-100:4 (Adam Kincaid).

348. Indeed, Kincaid claimed that maximizing Republican performance influenced how he drew CD 35. Kincaid specifically stated that he was trying to "maximize the Trump and Cruz numbers" in the district and if he had "drawn the Kirby area that fingered to the east into 35, the 35th District would have been less Trump and less Cruz than the draw we ended up …" Trial Tr. AM (October 7, 2025) 163:8-16. To achieve this goal, Kincaid looked at putting the Kirby area in CD 35 and "looked at adding the southern area below down south of there." According to Kincaid, his software showed Trump and Cruz performing better the area South of San Antonio versus the east. Trial Tr. PM (October 7, 2025) 71:22-72:4. He denied other goals, such as incumbent preservation played a role in his decision. *Id.* at 73:4-20 (Adam Kincaid).

349. But this assertion cannot be true. Evidence demonstrates that the map drawer added very high density Hispanic and Democratic areas instead of adding more Republican areas to the district. Trial Tr. AM (October 4, 2025) 110:12-112:1 (Dr. Barreto). Indeed, the partisan objectives of the map drawer were subverted to achieve specific Hispanic CVAP goals in CDs 9 and 35. Trial Tr. 122:19-123:1 (Dr. Barreto).

350. As Dr. Trende testified on cross-examination, there are possible alternative mapping configurations for CD 9 and CD 35 that would see Republican candidate receive a larger vote share than under the enacted Plan C2333 but would be less Hispanic. *See* Trial Tr. AM (October 10, 2025) 79:10-110:8; 127:8-131:3 (Dr. Trende); Brooks Ex. 520-522.

351. Moreover, the racial and partisan configuration of Plan C2333 is almost statistically impossible. Simulations demonstrated that "simulations that control for the purported partisan goal by creating 30 Trump performing districts yield between 12 and 15 districts in which no single race constitutes a majority of a district's CVAP, with between 23 and 26 single race majority districts. It is thus statistically impossible that a partisan motivation could have resulted in the extreme outlier in Plan C2333 of just 4 districts lacking a single-race majority CVAP." Brooks Ex. 283 (Barreto Supplement) at 5.

352. It is statistically impossible for the State to have drawn the number of majority Hispanic CVAP districts with over 55% Republican performance, as was the stated goal of Adam Kincaid. Indeed, "out of 332,000 simulations that created one Trump 55% or higher district exactly zero were majority Hispanic CVAP. While about 100 out of 332,000 simulations came in around 49% HCVAP, none were generated by the model simulation that exceeded 50% HCVAP." Brooks Ex. 269 (Barreto Report) at 18; Brooks 283 (Barreto Report) at 5.

353. Moreover, the racial and partisan configuration of Plan C2333 is almost statistically impossible. Simulations demonstrated that "simulations that control for the purported partisan goal by creating 30 Trump performing districts yield between 12 and 15 districts in which no single race constitutes a majority of a district's CVAP, with between 23 and 26 single race majority districts. It is thus statistically impossible that a partisan

110

motivation could have resulted in the extreme outlier in Plan C2333 of just 4 districts lacking a single-race majority CVAP." Brooks Ex. 283 (Barreto-Rios Supplement) at 5.

354. It is statistically impossible for the State to have drawn the number of majority Hispanic CVAP districts with over 55% Republican performance, as was the stated goal of Adam Kincaid. Indeed, "out of 332,000 simulations that created one Trump 55% or higher district exactly zero were majority Hispanic CVAP. While about 100 out of 332,000 simulations came in around 49% HCVAP, none were generated by the model simulation that exceeded 50% HCVAP." Brooks Ex. 269 (Barreto Report) at 18; Brooks 283 (Barreto Report) at 5.

355. In conclusion, Dr. Barreto's simulations consistently revealed that creating Plan C2333 was statistically implausible without purposeful consideration of race. Trial Tr. AM (October 4, 2025) 117:9-121:10 (Dr. Barreto); Brooks Ex. 284 (Barreto and Rios Rebuttal) at 26-30. Specifically, none of the randomized simulations produced a majority Black district or more than four majority Hispanic districts without specifically inputting race as a consideration. Trial Tr. AM (October 4, 2025) 121:15-121:23 (Dr. Barreto); Brooks Ex. 284 (Barreto and Rios Rebuttal) at 26-30. By comparison, Plan C2333 produced each of these outcomes.

