# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| LULAC, *et al.*, <br><br>        *Plaintiffs*, <br><br> v. <br><br> GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*, <br><br>        *Defendants.* | Case No. 3:21-CV-00259-DCG-JES-JVB <br> [Lead Case] |

**BROOKS, LULAC, AND MALC PLAINTIFFS' POST-PRELIMINARY INJUNCTION HEARING BRIEF IN SUPPORT OF A PRELIMINARY INJUNCTION**

## INTRODUCTION

The overwhelming record evidence confirms that race drove Texas's mid-decade redistricting efforts from start to finish. In early 2025, Galveston County Commissioner Robin Armstrong told Adam Kincaid that the *Petteway v. Galveston County* decision justified redrawing the Texas congressional map to eliminate performing coalition districts. In July, the United States Department of Justice ("DOJ") demanded Governor Abbott redraw certain congressional districts *because of* their multiracial majority status. In response, Governor Abbott called the Texas Legislature into a Special Session specifically to eliminate the coalition and majority minority districts identified by DOJ. Over the course of the redistricting process—and continuing even through the preliminary injunction hearing—the Governor, DOJ, and multiple Texas legislators repeatedly, publicly, and explicitly stated that Texas was redistricting to eliminate multiracial majority districts. Texas legislators invoked the Governor's call to remove racial coalition districts and openly flaunted the racial bases for, and characteristics of, the newly drawn districts. As Chairman Hunter stated on the House floor, "[w]e're all talking race, and we talk neutral." Brooks Ex. 309-T (August 1, 2025, House Redistricting Committee) 90:2-7.[1] Finally, the map proves that Kincaid achieved the express racial goal of eliminating coalition districts. All four districts targeted by DOJ were substantially altered, decimating and Black and Latino electoral opportunities.

The preliminary record confirms that the 2025 map was enacted intentionally to dilute Black and Latino votes, and that the Legislature made predominant use of race. Every person responsible for the map relied on race and racial justifications as a tool while they claimed to pursue partisan goals. The Court should find that Plaintiffs are likely to succeed in showing that C2333 intentionally dilutes minority voting strength, and that it is a racial gerrymander, in

---

[1] All citations to the preliminary injunction transcript are to the rough transcripts.

violation of the Fourteenth and Fifteenth Amendments. The Court in weighing the equities should conclude that the map be enjoined.

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must make four showings: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 158 (W.D. Tex. 2022). Plaintiffs satisfy those requirements here.

## ARGUMENT

### I.    Plaintiffs have standing to bring their claims.

Plaintiffs have standing to bring their intentional vote dilution and racial gerrymandering claims. Standing for a claim of intentional vote dilution exists when a plaintiff demonstrates they are a registered voter who resides in the challenged district, and they are a member of a minority group whose voting strength they claim is being diluted. *See Harding v. Cnty. of Dallas, Texas*, No. 3:15-CV-0131-D, 2018 WL 1157166, at *5 (N.D. Tex. Mar. 5, 2018), *aff'd sub nom. Anne Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302 (5th Cir. 2020). A plaintiff has standing to assert a racial gerrymandering claim if "they live in the district that is the primary focus of their claim." *United States v. Hays*, 515 U.S. 737, 739 (1995).

The Brooks Plaintiffs all individual Black and Hispanic registered voters who reside in the districts they challenge. *See* Brooks FOFs, ¶¶ 1-18. Their voting strength is diluted under C2333. Similarly, MALC has standing because its members, including members of Mexican American descent, live in the districts they challenge, including CDs 9, 16, 18, 29, 33. *See* Brooks FOFs ¶¶

3

19-32. The LULAC organizational Plaintiffs have members who are registered voters, are Latino, and who reside in the challenged districts. Similarly, LULAC Plaintiffs include individual registered voters who are Latino and who reside in the challenged districts. *See* Brooks FOFs, ¶¶ 33-53.

Because Plaintiffs live and vote in the challenged districts and are members of minority groups whose voting strength they claim has been diluted, they have standing to pursue both their intentional vote dilution and racial gerrymandering claims.

## II.  Plaintiffs are likely to succeed on the merits.

### A.  Plaintiffs are likely to succeed on their intentional racial vote dilution claims.

Plaintiffs are likely to show that Plan C2333 was intentionally drawn to dilute the votes of racial minorities. The preliminary evidence establishes that both the Texas Legislature and the Governor intentionally sought to eliminate multi-racial coalition and Latino majority districts in enacting the 2025 map.

Redistricting plans are intentionally discriminatory if the plan has "the purpose and effect of diluting a racial group's voting strength." *Shaw v. Reno*, 509 U.S. 630, 649 (1993); *see also Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 312 (5th Cir. 2020) (Stating that redistricting plans are intentionally discriminatory if "conceived or operated as purposeful devices to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population."). A plaintiff demonstrates intentional vote dilution by establishing that race was *a part* (even if not the primary purpose) of the redistricting calculus *and* the adopted map has a discriminatory effect.[2] *See Veasey v. Abbott*, 830 F. 3d 216, 230 (5th Cir.

---

[2] "[W]hen discriminatory purpose (intentional vote dilution) is shown, a plaintiff need not satisfy the first *Gingles* precondition to show discriminatory effects. *Perez v. Abbott*, 253 F. Supp. 3d 864, 944 (W.D. Tex. 2017).

2016) (*en banc*). Notably, intentional vote dilution claims are "analytically distinct" from racial gerrymandering claims.[3] *See also Shaw I*, 509 U.S. at 645. In *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1, 38-29 (2024), the Court concluded that the plaintiffs' proof of racial predominance, by itself, was insufficient for a vote dilution claim because a plaintiff must also show the dilutive effect of the enacted voting scheme. 602 U.S. at 39. As such, *Alexander* does not change the quantum of evidence necessary to demonstrate intentional vote dilution.

Additionally, even if partisanship is a legitimate consideration in redistricting, if the desire for partisan advantage leads to enacting a map at least in part "because of" its adverse effects on a racial group, that is enough to demonstrate the "purpose" prong of an intentional discrimination claim. *Perez v. Abbott*, 253 F. Supp. 3d 864, 949 (W.D. Tex. 2017); *c.f. also Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments.").

Plaintiffs can establish intent through either direct or circumstantial evidence. *Perez v. Abbott*, 253 F. Supp. 3d 864, 941 (W.D. Tex. 2017); *Rogers v. Lodge*, 458 U.S.613, 618 (1982) ("Discriminatory intent need not be proved by direct evidence."). A discriminatory effect is powerful circumstantial evidence of discriminatory intent. *See Personnel Adm'r of Mass. v.*

---

[3] During closing arguments, there was a question as to whether *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1 (2024), alters the quantum of evidence necessary to show intentional vote dilution as compared to racial gerrymandering claims. *Alexander* does not do so. *Alexander's* discussion of vote dilution did not address at all the quantum of evidence necessary to show racially motivated intent. Here, the preliminary record is replete with both direct and circumstantial evidence showing that race played a predominant role, and was certainly a significant motive, in the new Congressional map. But the record is also replete with evidence of dilutive effect, including specific, unrebutted evidence of racially polarized voting and the inability of minority groups to elect the candidates of their choice in the newly created districts. *Infra* Part 1-2.

*Feeney,* 442 U.S. 256 379 n.25 (1979) (though a discriminatory purpose implies more than mere "awareness of the consequences . . . the inevitability or foreseeability of consequences . . . bear[s] upon the existence of discriminatory intent,"); *see also Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cnty. Texas*, 6 F.4th 633, 639 (5th Cir. 2021) ("[i]f the disparate impact is clearly 'unexplainable on grounds other than race,' then a court may infer racial animus.").

Courts may consider five non-exhaustive factors to determine whether a decision was made with discriminatory intent: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266 (1977); *Veasey v. Abbott,* 830 F.3d 216, 231 (5th Cir. 2016).

### 1.    Direct evidence from the redistricting process confirms C2333 was devised to minimize or cancel out minority voting strength

The record is replete with direct evidence of intentional vote dilution. Here, governmental actors at every level—the DOJ, Governor Abbott, and the Legislature—openly acknowledged their intent to dismantle multiracial coalition and majority Latino districts based on racial composition. *See Alexander,* 602 U.S. at 8. ("Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines."); *see also Arlington Heights*, 429 U.S. at 266 (looking to the sequence of events and contemporaneous legislative statements for evidence of intent).

From the beginning, every major player in Texas's mid-decade redistricting process considered *Petteway v. Galveston County,* 111 F.4th 596, 603 (5th Cir. 2024) (*en banc*) as the

justification for redrawing the map. Republican National Committeeman for Texas and Galveston County Commissioner Robin Armstrong contacted map-drawer Adam Kincaid in March 2025 and asserted that *Petteway* opened the door for Texas to redraw its congressional map. Trial Tr. PM (October 7, 2025) 8:9-17 (Adam Kincaid). Around the same time, both Armstrong and Kincaid were talking with the White House about redrawing Texas's congressional map. Trial Tr. PM (October 7, 2025) 7:5-8:16, 10:4-11:1, 12:9-12. After these conversations, DOJ used *Petteway* as a battering ram to force mid-decade redistricting in Texas.

