

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LULAC, et. al., | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| **Alexander Green, and Jasmine** | § | |
| **Crockett** | § | |
| | § | |
| **Plaintiff-Intervenors** | § | |
| | § | **Case No.: 3-21-CV-00259-DCG-JES-JVB** |
| | § | **[Lead Case]** |
| v. | § | |
| | § | |
| **GREG ABBOTT, in his official capacity** | § | |
| **As Governor of Texas, et. al.** | § | |
| | § | |
| *Defendants* | § | |

**PLAINTIFF-INTERVENORS' BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION**

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff-Intervenors Congresswoman Jasmine Crockett and Congressman Alexander Green respectfully submit this Closing Brief demonstrating that Texas Congressional Plan C2333 constitutes intentional racial discrimination in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the Voting Rights Act. **The evidence establishes beyond dispute that Plan C2333 systematically dismantles minority opportunity districts through a rushed, discriminatory process designed to dilute African American and Latino voting strength.** This mid-decade redistricting, prompted by a federal directive explicitly targeting minority districts, represents the culmination of Texas's long history of redistricting discrimination.

Dr. Richard Murray, who has followed congressional redistricting for more than fifty years, testified unequivocally: "This was the most extreme case of, seems to me, hiding the ball, from the affected populations across the state." 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 86, Lines 14-25. The map reduces Black opportunity districts from three to two and eliminates Harris County's only performing Hispanic opportunity district for the first time in three decades. Murray concluded:

the map is "intentionally racially discriminatory against minorities." 2-PI-Exhibit-B-Analysis-of-Texas-Plan-C2333-Murray.docx.pdf.[1][2]

**The Arlington Heights factors overwhelmingly establish discriminatory intent.** First, Texas has "found itself in court every redistricting cycle, and each time it has lost." *Perez v. Abbott*, 253 F. Supp. 3d 864, 957 (W.D. Tex. 2017). Second, the specific sequence of events—a federal directive targeting minority districts, followed by a five-day legislative process excluding minority input—demonstrates intentional discrimination. Third, the Legislature departed radically from normal procedures, adopting the map with no public hearings, same-day notice, and physical detention of minority legislators. Fourth, the map abandons traditional redistricting principles in ways that correlate directly with race. Fifth, the legislative record reveals explicit awareness of discriminatory consequences and deliberate disregard for minority voting rights.

**This Court should find that Plan C2333 violates the Constitution and the Voting Rights Act.**

## II. STATEMENT OF FACTS

### A. Texas's Unbroken Pattern of Redistricting Discrimination

Texas has maintained a persistent pattern of racial discrimination in redistricting since the adoption of the Voting Rights Act in 1965. *Perez v. Abbott*, 253 F. Supp. 3d at 957. Dr. Murray testified that "Ive been following Congressional Redistricting for more than 50 years. This was the most extreme case of, seems to me, hiding the ball, from the affected populations across the state." 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 86, Lines 14-25.

The D.C. Circuit found that "the way in which the State had carved apart the Congressional districts being represented by African-American members of Congress could be explained only by an intent to discriminate against minority voters in the districts." *Texas v. United States*, 887 F. Supp. 2d 133, 160-61 (D.D.C. 2012).

### B. The Trump DOJ Letter Targeting Minority Districts

On July 7, 2025, the Trump Administration's Department of Justice sent a letter to Governor Abbott and Attorney General Paxton declaring that Congressional Districts TX-09, TX-18, TX-29, and TX-33 "constitute unconstitutional, coalition districts" that must be "rectified immediately."

Rough Draft - Day 1 - 01October25 AM Session.pdf, p. 16-17, Line 25, Lines 1-7. **Significantly, all four districts targeted by the DOJ letter were minority opportunity districts.** Rough Draft - Day 1 - 01October25 AM Session.pdf, p.17, Lines 8--12.

When asked "what is your understanding of why the governor put this on the call?" Moody testified: "Because of the letter that came from the DOJ dated July 7th, 2025." Rough Draft - Day 1 - 01October25 AM Session.pdf, p.20, Lines 20--23.

The DOJ letter made no mention of partisan considerations—it focused solely on race, demanding that Texas eliminate districts where minority voters could elect candidates of their choice. MOTION FOR PRELIMINARY INJUNCTION v.2.pdf, Pg. 5-6.

**C. The Five-Day Legislative Process**

The Legislature enacted Plan C2333 in an unprecedented five days with no meaningful public input. Senator West testified: "Senator, as you know, I think this C2333 was introduced in the House on Monday. And less than five days later its actually law. Have you seen that occur with any other redistricting bill?" "No." Rough Draft - Day 2 - 02October25 AM Session.pdf, p.37, lines 12--17.

The timeline was as follows:

- **August 18**: Bill unveiled at 5:00 p.m. committee meeting and adopted same day with no hearing

- **August 20**: House floor consideration with 2nd and 3rd readings same day; Senate first reading same day

- **August 21**: Senate Committee passage with no changes

- **August 22**: Senate adoption with 2nd and 3rd readings same day

Rough Draft - Day 3 - 03October25 AM Session.pdf, p. 149, l. 17--19 ; MOTION FOR PRELIMINARY INJUNCTION v.2.pdf, Pg. 4.

