# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br>                     *Plaintiffs,*<br><br>ALEXANDER GREEN, *et al.*,<br>                     *Plaintiff-Intervenors,*<br><br>V.<br><br>GREG ABBOTT, *et al.*,<br>                     *Defendants.* | 3:21-cv-00259-DCG-JES-JVB<br>[Lead Case]<br><br>&<br><br>All Consolidated Cases |

---

**STATE DEFENDANTS' PROPOSED FINDINGS OF FACT**

---

TABLE OF CONTENTS

I.      Democratic-Majority States Have Engaged In Partisan Gerrymandering For Decades. ................................................................................................................1

II.     The Texas legislature drew its 2021 Congressional map blind to race. ...............5

III.    President Trump insisted that Texas redraw a new Congressional map to maintain a Republican majority in the U.S. House. ............................................................ 6

IV.     The Legislature held public hearings before introducing a new Congressional map. ......10

V.      The Texas Legislature Redistricted the Congressional Map to Maximize Republican Partisan Advantage. ..........................................................................................15

VI.     Early on, Texas Democrats Acknowledged the 2025 Congressional Map's Partisan Motivation. ........................................................................................................18

VII.    Texas House Democrats Broke Quorum to Prevent the Partisan Congressional Map from Passing. .....................................................................................................19

VIII.   House Democrats Returned to Texas and Claimed the Congressional Map Was Racially Gerrymandered. ...................................................................................23

IX.     The 2025 Map Achieves its Partisan Goals and Redresses Plaintiffs' Grievances with the 2021 Map. ...........................................................................................25

X.      The 2026 Elections Are Being Prepared Using the 2025 Map. .........................27

XI.     Evidence of Motivations for the Challenged Districts ......................................32

        A.  Direct Evidence.......................................................................................32

            1.  Testimony Concerning the Line-Drawing Process .................................33

            2.  Testimony Concerning Legislative Motive .......................................... 50

            3.  The DOJ Letter...............................................................................53

            4.  Gubernatorial Statements ................................................................56

        B.  Circumstantial Evidence .........................................................................57

            1.  The Redistricting Process ................................................................57

            2.  Expert Opinion...............................................................................65

                a)  Plaintiffs' Experts .....................................................................65

                    1)  Dr. Barreto ......................................................................... 66

                    2)  Dr. Duchin .........................................................................76

                    3)  Mr. Ely .............................................................................81

                b)  State's Experts .........................................................................85

                    1)  Dr. Trende.........................................................................85

ii

         2)  Dr. Lewis ....................................................................................... 91
XII.    Evidence of Racial Effect .............................................................. 93
    A.  Plaintiffs' Experts .................................................................. 93
        1.  Dr. Ansolabehere ............................................................ 93
        2.  Dr. Barreto ..................................................................... 94
        3.  Dr. Collingwood ............................................................. 95
        4.  Dr. Duchin ..................................................................... 95
        5.  Dr. Murray ..................................................................... 96
    B.  Defendants' Experts ............................................................. 98
        1.  Dr. Trende ..................................................................... 98
        2.  Dr. Lewis ....................................................................... 98
Certificate of Service ............................................................................ 100

<u>[PROPOSED] FINDINGS OF FACT</u>

**I. Democratic-Majority States Have Engaged In Partisan Gerrymandering For Decades.**

1.  Many Democrat-controlled states have used aggressive gerrymanders to systematically dilute Republican votes and give Democrats a strategic advantage in the upcoming race for control of the U.S. House. *See* Defs.' Ex. 1439 (noting that New York, Nevada, Wisconsin, Illinois, and Maryland are some of the most gerrymandered states in the union).

2.  The 1980 Congressional elections in California resulted in California sending 22 Democrats and 21 Republicans to Washington, D.C. to serve as United States Representatives. Defs.' Ex. 1389, Thomas E. Ladd, Statistics of the Presidential and Congressional Election of November 4, 1980, at 6–9 (Apr. 15, 1981), https://clerk.house.gov/member_info/electionInfo/1980election.pdf.

3.  The following year, U.S. Rep. Phillip Burton joined forces with the California legislature to draw a new Congressional map that included several more Democratic seats. Defs.' Ex. 1390, Wallace Turner, *California G.O.P. Seeks to Void Redistricting*, NY TIMES (Sept. 22, 1981), https://www.nytimes.com/1981/09/22/us/california-gop-seeks-to-void-redistricting.html.

4.  Republican vote share decreased by 3% in 1982. Defs.' Ex. 1391, Thomas E. Ladd, Statistics of the Congressional Election of November 2, 1982, at 6–9 (May 5, 1983), https://clerk.house.gov/member_info/electionInfo/1982election.pdf.

5.  But under the new Congressional map, in 1982, Democrats secured an eleven-seat majority in the California delegation. Defs.' Ex. 1392, Thomas E. Ladd, Statistics of the Presidential and Congressional Election of November 6, 1984, at 3–6 (May 1, 1985), https://clerk.house.gov/member_info/electionInfo/1984election.pdf.

6.  In the 1984 Congressional elections, Democrats secured a nine-seat majority in the California delegation. Defs.' Ex. 1392, Thomas E. Ladd, Statistics of the Presidential

and Congressional Election of November 6, 1984, at 5–8 (May 1, 1985), https://clerk.house.gov/member_info/electionInfo/1984election.pdf.

7.    In 2002, Democrats in Maryland followed California's lead and sought to gerrymander their Congressional districts so that Republicans would lose their seats. Defs.' Ex. 1395, Daniel LeDuc & Jo Becker, *Md. Democrats Redraw Morella's District*, WASH. PO. (Jan. 24, 2002), https://www.washingtonpost.com/archive/local/2002/01/25/md-democrats-redraw-morellas-district/276e7cee-6962-4e96-9140-4b83084fea20/.

8.    Their partisan gerrymandering efforts resulted in a three to one advantage to Democrats, an increase in Republican vote share notwithstanding. Defs.' Ex. 1396, Jeff Trandahl, Statistics of the Congressional Election of November 5, 2002, at 19 (May 1, 2003), https://clerk.house.gov/member_info/electionInfo/2002election.pdf; Defs.' Ex. 1393, Jeff Trandahl, Statistics of the Presidential and Congressional Election of November 7, 2000, at 26–27 (Jun. 21, 2001), https://clerk.house.gov/member_info/electionInfo/2000election.pdf.

9.    A Democratic majority in the 146th Georgia General Assembly drew a Congressional map intended to increase the number of Democrats elected to the Georgia delegation. Defs.' Ex. 1394, Thomas B. Edsall, *Georgia Democrats May Gain Up to 4 Seats in House*, WASH. PO. (Sep. 28, 2001), https://www.washingtonpost.com/archive/politics/2001/09/29/georgia-democrats-may-gain-up-to-4-seats-in-house/e489f9c3-4fe6-406b-804e-c985a671362c/.

10.   As a result of Democrats' partisan gerrymandering efforts in Georgia, in the 2004 Congressional elections, Democrats gained a majority in the Congressional delegation even though almost double the number of votes were cast for Republicans as were cast for Democrats. *See* Defs.' Ex. 1397, Jeff Trandahl, Statistics of the Presidential and Congressional Election of November 2, 2004, at 16 (Jun. 27, 2004) https://clerk.house.gov/member_info/electionInfo/2004election.pdf (showing

Republican candidates received 1,819,817 votes in congressional elections compared to Democratic candidates receiving 1,140,869).

11. These actions have sparked a partisan gerrymandering fight throughout the country. *See* Defs.' Ex. 1325, Texas Senate Chambers Aug. 22, 2025, (Part III) Tr. at 41:9–10.

12. For example, in Massachusetts, voters have cast one third of their ballots for Republican candidates in the previous seven presidential elections. Defs.' Ex. 1448, Massachusetts, 270 TO WIN (2025), https://www.270towin.com/states/massachusetts (compiling the popular vote percentages for the seven most recent Presidential elections); *see* Defs.' Ex. 1414, Kevin F. McCumber, Statistics of the Presidential and Congressional Election, November 5, 2024, at 33 (Mar. 10, 2025).

13. But the last time Massachusetts elected a Republican to Congress was 1994. Defs.' Ex. 1444, Chris Lisinski, *The Trump administration suggested Mass. is gerrymandered. Is that true?*, WBUR (Sep. 2, 2025), https://www.wbur.org/news/2025/09/02/massach usetts-trump-gerrymander-texas-california-democrats.

14. In the 2018 Congressional election, New Jersey voters cast 38% of their ballots for Republicans; only one Republican and 11 Democrats were elected. Defs.' Ex. 1401, Cheryl L. Johnson, Statistics of the Congressional Election, November 6, 2018, at 29–31 (Feb. 28, 2019), https://clerk.house.gov/member_info/electionInfo/2018/statistic s2018.pdf.

15. Democrats hold triple the number of Congressional seats in New Jersey as Republicans hold, even though Republicans are within approximately four percentage points of a majority of the statewide popular vote. Defs.' Ex. 1414, Kevin F. McCumber, Statistics of the Presidential and Congressional Election, November 5, 2024, at 43–44 (Mar. 10, 2025) https://clerk.house.gov/member_info/electionInfo/2024/statistics2024.pdf (showing Democrats lead Republicans 52.97%–45.79% in the popular vote but hold 75% of New Jersey's U.S. House seats).

16.    In the 2024 Congressional elections, New York Republicans won only 7 seats with approximately 42.5% of the vote, and Democrats won 19 seats with approximately 57.2% of the vote. Defs.' Ex. 1414, Kevin F. McCumber, Statistics of the Presidential and Congressional Election, November 5, 2024, at 46–51 (Mar. 10, 2025), https://clerk.house.gov/member_info/electionInfo/2024/statistics2024.pdf; Defs.' Ex. 1461, *Directory of Representatives*, U.S. HOUSE OF REPRESENTATIVES, https://www.house.gov/representatives#state-tennessee.

17.    In the 2024 Congressional elections, California Democrats won 43 of California's 52 seats, even though approximately 40% of voters voted for Republican candidates. Defs.' Ex. 1414, Kevin F. McCumber, Statistics of the Presidential and Congressional Election, November 5, 2024, at 6–10 (Mar. 10, 2025), https://clerk.house.gov/member_info/electionInfo/2024/statistics2024.pdf.

18.    Illinois also gerrymandered its Congressional map to favor Democrats. Defs.' Ex. 1405, Nathaniel Rakich & Tony Chow, *Illinois May Be The Worst Democratic Gerrymander In The Country*, FIVETHIRTYEIGHT (May 6, 2022), https://fivethirtyeight.com/videos/illinois-may-be-the-worst-democratic-gerrymander-in-the-country/.

19.    Just three (or 17.6%) of Illinois's 17 congressional representatives are Republican, although the state's overall population votes for Republican candidates 40% of the time. Defs.' Ex. 1462, United States House of Representatives Directory of Representatives, https://www.house.gov/representatives; Defs.' Ex. 1413, *Illinois President Results: Harris Wins*, NBC NEWS (Nov. 5, 2024), https://www.nbcnews.com/politics/2024-elections/illinois-president-results (showing 43.5% of Illinois voters backed Trump in the 2024 presidential election).

20.    In Illinois's 2024 Congressional elections, Democrats were elected to 82% of the seats despite Republicans winning approximately 47% of the votes. Defs.' Ex. 1406, *Compare* Cheryl L. Johnson, Statistics of the Congressional Election, November 8, 2022, at 15–16 (Feb. 28, 2023), https://clerk.house.gov/member_info/electionInfo/2022/statistics

2022.pdf *with* Kevin F. McCumber, Statistics of the Presidential and Congressional Election, Nov. 5, 2024, at 21–23 (Mar. 10, 2025), https://clerk.house.gov/member_info/electionInfo/2024/statistics2024.pdf; Defs.' Ex. 1412, *Kamala Harris wins Illinois*, POLITICO (last updated Sept. 16, 2025), https://www.politico.com/2024-election/results/illinois ; Defs.' Ex. 1452, *Illinois Senators, Representatives, and Congressional District Maps*, GOV. TRACK, https://www.govtrack.us/congress/members/IL#representatives.

21.     New Mexico and Connecticut have Congressional delegations comprised entirely of Democrats even though the Republican presidential candidate garnered a considerable percentage of the vote in each of those states during the 2020 (44%, 39%, respectively) and 2024 (46%, 42%) elections. Defs.' Ex. 1448, *Massachusetts Presidential Election Voting History*, 270 TO WIN, https://www.270towin.com/states/massachusetts; *see* Defs.' Ex. 1414, Kevin F. McCumber, Statistics of the Presidential and Congressional Election from Official Sources for the Election of November 5, 2024, at 13, 46 (Mar. 10, 2025).

22.     The Texas legislature responded to these Democratic partisan gerrymanders by redrawing its own Congressional map in 2025 to favor Republicans. Defs.' Ex. 1440, Benjamin Siegel, *Redistricting arms race: These are the states in addition to Texas and California where parties could redraw maps*, ABC NEWS (Aug. 21, 2025), https://abcnews.go.com/Politics/redistricting-arms-race-states-addition-texas-california-parties/story?id=124855541 (listing California, Ohio, Indiana, Missouri, Florida, Illinois, New York, and Maryland as the likely next states to engage in partisan redistricting before the 2026 election).

## II. The Texas legislature drew its 2021 Congressional map blind to race.

23.     The United States Census Bureau announced on April 26, 2021, that Texas would gain two Congressional seats based on the 2020 census results. Defs.' Ex. 1403, *2020 Census: Apportionment of the U.S. House of Representatives*, U.S. CENSUS BUREAU (Apr. 26,

2021), https://www.census.gov/library/visualizations/2021/dec/2020-apportionment
-map.html (announcing that Texas will gain two seats in the U.S. House of
Representatives per the 2020 Census).

24.    The Census Bureau released the population and demographic data necessary to draw
the new Congressional map on August 12, 2021. Defs.' Ex. 1404, *Decennial Census* P.L.
94-171 *Redistricting Data*, U.S. CENSUS BUREAU (Aug. 12, 2021),
https://www.census.gov/

programs-surveys/decennial-census/about/rdo/summary-files.html.

25.    On September 7, 2021, Governor Greg Abbott called a third special session of the Texas
Legislature, set to begin on September 20, 2021, to draw new Congressional, Texas
House, Texas Senate, and Texas State Board of Education maps based on the 2020
census data. Defs.' Ex. 385, *Governor Abbott Announces Third Special Session Date and
Agenda*, (Sep. 7, 2021), https://gov.texas.gov/news/post/governor-abbott-announces-
third-special-session-date-and-agenda.

26.    The Legislature drew the map without looking at racial data to give Republicans an
advantage and was reviewed by outside counsel for compliance with the Voting Rights
Act. Trial Jun. 7, 2025 Tr. PM at 02:51:16–02:51:44.

27.    Governor Abbott signed the new Congressional map into law on October 25, 2021.
ECF 1200-21, S. J. of Tex. 87th Lege., 3d C.S. 359 (Oct. 18, 2021).

## III. President Trump insisted that Texas redraw a new Congressional map to maintain a Republican majority in the U.S. House.

28.    On June 9, 2025, the New York Times reported that President Trump was pushing
Texas to redraw its Congressional map to increase the number of Republican seats in
Congress. Defs.' Ex. 1415, J. David Goodman & Shane Goldmacher, *White House Pushes
Texas to Redistrict, Hoping to Blunt Democratic Gains,* NY TIMES (June 9, 2025),
https://www.nytimes.com/2025/06/09/us/politics/trump-texas-redistricting.html.

29. On June 11, 2025, the Texas Tribune reported that President Trump was pressuring Governor Abbott to call a special session to redistrict the Congressional map to increase the likelihood that Republicans could flip Democratic seats in the 2026 midterm election. Defs.' Ex. 1418, Owen Dahlkamp & Natalia Contreras, *Trump Aides Want Texas to Redraw Its Congressional Maps to Boost the GOP. What Would that Mean?,* TEX. TRIB. (Jun. 11, 2025), https://www.texastribune.org/2025/06/11/texas-congress-midcycle-redistricting-trump-republicans/.

30. Historically speaking, the president's political party tends to lose House seats during mid-term elections. Defs.' Ex. 1445, David A. Lieb et al., *What to know about the Congressional trend kick-started by Trump*, ABC NEWS (Sept. 17, 2025), https://abcnews.go.com/US/wireStory/congressional-redistricting-trend-kick-started-trump-125655627 ; *see* Defs.' Ex. 1436, *The other states threatening action as Texas and California's redistricting feud intensifies*, PBS News (Aug. 14, 2025), https://www.pbs.org/newshour/politics/the-other-states-threatening-action-as-texas-and-californias-redistricting-feud-intensifies; Defs.' Ex. 1376, Steven Dial, (@StevenDialFox4),X, (Aug. 14, 2025, 8:09 PM), https://x.com/StevenDialFox4/status/1956085870001594630.

31. If Democrats flip four seats in the 2026 midterm election, then they will hold a majority of the seats in Congress. Defs.' Ex. 1463, *Member Data, Party Breakdown*, U.S. HOUSE OF REPRESENTATIVES PRESS GALLERY, https://pressgallery.house.gov/member-data/party-breakdown; Defs.' Ex. 1442 at 1, *Explainer: Understanding the mid-decade redistricting push in Texas*, HARVARD KENNEDY SCH. (Aug. 22, 2025), https://www.hks.harvard.edu/faculty-research/policy-topics/politics/explainer-understanding-mid-decade-redistricting-push-texas.

32. On June 23, 2025, Governor Abbott proclaimed a special session. Defs.' Ex. 1420, Press Release, Governor Greg Abott, "Governor Abbott Announces Special Session Date,

Initial Agenda" (Jun. 23, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-special-session-date-initial-agenda.

33.    The United States Department of Justice ("DOJ") published a letter threatening to sue Texas if it did not redraw its Congressional map; the letter suggested that Texas had drawn race-based coalition districts to comply with the Voting Rights Act. Brooks Ex. 253, Letter from Harmeet Dhillon, Assistant Attorney General of the Department of Justice Civil Rights Division, to Greg Abbott, Governor of Texas, and Ken Paxton, Attorney General of Texas (July 7, 2025).

34.    Governor Abbott repudiated DOJ's suggestion that Texas drew any electoral maps on the basis of race. Defs.' Ex. 1326, Letter from Ken Paxton, Texas Attorney General, to Harmeet Dhillon, Department of Justice Assistant Attorney General (July 11, 2025), at 2.

35.    On July 15, 2025, President Trump stated that he wanted Texas to flip five Congressional seats from Democratic to Republican. Defs.' Ex. 1352, *Press Gaggle: Donald Trump Speaks to Reporters Before Marine One Departure—July 15, 2025*, ROLL CALL (July 15, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-press-gaggle-before-marine-one-departure-july-15-2025/(providing a transcript of President Trump's conversation with reporter Ed O'Keefe detailing his desire to flip five Texas House Seats).

36.    On July 9, 2025, Governor Abbott announced that the upcoming special session agenda would include redistricting the Texas Congressional map. Defs.' Ex. 1422, Press Release, Governor Greg Abbott, "Governor Abbott Announces Special Session Agenda" (July 9th, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-special-session-agenda.

37.    On July 15, 2025, President Trump stated that he wanted Texas to flip five Congressional seats from Democratic to Republican. Defs.' Ex. 1352, *Press Gaggle: Donald Trump Speaks to Reporters Before Marine One Departure—July 15, 2025*, ROLL

CALL ( July 15, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-
press-gaggle-before-marine-one-departure-july-15-2025/(providing a transcript of
President Trump's conversation with reporter Ed O'Keefe detailing his desire to flip
five Texas House Seats).

38.    Realistically, the rank-and-file nature of party politics often means that "[w]hen Donald
Trump says jump, Republicans simply ask how high [.]" Ex. 1433, *Leader Jeffries:
"Republicans are Desperately Trying to Cling on to Power,"* CONGRESSMAN HAKEEM
JEFFRIES, https://jeffries.house.gov/2025/08/07/leader-jeffries-republicans-are-
desperately-trying-to-cling-on-to-power/.

39.    In response to President Trump's demand for up to five more Republican Congressional
seats in Texas, California governor Gavin Newson publicly vowed to advance retaliatory
gerrymandering efforts in California. *See* Defs.' Ex. 1438, *Governor Newson on
introduction of 'Election Rigging Response Act' Legislative Package*, Governor Gavin
Newsom (Aug. 18, 2025), https://www.gov.ca.gov/2025/08/18/governor-newsom-on-
introduction-of-election-rigging-response-act-legislative-package/; Defs.' Ex. 1375,
Gavin Newsom, (@GovPressOffice), X, (Aug. 11, 2025 12:15 PM),
https://x.com/GovPressOffice/status/1954954780339826936; *see also* Defs.' Ex. 1371,
The Redistricting Network, (@RedistrictNet), X, (Aug. 4, 2025 2:45 PM),
https://x.com/RedistrictNet/status/1952455855825170432 (discussing California
Democrats' commitment to partisan gerrymandering). These efforts would expand
Congressional Democrats' already-wide margin in the state. Defs.' Ex. 1461, *Directory
of Representatives*, United States House of Representatives,
https://www.house.gov/representatives#state-tennessee.

40.    Other Democratic leaders similarly declared their intentions to pursue state
Congressional redistricting plans that will affirmatively nullify Trump's attempt to
acquire more Republican seats regardless of whether Texas's 2025 map succeeds. Defs.'
Ex. 1436, *The other states threatening action as Texas and California's redistricting feud*

*intensifies*, PBS NEWS (Aug. 14, 2025), https://www.pbs.org/newshour/politics/the-other-states-threatening-action-as-texas-and-californias-redistricting-feud-intensifies; Defs.' Ex. 1376, Steven Dial (@StevenDialFox4), X, (Aug. 14, 2025, 8:09 PM), https://x.com/StevenDialFox4/status/1956085870001594630; *see also* Defs.' Ex. 1373, Gerry Callahan (@GerryCallahan), X, (Aug. 6, 2025 9:19 PM) https://x.com/GerryCallahan/status/1952917306411237875        (discussing Massachusetts Democrats' commitment to partisan gerrymandering).

**IV. The Legislature held public hearings before introducing a new Congressional map.**

41.    The Texas House and Senate were called to order to begin the special session on July 21, 2025. Defs.' Ex. 1253, H. J. of Tex. 89th Lege., 1st C.S. First Day at 1 (July 21, 2025); Defs.' Ex. 1252, S. J. of Tex., 89th Lege., 1st C.S. First Day at 1 (July 21, 2025).

