## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

LEAGUE OF UNITED LATIN AMERICAN
CITIZENS, *et al.*,

               *Plaintiffs,*

ALEXANDER GREEN, *et al.*,

               *Plaintiff-Intervenors,*

V.

GREG ABBOTT, *et al.*,

               *Defendants.*

|  |
|---|
| 3:21-cv-00259-DCG-JES-JVB |
| [Lead Case] |
| & |
| All Consolidated Cases |

---

## STATE DEFENDANTS' POST HEARING BRIEF

TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................................ iv

Preliminary Statement ...................................................................................................... 1

The Legal Standard ........................................................................................................... 3

Argument .......................................................................................................................... 4

I.   Plaintiffs' Burden to Prove Intentional Racial Discrimination Is Much Higher Than They Admit. ................................................................................................. 4

   A.   For Both Claims, Plaintiffs Must Prove Intentional Racial Discrimination, Not Mere Awareness of, or Disregard for, Racial Effects. ................................ 4

   B.   Racial Gerrymandering Requires Plaintiffs to Show that Race Predominated Over All Other Considerations ........................................................................... 6

   C.   Intentional Vote Dilution Requires Plaintiffs to Show a Specific Purpose, Harming Racial Groups Rather Than Political Groups ....................................... 7

   D.   The *Arlington Heights* Factors Provide, at Best, Weak Guidance on the Questions Before the Court ................................................................................. 9

II.  Plaintiffs Are Unlikely to Succeed on their Intentional Vote Dilution Claims ........... 10

   A.   Plaintiffs Are Unlikely to Show Discriminatory Intent ...................................... 11

      1.   Direct Evidence .......................................................................................... 11

         a.  Direct Evidence Concerning Line Drawing ........................................ 11

         b.  Legislative Statements ....................................................................... 14

         c.  The DOJ Letter .................................................................................. 20

         d.  Gubernatorial Statements .................................................................. 24

         e.  No Meaningful Direct Evidence ......................................................... 25

      2.   Circumstantial Evidence ............................................................................. 26

         a.  No Alternative Plan ........................................................................... 26

         b.  No Reason for Use of Racial Data. .................................................... 28

         c.  Expert Efforts to Show Racial Intent ................................................. 29

            i.   Choropleth and Dot-Density Maps ............................................ 30

            ii.  VTD Splits ................................................................................. 37

            iii. Mapping Simulations .................................................................. 39

            iv.  Dr. Murray ................................................................................ 48

d. Effort To Show Racial Intent Through *Arlington Heights* Factors ................... 50

    i. Effect of the Plan ................................................................ 50

    ii. Recent History................................................................... 53

    iii. Sequence of Events........................................................... 55

    iv. Legislative Procedure ....................................................... 56

    v. Legislative History ............................................................ 58

III. Plaintiffs Are Unlikely To Succeed on Their Racial Gerrymandering Claims ................ 58

    A. CD 9 and CD 18 in Harris County ............................................. 61

        1. Direct Evidence ........................................................... 61

        2. Circumstantial Evidence.................................................. 62

    B. CD 30, CD 32, and CD 33 in Dallas-Ft. Worth ............................. 65

        1. Direct Evidence ........................................................... 65

        2. Circumstantial Evidence.................................................. 67

    C. CD 35 in Central Texas ......................................................... 69

        1. Direct Evidence ........................................................... 69

        2. Circumstantial Evidence.................................................. 71

    D. CD 22 and CD 27 in the Gulf Coast Region ................................. 74

IV. Gonzales Plaintiffs Are Unlikely to Succeed on Their Foreclosed Mid-Decade Redistricting Claim........................................................................ 75

V. Equitable Considerations Independently Foreclose an Injunction................... 78

Conclusion ......................................................................................... 82

Certificate of Service ............................................................................ 83

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Perez,*
585 U.S. 579 (2018) ............................................................................... passim

*Agee v. Benson,*
No. 1:22-cv-272, 2023 WL 8826692 (W.D. Mich. Dec. 21, 2023) .......................... 52

*Agee v. Benson,*
No. 1:22-cv-272, 2024 WL 1298018 (W.D. Mich. Mar. 27, 2024) .......................... 22

*Ala. Legis. Black Caucus v. Alabama,*
575 U.S. 254 (2015) ........................................................................... 12, 60

*Alexander v. S. C. State Conf. of the NAACP,*
602 U.S. 1 (2024) ............................................................................... passim

*Allen v. Milligan,*
599 U.S. 1 (2023) ............................................................................... passim

*Anibowei v. Morgan,*
70 F.4th 898 (5th Cir. 2023).................................................................... 3

*Ardoin v. Robinson,*
142 S. Ct. 2892 (2022) ........................................................................ 79

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ........................................................................... 76

*Bartlett v. Strickland,*
556 U.S. 1 (2009) ............................................................................... 12, 53

*Benisek v. Lamone,*
585 U.S. 155 (2018) ........................................................................... 3, 78

*Bethune-Hill v. Va. State Bd. of Elections,*
368 F. Supp. 3d 872 (E.D. Va. 2019) ........................................................ 21

*Bethune-Hill v. Va. State Bd. of Elections,*
580 U.S. 178 (2017) ........................................................................... 12, 59, 60

*Brnovich v. Democratic Nat'l Comm.,*
594 U.S. 647 (2021) ........................................................................... 5, 14, 24

*Brown v. E. Miss. Elec. Power Ass'n,*
989 F.2d 858 (5th Cir. 1993)................................................................... 11, 24, 26

*Callais v. Landry*,
    732 F. Supp. 3d 574 (W.D. La. 2024) ................................................................... 79

*Chisom v. Roemer*,
    853 F.2d 1186 (5th Cir. 1988) ............................................................................... 79

*Cooper v. Harris*,
    581 U.S. 285 (2017) ........................................................................... 9, 12, 22, 59

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ................................................................................... 4

*Distributed v. U.S. Dep't of State*,
    838 F.3d 451 (5th Cir. 2016) ................................................................................. 78

*Easley v. Cromartie*,
    532 U.S. 234 (2001) ............................................................................................... 26

*Fusilier v. Landry*,
    963 F.3d 447 (5th Cir. 2020) ................................................................................... 4

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ............................................................................................... 48

*Griggs v. Chickasaw Cnty.*,
    930 F.3d 696 (5th Cir. 2019) ................................................................................... 5

*Growe v. Emison*,
    507 U.S. 25 (1993) ................................................................................................. 76

*Guile v. United States*,
    422 F.3d 221 (5th Cir. 2005) ................................................................................. 48

*Harness v. Watson*,
    47 F.4th 296 (5th Cir. 2022) ................................................................................... 8

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ........................................................................................... 7, 12

*Hunter v. Underwood*,
    471 U.S. 222 (1985) ............................................................................................... 11

*In re Landry*,
    83 F.4th 300 (5th Cir. 2023) ................................................................................. 80

*In re Zantac (Ranitidine) Products Liab. Litig.*,
    644 F. Supp. 3d 1075 (S.D. Fla. 2022) ................................................................. 47

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
335 F.3d 357 (5th Cir. 2003) ................................................................................................ 4

*LULAC v. Abbott*,
601 F. Supp. 3d 147 (W.D. Tex. 2022) ......................................................................... passim

*LULAC v. Abbott*,
604 F. Supp. 3d 463 (W.D. Tex. 2022) ................................................................................ 59

*LULAC v. Perry*,
548 U.S. 399 (2006) ............................................................................................. 2, 5, 12, 77

*Marks v. United States*,
430 U.S. 188 (1977) .............................................................................................................. 77

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) ................................................................................................................ 3

*McCleskey v. Kemp*,
481 U.S. 279 (1987) .............................................................................................................. 54

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ............................................................................................................ 79

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) .................................................................................................. 8

*Miller v. Johnson*,
515 U.S. 900 (1995) ......................................................................................................... passim

*Miss. Power & Light Co. v. United Gas Pipe Line Co.*,
760 F.2d 618 (5th Cir. 1985) .................................................................................................. 3

*Moore v. Harper*,
600 U.S. 1 (2023) .................................................................................................................. 76

*Nken v. Holder*,
556 U.S. 418 (2009) .............................................................................................................. 78

*Nord Hodges v. Albritton*,
No. 8:24-cv-879, 2025 WL 2391348 (M.D. Fla. Aug. 18, 2025) .................................. 33, 36, 38

*North Carolina v. Covington*,
585 U.S. 969 (2018) .............................................................................................................. 22

*Ohio ex rel. Davis v. Hildebrant*,
241 U.S. 565 (1916) .............................................................................................................. 76

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) ............................................................................ 20

*Paulino v. Harrison,*
    542 F.3d 692 (9th Cir. 2008) ............................................................. 26

*Perry v. Perez,*
    565 U.S. 388 (2012) ............................................................................ 80

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ................................................................5, 8, 25, 49

*Petteway v. Galveston County,*
    111 F.4th 596 (5th Cir. 2024) ........................................................17, 80

*Pierce v. N.C. State Bd. of Elections,*
    97 F.4th 194 (4th Cir. 2024) .......................................................... 79, 80

*Pignanelli v. Pueblo Sch. Dist. No. 60,*
    540 F.3d 1213 (10th Cir. 2008) ............................................................ 1

*Planned Parenthood of Hous. & Se. Tex. v. Sanchez,*
    403 F.3d 324 (5th Cir. 2005) ............................................................... 3

*Prejean v. Foster,*
    227 F.3d 504 (5th Cir. 2000) ............................................................... 4

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ............................................................................ 79, 81

*Radomsky v. United States,*
    180 F.2d 781 (9th Cir. 1950) ............................................................. 26

*Reno v. Bossier Par. Sch. Bd.,*
    528 U.S. 320 (2000) ............................................................................ 50

*Reno v. Bossier Parish School Bd.,*
    520 U.S. 471 (1997) ............................................................................. 5

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ............................................................................ 79

*Robinson v. Ardoin,*
    37 F.4th 208 (5th Cir. 2022) ............................................................. 79

*Robinson v. Callais,*
    144 S. Ct. 1171 (2024) ...................................................................... 80

*Rollerson v. Brazos River Harbor Navigation Dist.*,
　6 F.4th 633 (5th Cir. 2021) ................................................................ 50

*Rucho v. Common Cause*,
　588 U.S. 684 (2019) ............................................................... passim

*Salas v. Sw. Texas Jr. Coll. Dist.*,
　964 F.2d 1542 (5th Cir. 1992) .............................................................. 53

*Salazar v. Buono*,
　559 U.S. 700 (2010) ...................................................................... 78

*Shaw v. Hunt*,
　517 U.S. 899 (1996) ................................................................. 18, 22

*Shaw v. Reno*,
　509 U.S. 630 (1993) ................................................................ 5, 7, 69

*Singleton v. Allen*,
　No. 2:21-cv-1291, 2023 WL 6567895 (N.D. Ala. Oct. 5, 2023) .............................. 36

*Sw. Voter Registration Educ. Project v. Shelley*,
　344 F.3d 914 (9th Cir. 2003) .............................................................. 79

*Tex. Alliance for Retired Americans v. Hughs*,
　976 F.3d 564 (5th Cir. 2020) .............................................................. 81

*Twitter, Inc. v. Taamneh*,
　598 U.S. 471 (2023) ...................................................................... 50

*United States v. Abbott*,
　110 F.4th 700 (5th Cir. 2024) ............................................................. 4

*United States v. Adams*,
　444 F. Supp. 3d 1248 (D. Or. 2020) ...................................................... 47

*United States v. Cloud*,
　576 F. Supp. 3d 827 (E.D. Wash. 2021) ................................................... 47

*United States v. Hays*,
　515 U.S. 737 (1995) .................................................................. 5, 67

*United States v. Mitchell*,
　365 F.3d 215 (3d Cir. 2004) .............................................................. 47

*Va. House of Delegates v. Bethune-Hill*,
　587 U.S. 658 (2019) ...................................................................... 21

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016) .................................................................................. 54

*Veasey v. Abbott,*
    870 F.3d 387 (5th Cir. 2017) .................................................................................. 78

*Veasey v. Perry,*
    769 F.3d 890 (5th Cir. 2014) .................................................................................. 81

*Vieth v. Jubelirer,*
    541 U.S. 267 (2004) ......................................................................................... 76, 77

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ...................................................................................... passim

*Voinovich v. Quilter,*
    507 U.S. 146 (1993) ............................................................................ 22, 75, 76, 77

*Whitaker v. Livingston,*
    732 F.3d 465 (5th Cir. 2013) .................................................................................. 78

*Whitcomb v. Chavis,*
    403 U.S. 124 (1971) ................................................................................................ 51

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .......................................................................................... 3, 75, 78

**Constitutional Provisions**

TEX. CONST. art. IV, § 1 ............................................................................................ 24

TEX. CONST. art. IV, § 8(a) ....................................................................................... 24

U.S. CONST. art. I, § 4 ......................................................................................... 20, 76

**Statutes**

52 U.S.C. § 20302(a)(8) ............................................................................................ 81

Civil Rights Act of 1957,
    71 Stat. 634 (1957) ................................................................................................ 20

**Rules & Regulations**

28 C.F.R. § 0.50 ....................................................................................................... 20

**Other Authorities**

11 A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948
    (2d 3d. 1995) ............................................................................................................ 3

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989) ........................ 8

The prospect of a more Republican Texas Congressional delegation in 2026 has frightened Plaintiffs into double-backing on their four-year-old allegations of discrimination. So intolerable is Republican political gain to the Plaintiffs that they have resorted to seeking as relief the very map they claimed for years was racially discriminatory. They claimed at the status conference before the preliminary injunction hearing that the 2021 map was a lesser evil, but have since offered no metric or evidence by which this Court could so find or adjudicate—all of which begs the question: Why do Plaintiffs prefer Texas's 2021 map to its 2025 map?

Plaintiffs answer this question with a telling silence: they proffer no alternative map. Despite allegedly drawing millions of maps for this preliminary injunction proceeding, they have produced not a single, politically viable, alternative to Texas's 2025 map. Such a map would—of necessity—chart a path to five additional Republican Congressional seats and is thus every inch as intolerable to Plaintiffs as the duly passed and enacted Texas 2025 map. In partisan desperation, Plaintiffs have undercut their own racial claims. The righteous indignation and racial vitriol in Plaintiffs' latest accusations cannot disguise the fundamentally partisan character of their pleas. That is because Texas's 2025 map is, and always has been, about partisanship.

## PRELIMINARY STATEMENT

"[P]olitics ain't bean bag." *Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1219 (10th Cir. 2008). This is true in Texas and everywhere else in the nation. State legislatures controlled by the Democratic Party have systematically frustrated the ability of Republican voters in their states to elect their candidates of choice to Congress. In Illinois (where some Texas Democrats sought refuge during their quorum break), only three of seventeen congressional seats are held by Republicans, even though 43.5% of that state's vote went to President Trump in 2024. *See* Defs.' Ex. 1409. In New York, where more than 40% of the electorate backed Trump in 2024, Democratic members hold nineteen out of twenty-six congressional seats. *See* Defs.' Ex. 1411. New Mexico, Connecticut, and Massachusetts, meanwhile, have sent *only* Democrats to Congress, notwithstanding that Trump received a considerable percentage of the vote in each state 2024

(46%, 42%, and 36%). *See* Defs.' Ex. 1414. Massachusetts has not sent a Republican to Congress in thirty years. *See* Defs.' Ex. 1448.

Plaintiffs come to this Court with a heads-I-win-tails-you-lose theory of how politics should work in this country. Republican voters in Illinois, New York, New Mexico, Connecticut, and Massachusetts—and in California, where voters are asked to replace independent redistricting with partisan hard-ball—have no federal cause of action to remedy the extreme gerrymandering in those states. But because Plaintiffs belong to racial- and ethnic- minority groups that have often preferred Democratic candidates, they propose that the rule should be different for them. "A test that treats these two similarly effective plays in such different ways" cannot plausibly claim to be rooted in neutral legal principles and, in fact, creates the kind of race discrimination of which Plaintiffs purport to complain. *LULAC v. Perry*, 548 U.S. 399, 419 (2006) (opinion of Kennedy, J.).

After Texas redrew its congressional boundaries this year to offset the national Democratic advantage in the gerrymandering war, Plaintiffs wrote up partisan gerrymandering claims but re-labelled them "racial gerrymandering" and "vote dilution." They now ask for the extraordinary relief of a preliminary injunction on their claim but present no direct evidence that a single line of a single challenged district was drawn because of race. A veritable ocean of direct evidence stands against them. Their circumstantial-evidence-only case depends on the very methods the Supreme Court rejected in *Alexander v. S. C. State Conf. of the NAACP*, 602 U.S. 1 (2024), and even some of the *same* experts. *Alexander* contains a section labeled "*Dr. Moon Duchin*" that finds a district court clearly erred in relying on her opinions. 602 U.S. at 33. Yet here, Plaintiffs come to this Court with *Dr. Moon Duchin* and ask it to discredit "a pretty impressive witness," *see* Tr. 10/10/25 PM 78:20–21,[1] based on *her work*.

The *Alexander* decision warned courts to "be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare' that will deliver victories that eluded them 'in the political arena.'" *Alexander*, 602 U.S. at 11. If any case ever fit that description, this is it.

---

[1] References to the October 1–10, 2025 Preliminary Injunction proceedings cite the rough daily transcripts as "Tr. DD/MM/YY AM/PM" with pinpoint citations as necessary.

Knowing they must lose under *Alexander*, Plaintiffs try to avoid it by labelling one claim "intentional vote dilution" instead of "racial gerrymandering." But *Alexander*'s logic applies regardless of the claim: Plaintiffs cannot succeed because they failed to disentangle race from partisanship. Every basis *Alexander* provided for the standards it fashioned applies equally to this case, and its reasoning binds this Court. The decision makes this case straightforward. Politics and other non-racial criteria explains the map in every way. The new plan benefits Republican voters of all races (white, Black, and Hispanic) and disadvantages Democratic voters. This is the plan's intent and effect. Because Plaintiffs have not proven otherwise, they are not entitled to relief.

## THE LEGAL STANDARD

"The decision to grant a preliminary injunction is to be treated as the exception rather than the rule," *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985), because "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam) (applying this rule in a redistricting case). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11 A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 at 129–130 (2d 3d. 1995)); *accord Anibowei v. Morgan,* 70 F.4th 898, 902 (5th Cir. 2023).

A plaintiff moving "for preliminary injunctive relief" faces a "requirement for substantial proof . . . much higher" than one merely opposing "a defendant's motion for summary judgment." *Mazurek*, 520 U.S. at 972. A preliminary injunction cannot be granted unless the plaintiff proves "(1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest." *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (citing *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas*

*Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003)). "The district court should deny relief 'unless the party seeking it has clearly carried the burden of persuasion.'" *United States v. Abbott*, 110 F.4th 700, 706 (5th Cir. 2024) (quoting *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (vacating district court order granting injunction)).

## ARGUMENT

### I. Plaintiffs' Burden to Prove Intentional Racial Discrimination Is Much Higher Than They Admit.

For their racial-gerrymandering and vote-dilution challenges, Plaintiffs failed to clearly show a likelihood of success because they failed to grapple with the Supreme Court's standards for intentional racial discrimination.

### A. For Both Claims, Plaintiffs Must Prove Intentional Racial Discrimination, Not Mere Awareness of, or Disregard for, Racial Effects.

Racial-gerrymandering and vote-dilution claims "both require discriminatory intent." *LULAC v. Abbott*, 601 F. Supp. 3d 147, 162 (W.D. Tex. 2022). "[S]howing that a redistricting plan intentionally discriminates is not ordinarily an easy task." *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000).

"[I]n assessing a legislature's work, [courts] start with a presumption that the legislature acted in good faith." *Alexander*, 602 U.S. at 6; *accord Miller v. Johnson*, 515 U.S. 900, 916 (1995) ("the presumption of good faith that must be accorded legislative enactments"). Indeed, "the Supreme Court has long cautioned against the quick attribution of improper motives, which would interfere with the legislature's rightful independence and ability to function." *Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020). It is therefore "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 585 U.S. 579, 605 (2018).

"Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Perez*, 585 U.S. at 603 (citing *Reno v. Bossier*

*Parish School Bd.*, 520 U.S. 471, 481 (1997)). "This rule takes on special significance in districting cases," given that "[r]edistricting 'is primarily the duty and responsibility of the State,'" and redistricting litigation 'represents a serious intrusion on the most vital of local functions.'" *Id.* (citation omitted). Moreover, legislative motives—"a composite of manifold choices" made by manifold individuals—are difficult to discern, *LULAC*, 548 U.S. at 418 (opinion of Kennedy, J.), 512 (Scalia, J., concurring in the judgment in part and dissenting in part), because a plaintiff impugning the motives of a multi-member body ordinarily must "show that a majority" had prohibited animus, *Griggs v. Chickasaw County*, 930 F.3d 696, 704 (5th Cir. 2019); *see also Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021) ("no evidence that the legislature as a whole was imbued with racial motives"). That is why a robust "presumption of good faith" applies, and courts adjudicating such claims "must 'exercise extraordinary caution.'" *Alexander*, 602 U.S. at 7, 10–11 (citation omitted).

Proof of intent requires more than mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Plaintiffs must show that the Legislature passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* And that standard is only heightened in the redistricting context, where "evidence tending to show that the legislature was aware of the racial composition of" a district "is inadequate to establish injury in fact," much less a violation on the merits. *United States v. Hays*, 515 U.S. 737, 745–46 (1995); *see also, e.g.*, *Miller*, 515 U.S. at 916. "[T]he legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination." *Shaw v. Reno*, 509 U.S. 630, 646 (1993) (*Shaw I*).

Although both claims require proof of discriminatory intent, racial gerrymandering and intentional vote dilution are "analytically distinct." *Id.* at 652. Their different requirements are explained below.

