UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LULAC, et. al., | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| Alexander Green, and | § | |
| Jasmine Crockett | § | |
| | § | |
| Plaintiff-Intervenors | § | |
| | § | Case No.: 3-21-CV-00259-DCG- |
| | § | JES-JVB [Lead Case] |
| v. | § | |
| | § | |
| GREG ABBOTT, in his official capacity | § | |
| As Governor of Texas, et. al. | § | |
| | § | |
| Defendants | § | |

**Plaintiff Intervenors' Proposed Findings of Fact**

## I. Historical Background of Discrimination

**Finding 1.**

Texas has maintained a persistent pattern of racial discrimination in redistricting since the adoption of the Voting Rights Act in 1965.

Proof:

- "Texas has found itself in court every redistricting cycle, and each time it has lost." Perez v. Abbott, 253 F. Supp. 3d 864, 957 (W.D. Tex. 2017).
- Dr. Murray testified that "I've been following Congressional Redistricting for more than 50 years. This was the most extreme case of, seems to me, hiding the ball, from the affected populations across the state." 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 86, Lines 14-25

**Finding 2.**

The State's historic and repeated use of racial gerrymandering demonstrates a continuing intent to weaken Black and Latino political voting power.

Proof:

- Dr. Murray testified, "Well, in the Houston metropolitan area, this total dismantling of District 9, in my opinion, an obviously Black Opportunity District, and the merger of most of its voters into 18 is intentional discrimination. Here you had two Opportunity Districts, one existing for 50 years and the second for 20, and theyre merged into one district. And the voters in 9, a lot of them were shifted to districts -- that ones that didnt go into 18 were shifted to districts where they went from having the opportunity to elect, to the 35 or 40 percent who were not moved to 18, were put in districts where they have zero opportunity to elect a Congress member." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 15, Lines 11-22.
- "A. ...most of Nueces County, Corpus Christi, is added to the 34th District, but you take the most heavily Latino part of Corpus Christi, Nueces County, and put them in the district thats been reconfigured coming out of Travis County, where these voters in Corpus Christi, predominantly Latino, will have virtually no impact or influence. Conversely, though, you remove them when you shift Nueces County into existing District 34. You take -- youve taken out the most heavily Latino part of it. So it looks to me like very clear evidence of increased intentional discrimination diluting the influence of Latino voters in District 34. 80-something percent of district is added to -- of Nueces County is added to 34, but not the 15 percent thats most heavily Latino. So that has to be, in my judgment, intentional."10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 80, Lines 5-22

**Finding 3.**

Texas's history of Court-determined race discrimination provides strong circumstantial evidence of intent under Arlington Heights.

Proof:

- "Q Youve heard these statements about increasing the number of Black majority districts, increasing the number of Hispanic majority districts, protecting Barbara Jordans district. What is your response to that? Does this bill do any of those things? A Window dressing. Thats the only way I can explain it." 10-01-25 LULAC 1 Rough Draft.pdf, Pg. 93, Lines 8-13
- "Its a lot easier to figure out what the effect is. And the effect is to significantly dilute minority voting influence in Congressional elections in Texas. You know, intentions? Many different people can claim this or that or the other. Proof is hard to come by. Effect, based on historic and recent elections, thats a hell of a lot easier to measure. And the effects are discriminatory, in my opinion." 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 91, Lines 5- 12

2

- "...the Legislature did not carefully consider how these districts affect the ability of racial, ethnic, and groups to elect candidates of their choice. Quite the reverse. It reduced, clearly reduced, their ability in the arrangement of districts in this remap." 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 93, Lines 18-22.

## II. Sequence of Events Leading to Plan C2333

### Finding 1.

Mid-decade redistricting in 2025 began in the Governor's Call for a Special session and in the legislative record only after the Trump DOJ issued a letter directing Texas to dismantle minority opportunity districts.

Proof:

- "And so based on this, what is your understanding of why the governor put this on the call? Because of the letter that came from the DOJ dated July 7th, 2025." Rough Draft - Day 1 - 01October25 AM Session.pdf, p.20, Lines 20–23.
- "And on page 2 it sets a deadline by which the State is to respond. Do you see that? Yes. July 7th, 2025." 10-01-25 LULAC 1 Rough Draft.pdf, p.12, Lines 17–19.
- "Q. And we'll get into more of the details, but those four districts that are listed, were those four districts dramatically changed in the new map that passed? A. Yes." 10-01-25 LULAC 1 Rough Draft.pdf, p.13, Lines 1–4.

- "Now, I'm focusing on the district numbers for a moment. Where are those districts? Well, three of them were in Houston. ... Is that 9, 18, and 29? Yes. 9, 18, 29." Rough Draft - Day 1 - 01October25 AM Session.pdf, p.17, Lines 8–12

### Finding 2.

The DOJ letter's content and timing demonstrate that racial considerations, not partisanship or neutral criteria, prompted or justified the new map.

Proof:

- "This letter will serve as a formal notice by the Department of Justice to the State of Texas of serious concerns regarding the legality of four of Texas's congressional districts. As stated below, Congressional Districts TX9, TX18, TX29, TX33 currently constitute unconstitutional, 'coalition districts,' and we

urge the State of Texas to rectify these race-based considerations from these specific districts." Rough Draft - Day 1 - 01October25 AM Session.pdf, p. 16-17, Line 25, Lines 1-7.

- "It is the position of this department that several Texas congressional districts constitute unconstitutional racial gerrymanders under the logic and reasoning of Petteway. Specifically, the record indicates that TX9 and TX18 sort Houston voters along strict racial lines to create two coalition seats, while creating TX29, a majority Hispanic district. Additionally, TX33 is another racially-based coalition district that resulted from a federal court order years ago, yet the Texas Legislature drew TX33 on the same lines in the 2021 redistricting." (Rough Draft - Day 1 - 01October25 AM Session.pdf, p. 19, Lines 15-25.

- "Q. And so based on this, what is your understanding of why the governor put this on the call? A. Because of the letter that came from the DOJ dated July 7th, 2025." Rough Draft - Day 1 - 01October25 AM Session.pdf, p. 20, l. 20–23

## Finding 3.

The special-session process was designed to ensure rapid adoption of a racially motivated map without meaningful input, response, or analysis.

Proof:

- Same-day notice for a meeting where a new map was introduced:

  - "Q. And was this special meeting of the committee, did you give notice of it on the same day as the meeting? A. Yes." Rough Draft - Day 3 - 03October25 AM Session.pdf, p. 149, l. 9–11.

  - "Q. And the August 18th meeting was the meeting where a new map was introduced; is that correct? A. Yeah. Seven new districts was added." Rough Draft - Day 3 - 03October25 AM Session.pdf, p. 149, l. 17–19

  - "A. The first I heard about these seven additional districts that were added was at the meeting itself." Rough Draft - Day 3 - 03October25 AM Session.pdf, p. 151, l. 7–9.

- Insufficient time for review:

  - "Q. But in the first bill was such a link sent to invite access? Or opportunity to make -- A. Yeah. Two days before the public hearing." Rough Draft - Day 3 - 03October25 AM Session.pdf, p. 151, l. 10–12.

- Suspension of constitutional rules designed to ensure deliberation:

- "Q. Was the constitutional III-day rule suspended for Senate Bill 4? A. Yes, it was in the first called Special Session." (10-06-25 LULAC v Abbott 5 Rough Draft.pdf, p. 106, l. 17–19.

## Finding 4.

The sequence of events—federal prompting, immediately altered session call, and pre-prepared map—supports an inference of discriminatory intent.

