# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv-00259 |
| V. | § § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § § § | |
| *Defendants.* | § § | |
| TEXAS STATE CONFERENCE OF THE NAACP, | § § § | |
| *Plaintiff,* | § § | |
| V. | § § | Case No. 1:21-cv-01006 [Consolidated Case] |
| GREG ABBOTT, *et al.*, | § § § § | |
| *Defendants.* | § § | |

**PLAINTIFF TEXAS NAACP'S PROPOSED FINDINGS OF FACT**

Plaintiff Texas State Conference of the NAACP incorporates by reference and adopts proposed findings of fact 54-55, 91-94, 109-245; 264-265; 297-345; 363-381 from Brooks, MALC, and LULAC Plaintiffs' Proposed Findings of Fact ECF No. 1280; proposed findings of fact 1-5; 7; 21-22; 23-24; 28-29; 30-84; 85-87; 90-91; 92-93; 96; 100-124 from Gonzales Plaintiffs Proposed Findings of Fact ECF No. 1279, and offers this supplement containing additional proposed findings of fact.[1]

I.   **Parties**

1. The Texas State Conference of the NAACP ("Texas NAACP") is a subsidiary of the National Association for the Advancement of Colored People, Inc. ("NAACP"). Since its founding in 1937, Texas NAACP has relied on litigation, policy advocacy, community organizing, and public education to advance its mission of ensuring the political equality of all Texans. PL_TXNAACP 210_PI.

2. As part of its work, Texas NAACP also engages in voter education, registration and mobilization. PL_TXNAACP 210_PI.

3. Texas NAACP has over 100 local branches throughout the state of Texas and the parties in this case have stipulated that Texas NAACP has numerous—often hundreds—of members in each district challenged under the 2021 plan. *See* ECF 978 ¶ 9.

4. Some of these members have faced racially motivated threats and attacks in recent years. PL_TXNAACP 210_PI.

5. TX NAACP Member YY is a member of the Texas NAACP and a citizen of the United States over the age of 18. They are registered to vote in CD 9 under Plan C2333 and intend

---

[1] Texas NAACP also incorporates by reference, to the extent applicable, any of the remaining proposed findings of fact provided by Co-Plaintiffs relating to vote dilution and racial gerrymandering.

1

to vote in future elections. Under the prior map (Plan C2193) they were registered to vote in CD 29. TX NAACP Member YY identifies as Black. PL_TXNAACP 211_PI.

6. TX NAACP Member ZZ is a member of the Texas NAACP and a citizen of the United States over the age of 18. They are registered to vote in CD 32 under Plan C2333 and intend to vote in future elections. Under the prior map (Plan C2193) they were registered to vote in CD 32. TX NAACP Member ZZ identifies as Black. PL_TXNAACP 213_PI.

7. TX NAACP Member AAA is a member of the Texas NAACP and a citizen of the United States over the age of 18. They are registered to vote in CD 33 under Plan C2333 and intend to vote in future elections. Under the prior map (Plan C2193) they were registered to vote in CD 32. TX NAACP Member AAA identifies as Black. PL_TXNAACP 214_PI.

8. TX NAACP Member BBB is a member of the Texas NAACP and a citizen of the United States over the age of 18. They are registered to vote in CD 33 under Plan C2333 and intend to vote in future elections. Under the prior map (Plan C2193) they were registered to vote in CD 30. TX NAACP Member BBB identifies as Black. PL_TXNAACP 216_PI.

9. TX NAACP Member CCC is a member of the Texas NAACP and a citizen of the United States over the age of 18. They are registered to vote in CD 35 under Plan C2333 and intend to vote in future elections. Under the prior map (Plan C2193) they were registered to vote in CD 35. TX NAACP Member CCC identifies as Black. PL_TXNAACP 215_PI.

10. Jane Nelson is the Secretary of State of Texas. As Secretary of State, Ms. Nelson serves as Texas's Chief Election Officer. Tex. Elec. Code § 31.001(a). As "the chief election officer of the state," id., Ms. Nelson is required to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's election laws, including by issuing directives and instructions to all state and local authorities having duties in the administration of these laws, id.

