# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* <br><br> *Plaintiffs,* <br> V. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § § | Case No. 3:21-cv-00259 <br> [Lead Case] |
| TEXAS STATE CONFERENCE OF THE NAACP, <br><br> *Plaintiff,* <br> V. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § § § | Case No. 1:21-cv-01006 <br> [Consolidated Case] |

**PLAINTIFF TEXAS NAACP'S POST PRELIMINARY INJUNCTION HEARING BRIEF**

## INTRODUCTION

As *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1 (2024) is the Supreme Court's most recent exposition of the constitutional principles governing race and redistricting, counsel expect that this Court will focus intently on the decision. *Alexander* provides a road map for what plaintiffs need to show in order to prove a claim of intentional discrimination. Plaintiffs followed that road map, and the decision strongly supports a ruling for Plaintiffs in this case.[1] First, in the three paragraphs of *Alexander* dealing with vote dilution, the Court restated longstanding law, quoting a 1995 case, *Miller v. Johnson*, 515 U.S. 900, 911, and a 1993 case, *Shaw v. Reno*, 509 U.S. 630, 649 (1993), requiring plaintiffs to show a "purposeful device" to undermine minority influence and an effect on minority representation. Texas NAACP showed such a purpose, with the U.S. Department of Justice's July 7, 2025 Letter ("DOJ Letter") directing the State to dismantle majority minority districts based on their racial composition, the Governor's statements that they would do so, and legislators' comments echoing this pledge. Second, *Alexander* noted *four* times that the plaintiffs in that case had presented *no* direct evidence of racial intent and observed that their circumstantial evidence—almost entirely expert testimony—was "very weak." In this case, Plaintiffs focused extensively on direct evidence of intent, and their circumstantial evidence was powerful. For one, Texas NAACP's expert, Dr. Moon Duchin, explicitly accounted for each of the criticisms the Court advanced in *Alexander* regarding the expert analyses there. Constructing her model to address each of those factors, Dr. Duchin concluded that the new Texas map affected minority representation, causing a net loss of three opportunity districts for people of color, with overt cracking and packing in Dallas and Tarrant

---

[1] Texas NAACP incorporates by reference to the extent applicable, the facts asserted by Co-Plaintiffs relating to vote dilution and racial gerrymandering.

1

Counties (CD 32, CD 33); Harris and Fort Bend Counties (CD 9); and Bexar and Travis Counties (CD 35). Dr. Duchin's unrebutted statistical analysis showed that the effort to achieve partisan gains could not explain these results. Her findings are bolstered by other experts and lay witnesses offered by Texas NAACP and other Plaintiffs during the preliminary injunction hearing.

In sum, Texas NAACP and Consolidated Plaintiffs elicited both direct and circumstantial evidence to support its constitutional claims of intentional vote dilution and racial gerrymandering, including both expert and lay witness testimony.

## ARGUMENT

**I.    Texas NAACP Has Proven Its Intentional Discrimination Claims**

"The Equal Protection Clause 'prohibits intentional vote dilution—invidiously … minimizing or canceling out the potential of racial or ethnic minorities.'" *Singleton v. Allen*, 782 F.Supp.3d 1092, 1163, quoting *Abbott v. Perez*, 585 U.S. 579, 585-86 (2018). Courts assess both direct and circumstantial evidence when considering whether a defendant acted with discriminatory intent. As the Court noted in *Alexander*, "Direct evidence often comes in the form of a relevant state actor's express acknowledgement that race played a role in the drawing of district lines." 602 U.S. at 8. It can amount to a "confession of error." *Id.* But, as the Fifth Circuit noted in *Veasey v. Abbott*, 830 F.3d 216, 235 (2016), "In this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence." *See also id.* ("[P]eople hide discriminatory intent behind seemingly legitimate reasons."). Thus, it is necessary to assess circumstantial evidence of intent. *Arlington Heights* primarily focuses on the factors that constitute circumstantial evidence of discriminatory intent: discriminatory effect ("whether [the impact of official action] bears more heavily on one race than another"); historical background of the decision; specific sequence of events leading up to the challenged decision; departures from normal procedures; and statements by members of the

2

decision-making body. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266-68 (1977).

