### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs*, | § § | |
| ALEXANDER GREEN, *et al.*, | § § | **EP-21-CV-00259-DCG-JES-JVB** **[Lead Case]** |
| *Plaintiff-Intervenors*, v. | § § § | **&** |
| GREG ABBOTT, *in his official capacity as Governor of the State of Texas*, *et al.*, | § § § § | **All Consolidated Cases** |
| *Defendants*. | § | |

### MEMORANDUM OPINION AND ORDER
### GRANTING PRELIMINARY INJUNCTION

JEFFREY V. BROWN, United States District Judge:[1]

      In August 2025, the State of Texas enacted a new electoral map to govern elections for the U.S. House of Representatives (the "2025 Map"). Claiming that the 2025 Map is racially discriminatory, six groups of Plaintiffs (the "Plaintiff Groups") ask the Court to preliminarily enjoin the State from using the 2025 Map for the 2026 elections.

      For the reasons explained below, the Court **PRELIMINARILY ENJOINS** the State from using the 2025 Map. The Court **ORDERS** that the 2026 congressional election in Texas shall proceed under the map that the Texas Legislature enacted in 2021 (the "2021 Map").

---

[1] U.S. District Judge Jeffrey V. Brown delivers the opinion of the Court, which Senior U.S. District Judge David C. Guaderrama joins. U.S. Circuit Judge Jerry E. Smith will file a dissenting opinion.

## I.    INTRODUCTION

**"The way to stop discrimination on the basis of race
is to stop discriminating on the basis of race."[2]**

**—Chief Justice John Roberts**

The public perception of this case is that it's about politics. To be sure, politics played a role in drawing the 2025 Map. But it was much more than just politics. Substantial evidence shows that Texas racially gerrymandered the 2025 Map. Here's why.

Earlier this year, President Trump began urging Texas to redraw its U.S. House map to create five additional Republican seats. Lawmakers reportedly met that request to redistrict on purely partisan grounds with apprehension. When the Governor announced his intent to call a special legislative session, he didn't even place redistricting on the legislative agenda.

But when the Trump Administration reframed its request as a demand to redistrict congressional seats based on their racial makeup, Texas lawmakers immediately jumped on board. On July 7, Harmeet Dhillon, the head of the Civil Rights Division at the Department of Justice ("DOJ"), sent a letter ("the DOJ Letter") to the Governor and Attorney General of Texas making the legally incorrect assertion that four congressional districts in Texas were "unconstitutional" because they were "coalition districts"—majority-non-White districts in which no single racial group constituted a 50% majority. In the letter, DOJ threatened legal action if Texas didn't immediately dismantle and redraw these districts—a threat based entirely on their racial makeup. Notably, the DOJ Letter targeted only majority-non-White districts. Any mention of majority-White Democrat districts—which DOJ presumably would have also targeted if its aims were partisan rather than racial—was conspicuously absent.

---

[2] *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007) (Roberts, C.J., writing for Justices Scalia, Thomas, and Alito).

Two days later, citing the DOJ Letter, the Governor added redistricting to the special session's legislative agenda. In doing so, the Governor explicitly directed the Legislature to draw a new U.S. House map to resolve DOJ's concerns. In other words, the Governor explicitly directed the Legislature to redistrict based on race. In press appearances, the Governor plainly and expressly disavowed any partisan objective and instead repeatedly stated that his goal was to eliminate coalition districts and create new majority-Hispanic districts.

The Legislature adopted those racial objectives. The redistricting bill's sponsors made numerous statements suggesting that they had intentionally manipulated the districts' lines to create more majority-Hispanic and majority-Black districts. The bill's sponsors' statements suggest they adopted those changes because such a map would be an easier sell than a purely partisan one. The Speaker of the House also issued a press release celebrating that the bill satisfactorily addressed DOJ's "concerns." Other high-ranking legislators stated in media interviews that the Legislature had redistricted not for the political goal of appeasing President Trump nor of gaining five Republican U.S. House seats, but to achieve DOJ's racial goal of eliminating coalition districts.

The map ultimately passed by the Legislature and signed by the Governor—the 2025 Map—achieved all but one of the racial objectives that DOJ demanded. The Legislature dismantled and left unrecognizable not only all of the districts DOJ identified in the letter, but also several other "coalition districts" around the State.

For these and other reasons, the Plaintiff Groups are likely to prove at trial that Texas racially gerrymandered the 2025 Map. So, we preliminarily enjoin Texas's 2025 Map.

## II.    BACKGROUND

### A.    The Law Governing Racial Discrimination Challenges to Redistricting Plans

Because "racial discrimination in voting . . . cannot coexist with democratic self-government," federal law provides various avenues for challenging an electoral map as racially discriminatory.[3] There are at least three avenues to do so.

### 1.    Racial Gerrymandering

First, a plaintiff can bring a racial-gerrymandering claim under the Fourteenth and Fifteenth Amendments.[4] A racial-gerrymandering claim alleges that the "State, without sufficient justification," has "separat[ed] its citizens into different voting districts on the basis of race."[5] The plaintiff "must prove that the State subordinated race-neutral districting criteria . . . to racial considerations," such that race was "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."[6]

### 2.    Intentional Vote Dilution

Second, a plaintiff can bring an intentional vote-dilution claim, which is "analytically distinct from a racial-gerrymandering claim and follows a different analysis."[7] An intentional vote-

---

[3] *Jackson v. Tarrant County*, --- F.4th ----, 2025 WL 3019284, at *7 (5th Cir. Oct. 29, 2025) (citation modified).

We adhere to our prior ruling that we must follow published Fifth Circuit opinions as binding precedent, *see League of United Latin Am. Citizens v. Abbott*, 767 F. Supp. 3d 393, 401 & n.18 (W.D. Tex. 2025), even though any appeals from this order will go directly to the Supreme Court instead of the Fifth Circuit, *see* 28 U.S.C. § 1253.

[4] *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-00259, 2022 WL 4545757, at *1 n.9 (W.D. Tex. Sept. 28, 2022) [hereinafter *Intervenors MTD Op.*] (noting that "[c]ourts agree that racial gerrymandering can violate the Fourteenth and Fifteenth Amendments alike").

[5] *E.g.*, *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (citation modified).

[6] *E.g.*, *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024) (citation modified).

[7] *E.g.*, *id.* at 38 (citation modified).

dilution claim alleges that the State has "enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities."[8] Intentional vote dilution violates both the Constitution[9] and Section 2 of the Voting Rights Act ("VRA § 2").[10] To prevail on an intentional vote-dilution claim, "the plaintiff must show that the State's districting plan has the purpose *and* effect of diluting the minority vote."[11]

### 3.    Effects-Based Vote Dilution ("*Gingles*" Claims)

Both of the first two claims require the plaintiff to prove that the Legislature acted with some sort of unlawful intent.[12] To supplement these intent-based causes of action, Congress amended VRA § 2 to enable plaintiffs to challenge electoral maps based on their racially dilutive effects alone.[13]

---

[8] *E.g.*, *id.* (citation modified).

[9] We have no occasion or need to decide whether intentional vote dilution violates the Fourteenth Amendment to the Constitution, the Fifteenth Amendment, or both. *See, e.g.*, *Intervenors MTD Op.*, 2022 WL 4545757, at *1 n.7 (noting that "[t]he Supreme Court has not yet [answered that question] conclusively").

[10] *See, e.g.*, *Garza v. County of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990) ("To the extent that a redistricting plan deliberately minimizes minority political power, it may violate both the Voting Rights Act and the Equal Protection Clause of the fourteenth amendment.").

[11] *E.g.*, *Alexander*, 602 U.S. at 39 (citation modified).

[12] *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 162 (W.D. Tex. 2022) [hereinafter *1st Prelim. Inj. Op.*] (remarking that racial-gerrymandering and intentional vote-dilution claims "both require discriminatory intent").

[13] *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 493 (W.D. Tex. 2022) ("Before [the 1982 amendments to the VRA], intent was integral to any Section 2 claim . . . . The 1982 amendments removed that requirement, allowing plaintiffs to show a violation by demonstrating discriminatory effect." (citations omitted)).

To prevail on an effects-based vote-dilution claim under VRA § 2, a plaintiff must satisfy what are known as the three "*Gingles*" preconditions.[14] The first and second *Gingles* preconditions are both defined with reference to a "minority group": Precondition #1 asks whether a "minority group [is] sufficiently large and geographically compact to constitute a majority in a reasonably configured district" that the Legislature could have drawn, while Precondition #2 asks whether "the minority group . . . is politically cohesive."[15]

Critical to this case, the law governing how to define the requisite "minority group" has shifted over time. From 1988 to 2024, a Fifth Circuit case, *Campos v. City of Baytown*, permitted *Gingles* claimants to define the "minority group" as a coalition of two or more races.[16] *Campos* thus permitted plaintiffs to satisfy the *Gingles* prerequisites by showing that it would be possible to draw a "coalition district"—a district in which no single race constitutes more than 50% of the voting population, but in which the total minority CVAP exceeds 50% in the aggregate.[17] To avoid the possibility that a court might invalidate their districting plans under *Campos*, legislatures sometimes needed to preemptively enact maps that contained one or more coalition districts.

---

[14] *See generally Thornburg v. Gingles*, 478 U.S. 30 (1986); *see also, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 614 (2018) ("To make out a § 2 'effects' claim, a plaintiff must establish the three so-called '*Gingles* factors.'").

The plaintiff must also "show, under the totality of the circumstances, that the political process is not equally open to minority voters." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (citation modified). That additional requirement isn't pertinent here.

[15] *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 18 (2023).

[16] *See Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988) ("There is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics."), *overruled by Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024) (en banc).

[17] *See, e.g.*, *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion) (defining a "coalition district" as one "in which two minority groups form a coalition to elect the candidate of the coalition's choice").

In 2024, however, the en banc Fifth Circuit overruled *Campos* in *Petteway v. Galveston County*.[18] *Petteway* holds that "Section 2 of the Voting Rights Act does not authorize separately protected minority groups to aggregate their populations for purposes of a vote dilution claim."[19] To satisfy *Gingles*'s 50% threshold, a plaintiff in this Circuit must now prove that a single racial group could constitute a numerical majority in the plaintiff's proposed district—not a coalition of two or more racial groups.[20]

*Petteway* changed the applicable standard only for effects-based vote-dilution claims under VRA § 2 and *Gingles*.[21] *Petteway* did not modify the legal standards governing intentional vote-dilution claims or racial-gerrymandering claims under the Constitution because no such claims were before the en banc court.[22]

---

[18] *See Petteway*, 111 F.4th at 599 ("We OVERRULE *Campos* . . . .").

[19] *Id.* at 603.

[20] *See, e.g.*, *id.* at 610 ("When, as here, a minority group cannot constitute a majority in a single-member district without combining with members of another minority group, Section 2 does not provide protection.").

[21] *See, e.g.*, *id.* at 599 ("The issue in this *en banc* case is whether Section 2 of the Voting Rights Act authorizes coalitions of racial and language minorities to claim vote dilution in legislative redistricting."); *id.* at 601 ("The primary issue here concerns the first Gingles precondition . . . .").

[22] *See id.* at 600 ("Following a ten-day bench trial, the district court found that the enacted plan violated Section 2 . . . . The district court declined to reach the intentional discrimination and racial gerrymandering claims brought by the Petteway Plaintiffs and NAACP Plaintiffs because the relief they requested with respect to those claims was no broader than the relief they were entitled to under Section 2.").

*See also, e.g.*, *id.* at 599 n.1 ("[T]he issue of intentional discrimination was not part of the district court's Section 2 ruling. The court withheld ruling on that constitutional issue, which we remand for further consideration.").

Furthermore, *Petteway* holds only that "Section 2 does not require" legislatures "to draw precinct lines for the electoral benefit of" multiracial coalitions.[23] *Petteway* nowhere implies that legislatures must deliberately avoid drawing coalition districts—or that a legislatively drawn map that happens to contain one or more coalition districts is somehow unlawful.[24] This point is critical to this case.

### 4.    Partisan Gerrymandering

In *Rucho v. Common Cause*, the Supreme Court ruled that partisan gerrymandering claims aren't cognizable in federal court.[25] Subject to legal restrictions that exist in some states, but not in Texas,[26] it is not illegal for a legislature to enact a redistricting plan with the purpose of favoring one political party over another.[27] When a plaintiff brings race-based gerrymandering claims, "partisan motivation [acts] as a defense, not a jurisdictional bar."[28] These principles will likewise prove critically important below.[29]

---

[23] *See id.* at 614.

[24] *See generally id.* at 599–614; *see also infra* Section II.D.

[25] *See* 588 U.S. 684, 718 (2019) ("[P]artisan gerrymandering claims present political questions beyond the reach of the federal courts.").

[26] *See id.* at 719–20 (noting that "numerous other States" have "restrict[ed] partisan considerations in districting through legislation," and that several States "have outright prohibited partisan favoritism in redistricting"); *see also id.* at 720–21 (remarking that the U.S. Congress could theoretically pass legislation to restrict partisan gerrymandering).

[27] *See, e.g., Alexander*, 602 U.S. at 6 ("[A]s far as the Federal Constitution is concerned, a legislature may pursue partisan ends when it engages in redistricting.").

[28] *Jackson*, 2025 WL 3019284, at *6.

[29] *See infra* Section III.B.2.

**B.    The 2021 Map**

In 2021—four years before the Legislature enacted the 2025 Map challenged here—the State redrew its congressional map to account for population shifts in the 2020 census.[30] Four of the 2021 Map's congressional districts ("CDs") are especially relevant here.

---

[30] *See, e.g.*, *1st Prelim. Inj. Op.*, 601 F. Supp. 3d at 155–56.

*See also, e.g.*, *Jackson*, 2025 WL 3019284, at *2 ("To comply with the federal 'one person, one vote' principle . . . states and their political subdivisions must generally redistrict upon release of the decennial census to account for any changes or shifts in population." (citation modified)).

The first is **CD 9**, in the Houston area:



Although CD 9 was majority non-White under the 2021 Map, no single racial group constituted a 50%+ majority by CVAP. The district was 45.0% Black, 25.6% Hispanic, 18.1% White, and 9.3% Asian.[31]

---

[31] *See* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1.

Here and below, the numbers don't add up to 100% because the Court has omitted the percentages of voters belonging to racial groups that are not numerous in Texas, such as Native Hawaiians and American Indians. *See, e.g.*, *id.* (noting that the 2021 version of CD 9 was 0.2% American Indian by CVAP). The Court of course does not imply any disrespect for those voters by doing so.

Additionally, all CVAP figures in this opinion are subject to a margin of error. *See, e.g.*, *id.*

The second relevant district is **CD 18**, also in the Houston area:



Like CD 9, CD 18 was majority non-White under the 2021 Map, with no single racial group constituting a 50%+ majority. The district was 38.8% Black, 30.4% Hispanic, 23.4% White, and 5.3% Asian.[32]

---

[32] *See id.*

The third relevant district is **CD 29**, also in the Houston area:



Unlike CD 9 and CD 18, the 2021 version of CD 29 was a single-race majority district—specifically, majority-Hispanic. By CVAP, the 2021 configuration of CD 29 was 63.5% Hispanic, 18.4% Black, 13.7% White, and 3.2% Asian.[33]

---

[33] *See id.*

The fourth relevant district is **CD 33**, in the Dallas/Fort Worth area:



Like CD 9 and CD 18, the 2021 version of CD 33 was majority non-White, with no single racial group constituting a 50%+ majority by CVAP. The district was 43.6% Hispanic, 25.2% Black, 23.4% White, and 5.7% Asian.[34]

---

[34] *See id.*

When the Legislature enacted the 2021 Map, the Fifth Circuit had not yet decided *Petteway*.[35] Because the 2021 versions of CDs 9, 18, and 33 were more than 50% non-White, with no single racial group constituting a numerical majority by CVAP, those districts were coalition districts.

The sponsor of the bill that became the 2021 Map, Senator Joan Huffman, stated repeatedly that the mapmakers did "not look[] at any racial data as [they] drew" the 2021 Map.[36] Instead, they based the district boundaries exclusively on race-neutral considerations like partisanship.[37] The

---

[35] *See Petteway*, 111 F.4th 596 (decided August 1, 2024); *see also supra* Section II.A.3.

[36] *See* Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 18.

*See also, e.g.*, *id.* at 17 ("[The 2021 Map] was drawn race blind. Any work we did on it was race blind."); *id.* at 19 ("Based on [the Supreme Court's] warning against race-based redistricting, I drafted all the proposed maps totally blind to race.").

[37] *See id.* at 17 ("[T]he maps were drawn blind to race. So adjustments were made for population. Sometimes for partisan shading and so forth. But those were the priorities that we used."); *id.* ("All the race neutral objectives were used . . . in drawing the maps . . . .").

Mr. Adam Kincaid—who was the outside mapmaker who drew all of the 2021 Map except for the four districts highlighted above (CDs 9, 18, 29, and 33), *see, e.g.*, Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 58–59—likewise testified that he didn't look at racial data when drawing the map. *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 19 ("I didn't look at the minority numbers in 2021 . . . ."); Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 87 ("[T]he entire 2021 map was drawn race-blind as far as I drew it.").

The four districts that Mr. Kincaid didn't draw resulted from amendments in the Texas House after the Senate passed Senator Huffman's bill. *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 58–59. Here too, the preliminary-injunction record contains no evidence that the Legislature made any of those changes to comply with *Campos*. The record instead suggests that the Legislature passed those amendments to eliminate incumbent pairing, respect communities of interest, and preserve economic engines within the districts. *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 2 (Morning), ECF No. 1415, at 79–86, 139; *see also Chen v. City of Houston*, 206 F.3d 502, 515 (5th Cir. 2000) (noting that "concern about communities of interest is a valid traditional districting tool that may serve to deflect an inference that race predominated in districting").

plan that the mapmakers drew on partisan grounds appeared to also satisfy VRA § 2 as *Campos* interpreted it, so the Legislature passed the map.[38]

If we take Senator Huffman at her word,[39] then any coalition districts that ended up in the 2021 Map were a coincidental by-product of the Legislature's decisions to draw district lines based on race-neutral considerations like partisanship. In other words, there's no evidence in the preliminary-injunction record that the Legislature purposefully drew coalition districts that it wouldn't have otherwise drawn based on concerns that a court would otherwise invalidate the 2021 Map under VRA § 2 and *Campos*.[40] Thus, there's no indication that the 2021 Legislature placed a thumb on the scale in favor of minority coalitions based on a now-discredited interpretation of § 2.

## C.    Calls to Redistrict for Political Purposes

Beginning in February or March 2025, and continuing in earnest in April and May, Republicans met with contacts in the White House to discuss the prospect of Texas redrawing its congressional map.[41] On June 9, 2025, the *New York Times* published an article reporting that

---

[38] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 19 ("Once I drafted the maps, I ensured that they underwent a legal compliance check to ensure that there were no inadvertent violations of the law, including the Voting Rights Act."); *id.* at 17 ("All the race neutral objectives were used . . . in drawing the maps that were drawn blind to race and then submitted [to outside attorneys for a legal compliance check]. And then our attorneys gave us—we were advised that [the maps] did not violate the Voting Rights Act. They were legally compliant.").

[39] Given the current procedural posture, we have no occasion to make binding, definitive findings about the 2021 Legislature's intent when devising and enacting the 2021 congressional map—or, for that matter, the Texas House and Senate maps that the Legislature also enacted in 2021. The latter were the subject of a bench trial we held several months ago, and the Court has yet to rule on them.

*See also, e.g.*, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[F]indings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

[40] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 9 (Afternoon), ECF No. 1345, at 123 (the State Defendants' closing argument at the preliminary-injunction hearing, agreeing that none "of the districts in the 2021 map were drawn based on race"); Defs.' Post-Hr'g Br., ECF No. 1284, at 30 (insisting that "districts in 2021 . . . were drawn race-blind").

[41] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 7–9, 17.

"President Trump's political team [was] encouraging Republican leaders in Texas to examine how House district lines in the state could be redrawn ahead of next year's midterm elections to try to save the party's endangered majority."[42] Contemporaneous press coverage indicated that partisan—rather than racial—motivations were behind the White House's redistricting push.[43]

By all appearances, however, Republican lawmakers didn't have much appetite to redistrict on purely partisan grounds—even at the President's behest. The same *New York Times* article reported that "[t]he push from Washington ha[d] unnerved some Texas Republicans, who worr[ied] that reworking the boundaries of Texas House seats to turn Democratic districts red by adding reliably Republican voters from neighboring Republican districts could backfire in an election that is already expected to favor Democrats."[44] "Rather than flip the Democratic districts," Texas lawmakers feared that "new lines could endanger incumbent Republicans."[45] At an emergency meeting in the Capitol shortly before the *New York Times* article was published, "congressional Republicans from Texas professed little interest in redrawing their districts."[46]

Perhaps due to this apparent lack of interest, when the Governor announced on June 23, 2025, that he was calling a special legislative session to address various issues, redistricting was not among them.[47] As far as some influential members of the Legislature were aware, the prospect

---

[42] *See* Defs.' Prelim. Inj. Ex. 1415, ECF No. 1364-5, at 2.

[43] *See id.*

[44] *See id.*

[45] *See id.*

[46] *See id.*

[47] *See* Gonzales Prelim. Inj. Ex. 35, ECF No. 1388-19, at 1–2; *see also* Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 119–20; Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 19.

of redistricting in 2025 was just a rumor.[48] In fact, at the bench trial this Court held on the 2021

Map in May–June 2025,[49] when counsel asked Senator Huffman whether "the Texas Legislature

might be considering redrawing the [c]ongressional [d]istricts" as the *New York Times* had reported

just one day earlier, Senator Huffman unequivocally responded: "They are not."[50]

### D.    The DOJ Letter

Instead, what ultimately spurred Texas to redistrict was a letter that DOJ sent to the

Governor and the Texas Attorney General on July 7, 2025.[51] The DOJ Letter exhorted Texas to

redistrict for a very different reason than the political objectives mentioned in the *New York Times*

article. Because the letter is critical to our analysis, we reproduce it here in full:

Re:    Unconstitutional Race-Based Congressional Districts
TX-09, TX-18, TX-29 and TX-33

Dear Governor Abbott and Attorney General Paxton,

This letter will serve as formal notice by the Department of Justice to the State of Texas of serious concerns regarding the legality of four of Texas's congressional districts. As stated below, Congressional Districts TX-09, TX-18, TX-29 and TX-33 currently constitute unconstitutional "coalition districts" and we urge the State of Texas to rectify these race-based considerations from these specific districts.

---

[48] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 2 (Morning), ECF No. 1415, at 90–91 ("Q. "Now, it's been stated by others that redistricting was in the conversation prior to [the DOJ Letter discussed later in this opinion] . . . . What do you say to that? | [REPRESENTATIVE THOMPSON:] I heard it all during the session, and I made inquiries about it. And I asked [Chairman Hunter] . . . if they were going to be redistricting. . . . [H]e said he didn't know. You know, I think he told me he was unaware of any redistricting. And he kind of brushed it off as though it just might have been just a rumor or something, you know.").

[49] The Legislature amended the State's congressional map before our panel was able to rule on the 2021 Map's legality.

[50] Trial Tr. (June 10, 2025), ECF No. 1413, at 54.

[51] *See generally* Brooks Prelim. Inj. Ex. 253, ECF No. 1326.

In *Allen v. Milligan*, 599 U.S. 1, 45 (2023), Justice Kavanaugh noted that "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." 599 U.S. 1, [sic] (Kavanaugh, J., concurring). In *SFFA v. Harvard*, the Supreme Court reiterated that "deviation from the norm of equal treatment" on account of race "must be a temporary matter." 600 U.S. 181, 228 (2023). When race is the predominant factor above other traditional redistricting considerations including compactness, contiguity, and respect for political subdivision lines, the State of Texas must demonstrate a compelling state interest to survive strict scrutiny.

It is well-established that so-called "coalition districts" run afoul the [sic] Voting Rights Act and the Fourteenth Amendment. In *Petteway v. Galveston County*, No. 23-40582 (5th Cir. 2024), the en banc Fifth Circuit Court of Appeals made it abundantly clear that "coalition districts" are not protected by the Voting Rights Act. This was a reversal of its previous decision in *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988). In *Petteway*, the Fifth Circuit aligned itself with the Supreme Court's decision in[52]

*Bartlett v. Strickland*, 556 U.S. 1 (2009), and determined that a minority group must be geographically compact enough to constitute more than 50% of the voting population in a single-member district to be protected under the Voting Rights Act. *See also Thornburg v. Gingles*, 478 U.S. 30 (1986). Opportunity and coalition districts are premised on either the combining of two minority groups or a minority group with white crossover voting to meet the 50% threshold. Neither meets the first *Gingle's* [sic] precondition. Thus, the racial gerrymandering of congressional districts is unconstitutional and must be rectified immediately by state legislatures.

It is the position of this Department that several Texas Congressional Districts constitute unconstitutional racial gerrymanders, under the logic and reasoning of *Petteway*. Specifically, the record indicates that TX-09 and TX-18 sort Houston voters along strict racial lines to create two coalition seats, while creating TX 29, a majority Hispanic district. Additionally, TX-33 is another racially-based coalition district that resulted from a federal court order years ago, yet the Texas Legislature drew TX-33 on the same lines in the 2021 redistricting. Therefore, TX-33 remains as a coalition district.

Although the State's interest when configuring these districts was to comply with Fifth Circuit precedent prior to the 2024 *Petteway* decision, that interest no longer exists. Post-*Petteway*, the Congressional Districts at issue are nothing more than vestiges of an unconstitutional racially based gerrymandering past, which must be abandoned, and must now be corrected by Texas.

---

[52] Abrupt line break in original. *See id.* at 2.

Please respond to this letter by July 7, 2025, and advise me of the State's intention to bring its current redistricting plans into compliance with the U.S. Constitution. If the State of Texas fails to rectify the racial gerrymandering of TX-09, TX-18, TX-29 and TX 33, the Attorney General reserves the right to seek legal action against the State, including without limitation under the 14th Amendment.[53]

It's challenging to unpack the DOJ Letter because it contains so many factual, legal, and typographical errors. Indeed, even attorneys employed by the Texas Attorney General—who professes to be a political ally of the Trump Administration[54]—describe the DOJ Letter as "legally[] unsound,"[55] "baseless,"[56] "erroneous,"[57] "ham-fisted,"[58] and "a mess."[59]

The gist of the letter, though, is that DOJ is urging Texas to change the racial compositions of CDs 9, 18, 29, and 33. From the premise that *Petteway* forbids a plaintiff from proposing a coalition district for purposes of an effects-based vote-dilution claim under VRA § 2,[60] DOJ leaps to the conclusion that whenever a legislature enacts a map that happens to contain one or more coalition districts, that legislature has necessarily and unconstitutionally engaged in "racial

---

[53] *Id.* at 1–2.

[54] *See* Defs.' Prelim. Inj. Ex. 1466, ECF No. 1380-25, at 4 ("My office stands ready to support President Trump, Governor Abbott, and the Texas Legislature in their redistricting goals and will defend any new maps passed from challenges by the radical Left.").

[55] *See* Defs.' Resp. Gonzales Pls.' Prelim. Inj. Mot., ECF No. 1199, at 12.

[56] *See id.* at 20.

[57] *See* Defs.' Resp. J. Prelim. Inj. Mot., ECF No. 1200, at 13, 30.

[58] *See id.* at 13.

[59] *See* Prelim. Inj. Hr'g Tr. Day 9 (Afternoon), ECF No. 1345, at 123.

[60] *See supra* Section II.A.3.

gerrymandering."[61] The remedy for such racial gerrymandering, according to DOJ, is to change the offending districts' racial makeup so that they no longer qualify as coalition districts.[62]

That reading of *Petteway* is clearly wrong. Nowhere in *Petteway* does the Fifth Circuit hold that merely having a coalition district in an electoral map is *per se* unconstitutional.[63] The *Petteway* court had no occasion to opine about the constitutionality of coalition districts. Instead, the en banc court remanded the case to the district court to consider the plaintiffs' constitutional claims in the first instance.[64]

Nor could *Petteway* stand for such a proposition. That would contradict the Supreme Court's admonition that "the Constitution does not place an affirmative obligation upon the legislature to avoid creating districts that turn out to be heavily . . . minority."[65] Rather, the Constitution "simply imposes an obligation not to create such districts for predominantly racial, as opposed to political or traditional, districting motivations."[66] Thus, even though federal courts in this Circuit can no longer force a legislative body to create a coalition district under VRA § 2,

---

[61] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1 (describing "coalition districts" as "unconstitutional"); *id.* at 2 (claiming that "'coalition districts' run afoul the [sic] Voting Rights Act and the Fourteenth Amendment"); *id.* ("It is the position of this Department that [CDs 9, 18, 29, and 33] constitute unconstitutional racial gerrymanders, under the logic and reasoning of *Petteway*.").

[62] *See id.* at 1 ("Congressional Districts TX-09, TX-18, TX-29 and TX-33 currently constitute unconstitutional 'coalition districts' and we urge the State of Texas to rectify these race-based considerations from these specific districts."); *id.* at 2 ("If the State of Texas fails to rectify the racial gerrymandering of TX-09, TX-18, TX-29 and TX 33, the Attorney General reserves the right to seek legal action against the State . . . .").

[63] *See generally Petteway*, 111 F.4th at 599–614.

[64] *See supra* note 22.

[65] *Easley v. Cromartie*, 532 U.S. 234, 249 (2001) [hereinafter *Cromartie II*] (emphasis omitted).

[66] *Id.*

that doesn't prohibit such a body from voluntarily creating a coalition district for political or other race-neutral reasons.[67]

The Supreme Court's plurality opinion in *Bartlett v. Strickland*[68] further reinforces this point. Even if VRA § 2 doesn't require a legislature to create a particular type of district, VRA § 2 and the Constitution don't prohibit the legislature from drawing that type of district. Nor is it lawful for a legislature to purposefully target such districts for destruction.[69] *Bartlett* involved a slightly different type of district[70]—a "crossover district," in which the minority population "make[s] up less than a majority of the voting-age population," but "is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over

---

[67] *Cf. Voinovich v. Quilter*, 507 U.S. 146, 156 (1993) ("[T]he federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law. But that does not mean that the State's powers are similarly limited. Quite the opposite is true . . . ." (citation omitted)); *id.* at 155 ("Section 2 contains no *per se* prohibitions against particular types of districts . . . . Instead, § 2 focuses exclusively on the consequences of apportionment. Only if the apportionment scheme has the *effect* of denying a protected class the equal opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter.").

[68] 556 U.S. 1.

Under the "*Marks* rule," "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977). The plurality opinion in *Bartlett* decides the case on much narrower grounds than the concurrence. *Contrast* 556 U.S. at 6–26 (plurality opinion) (concluding that a VRA § 2 plaintiff cannot satisfy the *Gingles* factors by proposing a crossover district), *with id.* at 26 (Thomas, J., concurring) (concluding that VRA § 2 "does not authorize any vote dilution claim, regardless of the size of the minority population in a given district"). The plurality opinion is therefore the precedential one under *Marks*.

[69] *See, e.g.*, *1st Prelim. Inj. Op.*, 601 F. Supp. 3d at 163 (our prior opinion interpreting *Bartlett* to mean that "it must be possible for a state to violate the Constitution by dismantling a district that does not meet all three *Gingles* requirements").

Given that *Bartlett* undermines DOJ's argument, it's puzzling that DOJ cited *Bartlett* in its letter. *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 2.

[70] *See* 556 U.S. at 13–14 (noting that *Bartlett* did "not address th[e] type of coalition district" that is at issue here).

