# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | Case No. 3:21-cv-00259-DCG-JES-JVV |
| | § | [Lead Case] |
| V. | § | |
| | § | & |
| GREG ABBOTT, *et al.*, | § | |
| | § | All Consolidated Cases |
| Defendants. | § | |

---

**STATE DEFENDANTS' OPPOSED MOTION TO STAY PENDING APPEAL**

---

## TABLE OF CONTENTS

Page

Table of Authorities ...................................................................................................... iii

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 1

Argument ......................................................................................................................... 5

    I.   Plaintiffs Have Not Shown a Likelihood of Success on the Merits ..................... 5

        A.  Plaintiffs Are Unlikely to Show Discriminatory Intent ............................... 6

        B.  Direct Evidence ........................................................................................... 6

            1.  Plaintiffs have produced no direct evidence of intentional discrimination ............ 6

            2.  Plaintiffs rely only upon circumstantial evidence, yet produce no alternative plan. ........... 9

    II.  Equitable Considerations Foreclose an Injunction ......................................... 12

Conclusion ..................................................................................................................... 21

Certificate of Conference .............................................................................................. 22

Certificate of Service ..................................................................................................... 23

## TABLE OF AUTHORITIES

Page

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018) ................................................................................................. 8

*Alexander v. S.C. State Conf. of the NAACP,*
    602 U.S. 1 (2024) ........................................................................................... passim

*Allen v. Milligan,*
    599 U.S. 1 (2023) ................................................................................................ 18

*Ardoin v. Robinson,*
    142 S. Ct. 2892 (2022) ....................................................................................... 15

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
    576 U.S. 787 (2015) .............................................................................................. 8

*Benisek v. Lamone,*
    585 U.S. 155 (2018) ..................................................................................... 11, 12

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) .............................................................................................. 7

*Brown v. E. Miss. Elec. Power Ass'n,*
    989 F.2d 858 (5th Cir. 1993) ............................................................................ 6, 7

*Burns v. Richardson,*
    384 U.S. 73 (1966) ............................................................................................. 20

*Callais v. Landry,*
    732 F. Supp. 3d 574 (W.D. La. 2024) ......................................................... 14, 20

*Carson v. Simon,*
    978 F.3d 1051 (8th Cir. 2020) .......................................................................... 18

*Chisom v. Roemer,*
    853 F.2d 1186 (5th Cir. 1988) .......................................................................... 13

*Cooper v. Harris,*
    581 U.S. 285 (2017) .............................................................................................. 7

*Def. Distributed v. U.S. Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) ............................................................................ 12

*Eastlake v. Forest City Enters., Inc.,*
    426 U.S. 668 (1976) .............................................................................................. 8

*Ely v. Klahr,*
    403 U.S. 108 (1971) ................................................................................. 13

*In re Landry,*
    83 F.4th 300 (5th Cir. 2023) .................................................................... 18

*Jackson v. Tarrant Cnty.,*
    No. 25-11055, 2025 WL 3019284 (5th Cir. Oct. 29, 2025) ........................... 4, 5, 7, 10

*La Union Del Pueblo Entero v. Abbott,*
    119 F.4th 404 (5th Cir. 2024) .................................................................. 13

*League of United Latin Am. Citizens v. Abbott,*
    601 F. Supp. 3d 147 (W.D. Tex. 2022) .................................................. 12, 14

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022) .............................................................................. 18

*Miller v. Johnson,*
    515 U.S. 900 (1995) ........................................................................ 5, 8, 9

*Mock v. Garland,*
    75 F.4th 568 (5th Cir. 2023) ..................................................................... 5

*Nixon v. United States,*
    506 U.S. 244 (1993) ................................................................................ 20

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 5, 13

*Petteway v. Galveston Cnty.,*
    87 F.4th 721 (5th Cir. 2023) (en banc) ................................................ 14, 15

*Pierce v. N.C. State Bd. of Elections,*
    97 F.4th 194 (4th Cir. 2024) .................................................................... 13

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) (per curiam) ................................................................ 13

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ................................................................................ 13

*Robinson v. Adroin,*
    37 F.4th 208 (5th Cir. 2022) ............................................................... 14, 15

*Robinson v. Ardoin,*
    86 F.4th 574 (5th Cir. 2023) ..................................................................... 7

*Robinson v. Callais,*
    144 S.Ct. 1171 (2024) ........................................................................ 14, 20

*Rucho v. Common Cause,*
    588 U.S. 684 (2019) ................................................................................ 20

*Salazar v. Buono,*
    559 U.S. 770 (2010) ................................................................................ 13

*Scripps–Howard Radio, Inc. v. FCC,*
    316 U.S. 4 (1942) ...................................................................................... 5

*Singleton v. Merrill,*
    582 F. Supp. 3d 924 (N.D. Ala. 2022) .................................................. 18

*Sw. Voter Registration Educ. Project v. Shelley,*
    344 F.3d 914 (9th Cir. 2003) ................................................................ 13

*Tex. Alliance for Retired Americans v. Hughs,*
    976 F.3d 564 (5th Cir. 2020) (per curiam) .......................................... 19

*United States v. O'Brien,*
    391 U.S. 367 (1968) .................................................................................. 9

*Veasey v. Abbott,*
    870 F.3d 387 (5th Cir. 2017) (per curiam) .......................................... 12

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ............................................................................ 9, 11

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ....................................................................... 10, 11, 12

*Wise v. Circosta,*
    978 F.3d 93 (4th Cir. 2020) (per curiam) ........................................ 17, 18

*Wise v. Lipscomb,*
    437 U.S. 535 (1978) ................................................................................ 20

## Other Authorities

Gabby Birenbaum, *Court order striking down Texas redistricting map upends plans for candidates across the state*, KWTX (Nov. 19, 2025),
    https://www.kwtx.com/2025/11/19/court-order-striking-down-texas-redistricting-map-upends-plans-candidates-across-state/ .............................................................. 17

J. David Goodman & Shane Goldmacher, *White House Pushes Texas to Redistrict, Hoping to Blunt Democratic Gains*, NYTIMES, (Jun. 9, 2025),
    https://www.nytimes.com/2025/06/09/us/politics/trump-texas-redistricting.html ..............2

Kayla Guo & Eleanor Klibanoff, *Texas House Democrats flee the state in bid to block GOP's proposed congressional map*, Texas Tribune (Aug. 3, 2025), https://www.texastribune.org/2025/08/03/texas-democrats-quorum-break-redistricting-map/ .......................................................................................... 3

Press Release, Governor Greg Abott, *Governor Abbott Announces Special Session Date, Initial Agenda\* (Jun. 23, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-special-session-date-initial-agenda ........................................... 2

