UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, et al.,<br><br>Defendants. | Civil Action<br><br>Lead Case No.:<br>   3:21-CV-00259-DCG-JES-JVB |
| CECILIA GONZALES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JANE NELSON, et al.,<br><br>Defendants. | Consolidated Case No.:<br>   1:21-CV-00965-DCG-JES-JVB |

**GONZALES PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION FOR STAY PENDING APPEAL**

Plaintiffs in No. 1:21-CV-00965 (the "Gonzales Plaintiffs") file this Opposition to Defendants' motion for a stay of this court's preliminary injunction order pending appeal.

As the Court's thorough opinion makes clear, this is not an especially close or difficult case. When the President first called on Texas to redistrict, he got little traction. ECF No. 1437 at 15–17. But then the U.S. Department of Justice—after consulting with Adam Kincaid and Governor Abbott—ordered Texas to engage in a racial gerrymander by dismantling multi-race-majority "coalition" districts based on their racial makeup. *Id.* at 17–30, 98. Just two days later, Governor Abbott convened a special session of the legislature for the express purpose of complying with DOJ's unconstitutional demand. *Id.* at 30–31. The Governor then told the press, repeatedly, that the purpose of redistricting was to eliminate coalition districts, not to achieve partisan advantage. *Id.* at 31–34. The legislature adopted maps that did almost everything DOJ asked, and more—after legislative debates shot through with discussions by the legislative sponsors and their allies of the racial makeup of the districts, the race-focused *Petteway* decision, and the replacement of multi-race-majority coalition districts with single-race majority districts. *Id.* at 35–50, 66–76. And legislators went on TV to congratulate themselves for having done what DOJ demanded. *Id.* at 66–68. Perhaps Texas *could have* drawn purely partisan maps for purely partisan reasons. But that simply is not what the record shows happened here.

The Court should deny a stay because Defendants cannot show that the Supreme Court is likely to reach a different conclusion on appeal, and because the equitable factors weigh strongly against a stay. Conducting the 2026 election under the same congressional districts that were used for the last two congressional elections—and that will be used in a special election early next year—will not seriously confuse voters or badly disrupt election officials, but it will prevent

1

irreparable harm to voters across the state who have been unconstitutionally sorted into congressional districts because of their race.

## ARGUMENT

"The party requesting a stay bears the burden of showing that the circumstances justify" one. *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). And a stay is never "a matter of right, even if irreparable injury might otherwise result." *Id.* (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). To decide whether to grant a stay pending appeal, courts consider whether (1) "the stay applicant has made a strong showing that he is likely to succeed on the merits," (2) "whether the applicant will be irreparably injured absent a stay," (3) whether a stay "will substantially injure the other parties," and (4) the public interest. *Id.*

Defendants get an important part of this standard backwards. They say that "*Plaintiffs* must show a substantial likelihood of success on the merits." ECF No. 1440 at 11 (emphasis altered). But it is Defendants who seek a stay, so Defendants now bear that burden. *Nken*, 556 U.S. at 434. They do not meet it.

### I.     Defendants do not make a strong showing of success on the merits.

Defendants' merits discussion barely acknowledges this Court's 160-page opinion and makes no showing, much less a strong one, that the Supreme Court is likely to reverse it on appeal. ECF No. 1440 at 5–12. The trial record, and the Court's reasoning, includes multiple, independently sufficient bases for the conclusion that the 2025 Map is racially gerrymandered, and Defendants do not show that the Supreme Court is substantially likely to reverse any of them—much less all of them, as would be needed for Defendants to prevail on appeal.

First, the Court rightly concluded that the DOJ Letter called for Texas to engage in a racial gerrymander, that Governor Abbott's special session call explicitly directed the legislature to redistrict based on race, and that Governor Abbott himself repeatedly and publicly said that was