356. Plaintiffs' expert, Mr. Ely also demonstrated that race more closely explains the changes to CDs 9 and 35. First, Mr. Ely found that both Plan C2333 version of CD 35 and CD 9 would not allow Hispanic voters to elect candidates of choice. Trial Tr. PM (October 2, 2025) at 113:6–17l; LULAC Ex. 831, Appendix A, Tbl. 2; Trial Tr. PM (October 2, 2025) at 119:7-25; LULAC Ex. 831, Appendix A, Tbl. 1.

357. Accordingly, there was no need for Hispanic voters to be placed in a district that adhered to a fifty percent bright line test in order to elect their candidates of choice. Trial Tr. PM (October 2, 2025) at 120:4–12.

358. Mr. Ely concluded that CD 35 as drawn in Plan C2333 is a "pseudo-Hispanic Opportunity District" that appears to be designed to perform, but when you look at the actual performance it is designed not to perform. Trial Tr. PM (October 2, 2025) at 115:11-14. Mr. Ely concluded that in Plan C2333 "ethnicity was used initially to achieve over 50 percent Latino Citizen Voting-Age Population" in CD 35. *Trial Tr. PM (October 2, 2025)* at 115:2-7. But the map drawer then combined that area of CD 35 with other areas that are both more White and that vote as a block against the Latino -preferred candidate. Trial Tr. PM (October 2, 2025) at 115:7-10.

359. Mr. Ely observed that CD 35 as drawn in Plan C2333 cuts through a concentrated Hispanic community, splitting Hispanic voters into CD 20 and CD 35, while simultaneously expanding the rest of CD 35 into three White majority counties that are "quite distinct from the Latino – or Hispanic community in Bexar County that's included in [CD 35]." Trial Tr. PM (October 2, 2025) at 110:19-111:15. Thus, while Hispanic voters were previously able to elect their candidates of choice under Plan C2193, all six Hispanic preferred candidates would be defeated in CD 35 under Plan C2333. Trial Tr. PM (October 2, 2025) at 113:6–17; LULAC Ex. 831, Appendix A, Tbl. 3.

360. Mr. Ely also concluded that CD 9 was created by combining Hispanic CVAP concentrations sufficient to reach a target of 50% with a maximum White voting precinct that bloc vote against Hispanic preferred candidates. LULAC Ex. 831, Appendix A, Tbl. 1; LULAC Ex. 831, Appendix A, Tbl. 1. This is because the district was carefully

crafted to have a Hispanic CVAP majority in the map drawer's data files, but "when you look at what else is in the district, it's areas that are solidly white bloc voting against the Hispanic candidates of choice."  CD 9 is also a "pseudo-Hispanic Opportunity District." Trial Tr. PM (October 2, 2025) at 119:18–25.

361. Furthermore, Mr. Ely testified that he would not draw a Hispanic majority district like CD 9 or CD 35 to comply with the Voting Rights Act.  He explained, "the 50 percent bright line test with Citizen Voting Age is a first prong requirement that it be possible to draw such a district.  It's not a goalpost."  *Trial Tr. PM (October 2, 2025)* at 120:1-12.

362. Mr. Ely explained that it was possible to draw an alternate map without a goal of hitting a fifty percent Hispanic CVAP target, create a Republican CD 9 and preserve CD 29 as a Hispanic opportunity district.  In fact, Mr. Ely testified that "if you were to restore the western portion of CD 9 with CD 9 to District 29 and then wraparound the northern part of it, you would be able to maintain this CD 9 as a Republican district and leave 29 as – as an effective majority Latino district.  And not disrupt the partisan balance of the other Republican districts."  Trial Tr. PM (October 2, 2025) at 120:13-23.

**Duchin Analysis**

363. Dr. Duchin analyzed three "clusters" of districts in Plan C2333. A Tarrant/Dallas cluster, a Harris/Ft. Bend cluster, and a Travis/Bexar cluster. TXNAACP PI EX. 208 at 2. Each cluster is made up of all the districts that touch the named counties. Trial Tr. AM (October 6, 2025) at 28:15-29:12. These clusters allowed her to analyze alternative plans in a way that is "modular" and "self-contained." That is, all of the alternative cluster maps analyzed as part of her ensemble can be plugged into the rest of Plan C2333 without causing any

ripple effects or requiring any other changes to the map. Trial Tr. AM (October 6, 2025) at 27:21-28:18; TXNAACP PI EX. 208 at 2.