On July 7, 2025, DOJ sent a letter to Texas demanding that four congressional districts, TX-9, TX-18, TX-29, and TX-33, be redrawn based on their racial composition. *See, e.g.*, Brooks Ex. 253. DOJ (1) researched the racial composition of Texas's congressional districts, (2) objected to the existence of multiracial majority "coalition" districts generally and specifically to CDs 9, 18, 29, and 33,[4] (3) demanded that Texas dismantle these congressional districts, citing *Petteway*, (4) labeled any coalition districts racial gerrymanders, and (5) threatened to file an equal protection challenge if Texas did not comply. *Id.* Governor Abbott, who had not, over the previous four weeks, taken up the call to redraw the State's congressional map, eagerly embraced the DOJ letter and its concerns over racial gerrymandering with respect to coalition districts and added re-redistricting to the agenda of the upcoming special session. Brooks Ex. 254 (1st Proclamation) (adding agenda item for the first special session to enact "[l]egislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice."); *see also* Trial Tr. AM (October 1, 2025) 20:2-20:3 (Senator Alvarado); Trial Tr. AM (October 2, 2025) 86:23-25 (Rep. Thompson).

---

[4] The DOJ letter varyingly refers to CD 29 as both a coalition and Hispanic majority district. Only the latter was correct. Nevertheless, and despite CD 29's majority Latino composition, the DOJ letter demanded that Texas "rectify" its boundaries.

This sequence of events, as well as the contemporaneous statements by Governor Abbott, confirms that the 2025 map was enacted with discriminatory intent. Legislation violates the Fourteenth and Fifteenth Amendments where intentionally discriminatory intent is the "but for" cause of the enactment. *Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (holding Alabama's felony disenfranchisement law intentionally discriminatory because discrimination against the Black populace was a "'but for' motivation for the enactment"); U.S. Const. amend. XV (prohibiting voting discrimination "on account of" race, color, or previous condition of servitude); *accord Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) ("As this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.' . . . That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause.") (internal citations omitted). Governor Abbott's actions satisfy the "but for" causation standard under both the Fourteenth and Fifteenth Amendments.

Without Governor Abbott's call, there would be no 2025 map. In order to redraw the congressional districts, Governor Abbott had to call a special session. To enact the map, Governor Abbott had to sign the legislation. And his public statements provide direct evidence that the call had a discriminatory intent. Embarking on a rapid and extensive media blitz in defense of the mid-decade redistricting, Governor Abbott stated that that Texas "wanted to remove those coalition districts and draw them in ways that in fact turned out to provide more seats for Hispanics." Brooks Ex. 335. He explained that "coalition districts are no longer required" and "we can draw maps to not have coalition districts." Brooks Ex. 325-T. He openly acknowledged an intent to dilute minority votes, stating that "we're able to take the people who were in those coalition districts and make sure they're going to be in districts that really represent the voting preference of those people who live here in Texas." Brooks Ex. 332-T. And he openly acknowledged a specific racial

population target for the districts. Brooks Ex. 331-T ("Four of the five districts we're drawing, they're going to be Hispanic districts."). Governor Abbott's statements are precisely the type of direct evidence *Alexander* describes, *i.e.*, a "relevant state actor's express acknowledgment that race played a role in drawing the district lines." 602 U.S. at 8. *But for* the Governor's intent to eliminate multiracial coalition districts and take minority voters and subsume them in "districts that really represent the voting preference of those people who live here in Texas," Plan C2333 would not exist. Brooks Ex. 326-T. This is intentional vote dilution.

The Legislature's actions also provide direct evidence of the discriminatory intent behind the mid-decade redraw. First, legislators understood—and responded to—the Governor's call as a command to respond to the DOJ letter. Brooks Ex. 301 at 13:6–13; Brooks Ex. 304 at 41:16–43:4. Redistricting Committee Chairman Vasut acknowledged that "the whole point of this process is solely to respond to the Governor's call." Brooks Ex. 301-T at 18:23–19:3. Chairman Hunter confirmed he "looked at [the DOJ letter] took it all into count, and then we came up with this plan." Brooks Ex. 316-T at 111:12-15. According to Hunter, the DOJ letter "mapped the threshold. It mapped the requirements" for redistricting. *Id.* After passing Plan C2333, House Speaker Burrows announced: "[t]he Texas House today delivered legislation to redistrict certain congressional districts to address concerns raised by the Department of Justice." Brooks Ex. 282. The Legislature's stated compliance with the DOJ and Governor Abbott's race-based demands constitutes direct evidence that race drove redistricting. *Cf. Miller v. Johnson*, 515 U.S. 900, 918-19 (1995) (holding DOJ demands for majority-minority district and the Georgia Assembly's compliance was evidence race predominated).

Second, legislators specifically discussed race as motivating the new map. When asked whether the map was drawn race neutral, Chairman Hunter stated, "I don't know what you mean

by 'racial neutral' "[w]e're all talking race, and we talk neutral." Brooks Ex. 309-T (August 1, 2025, House Redistricting Committee) 89:25-90:7. When asked whether it was a coincidence that numerous districts' Hispanic and/or Black Citizen Voting Age Populations (CVAP) increased, Representative Hunter responded that "nothing is a coincidence." Trial Tr. PM (October 1, 2025) 46:17-23 (Rep. Moody); Brooks Ex. 309-T (Aug. 1, 2025, House Committee on Congressional Redistricting) 105:13- 107:13. Chairman Hunter confirmed that changes to the racial compositions of districts were made purposefully. *See* Def. Ex. 1289 at 868:1-6; Brooks Ex. 309-T at 861:8-865:24. For example, Chair Hunter stated that "CD 18 was drawn to be a 50.81 percent CVAP, which is a 11.82 change plus." Def Ex. PI 1289 at 862:11-17. Chairman Hunter knew little else about the map besides its racial demographics. Brooks Ex. 309-T (Aug. 1, 2025, House Committee on Congressional Redistricting) 88:7- 89:17. Again, direct evidence of a "relevant state actor's express acknowledgment that race played a role in drawing of district lines." *Alexander*, 602 U.S. at 8.

Indeed, after the introduction of Plan C2333, race completely dominated the Legislature's discussion. Chair Hunter spoke in granular detail for hours about the racial composition of the districts. *See* Brooks Ex. 316-T (Aug. 20, 2025, House Special Session) 29:24- 30:3; Brooks Ex. 316-T (Aug. 20, 2025, House Special Session) 79:5-18 (Rep. Spiller stating that CD 18 "is currently one of these coalition districts, and under HB 4, changes to a majority Black CVAP district. Is that correct? Rep. Hunter: That is correct); 80:13-24 ("Rep Hunter: Yes. For the record, the Hispanic CVAP of Congressional District 9 under this plan, the Hispanic CVAP is 50.15 percent."); 80:25-17 ("Rep Hunter: Let me give you the information on 29, because I just heard some of that, so everybody knows. 29 has gone from a Black CVAP in 18.31 percent in 2021 to now 32.79 percent. As they said, Hispanic CVAP decreased, but to 43.12 percent."); 81:18-82:23.

He trumpeted the various "new" majority-minority districts within Plan C2333. *Id*. And he highlighted the importance of the racial considerations underlying the map, including specific districts in Plan C2333 that would either remain or become majority minority districts. Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 29:19-30: 24 ("It is important to note—Please note members. Four of the five new districts are majority minority Hispanic, what we call CVAP districts); Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 30:21- 31:11.

Third, although legislators occasionally mentioned partisan preferences, those preferences were paired with legislators' assertions that *Petteway* empowered them to achieve partisan advantage by eliminating multiracial majority districts and diluting minority votes. Trial Tr. PM (October 1, 2025) 84:23-85:23 (Rep. Moody). In one instance, Representative Spiller asked Chairman Hunter, "[s]o now, in Texas, one of the reasons that were doing this now is that we are, feel compelled to because of the *Petteway* case and the ruling in the *Petteway* case as it relates to these coalition districts, correct." Brooks Ex. 316-T (Aug. 20, 2025, House Special Session) 77:4-77:23; Trial Tr. PM (October 1, 2025) 85:15-6 (Rep. Moody). Chairman Hunter agreed. *Id*.[5] Even during the preliminary injunction hearing in this case, *Petteway* was still being used as the public impetus for redistricting. *See* Brooks Ex. 339-T at 2:14-15 (Representative Toth stating that during an October 2, 2025, interview that congressional redistricting "was required of us to do it in, yes, in response to Petteway to get compliant.").

---

[5] Of note, nothing in *Petteway* compels the elimination of performing coalition districts. *See generally*, 111 F.4th 596; *cf. Bartlett*, 556 U.S. at 24 ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."). But even if the DOJ, the Governor, and the Legislature honestly misunderstood *Petteway* rather than purposefully misunderstanding it for pretextual reasons, legal error cannot excuse race-based decision-making that violates the Fourteenth and Fifteenth Amendments. Cf. *Cooper v. Harris*, 581 U.S. 285, 306 (2017) ("But neither will we approve a racial gerrymander whose necessity is supported by no evidence and whose raison d'être is a legal mistake.").

Fourth, legislators relied on the DOJ letter as the justification for dismantling Latino majority districts that Texas had created to comply with the Voting Rights Act. Legislators followed the DOJ's directive to dismantle CD 29 despite their knowledge that it was an HCVAP majority district that elected the Latino candidate of choice, and despite the incumbent's testimony before them that CD 29 was protected by the Voting Rights Act. Trial Tr. PM (October 9, 2025) 132:20-137:6.