**D. Exclusion and Detention of Minority Legislators**

Minority legislators were systematically excluded from the process. Senator West testified: "Well, again, there was no -- how do I put this? Deliberate steps taken by the authors of the bill to reach out to us. Wherein some of the prior sessions there had been instances where we would be asked our input into this. But not this time around. Not at all." Rough Draft - Day 2 - 02October25 AM Session.pdf, p. 40, l. 15--23. **Democratic legislators, including members of the Texas Legislative Black Caucus, were physically detained.** State Representative Nicole Collier was held in custody for 48 hours after quorum had already been established. MOTION FOR PRELIMINARY INJUNCTION v.2., Pg. 6.

**E. Systematic Dismantling of Minority Opportunity Districts**

Dr. Murray's analysis demonstrates the devastating impact on minority voters:

**Houston Area (Districts 9, 18, 29):** "Well, in the Houston metropolitan area, this total dismantling of District 9, in my opinion, an obviously Black Opportunity District, and the merger of most of its voters into 18 is intentional discrimination. Here you had two Opportunity Districts, one existing for 50 years and the second for 20, and they're merged into one district. And the voters in 9, a lot of them were shifted to districts -- that ones that didn't go into 18 were shifted to districts where they went from having the opportunity to elect, to the 35 or 40 percent who were not moved to 18, were put in districts where they have zero opportunity to elect a Congress member." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 15, Lines 11-22.

**The Ninth District:** "99 of the Black voters in the existing 9th District are removed mostly to the 18th District." 2-PI-Exhibit-B-Analysis-of-Texas-Plan-C2333-Murray.docx.pdf. "The new district retaining the number 9 is an entirely new territory in eastern Harris County and Liberty County where Black voters have no influence." *Id.*

**The Twenty-Ninth District:** Plan C2333 dismantles CD29, "a performing Latino opportunity district since 1992." *Id.* "The C2333 plan will result in the Hispanic population in Harris County, totaling 2,034,700 in 2020, having, for the first time in three decades, no good opportunity to elect a candidate of their choice to Congress." *Id.*

**Dallas-Fort Worth Area (Districts 30, 32, 33):** All three African American Congresspersons were drawn out of their districts. 10-03-25 LULAC v Abbott 3 Rough Draft.pdf,

Pg. 24, lines 8-20. Congresswoman Crockett's residence was moved from District 30 to District 33. 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 104, lines 10-18.

**Statewide Impact:** "The Anglo population in Texas is less than 40 percent of the state total, yet Anglo voters elect candidates they support in 25 of the states 38 congressional districts. That total would increase to as many as 30 seats if C2333 is used for the 2026 elections." 2-PI-Exhibit-B-Analysis-of-Texas-Plan-C2333-Murray.

## F. Admission of Knowledge and Disregard

Map drawer Adam Kincaid admitted he knew the racial character of the districts but chose not to turn on racial shading. When asked whether Senator King ever asked if maps were "drawn based on race," Kincaid testified: "He did at one point ask me if I was using race data, and I said no." Rough Draft - Day 6 - 07October25 AM Session.pdf, trialdate 07October25, p. 59, l. 24--p. 60, l. 2.

Yet Kincaid also admitted: "Do you ever become aware of racial data after you draw a map?" "Yes." Rough Draft - Day 6 - 07October25 AM Session.pdf, p. 53, l. 9--11.

### III. LEGAL STANDARD

To establish intentional discrimination under the Fourteenth Amendment, courts apply the framework set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), examining: (a) historical background of discrimination; (b) the specific sequence of events leading to the challenged decision; (c) departures from normal procedural sequence; (d) substantive departures from neutral principles; and (e) legislative history and contemporary statements. *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016).

"As courts recognized in *Merrill v. Milligan*, 142 S. Ct. 879 (2022), courts employ the framework established in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977), to determine intentional discrimination. This inquiry involves a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." MOTION FOR PRELIMINARY INJUNCTION v.2, Pg. 5.

Under *Miller v. Johnson*, 515 U.S. 900 (1995), plaintiffs must show that race was the predominant motive overriding traditional redistricting principles. "The plaintiffs evidentiary burden is to show, either through circumstantial evidence of a districts shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislatures decision to place a significant number of voters within or without a particular district." MOTION FOR PRELIMINARY INJUNCTION v.2, Pg. 11.

## IV. ARGUMENT

### A. Historical Background Establishes Pattern of Discrimination

**Texas has an unbroken record of redistricting discrimination spanning six decades.** As this Court previously found, "Texas has found itself in court every redistricting cycle, and each time it has lost." *Perez v. Abbott*, 253 F. Supp. 3d at 957. This losing streak includes violations found in every redistricting cycle since the adoption of the Voting Rights Act: *LULAC v. Perry*, 548 U.S. 399 (2006); *Bush v. Vera*, 517 U.S. 952 (1996); *Upham v. Seamon*, 456 U.S. 37 (1982); *White v. Weiser*, 412 U.S. 783 (1973); *White v. Regester*, 412 U.S. 755 (1973).