42.    That same day, Sen. King moved to suspend Senate Rule 8.02 to allow the Senate to immediately consider Senate Resolution 5, which would implement procedures for the Senate to follow during redistricting. Defs.' Ex. 1252, S. J. of Tex. 89th Lege., 1st C.S. at 4 (July 21, 2025).

43.    Senate Resolution 5 implemented the same process, which was adopted unanimously, used by the Senate during the 2021 and 2023 redistricting cycles. Defs.' Ex. 1277, Senate Chambers (Part II) Jul. 21, 2025 Tr. at 158:21–159:1.

44.    In 2025, however, Senate Democrats opposed Senate Resolution 5, and it passed along partisan lines. Defs.' Ex. 1252 at 7.

45.    The House Select Committee on Congressional Redistricting held its first public hearing on Congressional redistricting in Austin on July 24, 2025. Defs.' Ex. 1129, House Select Comm. on Congressional Redistricting Minutes (Jul. 24, 2025); Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 5:19–6:5.

46.   Chair Cody Vasut solicited public input on Congressional redistricting. Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 5:19–7:12.

47.   Chair Vasut stated that he wished to hear from the public in order to guide committee members in making decisions. Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 32:17–22.

48.   Chair Vasut emphasized that holding hearings at which the committee could hear public testimony was the Legislature's standard practice. Defs.' Ex. 1279 House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 90:17–25.

49.   Chair Vasut noted that he scheduled public hearings to take place because holding such hearings is usual practice and not based on DOJ's letter. Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 93:7–17.

50.   Vice Chair Jon Rosenthal, a Democrat, testified that the redistricting process was a power grab. Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 93:14–19.

51.   Congresswoman Sylvia Garcia testified that DOJ's letter was a pretext to redraw the Congressional map to get five more Republican districts, which would maintain President Trump's power. Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 67:9–11.

52.   Congressman Julian Castro echoed her sentiments. Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 69:1–70:7.

53.   Dean Senfronia Thompson, a Democrat, stated that DOJ's accusations in its letter were wrong, because Texas would not pass a race-based map. Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 27:9–22.

54.   Chair Vasut emphasized that every map he had ever voted on complied with the Voting Rights Act. Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 94:4–6.

55.  And Gary Bledsoe, counsel for Intervenor-Plaintiffs, testified in opposition to race-blind map drawing. Defs.' Ex. 1279, House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 135:3–23.

56.  Mr. Bledsoe testified at the House Committee Hearing on July 24, 2025, and expressly claimed "it's an act of discrimination in itself when you decide you're not going to look at race." Defs.' Ex. 1279, House Select Comm. on Redistricting, Jul. 24 2025 Tr. at 135:13–15.

57.  The Senate Committee on Congressional Redistricting held its first public hearing on July 25, 2025. Defs.' Ex. 1130, Senate Special Comm. On Congressional Redistricting Minutes ( Jul. 25, 2025).

58.  The committee received three hours of public testimony at the July 25th hearing. Defs.' Ex. 1130, Senate Special Comm. on Congressional Redistricting Minutes ( Jul. 25, 2025) at 1–2.

59.   Sen. Phil King clarified that the purpose of the hearing was not to debate the merits of DOJ's letter. Defs.' Ex. 1280, Senate Special Comm. on Congressional Redistricting, Jul. 25, 2025 Tr. at 33:20–34:2.

60.  The House Select Committee held its second public hearing on July 26, 2025, in Houston. Defs.' Ex. 1131, House Select Comm. on Congressional Redistricting Minutes ( Jul. 26, 2025).

61.  The committee received five hours of public testimony at the July 26th hearing. Defs.' Ex. 1131, House Select Comm. on Congressional Redistricting Minutes ( Jul. 26, 2025) at 1–3.

62.  Chair Vasut said that the House would hold more public hearings after the new map was published, and would provide more than 24 hours' notice of upcoming hearings. Defs.' Ex. 1281, House Select Comm. on Congressional Redistricting, Jul. 26, 2025 Tr. at 48:14–49:12.

63.    A Democratic member of the committee objected to Chair Vasut's efforts at following the House's typical procedures. Defs.' Ex. 1281, House Select Comm. on Congressional Redistricting, Jul. 26, 2025 Tr. at 214:2–8.

64.    At the July 26th hearing, Congresswoman Lizzie Fletcher, a Democrat, suggested in her testimony that a partisan gerrymander giving Republicans an advantage was a racial gerrymander. Defs.' Ex. 1281, House Select Comm. on Congressional Redistricting, Jul. 26, 2025 Tr. at 70:19–71:6.

65.    The Senate Committee on Congressional Redistricting also held a public hearing on July 26, 2025. Defs.' Ex. 1132, Senate Special Comm. on Congressional Redistricting Minutes (Jul 26, 2025).

66.    Chair King welcomed testimony from anyone who wished to offer it and said that the session would continue as long as was necessary to allow members of the public to testify. Defs.' Ex. 1132, Senate Special Comm. on Congressional Redistricting Minutes (Jul. 26, 2025) at 4.

67.    The House Committee held its third public field hearing on July 28, 2025, at which it received five hours of public testimony. Defs.' Ex. 1133, House Select Comm. on Congressional Redistricting Minutes (Jul. 28, 2025).

68.    Chair Vasut emphasized that public testimony was being considered, and hearings on proposed maps would be held as soon as they were filed. Defs.' Ex. 1283, House Select Comm. on Congressional Redistricting Jul. 28, 2025 Tr. at 266:9–267:17.

69.    The Senate Redistricting Committee held a hearing on July 28, 2025, at which it received three hours of public testimony. Defs.' Ex. 1134, Senate Special Comm. on Congressional Redistricting Minutes at 1–2 (Jul. 28, 2025).

70.    During the July 28th hearing, Congressman Al Green testified stating, "And we are not going to win under Section 2 unless we show that this act by the state of Texas. If it doesn't, and I pray that it won't, I take no delight in saying what I say, but if we don't say that this is racial, if we don't indicate that, we're not going to get to Section 2 and

we can't win. And people are very smart. They understand that if they say that this is just politics, this is partisan politics, or this is a power grab, they understand now that the law has devolved to the point where you can say that, and then I've got to prove, no, that's not what your intent was. And that is almost impossible." Ex. 1284 at 36, Testimony on Congressional Redistricting before the Senate Special Comm. on Congressional Redistricting, 89th Leg., 1st C.S. 36 ( Jul. 28, 2025).

71.   The Senate Special Committee on Congressional Redistricting held a hearing on July 29, 2025, at which Nina Perales, counsel for LULAC Plaintiffs, testified. Defs.' Ex. 1286, Senate Special Comm. on Congressional Redistricting, Jul. 29, 2025 Tr. at 26:7–27:21.

72.   Ms. Perales testified that the Legislature should consider racial data when drawing the new Congressional map. Defs.' Ex. 1286, Senate Special Comm. on Congressional Redistricting, Jul. 29, 2025 Tr. at 27:18–21.

73.   Ms. Perales also showed concerns regarding DOJ's letter and questioned its motives for publishing the letter. Defs.' Ex. 1286, Senate Special Comm. on Congressional Redistricting, Jul. 29, 2025 Tr. at 34:4–12.

74.   In closing arguments Ms. Perales criticized the Legislature for pointing out the HCVAP of certain districts, Tr. 10/10/25 PM 105:5–6,[1] and criticized the mapdrawer for knowing racial demographics, Tr. 10/10/25 PM 106:24–107:3.

75.   Sen. Miles accused Sen. King of racism in the July 29th hearing. Defs.' Ex. 1286, Senate Special Comm. on Congressional Redistricting, Jul. 29, 2025 Tr. at 216:4–20.

76.   In a public hearing on July 30, 2025, Sen. King said that DOJ's letter was not relevant to the Senate Redistricting Committee or the Legislature as a whole. Defs.' Ex. 1287, Senate Special Comm. on Congressional Redistricting, Jul. 30, 2025 Tr. at 5:1–7:6.

---

[1] References to the October 1–10, 2025 Preliminary Injunction proceedings cite the rough daily transcripts as "Tr. DD/MM/YY AM/PM" with pinpoint citations as necessary.

77.    Sen. Carol Alvarado, a Democrat, said that partisan efforts were the first step in the redistricting process. Defs.' Ex. 1287, Senate Special Comm. on Congressional Redistricting, Jul. 30, 2025 Tr. at 11:22–12:3.

78.    During the July 30th hearing, Sen. King stated, "I would never see any benefit to bringing in whoever was the actual mapdrawer and saying, 'Why did you do this and how did you do that?' I would want to look at the map, determine if it – have someone take a – give it a good legal scrub and determine if it is legal in all respects, and then we would want to look at it as policy makers and determine if it's the best policy for the state of Texas. It doesn't matter to me who drew it." Ex. 1287, Senate Special Comm. on Congressional Redistricting, Jul. 30, 2025 Tr. at 27:21–28:4.

## V. The Texas Legislature Redistricted the Congressional Map to Maximize Republican Partisan Advantage.

79.    Rep. Todd Hunter, the sponsor of House Bill 4, stated that, "the primary changes, though, are focused on five districts for partisan purposes . . . Each of these newly drawn districts now trend Republican in political performance." Defs.' Ex. 1494 House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 51:10–52:00.

80.    Rep. Hunter also said, referencing DOJ's letter, "[A]ll I know is that we are here by proclamation of the Governor, as to what the letter has to do with it, I got no personal knowledge, I have no knowledge. And I will tell you, I don't know what that has to do with this. That wasn't part of me. All I know is that we had a special session and this was a topic, and I agreed by the request of the chairman to file this bill." Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 58:38–59.

81.    Rep. Hunter introduced Plan C2308 as House Bill 4 on July 30, 2025. Defs.' Ex. 1059, H.B. 4, 89th Leg., 1st Spec. Sess. (Tex. 2025).

82.    House Bill 4 was first presented in the House Redistricting Committee meeting held on August 1, 2025. Defs.' Ex. 1137, House Select Comm. on Congressional Redistricting Minutes at 2 (Aug. 1, 2025).

83. The public was allowed to offer written testimony at the August 1st hearing, which the clerk shared with all committee members. Defs.' Ex. 1137, House Select Comm. on Congressional Redistricting Minutes at 2 (Aug. 1, 2025).

84. More than 110 people registered to offer testimony before the committee at the August 1st hearing. Defs.' Ex. 1120, House Select Comm. on Congressional Redistricting Witness List (Aug. 1, 2025).

85. During the meeting, Democratic committee members objected to the map as rigged in a partisan way. Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 8:10–8:20, 9:05–9:12.

86. Rep. Jon Rosenthal objected to partisan map drawing as a power grab by the Trump Administration. Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 10:05.

87. Rep. David Spiller asked, "Is it fair to say that the map in HB 4 is based on political performance or partisan performance?" Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 1:07:50.

88. Rep. Todd Hunter replied to Rep. Spiller, "The answer is yes, and I want everybody to know that, being transparent, that is correct: it is based on *Rucho*, the United States Supreme Court case." Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 1:08:00.

89. Rep. Hunter also said, "We have five new districts, these five new districts based on political performance." Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 1:11:40.

90. Rep. Christian Manuel said, "I know some people say there are no coincidences," and asked whether changes to "Congressional districts 9, 18, 30, and 35" that led to "each [having] between 50 and 52 percent for Hispanic and black voting age" was "a coincidence?" Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 1:45:30–1:46:55.

91.    Rep. Hunter replied to Rep. Manuel, "Nothing is a coincidence . . . part of the reason it was increased was to follow the compactness-contiguous [goal] and some of the districts were historic and so there has been a growth and you bring them back to the configuration: they are going to . . . increase. Most of the ones that you have referenced were . . . on compact and the configuration." Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 1:47:00–1:47:28.

92.    After this discussion with Rep. Hunter, Rep. Manuel noted that he did not believe House members had racially discriminatory intent when enacting the proposed Congressional map. Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 1:49:40.

93.    Rep. Manuel then said, "Congressman Al Green and, we know, President Trump have not been on any terms near where they are best friends . . . is this political retribution against Congressional members, particularly those who have been outspoken, whether intentional or not, who happen to be African American . . . because they won't follow along with what the current administration is currently doing." Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 2:03:50.

94.    Rep. Hunter said to Rep. Gervin-Hawkins, responding to her question about the number of seats Republicans wanted to flip, "It sure did help to get to five; you are going to keep talking about it, if we keep talking about it maybe we will go to six." Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 1:59:27.

95.    Rep. Gervin-Hawkins responded, "Maybe we will go to seven or eight, or go to nine or ten." Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 1:59:35.

96.    Rep. Hickland noted during the August 1 hearing that relying on racial data would not have been useful in drawing a map based on partisan performance. Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 13:41:30.

97.    Rep. Hunter agreed with Rep. Hickland that using racial data would not have enabled the Legislature to achieve its partisan goals. Defs.' Ex. 1494, House Select Comm. on Congressional Redistricting, Aug. 1, 2025 Video at 13:41:51.

98.    The House Committee on Congressional Redistricting met on August 2, 2025; at this meeting, Rep. Christian Manuel, a Democrat, said, "I understand, again, that politics wins the day; and I understand that everybody wants to do what they can for their political survival." Ex. 1291, House Select Comm. on Congressional Redistricting, Aug. 2, 2025 Tr. at 9:3–5.

99.    House Bill 4 was then voted favorably out of committee along partisan lines, with twelve Republicans voting in favor of the bill and six Democrats voting against the bill. Defs.' Ex. 1138, House Select Comm. on Congressional Redistricting Minutes at 2 (Aug. 2, 2025).

## VI. Early on, Texas Democrats Acknowledged the 2025 Congressional Map's Partisan Motivation

100.    By and large, Texas Democrats initially characterized the 2025 redistricting effort as a partisan power grab.

101.    Rep. C. Morales observed political gain as the purpose of the map. Defs.' Ex. 1267, H.J. of Tex. 89th Lege., 2nd C.S at 66–67 (Aug. 20, 2025).

102.    Senator Royce West remarked, "Let's call this redistricting what it is: a naked, partisan, political power grab." Ex. 1271, S. J. of Tex. 89th Lege., 2nd C.S., at 64 (Aug. 22, 2025).

103.    And Congresswoman Sylvia Garcia urged her fellow legislators to "ask yourselves why you're here, you're here because Donald Trump wants to remain in power. . . . That big ugly bill passed by just one vote and that was his signature agenda. . . . So he knows he has got to find seats somewhere to offset some of their losses. . . ." Ex. 1281, House Select Comm. on Congressional Redistricting, Jul. 26, 2025 Tr. at 72:20–73:5.

104.    Even prominent Democrat Eric Holder, chairman of the National Democratic Redistricting Committee, initially characterized the 2025 redistricting effort as an

attempt to expand Republican political power. Defs.' Ex. 1387, NBC NEWS, *Fmr. AG Eric Holder slams GOP redistricting, says blue states should fight back: Full Interview* (Youtube,          Aug.          10,          2025), https://youtu.be/p0WamTGMB8o?si=CYp1AXYz7uFLZGTB;   Defs.'   Ex. 1428, Nicholas Kerr, *Eric Holder backs Democratic response to Texas redistricting plan*, ABC NEWS (Aug. 3, 2025), https://abcnews.go.com/Politics/eric-holder-backs-democratic-response-texas-redistricting-plan/story?id=124321476.

## VII.    Texas House Democrats Broke Quorum to Prevent the Partisan Congressional Map from Passing.

105.    Over fifty Democratic Texas Representatives fled Texas to deprive the House of the quorum needed to pass any legislation. Defs.' Ex. 1429, Kayla Guo & Eleanor Klibanoff, *Texas House Democrats flee the state in bid to block GOP's proposed congressional map*, Tex. Tribune (Aug. 3, 2025) https://www.texastribune.org/2025/08/03/texas-democrats-quorum-break-redistricting-map/.

106.    The House issued civil arrest warrants to bring the errant state representatives into custody and restore a quorum in the Texas House. Defs.' Ex. 1256, H. J. of Tex. 89th Lege., 1st C.S. at 23–50 (Aug. 4, 2025).

107.    Meanwhile, the fugitive Texas Democrats met with leaders of Democratic states, and other Democrats disparaged HB 4 as a partisan gerrymander. Defs.' Ex. 1434, *Governor Newsom and California leaders host Texas officials amid their fight to protect democracy* (Aug 8,    2025),    https://www.gov.ca.gov/2025/08/08/governor-newsom-and-california-leaders-host-texas-officials-amid-their-fight-to-protect-democracy/;   Defs.'   Ex. 1447, Arlette Saenz, *Obama praises Texas Democrats and calls state redistricting effort 'a systematic    assault    on    democracy*,    CNN    (Aug.    14,    2025,    12:56    AM), https://www.cnn.com/2025/08/15/politics/obama-texas-democrats-redistricting-systematic-assault; *see* Defs.' Ex. 1367, Andrew Kaczynski(@KFILE), X, (Aug. 3, 2025 8:21 AM), https://x.com/KFILE/status/1952359281774191088; Defs.' Ex. 1429, Kayla

Guo & Eleanor Klibanoff, *Texas House Democrats flee the state in bid to block GOP's proposed Congressional map*, TEX. TRIB. (Aug. 3, 2025), https://www.texastribune.org/2025/08/03/texas-democrats-quorum-break-redistricting-map/.

108.   Those Democratic officials advised Texas Democrats about how to stymie—if not altogether defeat—the Texas Republicans' 2025 redistricting efforts. Defs.' 1354, Brittany Shepherd(@brittanys), X, (Jul. 22, 2025, 2:12 PM), https://x.com/brittanys/status/1947736642988523885; *see also* Defs.' Ex. 1355, The Redistrict Network(@RedstrictNet), X, (Jul. 23, 2025, 4:27 PM), https://x.com/RedstrictNet/status/1948133007417589767; Defs.' Ex. 1369, The Texas Voice(@TheTXVoice), X, (Aug. 4, 2025, 12:29 PM), https://x.com/TheTXVoice/status/1952421743362003370.

109.   On August 4, 2025, the Texas Senate introduced Plan C2308 as Senate Bill 4. Defs.' Ex. 1255, S. J. of Tex. 89th Lege., 1st C.S. at 35 (Aug. 4, 2025).

110.   That same day, Senate Bill 4 was referred to the Senate Committee on Congressional Redistricting. Defs.' Ex. 1255, S. J. of Tex. 89th Lege., 1st C.S. at 35 (Aug. 4, 2025). Defs.' Ex. 1255

111.   The Senate Committee on Congressional Redistricting held two hearings after the bill's filing. Defs.' Ex. 1139, Senate Special Comm. on Congressional Redistricting Minutes (Aug. 6, 2025); Defs.' Ex. 1140, Senate Special Comm. on Congressional Redistricting Minutes (Aug. 7, 2025).

112.   The first post-filing hearing the Senate Redistricting Committee held took place on August 6, 2025. Defs.' Ex. 1139, Senate Special Comm. on Congressional Redistricting Minutes (Aug. 6, 2025).

113.   At the August 6th hearing, Sen. King "requested, the Democrat caucus to submit the names of any—anyone that they wanted to bring in as invited testimony" and invited

20

each of the people whose names were submitted. Defs.' Ex. 1296, Senate Special Comm. on Congressional Redistricting, Aug. 6, 2025 Tr. at 5:8–10.

114. Sen. King affirmed that the reason for having an additional hearing was to allow the invited members to discuss the filed Congressional map. Defs.' Ex. 1296, Senate Special Comm. on Congressional Redistricting, Aug. 6, 2025 Tr. at 5:1–6:9.

115. Sen. King also clarified that separating invited and public testimony was arranged as a public courtesy. Defs.' Ex. 1296, Senate Special Comm. on Congressional Redistricting, Aug. 6, 2025 Tr. at 6:10–7:14.

116. The Senate Redistricting Committee did not receive a response from the NAACP or La Unión Del Pueblo Entero regarding its invitation to testify. Defs.' Ex. 1296, Senate Special Comm. on Congressional Redistricting, Aug. 6, 2025 Tr. at 7:15–19.

117. Asian Americans Advancing Justice, Every Texan, LULAC, Texas NAACP, Brennan center for Justice, University of Michigan Law School, and MALDEF told the Senate Redistricting Committee that they were "unable or did not wish to attend" to testify. Defs.' Ex. 1296, Senate Special Comm. on Congressional Redistricting, Aug. 6, 2025 Tr. at 7:20–8:3.

118. The Senate Redistricting Committee also invited all twelve Democratic members of the Texas Congressional delegation to testify. Only Congressman Marc Veasey filed written testimony; no others accepted the invitation to testify. Defs.' Ex. 1296, Senate Special Comm. on Congressional Redistricting, Aug. 6, 2025 Tr. at 8:15–9:23.

119. On August 7, 2025, the Senate Committee on Congressional Redistricting met again to discuss SB 4. Defs.' Ex. 1140, Senate Special Comm. on Congressional Redistricting Minutes (Aug. 7, 2025); Defs.' Ex. 1107, Senate Special Comm. on Congressional Redistricting, Notice of Public Hearing (Aug. 7, 2025).

120. Sen. King reiterated that Plan C2308 was drawn without the use of racial data. Defs.' Ex. 1298, Senate Special Comm. on Congressional Redistricting, Aug. 7, 2025 Tr. at 17:17–23.

121.  Sen. Adam Hinojosa noted his belief that racial data was not used in drawing Plan C2308. Defs.' Ex. 1298, Senate Special Comm. on Congressional Redistricting, Aug. 7, 2025 Tr. at 43:1–5.

122.  Sen. Miles also explained that Democrats knew DOJ's letter was intended to provide political cover in order to gain five additional Republican seats in Congress. Defs.' Ex. 1298, Senate Special Comm. on Congressional Redistricting Aug. 7, 2025 Tr. at 25:11–26:4.

123.  Senate Bill 4 was reported favorably out of committee along partisan lines, with six votes in favor and one vote against the bill. Defs.' Ex. 1140, Senate Special Comm. on Congressional Redistricting Minutes (Aug. 7, 2025).

124.  On August 12, 2025, Sen. King moved for suspension of the regular order of business to consider Senate Bill 4 on its second reading. Defs.' Ex. 1259, S. J. of Tex. 89th Lege., 1st C.S. at 52 (Aug. 12, 2025).

125.  Sen. King noted that the redistricting committee received testimony from 205 witnesses, including sitting U.S. Representatives. Defs.' Ex. 1305, Texas Senate Chambers Aug. 12, 2025 Tr. at 5:16–25.

126.  None of the members who the redistricting committee invited at the Democratic caucus' request attended the August 6, 2025, hearing except Gary Bledsoe, counsel for Intervenor-Plaintiffs, who testified the next day. Defs.' Ex. 1305, Texas Senate Chambers Aug. 12, 2025 Tr. at 5:16–6:16.