**B. Racial Gerrymandering Requires Plaintiffs to Show that Race Predominated Over All Other Considerations**

A claim of racial gerrymandering requires proof "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916. "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.*; *see also Alexander*, 602 U.S. at 7, 38.

Because "partisan gerrymandering claims present political questions beyond the reach of the federal courts," *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019), plaintiffs attempt to "repackage a partisan-gerrymandering claim as a racial-gerrymandering claim by exploiting the tight link between race and political preference" and thereby "sidestep [the] holding in *Rucho* that partisan-gerrymandering claims are not justiciable." *Alexander*, 602 U.S. at 21. "When partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map." *Id.* Legislatures "may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (citation omitted). A plaintiff therefore "must 'disentangle race from politics.'" *Id.* (citation omitted).

"If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Id.* at 10. Moreover, precedent requires "an adverse inference" against plaintiffs who do not provide a "substitute map that shows how the State 'could have achieved its legitimate political objectives' in [a challenged district] while producing 'significantly greater racial balance.'" *Id.* at 34 (citation omitted).

In sum, Plaintiffs bear the burden of "disentang[ling] race and politics" to show that race was *the* predominant factor, above all else undergirding the state-wide map. *Id.* at 6. The Legislature is entitled to a presumption that it acted in good faith, based on traditional redistricting

criteria and not "race for its own sake." *Id.* at 10–11. And because they elected not to produce a state-wide map which could "be designed with ease," Plaintiffs are saddled with an additional adverse inference that "may be dispositive in many, if not most, cases." *Id.* at 31.

## C. Intentional Vote Dilution Requires Plaintiffs to Show a Specific Purpose, Harming Racial Groups Rather Than Political Groups

An intentional-vote-dilution claims is in some ways harder to show. "A plaintiff pressing a vote-dilution claim cannot prevail simply by showing that race played a predominant role in the districting process. Rather, such a plaintiff must show that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'" *Alexander*, 602 U.S. at 38–39 (quoting *Miller*, 515 U.S. at 911)). "[T]he plaintiff must show that the State's districting plan 'has the purpose *and* effect' of diluting the minority vote." *Id.* at 39 (quoting *Shaw I*, 509 U.S. at 649)). The racial vote-dilution standard requires proof that the challenged state action "minimize[s] or cancel[s] out the voting potential of racial or ethnic minorities." *Id.* at 38 (citation omitted).

Thus, even if Plaintiffs could demonstrate some use of race in the development of the map (they cannot) it still would not be enough. They must show the map was designed for the express purpose of hurting racial minorities *qua* racial minorities. In this case, such a conclusion would fly in the face of the overwhelming evidence the map was designed to hurt Democrats *qua* Democrats. The Supreme Court's "prior decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Alexander*, 602 U.S. at 9 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (*Cromartie I*)).

Even if Plaintiffs are right that they need not show predominance in an intentional-vote-dilution claim, that does not help them. They still have to show not only that the intent and effect were to hurt the voting power of racial minorities rather than Democrats, but also that that invidious intent was *causally* relevant to the map passing. In other words, assuming a plaintiff establishes "that racial discrimination was a substantial or motivating factor in enacting the

challenged provision," the State can still prevail if it "demonstrate[s] that the provision would have been enacted without an impermissible purpose." *Harness v. Watson*, 47 F.4th 296, 304 (5th Cir. 2022). Absent such a causal link, the plaintiff "no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose," meaning "there would be no justification for judicial interference with the challenged decision." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 271 n.21 (1977).

Plaintiffs attempt to avoid their burden by suggesting *Alexander*'s directives do not apply to their intentional vote-dilution claims. *See, e.g.*, ECF 1211-1 at 8–9. That argument fails. Every reason *Alexander* supplied for demanding that plaintiffs disentangle race and politics in racial gerrymandering cases applies to intentional vote dilution cases, as well. "[L]ower courts" are "'bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis.'" *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)).

First, as noted, *Alexander* observed that racially and politically motivated line-drawing can achieve "very similar" maps. 602 U.S. at 9. That is equally true in an intentional vote dilution case. Here, Plaintiffs found their race-based vote dilution claim on the premise that the enacted plan is likely to elect fewer Democratic members to Congress than some (unknown) plan Plaintiffs prefer. That *is* a prohibited political gerrymandering claim *unless* Plaintiffs "disentangle race from politics" as *Alexander* demands. 602 U.S. at 9 (citation omitted).

Second, *Alexander* noted that numerous Supreme Court "decisions have made clear that a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (citation omitted). That rule applies to *all* racial-intent claims. Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279. "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*; *Miller*, 515 U.S. at 916 (citing *Feeney,* 442 U.S. at 279). By consequence, political motivation,

combined with awareness of adverse effect on minority groups, does not violate the Constitution. That *Alexander* recognized this explicitly in addressing a racial gerrymandering claim does not negate the same proposition's applicability to racial vote-dilution claims.

Third, the Supreme Court warned courts to "be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare' that will deliver victories that eluded them 'in the political arena.'" *Alexander*, 602 U.S. at 11 (quoting *Cooper v. Harris*, 581 U.S. 285, 335 (2017) (Alito, J., concurring in judgment in part and dissenting in part)). Plaintiffs face the same temptation whether they label their claim "racial gerrymandering" or "intentional vote dilution."

Thus, it is no surprise that problems with the factual assertions underlying a "racial-gerrymandering analysis" often mean that "an independent vote-dilution claim" also "cannot stand." *See id.* at 38 (noting that the errors underlying a racial gerrymandering claim carried over to an "independent vote-dilution claim").

## D. The *Arlington Heights* Factors Provide, at Best, Weak Guidance on the Questions Before the Court

Plaintiffs overstate the relevance of factors identified in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). Although the Supreme Court has cited *Arlington Heights* in redistricting cases, *see, e.g.*, *Miller*, 515 U.S. at 913, it has not recently focused on the *Arlington Heights*' enumerated factors in redistricting cases, much less invalidated a district merely because some confluence of those factors were present.

Plaintiffs cite *Perez*, ECF 1211–1 at 8, but that case proves State Defendants' point. The *Perez* majority opinion cited *Arlington Heights* a single time concerning one factor that it ultimately concluded had no "logical bearing on" the claim. *See Perez,* 585 U.S. at 604, 619 (noting "historical background" factor, but ultimately finding the "long history of voting-related discrimination" in Texas "in no way undermine—or *even has any logical bearing on*—the conclusions" about minority opportunity (emphasis added)). *Perez*'s analysis was not oriented around the *Arlington Heights* factors. *Id.* at 584–622. Indeed, the dissent specifically complained about this, faulting the majority for not contend[ing] with the [district court's] thorough analysis of the *Arlington Heights* factors."

*Id.* at 654 (Sotomayor, J., dissenting); *see also id.* at 647 (contrasting the district court's "thorough *Arlington Heights* inquiry" with the majority's "analysis of the record"). Under the majority's framework, those factors are, at most, relevant "to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of the 20[25] Legislature." *Id.* at 607 (majority) (discussing the possible relevance of other considerations). This Court should not break new ground by invalidating a congressional district based solely on the *Arlington Heights* factors.

Nor is it helpful to Plaintiffs' cause that "intentional-vote-dilution theories call for the application of general constitutional principles." *LULAC*, 601 F. Supp. 3d at 160. That is accurate only at the highest level of generality—that such claims require proof of intent, not just effect—but not at the level of particularity. This is because of the "special" features of redistricting cases, *Perez*, 585 U.S. at 603, beginning with *Rucho*'s holding that partisan-gerrymandering claims are non-justiciable. *Rucho*, 588 U.S. at 718. The *Arlington Heights* factors were not fashioned to account for that holding because it is unique to redistricting—certainly not when the Supreme Court just last year urged federal courts to "exercise extraordinary caution" in "a traditional domain of state legislative authority." *Alexander*, 602 U.S. at 7.

Nor is it helpful to Plaintiffs that "intentional-vote-dilution theories call for the application of general constitutional principles." *LULAC*, 601 F. Supp. 3d at 160. Courts apply general constitutional principles in specific contexts. In redistricting cases, the context includes both the statistical relationships between partisanship and race and *Rucho*'s holding that partisan-gerrymandering claims are non-justiciable, which combine to make the ordinary *Arlington Heights* factors less helpful than usual.

## II.    Plaintiffs Are Unlikely to Succeed on their Intentional Vote Dilution Claims

Plaintiffs have failed to show a substantial likelihood of success on their vote dilution claims. As noted, they "must show that the State's districting plan 'has the purpose and effect' of diluting the minority vote." *Alexander*, 602 U.S. at 39 (citation omitted). On both elements, purpose and effect, their showing comes up short.

### A. Plaintiffs Are Unlikely to Show Discriminatory Intent

Plaintiffs have failed to demonstrate that any district "would not have been adopted," or even that a single Texas would not have been placed in a given district, "in the absence of racially discriminatory motivation." *Hunter v. Underwood*, 471 U.S. 222, 231 (1985). Moreover, the evidence amply shows "that the same decision would have resulted" if an "impermissible purpose [had] not been considered." *Arlington Heights*, 429 U.S. at 271 n.21.

The Legislature reconfigured districts "to achieve a partisan end." *Alexander*, 602 U.S. at 9. The witnesses *Plaintiffs* called had "[n]o doubt" that the redistricting occurred "because [P]resident . . . Trump wanted a chance for Texas to elect up to five more Republicans to Congress in 2026." Tr. 10/3/25 PM 45:8–13 (Rep. Gervin-Hawkins); Tr. 10/1/2025 AM 162:2–12 (Sen. Alvarado); Tr. 10/1/2025 PM 120:9–121:2 (Speaker Moody); Tr. 10/1/2025 PM. 122:3–13 (Speaker Moody); Tr. 10/2/2025 PM 78:11–13 (Rep. Romero). That was confirmed by Rep. Vasut, Sen. King, and Adam Kincaid. Tr. 10/9/2025 PM 77:1–78:2 (Vasut); Tr. 10/6/2025 PM 76:13–22 (Sen. King); Tr. 10/7/2025 AM 60:3–63:23 (Kincaid). Even Plaintiffs' expert testified that the map looked exactly like a response to President Trump's wishes. Tr. 10/6/2025 PM 5:22–6:12 (Dr. Murray). Plaintiffs' objection to that is non-justiciable. *Rucho*, 588 U.S. at 718. Plaintiffs' effort to repurpose their partisan gerrymandering claim as a racial-vote-dilution claim is unlikely to succeed. *Alexander*, 602 U.S. at 21. All probative direct and circumstantial evidence show that race was not a but for factor in the configuration of a single district in the challenged plan.

### 1. Direct Evidence

"Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993). The only evidence that meets this standard confirms race was not a factor in the redistricting.

#### a. Direct Evidence Concerning Line Drawing

The State Defendants predicted that Plaintiffs would not provide direct evidence that any racial target was used in configuring districts or that a single line was drawn on the basis of race.

*See* ECF 1196–1 at 10–12 (predicting that no direct evidence would be provided). That prediction proved correct. No eyewitness testified that race was used in line-drawing. Moreover, the record now amply demonstrates—with the most probative form of direct evidence there is—that race was not used.

Because "[d]istricting legislation … classifies tracts of land, precincts, or census blocks," racially discriminatory intent must be "prove[n]" in how a given district "was drawn." *Cromartie I*, 526 U.S. at 547. Accordingly, direct evidence of racial intent will take the form of testimony by the mapdrawer (legislator or consultant, or both) that the legislature "purposefully established a racial target," *Cooper*, 581 U.S. at 299, that "was used in drawing the Challenged Districts." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 184 (2017); *see Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 259–60 (2015) ("Alabama believed that, to avoid retrogression under § 5, it was required to maintain roughly the same black population percentage in existing majority-minority districts."); *see also Alexander*, 602 U.S. at 8 ("States often admit to considering race for the purpose of satisfying our precedent interpreting the Voting Rights Act"). Plaintiffs cite no case, ever, where a court enjoined an electoral district or plan "without reference to the content of the legislation enacted," that is, without evaluating "the complex of choices [the legislature] made while drawing the lines." *LULAC*, 548 U.S. at 418 (plurality opinion).

That background provides the necessary context to understand the dictum in a plurality opinion that, "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality opinion). In the plainest terms, that dictum asks how the mapdrawer "*intentionally drew district lines.*" If it means anything, the statement looks to backdrop principles that require proof that the Legislature targeted such districts for racial, not partisan, reasons and that race impacted how a district "was drawn." *Cromartie I*, 526 U.S. at 547; *see also Alexander*, 602 U.S. at 8 (describing "direct evidence" as "a relevant state actor's express acknowledgment that race played a role in *the drawing of district lines*" (emphasis added)). Plaintiffs urge the Court to reformulate this dictum

to prohibit revising the lines of a crossover (or coalition) district, but that would transform such districts into perpetual sinecures for Democratic representatives "if it so happens that the most loyal Democrats happen to be black Democrats and . . . the State [is] *conscious* of that fact." *Alexander*, 602 U.S. at 9 (citation omitted).

The Gonzales Plaintiffs criticize the State Defendants for supposedly making "no attempt to distinguish *Strickland*." ECF 1211–1 at 4. State Defendants did not deem it mission critical to "distinguish" dictum from a case that did not find intentional vote dilution and where it was not even alleged. Besides, it is easy to distinguish this case from a statement requiring proof that race impacted how a mapdrawer "intentionally drew district lines." Race was not used here.

Over hours of unrebutted testimony, Adam Kincaid repeatedly explained that he drew the plan without racial data. Tr. 10/7/25 PM 41:18–20; Tr. 10/7/25 AM 186:25 ("I don't draw off of race."). He testified that he "uses election results that show" him "how Republicans and Democrats vote in specific elections." Tr. 10/7/25 AM 42:7–9. He consistently stated that he draws maps using purely partisan data for partisan purposes, and that he believes it is unconstitutional to do otherwise.[2] Tr. 10/7/25 AM at 42:10–11. Mr. Kincaid was "a pretty impressive witness," whose testimony was precise, consistent with the record, and credible. *See* Tr. 10/10/2025 PM 78:20–21. None of Plaintiffs' six attorneys who cross-examined Mr. Kincaid

---

[2] *E.g.,* Tr. 10/7/25 AM 142:7–9 ("it's a purely partisan draw in Travis County that aligns with the President's performance in 2024"); Tr. 10/7/25 AM 171:11–16 ("moved a portion of Brazoria County into" the 36th District for "the partisan purpose" of "add[ing] population in 36 that was not too heavily Democrat to hurt the seat too much"); Tr. 10/7/25 AM 173:2–13 (moved Republican population between districts "to balance the populations" while "mak[ing the 22nd] a district that President Trump carried with 60 percent or more" and "put[ting] a little bit more Republican strength back into the 8th District so it didn't sink too far down"); Tr. 10/7/25 PM 59:5–7 (drew District 18 "as [a] Democrat vote sink[]");Tr. 10/7/25 PM 64:14–17 ("I drew blind to race and used politics. So as far as I was concerned, Texas 35 was a necessary partisan gerrymander that absorbed Democrats in Austin to San Antonio"); Tr. 10/7/25 PM 90:17–18 ("I drew my map using politics from start to finish and provided that to the Legislature"); Tr. 10/8/25 AM 65:3–4 ("I drew a race-blind map using partisan results, and that's how I created the map"); Tr. 10/8/25 AM 89:8–10 ("To be clear, the data I look at, I don't look at the racial data, number one. So I want to make sure I clarify that again.").

succeeded in eliciting anything but consistent statements that Mr. Kincaid never uses race to draw redistricting maps and did not depart from that conviction in drawing the challenged plan (or any districts in it).

Mr. Kincaid explained that he did not "have racial data visible" on the computer while drawing lines. Tr. 10/7/25 AM 41:24–42:1. He does not use the preloaded census data, including racial information, available in his mapping software because it "would not be helpful in drawing maps for partisan performance" and because it would not be "right" to do so. Tr. 10/7/25 AM 43:8–10. He does not "use race as a proxy for partisanship," Tr. 10/7/25 AM 52:2–4, or as a "political pretext." Tr. 10/7/25 PM 110:22–24. And having drawn a map, he has never gone back and changed it due to its "racial or demographic character." Tr. 10/7/25 AM 186:20–25. Although Plaintiffs assert that Mr. Kincaid "knew the racial demographics of those districts," Tr. 10/10/25 PM 80:11–15, the Supreme Court has warned against the inference that "he did it" because "[h]e knew it," *id.*; *see Alexander*, 602 U.S. at 37 ("[T]here is nothing nefarious about his awareness of the State's racial demographics. Roberts has spent nearly 20 years drawing maps for various state and local initiatives, and it is therefore entirely unsurprising that he exhibited a wealth of knowledge about who lives in which part of the State."). Mr. Kincaid testified that, after he became aware of demographic characteristics of the plan, he did not make further changes because "I don't draw off of race." Tr. 10/7/25 AM 186:15–25.

### b. Legislative Statements

As noted, direct evidence can "come[] in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8. Plaintiffs have no such evidence. The most relevant state actors are the legislators who collectively compose the two houses of the Texas Legislature. The question is whether there is sufficient "evidence that the legislature as a whole was imbued with racial motives." *Brnovich*, 594 U.S. at 689. In this case, there simply is not.

Sen. King testified repeatedly, both live and through recordings of statements during the legislative session, that he did not consider any racial data when reviewing the map for the

legislative process. Tr. 10/6/2025 PM 110:22–24; Tr. 10/1/2025 AM 26:13–15; Tr. 10/2/2025 AM 28:2–3. This testimony went unrebutted. Sen. Alvarado confirmed that Sen. King spoke repeatedly and consistently "throughout the process" that partisanship and compactness directed his review of the plan, Tr. 10/1/2025 AM 92:21–93:9, and that he did not look at racial data, Tr. 10/1/2025 AM 118:16–119:6. Sen Alvarado was asked directly if, in the 2025 session, "the discussion of race [was] on the mouth of the governor, other leaders in the legislature from the word go?" and she answered "No." Tr. 10/1/2025 AM 15:18–21. On the House side, Rep. Vasut, Chair of the House Redistricting Committee, rejected the idea that his purpose was to "change the districts based on their racial makeup by virtue of the fact that they're majority-minority districts," and, instead testified that "the whole point of this process is solely to respond to the governance call," Tr. 10/9/2025 PM 84:20–85:2. "I don't believe that the [DOJ] letter is a specific request for us to dismantle any district." Tr. 10/9/2025 PM 84:7–8. In laying out the bill for the House, Rep. Hunter commented on the political performance of the districts, reported the CVAP for specific districts and answered questions about that data from members of the committee. Tr. 10/9/2025 PM 104:22–105:25. Chairman Vasut stated clearly both at the time of the legislative process and on the stand that he "disagree[d] with the assumption that this process had anything to do with the DOJ letter." Tr. 10/9/2025 PM 115:13–116:13. Chairman Vasut corroborated under oath an interview he gave at the time of the redistricting process: "I see no evidence that this was racially drawn. This is a political performance map." Defs.' Ex. 1385; Tr. 10/9/2025 PM 114:17–18.

Plaintiffs provided no reason to disagree with that testimony. While they brought six members of the Legislature to El Paso, none testified that race was used in mapmaking, that it represented a factor motivating passage, or even to a genuine belief that the redistricting was racially motivated. These witnesses, in fact, went a long way to disclaiming Plaintiffs' theory of race-based motivation. Speaker Moody complained that "this is politics over people in the grossest way possible. It's a power grab" orchestrated by "the felon in chief," "President Trump." Tr. 10/1/2025 PM 122:14–123:15. In his view, the DOJ letter, Brooks Ex. 253, was merely a tool that "gave anybody who wanted to redraw these maps the check box of, these are – according to

the DOJ, they're unconstitutional," Tr. 10/1/2025 PM 11:24–12:13. Likewise, Rep. Gervin-Hawkins testified unequivocally that the goal of the redistricting was "to try to bring about [President Trump's] partisan goal of redistricting and getting up to five more Congressional seats from Texas." Tr. 10/3/2025 PM 50:13–51:4. Sen. Alvarado testified that the DOJ letter contained "many errors," Tr. 10/1/2025 AM 18:18–19:1, and that she checked with Sen. King and learned that the redraw would be "from a race-blind perspective." Tr. 10/1/2025 AM 57:19–58:3. She expressed no disagreement with Sen. King's representation and said that his position that the redraw was for partisan and compactness reasons remained consistent "throughout the process." Tr. 10/1/2025 AM. 92:21–93:9.

Even though Plaintiffs seek to have the DOJ letter interpreted as calling for something race-based, Rep. Gervin-Hawkins testified that no legislators voted for the map because of the DOJ letter. She believed the letter was just a way for President Trump to bring about his partisan goal. Tr. 10/3/2025 AM 50:13–51:4. Dean Senfronia Thompson gave a passionate defense of the State and of the Attorney General saying that she was shocked at the DOJ letter's accusation of race-based drawing and disagreed with it. Tr. 10/2/2025 AM 90:6–15. "I could not understand how the DOJ could have accused him, the State of Texas, and how they could have accused him of letting this happen." *Id.* Sen. West viewed "minority seats" as "pawns" but testified clearly that it was not racial intent that drove the process but that the special session was called "in order to do the bidding of the President in order to attempt to get additional Republican seats in Congress ahead of the 2026 election." Tr. 10/2/2025 AM 25:18–26:5. "That's what this is all about." *Id.* Rep. Romero, chair of Plaintiff group MALC, also testified that a vote for the bill's passage did not make members of his caucus racist. Tr. 10/2/2025 PM73:4–16. Like others, he was confused by the DOJ letter. Tr. 10/2/2025 PM56:7–8.