Proof:

- Maps appeared quickly with little time for legislative or public review:

  - "Q. And the August 18th meeting was the meeting where a new map was introduced; is that correct? A. Yeah. Seven new districts was added." Rough Draft - Day 3 - 03October25 AM Session.pdf, p. 149, l. 17–19.

  - "A. Yeah. Two days before the public hearing." [referring to the limited time to review the bill] Rough Draft - Day 3 - 03October25 AM Session.pdf,                    p.                    151,                    l.                    12
    Maps appeared quickly with little time for legislative or public review:

  - "Q. So Madame Chair, could you tell the judges why it is that you raised race into the discussion? A. First of all, CD9, which is held by -- currently held by Congressman Al Green, has been an African American seat for decades…When you take two districts that, for decades, have been African American-leaning and you change them, that tells me you're focusing on race. And that, to me, was a problem." (10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 18, l. 8–19.

  - "A. And I think that's -- that's a scary, in my opinion, racist way of hiding behind partisanship." 10-02-25 LULAC v Abbott Rough.pdf, p. 67, l. 24–25.

## III. Procedural Irregularities and Legislative Conduct

## Finding 1.

The Legislature departed from normal procedures by enacting Plan C2333 in five days without holding public hearings and without input from legislators.

Proof:

- "Senator, as you know, I think this C2333 was introduced in the House on Monday. And less than five days later it's actually law. Have you seen that occur with any other redistricting bill? No." Rough Draft - Day 2 - 02October25 AM Session.pdf, p.37, lines 12–17.
- "Did the committee take any public testimony? We had a public hearing. We did not take public testimony." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, p.109, lines 13–14)
- "I know it wasn't. And you can tell by the lack of answers from the gentleman who led the charge, Representative Hunter. And throughout the whole process, it was not legitimate. The lack of must be notice. The lack of public hearing. The lack of maps. All of those things. The lack of answers." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p.42, lines 9-14.

**Finding 2.**

Minority legislators were physically constrained and excluded from participation to ensure passage.

Proof:

- "Q. And how do you assess the failure of leadership to reach out to you and the Black caucus in the Senate to discuss whether the map might dilute minority voting interests? A. Well, again, there was no -- how do I put this? Deliberate steps taken by the authors of the bill to reach out to us. Wherein some of the prior sessions there had been instances where we would be asked our input into this. But not this time around. Not at all." Rough Draft - Day 2 - 02October25 AM Session.pdf, p. 40, l. 15–23
- "Q. And so did anyone reach out to you to discuss the potential vote dilution that might have occurred in this bill? A. No." Rough Draft - Day 2 - 02October25 AM Session.pdf, p. 40, l. 9–12
- "Q. Did they reach out to the Black caucus in the Senate? A. No." Rough Draft - Day 2 - 02October25 AM Session.pdf, p. 40, l. 13–14
- "A. It was obvious he didn't take it serious. Not only not because of what he said on the floor, but throughout this whole process. Not engaging us in any meaningful or rich conversations. It was just, 'This is gonna happen and we don't care what you-all think.'" (10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 13, l. 13-17
- "A. I think for the most part their decision was made, and the plea that she just made…is something that legislators not only devalue, but are willing to intentionally destroy a district that's been performing and allowing for that representation…" 10-02-25 LULAC v Abbott Rough.pdf, p. 47, l. 8-15.

**Finding 3.**

Leadership manipulated chamber rules to suppress debate and block minority amendments.

Proof:

- "Q. Okay. But what we see here, it says on the very same day that it's referred to Congressional Redistricting Committee? Do you see that... A. Oh, I'm sorry. You're talking about -- yes, the bill was received from the House at 7:44 p.m. on 8-20. I'm sorry I was misreading it." 10-09-25 LULAC v Abbott 8 Rough Draft.pdf, p. 41, l. 6–11

- "Q. So you believe you gave them notice on the 20th for a meeting on the 21st? A. I'd have to go back and look but we got it out very quickly..." 10-09-25 LULAC v Abbott 8 Rough Draft.pdf, p. 43, l. 8–11

- "Q. Okay. So the next day you had your first -- your only hearing, and that's called a public hearing here, but you already acknowledge there were no witnesses, correct? A. That's correct, because it was the companion bill to SB4, and we'd had multiple hearings on that basic same map." 10-09-25 LULAC v Abbott 8 Rough Draft.pdf, p. 42, l. 15–19.

**Finding 4.**

These procedural departures were unprecedented and served no legitimate legislative purpose other than to entrench racial outcomes without input or amendment.

Proof:

- "Q. So did you determine in your mind or opinion whether or not the processes that were being undertaken by the opposition party were legitimate for the legislative process? A. It was not legitimate at all." (Rough Draft - Day 3 - 03October25 AM Session.pdf, p. 146, l. 14–18)

- "A. I know it wasn't. And you can tell by the lack of answers from the gentleman who led the charge, Representative Hunter. And throughout the whole process, it was not legitimate. The lack of must be notice. The lack of public hearing. The lack of maps. All of those things. The lack of answers." (10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 42, l. 9-14)
- "Q. Senator, as you know, I think this C2333 was introduced in the House on Monday. And less than five days later it's actually law. Have you seen that

occur with any other redistricting bill? A. No." (Rough Draft - Day 2 - 02October25 AM Session.pdf, p. 37, l. 12–17)

## IV. Substantive Departures from Neutral Redistricting Principles

### Finding 1.

Plan C2333 ignored traditional districting principles such as compactness, contiguity, and preservation of communities of interest.

Proof:

- Expert analysis concluded the map violated traditional principles:

  - "Q. And did you observe if -- in the changes made to 9 and 18, if there was or was not compliance with redistricting principles? A. In my opinion, the changes made to District 9 and 18 do not conform to traditional redistricting principles. These changes were wholly unnecessary." (10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 96, l. 13–18)

  - "Q. Now, your report attributes the robot's failure to draw districts as partisan as the Enacted Map to redist using traditional redistricting principles of compactness, contiguity, and county city splits. Do you remember that writing that? A. That sounds right." (10-04-25 LULAC v Abbott 4 Rough Draft.pdf, p. 15, l. 18–23)

- "A. ...the existing District 9 is like exactly the equal population required. Almost all its population, 98 percent, were moved or pushed out and the larger number was pushed to the north and west into existing District 18." (10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 92, l. 9–13)

- "Q. What -- tell the Court what they show about the voters that -- that the move voters. What's the percentage on that? A. So specifically in District 30, of the District 6, 78 percent of that district was moved. From District 25, 76 percent of that district was moved. And District 32, 96.6 percent of that district was moved. And in District 33, 92 percent was moved." (10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 31, l. 7–13)

- "Q. Was Congresswoman Jasmine Crockett harmed by the reconfiguration of Congressional District 30? A. Yes. Her residence was moved out of the district and, you know, she was given a substantial number of new voters that,

particularly in Tarrant County, that she had never represented. Downtown Dallas, which, you know, is a major economic engine, that historically has been in the 30th District, was moved out, along with her residence." (10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 119, l. 2–9)

**Finding 2.**

Core preservation and incumbent protection were applied selectively to benefit Anglo incumbents.

Proof:

- "A. The changes made the district even safer for the White voters and the incumbent, who's Anglo. So there are four districts in metropolitan Houston area that were Democratic voters had been successful lately in electing Congress members. This one, the one White-controlled district, was not significantly modified in contrast to the three minority-controlled districts." (10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 101, l. 17–23)

- "Q. Does your analysis of what occurred with Congressional District 7, compared to what occurred with the 9th, 18th, and 29th support your decision or opinion that the map in the Harris County area was drawn with a racist -- or motivated by potential racist inaudible? A. It does. Voters of color, particularly Black and Latino voters, were treated very different in the metropolitan Houston area than were White voters." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 102, l. 2–9

**Finding 3.**

The Legislature split cohesive minority communities without population necessity.