§ 31.003. Ms. Nelson is empowered to order any official to correct conduct that "impedes the free exercise of a citizen's voting rights." Id. § 31.005(b). Ms. Nelson prescribes the form that individuals must complete for a place on a political party's general primary ballot, see id. §§ 141.031, 172.021-.024. Political parties who wish to hold a primary must deliver written notice to the Secretary of State noting their intent to hold a primary election, id. § 172.002, and the party chairs must certify to the Secretary of State the name of each candidate who has qualified for placement on the general primary election ballot, id. § 172.028. The Secretary of State also serves as the filing authority for independent candidates for federal office, including members of Congress. See id. § 142.005. The adopted redistricting plans are filed with the Secretary of State to ensure that elections are conducted in accordance with those plans.

11. Gregory Wayne Abbott is the Governor of the State of Texas. Under Texas's election laws, Governor Abbott "shall order . . . each general election for . . . members of the United States Congress" by proclamation. Tex. Elec. Code § 3.003.

## II. The Sequence of Events

12. Between May 21, 2025, and June 11, 2025, a three-judge panel held a trial in the District Court for the Western District of Texas in El Paso, TX related to Plan C2193.

13. On June 10, 2025, Joan Huffman testified that despite the partisan pressure the Texas Legislature was not considering redrawing their congressional districts. 6/10 Rough Trial Tr. at 53:25-54:7.

14. On July 11, 2025, following Governor Abbott's proclamation calling a special session to enact "legislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice" Lt Gov. Dan Patrick and Speaker of the House Dustin Burrows issue a joint statement "highlighting the close collaboration between

3

the House and Senate on legislation to address concerns raised by the U.S. Department of Justice over Texas congressional districts." PL_TXNAACP 177_PI.

15. On August 6, Rep. Oliverson—chair of the House Republican Caucus—disclaimed the idea that they were taking up redistricting for political reasons and said redistricting discussions began "as a result of a court case where the federal appeals court basically rejected the idea of coalition districts..." 10/1 PM Rough Hearing Tr. at 68:19-69:3; Brooks Exhibit 327.

16. Representative Barbara Gervin-Hawkins is the chair of the Texas Legislative Black Caucus. 10/3 AM Rough Hearing Tr. at 138:16-139:12. She was also a member of the House Redistricting Committee during both the 89th regular session and special sessions. *Id*.

17. There was no discussion of mid-decade redistricting by the House Redistricting Committee during the regular session. 10/3 AM Rough Hearing Tr. at 139:13-19. In fact, the House Redistricting Committee did not hold a single meeting during the regular session. *Id*.

18. Discussion about redistricting among House Redistricting Committee members did not begin until Governor Abbott received the DOJ Letter. 10/3 AM Rough Hearing Tr. at 139:20-140:4. After that, the DOJ Letter and its directive to target minority controlled districts was a fixture of the legislative discussion. 10/3 AM Rough Hearing Tr. at 140:13-23.

19. Representative Todd Hunter was also appointed to serve alongside Rep. Gervin-Hawkins on the Redistricting Committee in the Special Sessions and was the sponsor of Plan C2333. This is despite the fact a three-judge panel in a prior round of redistricting found that there was evidence "that the map drawers, including specifically Rep. Hunter, racially gerrymandered the districts that remained in Nueces County to further undermine Latino voting strength." 10/3 AM Rough Hearing Tr. at 141:7-142:2.

4

20. Most hearings held by the House Redistricting Committee took place before there was any map that concerned citizens could review and speak for or against. 10/3 AM Rough Hearing Tr. at 143:3-144:21.

21. Rep. Gervin-Hawkins tried to engage with Rep. Hunter about the map, how it was created, and the concerns she and others had but she was unable to get forthright answers to her questions, acknowledgment of her concerns, or legal counsel similar to that provided to Rep. Hunter. 10/3 AM Rough Hearing Tr. at 147:12-148:6.

22. On August 15, the first special session adjourns early and a second special session is called in order to "reset the clock" on the special session. 10/1 PM Rough Hearing Tr. at 72:12-20.

23. On August 18, 2025, Kincaid called King to get Rep. Toth's contact information. Kincaid also told King that a new map was going to be released. 10/9 AM Rough Hearing Tr. 163:4-164:1. That same day the House Redistricting Committee departed from ordinary procedure by giving same day notice of a special meeting of the committee. 10/3 AM Rough Hearing Tr. at 149:6-150:2. At this meeting, Rep. Hunter introduced a new map, Plan C2333. The committee voted out the map less than an hour later, giving members no time to meaningfully review it. *Id.* at 150:3-151:1.