The plaintiff must show that race was "a motivating factor" in the decision, not the sole factor or even the dominant one. *Id.* at 266. In assessing intent, "'[r]acial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016), citing *U.S. v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). In closing arguments, the Court considered whether *Alexander* established a new standard for evaluating intentional vote dilution claims based on the following language:

> [A] plaintiff must show that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.' *Miller v. Johnson*, 515 U.S. 900, 911…In other words, the plaintiff must show that the State's districting plan 'has the purpose *and* effect' of diluting the minority vote. *Shaw v. Reno*, 509 U.S. 630, 649 (1993) (emphasis added).

602 U.S. 1, 38 (2024).

With respect to intentional vote dilution claims, *Alexander* only held that the claim must be remanded to the district court because the court applied the "same findings of fact and reasoning" of Appellees' racial gerrymandering claim to their intentional vote dilution claim, which the Supreme Court determined was clearly erroneous. *Id*. While the Court clarified that intentional vote dilution claims are analytically distinct from racial gerrymandering claims, it did not establish a new standard, but rather reiterated this distinction as done in *Miller* and *Shaw*. *Id*. Moreover, the Court did not overturn *any* precedent regarding intentional vote dilution claims or instruct the lower court to apply a new standard on remand. The *Alexander* recitation of the intentional vote dilution standard is consistent with this Court's prior ruling and prior case law governing this body of law. ECF 278 at 20 ("While intentional discrimination means only that a decisionmaker acted 'at least in part' with a discriminatory purpose," *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), racial gerrymandering requires that the decisionmaker

3

"subordinated" other redistricting considerations to race, *Miller*, 515 U.S. at 916.)); *see, e.g.*, *Veasey, supra* at 230; *Brown, supra* at 433; *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272 (1982); *Mobile v. Bolden,* 446 U.S. 55, (1980); *White v. Regester,* 412 U.S. 755 (1973); *Whitcomb v. Chavis,* 403 U.S. 124, (1971). Accordingly, Texas NAACP applies the existing intentional vote dilution standard to its claims in this case.

  A. **Texas NAACP Has Established Discriminatory Effect**

    1. **Dr. Duchin's Uncontroverted Analysis Demonstrates that HB 4 is Race-Based and Cannot Be Explained by Partisanship**

The evidentiary record supports a finding that Plan C2333 (HB 4) has a discriminatory effect on Black and other people of color. Plaintiff's expert Dr. Moon Duchin found that partisan considerations do not explain the racial composition of the districts at issue. Texas NAACP FOF ¶ 43. Analyzing clusters of districts in the Dallas/Fort Worth area, Harris and Fort Bend counties, and Bexar/Travis county area, Dr. Duchin first concluded that while the population growth both statewide and specific to the clusters is primarily attributable to people of color, Plan C2333 decreases their ability to elect candidates of their choice. *Id.* at ¶ 50.

She then prepared dot density analyses, performance analyses, and ensemble analyses of each district cluster. *Id.* at ¶¶ 49-65. The dot density maps serve as visual representation of the packing and cracking of voters of color in the district clusters, providing evidence of sorting voters on the basis of race. *Id.* at ¶¶ 55; 59. Her performance analyses indicate that Plan C2333 yields a net loss of three performing Congressional districts for Black and other voters of color—a loss of one district in each cluster. *Id.* at ¶¶ 56; 60; 62.