- 21 -

to support the minority's preferred candidate."[71] Much like *Petteway* would subsequently hold with respect to coalition districts, *Bartlett* held that a plaintiff may not satisfy the *Gingles* preconditions by proposing a crossover district.[72] Thus, legislatures need not create crossover districts to avoid violating VRA § 2.[73]

Critically, however, the *Bartlett* Court emphasized that its "holding that § 2 does not require crossover districts" did not address "the permissibility of such districts as a matter of legislative choice or discretion."[74] The Supreme Court cautioned that *Bartlett* "should not be interpreted to entrench majority-minority districts by statutory command, for that, too, could pose constitutional concerns."[75] The Court stressed that "States that wish to draw crossover districts are free to do so where no other prohibition [against such districts] exists."[76] But the *Bartlett* Court also admonished that if a State "intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."[77]

---

[71] *See id.* at 13.

[72] *See id.* at 23 ("§ 2 does not require crossover districts . . . .").

[73] *See id.*

[74] *See id.*

[75] *Id.* at 23–24.

[76] *Id.* at 24.

[77] *See id.* at 24.

Although the State Defendants dismiss this language as mere dicta, *see* Defs.' Post-Hr'g Br., ECF No. 1284, at 22–23, Fifth Circuit precedent requires us to "take [dicta] from the Supreme Court seriously." *See, e.g.*, *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010).

Fifteen years after *Bartlett*, *Petteway* determined that all the same legal considerations that apply to crossover districts apply equally to coalition districts.[78] To underscore the point, the Fifth Circuit took the *Bartlett* opinion, replaced each instance of the word "crossover" with "coalition," and pronounced that the opinion's logic remained sound.[79]

Performing *Petteway*'s word-replacement exercise with the above-quoted passages from *Bartlett* yields the following propositions: *Petteway*'s "holding that § 2 does not require [coalition] districts" has no bearing on "the permissibility of such districts as a matter of legislative choice or discretion."[80] "States that wish to draw [coalition] districts are free to do so where no other prohibition exists."[81] "And if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective [coalition] districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments."[82] Those propositions directly contradict the DOJ Letter's assertion that coalition districts are *per se* "unconstitutional"—as well as its argument that Texas can and must "rectify" any coalition districts that exist in the 2021 Map.[83]

---

[78] *See Petteway*, 111 F.4th at 610 ("Each of the[] reasons articulated in *Bartlett* for rejecting crossover claims applies with equal force to coalition claims.").

[79] *See id.* ("One need only transpose *Bartlett*'s language to indicate the problems [with coalition districts]: 'What percentage of [black] voters supported [Hispanic]-preferred candidates in the past? How reliable would the [coalition] votes be in future elections? What types of candidates have [black] and [Hispanic] voters supported together in the past and will those trends continue? Were past [coalition] votes based on incumbency and did that depend on race? What are the historical turnout rates among [black] and [Hispanic] minority voters and will they stay the same?'" (quoting *Bartlett*, 556 U.S. at 17)).

[80] *Cf. Bartlett*, 556 U.S. at 23.

[81] *Cf. id.* at 24.

[82] *Cf. id.*

[83] *Contra* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1–2.

Besides those legal errors, the DOJ Letter also contains factual inaccuracies. Most egregiously, the letter lumps CD 29 in with CDs 9, 18, and 33 as examples of "coalition districts" that Texas must "rectify."[84] As DOJ realizes halfway through the letter, however,[85] CD 29 was not a coalition district under the 2021 Map; it was a majority-Hispanic district.[86] Nothing in *Petteway* has any bearing on single-race-majority districts like CD 29,[87] so *Petteway* doesn't provide any legal basis to attack CD 29's racial composition.

All that said, DOJ might have had a decent argument if there were evidence that the Legislature intentionally drew the 2021 Map to include coalition districts that the Legislature wouldn't have otherwise drawn. As noted above, however, the preliminary-injunction record reveals no such thing. Again, nothing in the current record indicates that the Legislature drew the 2021 Map with an eye toward creating coalition districts. We thus presume that any coalition districts that ended up in the 2021 Map were coincidental by-products of the Legislature applying race-neutral redistricting criteria like partisanship.[88] There's consequently no indication that the Legislature would have drawn its maps differently if *Petteway* had been the governing law in 2021 instead of *Campos*.

---

[84] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1 ("Congressional Districts TX-09, TX-18, TX-29 and TX-33 currently constitute unconstitutional 'coalition districts' and we urge the State of Texas to rectify these race-based considerations from these specific districts.").

[85] *See id.* at 2 (describing CD 29 as "a majority Hispanic district" on the very next page).

[86] *See* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1 (indicating that CD 29's Hispanic CVAP was 63.5% under the 2021 Map); *see also supra* Section II.B.

[87] *See generally Petteway*, 111 F.4th at 599–614.

[88] *See supra* Section II.B.

Legally and factually, DOJ had no valid argument that the Legislature should restore the House map to some preexisting racial equilibrium since *Petteway* supplanted *Campos*. Far from seeking to "rectify . . . racial gerrymandering,"[89] the DOJ Letter urges Texas to inject racial considerations into what Texas insists was a race-blind process.

But what about DOJ's assertion that "TX-33 is [a] racially-based coalition district that resulted from a federal court order years ago"?[90] If a court forced Texas to draw CD 33 as a coalition district based on *Campos*'s discredited interpretation of VRA § 2, can't the Legislature redraw that district now that VRA § 2 no longer requires coalition districts?

The short answer is that this is another one of the DOJ Letter's many inaccuracies. It's true that CD 33 traces its lineage to a court-ordered map that a different three-judge panel of this Court imposed in 2012 when the State couldn't get its own map precleared under VRA § 5.[91] It's also true that the three-judge panel based CD 33's boundaries partly on racial considerations.[92] The

---

[89] *Contra* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 2.

[90] *See id.*

[91] *See, e.g.*, *Perry v. Perez*, 565 U.S. 388, 391–92 (2012) ("As Texas' 2012 primaries approached, it became increasingly likely that the State's newly enacted plans would not receive preclearance in time for the 2012 elections. And the State's old district lines could not be used, because population growth had rendered them inconsistent with the Constitution's one-person, one-vote requirement. It thus fell to the District Court in Texas to devise interim plans for the State's 2012 primaries and elections.").

*See also, e.g.*, *id.* at 390–91 (explaining the VRA § 5 preclearance process).

*But see Perez v. Texas*, 970 F. Supp. 2d 593, 598 (W.D. Tex. 2013) (explaining that, in *Shelby County v. Holder*, 570 U.S. 529 (2013), the Supreme Court "str[uck] down the coverage formula in § 4(b) of the Voting Rights Act which, in turn, means that Texas is no longer automatically subject to § 5 preclearance requirements").

Texas legislatively adopted the court-drawn map as its own in 2013. *E.g.*, *Abbott v. Perez*, 585 U.S. at 590 ("The 2013 Legislature . . . enacted the Texas court's interim plans . . . . The federal congressional plan was not altered at all . . . .").

[92] *See Perez v. Texas*, 891 F. Supp. 2d 808, 830 (W.D. Tex. 2012) [hereinafter *Perez v. Texas 2012*] (acknowledging that "race was necessarily considered in drawing CD 33 to some degree").

challengers in the VRA § 5 preclearance proceedings had raised potentially viable claims that the Legislature had intentionally discriminated when drawing CD 33, and the panel configured CD 33 to address that concern.[93]

But it's not true that the 2012 panel drew CD 33 as a "racially[] based coalition district" based on a now-overruled interpretation of VRA § 2.[94] Because the panel was "unable to conclude" that the plaintiffs were "likely to succeed on their § 2 claims premised upon coalition districts," the panel said it would have been "inappropriate to intentionally create a coalition district on the basis of race or otherwise intentionally unite populations based on race."[95] Thus, in its order imposing the court-drawn map, the panel emphasized that its configuration of CD 33 was "not a minority coalition district and was not drawn with the intention that it be a minority coalition district."[96] In a subsequent order issued five years later, the panel again reiterated that "CD 33 was not intentionally drawn as a minority coalition district under § 2. Rather, it was created to remedy the alleged intentional discrimination (cracking) claims" raised in the VRA § 5 preclearance proceedings.[97]

---

[93] *See id.* ("The contours of CD 33 are a result of addressing the 'not insubstantial' § 5 claims of cracking and packing and the application of neutral redistricting criteria. . . . [T]he use of race was appropriate to remedy the alleged race-based discrimination that occurred . . . . The Court finds that [the court-drawn map] adequately resolves the 'not insubstantial' § 5 claims . . . .").

*See also Perez v. Abbott*, 274 F. Supp. 3d 624, 652 (W.D. Tex. 2017) ("To address the § 5 discrimination claims, [the court-drawn map] included new CD 33, spanning Dallas and Tarrant Counties. [The court-drawn map] withdrew many of the encroachments into minority communities from the Anglo districts surrounding DFW, and the population left behind in DFW from the removed encroachments was placed in new CD 33, while accommodating congressional incumbents and taking into account population growth."), *rev'd and remanded*, *Abbott v. Perez*, 585 U.S. 579 (2018).

[94] *Contra* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 2.

[95] *See Perez v. Texas 2012*, 891 F. Supp. 2d at 830.

[96] *See id.*

[97] *See Perez v. Abbott*, 274 F. Supp. 3d at 653.

While it might be accurate to say that CD 33 ultimately became a coalition district based on its electoral performance and racial composition,[98] DOJ's implication that the Legislature purposefully drew CD 33 as a "racially-based coalition district" based on pre-*Petteway* law is demonstrably false.[99] Because the prior three-judge panel didn't force Texas to draw CD 33 as a coalition district under VRA § 2, nothing about *Petteway*'s subsequent reinterpretation of § 2 casts any doubt on CD 33's legality.

Even if the three-judge panel had drawn CD 33 as a coalition district based on VRA § 2 and *Campos*, CD 33's lines changed when the Legislature redistricted in 2021, as the blue arrows on the following maps reflect:

---

[98] *See id.* ("[CD 33] is majority-minority CVAP when Black and Hispanic CVAP are combined, and it has elected an African-American, Mark Veasey. It has thus performed as a minority coalition district under most [p]laintiffs' view that such districts require minority cohesion only in the general elections.").

[99] *Contra* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 2.





(Red lines with red numerals indicate the boundaries of the 2012 districts;
white lines with black numerals reflect the boundaries of the 2021 districts.)

To the extent the DOJ Letter accuses the Legislature of "dr[awing] TX-33 on the same lines" as the 2012 court-drawn map "in the 2021 redistricting,"[100] that is also factually inaccurate.

The DOJ Letter is equally notable for what it *doesn't* include: any mention of partisanship.[101] Had the Trump Administration sent Texas a letter urging the State to redraw its congressional map to improve the performance of Republican candidates, the Plaintiff Groups would then face a much greater burden to show that race—rather than partisanship—was the driving force behind the 2025 Map. But nothing in the DOJ Letter is couched in terms of partisan politics.[102] The letter instead commands Texas to change four districts for one reason and one reason alone: the racial demographics of the voters who live there.[103]

### E.    The Governor Adds Redistricting to the Legislative Agenda Immediately After Receiving the DOJ Letter

Though the Trump Administration's plea to redistrict for political reasons failed to gain any immediate traction,[104] the Administration's demand that Texas redistrict for racial reasons achieved quick results.[105] On July 9, 2025—just two days after the DOJ Letter[106]—Governor Abbott issued a proclamation adding the following item to the agenda for the upcoming special legislative session: "Legislation that provides a revised congressional redistricting plan *in light of*

---

[100] *See id.*

[101] *See id.* at 1–2.

[102] *See id.*

[103] *See id.*

[104] *See supra* Section II.C.

[105] *See* Brooks Prelim. Inj. Ex. 322-T, ECF No. 1327-22, at 3 (Harmeet Dhillon's statement that the DOJ Letter "is what triggered the Texas legislature and the Texas governor to call the legislature into session to put new maps together").

[106] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1.

*constitutional concerns raised by the U.S. Department of Justice.*"[107] The Governor shared—or, at minimum, wanted the Legislature to take legislative action to address—DOJ's "concerns" that CDs 9, 18, 29, and 33 were "unconstitutional" because of their racial makeup.[108]

Like the DOJ Letter, the Governor's proclamation contains no request that the Legislature revise the congressional map for partisan purposes.[109] Here too, if the Governor had explicitly directed the Legislature to amend the congressional map to improve Republican performance, the Plaintiff Groups would then face a higher burden to prove that the motivation for the 2025 redistricting was racial rather than political.[110] Instead, by incorporating DOJ's race-based redistricting request by reference, the Governor was asking the Legislature to give DOJ the racial rebalancing it wanted—and for the reasons that DOJ cited.

Contemporaneous media interviews reinforce that the Governor was asking the Legislature to redistrict for racial rather than partisan reasons. When asked during an August 11, 2025, press interview whether his decision to add redistricting to the legislative agenda was motivated by President Trump's demand for five additional Republican seats, the Governor demurred and insisted that the real impetus for redistricting was *Petteway*:

> MR. TAPPER: The Texas Tribune reports that in June you told Texas Republicans delegation [sic] of Congress that you were reluctant to add redistricting to the legislative agenda in Austin. The Tribune says that President Trump then called you to discuss redistricting, and you agreed to put it on the special session agenda.
>
> Would you have gone forward with redistricting if President Trump had not personally got involved and asked you to do this?

---

[107] Brooks Prelim. Inj. Ex. 254, ECF No. 1326-1, at 3 (emphasis added).

[108] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1–2.

[109] *See* Brooks Prelim. Inj. Ex. 254, ECF No. 1326-1, at 3.

[110] *See supra* Section II.A.4 (discussing *Rucho*).

GOVERNOR ABBOTT: To be clear, Jake, this is something that I have been interested in for a long time.

First of all, I have been involved in redistricting litigation for more than 20 years now.

Second, one thing that spurred all this is a federal court decision that came out last year, by the way, a case that was filed by Democrats. The federal court decision that came out last year said that Texas is no longer required to have coalition districts. And as a result, we had drawn maps with coalition districts in it. Now we wanted to remove those coalition districts and draw them in ways that, in fact, turned out to provide more seats for Hispanics. For example, four of the districts are predominantly Hispanic. It just coincides it's going to be Hispanic Republicans elected to those seats.

One thing that's happened in the state of Texas is the Hispanic community, a lot of it, have [sic] decided they are no longer with the Democrats who believe in open border policies, who believe in going against our law enforcement, who believe that men should play in women's sports. And they instead align with Republicans.

What we want to do is to draw districts that give those Hispanics and African Americans in the state of Texas the ability to elect their candidate of choice.

MR. TAPPER: But that's not really—I mean, you are doing this to give Trump and Republicans in the House of Representatives five additional seats, right? I mean, that's the motivation, is to stave off any midterm election losses.

GOVERNOR ABBOTT: Again, to be clear, Jake, the reason why we are doing this is because of that court decision, Texas is now authorized under law that changed that was different than in 2021 when we last did redistricting. Under new law, as well as new facts that served us in the aftermath of the Trump election, showing that many regions of the state that historically had voted Democrat that were highly Hispanic now chose to vote Republican and vote for Trump as well as other Republican candidates. Districts where the electorate voted heavily for Trump, they were trapped in a Democrat congressional district that have every right to vote for a member of congress who is a Republican. We will give them that ability.[111]

---

[111] Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 12–14; *see also* Brooks Prelim. Inj. Ex. 335-T, ECF No. 1328-1, at 4–5.

When given an opportunity to publicly proclaim that his motivation for adding redistricting to the legislative agenda was solely to improve Republicans' electoral prospects at President Trump's request, the Governor denied any such motivation.[112] Instead, the Governor expressly stated that his predominant motivation was racial: he "wanted to remove . . . coalition districts" and "provide more seats for Hispanics."[113] The fact that the racially reconfigured districts would happen to favor Republicans was, to paraphrase the Governor's own words, just a fortuitous coincidence.[114]

In other press statements around the same time, the Governor similarly stated that his motivation for directing the Legislature to redistrict was to eliminate coalition districts[115]—not for political reasons like appeasing President Trump.[116] And the Governor consistently used language suggesting that he viewed the map's improved Republican performance not as an end in itself, but

---

[112] *Compare* Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 13 ("[Y]ou are doing this to give Trump and Republicans in the House of Representatives five additional seats, right?"), *with id.* at 14 ("[T]he reason why we are doing this is because of that court decision.").

[113] *See id.*

[114] *See id.* ("*It just coincides* it's going to be Hispanic Republicans elected to those seats." (emphases added)).

[115] *See* Brooks Prelim. Inj. Ex. 325-T, ECF No. 1327-25, at 3–4 (July 22, 2025, interview in which the Governor stated that "we want to make sure that we have maps that don't impose coalition districts"); *see also* Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 32.

*See also, e.g.*, Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 84 ("[The Fifth Circuit] decided that Texas is no longer required to have what are called coalition districts and, as a result, we[']re able to take the people who were in those coalition districts and make sure they are going to be in districts that really represent the voting preference of those people who live here in Texas."); *see also* Brooks Prelim. Inj. Ex. 332-T, ECF No. 1411-3, at 2.

[116] *See, e.g.*, Brooks Prelim. Inj. Ex. 325-T, ECF No. 1327-25, at 4–5 ("STEVEN DIAL: . . . There's been criticism of you saying you're letting President Trump call the shots. | GOV. GREG ABBOTT: Listen, people are always going to lodge criticisms. I'm not worried about stuff like that. What I'm worried about is making sure that we are going to have congressional districts . . . that fit the structure of [*Petteway*] . . . .").

as a coincidental by-product of the plan's goal of increasing the number of majority-Hispanic districts.[117]

## F.     The Texas Attorney General's Response to the DOJ Letter

At the same time the Governor was announcing the 2025 Map's racial objectives to the press, the Attorney General of Texas was saying the opposite. Just two days after the Governor added redistricting to the legislative agenda based on DOJ's "constitutional concerns,"[118] the Attorney General sent DOJ a response to its letter.[119] That response said essentially the same thing we say above[120]—that the change in law effected by *Petteway* cast no doubt on the legality of the 2021 Map, since there's no indication that the 2021 Legislature drew any coalition districts for legal-compliance reasons that it wouldn't have drawn anyway for race-neutral reasons like partisanship.[121] Although the Attorney General doesn't say so explicitly, the purpose behind his letter appears to have been to refocus the redistricting dialogue toward permissible considerations

---

[117] *See* Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 84 ("Four of the five districts that we are going to create are predominantly Hispanic districts that *happen to be* voting for Republicans as opposed to Democrats." (emphasis added)); *id.* at 77 ("Four of the five districts we are drawing, they would be *Hispanic* districts. They *happen to be* Hispanic *Republican* districts." (emphases added)).

[118] *See supra* Section II.E.

[119] *See* Defs.' Prelim. Inj. Ex. 1466, ECF No. 1380-25, at 2.

[120] *See supra* Section II.D.

[121] *See* Defs.' Prelim. Inj. Ex. 1466, ECF No. 1380-25, at 2–3 ("I am . . . keenly aware of the Fifth Circuit's decision in *Petteway* . . . . We . . . agree that, had the Texas legislature felt compelled under pre-*Petteway* strictures to create coalition districts, the basis for such decisions—as you say—'no longer exists.' However, my office has just completed a four-week trial against various plaintiff groups concerning the constitutionality of Texas's congressional districts . . . . The evidence at that trial was clear and unequivocal: *the Texas legislature did not pass race-based electoral districts* . . . . Texas State Senator Joan Huffman, who chaired the Senate Redistricting Committee, testified under oath that she drew Texas districts blind to race, and sought to maximize Republican political advantage balanced against traditional redistricting criteria. . . . The Texas Legislature . . . has drawn its current maps in conformance with traditional, non-racial criteria to ensure Texas continues to adopt policies that will truly Make America Great Again. As permitted by federal law, the congressional maps in 2021 were drawn on a partisan basis." (citations omitted)).

like partisanship, politics, and traditional districting criteria—and away from legally fraught considerations like race.[122]

If that was the letter's purpose, it didn't work. The Governor continued to declare publicly that *Petteway* was the impetus for the 2025 redistricting, and that Texas's reason for redistricting was to change the map's racial characteristics by eliminating coalition districts and increasing the number of majority-Hispanic districts.[123] And the Legislature proceeded to do just that.

## G.    The Legislature Enacts the 2025 Map

Ultimately, the 2025 Map did all but one of the things that DOJ and the Governor expressly said they wanted the Legislature to do.

### 1.    CD 9

First, the Legislature eliminated CD 9's status as a coalition district by making it a district in which a single racial group (Hispanics) are just barely a majority by CVAP (50.3%).[124] By doing so, the Legislature simultaneously satisfied not just DOJ's command that Texas convert CD 9 from a coalition district to a single-race-majority district, but also the Governor's goal of increasing the number of majority-Hispanic districts in the State. The Legislature reached that outcome by

---

[122] *See id.* at 3–4 ("The Texas Legislature has led the Nation in rejecting race-based decision-making in its redistricting process—it has drawn its current maps in conformance with traditional, non-racial redistricting criteria to ensure Texas continues to adopt policies that will truly Make America Great Again. . . . For these reasons, I welcome continued dialogue about how Texas's electoral districts can best serve Texas voters without regard to outdated and unconstitutional racial considerations. My office stands ready to support President Trump, Governor Abbott, and the Texas Legislature in their redistricting goals . . . .").

[123] *See supra* Section II.E.

[124] *See* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1.

reconfiguring CD 9's boundaries so radically that only 2.9% of the people who were in CD 9 under

the 2021 Map remain in the district under the 2025 Map:[125]

---

[125] *See* Brooks Prelim. Inj. Ex. 267, ECF No. 1326-14, at 2 (indicating that 12.6% of new CD 9 consists of voters from old CD 2, 2.9% consists of voters from old CD 9, 43.7% consists of voters from old CD 29, and 40.7% consists of voters from old CD 36).



The 2021 Map (Plan C2193) is on the left, while the 2025 Map (Plan C2333) is on the right.

### 2.    CD 18

The Legislature likewise eliminated CD 18's status as a coalition district—another one of the "asks" in DOJ's Letter[126]—by making it just barely a majority Black district (50.5%).[127] The Legislature did so primarily by importing large numbers of predominantly Black voters from CD 9.[128]

### 3.    CD 29

Perhaps perplexed by DOJ's request to "rectify" CD 29's status as a "coalition" district when it wasn't actually a coalition district,[129] the Legislature eliminated CD 29's status as a majority-Hispanic district. Under the 2025 Map, CD 29's Hispanic CVAP drops from 63.5% to 43.3.[130] Here too, the Legislature achieved that result by radically reconfiguring the district's boundaries[131] to remove various Latino communities.[132]

---

[126] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1–2.

[127] *See* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1.

[128] *See* Brooks Prelim. Inj. Ex. 267, ECF No. 1326-14, at 3 (indicating that 64.5% of new CD 18's population came from old CD 9, and that a plurality of the population that the Legislature moved from old CD 9 (46.1%) was Black).

[129] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1–2.

[130] *Compare* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1 (CD 29's CVAP statistics under the 2021 Map), *with* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1 (CD 29's CVAP statistics under the 2025 Map).

*See also* Prelim. Inj. Hr'g Tr. Day 2 (Afternoon), ECF No. 1338, at 36–37.

[131] *See* Brooks Prelim. Inj. Ex. 267, ECF No. 1326-14, at 5 (indicating that only 37.2% of the voters who were in CD 29 under the 2021 Map remain in CD 29 under the 2025 Map).

[132] *See* Prelim. Inj. Hr'g Tr. Day 2 (Afternoon), ECF No. 1338, at 44–45 (stating that "Latino neighborhoods like Denver Harbor, Magnolia Park, Second Ward, Manchester, and Northside"—"historic centers of Latino political strength"—were "carved out" of CD 29).

### 4. CD 33

There is, admittedly, one thing that DOJ requested that the Legislature didn't do: eliminate CD 33's status as a coalition district.[133] Under both the 2021 Map and the 2025 Map, CD 33 remains majority non-White.[134] Nevertheless, the district—like CDs 9, 18, and 29—is completely reconfigured and unrecognizable when compared to the old CD 33:

---

[133] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1–2; *see also supra* Section II.B.

[134] *Compare* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1 (indicating that, under the 2021 Map, CD 33 was 43.6% Hispanic, 25.2% Black, 23.4% White, and 5.7% Asian), *with* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1 (indicating that, under 2025 Map, CD 33 is 38.2% Hispanic, 19.6% Black, 35.5% White, and 4.4% Asian).



In these and the following figures, the 2021 Map (Plan C2193) is on top, while the 2025 Map (Plan C2333) is on the bottom.

5.     **Other Districts Converted to Single-Race-Majority Districts (CDs 22, 27, 30, 32, and 35)**

In keeping with the spirit of DOJ's request, the Legislature also eliminated five coalition districts that DOJ didn't mention.[135]

First was CD 22. Under the 2021 Map, CD 22 was just shy of being a majority-White district (49.2%).[136] The remaining 50.8% was made up of voters of various other races, making the district majority-non-White.[137] Thus, at least with respect to its racial composition (though maybe not with respect to its electoral performance),[138] the 2021 version of CD 22 could have been described as a coalition district. The 2025 Map increased CD 22's White CVAP to 50.8%, thereby making it just barely a single-race-majority district:[139]

---

[135] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1–2.

[136] *See* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1.

*See also, e.g.*, Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 40 ("Under [the 2021 Map], CD 22 was a plurality White district. That is, the majority of the population were [sic] of no particular racial group; but the largest group were [sic] White.").

[137] *See* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1 (indicating that the 2021 version of CD 22 was 24.6% Hispanic, 12.7% Black, and 11.3% Asian).

*See also, e.g.*, Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 40 ("[T]he remainder would be non-Whites. So it was a majority non-White district.").

[138] Coalition districts are also defined by whether the two aggregated minority groups can successfully "elect the candidate of the coalition's choice." *See, e.g.*, *Bartlett*, 556 U.S. at 13. The preliminary-injunction record indicates that the 2021 version of CD 22 did not elect minorities' candidate of choice. *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 9.

[139] *See* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1; *see also, e.g.*, Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 41 ("New CD 22 is majority White.").





Second was CD 27. No single race constituted a majority in the 2021 version of CD 27 either; the electorate was split relatively equally between Hispanics (48.6%) and Whites (44.1%), with voters of other races constituting the remainder.[140] Here too, CD 27 could be described as a coalition district with respect to its racial composition, even if it might not be so described with respect to its electoral performance.[141] The 2025 Map increased CD 27's White CVAP to 52.8% while decreasing Hispanic CVAP to 36.8%—thereby making CD 27 another new single-race-majority district:[142]

---

[140] *See* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1.

*See also, e.g.*, Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 41 ("[The 2021 version of] CD 27 was a Hispanic plurality district. 48.8 percent of the CVAP were [sic] Hispanic.").

[141] The preliminary-injunction record indicates that the 2021 version of CD 27 did not elect a minority coalition's candidate of choice. *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 9.

[142] *See* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1; Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 41 ("[The 2025 version of] CD 27 is . . . majority White.").



Third was CD 30. Under the 2021 Map, CD 30 was a coalition district: it was majority non-White by CVAP, with no single racial group constituting more than 50% of eligible voters.[143] The 2025 Map converts CD 30 to a single-race-majority district by making it just barely majority-Black (50.2%):[144]

---

[143] *See* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1 (indicating that, under the 2021 Map, CD 30 was 46.0% Black, 24.5% Hispanic, 24.0% White, and 3.2% Asian).

[144] *See* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1.





Fourth was CD 32. Although Whites constituted a plurality of eligible voters (43.9%) under the 2021 version of CD 32, it was nevertheless a majority-non-White coalition district.[145] The 2025 Map radically reshapes the boundaries of CD 32 and converts it to a single-race-majority district by making it 58.7% White:[146]

---

[145] *See* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1 (indicating that, under the 2021 Map, CD 32 was 43.9% White, 23.4% Black, 22.9% Hispanic, and 6.9% Asian).

[146] *See* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1.





The final district was CD 35, which was also a coalition district.[147] The 2025 Map converts

CD 35 to a single-race-majority district by making it just barely majority Hispanic (51.6%):[148]





---

[147] *See* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 2 (indicating that, under the 2021 Map, CD 35 was 46.0% Hispanic, 35.7% White, 13.0% Black, and 2.7% Asian).

[148] *See* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 2.

In sum, the 2025 Map:

(1)    fundamentally changed the racial character of three of the four districts identified in the DOJ Letter, and dramatically dismantled and left unrecognizable all four districts;

(2)    eliminated seven total coalition districts;

(3)    created two new bare-majority-Hispanic districts, while eliminating an existing strongly majority-Hispanic district identified in the DOJ Letter; and

(4)    created two new bare-majority-Black districts.

## H.    The Plaintiff Groups' Preliminary Injunction Motions

Immediately after the Texas Senate passed the 2025 Map on August 23, 2025—and, indeed, before the Governor even signed the bill[149]—the Plaintiff Groups moved to preliminarily enjoin the State from using the 2025 Map for the upcoming U.S. House elections.[150] The Plaintiff Groups' theory of the case is that:

(1)    DOJ unlawfully demanded that Texas "redraw certain congressional districts because of their multiracial majority status";

(2)    "In response, Governor Abbott called the Texas Legislature into a Special Session specifically to eliminate the coalition and majority minority districts identified by DOJ"; and

(3)    "Over the course of the redistricting process . . . the Governor, DOJ, and multiple Texas legislators repeatedly, publicly, and explicitly stated that Texas was redistricting to eliminate multiracial majority districts."[151]

---

[149] *See* H.B. 4, 89th Leg., 2d Spec. Sess. (Tex. 2025) (signed on August 29, 2025).

[150] *See generally* Tex. NAACP Prelim. Inj. Mot., ECF No. 1142; Intervenors' Prelim. Inj. Mot., ECF No. 1143; Gonzales Pls.' Prelim. Inj. Mot., ECF No. 1149; Brooks, LULAC, & MALC Pls.' Joint Prelim. Inj. Mot., ECF No. 1150.

[151] *E.g.*, Brooks, LULAC, & MALC Pls.' Post-Hr'g Br., ECF No. 1281, at 2 (emphasis omitted).

The Plaintiff Groups thus claim that Texas's actions in the 2025 redistricting amount to unconstitutional racial gerrymandering.[152] Altogether,[153] the Plaintiff Groups challenge the following districts on racial-gerrymandering grounds: CDs 9, 18, 22, 27, 30, 32, 33, and 35.[154]

The State Defendants, by contrast, insist that the motives underlying the 2025 redistricting were exclusively partisan and political[155]—not racial.[156] According to the Defendants, the Legislature enacted the 2025 Map solely to satisfy President Trump's demand that Texas create

---

[152] *See, e.g.*, *id.* at 4–38.

The Plaintiff Groups also raise intentional vote-dilution challenges that we need not address in this opinion. *See* Chart of Claims, ECF No. 1208-1, at 2–4; *see also infra* text accompanying note 163.

[153] Each Plaintiff Group challenges a slightly different set of districts. *See* Chart of Claims, ECF No. 1208-1, at 2–4.

[154] *See id.*

No Plaintiff Group challenges CD 29 under a racial-gerrymandering theory, as opposed to an intentional vote-dilution theory. *See id.* at 2. Although we discuss CD 29 at various points in this opinion to illuminate the Legislature's intent in drawing the map more broadly, we do not base our ruling on the State's alleged gerrymandering of CD 29. *See Bethune-Hill*, 580 U.S. at 191–92 (explaining that although plaintiffs "can present statewide evidence in order to prove racial gerrymandering in a particular district," "[r]acial gerrymandering claims" must ultimately "proceed district-by-district" (citation modified)).