Press Release, Greg Abbot, *Governor Abbott Announces Special Session Agenda*, (Jul. 9th, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-special-session-agenda- ................................................................................................................. 2

Proclamation, Governor of the State of Texas (Nov. 17, 2025), https://tinyurl.com/4ayrpr9u ............................................................................................ 4

Roll Call, *Press Gaggle: Donald Trump Speaks to Reporters Before Marine One Departure - July 15, 2025* (Jul. 15, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-press-gaggle-before-marine-one-departure-july-15-2025/ ............................... 2

Texas Secretary of State, Candidate Portal, https://goelect.txelections.civixapps.com/ivis-cbp-ui/candidate-information ...................... 17

**Texas Legislative Transcripts**

Hearing on H.B. 4 before the Senate Special Comm. on Congressional Redistricting, 89th Leg., 1st C.S. (Jul. 28, 2025) .............................................................................. 3

Hearing on H.B. 4 on the Floor of the Senate (Part I), 89th Leg., 2nd C.S. (Aug. 22, 2025) ......... 3

House Select Comm. on Congressional Redistricting (Aug. 18, 2025) ............................ 3

House Select Comm. on Congressional Redistricting (Jul. 24, 2025) ............................ 2

House Select Comm. on Congressional Redistricting, Notice of Public Hearing (Jul. 24, 2025) .......................................................................................................................... 2

**Texas Legislative Journals**

H. J. of Tex. 89th Lege., 1st C.S. (Jul. 21, 2025) ............................................................. 2

H. J. of Tex. 89th Lege., 2nd C.S. (Aug. 20, 2025) ......................................................... 3

S. J. of Tex. 89th Lege., 2nd C.S. (Aug. 22, 2025) ......................................................... 3

S. J. of Tex., 89th Lege., 1st C.S. (Jul. 21, 2025) ............................................................. 2

Defendants Greg Abbott, in his official capacity as Governor of Texas, Jane Nelson in her official capacity as Secretary of State of Texas, Dave Nelson, in his official capacity as Deputy Secretary of State, and the State of Texas (collectively State Defendants) file this Motion to Stay Pending the outcome of Defendants' Appeal (*see* ECF No. 1438) of the Court's Order Granting Preliminary Injunction (ECF No. 1437 ).

## INTRODUCTION

After a long and hard-fought preliminary injunction hearing, this Court found in favor of the various Plaintiff groups. This fact notwithstanding, the Court should stay its preliminary injunction for at least three reasons. *First*, Plaintiffs did not show a likelihood of success on the merits. *Second*, State Defendants will suffer irreparable harm in the absence of a stay. *Third*, the balance of equities and public interest, including the *Purcell* doctrine, weigh heavily in favor of State Defendants.

## BACKGROUND

In 2021, the Texas Legislature enacted a Congressional map with the stated goal of improving Republican performance. The 2021 Map was drawn blind to race and then sent to outside counsel for VRA compliance review. *See* Trial Tr. 6/7/25 PM at 95:12–99:20; Trial Tr. 6/10/25 PM at 81:15–84:7; Trial Tr. 6/10/25 AM at 96:9–97:11; Trial Tr. 6/7/25 PM at 33:10–24; Trial Tr. 6/7/25 PM at 02:51:16–02:51:44. Despite the stated partisan goals, the result was a map that "left a lot" of Republican districts "on the table." Trial Tr. 05/31/25 AM at 57:24–25. When Plaintiff groups sued to enjoin the map, they argued that the Legislature's insistence that it did not consider race when drawing the maps was "suspicious." ECF No. 1; Trial Tr. 5/27/25 PM at 135:6–21.

Despite Texas's strong Republican advantage, the White House was not satisfied. On June 9, 2025, President Trump began a redistricting pressure campaign on state legislatures to redraw Congressional districts to "pick up as many as four or five House seats in 2026 . . . ." Defs.' Ex. 1415 (J. David Goodman & Shane Goldmacher, *White House Pushes Texas to Redistrict, Hoping*

*to Blunt Democratic Gains*, NYTIMES, (Jun. 9, 2025)). Just two weeks after Trump's pressure campaign became public, Governor Abbott announced that he planned to call a special session the following month. Defs.' Ex. 1420 (Press Release, Governor Greg Abott, *Governor Abbott Announces Special Session Date, Initial Agenda* (Jun. 23, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-special-session-date-initial-agenda). On July 7th, 2025, prompted by President Trump's public statements, the Department of Justice issued a letter threatening to sue Texas if it failed to revise its congressional districts. ECF No. 1141-2. On July 15th, 2025, President Trump made public statements to the press that he wanted Texas to flip "five [seats]" to the Republican Party. Defs.' Ex. 1352 (ROLL CALL, *Press Gaggle: Donald Trump Speaks to Reporters Before Marine One Departure - July 15, 2025* (Jul. 15, 2025), https://rollcall.com/factbase/trump/transcript/donald-trump-press-gaggle-before-marine-one-departure-july-15-2025/ ).

Six days later, the Texas House and Texas Senate came to order in response to Governor Abbott's Proclamation. Defs.' Ex. 1253 (H. J. of Tex. 89th Lege., 1st C.S. First Day at 1 (Jul. 21, 2025)); Defs.' Ex. 1252 (S. J. of Tex., 89th Lege., 1st C.S. First Day at 1 (Jul. 21, 2025)); Defs.' Ex. 1054 (Press Release, Greg Abbot, *Governor Abbott Announces Special Session Agenda*, (Jul. 9th, 2025), https://gov.texas.gov/news/post/governor-abbott-announces-special-session-agenda-). In accordance with prior precedent for redistricting, the House Select Committee on Congressional Redistricting held a series of public hearings. The first meeting, on July 24th, was met with vicious opposition by Democrats who objected to the effort because it was a partisan "power grab", a "pretext" to "get those five districts," and that any remedial basis for redistricting was an absurdity because the Texas House would never have passed a race-based map. Defs.' Ex. 1279 (House Select Comm. on Congressional Redistricting, Jul. 24, 2025 Tr. at 14:19, 67:9–11, 27:9–22). The Senate similarly held a series of public hearings to receive testimony. *See e.g.,* Defs.' Ex. 1096 (House Select Comm. on Congressional Redistricting, Notice of Public Hearing (Jul. 24, 2025)). Democrats objected to the implementation of a map that would increase Texas's Republican advantage in Congress and acknowledged the need to paint Texas's redistricting effort as racial opposed to partisan in order to seek judicial relief. Defs.' Ex. 1284 (Hearing on H.B. 4 before the

Senate Special Comm. on Congressional Redistricting, 89th Leg., 1st C.S. Tr. at 36:22–37:5 (Jul. 28, 2025 ) ("If we don't say that this is racial, if we don't indicate that, we're not going to get to Section 2 and we can't win.")).