2

what he was doing. ECF No. 1437 at 17–34, 61–64. The factual basis for this conclusion is wholly undisputed. Defendants' only response is to argue that the Governor is not a "relevant state actor" because he is not a legislator. ECF No. 1440 at 6–7 (quoting *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 8 (2024)). But as the Gonzales Plaintiffs have explained, ECF No. 1278 at 3, the Governor's proclamation of a special session was an essential step in the enactment of the 2025 Map. *See* Tex. Const. art. III, § 40. The Governor's decision to proclaim a special session for the express purpose of "mak[ing] sure that we have maps that don't impose coalition districts," Brooks Ex. 325-T at 3–4, ECF No. 1327-25, is therefore a but-for cause of the 2025 Map's enactment. *See Hunter v. Underwood*, 471 U.S. 222, 232 (1985). *Alexander* says only that direct evidence means a statement from a "relevant state actor," 602 U.S. at 8—it does not say only *legislators* matter. And while *a legislature* may be "answerable only for its *own* unconstitutional actions and motivations," *Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1364 (N.D. Fla. 2024), this is not a case against the legislature—it is a challenge to the enforcement of a law that resulted from the combined official actions of both the legislature *and* the Governor. To prevail, Defendants would need an answer to this argument, but they do not have one.

Second, the Court rightly concluded that the legislature adopted the Governor's racial objectives in any event. ECF No. 1437 at 66–79. Speaker Burrows announced that the map was passed to address the DOJ Letter's concerns. Brooks Ex. 282, ECF No. 1326-28. Numerous representatives supportive of the 2025 Map made similar statements about the racial characteristics of the 2025 Map, and about *Petteway*'s role in the process, both in public and on the legislative floor. ECF No. 1437, at 67–79. As the Court asked, if the "motives were exclusively partisan, . . . why mention *Petteway* at all?" ECF No. 1437 at 79. Defendants have no answer to that question. Instead, they simultaneously criticize Plaintiffs and the Court for (1) considering statements by

3

non-legislators, ECF No. 1440 at 6–7, (2) considering "isolated statements" by legislators, *id.* at 8, and (3) "tallying" multiple statements by multiple legislators, *id.* at 9. But if the test is legislative intent—as Defendants say it is, *id.* at 6—there must be *some way* to determine legislative intent. The answer cannot be that the Court must credit only the good things that legislators say and not the bad ones, as Defendants effectively demand. *See id.* at 7, 9.

Moreover, the different statements that Defendants prefer to emphasize instead are not inconsistent with the Court's ruling. Defendants themselves argue that "legislatures are not motivated 'solely by a single concern,'" *id.* at 8–9 (quoting *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)), and the Court's decision acknowledges from the start that "politics played a role in drawing the 2025 Map. But it was more than just politics"—it was race, too. ECF No. 1437 at 2. Defendants also argue that racial awareness is not the same as racial purpose, and that answering questions about race is not particularly relevant. ECF No. 1440 at 7. But those arguments do nothing to help them overcome the many "value-laden" statements from the Governor and legislators alike that expressly described a racial *purpose* for their actions, and that did not come in response to an adverse questioner's invocation of race. *See, e.g.*, ECF No. 1437 at 62–64, 66–76.

Third, Defendants emphasize Adam Kincaid's testimony. ECF No. 1440 at 7. But Kincaid was privately retained by a national political party and has no official or unofficial role in Texas government, so he cannot possibly be a "relevant *state actor*." *Alexander*, 602 U.S. at 8 (emphasis added). During the legislative process, Chairman King agreed, telling his colleagues that the mapdrawer's "methodology and their thoughts behind it . . . are irrelevant . . . because what really matters to us is . . . determining ourselves is it good policy for the State of Texas." Brooks Ex.

4

308-T at 31:5–12, ECF No. 1327-8. And Defendants have no explanation for how the Governor's intent could be irrelevant while Kincaid's could be dispositive.

In any event, Defendants have no answer to this Court's well-founded adverse credibility finding. ECF No. 1437 at 96. Defendants argue that Kincaid's testimony about his use of race, specifically, was "uncontroverted." ECF No. 1440 at 7. But it could not possibly be otherwise—only Kincaid knows what he looked at. And when Kincaid was questioned about topics on which other witness testimony *was* available—his meetings and communications with Texas legislators—there were direct contradictions and inconsistencies everywhere Plaintiffs turned. ECF No. 1437 at 83–87, 99. The Court need not—and properly did not—take Kincaid's self-serving, unverifiable race-blind story at face value when he was contradicted about so much else, and when his story was so hard to square with the objective features of the districts that he drew. ECF No. 1440 at 96–99.