364. Population growth both statewide and in each of the three clusters was primarily made up of people of color. TXNAACP PI EX. 208 at 3. Despite this, the ability of people of color to elect their preferred candidate decreases under Plan C2333. TXNAACP PI EX. 208 at 9.

365. Dr. Duchin's methodology in this case involved generating an initial group of maps (known as an ensemble). This initial ensemble uses certain "district generation parameters" to make sure the maps that are generated are similar to the map adopted by the state. TXNAACP PI Ex. 208 at 22. This initial ensemble contains millions of maps. Trial Tr. AM (October 6, 2025)at 131:25-132:4. Dr. Duchin then applies a series of "winnowing factors" to take from the millions of maps in the initial ensemble a sub-set of 40,000 maps that perform as well or better than the enacted map in certain key metrics the legislature was likely to consider. TXNAACP PI Ex. 208 at 23. Finally, in what she refers to as her "robustness check" Dr. Duchin generates numerous additional ensembles based on different district generation parameters to see if that alters her findings. *Id*. As Dr. Duchin testified, the goal of this analysis is not to read the minds of the legislature and incorporate every single factor they may or may not have considered. Trial Tr. AM (October 6, 2025)at 52:2-53:13. Rather, her analysis seeks to generate a sufficiently large and representative sample that can serve as a relevant baseline to which one can compare the enacted plan. *Id*.

366. Consistent with this methodology, Dr. Duchin began her analysis here by generating an ensemble containing millions of maps. The district generation parameters for this ensemble included contiguity, population balance, county integrity, integrity of political

subdivisions, and core retention. TXNAACP PI Ex. 208 at 22. They also included three different partisanship parameters. The first partisanship parameter sought to maximize republican success based on the results of 29 general elections. TXNAACP PI Ex. 208 at 22-23. The second partisan parameter, sought to maximize partisanship based on President Trump's election performance in 2016, 2020, 2024. *Id*. The third partisan district generation parameter sought to maximize partisanship based solely on Trump's performance in the 2024 presidential election. *Id.*

367. From this larger ensemble of maps generated in accordance with the above noted district generation parameters, Dr. Duchin applied her winnowing factors to select a sub-sample of 40,000 maps for each cluster. *Id*. This sub-sample only included maps that when compared to Plan C2333 had: (a) at least as many republican wins; (b) at least as many districts with a plurality for Trump in the 2024 election; (c) no more than a 10% deviation in the urban/rural composition of districts; and (d) no double bunking of incumbents based on the most recent address file available to her. TXNAACP PI Ex. 208 at 23.

368. After running her analysis, Dr. Duchin further confirmed her findings through a series of "robustness checks" where she checked to see if considering additional factors when generating her initial ensemble changed her findings. These additional factors included: (a) optimizing republican wins; (b) matching the number of districts with a Trump 2024 vote share over 55 percent; (c) changing the extent to which the maps respect county lines and political subdivisions; and (d) changing the "starting point" or seed value for the ensemble. None of these factors altered her findings. TXNAACP PI Ex. 208 at 23.

369. Only racial data is provided by the Census at the Block level. Partisanship data is available at only the precinct level. One cannot disaggregate precinct level partisan data down to the

Census block level without a reliable ancillary data source. Trial Tr. AM (October 6, 2025) at 81:6-25. The State has not provided Plaintiffs or this Court with any ancillary data source. Trial Tr. AM (October 6, 2025) at 84:5-15.

370. The State concedes that Dr. Duchin produced 300 gigabytes of data underlying her analysis. That included all the code used, all the inputs necessary to run the code, and notably, all the outputs i.e. the millions of "literal maps" produced by her analysis. Trial Tr. AM (October 6, 2025) at 101:7-102:2.

**The Tarrant/Dallas Cluster**

371. Dr. Duchin testified to the changes made to CD 32 and CD 33 in Plan C2333. In both cases, Dr. Duchin explained the existing district was changed to stretch out more into rural counties. A pattern "characteristic" of taking diverse urban populations and submerging them in districts that contain heavily white rural populations. Trial Tr. AM (October 6, 2025) at 31:11-33:4.