Legislators also targeted and eliminated Latino opportunity to elect in CD 35 after declaring that it too was a "coalition" district. Brooks Ex. 309-T (Aug. 1, 2025, House Select Committee on Congressional Redistricting) 97:8-15 ("REP. PIERSON:  And this is one of the coalition districts that is one of the new majority Hispanic CVAP districts; is that correct?  REP. HUNTER:  Well, again [CD 35] is 51.57 percent. It's an increase of 5.71 change."). *See also* Trial Tr. PM (October 9, 2025) 142:14-21. Of note, the 2021 map's version of CD 35 carried forward last decade's configuration—a district configuration that Texas defended in the U.S. Supreme Court. *See Abbott v. Perez*, 585 U.S. 579, 616 (2018) (holding that "the 2013 Legislature had 'good reasons' to believe that the district at issue (here CD35) was a viable Latino opportunity district that satisfied the *Gingles* factors," and that Texas had good reason to believe Section 2 of the VRA required the district.).

Finally, testimony by the map-drawer Adam Kincaid and Senator King that they allegedly did not consider race in redistricting should be given little weight.  The sheer number of conflicting statements regarding their interactions and communications during the 2025 redistricting process render both Kincaid and King not credible. *See generally,* Brooks Plaintiffs FOF. Likewise, Mr. Kincaid's demeanor on the stand—attempting to control the questioning and objections, requesting that his counsel ask questions that were not posed, and becoming argumentative when he

anticipated cross examination questions about implausible testimony regarding the map drawing process—suggested a clear agenda and not a dispassionate presentation of the facts when merely asked questions. But even taking Kincaid and Senator King at their word that they were motivated solely by partisanship, the Governor and the House's open and avowed racially discriminatory intent, the Senate's conscious adoption of the House's map, and the overwhelming evidence that the map met any partisan goals through intentional racial discrimination, require that the map be enjoined.  *See Veasey*, 830 F.3d at 230 ("[R]acial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (internal quotation marks omitted).[6]  The State's defense that Kincaid supposedly did not draw based on race and President Trump sought five seats for political reasons *does not* overcome the clear and direct statements of racial intent by the Governor and legislators is precluded by precedent. *See Brnovich v. Democratic National Cmte.,* 594 U.S. 647, 681 (2021)  ("The 'cat's paw' theory has no application to legislative bodies."). And that principle cannot work in only one direction. Even if Mr. Kincaid had no racial motive (an implausible conclusion as explained below), he was entirely shielded from the relevant state actors whose decision-making is at issue.

In sum, the DOJ demanded race-based revisions to the 2021 Texas congressional plan and the Governor and Legislature complied with those demands. The map does exactly what the DOJ

---

[6] Furthermore, Kincaid's testimony supports the conclusion that he had racial motives in drawing the map, even if the court credits his testimony that he did not turn on racial shading while he assigned voters to districts.  Kincaid, who drew multiple Texas congressional maps for the 2021 redistricting cycle, testified that he knew he was assigning Latino voters to CD 9 and CD 35 where they could not elect their preferred candidate.  Consistent with the DOJ letter, Kincaid also testified that he sought first to redraw the minority opportunity districts CD9 and CD 18 in Harris County, and not CD7, which is a Democratic district represented by a White member of Congress and not mentioned in the DOJ letter.  Trial Tr. AM (October 8, 2025) at 135:14-136:19 (Adam Kincaid).

demanded —it dismantles multiracial majority districts across the state, including the districts specified in the letter (and more). This conduct violates the Fourteenth and Fifteenth Amendment by intentionally diluting the voting strength of minority voters on account of race. *Miller v. Johnson*, 515 U.S. 900, 918-19 (1995) (compliance with race-based demands from DOJ constitutes evidence of racial discrimination); *Bartlett*, 556 U.S. at 24 (intentionally destroying a district that performs for racial minorities raises "serious questions under both the Fourteenth and Fifteenth Amendments."). Unlike the plaintiffs in *Alexander*, the record evidence here establishes repeatedly through relevant state actor's express acknowledgments that race played a substantial part, if not the driving and predominant basis, for drawing the new map, and the map dilutes minority voting strength. Plaintiffs' direct evidence of intentional vote dilution establishes a strong likelihood of success on the merits.

> **2.    The *Arlington Heights* factors support a finding of intentional racial vote dilution**

Plaintiffs are also likely to prevail on their claim that C2333 intentionally discriminates against Black and Latino voters based on the *Arlington Heights* factors, including through circumstantial evidence of the plan's discriminatory effects.

> **i.    Plan C2333 bears more heavily on Black and Latino voters**

Plaintiffs are likely to prevail on their claim that Plan C2333 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (cleaned up). The reduction of districts in which minority voters can elect candidates of choice, the minimization of political strength, and the existence of racially polarized voting, independently and together, demonstrate discriminatory effect. *See York v. City of St. Gabriel,* 89 F. Supp. 3d 843, 864 (M.D. La. 2015); *LULAC v. Abbott,*

601 F. Supp. 3d 147, 170 (W.D. Tex. 2022). Importantly, the State did not offer much, if any, evidence rebutting the discriminatory effects of Plan C2333.[7]

Plan C2333 reduces Black and Hispanic political strength by eliminating at least four congressional districts in which minority voters were able to elect their candidates of choice. Gonzales Ex. 39 at 5. Under Plan C2333, racial polarization denies Hispanic voters the opportunity to elect in two previous majority Latino opportunity districts, CD 29 and CD 35. Brooks Ex. 269 at 4; LULAC Ex. 829. Hispanic voters also lack the opportunity to elect their preferred candidate in CD 9. LULAC Ex. 829, 831. Hispanic voters are also harmed by the dismantling of CD 30. Brooks Ex. 269 at 3, 47.

Black Texans also see their voting power minimized under Plan C2333. While CDs 18 and 30 are majority Black CVAP districts, the creation of these districts harms rather than improves Black voters' electoral strength. CDs 18 and 30 replace multiple plurality-Black districts in which Black voters were consistently able to elect their candidates of choice. Gonzales Ex. 39 at 5. "[B]y reducing the number of other majority-minority districts in which Black voters would consistently have been able to elect their candidates of choice, the [2025 Map's] overall effect is to reduce Black voters' electoral opportunities." Gonzales Ex. 39 at 5. The reduction of four opportunity

---

[7] State Defendants took contradictory positions regarding the new map's effect on Latino voters. While not disagreeing that Latino voters lost the ability to elect their preferred candidates in CD 29 and 35 and lack the opportunity to elect their preferred candidate in the new CD 9, State Defendants maintain that any effects of the new map are partisan, *i.e.* because Latino voters are Democrats. At the same time, the State maintained that Latino voters are Republicans, suggesting that the new map was doing Latino voters a favor by putting them in new Republican performing districts. *See e.g.* Brooks Ex. 316 (Aug. 20, 2025, House Special Session) 29:19-30: 24 (Rep. Hunter: "It is important to note—Please note members. Four of the five new districts are majority minority Hispanic, what we call CVAP districts); Brooks Ex. 331-T (Gov. Abbott: "four of the five districts we're drawing, they're going to be Hispanic districts."). This latter evidence supports Plaintiffs' contention that the new map makes predominant use of race and cannot survive strict scrutiny.

districts for minority voters is so extreme that it is alone enough to demonstrate a disparate impact. *See LULAC v. Abbott,* 601 F. Supp. 3d 147, 167(W.D. Tex. 2022) ("the destruction of a majority-minority district, particularly one controlled by one racial group, [is] a relatively clear discriminatory impact.").

Plan C2333 also disperses Hispanic voters in the DFW, Houston, and Travis/Bexar County areas, while it packs Black voters in the Houston and DFW areas. See Brooks Ex. 269; Gonzalez Ex. 39 at 3-4. In the 2021 map, nine districts were multiracial majority, with no single race constituting a majority of eligible voters. Brooks Ex. 258 (Plan C2193 CVAP Report). Under C2333, just four districts are multiracial majority. Brooks Ex. 265 (Plan C2333 CVAP Report) (CDs 7, 8, 29, 33). Additionally, each of the eight most-altered districts under Plan C2333 are those that were majority-minority districts in the 2021 map. Brooks Ex. 267; 258.

As a result of these changes, Defendants' own expert Dr. Lewis confirmed that, regardless of political party affiliation, Black and Hispanic voters have less political influence under C2333. *See* Trial Tr. AM (October 9, 2025) 19:1-5 (Dr. Lewis). Given that Black and Hispanic voters lose electoral strength in multiple districts and that Black and Hispanic political influence is diminished under Plan C2333 regardless of political preference, Plan C2333 bears more heavily on Black and Hispanic voters. The Court should find that Plaintiffs' have satisfied this factor.