Dr. Murray, who has studied Texas redistricting since the 1970s, testified that Plan C2333 represents "the most extreme case" of discrimination he has witnessed in over fifty years. 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 86, Lines 14-25. **This historical context is "a critical circumstantial factor under Arlington Heights."** *Texas v. United States*, 887 F. Supp. 2d at 161.

The D.C. Circuit specifically found that Texas has systematically targeted minority elected officials: "the way in which the State had carved apart the Congressional districts being represented by African-American members of Congress could be explained only by an intent to discriminate against minority voters in the districts." *Id.* at 160-61.

**Plan C2333 repeats this discriminatory pattern with precision.** All three African American Congresspersons were drawn out of their districts. When asked whether "all three were moved out," the witness responded: "Yes, sir." And: "Do you think that is significant?" "Very significant, because, why would you move a Representative out of their district that theyre serving? That was just so unfair and so wrong." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 24, lines 8-20.[1]

This historical background provides overwhelming circumstantial evidence that Plan C2333 was enacted with discriminatory intent.

**B. The Sequence of Events Demonstrates Discriminatory Purpose**

**The specific sequence of events leading to Plan C2333's enactment establishes clear discriminatory intent.** The process began with the Trump DOJ's July 7, 2025 letter explicitly demanding that Texas eliminate minority opportunity districts. The letter declared that Congressional Districts TX-09, TX-18, TX-29, and TX-33 "constitute unconstitutional, coalition districts" that must be "rectified immediately." Rough Draft - Day 1 - 01October25 AM Session.pdf, p. 16-17.

**Significantly, the DOJ letter made no mention of partisan considerations—it focused solely on race.** "This letter will serve as a formal notice by the Department of Justice to the State of Texas of serious concerns regarding the legality of four of Texass congressional districts... we urge the State of Texas to rectify these race-based considerations from these specific districts." *Id.*

Moody testified that the DOJ letter was the direct cause of the special session: "And so based on this, what is your understanding of why the governor put this on the call?" "Because of the letter that came from the DOJ dated July 7th, 2025." Rough Draft - Day 1 - 01October25 AM Session.pdf, p.20, Lines 20--23.

**All four districts targeted by the DOJ were dramatically changed in the new map.** "And well get into more of the details, but those four districts that are listed, were those four districts dramatically changed in the new map that passed?" "Yes." 10-01-25 LULAC 1 Rough Draft.pdf, p.13, Lines 1--4. The sequence of federal prompting followed immediately by adoption of a map that systematically dismantles minority opportunity supports an inference of discriminatory intent. *Arlington Heights*, 429 U.S. at 267.

**C. Dramatic Departures from Normal Procedural Sequence**

**The procedural departures in adopting Plan C2333 were extraordinary, unprecedented, and served no legitimate purpose other than to prevent minority input and entrench racial outcomes.**

### 1. Unprecedented Five-Day Timeline

Senator West testified: "Senator, as you know, I think this C2333 was introduced in the House on Monday. And less than five days later its actually law. Have you seen that occur with any other redistricting bill?" "No." Rough Draft - Day 2 - 02October25 AM Session.pdf, p.37, lines 12--17.

**This five-day timeline was a dramatic departure from normal practice.** For comparison, the 2021 redistricting plan (C2193) "was first read on September 30 and adopted approximately three weeks later." MOTION FOR PRELIMINARY INJUNCTION, Pg. 4. The compressed timeline "prevented meaningful analysis or public input." *Id.*

### 2. Elimination of Public Hearings

"Did the committee take any public testimony?" "We had a public hearing. We did not take public testimony." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, p.109, lines 13--14. Representative Gervin-Hawkins testified: "I know it wasnt [legitimate]. And you can tell by the lack of answers from the gentleman who led the charge, Representative Hunter. And throughout the whole process, it was not legitimate. The lack of must be notice. The lack of public hearing. The lack of maps. All of those things. The lack of answers." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p.42, lines 9-14.

### 3. Same-Day Notice and Adoption

"And was this special meeting of the committee, did you give notice of it on the same day as the meeting?" "Yes." Rough Draft - Day 3 - 03October25 AM Session.pdf, p. 149, l. 9--11. "The first I heard about these seven additional districts that were added was at the meeting itself." Rough Draft - Day 3 - 03October25 AM Session.pdf, p. 151, l. 7--9.

### 4. Physical Detention of Minority Legislators

### 5. Systematic Exclusion of Minority Input

Senator West testified about the failure to consult minority legislators: "Well, again, there was no -- how do I put this? Deliberate steps taken by the authors of the bill to reach out to us. Wherein some of the prior sessions there had been instances where we would be asked our input

into this. But not this time around. Not at all." Rough Draft - Day 2 - 02October25 AM Session.pdf, p. 40, l. 15--23. When asked whether anyone reached out to discuss potential vote dilution: "And so did anyone reach out to you to discuss the potential vote dilution that might have occurred in this bill?" "No." *Id.* at p. 40, l. 9--12. "Did they reach out to the Black caucus in the Senate?" "No." *Id.* at p. 40, l. 13--14.