127.  The Senate Committee on Congressional Redistricting heard testimony from 242 total witnesses in its hearings. Defs.' Ex. 1305, Texas Senate Chambers Aug. 12, 2025 Tr. at 6:23.

128.  On August 12, 2025, the Senate passed Senate Bill 4 along party lines, with 19 votes in favor, 2 votes against, and nine Democratic senators walking out in protest of the bill's passage. Defs.' Ex. 1259, S. J. of Tex. 89th Lege., 1st C.S. at 53 (Aug. 12, 2025).

129.    The first special session adjourned sine die on August 15, 2025. Defs.' Ex. 1261, H. J. of Tex. 89th Lege., 1st C.S. at 75 (Aug. 15, 2025).

130.    That same day, Governor Abbott called a second special session for the Legislature to consider "[l]egislation that provides a Congressional redistricting plan." Ex. 1262, H. J. of Tex. 89th Lege., 2nd C.S. at 1–2 (Aug. 15, 2025).

131.    The House came to order and then immediately adjourned because it still lacked a quorum. Defs.' Ex. 1262, H. J. of Tex. 89th Lege., 2nd C.S. at 1–2, 4 (Aug. 15, 2025).

## VIII.  House Democrats Returned to Texas and Claimed the Congressional Map Was Racially Gerrymandered.

132.    On August 17, 2025, Plan C2308 was reintroduced in a Senate redistricting committee hearing as Senate Bill 4. Defs.' Ex. 1141, Senate Special Comm. on Congressional Redistricting Minutes (Aug. 17, 2025).

133.    Rep. Hunter introduced Plan C2331 as House Bill 4. Defs.' Ex. 1264, H. J. of Tex. 89th Lege., 2nd C.S. at 39 (Aug. 18, 2025).

134.    Plan C2331 made small changes to the boundary between CD 23 and CD 16 to put Fort Bliss in CD 16; it was otherwise identical to Plan C2308. Defs.' Ex. 939, Comparison of Plan C2331 with Plan C2308.

135.    Rep. Hunter said the changes were made to the Congressional districts, "To make it more Republican . . . partisanship, political performance. That's what I said at the very top. Absolutely they've been enhanced, and it makes it stronger, and it allows a Republican performance, partisan under the U.S. Supreme Court. Defs.' Ex. 1317, House Select Comm. on Congressional Redistricting Aug. 18, 2025 Tr. at 14:5–13.

136.    On August 18, 2025, a quorum in the House was restored and HB 4 was referred to the House Select Comm. on Redistricting. Defs.' Ex. 1264, H. J. of Tex. 89th Lege., 2nd C.S. at 34, 39 (Aug. 18, 2025).

137.    Plan C2333 was substituted for Plan C2331 at a committee meeting on August 18, 2025. Defs.' Ex. 1142, House Select Comm. on Congressional Redistricting Minutes (Aug. 18, 2025).

138.    Plan C2333 was reported favorably out of committee along partisan lines as House Bill 4. Defs.' Ex. 1142, House Select Comm. on Congressional Redistricting Minutes (Aug. 18, 2025).

139.    Plan C2333 made changed CD 6, CD 9, CD 17, and CD 18 to strengthen Republican performance in Harris County; it was otherwise identical to Plan C2331. Defs.' Ex. 1028; *see also* Defs.' Ex. 1317, House Select Comm. on Congressional Redistricting Aug. 18, 2025 Tr. at 3:22–6:17.

140.    On August 20, 2025, the House passed Plan C2333 on party lines as House Bill 4. Defs.' Ex. 1267, H. J. of Tex. 89th Lege., 2nd C.S. at 65 (Aug. 20, 2025).

141.    The Senate Redistricting Committee voted to send HB 4 to the Senate floor on August 21, 2025. Defs.' Ex. 1143, Senate Special Comm. on Congressional Redistricting Minutes (Aug. 21, 2025).

142.    On August 22, 2025, the full Senate considered and debated HB 4. Defs.' Ex. 1271, S. J. of Tex. 89th Lege., 2nd C.S. at 59–60 (Aug. 22, 2025).

143.    Sen. King reiterated that the map was drawn to give Republicans a partisan advantage and no racial data was used in drawing the map. Defs.' Ex. 1323, Texas Senate Chambers (Part I) Aug. 22, 2025 Tr. at 7:24–8:6.

144.    On the one hand, Sen. Carol Alvarado, a Democrat, argued that the map was racially discriminatory and indicated that she believed the mapdrawers did view and consider racial data. Defs.' Ex. 1323, Texas Senate Chambers (Part I) Aug. 22, 2025 Tr. at 12:3–13:13.

145.    On the other hand, Sen. Nathan Johnson, a Democrat, suggested the map was racially discriminatory because the mapdrawers did not use racial data. Defs.' Ex. 1323, Texas Senate Chambers (Part I) Aug. 22, 2025 Tr. at 66:5–68:11.

146.    The full Senate passed House Bill 4 on partisan lines in the wee hours of August 23, 2025. Defs.' Ex. 1271, S. J. of Tex. 89th Lege., 2nd C.S. at 59–61 (Aug. 22, 2025).

147.    Governor Abbott then signed the bill into law. Defs.' Ex. 1274, H. J. of Tex. 89th Lege., 2nd C.S. at 316 (Sep. 2, 2025).

148.    In response to the map, Ryan Chandler, a correspondent for NBC News, said, "This is not about 'constitutional concerns' like Gov. Abbott cited in the special session call. This is, nakedly and unapologetically, about power." Ex. 1364, Ryan Chandler, (@RyanChandlerTV), X, (Aug. 2, 2025, 10:01 AM), https://x.com/RyanChandlerTV/status/1951659747368718621.

149.    Texas House Rep. John Bucy, III, a Democrat, said that HB 4's passage was about power. Defs.' Ex. 1380, John Bucy III, (@BucyForTexas), X, (Aug 21, 2025, 9:58 AM), https://x.com/BucyForTexas/status/1958544198669578367.

150.    And Eric Holder, Chairman of the National Democratic Redistricting Committee, responded to HB 4's passage by arguing that Democrats should engage in partisan gerrymandering, too. Defs.' Ex. 1374, Western Lensman, (@WesternLensman), X, (Aug. 10, 2025, 8:53 AM) https://x.com/WesternLensman/status/1954541716087656907.

## IX. The 2025 Map Achieves its Partisan Goals and Redresses Plaintiffs' Grievances with the 2021 Map.

151.    The 2025 Map increases Republican partisan advantage and resolves Plaintiffs' grievances with the 2021 Map. For instance, the 2025 Map is more compact than its predecessor by every judicially recognized measure. Defs.' Ex. 1305, Texas Senate Chambers Aug. 12, 2025 Tr. at 11. And it also creates additional majority-minority districts. Gonzales Ex. 39, Expert Report of Stephen Ansolabehere at 5, August 23, 2025.

152.    In achieving its partisan goals, the 2025 Map adds three majority-minority districts—one Hispanic and two Black. Gonzales Ex. 39, Expert Report of Stephen Ansolabehere at 2–3, August 23, 2025.

153.   As it did during the 2021 Map process, the Legislature sent the new 2025 Congressional map to outside counsel for a VRA compliance check. Defs.' Ex. 1305, Texas Senate Chambers Aug. 12, 2025 Tr. at 8.

154.   This time, the Legislature was more prepared to answer questions about the racial makeup of the map during legislative deliberations. *See e.g.,* Defs.' Ex. 1289, House Select Comm. on Congressional Redistricting Aug. 1, 2025 Tr. at 777:24–779:16 (Rep. Hunter answering questions from Dean Thompson regarding racial makeup with information received from counsel after map was drawn).

155.   After drawing the map blind to race and checking for VRA compliance, some legislators reviewed publicly available VAP data to answer criticisms of the map during debate. *See e.g.,* Tr. 10/09/25 PM 51:1–5 (Sen. King stating the map was drawn blind to race); Tr. 10/09/25 PM 104:22–105:18 (Rep. Vasut stating that Rep. Hunter spoke on the racial effects of the 2025 Map and the racial data is publicly available data).

156.   Plaintiffs now point to those legislators' knowledge of that publicly available VAP data as evidence of intentional discrimination. ECF 1150 at 19–21.

157.   But Plaintiffs alleged, just months ago, that a legislator's consistent statements that they *did not* consider race supported a finding that they in fact *did* consider race. *See* Trial Tr. 5/27/25 PM at 135:6–21.

158.   Gonzales Plaintiffs now argue that Rep. Hunter's *failure* to disavow knowledge of publicly available VAP data supports a finding of intentional discrimination. ECF 1149 at 6.

159.   But Plaintiffs' real complaint is that Texas's 2025 Congressional Map is set to elect five more Republicans to the U.S. House of Representatives. *See, e.g.*, ECF No 1134-1, Brooks, LULAC, & MALC Pls.' Mot. Prelim. Inj., at 45–46 (requesting Plan C2193, a map they believe violated the VRA but has five less Republican seats, as their remedy).

160.   Indeed, the 2025 Congressional map increases the predicted number of Republican-leaning Congressional districts from 25 to 30. *See* Defs.' Ex. 1363, Dave Wasserman (@Redistrict) X, (July 30, 2025, 2:55 PM), https://x.com/Redistrict/status/1950570851356594511;

Defs.' Ex. 1382, Brad Johnson, (@BradJ_TX), X (Aug. 23, 2025, 5:35 PM), https://x.com/bradj_TX/status/1959308526318153847.

161. All told, the fairness of partisan redistricting is not one for the federal courts to resolve. Defs.' Ex. 1289, House Select Comm. on Congressional Redistricting Aug. 1, 2025 Tr. at 877:3–877:23.

162. Earlier statements by Congressman Al Green help demystify Plaintiffs' insistence that Texas Republicans passed the 2025 Map with discriminatory intentions. Defs.' Ex. 1284, Senate Special Comm. on Congressional Redistricting July 28, 2025 Tr. at 36:14–37:7.

163. Congressman Green, in his July 28, 2025, remarks before the Texas Senate Special Committee on Redistricting, warned his fellow Texas Democrats that "we are not going to win under Section 2 unless we show that this act by the State of Texas . . . if we don't say this is racial, if we don't indicate that, we are not going to get to Section 2 and we can't win." *Id.*

164. And Sen. Eckhardt claimed the new Congressional map is discriminatory because its drafters *failed to view* racial data. *See* Defs.' Ex. 1324, Texas Senate Chambers Aug. 22, 2025, (Part II) Tr. at 87:21–88:19 ("Senator Eckhardt: What I'm suggesting is that you are willfully not looking at important information about whether this map is a racial gerrymander.").

## X. The 2026 Elections Are Being Prepared Using the 2025 Map.

165. Christina Adkins is the Director of Elections for the Texas Secretary of State's office, where Ms. Adkins oversees the election division's work related to the statewide election management system and the administration of elections. Tr. 10/8/25 AM 141:10–16. Ms. Adkins has been in that role for over two years and has worked in the office for four presidential elections. Tr. 10/8/25 AM 141:18–142:1.

166. Ms. Adkins testified that the primary election is March 3, 2026. Tr. 10/8/25 AM 146:9–10.

167. Ms. Adkins testified that counties are already preparing to run the election under the 2025 map. Tr. 10/8/25 PM 13:16–18. Ms. Adkins testified that, in her view, "as soon as" the governments knew "what the lines were gonna be," the primary election process began for "most" of the counties impacted. Tr. 10/8/25 PM 13:21–14:1.

168. Ms. Adkins testified that there are a "number of very relevant dates and deadlines that pertain specifically to candidacy." Tr. 10/8/25 AM 146:10–12.

169. September 9th, 2025, is the first day of the filing period for individuals applying for party office. Tr. 10/8/25 AM 146:13–17.

170. November 8th, 2025, is the first day of the filing period for candidates primarily seeking public office. That filing period runs for 30 days. Tr. 10/8/25 AM 146:18–22.

171. December 8, 2025, is the final date for which a person seeking nomination for public office may file with the State. Tr. 10/8/25 AM 146:23–147:2.

172. The candidate filing dates cover Congressional candidates. Tr. 10/8/25 AM 147:6–8.

173. Ms. Adkins testified that various other election deadlines are set by statute. Tr. 10/8/25 AM 147:14–17. Ms. Adkins testified that "the deadlines for an election kind of all meet in the middle or they have a point where they all come together." Tr. 10/8/25 AM 147:18–20.

174. Ms. Adkins testified that the counties will be using C2333 for the upcoming primary election. Tr. 10/8/25 AM 148:4–10. The Secretary of State began the process of educating the counties on the new maps "immediately" after the governor signed the map into law. Tr. 10/8/25 AM 148:13–25. The training included web-based trainings, an in-person training, and answering questions from the counties. Tr. 10/8/25 AM 148:25–149:5. The Secretary of State's office reiterated to the counties that the 2025 maps would be the maps for the primary election. Tr. 10/8/25 AM 149:5–10. A number of county election officials told Ms. Adkins that they "immediately" began reviewing the maps upon their adoption. Tr. 10/8/25 AM 149:11–18. Many of the counties are

28

already redrawing county election voter registration precincts. Tr. 10/8/25 AM 149:19–150:5.

175. Ms. Adkins testified that candidates have started to campaign under the 2025 map and made inquiries of the Secretary of State's office "to determine what their requirements were for seeking public office" under the new map, including filing process details. Tr. 10/8/25 AM 150:14–151:2.

176. Ms. Adkins testified about the candidate petition process. The candidate petition process requires gathering signatures of individuals in the candidate's specific district. Tr. 10/8/25 AM 151:3–7. The Secretary of State's office received questions from candidates about "what territory lines should be used." Tr. 10/8/25 AM 151:7–9. In Congressional races, candidates must acquire 500 signatures from individuals that reside within their district. Tr. 10/8/25 AM 151:17–21. Many candidates use the petition method instead of the cost of the alternate method of the filing fee and as a way to introduce themselves to voters. Tr. 10/8/25 PM 5:16–23.

177. Ms. Adkins testified about the effect on candidates of not using the 2025 map in the 2026 election cycle. She testified that candidates who have already begun gathering signatures and relied on the 2025 district lines may have collected signatures that would not be valid if the district lines are moved. Tr. 10/8/25 PM 6:10–19. Depending on the number of signatures gathered, this could lead to a candidate's application being rejected by the Secretary of States' office. Tr. 10/8/25 PM 6:22–7:2. Because a number of inquiries from candidates had already come into the Secretary of State's office, Ms. Adkins believed it was "very likely that many candidates have already begun the petition-gathering process" as of October 8, 2025. Tr. 10/8/25 PM 7:5–8.

178. Ms. Adkins testified about the effect on voters of an injunction against the 2025 maps. Voters may experience confusion if there are changes to the candidates they will be voting for if candidates have engaged in the campaign and signature-gathering process. Tr. 10/8/25 PM 7:12–20.

179.  Ms. Adkins testified about what the state and local governments must do by the election deadlines. When the candidate filing period ends (currently December 8, 2025), the political party chairs enter information into the candidate filing system, run by the Secretary of State's office, which then uses the website to display all the candidates that have filed. Tr. 10/8/25 PM 8:2–9. It takes several days after the candidate filing deadline to enter all the information into the system. Tr. 10/8/25 PM 8:10–12. Immediately following that, the counties perform ballot drawings. Tr. 10/8/25 PM 8:13–17. After the ballot drawings, the counties begin preparing ballots. Tr. 10/8/25 PM 8:218–19. The counties begin the programming process and test ballots within about a three-week period. Tr. 10/8/25 PM 8:19–22. The counties do a public accuracy testing process which under the law must be done ahead of the mail ballots being sent out 45 days before election day. Tr. 10/8/25 PM 8:18–25. The ballot drawing, preparation, voting system equipment testing, and some ballot printing must be done ahead of the 45-day deadline. Tr. 10/8/25 PM 9:3–9.

180.  February 17, 2026, 45 days before the primary, is the deadline for the mail ballots to be mailed out. Tr. 10/8/25 PM 9:1–2.

181.  Early voting for overseas and military voters beings January 17, 2026 as required under the federal UOCAVA, 52 U.S.C. § 20302(a)(8).

182.  Ms. Adkins testified about the logistical consequences of delaying the opening of the candidate filing period. A delay would cause a "cascading effect" on all deadlines that could impact the counties' ability to prepare and test ballots ahead of the 45-day deadline. Tr. 10/8/25 PM 9:12–21.

183.  Ms. Adkins testified that ballot testing is necessary both under the law and to ensure accurate tabulation of election results. Tr. 10/8/25 PM 10:2–8. Moving the candidate filing period "shifts everything" and affects all deadlines. Tr. 10/8/25 PM 10:12–15.

184.  Ms. Adkins testified about the impact of changing the primary date on election administration. Delaying the date could be "catastrophically bad." Tr. 10/8/25 PM

10:16–18. It impacts the ability to plan and prepare the ballot for the general election in November by compressing an already tight time frame. Tr. 10/8/25 PM 10:17–11:4.

185.    Ms. Adkins testified about the impact on candidates of changing the primary date. Candidates using the convention process, minor party candidates, could face changed convention dates and deadlines. Tr. 10/8/25 PM 11:5–9. Independent and write-in candidates could be negatively impacted in their ability to collect petition signatures ahead of the general election. Tr. 10/8/25 PM 11:10–14.

186.    Ms. Adkins testified that it was "very possible" that changing the primary date could affect the outcomes of elections because affected candidates would be impacted in their campaigning and ability to educate the public on their views. Tr. 10/8/25 PM 11:17–12:1.

187.    Ms. Adkins testified that bifurcating the primary to have separate federal and state elections would be "extremely challenging." Tr. 10/8/25 PM 12:4–6. First, Texas has not used a bifurcated process in recent cycles and is not used to that structure. Tr. 10/8/25 PM 12:6–9. Second, voters have an expectation that Super Tuesday will cover all races, state and federal. Tr. 10/8/25 PM 12:10–16. Third, bifurcation would create a "substantial" funding issue. Tr. 10/8/25 PM 12:17–18. Texas has a primary fund by which the State pays for most of the expenses associated with primary election on the assumption of a primary and a primary runoff, but a bifurcated system would double the elections to four, which is not within the budget. Tr. 10/8/25 PM 12:18–25. Fourth, the counties do not have additional budget for two additional elections. Tr. 10/8/25 PM 13:1–5.

188.    Ms. Adkins testified that an injunction would negatively impact elections in Texas: "It's going to be harder [on] candidates, harder on voters, harder on election officials the closer we get to an election with any kind of changes in election policy." Tr. 10/8/25 PM 13:6–15.

189.    Atkins testified that if an injunction were issued on October 9, 2025, it would cause some level of voter confusion. Tr. 10/8/25 PM 14:10–12.

190.    Atkins testified that if an injunction were issued on October 9, 2025, it would cause some candidates to reconsider what district they are running in and will have to restart the process of collecting signatures. Tr. 10/8/25 PM 14:13–18.

## XI. Evidence of Motivations for the Challenged Districts

191.    The most significant dispute of fact concerns whether, and to what extent and qualitative degree, partisan or racial considerations motivated the creation or enactment of districts in the 2025 Plan. The parties made competing presentations purporting to show direct and circumstantial evidence concerning motive. The evidence, however, ended up entirely one-sided. Plaintiffs presented no direct evidence establishing that districts were configured or enacted with any modicum of racial intent, and all direct evidence was to the contrary. Plaintiffs' effort to make up for the lack of direct evidence with circumstantial evidence was flawed and ultimately unhelpful as a basis to infer racial motive of any kind, because it depended on expert presentations that were unreliable in method and in the use of data less precise than that of the mapmaker. Plaintiffs' experts instead largely attempted a VRA-style, disparate impact analysis, failing to disentangle race from partisanship. Plaintiffs also failed to produce an alternative map showing how the State could have achieved its legitimate political objectives while producing significantly greater racial balance. Plaintiffs provided no evidence supporting a finding of fact that race played any role in the 2025 redistricting beyond general awareness.

### A. Direct Evidence

192.    Direct evidence came in two forms: (1) testimony from Adam Kincaid, who created the 2025 Plan, about his motives in line drawing and (2) testimony from legislators concerning their motives for map-making. Both forms of evidence established that

racial considerations did not motivate the 2025 redistricting in any way. Plaintiffs point away from this evidence towards a letter of the Department of Justice (DOJ) sent months after the redistricting process had started and statements of the Governor, but neither participated in drawing the map or voting for its passage and therefore are not helpful sources of evidence about legislative intent.

### 1. Testimony Concerning the Line-Drawing Process

193.    Adam Kincaid created the 2025 Plan, without staff and without the Governor or legislators present. Tr. 10/7/25 PM 41:12–20.

194.    Mr. Kincaid testified about the DOJ letter. Mr. Kincaid did not perceive the Dhillon Letter "as a full threat to sue" Texas, in large part because he was "not sure the DOJ can sue under the Fourteenth Amendment." Tr. 10/7/25 PM 60:1–5. He "disagree[d] with Governor Abbott's" public statements but could not "speak to the Governor's mental state or what he was thinking." Tr. 10/7/25 PM 62:8–11. Mr. Kincaid believed the Dhillon "letter was a bad idea in general," in part because it was "completely unnecessary" as the 2021 map was "a completely political draw from start to finish." Tr. 10/7/25 PM 88:21–89:8. While "[t]he Governor issued the proclamation," he did not "think the DOJ letter was necessary to do that" and said "repeatedly" that he thought the letter was a bad idea. Tr. 10/7/25 PM 104:22–105:8.

195.    Mr. Kincaid believed that the redistricting process was "kicked off" by RNC Delegate Robin Armstrong. Tr. 10/8/25 AM 117:16–20.

196.    Mr. Kincaid acknowledged that the Legislature liked the map after conducting their own VRA analysis. Tr. 10/7/25 PM 94:15–18.

197.    Mr. Kincaid did not "have racial data visible" while drawing maps. Tr. 10/7/25 AM 41:24–42:1. He testified: "Have I ever used racial data? Not for a very long time, if ever." Tr. 10/7/25 AM 51:20–21.

198. Mr. Kincaid testified that "I want to use election results that show me how Republicans and Democrats vote in specific elections." Tr. 10/7/25 AM 42:2–11.

199. Mr. Kincaid testified that because he believes minority voters "in Texas are moving toward the Republican Party" he has no incentive "to dilute the votes of population who were moving, in [his] personal opinion, towards the Republican Party." Tr. 10/7/25 AM 187:5–18.