Plaintiffs claim to find evidence of racial intent in the legislative history but fall short. Their examples of supposed racial intent—which come only from hearings in the House—*might* establish *awareness* of race. But the Supreme Court has explained that it "expect[s] that "[r]edistricting legislatures will ... almost always be aware of racial demographics." *Alexander*, 602 U.S. at 22

(quoting *Miller*, 515 U.S. at 916)). It is unremarkable that House members had an understanding of demographic data and could answer questions about race. *See id.* at 22 (criticizing district court for placing "too much weight on the fact that several legislative staffers . . . viewed racial data at some point"). None of Plaintiffs' examples are compatible with "an inference that politics drove the mapmaking process," *id.*, much less show that a single voter was moved from one district to another on account of race or that any district was enacted into law with a racial purpose.

To begin, Plaintiffs emphasize Rep. Hunter's floor layout because it identified new majority BCVAP and majority HCVAP districts. Tr. 10/1/2025 AM94:4–95:19 (playing Brooks Ex. 316 at 29:19–31). In context, Rep. Hunter was providing racial data after the map was drawn, not racial targets used to develop the map. This shows, at most, awareness of racial consequences *ex post*, not racial intent *ex ante*. *See Alexander*, 602 U.S. at 22 (legislative actor "considered the relevant racial data only *after* he had drawn" the map and generated it "to check that the maps he produced complied with" the VRA). This is clear from Sen. Alvarado acknowledging that Rep. Hunter first spoke of partisanship in his layout, Rep. Hunter was criticized for not providing the racial makeup in 2021, and Speaker. Moody simply recognizing racial data in Rep. Hunter's notes. Tr. 10/1/2025 AM95:22–96:5; Tr. 10/1/2025 PM130:4–131:3; and Tr. 10/1/2025 PM 45:2–25.

Democrat legislators wanted racial data during the layout. Dean Thompson testified that she hoped Rep. Hunter would show up to answer questions about racial makeup during the layout. Tr. 10/2/2025 AM119:8–13. Dean Thompson testified that she herself looked at the racial makeup of proposed maps in 2021 and 2025. Tr. 10/2/2025 AM119:14–22. In the senate, Sen. Menendez criticized Sen. King for not providing racial data like Rep. Hunter, which Sen. King explained was unnecessary because he looked at it from a partisan perspective. Tr. 10/1/2025 AM 106:16–107:7.

Next, Plaintiffs cite the legislature's reliance on the *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024), as proof they used race. The context for that statement was that throughout the legislative process, Rep. Hunter referenced the *Petteway* decision. But it only shows awareness of race, not racial intent. Dean Thompson said she was told it had to be "racial neutral" because

of *Petteway*. Tr. 10/2/2025 AM 90:16–22. Rep. Gervin-Hawkins believed the legislature should maintain minority opportunity districts. *See* Tr. 10/3/2025 PM 14:19–15:8 (agreeing that Rep. Hunter could have said "yes" when asked whether it's important to keep minority opportunity districts). Neither federal statutes nor the Constitution require the creation or maintenance of majority-minority districts. *See Miller*, 515 U.S. at 924–25. Any reference to *Petteway*, which gave the State more leeway to draw congressional districts, is fully consistent with a focus on "adhering to other districting principles"—like partisan advantage or incumbent protection—"instead of creating as many majority-minority districts as possible." *Shaw v. Hunt*, 517 U.S. 899, 913 (1996) (*Shaw II*). That "does not support an inference" of race discrimination. *Id.*

Plaintiffs raised Rep. Hunter's knowledge of racial data throughout the hearings. *See, e.g.* Defs.' Ex. 1289, House Committee Hearing, Aug. 1 2025 Tr. 106:22–107:13 ("Nothing's a coincidence"); Defs.' Ex. 1289, House Committee Hearing, Aug. 1 2025 Tr. 862:8–863:2 (affirming that the BCVAP and HCVAP increased in certain districts). The context for those statements was almost always a district-specific question to which he responded. Rep. Hunter's affirmation of the racial data reflects only *awareness* of racial information. That is evident from Rep. Hunter's response to Rep. Pierson's concerns about proportionate Black representation and Rep. Hunter responding to Rep. Gervin-Hawkins asking about African American districts. Brooks Ex. 309 at 98:21–101:7; Tr. 10/3/2025 PM 16:13–18:7. Rep. Hunter repeatedly stated the BCVAP and HCVAP increases to certain districts were not because of the DOJ letter. *See, e.g.,* Defs.' Ex. 1289, House Committee Hearing, Aug. 1 2025 Tr. 864:23–865:1 (responding to Rep. Turner by saying "You keep saying 'we're here because of DOJ.' I'm not saying that.").

Plaintiffs emphasize Rep. Hunter's floor statement that "nothing is a coincidence." Brooks Ex. 309 at 107:3–13. The context for that statement was that Rep. Christian Manuel asked Rep. Hunter if it was a coincidence that CD 9, 18, 30, and 35 now had minority majorities between 50 and 52%. *Id.* at 106:1–24. This statement indicates only awareness of racial impact; that the outcome is not coincidence because of correlations with other factors that motivated line-drawing.

That is clear from Rep. Hunter explaining these changes were the correlative effect of considerations such as compactness and population equality. *Id.* at 107:3–113:6. Plaintiffs' pernicious insinuations otherwise directly conflict with Rep. Hunter's conversant and committee colleague, Rep. Manuel, who affirmatively stated that he did not think, and was not suggesting, that *any* member of the House had racial bias when enacting the map. *Id.*

Plaintiffs' interpretation of Rep. Hunter's statements concerning the mapdrawer's intent is wholly inconsistent with the evidence that Rep. Hunter did not draw the map. Tr. 10/07/25 41:12–15 (stating no legislators were present while Kincaid drew the map). Plaintiffs' interpretation of Rep. Hunter's statements also conflicts with Rep. Hunter's repeated assertions that the coalition districts were changed because of politics, not targeted because of their race. *See., e.g.,* Defs.' Ex. 1289, House Committee Hearing, Aug. 1, 2025 Tr. 54:17–19 ("The primary changes, though, are focused on five districts for partisan purposes."); *see also* Defs.' Ex. 1289, House Committee Hearing, Aug. 1, 2025 Tr. 867:19–22 ("the Democrats are looking one way and the Republicans are shaking their head the other way. That's why we disagree on this bill."). Instead of disclosing that Rep. Hunter's statement confirming the district's racial makeup was a response to a compound question asked after fourteen and a half hours of debate, Plaintiffs hope the Court relies on handful of Rep. Hunter's tired words to unravel the careful record built in the initial fourteen hours of the hearing. *See* Defs.' Ex. 1289 House Committee Hearing Aug. 1, 2025 Tr. 50:17–55:5 (Rep. Hunter's opening remarks).

Moreover, Plaintiffs urge incompatible standards. Counsel for Intervenor Plaintiffs, Mr. Bledsoe, testified at the House Committee Hearing on July 24, 2025, and expressly claimed "it's an act of discrimination in itself when you decide you're not going to look at race." Defs.' Ex. 1279, House Committee on Redistricting Jul. 24, 2025 Tr. at 135:13–15. Intervenor co-Plaintiffs' counsel cannot seem to decide whether they agree. On October 1, Counsel for Brooks Plaintiffs impliedly criticized representative Hunter for talking a lot about race, Tr. 10/1/25 AM 94:4–96:8, then five days later on October 6, accused Sen. King of "just look[ing] at [people] as Democrats[.]" Tr. 10/6/25 PM 139:2–139:17. Counsel for LULAC Plaintiffs, Ms. Perales, testified

19

in a Senate Committee Hearing on July 29, 2025 that "if you are not there at the table asking the difficult questions about population, voting patterns, about minority communities, you cannot ensure that the map will be lawful[,]" Defs.' Ex. 1286, Senate Special Committee on Congressional Redistricting Jul. 29 2025 Tr. 31:17–20, then in closing arguments criticized the legislature for pointing out the HCVAP of certain districts, Tr. 10/10/25 PM 105:5–6 and criticized the mapdrawer for knowing racial demographics, Tr. 10/10/25 PM 106:24–107:3.

### c. The DOJ Letter

The dominant player in Plaintiffs' racial-intent narrative is not a "relevant state actor[]," *Alexander*, 602 U.S. at 8, but Harmeet Dhillon, the U.S. Assistant Attorney General for Civil Rights at the U.S. Department of Justice (DOJ). The power to draw congressional districts is lodge in the state Legislature. *See* U.S. CONST. art. I, § 4. That is why the Supreme Court has said it is the enacting "*Legislature's* intent" that matters for purposes of the kinds of claims plaintiffs press here. *Perez*, 585 U.S. at 607–14 (emphasis added) (fixating on "the 2013 Legislature's intent"). Ms. Dhillon, of course, is not a state legislator. *See* Civil Rights Act of 1957, 71 Stat. 634, 637, Pub. L. No. 85-315, § 131 (1957) (creating the office of Assistant Attorney General for the Civil Rights Division); 28 C.F.R. § 0.50.

In any event, Plaintiffs' argument about this letter rests on a series of *non-sequiturs* that get them nowhere towards meeting their heavy burden.

At the outset, Plaintiffs misread the DOJ letter in claiming it urged race-based redistricting. That is not what the letter says. Its only reference to "race-based considerations" was an accusation leveled against four previously-drawn districts (CD 9, CD 18, CD 29, and CD 33) in the 2021 plan. Brooks Ex. 253 at 1. The assertion was mistaken; districts in 2021 (as in 2025) were drawn race-blind. But that mistake does not somehow translate into a demand *for* race-based redistricting. The letter simply states that "the racial gerrymandering of congressional districts is unconstitutional and must be rectified immediately by state legislatures." *Id.* at 2. That is not a demand for race-based line-drawing; it is the opposite. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (plurality opinion) ("The way to stop discrimination on the

basis of race is to stop discriminating on the basis of race."); Tr. 10/9/2025 PM 84:7–8 ("I don't believe that the [DOJ] letter is a specific request for us to dismantle any district.").

Legislators testified that they understood the letter asked the State "[t]o go back and change these district lines." Tr. 10/1/2025 AM 20:2–3 (Alvarado); Tr. 10/2/2025 PM 85:3–7 (Dean Thompson) ("[T]here was a letter that came from the Department of Justice that said that the 2021 maps were discriminatory. And it used race in drawing those maps and that they needed— that they were basically needed to be redrawn."); Tr. 10/1/2025 PM 12:24–25 (Speaker Moody) ("My understanding was, yes, this was a directive to redraw the map."); Tr. 10/1/2025 PM 12:5– 8 (Speaker Moody) ("everything began in earnest after this letter, because this was -- this gave anybody who wanted to redraw these maps the check box of, these are—according to the DOJ, they're unconstitutional."); Tr. 10/1/2025 PM 22:21–22 (Speaker Moody) ("it was meant to spur this action, whether people wanted to do this or not."). Clips of Ms. Dhillon herself explained the request was "to put new maps together." Tr. 10/1/2025 AM 78:24–25. Merely redrawing lines to rectify (mistakenly-perceived) racial discrimination is not race-based line drawing. Plaintiffs' repeated insistence that a demand for racial gerrymandering supposedly in the letter "means" what "it says," *e.g.*, ECF. 1217–1 at 9, steadfastly reads words into the document that do not appear. They quote nothing at all for their view that it contained a "race-based command." ECF 1217–1 at 7.

Plaintiffs erroneously assume that, when a district is believed to be race-based, and is redrawn, that redrawn district *must* itself be race-based. *See, e.g.*, ECF 1211–1 at 6 ("The *Dhillon Letter* targeted districts based on race"). Not so. Plaintiffs have no answer to the State Defendants' observation that this theory has failed in cases where districts were found to be race-based but remedial efforts to redraw them were found *not* to be race based. *See Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 879–80 (E.D. Va. 2019) (three-judge court)[3]; *North Carolina v.*

---

[3] Notably, it was contested in *Bethune-Hill* whether the redrawn districts were race-based, but the Supreme Court never reviewed the issue because it dismissed the appeal for lack of standing. *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658 (2019).

*Covington*, 585 U.S. 969, 978–79 (2018) (per curiam) (affirming district court's "finding that 'no racial targets were sought or achieved' in drawing the remedial districts"); *see also Agee v. Benson*, No. 1:22-cv-272, 2024 WL 1298018, at *5 (W.D. Mich. Mar. 27, 2024) (rejecting claim that districts redrawn to cure past racial gerrymandering were the product of racial intent). If the law were otherwise, then *every* time a district were redrawn in a remedial setting, the new district would have to satisfy strict scrutiny. Notwithstanding the dozens—if not hundreds—of remedial redistricting proceedings in this nation over the decades, Plaintiffs fail to cite a single case for that startling proposition. Supreme Court precedent, meanwhile, establishes that Legislatures redrawing congressional districts are entitled to the good faith presumption anew, even after "a finding of past discrimination." *Perez*, 585 U.S. at 603.

Plaintiffs endeavor to "flip[] the evidentiary burden on its head," *id.*, and claim a mere mistake of fact or law meets their burden. *See* ECF . 1217–1 at 9 (criticizing the DOJ letter); ECF 1211–1 at 6 (same). Plaintiffs look to *Shaw II* and *Cooper* for this proposition, but both decisions were conducting a strict scrutiny analysis *after* racial intent had been proven. In *Shaw II*, race was shown to predominate and, in rejecting the state's narrow-tailoring defense, the Court explained that there is no "compelling interest" "in avoiding meritless lawsuits." 517 U.S. at 908, n.4. In *Cooper*, race was again shown to predominate, the Court rejected the narrow-tailoring defense under the Voting Rights Act because its "*raison d'être* is a legal mistake." 581 U.S. at 306. But in no case has the Supreme Court held that a mistake of law or fact *triggers* strict scrutiny. Plaintiffs cannot deny that states can redistrict regardless of whether that is needed "to remedy a violation of federal law." *Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). Strict scrutiny does not apply merely because someone, somewhere in connection with the redistricting offers an incorrect view of why that redistricting does or should occur.

Furthermore, even if the DOJ letter did represent a request for race-based redistricting it does not follow that Texas granted the request. The reasons identified in the DOJ letter for redistricting were not the reasons that the Texas Legislature enacted the 2025 map. Tr. 10/9/25 PM 116:11–25 (Rep. Vasut); Tr. 10/03/25 PM 50:15–51:4 (Rep. Gervin-Hawkins). Testimony

demonstrated that the letter was met with confusion, not adherence to the rationale pushed from Washington, D.C. Tr. 10/6/25 PM 79:5–10 (Sen. King) ("[F]or me it really didn't carry any significance. The letter wasn't addressed to the Legislature. It was addressed to the Attorney General and to the Governor. I obviously read it, but it—I think people tried to make it into something of influence, but I really don't believe it directed us in any manner."); Tr. 10/9/25 AM 134:1–7 (Sen. King) (DOJ Letter "unnecessarily confused the process"); Tr. 10/2/25 PM 56:7–8 (Rep. Romero) ("I didn't know what to make of the DOJ letter."). At most, the letter was understood as an underhanded partisan request for more Republican districts. Tr. 10/2/25 AM 7:1–4 (Sen. West) ("President Trump, through his Department of Justice, sent a letter to the State of Texas asking for five more congressional districts. And specifically laid out in this particular letter what their thoughts were as to why."); Tr. 10/2/25 AM 25:23–26:3 (Sen. West) ("[G]etting a letter from the Department of Justice and then calling a special session in order to do the bidding of the President in order to attempt to get additional Republican seats in Congress ahead of the 2026 election. That's what this is all about."); Tr. 10/3/25 PM 49:3–6 (Rep. Gervin-Hawkins) ("I just looked at [the DOJ letter] in combination of trying to take five seats. I didn't do an analytical of the letter or try to judge that, other than it was wrong.").

In fact, the Texas Attorney General responded to DOJ with a letter *rejecting* its premises explaining that "[t]he evidence at that trial was clear and unequivocal"—against *Plaintiffs'* assertion (never withdrawn)—that "the Texas legislature did not pass race-based electoral districts for any of those three political maps." Defs.' Ex. 1326 at 2. Dean Thompson, whom Plaintiffs called, attested that she "know[s] [Ken Paxton] well," that "he would not have" considered race, and that she "could not understand how the DOJ could have accused him, the State of Texas, and how they could have accused him of allowing this to happen." Tr. 10/2/25 AM 90:6–15. Dean Thompson, like everyone in Texas, understands that the DOJ did not control the redistricting. Tr. 10/2/25 AM. 126:25–127:1 ("I'm not accusing anyone of -- on the committee of being guided by the DOJ."). No one testified that they believed the DOJ letter asked Texas to use race in drawing any districts. That fact—in light of the strong incentive for Plaintiffs to elicit such

testimony—confirms that the letter is not "evidence which, if believed, proves the fact without inference or presumption." *Brown*, 989 F.2d at 861.

But even if Plaintiffs had proved (1) that the DOJ Civil Rights Division acted based on invidious racial motivations and (2) that the DOJ Letter caused the Texas Legislature to redistrict, that would not suffice. Even if something "racially-tinged" had "helped spur the debate about" redistricting, that would not be "evidence that the legislature as a whole was imbued with racial motives." *Brnovich*, 594 U.S. at 689. "The 'cat's paw' theory has no application to legislative bodies" because "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents," much less of the DOJ. *Id.*

### d. Gubernatorial Statements

That leaves Plaintiffs to stand on various statements by Governor Abbot, which provide no foundation for their claims. The statements shed no light on "the drawing of district lines," *Alexander*, 602 U.S. at 8, and the Governor's statements are the least probative place to look for "evidence that the legislature as a whole was imbued with racial motives." *Brnovich*, 594 U.S. at 689. Plaintiffs consider Governor Abbot's statements next to dispositive because he "was singularly responsible for calling the special session." ECF 1217-1 at 8 n.6. But he was not responsible for the resulting plan, the passage of the plan or anything else that followed.

Like Ms. Dhillon, Governor Abbott is not a state legislator. Instead, he is the "Chief Executive Officer" of this State, authorized to call special sessions. TEX. CONST. art. IV, §§ 1, 8(a). Accordingly, the language of the Governor's proclamations calling on the Legislature to consider congressional redistricting are simply irrelevant to Plaintiffs' claims. Assuming the Governor's initial proclamation on July 9, 2025 was even relevant somehow—despite H.B. 4 passing pursuant to a second proclamation issued on August 15, 2025—that proclamation never mentioned race. To make up for the gap, Plaintiffs' either misunderstand or distort its fleeting reference to "constitutional concerns." Whether the Texas Legislature has more leeway in 2025 than it had in 2021 as a result of the *Petteway* decision implicates the U.S. Constitution—namely, Article I, Section 4, which assigns redistricting authority to the Legislature. If new precedent

governing that constitutional power gives the Legislature more freedom, but existing congressional maps remain under a now-defunct legal regime, that is plainly a "constitutional concern."

Besides, Plaintiffs are unpersuasive in attempting to read the requisite racial intent into the Governor's other statements. All statements they cherry-pick consist of the basic assertion (1) "that Texas is no longer required to have coalition districts," (2) "we wanted to remove those coalition districts," to allow for more partisan gerrymandering, and (3) they were "draw[n] in ways that in fact turned out to provide more seats for Hispanics." Brooks Ex. 335. The first part was legally correct after *Petteway*. The second part merely refers to new districts, not new *race-based* districts. And the third part confirms that point: the new configuration "*in fact turned out* to provide more" Hispanic opportunity seats. This phrase—*turned out*—clearly refers to the incidental, not intended, effect of the redraw. That is confirmed further in the Governor's observation that "[i]t *just coincides* it's going to be Hispanic Republicans," again referring to incidental effect, not intended effect. The law could not be clearer in differentiating the two. *Feeney*, 442 U.S. at 279 (1979); *Miller*, 515 U.S. at 916.

To the extent the Governor's statements matter at all, Plaintiffs strategically ignore the statement showing a singularly partisan motivation for signing H.B. 4 into law: "Texas is now more red in the United States Congress." Defs.' Ex. 1595. That is why House Democrats broke quorum—to prevent what even they called a "power grab engineered in Washington" which "clearly and deliberately manufactures five more Republican seats in Congress[.]" Defs.' Ex. 1319 House Hearing, Aug. 20, 2025, Tr. 246:24–247:4 (Rep. Bucy); *see also* Defs.' Ex. 1370 Rep. John Bucy III (@BucyForTexas), X (Aug. 4, 2025 2:56 AM), https://x.com/BucyForTexas/status/1952201862595412379 (explaining Democrats broke quorum because of Donald Trump).

### e. No Meaningful Direct Evidence

As the foregoing discussion demonstrated, Plaintiffs failed to present direct evidence, their contrary protestations notwithstanding. Neither the individual evidentiary components nor the cumulative showing rises "to evidence which, if believed, proves the fact without inference or

presumption." *Brown*, 989 F.2d at 861. At most, Plaintiffs plead "a set of facts from which another fact may be inferred," which is "circumstantial evidence." *Paulino v. Harrison*, 542 F.3d 692, 700 n.6 (9th Cir. 2008); *Radomsky v. United States*, 180 F.2d 781, 783 (9th Cir. 1950) ("Circumstantial evidence is that which establishes the fact to be proved only through inference based on human experience that a certain circumstance is usually present when another certain circumstance or set of circumstances is present. Direct evidence establishes the fact to be proved without the necessity for such inference."). At every step, Plaintiffs ask the Court to *infer* that references to redistricting must mean references to race-based redistricting. That is not "a wall of direct evidence." ECF 1217–1 at 2, but a highly attenuated attempt to show intent by indirect—or circumstantial—means. *See Easley v. Cromartie*, 532 U.S. 234, 253–54 (2001) (*Cromartie II*) (finding that the "direct" evidence the district court relied on—an email and a statement that could be interpreted in different ways—were "less persuasive than the links of direct evidence we have found significant in other redistricting cases").

### 2. Circumstantial Evidence

Because Plaintiffs lack direct evidence of discriminatory intent, they are left to rely on circumstantial evidence. "A circumstantial-evidence-only case is especially difficult when the State raises a partisan-gerrymandering defense." *Alexander*, 602 U.S. at 9. "When partisanship and race correlate, it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map." *Id.* Legislatures "may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Id.* (citation omitted). A plaintiff therefore "must 'disentangle race from politics.'" *Id.* (citation omitted). Plaintiffs have failed to do this and are unlikely to succeed on the merits.