Proof:

- "Well, again, for 50 years a well-defined, cohesive Black community, Acres Homes, has been in the 18th District. And, you know, that district was removed, along with independence Heights. But also a bunch of sub you are bran growing areas, and it shifted into the 29th, which has always been nearby, but." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, p. 29, l. 21–25

- "You get specific instances, like you have a fast-growing Black and Hispanic population moving into north Brazoria County. The map Enacted by the Legislature in 2021 recognized that and moved some of those voters into Congressman Al Green's Ninth District. That was totally wiped out by the new map that put those growing minority populations in north Brazoria County in

a district that runs deep in East Texas to the Louisiana border. These voters now have been effectively neutered. They have no connection to the heavily rural areas in far East Texas. They're part of the metropolitan Houston." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p. 113, l. 15–25

**Finding 4.**

The State's deviations from neutral criteria demonstrate intentional discrimination rather than legitimate policy.

Proof:

- "A. Well, in the Houston metropolitan area, this total dismantling of District 9, in my opinion, an obviously Black Opportunity District, and the merger of most of its voters into 18 is intentional discrimination. Here you had two Opportunity Districts, one existing for 50 years and the second for 20, and theyre merged into one district. And the voters in 9, a lot of them were shifted to districts -- that ones that didnt go into 18 were shifted to districts where they went from having the opportunity to elect, to the 35 or 40 percent who were not moved to 18, were put in districts where they have zero opportunity to elect a Congress member?"10-06-25 LULAC v Abbott 8 Rough Draft.pdf, Pg. 15, Lines 15-24

- "Q. Inaudible selection of Congressional Districts and the race of predominant voters and how that selection impacts your decision about this being intentional discrimination of amp Americans and Latinos? A. Well, you have two districts under the existing plan, District 7 in Houston, and District 37 in Travis County, that are dominated by White voters but have elected, lately, Democrats. Those two Democratic districts were not targeted by this redraw, as opposed to five districts that have substantial minority opportunity that were targeted. So two White Democratic districts are passed over, not substantially changed, but you have huge changes in District 9, District 18, district 29, District 33 in Dallas, District 32, where theres significant minority impact. So thats how you get your five new members." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 32, Lines 1-15

## V. Legislative History and Statements

**Finding 1.**

Legislative leaders concealed the redistricting process and refused to disclose the identity of the map-drawers.

Proof:

- "Q. These trained lawyers and resources that were just described, based on what you saw and what you were told in 2025, were any of them brought to bear on this new map? A. No. Q. Senator Huffman used them and employed the current map drawers or whoever they were did not, as far as you know? A. Correct." Rough Draft - Day 1 - 01October25 AM Session.pdf, Pg. 168, Lines 8-14

- "Q. Mr. Kincaid, did you draw all or most of the Texas 2025 enacted congressional map? A. I drew most of it, yes." Rough Draft - Day 6 - 07October25 AM Session.pdf, Pg. 29, Lines 22-24

## Finding 2.

Minority legislators repeatedly warned that Plan C2333 would eliminate minority opportunity districts, and those warnings were ignored indicating intent to harm minority voters.

Proof:

- "Q. Did you think his response indicated to you, one way or the other, whether he probably took seriously the concerns of minority legislators about the vote dilution that was being discussed on the floor? A. It was obvious he didn't take it serious. Not only not because of what he said on the floor, but throughout this whole process. Not engaging us in any meaningful or rich conversations. It was just, This is gonna happen and we don't care what you-all think." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 13, Lines 9–17

- "Q. Okay. And did he directly answer your question about whether or not it's important to keep Minority Opportunity Districts? Did he directly answer your question?
  A. No, he didn't." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 14, Line 24–Pg. 15, Line 2

- "Q. Did you think his response indicated to you, one way or the other, whether he probably took seriously the concerns of minority legislators about the vote dilution that was being discussed on the floor?A. It was obvious he didn't take it serious. Not only not because of what he said on the floor, but throughout this whole process. Not engaging us in any meaningful or rich conversations. It was just, This is gonna happen and we don't care what you-all think."10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 13, Lines 9–17

## Finding 3.

Legislators expressed awareness of the racial consequences of their actions.

Proof:

- "Q. So Madame Chair, could you tell the judges why it is that you raised race into the discussion? A. First of all, CD9, which is held by -- currently held by Congressman Al Green, has been an African American seat for decades. So Representative Hunter is well aware of what that district represents. Also, when you look at the other district, again, these are historically African American districts. And so no doubt I felt that there was an attack. When you take two districts that, for decades, have been African American-leaning and you change them, that tells me you're focusing on race. And that, to me, was a problem."10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 18, Lines 8-19
- "Q. And I think, because they have voted Democrat as Senfronia Thompson said earlier, they for so long, they can claim that it's partisan, but they're taking Black folks and sending them out where they'll never be represented properly. A. And I think that's -- that's a scary, in my opinion, racist way of hiding behind partisanship." 10-02-25 LULAC v Abbott Rough.pdf, Pg. 67, Lines 20-25
- "Q. Now, you note that Dean Thompson asked first about what the district is and she says, well, let's talk about District 18. What did you do in 18? And how would you characterize the response from Chairman Hunter? Was it about lines and neighbors and communities of interest, or race? A. I mean, the references to CVAP and Black and Hispanic CVAP." 10-01-25 LULAC 1 Rough Draft.pdf, Pg. 76 Line 25 - Pg.77 Line 5
- "Q. He acknowledges the racial change that was made. Calls it an effect. And then also talks about politics? A Correct. It was all kind of wrapped together." 10-01-25 LULAC 1 Rough Draft.pdf, Pg. 53, Lines 21-23
- "Q. Or it could be to show that there was a demonstration of an intentional racial target that was actually hit by the leadership in any particular district? A. Well, certainly. I mean, the racial numbers that were broken down in committee and on the floor were very precise."10-01-25 LULAC 1 Rough Draft.pdf, Pg. 108, Lines 9-13

**Finding 4.**

The legislative record as a whole demonstrates awareness and acceptance of racially discriminatory consequences.

Proof:

- "A. Ive been following Congressional Redistricting for more than 50 years. This was the most extreme case of, seems to me, hiding the ball, from the affected

populations across the state... no ones opinion in Texas was really solicited about this map. It was an inside job pushed from Washington, DC. And in my experience of Congressional Redistricting, this was absolutely unprecedented. Minimal opportunity for public influence. Maximum opportunity for outside political pressure, as reflected in the letter from the Department of Justice, I think, dated July 7th." 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 86, Line 20 - Pg. 87, Line 25

- "Q. Okay and can you -- can you explain to the judges what the process was that they just undertook in laying out the information in front of the Legislature? A. I think they were just laying out a clear record of the discriminatory practices thats been going on. And so they were clear on how those districts were leaning in terms of getting either low pro pens -- low voter turnout folks, as well as non-citizen voters, and packing certain districts with those so that they could craft a district where folks that didnt vote, wouldnt vote and wouldnt participate." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 21, Lines 15-24

## VI. Discriminatory Impact on Minority Voters (African American and Latino)

**Finding 1.**

Plan C2333 dismantled Houston's only performing Latino opportunity district (CD-29).