24. On August 20, 2025, the full House debated HB 4 (Plan C2333). During these debates, Rep. Gervin-Hawkins asked Rep. Hunter directly about the DOJ letter. He acknowledged that the DOJ letter was considered in the formation of a map. 10/3 PM Rough Hearing Tr. at 8:10-23; Brooks Ex. 316.

25. Later in their exchange, Rep. Hunter said they should follow the law—including *Petteway*—and that his law firm told him it had done so. 10/3 PM Rough Hearing Tr. at 13:19-

14:6; Brooks Exhibit 316. He also conceded that race was a factor he considered. 10/3 PM Rough Hearing Tr. at 17:6-18:6.

26. Rep. Toth—one of the few legislators Kincaid sought to contact—maintains that Plan C2333 was not a partisan gerrymander but rather was drawn to dismantle coalition district following *Petteway*. As recently as October 2, one day after this Court's preliminary injunction hearing began, Rep. Toth rejected the idea that Plan C2333 was motivated by politics. Rather, he said emphatically that "it was required of us to do it yes in response to *Petteway* to get compliant." Brooks Exhibit 339.

### III. Lay Witness Testimony

27. Shemaiah Stokes testified to the impact of these changes on her and similarly situated Black voters who remain in the newly drawn CD 35.

28. Ms. Stokes is a Texas NAACP member and is registered to vote at her home in Bexar County. She regularly votes in state and federal elections and plans to continue to do so. 10/4 AM Rough Hearing Tr. at 3:2-22.

29. Under the 2021 map, Ms. Stokes and similarly situated members of her community lived in a district—CD 35—that combined Black communities in a district that included their employers, families, churches, schools, and even an African American History Museum. 10/4 AM Rough Hearing Tr. at 8:7-10:18.

30. As redrawn in Plan C2333 Ms. Stokes still lives in CD 35, but the district no longer connects her with other Black communities and their shared communal hubs. 10/4 AM Rough Hearing Tr. at 11:24-12:13. Rather, under Plan C2333 CD 35 connects Ms. Stokes with rural communities in Karnes, Wilson, and Guadalupe Counties, areas that have different interests than

the Black population in the San Antonio portion of CD 35. 10/4 AM Rough Hearing Tr. at 12:8-13:9.

31. As a result of this redraw, the votes of the Black community in the San Antonio portion of CD 35 will be diluted and their needs will be secondary to those of the rural population that now makes up a majority of their district. 10/4 AM Rough Hearing Tr. at 13:10-24.

32. The Court finds Ms. Stokes to be reliable. Her extensive work with communities in need across Bexar County—including her experience working as a parent educator, intervention specialist, and community case manager—provide a strong basis to credit her description of Bexar County, and San Antonio specifically. 10/4 AM Rough Hearing Tr. at 4:3-20.

33. The Court also heard from Tiffinni Young, a Black Texan from the Dallas area, who testified about the impact of redistricting on her. Ms. Young is a member of the Texas NAACP who is registered to vote at her current address. regularly votes in state and federal elections and plans to do so in the future. 10/2 AM Rough Hearing Tr. at 148:4-149:13.

34. Following Texas's 2013 redistricting, Ms. Young lived in CD 30. Under that congressional map, CD 30 connected Black populations in places like West Dallas, Pleasant Grove, Oak Cliff, and Joffey. 10/2 PM Rough Hearing Tr. at 6:11-9:17. Her representative there was Eddie Bernice Johnson.

35. The congressional maps in 2021 moved Ms. Young into CD 32. This district split historically Black areas in Richardson and Dallas and contained fewer identifiable Black communities overall. 10/2 PM Rough Hearing Tr. at 12:2-15:20.

36. Texas's newest map, Plan C2333, moves Ms. Young again, this time to CD 33. The new district connects Black populations in the West Dallas and Love Field area to Black populations in the Pleasant Grove and Kelberg/Riley area. 10/2 PM Rough Hearing Tr. at 17:12-

7

19:9. Like CD 32 under the 2021 plan, this district also connects fewer Black communities than CD 30 did in the 2013 plan. *Id.* at 19:10-20:1.