Dr. Duchin's ensemble analysis in each district cluster further demonstrates packing and cracking of voters of color, accounting for the litany of traditional redistricting criteria noted in *Alexander*, 602 U.S. at 43-44, as well as three different measures of partisanship: (1) maximizing

4

republican success based on 29 general election results; (2) maximizing partisanship based on President Trump's 2016, 2020, and 2024 election performance; and (3) maximizing partisanship solely based on Trump's 2024 election performance. Texas NAACP FOF at ¶ 49. She then applied four winnowing conditions, including but not limited to additional measures of partisanship and avoiding pairing incumbents based on the address information available to her, to randomly select a sub-sample of 40,000 maps in each cluster. *Id.* at ¶ 50. Her findings in the Dallas/Tarrant county cluster show that all or nearly all of the 40,000 maps she produced achieve similar partisan outcomes without the same extreme level of cracking and packing of voters of color. *Id.* at ¶ 57. In the Harris/Fort Bend county cluster, Dr. Duchin indicates that none of the maps in either of the 40,000 maps in her ensemble had a level of packing and cracking of voters as extreme as in Plan C2333. Id. at ¶ 61. She also finds a similar, albeit not as extreme, pattern of packing and cracking of voters of color in the Bexar/Travis county cluster that is indicative of dilution of minority voting strength. *Id.* at ¶ 63. In addition, Dr. Duchin conducted a series of robustness checks of her ensemble analysis using additional factors that included optimizing republican wins and matching the number of districts with a Trump 2024 vote share over 55%, among other factors. None of the criteria changed her findings. *Id.* at ¶ 51. Moreover, Defendants offered no expert analysis to rebut her analysis or conclusions.

    **2. Lay Witness Testimony Corroborates Dr. Duchin's Analysis**

Texas NAACP presented testimony from two of its members, Tiffinni Young and Shemaiah Stokes. Ms. Young, a resident of Dallas, Texas, explained that since 2019 she has been drawn into three different congressional districts: CD 30 in 2013, CD 32 in 2021, and now CD 33 in 2025. *Id.* at ¶¶ 32-34. Each redraw further submerged her heavily minority community into districts that dilute her community of interest and add non-diverse areas, making it increasingly difficult for her to elect her candidate of choice. *See* 10/2 PM Rough Hearing Tr. 6:16-20:1. Dr. Duchin's

5

performance analysis indicates that while CD 33 performed for Black and other voters of color under C2193, it no longer performs as such under C2333. Texas NAACP FOF ¶ 55.

Ms. Stokes, a resident of San Antonio, Texas, testified that under C2193 she resided in CD 35, which contains urban and suburban areas of Travis and Bexar counties and the counties connecting them. The district had pockets of the Black community that shared a community of interest and common needs that they want their legislative representative to address. *Id.* at ¶ 27. Under C2333, the new configuration of CD 35 excludes Black community pockets in urban and suburban areas and added non-diverse rural areas of new counties. *Id.* at ¶ 28. She explained that these counties have many different needs than she and other voters of color have and that the new construction of CD 35 will dilute her vote. *Id.* at ¶ 29. As with Ms. Young's district, Dr. Duchin's performance analysis demonstrates that while CD 35 performed for Black and other voters of color under C2193, these voters can likely nominate—but almost never elect—their preferred candidate of choice under C2333. *Id.* at ¶ 60.

### B. The State of Texas Has an Extensive and Recent History of Discrimination in Voting

This Court has already found that Texas has a history of discrimination in voting, focusing its analysis on incidents "reasonably contemporaneous with the challenged decision." *McCleskey v. Kemp*, 481 U.S. 279, 298 n. 20 (1987); ECF 278 at 34-35. Plaintiff Texas NAACP presented evidence in the May/June 2025 trial from historical expert Dr. Monica Munoz Martinez that not only catalogued Texas's history of discrimination in voting from its inception, but also identified recent incidents of discrimination beyond this Court's earlier findings. ECF 1113 at 8. Linda Lewis reinforced Dr. Martinez's testimony, offering the Court further recent evidence of discrimination in voting through her work as a member of the Texas NAACP. *Id.* at 8-9. Defendants offer no new evidence at this stage that refutes this Court's findings.