[155] *See, e.g.*, Defs.' Resp. Intervenors' & Tex. NAACP's Prelim. Inj. Mot., ECF No. 1195, at 6 ("The Texas Legislature passed [the] 2025 congressional map on precisely partisan lines."); Defs.' Post-Hr'g Br., ECF No. 1284, at 11 ("Texas's 2025 map is, and always has been, about partisanship.").

[156] *See, e.g.*, Defs.' Post-Hr'g Br., ECF No. 1284, at 23 ("Race was not used here.").

five more Republican seats in the U.S. House of Representatives[157] and counteract threatened partisan gerrymanders in Democrat states.[158]

To resolve the preliminary-injunction motions, the Court held a nine-day hearing from October 1–10, 2025, at which the parties introduced voluminous documentary and testimonial evidence. Having now carefully reviewed that evidence and the applicable caselaw, the Court rules as follows.

---

[157] *See, e.g.*, *id.* at 21 ("[T]he redistricting occurred because President Trump wanted a chance for Texas to elect up to five more Republicans to Congress in 2026." (citation modified)); Defs.' Resp. Gonzales Pls.' Prelim. Inj. Mot., ECF No. 1199, at 10–11 ("Mindful of history showing that a president's political party tends to lose House seats in mid-term election years and concerned that a Democrat majority would disrupt his national agenda, President Trump . . . called on Texas lawmakers to find five additional congressional seats . . . . It is this political arms-race that motivated Texas legislators to redistrict mid-decade, not race.").

[158] *See, e.g.*, Defs.' Resp. Intervenors' & Tex. NAACP's Prelim. Inj. Mot., ECF No. 1195, at 23–24 ("Given the danger to President Trump's legislative agenda posed by [the] 2026 elections and the historical trend of the presidential party doing poorly in non-presidential election years, there was a great deal of political pressure placed on the State of Texas to match the political gerrymandering of Democrat states. This pressure only intensified when other states, especially California, pledged to perform mid-decade redistricting to make their already one-sided congressional maps even more favorable to Democrats. . . . None of those factors indicate race was involved . . . .").

After we held the preliminary-injunction hearing in this case, California passed Proposition 50, which increases the number of Democrat-leaning congressional districts in California to counterbalance the 2025 Map's creation of additional Republican-leaning congressional seats in Texas.

# III.    DISCUSSION

## A.    The Legal Standard for Obtaining a Preliminary Injunction

To obtain a preliminary injunction, the Plaintiff Groups must show:

(1)    "a likelihood[159] of success on the merits" of their claims;

(2)    "a likelihood of suffering irreparable harm if an injunction is not granted;"

(3)    "that the balance of equities tips in their favor;" and

(4)    "that an injunction would serve the public interest."[160]

"In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion."[161]

---

[159] Some Fifth Circuit opinions state that a plaintiff seeking a preliminary injunction must show "a *substantial* likelihood that he will prevail on the merits," *see, e.g.*, *TitleMax of Tex., Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025) (emphasis added), whereas others state that the plaintiff need only show "*a* likelihood of success on the merits," *see, e.g.*, *Jackson*, 2025 WL 3019284, at *3 (emphasis added).

We will go with the language in the Fifth Circuit's most recent redistricting opinion, since it's the preliminary-injunction opinion that's most factually and procedurally analogous to the instant case. *See Jackson*, 2025 WL 3019284, at *3.

Either way, given the Fifth Circuit's sliding-scale approach to the likelihood-of-success inquiry, *see infra* note 167 and accompanying text, we perceive no substantive difference between the two formulations of the standard.

[160] *Jackson*, 2025 WL 3019284, at *3 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

[161] *TitleMax*, 142 F.4th at 328 (quoting *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)).

*See also, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (case cited by the State Defendants for a similar proposition); *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) (same).

**B.    The Plaintiff Groups Have Demonstrated a Likelihood of Success on the Merits of Most of their Racial-Gerrymandering Claims**

For the reasons explained below, the Plaintiff Groups have successfully shown a likelihood of success on their racial-gerrymandering challenges to CDs 9, 18, 27, 30, 32, and 35.[162] Because that alone suffices to preliminarily enjoin the 2025 Map—and given the short timeframe the Court had to write this complex and record-intensive opinion—the Court will not address the Plaintiff Groups' intentional vote-dilution claims at this time.[163]

### 1.    Applicable Procedural Standards

The "likelihood of success on the merits" factor is "the most important."[164] To demonstrate a likelihood of success on the merits, the Plaintiff Groups don't need to prove that they're definitely going to win at the trial on the merits; they need only prove that they're likely to win at trial.[165]

---

[162] The Plaintiff Groups have not shown that they're likely to succeed on their racial-gerrymandering challenge to CD 33. *See infra* Section III.B.6.a. Nor have the Plaintiff Groups shown that they're likely to succeed on their racial-gerrymandering challenge to CD 22. *See infra* note 358. Thus, we do not base our grant of a preliminary injunction on those claims.

[163] Nor do we base our preliminary injunction ruling in any way on the Gonzales Plaintiffs' malapportionment claim. *See* Gonzales Pls.' Post-Hr'g Br., ECF No. 1278, at 3 n.2 (stating that "[t]he Gonzales Plaintiffs continue to seek preliminary relief as to this claim"). We dismissed the count on which that claim was based on September 30, 2025. *See generally* Mem. Op. & Order, ECF No. 1226.

The Court's ruling on the Gonzales Plaintiffs' motion to enter an appealable partial final judgment on that claim is forthcoming. *See generally* Gonzales Pls.' Mot. Rule 54(b) Entry of Final J., ECF No. 1265.

[164] *E.g.*, *Jackson*, 2025 WL 3019284, at *3.

[165] *See, e.g.*, *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (noting that a plaintiff "need not show that he is certain to win" to obtain a preliminary injunction (quoting CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995))).

The exact quantum of evidence that a plaintiff must present to satisfy the likelihood-of-success factor varies from case to case.[166] The Fifth Circuit applies a "sliding scale" approach, whereby a plaintiff who makes a strong showing on the other three preliminary injunction factors bears a lesser burden on the likelihood-of-success requirement (and *vice versa*).[167] "Where the other factors are strong," the movant need only show "some likelihood of success on the merits" to obtain a preliminary injunction.[168]

To preview our conclusions below, the Plaintiff Groups have made a very strong showing on the irreparable-injury factor[169] and a compelling showing on the balance-of-equities and public-interest factors.[170] Under the Fifth Circuit's sliding-scale approach, the Plaintiff Groups need to show more than just "some likelihood of success on the merits" to obtain a preliminary injunction, but not much more.[171]

---

[166] *See, e.g.*, *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 626 (5th Cir. 2017) ("[T]here is no particular degree of likelihood of success that is required in every case . . . ."); *TitleMax*, 142 F.4th at 328 ("The importance and nature of the likely success on the merits requirement can vary significantly . . . ." (citation modified)); *Fla. Med. Ass'n v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979) ("[F]inding a substantial likelihood that [the] movant will ultimately prevail on the merits does not contemplate a finding of fixed quantitative value." (citation modified)).

[167] *See, e.g.*, *TitleMax*, 142 F.4th at 328 ("This court has applied a sliding-scale analysis to the four preliminary injunction requirements. The importance and nature of the likely success on the merits requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory relief and the relative balance of the threatened hardship faced by each of the parties." (citation modified)).

[168] *E.g.*, *id.*

[169] *See infra* Section III.C.

[170] *See infra* Section III.D.

[171] *Cf., e.g.*, *TitleMax*, 142 F.4th at 328.

2.      **Applicable Substantive Standards**

"To assess the likelihood of success on the merits," we must "look to standards provided by the substantive law."[172]

A plaintiff asserting a racial-gerrymandering claim may "make the required showing through direct evidence of legislative intent,"[173] such as "a relevant state actor's express acknowledgement that race played a role in the drawing of district lines,"[174] "circumstantial evidence of a district's shape and demographics, or a mix of both."[175] The court must "make a sensitive inquiry into all circumstantial and direct evidence of [the legislature's] intent" to determine whether "race . . . drove [the challenged] district's lines."[176]

Although a plaintiff pressing a racial-gerrymandering claim need not prove that the enacted map has racially dilutive effects,[177] there are several other significant obstacles that a racial-gerrymandering plaintiff must surmount. First, in a state like Texas—where race and partisan affiliation are closely correlated[178]—"a map that has been gerrymandered to achieve a partisan end can look very similar to a racially gerrymandered map."[179] Again, though, partisan-

---

[172] *See id.* at 329 (citation modified).

[173] *E.g.*, *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (citation modified).

[174] *E.g.*, *Alexander*, 602 U.S. at 8.

[175] *E.g.*, *Cooper*, 581 U.S. at 291 (citation modified).

[176] *E.g.*, *id.* at 308 (citation modified).

[177] *See, e.g.*, *Jackson*, 2025 WL 3019284, at *7 ("[B]ecause the gravamen of a [racial-gerrymandering] claim is the sorting of persons with an intent to divide by reason of race, and this holds true regardless of the motivations of those doing the sorting, plaintiffs raising such a claim need not show that the legislature either intended or succeeded in diluting any particular racial group's voting strength. Rather, the racial classification itself is the relevant harm in that context." (citation modified)).

[178] *See, e.g.*, *Perez v. Abbott*, 253 F. Supp. 3d at 945.

[179] *E.g.*, *Alexander*, 602 U.S. at 9.

gerrymandering claims aren't cognizable in federal court.[180] So, to prevail on a racial-gerrymandering claim, "a plaintiff must disentangle race from politics by proving that the former drove a [challenged] district's lines."[181]

Second, the mere fact that a legislature was aware of a particular district's racial demographics when it made its districting decisions doesn't necessarily mean that the legislature engaged in illegal racial gerrymandering. "Redistricting legislatures will . . . almost always be aware of racial demographics[,] but it does not follow that race predominates in the redistricting process."[182] Thus, litigants and courts must be mindful of "[t]he distinction between being aware of racial considerations and being motivated by them."[183]

Finally—and most importantly—"federal courts must exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race."[184] "The Constitution entrusts state legislatures"—not federal courts—"with the primary responsibility for drawing

---

[180] *E.g.*, *id.* at 6; *see also supra* Section II.A.4.

[181] *E.g.*, *Alexander*, 602 U.S. at 9 (emphasis omitted).

[182] *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

*See also, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) ("[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact.").

[183] *E.g.*, *Miller*, 515 U.S. at 916.

[184] *E.g.*, *Alexander*, 602 U.S. at 7 (citation modified).

congressional districts."[185] "Federal-court review of districting legislation" thus "represents a serious intrusion on the most vital of local functions."[186]

Aside from those federalism concerns, federal courts must also be mindful that "[e]lectoral districting is a most difficult subject for legislatures" and that "the States must have discretion to exercise the political judgment necessary to balance competing interests."[187] Courts must therefore "be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus."[188]

For those reasons, courts must "presum[e] that the legislature acted in good faith" when devising and enacting a redistricting plan.[189] When "confronted with evidence that could plausibly support" either a racial or a non-racial motivation for a legislature's action, "district courts [must] draw the inference that cuts in the legislature's favor."[190]

"If a plaintiff can demonstrate that race drove the mapping of district lines, then the burden shifts to the State"[191] "to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end.'"[192] The Court will expound on those requirements below.[193]

---

[185] *E.g.*, *id.* at 6 (citation modified).

*See also* U.S. CONST. art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of ch[oo]sing Senators.").

[186] *E.g.*, *Alexander*, 602 U.S. at 7 (citation modified).

[187] *E.g.*, *Miller*, 515 U.S. at 915.

[188] *E.g.*, *id.* at 915–16.

[189] *E.g.*, *Alexander*, 602 U.S. at 6.

[190] *E.g.*, *id.* at 10.

[191] *E.g.*, *id.* at 11.

[192] *E.g.*, *Cooper*, 581 U.S. at 292.

[193] *See infra* Section III.B.8.

### 3.    Direct Evidence of Racial Gerrymandering

The direct evidence here is strong. In conjunction with the circumstantial evidence discussed below,[194] the direct evidence indicates that the Plaintiff Groups have more than some likelihood of prevailing on their racial-gerrymandering claims at trial.

### a.    DOJ Asked Texas to Engage in Unlawful Racial Gerrymandering

By directing Texas to "separate its citizens into different voting districts on the basis of race," DOJ directed Texas to engage in racial gerrymandering.[195] The letter asserts—incorrectly[196]—that CDs 9, 18, and 29, and 33 are unlawful because they happen to be coalition districts.[197] That is, the districts are objectionable to DOJ solely because of their racial composition.[198] Although the letter doesn't specify how DOJ wants Texas to "rectify" and "correct[]" the listed districts,[199] there's only one way to remedy a district whose only "objectionable" characteristic is that no single racial group constitutes a 50% majority by CVAP: redraw it so a single racial group constitutes a 50% majority by CVAP.[200] We therefore interpret the DOJ Letter as imposing a 50% racial target for Texas to meet when redrawing its districts.

---

[194] *See infra* Section III.B.5.

[195] *E.g.*, *Miller*, 515 U.S. at 911.

[196] *See supra* Section II.D.

[197] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 1–2.

[198] *See id.*

[199] *See id.*

[200] For that reason, we reject the State Defendants' argument that the DOJ Letter was not "a demand for race-based redistricting," but was instead a demand to conduct race-neutral redistricting. *Contra* Defs.' Post-Hr'g Br., ECF No. 1284, at 30–31 (emphasis omitted).

Even if the State Defendants' interpretation of the DOJ Letter was correct, that's not how the Legislature interpreted it.

Our interpretation—that DOJ commanded Texas to meet a 50% racial target—is consistent with the map the Legislature ultimately passed. As discussed, the Legislature took two of the three true coalition districts mentioned in the DOJ Letter and increased their CVAP figures to just barely over 50%: CD 9 (50.3% Hispanic); CD 18 (50.5% Black).[201]

Supreme Court precedent establishes that when:

(1)    a relevant political actor "purposefully establish[es] a racial target" that voters of a single race "should make up no less than a majority" of the voting population; and

(2)    the Legislature "follow[s] those directions to the letter, such that the 50%-plus racial target ha[s] a direct and significant impact on [the districts'] configuration,"

a court may permissibly conclude "that race predominated in drawing" those districts.[202] DOJ and the Governor did the first of those things. The Legislature did the second.

---

[201] *See* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1–2.

*Cf. Cooper*, 581 U.S. at 313 (concluding that "the redistricters' on-the-nose attainment of a 50% BVAP" supported the district court's finding that the legislature "deliberately redrew [the challenged district] as a majority-minority district"); *see also infra* Section III.B.5.b.

[202] *See Cooper*, 581 U.S. at 299–301 (citation modified).

### b.    The Governor's Actions Suggest a Predominantly Racial Motivation

### i.    The Governor's Proclamation

By explicitly referring to DOJ's "constitutional concerns" in his proclamation,[203] the Governor:

(1)    endorsed DOJ's erroneous view that *Petteway* required the Legislature to fundamentally change the targeted districts' racial character;[204] and

---

[203] Notably, the Legislature did not pass redistricting legislation during the first called special session due to a quorum break. *See* Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 109–110. The Governor then called a second special session, *see* Defs.' Prelim. Inj. Ex. 1055, ECF No. 1373-16, at 2–3, during which the Legislature passed the 2025 Map. The Governor's August 15, 2025, proclamation placing redistricting on the agenda for the second special session omits any reference to DOJ's "constitutional concerns." *Contrast* Defs.' Prelim. Inj. Ex. 1054, ECF No. 1373-15, at 2–3 (directing the Legislature "to consider and act upon . . . [l]egislation that provides a revised congressional redistricting plan *in light of constitutional concerns raised by the U.S. Department of Justice*" (emphasis added)), *with* Defs.' Prelim. Inj. Ex. 1055, ECF No. 1373-16, at 2–3 (merely directing the Legislature "[t]o consider and act upon . . . [l]egislation that provides *a congressional redistricting plan*" (emphasis added)). *See also* Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 49–50.

We don't interpret that omission as evidence that the Governor abandoned the racial goals he had espoused in the media just four days earlier. *See* Brooks Prelim. Inj. Ex. 335-T, ECF No. 1328-1, at 1, 4–5 (Governor Abbott's August 11, 2025, interview proclaiming that he "wanted to remove . . . coalition districts and draw them in ways that . . . provide more seats for Hispanics").

Nor do we agree with the State Defendants' suggestion that removing the reference to DOJ's constitutional concerns from the second proclamation somehow cleansed the first proclamation's racial taint. *Contra* Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 50 ("Q. . . . [E]ven if, as Plaintiffs allege, that the Governor's stated reasoning for adding the subject of redistricting to the call had some significance to the Legislature during the first legislative session, could the Legislature be legally permitted to consider that language during the Second Special Session?" | A. No."). The map that the Legislature passed during the second session was largely identical to the first, indicating that racial considerations have already infected the map by the time the Governor issued the second proclamation. *See* Brooks Prelim. Inj. Ex. 264, ECF No. 1326-11, at 1–3 (showing the significant overlap between the map introduced in the first session and the map introduced in the second); Brooks Prelim. Inj. Ex. 266, ECF No. 1326-13, at 1–4 (showing the significant overlap between the map introduced in the second session and the enacted map).

In any event, the Legislature acted under the DOJ Letter's directive even after the second proclamation. When the House passed the bill in the second session, the Speaker's press release explicitly stated that the House had just "delivered legislation to . . . address concerns raised by the Department of Justice." *See* Brooks Prelim. Inj. Ex. 282, ECF No. 1326-28, at 1; *see also infra* Section III.B.3.d.i.

[204] *See supra* Section II.D.

- 61 -

(2)    exhorted the Legislature to redistrict for the same racial reasons that DOJ
        gave in its letter.

The DOJ Letter is dated July 7. On July 9, the Governor issued a proclamation adding redistricting to the legislative agenda to advance DOJ's racial objectives. This close temporal proximity undermines the State Defendants' position that the motivation for the 2025 redistricting was political rather than racial. Lawmakers initially showed little appetite to redistrict when the Trump Administration pressed the State to redistrict for exclusively partisan reasons.[205] What triggered the redistricting process was the Administration reframing the request in exclusively racial terms.[206]

### ii.    The Governor's Contemporaneous Press Statements

In his contemporaneous press statements, the Governor framed his objectives for the 2025 redistricting in slightly different terms than the DOJ Letter. Governor Abbott said that *Petteway* permitted Texas to "remove . . . coalition districts" from the congressional map, and that this provided an opportunity for the Legislature to replace those coalition districts with majority-Hispanic districts, as opposed to single-race-majority districts more generally.[207] That was

---

[205] *See supra* Section II.C.

[206] *See supra* Sections II.D–E.

President Trump's July 15, 2025, press statement that he "want[ed] the Republicans to draw . . . five seats" is not particularly probative of the motivation underlying the 2025 redistricting. *Contra* Defs.' Prelim. Inj. Ex. 1352, ECF No. 1360-2, at 7–8; *see also* Prelim. Inj. Hr'g Tr. Day 2 (Morning), ECF No. 1415, at 127–29 (introducing that statement to support the State Defendants' argument that Texas redistricted for political rather than racial reasons). By the time President Trump made that statement, DOJ had already asked Texas to redistrict for exclusively racial reasons on July 7, 2025, and the Governor had already asked the Legislature to redistrict based on DOJ's letter on July 9, 2025. *See supra* Sections II.D–E.

[207] *See, e.g.*, Brooks Prelim. Inj. Ex. 335-T, ECF No. 1328-1, at 4–5 ("[W]e wanted to remove those coalition districts and draw them in ways that in fact turned out to provide more seats for Hispanics."); *see also supra* Section II.E.

fortuitous, according to the Governor, because many Hispanic voters had recently "decided they're no longer with the Democrats who believe in open border policies, who believe in going against our law enforcement[,] who believe that men should play in women's sports[,] and they instead align with the Republicans."[208] The purpose behind the 2025 redistricting was to "take the people who were in those coalition districts"—specifically, "Hispanics and [B]lacks"—and place them "in districts that really represent the voting preference[] of those people who live . . . in Texas."[209]

That's a stark admission. The Governor wanted Texas to "use[] race as a basis for separating voters into districts."[210] According to the Governor, the 2025 Map's *modus operandi* was to:

(1)    specifically target Hispanic and Black voters based on the assumption that Texan voters of color—especially Hispanics—now trend Republican;[211]

(2)    take those voters out of their existing districts; and

(3)    place those voters into new districts—all because of their race.

---

[208] *See* Brooks Prelim. Inj. Ex. 335-T, ECF No. 1328-1, at 5.

*See also* Brooks Prelim. Inj. Ex. 332-T, ECF No. 1411-3, at 2 ("[W]e saw in the aftermath of the Trump election[] that an overwhelming number of Hispanics and [B]lacks as well as others[] chose to vote for Trump. . . . Democrats think they have an ownership right to voters who are Hispanic or Black. They're now learning the hard way. Those voters are supporting Republicans.").

[209] *See* Brooks Prelim. Inj. Ex. 332-T, ECF No. 1411-3, at 2.

[210] *See, e.g.*, *Miller*, 515 U.S. at 911.

[211] The Governor's assertions regarding Hispanic voting preferences are factually inaccurate. The preliminary-injunction record indicates that Hispanic voters in the relevant areas of Texas still favor Democrats over Republicans by a comfortable margin. *See* Prelim. Inj. Hr'g Tr. Day 4 (Morning), ECF No. 1417, at 60–63. The record further indicates that the shift in Hispanic support towards President Trump in the 2024 general election did not carry over to other Republican candidates on the ballot. *See id.* at 61–63.

That's tantamount to using "race . . . as a proxy for political characteristics" and "stereotyp[ing]" voters based on race.[212] "[D]istricting decisions that rely on stereotypes about racial voting are constitutionally suspect."[213] As the Supreme Court has explained, "[w]hen the State assigns voters [to particular districts] on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, think alike, share the same political interests, and will prefer the same candidates at the polls."[214]

At the same time, Governor Abbott consistently rejected the idea that Texas was redistricting to fulfill President Trump's demand for additional Republican districts.[215] The Governor "subordinated race-neutral districting criteria" like partisanship "to racial considerations."[216] Race—not politics—was "the predominant factor motivating the . . . decision to place a significant number of voters within or without a particular district."[217]

---

[212] *See Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality opinion).

*See also Tenn. State Conf. of NAACP v. Lee*, 746 F. Supp. 3d 473, 488 (M.D. Tenn. 2024) ("Just as a State should not use race to identify the schools that children may attend, so too it should not use race to determine the districts in which citizens should vote.").

[213] *See Jackson*, 2025 WL 3019284, at *10.

[214] *Miller*, 515 U.S. at 911–12 (citation modified).

*See also Bush*, 517 U.S. at 968 (1996) ("[T]o the extent that race is used as a proxy for political characteristics, a racial stereotype requiring strict scrutiny is in operation.").

[215] *See supra* Section II.E.

[216] *See, e.g., Alexander*, 602 U.S. at 7 (citation modified).

[217] *See, e.g., id.* (citation modified).

### c.    The Motives of State and Federal Executive Branch Actors Aren't Automatically Imputable to the Legislature

The mere fact that the federal and state executive branches told the Legislature to engage in racial gerrymandering is not dispositive. "[L]egislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents," as "legislators have a duty to exercise their [own independent] judgment" when crafting and passing legislation.[218] What ultimately matters is the Legislature's motivation for devising and enacting the 2025 Map—not the motivations of political actors outside the legislative branch.[219] The unlawful motivations of DOJ and the Governor "do not become those of the [Legislature] as a whole unless it is shown that a majority of the [Legislature's] members shared and purposefully adopted (*i.e.*, ratified) the [Governor and DOJ's] motivations."[220]

The Northern District of Florida's recent decision in *Common Cause Florida v. Byrd* illustrates this point. There, the Governor of Florida proposed a congressional districting map that eliminated a district that elected Black voters' candidates of choice.[221] The Florida Legislature ultimately enacted that map.[222]

The district court assumed without deciding that the Governor had "acted with some unlawful discriminatory motive in creating and proposing the redistricting map that was ultimately enacted into law."[223] Even assuming that "the Governor was motivated in part by racial animus,"

---

[218] *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021).

[219] *See Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1364 (N.D. Fla. 2024) ("A public and collective decision-making body, like the . . . Legislature, is answerable only for its own unconstitutional actions and motivations." (emphasis omitted)).

[220] *Id.* at 1364–65.

[221] *See, e.g.*, *id.* at 1343–44.

[222] *See, e.g.*, *id.*

[223] *Id.* at 1361.

however, the plaintiffs also needed to "prove that the Florida Legislature itself acted with some discriminatory purpose when adopting and passing the Enacted Map"[224]—such as by introducing "evidence that the [legislators] themselves agreed with the discriminatory motives," or that they passed the map "for the purpose of giving effect to the [Governor's alleged] discriminatory motives."[225] Because "not one legislator said or did anything to suggest . . . that any legislator voted for the Enacted Map because they shared or intended to effectuate any racially discriminatory motive on the Governor's part," the plaintiffs failed to prove "that the Legislature acted with race as a motivating factor in passing the Enacted Map."[226]

### d.    Legislators' Statements

This case is very different from *Common Cause Florida*. Direct evidence in the preliminary-injunction hearing shows that key legislators in the 2025 redistricting process had the same racial objectives as DOJ and the Governor.

### i.    Speaker Burrows

When the Texas House passed the 2025 Map, the Speaker of the House, Representative Dustin Burrows, issued a press release favorably announcing that the House had just "delivered legislation to redistrict certain congressional districts *to address concerns raised by the Department of Justice* and ensure fairness and accuracy in Texans' representation in Congress."[227] This press release publicly announces that high-ranking legislators honored and followed the instruction in the Governor's proclamation to redistrict for the racial reasons cited in the DOJ

---

[224] *Id.* (citation modified).

[225] *Id.* at 1363.

[226] *Id.* at 1366 (emphases omitted).

[227] Brooks Prelim. Inj. Ex. 282, ECF No. 1326-28, at 1 (emphasis added); *see also* Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 132–33.

Letter.[228] The Speaker's press release also undermines other legislators' assertions (discussed below) that the DOJ Letter did not influence the Legislature during the 2025 redistricting process.[229]

In the same press release, the Speaker also praised the House for "deliver[ing] the *legal, remedied maps* Texas voters deserve."[230] Speaker Burrows shared DOJ's erroneous view that the 2021 Maps were illegal because they contained coalition districts and that the Legislature needed to "remedy" that defect by extirpating those districts.

To be sure, the press release is also peppered with statements that could suggest a partisan motive. Speaker Burrows celebrates that "the new map . . . secures Republican representation in Congress."[231] For that reason, the press release does not establish by itself that race predominated over partisan concerns during the 2025 redistricting cycle. But the press release is not the only direct evidence of racial motivation in the record.

### ii.    Representative Oliverson

In contemporaneous interviews and press releases, several other high-ranking legislators espoused that the Legislature's motivation for redistricting was not to fulfill President Trump's demand for more Republican congressional seats, but rather to eliminate coalition districts as DOJ requested. In an August 6, 2025, interview with National Public Radio ("NPR"), the Chair of the Texas House Republican Caucus, Representative Tom Oliverson, said the following:

---

[228] *See Common Cause Fla.*, 726 F. Supp. 3d at 1363 (stating that "[r]atification of another's discriminatory motives . . . may be demonstrated with evidence that the decision-makers knowingly chose a particular course of action for the purpose of giving effect to the discriminatory motives").

[229] *See infra* notes 277, 286, 321 and accompanying text.

[230] Brooks Prelim. Inj. Ex. 282, ECF No. 1326-28, at 1 (emphasis added).

[231] *See id.*

> AILSA CHANG: . . . So this congressional map. It's being redrawn after your party already drew it in 2021. And one of the main objections to what you all are doing is that Texas Republicans are doing this only because President Trump asked you to do so.
>
> Let me just ask you directly. Is that true? Are you redoing this map now specifically because of the [P]resident's request?
>
> REP. TOM OLIVERSON: No, we are not. And in fact, the first conversations that I heard about and had myself regarding redistricting began before the legislative session began in January as a result of a court case where a federal appeals court basically rejected the idea of the coalition districts as being consistent with the Voting Rights Act.[232]

Another stark admission: the desire to eliminate coalition districts drove the 2025 redistricting—

not pressure from President Trump to redistrict for partisan gain.

### iii.    Representative Toth

In a press interview following the 2025 Map's enactment, Representative Steve Toth

similarly insisted that the motive behind the 2025 redistricting was not to achieve political gains,

but rather because DOJ had commanded Texas to redistrict in response to *Petteway*:

> JOHN SOLOMON: . . . [Y]ou pointed out something important here, which is that the storyline Democrats and their liberal friends like to say is, oh, this is being done by Texas for gerrymandering and for political gain in the [2026] election. But in fact, the Justice Department required the state to do this because there were appellate court rulings that said Texas was out of compliance with the current law. So, this isn't actually gerrymandering. This was actually required to be done, right?
>
> STEVE TOTH: It was required of us to do it in . . . response to *Petteway* to get compliant.[233]

---

[232] Brooks Prelim. Inj. Ex. 327-T, ECF No. 1327-27, at 2–3; *see also* Prelim. Inj. Hr'g Tr. Day 1 (Afternoon), ECF No. 1337, at 68–69.

[233] Brooks Prelim. Inj. Ex. 339-T, ECF No. 1411-5, at 3; *see also* Prelim. Inj. Hr'g Tr. Day 9 (Afternoon), ECF No. 1345, at 67 (admitting that interview into the record).

Like the Governor, Speaker Burrows, and Representative Oliverson, Representative Toth shared

DOJ's erroneous legal position that *Petteway* affirmatively required Texas to eliminate coalition

districts. He therefore shared and adopted DOJ's racial objective of erasing coalition districts from

the map. Representative Toth's statements reinforce that "Justice Department pressure led the State

to act based on an overriding concern with race."[234]

### iv.    Chairman Hunter and His Joint Authors

Further evidence that race was a key factor motivating the 2025 redistricting comes from

Chairman Todd Hunter's statements and exchanges with other legislators on the House floor.[235]

Because Chairman Hunter introduced and championed the bill that ultimately became the 2025

Map,[236] we consider his and his joint authors' statements to be more probative of the full

Legislature's intent than those of other legislators.[237]

---

[234] *See Abrams v. Johnson*, 521 U.S. 74, 87–88 (1997).

[235] We refer to Representative Hunter as "Chairman" because he was the Chair of the Calendars Committee during the 89th Legislature. We emphasize that Representative Vasut—not Representative Hunter—was the Chair of both the House Redistricting Committee and the House Select Committee on Congressional Redistricting in 2025. *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 60; *see also infra* note 285 and accompanying text.

[236] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 106.

[237] To be clear, we do not treat Chairman Hunter's floor statements as dispositive of the intent of the Legislature as a whole. "[S]tatements of individual legislators"—"even the sponsors of legislation"—"should not be given controlling effect." *N. & S. Rivers Watershed Ass'n v. Town of Scituate*, 949 F.2d 552, 555 n.6 (1st Cir. 1991), *overruled on other grounds by Blackstone Headwaters Coal., Inc. v. Gallo Builders, Inc.*, 32 F.4th 99 (1st Cir. 2022); *see also, e.g.*, *Fusilier v. Landry*, 963 F.3d 447, 466 (5th Cir. 2020) (cautioning "against overemphasizing statements from individual legislators").