Desperate to prevent Republicans from gaining five additional Republican seats, more than fifty Texas legislators—all Democrats—fled the state to deprive the House of the quorum necessary to take legislative action. Defs.' Ex. 1429 (Kayla Guo & Eleanor Klibanoff, *Texas House Democrats flee the state in bid to block GOP's proposed congressional map*, TEXAS TRIBUNE (Aug. 3, 2025)). This was not successful; the House reestablished quorum on August 18, 2025. After the Democrats returned, Republicans, rather than shying away from their partisan motives, made clear again that the purpose of the map was to "make it more Republican." Defs.' Ex. 1316 (House Select Comm. on Congressional Redistricting (Aug. 18, 2025), Tr. at 14:5–13). Republicans emphasized that the new map, like the 2021 Map, was drawn blind to race. Defs.' Ex. 1323 (Hearing on H.B. 4 on the Floor of the Senate (Part I), 89th Leg., 2nd C.S. (Aug. 22, 2025) Tr. at 7:24–8:6 (Aug. 22, 2025)). The bill passed both chambers on party lines and implemented a new congressional map that increased the number of predicted Republican congressional districts from twenty-five to thirty. Defs.' Ex. 1267 (H. J. of Tex. 89th Lege., 2nd C.S. at 65 (Aug. 20, 2025)); Defs.' Ex. 1271 (S. J. of Tex. 89th Lege., 2nd C.S. at 59–61 (Aug. 22, 2025)).

Despite Republican's clear partisan motive, Plaintiffs complain that the 2025 Map was enacted with a discriminatory purpose. This is just a façade, as their actual grievance is that Texas's 2025 Congressional Map is set to elect five more Republicans to the U.S. House of Representatives. *See, e.g.,* ECF No. 1134-1 (Brooks, LULAC, & MALC Pls.' Mot. Prelim. Inj., at 45–46 (requesting Plan C2193, a map they believe violated the VRA but has five fewer Republican seats, as their remedy)). But as Representative Al Green put it, "[i]f we don't say that this is racial, if we don't indicate that, we're not going to get to Section 2 and we can't win." Defs.' Ex. 1284 (Hearing on H.B. 4 before the Senate Special Comm. on Congressional Redistricting, 89th Leg., 1st C.S., Tr. at 36:22–37:5 (Jul. 28, 2025)).

To support their claim of discrimination, Plaintiffs pointed to statements by legislators answering questions posed by Democrats regarding the racial composition of districts. *See e.g.,* ECF No. 1282 at 13 (Prelim. Inj. Intervenor Post-Hr'g Br. (noting that Chairman Hunter answered questions from Democrats about race)). However, when remarks are made "in response to a question that itself raised the race issue" and the response to the question also mentions race, then the exchange has "little or no probative value" regarding discriminatory purpose. *See Jackson v. Tarrant Cnty.*, No. 25-11055, 2025 WL 3019284 at *10 (5th Cir. Oct. 29, 2025) (discussing the probative value of responses to questions that raise race issues in the redistricting context in the State of Texas).

This Court received post-hearing briefing on October 9. Yesterday, this Court entered a preliminary injunction preventing Texas from using the 2025 map and requiring use of the (repealed) 2021 map.

The first day of the filing period for candidates that are seeking public office was November 8, 2025. Tr. 10/08/2025 AM at 150:25–151:9. That was eleven days ago. That filing period ends in nineteen days. Candidates have already filed and are campaigning and collecting signatures under the new maps. *Id.* at 154:17–19; 155:22–156:4. The primary election is already underway under the 2025 maps. Tr. 10/8/2025 AM 150:25–151:9; Tr. 10/8/2025 PM at 8:7–9; *see, e.g.*, Proclamation, Governor of the State of Texas (Nov. 17, 2025), https://tinyurl.com/4ayrpr9u (noting "several candidates . . . have filed or announced to run for the current Congressional District No. 18). This Court's decision imposing court-ordered maps has thrown the State's electoral system into immediate chaos, with candidates already disrupting their plans and campaigns. Indeed, the Court's order will change the boundaries of every congressional district in the State—save one.

The State Defendants filed a notice of appeal to the Supreme Court on the same day as this Court's order. They now ask this Court to stay its injunction pending appeal. If this Court denies that relief, it should at least avoid immediate harm and stay the injunction for a brief period

(preferably until Monday, November 24 but at least until midnight on Friday, November 21) to allow the State Defendants to seek relief from the Supreme Court.

ARGUMENT

"[A]s part of its traditional equipment for the administration of justice, a federal court can stay the enforcement of a judgment pending the outcome of an appeal." *Nken v. Holder*, 556 U.S. 418, 421 (2009) (quoting *Scripps–Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9–10 (1942)). In this case, the traditional stay factors govern this request for a stay pending judicial review. *See id.* at 426. These traditional factors are: "(1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm if an injunction is not granted; (3) that the balance of equities tips in their favor; and (4) that an injunction would serve the public interest." *Jackson*, 2025 WL 3019284 at *3. "The first factor—likelihood of success on the merits—is the most important." *Scripps–Howard Radio, Inc.*, 316 U.S. at 8, 18–27 (quoting *United States v. Abbott*, 110 F.4th 700, 706 (5th Cir. 2024)) (finding that challengers were not likely to succeed on the merits of their intentional race-discrimination claim under the *Arlington Heights* framework) (cleaned up). Importantly, Plaintiffs must show a *substantial* likelihood of success on the merits. *Mock v. Garland*, 75 F.4th 568, 577 (5th Cir. 2023). Here, each of the traditional factors that courts weigh when considering whether to grant a stay tip the scales in favor of State Defendants.

## I.    Plaintiffs Have Not Shown a Likelihood of Success on the Merits

The Court granted Plaintiffs' request for a preliminary injunction based only on Plaintiffs' racial gerrymandering claims. ECF No. 1437 at 54. To prevail on a racial gerrymandering claim, Plaintiffs must show "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). "To make this showing, a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Id.* Moreover, Plaintiffs must disentangle race and

politics. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024). Plaintiffs have not done so.

### A. Plaintiffs Are Unlikely to Show Discriminatory Intent

Plaintiffs may show discriminatory intent through some combination of direct and circumstantial evidence. *Alexander*, 602 U.S. at 8. In the absence of direct evidence, Plaintiffs must supply the Court with a "substitute map that shows how the State 'could have achieved its legitimate political objectives' in [a challenged district] while producing 'significantly greater racial balance.'" *Id.* at 34. If they fail to do so, the Court must take an adverse inference. *Id.* Here, Plaintiffs have no direct evidence, no alternative map, and no likelihood of success.