Defendants do not even argue that the Supreme Court is likely to reverse the Court's credibility finding, and it is not. The Supreme Court "give[s] singular deference to a trial court's judgments about the credibility of witnesses, . . . because the various cues that 'bear so heavily on the listener's understanding of and belief in what is said' are lost on an appellate court later sifting through a paper record.'" *Cooper v. Harris*, 581 U.S. 285, 309 (2017) (citing *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)). And the Supreme Court has specifically held that the presumption of legislative good faith on which Defendants rely in response is *not* a "super-charged, pro-State presumption on appeal, trumping clear-error review" and overcoming such a finding. *Id.* at 309 n.8. The issue here is directly analogous to the similar issue in *Cooper*, and Defendants offer no explanation for why the result would be different here.

5

Finally, Defendants argue that Plaintiffs' claims are barred by their failure to provide a "substitute map" showing that the State could have achieved its partisan objectives without its racial ones. ECF No. 1440 at 9–12. But even Defendants argue *only* that such a map is needed for claims "based on circumstantial evidence." *Id.* at 11. They make no argument that a substitute map is required in a direct-evidence case, no doubt because the Supreme Court has directly held otherwise. *Cooper*, 581 U.S. at 321–22. That alone distinguishes this case from *Alexander*, because as explained above, the Court rightly held that there is "substantial direct evidence" of racial gerrymandering here. ECF No. 1437 at 132.

Moreover, even if a map might sometimes be needed in a direct evidence case, the Court correctly held that generating such a map would have been procedurally impossible here, refuting any conceivable adverse inference. ECF No. 1437 at 133. Most significantly, Plaintiffs learned Kincaid's detailed, 8-part partisan objectives for the 2025 Map only after the close of their case-in-chief, when Kincaid testified for Defendants on the sixth and seventh days of the hearing. *Id.* at 92–95. And Plaintiffs *still* do not have the complete set of objectives even now, because Kincaid claimed privilege over a set of "significant requests" from members of Congress that he "had to consider" as he drew the districts, and of which he honored "[a]s many as [he] could." Prelim. Inj. Hr'g Tr. Day 7 (Morning) at 128–29, ECF No. 1420. Plaintiffs could not—and still cannot—draw a substitute plan accomplishing the State's asserted partisan objectives when Plaintiffs did not have and still do not have a complete list of what those objectives were. *Alexander* cannot require a map where Defendants refuse to disclose the facts needed to draw it.

For all of those reasons, Defendants do not meet their burden to show that they are likely to succeed on the merits in the Supreme Court.

## II. The equities and the public interest disfavor a stay.

Defendants also do not meet their burden to show that they will be "irreparably injured absent a stay," nor that the stay will not "substantially injure the other parties" or the public interest. *Nken*, 556 U.S. at 434.

Defendants do not face irreparable harm from the continued use of congressional districts that the Texas Legislature enacted just four years ago, that have been used for the past two federal elections, and that Defendants have consistently defended in this Court as fair and constitutional. As explained in the prior section, the Court properly concluded that the 2025 Map is an unconstitutional racial gerrymander, and "neither the state nor the public has an interest in enforcing a [statute] that violates federal law." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) (citation modified). And the comparatively modest relief granted here is far less of an intrusion on state sovereignty than would be involved with the crafting of a new, court-drawn plan.

Meanwhile, the Gonzales Plaintiffs—and voters in districts across Texas—will be substantially and irreparably injured if a stay is granted. If elections are allowed to occur under the 2025 Map, millions of Black and Latino Texans would be forced to vote in congressional districts to which they were unconstitutionally assigned on the basis of race for no adequate reason. Such classifications "are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). And "once the election occurs, there can be no do-over and no redress" for voters whose rights were violated. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014). For that reason, the Supreme Court has stated that subjecting voters to an unlawful redistricting plan for even one election would require an "unusual" showing that doing so is a "[n]ecessity." *Upham v. Seamon*, 456 U.S. 37, 44 (1982); *see also Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[I]t would be the unusual case in which a court

7

would be justified in not taking appropriate action to insure that no further elections are conducted under [an] invalid plan."). As the Court rightly concluded, there is no necessity here—it is perfectly possible to conduct the 2026 election under the 2021 Map.