372. The dot density map of the Tarrant/Dallas cluster in Dr. Duchin's report shows a clear pattern of sorting voters by race. TXNAACP PI EX. 208 p. 11 (Figure 4). All the dot density maps in Dr. Duchin's report were constructed by randomizing the order of the dots so later added points would not obscure that underneath. This makes it an accurate representation of the racial sorting of voters. Trial Tr. AM (October 6, 2025) at 33:11-34:19. In particular, it shows CD 24 was drawn to exclude non-white populations. Trial Tr. AM (October 6, 2025) at 35:4-11; TXNAACP PI Ex. 208 at 11 (Figure 4).

373. Dr. Duchin's effective minority representation analysis showed a decline in the ability of people of color to nominate and elect their candidate of choice in each of the clusters she analyzed. Using a peer-reviewed method accepted by other courts, Dr. Duchin

demonstrated that based on a localized analysis of primary elections, the map reduced the ability of minority candidates in the Tarrant/Dallas cluster. Trial Tr. AM (October 6, 2025) at 35:23-38:14. Specifically, CD 33 went from a district where people of color could reliably nominate and elect candidates of their choice on their own, to a district where they can only consistently do so if they received the help of white crossover votes. TXNAACP PI EX. 208 p. 9 (Table 3); Trial Tr. AM (October 6, 2025)at 39:2-44:10. While CD 32 in the same cluster went from a district where people of color could regularly nominate and elect their preferred candidate with the occasional help of white crossover votes to a district where they can no longer elect their preferred candidate at all. TXNAACP PI EX. 208 p. 9 (Table 3); Trial Tr. AM (October 6, 2025) at 39:9-17; 41:21-44:10. Taken together, these changes in CD 32 and CD 33 combine to amount to a net loss of one district that would perform for the preferences of people of color. Trial Tr. AM (October 6, 2025) at 42:25-43:10.

374. Figure 8 in Dr. Duchin's report shows her analysis of the "cracking and packing" of voters of color in the Tarrant/Dallas cluster of Plan C2333. Dr. Duchin's box charts show the range of demographics found in both the "winnowed" sub-sample of 40,000 maps (represented on the chart in orange) and a representative 40,000 plan sample from the original larger ensemble (represented on the chart in black). Trial Tr. AM (October 6, 2025)at 64:3-66:19. The boxes in the chart represent the 25th – 75th percentile range while the whiskers mark the 1st and 99th percentile. *Id*. Outliers at or below the 1st percentile show an abnormally low minority population when compared with similarly partisan districts and are thus indicative of cracking. *Id*. And vis-versa, outlier districts at or above the 99th percentile have an unusually high concentration of minority voters when compared

with similarly partisan plans and are thus indicative of packing. *Id*. The blue dots show where the districts in Plan C2333 fall along this distribution. *Id*. As Figure 8 shows, and as Dr. Duchin testified, one district from the Tarrant/Dallas cluster in Plan C2333 is off the chart or in the 99th percentile suggesting the packing of voters of color (seen in the second plot from the right). While two other districts are off the charts or in the 1st percentile suggesting the cracking of voters of color (seen in the third and fourth plot from the right).[3] TXNAACP PI EX. 208 p. 14 (Figure 8); Trial Tr. AM (October 6, 2025)at 65:3 – 67:3. Put differently, all or nearly all of the 40,000 maps of the Tarrant/Dallas cluster produced by Dr. Duchin achieve similar partisan outcomes without the same level of cracking and packing of voters of color.

**The Harris/Ft. Bend Cluster**

375. Dr. Duchin explained that CD 9—like CD 32 and CD 33—was drawn to take in more rural and heavily white areas in a way that is characteristic of diluting the votes of diverse urban areas. Trial Tr. AM (October 6, 2025)at 46:19-47:12. Unlike CDs 32 and 33, however, newly drawn CD 9 has little territorial overlap with old CD 9. In fact, the district with the most territorial overlap with old CD 9 is the new CD 29. Trial Tr. AM (October 6, 2025)at 46:6-18. As Dr. Duchin explained, this is an unexplained and obfuscating departure from standard district numbering practice, which is to give the new district the same number as the old district with which it most overlaps. *Id.* at 45:12-46:5.

---

[3] The Box plots themselves are not given district labels because the maps from the ensemble mix and merge districts such that the district with the same given number might not be the best comparator in a given map. Accordingly, the districts are compared to their most similar counterpart in a given map without regard for its specific number.