### ii.   The historical context supports an inference that C2333 was enacted with discriminatory intent

Second, the historical context supports an inference of discriminatory intent. Courts analyzing this factor must look at contemporaneous historical events. *See McCleskey v. Kemp,* 481 U.S. 279, 298 n.20 (1987). This Court has already found that "[i]n every decade since the statute was passed in 1965, federal courts have held that Texas violated the VRA." *See LULAC*, 601 F. Supp. 3d at 170. "That includes the [2011] redistricting cycle" *Id. See also Veasey*, 830 F.3d at

239 (citing the 2012 decision regarding SD 10 in Tarrant County as a "contemporary example[ ] of State-sponsored discrimination"); *Abbott v. Perez*, 585 U.S. 579, 620-22 (2018) (concluding Texas unconstitutionally racially gerrymandered Ft. Worth in its State House map in 2013).

With respect to the past twenty years, multiple courts have found Texas to have violated minority voting rights. All three federal judges adjudicating the 2011 congressional map's lawfulness agreed that its configuration of congressional districts in Tarrant County was intentionally discriminatory. *Perez*, 253 F. Supp. 3d at 961; *id.* at 986 (Smith, J., dissenting); *see also Perez v. Abbott,* 390 F. Supp. 3d 803, 811-12 (W.D. Tex. 2019) ("[The Supreme Court] never addressed or in any way called into question this Court's findings as to the Legislature's discriminatory purpose in enacting the 2011 plans."). Of note here, Texas has intentionally dismantled CD 33 (despite assigning that number to an entirely different district in Dallas County), which the *Perez* court ordered the State to implement after a finding that the 2011 map's cracking of minority populations in Tarrant County constituted intentional racial discrimination. Plan C2333 similarly harms the minority populations in Tarrant County.  Moreover, Texas intentionally dismantled a Hispanic opportunity district, CD 35, that the State previously argued that it had good reasons to think was required by Section 2 of the Voting Rights Act (and the Supreme Court agreed).

Other contemporaneous examples of racial discrimination, particularly in voting, abound. In 2016, the *en banc* Fifth Circuit found that Texas's voter identification law had the  effect of discrimination against minority voters. *Veasey v. Abbott*, 830 F.3d 216, 272 (5th Cir. 2016) (*en banc*) (finding effects discrimination in violation of Section 2 of the Voting Rights Act). And during the last instance of mid-decade redistricting in 2006, the Supreme Court held that Texas violated Section 2 of the Voting Rights Act by weakening Hispanic voting strength in West Texas.

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439 (2006). Like with SD10, this Court should find that the "historical evidence weighs in favor of an inference of discriminatory intent," (*LULAC*, 601 F. Supp. 3d at 17) with respect to Plan C2333.

>     iii.    **The sequence of events leading to C2333's enactment supports a finding of intentional discrimination**

From start to finish, the sequence of events leading to C2333's enactment supports an inference of intentional discrimination. *See supra,* Part II.A.1. First, the private machinations behind the scenes prior to redistricting and during the 2025 redistricting process are instructive. During February or March, Adam Kincaid, White House officials, and Texas officials, including Robin Armstrong, met to discuss Texas mid-decade redistricting. Trial Tr. PM (October 7, 2025) 6:14-8:13 (Adam Kincaid). At some point during these conversations, Armstrong told Kincaid that the *Pettaway* case provided Texas an opportunity to redraw the Texas congressional map. Trial Tr. PM (October 7, 2025) 8:9-17 (Adam Kincaid). Despite the State of Texas going to trial in this Court during May and June of 2025 to defend the congressional map, Governor Abbott and Texas officials continued to have discussions on congressional redistricting. In either late June or early July, Adam Kincaid was provided a draft of the DOJ letter while he was in the West Wing. Trial Tr. PM (October 7, 2025) 49:12-51:14 (Adam Kincaid). Kincaid discussed the letter with Governor Abbott prior to its release and shared his views "openly and widely" that the DOJ Letter was unnecessary. Trial Tr. PM (October 7, 2025) 52:16-53:13, 57:20-58:2; 82:13-20 (Adam Kincaid). Nevertheless, Governor Abbott used the DOJ letter to justify calling for a mid-district redistricting process, and Texas legislators repeatedly cited DOJ's demands to dismantle racial coalition districts in enacting a map that did precisely that. *See supra,* Part II.A.1.

Kincaid, the map drawer for the 2021 Congressional map, knew the racial composition of the 2021 congressional plan and understood that CDs 9, 18, 29, and 33 in the 2021 plan were Black

and Hispanic opportunity districts. Trial Tr. AM (October 8, 2025) 129:3-11 ("When you drew the 2025 map, did you know that CDs 9, 18, 29, and 33 under the 2021 map were considered minority opportunity districts, in that they provided minorities an opportunity to elect candidate of their choice?" Kincaid: "I did."). Trial Tr. PM (October 7, 2025) 105:21-17 (Adam Kincaid); Brooks Ex. 341.

Further, the private conversations between Kincaid and Chairman King support an interference of intentional discrimination. Despite being coy about Kincaid's involvement with fellow Senators, Chairman King had multiple conversations with Adam Kincaid during the redistricting process. Trial Tr. PM (October 7, 2025) 18:8-14 (Kincaid). *Cf.* Trial Tr. PM (October 6, 2025) 81:1-13 (Senator King). Chairman King and Kincaid met at the annual American Legislative Exchange Council ("ALEC") conference in mid-July and discussed the details of the map (details Senator King did not ever share publicly). Trial Tr. PM. (October 7, 2025) 20:6-14 (Adam Kincaid). *Cf.* Trial Tr. PM (October 6, 2025) 81:14-18 (Senator King); Trial Tr. PM (October 7, 2025) 18:21-19:15 (Adam Kincaid) (Kincaid testifying that he told Chairman King that there would be a "five-seat pickup."). During another conversation Chairman King asked Kincaid if he received his invitation to testify and providing him with Representative Toth's contact information. Trial Tr. PM (October 7, 2025) 22:2-18 (Adam Kincaid). *Cf.* Trial Tr. PM (October 7, 2025) 35:19-36:9 (Kincaid). *Cf.* Trial Tr. PM (October 9, 2025) 165:25-166:24 (Senator King). The number of conversations between Chairman King and Kincaid, coupled with Senator King being less than forthcoming during the Senate proceedings with his relationship with Kincaid should be viewed by this Court as supporting an inference of discriminatory intent.

> iv. **The procedural and substantive departures from the normal process support a finding of intentional discrimination.**

Moreover, substantive and procedural departures from the normal process support a finding of intentional discrimination. Under this factor, courts look to the ability of minority members of the Legislature to be included in the redistricting process, the failure to release redistricting proposals in a timely manner, limited time for review, and lack of public input. *See Texas v. United States*, 887 F. Supp. 2d 133, 161 (D.D.C. 2012), *vacated and remanded*, 570 U.S. 928 (2013); *Veasey v. Abbott*, 830 F.3d 216, 272 (5th Cir. 2016).

Here, the public redistricting process was a sham. There was a complete disregard for public input during the entire process, and specifically with respect to C2333. Public hearings were held before any map was publicly available. Trial Tr. AM (October 1, 2025) 53:19-55:4 (Senator Alvarado); Trial Tr. AM (October 2, 205) 22:17-23:8 (Senator West); Trial Tr. AM (October 2, 2025) 88:14-17) ("And what – was there a map for you to consider at this point, a new map? A: We never saw a map, period, at none of the hearings. None. Nothing. Nada."). This was so despite the fact that Kincaid had produced a proposed map to the Legislature before the public hearings were held. Trial Tr. PM (October 7, 2025) 48:6-49:4 (Adam Kincaid).

Members of the public were also not given adequate notice of the public hearings, and the hearings were inaccessible. Trial Tr. PM (October 3, 2025) 10:16- 11:3 (Rep. Hawkins). For example, the Houston regional hearing was "standing room only, long line, and over a thousand people," Trial Tr. AM (October 1, 2025) 31:17:19 (Senator Alvarado). The room was "jam packed," and "very hot." Trial Tr. PM (October 1, 2025) 30:19-31:24 (Rep. Moody). The House Redistricting Committee gave only a limited amount of time for each person's testimony, monitoring each statement with a timer. Trial Tr. PM (October 1, 2025) 33:18-25 (Rep. Moody). During the Dallas Fort-Worth area field hearing, University of Arlington officials were instructed not to open additional spaces in which member of the public could wait. Trial Tr. AM (October 2,

2025) 21:4-11 (Senator West). Furthermore, Representative Hawkins raised concerns that those testifying at the first hearing in Austin were told that they could not have testimony registered as "yea" or "nay," rather, everyone was required to sign into the hearing as having a neutral position. Trial Tr. AM (October 3, 2025) 143:12-144:21 (Rep. Hawkins).

The intentionally shoddy nature of the public hearings, and the failure to present the proposed map for public comment, confirm that the Legislature had no interest in considering the public's input. Trial Tr. AM (October 2, 2025) 18:4-10 (Senator West); Trial Tr. AM (October 2, 2025) 138:8-10 (Rep. Thompson) (Testifying that the map "does not reflect the views of the public and the testimony from the public."). Indeed, Kincaid confirmed, that he did not take into consideration public input and testimony when drawing his plan. Trial Tr. PM (October 7, 2025) 90:13-18 (Adam Kincaid).