Representative Gervin-Hawkins testified: "It was obvious he didnt take it serious. Not only not because of what he said on the floor, but throughout this whole process. Not engaging us in any meaningful or rich conversations. It was just, This is gonna happen and we dont care what you-all think." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 13, l. 13-17. **These procedural departures parallel those found discriminatory in prior Texas redistricting cases and demonstrate conscious efforts to prevent minority communities from effectively opposing the discriminatory plan.** *Texas v. United States*, 887 F. Supp. 2d at 160-61.

**D. Substantive Departures from Neutral Redistricting Principles**

**Plan C2333 represents massive substantive departures from traditional redistricting principles, with these departures correlating directly with race rather than neutral factors.**

**1. Abandonment of Core Preservation**

The Supreme Court has recognized that "preserving the cores of prior districts constitutes a legitimate redistricting principle." *Karcher v. Daggett*, 462 U.S. 725 (1983); *Bush v. Vera*, 517 U.S. 952 (1996). **Plan C2333 completely abandons this principle for minority districts while preserving it for Anglo-dominated districts.**

Dr. Murray testified: "the existing District 9 is like exactly the equal population required. Almost all its population, 98 percent, were moved or pushed out and the larger number was pushed to the north and west into existing District 18." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 92, l. 9--13. Expert analysis concluded: "And did you observe if -- in the changes made to 9 and 18, if there was or was not compliance with redistricting principles?" "In my opinion, the changes made to District 9 and 18 do not conform to traditional redistricting principles. These changes were wholly unnecessary." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 96, l. 13--18. **The extent of population movement was extraordinary:** "So specifically in District 30, of the District 6, 78

percent of that district was moved. From District 25, 76 percent of that district was moved. And District 32, 96.6 percent of that district was moved. And in District 33, 92 percent was moved." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 31, l. 7--13.

### 2. Selective Application Favoring Anglo Incumbents

**Core preservation was applied selectively to benefit Anglo incumbents while dismantling minority districts.** Dr. Murray testified: "The changes made the district even safer for the White voters and the incumbent, whos Anglo. So there are four districts in metropolitan Houston area that were Democratic voters had been successful lately in electing Congress members. This one, the one White-controlled district, was not significantly modified in contrast to the three minority-controlled districts." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 101, l. 17--23. "Does your analysis of what occurred with Congressional District 7, compared to what occurred with the 9th, 18th, and 29th support your decision or opinion that the map in the Harris County area was drawn with a racist -- or motivated by potential racist [intent]?" "It does. Voters of color, particularly Black and Latino voters, were treated very different in the metropolitan Houston area than were White voters." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 102, l. 2--9.

### 3. Fracturing of Minority Communities

**Rather than keeping communities of interest together, Plan C2333 fractures longstanding minority communities.** *Bush v. Vera*, 517 U.S. at 977 (recognizing that maintaining communities of interest is a traditional districting principle).

Dr. Murray testified: "Well, again, for 50 years a well-defined, cohesive Black community, Acres Homes, has been in the 18th District. And, you know, that district was removed, along with independence Heights." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, p. 29, l. 21--25. "You get specific instances, like you have a fast-growing Black and Hispanic population moving into north Brazoria County. The map Enacted by the Legislature in 2021 recognized that and moved some of those voters into Congressman Al Greens Ninth District. That was totally wiped out by the new map that put those growing minority populations in north Brazoria County in a district that runs deep in East Texas to the Louisiana border. These voters now have been effectively neutered. They have no connection to the heavily rural areas in far East Texas. Theyre part of the metropolitan Houston." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 113, l. 15--25.

**4. Discriminatory Targeting of Minority Incumbents**

While the Supreme Court has acknowledged that avoiding contests between incumbents is a legitimate objective, Plan C2333 specifically targets minority incumbents while protecting Anglo representatives. *Abbott v. Perez*, 585 U.S. 579, 616 (2018).

"Was Congresswoman Jasmine Crockett harmed by the reconfiguration of Congressional District 30?" "Yes. Her residence was moved out of the district and, you know, she was given a substantial number of new voters that, particularly in Tarrant County, that she had never represented. Downtown Dallas, which, you know, is a major economic engine, that historically has been in the 30th District, was moved out, along with her residence." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 119, l. 2--9. **All three African American Congresspersons were drawn out of their districts—an unprecedented targeting that mirrors discriminatory patterns from prior redistricting cycles.** *Texas v. United States*, 887 F. Supp. 2d at 160-61.

**5. Disproportionate Impact Demonstrates Intentional Discrimination**

Dr. Murray testified: "Well, you have two districts under the existing plan, District 7 in Houston, and District 37 in Travis County, that are dominated by White voters but have elected, lately, Democrats. Those two Democratic districts were not targeted by this redraw, as opposed to five districts that have substantial minority opportunity that were targeted. So two White Democratic districts are passed over, not substantially changed, but you have huge changes in District 9, District 18, district 29, District 33 in Dallas, District 32, where theres significant minority impact. So thats how you get your five new members." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 32, Lines 1-15.[1] **This selective targeting of minority districts while preserving Anglo-controlled districts—including Anglo-controlled Democratic districts—demonstrates that race, not partisanship, was the predominant factor.**

**E. Legislative History and Contemporary Statements Reveal Discriminatory Intent**

**The legislative record provides overwhelming evidence of discriminatory intent through both direct statements and deliberate concealment.**

**1. The DOJ Letter as Direct Evidence**

The Trump DOJ letter provides direct evidence that race was the predominant motivating factor. The letter "explicitly demanded elimination of districts based on their racial composition and minority electoral success, not based on partisan considerations or neutral redistricting principles."