200. Mr. Kincaid testified that "I don't think it's constitutional to draw maps based off of race." Tr. 10/7/25 AM 42:10–11. By contrast, he agreed that the existence of a coalition district "drawn without regard to race can't be a racial gerrymander" and stated that "drawing for politics" is "totally fine." Tr. 10/7/25 PM 56:2–7. Mr. Kincaid did not "use race as a proxy for partisanship," Tr. 10/7/25 AM 51:22–52:4, and "[d]id not use race as a pretext." Tr. 10/7/25 PM 110:22–24. When asked whether he used race "as a political pretext" to provide "political talking points" while "hit[ting] certain racial targets," he responded that he "wasn't using race to hit racial targets" as he had said "multiple times." Tr. 10/7/25 PM 110:22–111:25.

201. Mr. Kincaid did not use preloaded census data in ESRI because "[i]t would not be helpful in drawing maps for partisan performance, and I don't think it's right to use race when drawing maps." Tr. 10/7/25 AM 42:18–43:10.

202. Mr. Kincaid explained that his motivations and methods involved purely political performance metrics. Tr. 10/7/25 AM 142:2–9 ("it's a purely partisan draw in Travis County that aligns with the President's performance in 2024"); Tr. 10/7/25 AM 171:11–16 ("moved a portion of Brazoria County into" District 36 for "the partisan purpose" of "add[ing] population in 36 that was not too heavily Democrat to hurt the seat too much"); Tr. 10/7/25 AM 173:5–15 (moved Republican population between districts "to balance the populations" while "mak[ing the 22nd] a district that President Trump carried with 60 percent or more" and "put[ting] a little bit more Republican strength back into the 8th District so it didn't sink too far down");

Tr. 10/7/25 PM 59:4–7 (drew District 18 "as [a] Democrat vote sink[]"); Tr. 10/7/25 PM 64:9–21 (I drew blind to race and used politics. So as far as I was concerned, Texas 35 was a necessary partisan gerrymander that absorbed Democrats in Austin to San Antonio"); Tr. 10/7/25 PM 90:13–18 ("I drew my map using politics from start to finish and provided that to the Legislature"); Tr. 10/8/25 AM 64:24–65:4 ("I drew a race-blind map using partisan results, and that's how I created the map"); Tr. 10/8/25 AM 89:8–10 ("To be clear, the data I look at, I don't look at the racial data, number one. So I want to make sure I clarify that again.").

203. Mr. Kincaid testified that he "Has never learned racial makeup of a given district and then "gone back and made changes to that district based on that racial understanding." Tr. 10/7/25 AM 53:20–23. He testified that he made no "change[s] to District 9 based on racial data." Tr. 10/7/25 AM 169:6–11. He further testified that he did not "make any changes as a result of becoming aware of the racial or demographic character of the districts" because he "d[oesn't] draw off of race." Tr. 10/7/25 AM 186:20–25.

204. "My top criteria was to make sure that every Republican incumbent who lived in their seat stayed in their seat. That was one of the criteria. Another criteria was to make sure that every Republican incumbent who was in a district that President Trump had won with 60 percent of the vote or more in 2024 stayed in a district that President Trump won by—with 60 percent of the vote or more. I was not allowed to take any incumbent Republican who was above 60 below 60. In addition to that, there were a series of members across the state who were in districts that President Trump had carried but by less than 60 percent of the vote. So for those seats, I either had to improve them or keep their Partisan Voting Index exactly the same." Tr. 10/7/25 AM 60:9–61:6. These instructions came from Mr. Blair at the White House. Tr. 10/8/25 AM 121:17–25.

205. Mr. Kincaid investigated whether he could create a sixth pick-up opportunity, by reducing the number of Democrat districts in Houston from three to two. Tr. 10/8/25 AM 136:5-16. However, because of the need to protect "three members of Congress

that are [not] currently running for re-election"—Reps. McCaul, Luttrell, and Hunt—Mr. Kincaid was unable to create another Republican pickup opportunity in District 7. Tr. 10/8/25 AM 130:1–8.

206.  An example is Rep. Crenshaw, who was not drawn into the District 9 because "Texas 2 is a district that President Trump carried with 60 percent or more" and if had been drawn into the 9th "he would be in a seat that President Trump did not carry with 60 percent or more." Tr. 10/7/25 AM 125:3–10.

207.  Another example is District 10, which had "to accommodate where Congressman McCaul lived" and "pick up all of Brazos County" at the Congressman's request—all while keeping the district above the 60% threshold of 2024 support for President Trump. Tr. 10/7/25 AM 144:9–15.

208.  Similarly, District 15 was "pretty complicated" because Rep. De La Cruz was in "R plus seven district," and Mr. Kincaid was obligated to maintain that seven-point Republican advantage. Tr. 10/7/25 AM 151:17–152:3.

209.  He was forced to release a subsequent version of the map prior to its release as C2308 because he "had to fix [Rep.] Chip Roy's house." Tr. 10/7/25 PM 48:16–25.

210.  He also "wanted to improve the overall compactness of the map" compared with 2021. This included making it cleaner, more compact, more city based, more county based, where [he] could." Tr. 10/7/25 AM 62:11–23.

211.  For instance, he moved certain VTD's from District 36 to District 9, in part, because he "didn't want to split Baytown['s] downtown area in half." Tr. 10/7/25 AM 181:22–25.

212.  For the five pickup opportunities, "every single one of them had to be a district that President Trump carried by ten points or more at a minimum. Second . . . every one of those seats had to be carried by Ted Cruz in 2024. "There was no set amount of range on how much he had to win it by, but he had to win each of those five seats." Tr. 10/7/25 AM 63:9–23.

213.    Mr. Kincaid also was asked to maintain certain characteristics of districts held by Republican incumbents. For example, "a nonnegotiable for Texas 5" was keep[ing] Kaufman, Van Zandt, and Henderson Counties whole." Tr. 10/7/25 AM T. 85:5–13. Similarly, the Representative for District 14 "wanted . . . to keep all seven of the ports he held in the 14th District." Tr. 10/7/25 AM 138:10–18.

214.    He did not receive instructions, unlike in 2021, "that some Democrat districts were to be left alone or not messed with or protected." Tr. 10/8/25 AM 130:9–17 (question from Brown, J.).

215.    A mapmaker must "balance the population of every district," which cannot be done using precincts or census VTDs because they are too large. Tr. 10/7/25 PM 50:7–20. Instead, Mr. Kincaid uses "the number of people that were enumerated by the census at a specific census block" as the basis for his district population calculations. *Id.* These blocks "can be pretty small," sometimes including "just a single city block or even just a single building." Tr. 10/7/25 PM 125:24–25, 26:1–2. They represent "the smallest unit of geography . . . for which population data is collected." Tr. 10/7/25 PM 125:17–21.

216.    This raises two problems for a mapdrawer. Tr. 10/8/25 AM 81:20–82:1 (explaining complications arising from the distinctions between data produced by VTDs and precincts); Tr. 10/8/25 AM 50:23-24; 51:3–6 (noting the 2025 congressional map was drawn using 2020 VTDs and clarifying 2024 presidential election results are "not available in 2020 VTDs").

217.    The first challenge, from a partisan standpoint, is that election results are released at the precinct level. Tr. 10/8/25 AM 81:20–82:1. So a mapdrawer will have a sense of a given precinct's partisan leanings, but he or she will not know the partisan breakdown of the (much more granular) census blocks that are required to draw districts with equivalent population.

218.    Second, precinct borders change. The 2024 presidential results received from the Texas Legislative Counsel, for instance, are available for 2024 VTDs—not the 2020 VTDs which Mr. Kincaid used to draw his map. Tr. 10/8/25 AM 51:3–6; 50:23–24. In order to translate political results into a useable format for map drawing software, 2024 election results must be "transpos[ed] . . . into 2020 VTDs using some type of methodology." Tr. 10/8/25 AM 51:7–10; *see Tr. 10/8/25* AM 82:2–83:19.

219.    Mr. Kincaid has addressed these problems by developing a process that allows him to "allocate election results" to the census block level. Tr. 10/7/25 PM 126:14–15. This permits what opposing counsel conceded is "granular precision targeting." Tr. 10/7/25 PM 127:23.

220.    Mr. Kincaid begins with partisan data from the voter file. In Texas, this includes three types of data: election history (which elections a voter participated in), primary voter history (which party's primary a voter participated in), and voting method. *E.g.* Tr. 10/7/25 PM 134:3–8. This information can be matched to a physical address, allowing it to be "geocoded" and "assigned to the centroid within the census block." Tr. 10/7/25 PM 129:10–20. In other words, the partisan data for each voter is aggregated, anonymized, and assigned to his or her census block.

221.    Because Texas does not have partisan registration, Tr. 10/7/25 PM 134:4, primary voter history—whether a given voter voted in the Republican or Democratic primary—is used "to assign the likely partisan lean to [those] voters." Tr. 10/7/25 PM 134:25; 135:1–4. But not all voters participate in primaries. And, as noted, general election results are reported based on precincts, not census blocks. So in order to capture the election results—the number of votes actually cast for, say, Sen. Cruz—at a useful level, Mr. Kincaid subtracts the votes for which he has primary voter information and "washes" the remainder uniformly across the census block making up the given VDT. Tr. 10/7/25 PM 135:1–4.

222. Mr. Kincaid gave an example during his testimony. Tr. 10/7/25 PM 135:5–25. Assume a VDT with 1,000 people, of whom 600 voted in a given election. Assume further that there is "primary vote history"—that is, information on which primary they voted in— for only 200. In that case, for "the other 400 votes from that VDT, we don't have any way to assign the partisanship on those individuals." *Id.* at 135:14–15. In that case those 400 votes would be "uniformly applied . . . across the blocks within the VDT." Tr. 10/7/25 PM 137:17–18.

223. Having assigned all VDT voters to a census block, Mr. Kincaid is able to draw maps at a particularly granular level, one opposing counsel agreed is "more granular and more precise, surgically so." Tr. 10/7/25 PM 136:5.

224. Mr. Kincaid drew the C2308 map, which was the basis and precursor for the C2333 map. Tr. 10/7/25 AM 59:10–59:14.

225. Mr. Kincaid made changes to the map between versions 2308 and 2333, the enacted map. Tr. 10/7/25 AM 167:21–168:8 (Kincaid briefly describing the changes he made and those he did not make).

226. Mr. Kincaid testified that "[T]here were four Democrat seats in the middle of Harris County" and, in order "to pick up five seats, one of those seats had to be flipped." Tr. 10/7/25 AM 119:1–5.

227. First, he "shaded on the partisanship and looked for the most partisanly Democrat precincts in Harris County and then into Fort Bend and Brazoria County and put all of those together in the 18th District." Tr. 10/7/25 AM 119:13–16.

228. Having established the core of the district, the Northern and Eastern borders of CD 18 were "straightforward" with both borders including "very, very heavily Democrat precincts." Tr. 10/7/25 AM 120:12–14, 121:8–9. "[T]he 18th District was drawn wholly off of partisanship going up on the eastern side to the northern side," with Mr. Kincaid "looking at the politics there and taking the most heavily Democrat precincts and putting them into 18." Tr. 10/7/25 AM 124:4–8.

229.   In drawing CD 18, Mr. Kincaid also needed to take account of District 22, which Trump
       had carried with 60% of the vote, a vote total that needed to be maintained in the new
       map. So, some of the "precincts along the border of 22 and 18 are not as deep blue as
       the ones you would see in the rest of 18, but they are still much more Democrat than
       the rest of 22." Tr. 10/7/25 AM 122:3–6. For these precincts, he "was trying to keep
       the 22nd District where it was or getting better." Tr. 10/7/25 AM 123:17–18.

230.   Mr. Kincaid also liked "the shape of the seat," since another of his "objective[s] was to
       clean up the overall twisting profile of 18, 29, and 9" under the 2021 map.
       Tr. 10/7/25 AM 124:8–12. He was asked, however, about "an epiglottis that sticks
       down, a trigger, if you will, that sticks down from the northeast portion" of the district
       and explained that it contained "two or three very Democrat VTDs" and is "a feature
       that exists on the 2193 map as well." Tr. 10/7/25 AM 125:17–25.



231.  Mr. Kincaid pointed out "that the eastern and northern border of (District) 29 and (District) 18 here are very clearly bound by heavily Democrat VTDs . . . the ones that are more Republican are drawn into the Republican districts. Tr. 10/7/25 AM 184:11–24.



232.  Mr. Kincaid drew District 9 next. Tr. 10/7/25 AM 126:5–6. After drawing Districts 18 and 36, "the 9th kind of drew itself." Tr. 10/7/25 AM 126:9–10. After the "eastern border of 18 was set and the northern border of 36 in Harris County was set" he drew the "9th District up the eastern side of Harris County," meaning the Harris County border. Tr. 10/7/25 AM 126:11–19.

233.  The exception is Baytown, in two ways. First, a small "area just north of Baytown" was excluded because it includes Rep. Crenshaw's home, and drawing him into District 9 would take him out of a district President Trump won with 60% of the vote (District 2) and into one with a lower margin of victory. Tr. 10/7/25 AM 126:20–25, 127:1–10.

Second, "there is a series of Democrat precincts that are all kind of lumped together" in "the downtown area of Baytown." Tr. 10/7/25 AM 127:14–6. Because Mr. Kincaid was "trying to make the 9th District as Republican" as possible, those precincts were given to District 36. Tr. 10/7/25 AM 127:16–20.

234. He expressly testified that he did not "make any changes to District 9 based on racial data." Tr. 10/7/25 AM 169:9–10.

235. Most importantly, he "added Liberty County to the 9th District." Tr. 10/7/25 AM 168:21. This was because while the rest of the map was simply "the area in eastern Harris County that [he] could put in that district that didn't include [Rep.] Dan Crenshaw's house," the resulting district "was also not as Republican as [he] would have liked." Tr. 10/7/25 AM 168:25, 169:1–3. So, he "added Liberty County to it." Tr. 10/7/25 AM 169:3–5.

236. This made the 36th District "underpopulated by about 93,000 people" and noncontiguous. Tr. 10/7/25 AM 169:18–20. Fixing these population imbalances led to "a clockwise rotation around the Houston area." Tr. 10/7/25 AM 171:20–21. This in turn resulted in population being shifted out of the 18th District, which "had to grow in population."

237. To address this, Mr. Kincaid drew the northern border of District 18 "up to the Sam Houston Parkway." Tr. 10/7/25 AM 176:19–22. He also shifted two "pretty Democratic" VTDs from the northeastern portion of District 9 to District 18. Tr. 10/7/25 AM 176:24–25, 177:1–2. He also moved "a couple of VTDs" on "the eastern side of downtown into 18 to balance the population." Tr. 10/7/25 AM 177:11–14.

238. Mr. Kincaid pushed back on criticism of District 9, noting that "the core of Texas 9 is now in Texas 18" and "the number changed from 9 to 18." Tr. 10/7/25 AM 93:24–25; 94:1–3. And he argued that Rep. Al Green was not moved out of his district because he

no longer lived in District 9, he lived in District 18 and "the number of the district changed." Tr. 10/8/25 AM 111:3–8.

239.    Mr. Kincaid drew District 32 as a "Republican district in North Dallas County" that he had previously known was possible because "the precincts in North Dallas County are not as Democrat as the precincts in Central and Southern Dallas County." Tr. 10/7/25 AM 82:16–25, 84:23–25, 85:1–3. He did this by taking precincts with higher Republican support and then "extend[ing] the district east using a series of whole counties out into East Texas, with the exception of Hunt, which [he] had to split because it spanned the whole . . . width of the district." Tr. 10/7/25 AM 83:1–16. These counties to the east are "heavily Republican." Tr. 10/7/25 AM 83:17–19.



240.    Having drawn Republican district to the north, Mr. Kinkaid wanted to avoid re-drawing "whole areas of [the] map" because of later-discovered population imbalances. Tr. 10/7/25 AM 97:14–19. So he "drew one megadistrict" with "the most Democrat

VTDs [he] could find in Dallas and Tarrant County." Tr. 10/7/25 AM 97:14–23. This "megadistrict" became districts "30 and 33." *Id.* He then drew District 6, where portions of Irving that had "bec[o]me more pro Trump in 2024." Tr. 10/7/25 AM 100:11–13. Mr. Kincaid "put[] more Republicans in the Texas 6 and out of 30 and 33" to "make sure that the future 30 and 33 were as Democrat as [he] could possibly make them." Tr. 10/7/25 AM 100:18–21.

241.    In dividing Districts 30 and 33, Mr. Kincaid began with a series of precincts "just south of Downtown Dallas" where President Trump had received 20% or less of the 2024 vote and "assigned them all to the 30th District." Tr. 10/7/25 AM 105:16–24. He then added "a series of heavily Democrat precincts" to the west of Dallas, as well as "250,000 from Tarrant" County living in "heavily Democrat precincts."



242.    Tr. 10/7/25 AM 25:24–25, 26:1–18. The "reason [he] put" those groupings into District 30 is because they are "heavily Democrat." Tr. 10/7/25 AM 116:11–18.

243.    He then set the border "using neutral boundaries" where possible. Tr. 10/7/25 AM
107:3–13. Beginning in Grand Prairie, he followed I-70, "worked north to some streets
and then up the local metro line" before "again join[ing] the highway." Tr. 10/7/25 AM
107:5–7. "Bumpy" portions of the line reflect "precinct lines." Tr. 10/7/25 AM 107:21–
25, 108:1–4. He then balanced the district's population using a "little triangle . . . just
south of the interstate." Tr. 10/7/25 AM 108:13–15.

244.    His goal was to make District 30 "the more heavily Democrat seat of the two," so he
"put all of the most heavily Democrat contiguous precinct in there," which "made for
a more compact seat." Tr. 10/7/25 AM 109:2–13. District 33 was what remained of the
previous "megadistrict" once the 30th was drawn. Tr. 10/7/25 AM 109:20–21.



245.    On cross-examination, Mr. Kincaid clarified that in drawing toward Tarrant County he
"moved west long the footprint of the existing Texas 30." Tr. 10/7/25 PM 69:10–16.
He also noted that while "the most Democrat cluster you can draw is actually right there

in the center of Dallas County" doing so "creates a wall of a whole bunch of Democrats on the eastern side" that he "needed to be able to move ... west somehow." Tr. 10/7/25 PM 70:22–25, 71:1–4. This was his reason for taking "the 30th District down and put[ting] it in its current footprint." Tr. 10/7/25 PM 71:3–4.

246. He acknowledged that District 33 was previously a coalition district. Tr. 10/7/25 PM 59:14–16. He also acknowledged that Rep. Jasmine Crockett "is not in the 30th District any longer," Tr. 10/8/25 AM 110:18–20, that CD 30 "has been electing African Americans since the 1990s," and that the district was "an African American district" because of the "high correlation between African Americans and Democrat votes." Tr. 10/8/25 AM 100:2–25, 101:1–3.

247. Mr. Kincaid took a high-level approach to drawing District 35, which now includes "three whole counties plus Bexar County." Tr. 10/7/25 AM 150:21–151:6.

248. First, he drew District 34 as "a series of whole counties all the way up the Gulf Coast until it ran out of population in Corpus Christi" making it a "more compact district" and taking it out of Hidalgo County. Tr. 10/7/25 AM 151:7–13. Then he worked through District 15, which was complicated because it is Congresswoman Monica De La Cruz's (R) district and performs for Republicans by seven points. Tr. 10/7/25 AM 151:17–25. Following his criteria, he did not want to disturb the partisan advantage of her district. Tr. 10/7/25 AM 152:2–14. He achieved that by moving eastern Hidalgo County from District 34 to District 15, which also moved it north. Tr. 10/7/25 AM 152:5–13. Those portions of Hidalgo County were not strongly Republican, however, so this created a partisan problem that he remedied by moving District 15 north. Tr. 10/7/25 AM 152:19–153:5.

249. He then moved two VTDs north of El Paso, including the airport and Fort Bliss, from District 16 into District 23, but that change was abandoned from PLANC2308 to PLANC2333. Tr. 10/7/25 AM 153:23–154:11. Nonetheless, he then moved east with

District 23 and kept the northern boundary with District 11 unchanged and proceeded south to draw District 28. Tr. 10/7/25 AM 155:7–16.

250.    Mr. Kincaid placed the remainder of Hidalgo County in District 28 to make a Trump plus 10-point Republican pickup opportunity. Tr. 10/7/25 AM 155:22–156:6. Mr. Kincaid notes that although District 28 performed for President Trump and Sen. Cruz, as drawn, it did not perform for Governor Abbott under his 2022 results. Tr. 10/7/25 AM 156:11–18.

251.    After moving District 15 to the east and District 28 to the south, Guadalupe, Wilson, and Karnes Counties were freed up and he combined them with a piece of Bexar County to make District 35. Tr. 10/7/25 AM 156:25–157:9. This achieved his partisan goal of Trump 10-point seat that was carried by Sen. Cruz and Governor Abbott and the new district passed his durability test looking at older election results. Tr. 10/7/25 AM 157:10–158:2.

252.    Mr. Kincaid placed heavily Democrat precincts in the San Antonio area and Bexar County into District 20 so that they would not go into District 35. Tr. 10/7/25 AM 164:24–165:16.



253. After completing changes to District 29, Mr. Kincaid focused on District 22 in the Gulf Coast Region. Tr. 10/7/25 AM 135:10–21. First, he gave District 22 VTDs from Fort Bend County that performed better for Trump. Tr. 10/7/25 AM 135:22–135:13.

254. Next, he moved areas of Sugar Land in District 7 that were performing better for Republican candidates into District 22 to try to make it as Republican as he could. Tr. 10/7/25 AM 136:14–137:11. District 7 was a Democrat seat that he was trying to "put as many Democrats in there as I could." Tr. 10/7/25 AM 137:9–14. The old District 22 had northern Brazoria County, which he swapped with District 14's southern portion of Brazoria County, to keep the district at a good Republican number, or better than it was before. Tr. 10/7/25 AM 137:15–138:7.

255. At the request of District 14's incumbent, Congressman Randy Weber, Mr. Kincaid ensured that seven ports were kept in the district, giving District 22 its southeastern border. Tr. 10/7/25 AM 138:10–18.

256. Mr. Kincaid testified that in order to draw District 27, he first reviewed District 37 in Travis County. Tr. 10/7/25 AM 141:12–22. The southeastern border of District 37 separates Trump 30%+ VTDs south into District 27, and anything less than Trump 30% north into District 37. Tr. 10/7/25 AM 142:2–9. His goal was to keep District 27 above 60% Trump. Tr. 10/7/25 AM 143:12–16.