#### a. No Alternative Plan.

Precedent requires "an adverse inference" against plaintiffs who do not provide a "substitute map that shows how the State 'could have achieved its legitimate political objectives' in [a challenged district] while producing 'significantly greater racial balance.'" *Id.* at 34 (citation

omitted). "If either politics or race could explain a district's contours, the plaintiff has not cleared its bar." *Id.* at 10. Plaintiffs have not cleared it here.

Mr. Kincaid described "multiple criteria across multiple tiers," including "to make sure that every Republican incumbent who lived in their seat stayed in their seat," that "every Republican incumbent who was in a district that President Trump had won with 60 percent of the vote or more in 2024 stayed" in such a district, and "that Republicans could gain" "five districts" "that President Trump carried by ten points or more at a minimum" and that were "carried by Ted Cruz in 2024." Tr. 10/7/25 AM. 60:12–63:23. There is no serious contention that any statewide plan on the record meets this standard. In fact, Dr. Duchin was asked why she did not submit a plan to the Texas Legislature during the mapping process that configured five additional Republican seats while resolving "racial concerns," and she responded by saying her "motivating influence" was not "contribut[ing] to the goal of partisan gerrymandering." Tr. 10/6/2025 AM 133:23–134:4. Personal scruples notwithstanding, this failure to produce an alternative map that meets the Legislature's partisan goals without the racial effects Plaintiffs complain—despite producing "millions" of simulated plans as part of her analysis (Tr. 10/6/2025 AM 131:25–132:3)—counts against a finding that such a plan exists. *See Alexander*, 602 U.S. at 36–37 (where racial gerrymandering plaintiffs introduce "tens of thousands of other maps into the record" but do not provide an alternate map, "that is most likely because such a map cannot be created"). This fact directs an adverse inference, which Plaintiffs have not shown any realistic prospect of defeating.

Plaintiffs' last-ditch effort to craft an alternative map on cross examination, without a sponsoring witness to testify to its validity, by nibbling around the edges of a *single district* does not discharge their obligation in their statewide challenge to a statewide map. This failure to make any effort is inexcusable after the Supreme Court's observation that "an alternative map [not] difficult to produce." *Id.* at 34.

27

### b. No Reason for Use of Racial Data.

Plaintiffs acknowledge the Legislature's overriding political goal of increasing Republican representation in Congress but theorize that race was used "as a proxy" for politics. *See, e.g.*, ECF 1217-1 at 9 (citation omitted). However, as in *Alexander*, Plaintiffs here have not explained why Mr. Kincaid would "have used racial data—with the associated legal risks—as a proxy for partisan data when he had access to refined, sub-precinct-level political data that accounted for voter turnout and electoral preferences." *Alexander*, 602 U.S. at 22–23. Here, Mr. Kincaid testified that he was able to "allocate election results" to the census block level, Tr. 10/7/25 PM 126:14–15, which enabled "granular precision targeting," Tr. 10/7/25 PM 127:23, that Plaintiffs' counsel agreed is "more granular and more precise, surgically so." Tr. 10/7/25 PM 136:5. There was no reason for racial data when political data was up to the task.

Indeed, there was even less incentive to use race as a proxy for politics here than in *Alexander* because of the "substantial variation . . . of Hispanic cohesion across the state." Tr. 10/8/25 PM 97:18–21 (Dr. Lewis). "[P]revious electoral data . . . from the precincts is very strongly predictive of subsequent partisan voting in the precincts" and provides "stronger predictions tha[n] you could make using information about the racial composition of those precincts." Tr. 10/8/25 PM 97:22–98:6 (Dr. Lewis). Dr. Lewis rebutted the claim of Dr. Barreto and Dr. Duchin that the Legislature may have used race as a proxy for partisanship. *See* Tr. 10/4/25 AM 122:18–21 (Dr. Barreto); *see also* NAACP Ex. 208 at 14 (Dr. Duchin Report). Dr. Lewis demonstrated the fallacy of this argument through a straightforward regression analysis. He "took the precinct-level voting and demographic data provided by Professor Ansolabehere and . . . plotted the share for Donald Trump in the 2024 general election against the . . . share of vote for Governor Abbott in 2022, and also against the share of each precinct's Citizen Voting Age Population that was associated with Black voters and Hispanic voters." Tr. 10/8/25 PM 105:17–24. The analysis (shown at Defs.' Ex. 570, Fig. 1) demonstrates that support for Governor Abbott in 2022 was a "strong predictor of subsequent vote for Trump in 2024," with "96 percent of the variation observed in Trump support can be accounted for by variation in Abbott support." Defs.'

Ex. 570 at 3, ¶ 9. By contrast, outside of precincts with very large Black populations, knowledge of a precinct's Black or Hispanic population "was much less indicative of Trump support than knowledge of previous support for a Republican candidate." *Id.* at 4, ¶¶ 10–11. A more sophisticated regression analysis, which Dr. Lewis reports on Figure 2, corroborates this finding that past partisan performance better predicts future electoral performance than demographic analyses. Tr. 10/8/25 PM 112:5–21.

Claiming to criticize Dr. Lewis's approach, Dr. Barreto responded that it is inappropriate to compare Governor Abbott's 2022 performance to President Trump's because, if a precinct "voted 76 percent for Governor Abbott, it's extremely likely that if those same exact voters are there two years later, they might vote 77 percent for Trump." Tr. 10/4/25 AM 67:1–9. Dr. Barreto agreed that such a high correlation is expected "because partisanship is a choice that people make," and "they usually stick by that in their votes two years later." Tr. 10/4/25 AM 67:16–21. That turns is no criticism at all, but rather confirmation that partisan data is the far better tool for the Legislature's purpose than racial data.[4] And to the extent Plaintiff contend that Mr. Kincaid's "political data was inferior" to other metrics, "the relevant question is not whether the State used the best available data but whether it is reasonable to infer that the mapmakers' political data was so obviously flawed that they must have surreptitiously used racial data." *Alexander*, 602 U.S. at 23.

### c.  Expert Efforts to Show Racial Intent

Plaintiffs brought more than a basketball team of experts to El Paso—Dr. Ansolabehere, Dr. Barreto, Dr. Collingwood, Dr. Duchin, Dr. Murray, and Mr. Ely. But they could not establish that racial motive determined any district lines. In fact, two of Plaintiffs' experts expressly disclaimed any opinions about legislative intent. Dr. Ansolabehere (1) stated he was not an "intent expert" and analyzed only "effect," Tr. 10/3/25 AM 62:10–19; 63:15–16, (2) was unaware that the

---

[4] Dr. Barreto also criticized Dr. Lewis for not addressing "literature" contending that race and racial attitudes predict partisan affiliation, Tr. 10/4/25 AM 67:22–68:1, but that literature has nothing to do with the question of map-making intent posed in this case.

Gonzales Plaintiffs, for whom he was testifying, alleged a racial quota, and (3) did not consider whether districts were drawn to hit a racial quota in his report. Tr. 10/3/25 AM 62:10–19; *cf.* ECF 1149 at 18. Dr. Collingwood also confirmed that his reports did not offer any opinions on "legislative intent" and admitted he did not even know who drew the 2025 Plan. Tr. 10/3/25 AM 99:23–100:3. Moreover, Dr. Collingwood studied only CD 9 and CD 35, admitted his opinion about those two districts cannot be "extrapolated" to other districts, and offered no opinions about whether the 2025 Plan "got better or worse for Hispanic voters." Tr. 10/3/25 AM 99:4–16. Expert opinion about effect does not even begin to get at the question whether any district is "a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 38–39 (citation omitted).

That leaves Dr. Barreto, Dr. Duchin, Dr. Murray, and Mr. Ely. While these experts did attempt to show racial intent, none of their analyses were sound or persuasive. For example, like Plaintiffs' counsel, Dr. Duchin cannot decide what constitutes evidence of racial discrimination. In May, Dr. Duchin testified that the 2021 Map was not partisan enough to be a partisan gerrymander. *See* Tr./31/25 AM 57:24–25 (the 2021 map "left a lot on the table"). In October, Dr. Duchin acknowledged that the 2025 Map is a partisan gerrymander but reached the same conclusion as to the use of race. *See* Tr. 10/06/25 AM 70:15–19 (concluding race was used); *see also* Tr. 10/06/25 AM 133:23–134:4 (stating she does not want to help Texas engage in partisan gerrymandering). Dr. Barreto, on the other hand, simply does not sufficiently understand the basic elements of his code to give persuasive effect to his conclusions of racial discrimination. Tr. 10/4/25 AM 156:24–163:16.

### i. Choropleth and Dot-Density Maps.

Dr. Duchin and Dr. Barreto examined visual depictions of district lines and racial demographics in an effort to reverse-engineer intent. These attempts failed to "untangle race from other permissible considerations." *Alexander*, 602 U.S. at 7.

Dr. Duchin testified about the dot-density maps in her report (NAACP Ex. 208), which she contends reflect race-based line-drawing in three "clusters" of interest. In each "cluster," she produced a dot-density map: C1 for Dallas-Ft. Worth, C2 for Houston/Ft. Bend, and C3 for Travis County. Dr. Duchin provided conclusory opinions that the district lines in C1 and C2 appeared to be drawn in service of a racial goal and provided no quantitative or meaningfully detailed analysis to explain her conclusions. *See, e.g.*, Tr. 10/5/25 AM 35:4–11, 48:8–16, 49:9–16. Plaintiffs never meaningfully explored C3. *See id.* at 49:9–50:6.

Most fundamentally, Dr. Duchin did not distinguish race from politics. An example illustrates this point. Following is Figure 4 of her report, showing CD 24, CD 30, and CD 33 in the Dallas-Ft. Worth area:



**Figure 4:** Dot density from Cluster C1 in Tarrant/Dallas shows that CD 24 is carefully designed to include White population and avoid pockets of minority groups.

NAACP Ex. 208 at 11 Fig. 4. On direct, she testified only that the lines for CD 24 "seem[ed] to be drawn in a way that the lines encompass a lot of White population and carefully excludes non-White population around it," and that "both District 33 and District 32 are impacted by that

design." Tr. 10/5/25 AM 35:4–11. But a comparison of Dr. Duchin's dot-density map by race with a choropleth map showing the same region, color-coded by vote-share percentage for Trump in the 2024 election shows strong similarity:



Defs.' Ex. 571 at 30 Fig. 24. Dr. Duchin offered no analysis to explain why these boundaries are better explained by race than politics. *See Alexander*, 602 U.S. at 9.

Likewise, Dr. Barreto's opening report provided choropleth maps shaded by race but no corresponding maps showing political geography. *See* Brooks Ex. 269 at 16–43 Figs. 1–21. In his rebuttal report, Dr. Barreto presented a series of what he called "RPV Dispersion Plot" maps, which depicted congressional district boundaries, were shaded pink and green based on CVAP (by race), and had colored voting tabulation district (VTD) boundaries based on whether 50%+1 of the VTD supported the relevant Republican (red) or Democrat (blue) candidate. *See* Brooks Ex. 284 at 13–24 Figs. 1–22; Tr. 10/4/25 AM 107:19–108:14. On direct, Dr. Barreto focused on Figures 14 and 18 in his rebuttal report, depicting CD 30 and CD 35, respectively. Brooks Ex. 284 at 20, 22 Figs. 14, 18. But his testimony about these figures was conclusory and hard to understand, *see* Tr. 10/4/25 AM 107:19–112:1, and he provided testimony about none of the other 16 similar figures in his rebuttal report. Further, on cross-examination, Dr. Barreto conceded that he was unaware

that CD 30's boundary followed I-30 and I-35 through Dallas—confirming his analysis did not exclude non-racial explanations for district boundaries. Tr. 10/4/25 PM 36:8–22; *see Alexander*, 602 U.S. at 7 (explaining that task is to "untangle race from other permissible considerations"). Another court recently discredited Dr. Barreto's conclusory analysis about racial intent drawn from similar maps. *See Nord Hodges v. Albritton,* No. 8:24-cv-879, 2025 WL 2391348, at *17 (M.D. Fla. Aug. 18, 2025) ("[W]e can draw our own conclusions from Dr. Barreto's maps of the populations inside and outside of Senate District 16, and we do not think those maps reflect racial sorting around the borders of the district"). His work is no more informative here.

Plaintiffs also offered opinion testimony from Mr. Ely, who served as a mapping consultant to Richard Allen, the special master in the *Milligan* matter in Alabama, and helped craft a remedial plan in that state. Tr. 10/2/25 PM 96:1–14. Mr. Ely also offered a limited qualitative analysis principally involving two sets of choropleth maps of Harris and Bexar Counties—one set color-coded by which racial group (if any) constitutes the majority of each VTD, and another set shaded to reflect what Mr. Ely terms his "performance index." *See* LULAC Ex. 831 at 7–16. But like the other experts' maps, Mr. Ely's limited maps do not meaningfully distinguish race from partisanship, and neither Mr. Ely's report nor his testimony during direct examination provided sufficient detail about his analysis of the district boundaries in those counties to allow the Court to assign it much weight. *See, e.g.*, Tr. 10/2/25 PM 106:24–109:8 (CD 9), 110:17–111:17 (CD 35).

In particular, Mr. Ely's apparent attempt to evaluate whether partisanship explains the boundaries in those counties is not credible. Mr. Ely's only look at partisanship was to construct a "performance index" based on six elections that LULAC Plaintiffs' counsel instructed him to consider—the same six elections Dr. Collingwood considered (2020 Railroad Commissioner, 2020 Supreme Court Seat 8, 2022 Attorney General, 2022 Supreme Court Seat 5, 2022 Supreme Court Seat 9, and 2024 U.S. Senate). Tr. 10/2/25 PM 131:22–132:7; LULAC Ex. 831 at 18 (listing contests). The index score refers to how many of those contests the minority-preferred candidate won. Mr. Ely used his "performance index" map of Bexar County to argue that the border between CD 20 and CD 35 "cuts through a concentrated Latino or Hispanic community," Tr. 10/2/25 PM

110:24–111:2, and that politics did not explain the difference because, he claimed, "the line between 20 and 35 clearly has a split of communities with the same election result behavior." Tr. 10/2/25 PM 114:17–23.

Bexar County – Performance Index

C2333



LULAC Ex. 833 at 9.

But there is no evidence in this case that Mr. Ely's index of six elections was used by the Legislature to draw the 2025 Plan or evaluate its political performance. To the contrary, Mr. Ely did not consider President Trump's elections or even analyze political performance in a Republican vs. Democrat perspective. Tr. 10/3/25 AM 3:12–25. Further, the map only applies colors according to the index score and does not account for the *margin* of victory in each block. That makes a significant difference, as this choropleth map of Bexar County produced by Dr. Trende, Defs.' Ex. 571 at 33 Fig. 27, shows:



Figure 27: Austin/San Antonio area precincts by Donald Trump Two-Party Vote Share, with C2333 district boundaries overlaid

This choropleth map, which includes President Trump's vote share and reflects election data considered by the Legislature, shows a clear difference in the political preferences of the voters residing across the border of CD 20 and CD 35—CD 20 is principally comprised of yellow and light-green shaded territory (i.e., areas that strongly supported Vice President Harris in the 2024 presidential election) whereas CD 35 has more darker-shaded territory (i.e., areas more supportive of President Trump in that election). Mr. Ely agreed that a mapdrawer who wanted to create a "partisan map" would want to know "the difference between a precinct that supports Donald Trump at 80 percent and a precinct that supports him at 51 percent," which Mr. Ely's "election performance" maps do not depict. Tr. 10/2/25 PM Tr. 129:22–130:20. Therefore, these choropleth maps ultimately do not enable the Court to disentangle race from politics and are

unhelpful in determining whether there was racial motive in this case. *Cf. Nord Hodges*, 2025 WL 2391348, at *17.

Mr. Ely also suggested the fact that Hispanic or Black CVAPs of certain districts in the 2025 Plan were slightly over 50% implied a racial target for drawing those districts. LULAC Ex. 831 at 7, ¶ 21–22. But on cross-examination, Mr. Ely admitted that he himself drew a 50.1% black congressional district race blind. Tr. 10/2/25 PM 124:3–128:7. Mr. Ely denied that he drew that plan using racial population data or to achieve any racial target, and the *Milligan* court agreed, finding that Mr. Ely did not rely on racial data. *Singleton v. Allen*, No. 2:21-cv-1291, 2023 WL 6567895, at *7 (N.D. Ala. Oct. 5, 2023) (three-judge court). Mr. Ely's own work thus undercuts any suggestion that districts with racial voting-age percentages near 50% are necessarily gerrymandered or evidence of an impermissible racial target.

By contrast, Dr. Trende provided choropleth maps of the different disputed regions of the state—essentially "heat maps" depicting the percentage of support for President Trump in 2024 by VTD—to assess the relative role of race and party. Dr. Trende showed in each case that politics furnished a better explanation than race for the district lines. In the Houston/Harris County area, Dr. Trende observed that a "heavy cluster of low Trump performing precincts around downtown Houston" are "crammed into Districts 29, 18, and 7." Tr. 10/10/25 AM 34:12–21. He observed that of all the Harris County VTDs where Vice President Harris received over 70% of the two-party vote, there are 31 in CD 7, 150 in CD 18, 61 in CD 29, and a mere handful in CDs 8, 9, 36, and 38. Defs. Ex. 571 at 23–24. As for race, Dr. Trende observes that CD 7 and CD 18 both contain a fair number of White residents—but White residents that voted for Vice President Harris—which Dr. Trende concluded "is not the tactic of a racial segregator." *Id.* at 24–25.

Dr. Trende also addressed concerns raised by Dr. Barreto about CD 9 in the Houston area. Dr. Trende pointed out that the changes from C2331 to C2333 in CD 9 "grew into a complex chain of events involving almost 700,000 residents in 12 districts, 667,000 of whom lived in the Houston area," which required careful balancing from a political performance perspective. Defs.' Ex. 571 at 27. Dr. Barreto focused on the addition of Liberty County from CD 36 to CD 9 but ignored that

this required careful rebalancing of multiple redistricting factors—including county splits, contiguity, population equality, and partisan performance—that require a broader perspective than just a narrow focus on CD 9. *Id.* at 28.

Similar patterns exist in Dallas and Tarrant Counties, Defs.' Ex. 571 at 29–32, and Bexar and Travis Counties, *id.* at 32–35. In Tarrant County, for example, Dr. Trende noted the "stunning outcome[]" that President Trump received 85% of the vote in the rural counties outside Tarrant County in CD 25, which provided a "big buffer to go into Tarrant County and soak up a lot of Democratic precincts, while still producing a heavily Trump district." Tr. 10/10/25 AM 38:10–19. And, in another finding inconsistent with a racially motivated mapdrawer, Dr. Trende explains that Figure 25 shows white plurality precincts that supported Vice President Harris are included in CD 30 and CD 33. Tr. 10/10/25 AM 39:16–24.

Dr. Trende's conclusions, which are based on both a visual inspection of district lines and quantitative analyses, persuasively show that politics—not race—explain the district lines. As such, Plaintiffs have not cleared their "high bar" by showing politics cannot explain the district lines and are therefore not likely to succeed on their claims. *Alexander,* 602 U.S. at 9–10.

### ii. VTD Splits

Plaintiffs also claimed to find evidence of race-based line drawing in the splits of VTDs. One initial problem with Plaintiffs' treatment of this topic is that the splits concerned a very small number of residents, and thus do not address whether "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," *Miller*, 515 U.S. at 916, or whether the districts could "minimize or cancel out the voting potential of racial or ethnic minorities," *Alexander*, 602 U.S. at 38 (citation omitted). In all events, Plaintiffs' arguments on this topic are unpersuasive. While Dr. Barreto led this line of attack, he admitted it is common to find split VTDs in congressional plans because of the "fine margin" of population equality required. Tr. 10/4/25 PM 50:10–13. Dr. Barreto's two claimed reasons to infer racial intent here fall flat.

First, Dr. Barreto insists VTDs cannot be split based on partisanship because he claims there is "not reliable partisan data" at the census block level and the "only reliable data that a mapdrawer could use is race." Tr. 10/4/25 PM 51:5–12. But Dr. Baretto's claim is wrong, and he admitted that there are ways to interpolate partisan data to the census block level. Tr. 10/4/25 PM 44:2–12. Another of Plaintiffs' experts admitted partisan data is available at the census block level—whether directly or by disaggregation from VTD-level data. Tr. 10/5/25 AM 79:6–16 (statement of Dr. Duchin). Indeed, Mr. Ely confirmed that racial CVAP data—which is derived from the American Community Survey—is *also* not available at the block level (it is published at the block group level) and must be disaggregated. Tr. 10/2/25 PM 102:24–103:22. Accordingly, information about *Hispanic* citizen voting patterns is also *not* available at the census block level, and this fact defeats the second part of Dr. Barreto's flawed syllogism.

Second, Dr. Barreto claimed to find some racial difference in the composition of split VTDs. But his report provides no analysis of the issue, *see* Brooks Ex. 269 at 14, ¶ 43, even as Dr. Baretto criticized Dr. Trende for analyzing *all* split VTDs in CD 18, one of the hotly disputed districts in this case. *Compare* Defs.' Ex. 571 at 2–21 (showing images of each split VTD). Dr. Barreto's analysis was even less detailed than the "adjacency analysis" he performed in *Nord Hodges v. Albritton,* where he analyzed the racial composition of adjacent VTDs on either side of a district boundary, looking for differences. That court discredited Dr. Barreto's adjacency analysis because it was "not useful to determine whether race *predominated* over other redistricting criteria" because it "assume[d] a world in which lines are drawn randomly without regard to natural, municipal, or other boundaries," 2025 WL 2391348, *17 (emphasis in original), which was not the case there—or in Texas.