Proof:

- "Q. And yet HB4 silences that diversity instead of celebrating it. Under this map, Latino communities in Harris County have been split apart and scattered across multiple districts, silencing their voice and diluting their ability to elect their candidate of choice. Nowhere is this clearer than Congressional District 29. For decades, CD29 has stood as a performing Latino majority district, a community of interest where Hispanic voters could elect their candidate of choice. But this map dismantles that district. Latino neighborhoods like Denver Harbor Magnolia park, Second Ward, Manchester, and North side, historic centers of Latino political strength, have been carved out. The Hispanic Citizen Voting Age population has been reduced almost 20 points, from roughly 63 percent to just 43 percent. That kind of drastic change does not -- has nothing to do with population shifts or routine adjustments." 10-02-25 LULAC v Abbott Rough.pdf, Pg. 44, Lines 10-25

**Finding 2.**

African-American voters lost a performing district through the elimination of CD-9 and the packing of Black voters into CD-18.

- "A. Well, in the Houston metropolitan area, this total dismantling of District 9, in my opinion, an obviously Black Opportunity District, and the merger of most of its voters into 18 is intentional discrimination. Here you had two Opportunity Districts, one existing for 50 years and the second for 20, and they're merged into one district. And the voters in 9, a lot of them were shifted to districts -- that ones that didn't go into 18 were shifted to districts where they went from having the opportunity to elect, to the 35 or 40 percent who were not moved to 18, were put in districts where they have zero opportunity to elect a Congress member.?" 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 15, Lines 15-24

- "A. You get specific instances, like you have a fast-growing Black and Hispanic population moving into north Brazoria County. The map Enacted by the Legislature in 2021 recognized that and moved some of those voters into Congressman Al Green's Ninth District. That was totally wiped out by the new map that put those growing minority populations in north Brazoria County in a district that runs deep in East Texas to the Louisiana border. These voters now have been effectively neutered. They have no connection to the heavily rural areas in far East Texas. They're part of the metropolitan Houston."10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 113, Lines 15-24

**Finding 3.**

The plan systematically weakened minority voting strength statewide while preserving Anglo control for both Republicans and Democrats, rendering the allegation that the Legislator was only interested in partisan motivations a pretextual incongruity.

Proof:

- "A. Well, you have two districts under the existing plan, District 7 in Houston, and District 37 in Travis County, that are dominated by White voters but have elected, lately, Democrats. Those two Democratic districts were not targeted by this redraw, as opposed to five districts that have substantial minority opportunity that were targeted. So two White Democratic districts are passed over, not substantially changed, but you have huge changes in District 9, District 18, district 29, District 33 in Dallas, District 32, where theres significant minority impact. So thats how you get your five new members." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 32, Lines 5-15.

14

## VII. Treatment of Minority Representatives and Incumbents

**Finding 1.**

Plan C2333 intentionally removed Black and Latino incumbents from their established districts.

Proof:

- "Q. And I'm gonna ask you, in terms of your assessment of -- of the map, did you take a look and see what the reformation of the districts, if anything happened with the residences of the three African American Congresspersons? Were they maintained within their districts or were they all moved out of their districts? A. Many was moved out. Q. Were all three moved out? A. Yes, sir. Q. And do you think that is significant? A. Very significant, because, why would you move a Representative out of their district that theyre serving? That was just so unfair and so wrong." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 24, lines 8-20
- "Q. The -- so if we look at -- at DFW, you mentioned DFW in your report as well. That's where Congresswoman Jasmine Crockett lives. I guess she currently lived in the 30th, but she'll be in 33 in the new configuration. Is that right doc? A. That's my understanding, that her residence was in the existing 30th District, but the map moved the Congresswoman's residence into District 33, which was substantially reconfigured by this remap." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, Pg. 104, lines 10-18
- "Q. And the -- and there's no incumbent in CD33. Is that correct?A. In CD33, I think Veasey is currently the incumbent. But he's -- all of his constituency in Tarrant County was removed. So, in a sense, you created a realistic vacancy." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 33 line 25 - Pg. 34 line 5
- "Q. And so as part of that, as you've analyzed, is there a different treatment of Black and White and White Democratic voters in the map? A. Yes. And even looking at the sort of minimal changes from 2000- -- plan 2308 to 2333 in the Houston area, the accommodations were made for a White Congress member, Representative Crenshaw, by giving -- reuniting King Aboud. But at the same time harming Latino voters by bringing Liberty County into the newly created District 9. Side by side, these two districts were treated quite dramatically different. One, you know, with the incumbent Congress member that represented east Harris County, Sylvia Garcia's district, being effectively dismantled, and then," 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 91, lines 13-25

- "Q. And as a result of the redistricting that was done by the Texas Legislature in the summer of 2025, do you expect that Representative Casar can be reelected in 2026, in some district? A. Well, from his public comments, he concluded he could not get reelected, or did not choose to even run, in the part of District 35 that was moved to a different district. 35 was moved entirely out of Travis County, his county of residence. So he moved over to the remaining Democratic-dominated district, where the incumbent has indicated he will not seek re-election. But that is not a district that Latino voters have an opportunity to elect a candidate of their choice. It's a district dominated by Anglo voters. They may well choose to elect to replace their incumbent, long-term Congress member, with the new Congressman, but that re-election, unlike his..." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 19, lines 6-25

- "Q. And can you explain to us why you stand by your position of the map being intentionally discriminatory against Blacks and Browns? A. Because to achieve the president's stated objective of five more seats from Texas, you have to very deliberately and aggressively dismantle existing minority districts, where they clearly had the opportunity to elect candidates of their choice. You have to split and fragment communities that have historically been placed in districts that gave them a meaningful opportunity to elect candidates of their choice. So to carry out the directive, you have to engage in highly discriminatory actions, to the detriment of Latino and Black voters. And that's what happened." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 31, lines 8-20

- "Q. Inaudible selection of Congressional Districts and the race of predominant voters and how that selection impacts your decision about this being intentional discrimination of amp Americans and Latinos? A. Well, you have two districts under the existing plan, District 7 in Houston, and District 37 in Travis County, that are dominated by White voters but have elected, lately, Democrats. Those two Democratic districts were not targeted by this redraw, as opposed to five districts that have substantial minority opportunity that were targeted. So two White Democratic districts are passed over, not substantially changed, but you have huge changes in District 9, District 18, district 29, District 33 in Dallas, District 32, where there's significant minority impact. So that's how you get your five new members." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 32, lines 1-15

## VIII. Expert Testimony (Murray, Barreto, Duchin, etc.)

## Finding 1.

Expert statistical, computational, political/historical, and demographic analyses establish that race, not partisan or neutral principles, was the predominant factor driving Plan C2333's design.

Proof:

- "A. My analysis is that race is much more evident and a factor in the redrawn map than it was in the Enacted Map of 2021. That map, too, in my opinion, reflected systemic discrimination against Black and Hispanic voters. But the new map, 2333, takes that to a greater extreme by much more aggressively cracking, reaching far out from the Metro areas, for example, to bring in counties with a very well-documented history of polarized voting against racial minorities." 10-04-25 LULAC v Abbott 4 Rough Draft.pdf, Pg. 84, Lines 12-19.