37. The Court finds the testimony of Ms. Young to be reliable. Ms. Young established that she has an in-depth understanding of the Dallas area gained through her experience campaigning for and serving on the Dallas City Council, the Dallas Park and Recreation Board, and the City of Dallas Bond Task Force. 10/2 AM Rough Hearing Tr. At 150:2-153:10.

### IV. Dr. Duchin's Analysis

38. Dr. Moon Duchin is a professor at the University of Chicago where she is tenured in computer science. 10/6 Rough Hearing Tr. at 24:7-13. She is on leave from her position as a professor at Cornell University, where she teaches mathematics and is tenured in public policy. 10/6 Rough Hearing Tr. at 24:15-18.

39. Dr. Duchin's research focuses on mathematics and computing as it relates to elections, democratic mechanisms, and redistricting. 10/6 AM Rough Hearing Tr. at 24:23-25:2.

40. Additionally, Dr. Duchin directs the Data and Democracy Research Initiative within the Data Science Institute at the University of Chicago. 10/6 Rough Hearing Tr. at 24: 20-22.

41. In August 2025, Dr. Duchin was retained by the Texas NAACP to analyze Texas's proposed congressional plans as they were released and report her findings. 10/6 AM Rough Hearing Tr. at 25:19-25.

42. Dr. Duchin filed her final report for this hearing on September 7, 2025. PL_TXNAACP 208_PI.

43. Defense Experts Dr. Trende and Dr. Lewis submitted rebuttal reports on September 22, 2025. Neither of these reports call into question or in any way address the analysis and conclusions in Dr. Duchin's September 2 report. *See* State Ex. 570, 571.

44. The Court accepted Dr. Duchin as an expert in the fields of data science and applied mathematics in this proceeding without objection. 10/6 AM Rough Hearing Tr. at 70:20-71:2.

45. Based on her analysis, Dr. Duchin concluded that the changes made in Plan C2333 were not consistent with the race neutral pursuit of partisan gain. Rather, she found strong evidence that race was used in the creation of Plan C2333 in a manner that diluted the votes of people of color. 10/6 AM Rough Hearing Tr. at 26:12-27:1.

46. In her report. Dr. Duchin analyzed three "clusters" of districts in Plan C2333. A Tarrant/Dallas cluster, a Harris/Ft. Bend cluster, and a Travis/Bexar cluster. PL_TXNAACP 208_PI at 2. Each cluster is made up of all the districts that touch the named counties. 10/6 Rough Hearing Tr. at 28:15-29:12. These clusters allowed her to analyze alternative plans in a way that is "modular" and "self-contained." That is, all of the alternative cluster maps analyzed as part of her ensemble can be plugged into the rest of Plan C2333 without causing any ripple effects or requiring any other changes to the map. 10/6 AM Rough Hearing Tr. at 27:21-28:18; PL_TXNAACP 208_PI at 2.

47. Population growth both statewide and in each of the three clusters was primarily attributable to people of color. PL_TXNAACP 208_PI at 3. Despite this, the ability of people of color to elect their preferred candidate decreases under Plan C2333. PL_TXNAACP 208_PI at 9.

48. Dr. Duchin's methodology in this case involved generating an initial group of maps (known as an ensemble). This initial ensemble uses certain "district generation parameters" to make sure the maps she generates are comparable to the map adopted by the state. PL_TXNAACP 208_PI at 22. This initial ensemble contains millions of maps. 10/6 AM Rough Hearing Tr. at 131:25-132:4. Dr. Duchin then applies a series of "winnowing factors" to select the maps from her ensemble that perform as well or better than the enacted map in certain key metrics the legislature

was likely to consider. PL_TXNAACP 208_PI at 23. After this winnowing, she randomly samples 40,000 maps from each cluster. Finally, in what she refers to as her "robustness checks" Dr. Duchin generates numerous additional ensembles based on different district generation parameters to see if that alters her findings. *Id*. As Dr. Duchin testified, the goal of this analysis is not to read the minds of the legislature and incorporate every single factor they may or may not have considered. 10/6 AM Rough Hearing Tr. at 52:2-53:13. Rather, her analysis seeks to generate a sufficiently large and representative sample that can serve as a relevant baseline to which one can compare the enacted plan. *Id*.