### C. The Sequence of Events and Contemporaneous Statements Support a Finding of Intentional Discrimination

This record proves that the sequence of events and contemporaneous statements are not only indicia, but direct evidence of race-based redistricting. *See* Texas NAACP FOF ¶¶ 11-24. *First*, the July 7 DOJ Letter explicitly directs the State of Texas to dismantle four "coalition districts"—CDs 9, 18, 29[2], and 33—which by its very nature requires consideration of race to ameliorate purported—but obviously nonexistent—constitutional infirmities.[3] PL_TXNAACP 181_PI. It is not "well established," as the Letter states, that coalition districts run afoul of the Voting Rights Act ("VRA") and the Fourteenth Amendment. *Petteway* does not stand for the proposition that the existence of coalition districts is impermissible as a matter of law, only that they cannot be the basis for a VRA § 2 claim. *See Petteway v. Galveston Cnty.*, 111 F.4th 596, 603 (5th Cir. 2024). Even Defendants concede that the Letter's legal rationale is "faulty." ECF 1195 at 13. However, the DOJ Letter relies on this flawed reasoning as the basis to demand redrawing of the four majority-minority districts.

*Second*, Governor Abbott's July 9 Proclamation and media statements pick up the mantle of the DOJ Letter's demand to dismantle coalition districts, echoing its misinterpretation of *Petteway*. Abbott did not call for congressional redistricting until *after* DOJ issued its Letter, hearkening to its purported "constitutional concerns" as the basis for adding mid-decade redistricting to the special session agenda. PL_TXNAACP 182_PI; TX NAACP FOF ¶¶ 17-18. Lieutenant Governor Dan Patrick and Speaker of the House Dustin Burrows likewise parroted these sentiments, indicating "close collaboration between the House and Senate on legislation to

---

[2] The DOJ Letter erroneously describes CD 29 as coalition district. CD 29 under Plan C2193 was a majority-Hispanic district.
[3] One reason it is obvious that the Court did not address the constitutionality of coalition districts is that the Court remanded for consideration of constitutional issues raised by the plaintiffs. *Petteway*, 111 F.4th at 614.

address concerns raised by the Department of Justice over Texas congressional districts." PL_TXNAACP 177_PI. Governor Abbott reiterated throughout the redistricting process that *Petteway* allowed the State of Texas to dismantle coalition districts and that the new map would yield four new Hispanic republican districts. *See, e.g.,* Brooks FOF at ¶ 336-37; PL_TXNAACP 209_PI. Even when confronted directly about partisan aims, Abbott stated that the reason why they were engaging in mid-decade redistricting "is because of that court decision [*Petteway*]." PL_TXNAACP 175_PI. Governor Abbott, moreover, expressly stated that the goal was to "remove" coalition—i.e. majority minority—districts. *See* Brooks FOF at ¶ 336-37.

*Third*, Legislators repeatedly emphasized *Petteway* as the basis for its redistricting and adopted the Kincaid map because it met the Legislature's goals of not only increasing partisan advantage but also dismantling coalition districts in accordance with *Petteway*. *See, e.g.*, TX NAACP FOF ¶¶ 23-24. Shortly after the introduction of Plan C2308, Representative Tom Oliverson, Chair of the House Republican Caucus, stated on August 6 that the Legislature was not redrawing because of President Trump's request, but rather "as a result of a court case [*Petteway*] where a federal appeals court basically rejected the idea of the coalition districts…" Brooks Exh. 327 at 0:53-1:54. After lead bill sponsor Representative Todd Hunter introduced Plan C2333, he made several statements in the House floor debate indicating that:

- His counsel reviewed the DOJ letter and "took it all into account, and then we came up with this plan…" PL_TXNAACP 194_PI at 111:6-16;

- "[R]ace is a discussion factor, and so is political performance…The problem is we've had new court cases [Petteway] that provide new elements to the redrawing and redistricting, and that is what we're following." *Id.* at 127:2-9; and

- *Petteway* "also says there's not a requirement that you have to use coalition [districts]…So, today, this map is taking those in factor." Brooks Exh. 316-T at 122:1-9.