All we're saying is that (1) Chairman Hunter's statements about his reasons for introducing and passing the redistricting bill are relevant when assessing the intent of the Legislature as a whole, and (2) Chairman Hunter's role as the redistricting bill's sponsor makes his statements more probative than those of rank-and-file legislators who had minimal personal involvement with the bill. *See, e.g.*, *Brock v. Pierce County*, 476 U.S. 253, 263 (1986) (stating that although statements by a bill's sponsor "should not be given controlling effect," they nonetheless "provide evidence of [the legislature's] intent" if "they are consistent with the statutory language and other legislative history"); *Campbell v. McCarthy*, 952 F.3d 193, 204 (4th

Chairman Hunter introduced a redistricting bill on July 30, 2025, during the first special legislative session.[238] With certain changes, the Legislature would ultimately pass Chairman Hunter's bill in the second special session.[239] In his August 1, 2025, layout of that bill,[240] Chairman Hunter volunteered—without prompting from any other legislator[241]—that "four of the five" new Republican districts proposed by the bill were "majority[-]minority Hispanic CVAP districts."[242] Chairman Hunter likewise volunteered, again without prompting:[243]

---

Cir. 2020) ("In determining legislative intent, the statements of a bill's sponsor made during debate are entitled to weight." (citation modified)).

Our panel reached the same conclusion in our previous preliminary-injunction opinion in this case. *See 1st Prelim. Inj. Op.*, 601 F. Supp. 3d at 175 n.13 ("[S]tatements of discriminatory intent by a committee chair made during floor debate would doubtless be of some weight in judging the intentions of the body as a whole, particularly at this preliminary stage.").

[238] *See* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 46; *see also* H.B. 4, 89th Leg., 1st Spec. Sess. (Tex. 2025).

[239] *See, e.g.*, Brooks Prelim. Inj. Ex. 315-T, ECF No. 1327-15, at 4–6 (identifying changes the mapmaker made between the first special session and the second); Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 32–33 (Chairman Hunter's statement that "[h]e and [his] lawyers" made changes between the version introduced in the first legislative session and the enacted version to "increase[] Republican political performance"); *see also* H.B. 4, 89th Leg., 2d Spec. Sess. (Tex. 2025).

[240] *See* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 1, 45–46.

A "layout" is when a bill's sponsor first presents the bill to the body in a public hearing. Prelim. Inj. Hr'g Tr. Day 1 (Afternoon), ECF No. 1337, at 43. The layout was Chairman Hunter's "first opportunity to talk about the map as it was introduced." *Id.*

[241] *See* Prelim. Inj. Hr'g Tr. Day 1 (Afternoon), ECF No. 1337, at 44 ("Q. Did anybody ask Chairman Hunter at this stage of the proceedings, 'Tell us what the racial makeup of these five new districts are that you're drawing?' | [SPEAKER MOODY:] No. This is his layout of the bill, so this is him explaining the bill to the members and to the public for the first time.").

*See also Jackson*, 2025 WL 3019284, at *10 (indicating that statements related to race are more probative of intent when unprompted, as opposed to a response to a question phrased in racial terms).

[242] *See* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 54.

[243] *See* Prelim. Inj. Hr'g Tr. Day 1 (Afternoon), ECF No. 1337, at 48 ("Q. So these comments that Chairman Hunter is giving, are they in response to a question? | [SPEAKER MOODY:] No, I don't believe so. I think this is all still part of his layout. | Q. In other words, this is something he came in with his own notion to say? | A. I mean, that's typically how a layout works.").

(1)    that the introduced map increased the total number of majority-Hispanic[244] and majority-Black[245] congressional districts; and

(2)    the CVAP statistics for the majority-Hispanic[246] and majority-Black[247] districts in the introduced plan.[248]

Taken by themselves, those factual statements about the bill's racial statistics do not imply anything more than mere awareness of race, which is not actionable.[249] Chairman Hunter could have had an innocuous reason to preemptively mention the districts' racial characteristics in his layout—namely, to stave off the criticism that opposing legislators had made during the previous redistricting cycle, which was that he didn't have certain racial data ready in response to legislators' questions.[250] These statements alone do not clear the presumption of legislative good

---

[244] *See* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 58 ("[CHAIRMAN HUNTER:] In the 2021 plan, there were 7 Hispanic citizen voting age districts; and under this plan, there are 8.").

[245] *See id.* ("[CHAIRMAN HUNTER:] There were no majority Black CVAP . . . districts under the 2021 plan. In the proposed plan today, there are 2 . . . .").

[246] *See id.* at 57–58 ("[CHAIRMAN HUNTER:] Congressional District 9, the new district, has a 50.5-percent Hispanic CVAP. CD 28 . . . has an 86.70-percent Hispanic CVAP. . . . CD 34, 71.9 percent, is now a Hispanic CVAP. And CD 35, which is in San Antonio, is now a 51.6-percent Hispanic CVAP.").

[247] *See id.* at 58 ("[CHAIRMAN HUNTER:] CD 18 is now 50.8 percent Black CVAP; in 2021 it was 38.8. CD 30 is now 50.2 percent Black CVAP; in 2021 it was 46 percent.").

[248] *See also* Prelim. Inj. Hr'g Tr. Day 1 (Afternoon), ECF No. 1337, at 44 (Speaker Moody's testimony that he saw the notes that Chairman Hunter had prepared to deliver the layout, which contained "Black CVAP, HCVAP[,] [t]he shifts between this map and that map," etc.); *id.* at 45 ("[SPEAKER MOODY:] [T]hey were like bulleted out . . . . it looked like talking points. . . . like you're presenting a bill, you've got that broken down.").

[249] *See supra* notes 182–183 and accompanying text.

[250] *See, e.g.,* Defs.' Post-Hr'g Br., ECF No. 1284, at 27 ("Rep. Hunter was criticized for not providing the racial makeup in 2021 . . . . Democrat legislators wanted racial data during the [2025] layout. . . . In the [Texas S]enate, Sen. Menendez criticized Sen. King for not providing racial data like Rep. Hunter."); Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 129 ("[CHAIRMAN VASUT:] [T]he last time we went through this in 2021 . . . [Chairman Hunter] was asked questions about CVAP by everybody, and every amendment that came up, it was constantly a question asked, particularly by members of the Democratic Party.").

faith.[251] But the combination of these statements with Chairman Hunter's additional direct evidence overcomes that presumption.

Chairman Hunter's floor statements and exchanges with other legislators suggest that he and the bill's joint authors viewed the plan's racial numbers not merely as raw statistical facts, but as selling points of the bill. After Chairman Hunter's layout,[252] a Republican legislator and one of the bill's joint authors, Representative Katrina Pierson,[253] engaged in a colloquy with Chairman Hunter about the proposed plan's racial makeup. The purpose of that exchange was apparently to elicit for the legislative record that, by increasing the number of majority-Black districts, the bill would improve representation for voters of color, thereby addressing concerns about minority representation raised earlier in the legislative process.[254] One of the bill's other joint authors,

---

[251] *See, e.g.*, *Alexander*, 602 U.S. at 10 ("Th[e] presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions."); *see also supra* notes 189–190 and accompanying text.

[252] *See* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 59.

[253] *See, e.g.*, *id.* at 95 ("REP. PIERSON: . . . Chairman Hunter, I just want to say: thank you for bringing the bill. I'm proud to be a joint author.").

[254] *See id.* at 99–101 ("REP. PIERSON: . . . The stakeholders who testified during the field hearings [that the Legislature conducted before Chairman Hunter introduced the redistricting bill] testified that the population of Black voters in the state did not have proportionate representation. . . . Well, this current map that you have submitted actually shows where there's not just one but two majority Black CVAP districts drawn on this map; is that true? | REP. HUNTER: That is correct. And let me give everybody details. CD 18 is now 50.8 percent Black CVAP; in 2021 it was only 38.3 percent. CD 30 is now 50.2 percent Black CVAP; in 2021 it was 46 percent. | REP. PIERSON: So that's two Black CVAP districts. How many Black districts are there on the [2021 Map]? | REP. HUNTER: I don't have all the counts on that. | REP. PIERSON: The answer is zero. So overall, Black voters in the state of Texas go from zero to two majority Black CVAP seats out of the 38 seats in Texas; is that accurate? | REP. HUNTER: It's accurate . . . . | REP. PIERSON: . . . So would it be fair to say that your proposed map directly resolves many of the concerns that were expressed during those field hearings in your proposed map and would, in fact, strengthen minority representation in our state. Would you agree? | REP. HUNTER: The answer is, 'Yes.'").

*See also* Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 370, 373 ("REP. PIERSON: . . . They say we're diluting the minority districts. They call us racist, but the facts don't match your rhetoric. Texas currently has zero Black CVAP districts. And under the new map, there are two. Now, I haven't been to third grade in a really long time, but when you go from zero to two, that's an increase; or perhaps you're using liberal logic. . . . Increasing minority representation is the right thing to do . . . .").

Representative David Spiller,[255] likewise engaged in a colloquy with Chairman Hunter. In this colloquy, Representative Spiller emphasized that the proposed map increased the number of majority-Black and majority-Hispanic districts to rebut opponents' arguments that the map was "racially motivated" and "race negative."[256] Chairman Hunter himself said multiple times during the process that it was "important [for other legislators] to note that four of the five new [Republican] districts [were] majority[-]minority Hispanic CVAP districts."[257] He said it was "good," "great," and a "strong message" that those four districts were majority-Hispanic.[258] Chairman Hunter also made value-laden statements indicating that he thought his map's racial numbers were "better" and "improv[ed]" over the 2021 Map.[259]

---

[255] *See, e.g.*, Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 59 ("REP. SPILLER: . . . [T]hank you for allowing me the opportunity to joint author [the redistricting bill].")

[256] *See* Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 82 ("REP. SPILLER: . . . And this claim, that a lot of this stuff is racially motivated and race negative—let me ask you, and you've touched on it before, but we went under the [2021 Map] from zero majority Black CVAP districts in the State of Texas. And now, under your map, we added two to the list [that were] there. There there [sic] are two majority Black CVAP districts, correct? | REP. HUNTER: Correct. 18 and . . . 30. | REP. SPILLER: And on the current map we have seven majority Hispanic CVAP districts, and that is increased . . . under your [b]ill to 8. So, we're adding one more majority Hispanic CVAP district, correct? | REP. HUNTER: Yeah.").

[257] Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 54 (emphasis added).

*See also* Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 29 ("It's important to note—please note members—four of the five new districts are majority/minority Hispanic . . . .").

[258] *See* Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 122 ("REP. HUNTER: . . . [W]e created four out of five new seats of [sic] Hispanic majority. I would say that's great. That doesn't ensure that a political party wins them, but the Hispanic—four out of five Hispanic majority out of those new districts— that's a pretty strong message, and it's good.").

[259] *See, e.g.*, Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 77 (Chairman Hunter's statement that "the percentage for Black CVAP [was] better" under his proposed map); Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 220 ("REP. HUNTER: . . . CD 18 now becomes a 50.8 percent Black CVAP. [The 2021 version of CD 18 was] 38.8 percent [Black] CVAP. I think my map is much more improving [sic].").

The joint authors also repeatedly invoked *Petteway*. Chairman Hunter referred again and again to *Petteway* as one of the main impetuses for the 2025 redistricting.[260] He said that he and his joint authors had "redrawn the congressional map" based on *Petteway*'s "clarification" that "Section 2 does not require [the Legislature] to draw coalition districts."[261] He likewise commented that *Petteway* had given the Legislature a new "justification . . . to look at redistricting" since the 2021 Map's enactment.[262] And he indicated that his proposed map had taken into account *Petteway*'s holding that "there's not a requirement" to have coalition districts.[263] That all suggests

---

[260] *See, e.g.*, Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 357–58 ("REP. DUTTON: So, what else happened between the last redistricting and this [b]ill that causes you comfort to make these changes? | REP. HUNTER: Well, number one, in 2024 the *Petteway* case . . . was decided. . . . And there they said, Section 2 of the Voting Rights Act does not authorize separately protected minority groups to aggregate their populations for purposes of a vote dilution claim, and it does not require political subdivisions to draw precinct lines for these particular groups. So, this changed a lot of the law that happened in 2021.").

*See also* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 53 ("[CHAIRMAN HUNTER:] Under the Fifth Circuit—and this is a recent decision; they changed the law . . . . [c]oalition districts were held by the Court that Section 2 no longer requires the drawing of coalition districts.").

*See also* Brooks Prelim. Inj. Ex. 315-T, ECF No. 1327-15, at 6, 11, 29 (similarly referencing *Petteway*); Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 34, 49, 93, 121, 215, 326, 328, 329, 343–44, 357–58 (same).

[261] Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 28–29 ("[T]he [Fifth] Circuit, in *Petteway v. Galveston* indicates that the law has changed. The court held that Section 2 does not require us to draw coalition districts. So, giving partisan political performance as an acceptable reason and clarification from these courts, we have redrawn the congressional map with that emphasis.").

*See also* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 53 (similarly stating that the bill authors had "redrawn the congressional map" based in part on the "clarification from the Fifth Circuit on coalition districts").

[262] *See* Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 110 ("You have had a discussion about a U.S. Supreme Court [case] and a [Fifth] Circuit [case] that has new impact on the law, which gives us justification further to look at redistricting. And we looked at redistricting, and we created five new congressional seats, four are Hispanic majority.").

[263] *See id.* at 122 ("[*Petteway*] says there's not a requirement that you have to use coalition [districts]. . . . So, today, this map is taking th[at] in factor [sic].").

that the mapdrawers purposefully manipulated the districts' racial demographics to convert coalition districts into single-race-majority districts.

Chairman Hunter's exchanges with Representative Spiller reinforce this point. Representative Spiller shared DOJ's mistaken view that *Petteway* "compelled" the Legislature to systematically eliminate coalition districts from the 2021 Map.[264] Representative Spiller and Chairman Hunter identified districts that the bill would transform from coalition districts into single-race-majority districts.[265] In doing so, they emphasized that changing the coalition districts in this way brought the map into "compliance" with *Petteway*.[266]

---

[264] *See id.* at 76–77 ("REP. SPILLER: . . . [U]nder the [2021 Map], there are coalition districts that were created as such in '21 because of the law as it existed in Texas under the 5th Circuit at that time. Is that fair to say? | REP. HUNTER: That is correct . . . ."); *id.* at 77 ("REP. SPILLER: . . . So, now, in Texas, one of the reasons that we're [redistricting] now is that, we feel compelled to because of the *Petteway* case and the ruling in the *Petteway* case . . . as it relates to these coalition districts, correct? | REP. HUNTER: Well, I think it's a combination, Mr. Spiller. I think you have a U.S. Supreme Court [case], *Rucho*. You have a Fifth Circuit [case], *Petteway.* The combination of both of those cases are involved in this map.").

[265] *See* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 75 ("REP. SPILLER: I would submit to you that [CD 18] is currently a coalition district; under [your proposed map], it would not be. Coalition districts are the type that are addressed in the *Petteway* case; and so I would submit to you that it goes from a coalition district to a majority Black CVAP district, being 58.1 [sic] percent Black. | REP. HUNTER: That is correct."); Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 79 ("[REP. SPILLER:] [CD 18 was] one of these coalition districts, and under HB 4, [it] changes to a majority Black CVAP district. Is that correct? | REP. HUNTER: That is correct. It is now 50.71 percent Black CVAP. In 2021, it was 38.99 percent Black CVAP. | REP. SPILLER: And so, previously, Black voters in that district did not hold a majority, but under your [b]ill, under HB 4, they actually do. Is that correct? | REP. HUNTER: That is correct."); *id.* at 80 ("REP. SPILLER: . . . District 9 . . . was also . . . a coalition district and the [type of] district that was addressed in the *Petteway* case. And now, under your HB 4, it changed from a coalition district to a majority Hispanic CVAP district. Is that correct? | REP. HUNTER: Yes. For the record, the Hispanic CVAP of Congressional District 9 under this plan . . . is 50.15 percent. In 2021, it was 25.73 percent.").

[266] *See* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 81–82 ("REP. SPILLER: . . . So, in summary, is it your testimony here today that you believe that the map created under [your bill] is in compliance with the *Petteway* case . . . ? | REP. HUNTER: Yes.").

Finally, when a legislator from the opposing party directly asked Chairman Hunter whether he had "purposely altered" certain coalition districts to make them single-race-majority districts, Chairman Hunter did not deny that he had.[267]

All the evidence discussed so far overcomes the presumption of legislative good faith. Chairman Hunter and the other joint authors evidently strategized that a map that eliminated coalition districts and increased the number of majority-Hispanic and majority-Black districts would be more "sellable" than a nakedly partisan map.[268] The legislators could point to the map's increased number of majority-minority districts to rebut accusations of racism.[269] The Governor could promote the map to Hispanic voters who might be inclined to swing Republican.[270] And legislators could deny they were redistricting for purely partisan reasons or to placate President Trump, and instead say that DOJ and *Petteway* had forced their hand.[271] It was, therefore, critical for the redistricting bill's authors to compile a legislative record replete with racial statistics and references to *Petteway*—which is exactly what they did.

---

[267] *See* Prelim. Inj. Hr'g Tr. Day 1 (Afternoon), ECF No. 1337, at 51 ("REPRESENTATIVE TURNER: . . . CD18 was purposely altered to a Black CVAP majority district rather than a 38.8 percent Black CVAP district, right? | REPRESENTATIVE HUNTER: CD18 was drawn to be a 50.81 percent CVAP, which is 11.82 change plus. . . . | REPRESENTATIVE TURNER: . . . And similarly, the proposed CD35 was purposely changed to increase its Hispanic CVAP to be about 50 percent, correct? . . . | REPRESENTATIVE HUNTER: 51.57 percent. And it also has political performance involved . . . in all of this.").

[268] *Cf. Cooper*, 581 U.S. at 308 n.7 ("[I]f legislators use race as their predominant districting criterion with the end goal of advancing their partisan interests—perhaps thinking that a proposed district is more 'sellable' as a race-based VRA compliance measure than as a political gerrymander and will accomplish much the same thing—their action still triggers strict scrutiny.").

[269] *See supra* notes 252–259 and accompanying text.

[270] *See supra* Sections II.E & III.B.3.b.ii.

[271] *See supra* notes 264–266; *see also supra* Section III.B.3.d.iii.

Even though partisanship was undoubtedly a motivating factor in the 2025 redistricting process, "race was the criterion that, in the State's view, could not be compromised."[272] It wasn't enough for the map to merely improve Republican performance; it also needed to convert as many coalition districts to single-race-majority districts as possible. That best explains the House bill's authors' comments during the legislative process and the map's stark racial characteristics. The bill's main proponents purposefully manipulated the districts' racial numbers to make the map more palatable. That's racial gerrymandering.[273]

We reach that conclusion even though Chairman Hunter stated repeatedly that the bill was primarily driven by non-racial partisan motivations.[274] Chairman Hunter often referred to *Rucho* as another primary driver for the 2025 redistricting—sometimes in the same breath as *Petteway*,[275]

---

[272] *E.g.*, *Bethune-Hill*, 580 U.S. at 189 (citation modified).

[273] *See, e.g.*, *Abbott v. Perez*, 585 U.S. at 585–86 ("The Equal Protection Clause forbids racial gerrymandering, that is, intentionally assigning citizens to a district on the basis of race without sufficient justification." (citation modified)).

[274] *See, e.g.*, Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 52 ("[W]e are allowed to draw congressional districts . . . based on political performance, political partisanship. That's recognized by the United States Supreme Court. These districts were drawn . . . primarily using political performance . . . ."); Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 28 ("You want transparency? Here's the U.S. Supreme Court legal transparency. The underlying goal of this plan is straightforward, improve Republican political performance."); Brooks Prelim. Inj. Ex. 315-T, ECF No. 1327-15, at 4 ("[T]his map is based on partisanship, political performance . . . . [I]t has enhanced and increased Republican partisanship enhanced performance [sic].").

[275] *See, e.g.*, Brooks Prelim. Inj. Ex. 315-T, ECF No. 1327-15, at 6 ("So based on *Rucho*, based on *Petteway*, this, Mr. Chairman, is what the Committee substitute addresses."); *id.* at 29 ("I'm following *Rucho*, the U.S. Supreme Court [sic] in *Petteway*. And it allows us to do this . . . ."); Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 77 ("[I]t's a combination . . . I think you have a U.S. Supreme Court [case], *Rucho*. You have a Fifth Circuit [case], *Petteway*. The combination of both of those cases are involved in this map.").

sometimes not.[276] Chairman Hunter also stated on the House floor that he was "not guided" by the

DOJ Letter in the redistricting process.[277] He mentioned at various times that he had taken other

race-neutral districting criteria like compactness into account.[278] And he said on the floor that he

"didn't go at" any coalition districts.[279]

---

[276] *See, e.g.*, Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 28 ("We are allowed to draw congressional districts on the basis of political performance as recognized by the U.S. Supreme Court in *Rucho v. Common Cause*."); Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 68–69 ("REP. SPILLER: . . . Is it fair to say that the map in HB 4 based [sic] on political performance or partisan performance? | REP. HUNTER: The answer is, 'Yes.' And I want everybody to know that. . . . [I]t's based on *Rucho*, a United States Supreme Court case.").

[277] *See* Prelim. Inj. Hr'g Tr. Day 2 (Morning), ECF No. 1415, at 131 ("[T]he Department of Justice letter is a letter. . . . That's not guiding me. I'm presenting a plan. And they can review the plan. . . . And if they . . . believe that I've addressed issues, good. If they believe I haven't, good. But whatever they've sent, I'm not ignoring, I'm not accepting. I'm doing this plan. So whatever their involvement is, they just sent a letter, as far as I'm concerned.").

*See also* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 61 ("I don't know if [the 2025 redistricting] was caused by the Department of Justice. I keep hearing that, and I keep hearing about a letter. All I know is we're here by proclamation of the [G]overnor. Now, what the letter has to do with it, I've got no personal knowledge. I have no knowledge. And I will tell you: I don't know what that has to do with this. That wasn't part of me. All I know is we had a Special Session called and this was the topic and I agreed, by the request of [Chairman Vasut], to file this bill.").

*See also* Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 108–09 ("REP. GARVIN HAWKINS: . . . What was your understanding of the DOJ's letter regarding redistricting? | REP. HUNTER: Well, my answer hasn't changed one bit. There was a DOJ letter. It's out there. DOJ will get to review this. I have no criticism. I have no feedback. They do what they want. We do what we want. Nothing any different. | REP. GARVIN HAWKINS: Okay. So you've read [the DOJ Letter] now. . . . | REP. HUNTER: I have not . . . I just read parts of it.").

However, Chairman Hunter also made a statement suggesting that the lawyers he hired to produce the map had "t[aken the DOJ Letter] into account" when creating the map. See Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 111 ("REP. HUNTER: Look, there was a DOJ letter. . . . [T]he lawyers looked at it, took it all into account, and then we came up with this plan which set it dot [sic]. It mapped the threshold. It mapped the requirements.").

[278] *See, e.g.*, Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 95 ("REP. PIERSON: . . . This has been redrawn, as you stated in your opening statement, to reflect political performance but also compactness; is that right? | REP. HUNTER: Yes.").

[279] *See* Brooks Prelim. Inj. Ex. 316-T, ECF No. 1327-16, at 344 ("I didn't go at coalition districts. I had the lawyers come up with five seats and enhance the Republican performance, and that's what we did. I didn't go at a coalition.").

But if Chairman Hunter's motives were exclusively partisan as the State Defendants contend, why mention *Petteway* at all? Why not just base the 2025 redistricting exclusively on *Rucho*?[280] The answer must be that race and *Petteway* were essential ingredients of the map, without which the 2025 redistricting wouldn't have occurred.[281] The fact that *Rucho* was already the law when the Legislature redistricted in 2021[282] further cements the notion that *Petteway* was the primary driver behind the 2025 redistricting. *Petteway* was the only thing about the legal landscape that had changed since 2021.[283]

### 4.    Contrary Direct Evidence of Legislative Intent

The State Defendants' contrary direct evidence regarding the Legislature's intent primarily comes from:

(1)    Senator Phil King, the Chairman of the Senate Redistricting Committee and the sponsor of the Senate counterpart to the House redistricting bill;[284]

(2)    Senator Adam Hinojosa; and

(3)    Representative Cody Vasut, who was the Chairman of the House Select Committee on Congressional Redistricting in 2025.[285]

---

[280] *See supra* Section II.A.4.

[281] *See supra* Section II.C (recounting that requests to redistrict for purely partisan reasons went nowhere).

[282] *See Rucho v. Common Cause*, 588 U.S. 684 (decided June 27, 2019).

[283] *See Petteway v. Galveston County*, 111 F.4th 596, 600 (5th Cir. 2024) (en banc) (decided August 1, 2024); *see also supra* Section II.B.

[284] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 77.

[285] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 60.

These legislators each testified at the preliminary-injunction hearing that race played no role in the 2025 redistricting process. But their testimony is less probative than the Plaintiff Groups' evidence.

### a.    Chairman King

At the preliminary-injunction hearing, as well as on the Senate floor, Chairman King insisted that the DOJ Letter did not motivate his votes and actions during the 2025 redistricting process.[286] He claimed that he did not look at racial data at all,[287] and that, to his knowledge, the 2025 Map was drawn blind to race.[288]

Chairman King maintained that his goals in the 2025 redistricting were to achieve three lawful, race-neutral objectives:

(1)    to increase the likelihood that the districts would elect Republicans;

(2)    to enact a map that complied with all applicable law; and

(3)    to make several of the districts more compact.[289]

---

[286] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 80 ("Q. What significance did [the DOJ L]etter play in Texas redistricting in 2025? | A. Well, I can't speak for everyone else in the Legislature, but for me it didn't really carry any significance."); Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 107 ("[M]y support . . . of [the redistricting bill] does not in any way take into account the DOJ letter."); Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 139 ("I honestly never took the [DOJ L]etter into account. I didn't think it mattered.").

*See also* Brooks Prelim. Inj. Ex. 319-T, ECF No. 1327-12, at 208 (Chairman King's statement on the Senate floor that he "thought the DOJ Letter . . . unnecessarily confused the redistricting process").

[287] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 111 ("Q. . . . Did you review any racial data associated with [the redistricting bill]? | A. No, I didn't look at any racial data."); Prelim. Inj. Hr'g Tr. Day 2 (Morning), ECF No. 1415, at 32 ("I have not taken racial data into consideration in drawing the map.").

[288] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 111 ("Q. To your knowledge, was race used in the drawing of the map? | A. It was not.").

[289] *See, e.g.*, *id.* at 85.

Chairman King said that he sponsored and voted for the enacted map because it achieved all three of those race-neutral objectives.[290] Chairman King further testified that the motives of the Legislature as a whole were partisan rather than racial.[291] Chairman King's testimony thus supports the State Defendants' position that race didn't play any role whatsoever, let alone predominate, in the 2025 redistricting process.[292]

For the following reasons, though, we find Chairman King's testimony and legislative statements less probative of the Legislature's intent than those of Speaker Burrows, Chairman Hunter, Representative Oliverson, Representative Toth, Representative Spiller, and Representative Pierson.

### i.    Chairman King's Minimal Role in the Redistricting Process

First, Chairman King played a much less significant role in the 2025 Map's development and passage than other legislators, even though he served as Chairman of the Senate Redistricting Committee. He testified that the House—not the Senate—took "the lead on redistricting."[293] He further admitted that he played "[no role] whatsoever" in drafting the map that the Legislature

---

[290] *See, e.g.*, *id.* at 115 ("Q. And did the map that ultimately passed both houses of the Legislature, did it meet all three of your stated goals? | A. Yes. It was a legal map, it should elect more Republican members to the U.S. House, and it did improve compactness in some districts."); Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 52–53 (similar).

[291] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 77 ("Q. And what is your understanding of why . . . redistricting was being considered in Texas? | A. Well, it was absolutely to create more Republican seats in the U.S. Congress."); *id.* at 99–100 ("Q. And so was Texas Congressional Redistricting, and the reasons for it, widely publicized both prior to it being placed on the call and during the redistricting effort? | A. Oh, yes. I think it was apparent to everyone the purpose of it was partisan . . . .").

[292] *See supra* notes 155–158 and accompanying text.

[293] Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 91.

*See also, e.g.*, *id.* at 121–22 ("The Lieutenant Governor . . . had told me that [he and the Speaker had] divided up all the major issues between the House and the Senate. . . . He informed me that the House would take the lead [on redistricting] . . . .").

ultimately enacted.[294] Chairman King merely took the same map that the House had introduced during the Legislature's first special session and introduced it, unchanged, in the Senate.[295] He stated on the Senate floor that he didn't "really have any personal knowledge of the inner workings that went into who participated in drawing the maps."[296] And, by his own admission, Chairman King was "out of the loop" for key milestones in the 2025 redistricting process.[297] Thus, as between Chairman King and Chairman Hunter—the latter of whom was far more intimately involved in the 2025 Map's development and passage—we find Chairman Hunter's statements regarding the purposes underlying the 2025 redistricting much more probative.

---

[294] *See id.* at 91 ("Q. Did you play any role in drawing the map for [the Senate counterpart to the House redistricting bill] during the first Special Session? | A. No, none whatsoever. | Q. And did you draw any map for redistricting in 2025? | A. No, I did not. | Q. Did you open any map-drawing software? | A. No, I did not.").

*See also* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 127 ("Q. . . . [Y]ou only saw the final product, right? You only saw the versions that were filed in the House that you then filed during each of the special sessions, correct? | A. That is correct. | Q. You weren't involved in any interim steps of the map, true? | A. That is correct.").

[295] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 91 ("A. . . . [The House] passed their bill out of committee and then, before it got to the floor, the Democrats broke quorum and left the state. And so at that point I went ahead and filed the companion bill, which was SB4. | Q. Where did you get the map that was associated with Senate Bill 4? | A. Well, it was the same map that was being considered by the House.").

[296] Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 108.

[297] *See* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 140–41 ("Q. . . . Do you have any idea when it is that the map that Mr. Kincaid drew landed with the lawyers for Chairman Hunter? | A. No. | Q. The testimony here is that took place on July the 23rd. And it sounds to me like you were out of the loop in terms of the delivery of that map. Is that fair to say? | A. Yes.").

*See also* Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 119 ("CHAIRMAN KING: . . . [The mapdrawer, Adam Kincaid] called me and asked me if I was aware that the House was going to be putting out a map that had some changes from the original H.B. 4. And I said, no, I wasn't.").

*See also* Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 120 ("SENATOR GUTIERREZ: . . . There were some changes between the final version of H.B. 4 and the committee sub[stitute]? . . . My understanding of that is those changes were made at the behest of incumbent congresspeople. Is that accurate? | CHAIRMAN KING: I do not know.").

ii.        **Inconsistencies in Chairman King's Testimony**

Second, a concerning portion of the hearing evidence was inconsistent with Chairman King's testimony and floor statements.

On direct- and cross-examination, the parties thoroughly explored conversations between Chairman King and Adam Kincaid during the legislative process. Mr. Kincaid was the outside mapmaker who drew nearly all of the 2025 Map.[298] Significant aspects of Chairman King's testimony about those conversations were inconsistent with other evidence.

For instance, Chairman King spoke briefly with Mr. Kincaid at the American Legislative Exchange Council ("ALEC") conference in mid-July 2025.[299] As Chairman King tells it, he told Mr. Kincaid that he didn't want to talk about the redistricting maps, because he believed he'd likely be chairing the Senate Redistricting Committee, and he wanted all information about redistricting to come through public channels.[300] By contrast, Mr. Kincaid testified that Chairman King openly questioned him about the redistricting efforts during their conversation at ALEC—without ever stating that he'd prefer not to talk about the maps due to his likely future position on the

---

[298] *See infra* Section III.B.4.d.

[299] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 82 (Chairman King's testimony); Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 20 (Mr. Kincaid's testimony).

[300] *See* Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 82 ("I told him at that—when we met that I would not—or that I would probably be chairing the Redistricting Committee and that I preferred that we not discuss the redistricting maps."); *id.* at 118 ("Q. . . . [W]hat you stated here today is that you told Mr. Kincaid you didn't want to hear anything about the Texas Redistricting Map. Did I hear that correctly? | A. Yes."); *id.* at 119 ("Q. . . . Why did you tell Adam Kincaid you didn't want to know anything about the Texas map that you were about to facilitate the passage of? | A. . . . I wanted all information that came to me to come in a public forum."); *id.* ("I said, 'Let's not talk about the map.'").