### B. Direct Evidence

Direct evidence is "evidence which, if believed, proves the fact without inference or presumption[.]" *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993). The only evidence presented that meets this standard—Kincaid's testimony—confirms that race was not a factor in redistricting.

#### 1. Plaintiffs have produced no direct evidence of intentional discrimination

Plaintiffs have not produced *any* direct evidence that the legislature acted with racially discriminatory intent. "Direct evidence often comes in the form of a *relevant state actor's express acknowledgment* that race played a role in the drawing of district lines. Such concessions are not uncommon because States often admit to considering race for the purpose of satisfying our precedent interpreting the Voting Rights Act of 1965." *Alexander,* 602 U.S. at 8 (emphasis added). Plaintiffs wave the Department of Justice letter (DOJ Letter) as though it is their golden ticket, but it is nothing more than a red herring. The Court first cited the DOJ letter as direct evidence of legislative intent, though the letter was not authored by a *state legislator*, but rather a *federal executive official*. *See* ECF No. 1437 at 59–64. Next, the Court cited Governor Abbott's statements as direct evidence of legislative intent. ECF No. 1437 at 61–64. However, as the Supreme Court acknowledged, neither the DOJ, Harmeet Dhillon, nor Governor Abbott are "relevant state

actor[s]" for purposes of determining legislative intent. *Alexander*, 602 U.S. at 8; ECF No. 1437 at 65. Moreover, to conclude that the legislature acted with racial discrimination as its *predominant* motive based on these statements requires the factfinder to make inferences and presumptions and ignore directly contradictory statements by the legislators—and the mapdrawer—themselves. *See e.g.*, Tr. 10/6/25 PM 80:4–6 (Sen. King) ("[F]or me it really didn't carry any significance. The letter wasn't addressed to the Legislature."); Tr. 10/9/25 PM 118:8–13 (Rep. Vasut) ("I disagree with the assumption that this process had anything to do with the DOJ letter."); Tr. 10/8/25 AM 69:6–7 (Kincaid) ("I drew a race-blind map using partisan results"). As such, the DOJ Letter and Governor Abbott's statements are not direct evidence. *See E. Miss. Elec. Power Ass'n*, 989 F.2d at 861; *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021).

Moreover, Representative Hunter's statements concerning the racial *effects* of the map are not evidence of intent to discriminate. *Robinson v. Ardoin*, 86 F.4th 574, 593 (5th Cir. 2023) ("Awareness of race is permissible, and redistricting will often require awareness of the demographics of proposed districts."); *Jackson*, 2025 WL 3019284 at *10 (finding remarks about race made "in response to a question that itself raised the race issue" have "little or no probative value" regarding discriminatory purpose.). As a result, Plaintiffs have not shown any direct evidence of discriminatory intent on behalf of the Legislature.

The direct evidence on the record contradicts any finding that the Legislature had racially discriminatory motives. Adam Kincaid—the mapdrawer—testified that he drew the maps without consideration of race. Tr. 10/8/25 AM 69:6–7 ("I drew a race-blind map using partisan results"). Kincaid went into granular detail about the partisan makeup and process by which he drew the maps. *See e.g., Tr.* 10/7/25 AM at 64:19–65:13 (describing his criteria); Tr. 10/7/25 AM at 143:18–145:22 (describing the process of drawing 7, 8 and 38). Because direct evidence of racial intent takes the form of testimony by the mapdrawer, legislators, or both that the legislature "purposefully established a racial target[,]" *Cooper v. Harris*, 581 U.S. 285, 299 (2017), Kincaid's *uncontroverted* testimony that he did not use racial data to draw the Congressional map dooms Plaintiffs' claims.

Legislators' direct statements concerning their intent corroborate Kincaid's testimony. Both Senator King and Representative Vasut testified that race was not a consideration when they passed the map through their respective committees. Tr. 10/9/25 PM at 117:11–12, 118:20–119:5 (Rep. Vasut); Tr. 10/6/25 PM at 111:11–25 (Sen. King). Plaintiffs cite no direct evidence that contradicts this testimony.

Further, any potential direct evidence must be viewed through the lens of the presumption of legislative good faith. The presumption of good faith operates as a foundational constraint on judicial review of legislative action, reflective of the principle that duly elected lawmakers are entitled to have their motives, deliberations, and enactments viewed through a lens of legitimacy. *Miller*, 515 U.S. at 915 ("[T]he good faith of a state legislature must be presumed."). When a court declines to extend this presumption, the balance of our constitutional design is disturbed. *Id.* at 916 ("[T]he presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution."). When courts do not begin with an understanding that legislators act to advance permissible public purposes, they risk converting political disagreements into invidious and racial disputes, thereby encroaching upon the policy-making authority assigned to the legislature to settle issues through the political process. *Abbott v. Perez*, 585 U.S. 579, 603 (2018) ("Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions.").

Legislatures are collective bodies, and their work product arises from compromise, debate, and the input of many actors deriving their lawmaking powers from their representative capacity. *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 814 (2015); *Eastlake v. Forest City Enters., Inc.,* 426 U.S. 668, 672 (1976) ("Under our constitutional assumptions, all power derives from the people, who can delegate it to representative instruments which they create."). Because of this complexity, isolated statements cannot reliably reflect the institution's purpose. A failure to maintain the presumption then treats the legislature as though it were a unitary body rather than the representation of the political wills of the state as a whole. *Vill. of Arlington Heights*

*v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977) (recognizing that legislatures are not motivated "solely by a single concern").

Ignoring this context results in a disregard for the structural reality that legislative intent cannot be reconstructed through a mere tallying of statements. *See United States v. O'Brien,* 391 U.S. 367, 384 (1968) ("It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork."). But the Court engaged in this tallying practice in direct contravention to *O'Brien*. ECF No. 1437 at 66–79. The presumption does not permit an exercise in weighing snippets of legislative statements and the actions of non-legislative parties until the scale tips. If statements are uncertain, the courts must resolve that uncertainty in favor of the legislature acting with a proper purpose. *Miller*, 515 U.S. at 916; *O'Brien,* 391 U.S. at 383–84. This presumption reflects the proper recognition that courts should not upend the result of the democratic process without valid cause.

This Court committed a legal error by mischaracterizing Plaintiffs' evidence as direct evidence and by failing to apply *Alexander*'s presumption of good faith.

## 2. Plaintiffs rely only upon circumstantial evidence, yet produce no alternative plan.

Because Plaintiffs lack direct evidence of discriminatory intent, they are left to rely on circumstantial evidence. "A circumstantial-evidence-only case is especially difficult when the State raises a partisan-gerrymandering defense." *Alexander,* 602 U.S. at 9. A plaintiff therefore "must 'disentangle race from politics.'" *Id.* (citation omitted). Plaintiffs have failed to do this and are thus unlikely to succeed on the merits.