Finally, staying the injunction will disserve the public interest. When a statute "is unconstitutional," "the public interest [i]s not disserved by an injunction preventing its implementation." *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). It is not "equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (quoting *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011)); *see also, e.g.*, *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) (there is no public interest "in enforcing an unconstitutional law").

### III. *Purcell* does not require a stay.

Finally, the so-called *Purcell* principle does not weigh in favor of a stay here—or suggest a likelihood of reversal on the merits. *See Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam). The *Purcell* principle is meant to avoid "voter confusion and consequent incentive to remain away from the polls" that could flow from changes to election procedures immediately before an election. *Id.* at 4–5. But the 2026 primary is still more than three months away, and the general election is nearly a year away. Nothing in the record suggests that conducting the 2026 elections under the same districts that have governed the last two congressional elections, on the same schedule that the elections would ordinarily have been conducted on, would have that effect. The *only* significant date on the 2026 election calendar that has passed is the opening of the candidate filing period on November 8, 2025. Tex. Elec. Code § 172.023. And that filing period does not end until December 8, 2025—nearly three weeks from the date of the Court's injunction. *Id*. Voting

8

in the primary election will then begin on February 17, 2026—a full fifteen weeks after the date of the injunction—and end on election day, March 3, *id.* §§ 85.001, 41.007.

Defendants focus instead on alleged effects on election administrators and candidates. But they seriously overstate those effects. As for election officials, it may be true that some preliminary preparations for the use of the 2025 Map have begun. ECF No. 1437 at 144. But that such efforts will be wasted after this Court's injunction does not mean that election officials are not *also* ready to conduct elections under the 2021 Map. The Court rightly emphasized that a statewide election occurred under precincts set based on the 2021 Map just weeks ago, and that another such election will occur in CD 18 on January 31, 2026. *Id.* at 145. Defendants' argument that a change only to the *opening* of the candidate filing period will have cascading effects is utterly illogical—election officials cannot possibly "prepare and test their ballots" until the filing period *closes*, and they know what candidates to list. ECF No. 1440 at 15. Christina Adkins, the Director of Elections for the Texas Secretary of State's office, testified that the candidate filing period could be moved by "one week" without "caus[ing] significant administrative upheaval." Prelim. Inj. H'rg Tr. Day 7 (Afternoon) at 31, ECF No. 1343. And while Defendants quibble with the Court's citation, ECF No. 1440 at 19 n.1, Ms. Adkins in fact did testify that "election officials are very good at adapting and moving quickly when necessary," and that her "office is always going to comply with the law that's provided to it," Prelim. Inj. Hr'g Tr. Day 7 (Afternoon) at 30, ECF No. 1343.

As for candidates, the Court's order does not cut the candidate filing period "in half," ECF No. 1440 at 15—it was entered with 20 days still to run, and it left the filing deadline unchanged. Candidates therefore have the same deadline to make their choice as before, and they will make it under the districts that were in force until just a few months ago. There is no question of filing

9

under the 2021 or the 2025 Map—the Court's order is clear as can be, and absent a stay, the 2021 Map will be used.

This is all a very different circumstance from that faced by voters, candidates, and election officials in 2012, which Defendants cite in support of their parade of horribles. In that year, the district court ordered an interim congressional map for the 2012 elections on November 26, 2011. *See Perez v. Texas*, 891 F. Supp. 2d 808, 816 (W.D. Tex. 2012) (recounting procedural history). The Supreme Court reversed that order on January 12, 2012. *Perry v. Perez*, 565 U.S. 388 (2012). And, after remand and further remedial proceedings, the district court adopted a final map for the 2012 elections on February 28, 2012—more than *three months* later, and after significant deadlines in Texas's election calendar had passed. *Perez*, 891 F. Supp. 2d at 838. There is no prospect of that here, for the simple reason that no new map is needed—the 2021 Map already exists.[1]

This case is also nothing like the three cases Defendants rely on most heavily: *Robinson*, *Callais*, and *Milligan*. The Supreme Court's stays in *Robinson* and *Callais* were each issued in the middle of a general election year—not months earlier the year before. *See Ardoin v. Robinson*, 142 S. Ct. 2892 (Mem) (2022) (staying, on June 28, an injunction entered on June 6); *Robinson v. Callais*, 144 S. Ct. 1171 (2024) (staying, on May 15, an injunction issued on April 30).[2] Similarly,