376. The dot density plot of the Harris/Ft. Bend cluster in Dr. Duchin's report similarly shows a pattern of sorting voters based on race. Trial Tr. AM (October 6, 2025) at 48:8-16; TXNAACP PI EX. 208 p. 12 (Figure 5).

377. Dr. Duchin's analysis demonstrates that CD 9 in the Harris/Ft. Bend cluster went from a district where people of color could reliably nominate and elect their candidate of choice to a district where they can likely nominate, but almost certainly not elect, their preferred candidate. TXNAACP PI EX. 208 p. 9 (Table 3).

378. Dr. Duchin's box plot for the Harris/Ft. Bend cluster shows partisanship does not explain its district demographics under Plan C2333. When compared to two sub-samples of 40,000 maps that achieved similar partisan performance, one district was off the charts when it came to the packing of voters of color (the second district from the right on the chart) while four districts were either off the chart or at the first percentile in their cracking of voters of color (the fourth, fifth, sixth, and seventh from the right on the chart). TXNAACP PI EX. 208 p. 13 (Figure 9). To sum it up, not one of the maps in either of the partisan 40,000 map samples had the same level of cracking and packing of voters of color as Plan C2333. TXNAACP PI EX. 208 p. 13 (Figure 9).

**The Travis/Bexar Cluster**

379. New CD 35 under Plan C2333 is drawn to include more rural and less diverse counties. Trial Tr. AM (October 6, 2025) at 50:7-51:2. Dr. Duchin's analysis shows that this has the effect of changing it from a district where people of color can reliably nominate and elect their candidates of choice to a district where they can likely reliably nominate—but almost certainly never elect—their preferred candidate. TXNAACP PI EX. 208 p. 9 (Table 3); Trial Tr. AM (October 6, 2025) at 51:3-21.

380. Figure 10 in Dr. Duchin's report similarly shows a pattern of cracking and packing in the Travis/Bexar cluster. Dr. Duchin candidly acknowledged that when compared to two 40,000 sub-samples of similarly partisan maps, the Travis/Bexar cluster in Plan C2333 was not as much of an outlier as the other two clusters. TXNAACP PI EX. 208 p. 13 (Figure 10). However, she noted several of its districts (the first, third, and fourth from the right) landed around the fifth percentile meaning it is still significantly more dilutive of minority voting strength than the significant majority of partisan draws of the Travis/Bexar cluster created by Dr. Duchin. TXNAACP PI EX. 208 p. 13 (Figure 10); Trial Tr. AM (October 6, 2025) at 69:11-70:4.

381. In conclusion, the changes made in Plan C2333 were not consistent with the race neutral pursuit of partisan gain. Rather, she concluded that there was strong evidence that race was used in the creation of Plan C2333 in a manner that diluted the votes of people of color. Trial Tr. AM (October 6, 2025) at 26:12-27:1.

## Alternative Mapping Proposal

382. Plaintiffs have provided multiple alternative mapping proposals that would achieve Texas' stated partisan goals of drawing five more Republican districts without dismantling CDs 9, 18, 27, 30, 33.

383. The map drawer testified that when drawing his new map he had the following goals: make CD 30 as Democratic as possible. Trial Tr. PM (October 7, 2025) 64:18-25 (Adam Kincaid). The map drawer had no concern regarding incumbents nor core retention with respect to Democratic districts. Trial Tr. PM (October 7, 2025) 65:4-11 (Kincaid).

384. While Kincaid testified that he had enhanced political data for census block groups within voting precincts, this data is only based on 30 percent of the electorate and is not accurate

for determining partisanship at the block level. Trial Tr. PM (October 7, 2025) 134:9-136:4 (Adam Kincaid).