In total, there was only one opportunity for public testimony on an actual mapping proposal after Chairman Hunter introduced HB 4. Trial Tr. PM (October 1, 2025) 43:15-4 (Rep. Moody). Neither the Legislature nor Defendants offered any explanation as to why the public could not have seen a proposed map prior to July 30, 2025. Kincaid began working on a plan around July 13 or 14, when he connected with Butler Snow attorneys representing members of the Texas House of Representatives. Trial Tr. AM (October 7, 2025) 58:1-58:17 (Adam Kincaid). He provided a map to the Legislature a week and a half later, on July 23. Trial Tr. AM (October 7, 2025) 58:16-17 (Adam Kincaid). No public hearing ever was held on C2333, which was introduced in the House on August 18, 2025, and passed out of both chambers less than five days later.

Despite the apparent rush, and in contrast to past redistricting cycles, there is no evidence that the Legislature established any public timeline for redistricting during the 2025 special sessions. Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 212:7-

212:10 (Chairman King stating that he had no timeline and was "trying to work through a timeline mentally… You know, the Senate may desire to wait and see what the House passes out); Trial Tr. PM (October 1, 2025) 37:6-12 (Rep. Moody). The lack of timeline is nonsensical and represents yet another departure from the norm. Record evidence demonstrates that Texas legislators, the Governor, the White House, and the map drawer Adam Kincaid were all discussing redistricting for months. Trial Tr. PM (October 7, 2025) 6:14-8:13 (Adam Kincaid); Trial Tr. AM (October 7, 2025) 54:22-55:4 (Adam Kincaid). Senator King was in contact with Adam Kincaid months before. Trial Tr. PM (October 6, 2025) 81:5-8 (Senator King). Yet C2333 was rushed through despite legislators' asserted lack of any concrete timeline.

In another departure from the usual process, legislators obscured the identity of the map-drawer, despite Kincaid's early involvement. Defendants have failed to provide any credible explanation for this lack of transparency. During the process, no legislators would say with any certainty who drew the congressional map. *See* Trial Tr. AM (October 1, 2025) 124:2-11 (Senator Alvarado); Trial Tr. PM (October 9, 2025) 125:7-10 (Rep. Vasut). This was despite consistent efforts by Democratic legislators to determine the map-drawer's identity in light of the obvious racial implications of the map. Trial Tr. AM (October 1, 2025) 124:5-11 (Senator Alvarado); Trial Tr. PM (October 1, 2025) 77:20-11 (Rep. Moody). Chairman King refused to say who drew the map and repeatedly stated that no map had been presented to him, even though the process was underway. Trial Tr. AM (October 1, 2025) 22:13-19 (Senator Alvarado); Brooks Ex. 307 (July 29, 2025, Senate Committee on Congressional Redistricting) 210:3- 210:6.

Throughout the process, legislators were also boxed out of any meaningful opportunity to participate. Senator Alvarado was not permitted to filibuster the redistricting plan during the last date of debate, in violation of Senate norms and rules. Trial Tr. AM (October 1, 2025) 133:19-

135:24 (Senator Alvarado). During prior redistricting cycles, legislators would seek input from the Black Caucus during the legislative process. This was not done during the 2025 redistricting cycle. Trial Tr. AM (October 2, 2025) 39:21-40:23 (Senator West).

Throughout the 2025 redistricting process, supporters of redistricting sought to block public testimony from Kincaid and from Assistant Attorney General Harmeet Dhillon, who signed the DOJ letter. Brooks Ex. 304 (July 25, 2025, Senate Redistricting Committee Hearing) 30:8-39; Brooks Ex. 306 (July 28, 2025, Senate Redistricting Committee) 22:13–24:2; Brooks Ex. 308-T (July 30, 2025, Senate Committee on Congressional Redistricting) 25-26. The Senate majority refused to issue subpoenas. Despite a practice of issuing out-of-state subpoenas in other contexts, the Senate leadership suddenly asserted that it lacked authority to subpoena Dhillon and Kincaid. Trial Tr. AM (October 1, 2025) 36:14-23 (Senator Alvarado). Though Chairman King ultimately invited Adam Kincaid and Harmeet Dhillon to testify after substantial pressure from other legislators, these invitations were disingenuous. Kincaid testified that though Chairman King called him on his personal cell phone to invite him to testify, he made a point to say that he was only doing so because "he had made a promise to the Democrat he was working with to, you know, he would do that, so he did." Trial Tr. PM (October 7, 2025) 21:10-22:18 (Adam Kincaid). Chairman King did not disclose this conversation to his Senate colleagues and actually denied having made such call even when presented the opportunity to change his testimony. Senator King's numerous inconsistent statements and testimony raise an inference that he was making these misstatements to hide illicit purpose. At a minimum these extensive inconsistencies render Chairman King an unreliable witness for the State—just as Mr. Kincaid is.

Legislators responsible for shepherding the new map did not want to discuss the map drawer. When Senators discussed having Kincaid come and testify, Chairman King stated that he

did not think that hearing a map drawer's methodology or mental state was relevant to their redistricting. Brooks Ex. 308 (July 30, 2025, Senate Committee on Congressional Redistricting) 31:5- 31:15; Brooks Ex. 308-T at 31 (Sen. Alvarado: "I just don't see the harm in inviting somebody who drew a map and asking how and why they drew the map." Sen. King: "Well, if the point is to determine their methodology and their thoughts behind it and all that, I just – I just think those are irrelevant in the unique situation of a redistricting map . . . . I don't think it really matters because I think the methodology gets wiped out by our legal scrub and the mental state gets knocked out by our policy decisions."). King appears intent on using the process to launder intent, which should invalidate any presumption of legislative good faith by the Court.

Finally, mid-decade redistricting—unprompted by an unlawful population deviation or a federal or state court order finding a legal violation in the existing map—is itself exceedingly unusual. Trial Tr. AM (October 1, 2025) 21:16-21 (Senator Alvarado) (The Texas Senate had to establish a redistricting committee during the First Special Session because there was no standing committee due to the fact that prior to July 9, 2025, the Texas Senate wasn't "going to do any redistricting. It was mid-decade."). These and other departures support a finding of intentional discrimination.

### v.    Contemporary statements confirm discriminatory intent.

Contemporary statements from legislators, Governor Abbott, and Assistant Attorney General Dhillon confirm a discriminatory purpose to dismantle multiracial majority and other districts. *See e.g.,* Brooks Ex. 335; Brooks Ex. 325-T ("a decision came out last year, it says that coalition districts are no longer required. And so we want to make sure that we have maps that don't impose coalition districts" and "[w]e are no longer compelled to have coalition districts.); Brooks Ex. 332-T. Assistant Attorney General Harmeet Dhillon gave a news interview on August

24

5, 2025, stating that the careers of Texas politicians of color are due to a "system of racial spoils." Brooks Ex. 335. In interviews, Assistant Attorney General Dhillon discussed how the DOJ explicitly looked at the racial composition of congressional districts in Texas and wrote to Texas stating "they need to take action to fix" having racial coalition districts. Brooks Ex. 322. She then stated that the DOJ's demand to "fix" having any racial coalition congressional districts "is what triggered the Texas Legislature and the Texas governor to call the Legislature in session to put new maps together." *Id.*

> ### vi. Plan C2333 does not accomplish the stated goal of maximizing Republican gains

Finally*,* Plan C2333 does not meet the stated goals of the map-drawer of maximizing partisan outcomes for Republican and Democratic districts. Kincaid testified that his goal was to maximize Republican political performance and Democratic political performance in their respective districts. Trial Tr. AM (October 7, 2025) 163:8-16 (Adam Kincaid); Trial Tr. PM (October 7, 2025) 71:22-72:4; 71:22-72:4 (Adam Kincaid); Trial Tr. AM (October 8, 2025) 99:21-100:4 (Adam Kincaid). But this assertion cannot be true. Evidence demonstrates that the map drawer added very high density Hispanic and Democratic areas instead of adding more Republican areas to the districts that intended to vote Republican. Trial Tr. AM (October 4, 2025) 110:12-112:1 (Dr. Barreto). Indeed, the partisan objectives of the map drawer were subverted to achieve specific Hispanic CVAP goals in CDs 9 and 35. Trial Tr. 122:19-123:1 (Dr. Barreto). Mapping simulations demonstrate as such. Trial Tr. AM (October 4, 2025) 121:11-122:11 (Dr. Barreto) (Finding that when controlling for Texas's partisan objectives, simulations demonstrated that no majority Black CVAP districts could be drawn, and neither could four majority Hispanic-Trump districts); *See also* TXNAACP PI EX. 208 (Report of Dr. Duchin); Trial Tr. PM (October 2, 2025) at 120:13-23 (Mr. Ely).

\*      \*      \*

Taken together, the *Arlington Heights* factors support an inference of intentional discrimination.

### B.    Plaintiffs are likely to succeed on their racial gerrymandering claims

Based on record evidence, Plaintiffs are likely to prevail on their claim that several districts in Plan C2333 are unconstitutional racial gerrymanders. Plaintiffs establish a racial gerrymandering violation by showing "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916; *see also Cooper*, 581 U.S. at 291; *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017). Plaintiffs can succeed on their racial gerrymandering claims "even if the evidence reveals that a legislature elevated race to the predominant criterion in order to advance other goals, including political ones." *Cooper v. Harris*, 581 U.S. 285, 291, n. 1 (2017) (citing *Bush v. Vera,* 517 U.S. 952, 968–970 (1996)). Additionally, "an alternative map can perform the critical task of distinguishing between racial and political motivations when race and partisanship are closely entwined." *Alexander v. S.C. State Conference of the NAACP*, 602 U.S. 1, 34 (2024).