Moody testified that the DOJ letter explicitly focused on race: "This letter will serve as a formal notice by the Department of Justice to the State of Texas of serious concerns regarding the legality of four of Texass congressional districts... we urge the State of Texas to rectify these race-based considerations from these specific districts." Rough Draft - Day 1 - 01October25 AM Session.pdf, p. 16-17, Line 25, Lines 1-7.

## 2. Legislators' Awareness of Racial Consequences

**Minority legislators repeatedly warned that Plan C2333 would eliminate minority opportunity districts, and those warnings were ignored—demonstrating intent to harm minority voters.**

Representative Gervin-Hawkins testified: "First of all, CD9, which is held by -- currently held by Congressman Al Green, has been an African American seat for decades. So Representative Hunter is well aware of what that district represents. Also, when you look at the other district, again, these are historically African American districts. And so no doubt I felt that there was an attack. When you take two districts that, for decades, have been African American-leaning and you change them, that tells me youre focusing on race. And that, to me, was a problem." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 18, Lines 8-19. Senator West testified: "And I think thats -- thats a scary, in my opinion, racist way of hiding behind partisanship." 10-02-25 LULAC v Abbott Rough.pdf, Pg. 67, Lines 20-25.

When asked about Chairman Hunter's response to concerns about minority opportunity districts: "Did you think his response indicated to you, one way or the other, whether he probably took seriously the concerns of minority legislators about the vote dilution that was being discussed on the floor?" "It was obvious he didnt take it serious. Not only not because of what he said on the floor, but throughout this whole process. Not engaging us in any meaningful or rich conversations. It was just, This is gonna happen and we dont care what you-all think." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 13, Lines 9--17.

## 3. Explicit Racial Discussions on the Floor

**The legislative record demonstrates explicit awareness of racial impacts.** "Now, you note that Dean Thompson asked first about what the district is and she says, well, lets talk about District 18. What did you do in 18? And how would you characterize the response from Chairman Hunter? Was it about lines and neighbors and communities of interest, or race?" "I mean, the references to CVAP and Black and Hispanic CVAP." 10-01-25 LULAC 1 Rough Draft.pdf, Pg. 76 Line 25 - Pg.77 Line 5.

"He acknowledges the racial change that was made. Calls it an effect. And then also talks about politics?" "Correct. It was all kind of wrapped together." 10-01-25 LULAC 1 Rough Draft.pdf, Pg. 53, Lines 21-23.

"Or it could be to show that there was a demonstration of an intentional racial target that was actually hit by the leadership in any particular district?" "Well, certainly. I mean, the racial numbers that were broken down in committee and on the floor were very precise." 10-01-25 LULAC 1 Rough Draft.pdf, Pg. 108, Lines 9-13.

## 4. Secret Map-Drawing Process

**Legislative leaders admitted that the map was drawn in secrecy by unnamed parties and refused to answer basic questions about its drafting.** "Mr. Kincaid, did you draw all or most of the Texas 2025 enacted congressional map?" "I drew most of it, yes." Rough Draft - Day 6 - 07October25 AM Session.pdf, Pg. 29, Lines 22-24. Yet when asked about the use of racial data, Kincaid testified: "Did Senator King ever ask you whether maps you were working on were drawn based on race?" "He did at one point ask me if I was using race data, and I said no." Rough Draft - Day 6 - 07October25 AM Session.pdf, p. 59, l. 24--p. 60, l. 2.

However, **Kincaid also admitted awareness of racial data:** "Do you ever become aware of racial data after you draw a map?" "Yes." Rough Draft - Day 6 - 07October25 AM Session.pdf, p. 53, l. 9--11. **This admission establishes that Kincaid knew the racial character of the districts he was drawing, even while claiming not to use racial data—demonstrating deliberate concealment of discriminatory intent.**

## 5. Dr. Murray's Expert Conclusion

Dr. Murray, with over fifty years of experience analyzing redistricting, concluded unequivocally: "Ive been following Congressional Redistricting for more than 50 years. This was the most extreme case of, seems to me, hiding the ball, from the affected populations across the state... no ones opinion in Texas was really solicited about this map. It was an inside job pushed from Washington, DC. And in my experience of Congressional Redistricting, this was absolutely unprecedented. Minimal opportunity for public influence. Maximum opportunity for outside political pressure, as reflected in the letter from the Department of Justice, I think, dated July 7th." 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 86, Line 20 - Pg. 87, Line 25. Murray's final conclusion: the map is "intentionally racially discriminatory against minorities." 2-PI-Exhibit-B-Analysis-of-Texas-Plan-C2333-Murray

### F. The Collective Evidence Establishes Intentional Discrimination

**Under *Arlington Heights*, this Court must consider the cumulative weight of the evidence.** *Arlington Heights*, 429 U.S. at 266. Here, every factor points unmistakably toward intentional discrimination:

1. **Historical Background**: Texas's unbroken record of redistricting discrimination spanning six decades
2. **Sequence of Events**: Federal directive targeting minority districts, followed by rushed adoption
3. **Procedural Departures**: Five-day timeline, no public hearings, detention of minority legislators
4. **Substantive Departures**: Abandonment of traditional principles correlating with race
5. **Legislative History**: Explicit awareness of discriminatory impact and deliberate disregard

**The evidence is overwhelming and undisputed.** As this Court found in *Perez v. Abbott*, such evidence establishes intentional discrimination. 253 F. Supp. 3d at 957-59.