Defendants'
Exhibits

1541

257.   By the time he drew District 27, he had already worked his way through the Rio Grande Valley seats and so he moved north along the Gulf Coast and kept Victoria County in District 27 because the incumbent lived there. Tr. 10/7/25 AM 142:19–143:8. At the time, he did not know Rep. Mike McCaul in District 10 was retiring, so he was not very flexible with District 27's northern border. Tr. 10/7/25 AM 144:9–20.

258.   In the northwest, the line between District 21 and 27 in Hays County, allowed him to get District 27 just above 60% Trump. Tr. 10/7/25 AM 144:21–145:6. He tried to avoid a split in the southwest in Refugio, Aransas, and San Patricio, but needed to ensure District 27 was contiguous by road. Tr. 10/7/25 AM 145:1–6.

259.   In summary, Mr. Kincaid's testimony made clear that race did not inform any part of the 2025 Plan, including the districts challenged in this action.

### 2. Testimony Concerning Legislative Motive

260.    Texas legislators gave testimony, both live and through recordings played at trial, regarding their respective intents in the redistricting process.

261.    Sen. King testified repeatedly, both live and through recordings of statements during the legislative session, that he did not consider any racial data when reviewing the map for the legislative process. Tr. 10/6/25 PM 110:22–24; Tr. 10/1/25 AM 26:13–15; Tr. 10/2/25 AM 28:2–3. Sen. King also not did believe the July 7, 2025, letter from Harmeet Dhillon mattered to the Legislature. It was not addressed to the Texas Legislature, it had been responded to by the state's Attorney General, and was not relevant to the Senators considering redistricting as requested by the Governor. Tr. 10/9/25 AM 134:1–135:8.

262.    Sen. Alvarado testified that Sen. King spoke repeatedly and consistently "throughout the process" that partisanship and compactness directed his review of the plan, Tr. 10/1/25 AM 92:21–93:9, and that he did not look at racial data, Tr. 10/1/25 AM 118:16–119:6. Sen. Alvarado was asked if, in the 2025 session, "the discussion of race [was] on the mouth of the governor, other leaders in the Legislature from the word go?" and her answer was "No." Tr. 10/1/25 AM 15:18–21.

263.    On October 6, Counsel for Brooks Plaintiffs accused Sen. King of "just look[ing] at [people] as Democrats[.]" Tr. 10/6/25 PM 139:2–139:17.

264.    On the House side, Rep. Vasut, Chair of the House Redistricting Committee, testified that it was not the purpose of the process to "change the districts based on their racial makeup by virtue of the fact that they're majority-minority districts," and, instead testified that "the whole point of this process is solely to respond to the [Governor's] call," Tr. 10/9/25 PM 84:20–85:1–2. Chairman Vasut stated both at the time of the legislative process and on the stand that he "disagree[d] with the assumption that this process had anything to do with the DOJ letter." Tr. 10/9/25 PM 115:13–116:13. Chairman Vasut corroborated under oath an interview he gave at the time of the

redistricting process: "I see no evidence that this was racially drawn. This is a political performance map." Defs.' Ex. 1385; Tr. 10/9/25 PM 114:17–18.

265. In laying out the bill for the House, Rep. Hunter commented on the political performance of the districts, reported the CVAP for specific districts and answered questions about that data from members of the committee. Tr. 10/9/25 PM 104:22–105:25.

266. On October 1, Counsel for Brooks Plaintiffs criticized Rep. Hunter for discussing the racial composition of districts following introduction of a proposed map. Tr. 10/1/25 AM 94:4–96:8.

267. Chairman Vasut stated clearly both at the time of the legislative process and on the stand that he "disagree[d] with the assumption that this process had anything to do with the DOJ letter." Tr. 10/9/25 PM 115:13–116:13. Chairman Vasut corroborated under oath an interview he gave at the time of the redistricting process: "I see no evidence that this was racially drawn. This is a political performance map." Defs.' Ex. 1385; Tr. 10/9/25 PM 114:17–18.

268. Speaker Moody testified that the redistricting process was "politics over people in the grossest way possible. It's a power grab" orchestrated by "the felon in chief," "President Trump." Tr. 10/1/25 PM 122:14–123:15. In his view, the DOJ letter was merely a tool that "gave anybody who wanted to redraw these maps the check box of, these are – according to the DOJ, they're unconstitutional," Tr. 10/1/25 PM 11:24–12:13.

269. Rep. Gervin-Hawkins testified that the goal of the redistricting was "to try to bring about [President Trump's] partisan goal of redistricting and getting up to five more Congressional seats from Texas." Tr. 10/3/25 PM 50:13–51:4.

270. Sen. Alvarado testified that the DOJ letter contained "many errors," Tr. 10/1/25 AM 18:18–19:1, and that she checked with Sen. King and learned that the redraw would be "from a race-blind perspective." Tr. 10/1/25 AM 57:19–58:3. She expressed no

disagreement with Sen. King's representation and said that his position that the redraw was for partisan and compactness reasons remained consistent "throughout the process." Tr. 10/1/25 AM 92:21–93:9.

271.   Sen. West viewed "minority seats" as "pawns" but testified clearly that it was not racial intent that drove the process but that the special session was called "in order to do the bidding of the President in order to attempt to get additional Republican seats in Congress ahead of the 2026 election." Tr. 10/2/25 AM 25:18–26:5. "That's what this is all about." *Id.*

272.   Rep. Romero, chair of Plaintiff group MALC, also testified that a vote for the bill's passage did not make members of his caucus racist. Tr. 10/2/25 PM 73:4–12. Like others, he was confused by the DOJ letter. Tr. 10/2/25 PM 56:7–8.

273.   Rep. Hunter identified in his floor layout that there were zero BCVAP districts under the 2021 map and that the proposed map had two new HCVAP districts. Tr. 10/1/25 AM 94:4–95:19, playing Brooks Ex. 316 at 29:19–31. The context for that statement was Rep. Hunter laying out the bill and providing racial makeup after the map was drawn, not racial targets used to develop the map. But it only shows, at most, awareness of race, not but for or predominant racial intent.

274.   Sen. Alvarado acknowledged that Rep. Hunter first spoke of partisanship in his layout, Rep. Hunter had been criticized for not providing the racial makeup in 2021, and Speaker Moody simply recognized racial data in Rep. Hunter's notes. Tr. 10/1/25 AM 95:22–96:5; Tr. 10/1/25 PM 130:4–131:3; and Tr. 10/1/25 PM 45:2–25.

275.   Dean Thompson testified that she hoped Rep. Hunter would show up to answer questions about racial makeup during the layout. Tr. 10/2/25 AM 119:8–13. Dean Thompson testified that she herself looked at the racial makeup of proposed maps in 2021 and 2025. Tr. 10/2/25 AM 119:14–22.

276. Sen. Menendez criticized Sen. King for not providing racial data like Rep. Hunter, which Sen. King explained was unnecessary because he looked at it from a partisan basis. Tr. 10/1/25 AM 106:16–107:7.

277. Throughout the legislative process, legislators referenced the *Petteway* decision. Dean Thompson said she was told redistricting had to be "racial neutral" because of *Petteway,* Tr. 10/2/25 AM 90:16–22, and Rep. Gervin-Hawkins believed *Petteway* requires you to maintain minority opportunity districts, Tr. 10/3/25 PM 14:19–15:8.

278. Legislators testified as to their awareness of race as part of the legislative debate. Rep. Hunter responded to Rep. Pierson's concerns about proportionate Black representation, Brooks Ex. 309 at 98:21–101, and Rep. Hunter responded to Rep. Gervin-Hawkins asking about African American districts, Tr. 10/3/25 PM 16:13– 17:18:7.

### 3. The DOJ Letter

279. Plaintiffs focused their case on a letter by Harmeet Dhillon, Assistant Attorney General for Civil Rights at the U.S. Department of Justice (DOJ). Ms. Dhillon is not a member of the Texas Legislature, and the letter does not establish racial motive in any respect concerning the Texas Legislature.

280. The letter did not urge the use of race in redistricting. Its only reference to "race-based considerations" was an accusation leveled against four districts (CD 9, CD 18, CD 29, and CD 33) in the 2021 plan. The letter simply states that "the racial gerrymandering of Congressional districts is unconstitutional and must be rectified immediately by state legislatures." The letter asked that certain districts be reconfigured, not that race be used in that process or that any racial goal be achieved in the new districts.

281. The letter bears no meaningful connection to the subsequent redistricting. As noted, it referenced only four districts. The Legislature, however, revised 37 of 38 districts across the State. The redistricting was not in any meaningful sense controlled or directed by

the DOJ letter. *Compare* Brooks Ex. 253, Letter from Harmeet Dhillon, Assistant Attorney General of the Department of Justice Civil Rights Division, to Greg Abbott, Governor of Texas, and Ken Paxton, Attorney General of Texas (July 7, 2025) (identifying districts 9, 18, 25, and 33) *with* Defs.' Ex. 1029, Comparison of Plan C2333 with Plan 2193 (showing changes to more districts than the four identified in the Dhillon letter); *see also* Defs.' Ex. 1289, House Select Comm. on Congressional Redistricting Aug. 1, 2025 Tr. at 54:10–16 (Todd Hunter states that "this plan includes political considerations ... [t]he proposed plan redraws—and I want everybody to know this—37 of the 38 congressional districts to some degree.").

282. Legislators gave testimony on the use and effect of the letter, confirming that it did not meaningfully impact the process or cause any racial motivations to impact passage or line drawing. Sen. King gave it no weight and held it irrelevant. Tr. 10/9/25 AM 134:1–135:8. Rep. Vasut made public statements that the Dhillon letter did not factor into his decision to make any votes on the 2025 enacted map. Tr. 10/9/25 PM 78:11–79:12. Further, Rep. Vasut publicly stated at the passage of the 2025 map that he did not pass the 2025 enacted map (C2333) because of the July 7, 2025, Dhillon letter, that he did not care what the Dhillon letter asserted about any districts, and did not know of any members who did care about the letter; he saw no evidence of a racial motive. Tr. 10/9/25 PM 115:1–23, 116:14–25. He did not believe that the letter affected the decision of any member on the Redistricting Committee. Tr. 10/9/25 PM 120:1–8.

283. Similarly, even Rep. Gervin-Hawkins testified that no legislators voted for the map because of the DOJ letter and that she believed the letter was just a way for President Trump to bring about his partisan goal. Tr. 10/3/25 PM 50:13–51:4.

284. Sen. Alvarado testified that she understood the letter to ask Texas "[t]o go back and change these district lines." Tr. 10/1/25 AM 20:2–3 (Sen. Alvarado). Dean Thompson described the letter as "a letter that came from the Department of Justice that said that the 2021 maps were discriminatory. And it used race in drawing those maps and that

they needed—that they were basically needed to be redrawn." 10/2 AM 85:3–7 (Dean Thompson).

285.    Speaker Moody testified that it was his "understanding was, yes, this was a directive to redraw the map." 10/1 PM 12:24–25. Moody testified that "everything began in earnest after this letter, because this was—this gave anybody who wanted to redraw these maps the check box of, these are—according to the DOJ, they're unconstitutional[,]" 10/1 PM 12:5–8, and the letter "it was meant to spur this action, whether people wanted to do this or not[,]" 10/1 PM 22:21–22.

286.    Rep. Vasut testified: "I don't believe that the [DOJ] letter is a specific request for us to dismantle any district." Tr. 10/9/25 PM 84:7–8.

287.    Dean Thompson testified that she was shocked at the DOJ letter's accusation of race-based drawing and disagreed with it. Tr. 10/2/25 AM 90:6–15. "I could not understand how the DOJ could have accused him, the State of Texas, and how they could have accused him of letting this happen." *Id.*

288.    The clips shown at trial of Ms. Dhillon explained the request was "to put new maps together." Tr. 10/1/25 AM 78:24–25.

289.    Sen. King testified that the letter "for me it really didn't carry any significance. The letter wasn't addressed to the Legislature. It was addressed to the Attorney General and to the Governor. I obviously read it, but it—I think people tried to make it into something of influence, but I really don't believe it directed us in any manner." Tr. 10/7/25 PM 79:5–10. And in Sen. King's view the letter "unnecessarily confused the process." Tr. 10/9/25 Tr. 134:1–7.

290.    Romero testified: "I didn't know what to make of the DOJ letter." Tr. 10/2/25 PM 56:7–8.

291.    Some legislators testified they believed the letter to be an underhanded partisan request to add Republican districts to Congress.

292.    Sen. West, for example, opined that "President Trump, through his Department of Justice, sent a letter to the State of Texas asking for five more Congressional districts. And specifically laid out in this particular letter what their thoughts were as to why." Tr. 10/2/25 AM 7:1–4. Sen. West further stated that the redistricting process was about "getting a letter from the Department of Justice and then calling a special session in order to do the bidding of the President in order to attempt to get additional Republican seats in Congress ahead of the 2026 election. That's what this is all about." Tr. 10/2/25 AM 25:23–26:3.

293.    Gervin-Hawkins testified: "I just looked at [the DOJ letter] in combination of trying to take five seats. I didn't do an analytical of the letter or try to judge that, other than it was wrong." 10/3 PM 49:3–6.

### 4.    Gubernatorial Statements

294.    Plaintiffs also focused on statements by Governor Abbott that referenced the *Petteway* case and redistricting. The various statements generally contained three basic assertions (1) "that Texas is no longer required to have coalition districts," (2) "we wanted to remove those coalition districts," and (3) they were "draw[n] in ways that in fact turned out to provide more seats for Hispanics." [Brooks Ex. 335.] These statements do not reflect racial motive of the Legislature in adopting or configuring the 2025 Plan. The first proposition was a correct legal observation that coalition districts are not mandated. The reference to "removing" coalition districts is consistent with a goal to revise the districts on a race-blind basis. The third statement confirms that Governor Abbott referred to the *effect* of a race-blind redraw—some districts "in fact turned out" to have a certain racial impact.

295.    Governor Abbott's statements are best understood in light of national controversy surrounding the politically contentious redistricting. The Governor was incentivized to identify a legal justification to emphasize in place of the political motivation that was, in

fact, driving the line drawing and enactment. The Governor's statements do not override the clear, direct evidence that politics motivated the redistricting and race did not.

### B. Circumstantial Evidence

#### 1. The Redistricting Process

296. Evidence was received concerning the redistricting process and recent acts of the Texas Legislature. Plaintiffs attempted to claim evidence of racial intent through unusual acts or processes, but their position is unpersuasive. The circumstances surrounding the redistricting suggest nothing unusual that might point to invidious intent.

297. Witnesses involved in the redistricting process testified about the recent history and sequence of events leading up to the 2025 redistricting.

298. Sen. Alvarado testified that the redistricting was race neutral when the 2021 map was enacted. Tr. 10/1/25 AM 12:9–13, 15:11–14 (Sen. Alvarado).

299. Mr. Kincaid testified that the 2021 map was drawn race blind. Tr. 10/7/25 PM 84:25–85:1(Kincaid).

300. Dean Thompson testified that Chairman Hunter was sensitive to Dean Thompson's concerns about communities of interest when the 2021 map was drawn. Tr. 10/2/25 AM 109:5–19 (Dean Thompson). Dean Thompson (D) would have been "absolutely shocked" to see the Attorney General or Lieutenant Governor pass a race-based map. Tr. 10/2/25 AM 111:23–25 (Dean Thompson). Dean Thompson considered it insulting to be asked whether Sen. Joan Huffman (R) was racist because they worked together for many years and Dean Thompson never thought Sen. Huffman was racist. Tr. 10/2/25 AM 106:19–108:3 (Dean Thompson).

301. Per Sen. Alvarado's testimony, race was not "on the mouth of the governor" and the "legislature" when the 2025 redistricting process began. Tr. 10/1/25 AM 15:18–21 (Sen. Alvarado).

302.  Sen. Alvarado also testified that redistricting is a "contentious" and "difficult" process. Tr. 10/1/25 AM 7:19–21 (Sen. Alvarado). The Legislature has become hyper-partisan, and there is no way to remove partisanship from the redistricting process. Tr. 10/1/25 PM 119:7–120:2 (Speaker Moody).

303.  In March 2025, Adam Kincaid was contacted by Robin Armstrong, who is one of the three members of the Republican National Committee from Texas, and they discussed redrawing the Texas Congressional map. Tr. 10/7/25 AM 54:15–55:18 (Kincaid). The RNC hired Mr. Kincaid to assist in mid-cycle redistricting. Tr. 10/7/25 AM 55:20–24 (Kincaid). Mr. Kincaid testified that early as February or March of 2025, Republican strategists were meeting with White House officials to discuss redistricting before the mid-term election. Tr. 10/7/25 AM 54:6–11 (Kincaid).

304.  In June 2025, President Trump urged Texas to redistrict to get five more Republican seats. The *New York Times* reported in early June that President Trump was pressuring Texas Republicans to redistrict to increase partisan advantage. Tr. 10/2/25 AM 120:9–121:1 (Dean Thompson); *see also* Defs.' Ex. 1415.

305.  The Democrat legislators testified at trial that they believed President Trump wanted five more Republican seats in Texas: Sen. West (D), Tr. 10/2/25 AM 6:22–7:4 (Sen. West); Sen. Alvardo (D), Tr. 10/1/25 AM 10:15–19 (Sen. Alvarado); Speaker Moody (D), Tr. 10/1/25 PM 120:9–121:2 (Speaker Moody); *see also Tr. 10/1/25* PM 122:3–13 (Speaker Moody); Rep. Romero (D), Tr. 10/2/25 PM 78:11–13 (Rep. Romero); and Rep. Gervin-Hawkins (D), Tr. 10/3/25 PM 45:8–13 (Rep. Gervin-Hawkins).

306.  At the hearing after the layout for the redistricting bill was presented, Speaker Moody (D) stated, "The felon in chief said, get me five seats, and so here we are." Tr. 10/1/25 PM 122:18–24 (Speaker Moody).

307.  The special sessions for redistricting were called, according to Sen. West (D), "in order to do the bidding of the President in order to attempt to get additional Republican seats in Congress ahead of the 2026 election." Tr. 10/2/25 AM 25:20–26:3 (Sen. West). On

July 9, 2025, West posted on Facebook that the 2025 redistricting was "nothing more than a naked power grab by Republicans through the governor's call at Trump's behest." Tr. 10/2/25 AM 51:3–20 (Sen. West).

308.  Dr. Murray was aware of the president's demand in 2025 for five more Congressional seats for Republicans, and he had no reason to think that the president was not sincere. Day Tr. 5 AM 138:19–139:7 (Dr. Murray). Dr. Murray believed that the Texas Legislature responded to President's Trump wish to deliver five more Republican districts. Tr. 10/6/25 PM 5:23–6:12 (Dr. Murray).

309.  In mid-to-late July, Kincaid provided a Congressional map to the Texas Legislature. Tr. 10/7/25 AM 58:16–18.

310.  Witnesses testified about the legislative procedure and history of the mid-decade redistricting process.

311.  Sen. West testified that there is nothing unusual with mid-decade redistricting, and that has been done before. Tr. 10/2/25 AM 45:6–24 (Sen. West). Similarly, Sen. West testified that it was not unusual with redistricting in either a general session or a special session, and redistricting has happened in both general and special sessions before. Tr. 10/2/25 AM 44:25–45:5.

312.  Likewise, Sen. King testified that Texas has performed mid-decade redistricting before on several occasions and during special sessions in five of the last six redistricting cycles. Tr. 10/6/25 83:15–20 (Sen. King).

313.  Vasut testified as well that there was nothing unusual about the process for redistricting in 2025; hearings were held by both chambers in a manner that allowed testimony from witnesses across the state and beyond; Republicans worked with Democrat members to ensure that every requested witness was invited to testify; and members had the opportunity to ask questions and offer amendments. *See, e.g.*, Tr. 10/9/25 PM 80:13–23 (Rep. Vasut).

314. The Texas Legislature provided multiple opportunities for people across the state to participate in virtual and in-person hearings on redistricting. Tr. 10/2/25 AM 61:21–62:23 (Sen. West); Tr. 10/1/25 PM 19:2–22, 30:12–25, 32:15–25, 37:13–21 (Speaker Moody).

315. The Senate held four virtual hearings on the map, where anyone from anywhere in the state could participate. Tr. 10/2/25 AM 61:21–62:23 (Sen. West); *see also* Defs.' Ex. 1097. The virtual format enabled anyone in the state to log onto a computer and testify. Tr. 10/2/25 AM 62:21–23 (Sen. West).

316. The Senate held an in-person hearing at the Capitol for invited testimony and a separate in-person hearing at the Capitol for public testimony. Tr. 10/2/25 AM 62:24–63:6 (Sen. West).

317. The Senate enabled anyone to testify and provided both virtual and in-person options for testifying. Tr. 10/2/25 AM 63:7–9 (Sen. West).

318. The Texas Senate gathered public input through regional hearings held via teleconference. There were four days of hearings centered on the north, south, east, and west, respectively. There were thousands of people watching online. Tr. 10/6/25 PM 86:11–87:2 (Sen. King).

319. The Senate heard testimony from 242 witnesses. Tr. 10/1/25 AM 150:25–151:14 (Sen. Alvarado).

320. In addition to the Senate hearings, the Senate redistricting committee also opened a public portal to allow the public to submit comments or submit proposed amendments or other documents; there were more than 7,000 public portal submissions that were available to all of the Senators. Tr. 10/6/25 PM 96:20–97:5 (Sen. King).

321. The House held in person hearings in Austin, Houston, and Arlington, which included full–day hearings with testimony from invited witnesses and members of the public. Tr. 10/1/25 PM 19:2–22, 30:12–25, 32:15–25, 37:13–21 (Speaker Moody).

322. The field hearings held by the House on the redistricting bill were packed. Tr. 10/2/25 AM 87:22–88:3 (Dean Thompson). The room was appropriately set up for the hearing. Tr. 10/2/25 AM 88:18–21 (Dean Thompson).

323. When the space for the House hearing in UT Arlington reached full capacity, the Republican leadership worked to ensure that an overflow room was provided to accommodate more people being able to attend the hearing. Tr. 10/2/25 AM 20:18–21:16 (Sen. West).

324. There was testimony for and against redistricting. Tr. 10/9/25 PM 102:21–103:5 (Rep. Vasut).

325. Similarly, the Senate held hearings in the 2021 redistricting cycle, and all of the senators and representatives were able to review all of that testimony regarding "communities of interest, industry, and anything else they wanted related to that census." Tr. 10/1/25 AM 152:18–153:20 (Sen. Alvarado).

326. The hearing notice regarding redistricting was not focused on CD 9, CD 18, CD 29, and CD 33, which were the Congressional districts mentioned in the DOJ letter. Tr. 10/1/25 PM 22:23–23:1 (Speaker Moody).