Dr. Trende refuted Dr. Barreto's suggestion that VTD splits in the 2025 Plan suggest racial motive. Dr. Trende explained that Texas has about 8,800 VTDs, of which 440 were split between districts. Tr. 10/10/25 AM 23:3–16. Dr. Trende observed that the number of VTD splits does not suggest anything nefarious, *id.* at 23:17–24, as race-neutral reasons for splitting VTDs abound—e.g., for compactness, or to follow a natural boundary. *Id.* at 24:4–18. Mr. Ely confirmed this

analysis. Tr. 10/3/25 AM 7:17–8:6. Dr. Trende also confirmed that partisan data can be derived for the census block level and thus providing another reason to split VTDs. Tr. 10/10/25 AM 24:19–25:2.

To assess Dr. Barreto's accusation about VTD splits, Dr. Trende analyzed each VTD split in CD 18 and found no racial connection. *See* Defs.' Ex. 571 at 3–21, Figs. 1–19 (finding no evidence of racial sorting in any of the 19 split VTDs in CD 18). In many instances, Dr. Trende testified credibly to obvious non-racial explanations—e.g., to follow a street boundary, slice off a "tongue" to make the boundary more regular, or follow an interstate or rail line. *See* Tr. 10/10/25 AM 26:1–29:13. Further, Dr. Trende explained that, because racial groups tend to "cluster together" and can cluster around neutral boundaries like interstate highways or city boundaries, VTD splits may exhibit a racial pattern for non-racial reasons. *Id.* at 29:14–30:4. Dr. Barreto in fact admits that precinct splits are "inevitable for a Congressional Plan, because you do have to get the population deviation" to zero. Tr. 10/4/25 AM 99:11–17. Dr. Barreto also acknowledged that VTD shifts can accomplish other non-racial goals—for example, he noted that between Plan C2308 and C2331, the Legislature "moved one precinct or set of blocs in El Paso to move Fort Bliss" into a different district. *Id.* at 114:10–17; *see also* Tr. 10/4/25 PM 50:17–20 (VTD might be split to follow natural boundaries, like I-35). Finally, Dr. Trende credibly explained that the number of people in CD 18 affected by all the split VTDs is fairly minimal—of the 19 split VTDs, four had unpopulated portions (i.e., nobody lived in the split portion of the VTD) and seven involved a population split of less than 500 individuals. Tr. 10/10/25 AM 30:5–31:10.

### iii.    Mapping Simulations

Dr. Barretto and Dr. Duchin also performed mapping-simulation analyses of the same type rejected in *Alexander* and *Allen v. Milligan*, 599 U.S. 1 (2023). *Alexander* held that a district court committed reversible clear error in finding racial intent based on multiple simulated-plan analyses because the plans, though numerous, "do not replicate the 'myriad considerations' that a legislature must balance as part of its redistricting efforts." *Alexander*, 602 U.S. at 24 (citation

omitted); *see also id.* at 25–33. In *Milligan*, Chief Justice Roberts went even further and called the simulation approach "flawed in its fundamentals." 599 U.S. at 35. Notably, in *both* cases, one of the rejected expert methods was performed *by Dr. Duchin. Id.* at 34; *Alexander*, 602 U.S. at 33 (section of opinion titled "*Dr. Moon Duchin*").

The simulation exercises failed here for the same reasons they failed in the Supreme Court. All sides agree that to say anything about intent, a simulation method must be built using "stated rules and priorities" to assess "whether a proposed plan behaves as though it was created by the stated rules." Tr. 10/5/25 AM 52:18–53:5. Dr. Duchin agreed that the similarities between the parameters used to draw simulated maps and the Legislature's stated intent was important. *Id.* at 115:17–20. So did Dr. Barreto, Tr. 10/4/25 PM 12:7–14, who also conceded that the lack of a partisan reason behind why a district line was drawn a certain way "does not automatically mean that the line was drawn for racial purposes." *Id.* at 37:12–17. This is because redistricting is not a "zero sum game between partisanship and race" but can also include other criteria like "compactness and population equality." *Id.* at 37:8–11. But, as in *Milligan* and *Alexander*, the map drawing robots here were not built with parameters meeting the Legislature's goals. They therefore say nothing at all.

**Failure to Model Political Performance.** The experts failed to model the Legislature's partisan criteria, as *Alexander* demands. 602 U.S. at 24–25 (treating the "legislature's partisan interests" as "traditional districting criteria" that must be considered). All parties agree that the 2025 Plan creates more Republican electoral opportunity than the 2021 Plan. Dr. Barreto concedes that "race and party [are] heavily correlated in Texas." Tr. 10/4/25 AM 68:11–12. And there is no doubt of partisan motive. Mr. Kincaid testified about the political criteria had he had to meet. For example, every Republican incumbent who lived in their district must remain in their district. Tr. 10/7/25 AM 60:12–18. Every Republican incumbent who was in a district President Trump won with 60% of the vote or more in 2024 had to stay in a district President Trump won with 60% of the vote or more. *Id.* at 60:19–24. Every district with a Republican incumbent that President Trump won with less than 60% of the vote had to have an increased Trump vote share or its Partisan

Voting Index stay exactly the same. *Id.* at 60:25–61:6. And every pickup opportunity had to be a district President Trump carried by ten points or more and that Sen. Cruz won in 2024. *Id.* at 63:9–64:21. Neither Dr. Barreto nor Dr. Duchin captured these criteria in their analyses.

First, Dr. Barreto chose President Trump's 2024 performance as his sole partisan criterion. Using that measure, he *tried* to draw simulated plans—both statewide and within different areas of the State—that resulted in five new Republican-leaning districts. For example, in his analysis of CD 35 in Bexar County, Dr. Barreto told his map drawing robot to draw 332,000 maps where President Trump carried the district by "about ten points"—based on a deposition Mr. Kincaid gave about the 2021 Plan. Tr. 10/4/25 AM 72:10–19. But the 2021 Plan is not the right place to look for political goals in the 2025 redistricting. The whole point of the redistricting was to pursue different partisan goals compared to 2021.

Worse yet for Plaintiffs' position, Dr. Barreto's software was repeatedly unable to produce plans that matched the number of Trump-performing districts using his own partisan criteria, so Dr. Barreto artificially relaxed his own partisan constraints below what he observed in the 2025 Plan to force out plans with the "same" number of Trump districts. *See, e.g.*, Brooks Ex. 283 at ¶ 9 n. 2 (in Harris County, had to reduce threshold from 59% to 56%); *id.* at 4–5, ¶¶ 15–17 (statewide, had to reduce threshold from 55% to 53% to generate 30 Trump-performing districts). It is not credible that Dr. Barreto claims to apply a partisan constraint to his simulations when he repeatedly relaxed that constraint below the partisanship observed in the Legislature's 2025 Plan simply to generate "comparable" plans.

For all these reasons, it is simply false for Dr. Barreto to contend that his simulations are "using the same exact [partisan] constraint that the State has set" for the 2025 Plan. Tr. 10/4/25 AM 79:15–20. Dr. Barreto's robot was unable to draw a plan politically comparable to the 2025 Plan even *once*. The plans the robot was able to draw under looser constraints are not a legitimate apples-to-apples comparison to the 2025 Plan.

Second, Dr. Duchin, who conceded she did not know how the legislature considered "partisanship" in "the creation of the new plans," tried a different approach. She considered

whether a Republican won a variety of elections—most of which there was no evidence to suggest the Legislature or Mr. Kincaid relied upon—but did not differentiate whether a Republican won by a lot or with as little as "50.1 percent" of the vote. Tr. 10/5/25 AM 57:20–58:3, 58:24–59:1. While Dr. Duchin did claim to check her results by requiring that her ensemble maps created as many Republican "wins" in each "cluster" as the 2025 Plan, *see id.* at 60:10–18, and then conducted a "robustness check" where she "sought out plans" with districts President Trump won in 2024 with "at least 55 percent" of the vote, *id.* at 60:19–61:8, there is no evidence the Legislature imposed a "cluster-based" constraint or drew Republican congressional districts across the board with a 55% vote share for President Trump.

Dr. Duchin could not explain on cross-examination how she selected the 55% value. *See* Tr. 10/5/25 AM 117:9–13. Nor does it comport with the record, which reflects that President Trump carried many of the disputed districts with nearly 60% of the vote in 2024: 59.5% in CD 9, 59.9% in CD 22, 60.0% in CD 27, 60.1% in CD 31, 57.7% in CD 32, 54.6% in CD 34, and 54.6% in CD 35. Defs. Ex. 984 at 3, 6. Statewide, of the 30 districts in the 2025 Plan that President Trump carried in 2024, he carried 20 with 60% or more of the vote, and 24 with 58% or more of the vote. *See id.* Applying a 55% or 50%-plus-one threshold is too low to fairly model the political performance of the 2025 Plan—especially when only looking at President Trump's performance and not also Sen. Cruz's, which Mr. Kincaid also relied upon.[5]

Then, in the same breath Duchin concluded that her analyses "are highly suggestive that race was used" *and* conceded that her work is not "an exercise in mind reading" and she cannot "look into the hearts and minds" of legislators. Tr. 10/5/25 AM 70:5–19.

**Core Retention.** The Supreme Court rejected—and found clear error when a district court credited—simulated maps that fail to account for "core district retention," which refers to "the

---

[5] As Dr. Trende explained, a 50% + one Republican district using President Trump's 2024 vote-share would be a "vulnerable seat" and "a district we would consider to have a Democratic lean because it would be to the left of President Trump's 2024 vote share." Tr. 10/10/25 AM 56:7–57:2.

proportion of districts that remain when a State transitions from one districting plan to another." *Alexander,* 602 U.S. at 26 (quoting *Allen,* 599 U.S. at 21)). As the Court explained, ignoring core retention "betrays a blinkered view of the redistricting process," as lawmakers "usually begin with the existing map and make alterations to fit various districting goals." *Id.* at 27. Where this factor is not addressed, "we cannot rule out core retention as another plausible explanation for the difference between the Enacted Plan and the average" map in any simulated ensemble. *Id.*

Dr. Barreto's analysis fails on this basis. Dr. Barreto admitted that, like Dr. Imai in *Alexander,* he did not instruct his mapping software to retain district cores. Tr. 10/4/25 PM 27:12–14. That obvious deficiency is dispositive.

While Dr. Duchin attempted to model core retention by having her robot "surcharge" simulated districts with a lower core retention, Tr. 10/5/25 AM at 97:13–98:4, it did not differentiate between core retention of Republican-held districts versus Democratic-held districts, *id.* at 98:5–15, which betrays an equally "blinkered" view of the 2025 redistricting process in Texas. Mr. Kincaid "was definitely trying to minimize the disruption in the Republican incumbent seats" but "had to rework most of the Democrat seats to create new pickup opportunities." Tr. 10/7/25 AM 125:7–16. Pretending the mapdrawer prioritized Republican core-retention and Democratic core-retention equally is just as wrong as pretending the mapdrawer paid not attention to core retention at all. Dr. Duchin is therefore also incapable of excluding the possibility that core district retention—especially in Republican-held districts—explains any differences between the 2025 Plan and her simulations.

**Incumbency Protection.** The Supreme Court has found incumbency protection to be a traditional districting criterion. *Rucho,* 588 U.S. at 706–707; *see also Allen*, 599 U.S. at 35. It is, therefore, one of the "myriad considerations" that Plaintiffs' expert reports must "replicate" to be probative of racial intent. *See Alexander*, 602 U.S. at 24. Here, too, both Drs. Barreto and Duchin's simulation evidence falls short.

Dr. Barreto's analysis failed to consider any incumbency protection. Tr. 10/4/25 PM 27:5–11; 33:4–14. And Dr. Barreto failed to do so even though articles in the Texas press discussed the

partisan nature of the incumbent pairings well before the new map was passed: "[t]he new configurations would leave Democratic members in those regions with the uncomfortable prospect of battling each other for the dwindling seats in next year's primaries; retiring; or taking their chances in nearby GOP-leaning districts . . . ." *Id.* at 34:9–16 (quoting Defs.' Ex. 1517 at 1). This failure means that Dr. Barreto's simulation analysis is unable to exclude the possibility that incumbency protection explains the differences between the 2025 Plan and his simulations.

Dr. Duchin attempted to model incumbency protection, but her model is unreliable and unpersuasive for two reasons. First, while Dr. Duchin required the algorithm to draw simulated plans that did not pair more incumbents than Plan C2333, she failed to consider whether the simulated plans paired Republican or Democrat incumbents with each other. Tr. 10/5/25 AM 100:11–101:1. But incumbents are not fungible—and given the Legislature's partisan goal of flipping five Democrat-held seats to Republican-held seats, it is not reasonable to assume that a plan that paired two sets of Republican incumbents would be equally preferred to a plan that paired two sets of Democrats. Nor is Dr. Duchin's assumption consistent with testimony in this case that only Republican incumbents were not paired together in the mapmaking process. Tr. 10/7/25 AM 60:12–18, 93:12–15 (statements of Mr. Kincaid).

Second, Dr. Duchin performed her incumbency analysis using an out-of-date list of incumbent addresses, which only listed 36 congressman, and Dr. Duchin did not dispute that ten of the incumbents on the list she used were not in Congress in 2024–2025. *See* Tr. 10/5/25 AM 102:14–103:24. Former members of Congress are *not* incumbents the Legislature would want to protect in 2025; therefore, Dr. Duchin's use of outdated incumbent addresses severely impacts her analysis. For these reasons, Dr. Duchin's incumbency analysis not reliable and should be rejected.

**Modeling Issues**. Much of Dr. Barreto's simulation analysis did not address the entire state but only specific areas of the state—sometimes limited to the outer boundaries of specific groups of districts. Dr. Trende explained that Dr. Barreto over constrained his model, by, for example, making the robot think "that the only precincts that were available to the mapdrawer are

44

the precincts that ended up in Districts 7, 18, and 29," which was not a reasonable assumption because "the shape of those districts changed." Tr. 10/10/25 AM 59:3–12. By over constraining the model, Dr. Barreto did not "giv[e] the simulations room to breathe." *Id.* at 59:15–17. When Dr. Trende ran the redist program's diagnostic reports after running Dr. Barreto's code, he discovered the software reported problems with the simulations. Defs.' Ex. 571 at 45–52. Those issues included chain non-convergence issues and plan diversity issues, which render analysis unreliable. *Id.*

In some areas, especially in South Texas, there were chain non-convergence errors, which is reflected in the diagnostic reports. Chain non-convergence errors call into question whether the simulation software returned a "nice random sample" that is "reliable" for statistical analysis. Tr. 10/10/25 AM 60:19–61:19. Without convergence, "you don't have a random sample you can reliably base inferences on." *Id.* at 62:4–10.

All of Dr. Barreto's regional simulations suffered from "severe plan diversity issues." Tr. 10/10/25 AM 64:6–64:21. As Dr. Trende explained, low plan diversity means the simulation model is not drawing a sufficiently large number of unique maps to create a good sample. The chain acceptance rates "are supposed to be above 10 percent," but, for example, were only "around a tenth of a percent" in Dr. Barreto's South Texas simulations. *Id.* at 62:8–19. Therefore, while Dr. Barreto had 51,360 sampled plans in South Texas, there were only 107 unique plans—the other 51,000+ were *duplicates*. *Id.* at 63:21–64:4. Dr. Barreto's plan diversity issues mean he did not have a sufficiently large sample to conduct a reliable analysis. *Id.* at 64:5–10.

**Compactness**. Dr. Barreto's simulated plans were not reasonable plans against which to compare the 2025 Plan because he drew his plans in a manner that excessively considered district compactness. Specifically, Dr. Barreto admitted that he instructed his simulation software to apply a compactness "weight" of 1.5 to 2.0 when drawing simulated plans. Tr. 10/4/25 PM 16:21–17:1. While Dr. Barreto claimed this was a "small number," *id.* at 16:24–25, he admitted that the compactness scale in the software is "not linear" and "not a simple one-to-one," *id.* at 23:11–22, meaning a compactness score of 2 is more than twice the weight of a score of 1. *See also*

45

Tr. 10/10/25 AM 70:5–70:18 (Dr. Trende explaining that "you are actually talking about orders of magnitude of differences in how heavily [compactness is] weighted going from 1 to 2"). This exacerbates the difficulty simulation programs, which "just naturally draw compact districts," Tr. 10/10/25 AM 51:12–18, face when modeling plans drawn with lower compactness.

The effect of this methodological choice was substantial. As Dr. Barreto admitted, in some instances the redist software was unable to match the 2025 Plan's political performance because the 2025 Plan "sacrificed" compactness in a way the simulations did not. *See* Tr. 10/4/25 PM 16:13–20; *see also* Brooks Ex. 283 at 2–3 n. 2. But this admission means that the compactness criterion Dr. Barreto applied was so aggressive the software was overlooking plans with compactness comparable to the 2025 Plan—which, notwithstanding Dr. Barreto's complaints, was more compact than the 2021 Plan, *see* Tr. 10/5/25 AM 75:21–23 (Dr. Duchin conceding the 2025 Plan was more compact), and by itself not inherently suspicious. This means Dr. Barreto's software was failing to draw plans using the criteria followed by the Legislature, as the Legislature was entitled to draw districts less compact than Dr. Barreto's robot—especially when it was instructed to heavily weight compactness.

**Procedural Violations.** Dr. Barreto's opinions also lack credibility because, whether by design or a lack of technical experience with the redist software (this was the first lawsuit where he used it, *see* Tr. 10/4/25 AM 143:14–144:5), he omitted data which hampered Dr. Trende's ability to replicate his work. He did so principally in two ways. First, Dr. Barreto neither disclosed the simulated plans his software created nor included a "seed" value to replicate his plans. Tr. 10/10/25 AM 12:7–17. Thus, Dr. Trende was forced to create a *new* set of simulated plans to review Dr. Barreto's work—simulations Dr. Barreto admitted took up to 48 hours to run. Tr. 10/4/25 AM 46:1–9. Second, Dr. Barreto admitted on the stand that he created a merged data file—the file combining CVAP, 2024 presidential election results, and Plan C2333 boundaries merged at the VTD level—to conduct his analysis. Tr. 10/4/25 AM 169:5–7. But he did not provide the merged data file with his reports, and admitted he did not do so because he did not save the file. *Id.* at 172:25–173:3. While he tried to dismiss that failure by explaining that other

experts could create their own merged data, Dr. Trende explained it takes time to create merged data sets. And the omission of Dr. Barreto's data precluded Dr. Trende from reviewing it to confirm whether Dr. Barreto's merged data was free of errors—which can happen. Tr. 10/9/25 PM 173:1–23 (Dr. Trende testifying that choices an expert makes during the merging process can affect the results, and mistakes in merging are possible); Tr. 10/10/25 AM 10:13–23 (Dr. Trende testifying that he discovered an error in merging data by an expert in prior case in New York).

This matters because expert evidence should be replicable, i.e., "someone else could repeat the exact methodology the expert used." *United States v. Cloud*, 576 F. Supp. 3d 827, 839 (E.D. Wash. 2021). This means "a method must be objective enough that someone else not associated with the case could duplicate it and get the same results." *Id.* at 840 (quoting *United States v. Adams*, 444 F. Supp. 3d 1248, 1260 (D. Or. 2020)). Thus, "courts across the country have excluded expert opinions based on scientific testing where the testing was inadequately documented to permit scrutiny and replication[.]" *In re Zantac (Ranitidine) Products Liab. Litig.*, 644 F. Supp. 3d 1075, 1130 (S.D. Fla. 2022) (collecting cases); *see also United States v. Mitchell*, 365 F.3d 215, 245–46 (3d Cir. 2004) (courts "will generally act within their discretion in excluding testimony of recalcitrant expert witnesses—those who will not discuss on cross-examination things like error rates or the relative subjectivity or objectivity of their methods."). The Court denied the State Defendants' motion to exclude Dr. Barreto's testimony or reports over these issues, *see* ECF 1205, but observed that a similar complaint about Dr. Barreto from the *Pierce* litigation "may evince a troubling pattern on Dr. Barreto's part," *id.* at 7, and the Court reserved the right to consider the sufficiency of his disclosures as part of its assessment of Dr. Barreto's reliability and what weight to give his conclusions. *Id.* at 15. Here, it is notable that Dr. Barreto could not credibly explain his failure to produce his merged data set (at a minimum) or his output, and his failure to do so prevented Dr. Trende from testing his merging process. Given the short timeframe available due to the expedited proceedings on Plaintiffs' preliminary-injunction motions, this issue weighs against Dr. Barreto's credibility and this Court should discount his opinions.

**Failure to Show Partisan Outliers**. A final problem with on Dr. Duchin's ensemble approach is that, while she prepared box plot diagrams to show the degree to which the congressional district CVAPs for the 2025 Plan were statistically unusual when compared to the range of the "clusters" in her simulated plans, Dr. Duchin failed to produce similar box plots to show how the new districts' *partisanship* compared to the range of the simulations to determine if the 2025 Plan was an outlier with regard to partisanship too. *See* Tr. 10/5/25 AM 124:4–126:3. This is a critical omission given the Plaintiffs' burden to disentangle race from politics. By reading her report and listening to her testimony, this Court cannot determine whether the 2025 Plan was unusual, according to Dr. Duchin's simulations, regarding both race *and* politics.

### iv.    Dr. Murray

Dr. Murray did not make up for the failings of Plaintiffs' other experts. There was substantial confusion about which version of Dr. Murray's report he was testifying from—it appears Dr. Murray amended his August 22, 2025 report on August 24, and Plaintiffs' counsel admitted that "the report [from] the 24th is clearly a better report." Tr. 10/6/25 PM 47:2–6. During *redirect* examination, Plaintiffs' counsel took Dr. Murray through a lengthy examination of the amendments to his report—spanning 12 transcript pages—between the August 22 to 24 versions. *See id.* at 26:5–38:18. Suffice it to say, this is not a hallmark of expert credibility.