- "But could you tell us what the overall conclusion of your report was? Yes. In the report I consider the evidence regarding whether the changes in the map are consistent with, as I call it here, the race neutral pursuit of pure partisan aims. In other words, I considered the signatures of partisanship and signs that race was used in the creation of the map and I conclude that there is strong evidence that race was used in the creation of this map in a manner that is dilutive of — that shows racial vote dilution." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.26, lines 12–21

- "So what does that tell you about C2333? That even when holding the partisan objectives constant, there were racial objectives in there. And that was to create those two Black majority districts. The simulations would not have done that. Those weren't for partisan reason, because the partisanship of those Black districts is basically the same in the old map and the new map. The only thing that's changed is now they are suddenly majority Black." Rough Draft - Day 4 - 04October25.pdf, p.121, lines 24–p.122, line 7

- "In other words, President Trump could have gotten his five more Republican districts without the racial effects that are in C2333? Correct. Absolutely." Rough Draft - Day 4 - 04October25.pdf, p.122, lines 8–11

- "And to be clear on these figures that we're going to walk through now, they relate to the geography in Plan C2333? That's correct. In the new Plan C2333, in these exact boundaries, the State has drawn a Black majority CVAP district. We wanted to tell the computer, take those same exact boundaries and tell us how often, out of your million draws, do you get a majority Black CVAP district." Rough Draft - Day 4 - 04October25.pdf, p.76, lines 5–12

- "And what is the conclusion you reached from this histogram? In this, that there was a zero possibility of drawing a majority Black district through the

simulation draws. It would have to be something that was purposefully done." Rough Draft - Day 4 - 04October25.pdf, p.77, lines 5–9

- "And why do you think that conclusion matters, that conclusion matters? Well, because it shows that what the State did is a statistical outlier. It doesn't show six majority Hispanic districts out of those 30. In fact, it shows for those next districts there, you know, down in the 40s, which is what our other simulation shows. It wasn't something that the computer was able to produce six majority Hispanic districts out of the 30 Trump districts." Rough Draft - Day 4 - 04October25.pdf, p.84, lines 9–17

- "What is the takeaway? Well, the takeaway is that you see in purple those that eclipse 50 percent and are a majority, but there is only four. And the State has drawn many more than four majority Hispanic districts out of their 30. What this is telling us is that the natural draw with the Hispanic population in Texas, when you draw 30 Trump districts, you could get four that are majority Hispanic CVAP but you should not get more than four. Those are all the rest in green as saying they should be below 50 percent." Rough Draft - Day 4 - 04October25.pdf, p.83, lines 23–p.84, line 8

- "Here in paragraph 18 we're looking at the total number of districts in which there was a single race which was a majority, something that the State had talked about at least in the media, between state leaders and the governor, about trying to create more districts in which there was a single race majority. And here we ask the simulation to tell us that as well... the State plan appears to preference single group majority districts and they have drawn many, many more single-race majority districts than what the computer simulation did." Rough Draft - Day 4 - 04October25.pdf, p.84, lines 18–p.85, line 15

- "My opinion is that while there were partisan objectives, they achieved those partisan objectives by focusing on race. Whether it is in the CD 9 District of Baytown, or whether it is in the creation of majority Black districts in Dallas and Houston, or the majority Hispanic district in Bexar County CD 35, there were clear objectives to try to hit specific Hispanic numbers that cannot be explained by partisanship." Rough Draft - Day 4 - 04October25.pdf, p.122, line 19–p.123, line 1

- "Based on the total of Table 3, what is your bottom line for the loss of minority opportunity as a result of C2333, the 2025 plan? I see a net loss of a district in each cluster in which minority voters can nominate and elect a candidate of choice. And that's true in a manner that takes into account primaries. So it is disentangling race from party." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.51, lines 14–21

- "What do you conclude from the distribution, the demographic distribution reflected on this chart? Well, one thing that I think jumps out is, as I just identified a moment ago, District 24, it seems to be drawn in a way that the lines encompass a lot of White population and carefully exclude non-White population around it. And that includes both District 33 and District 32 are impacted by that design." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.35, lines 4–11

- "Could you explain what this figure represents? This is a dot density plot in exactly the same manner as the previous one. And all I'm remarking here is that you can see visually clear patterns of sorting by race. You can tell that because the lines cut in a way that, on the opposite side of the lines, you see different colors. That's what it looks like to follow demographic lines that are created by residential segregation and to sort districts by race." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.48, lines 8–16

**Finding 2.**

Collectively, expert evidence proves that the discriminatory outcomes of Plan C2333 were foreseeable, avoidable, and deliberately chosen.

Proof:

- "Here in paragraph 18 we're looking at the total number of districts in which there was a single race which was a majority… the State plan appears to preference single group majority districts and they have drawn many, many more single-race majority districts than what the computer simulation did." Rough Draft - Day 4 - 04October25.pdf, p.84, line 20–p.85, line 15

- "Well, you have two districts under the existing plan, District 7 in Houston, and District 37 in Travis County, that are dominated by White voters but have elected, lately, Democrats. Those two Democratic districts were not targeted by this redraw, as opposed to five districts that have substantial minority opportunity that were targeted. So two White Democratic districts are passed over, not substantially changed, but you have huge changes in District 9, District 18, district 29, District 33 in Dallas, District 32, where there's significant minority impact. So that's how you get your five new members." 10-06-25 LULAC v Abbott 5 Rough Draft.pdf, Pg. 32, lines 5–15

**IX. Public Harm and Loss of Minority Representation**

**Finding 1.**

19

Implementation of Plan C2333 will immediately deprive minority communities of meaningful representation in Congress.

Proof:

- "Now in — to the right, under 2333, the 2025 plan for CD 32, it shows that the preferred candidate of minority — of the minority community prevailed in 9 out of 14 primaries, right? Right. And that means there is a slightly stronger possibility of having the preferences of minority voters prevail in the primary. But that's probably cold comfort to these voters because there is a zero out of 14 track record in the general. So they have a slightly improved ability to nominate but, practically speaking, no ability to elect their preferred candidate." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.42, lines 11–21

- "And so there is a Republican elected in that district? In every instance, yes." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.42, lines 22–23

- "And is that — do you count that as a loss in your calculation of the net loss to the minority community from 2333? Well, I tried to give a fairly nuanced discussion where I have analyze CD 32 and CD 33 together. And considered together, my view is that 32 is now clearly out of reach for Democrats. 33 has become markedly weaker for the preferences of people of color in primaries. So taken together I would regard that as a clear net loss of a district that would perform for the preferences of people of color." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.42, line 25 – p.43, line 10

- "So looking at CD 33, just to make sure we have this right, the chart shows that for C2193 that the candidate of choice where people of color prevails is in 13 of 14 primary contests? That's right. In CD 33 there used to be a very strong track record. 13 out of 14 contests show alignment." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.43, lines 11–16

- "And what happens under C2333, the 2025 plan? The electoral conditions in the primary are now measurably harder for people of color. And that means in the instances which, again, isn't every case, but in the instances where the primary itself is polarized, it's going to now be measurably harder for people of color to nominate their candidate of choice." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.43, line 20– Pg. 44 line 25

- "So let's then analyze CD 9 in Table 3, page 9 of your report. So that's the fourth one down under cluster 2. And what does Table 3 show about the ability of

people of color to advance their candidates of choice in the primaries and elect them in the general election under the 2021 plan? Well, here new CD 9 is better aligned in the primaries with the preferences of minority voters than old CD 9, consistent with old CD 29, which it most overlaps. But no matter which district you compare it to, the net loss is obvious, that it's now become out of reach to get that candidate, who will advance to the general, to get them elected in the general. That is now out of reach." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.47, lines 13–25

- "Do you treat this as a loss of opportunity for minorities to elect their candidate of choice? Oh, this is a perfectly clear net loss of one district. "Rough Draft - Day 5 - 06October25 AM Session.pdf, p.48, lines 1–4