49. Consistent with this methodology, Dr. Duchin began her analysis here by generating an ensemble containing millions of maps. The district generation parameters for this ensemble included contiguity, population balance, county integrity, integrity of political subdivisions, and core retention. PL_TXNAACP 208_PI at 22. They also included optimization using three different partisanship measures. The first partisanship parameter sought to maximize republican success based on the results of 29 general elections. PL_TXNAACP 208_PI at 22-23. These included the Cruz election and the Abbott election that Kincaid claimed were part of his criteria. 10/7 Rough Hearing Tr. 145:16-25. The second partisan measure, sought to maximize partisanship based on President Trump's election performance in 2016, 2020, 2024. PL_TXNAACP 208_PI at 22-23. The third partisan measure sought to maximize partisanship based solely on Trump's performance in the 2024 presidential election. *Id*. This too is a close match to Kincaid's asserted considerations. 10/7 AM Rough Hearing Tr. at 179:10-11.

50. From this larger ensemble of maps generated in accordance with her district generation parameters, Dr. Duchin applied her winnowing factors then randomly selected a sub-sample of 40,000 maps for each cluster. *Id*. This sub-sample only included maps that when

10

compared to Plan C2333 had: (a) at least as many republican wins; (b) at least as many districts with a plurality for Trump in the 2024 election; (c) no more than a 10% deviation in the urban/rural composition of districts; and (d) no double bunking of incumbents based on the most recent address file available to her. PL_TXNAACP 208_PI at 23.

51. After running her analysis, Dr. Duchin further confirmed her findings through a series of "robustness checks" where she checked to see if considering additional factors when generating her initial ensemble changed her findings. These additional factors included: (a) optimizing republican wins; (b) matching the number of districts with a Trump 2024 vote share over 55 percent; (c) changing the extent to which the maps respect county lines and political subdivisions; and (d) changing the "starting point" or seed value for the ensemble. None of these factors altered her findings. PL_TXNAACP 208_PI at 23.

52. Only racial data is provided by the Census at the Block level. Partisanship data is available at only the precinct level. One cannot disaggregate precinct level partisan data down to the Census block level without a reliable ancillary data source. 10/6 Rough Hearing Tr. at 81:6-25. The State has not provided Plaintiffs or this Court with any ancillary data source. 10/6 Rough Hearing Tr. at 84:5-15.

53. The State concedes that Dr. Duchin produced to them 300 gigabytes of data underlying her analysis. That included all the code used, all the inputs necessary to run the code, and notably, all the outputs i.e. the millions of "literal maps" produced by her analysis. 10/6 AM Rough Hearing Tr. at 101:7-102:2.

A. The Tarrant/Dallas Cluster

54. Dr. Duchin testified to the changes made to CD 32 and CD 33 in Plan C2333. In both cases, Dr. Duchin explained the existing district was changed to stretch out more into rural

counties. This is a "characteristic" pattern taking diverse urban populations and submerging them in districts with heavily white rural populations. 10/6 AM Rough Hearing Tr. at 31:11-33:4.

55. The dot density map of the Tarrant/Dallas cluster in Dr. Duchin's report shows a clear pattern of sorting voters by race. PL_TXNAACP 208_PI p. 11 (Figure 4). All the dot density maps in Dr. Duchin's report were constructed by randomizing the order of the dots so later added points would not obscure those underneath. This makes it an accurate representation of the racial sorting of voters. 10/6 Rough Hearing Tr. at 33:11-34:19. In particular, it shows CD 24 was drawn to exclude non-white populations. 10/6 AM Rough Hearing Tr. at 35:4-11; PL_TXNAACP 208_PI p. 11 (Figure 4).

56. Dr. Duchin's analysis of effective minority representation showed a decline in the ability of people of color to nominate and elect their candidate of choice in each of the clusters she analyzed. Using a peer-reviewed method accepted by other courts, Dr. Duchin demonstrated that based on a localized analysis of primary elections, the map reduced the ability of minority candidates in the Tarrant/Dallas cluster. 10/6 Rough Hearing Tr. at 35:23-38:14. Specifically, CD 33 went from a district where people of color could reliably nominate and elect candidates of their choice on their own, to a district where they can only consistently do so if they received the help of white crossover votes. PL_TXNAACP 208_PI p. 9 (Table 3); 10/6 AM Rough Hearing Tr. at 39:2-44:10. CD 32 in the same cluster went from a district where people of color could regularly nominate and elect their preferred candidate with the occasional help of white crossover votes to a district where they can no longer elect their preferred candidate at all. PL_TXNAACP 208_PI p. 9 (Table 3); 10/6 AM Rough Hearing Tr. at 39:9-17; 41:21-44:10. Taken together, these changes in CD 32 and CD 33 combine to a net loss of one district that would perform for the preferences of people of color. 10/6 Rough Hearing Tr. at 42:25-43:10.