Once the House passed HB 4 on August 20, Speaker Burrows' press release noted that it "delivered legislation to redistrict certain congressional districts to address concerns raised by the Department

8

of Justice." PL_TXNAACP 185_PI. Senate Redistricting Committee Chair Phil King's testimony confirms that the House led the charge on Congressional redistricting, noting that he did not engage in any map drawing and that he had his counsel review maps for legal compliance. 10/9 AM Rough Hearing Tr. at 135:22-136:25; 10/9 PM Rough Hearing Tr. at 38:10-15. Even as recently as October 2, Representative Steve Toth reaffirmed that the Legislature's motivation for redistricting was that, "[i]t was required of us to do it [sic] in response to *Petteway* to get compliant…" Brooks Ex. 339 at 1:49-2:14. The evidentiary and legislative record demonstrates that race-based redistricting was one of the purposes of pursuing mid-decade redistricting and passing Plan C2333.

### D. Procedural and Substantive Departures Support a Finding of Intentional Discrimination

Legislators executed the racial directive of the DOJ letter swiftly by suspending or completely ignoring procedural and substantive rules to rush a new Congressional plan into effect. In doing so, the redistricting process was marred by several substantive and procedural departures. First, the Senate had to establish a redistricting committee during the first special session; no committees existed during the regular session earlier this year because legislators had not planned to redistrict any of their prior maps. Brooks FOF at ¶ 300. Second, the Legislature restricted public comment and access to public hearings. The Legislature held regional hearings for public comment prior to introducing any proposed maps and each chamber varied in its accessibility to the public. While the House held its hearings both in person and virtually, the Senate only hosted its hearings virtually. *Id.* at ¶¶ 304-306. The Legislature continued to limit public participation after introducing proposed maps either outright in some hearings, or by providing minimal notice before holding other public hearings. *See id.* at ¶¶ 307-308. In the Senate, legislators suspended notice requirements for the second session.

9

Third, the Legislature engaged in procedural and substantive gamesmanship throughout the process. Republican committee leadership imposed restrictive special procedures for legislators to introduce amendments to the bills and rushed votes through committee. *See id.* at ¶¶ 327-28. Legislative leadership and bill sponsors did not draw any maps, nor did they consult the Attorney General's office for legal compliance as in prior redistricting cycles; outside counsel for Representative Hunter, Representative Cody Vasut, and Senator King, respectively, reviewed proposed maps for compliance. *See id.* at ¶¶ 311-12, 318, 322, 324. Furthermore, they did not confer with minority legislators to take into account communities of interest or other relevant redistricting criteria, another departure from longstanding practice. *Id.* at ¶ 325-326, 329. While in 2021, Senator Huffman testified that she held one-on-one meetings with legislators to seek their input, opponents in this round were not consulted even about the contours of their own Congressional districts. *Id*. In fact, no member of the Black Caucus had an opportunity to provide input on the map. *Id.* at ¶ 326. These procedural and substantive departures support an inference of discriminatory intent.

## II. Texas NAACP Has Proven Its Racial Gerrymandering Claims

A racial gerrymandering claim asserts "that race was improperly used in the drawing of the boundaries" of an electoral district. *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262–63 (2015). Sorting voters predominantly on the basis of their race is a "racial classification" that inflicts individualized harm on voters living within those districts. *Id.* at 263; *Shaw v. Reno*, 509 U.S. 630, 643–44 (1993). Such classifications are suspect "regardless of purported motivation." *Id.*

Courts engage in a two-step analysis to assess whether a district is an unconstitutional racial gerrymander. *Cooper v. Harris*, 581 U.S. 285, 291 (2017). Plaintiffs must show that "race was the 'predominant factor motivating the legislature's decision to place a significant number of voters

10

within or without a particular district.'" *Alexander*, 602 U.S. at 7, quoting *Miller*, 515 U.S. at 915-16. "[T]he sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics." *Cooper*, 581 U.S. at 308 n.7; accord *Bush v. Vera*, 517 U.S. 952, 968–70 (1996) (plurality opinion) (race predominated where Black population was "spread[]" between districts in order to protect incumbents); *Miller*, 515 U.S. at 914 ("use of race as a proxy" for "political interest[s]" is "prohibit[ed]").