*See also* Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 117–18 (Chairman King's floor statement that he "specifically told" Mr. Kincaid: "Don't tell me anything you are doing with regard to map drawing. Don't tell me about the details of any map if you are involved in it."); Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 128 (Chairman King's floor statement that he "specifically told" Mr. Kincaid: "Don't tell me anything about the maps you're drawing. I don't want to discuss that.").

committee.[301] While Chairman King testified that he never asked how many seats Republicans would potentially gain under the 2025 Map,[302] Mr. Kincaid unequivocally testified that Chairman King specifically asked him how many seats Republicans could pick up under the new map, and Mr. Kincaid told him.[303] When counsel confronted Chairman King with that discrepancy at the preliminary-injunction hearing, he conceded that either he was misremembering or Mr. Kincaid's testimony was incorrect.[304] That leads us to question whether Chairman King, Mr. Kincaid, or neither one was accurately relaying the substance of their meeting at ALEC—and whether anything happened during that meeting that would betray an unlawful legislative motive.

---

[301] *See* Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 20–22 ("Q. And what did you discuss? | [MR. KINCAID:] . . . He said, 'How many seats are we talking?' I said, 'Five seats. It's going to be a five-seat pickup.' . . . | Q. . . . But you did talk about the map? | A. Broadly, yes. There was kind of open questioning at that point in time whether or not we would actually be able to pick up five seats. . . . | Q. And he was curious about that? | A. Yeah. He was curious, like, 'Is it actually five seats?' And I said, 'Yes, five seats.' | Q. And you confirmed that for him? | A. I believe so. . . . | Q. Do you remember anything else he said to you in that meeting? | A. He mentioned something about, you know, getting the map done—or, you know, working together to get the map done, something along those lines.").

[302] *See* Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 119 ("Q. You left that meeting with not a bit of knowledge over what this map would look like? | [CHAIRMAN KING:] I don't recall us discussing any details of the map. . . . I said, 'Let's not talk about the map.' | Q. He didn't tell you how many Republican seats might be harvested? | A. Not that I recall.").

[303] *See* Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 20–22 ("[ADAM KINCAID:] . . . He said, 'How many seats are we talking?' I said, 'Five seats. It's going to be a five-seat pickup.' . . . | Q. And he was curious about that? | A. Yeah. He was curious, like, 'Is it actually five seats?' And I said, 'Yes, five seats.'").

[304] *See* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 131–32 ("Q. . . . I specifically asked you if you were told [during the ALEC] meeting whether or not the map was going to make changes to five districts. . . . And you said, no, I didn't want to know anything about the map. That was your testimony here. | [CHAIRMAN KING:] My recollection of the meeting was that when we sat down and I told Adam it looks like I'm going to be the chairman of the committee and so I don't want to talk anything about the map. | Q. And so if it's been stated under oath here in this courtroom in that chair by a different witness that . . . you specifically asked about the number of districts that would be affected and were told five would be affected, that testimony was false, in your opinion? | A. It's either incorrect or I'm remembering incorrectly.").

Chairman King's testimony at the preliminary-injunction hearing was also inconsistent with statements he gave on the Senate floor. He testified that "sometime late in the first-called Special Session"[305]—*i.e.*, sometime shortly before August 15, 2025[306]—he called Mr. Kincaid to ask whether he "use[d] racial data in drawing the map."[307] According to Chairman King, Mr. Kincaid answered that he hadn't used racial data.[308]

However, on August 22, 2025—shortly after that call allegedly occurred—Senator Roland Gutierrez directly asked Chairman King on the Senate floor if he knew whether the mapdrawer "looked at race in creating the[] map."[309] Despite having allegedly called Mr. Kincaid a little over a week earlier to ask him exactly that question, Chairman King told Senator Gutierrez that he didn't know whether the mapdrawer had looked at race.[310] In fact, Chairman King told Senator Gutierrez during that same exchange that he hadn't even "inquired as to who physically drew the

---

[305] Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 82–83.

[306] *See* Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 110 (testimony that the first-called special session adjourned on August 15, 2025).

[307] Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 83 ("I had been repeatedly asked on the floor and in hearings if racial data was used to draft the map. I had always answered that, to my knowledge, it was not. I finally just picked up the phone and called Adam [Kincaid] and said, 'Adam, I just have one question to ask you. Did you use racial data in drawing the map?'").

*See also* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 128–29 ("I did call [Mr. Kincaid] and ask him if he used racial data because I had been asked so many times on the floor and in committee. And I finally thought, well, I'll just call him and ask him. And so I picked up the phone and I said, [']Mr. Kincaid, just one question for you. I don't want to talk about the map. Did you use racial data in drawing this map?[']").

[308] *See* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 129 ("[H]e responded, [']no, I did not.[']").

[309] *See id.* at 176; *see also* Brooks Prelim. Inj. Ex. 319-T, ECF No. 1327-19, at 14.

[310] *See* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 176 ("SENATOR GUTIERREZ: And you don't know whether [the mapdrawer] looked at race in creating these maps, do you? | SENATOR KING: What I—no."); *see also* Brooks Prelim. Inj. Ex. 319-T, ECF No. 1327-19, at 14.

maps."[311] Yet Chairman King clearly knew Mr. Kincaid had drawn the map, since he had allegedly

called Mr. Kincaid just a week or two earlier to ask him whether he had based that map on race.

Chairman King's testimony in court thus conflicts with his responses to Senator Gutierrez on the

Senate floor—causing us to further question his credibility.[312]

The record also contains discrepancies regarding:

(1)     whether Chairman King's meeting with Mr. Kincaid at ALEC was
        unplanned or prearranged;[313] and

---

[311] *See* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 176; *see also* Brooks Prelim. Inj. Ex. 319-T, ECF No. 1327-19, at 14.

[312] Respectfully, we disbelieve Chairman King's assertion that his conversation with Mr. Kincaid about whether he used racial data simply slipped his mind during his exchange with Senator Gutierrez because Chairman King was drained from a lengthy legislative debate. *Contra* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 129 ("[T]hat was in the middle or toward the end . . . of a four- to six-hour debate where I had been standing on the floor as the sole member representing that map, that bill. And, you know, it's just easy to make a mistake when you have been through that long a debate."). We find it unlikely that Chairman King would have forgotten about a particularly recent conversation that he personally initiated with one of the key participants in the redistricting process about an issue critical to the map's legality. *See id.* ("Q. . . . [I]t seems like when Senator Gutierrez asked you about your contacts with Kincaid . . . that might be the first one at the front of your lobe that you would think of. Don't you agree? | A. I don't disagree with that . . . .").

[313] *Contrast, e.g.*, Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 130 (Chairman King's testimony at the preliminary-injunction hearing that he and Mr. Kincaid "bumped into each other" at ALEC), *and* Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 82 (similarly testifying that he and Mr. Kincaid "ran into each other at the ALEC . . . conference"), *and* Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 117 (Chairman King's floor statement that he "ran into [Adam Kincaid] at the ALEC Annual Conference"), *with* Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 21–22 (Q. And you just, like, happened to run into each other or had you made a plan to— | [ADAM KINCAID:] We planned to meet. | Q. Okay. How did that planning process happen? Did he call you, text you? | [ADAM KINCAID:] I think we spoke briefly the day before and said, 'Hey, let's meet up at ALEC.' | Q. Okay. And that was a phone call that he made? | [ADAM KINCAID:] Yeah. Or I made. I can't remember . . . who called who.").

*See also* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 130–31 ("Q. And so if it's been stated under oath in this courtroom that you didn't run into Mr. Kincaid, you had a phone call with him the day before to arrange a meeting with Mr. Kincaid, that testimony is false, in your opinion? | [CHAIRMAN KING:] I don't remember a phone call with Adam Kincaid . . . during the ALEC.").

(2)    the substance and existence of other communications between Chairman King and Mr. Kincaid during the 2025 redistricting process.[314]

We might dismiss those inconsistencies as innocuous memory lapses if we considered either one of them in a vacuum. But the number of inconsistencies regarding potentially critical exchanges between the Chair of the Senate Redistricting Committee and the person who drew the 2025 Map makes us doubt the veracity of Chairman King's testimony.

For the foregoing reasons, we do not credit Chairman King's testimony about the Legislature's motives.

### b.    Senator Hinojosa

We next consider the testimony of Senator Adam Hinojosa. Senator Hinojosa delivered a speech on the Senate floor stating that he was voting for the 2025 Map for partisan rather than

---

[314] *Contrast* Prelim. Inj. Hr'g Tr. Day 5 (Afternoon), ECF No. 1341, at 142 (Chairman King's testimony at the preliminary-injunction hearing that he never "call[ed] up Adam Kincaid" to "ask him to come give his testimony to the Senate" because he'd "already sent him a letter formally inviting [Mr. Kincaid] to do so"), *with* Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 23 ("[ADAM KINCAID:] [Chairman King] called me one time during the hearings . . . . He wanted to make sure . . . I had received the invitation to testify. | Q. Okay. And what did you say? | A. 'Yes.' | Q. And what else did you say? | A. 'I couldn't make it to Austin.' | Q. And how did he respond to that? | A. 'Okay.' | Q. And so . . . the general nature of that phone call was just calling you to . . . ask if you'd gotten the invitation? | A. He wanted to make sure I knew I was invited to come. . . . He made a point to say that he had made a promise to the Democrat he was working with to, you know—he would do that, so he did.").

*See also* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1421, at 147–48 ("Q. Now, you recall the testimony here on Monday, I asked you . . . did it ever occur to you, since you had [Mr. Kincaid's] number and your colleagues were asking for it, to just call him up and ask him to come down and talk to the committee? . . . | [CHAIRMAN KING:] I do. | Q. And you said nobody ever asked me to do that. Do you remember that? | A. That sounds correct. Nobody did ever ask me to do that. | Q. And so if it's been the testimony here that in fact you did call Mr. Kincaid and ask him to come to the committee and testify, and he told you he was too busy and couldn't spare three days, that testimony, in your view, is false? . . . . | A. It would be incorrect. I sent him a letter as an invitation.").

racial reasons.[315] While we have no reason to doubt the truthfulness or sincerity of that speech, we don't think Senator Hinojosa's testimony and contemporaneous legislative statements move the needle. Senator Hinojosa had little involvement in the redistricting process beyond voting for the bill and delivering a brief speech in support.[316] Thus, Senator Hinojosa's testimony tells us, at most, why one single legislator voted for the 2025 Map. Precedent cautions us not to "overemphasiz[e] statements from individual legislators,"[317] as "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it."[318] We find the contemporaneous statements of the 2025 Map's sponsors and primary champions more probative of the Legislature's intent.[319]

---

[315] *See* Prelim. Inj. Hr'g Tr. Day 7 (Afternoon), ECF No. 1343, at 67–70 ("[L]et's stop pretending that this is all about race. It is about values. It is about representation—real representation. The fact that we are redrawing the maps is to ensure that . . . the people are able to have representation that reflects their values, not their last name, not their skin color. . . . And with that, members, I proudly stand and look forward to casting my vote in favor of House Bill 4."); *see also* Defs.' Prelim. Inj. Ex. 1325, ECF No. 1357-5, at 63–66.

[316] *See* Prelim. Inj. Hr'g Tr. Day 7 (Afternoon), ECF No. 1343, at 78–79 ("Q. This record reflects that at no point prior to [your speech on the floor] had you engaged in the legislative process on the map. Isn't that true? | A. Right, drawing maps or anything like that, no. | Q. There was [sic] no public comments from you in committee, either on the dais or as a participant, as a witness, or in any of the Senate floor proceedings on this map until that speech that we saw here in Court today. Is that fair to say? | A. Fair to say."); *id.* at 80 ("Q. . . . [Y]ou weren't involved in the drawing of the lines that are made up of this new congressional map. Is that fair to say? | A. That's correct, sir.").

*See also id.* at 65 (Senator Hinojosa's testimony that he didn't serve on the Senate Redistricting Committee in 2025).

[317] *See Fusilier*, 963 F.3d at 466.

[318] *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *see also, e.g.*, *Fusilier*, 963 F.3d at 466 (indicating that the quoted language from *O'Brien* remains good law).

[319] *See supra* note 237 and accompanying text.

### c.    Chairman Vasut

Finally, Chairman Vasut. In contemporaneous statements to the media, Chairman Vasut insisted that the 2025 Map was motivated by partisan rather than racial considerations,[320] and that the DOJ Letter did not influence the Legislature in the redistricting process.[321] Chairman Vasut likewise stated in legislative hearings that he wasn't influenced by the Governor's media statements conveying a desire to eliminate coalition districts.[322]

We do not disregard Chairman Vasut's testimony on credibility grounds like Chairman King's. And unlike Senator Hinojosa, Chairman Vasut held a key position in the redistricting process as Chair of the House Select Committee on Congressional Redistricting[323] and as one of the House bill's joint authors.[324] Accordingly, we do not dismiss Chairman Vasut's statements as the views of a rank-and-file legislator who wasn't intimately involved in the redistricting process.

---

[320] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 117 ("I have not seen any evidence that this map was racially based. What I have seen is evidence that this map was politically based.").

[321] *See id.* at 118 ("I disagree with the assumption that this process had anything to do with the DOJ letter. Yeah, they sent us a letter, but as you know, the proclamation called us in to do congressional redistricting, and we did congressional redistricting when we passed HB4 based off of political performance. So I frankly don't care what the DOJ letter said—and I think it's pretty clear that no one does. . . . So this bill was not based off of that DOJ letter. That bill was based off of improving political performance.").

*See also id.* at 81 (Chairman Vasut's testimony that the "DOJ [L]etter did not factor into [his] decision to make any vote on" the 2025 Map).

[322] *See id.* at 93–94 ("REPRESENTATIVE WU: Do you know whether the Governor's true intent is to remove coalition districts from Texas maps? . . . Would you be surprised if the Governor specifically said, point blank, quote, We have the ability now to draw maps that don't have coalition districts, end quote? . . . | REPRESENTATIVE VASUT: I'm aware of the Governor making remarks . . . . [b]ut it's not the [C]hair's intention to be taking action based off the . . . expressed words of the Governor in a private setting. The Governor has given a proclamation, and, as the [C]hair has indicated, the [C]hair is going to act on that proclamation.").

[323] *See supra* note 286 and accompanying text.

[324] *See* H.B. 4, 89th Leg., 1st Spec. Sess. (Tex. 2025); H.B. 4, 89th Leg., 2d Spec. Sess. (Tex. 2025).

On balance, however, the direct evidence of a predominant racial motive outweighs the direct evidence on the other side. The fact that one witness provided testimony that challenges the Plaintiff Groups' claims doesn't prevent them from meeting their burden at this stage.

We conclude that the contemporaneous statements of legislators involved in the 2025 redistricting are more indicative of racial motives than partisan ones. When we consider that direct evidence with the circumstantial evidence of racial gerrymandering, the totality of the record persuades us that the Plaintiff Groups have shown the requisite likelihood of success on the merits of most of their racial-gerrymandering claims.

### d.    Adam Kincaid

As previewed above, the person who drew all but a small portion[325] of the 2025 Map was Mr. Adam Kincaid.[326] Mr. Kincaid wasn't a member of the Legislature; instead, the Republican National Committee hired Mr. Kincaid as an outside mapmaker to draw the State's congressional plan.[327]

---

[325] The Legislature made certain changes to the introduced map that Mr. Kincaid didn't draw. *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 159 ("Q. . . . [D]id the border you drew that we see in [the introduced version of the 2025 Map] between [CDs] 16 and 23 make it into the final map? | A. It did not. | Q. Did you draw the change between 16 and 23 between [the introduced map] and [the enacted map]? | A. I did not."); *id.* at 173 ("The . . . change was in El Paso. . . . [T]hat was a change that had come from the Texas House. I did not draw that.").

No Plaintiff Group challenges those non-Kincaid-drawn districts on racial-gerrymandering grounds, *see* Chart of Claims, ECF No. 1208-1, at 2–4, so nothing about Mr. Kincaid's non-involvement with those districts affects our legal conclusions.

[326] *See* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 33–34.

[327] *See id.* at 59–62.

### i.    Mr. Kincaid's Testimony

At the preliminary-injunction hearing, Mr. Kincaid testified extensively about his thought process when drafting the 2025 Map.[328] He stated that although he has the ability to display racial demographic data on his mapdrawing software,[329] he did not look at any racial data when drafting the 2025 Map.[330] Mr. Kincaid thus testified unequivocally that he drew the 2025 Map completely blind to race.

---

[328] *See id.* at 76–191.

We leave undetermined the issue of whether Mr. Kincaid's testimony amounted to undisclosed expert testimony that we must exclude from the preliminary-injunction record. *See id.* at 6–32 (the parties' arguments on that issue). Either way the Court were to rule on that issue would not substantially change the Court's determination of the preliminary-injunction motions.

[329] *See id.* at 43 ("Q: Is the census data that comes preloaded in . . . your redistricting software, your map drawing software, is there racial data in there? | A. Yes."); *id.* at 45 ("Q. Can you help the Court understand whether you can ever see racial data on this screen? How that happens? | A. Sure. So . . . [the software] has at the top left corner is a . . . demographics tab. You click on that. . . . [I]t will have all the census data that's provided by the [B]ureau . . . . So you can select or not select . . . whatever datasets you are looking to work with.").

*See also, e.g.*, Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 54 ("Q. . . . [I]f you had [CVAP] by race on your platform . . . you could also set it up in [a display box on the screen] so that every time you moved geography into and out of the district, even if you are using shading on political performance, you could watch those numbers changing as you are adding or taking out geography with respect to, for example, Hispanic [CVAP]? | A. You could do that, yes.").

[330] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 46 ("[W]hen you draw a map . . . do you have racial data visible? | A. I do not.").

*See also id.* at 57–58 ("Q. Do you ever become aware of racial data after you draw a map? | A. Yes. | Q. Do you then incorporate that racial data into your next draw of the map? . . . So let's say—have you ever been in a situation where you drew a map without looking at race? | A. Uh-huh. | Q. And then found out the racial makeup of a given district and then gone back and made changes to that district based on that racial understanding? | A. No."); *id.* at 191 ("Q. Did you make any changes as a result of becoming aware of the racial demographic character of the districts in [the first version of the 2025 Map you drew]? | A. I did not. | Q. Why not? | A. I don't draw based off of race.").

- 91 -

Mr. Kincaid testified that he instead based his districting choices entirely on partisan, political, and other race-neutral criteria:

(1)    "[E]very Republican incumbent who lived in their seat" under the 2021 Map needed to "stay[] in their seat" under the 2025 Map.[331]

(2)    "[E]very Republican incumbent who was in a district that President Trump had won with 60 percent of the vote or more in 2024" needed to "stay[] in a district that President Trump won . . . with 60 percent of the vote or more."[332]

(3)    For incumbent Republican members "who were in districts that President Trump had carried but by less than 60 percent of the vote," Mr. Kincaid "either had to improve" the Republican performance of those districts "or keep their Partisan Voting Index" ("PVI") "the same."[333]

---

[331] *See id.* at 64.

*See also* Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 125–26 (testifying that the requirement that "incumbent Republicans who lived in their seats stayed in their seats" was an "instruction[]" from the White House").

[332] *See* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 65.

*See also, e.g., id.* ("I was not allowed to take any incumbent Republican who was above 60 below 60."); Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 125–26 (testifying that "the 60 percent threshold for incumbent [Republican] members of [C]ongress" was an "instruction[]" from the White House").

[333] *See* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 65.

*See also* Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 125–26 (testifying that the requirement not to "decrease [the partisan performance of] the districts that were under 60 percent" was an "instruction[]" from the White House").

*See also* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 65–66 (defining PVI); Prelim. Inj. Hr'g Tr. Day 9 (Morning), ECF No. 1422, at 59–61 (expert testimony further explaining how PVI is measured).

(4)    The map needed to create five new Republican-leaning seats ("pickup opportunities")[334] in which:

(a)    President Trump carried the district by at least 10% in the 2024 Presidential Election;[335] and

(b)    Senator Ted Cruz carried the district in the 2024 U.S. Senate Election.[336]

---

[334] *See* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 67 ("Another [criterion] was the five pickup opportunities. . . . five districts that Republicans could gain that we currently did not hold in the 2026 midterms.").

Mr. Kincaid testified that he was free to decide which specific districts to flip, and that he based those decisions on the "political realities as [he] worked through the map." *See* Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 129–30.

[335] *See* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 67 ("[T]he five [new districts], at a minimum, every single one of them had to be a district that President Trump carried by ten points or more . . . ."); *id.* at 68–69 ("[T]he 10 points was a minimum result. He had to win it by a minimum of 10 percent. It didn't mean I couldn't draw a district at Trump plus 20 . . . ."); *id.* at 69 ("Q. . . . If you had the opportunity to draw a district that was more Republican than Trump plus 10 in '24, did you try to take that opportunity? | A. Absolutely.").

[336] *See, e.g.*, *id.* at 68 ("[E]very one of those seats had to be carried by Ted Cruz in 2024. There was no set amount of range on how much he had to win it by, but he had to win each of those five seats.").

Where possible, Mr. Kincaid also configured those districts such that Governor Abbott carried the district by a comfortable margin in 2018 and 2022. *See id.* at 72 ("I also looked at Governor Abbott's performance in 2022 and 2018. We wanted to make sure that all of those districts, or at least most of them, were seats that he carried by as decent a margin as possible within the criteria in [20]22 and [20]18 because, obviously, the first test of this map would be in a midterm election versus a presidential election."). Mr. Kincaid occasionally deviated from that criterion, however. *See id.* at 161 ("Q. Did you look at the Abbott 2022 numbers when you were drawing District 28? | A. I did. | Q. How, if at all, did that inform the way that you drew it? | A. Governor Abbott didn't carry those districts down there, but I was able to get them the Cruz and Trump numbers that did. So that's what I looked at.").

(5)    It needed to appear likely, based on various predictors, that the map's Republican districts would remain Republican after the 2026 midterms.[337]

(6)    Mr. Kincaid also sought to improve the map's compactness and respect for municipal and geographical boundaries.[338]

(7)    To comply with the constitutionally mandated "one person, one vote" requirement,[339] the districts needed to be as close to equipopulous as possible.[340]

---

[337] *See id.* at 73 ("[O]ne thing that I did is I went back and I did a durability test on all of these districts. . . . We have a national redistricting dataset that has disaggregated results down to the block level going back . . . decades. So what I was able to do is, with Texas, look at the 2012 Romney results. And so I looked at every presidential, [U.S.] senate, and governor's race in Texas . . . from 2012 through 2024. And the reason I did that is[,] obviously, Texas has been . . . politically . . . volatile for . . . several years now. It's been . . . wide Republican wins, narrow Republican wins, wide Republican wins again. And the coalition[] that Republicans have been winning elections with has changed significantly from 2012 to now. And so what I wanted to do is look at how those districts performed over the last three iterations of the Republican coalition.").

[338] *See, e.g., id.* at 66–67 ("I wanted to improve the overall compactness of the map. That was another criteri[on]. . . . I just wanted to take [the districts in the 2021 Map] and make them cleaner, more compact, more city-based, more county-based, where I could than the previous one. That's more of a personal preference more than anything else. I like, when I can, to draw clean districts.").

*See also, e.g., id.* at 70–72 (discussing how Mr. Kincaid assesses compactness both visually and numerically when drawing maps); *id.* at 74–75 (exploring how Mr. Kincaid accounts for geographical boundaries when drawing maps).

[339] *See, e.g., Abrams*, 521 U.S. at 98 ("[T]he constitutional guarantee of one person, one vote . . . requires congressional districts to achieve population equality as nearly as is practicable." (citation modified)).

[340] *See, e.g.,* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 54 ("I have to balance the population of every district across the state . . . perfectly. Because we're not allowed to deviate from perfect population. So every district has to be about the same."); *id.* at 75–76 ("Q. . . . [Y]ou mentioned earlier that drawing the maps with the appropriate equality in population was part of the process. Generally, is that something you did when you drew the Texas maps? | A. Yes. I equalized the populations when drawing the maps, yes.").

(8)    Finally, Mr. Kincaid needed to comply with certain district-specific instructions from the Republican congressional delegation, like keeping certain counties together[341] or keeping district offices within the district.[342]

Even when Mr. Kincaid opted not to follow certain traditional districting criteria, he did so in a partisan fashion. For example, while Mr. Kincaid prioritized protecting Republican incumbents,[343] he gave no consideration to keeping Democrat incumbents in their districts.[344] Mr. Kincaid likewise prioritized core retention in Republican districts but not Democrat districts.[345]

On the stand, Mr. Kincaid went district by district—sometimes line by line—explaining the logic behind each of the redistricting choices he made.[346] Rather than relaying a blow-by-blow recitation of Mr. Kincaid's testimony, we'll simply acknowledge that Mr. Kincaid gave political or practical—*i.e.*, non-racial—rationales for his decisions at every step of the mapdrawing

---

[341] *See, e.g.*, *id.* at 89–90 ("[MR. KINCAID:] . . . [A] nonnegotiable for Texas 5 was that I had to keep Kaufman, Van Zandt, and Henderson Counties whole. I could not split those. So they had to remain the core of Texas 5. | Q. Is that, again, the instruction from the Texas Republican congressional delegation? | A. Yes.").

[342] *See, e.g.*, *id.* at 95 ("[T]he city of Addison is slightly split there; and that was to make sure that the district office for Texas 24 stayed in Texas 24.").

[343] *See supra* note 331 and accompanying text.

[344] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 97–98 ("Q. What consideration, if any, did you give to keeping Democratic incumbents in the districts where they were under the 2021 map? | A. I didn't.").

[345] *See, e.g.*, *id.* at 129–30 ("Q. As the map drawer, did you consider core retention more closely when dealing with districts with a Republican incumbent or did that—did that partisan consideration not matter? | A. I was definitely trying to minimize the disruption in the Republican incumbent seats, yes. | Q. What about the Democratic incumbent seats? | A. No. I was trying—I had to rework most of the Democrat seats to create new pickup opportunities. So that wasn't a consideration.").

[346] *See id.* at 76–191.

process.[347] In Mr. Kincaid's own words, he "drew the map using political data from start to finish."[348]

### ii.    The Court Does Not Credit Mr. Kincaid's Testimony

While Mr. Kincaid's statewide tour of his map was compelling,[349] we nonetheless discredit his testimony that he drew the 2025 Map blind to race. We find it extremely unlikely that Mr. Kincaid could have created so many districts that were just barely 50%+ CVAP by pure chance.

The Supreme Court's opinion in *Cooper v. Harris* illustrates the point.[350] As here, lawmakers commissioned an outside (*i.e.*, non-legislator) mapmaker "to assist them in redrawing district lines."[351] Like Mr. Kincaid, the outside mapmaker in *Cooper* claimed that "he displayed only [political] data, and no racial data, on his computer screen while mapping the [challenged] district."[352]

However, the mapmaker achieved an "on-the-nose attainment of a 50% BVAP" in the challenged district[353]—a feat that, in the district court's view, the mapdrawer would have been unlikely to achieve by blind adherence to partisan data alone.[354] The district court deemed it far

---

[347] *See id.* at 76–191.

[348] *See* Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 101.

[349] *See* Prelim. Inj. Hr'g Tr. Day 9 (Afternoon), ECF No. 1345, at 134 (observing that Mr. Kincaid testified "totally without notes").

[350] *See* 581 U.S. at 313–15.

[351] *See id.* at 295.

[352] *See id.* at 313–14.

[353] *See id.* at 313.

[354] *See id.* at 315 ("Whether the racial make-up of the county was displayed on his computer screen or just fixed in his head, the court thought, [the mapmaker]'s denial of race-based districting rang hollow." (citation modified)).

more likely that the mapdrawer used a 50% racial target to "deliberately redr[a]w [the challenged district] as a majority-minority district."[355] The district court "disbelieved [the mapmaker's] asserted indifference to the new district's racial composition,"[356] and the Supreme Court ruled that the district court didn't clearly err by doing so.[357]

The facts here are even starker. Mr. Kincaid would have us believe that, with racial data on his mapping program turned off, and relying purely on race-neutral criteria like partisan performance, compactness, and incumbency protection (for Republicans), he just coincidentally happened to transform not one, but *three*, coalition districts into districts that are single-race-majority by half a percent or less:

(1)    CD 9 (whose Hispanic CVAP increased from 25.6% to 50.3%);

(2)    CD 18 (whose Black CVAP increased from 38.8% to 50.5%); and

(3)    CD 30 (whose Black CVAP increased from 46.0% to 50.2%).[358]

---

[355] *See id.* at 313.

[356] *See id.* at 314.

We recognize that part of the reason why the district court disbelieved the outside mapmaker's testimony in *Cooper* was because he gave "self-contradictory testimony" at his deposition and at trial. *See id.* at 314–15. In our view, nothing that Mr. Kincaid said at the preliminary-injunction hearing was self-contradictory; it was instead inconsistent with the testimony of other witnesses and the enacted map's raw racial demographics. Nonetheless, *Cooper* remains illustrative.

[357] *See id.* at 316.

[358] *Contrast* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1, *with* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1. *See also supra* Section II.G.

We have purposefully omitted CD 22 from this list of "suspicious" districts. CD 22 went from being just 0.8% below 50% White to just 0.8% above. *Contrast* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1, *with* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1. That's the sort of negligible variation that could easily happen by chance.

For that reason, we conclude that the Plaintiff Groups haven't shown a sufficient likelihood of success on the merits of their challenge to CD 22.

While we acknowledge the possibility that Mr. Kincaid might have done that for one district by pure chance,[359] it is very unlikely that he would have hit a barely 50% CVAP *three times* by pure chance. Mr. Kincaid's "on-the-nose attainment of a 50% [C]VAP" in three districts causes us to doubt his testimony that "he displayed only [partisan] data, and no racial data, on his computer screen while mapping" those districts.[360] We find it far more likely that Mr. Kincaid "deliberately redrew [those districts as] majority-minority district[s]."[361]

Mr. Kincaid would also have us believe that it's just a coincidence that the 2025 Map achieves three of the four explicit racial directives outlined in the DOJ Letter:

(1)    eliminating CD 9's status as a coalition district;

(2)    eliminating CD 18's status as a coalition district; and

(3)    radically transforming the racial demographics of CD 29.[362]

Mr. Kincaid was well aware of the DOJ Letter. He saw a preliminary draft of it in the West Wing of the White House and discussed it with key White House and DOJ officials—and Governor Abbott—a week before DOJ released it.[363]

---

[359] *See* Prelim. Inj. Hr'g Tr. Day 2 (Afternoon), ECF No. 1338, at 123–24 (eliciting that one of the Plaintiff Groups' expert cartographers once drew a 50.1% Black district without purposefully trying to do so).

[360] *Cf. Cooper*, 581 U.S. at 313–14.

[361] *Cf. id.* at 313.

[362] *Contrast* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1, *with* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1. *See also supra* Section II.D.

[363] *See* Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 51–52, 54–55.

Finally, Mr. Kincaid would have us believe that it's just a coincidence that blindly following the political objectives that Governor Abbott expressly disclaimed happened to achieve the Governor's publicly stated racial goal of creating several new majority-Hispanic districts.[364]

But, as Chairman Hunter announced on the House floor, "Nothing's a coincidence."[365] It is far more plausible that Mr. Kincaid had both racial and partisan data turned on while drawing the 2025 Map and that he used the former to achieve the racial targets that DOJ and the Governor had explicitly announced as he simultaneously used the latter to achieve his partisan goals.[366] Only that would explain how Mr. Kincaid could point to putatively race-neutral criteria to justify his districting decisions at each step of the process while still arriving at such precise racial numbers.