The Court must take "an adverse inference" against plaintiffs who do not provide a "substitute map that shows how the State 'could have achieved its legitimate political objectives' in [a challenged district] while producing 'significantly greater racial balance.'" *Id.* at 34 (citation omitted). "If either politics or race could explain a district's contours, the plaintiff has not cleared

its bar." *Id.* at 10. Plaintiffs have not cleared it here. In fact, Plaintiffs' only attempt to shoulder their burden of proof to produce a single alternative map was to have their counsel pull up their laptop during cross examination and shuffle the edges of two districts—an exercise roundly rejected by State Defendants' expert, Dr. Sean Trende. *See e.g.*, Tr. 10/10/25 AM at 91:1–18; 113:21–114:5; Tr. 10/10/25 PM at 29:10–30:6; 47:7–20. Plaintiffs' failure is inexcusable after the Supreme Court's observation that "an alternative map [is not] difficult to produce." *Alexander,* 602 U.S. at 34.

Plaintiffs attempted to use departures from regular procedure as circumstantial evidence of a discriminatory purpose. *See e.g.,* ECF No. 1282 at 7–8, Prelim. Inj. Intervenor Post-Hr'g Br. (characterizing the redistricting timeline, July 21st to August 22nd, as taking only "five days"). However, departures of this type "are just as easily explained by a partisan motive as a racial motive" and because "partisan gerrymandering is unlikely to be popular," "it is understandable that a legislature engaging in it would want to avoid an extensive, public process." *Jackson*, 2025 WL 3019284 at *12. "While that may not be consistent with the best practices of good government, it is hardly suggestive of racial motivation." *Id.* In addition, the Fifth Circuit stated that "the choice to redistrict mid-cycle is easily explained by a desire to reap partisan benefits in the 2026, 2028, and 2030 elections rather than waiting until 2030." *Id.* Because Plaintiffs "must 'disentangle race from politics,'" *Alexander,* 602 U.S. at 9, procedures that "are just as easily explained by a partisan motive as a racial motive," *Jackson*, 2025 WL 3019284 at *12, do not meet Plaintiffs' burden.

The Court's suggestion that plaintiffs may forego the *Alexander* requirement because the matter arises in a preliminary injunction improperly limits the showing required to obtain such extraordinary relief. ECF No. 1437 at 132–33. A preliminary injunction demands proof of a substantial likelihood of success on the merits, and this does not permit a relaxed standard. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) ("[Preliminary] injunctive relief [i]s an extraordinary remedy that may only be awarded upon a *clear* showing that the plaintiff is entitled to such relief." (emphasis added)); *see also Mock*, 75 F.4th at 577 (requiring a showing of a "a *substantial* likelihood of success on the merits" (emphasis added)). Under *Alexander,* success on

the merits of a vote-dilution claim based on circumstantial evidence all but requires the presentation of a viable alternate map. *Alexander*, 602 U.S. at 35 ("The evidentiary force of an alternative map, coupled with its easy availability, means that trial courts should draw an adverse inference from a plaintiff's failure to submit one. The adverse inference may be dispositive in many, if not most, cases where the plaintiff lacks direct evidence.") Plaintiffs *cannot* demonstrate a likelihood of success where they have not produced the very evidence that *Alexander* has deemed essential to proving their claim. The absence of an alternative map is not a speedbump, but a brick wall, leaving a dispositive element of their merits case entirely unsubstantiated.

Moreover, plaintiffs' inability or unwillingness to supply such a map is not attributable to the speed of the litigation. Plaintiffs themselves urged the court to accelerate the litigation, and having invited an expedited timetable, they cannot rely on it to excuse a failure of proof. *See generally Benisek v. Lamone*, 585 U.S. 155 (2018) (denying preliminary injunction where plaintiffs, through their own litigation pace choices failed to present the necessary evidentiary showing); *see also Winter*, 555 U.S. at 22 ("Injunctive relief [i]s an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief"). Moreover, Dr. Duchin's generation of millions of maps "in a matter of seconds" demonstrates that the time and tools were more than adequate to produce at least one legally compliant alternative. Tr. 10/6/2025 AM at 75:24–76:4. Litigants who demand speed cannot then leverage that speed to excuse their inability to provide crucial evidence; this is even more true when the party seeks the extraordinary remedy of a preliminary injunction that would enjoin duly and democratically enacted congressional maps.

Additionally, Plaintiffs did not rebut State Defendants' evidence showing that the 2025 Map would have passed regardless of its racial makeup. Tr. 10/9/25 PM at 119:15–119:20. *Vill. of Arlington Heights*, 429 U.S. at 270 n.21 (establishing that if the legislature would have made "the same decision" without "the impermissible purpose" then "there would be no justification for judicial interference with the challenged decision."). Witness testimony confirmed that partisanship and political goals favoring Republican candidates were the motivating reasons behind

the redistricting effort. Even Plaintiffs' own expert testified that the map looks exactly like a response to President Trump's wishes. Tr. 10/6/25 PM at 5:22–6:12.

At every turn, Plaintiffs have failed to produce compelling evidence of racial motivation on behalf of the Legislature. They have not disentangled alleged racial motivations from partisan ones and have not provided an alternative map that would show that the Legislature could have accomplished its same goals with a different racial effect. Their claims fail as a matter of law, and they have not demonstrated a likelihood of success on the merits.

## II.    Equitable Considerations Foreclose an Injunction

Plaintiffs also fall short when examining the "equitable considerations" courts consider when deciding whether to grant a stay of injunction. Even if Plaintiffs could show a likelihood of success (they cannot), "a preliminary injunction does not follow as a matter of course." *Benisek*, 585 U.S. at 158. At the outset, a plaintiff must also show that he is "*likely* to suffer irreparable harm.*" Winter*, 555 U.S. at 20 (emphasis added). And because Plaintiffs have not shown that they are likely to prevail on their claims that the Legislature unconstitutionally discriminated on the basis of race, they cannot show that they are likely to suffer any harm at all, let alone irreparable harm. *Id.* at 22 (holding that a "possibility" of irreparable harm is not enough); *League of United Latin Am. Citizens (LULAC) v. Abbott*, 601 F. Supp. 3d 147, 182–83 (W.D. Tex. 2022) (finding Plaintiffs had not shown they were likely to suffer irreparable harm because they had not shown they were likely to succeed on the merits).