---

[1] For similar reasons, Defendants' disquisition on which map constitutes the "status quo" is beside the point. ECF No. 1440 at 17 (citing *Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020)). There is no "particular magic in the phrase 'status quo'" in preliminary injunction analyses, *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974), and "[t]here is no good blanket answer to the question of what the status quo is," *Labrador v. Poe*, 144 S. Ct. 921, 930 (2024) (Kavanaugh, J., and Barrett, J., concurring in the judgment). What matters for *Purcell* is voter confusion, 549 U.S. at 4–5, and using the 2021 Map again risks far less confusion than a brand new court-drawn plan.

[2] Looking simply at the time between the order and the next primary election is a misleading comparison, because while Texas has an unusually early primary, Louisiana has an unusually late one: it holds its "primary" on the day of the general election in November, followed by a runoff if needed. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759, 854 (M.D. La. 2022). To equate

in *Merrill v. Milligan*, 142 S. Ct. 879 (2022), the Supreme Court stayed an order issued seven weeks before early voting began in the 2022 primary—weeks earlier than here. And in all three cases, the district court's order had left the state without any lawful plan at all—unlike here, where the 2021 Map is waiting in the wings. This Court is not "swoop[ing] in and re-do[ing]" the Texas congressional map, *Milligan*, 142 S. Ct. at 881 (Kavanaugh, J., concurring); it is simply returning to the status quo that has been in place for more than two full election cycles.

The Court also rightly concluded that any confusion or administrative burden lies squarely at the feet of the Governor and the Texas Legislature, who could have avoided any inconvenience for election administrators, voters, and candidates by refraining from engaging in an unconstitutional redistricting conducted expressly for racial purposes just months before an upcoming primary. Contrary to Defendants' contention, ECF No. 1440 at 18, this is wholly distinguishable from the actions of the Alabama legislature in *Milligan*, which was delayed in enacting a new congressional map due to the belated disclosure of census data during the COVID-19 pandemic. *See Singleton v. Merrill*, 582 F. Supp. 3d 924, 944 (N.D. Ala. 2022). Texas was under no such time pressure—the Governor and the legislature *chose* to enact a new map less than a year before the 2026 primary. And Defendants' attempt to pin the timing of the 2025 Map on "an illegal quorum break orchestrated by . . . plaintiffs in this litigation," ECF No. 1440 at 14, ignores that the Gonzales Plaintiffs, at least, are individual Texas voters who had no role in the quorum break and no say in whether it occurred. Regardless, the special legislative session called by the Governor did not even begin until July 21—it was the Governor, not anyone else, who created the emergency. ECF No. 1437 at 154.

---

an injunction granted in June of an election year with an injunction granted a full year before the next general election blinks reality.

11

Finally, Defendants' complaint that the Texas Legislature has not been given an opportunity to enact a *new* set of districts as a remedial plan, ECF No. 1440 at 20–21, directly contradicts their argument that it is simply too late to change Texas's maps without "catastrophically bad" results, *id.* at 15. In any event, the legislature is not a party to this case and is not enjoined from doing anything. *See Trump v. CASA, Inc.*, 606 U.S. 831, 842 (2025). The Court's order simply enjoins the use of the racially gerrymandered 2025 Map and properly orders a return to the pre-2025 Map status quo. ECF No. 1437 at 160. Anything else is both speculative and premature, although it is hard to see how Defendants—having argued that changing the map now has such dreadful consequences—could possibly be heard to argue with clean hands that there is still time for implementation of some different, yet to be enacted new set of districts instead.

## CONCLUSION

The Court should deny Defendants' motion for a stay pending appeal.

Dated: November 20, 2025

Renea Hicks
Attorney at Law
Texas Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

Respectfully submitted,

*/s/ David R. Fox*
David R. Fox
Richard A. Medina
James J. Pinchak
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law
jpinchak@elias.law

Abha Khanna
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

*Counsel for Gonzales Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically and served on all counsel of record (via CM/ECF) on November 20, 2025.

/s/ David R. Fox