385. Particularly, under an alternative map created to maximize Republican performance in CD 9, the HCVAP would be lowered from 50.1% in the enacted C2333 to 48.1% HCVAP, but would have higher Republican performance in the 2024 Presidential election (59.8% compared to 59.5%), 2022 Gubernatorial election (56.5% compared to 55.7%), 2018 Senate election (50.7% Cruz compared to 49.3% Cruz), and 2024 Senate election (55% compared to 54.4%). Brooks Ex. 520; 521. The Republican performance is even stronger in the alternative plan, with Cruz winning the 2018 Senate race based on reconstituted precinct analysis. The Court finds that the map is reasonably configured and satisfies Mr. Kincaid's stated redistricting criteria. The Court observed the partisan shading and electoral data for the precincts that were exchanged between CD 9 and 36 in the creation of this map live in Court. It was apparent from the partisan shading of the precincts along the border of the districts that Mr. Kincaid avoided placing obviously more Republican precincts (which were majority Anglo CVAP) in CD 9 and instead included Democratic precincts (which were majority Hispanic CVAP) that readily could have been absorbed by the more-Republican CD 36 without violating his stated priority to keep all incumbent Republican districts above 60% Trump performance. Doing so, however, caused CD 9 to fall below the majority Hispanic CVAP status—clearly a dealbreaker. A map drawer without the racial target in mind (and with only a partisan goal) would not have drawn the district as Mr. Kincaid did.

386. An alternative mapping proposal to maximize Republican performance in CD 35 would similarly lower Hispanic CVAP from 51.6% under C2333 to 48.6%. Brooks Ex. 520; 522.

Specifically, Republican performance would increase in the 2024 Presidential election (54.8% compared to 54.5%), 2022 Gubernatorial election (52.8% compared to 52.5%), 2018 Senate election (50.8% compared to 49.7%) and 2024 Senate election (50.8% compared to 50.6%). Brooks Ex. 520; 522. The map is reasonably configured and actually reduces the number of city splits. Its Republican performance is increased over Plan C2333 merely by swapping precincts with a neighboring *Democratic* district. Like with the CD 9 alternative map, it was apparent to the Court that Mr. Kincaid made mapping choices that cannot be explained by a desire to maximize CD 35's Republican performance, which is what he testified was his goal. Trial Tr. PM (October 7, 2025) 71:22-72:4 (Adam Kincaid). One obvious example in this regard was the inclusion of a Republican precinct in Democratic CD 20—along with border with CD 35—rather than including it in CD 35. Trial Tr. PM (October 7, 2025) 72:20-75:15 (Adam Kincaid). Likewise, it is apparent from the partisan shading observed by the Court during Dr. Trende's testimony that Mr. Kincaid could have made CD 35 more Republican (but below majority Hispanic CVAP) by merely swapping out more heavily Democratic precincts that he included in CD 35 with less heavily Democratic precincts he included in CD 20. Brooks Ex. 520; 522. These precincts were along the borders of the two districts and would have been obvious to a map drawer focused solely on segregating the most Democratic voters into CD 20 and the most Republican voters into CD 35. Indeed, Mr. Kincaid specifically testified that he looked at swapping out the Kirby area, as the alternative map does. Trial Tr. PM (October 7, 2025) 71:18-72:6 (Adam Kincaid). It is implausible that, having spent hours on the districts seeking to maximize its Republican performance, Mr. Kincaid would have missed these obvious alterations that would increase its Republican performance—especially

considering it is the lowest performing Republican district in Plan C2333. Making these changes, however, would have lowered CD 35 below the apparent racial target that could not be compromised, even if doing so would come at the expense of Republican performance.

387. The alternative maps for CDs 9 and 35 (which make only minor changes to neighboring CDs 20 and 36 and do no otherwise affect the map and in fact improve its compliance with the purported redistricting criteria) illustrate that ensuring that both districts remained above the majority Hispanic CVAP target was the paramount goal that could not be compromised in the map drawing process. Republican partisan performance and traditional redistricting criteria were subordinated to this racial target.

388. Mr. Kincaid also testified that despite not caring largely about the configuration, core retention, incumbent locations, or preservation of economic hubs in the Democratic districts, Trial Tr. PM (October 7, 2025) 65:4-11 (Adam Kincaid), he did have an overriding goal for configuring Democratic districts in the Dallas/Tarrant and Harris County areas: making CDs 18 and 30 the most Democratic in those clusters. He offered no additional explanation for why, but he did acknowledge that the most Democratic voters were Black voters. Trial Tr. PM (October 7, 2025) 89:14-20 ("Q: But you would concede, would you not, that the only group that's 80 percent or greater would-be African Americans, yes? A: I will concede that there is a high correlation between African Americans and Democrat votes, yes.").

389. There was no reason to have this specific goal for CDs 18 and 30, given his otherwise careless attitude toward the configuration of the Democratic districts. But, together with the overwhelming statements from legislators, such as Chair Hunter, Rep. Spiller, and Rep.