Although legislatures enjoy a presumption of good faith when redistricting, that presumption is overcome "when there is a showing that a legislature acted with an ulterior racial motive." *LULAC*, 601 F. Supp. 3d at 181. "If a plaintiff can demonstrate that race drove the mapping of district lines, then the burden shifts to the State to prove that the map can overcome the daunting requirements of strict scrutiny." *Alexander*, 602 U.S. at 11. "Under that standard, we begin by asking whether the State's decision to sort voters on the basis of race furthers a

26

compelling governmental interest. We then determine whether the State's use of race is narrowly tailored—*i.e.*, necessary—to achieve that interest. This standard is extraordinarily onerous . . .." *Id.* (cleaned up).

Here, the record evidence shows that several districts in C2333 were drawn to achieve a particular racial population target, and that these racial considerations predominated over even partisanship. In *Cooper*, the Supreme Court affirmed the district court's finding that two North Carolina congressional districts were impermissible racial gerrymanders for precisely this reason. 581 U.S. at 291. There, the map drawers increased the Black voting age population ("BVAP") percentage from 48.6% to 52.7% in District 1 and 43.8% to 50.7% in District 12. *Id.* at 295-96. With respect to District 1, the Court noted that "[u]ncontested evidence in the record shows that the State's mapmakers, in considering District 1, purposefully established a racial target: African Americans should make up no less than a majority of the voting-age population." *Id.* at 299. The Court noted that the legislative redistricting leaders "were not coy in expressing that goal." *Id.* This "announced racial target [] subordinated other districting criteria," mandated a finding of racial predominance. *Id.* at 300.

The Court rejected the State's defense that Section 2 of the VRA required this 50%+1 racial target. "[E]lectoral history provided no evidence that a § 2 plaintiff could demonstrate the third *Gingles* prerequisite" because "[f]or more than twenty years prior to the new plan's adoption, African Americans had made up less than a majority of District 1's voters . . . . [y]et throughout those two decades . . . District 1 was an extraordinarily safe district for African American preferred candidates." *Id.* at 302. Because the State's "deliberate measures to augment the district's BVAP" were not supported by a "legislative record" reflecting that the "State carefully evaluate[d] whether

a plaintiff could establish the *Gingles* preconditions." *Id.* at 304. The Court likewise rejected the

rationale that the legislative leaders cited supporting their racial target:

> Over and over in the legislative record, [the legislative redistricting leaders] cited [*Bartlett*] as mandating a 50%-plus BVAP in District 1. They apparently reasoned that if, as [*Bartlett*] held, § 2 does not *require* crossover districts (for groups insufficiently large under *Gingles*), then § 2 cannot be *satisfied by* crossover districts (for groups in fact meeting *Gingles'* size condition). In effect, they concluded, whenever a legislature *can* draw a majority-minority district, it *must* do so—even if a crossover district would also allow the minority group to elect its favored candidates.

*Id.* at 305. "That idea," the Court explained, "is at war with our § 2 jurisprudence," because in such

a circumstance the third *Gingles* precondition would not be satisfied, and thus there would be no

basis in evidence to conclude that race-based districting was necessary to avoid Section 2 liability.

*Id.* at 306. "Although States enjoy leeway to take race-based actions reasonably judged necessary

under a proper interpretation of the VRA," the Court held that it would not "approve a racial

gerrymander whose necessity is supported by no evidence and whose *raison d'être* is a legal

mistake." *Id.*

   With respect to North Carolina's District 12, the State did not raise a VRA defense in the

litigation. "Instead, the State altogether denied that racial considerations accounted for (or, indeed,

played the slightest role in) District 12's redesign" and instead contended that it was "part of a

'strictly' political gerrymander, without regard to race." *Id.* at 307. The purpose, the State

contended, was "to 'pack' District 12 with Democrats, not African-Americans." *Id.* But the Court

reasoned that there was substantial record evidence, which the district court credited, of an express

goal "to ramp the minority percentage in [District 12] up to over 50 percent to comply with the

Voting Rights [Act]." *Id.* at 312. The Court held that the district court had not clearly erred in

rejecting the partisanship explanation.

Like in *Cooper*, the record here demonstrates that the Governor and Legislature had an overwhelming focus to dismantle multiracial coalition and other districts and draw single race majority-minority districts whether or not they offered minority voters the opportunity to elect their preferred candidates. Moreover, the record establishes that legislators prioritized this goal even at the expense of their secondary partisan goals. This fixation on meeting single-race majority CVAP targets renders several districts unconstitutional racial gerrymanders.

### 1.    CDs 18, 30, and 33 are unconstitutional racial gerrymanders.

CD 18 in Houston and CDs 30 and 33 in the Dallas Fort-Worth area are unconstitutional racial gerrymanders. CD 18 and CD 30 were drawn predominantly to achieve a majority Black CVAP. Nearly a third of CD 33's residents were assigned to that district to effectuate the race-based reconfiguration of CD 30. *See* Brooks Ex. 267. No legitimate or compelling state interest supports the drawing of these districts.

With respect to CD 18, the Governor and legislators openly admitted to using racial targets. When asked explicitly about the racial changes to district boundaries for CD 18, Chairman Hunter stated that "CD 18 was drawn to be a 50.81 percent [Black] CVAP, which is a 11.82 change plus." Def Ex. PI 1289 at 862:11-17. In another instance, Chair Hunter stated "First of all, CD 18 now becomes a 50.8 percent Black CVAP. In 2021, you're advocating for a 38.8 percent CVAP. I think my map is much more improving." Brooks Ex. 316-T (August 20, 2025 House Redistricting Committee) 220:4-7; *see also* Brooks Ex. 309-T (August 1, 2025, House Redistricting Committee) 102:22-103:5. In a colloquy with Republican Rep. David Spiller, Rep. Spiller said: "Let's talk about district 18 in Harris County, what is referred to as the Barbara Jordan district. Is it your understanding that district 18 was, or currently is, a coalition district?" Chair Hunter responded: "I can tell you that under this plan that it becomes a real performing Black CVAP district." *Id.* at

79:5-18. Rep. Spiller continued, regarding CD 18, "It was—it's currently a coalition district, under HB 4, changes to a majority Black CVAP district. Is that correct?" to which Chair Hunter responded, "That is correct. It is now 50.71 percent Black CVAP" *Id.* at 79:12-18. Similarly, Governor Abbott said in a television interview with Joe Pags: "Joe, something else that is going to happen in this process and that is the consolidation of what is known as the Barbara Jordan district over in the Houston area. A Black woman who served there for a long time – they've been begging to protect her district and that's exactly what we're doing." Brooks Ex. 326. What Governor Abbott meant was that Plan C2333 would consolidate CD 9 and CD 18's Black voters into one district to ensure that the district would be a majority Black CVAP.

Regarding both CD 18 and CD 30, legislators, including Chairman Hunter, repeatedly spoke about how the 2021 map had zero Black majority CVAP districts and the new map had two. Brooks Ex. 309-T (August 1, 2025, House Redistricting Committee) 58:14-23; 100:7-101:2; Brooks Ex. 316-T 82:7-16 (Rep. Spiller, "but we went under the current map from zero majority Black CVAP districts in the State of Texas. And now, under your map, we added two to the list… Rep. Hunter: Correct. 18, and—is one of the ones that we've talked about and 30."); 370:18-25. During the August 1, 2025, House Redistricting Committee meeting, Chairman Hunter told members that CD 18 "under this plan, that it becomes a real preforming Black CVAP district." Brooks Ex. 309-T (August 1, 2025, House Redistricting Committee) 74:24-75:1. Plaintiffs' experts demonstrated that the Black population and the boundary changes for these districts show the shifts were race-based. Brooks Ex. 269 (Barreto Report). Both districts were created by separating population along racial lines between *Democratic* districts—CD 30 and 33 in Dallas County and CD 18 and 29 in Harris County—a choice that does not benefit Republican

performance. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report); Trial Tr. PM (October 2, 2025) at 120:13-23 (Mr. Ely).

The desire to take Black voters out of CD 33 to make CD 30 a majority Black CVAP district was "the predominant factor motivating the legislature's decision to place a significant number of voters within" CDs 30 and 33. *Alexander*, 602 U.S. at 42.  Over 230,000 people were shifted out of CD 30 and into CD 33 predominantly on account of their race. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). Removing population from CD 30 and replacing it with population from other nearby districts with larger Black population shares was done only to achieve a razor thin Black CVAP majority in CD 30. There was no partisan benefit in placing the least Black segment of CD 30 into CD 33. Brooks Ex 269 at 6.

Mr. Kincaid's explanation for his map drawing process for these districts also shows—together with the surrounding circumstances of the repeated and emphasized statements about the creation of new Black CVAP majority districts—that at the very least partisanship was used as a proxy for race in boosting CDs 18 and 30's Black CVAP. Mr. Kincaid testified that he largely did not care what happened inside the two Democratic "super districts"—envelopes of territory that would comprise the Democratic districts. But he had one inexplicable goal—making CDs 18 and 30 the most Democratic in each cluster. But why? What possible purpose would that serve his supposedly Republican gerrymander? It did not make the remaining Democratic districts gettable for Republicans. The only plausible conclusion from this single goal is his acknowledgment that he knew that Black voters were the most Democratic voters. Mr. Kincaid's goal for CDs 18 and 30 only makes sense when considered together with the overall strategy evident from his testimony, the resulting map, and the coordinated and choreographed messaging campaign about

the map: disingenuously praise the majority minority status of various districts that they knew in fact reduced minority opportunities.