### G. Racial Gerrymandering Under Shaw and Miller

**Plan C2333 constitutes impermissible racial gerrymandering because race was the predominant factor motivating the redistricting, overriding traditional redistricting principles.** In *Shaw v. Reno*, 509 U.S. 630 (1993), the Supreme Court held that district lines drawn primarily on racial grounds violate the Equal Protection Clause and are subject to strict scrutiny.

Under *Miller v. Johnson*, 515 U.S. 900 (1995), plaintiffs must demonstrate that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," and that "traditional race-neutral districting principles...were subordinated to racial objectives."

**The DOJ letter provides direct evidence that race predominated over all other considerations.** The July 7, 2025 Trump Administration DOJ letter explicitly targeted four districts—TX-09, TX-18, TX-29, and TX-33—based solely on their racial composition, declaring them "unconstitutional, coalition districts" that must be "rectified immediately." *Rough Draft - Day 1 - 01October25 AM Session.pdf*, p. 17, Lines 3-7. When Moody was asked "what is your understanding of why the governor put this on the call?" he testified: "Because of the letter that came from the DOJ dated July 7th, 2025." *Rough Draft - Day 1 - 01October25 AM Session.pdf*, p.20, Lines 20-23. The letter contained no partisan analysis, no discussion of traditional redistricting principles, and no consideration of communities of interest—it focused exclusively on race: "This letter will serve as a formal notice by the Department of Justice to the State of Texas of serious concerns regarding the legality of four of Texass congressional districts...we urge the State of Texas to rectify these race-based considerations from these specific districts." *Rough Draft - Day 1 - 01October25 AM Session.pdf*, p. 16-17, Line 25, Lines 1-7.

**The Legislature's response to the DOJ letter demonstrates that racial considerations drove every aspect of Plan C2333.** Throughout the process, "from the very first time a bill was laid out in the House Committee, through the floor debate, Chairman Hunter talked consistently about the racial characteristics of districts." *10-09-25 LULAC v Abbott 8 Rough Draft.pdf*, p. 126, lines 14-19. When asked how to characterize Chairman Hunter's responses, the witness testified they were not "about lines and neighbors and communities of interest, or race?" but rather "the references to CVAP and Black and Hispanic CVAP." *10-01-25 LULAC 1 Rough Draft.pdf*, Pg. 76 Line 25 - Pg.77 Line 5. "He acknowledges the racial change that was made. Calls it an effect. And then also talks about politics?" "Correct. It was all kind of wrapped together." *10-01-25 LULAC 1 Rough Draft.pdf*, Pg. 53, Lines 21-23.

**The precision with which the Legislature hit racial targets demonstrates predominance.** Representative Turner stated on the record that "CD9 just to close the loop, was also purposefully changed so that the Hispanic CVAP would be over 50 percent now," to which

Chairman Hunter responded: "50.41 percent. Correct." This level of precision—targeting 50.41% Hispanic CVAP—can only be explained by racial predominance. One witness testified: "it could be to show that there was a demonstration of an intentional racial target that was actually hit by the leadership in any particular district...the racial numbers that were broken down in committee and on the floor were very precise." *10-01-25 LULAC 1 Rough Draft.pdf*, Pg. 108, Lines 9-13.

      **Expert statistical analysis confirms that race, not partisanship or neutral principles, drove the map.** Dr. Barreto testified that his computational analysis demonstrated "there were racial objectives" that "cannot be explained by partisanship." When Dr. Barreto's computer drew one million maps holding partisan objectives constant, he found "there was a zero possibility of drawing a majority Black district through the simulation draws. It would have to be something that was purposefully done." *Rough Draft - Day 4 - 04October25.pdf*, p.77, lines 5-9. When asked "In other words, President Trump could have gotten his five more Republican districts without the racial effects that are in C2333?" Dr. Barreto responded: "Correct. Absolutely." *Rough Draft - Day 4 - 04October25.pdf*, p.122, lines 8-11. The State's map constituted "a statistical outlier." *Rough Draft - Day 4 - 04October25.pdf*, p.84, lines 9-17.

      **Dr. Duchin's visual analysis reveals racial sorting that follows residential segregation patterns.** Her dot density plots showed "visually clear patterns of sorting by race. You can tell that because the lines cut in a way that, on the opposite side of the lines, you see different colors. Thats what it looks like to follow demographic lines that are created by residential segregation and to sort districts by race." *Rough Draft - Day 5 - 06October25 AM Session.pdf*, p.48, lines 8-16. She identified District 24 as particularly egregious: "it seems to be drawn in a way that the lines encompass a lot of White population and carefully exclude non-White population around it." *Rough Draft - Day 5 - 06October25 AM Session.pdf*, p.35, lines 4-11.