327. The Republican leadership in the Senate and House worked with their Democrat counterparts to invite every witness requested. Tr. 10/6/25 PM 86:11–87:2 (Sen. King); Tr. 10/1/25 PM 23:21–25:18 (Speaker Moody).

328. Chairman King also asked Sen. Alvarado to identify anyone she wished to provide testimony and they were invited to do so. Tr. 10/6/25 PM 86:11–87:2 (Sen. King). Chairman King invited all of the people that Sen. Alvarado wanted to testify about the 2025 redistricting process. Tr. 10/1/25 AM 156:15–22 (Sen. Alvarado).

329. For the Senate hearings held after the map was filed, Sen. Alvarado, the Democratic Caucus Chair, provided a list of witnesses that she requested be called to testify, including legal experts and they were all invited. Later, the Democratic Congressional

delegation and persons from NAACP and MALDEF were also invited to testify. Tr. 10/6/25 PM 92:25–96:4; *see also* Defs.' Exs. 1149, 1174, 1176, 1190, 1219.

330. Chairman King invited both Ms. Harmeet Dhillon from the DOJ and Mr. Adam Kincaid to provide testimony. Tr. 10/6/25 PM 101:15–24 (Sen. King). Senate hearing committees generally send invitations to testify instead of subpoenaing witnesses to testify. Tr. 10/6/25 PM 100:17–21 (Sen. King).

331. The plaintiffs and intervenors in this case were specially invited to provide testimony, but except for Mr. Bledsoe representing the NAACP, none of the plaintiffs or intervenors appeared. Tr. 10/1/25 AM 150:25–151:14 (Sen. Alvarado).

332. Chaiman Hunter worked with everyone to hear testimony in a day-long hearing from a wide variety of witnesses, including Professor Ellen Katz from the University of Michigan Law School. Tr. 10/1/25 PM 23:21–25:18 (Speaker Moody).

333. Members of the Legislature had the opportunity to ask questions and offer amendments. Tr. 10/1/25 AM 108:7–11 (Sen. Alvarado); Tr. 10/1/25 PM 83:4–9 (Speaker Moody).

334. When the map was debated in the Senate, the members had the opportunity to ask lots of questions. Most of the senators asked questions. Tr. 10/1/25 AM 108:7–11 (Sen. Alvarado).

335. In handling the 2025 redistricting process, the Texas Senate complied with every aspect of Senate precedent and rules, including Senate Resolution 5 that set out the rules for the committee. Tr. 10/6/25 PM 113:9–114:20.

336. The House Speaker was responsive to requests by Democrats. Tr. 10/1/25 PM 17:8–15 (Speaker Moody).

337. The time for debate on the 2025 map was extended in the House to allow more time for questions. Tr. 10/1/25 PM 83:4–9 (Speaker Moody).

338.    In the 2025 redistricting process, Sen. West did not submit any proposed maps, any amendments in committee, or any amendment on the floor. Tr. 10/2/25 AM 60:9–16 (Sen. West).

339.    Chairman Vasut evaluated what had been done in prior mid-decade redistricting and then followed that precedent. Tr. 10/9/25 PM 80:13–23 (Rep. Vasut).

340.    Sen. Alvarado was not able to filibuster in the Senate because of an ethical concern after she circulated a fundraising email linked to her intended filibuster. Tr. 10/1/25 AM 148:10–150:6 (Sen. Alvarado).

341.    The chairman of the Senate redistricting committee, Sen. King, testified to three goals for the 2025 redistricting cycles: (1) the map must comply with the law; (2) the map must improve political performance for Republicans; and (3) the map must increase compactness, if possible. Tr. 10/6/25 PM 84:1–14 (Sen. King).

342.    Chairman King hired legal counsel to review the 2025 map for legal compliance, and Chairman King's outside counsel informed him that the map complied with the law. Chairman King did not review racial data before or after the 2025 map was created, but he was generally aware of some racial demographics in the state based on his prior work on redistricting. To his knowledge, no racial data was used in drawing the 2025 map. Tr. 10/6/25 PM 110:2–24 (Sen. King).

343.    The chairman of the House redistricting committee, Rep. Cody Vasut, testified that the purpose of the 2025 map was to improve partisan performance for Republicans. Tr. 10/9/25 PM 116:11–13 (Rep. Vasut); *see also* Defs.' Ex. 1385.

344.    The legislative record is replete with evidence that the purpose for redistricting in 2025 was to improve partisan performance for Republicans in the midterm elections and beyond. *See* Defs.' Ex. 1277 at 152:13–153:15, 1279 at 214:20–215:10, 1289 at 53:10–22, 1298 at 14:12–24, 1305 at 8:22–9:11, 1317 at 4:11–17, 1319 at 27:19–28:5, 1320 at 5:4–14, 1323 at 7:11–8:6.

345. During the Senate's first and second special sessions, no citizen, expert, or other witness offered any proposed alternate map or amendment to the proposed 2025 map. Tr. 10/6/25 PM 102:17–103:8.

346. The reasons identified in the DOJ letter for redistricting were not the reasons that the Texas Legislature enacted the 2025 map. Tr. 10/9/25 PM 116:11–25 (Rep. Vasut); Tr. 10/3/25 PM 50:15–51:4 (Rep. Gervin-Hawkins).

347. No one in the House cared about the July 7, 2025, DOJ letter in deciding to pass the 2025 enacted plan. Tr. 10/9/25 PM 116:11–25 (Rep. Vasut).

348. No one on the Republican side of the Legislature that Rep. Gervin-Hawkins was aware of ever stated that they voted on the 2025 map because of the July 7, 2025 DOJ letter; she believed that the letter was a way to bring pressure for the partisan goal of obtaining five more Republican seats in Congress. Tr. 10/3/25 PM 50:15–51:4 (Rep. Gervin-Hawkins).

349. To prevent the Republicans from passing the 2025 map, the Democrats broke quorum and left the state. Tr. 10/1/25 AM 144:1–2 (Sen. Alvarado); Defs.' Ex. 1370. Breaking quorum has been a "go-to move" for Democrats in several prior redistricting cycles. Tr. 10/1/25 AM 143:19–25 (Sen. Alvarado). When the Democrats in the Texas House broke quorum, they were joined by representatives from over 35 states to join them in a protest. Tr. 10/2/25 AM 36:36:1–8 (Sen. West); Defs.' Ex. 1367.

350. The vote on the 2025 map was along partisan lines, not racial lines. Tr. 10/2/25 PM 70:5–17 (Rep. Romero). MALC is a bipartisan committee, and some MALC members voted for the 2025 map. Tr. 10/2/25 PM 70:5–17 (Rep. Romero).

351. Every single vote on redistricting during the 2025 redistricting was along party lines. Tr. 10/2/25 AM 65:21–25 (Sen. West).

352. The 2025 map was passed on a 100% party-line vote in the Senate. Tr. 10/8/25 PM 68:15–17.

353. The 2025 map was passed on a 100% party-line vote in the House. Tr. 10/1/25 PM 92:20–93:1 (Speaker Moody).

354. HB4 in the first special session was passed out of committee on party-line vote in the House. Tr. 10/9/25 PM 106:7–16 (Rep. Vasut). HB4 in the second special session passed out of committee and then passed in the House on a party-line vote. Tr. 10/9/25 PM 114:7–13 (Rep. Vasut).

355. The fact witnesses also described the political effect of the adopted map.

356. The 2025 map increases the number of majority-minority districts. Tr. 10/8/25 PM 74:7–20 (Sen. Hinojosa); *see also* Defs.' Ex. 1325 at 63:7–66:18.

357. The effect of the 2025 enacted map is to improve partisan performance for Republicans. Tr. 10/1/25 PM 44:23–45:1 (Speaker Moody); *see also* Defs.' Ex. 1289 House Select Comm. on Congressional Redistricting Aug. 1, 2025 Tr. at 54:17–54:19 (stating to the committee that "[t]he primary changes, though, are focused on five districts for partisan purposes").

358. Rep. Gervin-Hawkins believed that the 2025 enacted map (C2333) likely improved the political performance of Republicans in Texas and has a good chance of delivering up to 5 additional Republican seats in Congress. Tr. 10/3/25 PM 51:12–52:2.

359. There are Anglo members in the Democratic caucus and there are minority members in the Republican caucus. Tr. 10/2/25 AM 63:20–25 (Sen. West).

   **2. Expert Opinion**

   **a) *Plaintiffs' Experts***

360. Plaintiffs presented testimony from Dr. Barreto, Dr. Duchin, Dr. Ansolabehere, Dr. Collingwood, Dr. Murray, and Mr. Ely attempting to present circumstantial evidence of racial intent of the 2025 Plan.[2] Defendants presented testimony from Dr. Trende and Dr. Lewis on the same subject.

---

[2] State Defendants address the opinions of Drs. Ansolabehere and Collingwood *infra*, at Section XII.A.1, 3.

1) Dr. Barreto

361.  Dr. Barreto does not know the basic elements of his own code. Tr. 10/4/25 AM 156:24–163:16. Dr. Barreto did not know the name of a pipe operator used multiple times in his code. *Id.*

362.  Dr. Barreto testified about his choropleth maps and his analysis of the specific districts within the 2025 map. *See e.g.,* Tr. 10/4/25 AM 107:19–108:14; *id.* at 95:12–23.

363.  Dr. Barreto, in his opening report, provided choropleth maps shaded by race, but did not provide corresponding partisan-shaded maps. *See* Brooks Ex. 269 at Map Figs. 1–21. In his rebuttal report, Dr. Barreto presented a series of what he called "RPV Dispersion Plot" maps, which were shaded based on the CVAP (by specific races), depicted the district boundaries, and then shaded VTD boundaries red or blue based on whether 50%+1 of the precinct supported the Republican (red) or Democrat (blue) depicted. *See* Brooks Ex. 284 at Figs. 1–18; Tr. 10/4/25 AM 107:19–108:14.

364.  Dr. Barreto claimed that in configuring CD 9, the State "carefully excluded Black population" and "traced the Hispanic population to create a majority-HCVAP district." Brooks Ex. 269 (Barreto Report) at 7, ¶ 22. He provided the following choropleth map, color-coded by race (with orange being majority-Hispanic, green being majority-Black, and purple being majority-Anglo):



Map Figure 14: Harris County Congressional Districts 2021 enacted (black) and 2025 passed (red)

Brooks Ex. 269 at 33, Fig. 14.

365. Dr. Barreto focused on Figures 14 and 18 of his rebuttal, depicting CD 30 and CD 35, respectively. Brooks Ex. 284 at 20, 22. But his testimony in regard to these figures was conclusory and very difficult to comprehend, *see* Tr. 10/4/25 AM 107:19–112:1, and he provided testimony about none of the other 16 similar figures in his rebuttal report.

366. Dr. Barreto pointed out that part of the reconfiguration of CD 9 entailed moving Baytown despite Dr. Barreto's view that only a portion of Baytown's population would have needed to balance CD 9's population. Tr. 10/4/25 AM 91:11–92:23. Dr. Barreto testified he did not discuss the partisan effects of those changes on the adjacent CD 2. Tr. 10/4/25 AM 132:12–19. In the final 2025 Plan, CD 2 had a 60.8% Trump share. Tr. 10/4/25 AM 132:20–23.

367.   Dr. Barreto claimed in his supplemental report that changes made to CD 9 between Plan C2331 and the enacted Plan C2333 (aka the 2025 Plan) were made in five steps. Brooks Ex. 283 at 16-23, Figs. S13-S20.

368.   In the Dallas-Ft. Worth area for CD 30, CD 32, and CD 33, Dr. Baretto's opening report did not provide any choropleth maps based on partisanship (only providing them based on race), *see* Brooks Ex. 269 at 20-40, Figs. 1–21, his rebuttal report did include a series of what he called "RPV Dispersion Plot" maps, which were shaded based on the CVAP (by specific races), depicted the district boundaries, and then color-coded the VTD boundaries red or blue based on whether 50%+1 of the precinct supported a Republican (red) or Democrat (blue). *See* Brooks Ex. 284 at 12–22 Figs. 1–18; Tr. 10/4/25 AM 107:19–108:14.

369.   Figure 14 of Dr. Barreto's rebuttal report was his RPV Dispersion Plot map of CD 30. Brooks Ex. 284 at 20. But his testimony in regard to Figure 14 was conclusory and difficult to comprehend, appearing to focus on a claim that areas to the west of downtown Dallas—which he described as "Democrat areas" that had "more African Americans" that were added, and contrasting that with a different area of Dallas with an Anglo Democratic population that he alleges was removed from CD 30. Tr. 10/4/25 AM 107:19–110:2. Suffice it to say, identifying areas that are Democratic *and* African American does not help the trier of fact disentangle race from politics.

370.   Dr. Barreto conceded that he was unaware that CD 30's boundary followed I-30 and I-35 through Dallas—confirming his analysis did not exclude non-racial explanations for the district boundaries. Tr. 10/4/25 PM 36:8–22. The Anglo-Democratic piece of CD 30 that Dr. Barreto said was removed from CD 30 was located north of I-30. *Compare* Brooks Ex. 284 at Fig. 14 *with* Defs.' Ex. 1031 at 12 (depicting 2025 Plan boundaries in Dallas County with highways and other natural borders). By ignoring racially neutral reasons for drawing boundaries, Dr. Barreto essentially made sure he would find none.

68

371.    Regarding CD 35, Dr. Barreto displayed one of his "RPV Dispersion Plot" maps, Figure 18, depicting CD 35. Brooks Ex. 284 at 22. But, like his testimony with regard to CD 30 in Dallas, his testimony about CD 35 was extremely conclusory, with his discussion focused on his observation that the "more urban area of San Antonio that was added into CD 35" were "very high density Hispanic and Democratic areas that were added into this district." Tr. 10/4/25 AM 110:3–111:4. No partisan analysis was attempted.

372.    Dr. Barreto claimed to produce "[m]ore than 4 million, 5 million district simulations" in his work in this case, Tr. 10/4/25 AM 33:7–19, but failed to produce a single alternative plan that configured five additional Republican seats with greater racial balance than the enacted plan. As shown below, none of his plans were without serious problems.

373.    Dr. Barreto testified about VTD splits in the 2025 plan. Dr. Barreto contended that the VTD splits in the 2025 Plan were evidence of the use of race—even though he admits that it is common for mapmakers to have to split VTDs in Congressional plans in order to equalize population to such a "fine margin." Tr. 10/4/25 PM 50:10–13. Dr. Barreto in fact testified that precinct splits are "inevitable" for a Congressional Plan, because you do have to get the population deviation down to effectively zero. Tr. 10/4/25 AM 99:11–17. Dr. Barreto also acknowledged that VTD shifts can accomplish other non-racial goals—for example, he noted that between Plan C2308 and C2331, the Legislature "moved one precinct or set of blocs in El Paso to move Fort Bliss" into a different district. 4 AM 114:10–17; see also Tr. 10/4/25 PM 50:17–20 (VTD might be split to follow natural boundaries, like I-35). Despite this, as with other areas of his report, he did not perform a partisan analysis of the splits, nor investigate any alleged effects before announcing his conclusions.

374.    Dr. Barreto insists that racial intent may be found from VTD splits because, he contends, election results are allegedly only available at the VTD level and the "only

reliable data that a map drawer could use is race." Tr. 10/4/25 PM 51:5–12. But this argument is absurd—Dr. Barreto admits himself that there are ways to interpolate partisan data to the census block level, Tr. 10/4/25 PM 44:2–12, and another Plaintiffs' expert in the case has undertaken such disaggregation. Indeed, Mr. Ely confirmed that CVAP data—which is derived from the Census ACS—is *also* not available at the block level (it is published at the block group level) and must be disaggregated. Tr. 10/2/25 PM 103:11–22.

375. Dr. Barreto contends that there is some racial difference in the composition of portions of VTDs kept within, or without, districts. But his report provides no analysis of the issue, *see* Brooks Ex. 269 (Barreto Report) at 14, ¶ 43, while criticizing Dr. Trende for offering an analysis of all the split VTDs in CD 18, one of the hotly disputed districts in this case. *Compare* Defs.' Ex. 571 (Trende Report) at 2–21 (showing images of each split VTD). Dr. Barreto's analysis was even less detailed than the "adjacency analysis" he performed in *Nord Hodges v. Albritton,* where he analyzed the racial composition of adjacent VTDs on either side of a district boundary, looking for differences. Tellingly, that court discredited Dr. Barreto's adjacency analysis because it was "not useful to determine whether race predominated over other redistricting criteria" because it "assume[d] a world in which lines are drawn randomly without regard to natural, municipal, or other boundaries," No. 8:24-cv-879-CEH-UAM, 2025 WL 2391348, at *17 (M.D. Fl. Aug. 18, 2025), which was not the case there—or in Texas.

376. Regarding simulations evidence, Dr. Barreto agreed that the similarities between the parameters used to draw simulated maps and the stated intent of the Legislature was important. Tr. 10/4/25 PM 12:7–14. Dr. Barreto also testified that the lack of a partisanship reason for why a district line is drawn a certain way does not "automatically mean that the line was drawn for racial reasons." Tr. 10/4/25 PM 37:12–17. This is because redistricting is not a "zero sum game between partisanship and race" but could

also include other criteria like "compactness and population equality." Tr. 10/4/25 PM 37:8–11.

377.    On race and partisanship, Dr. Barreto admitted that "race and party [are] heavily correlated" in Texas. Tr. 10/4/25 AM 68:11–12.

378.    Dr. Barreto used President Trump's 2024 performance as the sole partisan criterion he would model. In his analysis of CD 35 in Bexar County, Dr. Barreto told his simulations software to generate 332,000 maps with one district President Trump carried by "about ten points"—based on a deposition Mr. Kincaid gave about the 2021 Plan. Tr. 10/4/25 AM 72:10–19.

379.    On core retention, Dr. Barreto testified that he did not instruct his simulations software to be mindful of core retention. Tr. 10/4/25 PM 27:12–14. Dr. Barreto also did not consider incumbency protection at all in his analysis. Tr. 10/4/25 PM 27:14–20; 33:4–14. He did not consider the press coverage that "[t]he new configurations would leave Democratic members in those regions with the uncomfortable prospect of battling each other for the dwindling seats in next year's primaries; retiring; or taking their chances in nearby GOP-leaning districts . . . ." Tr. 10/4/25 PM 34:9–16 (quoting Defs.' Ex. 1517 at 1).

380.    On compactness, Dr. Barreto testified that he instructed his simulations software to apply a compactness "weight" of 1.5 to 2.0 to the simulated plans. Tr. 10/4/25 PM 16:21–17:1. While Dr. Barreto claimed this was a "small number," Tr. 10/4/25 PM 16:24–25, he testified that the compactness scale in the software is "not linear" and "not a simple one-to-one," Tr. 10/4/25 PM 23:11–22, meaning a compactness weight of 2 is more than twice the weight of a weight of 1. As Dr. Barreto testified, in some instances the redist software was unable to match the 2025 Plan's political performance because the 2025 Plan "sacrificed" compactness in a way the simulations did not. Tr. 10/4/25 PM 16:13–20; *see also* Brooks Ex. 283 (Barreto Sep. Report) at 2 n. 2.

381.  Dr. Barreto conceded that his own analysis showed that in 2024, just 60% of Hispanic voters supported Democratic candidates on average across the State. Tr. 10/4/25 AM 127:4–14.

382.  Dr. Barreto testified as to his method. Dr. Barreto's simulations took up to 48 hours to run. Tr. 10/4/25 AM 46:1–9. Dr. Barreto had a merged data file—the file combining CVAP, 2024 presidential election results, and Plan C2333 boundaries merged at the VTD level—that he fed into his redist software to conduct the analysis. Tr. 10/4/25 AM 168:1–8 (describing it as a "database file or a shape file"). Dr. Barreto did not turn over the merged data file with his reports and admitted he did not do so because he failed to save the file. Tr. 10/4/25 AM 172:25–173:3.

383.  Dr. Trende pointed out this failure, along with a number of other serious flaws in Dr. Barreto's code and analysis. An initial problem, as noted above, was that Dr. Barreto never turned over his shapefile so that his coding could be checked and verified. Tr. 10/10/25 Tr. AM 2:17–35. Typically, redistricting experts would also provide their merging code so that other experts in the case can verify the work done, but Dr. Barreto never supplied his merging code, the results of the merging code, nor his output of maps. Tr. 10/10/25 Tr. AM 5:6–6:18. Dr. Duchin, in contrast, did supply such information so that her work could be checked. Tr. 10/10/25 AM 6:25–7:8. In Dr. Trende's opinion, Dr. Barreto simply failed or refused to supply to provide sufficient information with his code to allow other experts to check his work for mistakes. Tr. 10/10/25 Tr. AM 9:19–11:6, 13:1–22.

384.  Dr. Trende's maps produced by using Dr. Barreto's code looked similar to Dr. Barreto's, but he could not be sure that he actually replicated Dr. Barreto's work because of the above issues and potential errors made in the merge by Dr. Barreto that could not be caught without such data. Tr. 10/10/25 AM 16:19–17:10.

385.  Dr. Trende also did not find Dr. Barreto's bare conclusion that split VTDs were evidence of racial intent reliable. According to Dr. Trende, there are many reasons to

split VTDs in Congressional maps besides race. They may split it to keep population equal, to keep neighborhoods intact, or to give the district a more reasonable shape. Tr. 10/10/25 AM 22:22–23:10. Also, the 440 split VTDs have to be compared to the total number of VTDs in Texas, prior to any splits: on the order of 8,000. Tr. 10/10/25 AM 23:11–16. With 440 (of approximately 8,800 precincts) split by the 2025 enacted map (C2333), some portion of the split precincts may look like racial data was involved even without using such data; different racial groups can sometimes cluster together, and neutral boundaries like interstate highways can separate some groups, which can cause what only looks like racial disparities. Tr. 10/10/25 AM 29:14–30:4.

386.   Dr. Trende looked at all split precincts related to CD 18 on the 2025 enacted map (C2333), showing the splits follow major roadways and a railroad line. Tr. 10/10/25 AM 28:7–28:13; *see* Defs.' Ex. 571, p. 15, Fig. 13. Dr. Trende analyzed 19 precincts splits for CD 18. Four were unpopulated, while 7 had populations of under 500 people, which would have a negligible effect on voting in a district. Five of the rest involved higher BVAP populations in CD 18, which split could easily be done without ever considering race. Tr. 10/10/25 AM 30:5–31:6. Dr. Barreto performed no similar analysis and did not consider alternate explanations in rushing to his conclusions.