In any event, Dr. Murray's testimony provided no assistance in discerning legislative motive. Taken as a whole, his testimony fails to appropriately connect his inferences to the underlying record and instead resembles unadorned color commentary that the Court is under no obligation to credit. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005) ("A claim cannot stand or fall on the mere ipse dixit of a credentialed witness"). For example, Dr. Murray testified that he was "analyzing [the 2025 Plan] not in terms of the motivation of the mapdrawers, but what's the effect on the Black and Hispanic voters in

Texas," and did not "present [himself] as an expert on motivations of political actors." Tr. 10/5/25 PM 17:12–18:1. In addition, Dr. Murray admitted he did not approach his task by asking whether "the Congressional Districts in Plan C2333 were consistent with a Legislature that proceeded on purely partisan motivation to maximize the number of Republican districts . . . ," but rather approached it from the "perspective" of "what happens to the Black and Latino voters" as a result. Tr. 10/5/25 PM 16:11–19. These statements admit he did *not* directly analyze racial motivation.

Dr. Murray's analysis of racial effects is not probative of intent. He acknowledged that "[y]ou can be partisanally [sic] motivated, but also devastating to the political opportunity for Black and Latino voters at the same time." Tr. 10/5/25 PM 17:2–11. Likewise, Dr. Murray conceded that it was "[a]bsolutely" an "inevitable by product [sic] of trying to get five more Republican Congressional seats [in Texas], that you would have to make some big changes to existing districts that included very significant minority populations." *Id.* at 41:23–42:3.

To the extent Dr. Murray opined on intentional discrimination, it was based on his personal views of constitutional law, which are inconsistent with binding precedent. For example, he testified to his belief that the Fourteenth Amendment prohibits "the elimination of naturally occurring districts that perform for racial and ethnic minorities," Tr. 10/3/25 PM 113:9–15, which finds no support in current doctrine. Under a but-for causation standard, discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." *Feeney*, 442 U.S. at 279. "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*; *Miller*, 515 U.S. at 916. The Legislature's alleged knowledge of a racial "byproduct" of a *political* districting decision is not enough for Plaintiffs to clear their "high bar" of separating partisan from racial motive. *See Alexander*, 602 U.S. at 9–10 (requiring plaintiffs to "rul[e] out the competing explanation that political considerations dominated the legislature's redistricting effort"). That is because race and politics often correlate in redistricting, and when they do, "it naturally follows that a map that has been gerrymandered to achieve a partisan end can look very

similar to a racially gerrymandered map." *Id.* at 9. Dr. Murray assumed away that very question, rendering his testimony unhelpful.

### d. Effort To Show Racial Intent Through *Arlington Heights* Factors

Insofar as the factors addressed in *Arlington Heights* are relevant, *but see supra* Section I.D., they uniformly point in one direction: race does not explain the redistricting effort, let alone any district boundaries. The *Arlington Heights* factors include (1) discriminatory effect; (2) historical background; (3) the sequence of events leading up to a challenged decision; (4) departures from normal procedure; and (5) legislative history. *Vill. of Arlington Heights*, 429 U.S. at 266–68; *see Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 640 (5th Cir. 2021) ("These factors are not exhaustive"). Like any "multi-factor test," this one must not be construed "as a sequence of disparate, unrelated considerations without a common conceptual core" *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 504 (2023). The *Arlington Heights* factors are probative only insofar as they can fairly point to "a discriminatory goal." *Rollerson*, 6 F.4th at 640. In this analysis, "a court 'must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus.'" *Perez*, 585 U.S. at 603 (citation omitted).

#### i. Effect of the Plan

It is relevant, and is in fact dispositive, that the plan does not "minimize or cancel out the voting potential of racial or ethnic minorities." *Alexander*, 602 U.S. at 38 (citation omitted). A discriminatory "effect" is an independent element of a vote-dilution claim, *id.* at 39, and this element fails because Plaintiffs did not establish a legally cognizable effect. In "Fifteenth Amendment proceedings" alleging vote dilution, a "comparison must be made with a hypothetical alternative" to demonstrate "what the right to vote ought to be." *Reno v. Bossier Par. Sch. Bd.*, 528 U.S. 320, 334 (2000). In direct contradiction to their arguments challenging the 2021 Plan, Plaintiffs now abruptly change course and cite that plan as a comparator. *See, e.g.*, ECF 1211–1 at 9. This is not credible. In any event, proof that legislation "bears more heavily on one race than another" relates to the question of intent, Plaintiffs have not shown a "stark" pattern

"unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. 264–68. At most, they have shown a political impact with a rough racial correlation.

The Constitution does not condemn a plan merely because under it Republican candidates win and Democratic candidates lose. *See Whitcomb v. Chavis*, 403 U.S. 124, 150 (1971). Race and partisanship are correlated in Texas. Tr. 10/3/25 AM 3:1–3 (statement of Mr. Ely); *see also* Tr. 10/4/25 AM 68:11–12, 142:2–5 (statement of Dr. Barreto). Accordingly, it is possible that a map gerrymandered to achieve a partisan end can look very similar to a map that is racially gerrymandered. Tr. 10/3/25 AM 3:4–7 (statement of Mr. Ely). An approach to vote dilution that fails to differentiate racial and political impact would raise "a serious line-drawing problem in the redistricting context." *LULAC*, 601 F. Supp. 3d at 169. Plaintiffs' unconstitutional dilution claim in a plan hindering Democratic electoral prospects would bypass *Rucho* in the worst of ways by enabling only one political interest group, Democratic voters, to bring partisan-gerrymandering claims, but not Republican voters, because minority voters typically prefer Democratic candidates in general elections. To avoid that indefensible rule, the Court should require Plaintiffs to show more than mere political impact.

Here, all evidence that might differentiate one from the other shows a mere partisan harm, not a harm fairly deemed racial vote dilution. Examining SD10 as configured in 2021, this Court found the discriminatory effect prong met through evidence that "the cracking of the district bears more heavily on Black and Hispanic voters than it does on Anglos." *LULAC*, 601 F. Supp. 3d at 169. But that is not the case here. Dr. Lewis showed that the 2025 Plan disadvantaged Anglo, Black, and Hispanic Democrats *equally* in their ability to elect preferred candidates. *See* Defs.' Ex. 570, Lewis Rep. at 7 tbl. 1; Tr. 10/8/25 PM 131:23–132:2, 132:15–25. Dr. Trende's analysis of the 2025 Plan's challenged district lines showed that adverse impacts were borne by *Democratic* voters as compared to Republican voters, not minority voters as compared to white voters; he showed that the mapdrawer assigned Anglo-majority or -plurality precincts to districts based on partisanship, such as in CD 7 and CD 18 in Harris County, rather than by race. *See generally* Defs.' Ex. 571 at 23–

33. For example, Dr. Murray acknowledged that revisions in the Brownsville district made it more likely to elect a Republican, whether Hispanic or not. Tr. 10/5/25 PM 9:2–10.

Another way to disentangle racial and political impacts is to analyze primary data, which can control for partisan affiliation. However, three of Plaintiffs' four polarized-voting experts— Drs. Ansolabehere, Barreto, and Collingwood—did not examine primary elections. Dr. Ansolabehere, for example, generated estimates for Anglo, Hispanic, and Black voters for "Democratic" candidates in various general election contests in 2020–2024. ECF 1149–24, Ansolabehere Rep. at 8, tbl. 7. Dr. Collingwood analyzed CD 9 and CD 5 using six general election contests from 2020–2024. LULAC Ex. 829, Collingwood Rep. at 9 tbls. 3.1–3.2. Dr. Barreto similarly analyzed just general election contests in 2022–2024 in his report. Brooks Ex. 269 at 44– 54. This is a startling omission given the Court's prior criticism of an expert who failed to consider primary elections. *See LULAC*, 601 F. Supp. 3d at 165 ("giv[ing] little weight to Dr. Barreto's ultimate conclusions" because he maintained "that the only relevant factor in determining Black and Hispanic citizens vote as a cohesive group is how they vote in general elections"). And this omission is particularly important with respect to allegedly "packed" districts (i.e., CD 18 and CD 23) because in districts Democratic candidates will likely win, the relevant question is who will win the Democratic primary. *See Agee v. Benson,* No. 1:22-cv-272, 2023 WL 8826692 at *53 (W.D. Mich. Dec. 21, 2023) (three-judge court) (criticizing RPV expert for failing to consider primaries where "[e]veryone agrees that the elections in these districts are decided in the Democratic primaries, not the general election").

While Dr. Duchin did include a few primaries in her polarized-voting analysis, *see* NAACP Ex. 208, Duchin Rep. at 7, she inexplicably included *Democratic* primaries. She failed to consider the ability of Hispanic and Black voters to influence *Republican* primaries, even though, according to Dr. Barreto's ecological-inference estimates, President Trump carried a substantial share of the Hispanic vote. Brooks Ex. 269, Barreto Rep. at 44–48 (Trump 2024 vote-share among Hispanics, EI RxC, ranging from 26% in CD 32 to 48% in CD 2). As such, Dr. Duchin's opinions are entitled to little to no weight. *See LULAC*, 601 F. Supp. 3d at 165.

Plaintiffs' discriminatory-effects case fails for the additional reason that the 2025 plan increases the number of majority-minority districts. Tr. 10/8/25 PM 74:7–20 (statement of Sen. Hinojosa); *see also* Defs.' Ex. 1325 at 63:7–66:18. By contrast, it decreases the number of Democratic districts. That describes a partisan impact, not a racially discriminatory impact. Indeed, Plaintiffs challenge *majority-minority* districts as discriminatory. In a majority-minority district, the relevant minority group can "elect [its preferred] candidate based on their own votes and without assistance from others." *See Strickland*, 556 U.S. at 14 (plurality opinion). A state does not establish "a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities," *Alexander*, 602 U.S. at 38 (citation omitted), by creating districts in which the minority can elect its candidates of choice—assuming it has any—at will. While Plaintiffs predict that Hispanic voters may not exercise this opportunity, their expert shows that this is due to low Hispanic turnout and low cohesion. *See* LULAC Ex. 829, Collingwood Rep. at 9–25. That does not mean voting potential has been cancelled or minimized. *Cf. Salas v. Sw. Texas Jr. Coll. Dist.*, 964 F.2d 1542, 1556 (5th Cir. 1992) ("Obviously, a protected class is not entitled to § 2 relief merely because it turns out in a lower percentage than whites to vote."). Nor does it plausibly suggest motive to cancel out minority votes; it points to political motive.

Plaintiffs attacked Adam Kincaid for claiming he did not look at racial data and the 50 percent plus one BCVAP districts were the result a pure partisan draw. Tr. 10/08/25 AM 95:9–96:11. Plaintiffs' Expert Mr. Ely knows it is possible to draw a 50 percent plus one BCVAP district without looking at racial data—because he has done it too. Tr. 10/02/25 PM 128:1–14.

### ii.    Recent History

"The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. Plaintiffs misconstrue this standard as looking to the "history of discrimination" in the State. *See, e.g.*, ECF 1211–1 at 11; ECF 1214 at 1–2. The Supreme Court has held that "Texas's 'long history of voting-related discrimination'" has no "logical bearing on" the discriminatory intent inquiry.

*Perez*, 585 U.S. at 619 (citation omitted). That is because, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987); *see Veasey v. Abbott*, 830 F.3d 216, 232 (5th Cir. 2016). The analysis looks to the "historical background of the *decision*," *Arlington Heights*, 429 U.S. at 267 (emphasis added), not the history of *Texas*.

Properly framed, this inquiry plainly favors the State Defendants. Plaintiffs appear to have come around to concede the 2021 redistricting was conducted in a race-neutral manner, and all testimony confirmed this. *See, e.g.*, Tr. 10/1/25 AM 12:9–13, 15:11–14 (Sen. Alvarado); Tr. 10/7/25 PM 84:25–85:1 (Kincaid). In fact, Dean Thompson—Plaintiffs' witness—would have been "absolutely shocked" to see the Attorney General or Lieutenant Governor pass a race-based map, Tr. 10/2/25 AM 111:23–25 (Dean Thompson), and considered it insulting to be asked whether Republican Sen. Joan Huffman was racist because they worked together for years and Dean Thompson never thought Sen. Huffman was racist. Tr. 10/2/25 AM 106:19–108:3. This is powerful evidence against Plaintiffs' notion that the Texas Legislature has in recent times drawn maps with racial motive. Moreover, as of 2025, Plaintiffs' witnesses agreed that race not "on the mouth of the governor" and the "legislature" when the 2025 redistricting process began. Tr. 10/1/25 AM 15:18–21 (Sen. Alvarado). All relevant history points to political motive. The Legislature has become hyper-partisan, and there is no way to remove partisanship from the redistricting process. Tr. 10/1/25 PM 119:7–120:2 (Speaker Moody). When the Democratic members of the Texas House broke quorum, representatives from over 35 states joined them in a protest. Tr. 10/2/25 AM 36:1–8 (Sen. West). The relevant history reflects hard-nosed politics on both sides, not racial intent.

Plaintiffs show nothing to detract from this point. They have failed to show "a series of official actions taken for invidious purposes" by the current or near-current State Legislature. *Arlington Heights*, 429 U.S. at 267.

### iii.    Sequence of Events

Likewise, the course of events from which the challenged law emerged point to a political, not racial, motive. The ball was set rolling in February or March of 2025 when Republican strategists met with White House officials to discuss redistricting before the mid-term election. Tr. 10/7/25 AM 54:6–11 (Kincaid). In March, Robin Armstrong, one of the three members of the Republican National Committee from Texas, contacted Adam Kincaid to discuss mid-decade redistricting in Texas. Tr. 10/7/25 AM 54:15–55:18 (Kincaid). The RNC hired Kincaid to assist in that effort. Tr. 10/7/25 AM 55:20–24 (Kincaid). All indicia from these events suggest political purposes; no evidence suggests the goals were racial.

Raising the political stakes, President Trump in June publicly urged Texas to redistrict to obtain five more Republican seats. Tr. 10/2/25 AM 120:9–121:1 (Dean Thompson); *see also* Defs.' Ex. 1415. Democrats knew that President Trump's partisan goal launched the mid-decade redistricting effort. Every Democratic member of the Legislature to testify at trial acknowledged this fact including Sen. West, Tr. 10/2/25 AM 6:22–7:4 (Sen. West); Sen. Alvardo, Tr. 10/1/25 AM 10:15–19 (Alvarado); Speaker Moody, Tr. 10/1/25 PM 120:9–121:2 (Speaker Moody); *see also* Tr. 10/1/25 PM 122:13–123:3 (Speaker Moody); Rep Romero, Tr. 10/2/25 PM 78:11–13 (Rep. Romero); and Rep Gervin-Hawkins, Tr. 10/03/25 PM 45:8–13 (Gervin-Hawkins). At the hearing after the layout for the redistricting bill was presented, Speaker Moody (D) stated: "The felon in chief said, get me five seats, and so here we are." Tr. 10/1/25 PM 122:18–24 (Speaker Moody).

According to Sen. West, the special sessions were called "in order to do the bidding of the President in order to attempt to get additional Republican seats in Congress ahead of the 2026 election." Tr. 10/2/25 AM 25:20–26:3 (Sen. West). On July 9, 2025, West posted on Facebook that the 2025 redistricting was "nothing more than a naked power grab by Republicans through the governor's call at Trump's behest." Tr. 10/2/25 AM 51:3–20 (Sen. West). Likewise, Plaintiffs' expert Dr. Murray was aware of the President's demand and (unsurprisingly) had no reason to think the President was insincere. Tr. 10/05/25 AM 138:19–139:7 (Dr. Murray). Dr. Murray

believed that the Texas Legislature responded to President's Trump political wish. Tr. 10/05/25 PM 5:23–6:12 (Dr. Murray). Simply stated, politics explains everything.

### iv.    Legislative Procedure

Plaintiffs are also unpersuasive in claiming "[d]epartures from the normal procedural sequence" occurred or that they suggest racial motive. *Arlington Heights*, 429 U.S. at 267. Mid-decade redistricting is not itself suspect. Tr. 10/2/25 AM 45:6–24 (Sen. West). Texas has performed mid-decade redistricting on several occasions and during special sessions in five of the last six redistricting cycles. Tr. 10/05/25 PM 83:15–20 (Sen. King). Nor was there anything unusual with redistricting in special session, which has also occurred before. Tr. 10/2/25 AM 44:25–45:5 (Sen. West).

The process proceeded on an ordinary course. The Senate resolution creating the redistricting committee was identical to resolutions used in 2021 and 2023, which passed unanimously in those prior cycles. Defs.' Ex. 1056; Tr. 10/5/25 PM 85:8–85:17. The Senate redistricting committee was populated with members chosen because of their redistricting experience and broad geographic representation. Tr. 10/5/25 PM 84:23–85:7. (Sen. King). The Legislature provided multiple opportunities for public participation in virtual and in-person hearings. Tr. 10/2/25 AM 61:21–62:23 (Sen. West); Tr. 10/1/25 PM 19:2–22, 30:12–25, 32:15–25, 37:13–21 (Speaker Moody). Chairman King asked Democratic Senate caucus chair, Sen. Alvarado, to invite speakers to testify at regional hearings and prioritized that testimony. Tr. 10/5/25 PM 86:23–87:2; 88:9–20 (Sen. King) ("[O]ut of courtesy to the Democratic Caucus, we brought those witnesses up to testify as soon as they signed on online"). The Senate held four statewide virtual hearings. Tr. 10/2/25 AM 61:21–62:23 (Sen. West); *see also* Defs.' Ex. 1097; Tr. 10/2/25 AM 62:21–23 (West); Tr. 10/5/25 PM 86:13–88:8 (Sen. King). Chairman King solicited follow-up information from anyone who signed up to testify but failed to testify. Tr. 10/5/25 PM 89:3–17. (Sen. King). The Senate held separate in-person hearings at the Capitol for invited and public testimony. Tr. 10/2/25 AM 62:24–63:6 (Sen. West). The Senate enabled anyone to testify and

provided both virtual and in-person options for testifying. Tr. 10/2/25 AM 63:7–9 (Sen. West). The Texas Senate gathered public input through regional hearings held via teleconference; four days of hearings were centered on the north, south, east, and west, respectively; thousands of people watched online. Tr. 10/05/25 PM 86:11–87:2 (Sen. King). The Senate heard from 242 witnesses. Tr. 10/1/25 AM 150:25–152:5 (Sen. Alvarado). The Senate redistricting committee also opened a public portal and received more than 7,000 public submissions that were available to all senators. Tr. 10/05/25 PM 96:20–97:5 (Sen. King).

The process in the House was similar. Chairman Vasut evaluated prior mid-decade redistricting and followed that precedent. Tr. 10/9/25 PM 80:13–23 (Rep. Vasut). The House held in person hearings in Austin, Houston, and Arlington, which included full-day hearings with testimony from invited witnesses and members of the public. Tr. 10/1/25 PM 19:2–22, 30:12–25, 32:15–25, 37:13–21 (Speaker Moody). The field hearings were packed. Tr. 10/2/25 AM 87:22–88:3 (Dean Thompson). The room was appropriately set up. Tr. 10/2/25 AM 88:18–21 (Dean Thompson). The committee received testimony for and against the redistricting. Tr. 10/9/25 PM 102:21–103:5 (Rep. Vasut). The Republican leadership in the Senate and House worked with their Democrat counterparts to invite every witness requested. Tr. 10/06/25 PM 86:11–87:2 (Sen. King); Tr. 10/1/25 PM 23:21–25:18 (Speaker Moody). Chairman King invited all of the people that Sen. Alvarado wanted to testify about the 2025 redistricting process. Tr. 10/1/25 AM 156:15–22 (Sen. Alvarado). The plaintiffs and intervenors in this case were specially invited to provide testimony, but except for Mr. Bledsoe representing the NAACP, none of the plaintiffs or intervenors appeared. Tr. 10/1/25 AM 150:25–151:14 (Sen. Alvarado). Members of the Legislature had the opportunity to ask questions and offer amendments. Tr. 10/1/25 AM 108:7–11 (quoting Sen. Alvarado); Tr. 10/1/25 PM 83:4–9 (quoting Speaker Moody). The House Speaker was responsive to requests by Democrats. Tr. 10/1/25 PM 17:8–15 (quoting Speaker. Moody).[6]

---

[6] The hearing notice regarding redistricting was not focused on CD 9, CD 18, CD 29, and CD 33, which were the congressional districts mentioned in the DOJ letter. Tr. 10/1/25 PM 22:23–23:1 (Moody).

All this evidence points to a regular course of proceedings reflecting hard-nosed politics rather than hidden racial motive. In fact, even the Democratic strategy of fleeing the State to break quorum was increasingly normal: Breaking quorum has, in recent years, become a "go-to move" for Democrats in several prior redistricting cycles. Tr. 10/1/25 AM 143:19–25 (quoting Sen. Alvarado).

> v.    **Legislative History**

"The legislative . . . history" is "highly relevant" because "contemporary statements by members of the decisionmaking body" show political, not racial, motive. *Arlington Heights*, 429 U.S. at 268. As shown, *see supra* Section II.A.1.b, the legislative record is brimming with testimony from all sides that the purpose for redistricting in 2025 was to improve Republican electoral prospects. Sen. King, testified to three goals: (1) legal compliance; (2) Republican gain; and (3) increased district compactness, if possible. Tr. 10/5/25 PM 84:1–14. To Sen. King's knowledge, no racial data was used in drawing the 2025 map. Tr. 10/5/25 PM 110:10–24. Every single vote on redistricting during the 2025 redistricting was along party lines. Tr. 10/2/25 AM 65:21–25 (quoting Sen. West); Tr. 10/8/25 PM 68:15–17 (quoting Sen. Hinojosa); Tr. 10/1/25 PM 92:20–93:1 (quoting Speaker. Moody); Tr. 10/9/25 PM 106:7–16 (quoting Rep. Vasut); Tr. 10/9/25 PM 114:7–13 (quoting Rep. Vasut). Politics, not race, drove every facet of the process from start to finish.