- "Could you explain what this figure represents? This is a dot density plot in exactly the same manner as the previous one. And all I'm remarking here is that you can see visually clear patterns of sorting by race. You can tell that because the lines cut in a way that, on the opposite side of the lines, you see different colors. That's what it looks like to follow demographic lines that are created by residential segregation and to sort districts by race." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.48, lines 8–16

- "So going back to Table 3, what is the effect of a minority representation reflected in — for CD 35 reflected in Table 3? This is the same picture as in the previous cluster. You have CD 35, which used to be a clear opportunity for people of color to have — to nominate and elect a candidate of choice. Now it shows the strong potential to nominate and no ability to elect." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.51, lines 3–10

- "So that is a loss of a minority district? So that's a clear net loss of a district where minority voters can elect candidates of choice." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.51, lines 11–13

- "Based on the total of Table 3, what is your bottom line for the loss of minority opportunity as a result of C2333, the 2025 plan? I see a net loss of a district in each cluster in which minority voters can nominate and elect a candidate of choice. And that's true in a manner that takes into account primaries. So it is disentangling race from party." Rough Draft - Day 5 - 06October25 AM Session.pdf, p.51, lines 14–21

- "2333. What will that perform like? Well, it totally removes any meaningful influence of Black voters because the numerous high performance Black neighborhoods are all removed from the district. So 9, as reconfigured, has almost no similarity to the existing District 9." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p.94, lines 5–10

21

- "Are there polarized voters with the — the racially polarized voting dynamics that impact the outcome of elections in the new district? Approximate? Very much so. The new territory added constitute Enacted District 9 includes the most racially polarized White voting areas in Harris County, particularly in areas like Deer Park and south Pasadena, for example… Again, his district is the highest in terms of racial polarization, where the majority of White voters opposed by very large margins, the candidates supported by African American or Latino voters." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p.94, lines 11–21

- "And will the — the State has made a lot about the fact that Congressional District 9 now has a majority Latino Voting-Age Population. Can you — will this district elect the Latino candidate of choice on which you analyze? No, in my opinion. The Whites are added to this district, again, are very high registration, very high turnout, and very high polarization against candidates preferred by Hispanic voters." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p.94 line 22– p.95 line 4

- "So it will not function as a Latino majority seat? No." 10-03-25 LULAC v Abbott 3 Rough Draft.pdf, p.95, lines 5–6

### Kincaid Findings of Fact

**Finding 1**

Adam Kincaid, the mapdrawer, acknowledges that African Americans are demographically the strongest supporter of the democratic party among census groups.

> Q. Well, are African Americans the only demographic group that is measured, in terms of the data that you look at, the only ones that give 80 percent or greater support to Democrat candidates? A. To be clear, the data I look at, I don't look at the racial data, number one. So I want to make sure I clarify that again. As far as the partisanship goes, if you are looking at the partisanship of certain areas, that would be different, a different consideration.

> Q. But you would concede, would you not, that the only group that's 80 percent or greater would be African Americans, yes? A. I will concede that there is high correlation between African Americans and Democrat votes, yes.

> Q. And higher than other groups, correct? A. Among the census demographic groups, absolutely, yes

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 89 lines 4-20

**Finding 2**

Adam Kincaid, the mapdrawer, was aware that Latinos offer a greater preference for democratic candidates than do their white counterparts.

> Q. Okay. And you would agree with me, would you not, that there is a greater preference for Democratic candidates that you find in the Latino community than you do in the White or Anglo community? A. I would disagree with that.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 89 lines 21-25

**Finding 3**

Adam Kincaid, the mapdrawer, was familiar with Texas because, in part, of his experience in drawing the 2021 Legislative Map.

> Q. Okay. And you indicated, I think, you have a certain level of familiarity with what has occurred in Texas because of your involvement in Texas in the past; is that correct? A. I mean, I have pretty good knowledge of Texas, yes.

> Q. So you were involved, as we have talked about here, with the drawing of the 2021 map – A. Yes, sir.

> Q. -- correct? A. Yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 90 lines 1-10

**Finding 4**

Kincaid drew what was called a unified map in 2021 because all of the Republican legislators supported the map, and it included all districts. 9, 18, 29, 30 and 33 were all part of the unified map.

> Q. But let me go back to the question. I wasn't asking about what ultimately happened when it was adopted. I'm saying when that unified map went forward, did the 9, 18, 29, 30, 33, were those parts of the map drawn by others or were they drawn by you at the time it was originally tendered? A. The unified map was drawn by me, yes.

> Q. So you had a version of 9, 18, 29, 30, and 33 that you drew? A. Yes, sir. Yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 91 lines 16-25

**Finding 5**

Kincaid, the mapdrawer, was aware that Congressional District 9 had elected Congressman Al Green for some time.

> Q. And with Congressional District 9, you know that's a district that's been represented by Congressman Al Green for quite some time, right? A. Yes, sir. Yeah.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 92 lines 8-11

**Finding 6**

The mapdrawer, Kincaid, was aware in doing the drawing of the map that Congressional District 29 was a majority Hispanic district where the Latino voters elected their candidate of choice.

> Q. And 29 was a district where Latinos were able to elect their candidate of choice, correct? A. It was a majority Hispanic district, yes.

> Q. I know majority Hispanic. Not all majority Hispanic districts do that. So my question is, it was able to elect the Latino candidate of choice, correct? A. Sure. Yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 94 lines 12-19.

**Finding 7**

The mapdrawer, Kincaid, testified he changed the footprint of Congressional District 9.

> Q. But you changed the character of Congressional District 9; is that correct? A. I changed the footprint of it. I would agree with that.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 94 lines 4-7

**Finding 8**

The mapdrawer, Kincaid, admits that the African American candidate of choice was elected in the old configuration of the map but would not be elected in the new one.

> Q. Well, would you agree with me that the African American candidate of choice was elected consistently in Congressional District 9 prior to your changes? A. Yes.

> Q. And would you agree with me now it is not likely that the African American candidate of choice will be elected in the new configuration of Congressional District 9? A. In the new Texas 9, that's correct. In the new 18, yes, it would.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 94 lines 8-16

**Finding 9**

The mapdrawer indicated that even though he had classified the 9th as a coalition district, he would defer to the position taken by the State of Texas.

> Q. Okay. And I want to go over something with you later, but if the State has indicated in this case that they think it is an African American opportunity district, would you -- would you agree with their position? A. I agree with the State. Sure. Yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 94 line 24 to page 95 line 3.

**Finding 10**

The mapdrawer, admitted that he drew the 18th Congressional district so it would exceed 50 percent BCVAP, but indicated it would still function the same.

> Q. -- were you not, that by and large, most of the population in Congressional Districts 9 and 18 were African American and Latino combined? You knew that going in, right? A. Just real quick. I want to go back and clarify. You said above 50 percent. I assume you mean above 50 percent Black CVAP. Is that what you are saying?

> Q. Right. A. I want to clarify what you said before.

> Q. You changed it to over 50 percent BCVAP. A. Well, it was a 50. It is a majority Black CVAP seat, yes, as drawn.

> Q. All right. But it still will function the same, correct, electing an African American candidate of choice? A. It will, yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 95 line 16 to page 96 line 5

**Finding 11**

The mapdrawer was aware that districts 9 and 18 were heavily African American when he drew the new map.

> A. Well, it was a 50. It is a majority Black CVAP seat, yes, as drawn. Q. All right. But it still will function the same, correct, electing an African American candidate of choice? A. It will, yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 96 lines 6-14.