57. Figure 8 in Dr. Duchin's report shows her analysis of the "packing and cracking" of voters of color in the Tarrant/Dallas cluster of Plan C2333. Dr. Duchin's box charts show the range of demographics found in both the "winnowed" sub-sample of 40,000 maps (represented on the chart in orange) and a representative 40,000 plan sample from the original larger ensemble (represented on the chart in black). 10/6 AM Rough Hearing Tr. at 64:3-66:19. The boxes in the chart represent the 25th – 75th percentile range while the whiskers mark the 1st and 99th percentile. *Id*. Outliers at or below the 1st percentile show an abnormally low minority population when compared with similarly partisan districts and are thus indicative of cracking. *Id*. And vis-versa, outlier districts at or above the 99th percentile have an unusually high concentration of minority voters when compared with similarly partisan plans and are thus indicative of packing. *Id*. The blue dots show where the districts in Plan C2333 fall along this distribution. *Id*. As Figure 8 shows, and as Dr. Duchin testified, one district from the Tarrant/Dallas cluster in Plan C2333 is at or above the 99th percentile suggesting the packing of voters of color (seen in the second plot from the right). While two other districts are off the charts or in the 1st percentile suggesting the cracking of voters of color (seen in the third and fourth plot from the right).[2] PL_TXNAACP 208_PI p. 14 (Figure 8); 10/6 AM Rough Hearing Tr. at 65:3 – 67:3. Put differently, all or nearly all of the 40,000 maps of the Tarrant/Dallas cluster produced by Dr. Duchin achieve similar partisan outcomes without the same extreme level of cracking and packing of voters of color.

---

[2] The Box plots themselves are not given district labels because the maps from the ensemble mix and merge districts such that the district with the same given number might not be the best comparator in a given map. Accordingly, the districts are compared to their most similar counterpart in a given map based on partisanship without regard for its specific number.

13

### B. The Harris/Ft. Bend Cluster

58. Dr. Duchin explained that CD 9—like CD 32 and CD 33—was drawn to take in more rural and heavily white areas in a way that is characteristic of diluting the votes of diverse urban areas. 10/6 Rough Hearing Tr. at 46:19-47:12. Unlike CDs 32 and 33, however, newly drawn CD 9 has little territorial overlap with old CD 9. In fact, the district with the most territorial overlap with old CD 9 is the new CD 29. 10/6 AM Rough Hearing Tr. at 46:6-18. As Dr. Duchin explained, this is an unexplained and obfuscating departure from standard district numbering practice, which is to give the new district the same number as the old district with which it most overlaps. *Id.* at 45:12-46:5.

59. The dot density plot of the Harris/Ft. Bend cluster in Dr. Duchin's report similarly shows a pattern of sorting voters based on race. 10/6 AM Rough Hearing Tr. at 48:8-16; PL_TXNAACP 208_PI p. 12 (Figure 5).

60. Dr. Duchin's analysis demonstrates that CD 9 in the Harris/Ft. Bend cluster went from a district where people of color could reliably nominate and elect their candidate of choice to a district where they can likely nominate, but almost certainly not elect, their preferred candidate. PL_TXNAACP 208_PI p. 9 (Table 3).

61. Dr. Duchin's box plot for the Harris/Ft. Bend cluster shows partisanship does not explain its district demographics under Plan C2333. When compared to two sub-samples of 40,000 maps that achieved similar partisan performance, one district was off the charts as to the packing of voters of color (the second district from the right on the chart) while four districts were either off the chart or at the first percentile in their cracking of voters of color (the fourth, fifth, sixth, and seventh from the right on the chart). PL_TXNAACP 208_PI p. 13 (Figure 9). To sum it up, not

14

one of the maps in either of the partisan 40,000 map samples had a level of cracking and packing of voters of color as extreme as in Plan C2333. PL_TXNAACP 208_PI p. 13 (Figure 9).