Once a plaintiff has shown that the racial considerations predominated in the creation of the map, the drawing of the map must withstand strict scrutiny. *Alexander*, 602 U.S. at 11. The burden shifts to the jurisdiction to assess whether the race-based drawing is narrowly tailored to a compelling government interest. *Id.*

### A.   The DOJ Letter and Legislator Statements are Direct Evidence of Racial Predominance

When analyzing claims racial gerrymandering claims, a showing of racial predominance can be made by a combination of direct and circumstantial evidence. *Cooper,* 581 U.S. at 291. As noted, "[d]irect evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S at 9. As explained above, *supra* at I.C., dismantling of coalition districts necessarily requires a consideration of race by virtue of their makeup as multi-racial majority districts. The DOJ Letter is clear in its instruction to the State of Texas to redraw CD 9, CD 18, CD 29, and CD 33 because DOJ characterized these districts as illegal racial gerrymanders, based on a patently unsupportable reading of the law. PL_TXNAACP 181_PI. The Letter's reliance on *Petteway* as a justification for redrawing these districts demonstrates the racial context surrounding Texas's mid-decade

11

redistricting.[4] This misapplication of *Petteway* is the throughline connecting the DOJ Letter to the Governor's and Legislature's repeated statements that not only did redistricting occur because of Petteway, but also that Plan C2333 as drawn by Adam Kincaid complies with their interpretation of *Petteway's* demands.

### B. Dr. Duchin's Analysis Proves That Race Predominated Over Traditional Redistricting Principles

Dr. Duchin constructed her ensemble analysis based on the traditional redistricting principles identified in *Alexander*, 602 U.S. at 43-44: compactness, contiguity, respect for political subdivisions, communities of interest, incumbency, partisanship, urban character, media sources, transportation networks, and least change from a preferred map. TX NAACP FOF ¶¶ 49-51; PL_TXNAACP 208_PI at 22. When taking these criteria into account and winnowing her sample size of maps, her findings indicate that partisanship does not explain the drastic cracking and packing of people of color in any of the district clusters. *Id.* at ¶¶ 57; 61; 63. This disentangling of race and partisanship demonstrates that race predominated in the creation of Plan C2333. Again, no expert refutes the evidence Dr. Duchin proffered to the Court. The testimony of Adam Kincaid is no substitute. While he asserts that he drew the map based on race, the Court has no way to assess the veracity of his assertion because he provided no evidence comparable to any of the experts in this case of how he drew the map in real time, let alone any evidence of instructions he received indicating why he drew the map as he did. The evidence shows, moreover, that Kincaid was aware of DOJ's instruction to dismantle the so-called coalition districts, and the evidence further shows that the so-called coalition districts were not such in his map. 10/7 Rough Hearing Tr. at 49:7-51:14. Defendants' partisan-shaded exhibits are a post-hoc justification prepared for the

---

[4] *See, e.g. Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) ("[I]f there were a showing that a State, intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments.").

12

hearing based on arbitrary determinations of how much partisanship to depict in each area of interest. 10/8 Rough Hearing Tr. at 74:16-24.

Furthermore, Dr. Duchin's ensembles provide the Court with alternative maps that are consistent with traditional districting principles and the Legislature's political objectives. *See Alexander*, 602 U.S. at 10. The ensembles are specific to the respective district cluster, meaning that the alternative maps produced for each cluster can be placed into Plan C2333 without requiring further configuration to the remainder of the map. 10/6 Rough Hearing Tr. at 27:21-28:18; PL_TXNAACP 208_PI at 2. Plaintiff Texas NAACP's ensembles of alternative maps defeat the presumption of legislative good faith otherwise afforded to the State. *See Alexander*, 602 U.S. at 10.

### C. Defendants Cannot Survive Strict Scrutiny

Defendants have not argued that any race-based sorting of voters in Plan C2333 is narrowly tailored to a compelling government interest. Partisan gerrymandering under *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) held that partisan gerrymandering claims are nonjusticiable, not that they are a permissible justification for drawing districts on the basis of race. Furthermore, neither the Legislature nor Mr. Kincaid have offered any evidence in this record that compliance with the Voting Rights Act required the changes to Black and Hispanic citizen voting age population to create bare-majority CVAP districts or reduce their respective proportions in the challenged districts.