Apart from the 2025 Map's racial numbers, we also reiterate the significant inconsistencies between Mr. Kincaid's testimony and Chairman King's testimony and his contemporaneous statements on the Senate floor.[367] Just as those contradictions caused us to question Chairman King's credibility, they lead us to question Mr. Kincaid's veracity as well.

---

[364] *See supra* Section II.E.

[365] Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 105–07.

We agree with the State Defendants that the "nothing's a coincidence" comment is not direct evidence of racial intent. *See also* Defs.' Post-Hr'g Br., ECF No. 1284, at 28–29. In context, Chairman Hunter's "nothing's a coincidence" comment was not an admission of racial motives, but rather a preface to a discussion of traditional districting criteria. *See* Brooks Prelim. Inj. Ex. 309-T, ECF No. 1327-9, at 107.

[366] *See supra* note 329 and accompanying text (establishing that Mr. Kincaid had the ability to display both racial and partisan data in his mapmaking software and base his districting decisions on race accordingly).

[367] *See supra* Section III.B.4.ii.

### iii.    Mr. Kincaid's Professed Lack of Racial Motive Isn't Attributable to the Legislature

Even if Mr. Kincaid just happened to hit those precise racial bullseyes without enabling racial shading in his mapmaking software, Mr. Kincaid's professed lack of racial intent still would not defeat the Plaintiff Groups' racial-gerrymandering claims. Mr. Kincaid is not a member of the Legislature. The record contains no indication that the Legislature ever told Mr. Kincaid to draw the 2025 Map race-blind; Mr. Kincaid's instructions for how to draw the map came from the White House[368] and the Republican congressional delegation[369] rather than the Legislature or the Governor.[370] Just as we can't automatically impute DOJ's or the Governor's racial intent to the Legislature,[371] we can't automatically impute Mr. Kincaid's alleged lack of racial intent to the Legislature either.[372] What ultimately matters is why the Legislature—not Mr. Kincaid—did what it did.

---

[368] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 125–26 (discussing "the instructions from the White House" regarding how to draw the map).

[369] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 89–90 (discussing a mapdrawing instruction Mr. Kincaid received "from the Texas Republican congressional delegation").

[370] *See* Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 43 ("Q. . . . [W]hen you were drawing the map . . . there were no legislators present for that process? | [MR. KINCAID:] When I was drawing the map? No. | Q. . . . [T]he Governor wasn't there? | A. He was not looking over my shoulder, no."); *id.* at 46 (Q. . . . So no legislators present for the map drawing. You did not speak directly to any member of the House. You did not speak to anyone directly in the Senate other than Senator King. Is that right? | A. That's correct, as far as . . . during the map-drawing process.").

[371] *See supra* Section III.B.4.d.iii.

[372] *Cf. Brnovich*, 594 U.S. at 689–90 (emphasizing that "the legislators who vote to adopt a bill are not the agents of the bill's . . . proponents," as "legislators have a duty to exercise their judgment" when deciding whether to vote for a particular piece of legislation).

The Fifth Circuit's decision in *Prejean v. Foster* is illustrative.[373] There—as here—a non-legislator drew an electoral map that the legislature ultimately adopted.[374] There, too, the non-legislator mapmaker swore that he drew the map for predominantly political, non-racial reasons.[375] The map contained a majority-Black district, which the plaintiffs challenged as a racial gerrymander.[376]

The Fifth Circuit concluded that the outside mapdrawer's stated "intent in drawing the [map]" could not be "taken as conclusive proof of the legislature's intent."[377] Instead, the Fifth Circuit focused on why the legislature introduced and enacted the map that the mapmaker drew.[378] The Court indicated that even if the mapdrawer had truly based the map primarily on political rather than racial considerations, the Legislature's decision to introduce and pass that map for predominantly racial reasons could support a finding of racial gerrymandering.[379]

---

[373] *See generally* 227 F.3d 504 (5th Cir. 2000).

[374] *See id.* at 510 ("Judge Turner, formerly a lawyer in and unsuccessful candidate for an at-large judgeship in the 23rd [Judicial District Court ("JDC")] . . . drew the district lines . . . for the 23rd JDC, and the legislature adopted his proposed subdistricting scheme."); *id.* ("Judge Turner was not a member of the state legislature.").

[375] *See id.* ("Judge Turner averred that race did not predominate over traditional districting principles; he stated that, while following traditional districting principles, he drew the district lines to accommodate his candidacy.").

[376] *See id.* at 508.

[377] *Id.* at 510; *see also id.* at 514 ("Although Judge Turner's affidavit provides some insight into the legislature's intent, it is far from determinative.").

[378] *See id.* at 510 (emphasizing that "Judge Turner was not a member of the state legislature," and that a factfinder could plausibly infer "that the legislature was ready to adopt whatever proposal would satisfy its objective of creating a black subdistrict").

[379] *See supra* note 378.

The Fifth Circuit then explained that DOJ had been pressuring the state to create a majority-Black subdistrict.[380] The outside mapdrawer's plan proposed to do exactly that.[381] The court reasoned that if the legislature had introduced and passed the mapmaker's plan because "the legislature was ready to adopt whatever proposal would satisfy its objective of creating a black subdistrict," then that could support a finding of racial gerrymandering[382]—irrespective of the mapmaker's insistence that he based the map predominantly on political and other race-neutral principles.[383]

"[C]ontemporaneous statements attributable to the State suggest[ed] that the major purpose of" the enacted plan in *Prejean* "was to create a majority-minority subdistrict" as DOJ had demanded—not to achieve the mapdrawer's subjective political goals.[384] By all objective appearances, "the state was rushing headlong into the arms of DOJ regardless of legal consequences."[385] Perceiving a "disjunction . . . between [the mapmaker's professed] intent and the intent of the legislature," the Fifth Circuit concluded that the mapmaker's declarations

---

[380] *See* 227 F.3d at 510 ("To end [litigation with voters over the state's system for electing judges], and to address the Justice Department's [objections to preclearance], the state agreed to implement a subdistrict election plan . . . that would contain at least one subdistrict with a majority black voter registration." (citation modified)); *id.* at 511 ("[O]ne could readily infer that the state was motivated to pass [the challenged plan] by the desire to secure Section 5 preclearance, which, under DOJ's policy, meant creating racially-based subdistricts.").

[381] *See id.* at 508.

[382] *See id.* at 510.

[383] *See id.* at 510 n.8 (noting that the non-racial "factors [the mapmaker] considered in redrawing the district lines" included "contiguity, non-splitting of precincts, the one-person/one-vote principle, protection of incumbents, the political preference of incumbents to include parts of each parish in each subdistrict, and the location of [the mapdrawer]'s own [political] supporters").

[384] *See id.* at 511; *see also id.* (noting that "the state forthrightly declared that the reason for the change . . . was to reapportion" the challenged district to have "a majority black population").

[385] *See id.*

regarding his own thought process when drawing the map were "far from determinative" of "the legislature's intent."[386]

While we readily acknowledge factual and procedural distinctions between this case and *Prejean*,[387] *Prejean* stands for the principle that when an outside mapdrawer professes to have drawn a redistricting plan based on political rather than racial criteria, courts should not automatically impute the mapdrawer's lack of racial intent to the legislature.[388] The court should instead inquire why the legislature introduced and passed the map that the mapmaker drew. If other evidence in the record indicates that the legislature adopted the mapmaker's purportedly race-blind map because it happened to achieve some racial objective—such as creating a new single-race-majority district at DOJ's behest—that can potentially support a finding that race was the legislature's predominant motivation.[389]

---

[386] *See id.* at 514.

[387] *Prejean* arose in a summary judgment posture. *See id.* at 508. The *Prejean* court was therefore "required to view the evidence and all inferences therefrom in the light most favorable to" the plaintiffs challenging the map. *Id.* at 510. Here, by contrast, the Plaintiff Groups face a much heavier burden to show a sufficient likelihood that they'll ultimately succeed on the merits. *See supra* Section II.B.1. Our analysis accounts for that procedural distinction.

We also recognize that the mapmaker's affidavit in *Prejean* constituted far weaker evidence than Mr. Kincaid's extensive and detailed testimony. *See* 227 F.3d at 514 ("There is no supporting documentation showing who [the mapdrawer's] supporters were, and where they would be found—or not found—in the proposed subdistrict. No evidence of his previous candidacies' vote distribution was offered. Yet [the mapdrawer's] statement [that he drew the district lines to include his political supporters from his previous attempts at elective office] cries out for objective verification."). We've thus been careful not to read more into *Prejean* than is supportable.

[388] *See* 227 F.3d at 510 (refusing to treat the mapmaker's "affidavit describing his intent in drawing the subdistricts . . . as conclusive proof of the legislature's intent"); *id.* at 514 ("Although Judge Turner's affidavit provides some insight into the legislature's intent, it is far from determinative.").

[389] *See id.* (opining that the record permitted a "plausible inference . . . that the legislature was ready to adopt whatever proposal would satisfy its objective of creating a black subdistrict").

Even if we credited Mr. Kincaid's testimony that he drew the 2025 Map completely blind to race, the fact remains that the map he gave to the Legislature proposed to eliminate numerous coalition districts and replace them with single-race-majority districts. Mr. Kincaid gave the Legislature a map that achieved DOJ's and the Governor's objectives, while enabling the Legislature to portray the map as being more favorable to minority voters than its 2021 predecessor. If the reason why the Legislature introduced and enacted that map is because it just happened to achieve those objectives, then Mr. Kincaid's subjective lack of racial motivation is irrelevant.

"[C]ontemporaneous statements attributable to the State" and other direct and circumstantial evidence "suggest that the major purpose of" the 2025 Plan "was to create [more] majority-minority [districts]."[390] Mr. Kincaid's professed lack of racial intent is therefore "far from determinative" of "the legislature's [own] intent."[391] The "disjunction . . . between" Mr. Kincaid's stated intent and the apparent "intent of the legislature" leads us to conclude that Mr. Kincaid's testimony does not preclude the Plaintiff Groups from obtaining a preliminary injunction.[392]

---

[390] *Cf. id.* at 511; *see also* Section III.B.3.

[391] *Cf.* 227 F.3d at 514.

[392] *Cf. id.*

### 5. Circumstantial Evidence of Legislative Intent

Having canvassed the available direct evidence, we now discuss the circumstantial evidence.

#### a. The 2025 Map Achieved DOJ's and the Governor's Goals

First, the fact that the Legislature fulfilled almost everything that DOJ and the Governor desired supports the notion "that a majority of the [Legislature's] members shared and purposefully adopted (*i.e.*, ratified) the [Governor and DOJ's racial] motivations."[393] It further suggests that the Legislature "was rushing headlong into the arms of DOJ regardless of legal consequences."[394]

#### b. The Sheer Number of Just-Barely-50%-CVAP Districts Suggests that the Legislature Set and Followed a Racial Target

The 2025 Map's "on-the-nose attainment of a 50% [C]VAP" for so many districts[395] further suggests that the Legislature was following a "50%-plus racial target" "to the letter," such that the "racial target had a direct and significant impact on [those districts'] configuration[s]."[396] This fact is as much circumstantial evidence as it is direct.

---

[393] *Common Cause Fla.*, 726 F. Supp. 3d at 1364–65.

*Cf. Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 487 (1997) ("[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions.").

[394] *Cf. Prejean*, 227 F.3d at 511.

[395] *See Cooper*, 581 U.S. at 313.

[396] *See id.* at 300 (citation modified); *see also supra* Sections III.B.3.a & III.B.4.d.ii.

### c.    The Legislature Left a Majority-White Democrat District Largely Unchanged

If the Legislature's aims were exclusively partisan rather than predominantly racial, it is reasonable to assume the Legislature would have also reconfigured single-race-majority Democrat districts to make them Republican. In particular, we'd expect the Legislature to also make significant modifications to CD 37, a majority-White district[397] that generally elected Democrats.[398] Yet CD 37 remains a Democrat district under the 2025 Map.[399] It also remains majority-White.[400]

That stands in stark contrast to how the Legislature treated majority-non-White districts with the same partisan attributes as CD 37. To illustrate, here is the most telling example. Whereas 67.8% of the 2021 configuration of majority-White CD 37 remains intact in 2025 Map,[401] only 2.9% of majority-non-White CD 9 remains intact in the new map.[402] The fact that the Legislature completely gutted majority-non-White CD 9 and not majority-White CD 37—even though the two

---

[397] *See* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 2 (indicating that CD 37 was 60.7% White by CVAP under the 2021 Map).

[398] *See* Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 39 ("In [the 2021] version of CD 37, White voters voted for Democratic candidates. On average they voted 80 percent for Democrats."); *see also, e.g.*, Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 9.

[399] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 40 ("Q. So did the legislature change the nature of CD 37 as a majority White Democratic voting district? | A. No."); *id.* ("In new CD 37 the Whites . . . prefer Democratic candidates."); *see also, e.g.*, Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 9.

[400] *See, e.g.*, Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 2 (indicating that CD 37 is 54.0% White by CVAP under the 2025 Map); Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 39 ("New CD 37 remains a White majority district.").

[401] *See* Brooks Prelim. Inj. Ex. 267, ECF No. 1326-14, at 6.

[402] *See id.* at 2.

districts had the same political lean—constitutes additional circumstantial evidence that the Legislature's predominant consideration was race rather than partisanship.[403]

### d.    The Legislature Transformed a Republican Coalition District into a Republican Majority-White District

Coming at it from the opposite angle, if the Legislature's aims were partisan rather than racial, one would expect the Legislature not to make fundamental changes to the racial demographics of Republican districts, as doing so would net no gain in the number of Republican seats. Yet the 2025 Map takes an existing majority-non-White Republican district (CD 27) and

---

[403] *See, e.g.*, *Tenn. State Conf.*, 746 F. Supp. 3d at 494 (opining that if a map "treat[s] minority voters of one party worse than white voters of the *same* party," "that could undercut the possibility that partisan politics were to blame for the decision" (citation modified)).

While Mr. Kincaid provided putatively partisan and practical rationales for drafting CD 37 the way he did, *see* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 146–48, we discredit that testimony for the reasons given above. *See supra* Section III.B.4.d.ii.

The Legislature also left CD 7 in the Houston area largely untouched. *See* Brooks Prelim. Inj. Ex. 267, ECF No. 1326-14, at 1–2 (indicating that 74.6% of the voters in the old CD 7 remain in the new CD 7). Though CD 7 was not a majority-White district, *see* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1, it generally elected candidates preferred by White Democrats under the 2021 Map, and it will likely continue to do so under the 2025 Map. *See, e.g.*, Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 9. That shows the Legislature radically transformed districts that elected Democratic candidates preferred by voters of color while leaving districts that elected Democrats preferred by White voters mostly unchanged. *See, e.g.*, Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 9 (indicating that the Legislature changed the political performance of CD 9 but not CD 7). That reinforces that racial concerns predominated over partisanship. *See, e.g.*, *Tenn. State Conf.*, 746 F. Supp. 3d at 494.

We likewise discredit Mr. Kincaid's proffered race-neutral rationales for CD 7's configuration. *Contra* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 140–44. *See also supra* Section III.B.4.d.ii.

decreases the Hispanic CVAP from 48.6% to 36.8%, while raising the White CVAP from 44.1% to 52.8% to make it majority-White.[404]

### e.    The Testimony of Dr. Moon Duchin

Finally, the expert report and testimony of Dr. Moon Duchin (Professor of Data Science, University of Chicago) supplies additional circumstantial evidence that race, not politics, best explains the 2025 Map's contours.

### i.    Dr. Duchin's Methodology

Dr. Duchin is one of the pioneers of a technique for assessing whether an electoral map is more consistent with race-based decision-making than with race-neutral criteria, such as partisanship and traditional districting considerations.[405] Using a computer program, Dr. Duchin randomly generates hundreds of thousands of congressional maps that the Legislature might have hypothetically drawn.[406] The program is coded to generate maps that a Republican-controlled Legislature might have realistically enacted. The maps favor Republicans by various metrics,[407]

---

[404] *Compare* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1, *with* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1; *see also supra* Section II.G.5.

*See also* Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 41 (testimony affirming that CD 27 remains a district that "Republican candidates will consistently win").

Here too, Mr. Kincaid provided partisan and race-neutral rationales for CD 27's boundaries. *See* Prelim. Inj. Hr'g Tr. Day 6 (Morning), ECF No. 1419, at 146–51. We discredit that testimony too. *See supra* Section III.B.4.d.ii.

[405] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 56–60; Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 14 & n.7.

[406] *See, e.g.*, Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 23.

[407] *See, e.g.*, *id.* at 22–23 ("Partisanship favoring Republican candidates in general [elections] is accounted for with a score based on the number of Republican district wins across a set of 29 general elections . . . ."); *id.* at 23 ("Partisanship specific to the performance of Donald Trump is accounted for in two ways: counting the number of Trump district wins in three elections (2016, 2020, 2024) and by simply considering the most recent election . . . .").

and they obey (or at least favor) traditional districting criteria like contiguity, compactness, respect for municipal subdivisions, and core retention.[408]

After generating those hundreds of thousands of maps, the program "winnows" the maps down according to political criteria like Republican performance and incumbency protection.[409] That winnowing process yields approximately 40,000 hypothetical maps that the Republican-controlled Legislature could have conceivably passed.[410]

None of the programmed criteria for generating or filtering the maps is race-based; they are all race-neutral.[411] The program thus generates an enormous number of maps that the Legislature might have drawn if—as the State Defendants assert here[412]—the Legislature had truly

---

[408] *See, e.g.*, *id.* at 22; Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 58 ("[T]he basic method creates plans that take into account population balance [and] ensure contiguity and that prioritize compactness . . . .").

[409] *See* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 62–63 ("Q. So these parameters, do they generate a large number of maps? | [DR. DUCHIN:] Under these parameters I then generate a very large number of maps, correct. | Q. And do you winnow them down? | A. Right. . . . The second stage is to filter it. So by winnowing, . . . I mean I'll take all those maps and I'll filter them down by whether they meet some checklist of other conditions.").

*See also* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 23 (winnowing down to only include maps in which "Republicans overall have at least as many wins" as they do in the enacted map); *id.* (further winnowing down to only include maps in which "at least as many districts have a plurality win for Donald Trump from the 2024 election as in" the enacted map); *id.* (further winnowing down to only include maps in which "the double-bunking of incumbents . . . is no greater than in" the enacted map).

*See also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 64 (explaining that the program winnows down the universe of randomly generated maps to only include maps in which "the number [of districts] won by Republicans" is "at least as high as in" the Enacted Map); *id.* (explaining that "the winnowing, the filter, ensures that [the surviving maps] are getting at least as strong Republican performance as the [enacted] plan").

[410] *See, e.g.*, Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 23.

[411] *See, e.g.*, *id.* at 22–23.

[412] *See supra* notes 155–158 and accompanying text.

based its redistricting decisions exclusively on race-neutral considerations like partisanship and traditional districting criteria.

Dr. Duchin's program then compares the racial demographics of the enacted map to those of the hypothetical race-neutral maps.[413] The idea is that, if the Legislature had truly drawn the 2025 Map based solely on race-neutral criteria, then the enacted map's racial characteristics would likely fall somewhere within the expected range of the maps generated by the program.[414] By contrast, if the enacted map's racial characteristics fall outside the demographic ranges of the randomly generated maps, then the enacted map is a statistical outlier.[415] This finding would suggest that the Legislature was predominantly motivated by race rather than partisanship.[416] This technique provides a mathematical method to "disentangle partisanship and race"[417]—just as the Supreme Court has instructed courts and litigants to do in racial-gerrymandering cases.[418]

To visually depict the distribution of the randomly generated maps' racial characteristics, Dr. Duchin's expert report displays her results in the form of "box-and-whiskers" or "box" plots,[419] which look like this:

---

[413] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 68 (explaining that Dr. Duchin's method permits her "to compare the racial attributes of the [enacted] map to a baseline that's been constructed according to [the] parameters" explained above).

[414] *See, e.g.*, *id.* at 57 ("The point of this is just to show you what plans look like when created by known rules. So it lets you assess whether a proposed plan behaves as though it was created by the stated rules.").

[415] *See, e.g.*, *id.* at 66.

[416] *See id.* at 72 (explaining that if "race-blind comparators . . . don't reproduce [the] racial composition" of the enacted map, that would suggest "that race was used in making" the map).

[417] *See id.* at 68.

[418] *See, e.g.*, *Alexander*, 602 U.S. at 6.

[419] *See* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 68.

**Dallas/Fort Worth Area (CDs 5, 6, 12, 24, 25, 30, 32, 33)**[420]



---

[420] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 2, 14.

The boxplots don't correspond with specific district numbers. *See* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 69 ("[T]hey are arranged not in order of the district numbers but from lowest to highest POC CVAP.").

The y-axis represents the minority population of each district in each randomly generated map, with the dotted line showing the 50% mark.[421] The x-axis arranges the districts in each randomly generated map from lowest to highest by share of minority population.[422]

The orange figures—which are the ones we're most interested in for our purposes[423]—represent the range of minority populations for each district in each randomly generated map.[424] The "whiskers" (the T-shaped appendages on each end) measure from the 1st percentile to the 99th percentile.[425] Taking the orange figure on the far left as an example, in nearly all of Dr. Duchin's

---

[421] *See id.* at 14; *see also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 68 ("I'm showing you what is abbreviated POC CVAP, which means the minority citizen voting age percentage in each of the districts.").

[422] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 14.

[423] The black figures represent "a 40,000 plan subsample" without "filtering conditions" like "rural composition and various kinds of tests that the partisanship matches or exceeds that in the State's plan." Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 68. We're more interested in the orange figures, which "only include plans that meet the full checklist of districting principles." *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 14.

[424] *See* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 69.

[425] *See id.*

randomly generated maps, the district with the lowest minority population in the Dallas/Fort Worth area had a minority population percentage somewhere between 26% and 41%:[426]



---

[426] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 14.

- 113 -

The edges of the "boxes," meanwhile, measure "from the 25th to the 75th percentile[,] [m]eaning that 50 percent of the plans fall in the box."[427] So, in about half of Dr. Duchin's randomly generated maps, the district with the lowest minority population in the Dallas/Fort Worth area had a minority voter percentage between roughly 34% and 37%:[428]



---

[427] *See* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 69.

[428] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 14.

The line in the box marks "the median or 50th percentile":[429]



The blue dots, meanwhile, represent the minority population of each district in the enacted map.[430] For instance, the minority population of the lowest-minority-percentage district in the Dallas/Fort Worth area in the enacted map is around 30%:



---

[429] *See* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 69.

[430] *See id.* at 68 (explaining that "the blue dots" represent the "districts drawn by the State").

The "box-and-whiskers" plot is a pictorial method for comparing the enacted map's racial demographics to those of race-neutral hypothetical maps. If any particular dot falls within the same range as the "box," the enacted district's minority population is within the range we'd expect if the Legislature were relying exclusively on partisanship and other race-neutral districting criteria. If a dot falls outside the box but within the "whiskers," the enacted district's minority population is on the outer edge of what we'd expect if the Legislature were relying exclusively on partisanship and other race-neutral considerations. If the dot falls outside the whiskers entirely, none of the race-neutral maps that Dr. Duchin generated has the racial characteristics approximating that of the enacted district—and, thus, the enacted map is statistically anomalous.[431] These results would in turn suggest that race—not partisanship—is the variable that best explains the enacted map's configuration.[432]

### ii.    Dr. Duchin's Findings and Conclusions

Dr. Duchin applied that technique to the Houston area,[433] where three of the four districts mentioned in the DOJ Letter are located (CDs 9, 18, and 29).[434] The results are jarring:

---

[431] *See id.* at 70 (testifying that "if the dot is outside the whiskers altogether," that means "that no plan [that Dr. Duchin] generated in the sample ever had as low [or high] of a minority CVAP").

[432] *See id.* at 72 ("[T]hat is suggestive that race was used in making these plans because these race-blind comparators, even made with layer upon layer of different assumptions about partisanship and other principles, don't reproduce that kind of racial composition.").

[433] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 15.

[434] *See supra* Section II.D.

**Houston Area (CDs 2, 7, 8, 9, 18, 22, 29, 36, 38)**[435]



---

[435] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 2, 15.

Five of the dots fall outside of the whiskers—some by a sizable amount—while only one dot falls within its respective box. Four of the ten districts in the Houston area "have outlying low levels of minority citizens" under the enacted map, "while one district far above 50% is elevated to an outlying degree."[436] These results suggest that a Legislature motivated exclusively by partisan and other race-neutral concerns would be unlikely to produce a configuration of the Houston-area districts with racial characteristics similar to the 2025 Map.[437] This evidence supports the notion that the Legislature purposefully manipulated the racial statistics of Houston-area districts like CDs 9, 18, and 29 at DOJ's behest.

While the patterns in the Dallas/Fort Worth area (where CDs 30, 32, and 33 are located) are less visibly stark than those in the Houston area, and those in the Travis/Bexar County area (where CDs 27 and 35 are located) are even less so, they nonetheless reinforce the conclusion that the enacted map's racial composition is a statistical outlier:

---

[436] *See id.* at 15.

*See also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 73 ("The second [column] from the [right] is off the charts in the direction of packing. Where you would expect POC CVAP in the 60 to 70[%] range; instead, it's over 80 percent.").

[437] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 14 (concluding that "the racial composition of the districts is highly atypical of random plans whose partisan performance is at least as favorable to Republicans generally and to Donald Trump in particular").

*See also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 73 ("Q. So does this mean that the racial composition of the district was something you did not see in any of your maps? | [DR. DUCHIN:] Right. In several of these instances, it's past anything ever observed.").

**Dallas/Fort Worth Area (CDs 5, 6, 12, 24, 25, 30, 32, 33)**[438]



---

[438] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 2, 14.

**Travis/Bexar County Area (CDs 10, 11, 20, 21, 23, 27, 35, 37)[439]**



---

[439] *See id.* at 2, 15.

In the Dallas/Fort Worth area, one of the dots falls outside the whiskers entirely, while two dots fall precisely on a whisker's edge.[440] Though all of the districts in the Travis/Bexar County area fall within the whiskers, there are three dots that are a comfortable distance away from their respective boxes.[441]

According to Dr. Duchin's analysis, it is highly unlikely that a Legislature drawing a map based purely on partisan and other race-neutral considerations would have drawn a map with the 2025 Map's racial characteristics.[442] In other words, the best possible explanation for the 2025

---

[440] *See id.* at 14 ("[T]wo of the eight districts [in the Dallas/Fort Worth area]—both where we would expect districts near the 50% mark—show that the POC CVAP is outlyingly low. In the next district, it is outlyingly high.").

*See also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 70 ("A. . . . There are two districts where the minority citizen voting age population is really anomalously low. You can see that . . . in the fourth and the third column from the end . . . . In one case, the blue dot is at the whisker, which means it's at the 1st percentile. In the other case, it's below the whisker, suggesting that it is lower than whatever is observed in this large generation process to make plans under the assumptions reported earlier. | Q. What does it mean if . . . the dot is in the 1st percentile? | A. That means that . . . only 1 percent of the plans have a lower minority CVAP.").

[441] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 15 ("The signs of packing and cracking are less severe in the [Travis/Bexar County area], but the characteristic pattern is still present: one district near an expected 50% POC CVAP status has markedly diminished minority citizen share, while the next district is elevated to over 60%.").

*See also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 73–74 ("[W]hile directionally the same, [the Travis/Bexar County area] doesn't show as extreme or as strong of a pattern. However, you can see that in one district there is what looks like about a 5th percentile level of cracking. And in that top district there is what looks to be about a 5th percentile showing of packing. So you see directionally the same pattern, never the reverse. But the evidence here isn't as strong as in the previous two clusters.").

[442] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 66 ("[T]he State's plan is an outlier in its racial composition.").

Map's racial makeup is that the Legislature based the 2025 Map on racial considerations, and those racial considerations predominated over partisan ones.[443]

Dr. Duchin's results are fully consistent with the direct evidence and other circumstantial evidence in the record. Even more notably, Dr. Duchin's testimony was effectively unchallenged; no defense expert submitted a report rebutting Dr. Duchin's findings.[444] For all those reasons, we find Dr. Duchin's testimony and report highly credible and persuasive.

### iii.   The State Defendants' Critiques

The State Defendants—though none of their experts—attack Dr. Duchin's methods and conclusions on several fronts. They first note that in a different case in which Dr. Duchin served as an expert, *Alexander v. South Carolina State Conference of the NAACP*, the Supreme Court determined that Dr. Duchin's analysis suffered from "serious problems," and thus had "no probative force with respect to [the plaintiffs'] racial-gerrymandering claim."[445]

Dr. Duchin's report here doesn't suffer from the same defects that led the *Alexander* Court to reject her findings. For example, the Supreme Court discredited Dr. Duchin's report in *Alexander* because "various parts of [her] report did not account for partisanship or core

---

[443] *See, e.g.*, *id.* at 30 (concluding that "there is strong evidence that race was used in the creation of" the 2025 Map, and that the 2025 Map is not "consistent with . . . the race neutral pursuit of pure partisan aims"); *id.* at 72 ("[The results are] suggestive that race was used in making [the Enacted Map] because these race-blind comparators, even made with layer upon layer of different assumptions about partisanship and other principles, don't reproduce that kind of racial composition.").

[444] *See* Prelim. Inj. Hr'g Tr. Day 9 (Afternoon), ECF No. 1345, at 46–47, 164; Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 8.

[445] *See* 602 U.S. at 33.

*See also* Defs.' Post-Hr'g Br., ECF No. 1284, at 12 ("[The Plaintiff Groups'] case depends on the very methods the Supreme Court rejected in *Alexander* . . . and even some of the same experts. *Alexander* contains a section labeled 'Dr. Moon Duchin' that finds a district court clearly erred in relying on her opinions. Yet here, Plaintiffs come to this Court with Dr. Moon Duchin and ask it to discredit [Mr. Kincaid's testimony] based on her work." (emphases omitted) (citation modified)).

- 122 -

retention."[446] Here, Dr. Duchin's report explicitly took both of those variables into consideration.[447] The *Alexander* Court also discredited Dr. Duchin because her conclusions were "based on an assessment of the map as a whole rather than [the challenged district] in particular."[448] Here, instead of examining the State of Texas as a whole, Dr. Duchin focused exclusively on three geographic clusters containing only the challenged districts and their adjacent neighbors.[449] Therefore, the issues that caused the Supreme Court to discredit Dr. Duchin's conclusions in *Alexander* don't lead us to do the same here.

The State Defendants also attack the criteria that Dr. Duchin used to generate and winnow her numerous hypothetical maps. To ensure that Dr. Duchin's computer-generated maps resemble plans that the Legislature might realistically have enacted, the program's variables must resemble the race-neutral partisan and political parameters that the Legislature purported to follow when

---

[446] *See* 602 U.S. at 33.

[447] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 22 ("Core retention with respect to the State's new plan is implemented with a surcharge of 0.2 on edges that span across two of the State's new enacted congressional districts."); *id.* at 22–23 ("Partisanship favoring Republican candidates in general is accounted for with a score based on the number of Republican district wins across a set of 29 general elections . . . ."); *id.* at 23 ("Partisanship specific to the performance of Donald Trump is accounted for in two ways: counting the number of Trump district wins in three elections (2016, 2020, 2024) and by simply considering the most recent election . . . ."); *id.* (listing winnowing conditions that explicitly take partisanship into account).

[448] *See* 602 U.S. at 33.

*See also, e.g.*, *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015) ("A racial gerrymandering claim . . . applies to the boundaries of individual districts. It applies district-by-district. It does not apply to a State considered as an undifferentiated 'whole.'").

[449] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 2, 14–15.