Furthermore, there are several equitable factors that weigh in favor of this Court granting a stay. *First*, "the balance of harm requirement . . . looks to the relative harm to both parties if the injunction is granted or denied." *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016). This Court's preliminary injunction irreparably harms Texas. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). Accordingly, the balance of the equities and public interest "merge when the Government is the opposing party,"

*Nken*, 556 U.S. at 435, and courts "should be particularly cautious when contemplating relief that implicates public interest." *Salazar v. Buono*, 559 U.S. 770, 714 (2010). "Redistricting constitutes a traditional domain of state legislative authority," and the Supreme Court just last year urged federal courts to "exercise extraordinary caution . . . because [f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions." *Alexander*, 602 U.S. at 7 (internal quotations omitted). Here, both the balance of harm and the public interest weigh against an injunction.

*Second*, the *Purcell* doctrine cuts against a preliminary injunction. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). *Purcell* "stands for the principle that 'federal courts ordinarily should not enjoin a state's election laws in the period close to an election, and that when 'lower federal courts contravene that principle,' the Supreme Court will stop them." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 266 (4th Cir. 2024) (quoting *Merrill v. Milligan*, 142 S.Ct. 879, 879–80 (2022) (Kavanaugh, J., concurring)); *see Purcell*, 549 U.S. 1; *La Union Del Pueblo Entero v. Abbott*, 119 F.4th 404, 408 (5th Cir. 2024). This is not a new principle. In *Reynolds v. Sims*, 377 U.S. 533 (1964), the Supreme Court explained that the lower court "acted wisely in declining to stay the impending primary election in Alabama," *id.* at 586, even though the challenged redistricting plan was plainly unconstitutional, *id.* at 545. "*Sims* has been the guidon to a number of courts that have refrained from enjoining impending elections," *Chisom v. Roemer*, 853 F.2d 1186, 1190 (5th Cir. 1988), "even in the face of an undisputed constitutional violation," *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003); *Ely v. Klahr*, 403 U.S. 108, 114–115 (1971).

The injunction overturns this "bedrock tenet of election law," forbidding "[l]ate judicial tinkering with election laws." *Milligan*, 142 S.Ct. at 881 (Kavanaugh, J., concurring)). *Purcell* does not, however, prohibit state legislative action at any time. *See Milligan*, 142 S.Ct. at 881 (Kavanaugh, J., concurring)) (allowing "a State on its own to toy with its election laws close to a State's elections"). If there are to be any late changes to the congressional map, they should come from the state legislature, not a federal court.

This injunction cannot be squared with *Purcell*. The majority opinion faults the state legislature for supposedly acting late, *see* Maj. Op. 146-47, requiring it to declare Supreme Court precedents in "*Robinson* and *Milligan* are not dispositive," Maj. Op. at 143. This injunction has one key effect: "swoop[ing] in and re-do[ing]" the Texas congressional map "in the period close to an election." *Milligan*, 142 S.Ct. at 881 (Kavanaugh, J., concurring)).

Nor is this a plausible case for modifying *Purcell*'s distinction between judicial and legislative action. Legislative passage of the congressional map was delayed by an illegal quorum break orchestrated by those opposed to the map, including plaintiffs in this litigation. *See* Dissent at 21 (noting "some plaintiffs broke quorum and delayed the passage of the 2025 map for weeks"). Plaintiffs should not benefit in court from delaying the legislative process. As this Court has recognized, *LULAC*, 601 F. Supp. 3d at 186, the Supreme Court has not hesitated to stay injunctions under the *Purcell* principle. The *Robinson* and *Callais* cases are instructive. In *Robinson*, the Fifth Circuit declined to issue a stay based on the *Purcell* principle when the "primary elections [were] five months away." *Robinson v. Adroin*, 37 F.4th 208, 228–29 (5th Cir. 2022). That decision was erroneous, and the Supreme Court promptly issued the stay. *Ardoin v. Robinson*, 142 S.Ct. 2892, 2892–93 (2022). Likewise, in *Callais*, the three-judge district court enjoined Louisiana's congressional map but declined to enter a stay based on *Purcell*. *Callais v. Landry*, 732 F. Supp. 3d 574, 613–14 (W.D. La. 2024). Despite there being more than six months between the April 2024 order enjoining the map and the November 2024 primary elections, the Supreme Court stayed the injunction, citing *Purcell*. *Robinson v. Callais*, 144 S.Ct. 1171 (2024); *see also Petteway v. Galveston Cnty.,* 87 F.4th 721, 723 (5th Cir. 2023) (en banc) (Oldham, J., concurring and joined by a majority of the Court) (collecting cases).

This Court's injunction was issued just three and a half months before Texas' primary elections, already *shorter* than the time periods at issue in *Robinson* or *Callais*. Texas' primary elections are on March 3, 2026, just *three and a half months* away. Tr. 10/8/25 AM 150:16–17. Early voting begins on February 17, 2026, and early voting for overseas and military members begins on January 17, 2026, as federal law requires the issuance of absentee ballots to such voters 45 days

before the primary. Tr. 10/8/25 PM 10:1–6; 52 U.S.C. Sec. 20302(a)(8). The candidate filing period opened on November 8, 2025. Tr. 10/8/25 AM 150:25–151:14. That was eleven days ago—Texas's 2026 Congressional election is already well under way.

Indeed, "'*Purcell* is [not] just a tallying exercise.'" ECF No. 1437 at 143 (quoting *Robinson*, 37 F.4th at 229 (denying stay)); *but see Ardoin v. Robinson*, 142 S. Ct. 2892 (2022) (granting stay that Fifth Circuit did not enter). And it "is *not* the case 'that a district court may *never* enjoin a State's election laws in the period close to an election.'" ECF No. 1437 at 143 (quoting *Milligan*, 142 S.Ct. at 881 (Kavanaugh, J., concurring)). However, the dates in *Robinson* and *Milligan* remain helpful guideposts for courts. *See, e.g., Petteway*, 87 F.4th at 723 (Oldham, J., concurring and joined by a majority of the Court) (listing cases and considering how many days before the election did the Supreme Court apply *Purcell* to bar judicial intervention).

This Court's order will cut the candidate filing period in half and require potential candidates to make a difficult choice. For those, who have not yet filed, should they do so under the court-imposed map? Or should they roll the dice by filing under the map that is currently law? And "[c]hanging the opening of the candidate filing period, delaying it . . . has kind of a cascading effect." Tr. 10/8/25 PM 10:16–19. As Mrs. Christina Adkins, the Director of Elections at the Texas Secretary of State's Office explains, it could result in a change to the primary date, which "could potentially be catastrophically bad." Tr. 10/8/25 PM 11:12–25. Furthermore, "[c]hanging the opening of the candidate filing period . . . could impact the ability for counties to adequately prepare and test their ballots, and could impact their ability to meet that [federal] 45-day deadline." Tr. 10/8/25 PM 10:16–25. And testing ballots is "a very, very important piece of the process, because it ensures accuracy for your outcomes." Tr. 10/8/25 PM 11:10–11. Not only is "logic and accuracy testing" required by state law, it is also "the process by which we ensure that our equipment and the programming related to that equipment is accurate and will . . . accurately tabulate the election results." Tr. 10/8/25 PM 11:1–11.