Pierson, exclaiming that the map created two new Black CVAP majority districts (CDs 18

and 30), the testimony and evidence suggests that Mr. Kincaid's "most Democratic" goal

for CDs 18 and 30 was in fact the use of partisanship as a proxy for race—in order to

achieve the majority Black CVAP status of the districts, which was then used as a talking

point in favor of the map.

390. The alternative map evidence regarding CDs 9 and 35 must also be viewed together with

Mr. Kincaid's podcast statement announcing that four of the five new districts would be

majority Hispanic, along with the similar repeated statements by legislators and the

Governor. Together, the record makes obvious that this was a purposeful map drawing

goal.

391. Mapping proposals Brooks Exhibits 520-522 are alternative mapping proposals that

achieve the goal of increasing Republican performance but does not crack Hispanic voters.


## X. Timing of Elections

392. Although the filing period for precinct chairs opened in September, the period remains

open until December 8, 2025, allowing adequate time for any necessary changes to voting

precincts if plan C2333 is stayed. Trial Tr. (October 8, 2025 PM) 16:22-17:7 (Adkins).

393. Further, due to upcoming November 4, 2025, elections, counties are using the precinct

boundaries from 2021. Trial Tr. (October 8, 2025, PM) 17:12-18:2 (Adkins).  Counties will

not be modifying their precinct boundaries to conform to the newly enacted map until after

the November election. Trial Tr. (October 8, 2025, PM) 19:6-14 (Adkins).

394. As such, this Court finds that there is no barrier to staying Plan C2333 for the 2026

midterm elections. In fact, employing C2193, the map adopted in 2021, would be less

obstructive for election officials than would be to impose this new, dramatically different statewide map.

October 17, 2025                                     Respectfully submitted,

/s/ Nina Perales                                     /s/ Chad W. Dunn
Nina Perales                                         Chad W. Dunn (Tex. Bar No. 24036507)
Julia Longoria                                       Brazil & Dunn
Sabrina Rodriguez                                    4407 Bee Caves Road
Mexican American Legal Defense and                   Building 1, Ste. 111
Educational Fund (MALDEF)                            Austin, TX 78746
110 Broadway Street, Suite 300                       (512) 717-9822
San Antonio, TX 78205                                chad@brazilanddunn.com
 (210) 224-5476
Fax: (210) 224-5382                                  /s/ Mark P. Gaber
nperales@maldef.org                                  Mark P. Gaber*
jlongoria@maldef.org                                 Mark P. Gaber PLLC
srodriguez@maldef.org                                P.O. Box 34481
                                                     Washington, DC 20043
Ernest I. Herrera                                    (715) 482-4066
Mexican American Legal Defense and                   mark@markgaber.com
Educational Fund (MALDEF)
634 S. Spring Street, 9th Floor                      Jesse Gaines* (Tex. Bar. No. 07570800)
Los Angeles, CA 90014                                P.O. Box 50093
 (210) 629-2512                                      Fort Worth, TX 76105
eherrera@maldef.org                                  817-714-9988
                                                     gainesjesse@ymail.com
Khrystan N. Policarpio*
Mexican American Legal Defense and                   Molly E. Danahy*
Educational Fund (MALDEF)                            P.O. Box 51
1512 14th Street                                     Helena, MT 59624
Sacramento, CA 95814                                 (406) 616-3058
 (916) 444-3031                                      danahy.molly@gmail.com
kpolicarpio@maldef.org
                                                     Sonni Waknin*
*Admitted pro hac vice                               6417 N Figueroa St. # 10
                                                     Los Angeles, CA 90042
Counsel for LULAC Plaintiffs                         732-610-1283
                                                     sonniwaknin@gmail.com
SOMMERMAN, MCCAFFITY, QUESADA
& GEISLER, L.L.P.                                    *Admitted pro hac vice

/s/ Sean J. McCaffity                                Counsel for Brooks Plaintiffs

Sean J. McCaffity
State Bar No. 24013122
George (Tex) Quesada
State Bar No. 16427750
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219-4461
214-720-0720 (Telephone)
214-720-0184 (Facsimile)
SMcCaffity@textrial.com
Quesada@textrial.com

*Attorneys for MALC Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all counsel of record on October 17, 2025, via the Court's CM/ECF system.

*/s/ Sonni Waknin*