These redistricting choices were not narrowly tailored nor was there any compelling interest in drawing the districts this way. Black voters have long had the opportunity to elect candidates of choice under the former configurations of CD 18 and 30. The map's supporters were solely focused on whether the districts were Black CVAP majority, rather than the ability for Black voters to elect candidates of choice, and thus the Black CVAP majorities in CDs 18 and 30 served only as talking points to cover the fact that the map reduces Black electoral opportunities by two districts.  That does not satisfy strict scrutiny.

2.    **CDs 9 and 35 are unconstitutional racial gerrymanders.**

CD 9 and CD 35 are both unconstitutional racial gerrymanders. There is no explanation for the districts otherwise. CD 9 was redrawn from being 25.6% Hispanic CVAP and electing Black and Hispanic candidates of choice under the 2021 map to a 50.3% Hispanic CVAP district that will elect Anglo candidates of choice. Brooks Ex. 258; Brooks Ex. 265. CD 35 was redrawn from a 46% Hispanic CVAP district that elects Hispanic candidates of choice to 51.5% under the 2025 configuration. *Id.* While both CD 9 and CD 35 are now the barest majority Hispanic CVAP, the districts do not provide Latino voters within those districts an opportunity to elect candidates of choice. Brooks Ex. 265 (Plan C2333 CVAP Report); Brooks Ex. 269 (Barreto Report); Trial Tr. AM (October 4, 2025) 64:5-65:3 (Dr. Barreto).

The drawing of CDs 9 and 35 as majority HCVAP cannot be explained by partisan motivations. The map drawer added high density Hispanic and Democratic areas to CD 35 rather than the more Republican, but less Hispanic areas. Trial Tr. AM (October 4, 2025) 110:5-112:1 (Dr. Barreto). In CD 9, the inclusion of Hispanic voting precincts or voting tabulation districts

(VTDs) to reach a racial target is even more pronounced. Trial Tr. AM (October 4, 2025) 86:3-93:22 (Dr. Barreto). Instead of including heavily Republican voting precincts into CD 9 that were on the border of the district and would have achieved stated partisan goals of maximizing Republican performance, the map drawer included a 52% Democrat area that is 54% Hispanic CVAP and lowered partisan performance. There are possible alternative mapping configurations for CD 9 and CD 35 that would see the Republican candidate receive a larger vote share than under the enacted Plan C2333 but would be less Hispanic. *See* Trial Tr. AM (October 10, 2025) 79:10-110:8; 127:8-131:3 (Dr. Trende); Brooks Ex. 520-522.

Dr. Barreto also generated 332,000 simulated maps in the counties that contain both CDs 9 and 35 and programmed the code to draw districts matching President Trump's vote share in both CD 9 (Houston area) and CD 35 (San Antonio area) to control for the State's purported partisan goals. The code was blind to racial data and revealed that ***zero*** of the 332,000 maps yielded Republican districts that were Hispanic CVAP majority. Ex. 269 (Barreto Report). Statistically, this means it is impossible that CDs 9 and 35 became Hispanic CVAP majority without the 50%+1 race target being the overriding criterion.

Likewise, Dr. Trende confirmed on cross examination that CDs 9 and 35 could have been made more Republican—including flipping the results for at least one contest from Democratic to Republican—with just minor changes along the borders of those districts. For CD 35, this could have happened by trading precincts with neighboring *Democratic* CD 20—including a Republican precinct on the border of the two districts. But doing so would have dropped their Hispanic CVAPs below a majority—robbing them of the talking point they shouted to anyone who would listen. It is implausible that Mr. Kincaid—having spent a month on the map with hours devoted to these two districts—could have simply missed obvious opportunities to improve the districts'

Republican performance while complying with his stated criteria (and in fact reducing city splits) if he didn't have the overriding racial goal in mind. It is not believable that he carefully landed at these racial percentages by the happenstance of a goal maximize Republican performance and just missed these obvious partisan choices that would have prevented the racial outcome he achieved.

Legislators' statements during the redistricting process reveal their intent to create majority Hispanic CVAP districts. Chairman Hunter agreed that CD 9 was purposefully changed to be over 50% Hispanic CVAP. Def. Ex. 1289 at 868:1-6. When asked about the specific changes CD 35, including that CD 35 was purposefully changed from a "coalition" district to a district with Hispanic CVAP above 50%, Hunter responded "51.57%." Brooks Ex. 309 at 861:8- 865:24.

The State has no legitimate or compelling interest in pursuing these racial targets.   Both district configurations do what map drawers did in 2011, split large cohesive Hispanic areas that do not support Republican candidates and add in all or parts of Anglo counties while taking care to maintain HCVAP levels of 50%. *See Perez v. Abbott,* 390 F. Supp. 3d 803, 815 (W.D. Tex. 2019).  Legislators never asserted that these districts were drawn with a majority Hispanic CVAP to comply with the Voting Rights Act.  Creating a *façade* Latino opportunity district does not satisfy strict scrutiny.

### 3.        CD 27 is an unconstitutional racial gerrymander.

CD 27 is an unconstitutional racial gerrymander. Despite the district being a multiracial majority district that was strongly Republican preforming, CD 27 saw some of the greatest change under Plan C2333. Brooks Ex. 258 (Plan C2193 CVAP Report); Brooks Ex. 265 (Plan C2333 CVAP Report.) CD 27, which included all of majority-Hispanic Nueces County now only includes a small section of Corpus Christi, while adding Anglo-majority, rural areas. Brooks Ex. 267. Under Plan C2333, CD 27 switches from a combined Latino and Black CVAP majority to Anglo majority

and preforms *worse* for Republican candidates. Brooks Ex. 262 (Plan C2193 2024 Election Report); Brooks Ex. 268 (Plan C2333 Election Report). Thus, stated partisan goals cannot explain the reconfiguration of CD 27 given that the new CD 27 is not above "60 percent Trump." *See* Brooks Ex. 268 (Plan C2333 Election Report); Trial Tr. AM (October 7, 2025) 143:12-16 (Adam Kincaid) (saying that he had to keep CD 27 above 60 percent Trump).

While CD 27 loses Hispanic population and gains Anglo population, the Latino population it does include is taken from CD34. The removal of Latino voters from CD34, on the basis of their race, further emphasizes the racial gerrymander at work in CD27 and serves to reduce the ability of Latinos in CD34 to elect their preferred candidate.  The intentional racial targeting in these districts without any compelling interest that would justify such drawing is a violation of the Fourteenth and Fifteenth Amendments.

### 4.    The Legislature Did Not Act in Good Faith

The presumption of good faith that is normally applied to legislatures cannot withstand the overwhelming evidence demonstrating Defendants' subordination of purported rationales and contradictory testimony about their redistricting priorities. *See Miller*, 515 U.S. at 915. Although courts should assume that the legislature had a legitimate, nonracial motivation whenever the evidence can "plausibly support multiple conclusions," *Alexander*, 602 U.S. at 10, the record here plainly demonstrates that the Legislature was motivated by race. No other conclusions can be drawn from the Governor's proclamation to address the DOJ's concern with multiracial coalition districts and the specific congressional districts targeted by said letter. Public statements by Governor Abbott, Chairman Hunter, Rep. Spiller, and Rep. Peirson (to name a few) focused on the need to remove multiracial coalition districts from the map and replace those districts with single race majority districts. *See* Def. Ex. 1289 at 862:11-17, 868:1-6; Brooks Ex. 309 at 861:8-

865:24. Even though partisanship was mentioned during legislative debates, discussions of partisanship came hand in hand with discussions of race. Brooks Ex. 316-T (August 20, 2025, House Floor) 28:17-29:1. In a colloquy between Rep. Spiller and Chairman Hunter, Rep. Spiller stated:

> "Okay so, now in Texas, one of the reasons that we're doing this now is that, we feel compelled to because of the *Pettteway* case and the ruling in the *Petteway* case as it related—as it relates to these coalititon districts, correct? Rep Hunter: Well, I think it's a combination, Mr. Spiller. I think you have a U.S. Supreme Court, *Rucho*. You have a 5th Circuit, *Petteway*. The combination of both of those cases are involved in this map."

Brooks Ex. 316-T (August 20, House Floor) 77:14-23.

Importantly, the legislature did not need to invoke race in order to redistrict. Adam Kincaid, the map drawer, told Texas and DOJ officials as much. Trial Tr. PM (October 7, 2025) 57:20-58:2; 82:13-20 (Adam Kincaid). During the 2021 process, Senator Huffman never discussed race and stated that the congressional map was drawn blind to race. Trial Tr. AM (October 1, 2025) 12:6-8 (Senator Alvarado). It is the state that argues that the Court should not believe the Governor and legislator's open statements of their racial purposes. In effect they ask this Court to apply a presumption of *bad faith* to them. But this isn't a "heads we win tails you lose" rule.