      **The systematic movement of minority voters demonstrates racial predominance.** Dr. Murray testified that "in the Houston metropolitan area, this total dismantling of District 9, in my opinion, an obviously Black Opportunity District, and the merger of most of its voters into 18 is intentional discrimination." *10-06-25 LULAC v Abbott 5 Rough Draft.pdf*, Pg. 15, Lines 11-22. "The existing District 9 is like exactly the equal population required. Almost all its population, 98 percent, were moved or pushed out." *10-03-25 LULAC v Abbott 3 Rough Draft.pdf*, p. 92, l. 9-13. In Congressional Districts 30, 25, 32, and 33, between 76% and 96.6% of district populations were

moved. *10-03-25 LULAC v Abbott 3 Rough Draft.pdf*, p. 31, l. 7-13. This wholesale reconstruction cannot be explained by population shifts or neutral redistricting principles.

**Traditional redistricting principles were subordinated to racial objectives.** The changes to Districts 9 and 18 "do not conform to traditional redistricting principles. These changes were wholly unnecessary." *10-03-25 LULAC v Abbott 3 Rough Draft.pdf*, p. 96, l. 13-18. Longstanding communities were fractured: "for 50 years a well-defined, cohesive Black community, Acres Homes, has been in the 18th District" but was removed under Plan C2333. *10-06-25 LULAC v Abbott 5 Rough Draft.pdf*, p. 29, l. 21-25.

**The Legislature's treatment of Anglo-controlled districts versus minority districts reveals racial predominance.** Dr. Murray testified: "you have two districts under the existing plan, District 7 in Houston, and District 37 in Travis County, that are dominated by White voters but have elected, lately, Democrats. Those two Democratic districts were not targeted by this redraw, as opposed to five districts that have substantial minority opportunity that were targeted." *10-06-25 LULAC v Abbott 5 Rough Draft.pdf*, Pg. 32, Lines 1-15. "Voters of color, particularly Black and Latino voters, were treated very different in the metropolitan Houston area than were White voters." *10-03-25 LULAC v Abbott 3 Rough Draft.pdf*, p. 102, l. 2-9. **This selective preservation of Anglo-controlled districts while dismantling minority opportunity districts demonstrates that race, not neutral principles, drove the redistricting decisions.**

### H. The Presumption of Good Faith Is Rebutted

**While legislatures are ordinarily entitled to a presumption of good faith, that presumption is overcome by substantial evidence of discriminatory intent.** In *Abbott v. Perez*, 585 U.S. 579 (2018), the Supreme Court recognized that state legislatures are entitled to a presumption that they have acted in good faith, but this presumption can be rebutted by evidence demonstrating discriminatory purpose. Here, the presumption is not merely rebutted—it is obliterated by the involvement of legislators who were previously found to have engaged in intentional discrimination, the rushed and secretive process, and overwhelming evidence of bad faith.

**Chairman Todd Hunter, who shepherded Plan C2333 through the House, was the central figure in prior redistricting cycles in which federal courts found intentional**

discrimination against minority voters. In *Perez v. Abbott*, 253 F. Supp. 3d 864, 957 (W.D. Tex. 2017), this Court found that "Texas has found itself in court every redistricting cycle, and each time it has lost." The D.C. Circuit found that during cycles when Hunter led redistricting efforts, "the way in which the State had carved apart the Congressional districts being represented by African-American members of Congress could be explained only by an intent to discriminate against minority voters in the districts." *Texas v. United States*, 887 F. Supp. 2d 133, 160-61 (D.D.C. 2012).

**Chairman Hunter's conduct in 2025 mirrored his discriminatory behavior from prior cycles.** Representative Gervin-Hawkins testified: "It was obvious he didnt take it serious. Not only not because of what he said on the floor, but throughout this whole process. Not engaging us in any meaningful or rich conversations. It was just, This is gonna happen and we dont care what you-all think." *10-03-25 LULAC v Abbott 3 Rough Draft.pdf*, Pg. 13, Lines 9-17. When asked whether Chairman Hunter directly answered questions "about whether or not its important to keep Minority Opportunity Districts?" the witness testified: "No, he didnt." *10-03-25 LULAC v Abbott 3 Rough Draft.pdf*, Pg. 14, Line 24-Pg. 15, Line 2. **This pattern of refusing to engage with minority concerns while providing precise racial statistics demonstrates awareness of harm combined with deliberate indifference—the hallmark of bad faith.**

**The legislative record demonstrates systematic bad faith throughout the process.** When asked "as a legislator who observed this whole process, do you think that this bill was adopted in good faith?" the witness testified: "I know it wasnt. And you can tell by the lack of answers from the gentleman who led the charge, Representative Hunter. And throughout the whole process, it was not legitimate. The lack of must be notice. The lack of public hearing. The lack of maps. All of those things. The lack of answers." *10-03-25 LULAC v Abbott 3 Rough Draft.pdf*, p.42, lines 9-14.