387.   Dr. Trende also does not believe that dot density maps are useful in the present hearing. They are useful in showing concentrations of different groups, but do not provide information useful in ferreting out racial gerrymandering, in that data on other races, such as the population of White voters, are not shown. Tr. 10/10/25 AM 31:24–33:13.

388.   There are diagnostic commands that can be run in R—the map drawing algorithm used by Dr. Barreto and Dr. Trende—to verify that an expert's code is running correctly and as expected; Dr. Trende runs the commands every time as a check on his work. Dr. Barreto produced no diagnostic codes. When Dr. Trende tried to recreate Dr. Barreto's work, every simulation failed at least one diagnostic criterion. No map

from Dr. Barreto, as far as Dr. Trende was able to create them, passed the diagnostic metrics in R. Tr. 10/10/25 AM 51:20–54:9. Dr. Trende's opinion is that Dr. Barreto's maps are unreliable. Tr. 10/10/25 AM 54:10–17.

389. Dr. Barreto had three sets of simulations; Dr. Trende did not receive code for the first two. He searched all through the production and never found the code for either. The third simulation was labeled as using 2024 CVAP data, but Dr. Barreto affixed the 2021 map to it. As far as Dr. Trende can tell (because Dr. Barreto provided no input data for verification), Dr. Barreto analyzed the wrong map in his initial report. Tr. 10/10/25 AM 558:5–21.

390. In his September, 2025, report (the second report in support of the 2025 preliminary injunction hearing), Dr. Barretto analyzed only 3 districts in the Harris County area. Running simulations for only a few select districts constrained the computer algorithm (the "robot") to think that the 3 districts were the only ones available to the mapdrawer—when in reality, all of the surrounding districts had to be considered, as well. Tr. 10/10/25 AM 58:22–59:17. This obviously distorted—and constrained—the maps produced.

391. Dr. Trende ran diagnostics on the maps drawn by Barreto for his second 2025 report in South Texas; the results came back as unreliable with a lot of red Xs from the computer (indicating major errors). The R-hat values for summary statistics—to be considered reliable—should be between 1.0 and 1.5. Dr. Barreto's maps' values are as high as 2.536; they are not close to being reliable. Tr. 10/10/25 AM 60:1–61:19; *see* Defs.' Ex. 1594.

392. Dr. Trende stated that another problem with Dr. Baretto's maps, beyond R-hat values far too high, is that the robot reports low plan diversity. In order to be useful, the chain acceptance rates (showing a diversity of maps) should be above 10%; Dr. Barreto's maps had a chain acceptance value of .1%. This means that instead of the reported 51,360 sampled plans, the vast majority were simply duplicates. For the maps generated for South Texas, Dr. Barreto did not have 51,360 maps as claimed, but only 107 unique

maps—not enough maps to be a reliable foundation for any opinion. Tr. 10/10/25 AM 2:4–64:10; *see also* Defs.' Ex. 1594.

393.  Another mistake was caused by Dr. Barreto's compactness factor used for his code. Dr. Barreto's compactness measure within his code was at a level of "2," which he labeled as a "slight nudge" toward compactness. This is inaccurate, as the program, at a default level of "1" for compactness already favors it. The term is exponential—meaning a "2" level increases the affinity for compactness by orders of magnitude. Tr. 10/10/25 AM 69:6–70:18. The software R prefers diversity of plans of over 10%; Dr. Barreto's maps fall far short of that threshold, with some as low as .2 to .3%. Tr. 10/10/25 AM 70:19–71:5.

394.  A basic problem with Dr. Barreto's reports is that he could not get the requisite number of 59% Trump districts desired by the Legislature; he and his assistant, Mr. Rios had to lower their voting percentage to 56% Trump districts. At that point, they are no longer doing what the map maker wanted to do and are not matching the 2025 enacted map. Tr. 10/10/25 AM 71:10–72:6.

395.  In the case of every regional map drawn by Dr. Barreto using his robot, each had at least one of two problems: low plan diversity and/or the chains did not converge. Tr. 10/10/25 AM 72:7–15.

396.  Dr. Barreto, in his drawn maps, also did not properly account for incumbency, which was a constraint for the Legislature; half of Dr. Barreto's districts in Harris County paired Republican incumbents together in one district, and the Legislature would not accept that. Tr. 10/10/25 AM 72:7–73:1, 73:17–24. Nor did Dr. Barreto consider core retention for Republican incumbents; the mapdrawer did consider such retention. His districts in Harris County and statewide did not come close to the core retention of the 2025 enacted map (C2333). Tr. 10/10/25 AM 73:25–74:16.

397.  Dr. Barreto's statewide maps never converged; the diagnostic checks showed problems with every one. None of them reached the required acceptance rate of 10%, every map

placed at least two Republican incumbents into the same district, and none had core retention of over 20%, where the enacted plan has a core retention averaging 64%. Tr. 10/10/25 AM 74:17–75:5.

398.    In Dr. Trende's opinion, Dr. Barreto's reports did not demonstrate racial bias in the VTD splits, and the simulation outputs fail to show the diagnostic checks to verify reliable data. His reports do not disaggregate race from politics. Tr. 10/10/25 AM 75:6–16.

### 2) Dr. Duchin

399.    Dr. Duchin also provided testimony and analysis on choropleth and dot-density maps, including for specific districts.

400.    Dr. Duchin contends that she analyzed whether changes from the 2021 to 2025 Plan were "consistent with . . . the race neutral pursuit of pure partisan aims" and—despite disclaiming expertise on intent—purports to "conclude that there is strong evidence that race was used in the creation of this map in a manner that . . . shows racial vote dilution." Tr. 10/6/25 AM 26:14–20.

401.    In May, Dr. Duchin testified that the 2021 Map was not partisan enough to be a true partisan gerrymander. *See* Tr. 05/31/25 AM 57:24–25 (the 2021 map "left a lot on the table"). In October, Dr. Duchin acknowledged the 2025 Map is a partisan gerrymander, but her conclusion on the use of race remained the same. *See* Tr. 10/06/25 AM 70:15–19 (concluding race was used); s*ee* also Tr. 10/06/25 AM 133:23–134:4 (stating she does not want to help Texas engage in partisan gerrymandering).

402.    Dr. Duchin's analysis focused on three "clusters" of districts—C1, which is the "Tarrant/Dallas Area," C2, which is "Harris/Ft. Bend," and C3, "Travis/Bexar." Tr. 10/6/25 AM 28:1–3. The "clusters" comprise "all the districts and only the districts that touch Tarrant/Dallas in the first case, Harris/Ft. Bend in the second, and Travis/Bexar in the third." Tr. 10/6/25 AM 29:8–12.

403.   Dr. Duchin testified to a series of dot-density maps in her report (NAACP Ex. 208) which she contends reflect an intent to draw district lines by race in her three "clusters" of interest. Dr. Duchin's dot density maps show one dot per 25 people of different racial groups, with red dots for Asians, lavender for Anglos, amber for Blacks, and green for Latinos. Tr. 10/6/25 AM 33:21–25. In each of the three "clusters" she analyzed, she produced a dot-density map of the cluster—showing CD 24, CD 30, and CD 33 in Dallas-Ft. Worth in the first cluster, CD 7, CD 18, CD 29, and CD 38 in Houston/Ft. Bend in the second cluster, and CD 10, CD 17, CD 31, and CD 37 in Travis County in the third cluster. As for Clusters C1 and C2, she testified, in each instance with just a few sentences, to a conclusory opinion that the lines appeared to be designed with a racial goal. *E.g.*, Tr. 10/6/25 AM 35:4–11 (regarding CD 24, 32, and 33 in Cluster C1); Tr. 10/6/25 AM 48:8–16, 49:9–16 (discussing CD 9, 18, 29 in Cluster C2). But Plaintiffs never explored her third dot-density map with her (Duchin Report, Figs. 6–7). Further, she never provided any quantitative or detailed analysis to explain her conclusions.

404.   Regarding CD 9 and CD 18 in Harris County, Dr. Duchin provided a dot-density map of this region—which she termed "Cluster C2"—in her report. *See* NAACP Ex. 208 (Duchin Report) at 12, Fig. 5. On direct, she provided only a few sentences of conclusory statements to support her claim that race explains the boundaries. Tr. 10/6/25 AM 48:8–16, 49:9–16 (discussing CD 9, 18, 29 in Cluster C2).

405.   Dr. Duchin relied on a dot-density map of what she called "Cluster C1" in Tarrant and Dallas Counties by race. The following is Figure 4 of her report, showing CD 24, CD 30, and CD 33 in the Dallas-Ft. Worth area:



**Figure 4:** Dot density from Cluster C1 in Tarrant/Dallas shows that CD 24 is carefully designed to include White population and avoid pockets of minority groups.

NAACP Ex. 208 at 11, Fig. 4.

406.    On direct, Dr. Duchin testified only that the lines for CD 24, a district not challenged, "seem[ed] to be drawn in a way that the lines encompass a lot of White population and carefully excludes non-White population around it," and that "both District 33 and District 32 are impacted by that design." Tr. 10/6/25 AM 35:4–11.

407.    Dr. Duchin offered no analysis to explain why these boundaries are better explained by race than politics.

408.    Dr. Duchin was asked why she did not submit a plan to the Texas Legislature during the mapping process that configured five additional Republican seats while resolving "racial concerns," and she responded by saying her "motivating influence" was not "contribut[ing] to the goal of partisan gerrymandering." Tr. 10/6/25 AM 133:23–134:4. Dr. Duchin's produced "millions" of simulated plans as part of her analysis. Tr. 10/6/25 AM 131:25–132.

409. Regarding simulations evidence, Dr. Duchin attempted to create simulated plans that supposedly matched the Legislature's non-racial criteria for the 2025 Plan, including predicted Republican political performance of the 2025 Plan, and to then assess how frequently the simulated plans shared the 2025 Plan's racial characteristics. *See, e.g.,* Tr. 10/6/25 AM 52:14–17 (Dr. Duchin explaining that the "point of an ensemble analysis is to answer what we perceive as a need for a baseline for comparison").

410. Dr. Duchin agreed that the similarities between the parameters used to draw simulated maps and the stated intent of the Legislature was important. Tr. 10/6/25 AM 115:17–20.

411. Regarding race and partisanship, Dr. Duchin used a variety of elections—most of which the testimony does not suggest the Legislature or Mr. Kincaid relied upon— and treated Republican "wins" in districts as those won with as little as "50.1 percent" of the vote. Tr. 10/6/25 AM 57:20–58:3, 58:24–59:1. While Dr. Duchin did claim to check her results by requiring that her ensemble maps created as many Republican "wins" as in the 2025 Plan in different "clusters," *see* 5 AM 60:10–18, and then conducted a "robustness check" where she "sought out plans" with districts President Trump won in 2024 with "at least 55 percent," 5 AM 60:19–61:8, there is no evidence the Legislature imposed a "cluster-based" constraint or drew Republican Congressional districts across the board with a 55% win level for President Trump. Indeed, Mr. Kincaid's testimony on the subject showed that Dr. Duchin's analysis had no relation to how he drew the map at issue.

412. Dr. Duchin could not explain on cross-examination how she selected the 55% value. *See* Tr. 10/6/25 AM 117:9–13. Nor does it comport with the record, which reflects that all the disputed districts that President Trump carried in 2024 were ones he carried with nearly 60% of the vote: 59.5% in CD 9, 59.9% in CD 22, 60.0% in CD 27, 60.1% in CD 31, 57.7% in CD 32, 54.6% in CD 34, and 54.6% in CD 35. Defs.' Ex. 984 at 3, 6. Statewide, of the 30 districts in the 2025 Plan that President Trump carried in 2024, he carried 20

with 60% or more of the vote, and 24 with 58% or more of the vote. *Id.* Applying a 55% or 50%+1 threshold is too low to fairly model the political performance of the 2025 Plan—especially when only looking at President Trump's performance and not also Sen. Cruz's, which Mr. Kincaid also relied upon.[3]

413.    Dr. Duchin ultimately concluded that, while her work is not "an exercise in mind reading" and she cannot "look into the hearts and minds" with it, she draws the conclusion that her analyses "are highly suggestive that race was used" to draw Plan C2333. Tr. 10/6/25 AM 70:5–19.

414.    Dr. Duchin did attempt to model core retention, by having her algorithm "surcharge" districts drawn by her simulation algorithm that had lower core retention. Tr. 10/6/25 AM 97:13–98:4. However, Dr. Duchin's algorithm did not differentiate between core retention of Republican-held districts versus Democratic-held districts, Tr. 10/6/25 AM 98:5–15. Dr. Duchin only required the algorithm to draw simulated plans that did not pair more incumbents than Plan C2333, but failed to consider whether incumbent pairings were of Republican or Democratic members. Tr. 10/6/25 AM 100:11–101:1. This process deviated greatly from the goals of the Legislature in creating a Republican-friendly map, and a huge change from the 2021 redistricting process. Dr. Duchin's maps, under these conditions, were not going to match the enacted 2025 map.

415.    First, Dr. Duchin prepared box plot diagrams to show the degree to which the 2025 Plan's districts' CVAPs were statistically unusual in different "clusters" compared to the range of her simulated plans, but Dr. Duchin failed to produce similar box plots to show how the 2025 Plan's districts' *partisanship* compared to the range of the

---

[3] As Dr. Trende explained, a 50%+1 Republican district using President Trump's 2024 vote-share would be a "vulnerable seat" and "a district we would consider it to have a Democratic lean because it would be to the left of President Trump's 2024 vote share." Tr. 10/10/25 AM at 56:7–57:1.

simulations, to determine if the 2025 Plan was an outlier with regard to partisanship too. *See* Tr. 10/6/25 AM 124:4–126:3. Without disaggregating partisan data from racial data or other traditional redistricting criteria in the districts, Dr. Duchin's work simply cannot come to any substantive conclusion.

416.    Dr. Duchin stated that there is partisan data available at the census block level—whether directly or by disaggregation from VTD-level data. *E.g.*, Tr. 10/6/25 AM 79:6–16 (Dr. Duchin). Nevertheless, she did not use it to separate partisan motives from alleged racially motives.

### 3)   Mr. Ely

417.    Mr. Ely served as a mapping consultant to Richard Allen, the special master in the *Milligan* matter in Alabama, and helped craft a remedial plan in that state. Tr. 10/2/25 PM 96:1–14.

418.    Mr. Ely knows it is possible to accidentally draw a 50%+1 BCVAP district without looking at racial data because has done it too. 10/02/25 PM 128:1–14.

419.    Mr. Ely also offered a limited qualitative analysis principally involving two sets of choropleth maps of Harris and Bexar Counties—one set color-coded by which racial group (if any) constitutes the majority of each VTD, and another set shaded to reflect what Mr. Ely terms his "performance index." *See generally,* LULAC Ex. 831 (Ely Report).

420.    Mr. Ely's maps do not meaningfully attempt to distinguish race from partisanship, and neither Mr. Ely's report nor his direct examination provided sufficient detail about his analysis of the district boundaries in those counties to allow the Court to assign it much weight. *See generally* Tr. 10/2/25 PM 106:24–109:8 (CD 9), 110:17–111:17 (CD 35). He is also not an expert on intent.

421.    Mr. Ely agreed that a mapdrawer who wanted to create a "partisan map" would want to know "the difference between a precinct that supports Donald Trump at 80 percent

and a precinct that supports him at 51 percent," which Mr. Ely's "election performance" maps do not depict. Tr. 10/2/25 PM 129:22–130:20. This is a fatal flaw, as Mr. Ely's methodology would never produce maps similar to those created by the Legislature—and would never reliably perform for Republican candidates as desired by the Legislature.

422.    Mr. Ely's apparent attempt to evaluate whether partisanship explains the boundaries in those counties is not credible. Mr. Ely's only look at partisanship was to construct a "performance index" based on six elections that LULAC Plaintiffs' counsel instructed him to consider—i.e., Dr. Collingwood's six contests (2020 Railroad Commissioner, 2020 Supreme Court Seat 8, 2022 Attorney, Supreme Court Seat 5, and Supreme Court Seat 9, and 2024 U.S. Senate). *See* LULAC Ex. 831 at 18 (listing contests). The index score refers to how many of those contests the minority-preferred candidate prevailed in. Mr. Ely claimed the following "performance index" map of Bexar County showed evidence that the border of CD 20 and CD 35 "cuts through a concentrated Latino or Hispanic community," Tr. 10/2/25 PM 110:24–111:2, and that politics did not explain the difference because, he claimed, "the line between 20 and 35 clearly has a split of communities with the same election result behavior." Tr. 10/2/25 PM 114:17–23. Kincaid rejected the use of such down-ballot races as unhelpful predictors of partisan performance in Congressional elections. Tr. 10/7/25 AM 63:13–21 (describing his partisan criteria); *id.* at 67:21–68:6 (describing the Abbott criteria to ensure success in midterms); *id.* at 145:16-146:5 (stating that Cruz, Abbott and Trump numbers were enough to infer Republican down ballot results); Tr. 10/7/25 PM 71:22–72:6 (stating that he aimed to maximize Trump and Cruz numbers, not just Republican performance overall).

Bexar County – Performance Index

C2333



LULAC Ex. 833 (Ely Rebuttal Report) at 9.

423.  Mr. Ely did not consider President Trump's election or even analyze political performance in Republican vs. Democratic terms. Tr. 10/3/25 AM 3:12–25. Further, the map only applies colors corresponding to the index score but does not account for the *margin* of victory in each block depicted. As noted continually at trial, the margin of victory—producing a map that performed for Republicans and also was durable—was key to the mapdrawer's partisan project. *See*, *e.g.*, Tr. 10/7/25 AM 60:9–61:6 (Kincaid).

424.  Mr. Ely suggested that the Hispanic or Black CVAPs of certain districts in the 2025 Plan were slightly over 50% was evidence of the use of a racial target for drawing those

districts. LULAC Ex. 831 (Ely Report) at 7, ¶ 21–22; Tr. 10/2/25 PM 105:22–106:21. Mr. Ely admitted that he himself was accused of racial gerrymandering—an allegation he denied—in one of the proposed remedial plans he configured in Alabama in the *Milligan* litigation for use in the 2024 elections, because his second Black opportunity district had a Black voting-age percentage of 50.1%. Tr. 10/2/25 PM 124:3–11. Mr. Ely denied that he drew that plan using racial population data or to any racial target, and the *Milligan* court agreed, finding that Mr. Ely did not rely on racial data. *Singleton v. Allen*, No. 2:21-cv-1291, 2023 WL 6567895, *7 (N.D. Ala. Oct. 5, 2023) (three-judge court). Mr. Ely testified that the racial composition of that proposed remedial plan was the consequence of his use of election data to draw districts that would be "effective" for candidates. Tr. 10/2/25 PM 128:3–21.

425. Moreover, Mr. Ely testified that race and partisanship are correlated in Texas. Tr. 10/3/25 AM 3:1–3 (Ely). It is possible that a map gerrymandered to achieve a partisan end can look very similar to a map that is racially gerrymandered. Tr. 10/3/25 AM 3:4–7 (Ely). Racial intent and partisan intent cannot be disentangled based on evaluating CVAP data alone. Tr. 10/3/25 AM 3:12–15 (Ely). Mr. Ely agreed that a mapdrawer who wanted to create a "partisan map" would want to know "the difference between a precinct that supports Donald Trump at 80 percent and a precinct that supports him at 51 percent," which Mr. Ely's "election performance" maps do not depict. Tr. 10/2/25 PM 129:22–130:20. After noting how important the depth of partisan voting is for this type of analysis, he avoided looking at that data.

426. An area in CD 18 under the 2025 enacted map was pointed to as showing a map that affected racial minorities, but also correlated with partisan voters for and against Trump; a mapdrawer with pure partisan intent could "wind up drawing a line that happens to separate" a heavier concentration of Black voters from a heavier concentration of Hispanic voters without ever looking at racial data. Tr. 10/3/25 AM 4:15–7:6 (Ely); *see also* Defs.' Ex. 571, p.23, Fig. 20. He also admitted that a mapdrawer

might well draw a map district that included Hispanic areas but not Black areas without ever looking at racial data. Tr. 10/3/25 AM 6:19–7:6 (Ely). A map can result in a 50.1%-BVAP district when the mapdrawer relies on partisan performance indices to evaluate effectiveness while being blind to racial data. Tr. 10/2/25 PM 127:15–128:19 (Ely).

427.    There is nothing inherently suspicious about splitting VTDs because the one-person, one-vote rule requires population balancing. Tr. 10/3/25 AM 7:17–8:6 (Ely). Such splitting in inevitable.

428.    Mr. Ely confirmed that CVAP data—which is derived from the Census ACS—is *also* not available at the block level (it is published at the block group level) and must be disaggregated. Tr. 10/2/25 PM 103:11–22.

### b) *State's Experts*
#### 1) Dr. Trende

429.    Dr. Trende, one of the State's experts, provided choropleth maps of the different disputed regions of the state—essentially "heat maps" depicting the percentage of support for President Trump in 2024 by VTD—to assess the relative role of race and party by district. *See e.g.,* Defs.' Ex. 571 (Trende Report) at 22 n.7, 30 Fig. 24.

430.    For CD 9 and CD 18 in Harris County, Dr. Trende provided an equivalent choropleth map of the Houston region, shaded by President Trump's 2024 vote-share, with lighter colors corresponding to lower vote-share and darker colors corresponding to higher vote-share:



Figure 20: Houston area precincts by Donald Trump Two-Party Vote Share, with C2333 district boundaries overlaid

Defs.' Ex. 571 (Trende Report) at 23, Fig. 20.

431.    In the Houston/Harris County area, Dr. Trende shows that a "heavy cluster of low Trump performing precincts around downtown Houston" are "crammed into Districts 29, 18, and 7." Tr. 10/10/25 AM 34:12–21. He calculated that of all the Harris County VTDs where Vice President Harris received over 70% of the two-party vote, there are 31 in CD 7, 150 in CD 18, 61 in CD 29, and a mere handful in CDs 8, 9, 36, and 38. Defs.' Ex. 571 at 23–24.