Because there is no evidence showing intent to cancel or minimize anyone's vote on account of race, Plaintiffs have failed to show a likelihood of success on their intentional vote-dilution claim.

## III.    Plaintiffs Are Unlikely To Succeed on Their Racial Gerrymandering Claims

Because Plaintiffs have no prospect of proving racial motive of any kind, their racial gerrymandering claims are all but certain to fail. On these claims, Plaintiffs must "show that race was the 'predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Alexander*, 602 U.S. at 7 (quoting *Miller*, 515 U.S.

at 916). Although the standard does not require a showing of dilutive impact on votes or a purpose to cancel out minority electoral prospect, it is more robust than the vote-dilution standard in the limited respect of requiring proof "not just that race was a factor in redistricting, but that it was 'the predominant factor.'" *LULAC v. Abbott*, 604 F. Supp. 3d 463, 509 (W.D. Tex. 2022) (quoting *Miller*, 515 U.S. at 916)).

"To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller*, 515 U.S. at 916. The inquiry turns on "the design of the district as a whole," so "[a] court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue." *Bethune-Hill*, 580 U.S. at 192. Importantly, the predominance test is not satisfied merely because of a racial goal, even a racial target. *Allen v. Milligan*, 599 U.S. 1, 32–33 (2023) (plurality opinion) (explaining "that 'the use of an express racial target' [is] just one factor among others that the court would have to consider as part of '[a] holistic analysis.'"). "As a practical matter, in many cases, perhaps most cases, challengers will be unable to prove an unconstitutional racial gerrymander without evidence that the enacted plan conflicts with traditional redistricting criteria." *Bethune-Hill*, 580 U.S. at 190.

Plaintiffs' failings under this test follow closely from their failings to show the requisite motive for their vote-dilution claims. *See supra* Sections I.A–B. First, a racial-gerrymandering claim nearly always requires "[d]irect evidence" that "race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8. No evidence shows that here for reasons already explained. In summary, the only direct evidence of line-drawing came from Mr. Kincaid, who credibly attested that he drew lines without regard to race. *See supra* Section II.A.1.a. That alone differentiates this case from every prior Supreme Court decision finding (or suggesting) racial predominance. *See, e.g.*, *Cooper*, 581 U.S. at 299 ("Uncontested evidence in the record shows that the State's mapmakers, in considering District 1, purposefully established a racial target: African-Americans should make up no less than a majority of the voting-age population."); *Bethune-Hill*, 580 U.S. at 184 ("The parties

agreed, and the District Court found," that the Legislature had used a 55% BVAP figure structuring the districts.); *see Alabama*, 575 U.S. at 259–60 (recognizing that "Alabama believed that, to avoid retrogression under § 5, it was required to maintain roughly the same black population percentage in existing majority-minority districts."). Likewise, legislator testimony confirmed that race was not even *a* motive, let alone the *predominant* motive, for the enactment of any districts. *See supra* Section II.A.1.b. Plaintiffs' efforts to read race into the DOJ letter and then impute that supposed racial motive to the Texas Legislature fails along all the lines discussed: the letter asked for race-neutral (not race-based) lines, and the Legislature did not act to implement the letter's directives in any event. *See supra* Section II.A.1.c. And the gubernatorial statements Plaintiffs cite reflect mere "awareness" of racial outcomes, not intent to move voters on account of race. *See Alexander*, 602 U.S. at 37 (noting that "it is unfair . . . to question [a mapdrawer's] credibility simply because he, like every other expert who has ever worked on a Voting Rights Act case, has had to 'consum[e] . . . racial data' to comply with our precedents."); *see supra* Section II.A.1.d. It would not be possible to read from Governor Abbott's statements anything meaningful about "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," *Miller*, 515 U.S. at 916, when he did not draw the plan.

That leaves Plaintiffs to make a "circumstantial-evidence-only case," which "is especially difficult when the State raises a partisan-gerrymandering defense." *Alexander*, 602 U.S. at 9. This Court must "draw an adverse inference against the Challengers for not providing a substitute map that shows how the State 'could have achieved its legitimate political objectives' in" all challenged districts "while producing 'significantly greater racial balance.'" *Id.* at 34 (citation omitted); *see supra* Section II.A.2.a. "The adverse inference may be dispositive in many, if not most, cases." *Alexander*, 602 U.S. at 35. "A plaintiff's failure to submit an alternative map"—precisely because it can be designed with ease—"should be interpreted by district courts as an implicit concession that the plaintiff cannot draw a map that undermines the legislature's defense." *Id.* Plaintiffs cannot overcome the strong inference that politics, not race, predominated. A district-specific review of direct and circumstantial evidence proves this. *See Bethune-Hill*, 580 U.S. at 192 (noting

that "[a] court faced with a racial gerrymandering claim therefore must consider all of the lines of the district at issue; any explanation for a particular portion of the lines, moreover, must take account of the districtwide context.").

### A. CD 9 and CD 18 in Harris County

Plaintiffs challenge CD 9 and CD 18 in Harris County, but the only direct evidence concerning these districts supports the State. Plaintiffs' circumstantial evidence fails to prove anything at all, let alone overcome the adverse inference directed by *Alexander*.

#### 1. Direct Evidence

Mr. Kincaid testified that he approached this region from the understanding that "there were four Democrat seats in the middle of Harris County" and, in order "to pick up five seats, one of those seats had to be flipped." Tr. 10/7/25 AM 119:1–5. With geography on his computer screen "shaded on partisanship," Mr. Kincaid "looked for the most partisanly Democrat precincts in Harris County and then into Fort Bend and Brazoria County and put all of those together in the 18th District." Tr. 10/7/25 119:13–16. Then, with the core established, the north and eastern borders of CD 18 were "straightforward" as both borders included "very, very heavily Democrat precincts." Tr. 10/7/25 AM 120:12–14 & 121:8–9. These lines were also configured to account for CD 22, which President Trump had carried with 60% of the vote, leaving no room for reduction in Republican voting strength; some of the "precincts along the border of 22 and 18 are not as deep blue as the ones you would see in the rest of 18, but they are still much more Democrat than the rest of 22." Tr. 10/7/25 AM 122:3–6. Mr. Kincaid "was trying to keep the 22nd District where it was or getting better." Tr. 10/7/25 AM 123:17–18. Mr. Kincaid liked "the shape of the seat," since another of his "objective[s] was to clean up the overall twisting profile of 18, 29, and 9" under the 2021 map. Tr. 10/7/25 AM 124:8–12.

After configuring CD 18 and CD 36 nearby, "the 9th kind of drew itself." Tr. 10/7/25 AM 126:9–10. After the "eastern border of 18 was set and the northern border of 36 in Harris County was set," he drew the "9th District up the eastern side of Harris County." Tr. 10/7/25 AM 126:11–

14. Baytown, however, posed unique problems. First, a small "area just north of Baytown" was excluded because it includes Rep. Crenshaw's home, and drawing him into the 9th District would take him out of a district President Trump won with 60 percent of the vote (District 2) and into one with a lower margin of victory. Tr. 10/7/25 AM 126:20–127:10. Second, "there is a series of Democrat precincts that are all kind of lumped together" in "the downtown area of Baytown." Tr. 127:14–16 (10/7/25 AM). Because Mr. Kincaid was "trying to make the 9th District as Republican" as possible, those precincts were given to District 36. Tr. 10/7/25 AM 127:16–20. All of that reflects choices made without regard to race.

Changes made from version 2308 to 2333 were equally race-neutral. Tr. 10/7/25 AM 169:9–11. Mr. Kincaid "added Liberty County to the 9th District" because alternatives were "not as Republican as [he] would have liked." Tr. 10/7/25 AM 168:21169:5. This made District 36 "underpopulated by about 93,000 people" and noncontiguous. Tr. 10/7/25 AM 169:18–20. Fixing these population imbalances led to "a clockwise rotation around the Houston area." Tr. 10/7/25 AM 171:20–21. This compelling evidence provides Plaintiffs no room to prove that race predominated—because race was not used.

## 2. Circumstantial Evidence

Plaintiffs' experts' efforts to engineer a showing of racial intent in these districts failed. Dr. Barreto claimed that in configuring CD 9, the State "carefully excluded Black population" and "traced the Hispanic population to create a majority-HCVAP district." Brooks Ex. 269, Barreto Rep. at 7, ¶ 22. Dr. Barreto's choropleth map does not show this; the correlation is weak at best:



Map Figure 14: Harris County Congressional Districts 2021 enacted (black) and 2025 passed (red)

*Id.* at 33, Fig. 14. The same is true of Dr. Duchin's dot-density map of this same region. *See* NAACP Ex. 208 at 12, Fig. 5. On direct examination, she provided only conclusory statements to support her claim that race explains the boundaries. Tr. 10/5/25 AM 48:8–16, 49:9–16. Even a cursory read of the race choropleth map undermines this *ipse dixit*—majority-Hispanic territory lies on both the west and east boundary of CD 18 and CD 9.

Besides, neither expert disentangled race from politics. Dr. Trende provided an equivalent choropleth map of the Houston region shaded with political data:



Figure 20: Houston area precincts by Donald Trump Two-Party Vote Share, with C2333 district boundaries overlaid

Defs.' Ex. 571 at 23, Fig. 20. This shows that a "heavy cluster of low Trump performing precincts around downtown Houston" are "crammed into Districts 29, 18, and 7." Tr. 10/10/25 AM 34:12–21. Political data explains the boundaries better than racial data, which is no surprise given Mr. Kincaid's unrebutted testimony. Dr. Trende calculated that of all the Harris County VTDs where Vice President Harris received over 70% of the two-party vote, there are 31 in CD 7, 150 in CD 18, 61 in CD 29, and a mere handful in CDs 8, 9, 36, and 38. Defs.' Ex. 571 at 23–24. As for race, Dr. Trende observes that CD 7 and CD 18 both contain a fair number of Anglo residents, which Dr. Trende concluded "is not the tactic of a racial segregator." Defs.' Ex. 571 at 24–25.

Dr. Trende also addressed Dr. Barreto's contentions about CD 9. Dr. Barreto claimed in his supplemental report that changes made to CD 9 between Plan C2331 and the enacted Plan C2333 (aka the 2025 Plan) were made in five steps. Brooks Ex. 283, Barreto Rios Supp. Decl. at

16–24, Figs. S13 to S21. But Dr. Trende corroborated Mr. Kincaid's factual testimony that the changes from C2331 to C2333 in CD 9 were far more complex than five steps. Dr. Trende testified that the changes "grew into a complex chain of events involving almost 700,000 residents in 12 districts, 667,000 of whom lived in the Houston area," which required careful balancing from a political performance perspective. Defs.' Ex. 571 at 27. Dr. Barreto focused on the addition of Liberty County from CD 36 to CD 9 but ignored that this required careful rebalancing of multiple redistricting factors—including county splits, contiguity, population equality, and partisan performance—that require a broader perspective than just a narrow focus on CD 9. *Id.* at 28. As one example, Dr. Barreto pointed out that part of the reconfiguration of CD 9 entailed moving Baytown despite Dr. Barreto's view that only a portion of Baytown's population would have needed to balance CD 9's population. Tr. 10/4/25 AM 91:11–92:23. But on cross-examination, Dr. Barreto conceded he did not discuss the partisan effects of those changes on the adjacent CD 2. Tr. 10/4/25 AM 132:12–19. Nor did he dispute that in the final 2025 Plan, CD 2 had a 60.8% Trump share. Tr. 10/4/25 AM 132:20–23. This flawed presentation consisting of flawed opinions comes nowhere close to meeting Plaintiffs' exacting burden.

## B.  CD 30, CD 32, and CD 33 in Dallas-Ft. Worth

Plaintiffs fare no better in their challenge to CD 30, CD 32, and CD 33 in the Dallas-Ft. Worth region.

### 1.  Direct Evidence

Mr. Kincaid drew District 32 as a "Republican district in North Dallas County" that he had previously known was possible because "the precincts in North Dallas County are not as Democrat as the precincts in Central and Southern Dallas County." Tr. 10/7/25 AM 82:16–25; 84:23 85:3. He did this with Republican-leaning precincts by "extend[ing] the district east using a series of whole counties out into East Texas, with the exception of Hunt, which [he] had to split because it spanned the whole . . . width of the district." Tr. 10/7/25 AM 83:1–6. These counties to the East are "heavily Republican." Tr. 10/7/25 AM 83:17–19. Having drawn a Republican

district to the north, Mr. Kincaid wanted to avoid re-drawing "whole areas of [the] map" because of later-discovered population imbalances. Tr. 10/7/25 AM 97:14–19. So, he "drew one megadistrict" with "the most Democrat VTDs [he] could find in Dallas and Tarrant County." Tr. 10/7/25 AM 97:20–23. This "megadistrict" became districts "30 and 33." *Id.* He then drew CD 6, where portions of Irving that had "bec[o]me more pro Trump in 2024." Tr. 10/7/25 AM 100:11–13. Mr. Kincaid "put[] more Republicans in the Texas 6 and out of 30 and 33" to "make sure that the future 30 and 33 were as Democrat as [he] could possibly make them." Tr. 10/7/25 AM 100:18–21.

In dividing Districts 30 and 33, Mr. Kincaid began with a series of precincts "just south of Downtown Dallas" where President Trump had received 20 percent or less of the 2024 vote and "assigned them all to the 30th District." Tr. 10/7/25 AM 105:16–24. He then added "a series of heavily Democrat precincts" to the West of Dallas, as well as "250,000 from Tarrant" County living in "heavily Democrat precincts." Tr. 10/7/25 AM 105:24–106:18. The "reason [he] put" those groupings into the 30th District is because they are "heavily Democrat." Tr. 10/7/25 AM 116:11–18. He then set the border "using neutral boundaries" where possible. Tr. 10/7/25 AM 107:9. Beginning in Grand Prairie, he followed I-70, "worked north to some streets and then up the local metro line" before "again join[ing] the highway." Tr. 10/7/25 AM 107:5–13. "Bumpy" portions of the line reflect "precinct lines." Tr. 10/7/25 AM 107:21–108:4. He then balanced the district's population using a "little triangle . . . just south of the interstate." Tr. 10/7/25 AM 108:13–15.

His goal was to make the 30th District "the more heavily Democrat seat of the two," so he "put all of the most heavily Democrat contiguous precinct in there," which "made for a more compact seat." Tr. 10/7/25 AM 109:2–13. The 33rd District was what remained of the previous "megadistrict" once Mr. Kincaid drew the 30th. Tr. 10/7/25 AM 109:20–21. On cross-examination, Mr. Kincaid clarified that in drawing toward Tarrant County he "moved west along the footprint of the existing Texas 30." Tr. 10/7/25 PM 69:10–16. He also noted that while "the most Democrat cluster you can draw is actually right there in the center of Dallas County" doing

so "creates a wall of a whole bunch of Democrats on the eastern side" that he "needed to be able to move… west somehow." Tr. 10/7/25 PM 70:22–71:4. This was his reason for taking "the 30th District down and put[ting] it in its current footprint." Tr. 10/7/25 AM 71:3–4. Politics predominated; race played no role at all.

### 2. Circumstantial Evidence

Circumstantial evidence does nothing to undermine the direct evidence. Dr. Duchin worked from map of what she called "Cluster C1" in Tarrant and Dallas Counties by race:

**Figure 4:** Dot density from Cluster C1 in Tarrant/Dallas shows that CD 24 is carefully designed to include White population and avoid pockets of minority groups.



NAACP Ex. 208, Duchin Rep. at 11, Fig. 4. On direct, Dr. Duchin testified only that the lines for CD 24—a district not challenged—"seem[ed] to be drawn in a way that the lines encompass a lot of White population and carefully excludes non-White population around it," and that "both District 33 and District 32 are impacted by that design." Tr. 10/5/25 AM 35:4–11. That is not how racial-gerrymandering claims work; race must have predominated in the design of the *challenged* district, not *neighboring* districts. *See United States v. Hays*, 515 U.S. 737, 746 (1995) (noting that

even assuming a *Shaw* claim exists in one district, that alone is not enough, absent more evidence, to reflect the legislature's intent for another district).

Besides, Dr. Duchin did not consider partisan dot-plot maps. This omission is yet again significant, as an analysis that looks to political geography shows that political motive could easily explain the line-drawing. The following is one such figure from Dr. Trende's report:



Defs.' Ex. 571 at 30, Fig. 24. Dr. Trende's report quantitatively analyzed the distribution of precincts in CD 30 and CD 33 in Dallas. He showed that of the 354 counties which comprise Dallas County and Tarrant County where President Trump received under 30% of the vote, 83% of them (294) were placed into CD 25 (47), CD 30 (149), or CD 33 (98). Defs.' Ex. 571 at 30. Just nine such precincts were assigned to CD 32. *Id.* Likewise, for precincts that President Trump carried with at least 70% of the vote, the opposite pattern holds. Dr. Trende identified 79 such VTDs in Dallas and Tarrant Counties, and found just two (in CD 30) and six (in CD 33). *Id.* This pattern supports a finding that district boundaries in this region are correlated to politics.

While Dr. Barreto briefly testified about CD 30, his opening report provided no choropleth maps with political shading. *See* Brooks Ex. 269 at 16–40, Map Figs. 1–21. Dr. Barreto's rebuttal report did include a series of what he called "RPV Dispersion Plot" maps, which were shaded

based on the CVAP (by specific races), depicted the district boundaries, and then color-coded the VTD boundaries red or blue based on whether 50%+1 of the precinct supported a Republican (red) or Democrat (blue). *See* Brooks Ex. 284 at 13–22, Figs. 1–18;Tr. 107:19–108:14. But his testimony regarding Figure 14 was conclusory and difficult to comprehend, appearing to focus on a claim that areas to the west of downtown Dallas—which he described as "Democrat areas" that had "more African Americans" that were added, and contrasting that with a different area of Dallas with an Anglo Democratic population that he alleges was removed from CD 30. Tr. 10/4/25 AM 107:19–110:2. Suffice it to say, identifying areas that are Democratic *and* African American does not help the trier of fact disentangle race from politics.

Moreover, on cross-examination, Dr. Barreto conceded that he was unaware that CD 30's boundary followed I-30 and I-35 through Dallas—confirming his analysis did not exclude non-racial explanations for the district boundaries. Tr. 10/4/25 PM 36:8–22. Importantly, the allegedly Anglo-Democratic piece of CD 30 that Dr. Barreto appeared to complain about being removed from CD 30 was located north of I-30. *Compare* Brooks Ex. 284 at 20, Fig. 14 *with* Defs.' Ex. 1031, Plan C2333 Map Package by Cnty. at 12 (depicting 2025 Plan boundaries in Dallas County with highways and other natural borders). Dr. Barreto's testimony concerning these districts is not credible.

## C.  CD 35 in Central Texas

Plaintiffs' CD 35challenge rests on the implausible theory that replacing a *freeway district* with a compact district amounts to racial gerrymandering. Because "reapportionment is one area in which appearances do matter," *Shaw I*, 509 U.S. at 647, Plaintiffs have no realistic possibility of proving this bizarre contention.

### 1.  Direct Evidence

District 35, was a "pickup opportunit[y]" that "was drawn to be a Trump plus 10 seat that Ted Cruz had also carried in 2024." Tr. 10/7/25 AM 157:14–16. Kincaid stated—with regard to the 2021 version of District 35—that "the districts that [he] did draw, [he] drew blind to race and used

politics. So as far as [he] was concerned, [the old] Texas 35 was a necessary partisan gerrymander that absorbed Democrats in Austin to San Antonio." Tr. 10/7/25 PM 64:12–17.

The newly-drawn CD 35 grew organically out of other changes to the map. "The 15th had moved to the east. The 28th had moved to the south." Tr. 10/7/25 AM 156:25–157:1. As a result, they had "split pieces of Guadalupe County" and "had pieces of Wilson and Karnes." Tr. 10/7/25 AM 157:1–3. So Mr. Kincaid took "Guadalupe, Wilson, and Karnes" and combined them with an "area of Bexar County" to "make the 35th District." Tr. 10/7/25 AM 157:1–9. Map-drawing was complicated by the need to prioritize "incumbent Republican seats" and "make sure that the 21st, which had been a 60 percent or more Trump seat, stayed 60 percent or more Trump." Tr. 10/7/25 AM 159:3–6. Similarly, the Twenty-Third District had to remain "an R plus seven." Tr. 10/7/25 AM 159:7–9.

As a result, CD 35, which "used to extend all the way from Austin down to San Antonio" needed to shed "a lot of Democrat areas that had been in 35." Tr. 10/7/25 AM 159:10–15. These areas went to the 20th District, which was designed to be "as Democrat as" Mr. Kincaid could make it and which ended up "absorb[ing] pretty much all of Downtown San Antonio." Tr. 10/7/25 AM 159:10–22. Moreover, "there is a steady line of heavily Democrat precincts that are contained within [District] 20" and "a smattering" of "heavily Democrat precincts with smaller ones clustered in th[e] Kirby area," which is why the Kirby area "gets drawn into 20 and not 35." Tr. 10/7/25 AM 163:19–25.

Other options were not feasible: "the 21st District couldn't come over to the west more" and "precincts on the west side of 20" could not be "put in a more Republican seat" without making District 23 "miss[] its political targets." Tr. 10/7/25 AM 160:6–13. In short, because "35, 21, and 23 were the priority" and Mr. Kincaid had "specific targets [he] had to hit in all three" the "draw in Bexar County [was] very complicated." Tr. 10/7/25 AM 160:21–24. Race had nothing to do with the line-drawing here.

## 2. Circumstantial Evidence

The starting point on circumstantial evidence is, again, that a compact district replaced a highly irregular freeway district. This is the type of redistricting decision courts should encourage, not one they should deem suspect.