**Finding 12**

Despite being aware of the character of these districts, Kincaid did nothing in his mapdrawing efforts to protect them.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 97 line 5 to page 98 line 2

**Finding 13**

The mapdrawer, Kincaid, was aware that there were African American and Latino opportunity districts around the State but he did nothing to protect them and treated all districts the same under his new configuration.

Q. But I'm not asking about just Houston. I'm saying in the state of Texas, you were aware that there were a number of African American or Latino opportunity districts around the state? A. Sure. Yes. Q. Okay. And you sought to protect them in no way in terms of the methodology that you used to redraw the map? A. I drew the map using political data from start to finish and provided it to the Texas Legislature for them to do their VRA checks. Q. But the answer is you did nothing to protect African American and Latino existing opportunity districts, correct? A. I reconfigured almost the entire state when drawing a new map to create five Republican opportunity districts, yes. Q. So you considered all of the districts to be the same, that you had the absolute right to go in and change any district that you desired; is that right? A. I -- yes. My -- my task with this was to create a map that gave Republicans five pick-up opportunities in 2026. That was the -- that was the foundation of this redraw, yes.

**Finding 14**

The mapdrawer, Kincaid, was never provided the guide from the Texas Legislative Council for redistricting that advises the legislature to avoid engaging in minority vote dilution.

> Q. Now, the Texas Legislative Council advises our legislature to take great means, to take great effort to avoid diluting minority voting strength around the state. Were you advised of that requirement of the Texas Legislative Council? A. I was not advised of that.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 98 lines 14-29.

**Finding 15**

When he made changes to Congressional District 30 such as combining the S20.0 districts, he was aware that this was Jasmine Crockett's district that had been electing African American candidates historically and that the voters he was moving were African American.

> Q. Now, Ms. Perales put together this chart here. And it had the South Dallas 20.0. Do you see that? A. Yes. Q. And that includes part of Congressional District 30; is that right? A. That's correct. Yes. Q. Okay. And Congressional District 30 is represented by Congresswoman Jasmine Crockett; is that correct? A. That's correct. Q. That is an African American district; is that correct? A. I'm sorry. Can you say that again? Q. That district has been electing African Americans since the 1990s; is that correct? A. Yes. Q. Okay. Okay. And so as you indicated before, you are aware of the preference of African Americans for Democratic candidates; is that right? A. Yes. Q. So wouldn't you agree with me that that indicates a great likelihood that those 20.0 districts that we're talking about here were African American districts? A. Absolutely. I would agree with that. There is high correlation between African Americans and Democrat votes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 100 lines 5-25 to page 101 line 3

## Finding 16

The mapdrawer, concedes, that the occurrence of a naturally occurring district is not illegal.

> Q. A naturally occurring district. Sometimes districts naturally occur. It's not the intent of the map drawer. There's nothing wrong with having a district that has Blacks and Browns that elect candidates of choice. There is nothing that prevents that, is there? A. That's why I said intentionally versus not intentionally. Q. But you can draw them; is that right? A. If they are -- my view post Petteway is that if you are drawing them intentionally to be coalition districts, that is problematic. If you are drawing districts that happen to be not of one minority, majority, or one majority group, that's different because at that point you are not intentionally creating a district based off of race.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 103 lines 1-15.

## Finding 17

The mapdrawer, Kincaid, admits that it is legal to draw a naturally occurring district with Blacks and Browns in the majority.

Q. If you draw one that naturally occurs. That's what I'm asking you. You are injecting it to give a certain answer. What is your answer? Can't you draw a White and a Black district together? A. If I am drawing a natural district in just a geographic area, sure, and that's the only intention behind why I'm drawing it, yes. Q. And so therefore could you draw a Black and Brown district as long as it's not done for the purposes of race, yes? A. Absolutely. Q. Blacks and Browns have the same rights as Whites, don't they? A. Yes. Absolutely. They do. And I can definitely draw that if it's a naturally occurring district and I have not drawn it based off of race.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 106 lines 1-17.

## Finding 18

The mapdrawer, Kincaid, admits that in his official work he sometimes advises clients to hire lawyers to protect information as attorney client privilege.

Q. And is it not true that you -- that you sometimes advise in terms of the -- it's a good idea to hire a lawyer because then different communications can become privileged? A. I generally believe it's a good idea to hire a lawyer in redistricting, yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 109 lines 19-24.

## Finding 19

The mapdrawer, Kincaid, testified that he was aware in his mapdrawing that Congressman Veasey had been regularly elected to that position.

Q. Okay. And in reference to the drawing of the maps -- and, oh, I forgot. I think one thing I need to go over with you is District 33. Now, Congressional District 33 had elected the African American candidate of choice for seven consecutive elections; is that correct? A. I don't know the number of elections, but I know that Congressman Veasey was elected in that seat regularly, yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 110 lines 7-15.

## Finding 20

The mapdrawer, Kincaid, drew all three current African American members of Congress out of their districts.

Q. And you drew him out of his district? A. I believe I did, yes. Q. And you drew Congresswoman Jasmine Crockett out of her district? A. Yes. She is not in the 30th District any longer, yes. Q. And you clearly drew Congressman Green out

of his district when you removed 97.9 percent of it? A. I would argue that I changed the number of his district. It did not draw him out of his district. Q. Well, all 97.9 didn't end up in the same district. It got splintered and a good part of it went elsewhere, correct? A. The number -- the district number moved. But his district remained -- the core of his district still remained in Texas 18. Q. But he got moved to a different district, did he not? He is no longer living in Congressional District 9, is he? A. The number of the district changed. Q. Can you simply answer the question? JUDGE SMITH: The question is where does he live. THE WITNESS: He lives in the new 18th -- in the 18th District.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 110 line 16 to page 111 line 23.

## Finding 21

The mapdrawer, Kincaid, admits that he did not draw the white female Congressperson out of her district.

> Q. Did you draw Congresswoman Fletcher out of her district? A. I believe I did in 2308. And then with the edits I was -- she got back into the 7th District.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 111 line 24 to page 112 line 2.

## Finding 22

After initially drawing C2308, the mapdrawer Kincaid, said he was aware of the racial composition of the map.

> Q. Now, it's important to note that when -- I think you heard Mr. Gaber yesterday when he played the podcast interview with you when you were discussing 2308. You were discussing 2308 in terms of one of the -- one of the things you were describing about it was these two new minority opportunity districts that had been created, basically, the 18th and the 30th; is that right? A. I don't believe I characterized them as opportunity districts. I think that I described them as two majority Black districts is what I said. Q. Okay. So you were aware of the racial consequences of the map in light of those comments; isn't that correct? A. Yes. I knew what the racial composition of the map was after it was drawn, yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 112 lines 3-16.

## Finding 23

Even though he became aware of the complaints of discrimination after C2308 was released, in the map redraw the mapdrawer, Kincaid, did not fix them.

> Q. You were aware of the discrimination and didn't fix it. Isn't that true?A. I would not characterize it as discrimination, no. Q. You were aware of the complaints and didn't fix them, correct? A. I'm aware of the complaints, yes. Q. About race? A. I am aware of those complaints, yes.

Rough Draft - Day 7 - 08October25 AM Session-Adam Kincaid.pdf, p. 113 lines 11-18.

### Findings of Fact Christina Adkins

**Finding 1**

Changing the Congressional maps will require a great deal of additional work for election administrators around the State.

> Q. A couple of questions here. I think that first of all, I'd like to ask if it's true, is it not, that, in terms of the current map, C2193, the system is all set to move forward in terms of the precinct boundaries? They don't need to be changed, correct? A. You're talking about with the -- these 2025 maps, or are you talking about the previous? Q. 2021? A. 2021. That's correct. Those changes were made to conform though those maps back at the end of 2021.