### C. The Travis/Bexar Cluster

62. New CD 35 under Plan C2333 is drawn to include more rural and less diverse counties. 10/6 Rough Hearing Tr. at 50:7-51:2. Dr. Duchin's analysis shows that this has the effect of changing it from a district where people of color can reliably nominate and elect their candidates of choice to a district where they can likely reliably nominate—but almost certainly never elect—their preferred candidate. PL_TXNAACP 208_PI p. 9 (Table 3); 10/6 AM Rough Hearing Tr. at 51:3-21.

63. Figure 10 in Dr. Duchin's report similarly shows a pattern of cracking and packing in the Travis/Bexar cluster. Dr. Duchin candidly acknowledged that when compared to two 40,000 sub-samples of similarly partisan maps, the Travis/Bexar cluster in Plan C2333 was not as much of an outlier as the other two clusters. PL_TXNAACP 208_PI p. 13 (Figure 10). However, she noted several of its districts (the first, third, and fourth from the right) landed around the fifth percentile reflecting that it is still significantly more dilutive of minority voting strength than the vast majority of partisan draws of the Travis/Bexar cluster created by Dr. Duchin. PL_TXNAACP 208_PI p. 13 (Figure 10); 10/6 AM Rough Hearing Tr. at 69:11-70:4.

64. Like the Court in *Singleton v. Allen,* 782 F. Supp. 3d 1092, 1259 (N.D. Ala. 2025), we find Dr. Duchin's analysis and testimony to be "highly credible." Notably, her analysis stands entirely unrebutted by both Dr. Trende and Dr. Lewis, who had ample time to assess her work as demonstrated by their responses to Dr. Barretto and Dr. Collingwood. Further, Dr. Duchin was candid with the Court about the limits of her analysis explaining that she was not attempting to "simulate" the decision making of the legislature and freely conceding areas where her analysis

15

was not as strong. *See e.g.* 10/6 AM Rough Hearing Tr. at 52:2-53:13 ("…so again I would really avoid thinking of it as a simulation of what people do."); 69:14-22 ("...But the evidence here isn't as strong as in the previous two clusters"). Finally, the State's sole critique of Dr. Duchin's analysis, her use of outdated incumbent information for the limited purpose of avoiding double-bunking, does little to undercut her robust findings. The State concedes it had all the data and code it needed to test whether the updated incumbent addresses altered Dr. Duchin's findings but it did not do so. And there is no apparent reason to believe changes in incumbent addresses would meaningfully alter the demographic makeup of the ensembles analyzed by Dr. Duchin. Accordingly, we give great weight to her testimony and analysis.

Dated: October 17, 2025

        Respectfully submitted,

        /s/ Lindsey B. Cohan
        Lindsey B. Cohan
        Texas Bar No. 24083903
        DECHERT LLP
        515 Congress Avenue, Suite 1400
        Austin, TX 78701
        (512) 394-3000
        lindsey.cohan@dechert.com

        Robert Weiner
        David Rollins-Boyd*
        Jennifer Nwachukwu
        Jeremy Lewis*
        LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
        1500 K Street, Suite 900
        Washington, DC 20005
        (202) 662-8600
        robert.weiner@lawyerscommittee.org
        drollins-boyd@lawyerscommittee.org
        jnwachukwu@lawyerscommittee.org
        jlewis@lawyerscommittee.org

Neil Steiner*
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Robert Notzon
Texas Bar No. 00797934
THE LAW OFFICE OF ROBERT NOTZON
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
robert@notzonlaw.com

Gary Bledsoe
Texas Bar No. 02476500
THE BLEDSOE LAW FIRM PLLC
6633 Highway 290 East #208
Austin, Texas 78723-1157
(512) 322-9992
gbledsoe@thebledsoelawfirm.com
*Attorney only as to Texas NAACP's claims related to Texas state senate and state house plans*

Anthony P. Ashton*
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
aashton@naacpnet.org

Janette M. Louard
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
jlouard@naacpnet.org
*Attorneys appearing of counsel*

*Admitted *pro hac vice*.

*ATTORNEYS FOR THE TEXAS STATE CONFERENCE OF NAACP*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing and all attachments were filed and served on counsel of record via the Court's electronic filing system on October 17, 2025.

*/s/ Lindsey B. Cohan*
Lindsey B. Cohan
*Counsel for Plaintiff Texas NAACP*