### III. Texas NAACP Faces a Threat of Substantial Threat of Irreparable Injury Absent Injunctive Relief

Plan C2333 violates the constitutional rights of Black and other voters of color by dismantling CDs 32, 33, 9, and 35, and diminishing their opportunity to elect their preferred candidates. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("[T]he loss of constitutional freedoms 'for even minimal periods of time … unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), aff'd sub nom. *De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."). The Constitution guarantees equal protection of the law and freedom from discrimination in voting. *See* U.S. Const. amend. 14 § 1, 15 § 1. Votes, once cast, are virtually irrevocable. Voters can rarely correct constitutional violations. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."). Absent intervention from this Court, Texas NAACP members thus will be irreparably injured by having to vote in unconstitutional Congressional districts that dilute their voting strength as shown by Dr. Duchin.

### IV. The Balance of the Equities and Public Interest Weighs in Favor of Texas NAACP

Courts assess the balance of the equities and the public interest together because they "overlap considerably." *Nken v. Holder*, 556 U.S. 418, 435 (2009). With interlocutory stays, "[t]hese factors merge when the Government is the opposing party." *Id*. Ridding maps of unconstitutional racial discrimination outweighs any interest that Defendants have or burdens they may face as to the challenged redistricting plan. *See Jackson Women's Health Organization v. Currier*, 760 F.3d 448, 458 n. 9 (5th Cir. 2014). Furthermore, injunctions that prevent constitutional violations are "always in the public interest." *Ingebresten on Behalf of Ingebretsen v. Jackson*

14

*Public School District*, 88 F.3d 274, 280 (5th Cir. 1996) (appellants met the public interest requirement for preliminary injunction based on unconstitutionality of school prayer statute). Candidates have until December 8 to file any required paperwork to confirm their eligibility to run, giving the Court time to order implementation of a remedy without running afoul of *Purcell v. Gonzalez,* 549 U.S. 1 (2006). *See* Brooks FOF ¶ 392-94.  Both the balance of the equities and public interest weigh in favor of a preliminary injunction.

## CONCLUSION

The Court should issue an order determining that Defendants are liable for the Equal Protection violations proven in the preliminary injunction hearing and order a remedy into place.

Dated: October 17, 2025

>Respectfully submitted,
>
>/s/ Lindsey B. Cohan
>Lindsey B. Cohan
>Texas Bar No. 24083903
>DECHERT LLP
>515 Congress Avenue, Suite 1400
>Austin, TX 78701
>(512) 394-3000
>lindsey.cohan@dechert.com
>
>Robert Weiner
>David Rollins-Boyd*
>Jennifer Nwachukwu
>Jeremy Lewis*
>LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
>1500 K Street, Suite 900
>Washington, DC 20005
>(202) 662-8600
>robert.weiner@lawyerscommittee.org
>drollins-boyd@lawyerscommittee.org
>jnwachukwu@lawyerscommittee.org
>jlewis@lawyerscommittee.org
>
>Neil Steiner*

15

DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
*neil.steiner@dechert.com*

Robert Notzon
Texas Bar No. 00797934
THE LAW OFFICE OF ROBERT NOTZON
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
*robert@notzonlaw.com*

Gary Bledsoe
Texas Bar No. 02476500
THE BLEDSOE LAW FIRM PLLC
6633 Highway 290 East #208
Austin, Texas 78723-1157
(512) 322-9992
*gbledsoe@thebledsoelawfirm.com*
*Attorney only as to Texas NAACP's claims related to Texas state senate and state house plans*

Anthony P. Ashton*
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*aashton@naacpnet.org*

Janette M. Louard
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*jlouard@naacpnet.org*
*Attorneys appearing of counsel*

*Admitted *pro hac vice*.

*ATTORNEYS FOR THE TEXAS STATE CONFERENCE OF NAACP*

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing and all attachments were filed and served on counsel of record via the Court's electronic filing system on October 17, 2025.

>*/s/ Lindsey B. Cohan*
>Lindsey B. Cohan
>*Counsel for Plaintiff Texas NAACP*