*See also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 32 (explaining that focusing on these geographic clusters "make[s] [the analysis] local," while still "acknowledg[ing] that the drawing of lines in one district has an impact on neighboring districts").

drawing and enacting the actual map.[450] In other words, if you don't tell the computer to follow the same race-neutral criteria that the Legislature purported to follow, then the maps it generates won't tell you anything reliable about whether the enacted map is an outlier. The State Defendants argue that Dr. Duchin didn't program her computer to follow the same partisan and political criteria that the Legislature followed—and, consequently, that her maps aren't appropriate comparators.

For example, the State Defendants claim that Dr. Duchin set her partisanship thresholds too low.[451] As one of her winnowing conditions, Dr. Duchin culled the randomly generated maps to only include plans in which "at least as many districts ha[d] a plurality win for Donald Trump from the 2024 election as in" the enacted map.[452] As a robustness check, Dr. Duchin then "executed a run seeking to match the number of districts with Trump's 2024 major-party vote

---

[450] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 118–20 ("Q. When you are putting the parameters in your [computer program] to draw maps, you are putting those in there because you want for the maps the [program] draws to match your understanding of the stated intent of the map, right? | A. I am testing versions of that. That's right. . . . | Q. So the similarities between the maps you draw and the enacted map matter for the precision of your analysis? | A. The similarities between my parameters and the stated intent are important. I agree with that.").

[451] *See* Defs.' Post-Hr'g Br., ECF No. 1284, at 51–52.

[452] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 23.

*See also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 65 ("[DR. DUCHIN:] [O]ne set of runs were done under just simple Trump wins. Did Trump have more votes?").

share over 55%,"[453] and achieved results consistent with her prior findings.[454] The State Defendants argue that Dr. Duchin needed to set those thresholds higher to emulate the Republican performance of the 2025 Map,[455] since "President Trump carried many of the disputed districts with nearly 60% of the vote in 2024."[456]

We're not convinced that Dr. Duchin's 55% Trump threshold caused her to generate maps that deviated materially from the enacted one. While the State Defendants are correct that some of the challenged districts in the enacted map have Trump numbers that equal or approach 60%,[457] there are also districts that fall short of 60%,[458] including multiple districts hovering right around Dr. Duchin's 55% threshold.[459] Additionally, Dr. Duchin's 55% threshold was a floor rather than a ceiling—meaning that it would capture districts with Trump percentages closer to 60% like those

---

[453] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 23.

*See also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 65 ("[DR. DUCHIN:] But later, as a check, I also sought out plans in which Trump's percentage was at least 55 percent, to make sure that that 50 percent line wasn't guiding the findings."); *id.* at 67 ("[I]t's my understanding that when trying to execute partisan gerrymandering, you don't just want to win narrowly. You would like it to be durable and withstand some swing in partisan performance. So 55[%] is a threshold that tells you that even if the vote were to swing by 5 percent you would still win.").

[454] *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 23.

*See also* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 66 ("[DR. DUCHIN:] [S]ometimes layering in additional principles can change the observed range. But it never changes the finding that the State's plan is an outlier in its racial composition. And that includes the Trump 55 plus.").

[455] *See* Defs.' Post-Hr'g Br., ECF No. 1284, at 52 ("Applying a 55% or 50%-plus-one threshold is too low to fairly model the political performance of the 2025 Plan . . . .").

[456] *See id.*

[457] *See* LULAC Prelim. Inj. Ex. 1202, ECF No. 1402-6, at 5 (CD 9 = 59.5%); *id.* at 13 (CD 22 = 59.9%); *id.* at 16 (CD 27 = 60.0%).

[458] *See id.* at 19 (CD 32 = 57.7%).

[459] *See id.* at 20 (CD 34 = 54.6%); *id.* at 21 (CD 35 = 54.6%).

in the enacted map.[460] The State Defendants have therefore failed to persuade us that Dr. Duchin's 55% figure is disqualifying.

In any event, if raising the floor to a value closer to 60% would have undermined Dr. Duchin's conclusions, the State Defendants could have introduced expert rebuttal testimony to that effect. Again, though, the State Defendants let Dr. Duchin's testimony go unrebutted.[461] The State Defendants have therefore given us no concrete reason to think that Dr. Duchin's results would have looked significantly different had she selected different partisanship thresholds.

The same goes for the State Defendants' arguments that Dr. Duchin:

(1)     should have programmed her computer to favor only core retention and incumbency protection in Republican districts (like Mr. Kincaid did);[462] and

---

[460] *See* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 141–42 ("Q. And you executed a run seeking to match the number of districts with Trump's 2024 major party vote share over 55 percent, right? | [DR. DUCHIN:] Right. | Q. Does that mean that 55 percent was a minimum? | A. That's what that is. | Q. And so the districts that achieved more than 55 percent would be accounted for in that run? | A. That's right. That would include districts that achieve 60 percent or more.").

[461] *See supra* note 444 and accompanying text.

[462] *See* Defs.' Post-Hr'g Br., ECF No. 1284, at 53 ("While Dr. Duchin attempted to model core retention by having her [program] surcharge simulated districts with a lower core retention, it did not differentiate between core retention of Republican-held districts versus Democratic-held districts . . . ." (citation modified)).

*See also id.* at 54 ("[W]hile Dr. Duchin required the algorithm to draw simulated plans that did not pair more incumbents than [the enacted map], she failed to consider whether the simulated plans paired Republican or Democrat incumbents with each other. But incumbents are not fungible—and given the Legislature's partisan goal of flipping five Democrat-held seats to Republican-held seats, it is not reasonable to assume that a plan that paired two sets of Republican incumbents would be equally preferred to a plan that paired two sets of Democrats. Nor is Dr. Duchin's assumption consistent with [Mr. Kincaid's] testimony in this case that only Republican incumbents were not paired together in the mapmaking process." (citations omitted)).

*See also supra* notes 343–345 and accompanying text.

(2)    used an out-of-date list of incumbent addresses.[463]

Absent any rebuttal expert testimony that programming the computer to address those critiques would have significantly changed Dr. Duchin's results, we have no basis to dismiss her testimony as unreliable. And the record shows Dr. Duchin made a good-faith effort to update incumbent addresses for her preliminary-injunction report but was unable to do so for reasons outside of her control.[464]

In sum, Dr. Duchin generated tens of thousands of congressional maps that follow traditional districting criteria and favor Republicans by various metrics, and not one of them had racial demographics that looked anything like those in the 2025 Map.[465] That is entirely consistent with the rest of the direct and circumstantial evidence. The 2025 Map's racial characteristics did not result from the blind pursuit of partisan gain, but from the intentional manipulation of the districts' racial makeup.[466]

---

[463] *See* Defs.' Post-Hr'g Br., ECF No. 1284, at 54 ("Dr. Duchin performed her incumbency analysis using an out-of-date list of incumbent addresses . . . Dr. Duchin did not dispute that ten of the incumbents on the list she used were not in Congress in 2024–2025. Former members of Congress are *not* incumbents the Legislature would want to protect in 2025; therefore Dr. Duchin's use of outdated incumbent addresses severely impacts her analysis.").

[464] *See* Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 108–09 ("[DR. DUCHIN:] I have been aware for some time that these incumbent addresses are out of date and have been requesting updated incumbent addresses for months.").

[465] *See, e.g.*, *id.* at 73 ("Q. So does this mean that the racial composition of the district was something you did not see in any of your maps? | [DR. DUCHIN:] Right. In several of these instances, it's past anything ever observed.").

[466] *See, e.g.*, *id.* at 72 ("[The results are] suggestive that race was used in making [the Enacted Map] because these race-blind comparators, even made with layer upon layer of different assumptions about partisanship and other principles, don't reproduce that kind of racial composition.").

### 6.    Contrary Circumstantial Evidence

A few brief notes about circumstantial evidence that points in the opposite direction:

#### a.    CD 33 Remains a Coalition District

Although the DOJ Letter instructs Texas to eliminate CD 33's status as a coalition district, CD 33 remains a coalition district under the 2025 Map.[467] At least for CD 33, neither the DOJ Letter nor racial considerations more generally were the primary factor motivating the Legislature's reconfiguration of the district. Therefore, the Plaintiff Groups have not demonstrated a likelihood of success on the merits of their racial-gerrymandering challenge to CD 33.

That finding does not undermine our conclusion that the Plaintiff Groups have demonstrated a likelihood of success on the merits of most of their other racial-gerrymandering claims. Because "[r]acial gerrymandering claims proceed district-by-district,"[468] it's entirely possible for the Legislature to gerrymander one district without gerrymandering another. CD 33 is the lone exception to the Legislature's general pattern of converting as many coalition districts to single-race-majority districts as possible.

#### b.    The 2025 Map Comports with Traditional Districting Principles

As stated above, a plaintiff asserting a racial-gerrymandering claim bears the burden to "prove that the State subordinated race-neutral districting criteria such as compactness, contiguity, and core preservation to racial considerations."[469] To make that showing, plaintiffs "often need to

---

[467] *Compare* Brooks Prelim. Inj. Ex. 258, ECF No. 1326-5, at 1 (reflecting that, under the 2021 Map, CD 33 was 43.6% Hispanic, 25.2% Black, 5.7% Asian, and 23.4% White), *with* Brooks Prelim. Inj. Ex. 265, ECF No. 1326-12, at 1 (reflecting that, under the 2025 Map, CD 33 is 38.2% Hispanic, 19.6% Black, 4.4% Asian, and 35.5% White).

*See also supra* Section II.B.4.

[468] *See, e.g.*, *Bethune-Hill*, 580 U.S. at 191 (citation modified).

[469] *E.g.*, *Alexander*, 602 U.S. at 7 (citation modified).

show that the State's chosen map conflicts with" those "traditional redistricting criteria."[470] "That is because it may otherwise be difficult for challengers to find other evidence sufficient to show that race was the overriding factor causing neutral considerations to be cast aside."[471]

By some measures, the 2025 Map is more consistent with traditional districting criteria than its predecessors. For instance, the 2025 Map scores better on certain compactness measurements[472] and core-retention metrics[473] than the 2021 Map.

That hurdle is not dispositive here. Even though plaintiffs "often need to show that the State's chosen map conflicts with traditional redistricting criteria" to prevail on a racial-gerrymandering claim,[474] "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering."[475] "Race may predominate"—"even when a reapportionment plan respects traditional [districting] principles"—if:

(1)   "race was the criterion that, in the State's view, could not be compromised," and

(2)   "race-neutral considerations came into play only after the race-based decision had been made."[476]

---

[470] *E.g.*, *id.* at 8.

[471] *E.g.*, *id.* (citation modified).

[472] *See, e.g.*, Prelim. Inj. Hr'g Tr. Day 5 (Morning), ECF No. 1418, at 78–80.

[473] *See, e.g.*, *id.* at 81.

[474] *See, e.g.*, *Alexander*, 602 U.S. at 8.

[475] *E.g.*, *Bethune-Hill*, 580 U.S. at 190.

*See also, e.g.*, *id.* ("Of course, a conflict or inconsistency [with traditional districting principles] may be persuasive circumstantial evidence tending to show racial predomination, but there is no rule requiring challengers to present this kind of evidence in every case.").

[476] *E.g.*, *id.* at 189 (citation modified).

"[T]here may be cases where challengers will be able to establish racial predominance"—even "in the absence of an actual conflict" between the enacted map and traditional districting principles—"by presenting direct evidence of the legislative purpose and intent or other compelling circumstantial evidence."[477]

The Plaintiff Groups have introduced direct and circumstantial evidence that race was the criterion that could not be compromised in the 2025 redistricting[478] and that racial considerations predominated over political ones.[479] Therefore, the fact that the 2025 Map generally complies with traditional districting criteria isn't fatal.

### 7.    The Plaintiff Groups' Failure to Produce an *Alexander* Map

Finally, we address whether the Plaintiff Groups needed to present a so-called "*Alexander* map" to obtain a preliminary injunction. An "often highly persuasive way to disprove a State's contention that politics drove a district's lines" is for the plaintiff to introduce "an alternative map that achieves the legislature's political objectives while improving racial balance."[480] Such a map "show[s] that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group" between electoral districts.[481] The idea is that if the Legislature was "*really* sorting by political behavior instead of skin color," it "would have done—or, at least, could just as well have done—*this*."[482] "Such would-have, could-have, and (to round

---

[477] *E.g.*, *id.* at 191.

[478] *See supra* note 272 and accompanying text.

[479] *See supra* Sections III.B.3 & 5.

[480] *Cooper*, 581 U.S. at 317.

[481] *Id.*

[482] *Id.*

out the set) should-have arguments are a familiar means of undermining a claim that an action was based on a permissible, rather than a prohibited, ground."[483]

In *Alexander v. South Carolina State Conference of NAACP*, the Supreme Court ruled that, "[w]ithout an alternative map" of the sort described above, "it is difficult for plaintiffs to defeat [the] starting presumption that the legislature acted in good faith."[484] The *Alexander* Court further remarked that such alternative maps are not "difficult to produce"; "[a]ny expert armed with a computer can easily churn out redistricting maps that control for any number of specified criteria, including prior voting patterns and political party registration."[485] The Court thus held that "[t]he evidentiary force of an alternative map, coupled with its easy availability, means that trial courts should draw an adverse inference from a plaintiff's failure to submit one."[486] The Supreme Court further opined that this "adverse inference may be dispositive in many, if not most, cases where the plaintiff lacks direct evidence or some extraordinarily powerful circumstantial evidence."[487]

---

[483] *Id.*

[484] 602 U.S. at 10; *see also supra* notes 189–190 and accompanying text.

[485] 602 U.S. at 35 (citation modified).

[486] *Id.*

[487] *Id.*

At this early phase of the proceedings, the Plaintiff Groups have not submitted an *Alexander* map.[488] For the following reasons, that is not fatal.

For one thing, *Alexander* states that "[t]he adverse inference may be dispositive in many, if not most, cases where the plaintiff lacks direct evidence" of the legislature's intent.[489] Unlike the challengers in *Alexander*, who "provided no direct evidence of a racial gerrymander,"[490] the Plaintiff Groups here have produced substantial direct evidence indicating that race was the predominant driver in the 2025 redistricting process.[491] This case is not the sort of "circumstantial-evidence-only case" in which *Alexander*'s adverse inference is typically dispositive.[492]

Moreover, it's not even clear that *Alexander* requires us to draw an adverse inference against the Plaintiff Groups at this early phase of the case. The logic behind *Alexander*'s adverse inference is that, because an alternative map is relatively easy to generate as a technical matter,[493]

---

[488] The map that counsel produced while fiddling with map-drawing software in front of the State Defendants' expert for several hours doesn't qualify as a proper *Alexander* map. *See* Prelim. Inj. Hr'g Tr. Day 9 (Morning), ECF No. 1422, at 82–141; *see also* Prelim. Inj. Hr'g Tr. Day 9 (Afternoon), ECF No. 1345, at 29 ("[H]e's trying to draw an *Alexander* district through me." If the Plaintiff Groups intended that to be their *Alexander* map, they should have presented it through expert testimony during their case-in-chief. *See* Prelim. Inj. Hr'g Tr. Day 9 (Afternoon), ECF No. 1345, at 50 ("Q. To your knowledge, did Plaintiffs offer an expert to draw an alternative map, an *Alexander* map, as you discussed on cross-examination? | A. I have a feeling I am their *Alexander* witness.").

Nor do any of Dr. Duchin's randomly generated maps qualify as an *Alexander* map for our purposes, since none of those maps were introduced into evidence (as opposed to a pictorial representation of their racial demographics). *See* Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 14–15; *see also supra* Section III.5.e.

[489] *See* 602 U.S. at 35.

[490] *See id.* at 18.

[491] *See supra* Section III.3.

[492] *Contra Alexander*, 602 U.S. at 9.

[493] *See id.* at 35 ("Nor is an alternative map difficult to produce. Any expert armed with a computer can easily churn out redistricting maps that control for any number of specified criteria, including prior voting patterns and political party registration.").

if a plaintiff fails to present such a map at trial, it must be because it's impossible to draw a map that achieves the legislature's partisan goals "while producing significantly greater racial balance."[494]

But unlike *Alexander*, which reached the Supreme Court at the permanent injunction stage,[495] after the district court had conducted a full-fledged trial,[496] this case is still at the preliminary injunction phase. It's one thing to draw an adverse inference if a plaintiff fails to produce a suitable *Alexander* map after preparing for a trial for a year or more; it's quite another if a plaintiff fails to produce a suitable *Alexander* map at an accelerated, preliminary phase of the litigation. For that reason, at least one lower court has ruled that *Alexander*'s alternative map requirement does not apply at a redistricting case's preliminary phases.[497] It would be improper here to infer that the reason the Plaintiff Groups didn't produce an *Alexander* map at the

---

[494] *See id.* at 34 (citation modified).

*See also id.* at 35 ("A plaintiff's failure to submit an alternative map—precisely because it can be designed with ease—should be interpreted by district courts as an implicit concession that the plaintiff cannot draw a map that undermines the legislature's defense that the districting lines were based on a permissible, rather than a prohibited, ground." (citation modified)); *id.* ("The Challengers enlisted four experts who could have made these maps at little marginal cost." (emphasis omitted)).

[495] *See id.* at 15.

[496] *See id.* at 13.

[497] *Cf. Tenn. State Conf.*, 746 F. Supp. 3d at 482, 497 ("*Alexander* arose after a trial. This case, by contrast, remains at the pleadings stage. . . . We agree that the Challengers do not have to satisfy any alternative-map obligation at this stage.").

preliminary-injunction hearing is because it's impossible to create one. The most likely reason is that they simply didn't have time.[498]

If anything, the preliminary-injunction record suggests that the Plaintiff Groups will be able to present an acceptable *Alexander* map at trial. Although the Plaintiff Groups didn't offer any of Dr. Duchin's randomly generated maps as an *Alexander* map at the preliminary-injunction hearing,[499] the fact that she generated tens of thousands of pro-Republican maps that obey traditional redistricting principles without producing the enacted map's exaggerated racial features makes us confident that the Plaintiff Groups will be able to produce a suitable *Alexander* map once the Court ultimately tries this case on the merits.[500]

Thus, while *Alexander* will be a hurdle that the Plaintiff Groups will need to surmount at trial, it does not bar the Plaintiff Groups from obtaining a preliminary injunction here.

### 8. Texas's Use of Race When Drawing the 2025 Map Wasn't Narrowly Tailored to Achieve a Compelling Interest

We've thus determined that, at trial, the Plaintiff Groups will likely satisfy their initial burden to show that race predominated over partisanship for many of the districts they challenge.

---

[498] *Cf., e.g.*, Prelim. Inj. Hr'g Tr. Day 3 (Morning), ECF No. 1416, at 81, 116–19 (another expert's testimony that, due to the "limited time" he had to prepare his analysis, he had to restrict his focus to six prior elections); Prelim. Inj. Hr'g Tr. Day 7 (Afternoon), ECF No. 1343, at 139–40 ("Q. Now, you said in your report that you did not have enough time to run ecological inference analysis yourself, right? | [DR. JEFFREY LEWIS:] That's right. . . . [F]rom the time that . . . I was asked to provide opinions on the matters that I described, I think I had more on the order of ten days.").

[499] *See supra* note 488.

[500] *See supra* Section III.5.e.

Assuming they do so, the burden will then shift to the State Defendants[501] "to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored'" to that end."[502]

Because the State Defendants' theory of the case is that the Legislature didn't base the 2025 Map on race at all,[503] they make no serious effort to argue that the Legislature's use of race was narrowly tailored to achieve a compelling interest.[504] For that reason alone, we could rule against the State Defendants on this issue at this stage of the proceedings.

It's nevertheless prudent to consider whether DOJ's claim—that Texas needed to systematically eliminate coalition districts to break from its supposed "racially based gerrymandering past"[505]—constitutes a compelling interest to support race-based redistricting here. "There is a significant state interest in eradicating the effects of past racial discrimination."[506] "When a state governmental entity seeks to justify race-based remedies to cure the effects of past discrimination," however, courts "do not accept the government's mere assertion that the remedial action is required."[507] Instead, courts "insist on a strong basis in evidence of the harm being remedied."[508]

---

[501] *E.g.*, *Alexander*, 602 U.S. at 11; *see also supra* note 191 and accompanying text.

[502] *E.g.*, *Cooper*, 581 U.S. at 292; *see also supra* note 192 and accompanying text.

[503] *See, e.g.*, Defs.' Post-Hr'g Br., ECF No. 1284, at 17 (insisting that the Plaintiff Groups "cannot" "demonstrate [any] use of race in the development of the map"); *id.* at 23 ("Race was not used here.").

[504] *See generally* Defs.' Resp. Intervenors' & Tex. NAACP's Prelim. Inj. Mot., ECF No. 1195; Defs.' Resp. Gonzales Pls.' Prelim. Inj. Mot., ECF No. 1199; Defs.' Resp. J. Prelim. Inj. Mot., ECF No. 1200; Defs.' Post-Hr'g Br., ECF No. 1284.

[505] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 2.

[506] *Miller*, 515 U.S. at 920 (citation modified).

[507] *Id.* at 922.

[508] *Id.*

As discussed, the evidence in the preliminary-injunction record suggests that the 2021 Legislature didn't discriminate in favor of minority coalitions—whether to comply with *Campos* or for any other purpose.[509] Again, as far as the preliminary-injunction record reveals, the 2021 Legislature drew the 2021 Map based strictly on race-neutral criteria like partisanship.[510] By all current appearances, there was no past discrimination in favor of minority coalitions for the State to remedy—and, therefore, no "strong basis in evidence" to support the State's purposeful and predominant consideration of race in the 2025 redistricting process.

Besides remedying past discrimination, the Supreme Court has also "long assumed that complying with the VRA is a compelling interest."[511] The DOJ Letter appears to take the position that, post-*Petteway*, coalition districts violate the VRA.[512] Therefore, we consider whether we can excuse the State's race-based redistricting as a well-intentioned but misguided attempt to comply with the VRA.

We can't. "Although States enjoy leeway to take race-based actions reasonably judged necessary under a proper interpretation of the VRA,"[513] courts cannot "approve a racial gerrymander . . . whose *raison d'être* is a legal mistake."[514] As this opinion makes clear, the DOJ's interpretation of *Petteway*—that VRA § 2 and the Constitution render coalition districts *per se*

---

[509] *See supra* Section II.B; *see also supra* Section II.F.

[510] *See supra* Section II.B.

[511] *E.g.*, *Cooper*, 581 U.S. at 301.

[512] *See* Brooks Prelim. Inj. Ex. 253, ECF No. 1326, at 2 ("It is well established that so-called 'coalition districts' run afoul the [sic] Voting Rights Act . . . .").

[513] *See Cooper*, 581 U.S. at 306; *see also Wis. Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 404 (2022) (explaining that "State have breathing room to make reasonable mistakes" regarding whether the VRA requires the State to enact a particular compliance measure).

[514] *See Cooper*, 581 U.S. at 306.

unlawful—is obviously wrong.[515] Thus, the State's systematic, purposeful elimination of coalition districts and creation of new single-race-majority districts "was not reasonably necessary under a constitutional reading and application of [the VRA]."[516]

Nor, if the State were so inclined, could it avoid liability by arguing that it was just following orders from DOJ. "[T]he Justice Department's objection" to a state's map is not "itself . . . a compelling interest adequate to insulate racial districting from constitutional review."[517]

We therefore conclude that, once this case proceeds to trial, the State Defendants will be unlikely to carry their burden to show that the Legislature's use of race was narrowly tailored to achieve a compelling interest. The Plaintiff Groups have therefore shown that they're likely to succeed on their racial-gerrymandering challenges to CDs 9, 18, 27, 30, 32, and 35.

## C.    Irreparable Harm

Besides showing that they're likely to succeed on the merits, the Plaintiff Groups have also established that they are "likely to suffer irreparable harm in the absence of preliminary relief."[518] "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages."[519] Here, the Plaintiff Groups' alleged harm is the violation of their constitutional rights under the Fourteenth and Fifteenth Amendments.[520] "[T]he loss of constitutional freedoms," such

---

[515] *See supra* Section II.D.

[516] *See Miller*, 515 U.S. at 921.

[517] *See id.* at 922.

[518] *Winter*, 555 U.S. at 20.

[519] *SO Apartments, L.L.C. v. City of San Antonio*, 109 F.4th 343, 353 (5th Cir. 2024) (quoting *Janvey*, 647 F.3d at 600 (quotation marks omitted)).

[520] TX NAACP's Mot. Prelim. Inj., ECF No. 1142, at 22–23; Congr. Intervenors' Mot. Prelim. Inj., ECF No. 1143, at 14–15; Gonzales Pls.' Mot. Prelim. Inj., ECF No. 1149, at 24–25; Brooks, LULAC, and MALC Pls.' Joint Mot. Prelim. Inj., ECF No. 1150, at 44–45. *See also* U.S. CONST. amend. XIV § 1; *id.* amend. XV § 1.

as the right to equal protection of the law and to exercise the right to vote free from racial discrimination, "for even minimal periods of time unquestionably constitutes irreparable injury."[521] The inability to vote for and to elect a congressional representative under a constitutional map is undoubtedly "an injury that cannot be compensated with damages, making it irreparable."[522] No legal remedy, including monetary damages, can make up for losing a constitutional right.

The State Defendants do not dispute that a violation of a constitutional right is an irreparable harm.[523] Rather, the State Defendants argue that since the Plaintiff Groups are unlikely to succeed on the merits of their claims, the Plaintiff Groups also cannot show that they are likely to suffer irreparable harm.[524] Since the Court finds otherwise, the State Defendants' arguments fail.

Accordingly, the Court finds the Plaintiff Groups will suffer irreparable harm if the 2025 Map remains Texas's operative congressional map.

---

[521] *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (citation modified) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). *See also DeLeon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."), *aff'd sub nom. DeLeon v. Abbott*, 791 F.3d 619 (5th Cir. 2015); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When constitutional rights are threatened or impaired, irreparable injury is presumed . . . A restriction on the fundamental right to vote therefore constitutes irreparable injury.").

[522] *1st Prelim. Inj. Op.*, 601 F. Supp. 3d at 182; *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Obama for Am.*, 697 F.3d at 436.

[523] *See generally* Defs.' Resp. to Texas NAACP and Congr. Intervenors' Mtn. for Prelim. Inj., ECF No. 1195; Defs.' Resp. to Gonzales Pls.' Mtn. for Prelim. Inj., ECF No. 1199; Defs.' Resp. to Brooks, LULAC, and MALC Pls.' Joint Mtn. for Prelim. Inj., ECF No. 1200. *See also* Defs.' Post-Hr'g Br., ECF No. 1284, at 88.

[524] *See* the sources cited *supra* note 523.

D.    **Balance of Equities and the Public Interest**

The Court next addresses the remaining two factors necessary for imposing a preliminary injunction: (1) the balance of equities must favor the movant and (2) an injunction would not disserve the public interest.[525] The Plaintiff Groups have satisfied both factors.

The balance of equities addresses "the relative harm to both parties if the injunction is granted or denied."[526] "The public-interest factor looks to the public consequences of employing the extraordinary remedy of injunction."[527] Because these two factors "overlap considerably," federal courts routinely consider them together.[528] Indeed, "[t]hese factors merge when the Government is the opposing party."[529] This is because "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws, and the State's interest and harm thus merge with that of the public."[530] Accordingly, the Court considers both factors together.

---

[525] *TitleMax*, 142 F.4th at 328; *see also Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016) (per curiam).

[526] *1st Prelim. Inj. Op.*, 601 F. Supp. 3d at 183 (quotation marks omitted) (quoting *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016)).

[527] *Id.* (citation modified) (quoting *Winter*, 555 U.S. at 24).

[528] *Texas v. United States*, 524 F. Supp. 3d 598, 663 (S.D. Tex. 2021) (citing *Texas v. United States*, 809 F.3d at 187).

[529] *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[530] *1st Prelim. Inj. Op.*, 601 F. Supp. 3d at 183 (citation modified) (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam)).

1.    ***Purcell* Does Not Require the Court to Deny a Preliminary Injunction in This Case**

The State Defendants argue that these factors weigh strongly against an injunction based on *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam).[531] *Purcell* stands for the principles "(i) that federal district courts ordinarily should not enjoin state election laws in the period close to an election, and (ii) that federal appellate courts should stay injunctions when . . . lower federal courts contravene that principle."[532] These principles "require[] courts to consider the effect of late-breaking judicial intervention on voter confusion and election participation."[533]

"[T]he Supreme Court has never specified precisely what it means to be 'on the eve of an election' for *Purcell* purposes."[534] Instead, courts have applied *Purcell* as "a consideration, not a prohibition," based on a variety of factors and pre-election and election deadlines.[535] Applying the same analysis to this case, the Court finds that *Purcell* does not require us to deny a preliminary injunction.[536]

---

[531] State Defs.' Resp. to Gonzales Pls.' Mtn. for Prelim. Inj., ECF No. 1196-1, at 36–39; State Defs.' Post-Hr'g Br., ECF No. 1284, at 91.

[532] *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (mem.) (Kavanaugh, J., concurring).

[533] *Petteway v. Galveston Cnty.*, 87 F.4th 721, 723 (5th Cir. 2023) (per curiam) (Oldham, J., concurring) [hereinafter *Petteway Purcell Op.*].

[534] *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam)).

[535] *Kim v. Hanlon*, 99 F.4th 140, 160 (3d Cir. 2024). *See Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring) (collecting cases); *Petteway Purcell Op.*, 87 F.4th at 723 (Oldham, J., concurring) (collecting cases); *McClure v. Jefferson Cnty. Comm'n*, Nos. 25-13253, 25-13254, 2025 WL 2977740, at *2 (11th Cir. Oct. 16, 2025) (per curiam) (collecting cases).

[536] *See Jacksonville Branch of NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *2–3 (11th Cir. Nov. 7, 2022) (per curiam).

Two Supreme Court applications of *Purcell* are especially relevant here.[537] First is the *Robinson* line of cases. The Court will not belabor here these cases' complex development.[538] For this opinion's purposes, what matters is that the three-judge panel in *Callais* enjoined Louisiana's newly drawn congressional plan 189 days (about six months) before the November 5, 2024, general election.[539] On May 15, 2024, the Supreme Court stayed the injunction on *Purcell* grounds.[540] The Supreme Court's stay order included only a naked citation to *Purcell* without any accompanying reasoning or analysis about why *Purcell* compelled the stay.[541]

Then there is *Merrill v. Milligan*.[542] In that case, the three-judge panel issued its preliminary injunction on January 24, 2022.[543] The panel declined to stay the injunction on *Purcell* grounds because "the primary election [would not] occur [until] May 24, 2022, approximately four months from" the panel's preliminary-injunction order.[544] The Supreme Court disagreed and stayed the injunction.[545] Here again, the Supreme Court provided no reasoning for the stay.[546] In

---

[537] State Defs.' Resp. to Gonzales Pls.' Mtn. for Prelim. Inj., ECF No. 1196-1, at 37–38; State Defs.' Post-Hr'g Br., ECF No. 1284, at 89–91.

[538] For an exhaustive discussion of this development, *see Callais v. Landry,* 732 F. Supp. 3d 574, 585–87 (W.D. La. 2024).

[539] *See generally id.*

[540] *Robinson v. Callais*, 144 S. Ct. 1171, 1171 (2024) (mem.).

[541] *See id.*

[542] 142 S. Ct. 879 (2022).

[543] *See generally Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022).

[544] *Singleton v. Merrill*, No. 2:21-cv-1291, 2022 WL 272636, at *11 (N.D. Ala. Jan. 27, 2022).

[545] *See Milligan*, 142 S. Ct. at 879.