Furthermore, Election Administrators have already begun to prepare for the 2026 primaries under the 2025 congressional map. Tr. 10/8/25 PM 14:20–22; *see also* Tr. 10/8/25 AM

152:11–17 ("For the upcoming primary in March, the maps that our counties would be working under at this moment would be the maps that are current law," which are the "2025 maps."). While some parts of Harris County were preparing for elections under the 2021 map and the 2025 map due to a runoff election for a single district on January 31, 2026, the same is not true for the other 253 counties in the State. To prepare for the upcoming primary election, the Secretary of State has already begun educating county election officials about the maps so that they can "determine if there [are] any additional efforts they needed to make on the local level for compliance." Tr. 10/8/25 AM 152:18–153:12. Because counties are responsible for drawing county election voter registration precincts, "many counties have already begun that process and started mapping all those changes out." Tr. 10/8/25 AM 154: 11–13.

This injunction also disrupts settled reliance interests. For congressional races, November 8, 2026 is not the start of the race. The filing period for individuals applying for a party office opened on September 9, 2025. Tr. 10/8/25 AM 150:20–24. Announced candidates have also already begun campaigning for the districts drawn under the 2025 map. Tr. 10/8/25 AM 154:17–155:3. Some candidates have even chosen to forego reelection to an office they currently hold and run in a district drawn under the 2025 map. Defs.' Ex. 1380. Disrupting the status quo by changing the congressional map will "cause some level of voter confusion." Tr. 10/8/25 PM 15:14–16. Some candidates will have to "reconsider what district they're running in." Tr. 10/8/25 PM 15:17–19. And some candidates risk their application being rejected for invalid signatures, or will have to "restart the process of collecting signatures," the "only option" some candidates "have under the law to get on the ballot." Tr. 10/8/25 PM 7:21–8:23, 12:14–20, 15:14–25.

This injunction will confuse voters and candidates, may lead to "catastrophically bad" operational concerns for Texas elections, and disrupt the orderliness of Texas's electoral process. Under *Purcell*, this should not be. Even less than 48 hours after the injunction was entered, these negative effects are already occurring. "The ruling has set off a domino effect for politicians, with Democrats who had previously announced retirement now planning to run for their current districts under the lines set in 2021." Gabby Birenbaum, *Court order striking down Texas redistricting*

*map upends plans for candidates across the state*, KWTX (Nov. 19, 2025), https://www.kwtx.com/2025/11/19/court-order-striking-down-texas-redistricting-map-upends-plans-candidates-across-state/. "Republican candidates—especially in those districts that were completely redrawn—are now at the mercy of the Supreme Court[.]" *Id.* "Many GOP candidates have already filed for election, raised money and begun campaigning under the new lines, but those districts, under the ruling, would now revert to ones that favor Democrats." *Id.* Congressman Marc Veasey, a Fort Worth Democrat, "said the situation reminded him of his entry into Congress in the 2012 election cycle, when a panel of federal judges similarly rejected the Texas Legislature's map drawn in 2011." *Id.* Notably, Christina Adkins testified that the 2012 primary election cycle is an example of a time when a court's interference with the state's election process potentially had a substantive effect on the outcome of the election. *See* Tr. 10/8/25 PM 12:19–13:5.

Due to the injunction, Congressional candidates—at least 71 of them, both Republican and Democrat, across the State—are now running for election under different maps. *See* Gabby Birenbaum, *Court order striking down Texas redistricting map upends plans for candidates across the state*, KWTX (Nov. 19, 2025); Texas Secretary of State, Candidate Portal, https://goelect.txelections.civixapps.com/ivis-cbp-ui/candidate-information (database listing registered candidates for 2026 congressional primaries). The Court's injunction made the 2021 Maps the active maps for Congressional campaigns, essentially altering the boundaries for 37 congressional districts. ECF No. 1437 at 1. However, Congressman Briscoe Cain, a Republican in the Houston area is continuing to campaign under the 2025 maps. *Id.* Josh Cortez, a primary candidate in the 2025 Map's Congressional District (CD) 35 is continuing to run in the re-drawn CD 35. *Id.* Many more still do not know where they are running. Congressman Lloyd Doggett now plans to un-retire and run in CD 37 if the ruling is upheld. *Id.* Congressman Al Green does not know whether he is running in district 9 or 18. *Id.* This confusion is just the beginning.

In all events, *Purcell* protects the "status quo" a State establishes, regardless of when it does so. *Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020) (per curiam). The 4th Circuit in *Wise v. Circosta* found that "it is not federal court decisions, but state decisions, that establish the status

quo." *Id.* In that case, North Carolina's executive and judicial branches altered state election law in late September 2020 to address COVID-related concerns known long before, and the Fourth Circuit held that *Purcell* protected that choice, *id.* at 96–99, over the dissent's objection that the state action came too late, *id.* at 116–17 (Wilkinson, J., dissenting).

"The *Purcell* principle is a presumption against disturbing the status quo. The question here is who sets the status quo? The Constitution's answer is generally the state legislature." *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020). Here, H.B. 4 is the "status quo" and *Purcell* protects that status quo. A ruling otherwise would allow plaintiffs to make redistricting "a game of ambush." *In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023).

Nor has Texas "invited this issue by enacting a new map within *Purcell*'s range[.]" ECF No. 1437 at 147. Supreme Court precedent does not support a conclusion that the State has unclean hands if it passes election laws too close to an election date. *See, e.g.*, *Milligan*, 142 S.Ct. at 881 (Kavanaugh, J., concurring) ("It is *one thing for a State on its own* to toy with its election laws close to a State's elections. But it is *quite another thing for a federal court to swoop in* and re-do a State's election laws in the period close to an election." (emphasis added)). At the very least, Texas should not be disadvantaged any more than Alabama was in *Milligan*. In *Milligan*, the challenged statute was enacted 85 days before the candidate filing deadline closed and 201 days before the next election. *See Singleton v. Merrill*, 582 F. Supp. 3d 924, 935 (N.D. Ala. 2022), *stay granted sub nom. Allen v. Milligan*, 599 U.S. 1 (2023). Texas' statute was similarly enacted 101 days before the candidate filing deadline closed and 186 days before the next election. *See* Tr. 10/8/25 AM 150:16–17, 151:5–9.