The record is also littered with conflicting testimony regarding the persons involved in redistricting. Texas legislators, including the House Redistricting Chairman, could not say with any certainty or confidence who drew the congressional plan. *See* Trial Tr. AM (October 1, 2025) 124:2-11 (Senator Alvarado); Trial Tr. PM (October 9, 2025) 125:7-10 (Rep. Vasut). Senator King was less than forthcoming during redistricting as to whether Adam Kincaid drew the 2025 congressional map, HB 4's (the 2025 congressional map), and bill author Chairman Hunter did not know if Adam Kincaid was involved, Brooks Ex. 309 (Aug. 1, 2025, House Committee on Congressional Redistricting) 88:7- 89:17. No fewer than five times did Chairman Hunter state that

he did not have any involvement with Adam Kincaid, that he did not know if Adam Kincaid was involved in drawing the map and he could not say who was involved with drawing the map. *See* Brooks Ex. 309-T (Transcript of August 1, 2025, House Special Redistricting Committee) 88:7-17; 88:24-89:5; 127:7-128:8 ("Rep. Hunter: Todd Hunter has no knowledge of Adam Kincaid involved in this."); Trial Tr. PM (October 1, 2025) 58:5-16 (Rep. Moody).

There was also no reason to redistrict. Texas had just defended the congressional map before this Court as drawn without the consideration of race and no ruling had invalidated the 2021 plan for race-based redistricting. ECF No. X; Brooks Ex. 255 (AG Letter). Evidence during the preliminary injunction hearing revealed that legislators' and the map drawers' purported goals conflict with the configuration of CDs 9 and 35. Trial Tr. AM (October 4, 2025) 110:12-112:1; 122:19-123:1.[8]

Defendants ask this Court to close their eyes and ears to the legislative record; public statements by Governor Abbott, Assistant Attorney Dhillon, and legislators regarding the dismantling of multiracial coalition districts; the invocation of *Petteway* throughout the redistricting process; and the VTDs comprising the challenged districts and conclude that partisanship alone was the reason for redistricting. Defendants argue that the Governor and the Legislature used the DOJ letter and *Petteway* to cover up for their partisan goals. But such an assertion boils down to finding legislative good faith through the Legislature acting in bad faith.

---

[8] It is also worth noting that State Defendants produced no real contrary evidence beyond the choreographed testimony and naked denials of Adam Kincaid. Despite Kincaid's assertion of drawing the map race blind, State Defendants produced none of the underlying data or information to corroborate or establish that the map was, in fact, drawn blind to race. Indeed, State did not provide any of Kincaid's data to their own experts to review or analyze to confirm or corroborate their opinions regarding partisan motivations. The striking omission of the actual data Kincaid used in drawing the map, coupled with his bare assertion that race played no role, is in stark contrast to the actual population movement in C2333 and satisfaction of specific racial CVAP targets.

And that cannot be. No one had to invoke multiracial coalition districts to partisan gerrymander. Brooks Ex. 312 (Aug. 7, 2025, Senate Committee on Congressional Redistricting) 204:22- 205:1; 208:8-208:24 (Legislators acknowledged that the DOJ letter unnecessarily confused the redistricting process). Indeed, the map drawer himself basically testified that the DOJ letter and invocation of race unnecessarily complicated redistricting process—likely because he realized that the injection of race by Governor Abbott and legislators would result in this Court finding a racial gerrymander. *See* Trial Tr. PM (October 7, 2025) 89:3-8 (Adam Kincaid). As such, this Court should find that that CDs 9, 18, 27, 30, 33, and 35 are racial gerrymanders.

## III.    Plaintiffs will be irreparably harmed if Plan C2333 is not enjoined.

Plaintiffs will be substantially disenfranchised and face irreparable harm if Plan C2333 is not enjoined. The right to be free from intentional racial discrimination in voting is a core constitutional right under law and the United States Constitution. *See* U.S. Const. amend. XIV § 1, amend. XV § 1. Every election that continues under a deficient map is one that harms Plaintiffs. *See Garza v. Cty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990). This is because elections occur at a single point in time, and with each election Plaintiff's harm compounds. *See League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."). The State's adoption of Plan C2333 violates that right. Plan C2333 intentionally minimizes the ability of minority voters to elect their preferred candidates, at least in part because Governor Abbott and members of the Legislature disagree with the candidates elected by Latino and Black voters. Plan C2333 sorts plaintiffs on the basis of their race without any compelling governmental interest. The harm Plaintiffs will suffer by having to vote under a map that is constitutionally deficient cannot be undone through monetary relief. *See Deerfield*, 661 F.2d at 338 (holding that where a fundamental right is "either threatened

or in fact being impaired . . . mandates a finding of irreparable injury."). As such, the harm to Plaintiffs is irreparable. *Deerfield*, 661 F.2d at 338.

## IV.     The balance of the equities weights in favor of an injunction.

The public interest and balancing of the equities strongly favor injunctive relief. While the balancing of the equities and public interest consideration are two different factors, the "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs have demonstrated that Plan C233 is an unconstitutional enactment and as such the public interest is served in preventing its implementation. *See Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation."). Defendants lack any legitimate interest in enforcing a redistricting plan that violates Plaintiffs' constitutional rights to be free from discrimination. *See BST Holdings*, No. 21-60845 at *19 (finding that any interest that may be asserted in enforcing laws that infringe on constitutional freedoms is "illegitimate.").

The 2021 redistricting plan -- a plan that is properly apportioned --  will be used *this year* for a statewide election and the special election for CD 18.  Trial Tr. (October 8, 2025, PM) 17:12-18:2 (Adkins). Counties are not yet modifying their precinct boundaries to conform to the newly enacted map. Although the filing period for precinct chairs opened in September, the period remains open until December 8, 2025, allowing adequate time for any necessary changes to voting precincts if plan C2333 is enjoined. Trial Tr. (October 8, 2025, PM) 16:22-17:7 (Adkins).

Relying on the evidence offered here and the applicable evidence from the recent trial, the Court should preliminarily enjoin Plan C2333, in full. In doing so, the Court will enjoin the bill's repealer provision and necessarily revive Plan C2193, the 2021 plan. The State is currently

implementing Plan C2193, having done so twice before, and can continue to implement C2193. Falling back to this option preserves the status quo, remedies the egregious constitutional violations in Plan C2333, and ensures that the State suffers no prejudice by continuing to utilize the plan it crafted and *is currently using*, including for the November 2024 elections. An injunction also affords this Court the opportunity to rule on Plan C2193 in due course after the trial in May-June and likely with sufficient time before the November 2026 election.

Defendants' minimal burden is overcome by the overwhelming public interest in enjoining C2333 and protecting Plaintiffs' constitutional rights. *See De Leon*, 975 F. Supp. 2d at 665 ("[A] preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest."); *see also*, *e.g.*, *G & V Lounge, Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[T]he . . . cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest.").

## CONCLUSION

For the foregoing reasons and the based on the evidentiary record, this Court should grant Plaintiffs' motion for a Preliminary Injunction.

October 17, 2025                              Respectfully submitted,

/s/ Nina Perales                             /s/ Chad W. Dunn
Nina Perales                                 Chad W. Dunn (Tex. Bar No. 24036507)
Julia Longoria                               Brazil & Dunn
Sabrina Rodriguez                            4407 Bee Caves Road
Mexican American Legal Defense and           Building 1, Ste. 111
Educational Fund (MALDEF)                    Austin, TX 78746
110 Broadway Street, Suite 300               (512) 717-9822

San Antonio, TX 78205
 (210) 224-5476
Fax: (210) 224-5382
nperales@maldef.org
jlongoria@maldef.org
srodriguez@maldef.org

Ernest I. Herrera
Mexican American Legal Defense and
Educational Fund (MALDEF)
634 S. Spring Street, 9th Floor
Los Angeles, CA 90014
 (210) 629-2512
eherrera@maldef.org

Khrystan N. Policarpio*
Mexican American Legal Defense and
Educational Fund (MALDEF)
1512 14th Street
Sacramento, CA 95814
 (916) 444-3031
kpolicarpio@maldef.org

*Admitted pro hac vice

Counsel for LULAC Plaintiffs

SOMMERMAN, MCCAFFITY, QUESADA
& GEISLER, L.L.P.

/s/ Sean J. McCaffity
Sean J. McCaffity
State Bar No. 24013122
George (Tex) Quesada
State Bar No. 16427750
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219-4461
214-720-0720 (Telephone)
214-720-0184                    (Facsimile)
SMcCaffity@textrial.com
Quesada@textrial.com

Attorneys for MALC Plaintiffs

chad@brazilanddunn.com

/s/ Mark P. Gaber
Mark P. Gaber*
Mark P. Gaber PLLC
P.O. Box 34481
Washington, DC 20043
(715) 482-4066
mark@markgaber.com

Jesse Gaines* (Tex. Bar. No. 07570800)
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com

Molly E. Danahy*
P.O. Box 51
Helena, MT 59624
(406) 616-3058
danahy.molly@gmail.com

Sonni Waknin*
6417 N Figueroa St. # 10
Los Angeles, CA 90042
732-610-1283
sonniwaknin@gmail.com

*Admitted pro hac vice

Counsel for Brooks Plaintiffs

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record on October 17, 2025, via the Court's CM/ECF system.

*/s/ Sonni Waknin*