**The secret map-drawing process evidences bad faith.** When asked "do you know that...Mr. Kincaid drew this map?" one witness could not confirm: "My understanding—do I actually know that definitively, personally, still, no." Yet Mr. Kincaid testified: "Mr. Kincaid, did you draw all or most of the Texas 2025 enacted congressional map?" "I drew most of it, yes." *Rough Draft - Day 6 - 07October25 AM Session.pdf*, Pg. 29, Lines 22-24. **This deliberate concealment of the map-drawer's identity demonstrates bad faith.**

**The Legislature's inconsistent statements about racial data usage demonstrate bad faith.** Kincaid testified that "Senator King" asked "if I was using race data...I said no." *Rough Draft - Day 6 - 07October25 AM Session.pdf*, p. 59, l. 24-p. 60, l. 2. Yet Kincaid also admitted: "Do you ever become aware of racial data after you draw a map?" "Yes." *Rough Draft - Day 6 - 07October25 AM Session.pdf*, p. 53, l. 9-11. **This contradiction—claiming not to use racial data while demonstrating detailed knowledge of racial demographics and hitting precise racial targets—evidences bad faith.**

**The systematic exclusion of minority legislators destroys any presumption of good faith.** Senator West testified: "there was no—how do I put this? Deliberate steps taken by the authors of the bill to reach out to us. Wherein some of the prior sessions there had been instances where we would be asked our input into this. But not this time around. Not at all." *Rough Draft - Day 2 - 02October25 AM Session.pdf*, p. 40, l. 15-23. When asked if anyone discussed potential vote dilution with him, Senator West testified: "No." "Did they reach out to the Black caucus in the Senate?" "No." *Rough Draft - Day 2 - 02October25 AM Session.pdf*, p. 40, l. 9-14. **This use of state power to physically constrain minority legislators while ramming through a discriminatory redistricting plan represents bad faith of the highest order.**

**The Legislature's deliberate ignorance of discriminatory impact demonstrates bad faith.** One witness testified: "I think for the most part their decision was made, and the plea that she just made...is something that legislators not only devalue, but are willing to intentionally destroy a district thats been performing and allowing for that representation." *10-02-25 LULAC v Abbott Rough.pdf*, p. 47, l. 8-15. Senator West testified: "And I think thats -- thats a scary, in my opinion, racist way of hiding behind partisanship." *10-02-25 LULAC v Abbott Rough.pdf*, Pg. 67, Lines 20-25.

**Dr. Murray's expert testimony establishes that the Legislature acted with knowledge of discriminatory consequences.** Murray testified that the Legislature was "not that dense"—they knew exactly what they were doing. "Its a lot easier to figure out what the effect is. And the effect is to significantly dilute minority voting influence in Congressional elections in Texas...Effect, based on historic and recent elections, thats a hell of a lot easier to measure. And the effects are discriminatory, in my opinion." *10-04-25 LULAC v Abbott 4 Rough Draft.pdf*, Pg. 91, Lines 5-12. **The Legislature's decision to proceed despite this knowledge demonstrates bad faith.**

**The involvement of Chairman Hunter, who was found by federal courts to have engaged in intentional discrimination in prior redistricting cycles, combined with the secret drafting process, physical detention of minority legislators, systematic exclusion of minority input, and willful blindness to discriminatory impact, rebuts any presumption of good faith.** When legislators who have been found by federal courts to have engaged in intentional discrimination once again lead a redistricting effort that systematically targets minority opportunity districts, no presumption of good faith applies. Representative Gervin-Hawkins testified: "Well, first of all, I thought it was offensive. The reality is this. Were making decisions that impact people. We owe it to the people to make sure theyre well informed. So when one of my colleagues are acting like Cavalier about it, like it wasnt important, and then with so many things happening that I know was out of the bounds of how we should be operating, it was concerning to me of how he acted. And I thought it was totally inappropriate." *10-03-25 LULAC v Abbott 3 Rough Draft.pdf*, p. 13, l. 1-8. **The evidence establishes not merely a lack of good faith, but active bad faith designed to achieve discriminatory objectives while creating plausible deniability through claims of partisan motivation.**

## V. CONCLUSION

For the foregoing reasons, Plaintiff-Intervenors respectfully request that this Court find that Texas Congressional Plan C2333 violates the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the Voting Rights Act. The evidence establishes beyond any reasonable dispute that Plan C2333 was enacted with discriminatory intent and systematically dilutes minority voting strength through classic cracking and packing techniques.

**This Court should enter judgment for Plaintiff-Intervenors and order appropriate relief, including enjoining the use of Plan C2333 and requiring the adoption of a remedial plan that restores meaningful electoral opportunity for African American and Latino voters in Texas.**

Respectfully submitted,

*/s/ Gary Bledsoe*
**GARY BLEDSOE**
State Bar No. 02476500

The Bledsoe Law Firm PLLC

6633 Highway 290 East, Suite 208

Austin, Texas 78723-1157

Telephone: (512) 322-9992

gbledsoe@thebledsoelawfirm.com

*/s/ Robert S. Notzon*

**ROBERT S. NOTZON**

1502 West Avenue

Austin, Texas 78701

robert@notzonlaw.com

*Attorneys for Plaintiff-Intervenors Alexander Green and Jasmine Crockett*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all counsel of record in accordance with the Federal Rules of Civil Procedure on this 17th day of October, 2025.

*/s/ Gary Bledsoe*

Gary Bledsoe