432.    As for race, Dr. Trende observed that CD 7 and CD 18 both contain a fair number of Anglo residents, which Dr. Trende concluded "is not the tactic of a racial segregator." Defs.' Ex. 571 at 24–25. Notably, the Anglo residents included in CDs 7 and 18

86

predominantly supported Vice President Harris in the 2024 election, corroborating a partisan motivation for the district assignment. *Id.*

433.    Dr. Trende also addressed concerns raised by Dr. Barreto about CD 9 in the Houston area. S13 to S21. Dr. Trende testified that the changes "grew into a complex chain of events involving almost 700,000 residents in 12 districts, 667,000 of whom lived in the Houston area," which required careful balancing from a political performance perspective. Defs.' Ex. 571 at 27. Dr. Trende noted that Dr. Barreto focused on the addition of Liberty County from CD 36 to CD 9, but ignored that this required careful rebalancing of multiple redistricting factors—including county splits, contiguity, population equality, and partisan performance—that require a broader perspective than just a narrow focus on CD 9. *Id.* at 28; Defs.' Ex. 571, Trende Report at 30 (Fig. 24).

434.    In the Houston/Harris County area, Dr. Trende observes that a "heavy cluster of low Trump performing precincts around downtown Houston" are "crammed in Districts 29, 18, and 7." Tr. 10/10/25 AM 34:12–21. He observed that of all the Harris County VTDs where Vice President Harris received over 70% of the two-party vote, there are 31 in CD 7, 150 in CD 18, 61 in CD 29, and a mere handful in CDs 8, 9, 36, and 38. Defs.' Ex. 571 at 23–24. As for race, Dr. Trende observes that CD 7 and CD 18 both contain a fair number of White residents—but White residents that voted for Vice President Harris—which Dr. Trende concluded "is not the tactic of a racial segregator." Defs.' Ex. 571 at 24–25.

435.    Dr. Trende also addressed concerns raised by Dr. Barreto about CD 9 in the Houston area. Dr. Trende pointed out that the changes from C2331 to C2333 in CD 9 "grew into a complex chain of events involving almost 700,000 residents in 12 districts, 667,000 of whom lived in the Houston area," which required careful balancing from a political performance perspective. Defs.' Ex. 571 at 27. Dr. Barreto focused on the addition of Liberty County from CD 36 to CD 9, but ignored that this required careful rebalancing of multiple redistricting factors—including county splits, contiguity, population

equality, and partisan performance—that require a broader perspective than just a narrow focus on CD 9. *Id.* at 28.

436.    Similar patterns are found in Dallas/Tarrant Counties, Defs.' Ex. 571 at 29–32, and Bexar/Travis Counties, *id.* at 32–35. In Tarrant County, for example, Dr. Trende noted the "stunning outcome[]" that in the rural counties outside Tarrant County in CD 25, President Trump received 85% of the vote, which provided a "big buffer to go into Tarrant County and soak up a lot of Democratic precincts, while still producing a heavily Trump district." Tr. 10/10/25 AM 38:10–19. And, in another finding inconsistent with a racially motivated mapmaker, Dr. Trende finds in Figure 25 that white plurality precincts are included in CD 30 and CD 33—just the ones that tend to be precincts that supported Vice President Harris. Tr. 10/10/25 AM 39:16–24.

Figure 27: Austin/San Antonio area precincts by Donald Trump Two-Party Vote Share, with C2333 district boundaries overlaid



© OpenStreetMap contributors



© OpenStreetMap contributors

Defs.' Ex. 571, Trende Report at 30 (Fig. 24).

437.    Dr. Trende's report quantitatively analyzed the distribution of precincts in CD 30 and

CD 33 in Dallas. He showed that of the 354 Dallas and Tarrant County counties where

President Trump received under 30% of the vote, 83% of them (294) were placed into

CD 25 (47), CD 30 (149), or CD 33 (98). Defs.' Ex. 571 at 30. Just nine such precincts

were assigned to CD 32. *Id.*

438.    Likewise, for precincts that President Trump carried with at least 70% of the vote, the

opposite pattern holds. Dr. Trende identified 79 such VTDs in Dallas and Tarrant

Counties and found just two in CD 30 and six in CD 33. Defs.' Ex. 571 at 30. This

pattern supports a finding that district boundaries in this region are correlated with

politics.

439.    Regarding VTD splits, Dr. Trende analyzed each VTD split in CD 18 and found no

obvious connection between VTD splits and race. *See* Defs.' Ex. 571 (Trende Report)

at 3–21; Figs. 1–19 (reporting no evidence of racial sorting in any of the 19 split VTDs

in CD 18). Dr. Trende testified to an obvious non-racial explanation for the split—a

VTD split to follow a street boundary, or slicing off a "tongue" to make the boundary

more regular, or to follow an interstate highway or rail line. *See* Tr. 10/10/25 AM 26:1–

29:13. Finally, Dr. Trende explained that the number of people in CD 18 affected by all the split VTDs is fairly minimal—of the 19 split VTDs, four had unpopulated portions (i.e., nobody lived in the split portion of the VTD) and fifteen involved a population split of less than 500 individuals. Tr. 10/10/25 AM 30:5–17.

440.    Dr. Trende analyzed the modeling problems of Plaintiffs' experts. *See* Defs.' Ex. 571 at 42–54.

441.    Dr. Trende explained that Dr. Barreto unreasonably constrained his model, by, for example, making the robot think "that the only precincts that were available to the mapdrawer are the precincts that ended up in Districts 7, 18, and 29," which was not a reasonable assumption because "the shape of those districts changed." Tr. 10/10/25 AM 59:3–12. By setting these types of constraints on his model—ones that the Legislature did not have—Dr. Barreto did not "giv[e] the simulations room to breathe." *Id.* 59:15–17. When Dr. Trende ran the redist software's diagnostic reports after running Dr. Barreto's code, he discovered the software reported problems with Dr. Barreto's simulations. *See* Defs.' Ex. 571 at 45–46. The many listed errors demonstrate Dr. Barreto's simulations failed to return a "nice random sample" that is "reliable" for using for statistical analysis. Tr. 10/10/25 AM 60:19–61:19. Without convergence, "you don't have a random sample you can reliably base inferences on." Tr. 10/10/25 AM 62:4–10. Dr. Barreto's maps are simply not reliable.

442.    As noted above, all of Dr. Barreto's regional simulations suffered from "severe plan diversity issues." Tr. 10/10/25 AM 64:6–21. As Dr. Trende explained, low plan diversity means the simulations model is not drawing a sufficiently large number of unique maps in order to create a good sample. This lack of sufficient numbers of maps throws off the analysis and leaves the researcher without a sufficiently large sample to conduct reliable analysis. *Id.* at 64:5–10.

2)  Dr. Lewis

443.    Dr. Lewis, a professor of political science at UCLA, provided rebuttal to Plaintiffs' intent case by providing an analysis that corroborated Mr. Kincaid's testimony that past partisan performance is a better predictor of future political performance than racial data. This was, in part, due to the fact that Hispanic cohesion is so varied. Put simply, Dr. Lewis is unaware of "any" literature to support a claim that race is a better predictor of future voting than part partisan performance; past partisan voting is a far better indicator of future voting than using racial data. Tr. 10/09/25 AM 103:19–25.

444.    For his analysis, Dr. Lewis "took the precinct-level voting and demographic data provided by Professor Ansolabehere and . . . plotted the share for Donald Trump in the 2024 general election against the . . . share of vote for Governor Abbott in 2022, and also against the share of each precinct's Citizen Voting Age Population that was associated with Black voters and Hispanic voters." Tr. 10/8/25 PM 105:17–24. Figure 1 of his report, Defs.' Ex. 570, demonstrates that support for Governor Abbott in 2022 was a "strong predictor of subsequent vote for Trump in 2024," with "96 percent of the variation observed in Trump support can be accounted for by variation in Abbott support." *Id*. at 3, ¶ 9. By contrast, outside of precincts with very large Black populations, knowledge of a precinct's Black or Hispanic population "was much less indicative of Trump support than knowledge of previous support for a Republican candidate." *Id*. at 4, ¶¶ 10–11.

445.    A more sophisticated regression analysis, which Dr. Lewis reports in Figure 2, corroborates Mr. Kincaid's testimony that predictions of future electoral performance based on past partisan performance are better than those based on demographics. Tr. 10/8/25 PM 112:5–21; Tr. 10/7/25 AM 43:3–10.

446.    Dr. Lewis's analysis of racially-polarized voting revealed substantial variation in support among Hispanic voters for Republican candidates, with Hispanic support for

91

Democratic candidates in some Congressional districts in the 2025 Plan being "less than 40 [percent] in a few cases, and in the 40s in other cases." Tr. 10/8/25 PM 122:4–10; Defs.' Ex. 570 at 6, Fig. 3. This explains, in part, why past partisan figures are better predictors of future political performance than racial data. Defs.' Ex. 570 at 4–6, ¶ 11–15. This confirms there would be no point in use of race as a proxy for politics because political data would be far more accurate than racial data which would be highly inaccurate. This corroborates Mr. Kincaid's testimony that he did not—and would not—use race as a proxy for political behavior. Tr. 10/7/25 AM 51:22–52:4 (Kincaid stating he does not use race as a proxy for partisanship).

447.  Dr. Lewis' final conclusion was that the 2025 enacted map (C2333) disadvantaged Democrats without regard to race; the enacted plan allows Black and Hispanic voters an increase in win rates for their voting. Tr. 10/09/25 AM 111:22–112:4. The map does what it was designed to do – increase the chances for more Republicans in Congress.

448.  Dr. Lewis was repeatedly asked questions about claims under the Voting Rights Act and not about the claims at issue in this hearing. *See*, *e.g.*, Tr. 10/9/2025 AM 16:9–11 ("But to answer my question, isn't a very important issue the number of districts in which a given group has the opportunity to elect their candidates of choice?"); Tr. 10/9/2025 AM 25:10–32:14 (discussing types of statistical analyses conducted to support claims under the Voting Rights Act); 32:18–34:9 (discussing homogenous precinct analyses).

449.  Plaintiffs' counsel sought to fault Dr. Lewis for not conducting a homogenous precinct analysis of the type conducted for claims under the Voting Rights Act. Tr. 10/8/2025 PM 141:1–24; Tr. 10/9/2025 AM 35:19–49:9. Plaintiffs' Voting Rights Act claims were not at issue at the hearing and Dr. Lewis did not conduct such a homogenous precinct analysis. Tr. 10/9/2025 AM 49:6–9; 99:25–100:5.

450.  Plaintiffs attempted to criticize Dr. Lewis for not analyzing Asian voting patterns, Tr. 10/9/2025 AM 3:13–8:11, but Plaintiffs' own expert Dr. Ansolabehere did not analyze

Asian voting patterns in his report; "I did not analyze Asian voting patterns," Gonzales' Ex. 39, ECF No. 1149-24 at 3.

451.    Questions posed to Dr. Lewis about whether his figures and tables address statewide as opposed to district-specific figures, *see*, *e.g.*, 10/9/2025 AM Tr. 11:5–8, were beside the point where there was no allegation that the mapdrawer was conducting district-specific racially polarized voting analyses. Indeed, district-specific racially polarized voting analyses are the hallmark of claims under the Voting Rights Act which were not at issue in this hearing.

452.    Plaintiffs attempted to impugn Dr. Lewis's credibility for prior work he conducted in North Carolina, but it was established that in both pieces of prior work the North Carolina court depended on the reliability of Dr. Lewis's analyses in order to make findings in those cases. Tr. 10/9/25 AM 107:3-109:18; 109:19-111:4.

453.    Plaintiffs went so far as to try to impugn Dr. Lewis's credibility through the bad deeds of an advisee of his wife's. Tr. 10/9/25 AM 55:20-25.

## XII.    Evidence of Racial Effect

454.    The Parties presented expert testimony on the effect of the 2025 Plan on the ability of racial groups to elect preferred candidates.

### A.    Plaintiffs' Experts

#### 1.    Dr. Ansolabehere

455.    Dr. Ansolabehere stated he was not an "intent expert" and analyzed only "effect." Tr. 10/3/25 AM 62:10–19; 63:15–16. Indeed, Dr. Ansolabehere, despite being retained by the *Gonzales* Plaintiffs, was unaware that the *Gonzales* Plaintiffs had alleged districts were drawn to a racial target. Tr. 10/3/25 AM 62:10–19.

456.    Dr. Ansolabehere only reported that CD 22 and CD 27 were new "majority White CDs," Gonzales' Ex. 39 (Ansolabehere Report) at 4, but his report did not analyze any specific district lines or offer any opinions about legislative intent.

457.  Under Dr. Ansolabehere's election-by-election analysis of racially polarized voting, he found that CD 22 under Plan 2333 the candidate he identified as minority-preferred would prevail in 48% of elections from 2020–2024. Tr. 10/3/25 AM 56:21–57:4.

458.  Under Dr. Ansolabehere's analysis, the 2025 enacted map (C2333) would have CD 29 and CD 33 electing the Hispanic voters' candidate of choice 100% of the time. Tr. 10/3/25 AM 60:13–61:22 (Ansolabehere); *see also* Gonzales' Ex. 39, p. 13 (Tables 12, 13).

459.  Dr. Ansolabehere did not consider any primary elections, relying instead solely on general elections. Dr. Ansolabehere generated estimates for Anglo, Hispanic, and Black voters for "Democratic" candidates in various general election contests in 2020–2024. Gonzales' Ex. 39 ("Ansolabehere Report") at 8, Table 7.

460.  Dr. Ansolabehere's report stated that his racially-polarized voting analysis showed that in the 2021 Plan's CD 22, Hispanic voters were not cohesive. Gonzales' Ex. 39, Ansolabehere Report at 3–4. Dr. Ansolabehere also conceded that both CD 22 and CD 27 under the 2021 Plan elected Republican candidates, Tr. 10/3/25 AM 36:19–22, a trend which continues under the 2025 Plan's versions of CD 22 and CD 27. Tr. 10/3/25 AM 36:25–37:9.

### 2.  Dr. Barreto

461.  Dr. Barreto did not consider any primary elections, relying instead solely on general elections. Dr. Barreto similarly analyzed just general election contests in 2022–2024 in his report. Brooks Ex. 269 (Barreto Report) at 44–48. These experts omitted primaries from their analyses—a startling omission given the Court's prior criticism of an expert who failed to consider primary elections.

462.  According to Dr. Barreto's ecological-inference estimates, President Trump carried a substantial share of the Hispanic vote in districts in the 2025 Plan. Brooks Ex. 269

(Barreto Report) at App'x B, 44–48 (Trump 2024 vote-share among Hispanics, EI RxC, ranging from 26% in CD 32 to 48% in CD 2).

### 3. Dr. Collingwood

463.    Dr. Collingwood, a LULAC Plaintiffs' expert, also disclaimed offering any opinions about "legislative intent" and admitted he did not even know who drew the 2025 Plan. Tr. 10/3/25 AM 99:23–100:3. Moreover, Dr. Collingwood only studied CD 9 and CD 35 in the 2025 Plan, admitted that his results from those two districts cannot be "extrapolated" to other districts, and offered no opinions about whether the 2025 Plan "got better or worse for Hispanic voters." Tr. 10/3/25 AM 99:4–16.

464.    Dr. Collingwood did not attempt to disentangle race from partisanship in his report. Tr. 10/3/25 AM 124:12–125:4 (Collingwood). Dr. Collingwood did not include data from primaries in his analysis, despite the importance of voting data from primaries in disentangling race from partisanship. Tr. 10/3/25 AM 106:13–108:3 (Collingwood).

465.    Dr. Collingwood did not consider any primary elections, relying instead solely on general elections. Dr. Collingwood analyzed CD 9 and CD 5 using six contests from 2020–2024. LULAC Ex. 829 (Collingwood Report) at 9, Tables 3.1–3.2. Dr. Collingwood's six contests were: (2020 Railroad Commissioner, 2020 Supreme Court Seat 8, 2022 Attorney, Supreme Court Seat 5, and Supreme Court Seat 9, and 2024 U.S. Senate). *See* LULAC Ex. 831 at 18 (listing contests).

### 4. Dr. Duchin

466.    Regarding the political effect of the map, the 2025 enacted map (C2333) is definitely a more partisan Republican map than the 2021 map (C2193). Tr. 10/6/25 AM 95:15–96:6 (Dr. Duchin). In the change from the 2021 map (C2193) and the 2025 enacted map (C2333), minority voters' ability to elect their candidate of choice increased, according to Dr. Duchin from winning in 6 out of 14 contests to winning in 7 out of 14 contests. Tr. 10/6/25 AM 94:24–95:14 (Dr. Duchin).

467.    Dr. Duchin, did include certain primaries in her polarized-voting analysis. *See* NAACP Ex. 208 at 7. But inexplicably, she only included *Democratic* primaries. *Id*. In so doing, she fails to consider the ability of Hispanic and Black voters to influence *Republican* primaries.

### 5.  Dr. Murray

468.    Dr. Murray testified that he was "analyzing [the 2025 Plan] not in terms of the motivation of the mapdrawers, but what's the effect on the Black and Hispanic voters in Texas," and did not "present [himself] as an expert on motivations of political actors." Tr. 10/6/25 PM 17:12–18:1. In addition, Dr. Murray admitted he did not approach his task by asking whether "the Congressional Districts in Plan C2333 were consistent with a Legislature that proceeded on purely partisan motivation to maximize the number of Republican districts…," but rather approached it from the "perspective" of "what happens to the Black and Latino voters" as the result. Tr. 10/6/25 PM 16:11–19.

469.    Dr. Murray seemingly amended his August 22, 2025, report on August 24, and Plaintiffs' counsel admitted that "the report [from] the 24th is clearly a better report." Tr. 10/6/25 PM 47:2–6. Counsel took Dr. Murray through a lengthy examination of the amendments to his report—spanning 12 transcript pages—from the August 22 to 24 versions. *See* Tr. 10/6/25 PM 26:5–38:18.

470.    Dr. Murray contended that re-numbering of Congressional districts in the Houston area from the 2021 Plan to the 2025 Plan—e.g., his claim that "the new District 9 has virtually nothing to do with the old District 9"—was "evidence of intentional discrimination" on the basis of *race*, but the only evidence he cited was loose testimony about *political considerations* in Republican districts—e.g., that Congressman Crenshaw wanted Kingwood retained in CD 2. *See* Tr. 10/3/25 PM 100:2–101:10. Taken as a whole, his testimony fails to appropriately connect his inferences to the underlying

record and instead resembles unadorned color commentary that the Court is under no obligation to credit. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("A claim cannot stand or fall on the mere ipse dixit of a credentialed witness").

471.   Dr. Murray conceded that it was "absolutely" an "inevitable byproduct of trying to get five more Republican Congressional seats [in Texas], that you would have to make some big changes to existing districts that included very significant minority populations." Tr. 10/6/25 PM 41:23–42:3. Dr. Murray also testified to his belief that the Fourteenth Amendment prohibits "the elimination of naturally occurring districts that perform for racial and ethnic minorities," Tr. 10/3/25 PM 113:9–15, which is not consistent with the law. Under a but-for causation standard, discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*; *Miller v. Johnson*, 515 U.S. 900, 916 (1995). The Legislature's alleged knowledge of a racial "byproduct" of a *political* districting decision is not enough for Plaintiffs to clear their "bar" of separating partisan from racial motive. *See Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 9–10 (2024) (requiring plaintiffs to "rul[e] out the competing explanation that political considerations dominated the legislature's redistricting effort"). That is because race and politics often correlate in redistricting, and when they do, "it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map." *Id.* at 21. Dr. Murray therefore insists on using an improper standard that does not match the legal one established by the Supreme Court.

472.  Dr. Murray opined that the changes to the Brownsville district in the 2025 enacted map (C2333) made the new district more likely to elect a Republican, whether the Republican was Hispanic or not. Tr. 10/6/25 PM 9:2–10 (Dr. Murray).

**B. Defendants' Experts**

**1. Dr. Trende**

473.  Dr. Trende showed through detailed analysis of the 2025 Plan's challenged district lines that any impacts were borne more heavily by *Democratic* voters, not minority voters, including with evidence that the mapmaker assigned Anglo-majority—or—plurality precincts to districts based on partisanship, such as in CD 7 and CD 18 in Harris County, instead of by race. *See generally* Defs.' Ex. 571 (Trende Report) at 23–33.

**2. Dr. Lewis**

474.  Dr. Lewis cast doubt on the presumption that the effect of the 2025 map is racial in nature as opposed to partisan. Dr. Lewis showed that the 2025 Plan disadvantaged Anglo, Black, and Hispanic Democrats equally in their ability to elect preferred candidates. *See* Defs.' Ex. 570 at 7, Table 1; Tr. 10/8/25 PM 131:23–132:2, 132:15–25.

475.  Dr. Lewis conducted an analysis that considered how often voters of each partisan-racial pairing are expected to vote on the winning side under the 2021 and 2025 Plans. Defs.' Ex. 570 at 7, ¶ 16. Dr. Lewis observed that differences between plans in the rates at which voters of different groups are able to elect preferred candidates is an indicator of the plan on those groups. *Id.; see also* Tr. 10/8/25 PM 123:4–20.

476.    The results of this analysis are reported in Dr. Lewis's report as follows:

**Table 1: Estimated Share of Voting-Age Citizens Who Are Expected to Prefer the Winning Candidate by Party, Racial/Ethnic Group, and Plan**

|  | Plan | | |
|---|---|---|---|
|  | C2193 | C2333 | Difference |
| **Democrat** | | | |
| White | 41% | 31% | −11% |
| Black | 48% | 39% | −10% |
| Hispanic | 48% | 36% | −12% |
| **Republican** | | | |
| White | 90% | 93% | 3% |
| Black | 61% | 73% | 12% |
| Hispanic | 57% | 68% | 11% |

Defs.' Ex. 570 at 7, Table 1.

477.    As Dr. Lewis explained, these results show that "Plan 2333 benefits minority Republicans and harms all Democrats." Tr. 10/8/25 PM 131:100–14. In particular, Dr. Lewis finds that White, Black, and Hispanic Democrats all suffer relatively equal reductions in their ability to vote for the winning candidate. Tr. 10/8/25 PM 131:23–132:8.

478.    Correspondingly, Republicans of all races experience an increase in their ability to vote for the winning candidate, with Black and Hispanic Republicans experiencing a significant increase. Tr. 10/8/25 PM 132:9–22.

479.    Regarding the political effect of the map, Dr. Lewis testified that the effect of the 2025 plan is to increase Republicans chances of electing the candidate of their choice, which decreases the likelihood of Democrats electing the candidate of their choice. Tr. 10/8/25 PM 131:15–22 (Dr. Lewis).

Date: October 17, 2025

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

WILLIAM D. WASSDORF
Associate Deputy Attorney General for Civil Litigation
Texas Bar No. 24103022

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 787112–548
Phone: (512) 9361–700
Fax: (512) 4574–410
ryan.kercher@oag.texas.gov
will.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Special Counsel
Texas Bar No. 24125064

COUNSEL FOR STATE DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on October 17, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division