Ignoring this, Plaintiffs presented testimony from experts, again using choropleth or dot-density maps, to claim that race explains the CD 35 boundaries, but their analysis was not credible. Dr. Barreto testified about CD 35 during his direct examination. In doing so, Dr. Barreto displayed one of his "RPV Dispersion Plot" maps, depicting CD 35. Brooks Ex. 284 at 22, Fig. 18. But, like his testimony regarding CD 30 in Dallas, his testimony about CD 35 was extremely conclusory, with his discussion focused on his observation that the "more urban part of San Antonio that was added into CD 35" consisted of "very high density Hispanic and Democratic areas that were added into this district." Tr. 10/4/25 AM 110:3–111:4. Suffice it to say, conceding that Hispanic "and" Democratic areas were added to a district does not help determine whether race or politics drove the line-making process. This testimony is not credible.

Plaintiffs also relied on Mr. Ely, who, in his report, used a "performance index" based on six elections that LULAC Plaintiffs' counsel instructed him to consider—i.e., Dr. Collingwood's six contests (2020 Railroad Commissioner, 2020 Supreme Court Seat 8, 2022 Attorney General, Supreme Court Seat 5, and Supreme Court Seat 9, and 2024 U.S. Senate)—in an attempt to evaluate partisanship in CD 9 and CD 35. *See* LULAC Ex. 831 at 18 (listing contests). The index score refers to how many of those contests the minority-preferred candidate prevailed in.

Mr. Ely claimed the following "performance index" map of Bexar County showed evidence that the border of CD 20 and CD 35 "cuts through a concentrated Latino or Hispanic community," Tr. 10/2/25 PM 110:24–111:2, and that politics did not explain the difference because, he claimed, "the line between 20 and 35 clearly has a split of communities with the same election result behavior." Tr. 10/2/25 PM 114:17–23.

Bexar County – Performance Index

C2333



LULAC Ex. 833 at 9. But Mr. Ely does not present, nor does the record reflect, any evidence that the Legislature drew, or even considered, the political performance of the 2025 Plan using an index consisting of those six contests. And Mr. Ely did not consider President Trump's elections, or even analyze political performance in Republican vs. Democratic terms. Tr. 10/3/25 AM 3:12–4:11.

Further, Mr. Ely's map only applies colors corresponding to an index consisting of how many of the six contests the minority-preferred candidate prevailed in, but does not account for the *margin* of victory in each block depicted. That makes a significant difference.

As this choropleth map of Bexar County produced by Dr. Trende shows:



Figure 27: Austin/San Antonio area precincts by Donald Trump Two-Party Vote Share, with C2333 district boundaries overlaid

Defs.' Ex. 571 at 33, Fig. 27. This choropleth map, which both reflects election data considered by the Legislature and shows more detail about the margin of support for the candidate, shows a clear difference in the political preferences of the voters residing in territory north and south of the border of CD 20 and CD 35—CD 20 is comprised principally of yellow and light-green shaded territory (i.e., territory that strongly supported Vice President Harris in the 2024 presidential

election) whereas CD 35 has more darker-shaded territory (i.e., territory more supportive of President Trump in that election).

Mr. Ely agreed that a mapdrawer who wanted to create a "partisan map" would want to know "the difference between a precinct that supports Donald Trump at 80 percent and a precinct that supports him at 51 percent," which Mr. Ely's "election performance" maps do not depict. Tr. 10/2/25 PM 129:22–130:20. Ultimately, therefore, Mr. Ely's choropleth maps do not enable the Court to disentangle race from politics, and are unhelpful in assessing the claim of racial motive in this case.

### D.  CD 22 and CD 27 in the Gulf Coast Region

Plaintiffs offered no meaningful analysis of this region and thus failed to meet their burden. The direct evidence, which again went unrebutted, established race-neutral motive for the configuration. After completing revisions to CD 29, Mr. Kincaid focused on CD 22. Tr. 10/7/25 AM 135:19–21. First, he moved into CD 22 VTDs from Fort Bend County that performed well for Trump to strengthen the district for Republican interests. Tr. 10/7/25 AM 135:22–135:13. He advanced that goal further by moving in CD 22 areas of Sugar Land in CD 7 that performed well for Republican candidates. Tr. 10/7/25 AM 136:14–137:11. CD 7 is a Democratic seat, and Mr. Kincaid strove to "put as many Democrats in there as I could." Tr. 10/7/25 AM 137:9–14. The old CD 22 included northern Brazoria County, which Mr. Kincaid swapped with CD 14's southern portion of Brazoria County, again to improve Republican prospects. Tr. 10/7/25 AM 137:15–138:7. At the request of District 14's incumbent [Congressman Randy Weber], Mr. Kincaid ensured that seven ports remained in the district, giving District 22 its southeastern border. Tr. 10/7/25 AM 138:10–18.

Mr. Kincaid also described the interplay between CD 27 and CD 37 in Travis County. Tr. 10/7/25 AM 141:12–22. The southeastern border of CD 37 separates VTDs reflecting 30% support for Trump, which Mr. Kincaid placed in CD 27, and anything less than that into CD 37. Tr. 10/6/25 AM 142:2–9. This approach served Mr. Kincaid's goal of maintaining CD 27 above

74

60% using the 2024 Trump figures. Tr. 10/7/25 AM 143:12–16. By the time he drew CD 27, Mr. Kincaid had already worked his way through the Rio Grande Valley seats and so he moved north along the Gulf Coast and kept Victoria County in CD 27 because the incumbent lived there. Tr. 10/7/25 AM 143:19–144:8. At the time, he did not know Rep Mike McCaul in CD 10 was retiring, so he was not very flexible with CD 27's northern border. Tr. 10/7/25 AM 144:9–20. In the northwest, the line between CD 21 and CD 27 in Hays County allowed Mr. Kincaid to bring CD 27 just above the threshold under the Trump 2024 figure. Tr. 10/7/25 AM 144:21–145:6. He also worked to avoid a split in the southwest in Refugio, Aransas, and San Patricio, but needed to ensure CD 27 was contiguous by road. Tr. 10/7/25 AM 145:1–6. These goals, like every goal Mr. Kincaid employed, were race neutral. Plaintiffs cannot prove racial gerrymandering that simply did not occur.

## IV.    Gonzales Plaintiffs Are Unlikely to Succeed on Their Foreclosed Mid-Decade Redistricting Claim

Unable to show likelihood of success under some recognized cause of action, Gonzales Plaintiffs advance what they style an "unnecessary mid-decade redistricting" claim they somehow believe is "distinct from Plaintiffs' malapportionment claim." ECF 1211–1 at 15–16. They base this theory on the view that states' prerogative to redistrict is "grounded in legal necessity." *Id.* at 16. Gonzales Plaintiffs inexplicably ignore *Voinovich v. Quilter*, 507 U.S. 146 (1993), which dismissed that idea out of hand. It is hard to understand their refusal to confront binding precedent that the State Defendants cited and quoted to them at length. *See* ECF 1196–1 at 13–14; 26.[7]

*Voinovich* considered and rejected an assertion that a state must satisfy the *Gingles* preconditions (governing Section 2 results claims) before configuring a majority-minority district. *Voinovich*, 507 U.S. at 155–57. Noting that "the federal courts may not order the creation of

---

[7] Gonzales Plaintiffs' suggestion that a preliminary injunction should issue based on a waiver theory, ECF 1211–1 at 15–16, therefore verges on frivolous. *See Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right.").

majority-minority districts unless necessary to remedy a violation of federal law," the Supreme Court explained:

> that does not mean that the State's powers are similarly limited. Quite the opposite is true: Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States, and not the federal courts, to conduct apportionment in the first place. Time and again we have emphasized that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court."

*Id.* at 156 (citations omitted). Put succinctly, states exercise their own legislative power when they redistrict, and that power is *not* "grounded in legal necessity" created by federal law. ECF 1211–1 at 16. Supreme Court precedent "teaches that redistricting is a legislative function, to be performed in accordance with the State's prescriptions for lawmaking." *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 808 (2015); *see also Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916) (explaining that the power "of apportionment" is "part of the legislative power" to be accomplished by "the legislative authority of a state"); *Moore v. Harper*, 600 U.S. 1, 24–25 (2023) (reaffirming this point). An exercise of legislative power need not justify itself. *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality opinion).

Plaintiffs offer only a slight variation of the argument rejected in *Voinovich*. Rather than contend a state must justify majority-minority districts based on Section 2's dictates, they contend that states must justify mid-decade redistricting based on some legal need. ECF 1211–1 at 15–16. But the flawed premise is the same in both cases; legislative redistricting *can* be the result of legal necessity but it *need not* be. While it is true that the new census will nearly always reveal each state's congressional plan to be unconstitutionally malapportioned, and hence states *must* remedy the disclosed federal-law infirmity, but that *violation* does not provide the source of *power* for redistricting. *See Growe v. Emison,* 507 U.S. 25, 34, (1993) ("[T]he Constitution leaves with the State primary responsibility for apportionment of their federal congressional and state legislative districts."); U.S. CONST. art. I, § 4, cl. 1. (leaving to the states authority of the Times, Places and Manner of elections for congressional Reps). If there were any doubt of that, the Supreme Court

erased it in the controlling, plurality opinion of *LULAC v. Perry*, 548 U.S. 399 (2006), which rejected *both* a theory "that mid-decade redistricting for exclusively partisan purposes violates the one-person, one-vote requirement" *and* a theory that "mid-decennial redistricting . . . serves no legitimate public purpose and burdens one group because of its political opinions and affiliation." *Id.* at 416–23 (opinion of Kennedy, J.). In other words, *LULAC* rejected both theories Gonzales Plaintiffs insist are somehow different from each other.[8] ECF 1211–1 at 16.

Vague references to "racial demographics" and "partisan interests" do nothing to change the analysis here. ECF 1211-1 at 16. The question is simply whether some affirmative "prohibition" of federal law bars the legislation. *See, e.g., Voinovich,* 507 U.S. at 159–60 (concluding that mere invocation of race and partisanship are not sufficient to create a finding of discriminatory intent prohibited by law); *Miller*, 515 U.S. at 916 (holding that mere awareness of racial demographics does not meet the affirmative prohibition on racial motive predomination in the redistricting process); *Rucho,* 588 U.S. at 718 ("We conclude that partisan gerrymandering claims present political questions beyond the reach of the federal courts. . . . '[J]udicial action must be governed by *standard*, by *rule*,' and must be 'principled, rational, and based upon reasoned distinctions' found in the Constitution or laws." (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 278, 279 (2004)). There is no prohibition on "partisan interests," and Plaintiffs' *Rucho* citation on that topic shoots their claim in the foot. ECF 1211-1 at 16. While the use of "racial demographics," *id.*, can give rise to a claim, it depends on the standards discussed at length above. *See* discussion *infra*

---

[8] Because Justice Kennedy's opinion presents "the narrowest grounds" for the judgment on this issue in *LULAC*, it is controlling. *Marks v. United States*, 430 U.S. 188, 193 (1977); ECF 1226 at 5 n.19. Justices Scalia and Thomas supported the judgment on the broader ground that "claims of unconstitutional partisan gerrymandering do not present a justiciable case or controversy." *LULAC*, 548 U.S. at 511–512 (Scalia, J., concurring in the judgment in part and dissenting in part). Chief Justice Roberts and Justice Alito endorsed the judgment on the ground that the challengers did not "provide[] 'a reliable standard for identifying unconstitutional political gerrymanders.'" *Id.* at 492–493 (Roberts, C.J., concurring in the judgment in part, concurring in the judgment in part, and dissenting in part). Those are broader grounds for rejecting the claim (that would apply equally here), leaving Justice Kennedy's opinion as the narrowest of the three supporting the judgment. Either way, five Justices rejected a claim that redistricting was impermissible because it was performed mid-decade.

sections I and II. The fact of mid-decade redistricting adds nothing to their racial vote dilution or racial gerrymandering theories, so their styling of an independent cause of action does them no good.

## V.    Equitable Considerations Independently Foreclose an Injunction

Even if a plaintiff can show a likelihood of success, "a preliminary injunction does not follow as a matter of course." *Benisek*, 585 U.S. at 158. Plaintiffs must also show "a substantial threat of irreparable injury if the injunction is not issued." *Whitaker v. Livingston*, 732 F.3d 465, 466 (5th Cir. 2013). It is not enough to show that irreparable injury is possible, a plaintiff must demonstrate that "he is *likely* to suffer irreparable harm." *Winter*, 555 U.S. at 20. Because Plaintiffs here are not likely to prevail on their claims that the Legislature unconstitutionally discriminated on the basis of race, they cannot show that they are likely to suffer irreparable harm.

By comparison, an injunction would irreparably harm the State. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). Accordingly, the balance of the equities and public interest "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and courts "should be particularly cautious when contemplating relief that implicates public interests." *Salazar v. Buono*, 559 U.S. 700, 714 (2010). "[T]he balance of harm requirement . . . looks to the relative harm to both parties if the injunction is granted or denied." *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016). Here, that balance militates against an injunction.

The *Purcell* doctrine removes all possible remaining room for an injunction. *Purcell* is not simply about "switching election rules." Tr. 10/10/25 PM 168:7–168:11. It eschews switching those rules in a particular way—*i.e.*, federal courts overriding the Legislature's constitutional districting authority in the run-up to an election. *Purcell* "stands for the principle that 'federal courts ordinarily should not enjoin a state's election laws in the period close to an election,' and that when 'lower federal courts contravene that principle,' the Supreme Court will stop them." *Pierce v. N.C. State*

*Bd. of Elections*, 97 F.4th 194, 226 (4th Cir. 2024) (quoting *Merrill v. Milligan*, 142 S. Ct. 879, 879–80 (2022) (Kavanaugh, J., concurring)); *see Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)). Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others." *Pierce*, 97 F.4th at 226 (citation omitted). The *Purcell* principle has its genesis in *Reynolds v. Sims*, 377 U.S. 533 (1964), which ruled that the lower court "acted wisely in declining to stay the impending primary election in Alabama," *id.* at 586, even though the challenged redistricting plan was plainly unconstitutional, *id.* at 545. "*Sims* has been the guidon to a number of courts that have refrained from enjoining impending elections," *Chisom v. Roemer*, 853 F.2d 1186, 1190 (5th Cir. 1988), "even in the face of an undisputed constitutional violation," *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003).

As this Court has recognized, *LULAC*, 601 F. Supp. 3d at 186, the Supreme Court has not hesitated to stay injunctions against elections under the *Purcell* principle. In *Merrill v. Milligan*, the Supreme Court intervened to stay a three-judge panel's redistricting injunction, which was issued on January 24, 2022, "seven weeks" before the beginning of early voting on March 30, 2022, for the state's primary. *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring). According to the two Justices whose votes were decisive, the strength of the *Purcell* principle, standing alone, compelled that result. *Id.* at 879–82. This was confirmed when the Supreme Court ultimately affirmed on the merits, concluding that the lower court "faithfully applied our precedents." *Milligan*, 599 U.S. at 23.

The *Robinson* and *Callais* litigation is instructive. In *Robinson*, the Fifth Circuit declined to issue a stay based on the *Purcell* principle when the "primary elections [were] five months away." *Robinson v. Ardoin*, 37 F.4th 208, 228–29 (5th Cir. 2022). That decision was erroneous. The Supreme Court promptly entered the stay that the Fifth Circuit had refused to enter. *Ardoin v. Robinson*, 142 S. Ct. 2892 (2022). Likewise, in *Callais*, the three-judge district court enjoined Louisiana's congressional map but refused to enter a stay based on *Purcell*. *Callais v. Landry*, 732 F. Supp. 3d 574 (W.D. La. 2024). Despite there being more than six months between the April 2024

order enjoining the map and the November 2024 primary elections, the Supreme Court stayed the injunction, citing *Purcell*. *Robinson v. Callais*, 144 S. Ct. 1171 (2024); *see also Petteway*, 111 F.4th at 721, 723 (Oldham, J., concurring) (collecting cases).

Regardless of the merits to Plaintiffs' challenge, the 2026 elections should be held on the 2025 congressional map. As a starting point, Plaintiffs are wrong in their contention that the 2026 election can be held under the 2021 plan. *See* Tr. 10/10/25 PM 177:6–180:24. That map was repealed; it no longer exists as legislation of Texas. If an injunction were to issue in this case, the Court would need to "afford the [state legislature] a reasonable opportunity to redraw the Senate districts." *Pierce*, 97 F.4th at 227. "[T]he Supreme Court has repeatedly reminded lower federal courts that if legislative districts are found to be unconstitutional, the elected body must usually be afforded an adequate opportunity to enact revised districts before the federal court steps in to assume that authority." *In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023). In *Landry*, the Fifth Circuit found that point so clear that it issued a writ of mandamus where the district court had provided insufficient time for the legislature to redistrict after issuing a preliminary injunction. *Id.* at 304. The decision castigated the trial judge for rushing to remedial proceedings without even a "mention . . . about the state legislature's entitlement to attempt to conform the districts to the court's preliminary injunction determinations." *Id.* at 304. Notably, in this case, because there is no legal infirmity in the Legislature's goal of five additional Republican-leaning seats, the Legislature must have the opportunity to attempt that goal again. *See Perry v. Perez*, 565 U.S. 388, 395–96 (2012).

During closing arguments, Plaintiffs suggested this Court could refuse the State an opportunity to remedy any supposed defect itself by drawing new a map. *See* Tr. 10/10/25 PM 180:9–180:21 (suggesting this because of the "need to root and branch get rid of the discrimination"). Once again, that runs headfirst into Supreme Court precedent: "The allocation of the [plaintiffs'] burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Perez*, 585 U.S. at 603. In other words, a past redistricting violation is *not* like some "original sin" that "flips the evidentiary burden on its head" and requires a

Legislature to "cure[] any taint" before it may act again. *Id.* at 603–605. Instead, the presumption of the Legislature's good faith is so strong that it reattaches immediately. That, of course, is why this Court should find no violation in the first place.

There is no time for an injunction—compliant with Supreme Court precedents—before voting begins. The timeline between the Court's forthcoming order on the instant motion and Texas's primary elections is already *shorter* than the time periods at issue in *Robinson* or *Callais*. Here, Texas's primary elections are on March 3, 2026, which is already less than five months away. Tr. 10/8/25 AM 146:9–10. The timeline between now and early voting is much tighter—early voting begins on February 17, 2026, and early voting for overseas and military members begins on January 17, 2026, as federal law requires the issuance of absentee ballots to such voters 45 days before the primary. 52 U.S.C. § 20302(a)(8). Changing the status quo this close to the election would disrupt the orderliness of the election. *See Purcell*, 549 U.S. at 4–5 (noting that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy" and that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."). And make no mistake: The "status quo" is what "the state's voting laws" currently say—and what Plaintiffs asks a federal court to enjoin. *Veasey v. Perry*, 769 F.3d 890, 893 n.2 (5th Cir. 2014). When "a majority of the Texas legislature—composed of officials *elected* by Texans voters to represent them—passed a law" drawing new congressional districts, H.B. 4 "became the new 'status quo.'" *Tex. Alliance for Retired Americans v. Hughs*, 976 F.3d 564, 568 (5th Cir. 2020) (per curiam).

The State Defendants' concerns about disrupting the election administration are not theoretical. The process for holding Texas's 2026 primaries on the 2025 congressional map has already begun. Tr. 10/8/25 PM 13:16–18. Counties have already begun preparing. *Id.*; *see also* Tr. 10/8/25 AM 148:4–10 ("For the upcoming primary in March, the maps that our counties would be working under at this moment would be the maps that are current law," which is the "2025 maps."). Once the 2025 map was enacted, the Secretary of State "began educating county

election officials" about the "maps to make sure that they were aware that they needed to be reviewing them to determine if there is any additional efforts they needed to make on the local level for compliance." Tr. 10/8/25 AM 148:18–22. This included several "web-based trainings" and "an in-person training." Tr. 10/8/25 AM 149:1–3. Because counties are responsible for drawing county election voter registration precincts, "many counties have already begun that process and started mapping all those changes out." Tr. 10/8/25 AM 150: 3–5. Enjoining the 2025 maps and changing the status quo would disrupt this process.

Enjoining the map would also disrupt the work already begun by the candidates. More than a month ago on September 9, 2025, was the first day of the filing period for individuals applying for a party office. Tr. 10/7/25 AM 146:13–17. Candidates have also already begun campaigning in the districts drawn under the 2025 map. Tr. 10/8/25 AM 150:9–11. Disrupting the status quo by changing the congressional map will "cause some level of voter confusion" and some candidates may have to "reconsider what district they're running in" and "restart the process of collecting signatures" or risk having their applications rejected for invalid signatures. Tr. 10/8/25 PM 6:22–7:2, 14:10–18.

Moving any of the deadlines is also not an option because the overall timeline is already "very, very tight." Tr. 10/8/25 PM 9:3–9. The qualification period for public office runs from November 8, 2025, to December 8, 2025. Tr. 10/8/25 AM 146:18–147:2. Once that filing period closes, many tasks must be completed including entering candidate information, drawing ballots, printing ballots, and conducting logic and accuracy testing of electronic equipment used to facilitate voting. Tr. 10/8/25 PM 9:3–9. In short, enjoining the 2025 map and disrupting the status quo would be "harder [on] candidates, harder on voters, [and] harder on election officials." Tr. 10/8/25 PM 13:13–14 (Adkins). *Purcell* mandates against that.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to preliminarily enjoin implementation of Plan C2333 should be DENIED.

Date: October 17, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

WILLIAM D. WASSDORF
Associate Deputy Attorney General for Civil Litigation
Texas Bar No. 24103022

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 787112–548
Phone: (512) 9361–700
Fax: (512) 4574–410
ryan.kercher@oag.texas.gov
will.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Special Counsel
Texas Bar No. 24125064

COUNSEL FOR STATE DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on October 17, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division