10-8-25 LULAC v Abbott Rough Draft Afternoon Page 34 line 17 to page 35 line 1

**Finding 2**

The precincts changes will not be completed until after the November election.

> Q. Okay. And in fact, when you change boundaries for Congress, this impacts boundaries for other offices. Is that correct? A. If you change the maps, the boundaries for Congressional offices, it can affect the boundaries for voter registration precincts. Q. Okay. Well, yes. But what I'm asking is this. Let's say -- I think State law requires that for any office, like a constable's office, that the precinct can't overlap and the cost will have part of a precinct in their election precinct, correct? A. That's correct. The way -- what the law requires is that there can't be any more of one of certain offices. For example, Congressional -- Congressional District, no more than one state rep, no more than one State senator. And it encompasses some of the county-level offices as well. Q. So even after the decision's made to change the Congressional boundaries, you've got to make sure those conform with all the other offices at the local level? A. That's correct, sir. I think what I would want to clarify is that I don't see changes to any other offices. What I see are changes to precinct lines. So they're not shifting Congressional -- or commissioner precinct lines. They're shifting the voter registration precincts…. Q. But they would have to

be changed so that there would be consistency throughout, from constable to Congress? A. Yes, sir, for those parts of the State that were impacted, yes. I think there's broad swathes of the State, though, that were not impacted and those folks don't have to make any changes. Q. And that's already accomplished for 2193, correct? A. Correct.
10-8-25 LULAC v Abbott Rough Draft Afternoon Page 35 lines 2-25, and page 36 lines 3-10

## Finding 3

Normally such changes in redistricting years must be made by October 1st.

Q. -- C2333, that still needs to be done, correct? A. Yes, sir. My understanding is that most of the counties have begun making those determinations, but they won't formally finish -- finalize that process until after this November election.

Q. Okay. Because under State law, under chapter 262 of the election code, you're required to actually make -- make changes to precincts by October 1st if it's done in reference to redistricting. Isn't that correct? A. Pursuant to redistricting changes, yes, those changes have to be ordered by October 1st.
10-8-25 LULAC v Abbott Rough Draft Afternoon Page 37 lines 5-10

## Finding 4

New election boundaries and voter registrations must be determined and then uploaded or provided to the Secretary of State, neither of which would be required if the 2026 Congressional election is held under the current map.

Q. Okay. But now it's true, is it not, that when you -- that when you decide to make a change to these precinct boundaries,
that's gonna require some changes in the data that have to go to the Secretary of State's office. Correct? A. Yes. Counties have to provide that information. Whatever changes they make, they have to enter into the statewide system so that voters can be assigned their registration properly. Q. So that's gonna require some changes to voter registration. Is that correct? A. It could change the precinct that a person's assigned to. It wouldn't change their underlying voter registration record. So it wouldn't impact a voter by changing their date of registration or anything to that effect, but it may change the precinct number that they're in. Q. Because a voter may need to know where they need to go vote so they need to have the registration that shows them what precinct they're in, right? A. Absolutely. Q. And so that part still has to be done, correct? A. Yes. That's the work that I'm talking about as far as the information that's entered into our system after November. Those are the changes that would be entered into the statewide

31

system. Q. Okay. But that does not have to be done with 2193. That's already done, correct? A. Yes, sir, that's correct.
10-8-25 LULAC v Abbott Rough Draft Afternoon p.37 line 24 to page 38 line 24

## Finding 5

Precinct chairs have filed to run for office and may be disadvantaged by the change to C2333.

> Q. Okay. And a number of precinct chairs filed under the old boundaries. Is that correct? A. I believe in some counties, yes. Some individuals have filed their precinct chair applications. What I don't know, sir, is whether those are under older boundaries or if counties have been providing updated information to those party officials about what the new boundary lines may be. Q. But as a matter of fact, a number filed under the old boundaries, and they then would have their boundaries -- the applications to run for an offers just vitiated? A. Well, we hope that's not the case. We have provided training to our election officials on this matter, and for any county that may have to make some changes to their precinct boundary lines we've instructed those party chairs to confirm those changes and to notify candidates prior to that candidate filing deadline so that if a candidate needs to make adjustments, if they use the wrong precinct number because their precinct number has changed, that they have the opportunity to do that. This happened in 2021 as well. Q. Okay. But you're not aware of the specifics, but you are aware that there are some precinct chairs who would be disadvantaged by the change? A. I think. Q. Correct? A. There have been precinct chairs that have filed. I can't speak to whether they are under old -- with older information or if they've already received new information from their counties on precinct lines, so I can't speak to that but yes, there are precinct chairs that have filed.

10-8-25 LULAC v Abbott Rough Draft Afternoon Page 41 lines 1-25, page 42 lines 1-5

## Findings of Fact Senator Royce West

## Finding  1

The quorum break was a rational exercise of legislative judgment fully approved by the Texas Constitution

> Q. And, Senator, would you have joined in a quorum break yourself -- A. I would have. Q. -- if you had been presented with it? A. Yes. I would have. Q. Tell us why. A. Because, again, what was taking place. We were already dealing with a redistricting issue right here in this very court. And then all of a sudden those minority districts, we only had -- we have four African Americans in Congress from Texas. Federal courts over these many years have looked at redistricting

32

issues, made certain that these districts were in fact drawn pursuant to constitutional requirements. And now all of a sudden the Trump administration wants to target these districts and ask that they be, what, set aside based on constitutional concerns as expressed by the Fifth Circuit. When you have a court that's heard testimony that quote-unquote these districts were drawn without consideration of race. And that's an issue. And you also have a District 33 that was drawn by federal courts saying that they used constitutional criteria to do it. And so from that perspective it informed my decisions as to what I needed to do as a State Senator. And if I had -- if we had the votes, I would have done the same thing in order to protect the very people that I represent as a Senator.

Rough Draft – Day 2- 02October25 AM Session Page 36 Line 9 - Page 37 Line 11

## Finding 2

The quorum break is considered the nuclear option by legislators and is only adopted as a last resort in the face of great sacrifice.

Q. Okay. Are there sacrifices that one must make if they decide to undertake a quorum break? A. Quite a few challenges, yes, and sacrifices were made. Q. Give the Court an example of what's actually the kinds of sacrifices that legislators might be required to undertake in order to do that. A. First of all, as a legislator, one of the things that we're looking at is how it impacts our community and how it impacts our work. And so based on what was happening, it was so profoundly wrong that, you know, we consider a quorum break as a nuclear option, one that we don't want to touch if we don't have to. But when our colleagues was lying and being disingenuous and not making sure the people know what was going on, a decision had to be made. What could we do? Not to mention the flood. You know, we asked our leadership, the priority we have right now is the flood.

10-03-25 LULAC v Abbott 3 Rough Draft page 38 lines 3-20

Respectfully submitted,

/s/ Gary Bledsoe
GARY BLEDSOE
State Bar No. 02476500
The Bledsoe Law Firm PLLC
6633 Highway 290 East, Suite 208
Austin, Texas 78723-1157
Telephone: (512) 322-9992
gbledsoe@thebledsoelawfirm.com

/s/ Robert S. Notzon
ROBERT S. NOTZON
1502 West Avenue
Austin, Texas 78701
robert@notzonlaw.com

Attorneys for Plaintiff-Intervenors
Alexander Green and Jasmine Crockett

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 17th day of October 2025.

/s/ Robert S. Notzon
Robert S. Notzon

34