[546] *See id.*

fact, the Supreme Court did not cite to a single case to support its stay—not even to *Purcell*.[547] The only reasoning offered to support the stay was in Justice Kavanaugh's concurrence discussing *Purcell*, which Justice Alito joined.[548]

In his concurrence in *Petteway v. Galveston County*, Judge Oldham cited to the Supreme Court's stay order in *Milligan* to observe that "the Supreme Court . . . refused to bless judicial intervention in State elections . . . 120 days before the primary election date" in that case.[549] In addition to noting the Supreme Court's stay in *Milligan*, Judge Oldham noted the Fifth Circuit's own calendar constraints. The Fifth Circuit had already taken the case en banc, and the court's next en banc sitting was not until January 23–25, 2024, less than two months before the primary election.[550] But unlike in *Petteway*, allowing time for intermediate appellate review of this opinion is not a complicating factor.

The State Defendants argue that these cases preclude the Plaintiff Groups from obtaining injunctive relief here.[551] Texas's congressional primary election is March 3, 2026, about four months from now.[552] If the Court were to apply *Robinson*'s timeframe to the next scheduled election, then the window to issue a preliminary injunction in this case before the March 3 primary election closed on August 26, 2025—three days *before* Governor Abbott even signed the

---

[547] *See id.*

[548] *See id.* at 879–82 (Kavanaugh, J., concurring) (basing his vote on *Purcell*).

[549] *Petteway Purcell Op.*, 87 F.4th at 723 (Oldham, J., concurring).

[550] *See id.* at 724 (Oldham, J., concurring).

[551] State Defs.' Resp. to Gonzales Pls.' Mtn. for Prelim. Inj., ECF No. 1196-1, at 37–38; State Defs.' Post-Hr'g Br., ECF No. 1284, at 89–91.

[552] State Defs.' Resp. to Gonzales Pls.' Mtn. for Prelim. Inj., ECF No. 1196-1, at 37–38; State Defs.' Post-Hr'g Br., ECF No. 1284, at 89–91.

redistricting bill into law.[553] Similarly, under *Milligan*, if 120 days from the primary election is the cutoff, then the panel would have had only until November 3, 2025, to draft this opinion. If the Court applied these timeframes even further under *Purcell* precedent and considered the next scheduled election to begin when absentee ballots are issued for the primary election, those cut-off deadlines would be even earlier: July 12, 2025, under *Robinson* and September 19, 2025, under *Milligan*.[554]

We disagree with the State Defendants. *Robinson* and *Milligan* are not dispositive. "*Purcell* is [not] just a tallying exercise"[555] or a "magic wand that bars [c]ourts from issuing injunctions some amount of time out from an election."[556] That is for good reason. If it were, the *Purcell* principle would effectively be "absolute"—and it is not.[557] It is *not* the case "that a district court may *never* enjoin a State's election laws in the period close to an election."[558] *Purcell* "simply heightens the showing necessary for a plaintiff to overcome the State's extraordinarily strong interest in avoiding late, judicially imposed changes to its election laws and procedures."[559] Rather than setting a hard cut-off, *Purcell* sets a flexible standard based on a fact-intensive analysis that

---

[553] *See Robinson*, 144 S. Ct. at 1171; *see also* H.B. 4, 89th Leg., 2d Spec. Sess. (Tex. 2025) (signed on August 29, 2025).

[554] *See Milligan*, 142 S. Ct. at 879 (Kavanaugh, J., concurring) ("The District Court declined to stay the injunction for the 2022 elections even though the primary elections begin (via absentee voting) just seven weeks from now . . . ."). Primary absentee voting begins January 17, 2026, in the 2026 Texas congressional election. Seven weeks before then is November 29, 2025.

[555] *Robinson v. Ardoin*, 37 F.4th 208, 228–29 (5th Cir. 2022) (per curiam) (collecting cases).

[556] *Get Loud Ark. v. Thurston*, 748 F. Supp. 3d 630, 665 (W.D. Ark. 2024).

[557] *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).

[558] *Id.*

[559] *Id.*

- 143 -

considers the disruption an injunction would cause.[560] It's not just about counting the number of days until the next election.

An injunction in this case would not cause significant disruption. The Legislature passed the 2025 Map in August 2025, more than a year before the general election in November 2026. As of this writing, we are still one year out from the general election and four months out from the primary election. Even "critical deadlines that arise before election day itself," like overseas and absentee primary voting, are more than two months away.[561] And the candidate-filing period remains open for several weeks.

Based on the credible testimony of Christina Adkins, the director of elections for the Texas Secretary of State, some preliminary election preparations have begun. The State has begun educating county election officials, including holding trainings about the 2025 Map, and some counties have started drawing county election voter registration precincts based on this map.[562] Candidates have also started relying on the 2025 Map, including determining which district to run in, collecting signatures, and campaigning.[563] The Court also recognizes there is a trickle-down effect among elections because a candidate's decision to run for Congress means that candidate

---

[560] *See Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 897 (6th Cir. 2024) ("As others have recognized, the Supreme Court has not adopted any categorical answer to the question of 'how close is too close?' The answer might depend on injunction-specific factors about the nature of the required changes and the burdens they will impose." (citation modified)). *See also Milligan*, 142 S. Ct. at 881 n.1 (Kavanaugh, J., concurring) ("How close to an election is too close may depend in part on the nature of the election law at issue, and how easily the State could make the change without undue collateral effects."); *Jacksonville Branch of NAACP*, 2022 WL 16754389, at *2–3.

[561] *McClure*, 2025 WL 2977740, at *2; *cf. Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring) (noting that primary elections by absentee voting began seven weeks from the date of the Supreme Court's stay).

[562] Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 152:9–154:13.

[563] *Id.* at 154:14–155:21.

cannot run for another elected position.[564] Candidates may make different choices under different congressional maps.

Yet in several critical respects, the State is still operating under the 2021 Map. The State's counties used the precinct boundaries under the 2021 Map for the November 4, 2025, election, and the State used the 2021 Map's lines for the special election in CD 18 on November 4, in addition to having used the 2021 Map for all congressional districts in the 2022 and 2024 elections.[565] The special election in CD 18 is now proceeding to a runoff election under the 2021 Map on January 31, 2026.[566] This means the runoff election for CD 18 under the 2021 Map will occur almost two months *after* the candidate-filing deadline for the November 3, 2026, election, two weeks *after* the overseas and absentee 2026 primary ballots are mailed, and mere weeks *before* the 2026 primary election—all of which is set to take place under the 2025 Map.[567] This runoff also means that Harris County, the State's largest, will retain both its voter precinct boundaries and its district boundaries under the 2021 Map until after CD 18's special election has formally concluded.[568]

So, it is not the case that the entire State has been operating under the 2025 Map for months. The map wasn't even law three months ago, and Texas voters will continue to vote under the 2021 Map after several key pre-election deadlines for the 2025 Map have already passed. Although the filing period for precinct chairs opened in September 2025, its December 8, 2025, closing date will

---

[564] *See Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020) ("Moving one piece on the game board invariably leads to additional moves.").

[565] Prelim. Inj. Hr'g Tr. Day 7 (Afternoon), ECF No. 1343, at 18:16–19:24.

[566] "Abbott sets Jan. 31 runoff for special election to replace U.S. Rep. Sylvester Turner." Texas Tribune. Nov. 17, 2025. https://www.texastribune.org/2025/11/17/texas-18th-congressional-district-special-election-runoff-date-jan-31-houston/. (Accessed Nov. 17, 2025).

[567] *Id.*

[568] Prelim. Inj. Hr'g Tr. Day 7 (Afternoon), ECF No. 1343, at 20:10–18.

accommodate any changes to precinct filings that result from an injunction.[569] And the Court is issuing its ruling well before the candidate-filing deadline of December 8. Simply put, the 2026 congressional election is not underway.[570]

In any event, any disruption that would happen here is attributable to the Legislature, not the Court.[571] The Legislature—not the Court—set the timetable for this injunction. The Legislature—not the Court—redrew Texas's congressional map weeks before precinct-chair and candidate-filing periods opened. The State chose to "toy with its election laws close to" the 2026 congressional election, though that is certainly its prerogative.[572] But any argument that *this Court* is choosing "to swoop in and re-do a State's election laws in the period close to an election" is wholly misdirected.[573] In this case, "[l]ate judicial tinkering" with Texas's congressional map is not what could "lead to disruption and to unanticipated and unfair consequences for candidates,

---

[569] Brooks, LULAC, and MALC Post-Hr'g Br., ECF No. 1281, at 39–40; Prelim. Inj. Hr'g Tr. Day 7 (Afternoon), ECF No. 1343, at 17:19–18:11.

[570] *Contra La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 408 (5th Cir. 2024) (determining a stay pending appeal was warranted in part because the district court issued the injunction after counties had started to mail absentee ballots); *Pierce v. North Carolina State Bd. of Elections*, 97 F.4th 194, 226 n.11, 227 (4th Cir. 2024) (affirming the district court's denial of a preliminary injunction in part under *Purcell* because the election at issue was "well underway," including the primary election results having already been certified by the time the opinion was publicly released).

[571] *Cf. Chancey v. Ill. State Bd. of Elections*, 635 F. Supp. 3d 627, 645 (N.D. Ill. 2022) ("And to the extent the State claims any prejudice, the problem is in large measure self-inflicted; the State, not the plaintiffs, enacted these amendments, which raise substantial constitutional concerns, less than a year before the election.").

[572] *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring).

[573] *Id.*

political parties, and voters."[574] The Legislature—not the Court—opened that door.[575] No one disputes the fact that "state and local election officials need substantial time to plan for elections."[576] But for *Purcell* purposes, that fact became moot when the Legislature enacted a new congressional map days before the precinct chair filing period opened and two months before the candidate filing period opened. As between the Plaintiff Groups, who have a constitutional right to vote under a lawful map, and the State, who invited this issue by enacting a new map within *Purcell*'s range, the equities favor the Plaintiff Groups.

This finding is bolstered by the fact that the parties' swift action has mitigated to the greatest extent possible the risk of "significant logistical challenges" for Texas election officials and of voter confusion.[577] Unlike in other cases where the district court's injunction "would require heroic efforts by [] state and local authorities," in this case the Legislature's decision to enact a new congressional map has required "heroic efforts" certainly by the parties, and to a lesser extent by the Court.[578] The parties had approximately one month to prepare for a preliminary-injunction hearing in the most significant mid-decade redistricting case in recent memory. The Court likewise worked diligently to schedule a preliminary-injunction hearing at the earliest possible date and to issue substantive rulings on motions filed in the interim.[579] Not to mention the Court's considerable

---

[574] *Id.*

[575] *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 642 (7th Cir. 2020) ("The Justices have deprecated but not forbidden all change close to an election. A last-minute event may require a last-minute reaction.").

[576] *Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).

[577] *See Jacksonville Branch of NAACP*, 2022 WL 16754389, at *3 (affirming the district court's finding that "the primary reason for applying [*Purcell*'s heightened] standard—risk of voter confusion—[is] lacking").

[578] *Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).

[579] *See, e.g.*, ECF Nos. 1205, 1226.

efforts to issue its preliminary-injunction ruling on a nearly impossibly short fuse. Issuing a thoroughly researched and well-reasoned preliminary-injunction opinion of over 150 pages in just 38 days—after awaiting expedited proposed fact findings, legal conclusions, and briefing from the parties, which followed a nine-day evidentiary hearing featuring 23 witnesses and thousands of exhibits on the entire congressional map for the second-largest state in the country—is a Herculean task. Nevertheless, the panel has done everything in its power to rule as quickly as possible.

This case is *not* one in which "local elections [are] ongoing," poll workers have already been trained, the voter registration deadline is looming, state election officials have been fully operating under the new map for months, a signature deadline has passed, or the state is only days or weeks away from an election.[580] This case *is* one in which, despite the time constraints imposed by the Legislature, sufficient time remains for an injunction to take effect. Therefore, *Purcell* does not apply.

### 2.    If *Purcell* Applies, the Plaintiff Groups Satisfy *Purcell*'s Heightened Showing

Even if *Purcell* were to apply, the Plaintiff Groups have satisfied its requirements. This litigation—under *Purcell*—is the prototypical "extraordinary case where an injunction" is "proper."[581] Under *Purcell*'s heightened showing, a plaintiff "might be [able to] overcome [the *Purcell* principle] even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has

---

[580] *Contra League of Women Voters of Fla., Inc*, 32 F.4th at 1371; *Thompson*, 959 F.3d at 813; *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th at 898.

[581] *League of Women Voters of Fla., Inc.*, 32 F.4th at 1372 n.7 (citation modified); *see Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring); *see La Union Del Pueblo Entero*, 119 F.4th at 409 (noting that *Purcell* is not "absolute").

not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship."[582] Although the full Supreme Court has not adopted this *Purcell* exception, the Fifth Circuit has done so, so we apply it accordingly.[583]

First, undue delay. Without question, the Plaintiff Groups satisfy their showing on this element. The Court has already discussed this point and will re-emphasize it here: the Plaintiff Groups (as well as the State Defendants and the Court for that matter) could not possibly have acted faster or more diligently. On August 18, 2025, the Plaintiff Groups moved "the Court to schedule an expedited September preliminary injunction hearing on Texas's soon-to-be-enacted congressional map."[584] Two days later, the Court scheduled a status conference for August 27.[585] By then, or within a day thereafter, all of the Plaintiff Groups had filed their motions for preliminary injunction—*before* Governor Abbott even signed the bill into law.[586] During the status conference, the Court heard extensive argument on timing.[587] The Plaintiff Groups asked— actually "begged"—the Court to set the preliminary-injunction hearing as soon as possible, vowing that they were ready to begin the hearing any day the Court scheduled it.[588]

---

[582] *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring); *La Union Del Pueblo Entero*, 119 F.4th at 409.

[583] *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring); *La Union Del Pueblo Entero*, 119 F.4th at 409.

[584] Brooks, LULAC, and Gonzales Pls. Mtn. to Schedule Prelim. Inj. Hearing, ECF No. 1127, at 2.

[585] Order Scheduling Status Conf., ECF No. 1128.

[586] *See generally* Texas NAACP's Mot. for Prelim. Inj., ECF No. 1142; Congr. Intervenors' Mot. for Prelim. Inj., ECF No. 1143; Gonzales Pls.' Mot. for Prelim. Inj., ECF No. 1149; and Brooks, LULAC, and MALC Pls.' Joint Mot. for Prelim. Inj., ECF No. 1150.

[587] *See* Aug. 27, 2025, Minute Entry, ECF No. 1145.

[588] *See id.*

The Court scheduled the preliminary-injunction hearing for October 1 to give the parties time to prepare while still giving the Plaintiff Groups the earliest possible hearing date.[589] Preparing for a nine-day preliminary-injunction hearing in just one month—including the preparation of briefing, arguments, examinations, expert reports, witnesses, and exhibits—is no small feat. The Plaintiff Groups and the State Defendants met that challenge and in doing so exceeded the Court's expectations for preparedness, thoroughness, and professionalism.[590] There is no evidence that the Plaintiff Groups unduly delayed bringing their claims to the Court. In fact, everyone—the Plaintiff Groups, the State Defendants, and the Court—worked as quickly as possible at every stage of these preliminary-injunction proceedings.

"This is not a situation in which [the Plaintiff Groups] were sleeping on their rights."[591] The Plaintiff Groups moved for a preliminary-injunction hearing, the Court held a status conference on that motion and scheduled the preliminary-injunction hearing, and the Plaintiff Groups filed their motions for preliminary injunction all *before* Governor Abbott signed the 2025 Map into law. Then all parties proceeded one month later with a nine-day preliminary-injunction hearing—including a full day of trial on a Saturday—that involved more witnesses and exhibits than most trials on the merits. If that's not maximum diligence, what is?

Second, feasibility of changes close to the election. Because of the Plaintiff Groups' (and the State Defendants') rapid response to the new map, the changes necessary to use a map other

---

[589] *See* Aug. 28, 2025, Minute Entry.

[590] The lawyers in this case have exhibited exemplary legal acumen, advocacy skills, and professionalism, all under intense pressure. The Court is not surprised. Throughout this years-long litigation, the lawyers on both sides have conducted themselves in the ways we hope all lawyers will, including during this case's 18-day full merits trial only five months ago. All of the advocates and parties in this matter have earned this sincere commendation by the Court.

[591] *Carey v. Wis. Elections Comm'n*, 624 F. Supp. 3d 1020, 1035 (W.D. Wis. 2022).

than the 2025 Map are feasible at this stage of the election without "undue collateral effects."[592] The Court has already discussed in detail the ways in which enjoining the 2025 Map would not disrupt the election or cause voter confusion.[593] The Court need not repeat them here. The Court adds that even Ms. Adkins testified that the Texas election officials and systems are more than capable of proceeding with the 2026 congressional election under any map that is the law.[594] As a result, any burden the State would incur is not only minimal, but also far outweighed "by the overwhelming public interest in enjoining C2333 [the 2025 Map] and protecting Plaintiffs' constitutional rights."[595]

That leads to the third element: irreparable harm. For the same reasons previously discussed, the Plaintiff Groups would suffer irreparable harm absent the injunction. The obvious harm here is the likely violation of the Plaintiff Groups' constitutional rights absent the injunction.[596] The Plaintiff Groups will be forced to proceed under a congressional map that likely unconstitutionally sorts voters on the basis of race. Proceeding in this way deprives the Plaintiff Groups of their right to participate in a free and fair election. That deprivation is a *per se* irreparable harm.[597] And this irreparable harm outweighs any marginal voter confusion not already present because of the Legislature's late-breaking passage of the 2025 Map.

---

[592] *Milligan*, 142 S. Ct. at 881 n.1 (Kavanaugh, J., concurring).

[593] *See supra* Section III.D.1.

[594] Prelim. Inj. Hr'g Tr. Day 7 (Morning), ECF No. 1420, at 153:13–18.

[595] Brooks, LULAC, and MALC Joint Mot. for Prelim. Inj., ECF No. 1150, at 45; Brooks, LULAC, and MALC Post-Hr'g Br., ECF No. 1281, at 40.

[596] *See supra* Section III.C.

[597] *See DeLeon v. Perry*, 975 F. Supp. 2d at 663 ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law.").

Fourth, the underlying merits. Again, the Court will not rehash its painstaking analysis of the merits. As explained above in great detail, this Court's majority finds the underlying merits are clearcut in favor of the Plaintiff Groups.[598] The Court recognizes the panel's non-unanimous decision weighs against this finding.[599] But given the indubitable direct evidence in this case, the circumstantial evidence, and the Court's inability to assign the mapdrawer's intent to the Legislature,[600] "[a]t this preliminary juncture, the underlying merits" do not "appear to be close."[601] The Plaintiff Groups have clearly shown a likelihood of proving that at trial.

### 3.   As Both a Legal and Practical Matter, *Purcell* Cannot Apply to This Case

These legal conclusions are further buttressed by the fact that applying *Purcell* to this case would lead to absurd results.[602]

If the Court were to consider *Robinson* and *Milligan* dispositive, as the State Defendants suggest, the Plaintiff Groups would have had a *right* to bring their constitutional claims without any real opportunity for their requested *remedy* of a preliminary injunction. As this Court explained above, *Robinson*'s 189-day line would have foreclosed the Plaintiff Groups from even filing a

---

[598] *See supra* Section III.B.

[599] *See Milligan*, 142 S. Ct. at 881 n.2 (Kavanaugh, J., concurring) (finding the underlying merits "not clearcut in favor of the plaintiffs" in part because "[e]ven under the ordinary stay standard outside the election context, the State has at least a fair prospect of success on appeal—as do the plaintiffs, for that matter"). *But see Lower Brule Sioux Tribe v. Lyman Cnty.*, 625 F. Supp. 3d 891, 933 (D.S.D. 2022) ("What is 'entirely clearcut' is somewhat in the eye of the beholder, and here the probability of a VRA violation is sufficiently clearcut to allow for relief as discussed above.").

[600] *See, e.g.*, *Brnovich*, 594 U.S. at 689–90 ("[T]he legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools."); *see also supra* Section III.B.4.D.iii.

[601] *Milligan*, 142 S. Ct. at 881 (2022) (Kavanaugh, J., concurring); *cf. La Union Del Pueblo Entero*, 119 F.4th at 409 (applying the conditions under which *Purcell* can be overcome to a permanent injunction at the district court level).

[602] *League of Women Voters of Fla., Inc*, 32 F.4th at 1371, 1372 n.7 (citation modified).

motion for preliminary injunction, and *Milligan*'s 120-day line would have rendered that motion futile.[603] Applying *Purcell* under either timeframe would mean the Plaintiff Groups' motions for preliminary injunction were dead on arrival. *Purcell* and its progeny, like *Robinson* and *Milligan*, would bar the Plaintiff Groups from seeking a remedy that they have a legal right to seek. Reading *Purcell* and its progeny to lead to this result is diametrically opposed to the fundamental right of access to the courts that the Constitution affords plaintiffs.[604]

Even without an injunction, the Plaintiff Groups would not have been left without any remedy. The Plaintiff Groups could proceed with their claims to a full trial on the merits. Indeed, "practical considerations sometimes require courts to allow elections to proceed despite pending legal challenges," even if those legal challenges may prove meritorious.[605]

But this case is not one of those times. The practical considerations that courts refer to in cases like this one are the "imminence of the election" and "inadequate time to resolve the factual disputes."[606] Here, those practical considerations arise solely because of how close to the election the Legislature drew the 2025 Map. A final adjudication on the merits after one or more election cycles have passed would run roughshod over the purpose of a preliminary injunction to provide merited, immediate relief. That is especially the case when, as here, the Court is working within—not creating—the timeframe dictated by the Legislature and when the Court finds in favor of the Plaintiff Groups on the merits of their preliminary injunction. Denying the injunction based on

---

[603] *See supra* Section III.D.1.

[604] *See Graham v. Nat'l Collegiate Athletic Ass'n*, 804 F.2d 953, 959 (6th Cir. 1986) (collecting cases).

[605] *Milligan*, 142 S. Ct. at 882 (2022) (Kavanaugh, J., concurring) (quotation marks omitted) (quoting *Riley v. Kennedy*, 553 U.S. 406, 426 (2008)).

[606] *Riley*, 553 U.S. at 426 (citing *Purcell*, 549 U.S. at 5–6).

such practical considerations would also eschew this Court's obligation to bestow the Plaintiff Groups' merited, preliminary relief. *Purcell* cannot be read to gut the Plaintiff Groups' right to seek a preliminary injunction and this Court's obligation to award one when merited.

Applying *Purcell* to this case would also incentivize legislatures to redistrict as close to elections as possible. The Governor first placed redistricting on the proclamation for the first called special session on July 9, but the session didn't start until July 21.[607] That means the first day the Legislature could even *take up* redistricting was less than eight months before the congressional primary election, less than four months before the candidate filing period opened, and less than two months before the precinct chair filing period opened. About seven weeks later, the Legislature passed the new map, and five days after that Governor Abbott signed it into law. Solely because of the Legislature's and the Governor's timing, the Court had less than seven months before the primary election and less than three months before the candidate filing period to determine whether the new map was constitutional. By acting late, the State has not wholly surrendered the reasonable deference *Purcell* provides it to run elections as it pleases.[608] But if under *Purcell* this Legislature-imposed timeframe mandates denying an injunction, then the State would be immune from any immediate, legitimate constitutional challenge to its redistricting efforts. To secure an unchallenged election under a new map, the Legislature would need only to pass the map close enough to an election to foreclose any judicial review. No court has applied *Purcell* to mean legislatures have a license to belatedly redistrict at the expense of voters' constitutional rights for even one election, if not more.

---

[607] Brooks Prelim. Inj. Ex. 254, ECF No. 1326-1, at 3.

[608] *See* State Defs.' Resp. to Gonzales Pls.' Mtn. for Prelim. Inj., ECF No. 1196-1, at 38 (first citing *Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) (per curiam); then citing *Pierce*, 97 F.4th at 226–27).

Taking this logic one step further, applying *Purcell* based on the timeframe established by the Legislature and the Governor would allow the State's executive and legislative branches to hamstring the courts. The Plaintiff Groups had a viable legal claim against the 2025 Map as soon as the 2025 Map became law on August 29. As the Court has explained, some readings of *Purcell* could foreclose that claim as early as July or at a variety of dates from then through November 3. Applying *Purcell* in this way would mean the Plaintiff Groups had a viable legal claim against the 2025 Map only *after* the point at which the Court could reasonably adjudicate any claim against that map for preliminary-injunctive relief. That application of *Purcell* would amount to placing the starting line beyond the finish line.

This particular dynamic has serious implications for the interplay between legislatures and the courts in the election context. To allow legislatures to redistrict as close to elections as possible while limiting the courts' ability to review the constitutionality of that action—even in extraordinary cases like this one—would unduly tip the balance of the separation of powers between the legislative and judicial branches and impair the effectiveness of the Constitution's protections of voting rights. If all parties and the Court act with maximum diligence, and the Court finds the map is likely unconstitutional, and yet that likely unconstitutional map can still be deployed, then a legal proceeding like this one is a waste of time and a perversion of the Constitution. If the rule were otherwise and *Purcell* precluded relief in this case, any legislature could pass a blatantly unconstitutional new congressional map the day before the election, and the courts would be impotent to do anything about it. Denying an injunction in this case on the basis of *Purcell* permits such a scenario—a scenario that would allow for *more* election chaos, thereby undermining *Purcell*'s *raison d'être*.

It is precisely because of cases like this that *Purcell* is not "absolute."[609] The Court does not presume here "to articulate *Purcell*'s precise boundaries."[610] "Whatever *Purcell*'s outer bounds" may be, this case does not fall within them.[611] If it did, the law would hollow out the Plaintiff Groups' right to seek a preliminary injunction, foreclose this Court's obligation to award a meritorious remedy, license legislatures to flout plaintiffs' constitutional rights, and undermine the delicate balance of power between the State's law-making branches and the judiciary's obligation to review the constitutionality of even hastily passed redistricting legislation. The law does not and cannot compel that result, and this Court won't either.

*        *        *

This Court has been attuned to *Purcell* from the moment the Plaintiff Groups moved this Court for a preliminary-injunction hearing. At the August 27, 2025, status conference, this Court questioned the parties about how *Purcell* could affect a possible injunction.[612] The Supreme Court has made clear that "lower federal courts should ordinarily not alter the election rules on the eve of an election."[613] Indeed, the Supreme Court has stayed a lower federal court's election-related injunctions at least six times in the last 11 years.[614] This Court is not naïve to that reality.[615] But this Court is also not naïve to the likely unconstitutional realities of the 2025 Map.

---

[609] *Milligan*, 142 S. Ct. at 881 (2022) (Kavanaugh, J., concurring).

[610] *League of Women Voters of Fla., Inc*, 32 F.4th at 1372 n.6.

[611] *Id.* at 1372.

[612] Aug. 27, 2025, Minute Entry, ECF No. 1145.

[613] *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. at 424 (per curiam) (citations omitted).

[614] *See Petteway Purcell Op.*, 87 F.4th at 723 (Oldham, J., concurring) (collecting cases).

[615] *See id.* (staying orders issued by Judge Jeffrey V. Brown affecting the maps of Galveston County Commissioners Court precincts).

Without an injunction, the racial minorities the Plaintiff Groups represent will be forced to be represented in Congress based on likely unconstitutional racial classifications for at least two years.[616] In this case, the Plaintiff Groups' constitutional right to participate in free and fair elections is not outweighed by minor inconveniences to the State's election administrators and to candidates nor by any residual voter confusion, which would be marginal at best given the short timeframe since the 2025 Map was passed.

Based on the foregoing, this Court finds that the balance of equities and the public interest favor the Plaintiff Groups.

## IV.    REMEDY

Having found all four preliminary-injunction elements weigh in favor of the Plaintiff Groups, the Court next considers the appropriate remedy. Reverting to the 2021 Map is the proper remedy here. Despite the Plaintiff Groups' previous legal challenges to the 2021 Map, there are several reasons why reverting to that map is the most legally sound and reasonable solution. First, this remedy is the one the Plaintiff Groups request.[617] Second, the 2021 Map was drawn by the Legislature, and courts favor legislative-drawn maps over judicial ones.[618] Third, the State has already used the 2021 Map in two previous congressional elections and *is still using it* in one special election that is ongoing, as we have already discussed.[619] As a result, the State could

---

[616] "[T]he loss of constitutional freedoms *for even minimal periods of time* unquestionably constitutes irreparable injury." *BST Holdings*, 17 F.4th at 618 (citation modified) (emphasis added).

[617] *See generally* Texas NAACP's Mot. for Prelim. Inj., ECF No. 1142; Congr. Intervenors' Mot. for Prelim. Inj., ECF No. 1143; Gonzales Pls.' Mot. for Prelim. Inj., ECF No. 1149; and Brooks, LULAC, and MALC Pls.' Joint Mot. for Prelim. Inj., ECF No. 1150.

[618] *See In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023) (collecting cases).

[619] *See Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014) (noting that a law's "use[] in at least three previous elections" was a key fact in determining and "maintaining the status quo").

"easily . . . make the change" back to the 2021 Map.[620] No "complex or disruptive implementation" is involved.[621]

Reverting to the 2021 Map is also more proper than giving the Legislature an opportunity to redraw the map before issuing an injunction, as the State Defendants ask the Court to do.[622] "Since 1966, the Supreme Court has repeatedly reminded lower federal courts that if legislative districts are found to be unconstitutional, the elected body must usually be afforded an adequate opportunity to enact revised districts before the federal court steps in to assume that authority."[623] Courts should usually afford legislatures this opportunity because "redistricting and reapportioning legislative bodies is a legislative task which the courts should make every effort not to preempt."[624]

Here, the Court does not need to afford that opportunity for both practical and legal reasons. Giving the Legislature that opportunity is impracticable.[625] "Since the [L]egislature is not scheduled to be in session this year" or even next year, giving the Legislature an opportunity to fix the map "would require that the Texas Governor call a special session."[626] It is highly unlikely that the Governor could call a special session and that the Legislature could draw and pass a new map in that special session before the candidate filing deadline of December 8. Additionally, the Court

---

[620] *Milligan*, 142 S. Ct. at 881 n.1 (Kavanaugh, J., concurring).

[621] *Id.*

[622] State Defs.' Post-Hr'g Brief, ECF No. 1284, at 90. *See In re Landry*, 83 F.4th at 303.

[623] *In re Landry*, 83 F.4th at 303.

[624] *Id.* (quoting *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978)).

[625] *See Veasey v. Abbott*, 830 F.3d 216, 270 (5th Cir. 2016) (en banc) (collecting cases).

[626] *Id.* at 271.

has identified a serious legal flaw in the 2025 Map,[627] and the 2021 Map is already a viable congressional map that was drawn by the Legislature.[628] By reverting to the 2021 Map, this Court will not preempt the Legislature's authority to draw its congressional districts. Rather, this Court will uphold the Legislature's authority while requiring the least amount of change and disruption to both Texas's election officials and voters.

---

[627] *Contra Perry v. Perez*, 565 U.S. at 395–97.

[628] *See Veasey v. Perry*, 769 F.3d at 895 (noting that a law's "us[e] in at least three previous elections" was a key fact in determining and "maintaining the status quo").

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Plaintiff Groups' motions for preliminary injunction as to their racial-gerrymandering claims:

(1)    "Plaintiff Texas NAACP's Motion for a Preliminary Injunction" (ECF No. 1142);

(2)    "Plaintiff-Intervenors' Motion for Preliminary Injunction" (ECF No. 1143);

(3)    The "Gonzales Plaintiffs' Motion for Preliminary Injunction" (ECF No. 1149); and

(4)    The "Brooks, LULAC, and MALC Plaintiffs' Joint Motion for Preliminary Injunction" (ECF No. 1150).

The Court thereby **ENJOINS** the State of Texas from using the 2025 congressional map and **ORDERS** the State to use the 2021 Map, as it did in the 2022 and 2024 elections.

**So ORDERED and SIGNED on Galveston Island this 18th day of November 2025.**


**JEFFREY V. BROWN**
**U.S. DISTRICT JUDGE**