Furthermore, in support of its decision, the Court concludes that "any disruption that would happen" as a result of its Order "is attributable to the Legislature, not the Court." ECF No. 1437 at 146. The Court explains that this is because "[t]he Legislature—not the Court—set the timetable for this injunction." ECF No. 1437 at 146. From there, the Court then makes another notable conclusion—one that appears novel. While not disputing the fact that "'state and local election officials need substantial time to plan for elections,'" the Court reasons that "for *Purcell*

purposes, that fact became moot" because of the date the Legislature enacted the new congressional map. ECF No. 1437 at 147.

State Defendants respectfully disagree. State Defendants are unaware of precedent that supports the finding that "any disruption that would happen . . . is attributable to the Legislature, not the Court" or that "that fact became moot" because of the date the legislature enacted the congressional map. *See* ECF No. 1437 at 146–47. Rather, it is Texas's "prerogative" to "'toy with its election laws close to'" its own elections. ECF No. 1437 at 146 (quoting *Milligan*, 142 S.Ct. at 881 (Kavanaugh, J., concurring)). Texas's exercise of its own prerogative does not mean the Court's "'[l]ate judicial tinkering' with Texas's congressional map is not what *could* 'lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters.'" ECF No. 1437 at 146–47 (quoting *Milligan*, 142 S.Ct. at 881 (Kavanaugh, J., concurring)) (emphasis added). The Court's actions can, and will, lead to disruption and confusion on the ground.[1] The Court's contrary view mistakes the status quo, which is the law passed by the State of Texas. *Tex. Alliance for Retired Americans v. Hughs*, 976 F.3d 564, 568 (5th Cir. 2020) (per curiam). That changed *only* because a federal court saw fit to inject itself mid-election cycle.

Additionally, State Defendants respectfully disagree with the Court's conclusion "that applying *Purcell* to this case would lead to absurd results." ECF No. 1437 at 152. The Court reasons that if it "were to consider *Robinson* and *Milligan* dispositive, . . . the Plaintiff Groups would have had a *right* to bring their constitutional claims without any real opportunity for their requested *remedy* of a preliminary injunction . . . . Reading *Purcell* and its progeny to lead to this result is diametrically opposed to the fundamental right of access to the courts that the Constitution affords plaintiffs." ECF No. 1437 at 152–53. State Defendants read *Purcell* differently. *Purcell* necessarily means that sometimes Plaintiff Groups have a right to bring constitutional claims, but the specific

---

[1] State Defendants respectfully disagree with the Court's conclusion that "even Ms. Adkins testified that the Texas election officials and systems are more than capable of proceeding with the 2026 congressional election under any map that is the law." ECF No. 1437 at 151 (citing Tr. 10/8/25 AM 153:13–18). State Defendants contend the cited portion of Ms. Adkins' testimony does not support this conclusion.

remedy of a preliminary injunction will not available. This occurs every time a Plaintiff Group ordinarily would prevail in a preliminary injunction hearing, but the *Purcell* doctrine denies them their requested remedy of a preliminary injunction. *See, e.g.*, *Merrill*, 582 F.Supp.3d at 935 (granting preliminary injunction), *stay granted sub nom.*; *Milligan*, 599 U.S. at 1 (2023); *Callais,* 732 F.Supp.3d at 585–87 (granting preliminary injunction), *stay granted sub nom.*; *Robinson*, 144 S.Ct. at 1171. After all, it is well established that some rights do not have judicial remedies. *See, e.g.*, *Rucho v. Common Cause*, 588 U.S. 684, 718–21 (2019) (partisan gerrymandering); *Nixon v. United States*, 506 U.S. 244, 233–38 (1993) (senate impeachment procedures).

Finally, the Court also expresses a concern that "[d]enying an injunction in this case on the basis of *Purcell* permits . . . a scenario that would allow for *more* election chaos." ECF No. 1437 at 155; *see also* ECF No. 1437 at 154 ("Applying Purcell to this case would also incentivize legislatures to redistrict as close to elections as possible."). But it is not clear that failing to grant an injunction in this case would ultimately result in more election chaos. At the trial on the merits, the Court may choose certain remedies to promote orderly elections. *See* ECF No. 1437 at 153 (stating that Plaintiffs have a remedy, even without a preliminary injunction, by proceeding to a full trial on the merits). Voters also have a political remedy. They may punish incumbents that redistrict too close to an election or pressure legislatures to limit their own redistricting power. *See, e.g.*, *Rucho*, 588 U.S. at 719 ("Provisions in state statutes and state constitutions can provide standards for state courts to apply."). Voters can also pressure Congress to enact statutes to promote orderly elections by using its Elections Clause power, a power that "Congress has regularly exercised." *Rucho*, 588 U.S. at 698. An injunction at this time stymies this democratic process.

Perhaps worse, this injunction forbids the state legislature from enacting a remedial map. Maj. Op. at 158 (refusing to "giv[e] the Legislature an opportunity to redraw the map"); *id.* at 160 ("The Court . . . ORDERS the State to use the 2021 Map . . . ."). "[A] state's freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands of the Equal Protection Clause." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (quoting *Burns v. Richardson*, 384 U.S. 73, 85 (1966)). That is

true regardless of whether this Court thinks the State could feasibly produce new maps by a certain date and regardless of the Court's conclusions regarding the 2025 map. *Perez*, 585 U.S. at 603–605.

For these reasons, State Defendants seek a stay of the Court's injunction pending appeal. Alternatively, State Defendants respectfully seek a stay until the United States Supreme Court rules on a request for an administrative stay of the Court's order.

## Conclusion

For these reasons, State Defendants respectfully request the Court grant their Motion to Stay Pending Appeal. State Defendants respectfully request a ruling on the instant motion by 10 am CST Friday, November 21, 2025.

Date: November 19, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

WILLIAM D. WASSDORF
Associate Deputy Attorney General for Civil
Litigation
Texas Bar No. 24103022

OFFICE OF THE
ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
william.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov
thomas.bevilacqua@oag.texas.gov

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Special Counsel
Texas Bar No. 24125064

THOMAS MATTHEW BEVILACQUA
Assistant Attorney General
General Litigation Division
Texas Bar No. 00793342

COUNSEL FOR STATE DEFENDANTS

## CERTIFICATE OF CONFERENCE

I certify that on November 18, 2025, counsel for State Defendants conferred with counsel for Plaintiffs regarding the foregoing motion and counsel for Plaintiffs indicated they were opposed.

*Ryan G. Kercher*
RYAN G. KERCHER
Special Counsel

## CERTIFICATE OF SERVICE

I certify that on November 19, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

*Ryan G. Kercher*
RYAN G. KERCHER
Special Counsel